FILED
2021 Sep-27  PM 02:26
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## NOTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **BOBBY SINGLETON, RODGER** | ) | |
| **SMITHERMAN, EDDIE BILLINGSLEY,** | ) | |
| **LEONETTE W. SLAY, DARRYL** | ) | |
| **ANDREWS, and ANDREW WALKER,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **CASE NO.** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **JOHN H. MERRILL, in his official** | ) | |
| **capacity as Alabama Secretary of State,** | ) | |
| | ) | |
| **Defendant.** | | |

## COMPLAINT

Plaintiffs hereby complain against Defendant as follows:

1.     Alabama's current Congressional redistricting plan, enacted in 2011, Ala. Act No. 2011-518, is malapportioned and racially gerrymandered, packing black voters in a single majority-black Congressional district and minimizing their influence in five majority-white districts.  This action is brought to require the Alabama Legislature to enact a new plan with 2020 census data that remedies the existing unconstitutional gerrymander by restoring Alabama's traditional redistricting principle of drawing its Congressional districts with whole counties.

2.     In *Tennant v. Jefferson County Comm'n*, 567 U.S. 758 (2012), the

1

Supreme Court of the United States reaffirmed that mathematical precision is not constitutionally required for Congressional districts and that minor deviations from population equality can be justified by preserving county boundaries. This Complaint includes the map that shows how Alabama's Congressional districts can be redrawn constitutionally without splitting a single county, while maintaining the cores of existing districts.

3.     By returning to Alabama's traditional redistricting principle of aggregating whole counties, Alabama can remedy the existing racial gerrymander, restore a measure of rationality and fairness to Alabama's Congressional redistricting process, and afford African Americans an opportunity to elect candidates of their choice in at least two districts. Restoring the integrity of county boundaries will advance the representation of black citizens and, indeed, the fair representation of all Alabamians.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4), and 1357 to enforce the rights of plaintiffs alleged herein secured by Article I, § 2, and the Fourteenth Amendment of the Constitution of the United States and by 42 U.S.C. §§ 1983 and 1988.

5.     This Court has jurisdiction to grant declaratory and injunctive relief

2

pursuant to 28 U.S.C. §§ 2201 and 2202.

6.     Venue is proper in this District under 28 U.S.C. § 1391(b).

7.     Plaintiffs request a three-judge district court pursuant to 28 U.S.C. § 2284(a), which states "a district court of three judges shall be convened when otherwise required by Act of Congress, or when an action is filed challenging the constitutionality of the apportionment of congressional districts . . . ."

## PARTIES

8.     Plaintiffs Rodger Smitherman and Eddie Billingsley are registered voters who reside in Jefferson County and within the boundaries of the current Congressional District 7.  Plaintiffs Smitherman and Billingsley allege that Jefferson County is split in a manner that makes District 7 racially gerrymandered to separate black voters from white voters.

9.     Plaintiff Leonette W. Slay is a registered voter who resides in Jefferson County and within the boundaries of the current Congressional District 6.  At a deviation of 3.20% above the population of an ideal Congressional District drawn with 2020 census data, District 6 is malapportioned to a degree that cannot be justified by traditional districting principles and thus does not satisfy the constitutional standard of equal population as nearly as practicable.  Plaintiff Slay alleges that Jefferson County is split in a manner that makes District 6 racially

3

gerrymandered to separate black voters from white voters.

10.    Plaintiff Bobby Singleton is a registered voter who resides in Hale County and within the boundaries of the current Congressional District 7.  Plaintiff Singleton alleges that District 7 is racially gerrymandered to separate black voters from white voters.

11.    Plaintiffs Darryl Andrews and Andrew Walker are registered voters who reside in Montgomery County and within the boundaries of the current Congressional District 2.  Plaintiffs Andrews and Walker allege that Montgomery County is split in a manner that makes District 2 racially gerrymandered to separate black voters from white voters.

