FILED
2021 Nov-04  PM 02:54
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## NOTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| **BOBBY SINGLETON, RODGER SMITHERMAN, EDDIE BILLINGSLEY, LEONETTE W. SLAY, DARRYL ANDREWS, and ANDREW WALKER,** | ) ) ) ) ) | |
| **Plaintiffs,** | ) ) ) | **Case No. 2:21-cv-01291-AMM** |
| **v.** | ) ) | **Three-Judge Court** |
| **JOHN H. MERRILL, in his official capacity as Alabama Secretary of State,** | ) ) ) ) | |
| **Defendant.** | ) | |

## AMENDED COMPLAINT

Plaintiffs, pursuant to Fed. R. Civ. P. 15(a)(1)(B), hereby amend their complaint against Defendant as follows:

1.      As the original Complaint (Doc. 1) alleged, the undisputed purpose of the racial gerrymandering of Congressional District 7 in the 1992 *Wesch v. Hunt* consent decree was to create a majority-black District allegedly to comply with the Voting Rights Act, and that the plans Alabama adopted after the 2000 and 2010 censuses perpetuated the racially gerrymandered District 7.  The State conceded as much in *Chestnut v. Merrill*.  The original Complaint, filed September 27, 2021, put the Legislature on notice that it had a constitutional duty to eliminate the District 7

1

racial gerrymander by returning to its historical practice of drawing Congressional districts with whole counties.

2.     Instead, today, November 4, 2021, the Governor signed Act No. 2021-555, in which the Legislature intentionally perpetuated the unconstitutional racial gerrymandering. To maintain a black majority in District 7, it retained the splits that capture black voters in Jefferson, Tuscaloosa, and Montgomery Counties. Because District 7 was under-populated by 53,143 persons, Act No. 2021-555 added to District 7's already divided populations 16,835 more residents of Clarke County, 27,369 more residents of Montgomery County, 30,919 more residents of Tuscaloosa County, and 5,176 more residents of Jefferson County. These additions necessarily added more white population and reduced the District 7 black voting-age majority from 60.16% to 54.22%.

3.     Today, the Voting Rights Act no longer requires maintenance of a majority-black Congressional District in Alabama. To the contrary, the State cannot rely on the Voting Rights Act to justify splitting county boundaries when Districts drawn without racial gerrymandering provide black voters constituting less than a majority, combined with reliably supportive white voters, an opportunity to elect candidates of their choice. *Cooper v. Harris*, 137 S. Ct. 1455 (2017).

4.     In *Tennant v. Jefferson County Comm'n*, 567 U.S. 758 (2012), the

Supreme Court of the United States reaffirmed that mathematical precision is not constitutionally required for Congressional Districts and that minor deviations from population equality can be justified by preserving county boundaries. This Amended Complaint includes a map (see p. 31, *infra*, Figure 9) introduced as SB 10 in the special session that shows how Alabama's Congressional Districts can be redrawn constitutionally without splitting a single county, while maintaining the cores of existing districts and complying with the Voting Rights Act.

5. Because the Legislature has failed to remedy, and instead has perpetuated, the unconstitutional racial gerrymander in the 2011 Congressional plan, this Court must order a constitutional plan be implemented in time for the May 24, 2022, primary elections. The circumstances here are very much like those in *Abrams v. Johnson*, 521 U.S. 74 (1997), which affirmed the Congressional redistricting plan a three-judge District Court had ordered as a remedy for racial gerrymandering. The District Court had declined to adopt proposed plans that perpetuated the Georgia Assembly's racially gerrymandered majority-black districts; instead, it followed Georgia's historical policy of combining whole counties, even though avoiding county splits required slightly higher population deviations.

6. Plaintiffs' racial gerrymandering cause of action is not a claim of discrimination. It is based on Supreme Court jurisprudence that prohibits classifying

voters on the basis of race absent a compelling state interest. This Amended Complaint now adds a racial discrimination claim, alleging that Act 2021-555 intentionally dilutes black voting strength. The Legislature's refusal to adopt plans that replaced the racially gerrymandered majority-black District 7 with two reliable crossover districts drawn with race-neutral traditional districting principles violated the Fourteenth and Fifteenth Amendments, which prohibit discrimination based on race. In *Bartlett v. Strickland*, 556 U.S. 1 (2009), the Supreme Court held that plaintiffs cannot rely on Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, to require states to draw crossover districts; they must demonstrate the availability of a compact majority-black district. But states may draw crossover districts to comply with Section 2. "[C]rossover districts may serve to diminish the significance and influence of race by encouraging minority and majority voters to work together toward a common goal," and the Court's holding "should not be interpreted to entrench majority-minority districts by statutory command, for that, too, could pose constitutional concerns." 556 U.S. at 23-24. And, as Plaintiffs allege here, "if there were a showing that a State intentionally drew district lines in order to destroy otherwise effective crossover districts, that would raise serious questions under both the Fourteenth and Fifteenth Amendments." *Id*. at 24 (citation omitted).

      7.    By returning to Alabama's traditional redistricting principle of

aggregating whole counties, this Court can remedy the existing racial gerrymander, restore a measure of rationality and fairness to Alabama's Congressional redistricting process, and afford African Americans an opportunity to elect candidates of their choice in at least two districts. Restoring the integrity of county boundaries will advance the representation of black citizens and, indeed, the fair representation of all Alabamians.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4), and 1357 to enforce the rights of plaintiffs alleged herein secured by Article I, § 2, and the Fourteenth and Fifteenth Amendments of the Constitution of the United States, and by 42 U.S.C. §§ 1983 and 1988.

9.     This Court has jurisdiction to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

10.     Venue is proper in this District under 28 U.S.C. § 1391(b).

11.     A three-judge District Court has been appointed (Doc. 13) pursuant to 28 U.S.C. § 2284(a), which states "a district court of three judges shall be convened when otherwise required by Act of Congress, or when an action is filed challenging the constitutionality of the apportionment of congressional districts . . . ."

