FILED

2021 Nov-19  AM 11:46
U.S. DISTRICT COURT
N.D. OF ALABAMA


# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

**BOBBY SINGLETON, RODGER SMITHERMAN, EDDIE BILLINGSLEY, LEONETTE W. SLAY, DARRYL ANDREWS, and ANDREW WALKER,**

           **Plaintiffs,**

v.

**JOHN H. MERRILL, in his official capacity as Alabama Secretary of State,**

           **Defendant.**

**Case No.: 2:21-cv-01291-AMM**

**Three-Judge Court**

## PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW IN SUPPORT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. ii

BACKGROUND ...........................................................................1

I.     Origins of Alabama's Racial Gerrymander .....................................1

II.    The 2021 Plan Perpetuates the Racial Gerrymander ........................5

ARGUMENT ..............................................................................7

A.     Plaintiffs Are Entitled To The Requested Injunction ....................8

    1.     Plaintiffs Are Likely To Prevail On The Merits Of Their Claim Of An Unconstitutional Racial Gerrymander ...........................9

        a.     Legal Doctrine ..............................................................9

        b.     Race Predominated in the Creation of District 7 .....................13

        c.     The Racially Gerrymandered District 7 Is Not Narrowly Tailored to Further a Compelling State Interest ......................15

    2.     Plaintiffs Will Suffer Irreparable Harm Absent An Injunction ..........17

    3.     The Balance of The Equities Weighs In Favor Of Plaintiffs .............19

    4.     The Injunction Would Not be Adverse To The Public Interest ..........24

CONCLUSION ..........................................................................24

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Perez*,
   138 S. Ct. 2305 (2018)...................................................................................17

*Abrams v. Johnson*,
   521 U.S. 74 (1997)........................................................................................22

*Ala. Legislative Black Caucus v. Alabama*,
   575 U.S. 254 (2015)............................................................... 9, 10, 17

*Beer v. United States*,
   425 U.S. 130 (1976).......................................................................................5

*Bethune-Hill v. Va. State Bd. of Elections*,
   580 U.S. _____, 137 S. Ct. 788 (2017) ............................................ 9, 11, 12

*Bush v. Vera*,
   517 U.S. 952 (1996)................................................................... 10, 13

*Canal Auth. of Fla. v. Callaway*,
   489 F.2d 567 (5th Cir. 1974) ........................................................................20

*Charles H. Wesley Educ. Found., Inc. v. Cox*,
   324 F. Supp. 2d 1358 (N.D. Ga. 2004)............................................ 9, 18, 19

*Charles H. Wesley Educ. Found., Inc. v. Cox*,
   408 F.3d 1349 (11th Cir. 2005) ..............................................................9, 24

*Clark v. Putnam Cty.*,
   293 F.3d 1261 (11th Cir. 2002) ............................................................ 10, 11

*Cooper v. Harris*,
   137 S. Ct. 1455 (2017)......................................................................... passim

*Cunningham v. Adams*,
   808 F.2d 815 (11th Cir. 1987) ...............................................................9, 18

*Davis v. Chiles*,
   139 F.3d 1414 (11th Cir. 1998) ...................................................................12

*Dillard v. City of Greensboro*,
  870 F. Supp. 1031 (M.D. Ala. 1994) ................................................. 18, 19, 21

*Energy Four, Inc. v. Dornier Med. Sys., Inc*.,
  765 F. Supp. 724 (N.D. Ga. 1991) ................................................................8

*Figures v. Hunt*,
  507 U.S. 901 (1993) .................................................................................2, 3

*Ga. State Conf. of the N.A.A.C.P. v. Fayette Cty. Bd. of Comm'rs*,
  118 F. Supp. 3d 1338 (N.D. Ga. 2015) ................................. 18, 19, 20 21, 24

*Harris v. Graddick*,
  593 F. Supp. 128 (M.D. Ala. 1984) ..............................................................19

*Karcher v. Daggett*,
  462 U.S. 725 (1983) ....................................................................................23

*McDonald's Corp. v. Robertson*,
  147 F.3d 1301 (11th Cir. 1998) ....................................................................8

*Miller v. Johnson*,
  515 U.S. 900 (1995) ........................................................................... 7, 9, 11

*Moore v. Moore*,
  246 F. Supp. 578 (S.D. Ala. 1965) ..............................................................22

*Osmose, Inc. v. Viance, LLC*,
  612 F.3d 1298 (11th Cir. 2010) ....................................................................8

*Reynolds v. Sims*,
  377 U.S. 533 (1965) ............................................................................. 19, 20

*Scott v. Roberts*,
  612 F.3d 1279 (11th Cir. 2010) .................................................................9, 18

*Shaw v. Reno*,
  509 U.S. 630 (1993) .................................................................................4, 10

*Shelby County v. Holder*,
  570 U.S. 529 (2013) ......................................................................................5

*Tennant v. Jefferson County Commission*,
    567 U.S. 758 (2012)............................................................22

*Thornburg v. Gingles*,
    478 U.S. 30 (1986)........................................................ 16, 17

*United States v. Alabama*,
    791 F.2d 1450 (11th Cir. 1986) .......................................8

*United States v. Georgia*,
    892 F. Supp. 2d 1367 (N.D. Ga. 2012).........................8, 9

*Wesberry v. Sanders*,
    376 U.S. 1 (1964)..............................................................2

*Wesch v. Hunt*,
    785 F. Supp. 1491 (S.D. Ala. 1992) (three-judge court),
    *aff'd sub nom*. *Camp v. Wesch*, 504 U.S. 902 (1992) ..................... 2, 3, 4, 13