12.    Defendant John Merrill is sued in his official capacity as the Alabama Secretary of State.  "The Secretary of State is the chief elections official in the state and shall provide uniform guidance for election activities."  Ala. Code § 17-1-3.  As Secretary of State, Defendant Merrill certifies, to the judge of probate of each county, the names of candidates for members of Congress to be placed on the ballot in the primary election, Ala. Code § 17-13-5(b), and in the general election, Ala. Code § 17-9-3(b), and, following the general election, he issues certificates of election to the persons elected to Congress, Ala. Code § 17-12-21.

## ALLEGATIONS OF FACT

13.     Alabama's Congressional districts are malapportioned with 2020 census data. In this Court, the State conceded that the current redistricting plan, see p. 6, *infra*, Figure 1, enacted in 2011, is racially gerrymandered.[1]  The Legislature's duty, with the 2020 census data, is to remedy the racial gerrymander in Alabama's Congressional redistricting plan.  *Abrams v. Johnson*, 521 U.S. 74, 85-86 (1997).

---

[1] "As the Court pointed out at a pretrial conference, District 7 appears to be racially gerrymandered, with a finger sticking up from the black belt for the sole purpose of grabbing the black population of Jefferson County. Defendant does not believe that the law would permit Alabama to draw that district today if the finger into Jefferson County was for the predominate purpose of drawing African American voters into the district."  *Chestnut v. Merrill*, No. 2:18-CV-00907-KOB (N.D. Ala. Oct. 28, 2019), Doc. 101 (Defendant Merrill's pretrial brief) at 11.

DOCSBHM\2367117\6

**FIGURE 1**



2011 Congressional Districts

14.    To remedy a racial gerrymander, the Legislature must not allow traditional redistricting principles to be subordinated to racial considerations, unless they are necessary to satisfy a narrowly tailored, compelling state interest.  *E.g.*, *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 272 (2015); *Abrams v. Johnson*, 521 U.S. at 81, 85-86.

15.    Throughout the state's history, the most important traditional districting principle for drawing Alabama's Congressional districts has been preserving whole counties.

16.    For a century and a half, Alabama drew its Congressional districts with whole counties.[2]  That ended when Alabama lost a seat in the U.S. House after the 1960 census, going from nine to eight representatives.  In 1961, the Alabama Legislature, led by representatives of the Black Belt, passed what was called the "Jefferson Chop-Up" bill, which divided Jefferson County among four Congressional districts.  But Governor John Patterson vetoed the Chop-Up, saying it would "divest the citizens of that county of direct representation in Congress, is ...

---

[2] See https://archives.alabama.gov/legislat/ala_maps/getstart.html; State's exhibit 114-1 in *Chestnut v. Merrill*, CA No. 2:18-CV-00907-KOB (N.D. Ala.). Many of the maps are included in the allegations below.

unthinkable, unwise, above all wrong, and therefore unconstitutional."[3]  The regular legislative session adjourned without breaking the filibuster mounted by Jefferson County senators that prevented overriding the veto.  Governor Patterson then called a special session and got the Legislature to pass a compromise "9-8" plan, pursuant to which Democratic primary elections were held in all nine old districts, following which the general election for eight seats was conducted in the state at large.  The result was that eight Democratic incumbent Congressmen were elected, with the incumbent finishing ninth (Frank Boykin) losing his seat.[4]

17.     In February 1964, the U.S. Supreme Court ruled that Congressional districts must be equal in population.  *Wesberry v. Sanders*, 376 U.S. 1 (1964).  In March 1964, a three-judge U.S. District Court held that the nine-district scheme for primary elections violated Article I, § 2 of the U.S. Constitution and the Equal Protection Clause in the Fourteenth Amendment.  *Moore v. Moore*, 229 F. Supp. 435 (S.D. Ala. 1964) (three judge court).  But the federal court allowed the imminent 1964 elections to go forward under the 9-8 plan, giving the Legislature two years to

---

[3] ANNE PERMALOFF AND CARL GRAFTON, POLITICAL POWER IN ALABAMA 134-35 (1995).