## PARTIES

12.     Plaintiffs Rodger Smitherman and Eddie Billingsley are Black registered voters who reside in Jefferson County and within the boundaries of Congressional District 7 in both the 2011 and 2021 enacted plans.  Plaintiffs Smitherman and Billingsley allege that the 2011 plan split Jefferson, Tuscaloosa, Montgomery, and Clarke Counties in a manner that made District 7 racially gerrymandered to separate black voters from white voters, and that the 2021 plan perpetuates that racial gerrymander.  Plaintiffs Smitherman and Billingsley also allege that the 2021 redistricting plan was drawn intentionally to dilute Black voting strength by continuing to pack Black voters in a single district, instead of drawing two non-gerrymandered crossover districts that afford Black voters an equal opportunity to elect candidates of their choice.

13.     Plaintiff Leonette W. Slay is a White registered voter who resides in Jefferson County and within the boundaries of Congressional District 6 in both the 2011 and 2021 enacted plans.  Plaintiff Slay alleges that the 2011 plan split Jefferson County in a manner that made District 6 racially gerrymandered to separate black voters from white voters, and that the 2021 plan perpetuates that racial gerrymander.

14.     Plaintiff Bobby Singleton is a Black registered voter who resides in Hale County and within the boundaries of Congressional District 7 in both the 2011 and 2021 enacted plans.  Plaintiff Singleton alleges that the 2011 plan split Jefferson,

Tuscaloosa, Montgomery, and Clarke Counties in a manner that made District 7 racially gerrymandered to separate black voters from white voters, and that the 2021 plan perpetuates that racial gerrymander.  Plaintiff Singleton also alleges that the 2021 Congressional redistricting plan was drawn intentionally to dilute Black voting strength by continuing to pack Black voters in a single district, instead of drawing two non-gerrymandered crossover districts that afford Black voters an equal opportunity to elect candidates of their choice.

15.    Plaintiffs Darryl Andrews and Andrew Walker are Black registered voters who reside in Montgomery County and within the boundaries of Congressional District 2 in both the 2011 and 2021 enacted plans.  Plaintiffs Andrews and Walker allege that the 2011 plan split Montgomery County in a manner that made District 2 racially gerrymandered to separate black voters from white voters, and that the 2021 plan perpetuates that racial gerrymander.  Plaintiffs Andrews and Walker also allege that the 2021 redistricting plan was drawn intentionally to dilute Black voting strength by continuing to pack Black voters in a single district, instead of drawing two non-gerrymandered crossover districts that afford Black voters an equal opportunity to elect candidates of their choice.

16.    Defendant John Merrill is sued in his official capacity as the Alabama Secretary of State.  "The Secretary of State is the chief elections official in the state

and shall provide uniform guidance for election activities." Ala. Code § 17-1-3. As Secretary of State, Defendant Merrill certifies, to the judge of probate of each county, the names of candidates for members of Congress to be placed on the ballot in the primary election, Ala. Code § 17-13-5(b), and in the general election, Ala. Code § 17-9-3(b), and, following the general election, he issues certificates of election to the persons elected to Congress, Ala. Code § 17-12-21.

## ALLEGATIONS OF FACT

17.    In this Court, the State conceded that the redistricting plan, see p. 9, *infra*, Figure 1, enacted in 2011, was racially gerrymandered.[1]  The Legislature's duty, with the 2020 census data, was to remedy the racial gerrymander in Alabama's Congressional redistricting plan. *Abrams v. Johnson*, 521 U.S. 74, 85-86 (1997).

---

[1] "As the Court pointed out at a pretrial conference, District 7 appears to be racially gerrymandered, with a finger sticking up from the black belt for the sole purpose of grabbing the black population of Jefferson County. Defendant does not believe that the law would permit Alabama to draw that district today if the finger into Jefferson County was for the predominate purpose of drawing African American voters into the district." *Chestnut v. Merrill*, No. 2:18-CV-00907-KOB (N.D. Ala. Oct. 28, 2019), Doc. 101 (Defendant Merrill's pretrial brief) at 11.

**FIGURE 1**



18.     To remedy a racial gerrymander, the Legislature must not allow traditional redistricting principles to be subordinated to racial considerations, unless they are necessary to satisfy a narrowly tailored, compelling state interest.  *E.g.*, *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 272 (2015); *Abrams v. Johnson*, 521 U.S. at 81, 85-86.

19.     Throughout the state's history, the most important traditional Districting principle for drawing Alabama's Congressional districts has been preserving whole counties.

20.     For a century and a half, Alabama drew its Congressional districts with whole counties.[2]  That ended when Alabama lost a seat in the U.S. House after the 1960 census, going from nine to eight representatives.  In 1961, the Alabama Legislature, led by representatives of the Black Belt, passed what was called the "Jefferson Chop-Up" bill, which divided Jefferson County among four Congressional Districts.  But Governor John Patterson vetoed the Chop-Up, saying it would "divest the citizens of that county of direct representation in Congress, is ...

---

[2] See https://archives.alabama.gov/legislat/ala_maps/getstart.html; State's exhibit 114-1 in *Chestnut v. Merrill*, CA No. 2:18-CV-00907-KOB (N.D. Ala.). Many of the maps are included in the allegations below.

unthinkable, unwise, above all wrong, and therefore unconstitutional."[3]  The regular legislative session adjourned without breaking the filibuster mounted by Jefferson County senators that prevented overriding the veto.  Governor Patterson then called a special session and got the Legislature to pass a compromise "9-8" plan, pursuant to which Democratic primary elections were held in all nine old districts, following which the general election for eight seats was conducted in the state at large.  The result was that eight Democratic incumbent Congressmen were elected, with the incumbent finishing ninth (Frank Boykin) losing his seat.[4]

21.    In February 1964, the U.S. Supreme Court ruled that Congressional districts must be equal in population.  *Wesberry v. Sanders*, 376 U.S. 1 (1964).  In March 1964, a three-judge panel held that the nine-district scheme for primary elections violated Article I, § 2 of the U.S. Constitution and the Equal Protection Clause in the Fourteenth Amendment.  *Moore v. Moore*, 229 F. Supp. 435 (S.D. Ala. 1964) (three-judge court).  But the federal court allowed the imminent 1964 elections to go forward under the 9-8 plan, giving the Legislature two years to enact a

---

[3] ANNE PERMALOFF AND CARL GRAFTON, POLITICAL POWER IN ALABAMA 134-35 (1995).