*Williams v. Rhodes*,
    393 U.S. 23 (1968)..................................................... 19, 20, 24

*Yick Wo v. Hopkins*,
    118 U.S. 356 (1886)..........................................................19

**Statutes**

28 U.S.C. § 2284(b) ................................................................1

Ala. Code § 17-13-5(a) .........................................................25

Voting Rights Act, 52 U.S.C. § 10301 ....................................4

Voting Rights Act, 52 U.S.C. § 10303 ....................................8

Voting Rights Act, 52 U.S.C. § 10304 ....................................7

iv

Plaintiffs Bobby Singleton, Rodger Smitherman, Eddie Billingsley, Leonette W. Slay, Darryl Andrews, and Andrew Walker, through undersigned counsel, move for a preliminary injunction pursuant to Fed. R. Civ. P. 65(a), and 28 U.S.C. § 2284(b).  This motion seeks preliminary relief with respect only to Count I of their Amended Complaint - racial gerrymandering.  The decisions of the Supreme Court in the past decade, in particular, *Cooper v. Harris*, 137 S. Ct. 1455 (2017), are controlling.

Those decisions, which are discussed in detail below, provide that Section 2 of the Voting Rights Act cannot justify the Legislature's perpetuation of racially gerrymandered, majority-black Congressional District 7 when Plaintiffs' Whole County Plan, drawn without gerrymandering, provides two effective opportunity districts with Black voting-age populations which are less than 50%.  A preliminary injunction based on this narrow constitutional ground would make it unnecessary for this Court to address Count II of the Amended Complaint - intentional discrimination - in which Plaintiffs allege s that the Legislature rejected the Whole County Plan for the purpose of denying Black Alabamians an equal opportunity to elect two members of Congress.

## BACKGROUND

Before the Alabama Legislature convened to draw Congressional districts in 2021, Alabama's then-existing District 7 was undisputedly the result of racial

1

gerrymandering, splitting counties in violation of Alabama's traditional principle of keeping counties whole. Some of the Plaintiffs in this action, based on the 2020 census, proposed districts that eliminated the racial gerrymander, kept counties whole, and deviated from equal population by small, constitutionally permissible amounts. They also proposed alternative plans that eliminated the racial gerrymander and made minor county splits that would result in deviations from equal population as low as zero. The Legislature rejected these proposals in favor of a map that preserves nearly all the defining features of the racially gerrymandered District 7. Therefore, the new District 7 remains racially gerrymandered in violation of the United States Constitution.

Because of this racial gerrymander, Plaintiffs are entitled to a preliminary injunction on Count I of their Amended Complaint (ECF No. 15).[1] They are likely to succeed on the merits because the 2021 districting plan is substantially similar to previous plans that the State has admitted were racial gerrymanders. Plaintiffs will suffer irreparable harm if the 2022 elections are conducted using constitutionally infirm districts. The balance of hardships weighs in Plaintiffs' favor, as their fundamental right to vote would be infringed absent an injunction, outweighing any

---

[1] Plaintiffs base this motion solely on Count I (Racial Gerrymandering). Plaintiffs are not seeking preliminary injunctive relief on Count II (Intentional Discrimination).

burden that the State might experience in ensuring the constitutionality of its elections. Finally, protecting the right to vote is unquestionably in the public interest.

## I.     The Origins of Alabama's Racial Gerrymander

Alabama's Congressional districts did not divide counties from 1822 (when districts were first drawn) until 1965, when the Alabama Legislature split Jefferson County to comply with the Supreme Court's ruling that Congressional districts must be equal in population. Am. Compl. (ECF No. 15) at 10–15 ¶¶ 20–22 (citing *Wesberry v. Sanders*, 376 U.S. 1 (1964)).[2] In 1965, splitting Jefferson County was unavoidable because its population exceeded the ideal population of a Congressional district by a significant margin. *Id.* at 11–12 ¶ 21. In the 1965 plan and the plan following the 1970 census, Jefferson County was the only county in Alabama whose boundaries were split among multiple districts. *Id.* at 16–17 ¶ 23. In the plan following the 1980 census, only Jefferson and St. Clair Counties were split. *Id.* at 16, 18 ¶ 23.

In 1992 a court-ordered plan, designed specifically to allocate voters by race, split several counties in District 7. Following the 1990 census, certain Black citizens of Alabama filed suit against State officials, alleging that the existing Congressional

---

[2] Because discovery has just begun in this case, Plaintiffs' motion will rely on the allegations of the Amended Complaint and other facts that they believe they can prove, whether by stipulation, judicial notice, discovery, or evidence presented at the hearing. Plaintiffs would welcome the opportunity to submit a pre-hearing or post-hearing brief that reflects additional facts obtained through discovery, if the Court would find it useful and it did not delay this Court's resolution of the motion for preliminary injunction.

districts violated Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, by denying them "meaningful access to the voting process that would allow them to elect candidates of their choice." *Wesch v. Hunt*, 785 F. Supp. 1491, 1493 (S.D. Ala. 1992) (three-judge court), *aff'd sub nom*. *Camp v. Wesch*, 504 U.S. 902 (1992), *Figures v. Hunt*, 507 U.S. 901 (1993). The 1990 census data allegedly showed that "the African–American population in Alabama is sufficiently compact and contiguous to permit the creation of a congressional district in which 65% or more of the residents are African–Americans." *Id.* The parties to the suit "agree[d] that such a district should be created." *Id.* at 1493–94. The Alabama Legislature failed to enact a new districting plan in time for preclearance by the Department of Justice before the 1992 election, requiring the court to order a plan itself. *Id.* at 1494–95. The court accepted the stipulation of all parties that the Voting Rights Act justified the creation of that one majority-black Congressional district, without making a judicial finding that the agreed upon plan actually was justified by Section 2 of the Voting Rights Act. *Id.* at 1499. Ultimately, the court adopted a plan that concentrated Black citizens in District 7, where they constituted 67.53% of the population. Am. Compl. (ECF No. 15) at 19–20 ¶ 27. To do so, the plan split Jefferson, Tuscaloosa, Montgomery, Clarke, and Pickens Counties, placing a relatively large share of Black citizens in District 7 and