[4] See *id*. at 124-35 (1995).

enact a constitutional plan.  However, Governor George Wallace feared the at-large scheme would elect more Republicans.  In August 1964, he called the Legislature into special session to draw an eight-district plan.[5]  The plan that emerged kept all Alabama counties whole, including Jefferson County, even though at 634,864 in the 1960 census, the county's population greatly exceeded the ideal population of the eight Congressional districts at that time, which was 409,250.  See p. 10, *infra*, Figure 2.

---

[5] *The Montgomery Advertiser*, August 2, 1964, p. 1.

DOCSBHM\2367117\6



DOCSBHM\2367117\6

18.     Attorney General Richmond Flowers warned that such a large population deviation would not survive federal court scrutiny.[6]  In the 1965 regular session, the Legislature enacted a plan that split Jefferson County among three Congressional districts.  Governor George Wallace signed the bill, blaming the federal court.[7]  See p. 12, *infra*, Figure 3.  Jefferson County representatives asked the federal court to block this new "Chop-Up," but the court declared the plan constitutionally valid, even though it had a maximum population deviation of 13.3%.  *Moore v. Moore*, 246 F. Supp. 578 (S.D. Ala. 1965) (three judge court).  The court found it "obvious that [Jefferson County] must be divided between at least two Congressional Districts," and "while had this Court found it necessary to declare the 1965 Redistricting Act . . . unconstitutional and devise its own redistricting plan, it possibly would not have found it necessary to divide the political unit of Jefferson County into three congressional districts, these are not the Constitutional standards controlling the action of this Court."  246 F. Supp. at 580-82.

---

[6] *Alabama Journal*, November 23, 1964, p. 13.

[7] *Alabama Journal*, August 27, 1965, p. 13.

## FIGURE 3



ALABAMA'S
CONGRESSIONAL DISTRICTS

DOCSBHM\2367117\6

19.     Jefferson County was the only county split in the 1965 plan and in the post 1970 census plan.  The post 1970 census plan split Jefferson County between three districts.  See p. 14, *infra*, Figure 4.  Only Jefferson County and St. Clair County were split in the post 1980 census plan.  See p. 15, *infra*, Figure 5.

13

1970    FIGURE 4
ALABAMA'S CONGRESSIONAL DISTRICTS



DOCSBHM\2367117\6



FIGURE 5

ALABAMA
CONGRESSIONAL DISTRICTS
1980

DOCSBHM\2367117\6

20.    In 1992, seven counties were split for the purpose of drawing one majority-black district.

21.    Until the 1992 consent decree racial gerrymander, Alabama had no formal or informal maximum deviation limits on its Congressional redistricting plans.

22.    Zero population deviation in Alabama Congressional redistricting plans began in 1992, when a federal court drew the plan.  *Wesch v. Hunt*, 785 F. Supp. 1491 (S.D. Ala. 1992) (three-judge court), *aff'd sub nom. Camp v. Wesch*, 504 U.S. 902 (1992), *Figures v. Hunt*, 507 U.S. 901 (1993).  Because the 1992 plan was a federal court-ordered Congressional plan, the *Wesch* Court decided to achieve "perfect equality."   785 F. Supp. at 1497-98 (citations omitted).[8]  But had the Legislature acted in timely fashion, making it unnecessary for the District Court to draw a plan, there would have been more leeway with population deviations, so long as the Legislature could "justify each variance no matter how small." 785 F. Supp. at 1498 n.5 (quoting *Karcher v. Daggett*, 462 U.S. 725, 730 (1983)).

23.    The zero-deviation court-ordered plan facilitated splitting county

---

[8]  But see *Abrams v. Johnson*, 521 U.S. at 99 (affirming a federal court-ordered Congressional plan for Georgia that had a maximum deviation of 0.35%).

DOCSBHM\2367117\6

boundaries and census tracts to produce a racial gerrymander that was packed at 67.53% black.  The federal court in 1992 accepted the stipulation of all parties that the Voting Rights Act justified the creation of that one majority-black Congressional district, without making a judicial finding that the particular agreed upon plan actually was justified by Section 2 of the Voting Rights Act.[9]  See p. 18, *infra*, Figure 6.