[4] See *id*. at 124-35 (1995).

constitutional plan.  However, Governor George Wallace feared the at-large scheme would elect more Republicans.  In August 1964, he called the Legislature into special session to draw an eight-district plan.[5]  The plan that emerged kept all Alabama counties whole, including Jefferson County, even though at 634,864 in the 1960 census, the county's population greatly exceeded the ideal population of the eight Congressional districts at that time, which was 409,250.  See p. 13, *infra*, Figure 2.

---

[5] *The Montgomery Advertiser*, August 2, 1964, p. 1.



22.     Attorney General Richmond Flowers warned that such a large population deviation would not survive federal court scrutiny.[6]  In the 1965 regular session, the Legislature enacted a plan that split Jefferson County among three Congressional Districts.   Governor George Wallace reluctantly signed the bill, blaming the federal court.[7]   See p. 15, *infra*, Figure 3.   Jefferson County representatives asked the federal court to block this new "Chop-Up," but the court declared the plan constitutionally valid, even though it had a maximum population deviation of 13.3%.  *Moore v. Moore*, 246 F. Supp. 578 (S.D. Ala. 1965) (three judge court).  The Court found it "obvious that [Jefferson County] must be divided between at least two Congressional Districts," and "while had this Court found it necessary to declare the 1965 Redistricting Act . . . unconstitutional and devise its own redistricting plan, it possibly would not have found it necessary to divide the political unit of Jefferson County into three congressional Districts, these are not the Constitutional standards controlling the action of this Court."  246 F. Supp. at 580-82.

---

[6] *Alabama Journal*, November 23, 1964, p. 13.

[7] *Alabama Journal*, August 27, 1965, p. 13.

## FIGURE 3



ALABAMA'S
CONGRESSIONAL DISTRICTS

23.     Jefferson County was the only county split in the 1965 plan and in the post 1970 census plan.  The post 1970 census plan split Jefferson County between three Districts.  See p. 17, *infra*, Figure 4.  Only Jefferson County and St. Clair County were split in the post 1980 census plan.  See p. 18, *infra*, Figure 5.

1970   FIGURE 4
ALABAMA'S CONGRESSIONAL DISTRICTS





FIGURE 5

ALABAMA
CONGRESSIONAL DISTRICTS
1980

24.    In 1992, seven counties were split for the purpose of drawing one majority-black District.

25.    Until the 1992 consent decree racial gerrymander, Alabama had no formal or informal maximum deviation limits on its Congressional redistricting plans.

26.    Zero population deviation in Alabama Congressional redistricting plans began in 1992, when a federal court approved the plan. *Wesch v. Hunt*, 785 F. Supp. 1491 (S.D. Ala. 1992) (three-judge court), *aff'd sub nom*. *Camp v. Wesch*, 504 U.S. 902 (1992), *Figures v. Hunt*, 507 U.S. 901 (1993).  Because the 1992 plan was a federal court-ordered Congressional plan, the *Wesch* Court decided it should achieve "perfect equality."   785 F. Supp. at 1497-98 (citations omitted).[8]   But had the Legislature acted in timely fashion, making it unnecessary for the District Court to order a plan, there would have been more leeway with population deviations, so long as the Legislature could "justify each variance no matter how small." 785 F. Supp. at 1498 n.5 (quoting *Karcher v. Daggett*, 462 U.S. 725, 730 (1983)).

27.    The zero-deviation court-ordered plan facilitated splitting county

---

[8]  But see *Abrams v. Johnson*, 521 U.S. at 99 (affirming a federal court-ordered Congressional plan for Georgia that had a maximum deviation of 0.35%).

boundaries and census tracts to produce a racial gerrymander that was packed at 67.53% black.  The federal court in 1992 accepted the stipulation of all parties that the Voting Rights Act justified the creation of that one majority-black Congressional District, without making a judicial finding that the agreed upon plan actually was justified by Section 2 of the Voting Rights Act.[9]  See p. 21, *infra*, Figure 6.

---

[9] "This court will honor the stipulation, and accordingly, will not make an independent determination of whether § 2 of the Voting Rights Act requires the creation of a majority African–American congressional district in Alabama at this time."  *Wesch v. Hunt*, 785 F. Supp. at 1499.

**1582**     **785 FEDERAL SUPPLEMENT**     FIGURE 6

APPENDIX B TO FINAL JUDGMENT



28.     In 2019, the State conceded that the 1992 court-approved plan would violate the prohibition of racial gerrymandering first announced by the Supreme Court a year after *Wesch* was decided.[10]  *Shaw v. Reno*, 509 U.S. 630 (1993).

29.     Alabama continued the 1992 racial gerrymander in the Congressional redistricting plans enacted after the 2000 and 2010 censuses.  It told this Court it did so to comply with Section 5 of the Voting Rights Act.[11]  As a result, District 7 in the Act 2011-518 plan was still packed at 63.57% black.

30.     In 2012, the U.S. Supreme Court reaffirmed that preserving county boundaries can justify minor population deviations among Districts.[12]  Today, Alabama's Congressional districts can be drawn without splitting any counties (because Jefferson County's population has fallen below the ideal population of a Congressional district), and the plan enacted by the Legislature in 2021, which does

---

[10] See footnote 1 above.

[11] "[O]nce the [majority-black] district existed, Alabama had to continue to draw the district in order to comply with Section 5's anti-retrogression requirement."  *Chestnut v. Merrill*, CA No. 2:18-CV-00907-KOB (N.D. Ala. Oct. 28, 2019) Doc. 101 (State Pre-Trial Brief) at 11-12.