a relatively small share in other districts. *Id.* at 21.[3]   Among the ways this split manifests on the map are a "finger" reaching into Jefferson County to encompass the Black population of Birmingham while mostly avoiding the relatively White northern and southern suburbs; a line through the City of Tuscaloosa that places the relatively Black southern portion in District 7 and largely excludes the relatively White northern portion; and the inclusion of the predominantly Black western portion of Montgomery County but not the predominantly White eastern portion. *See id.* The court's overriding concern was explicitly racial; it honored the parties' stipulation that District 7 should have a "significant majority," at least 65% Black, and its opinion included 79 pages of tables that described the population of each district by race and no other attribute. *Wesch*, 785 F. Supp. at 1498–99, 1503–81. The 1992 map is below:

---

[3] The population of Jefferson County in District 7 was 75% Black, compared to 35% in the county overall. Disparities also existed for Tuscaloosa County (40% v. 26%), Montgomery County (80% v. 42%), Clarke County (56% v. 43%), and Pickens County (75% v. 42%). *Wesch*, 785 F. Supp. at 1505–07, 1558, 1569, 1575, 1577, 1581.



In 2019, the State of Alabama conceded that the 1992 court-approved plan would violate the prohibition of racial gerrymandering first announced by the Supreme Court a year after *Wesch* was decided. *See Shaw v. Reno*, 509 U.S. 630

(1993). In his pretrial brief in *Chestnut v. Merrill*, Secretary of State Merrill (who is

also the Defendant in this case) stated,

> District 7 appears to be racially gerrymandered, with a finger sticking
> up from the black belt for the sole purpose of grabbing the black
> population of Jefferson County. Defendant does not believe that the law
> would permit Alabama to draw that district today if the finger into
> Jefferson County was for the predomina[nt] purpose of drawing
> African American voters into the district. Alabama did so in the early
> 1990s as part of a consent decree ….

*Chestnut v. Merrill*, No. 2:18-CV-00907-KOB (N.D. Ala. Oct. 28, 2019), ECF No.

101 at 11 ("*Chestnut* Br."). Secretary Merrill also admitted that the State carried

forward the racial gerrymander in the plans that followed the 2000 and 2010

censuses: "once the district existed, Alabama had to continue to draw the district in

order to comply with Section 5's anti-retrogression requirement." *Id.* at 11–12; *see*

*also* Am. Compl. (ECF No. 15) at 9, 28 (maps of the 2002 and 2011 plans). Here,

Secretary Merrill was referring to Section 5 of the Voting Rights Act, 52 U.S.C. §

10304, whose purpose "has always been to insure [sic] that no voting-procedure

changes would be made that would lead to a retrogression in the position of racial

minorities with respect to their effective exercise of the electoral franchise." *Beer v.*

*United States*, 425 U.S. 130, 141 (1976). Alabama was prohibited from making such

changes without preclearance from the Department of Justice until 2013, when the

Supreme Court held the coverage formula in Section 4 of the Voting Rights Act, 52

U.S.C. § 10303, unconstitutional in *Shelby County v. Holder*, 570 U.S. 529 (2013).

As Secretary Merrill explained in 2019, "Today, with Section 5 effectively tabled, Alabama has more liberty to draw its districts differently." *Chestnut* Br. at 12.

## II.   The 2021 Plan Perpetuates the Racial Gerrymander.

Despite this newfound liberty, Alabama's 2021 plan draws District 7 strikingly similarly to its prior racially gerrymandered versions. The most noticeable change is that the new district is geographically larger, which was unavoidable because the existing district's population was 53,143 people below the population of an ideal district. Am. Compl. (ECF No. 15) at 39 ¶ 57; *id.* at 9, 36. Nevertheless, it retains key features of the racial gerrymander. The new District 7 still reaches into Jefferson County to encompass the Black population of Birmingham while mostly avoiding the relatively White northern and southern suburbs. *Id.* at 36. It still draws a line through the City of Tuscaloosa that places the relatively Black southern portion in District 7 and largely excludes the relatively White northern portion. *Id.* And it still reaches into the predominantly Black western portion of Montgomery County but not the predominantly White eastern portion. *Id.*[4] These continuing features of the district were undisputedly created in 1992 as part of a redistricting plan driven by race.

---

[4] The new District 7 eliminates the split in Clarke County, but this change affects only about 1% of the district's population.

Based on representations made by the co-chairs of the Reapportionment Committee during the special session of the Legislature, as well as Plaintiffs' own investigation, the 2021 plan was drafted by incumbent members of Alabama's Congressional delegation to maintain their current districts with only those changes necessary to equalize populations. Am. Compl. (ECF No. 15) at 34 ¶ 48. That conclusion is consistent with the maps themselves, which show only marginal changes in the shapes of all seven districts. *Compare id.* at 9 (2011 map) *with id.* at 36 (2021 map). The voting-age population in District 7 did decrease the size of its Black majority from about 60% to 54%, but the requirement that the population of the district be increased by 53,000 or so people made some reduction inevitable, barring even more racial gerrymandering. *Id.* at 2 ¶ 2.