---

[9] "This court will honor the stipulation, and accordingly, will not make an independent determination of whether § 2 of the Voting Rights Act requires the creation of a majority African–American congressional district in Alabama at this time."  *Wesch v. Hunt*, 785 F. Supp. at 1499.

DOCSBHM\2367117\6

**1582**   785 FEDERAL SUPPLEMENT   FIGURE 6

APPENDIX B TO FINAL JUDGMENT



24.    In 2019, the State conceded that the 1992 court-approved plan would violate the prohibition of racial gerrymandering first announced by the Supreme Court a year after *Wesch* was decided.[10]  *Shaw v. Reno*, 509 U.S. 630 (1993).

25.    Alabama continued the 1992 racial gerrymander in the Congressional redistricting plans enacted after the 2000 and 2010 censuses.  It told this Court it did so to comply with Section 5 of the Voting Rights Act.[11]  As a result, District 7 in the Act 2011-518 plan was still packed at 63.57% black.

26.    In 2012, the U.S. Supreme Court reaffirmed that preserving county boundaries can justify minor population deviations among districts.[12]  Today, Alabama's Congressional districts can be drawn without splitting any counties (because Jefferson County's population has fallen below the population of a Congressional district), and any plan enacted by the Legislature in 2021 that does

---

[10] See footnote 1 above.

[11] "[O]nce the [majority-black] district existed, Alabama had to continue to draw the district in order to comply with Section 5's anti-retrogression requirement."  *Chestnut v. Merrill*, CA No. 2:18-CV-00907-KOB (N.D. Ala. Oct. 28, 2019) Doc. 101 (State Pre-Trial Brief) at 11-12.

[12] *Tennant v. Jefferson County Comm'n*, 567 U.S. 758 (2012).

DOCSBHM\2367117\6

not keep all counties whole will likely violate the Fourteenth Amendment's prohibition of racial gerrymandering.

27.     The current Congressional redistricting plan, enacted as Act 2011-518, splits the boundaries of seven counties: Clarke, Montgomery, Cherokee, Blount, Tuscaloosa, Jackson, and Jefferson.  Montgomery County is split among three Congressional districts.  See p. 6, *supra*, Figure 1.

28.     The 1991 guidelines adopted by the Legislature's Reapportionment Committee, before the 1992 racial gerrymander was created, emphasized preserving county boundaries.  "Counties should be used as district building blocks where possible, and to the extent consistent with other aspects of these criteria."  785 F. Supp. at 1494 (quoting the guidelines).  "Preservation of political subdivisions promotes efficient representation, empowers a constituency's ability to organize productively, and serves as a deterrent to partisan gerrymandering."  785 F. Supp. at 1498 (citations omitted).

29.     Since the 2011 Congressional plan was enacted, the Supreme Court has reaffirmed that the U.S. Constitution "does not require that congressional districts be drawn with precise mathematical equality," and that preserving county boundaries can "justify population differences between districts that could have been avoided by 'a good-faith effort to achieve absolute equality.'"  *Tennant v. Jefferson*

DOCSBHM\2367117\6

*County Comm'n, West Virginia*, 567 U.S. 758, 759 (2012) (quoting *Karcher v. Daggett*, 462 U.S. 725, 730 (1983)). "[I]f a State wishes to maintain whole counties, it will inevitably have population variations between districts reflecting the fact that its districts are composed of unevenly populated counties." *Tennant*, 567 U.S. at 764.

30.   The Tennant Court approved a 0.79% maximum deviation for West Virginia's Congressional districts, and it did not foreclose higher deviations for the sake of avoiding county splits. To the contrary, the Supreme Court has repeatedly eschewed suggestions that it set a numerical limit for the "as nearly as practicable" deviation standard it first established in *Wesberry v. Sanders*, 376 U.S. 1, 7-8 (1964). "The whole thrust of the 'as nearly as practicable' approach is inconsistent with adoption of fixed numerical standards which excuse population variances without regard to the circumstances of each particular case." *Karcher*, 462 U.S. at 731 (quoting *Kirkpatrick v. Preisler*, 394 U.S. 526, 530 (1969)).