[12] *Tennant v. Jefferson County Comm'n*, 567 U.S. 758 (2012).

not keep all counties whole, violates the Fourteenth Amendment's prohibition of racial gerrymandering.

31.    The Congressional redistricting plan enacted as Act 2011-518 split the boundaries of seven counties: Clarke, Montgomery, Cherokee, Blount, Tuscaloosa, Jackson, and Jefferson.  Montgomery County was split among three Congressional Districts.  See p. 9, *supra*, Figure 1.

32.    The 1991 guidelines adopted by the Legislature's Reapportionment Committee, before the 1992 racial gerrymander was created, emphasized preserving county boundaries.  "Counties should be used as district building blocks where possible, and to the extent consistent with other aspects of these criteria."  785 F. Supp. at 1494 (quoting the guidelines).  "Preservation of political subdivisions promotes efficient representation, empowers a constituency's ability to organize productively, and serves as a deterrent to partisan gerrymandering."  785 F. Supp. at 1498 (citations omitted).

33.    Since the 2011 Congressional plan was enacted, the Supreme Court has reaffirmed that the U.S. Constitution "does not require that congressional districts be drawn with precise mathematical equality," and that preserving county boundaries can "justify population differences between districts that could have been avoided by 'a good-faith effort to achieve absolute equality.'"  *Tennant v. Jefferson*

*County Comm'n, West Virginia*, 567 U.S. 758, 759 (2012) (quoting *Karcher v. Daggett*, 462 U.S. 725, 730 (1983)).  "[I]f a State wishes to maintain whole counties, it will inevitably have population variations between districts reflecting the fact that its districts are composed of unevenly populated counties."  *Tennant*, 567 U.S. at 764.

34.    The Tennant Court approved a 0.79% maximum deviation for West Virginia's Congressional Districts, and it did not foreclose higher deviations for the sake of avoiding county splits.  To the contrary, the Supreme Court has repeatedly eschewed suggestions that it set a numerical limit for the "as nearly as practicable" deviation standard it first established in *Wesberry v. Sanders*, 376 U.S. 1, 7-8 (1964).  "The whole thrust of the 'as nearly as practicable' approach is inconsistent with adoption of fixed numerical standards which excuse population variances without regard to the circumstances of each particular case."  *Karcher*, 462 U.S. at 731 (quoting *Kirkpatrick v. Preisler*, 394 U.S. 526, 530 (1969)).

35.    The 1964 plan maintained the tradition going back to Alabama's first Congressional plan in 1822 of splitting no counties at all.  Jefferson County constituted District 6 by itself, even though, as the court found in *Moore v. Moore*, *supra*, its population greatly exceeded the ideal District population.  See p. 13, *supra*, Figure 2.  Alabama's 1965 Congressional plan split Jefferson County between three

Districts, but no other county was split.  As noted above, the federal court found the plan in compliance with *Wesberry v. Sanders*, even though it had a maximum deviation of 13.3%.  See p. 15, *supra*, Figure 3.

36.    Alabama lost a Congressional seat after the 1970 census, but the seven-District plan enacted in January 1972 also split only Jefferson County.  Jefferson County precincts 1, 2, and 4 were placed in District 7, while precinct 12 was placed in District 4.  District 6 was contained entirely within Jefferson County.  The maximum deviation was 0.8%.  See p. 17, *supra*, Figure 4.

37.    The Congressional redistricting plan enacted in August 1981 split Jefferson County and St. Clair County each between two Districts.  No other counties were split.  The ideal size of a District was 556,270, still smaller than Jefferson County's population, which was 671,371 in the 1980 census.  The maximum deviation among the seven Districts was 2.59%. See p. 18, *supra*, Figure 5.

38.    By the 1990 census Jefferson County's population had declined to 652,109, but it was still larger than the ideal size of seven Districts, which was 577,227.  *Wesch*, 785 F. Supp. at 1493.  As noted, to produce the racial gerrymander with a maximum deviation of plus or minus one person, the 1992 plan split seven counties.  See p. 26, *infra*, Figure 7.



Figure 7

39.     The 2001 plan maintained the racial gerrymander with zero population deviation.  In the 2000 census, Jefferson County's population rose to 662,285, which was still larger than the size of an ideal Congressional District (635,299).  In addition to Jefferson County, Morgan, St. Clair, Pickens, Coosa, Tuscaloosa, Montgomery, and Clarke Counties were split.  See p. 28, *infra*, Figure 8.

# 2002 Alabama US Congressional Districts

## Figure 8



Produced by the Department of Geography
College of Arts and Sciences
The University of Alabama

40.     In the 2010 census, Jefferson County's population, 658,158, fell below the ideal size of Congressional districts (682,819), making splitting an Alabama county no longer mathematically necessary.  Nevertheless, in 2011, the Legislature continued to split Jefferson County to retain the 1992 racial gerrymander with zero population deviation.  See p. 9, *supra*, Figure 1.

41.     With 2020 census data, it is practicable to end the 1992 racial gerrymander and draw a seven-district Congressional plan without splitting a single county and with only slight population deviations.

42.     The Plaintiffs' proposed Whole County Plan uses the official 2020 census data released on August 12, 2021.  With a maximum deviation of only 2.47%, it contains a Black Belt District 7 that is only 0.11% above ideal population and has 49.9% black registered voters, and a Jefferson-Bibb-Perry-Hale District 6 that is only 0.36% above ideal population and has 42.3% black registered voters.  Black voters have an opportunity to elect the candidate of their choice in both districts.  Joe Biden received 54.40% of the 2020 vote in the District 7 counties and 56.02% in the District 6 counties.  Doug Jones did even better, at 56.32% and 58.00%.  See p. 32, *infra*, Figure 9.  The 2020 election returns were not a one-off fluke; they are the most recent manifestation of dependable biracial coalition voting in the proposed Districts 6 and 7.  Federal and State statewide elections going back to 2012 show black voters'

choices, including Barack Obama, would have been elected in these two crossover Districts.