## ARGUMENT

To prevail on a motion for a preliminary injunction, Plaintiffs must show: (1) a substantial likelihood that they will succeed on the merits; (2) that the preliminary injunction is necessary to prevent irreparable injury; (3) that the threatened injury absent an injunction outweighs the injury an injunction may impose on Defendant; and (4) that the injunction would not be adverse to the public interest. *E.g.*, *Benisek v. Lamone*, 138 S. Ct. 1942, 1943 (2018) (citing *Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7, 24 (2008); accord, *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1307 (11th Cir. 2010); *Energy Four, Inc. v.*

9

*Dornier Med. Sys., Inc*., 765 F. Supp. 724, 732 (N.D. Ga. 1991). The decision to grant preliminary injunctive relief is within the broad discretion of the district court. *See United States v. Georgia*, 892 F. Supp. 2d 1367, 1372 (N.D. Ga. 2012) (granting motion for preliminary injunction).

The purpose of a preliminary injunction is "to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *United States v. Alabama*, 791 F.2d 1450, 1459 (11th Cir. 1986) (affirming preliminary injunction). An injury is considered to be irreparable "if it cannot be undone through monetary remedies." *Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010); *Cunningham v. Adams*, 808 F.2d 815, 821 (11th Cir. 1987); *see also Charles H. Wesley Educ. Found., Inc. v. Cox*, 324 F. Supp. 2d 1358, 1368 (N.D. Ga. 2004) (*Cox I*), *aff'd*, 408 F.3d 1349 (11th Cir. 2005) (*Cox II*) ("no monetary award can remedy the fact that [plaintiff] will not be permitted to vote in the precinct of her new residence."); *see also United States v. Georgia*, 892 F. Supp. 2d 1367, 1377 (N.D. Ga. 2012) (entering a preliminary injunction where "the potential deprivation of the ability to vote, the most basic of American citizens' rights, outweigh[ed] the cost and inconvenience" that the state might suffer, which were comparatively minor).

As explained below, injunctive relief is warranted, because all four elements strongly weigh in Plaintiffs' favor. Plaintiffs are likely to succeed on the merits.

They will suffer irreparable harm if the 2022 elections are conducted using constitutionally infirm districts. The balance of hardships weighs in favor of Plaintiffs as well: Alabamians' fundamental right to vote would be infringed absent an injunction, outweighing any burden that Defendant might experience in complying with the requested injunction. The requested injunction would serve the public interest because protecting the right to vote is unquestionably in the public interest.

## I.      Plaintiffs Are Likely To Prevail On The Merits Of Their Claim Of An Unconstitutional Racial Gerrymander.

### A.      A Racial Gerrymander Exists Where Race Predominates in the Design of a District.

A claim of racial gerrymandering requires "a two-step analysis." *Cooper v. Harris*, 137 S. Ct. 1455, 1463 (2017). "First, the plaintiff must prove that 'race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district.'" *Id.* (quoting *Miller v. Johnson*, 515 U.S. 900, 916 (1995)). "Second, if racial considerations predominated over others, the design of the district must withstand strict scrutiny. The burden thus shifts to the State to prove that its race-based sorting of voters serves a 'compelling interest' and is 'narrowly tailored' to that end." *Id.* at 1464 (citations omitted). Here, the new District 7 closely resembles previous districts undisputedly drawn with race as the predominant factor. No compelling interest requires this as a racial

gerrymander of District 7 is unnecessary to comply with the Voting Rights Act. Therefore, the 2021 redistricting plan violates the Constitution.

The Equal Protection Clause of the Fourteenth Amendment "prohibits a State, without sufficient justification, from 'separat[ing] its citizens into different voting districts on the basis of race.'" *Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 792 (2017) (citing *Miller v. Johnson*, 515 U.S. 900, 911 (1995)). "A racial gerrymandering claim ... applies to the boundaries of individual districts." *Ala. Legislative Black Caucus v. Alabama*, 575 U.S. 254, 263 (2015). The Supreme Court has explained that the harms of a racial gerrymander "are personal. They include being 'personally ... subjected to [a] racial classification,' as well as being represented by a legislator who believes his 'primary obligation is to represent only the members' of a particular racial group." *Ala. Legis. Black Caucus*, 575 U.S. 263 (quoting *Bush v. Vera*, 517 U.S. 952, 957 (1996) (O'Connor, J.) and *Shaw v. Reno*, 509 U.S. 630, 648 (1993)).

Importantly, the Supreme Court has explained that, even where the state's ultimate aim is a partisan one, the use of race as a proxy for partisanship triggers strict scrutiny:

> [I]f legislators use race as their predominant districting criterion with the end goal of advancing their partisan interests ... their action still triggers strict scrutiny. In other words, the sorting of voters on the grounds of their race remains suspect even if race is meant to function as a proxy for other (including political) characteristics.

*Cooper v. Harris*, 137 S. Ct. at 1473 n.7 (citations omitted); *id*. at 1464 n.1 (noting that a plaintiff succeeds in showing that race predominated "even if the evidence reveals that a legislature elevated race to the predominant criterion in order to advance other goals, including political ones"); *see also Vera*, 517 U.S. at 968 ("[T]o the extent that race is used as a proxy for political characteristics, a racial stereotype requiring strict scrutiny is in operation.").

To prevail on a racial gerrymandering claim, the plaintiff must first show "that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Bethune-Hill*, 137 S. Ct. at 797 (citing *Miller*, 515 U.S. at 916). If the plaintiff shows that race was the predominant factor, "the burden shifts to the State to 'demonstrate that its districting legislation is narrowly tailored to achieve a compelling interest.'" *Bethune-Hill*, 137 S. Ct. at 801 (citing *Miller*, 515 U.S. at 920).