31.   The 1964 plan maintained the tradition going back to Alabama's first Congressional plan in 1822 of splitting no counties at all. Jefferson County constituted District 6 by itself, even though, as the court found in *Moore v. Moore*, *supra*, its population greatly exceeded the ideal district population. See p. 10, *supra*, Figure 2. Alabama's 1965 Congressional plan split Jefferson County between three

DOCSBHM\2367117\6

districts, but no other county was split. As noted above, the federal court found the plan in compliance with *Wesberry v. Sanders*, even though it had a maximum deviation of 13.3%. See p. 12, *supra*, Figure 3.

32. Alabama lost a Congressional seat after the 1970 census, but the seven-district plan enacted in January 1972 also split only Jefferson County. Jefferson County precincts 1, 2, and 4 were placed in District 7, while precinct 12 was placed in District 4. District 6 was contained entirely within Jefferson County. The maximum deviation was 0.8%. See p. 14, *supra*, Figure 4.

33. The Congressional redistricting plan enacted in August 1981 split Jefferson County and St. Clair County each between two districts. No other counties were split. The ideal size of a district was 556,270, still smaller than Jefferson County's population, which was 671,371 in the 1980 census. The maximum deviation among the seven districts was 2.59%. See p. 15, *supra*, Figure 5.

34. By the 1990 census Jefferson County's population had declined to 652,109, but it was still larger than the ideal size of seven districts, which was 577,227. *Wesch*, 785 F. Supp. at 1493. As noted, to produce the racial gerrymander with a maximum deviation of plus or minus one person, the 1992 plan split seven counties. Jefferson County was split between two districts, but Montgomery County was split among three districts. See p. 23, *infra*, Figure 7.

DOCSBHM\2367117\6



Figure 7

ALABAMA

35.     The 2001 plan maintained the racial gerrymander with zero population deviation.  In the 2000 census, Jefferson County's population rose to 662,285, which was still larger than the size of an ideal Congressional district (635,299).  In addition to Jefferson County, Morgan, St. Clair, Pickens, Coosa, Tuscaloosa, Montgomery, and Clarke Counties were split.  See p. 25, *infra*, Figure 8.

DOCSBHM\2367117\6

# 2002 Alabama US Congressional Districts
## Figure 8



Produced by the Department of Geography
College of Arts and Sciences
The University of Alabama

25

36.   In the 2010 census, Jefferson County's population, 658,158, fell below the ideal size of Congressional districts (682,819), making splitting an Alabama county no longer mathematically necessary.  Nevertheless, in 2011, the Legislature continued to split Jefferson County to retain the 1992 racial gerrymander with zero population deviation.  See p. 6, *supra*, Figure 1.

37.   With 2020 census data, it is practicable to end the 1992 racial gerrymander and draw a seven-district Congressional plan without splitting a single county and with only minor population deviations.

38.   The Plaintiffs' proposed Whole County Plan uses the official 2020 census data released on August 12, 2021.  With an overall maximum deviation of only 2.47%, it contains a Black Belt District 7 that is only 0.11% above ideal population and has 49.9% black registered voters, and a Jefferson-Bibb-Perry-Hale District 6 that is only 0.36% above ideal population and has 42.3% black registered voters.  Black voters have an opportunity to elect the candidate of their choice in both districts.  Biden received 54.40% of the 2020 Presidential vote in the District 7 counties and 56.02% in the District 6 counties.  Jones did even better, at 56.32% and 58.00%.  See p. 27, *infra*, Figure 9.

DOCSBHM\2367117\6



Whole County Plan   Figure 9

39.     The key to any whole-county Congressional redistricting plan is Jefferson County.  The only other possible whole-county options that keep Jefferson County whole are to join Jefferson County either with Blount County or with Walker County.  In both options, however, for the district including Jefferson County, the black registered voter percentage would drop to about 38.9%.  At 4.67% and 5.49%, the overall maximum deviations would be twice as high as the Jefferson-Bibb-Perry-Hale district.  The only other counties contiguous to Jefferson – Tuscaloosa, St. Clair, and Shelby – are too populous to be joined in a whole-county Congressional district with Jefferson.  See p. 27, *supra*, Figure 9 and p. 30, *infra*, Figure 10.