43.     Below are the statistics for the Plaintiffs' Whole County Plan, and the map is in Figure 9.

Whole County US Congress Plan Deviations

| District | Population | Deviation | %Deviation | 18+ Pop | %18+ Wht | %18+ Blk | %18+ Hisp. | %WH RV | %BL RV | %Hisp RV | %Biden | %Trump |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 720903 | 3149 | 0.44% | 559860 | 67.90% | 23.71% | 3.25% | 71.91% | 24.62% | 0.98% | 34.69% | 65.31% |
| 2 | 709514 | -8240 | -1.15% | 553805 | 66.01% | 25.38% | 3.96% | 70.05% | 26.15% | 1.26% | 33.12% | 66.88% |
| 3 | 715486 | -2268 | -0.32% | 556784 | 75.21% | 16.64% | 4.13% | 79.99% | 16.84% | 1.11% | 27.29% | 72.71% |
| 4 | 712333 | -5421 | -0.76% | 550055 | 84.22% | 5.70% | 6.15% | 90.92% | 5.90% | 1.73% | 16.05% | 83.95% |
| 5 | 727206 | 9452 | 1.32% | 569546 | 72.27% | 17.14% | 4.96% | 77.32% | 17.65% | 1.72% | 36.77% | 63.23% |
| 6 | 720310 | 2556 | 0.36% | 562843 | 51.37% | 40.55% | 4.13% | 54.17% | 42.30% | 0.95% | 56.02% | 43.98% |
| 7 | 718527 | 773 | 0.11% | 564273 | 47.24% | 45.82% | 3.26% | 47.52% | 49.91% | 0.58% | 54.40% | 45.60% |

| | Population | Deviation | %Deviation | 18+ Pop | %18+ Wht | %18+ Blk | %18+ Hisp. | %WH RV | %BL RV | %Hisp RV | %Biden | %Trump |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Totals | 5024279 | | | 3917166 | 66.25% | 25.06% | 4.26% | 70.29% | 26.16% | 1.19% | 37.09% | 62.91% |



Whole County Plan   Figure 9

| District | Pop 2020 | % DEV | % WH 18 + | % BL 18 + | % LT 18 + | % WH RV | % BL RV | % LT RV | % Biden | % Trump |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 720901 | 0.44% | 67.90% | 23.71% | 3.25% | 71.91% | 24.82% | 0.98% | 34.69% | 65.11% |
| 2 | 709514 | -1.16% | 66.01% | 25.38% | 3.96% | 70.05% | 26.15% | 1.26% | 33.12% | 66.88% |
| 3 | 715486 | -0.32% | 75.21% | 16.64% | 4.13% | 79.95% | 16.84% | 1.11% | 27.29% | 72.71% |
| 4 | 712333 | -0.76% | 84.22% | 5.70% | 6.13% | 90.92% | 5.90% | 1.73% | 16.05% | 83.95% |
| 5 | 727206 | 1.30% | 72.27% | 17.14% | 4.98% | 77.32% | 17.65% | 1.72% | 36.77% | 63.23% |
| 6 | 720310 | 0.36% | 53.37% | 40.55% | 4.13% | 54.17% | 42.10% | 0.93% | 56.02% | 43.98% |
| 7 | 718527 | 0.11% | 47.24% | 45.82% | 3.26% | 47.52% | 49.91% | 0.58% | 54.40% | 45.60% |
| Totals | 5024279 |  | 66.25% | 25.06% | 4.26% | 70.29% | 26.16% | 1.19% | 37.09% | 62.91% |

31

44.     The key to any whole-county Congressional redistricting plan is Jefferson County.  The only other possible whole-county options that keep Jefferson County whole are to join Jefferson County either with Blount County or with Walker County.  In both options, even though in the district including Jefferson County the black registered voter percentage would drop to about 38.9%, it would still be an opportunity district, in which black voters could elect a candidate of their choice. However, at 4.67% and 5.49%, the overall maximum deviations would be twice as high as the Jefferson-Bibb-Perry-Hale District 6.  The only other counties contiguous to Jefferson – Tuscaloosa, St. Clair, and Shelby – are too populous to be joined in a whole-county Congressional District with Jefferson.

45.     Maximum population deviation in the range yielded by Plaintiffs' plan satisfies the constitutional standard for Congressional districts established by *Wesberry v. Sanders*, as most recently refined in *Tennant v. Jefferson County Comm'n, Karcher v. Daggett* and *Abrams v. Johnson*.  It can be justified as a remedy for the racial gerrymander preserved in the 2011 and 2021 plans and by Alabama's historic policy of preserving whole counties.

46.     In the first half of September 2021, the Legislature's Reapportionment Committee held over two dozen hearings across Alabama. At the first of those hearings, and at several hearings thereafter, as an example, the League of Women

Voters of Alabama presented the Whole County Plan that Plaintiffs propose in this Amended Complaint as one that responds to the many speakers' pleas to keep their counties whole and that remedies the current racial gerrymander.  Plaintiffs do not know of any other Congressional redistricting plan that was presented to or considered by the Reapportionment Committee during these hearings.

47.    In a special session of the Legislature that began October 28, 2021, Plaintiffs' Whole County Congressional plan was introduced as SB10, sponsored by Senators Singleton, Smitherman, Beasley, Figures, and Sanders-Fortier. Modifications of the SB10 plan were offered as substitutes, in case some legislators thought its 2.47% maximum deviation was too high.  One substitute made minor splits of three counties to achieve a 0.69% maximum deviation, which is lower than the deviation approved in *Tennant v. Jefferson County*.  The other substitute made minor splits in six counties to achieve a 0% maximum deviation.  These substitute plans, which moved fewer than 10,000 voters out of the counties split to lower the deviation, demonstrated that the enacted 2021 plan, which removes hundreds of thousands from Jefferson, Tuscaloosa, and Montgomery Counties, cannot be explained by pursuit of a zero-deviation policy.