To satisfy the "race as predominant factor" requirement, the plaintiff "must prove that the legislature subordinated traditional race-neutral districting principles … to racial considerations." *Bethune-Hill*, 137 S. Ct. at 801. Further, the fact that the lines in question could have been drawn with race-neutral criteria does not preclude a finding that race was the predominant factor used to draw the district boundaries. *Id*. at 799 ("The racial predominance inquiry concerns the actual

considerations that provided the essential basis for the lines drawn, not post hoc justifications the legislature in theory could have used but in reality did not").

To prove that race was the predominant factor in a redistricting decision, the plaintiff may rely on "'direct evidence' of legislative intent, 'circumstantial evidence of a district's shape and demographics,' or a mix of both." *Cooper*, 137 S. Ct. at 1464 (citation omitted); *see Davis v. Chiles*, 139 F.3d 1414, 1424 (11th Cir. 1998) ("A court may base such a finding either on circumstantial evidence regarding a district's shape and demographics or on direct evidence of a district-drawer's purpose."). Redistricting maps that violate traditional redistricting principles, for example, may constitute evidence of an unconstitutional racial gerrymander. *See Bethune-Hill*, 137 S. Ct. at 799 ("In general, legislatures that engage in impermissible race-based redistricting will find it necessary to depart from traditional principles in order to do so.").

### B.   Race Predominated in the Creation of District 7.

Race was the predominant factor when the district court adopted District 7 in 1992. As described above, the court accepted the parties' stipulation that the district's population should be at least 65% Black, and it chose a plan that split an unprecedented number of counties in order to include their relatively Black areas while excluding relatively White ones. Although the court reviewed other aspects of the plans it considered, such as "the desirability of preserving compactness, cores of

14

all districts, communities of interest, and political subdivisions," *Wesch*, 785 F. Supp. at 1499, these were secondary to the overriding objective that the district be at least 65% Black.

Secretary Merrill has admitted that race also drove Alabama's Congressional redistricting plans after the 2000 and 2010 censuses. These plans, which left District 7 largely intact,[5] were drawn allegedly to avoid retrogression—in other words, to keep the Black majority high enough to avoid running afoul of the preclearance requirement of Section 5 of the Voting Rights Act. *See supra* p. 7.

Alabama's members of Congress controlled the drafting of the Act 2021-555 plan, and they tried to maintain the 2011 districts, adjusting them only as necessary to reach population equality. Consequently, the new District 7 perpetuates the 1992 racial gerrymander. Of the residents of the previous District 7, 92% will remain in the new District 7. The "eye test" also indicates that the districts are largely the same: they still carve up Montgomery, Tuscaloosa, and Jefferson Counties in similar ways that result in a high concentration of Black voters in the district. In fact, 75.6% of the BVAP in District 7 comes from those three counties. Am. Compl. (ECF No. 15)

---

[5] The most notable exception was the transfer of Lowndes County and a portion of western Montgomery County to District 2 following the 2000 census. Am. Compl. (ECF No. 15) at 28 (2002 map). Lowndes County and another portion of western Montgomery County returned to District 7 following the 2010 census. *Id.* at 9 (2011 map).

at 37 ¶ 49.[6] These observations are consistent with the public statements of the Reapportionment Committee co-chairs that the new redistricting plan was designed largely to preserve existing districts. *Id.* at 34 ¶ 48. Strict scrutiny applies to the Legislature's decision to adopt it. *Cooper v. Harris*, 137 S. Ct. at 1464.

To be sure, the new District 7 is not identical to the previous one. Many precincts have been added because the population needed to be increased by about 53,000. And the "finger" that reaches into Jefferson County has been blunted somewhat by moving the Center Point area into District 6. Nevertheless, the new District 7 is mostly the same as the previous one, and it maintains a BVAP of approximately 54%—far higher than might be necessary to comply with the Voting Rights Act. Senator McClendon and Representative Pringle repeatedly stated that they confirmed District 7 still had a Black majority, and that counsel for the Reapportionment Committee advised them that 54% BVAP was sufficient by itself to satisfy Section 2 of the Voting Rights Act, making any further "polarized voting" study unnecessary.

The State may argue that these marginal changes to District 7 defeat its status as a racial gerrymander. The best response is from Secretary Merrill himself: "The answer to the question of how much racial gerrymandering is okay is 'zero.'"

---

[6] The portion of Jefferson County in District 7 is 61.6% Black, compared to 25.5% for the rest of the county. Am. Compl. (ECF No.15) at 37 ¶ 50. There are wide disparities in Tuscaloosa County (34.2% v. 8.1%) and Montgomery County (79.6% v. 47.4%) as well. *Id.* at 37 ¶¶ 51–52.

*Chestnut* Br. at 11. The vast majority of the district is drawn the way it is because of a racial gerrymander; most of the people in the district are there primarily because of their race. Adding voters to the district (which was required anyway to maintain substantial population equality) and moving a small fraction of voters out of the district does not change that fact. District 7 will constitute a racial gerrymander until the Legislature or this Court redraws it using traditional districting principles that comply with the Constitution. As Secretary Merrill said, "The DOJ-required discrimination of 1992 cannot excuse new discrimination in 2021." *Id.* at 12.