40.     Maximum population deviation in the range yielded by Plaintiffs' plan satisfies the constitutional standard for Congressional districts established by *Wesberry v. Sanders*, as most recently refined in *Tennant v. Jefferson County Comm'n, Karcher v. Daggett* and *Abrams v. Johnson*.  It can be justified as a remedy for the racial gerrymander preserved in the 2011 plan and by Alabama's historic policy of preserving whole counties.

41.     In the first half of September 2021, the Legislature's Reapportionment Committee held over two dozen hearings across Alabama. At several hearings, Plaintiffs' plan was presented as the best plan that responds to the many speakers' pleas to keep their counties whole and that remedies the current racial gerrymander.

42.    Plaintiff's plan is expected to be pre-filed for any special session that might be called in October 2021 to consider Congressional redistricting.

43.    Instead of adopting Plaintiffs' plan, based on comments at the September hearings by the Reapportionment Committee, when a special session is called, the Reapportionment Committee apparently intends to develop a redistricting plan that perpetuates the 2011 racial gerrymander by requiring zero deviation and allowing only one opportunity district for minority voters.

44.    Under the Administrative Calendar published by the Secretary of State, https://www.sos.alabama.gov/sites/default/files/Admin%20Calendar%20-2022%20-%2020210604%20LB_0.pdf, "Candidates intending to participate in the [May 24, 2022,] primary election may begin soliciting and accepting contributions [§ 17-5-7(b)(2)]" on May 24, 2021; and Candidates seeking nomination by a party primary must file declaration of candidacy with state party chairman (if seeking federal, state, circuit, district, or legislative office) … no later than this day [January 28, 2022] by 5 PM; 116 days before the election. [§ 17-13-5(a)]."

45.    The clock is already ticking on potential candidates in raising funds. In addition, candidates should know the district in which they will run weeks before January 28, 2022. Therefore, time is of the essence for this action, with a final hearing in November or December 2021 needed before the 2022 elections.

29

**COUNT I**
**Malapportionment**
**Equal Protection Clause of the Fourteenth Amendment**
**and Article I, § 2 of the U.S. Constitution**

46.    With a maximum population deviation of 13.44% Alabama's current Congressional redistricting plan, enacted in 2011, Ala. Act No. 2011-518, is malapportioned, in violation of the Equal Protection Clause of the Fourteenth Amendment and Article I, § 2 of the Constitution of the United States.

47.    The following table, Figure 10, shows the population variances among districts in the 2011 Congressional redistricting plan when 2020 census data are applied to those districts:

FIGURE 10

| District | Population | Deviation from ideal size |
|---|---|---|
| 1 | 726,276 | 1.19% |
| 2 | 693,466 | -3.38% |
| 3 | 735,132 | 2.42% |
| 4 | 702,982 | -2.06% |
| 5 | 761,102 | 6.04% |
| 6 | 740,710 | 3.20% |
| 7 | 664,611 | -7.40% |
| Ideal size and maximum deviation | 717,754 | 13.44% |

DOCSBHM\2367117\6

**COUNT II**
**Racial Gerrymandering**
**Equal Protection Clause of the Fourteenth Amendment**
**and Article I, § 2 of the U.S. Constitution**

48.     Alabama's current Congressional redistricting plan, enacted in 2011, Ala. Act No. 2011-518, is racially gerrymandered, in violation of the Equal Protection Clause of the Fourteenth Amendment and Article I, § 2 of the Constitution of the United States.

49.     Specifically, Districts 1, 2, 3, 4, 6, and 7 are racially gerrymandered. Majority-black District 7 splits Jefferson, Tuscaloosa, Clarke, and Montgomery Counties, separating black and white voters in ways designed to pack black voters in District 7.   Majority-white District 6 splits Jefferson County, majority-white District 4 splits Tuscaloosa County, and majority-white District 1 splits Clarke County, excluding black population in ways that are designed to minimize black voters' influence.  Montgomery County is split among Districts 2, 3, and 7, packing black neighborhoods in west Montgomery County in District 7 and splitting black neighborhoods in east Montgomery County in a manner designed to minimize black voters' influence in majority-white Districts 2 and 3.