48.    Instead of adopting Plaintiffs' Whole County Plan, the Legislature preserved the racial gerrymander of Congressional District 7, which necessarily

maintains the racial gerrymanders in Districts 2 and 6.  Ala. Act No. 2021-555.

Plaintiffs allege, based on information and belief and on representations made by the

co-chairs of the Reapportionment Committee during the special session of the

Legislature, that that the Act 2021-555 plan was drafted by incumbent members of

Alabama's Congressional delegation to maintain their current districts with only

those changes necessary to equalize populations.  Below are the statistics, and the

map is shown in Figure 10.

User:
Plan Name: **Draft Congress Plan**
Plan Type:

## Population Summary

Sunday, October 24, 2021                                                                                                          6:25 PM

| District | Population | Deviation | % Devn. | [18+_Pop] | [% 18+_Pop] | [18+_Wht] | [% 18+_Wht] | [18+_Blk] | [% 18+_Blk] |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 717,754 | 0 | 0.00% | 557,535 | 77.68% | 371,902 | 66.7% | 138,128 | 24.77% |
| 2 | 717,755 | 1 | 0.00% | 557,677 | 77.7% | 350,279 | 62.81% | 162,714 | 29.18% |
| 3 | 717,754 | 0 | 0.00% | 564,281 | 78.62% | 386,048 | 68.41% | 136,382 | 24.17% |
| 4 | 717,754 | 0 | 0.00% | 556,133 | 77.48% | 463,433 | 83.33% | 39,834 | 7.16% |
| 5 | 717,754 | 0 | 0.00% | 561,187 | 78.19% | 403,155 | 71.84% | 95,757 | 17.06% |
| 6 | 717,754 | 0 | 0.00% | 552,286 | 76.95% | 397,498 | 71.97% | 100,878 | 18.27% |
| 7 | 717,754 | 0 | 0.00% | 568,067 | 79.15% | 222,731 | 39.21% | 308,030 | 54.22% |

Total Population:                   5,024,279
Ideal District Population:          717,754

**Summary Statistics:**

| | |
|---|---|
| Population Range: | 717,754 to 717,755 |
| Ratio Range: | 0.00 |
| Absolute Range: | 0 to 1 |
| Absolute Overall Range: | 1 |
| Relative Range: | 0.00% to 0.00% |
| Relative Overall Range: | 0.00% |
| Absolute Mean Deviation: | 0.14 |
| Relative Mean Deviation: | 0.00% |
| Standard Deviation: | 0.35 |

Maptitude                                                                                                          Page 1 of 1



**Committee Draft Congressional Plan**

Legislative Committee on Reapportionment

49.    District 7 in the Act 2021-555 plan retains all or part of the same fourteen counties contained in District 7 in the 2011 plan, including the majority-black rural counties, Sumter, Greene, Hale, Perry, Marengo, Dallas, Wilcox, and Lowdnes.  But 232,758 or 75.6% of the 308,030 black voting-age population in District 7 comes from expanded parts of the same three urban counties that were split in the 2011 plan, Jefferson, Tuscaloosa, and Montgomery.

50.    Of the 294,027 people in the part of Jefferson County drawn into District 7, 61.6% are black.  Of the 380,694 people in the rest of Jefferson County, all of which is assigned to District 6, only 25.5% are black.

51.    Of the 184,266 people in the part of Tuscaloosa County placed in District 7, 34.2% are black.  Only 8.1% of the 42,767 people in the rest of Tuscaloosa County are black, and they are placed in District 4.

52.    79.6% of the 65,519 people in the part of Montgomery County placed in District 7 are black, while 47.4% of the 166,435 people in the rest of Montgomery County are black.

53.    Plaintiffs' proposed Whole County Plan eliminates these racial gerrymanders and provides black voters an effective opportunity to elect candidates of their choice in two Congressional districts.  By simply removing the county splits, the Whole County Plan preserves the cores of Districts 6 and 7 in the 2011 plan,

creating one district dominated by populous Jefferson County and a second district that includes all the Black Belt counties except Barbour.  There is no objective, non-racially discriminatory justification for preserving the racially gerrymandered District 7 first created in 1992.

54.    Under the Administrative Calendar published by the Secretary of State, https://www.sos.alabama.gov/sites/default/files/Admin%20Calendar%20-2022%20-%2020210604%20LB_0.pdf, "Candidates intending to participate in the [May 24, 2022,] primary election may begin soliciting and accepting contributions [§ 17-5-7(b)(2)]" on May 24, 2021; and Candidates seeking nomination by a party primary must file declaration of candidacy with state party chairman (if seeking federal, state, circuit, District, or legislative office) … no later than this day [January 28, 2022] by 5 PM; 116 days before the election. [§ 17-13-5(a)]."

55.    The clock is already ticking on potential candidates in raising funds. In addition, candidates should know the District in which they will run weeks before January 28, 2022. Therefore, time is of the essence for this action, with a final hearing in November or December 2021 needed before the 2022 elections.

**COUNT I**
**Racial Gerrymandering**
**Equal Protection Clause of the Fourteenth Amendment**
**and Article I, § 2 of the U.S. Constitution**

56.     Alabama's Congressional redistricting plan, enacted in 2021, Ala. Act No. 2021-555, is racially gerrymandered, in violation of the Equal Protection Clause of the Fourteenth Amendment and Article I, § 2 of the Constitution of the United States.

57.     District 7 has been expressly designed to perpetuate the racial gerrymander first created in 1992, by preserving the core of District 7 in the 2011 plan, retaining zero population deviation, expanding the splits in Jefferson, Tuscaloosa, and Montgomery Counties as necessary to add 53,143 persons, while maintaining a majority-black voting-age population in an alleged attempt to comply with Section 2 of the Voting Rights Act.

58.     Majority-white District 6 splits Jefferson County in ways that are designed to minimize black voters' influence.  Montgomery County is split among Districts 2 and 7, packing black neighborhoods in west Montgomery County in District 7 and minimizing black voters' influence in majority-white District 2.