### C.   The Racially Gerrymandered District 7 Is Not Narrowly Tailored to Further a Compelling State Interest.

As the State has conceded, whether or not compliance with the Voting Rights Act may have justified packing Black voters into a single Congressional district in 1992, it cannot justify further perpetuating the packed majority-Black District 7. *See supra* p. 7.[7]

Here, the Legislature simply ignored the Supreme Court's decision in *Cooper v. Harris*, which held that a Congressional redistricting plan does not violate the Voting Rights Act just because it does not have a District with a BVAP majority. In *Cooper* North Carolina contended that to avoid a Voting Rights Act violation it had

---

[7] In fact, it is Secretary Merrill's position—with which Plaintiffs do not agree—that compliance with the Voting Rights Act can *never* be a compelling state interest that justifies a racial gerrymander. *Chestnut* Br. at 8 ("The Fourteenth Amendment trumps a statute, and it is not okay to violate a voter's Constitutional rights through racial sorting even if Congress purports to require it.").

to add Black voters to districts that were 48% and 43% BVAP until they exceeded 50%. The Supreme Court rejected this argument and held that the 50% BVAP Districts were unconstitutional racial gerrymanders, because there was enough white crossover voting in the 48% and 43% BVAP Districts to provide black voters an equal opportunity to elect the candidates of their choice. 137 S. Ct. at 1465–66.[8]

*Cooper v. Harris* reminds us that to establish a Voting Rights Act violation, all three preconditions in *Thornburg v. Gingles*, 478 U.S. 30 (1986), must be satisfied. First, a "minority group" must be "sufficiently large and geographically compact to constitute a majority" in some reasonably configured legislative district. *Id.* at 50. Second, the minority group must be "politically cohesive." *Id.* at 51. And third, "a district's white majority must 'vote[] sufficiently as a bloc' to usually 'defeat the minority's preferred candidate.'" *Cooper v. Harris*, 137 S. Ct. at 1470 (quoting *Gingles*, 478 U.S. at 51).

Plaintiffs' proposed Whole County Plan, which was the first plan presented to the Reapportionment Committee and was introduced in the Legislature but rejected, shows that the third *Gingles* precondition is not satisfied. That plan contains two districts with BVAPs of 45.82% and 40.55% in which Black voters' preferred

---

[8] Attorney Dorman Walker, who represents the Intervenor-Defendants in this case, made this mistake at a recent public hearing at Lurleen B. Wallace Community College, stating, "The Voting Rights Act, section two, requires the drawing of a majority minority district -- and I'll just say a minority black district is what it's going to be in Alabama -- if it's possible to do so."

candidates would have prevailed in previous elections, many by substantial margins. Am. Compl. (ECF No. 15) at 29–31 ¶¶ 42–43. A partial list of these candidates is below.  Four of them are African Americans: Obama, Fields, Joseph, and Boyd.

| Year | Office | Candidate |
|------|--------|-----------|
| 2012 | President | Barack Obama |
| 2014 | Lieutenant Governor | James Fields |
| 2014 | Auditor | Miranda Joseph |
| 2017 | U.S. Senate | Doug Jones |
| 2018 | Lieutenant Governor | Will Boyd |
| 2018 | Auditor | Miranda Joseph |
| 2020 | President | Joe Biden |
| 2020 | U.S. Senate | Doug Jones |

In *Abbott v. Perez*, the Supreme Court cited *Cooper v. Harris* when it held that Texas had not shown good reasons to draw a racially gerrymandered District without showing that doing so was necessary to create an opportunity for minority voters to elect their preferred candidates: "North Carolina argued that its race-based decisions were necessary to comply with § 2, but the State could point to 'no meaningful legislative inquiry' into 'whether a new, enlarged' district, 'created without a focus on race, ... could lead to § 2 liability.'" 138 S. Ct. 2305, 2334–35 (quoting *Cooper v. Harris*, 137 S. Ct. at 1471). Similarly, because Plaintiffs' Whole County Plan yields two opportunity districts, the State cannot justify focusing on race to produce a majority BVAP district.[9]

---

[9] As Secretary Merrill has conceded, Section 5 of the Voting Rights Act also cannot justify racial gerrymandering in order to produce a majority BVAP district. *Chestnut* Br. at 12 ("Today, with

## II.     Plaintiffs Will Suffer Irreparable Harm Absent An Injunction.

In the absence of the requested injunction, Plaintiffs will suffer irreparable harm. "An injury is irreparable 'if it cannot be undone through monetary remedies.'" *Scott*, 612 F.3d at 1295 (quoting *Cunningham v. Adams*, 808 F.2d 815, 821 (11th Cir. 1987)). Recognizing this well-settled principle of law, courts considering motions for preliminary injunctions have repeatedly found that state actions infringing on the right to vote constitute irreparable injury. *See, e.g., Fayette County Ga. State Conf. of the N.A.A.C.P. v. Fayette Cty. Bd. of Com'rs*, 118 F. Supp. 3d 1338, 1347–18 (N.D. Ga. 2015) (Batten, J.) (holding that plaintiffs established irreparable harm if forced to vote using an election system that would dilute their votes); *Cox I*, 324 F. Supp. 2d at 1368 (holding that the defendant's refusal to accept plaintiff's voter registration in her precinct of residence, preventing her from voting in an upcoming election, constituted irreparable injury); *see also Dillard v. City of Greensboro*, 870 F. Supp. 1031, 1035 (M.D. Ala. 1994) (in denying defendant's motion for a stay pending appeal of the district court's injunction remedying a constitutionally defective election practice, holding that "monetary remedies would be inadequate compensation for the plaintiffs").

---

Section 5 effectively tabled, Alabama has more liberty to draw its districts differently."); *id.* ("Racial gerrymandering is therefore never permissible."); *see Ala. Legislative Black Caucus v. Alabama*, 575 U.S. 254, 279 (2015) (holding that it was erroneous for the Legislature and the district court to focus on the question, "How can we maintain present minority percentages in majority-minority districts?").