50.     The Supreme Court of the United States recently held that claims of partisan gerrymandering are nonjusticiable in federal courts, even though "such gerrymandering is 'incompatible with democratic principles.'" *Rucho v. Common*

*Cause*, 139 S. Ct. 2484, 2506 (2019) (quoting *Arizona State Legislature v. Arizona Independent Redistricting Comm'n*, 135 S. Ct. 2652, 2658 (2015)).  But the Court reaffirmed that federal courts may remedy two other forms of anti-democratic gerrymandering.  "In two areas—one-person, one-vote and racial gerrymandering— our cases have held that there is a role for the courts with respect to at least some issues that could arise from a State's drawing of congressional districts."  *Rucho*, 139 S. Ct. at 2496 (citing *Wesberry v. Sanders*, 376 U.S. 1, (1964), and *Shaw v. Reno*, 509 U.S. 630 (1993) (*Shaw I*)).

51.    Racial gerrymandering is unconstitutional when traditional redistricting principles have been subordinated to racial considerations in ways that do not satisfy a narrowly tailored, compelling state interest.  *E.g.*, *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 272 (2015).  "If district lines were drawn for the purpose of separating racial groups, then they are subject to strict scrutiny because 'race-based decisionmaking is inherently suspect.'" *Rucho v. Common Cause*, 139 S.Ct. at 2502 (citing *Miller v. Johnson*, 515 U.S. 900, 915 (1995); *Bush v. Vera*, 517 U.S. 952, 959 (1996) (principal opinion)).

52.    As the State of Alabama has conceded, whether or not compliance with the Voting Rights Act may have justified packing black voters in a single Congressional district in the 1992 consent decree, the Voting Rights Act cannot

justify further perpetuating the packed majority-black District 7 and the minimization of black voters' influence in Districts 1, 2, 3, 4, and 6.

53.     Consequently, when the Legislature draws new Congressional districts with 2020 census data, it has a constitutional duty to eliminate the existing racial gerrymanders.

54.     Remedying the racial gerrymanders in Alabama's current Congressional redistricting plan requires returning to traditional districting principles, which in Alabama history means preserving whole counties.

55.     Maintaining a zero maximum deviation requirement directly conflicts with the whole-county standard for avoiding racial gerrymandering.

56.     Harmonizing the Congressional equal population standard and the anti-racial gerrymandering standard of traditional districting principles requires allowing slightly higher deviations from population equality among districts.

57.     The Supreme Court held in *Tennant v. Jefferson County Comm'n, West Virginia*, that higher deviations were constitutionally permissible for the sake of preserving whole counties, even in a case that did not involve a racial gerrymandering violation.  Remedying a racial gerrymander, which the Alabama Legislature is obligated to do here, provides even greater justification for higher population deviations.

58.     In *Karcher v. Daggett*, another case that did not involve the more demanding racial gerrymandering standards, the Court suggested that acceptable population deviations for a Congressional redistricting plan can be determined by identifying those alternative plans which produce the lowest population deviations while respecting the state's policy of preserving political subdivisions (in that case municipalities).  462 U.S. at 739-40.  "The showing required to justify population deviations is flexible, depending on the size of the deviations, the importance of the State's interests, the consistency with which the plan as a whole reflects those interests, and the availability of alternatives that might substantially vindicate those interests yet approximate population equality more closely. By necessity, whether deviations are justified requires case-by-case attention to these factors."  *Id.* at 741.

59.     In *Abrams v. Johnson*, 521 U.S. 74 (1997), the Supreme Court affirmed a court-ordered Congressional redistricting plan that honored "Georgia's 'strong historical preference' for not splitting counties outside the Atlanta area . . . ."  *Id.* at 99 (citation omitted).  The Court agreed that Georgia's 159 counties provide "ample building blocks for acceptable voting districts without chopping any of those blocks in half."  *Id.* at 100 (citation omitted).  The District Court's plan had a maximum deviation of 0.35% and an average deviation of 0.11%.  It had rejected proposed plans with both higher and lower deviations because they perpetuated racial

gerrymandering.  *Id*. at 99.