59.     The Supreme Court of the United States recently held that claims of partisan gerrymandering are nonjusticiable in federal courts, even though "such gerrymandering is 'incompatible with democratic principles.'" *Rucho v. Common Cause*, 139 S. Ct. 2484, 2506 (2019) (quoting *Arizona State Legislature v. Arizona Independent Redistricting Comm'n*, 135 S. Ct. 2652, 2658 (2015)).  But the Court

reaffirmed that federal courts may remedy two other forms of anti-democratic gerrymandering. "In two areas—one-person, one-vote and racial gerrymandering— our cases have held that there is a role for the courts with respect to at least some issues that could arise from a State's drawing of congressional Districts." *Rucho*, 139 S. Ct. at 2496 (citing *Wesberry v. Sanders*, 376 U.S. 1, (1964), and *Shaw v. Reno*, 509 U.S. 630 (1993) (*Shaw I*)).

60.     Racial gerrymandering is unconstitutional when traditional redistricting principles have been subordinated to racial considerations in ways that do not satisfy a narrowly tailored, compelling state interest.  *E.g.*, *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 272 (2015).  "If District lines were drawn for the purpose of separating racial groups, then they are subject to strict scrutiny because 'race-based decisionmaking is inherently suspect.'" *Rucho v. Common Cause*, 139 S. Ct. at 2502 (citing *Miller v. Johnson*, 515 U.S. 900, 915 (1995); *Bush v. Vera*, 517 U.S. 952, 959 (1996) (principal opinion)).

61.     As the State of Alabama has conceded, whether or not compliance with the Voting Rights Act may have justified packing black voters in a single Congressional District in the 1992 consent decree, the Voting Rights Act cannot justify further perpetuating the packed majority-black District 7 and the minimization of black voters' influence in Districts 2 and 6.

62.    The Legislature simply ignored the Supreme Court's decision in *Cooper v. Harris,* 137 S.Ct. 1455 (2017), which held that a Congressional redistricting plan does not violate the Voting Rights Act just because it does not have a District with a black voting-age population majority (50% plus 1 BVAP). North Carolina contended that to avoid a VRA violation it had to increase to over 50% BVAP Districts that were 48% and 43 % BVAP.  The Supreme Court rejected this argument and held that the 50% BVAP Districts were unconstitutional racial gerrymanders, because there was enough white crossover voting in the 48% and 43% BVAP Districts to provide black voters an equal opportunity to elect the candidates of their choice.  137 S. Ct. at 1465-66.

63.    The *Cooper v. Harris* Court reminded us that to establish a VRA violation all three preconditions in *Thornburg v. Gingles*, 478 U.S. 30 (1986), must be satisfied.  First, a "minority group" must be "sufficiently large and geographically compact to constitute a majority" in some reasonably configured legislative District. *Id*. at 50.  Second, the minority group must be "politically cohesive." *Id*. at 51. And third, a District's white majority must "vote [ ] sufficiently as a bloc" to usually "defeat the minority's preferred candidate."  137 S. Ct. at 1470.

64.    Districts 6 and 7 have more than enough white crossover voting to prevent meeting the third *Gingles* precondition.  Black voters' choice of candidates

41

in Districts 6 and 7 have prevailed by substantial margins over the past decade.

65.   It is not possible to draw even one majority BVAP District without splitting at least one county – notably, Jefferson County.  Violating that traditional Districting principle to grab enough black population to reach 50% BVAP cannot be justified by a compelling state interest.  As shown above, it cannot be justified by the need to avoid violating Section 2 of the Voting Rights Act.

66.   In *Abbott v. Perez*, 138 S. Ct. 2305, 2315 (2018), the Court cited *Cooper v. Harris*, decided the year before, to hold that Texas had not shown it had good reasons to draw a racially gerrymandered District: "North Carolina argued that its race-based decisions were necessary to comply with § 2, but the State could point to "no meaningful legislative inquiry" into "whether a new, enlarged" District, "created **without a focus on race**, ... could lead to § 2 liability." 138 S. Ct. at 2334-35 (quoting *Cooper*, 137 S. Ct., at 1471) (bold emphasis added).  Similarly, because of the two opportunity Districts yielded by Plaintiffs' Whole County Plan, Alabama is unable to justify focusing on race to produce a majority BVAP District.

67.   Remedying the racial gerrymanders in Alabama's current Congressional redistricting plan requires returning to traditional Districting principles, which in Alabama history means preserving whole counties.

68.   Maintaining a zero maximum deviation requirement directly conflicts

with the whole-county standard for avoiding racial gerrymandering.

69.     Harmonizing the Congressional equal population standard and the anti-racial gerrymandering standard of traditional Districting principles requires allowing slightly higher deviations from population equality among Districts.

70.     The Supreme Court held in *Tennant v. Jefferson County Comm'n, West Virginia*, that higher deviations were constitutionally permissible for the sake of preserving whole counties, even in a case that did not involve a racial gerrymandering violation.  Remedying a racial gerrymander, which the Alabama Legislature was obligated to do here, provides even greater justification for higher population deviations.

71.     In *Karcher v. Daggett*, another case that did not involve the more demanding racial gerrymandering standards, the Court suggested that acceptable population deviations for a Congressional redistricting plan can be determined by identifying those alternative plans which produce the lowest population deviations while respecting the state's policy of preserving political subdivisions (in that case municipalities).  462 U.S. at 739-40.  "The showing required to justify population deviations is flexible, depending on the size of the deviations, the importance of the State's interests, the consistency with which the plan as a whole reflects those interests, and the availability of alternatives that might substantially vindicate those

interests yet approximate population equality more closely. By necessity, whether deviations are justified requires case-by-case attention to these factors." *Id*. at 741.