Here, Plaintiffs will suffer irreparable harm if the 2022 primary election is conducted under the unconstitutional maps for District 7, which would infringe upon Plaintiffs' "right to full and effective participation in the political processes." *Reynolds v. Sims*, 377 U.S. 533, 561–62 (1965). Because monetary remedies are inadequate to compensate for that injury, irreparable injury to their voting rights will ensue absent an injunction. *See, e.g., Fayette County*, 118 F. Supp. 3d at 1347–48; *Cox I*, 324 F. Supp. 2d at 1368; *Dillard v. Crenshaw County*, 640 F. Supp, at 1347, 1363 (M.D. Ala. 1986); *Harris v. Graddick*, 593 F. Supp. 128, 135 (M.D. Ala. 1984).

Moreover, the Supreme Court has long recognized that "[t]he right to vote freely for the candidate of one's choice is of the essence of a democratic society and any restrictions on that right strike at the heart of representative government." *Reynolds*, 377 U.S. at 555; *see Williams v. Rhodes*, 393 U.S. 23, 30 (1968) ("[T]he right of qualified voters … to cast their votes effectively … rank[s] among our most precious freedoms."); *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886) (the right to vote is "preservative of all rights"). In recognition of this fundamental principle, courts have repeatedly held that an infringement on the right to vote constitutes irreparable injury. *See, e.g., Dillard*, 640 F. Supp. at 1363; *Harris v. Graddick*, 593 F. Supp. 128, 135 (M.D. Ala. 1984).

21

### III.    The Balance of The Equities Weighs In Favor of Plaintiffs.

The irreparable injury that Plaintiffs will suffer absent an injunction outweighs any harm Defendant will suffer if the requested injunction is granted. Plaintiffs will suffer irreparable injury to their fundamental right to vote absent an injunction. *See Williams v. Rhodes*, 393 U.S. 23, 30 (1968) ("the right of qualified voters ... to cast their votes effectively ... rank[s] among our most precious freedoms."); *see also Scott,* 612 F.3d at 1295 (citation omitted). By contrast, any potential harm Defendant would face under the requested injunction would be substantially less, particularly in light of the schedule this Court has set to avoid any interference with relevant pre-election deadlines.

"If the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury, either by returning to the last uncontested status quo between the parties, by the issuance of a mandatory injunction, or by allowing the parties to take proposed action that the court finds will minimize the irreparable injury." *Fayette County*, 118 F. Supp. 3d at 1349 (quoting *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974)). Indeed, "once a State's legislative apportionment scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to insure [sic] that no further elections are conducted under the invalid plan." *Reynolds*, 377 U.S. at 585. Although the

requested injunction may "require additional efforts" on the part of Defendant, conducting the election using a constitutional plan that complies with the Voting Rights Act—by way of either the State adopting its own constitutional plan or by adopting Plaintiffs' Whole County Plan (or one of Plaintiffs' alternative plans)— would not be "impossible or unduly burdensome" before January 28, 2022. *See Fayette County*, 118 F. Supp. 3d at 1348. Additionally, if Defendant argues that the requested injunction would impose costs and burdens on the State, such burdens "cannot begin to compare with the further subjection of the [voters] to denial of their right, to full and equal political participation." *Dillard*, 640 F. Supp. at 1363.

Under the requested injunction, Defendant would not have to postpone any candidate qualifying dates or other pre-election deadlines. As the Court knows, Alabama law requires candidates seeking nomination in a party primary to declare their candidacies no later than 116 days before the primary election. Ala. Code § 17-13-5(a). In 2022, that deadline is January 28.[10] Moreover, the Alabama Legislature will be in regular session beginning on January 11, 2022.[11] Following the January 4 hearing on Plaintiffs' motion for a preliminary injunction, the Court should give the Legislature the opportunity to adopt new, race-neutral districts before the January 28

---

[10] The Alabama Secretary of State Administrative Calendar is located at the following link: https://www.sos.alabama.gov/sites/default/files/Admin%20Calendar%20-2022%20-%2020211012.pdf.
[11] *Id.*

deadline. Because time is of the essence, the Court should also order that if the Legislature does not adopt new, constitutional districts, the Court will adopt new districts that comply with the Constitution and the Voting Rights Act.

This Court's plan should give no deference to the racially gerrymandered Districts. *Abrams v. Johnson*, 521 U.S. 74, 85–86 (1997). It should accept slight deviations in population to accommodate Alabama's "strong historical preference" for not splitting counties. *Id*. at 99–100. And it should take account of the "significant degree of crossover voting" in the whole county Districts proposed by Plaintiffs. *Id*. at 92–94.

Plaintiffs' Whole County Plan preserves county boundaries (as every plan did from 1822 to 1965) while keeping population deviation to a minimum. Am. Compl. (ECF No. 15) at 29–32 ¶¶ 42–45. At 2.47%, Plaintiffs' proposed Whole County Plan has a smaller maximum population deviation than the 2.59% maximum deviation Alabama adopted in 1981, and a much smaller deviation than the 13.3% maximum deviation approved in 1965 by the three-judge district court in *Moore v. Moore*, 246 F. Supp. 578 (S.D. Ala. 1965). A court-ordered plan is "held to higher standards of population equality than legislative ones," *Abrams v. Johnson*, 521 U.S. 74, 98 (1997), but the Supreme Court has not decided exactly what those standards are. That said, the Supreme Court held in *Tennant v. Jefferson County Commission*, a case involving legislatively drawn Congressional districts, that higher deviations