60.    As the plan set out in this Complaint demonstrates, the existing racial gerrymander can be remedied with a plan that does not split a single county.  At 2.46%, Plaintiffs' proposed whole-county plan has a smaller maximum population deviation than the 2.59% Alabama adopted in 1981, and a much smaller deviation than the 13.3% maximum deviation approved in 1965 by the three-judge district court in *Moore v. Moore*, *supra*.  This is a maximum population deviation small enough to satisfy the "high standard of justice and common sense for the apportionment of congressional districts" required by Article I, § 2, of the Constitution.  *Karcher v. Daggett*, 462 U.S. at 730 (quoting *Wesberry v. Sanders*, 376 U.S. at 18) (internal quotation marks omitted).

WHEREFORE, Plaintiffs pray:

That this Court will advance this action on its docket and request the convening of a three-judge District Court.

Thereafter, that the Court will require Defendant to respond promptly to the claims set out herein, schedule a hearing in November 2021, concerning same, and provide relief as follows:

A.    Enter a declaratory judgment that Alabama's current Congressional redistricting plan, enacted in 2011, Act No. 2011-518, is malapportioned and racially

gerrymandered, in violation of Article I, § 2 and the Equal Protection Clause of the Fourteenth Amendment of the Constitution of the United States.

B.  Issue a temporary and permanent injunction prohibiting implementation of Act No. 2011-518 in future elections for members of Congress.

C.  Give the Alabama Legislature a reasonable opportunity to enact, in time for use in the 2022 primary and general elections, a new Congressional redistricting plan with 2020 census data that remedies the malapportionment and racial gerrymanders in Act No. 2011-518 and complies with the Constitution and laws of the United States.

D.  If the Legislature fails to remedy the constitutional violations in the current Congressional redistricting plan in time for the regularly scheduled 2022 primary and general elections, require implementation of a Court-ordered redistricting plan that complies with the Constitution and laws of the United States.

E.  Award plaintiffs their reasonable attorneys' fees and expenses.

F.  Grant such other and further relief as the Court may deem just and equitable.

36

/s/ James Uriah Blacksher
James Uriah Blacksher
825 Linwood Road
Birmingham, AL 35222
Tel:   (205) 612-3752
Fax:   (866) 845-4395
jublacksher@gmail.com


/s/ Myron Cordell Penn
Myron Cordell Penn
**PENN & SEABORN, LLC**
1971 Berry Chase Place
Montgomery, AL  36117
Tel:   (334) 219-9771
myronpenn28@hotmail.com


/s/ Joe Ramon Whatley, Jr.
Joe Ramon Whatley, Jr.
**WHATLEY KALLAS, LLP**
P.O. Box 10968
Birmingham, AL  35202
Tel.:  (205) 488-1200
Fax:   (800) 922-4851
jwhatley@whatleykallas.com


/s/ J.S. "Chris" Christie
J.S. "Chris" Christie (ASB-3162-H07J)
**DENTONS SIROTE PC**
2311 Highland Avenue South
Post Office Box 55727
Birmingham, AL 35255-5727
Tel:   (205) 930-5100
Fax:   (205) 930-5101
chris.christie@dentons.com

37

/s/ Diandra "Fu" Debrosse Zimmermann
Diandra "Fu" Debrosse Zimmermann
DICELLO LEVITT GUTZLER
420 20th Street North, Suite 2525
Birmingham, AL  35203
Tel.:   (205) 855.5700
fu@dicellolevitt.com

Attorneys for Plaintiffs


Serve Defendant:

John H. Merrill
Alabama Secretary of State
600 Dexter Ave. – Ste. S-105
Montgomery, AL 36103

Attorney General Steve Marshall
Office of the Attorney General
501 Washington Avenue
Montgomery, AL 36104

DOCSBHM\2367117\6