72.     In *Abrams v. Johnson*, 521 U.S. 74 (1997), the Supreme Court affirmed a court-ordered Congressional redistricting plan that honored "Georgia's 'strong historical preference' for not splitting counties outside the Atlanta area . . . ." *Id*. at 99 (citation omitted).  The Court agreed that Georgia's 159 counties provide "ample building blocks for acceptable voting Districts without chopping any of those blocks in half." *Id*. at 100 (citation omitted).  The District Court's plan had a maximum deviation of 0.35% and an average deviation of 0.11%.  It had rejected proposed plans with both higher and lower deviations because they perpetuated racial gerrymandering. *Id*. at 99.

73.     As the plan set out in this Amended Complaint demonstrates, the existing racial gerrymander can be remedied with a plan that does not split a single county.  At 2.47%, Plaintiffs' proposed Whole County Plan has a smaller maximum population deviation than the 2.59% Alabama adopted in 1981, and a much smaller deviation than the 13.3% maximum deviation approved in 1965 by the three-judge District court in *Moore v. Moore*, *supra*.  This is a maximum population deviation small enough to satisfy the "high standard of justice and common sense for the apportionment of congressional Districts" required by Article I, § 2, of the

Constitution. *Karcher v. Daggett*, 462 U.S. at 730 (quoting *Wesberry v. Sanders*, 376 U.S. at 18) (internal quotation marks omitted).

74.     Alternatively, if the Legislature had rejected Plaintiffs' Whole County Plan because it considered 2.47% maximum deviation too high, it could have adopted one of the whole county substitutes, that reduced the maximum deviation to 0.69% or 0.0%.

## COUNT II
### Intentional Racial Discrimination
### Section 1 of the Fourteenth Amendment and
### the Fifteenth Amendment of the U.S. Constitution

75.     The Supreme Court reads and understands the Fourteenth and Fifteenth Amendments, which prohibit denial or abridgement of the right to vote on account of race, as requiring proof of intentional discrimination. *Jones v. Latimer*, __ F.4th __, 2021 WL 4839896 (11th Cir., Oct. 18, 2021) at *4 (citing *City of Mobile v. Bolden*, 446 U.S. 55, 63 (1980) (plurality opinion); *Reno v. Bossier Parish School Bd.*, 520 U.S. 471, 481 (1997); *Nw. Austin Municipal Utility Dist. No. One v. Holder*, 557 U.S. 193, 223 (2009)).

76.     The drafters of Act No. 2021-555 violated the Fourteenth and Fifteenth Amendments by intentionally drawing Congressional District lines in order to destroy otherwise effective crossover Districts. *Bartlett v. Strickland*, 556 U.S. 1,

24 (2009).

77.     The Legislature's own guidelines and Alabama's traditional districting principle of drawing Congressional districts with whole counties were violated when, instead of adopting the Whole County Plan introduced as SB 10, the Legislature perpetuated the racially gerrymandered majority-black District 7.

78.     The Whole County Plan in SB 10 was rejected because it would have increased the number of Districts in which black voters would have an equal opportunity to elect candidates of their choice.

79.     Therefore, Act 2021-555 violates the Fourteenth and Fifteenth Amendments.

WHEREFORE, Plaintiffs pray:

That this three-judge Court will expedite a trial on the merits and render a decision in time for constitutional, non-discriminatory Congressional Districts to be put in place before the January 28, 2022, deadline for candidates to qualify for the May 24, 2022, primary elections.

That the Court require Defendant to respond promptly to the claims set out herein, authorize limited required discovery to commence immediately, schedule a trial on the merits in December 2021, and provide relief as follows:

A.  Enter a declaratory judgment that Alabama's Congressional redistricting

plan, enacted in 2021, Act No. 2021-555, is racially gerrymandered, in violation of Article I, § 2, and the Equal Protection Clause of the Fourteenth Amendment of the Constitution of the United States, and is intentionally racially discriminatory in violation of the Fourteenth and Fifteenth Amendments.

B.  Issue a permanent injunction prohibiting implementation of Act No. 2021-555 in future elections for members of Congress.

C.  Because, after citizens' notice in public hearings and legal notice in this action, the Legislature has failed to remedy the constitutional violations in the 2011 Congressional redistricting plan in time for the regularly scheduled 2022 primary and general elections, require implementation of a Court-ordered redistricting plan that complies with the Constitution and laws of the United States.

D.  This Court's plan should give no deference to the racially gerrymandered Districts.  *Abrams v. Johnson*, 521 U.S. 74, 85-86 (1997).  It should accept slight deviations in population to accommodate Alabama's "strong historical preference" for not splitting counties.  *Id*. at 99-100.  And it should take account of the "significant degree of crossover voting" in the whole county Districts proposed by Plaintiffs.  *Id*. at 92-94.

E.  Award plaintiffs their reasonable attorneys' fees and expenses.

F.   Grant such other and further relief as the Court may deem just and

equitable.

Respectfully submitted this 4th day of November, 2021.


/s/ James Uriah Blacksher
James Uriah Blacksher
825 Linwood Road
Birmingham, AL 35222
Tel:   (205) 612-3752
Fax:   (866) 845-4395
jublacksher@gmail.com


/s/ Myron Cordell Penn
Myron Cordell Penn
**PENN & SEABORN, LLC**
1971 Berry Chase Place
Montgomery, AL  36117
Tel:   (334) 219-9771
myronpenn28@hotmail.com


/s/ Joe Ramon Whatley, Jr.
Joe Ramon Whatley, Jr.
**WHATLEY KALLAS, LLP**
P.O. Box 10968
Birmingham, AL  35202
Tel.:   (205) 488-1200
Fax:   (800) 922-4851
jwhatley@whatleykallas.com

/s/ Diandra "Fu" Debrosse Zimmermann
Diandra "Fu" Debrosse Zimmermann
Eli Hare
DICELLO LEVITT GUTZLER
420 20th Street North, Suite 2525
Birmingham, AL  35203
Tel.:   (205) 855.5700
fu@dicellolevitt.com
ehare@dicellolevitt.com


Attorneys for Plaintiffs


<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 4, 2021, I electronically filed the foregoing with the court's electronic system, which provides service on all counsel of record.


/s/ James U. Blacksher
Counsel for Plaintiffs

49