were constitutionally permissible for the sake of preserving whole counties, even without the need to remedy a racial gerrymandering violation. 567 U.S. 758 (2012). Remedying a racial gerrymander, which the Alabama Legislature was obligated to do here, provides even greater justification for higher population deviations. In *Karcher v. Daggett*, another case that did not involve the more demanding racial gerrymandering standards, the Court suggested that acceptable population deviations for a Congressional redistricting plan can be determined by identifying those alternative plans which produce the lowest population deviations while respecting the state's policy of preserving political subdivisions. 462 U.S. 725, 739–40 (1983). "The showing required to justify population deviations is flexible, depending on the size of the deviations, the importance of the State's interests, the consistency with which the plan as a whole reflects those interests, and the availability of alternatives that might substantially vindicate those interests yet approximate population equality more closely. By necessity, whether deviations are justified requires case-by-case attention to these factors." *Id.* at 741. Given Alabama's long history of preserving county boundaries when possible, and the need to remedy a racial gerrymander, this Court would be within its discretion to adopt the Whole County Plan.

In the alternative, Plaintiffs request that the Court adopt one of their two other plans, one of which makes minor splits in three counties to achieve a 0.69%

maximum deviation, and the other of which makes minor splits in six counties to achieve zero deviation. Ex. A and Ex. B. (Plaintiffs' alternative proposals).

### IV.    The Injunction Would Not Be Adverse To The Public Interest.

Finally, the requested injunction would not be adverse to public interest. Plaintiffs and the citizens of Alabama have a fundamental right to "to cast their votes effectively." *Williams v. Rhodes*, 393 U.S. 23, 30 (1968) Additionally, "the protection of 'franchise-related rights is without question in the public interest,'" and in such a situation, public interest is "best served by ensuring … that all citizens … have an equal opportunity to elect the representatives of their choice." *Fayette County*, 118 F. Supp. 3d at 1349 (quoting *Cox II*, 408 F.3d at 1355). Plaintiffs' requested injunction would protect their franchise-related rights by allowing them to participate in elections using constitutionally drawn districts and ensure that citizens of Alabama have an equal opportunity to elect the representatives of their choice; thus, the requested injunction would be in the public interest. On the contrary, allowing the 2022 election cycle to proceed with the racially gerrymandered District 7 map does not further any public interest.

### CONCLUSION

Alabama's District 7 perpetuates an admitted racial gerrymander, without serving any compelling interest. Therefore, it cannot and should not be the basis for the 2022 election. The Court should adopt Plaintiffs' Whole County Plan (or in the

alternative, one of Plaintiffs' other proposals), which would go into effect on
January 28, 2022 if the State does not adopt its own constitutional plan by that date.

Dated: November 19, 2021                Respectfully submitted,

                                        /s/ James Uriah Blacksher
                                        James Uriah Blacksher
                                        825 Linwood Road
                                        Birmingham, AL 35222
                                        Tel: (205) 612-3752
                                        Fax: (866) 845-4395
                                        Email: jublacksher@gmail.com

                                        /s/ Joe R. Whatley, Jr.
                                        Joe R. Whatley, Jr.
                                        WHATLEY KALLAS, LLP
                                        2001 Park Place North
                                        1000 Park Place Tower
                                        Birmingham, AL 35203
                                        Tel: (205) 488-1200
                                        Fax: (800) 922-4851
                                        Email: jwhatley@whatleykallas.com

                                        /s/ Henry C. Quillen
                                        Henry C. Quillen
                                        (admitted pro hac vice)
                                        WHATLEY KALLAS, LLP
                                        159 Middle Street, Suite 2C
                                        Portsmouth, NH  03801
                                        Tel: (603) 294-1591
                                        Fax: (800) 922-4851
                                        Email: hquillen@whatleykallas.com

                                        /s/ Myron Cordell Penn
                                        Myron Cordell Penn
                                        PENN & SEABORN, LLC
                                        1971 Berry Chase Place
                                        Montgomery, AL 36117
                                        Tel: (334) 219-9771

Email: myronpenn28@hotmail.com

*/s/ Diandra "Fu" Debrosse Zimmmermann*
Diandra "Fu" Debrosse Zimmermann
Eli Hare
DICELLO LEVITT GUTZLER
420 20th Street North, Suite 2525
Birmingham, AL 35203
Tel.: (205) 855.5700
Email: fu@dicellolevitt.com
        ehare@dicellolevitt.com

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 19, 2021, I electronically filed the foregoing with the court's electronic system, which provides service on all counsel of record.

Edmund G. LaCour Jr.
James W. Davis
A. Reid Harris
Brenton M. Smith
Benjamin M. Seiss
Alexander Barrett Bowdre
Misty Shawn Fairbanks Messick
Thomas Alexander Wilson
State of Alabama
Office of the Attorney General
501 Washington Avenue
Montgomery, Alabama 36130
(334) 242-7300
(334) 353-8400 (fax)
Edmund.LaCour@AlabamaAG.gov
Jim.Davis@AlabamaAG.gov
Reid.Harris@AlabamaAG.gov
Brenton.Smith@AlabamaAG.gov
Ben.Seiss@AlabamaAG.gov
Barrett.Bowdre@alabamaAG.gov
Misty.Messick@AlabamaAG.gov
thomas.wilson@alabamaAG.gov

*Counsel for Secretary of State Merrill*

J. Dorman Walker
Balch & Bingham LLP
P O Box 78
Montgomery, AL 36101
334-834-6500
334-269-3115 (fax)

dwalker@balch.com [dwalker@balch.com](mailto:dwalker@balch.com)

*Counsel for Chris Pringle and Jim McClendon*

/s/ *Diandra "Fu" Debrosse Zimmmermann*
Counsel for Plaintiffs