FILED

2021 Dec-15  PM 04:53
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

**BOBBY SINGLETON et al.,**

      **Plaintiffs,**

v.                                                                          **Case No.: 2:21-cv-01291-AMM**

**JOHN H. MERRILL, in his official**                **Three-Judge Court**
**capacity as Alabama Secretary of State,**
**et al.,**

      **Defendants.**


## PLAINTIFFS' RENEWED MOTION FOR A PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW IN SUPPORT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................. iii

INTRODUCTION ............................................................................... 1

BACKGROUND ................................................................................. 3

    I.     The Origins of Alabama's Racial Gerrymander. ................................. 3

    II.    The 2021 Plan Perpetuates the Racial Gerrymander. ......................... 7

ARGUMENT ................................................................................... 10

    I.     Plaintiffs Are Entitled to a Preliminary Injunction Barring Secretary Merrill from Conducting Elections Under an Unconstitutional Plan. ...................................................... 10

          A.    Plaintiffs Are Likely To Prevail On The Merits Of Their Claim Of An Unconstitutional Racial Gerrymander. ............. 12

                  1.    A Racial Gerrymander Exists Where Race Predominates in the Design of A District. .................. 12

                  2.    Race Predominated in the Creation of District 7, Resulting in a Racial Gerrymander. ...................... 15

                  3.    The 2021 Plan Carried Forward and Made No Attempt to Remedy the Racial Gerrymander ...................... 16

                  4.    The Racially Gerrymandered District 7 Is Not Narrowly Tailored to Further a Compelling State Interest ...................................................... 18

          B.    Plaintiffs Will Suffer Irreparable Harm Absent an Injunction. ...................................................... 22

          C.    The Balance of The Equities Weighs In Favor of Plaintiffs. ...................................................... 24

          D.    The Injunction Would Not Be Adverse To The Public Interest. ...................................................... 26

II.     The Plaintiffs' Plans Are a Constitutional and Sensible Remedy for
        the Racial Gerrymander. ....................................................................27

        A.      The Plaintiffs' Plans Comply with the Supreme Court's
                "One Person, One Vote" Jurisprudence....................................32

        B.      The Plaintiffs' Plans Respect Communities of Interest,
                Including Counties and Municipalities, as Much as
                Possible. ....................................................................................35

        C.      The Plaintiffs' Plans Are About as Compact as the Enacted
                2011 and 2021 Plans. .................................................................37

        D.      The Plaintiffs' Plans Preserve the Cores of Existing Districts
                to the Extent Possible Without Perpetuating the Racial
                Gerrymander. .............................................................................37

        E.      The Plaintiffs' Plans Protect Incumbents to the Extent Possible
                Without Perpetuating the Racial Gerrymander or Radically
                Redrawing Districts. ..................................................................38

CONCLUSION .........................................................................................................40

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Perez*,
    138 S. Ct. 2305 (2018)........................................................................ 2, 21, 22

*Abrams v. Johnson*,
    521 U.S. 74 (1997)..............................................................................34

*Ala. Legislative Black Caucus v. Alabama*,
    575 U.S. 254 (2015)........................................................................ 13, 22

*Beer v. United States*,
    425 U.S. 130 (1976)..............................................................................7

*Bethune-Hill v. Va. State Bd. of Elections*,
    580 U.S. _____, 137 S. Ct. 788 (2017) .......................................... 13, 14, 15

*Bush v. Vera*,
    517 U.S. 952 (1996)..............................................................................13

*Canal Auth. of Fla. v. Callaway*,
    489 F.2d 567 (5th Cir. 1974) ..........................................................25

*Charles H. Wesley Educ. Found., Inc. v. Cox*,
    324 F. Supp. 2d 1358 (N.D. Ga. 2004)............................................ 11, 22, 23

*Charles H. Wesley Educ. Found., Inc. v. Cox*,
    408 F.3d 1349 (11th Cir. 2005) ............................................................ 11, 27

*Cooper v. Harris*, 137 S. Ct. 1455 (2017) ........................................................ passim

*Covington v. North Carolina*,
    283 F. Supp. 3d 410 (M.D.N.C. 2018),
    *aff'd in relevant part and reversed in part on other grounds*,
    138 S. Ct. 2548 (2018)............................................................................ 38, 39

*Cunningham v. Adams*,
    808 F.2d 815 (11th Cir. 1987) ............................................................ 11, 22

*Davis v. Chiles*,
    139 F.3d 1414 (11th Cir. 1998) ..............................................................15

*Dillard v. City of Greensboro*,
   870 F. Supp. 1031 (M.D. Ala. 1994)................................................ 23, 24, 25

*Easley v. Cromartie*,
   532 U.S. 234 (2001).....................................................................39

*Energy Four, Inc. v. Dornier Med. Sys., Inc.*,
   765 F. Supp. 724 (N.D. Ga. 1991)..................................................10

*Figures v. Hunt*,
   507 U.S. 901 (1993).....................................................................4, 5

*Ga. State Conf. of the N.A.A.C.P. v. Fayette Cty. Bd. of Com'rs*,
   118 F. Supp. 3d 1338 (N.D. Ga. 2015)...........................................22

*Georgia State Conf. NAACP v. Fayette Cnty. Bd. of Comm'rs*,
   118 F. Supp. 3d 1338 (N.D. Ga. 2015)...................................... 23, 24, 25, 27

*Harris v. Graddick*,
   593 F. Supp. 128 (M.D. Ala. 1984)................................................ 23, 24

*Jeffers v. Clinton*,
   756 F. Supp. 1195 (E.D. Ark. 1990) ..............................................39

*Karcher v. Daggett*,
   462 U.S. 725 (1983).....................................................................33

*Ketchum v. Byrne*,
   740 F.2d 1398 (7th Cir. 1984) ......................................................39

*Kirkpatrick v. Preisler*,
   394 U.S. 526 (1969).....................................................................33

*Miller v. Johnson*,
   515 U.S. 900 (1995)................................................... 1, 12, 13, 14

*Moore v. Moore*,
   246 F. Supp. 578 (S.D. Ala. 1965) ................................................32

*North Carolina v. Covington*,
   138 S.Ct. 2548 (2018)............................................. 2, 14, 21, 26

*Osmose, Inc. v. Viance, LLC,*
    612 F.3d 1298 (11th Cir. 2010) ....................................................................10

*Personhuballah v. Alcorn,*
    155 F. Supp. 3d 552 (E.D. Va. 2016) ...........................................................38

*Reynolds v. Sims,*
    377 U.S. 533 (1965)............................................................................... 23, 25

*Scott v. Roberts,*
    612 F.3d 1279 (11th Cir. 2010) ............................................................ 11, 22

*Shaw v. Reno,*
    509 U.S. 630 (1993)............................................................................ 6, 13, 38

*Shelby County v. Holder,*
    570 U.S. 529 (2013)...................................................................................7

*Tennant v. Jefferson County Commission,*
    567 U.S. 758 (2012)............................................................................... 32, 34

*Thornburg v. Gingles,*
    478 U.S. 30 (1986)......................................................................... 19, 21, 28

*United States v. Alabama,*
    791 F.2d 1450 (11th Cir. 1986) ..................................................................11

*United States v. Georgia,*
    892 F. Supp. 2d 1367 (N.D. Ga. 2012)................................................. 10, 11

*Vera v. Richards,*
    861 F. Supp. 1304 (S.D. Tex. 1994),
    *aff'd sub nom. Bush v. Vera*, 517 U.S. 952 (1996)........................................39

*Wesberry v. Sanders,*
    376 U.S. 1 (1964)..........................................................................................4

*Wesch v. Hunt*, 785 F. Supp. 1491 (S.D. Ala. 1992),
    *aff'd sub nom. Camp v. Wesch*, 504 U.S. 902 (1992) ........................... passim

*Williams v. Rhodes,*
    393 U.S. 23 (1968)......................................................................... 23, 24, 26

*Yick Wo v. Hopkins*,
  118 U.S. 356 (1886) ........................................................................23

**Statutes**

28 U.S.C. § 2284(b) ...........................................................................1

Ala. Code § 17-13-5(a) .....................................................................25

**Other Authorities**

Zachary L. Guyse,
  Note, Alabama's Original Sin: Property Taxes, Racism, and Constitutional
  Reform in Alabama, 65 Ala. L. Rev. 519, 532 (2013) ...................36

**Rules**

Fed. R. Civ. P. 65(a) ...........................................................................1

## INTRODUCTION

Pursuant to this Court's order, ECF No. 45, Plaintiffs Bobby Singleton et al. move for a preliminary injunction pursuant to Fed. R. Civ. P. 65(a), and 28 U.S.C. § 2284(b). This motion seeks preliminary relief with respect only to Count I of the Amended Complaint, i.e., racial gerrymandering.

Secretary Merrill has conceded in prior litigation that Alabama's 1992 Congressional districting plan was a racial gerrymander. All Defendants in this case have likewise stipulated that the predominant purpose of the 1992 plan was to draw a majority-Black district, which is the definition of a racial gerrymander. *Miller v. Johnson*, 515 U.S. 900, 916 (1995). Secretary Merrill has also conceded that the 2001 and 2011 plans were drawn the way they were because of race. Randolph Hinaman, who drew the 1992, 2011, and 2021 plans and consulted with the Legislature's Republicans on the 2001 plan, Ex. 1 (Hinaman Tr.) at 26:7–27:3, has testified that the 2011 plan can be traced back to the 1992 plan, that he used the 2011 plan as the starting point for the 2021 plan, and that he made no attempt to correct for the race-based line-drawing that characterized the 2011 plan and its predecessors. *Id.* at 39:12–16, 84:1–87:17. Secretary Merrill's own expert agrees that the approach to drawing the 2021 plan was to effect the "least change" from the 2011 plan. ECF No. 54-1 at 22. In short, the 2011 plan indisputably was a racial gerrymander, and no effort was made to remedy that gerrymander in the 2021 plan.

Recent decisions of the Supreme Court, including *Cooper v. Harris*, 137 S. Ct. 1455 (2017), *North Carolina v. Covington*, 138 S. Ct. 2548 (2018), and *Abbott v. Perez*, 138 S. Ct. 2305 (2018), hold that Section 2 of the Voting Rights Act cannot justify the perpetuation of a racially gerrymandered, majority-Black Congressional district when a legislature had no reason to believe that such a district was necessary to give Black voters the opportunity to elect the candidate of their choice. Here, the Alabama Legislature not only failed to perform any analysis that would have indicated that a single majority-Black district was necessary, but also absolved itself of any substantial involvement in the drawing of the plan, which it left to Mr. Hinaman and Alabama's Congressional delegation. Therefore, the racial gerrymander in the 2021 plan was unconstitutional.

The Legislature did not have to adopt an unconstitutional plan. Plaintiffs Rodger Smitherman and Bobby Singleton submitted to the Legislature three plans that eliminate the racial gerrymander and honor Alabama's traditional districting principle that Congressional districts should respect county boundaries where possible. They abide by the principle of "one person, one vote" as established by the Supreme Court, they connect Jefferson County to the counties with which it shared a district before it was large enough to form its own district, and they preserve the Black Belt as a community of interest better than the enacted plan. While these plans were drawn without gerrymandering, they nevertheless comply with Section 2 of the

Voting Rights Act by providing two effective opportunity districts with Black voting-age populations less than 50%. The Legislature essentially ignored these plans in favor of the unlawful racially gerrymandered plan it adopted.

Most of the evidence this Court will receive at the January 4 hearing will concern what remedy is required by the Constitution and the Voting Rights Act. First, because the racial gerrymander is unconstitutional, this Court should preliminarily enjoin Secretary Merrill from conducting the 2022 election using the enacted plan. Second, if this Court determines that the Legislature is entitled to an opportunity to remedy the racial gerrymander itself before the January 28 deadline for candidates to declare their candidacy, it can and should indicate that all three of the Plaintiffs' plans are constitutional. Third, because there is no guarantee that the Legislature will enact a constitutional plan, the Court should choose one of the Plaintiffs' three plans, and order that it will go into effect if the Legislature has not enacted a constitutional plan by January 28. These remedies will protect the constitutional rights of Alabama's voters.

## BACKGROUND

### I.     The Origins of Alabama's Racial Gerrymander

Alabama's Congressional districts did not divide counties from 1822 (when districts were first drawn) until 1965, when the Alabama Legislature split Jefferson County to comply with the Supreme Court's ruling that Congressional districts must

not have wide disparities in population. Stipulated Facts (ECF No. 47) ¶¶ 4, 9, 10 (citing *Wesberry v. Sanders*, 376 U.S. 1 (1964)). In 1965, splitting Jefferson County was unavoidable because its population exceeded the ideal population of a Congressional district by a significant margin. *Id.* ¶¶ 7, 10. In the 1965 plan and the plan following the 1970 census, Jefferson County was the only county in Alabama whose boundaries were split among multiple districts. *Id.* ¶ 11. In the plan following the 1980 census, only Jefferson and St. Clair Counties were split. *Id.* ¶ 13.

In 1992 a court-ordered plan, designed specifically to allocate voters by race, split several counties in District 7. Following the 1990 census, certain Black citizens of Alabama filed suit against State officials, alleging that the existing Congressional districts violated Section 2 of the Voting Rights Act by denying them "meaningful access to the voting process that would allow them to elect candidates of their choice." *Wesch v. Hunt*, 785 F. Supp. 1491, 1493 (S.D. Ala. 1992) (three-judge court), *aff'd sub nom. Camp v. Wesch*, 504 U.S. 902 (1992), *Figures v. Hunt*, 507 U.S. 901 (1993). The 1990 census data allegedly showed that "the African–American population in Alabama is sufficiently compact and contiguous to permit the creation of a congressional district in which 65% or more of the residents are African–Americans." *Id.* The parties to the suit "agree[d] that such a district should be created." *Id.* at 1493–94. The Alabama Legislature failed to enact a new districting plan in time for preclearance by the Department of Justice before the 1992

4

election, requiring the court to order a plan itself. *Id.* at 1494–95. The court accepted the stipulation of all parties that the Voting Rights Act justified the creation of that one majority-black Congressional district, without making a judicial finding that the agreed upon plan actually was justified by Section 2 of the Voting Rights Act. *Id.* at 1499. Ultimately, the court adopted a plan that concentrated Black citizens in District 7, where they constituted 67.53% of the population. *Id.* at 1581. To do so, the plan split Jefferson, Tuscaloosa, Montgomery, Clarke, and Pickens Counties, placing a relatively large share of Black citizens in District 7 and a relatively small share in other districts. *Id.* at 1582.[1] Among the ways this split manifests on the map are a "finger" reaching into Jefferson County to encompass the Black population of Birmingham while mostly avoiding the relatively White northern and southern suburbs; a line through the City of Tuscaloosa that places the relatively Black southern portion in District 7 and largely excludes the relatively White northern portion; and the inclusion of the predominantly Black western portion of Montgomery County but not the predominantly White eastern portion. *See id.* The court's overriding concern was explicitly racial; it honored the parties' stipulation that District 7 be at least 65% Black, and its opinion included 79 pages of tables that

---

[1] The population of Jefferson County in District 7 was 75% Black, compared to 35% in the county overall. Disparities also existed for Tuscaloosa County (40% v. 26%), Montgomery County (80% v. 42%), Clarke County (56% v. 43%), and Pickens County (75% v. 42%). *Wesch*, 785 F. Supp. at 1505–07, 1558, 1569, 1575, 1577, 1581.

described the population of each district by race and no other attribute. *Id.* at 1498–99, 1503–81.

In 2019, Secretary Merrill conceded that the 1992 court-approved plan would violate the prohibition of racial gerrymandering first announced by the Supreme Court a year after *Wesch* was decided. *See Shaw v. Reno*, 509 U.S. 630 (1993). In his pretrial brief in *Chestnut v. Merrill*, he stated,

> District 7 appears to be racially gerrymandered, with a finger sticking up from the black belt for the sole purpose of grabbing the black population of Jefferson County. Defendant does not believe that the law would permit Alabama to draw that district today if the finger into Jefferson County was for the predomina[nt] purpose of drawing African American voters into the district. Alabama did so in the early 1990s as part of a consent decree ….

*Chestnut v. Merrill*, No. 2:18-CV-00907-KOB (N.D. Ala. Oct. 28, 2019), ECF No. 101 at 11 ("*Chestnut* Br."). (Secretary Merrill and the other Defendants have stipulated here that the 1992 plan split Jefferson County and other counties "for the predominant purpose of drawing a one majority-black District." ECF No. 47 at ¶ 14.) Secretary Merrill also admitted in *Chestnut* that the State carried forward the racial gerrymander in the plans that followed the 2000 and 2010 censuses: "once the district existed, Alabama had to continue to draw the district in order to comply with Section 5's anti-retrogression requirement." *Id.* at 11–12; *see also* Am. Compl. (ECF No. 15) at 9, 28 (maps of the 2002 and 2011 plans). Here, Secretary Merrill was referring to Section 5 of the Voting Rights Act, whose purpose "has always been to

insure that no voting-procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Beer v. United States*, 425 U.S. 130, 141 (1976).

Randolph Hinaman, who drew the 1992 plan adopted in *Wesch*, consulted with the Legislature's Republicans on the 2001 plan, and drew the 2011 and 2021 plans, recently confirmed what Secretary Merrill has admitted: that the 2001, 2011, and 2021 plans perpetuated the basic features of the 1992 plan. Ex. 1 at 39:12–16. Mr. Hinaman's testimony is unsurprising, given the near-total resemblance of the 1992 and 2011 plans. With just one exception, District 7 in both plans contains the same whole counties and the same split counties, reaching into Jefferson, Tuscaloosa, and Montgomery Counties to draw Black voters into the district.[2]

## II.     The 2021 Plan Perpetuates the Racial Gerrymander.

Alabama was prohibited from making such changes without preclearance from the Department of Justice until 2013, when the Supreme Court held the coverage formula in Section 4 of the Voting Rights Act unconstitutional in *Shelby County v. Holder*, 570 U.S. 529 (2013). As Secretary Merrill explained in 2019,

---

[2] The exception is Pickens County, which was split between Districts 4 and 7 in the 1992 plan but was entirely within District 7 in the 2011 plan. Am. Compl. (ECF No. 15) at 9, 26 (maps of the 1992 and 2011 plans). According to the Census Bureau, the population of Pickens County was 19,746 in 2010, meaning the change affected a small portion of the approximately 683,000 people in the district.

"Today, with Section 5 effectively tabled, Alabama has more liberty to draw its districts differently." *Chestnut* Br. at 12.

Despite this newfound liberty, Alabama's 2021 plan draws District 7 strikingly similarly to its prior racially gerrymandered versions. The most noticeable change is that the new district is geographically larger, which was unavoidable because the existing district's population was 53,143 people below the population of an ideal district. Am. Compl. (ECF No. 15) at 39 ¶ 57; *id.* at 9, 36; *see* Ex. 1 (Hinaman Tr.) at 211:16–22. Nevertheless, it retains key features of the racial gerrymander. The new District 7 "retains all or part of the same fourteen counties contained in District 7 in the 2011 plan, including the majority-Black rural counties, Sumter, Greene, Hale, Perry, Marengo, Dallas, Wilcox, and Lowndes." ECF No. 47 ¶ 19. It still reaches into Jefferson County to encompass the Black population of Birmingham while mostly avoiding the relatively White northern and southern suburbs. Am. Compl. (ECF No. 15) at 36 (2021 map). It still draws a line through the City of Tuscaloosa that places the relatively Black southern portion in District 7 and largely excludes the relatively White northern portion. *Id.* And it still reaches into the predominantly Black western portion of Montgomery County but not the

predominantly White eastern portion. *Id.*[3] These continuing features of the district were undisputedly created in 1992 as part of a redistricting plan driven by race.

Mr. Hinaman did not attempt to remedy the race-driven design of the 2011 plan when he drafted the 2021 plan. Ex. 1 (Hinaman Tr.) at 94:5–11, 97:20–98:23, 142:13–143:12. Instead, he took the 2011 plan as his starting point, and asked the members of Alabama's Congressional delegation where they preferred to gain or lose constituents in order to maintain equally populated districts. *Id.* at 68:14–73:19, 84:1–85:18, 102:23–105:7. No member of the Alabama Legislature had any substantive involvement with the creation of the 2021 plan. *Id.* at 87:12–17. With limited exceptions, Mr. Hinaman kept the 2021 plan as close to the 2011 plan as possible.[4] Secretary Merrill's own expert has described the 2021 plan as a "least change approach," and pointed out that approximately 90% of the total population and 90% of the Black population of District 7 in 2011 remained there in 2021. Report of Thomas M. Bryan (ECF No. 54-1) at 22. Mr. Hinaman's testimony and the expert's report are consistent with the maps themselves, which show only marginal changes in the shapes of all seven districts. *Compare* Am. Compl. (ECF No. 15 at 9

---

[3] The new District 7 eliminates the split in Clarke County, but this change affects only about 1% of the district's population.

[4] Mr. Hinaman said that he allocated certain precincts based on a Representative's specific request. For example, at Representative Sewell's request, he unified the Acadome precinct in District 7 and removed the Whitfield precinct. Ex. 1 at 103:9–104:7; *see also id.* 113:25–117:1 (other requests from Representative Sewell). He also removed the northeasternmost precincts in Jefferson County from District 7 and added precincts in Homewood and southwestern Jefferson County to increase the compactness of the district. *Id.* at 132:2–19.

(2011 map) *with id.* at 36 (2021 map). The Black Voting Age Population in District 7 did decrease from about 60% to 54%, but not through any conscious effort on Mr. Hinaman's part. Ex. 1 (Hinaman Tr.) at 74:9–14, 97:20–99:25, 100:8–101:3, 142:13–22. In short, in 2021 no one attempted to remedy the racial gerrymander that began in 1992 and carried through to the 2011 plan. In fact, they did the opposite: they tried to keep the 2011 plan intact.

## ARGUMENT

### I.    Plaintiffs Are Entitled to a Preliminary Injunction Barring Secretary Merrill from Conducting Elections Under an Unconstitutional Plan.

To prevail on a motion for a preliminary injunction, Plaintiffs must show: (1) a substantial likelihood that they will succeed on the merits; (2) that the preliminary injunction is necessary to prevent irreparable injury; (3) that the threatened injury absent an injunction outweighs the injury an injunction may impose on Defendant; and (4) that the injunction would not be adverse to the public interest. *See Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1307 (11th Cir. 2010); *Energy Four, Inc. v. Dornier Med. Sys., Inc*., 765 F. Supp. 724, 732 (N.D. Ga. 1991). The decision to grant preliminary injunctive relief is within the broad discretion of the district court. *See United States v. Georgia*, 892 F. Supp. 2d 1367, 1372 (N.D. Ga. 2012) (granting motion for preliminary injunction).

The purpose of a preliminary injunction is "to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *United States v. Alabama*, 791 F.2d 1450, 1459 (11th Cir. 1986) (affirming preliminary injunction). An injury is considered to be irreparable "if it cannot be undone through monetary remedies." *Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010); *Cunningham v. Adams*, 808 F.2d 815, 821 (11th Cir. 1987); *see also Charles H. Wesley Educ. Found., Inc. v. Cox*, 324 F. Supp. 2d 1358, 1368 (N.D. Ga. 2004) (*Cox I*), *aff'd*, 408 F.3d 1349 (11th Cir. 2005) (*Cox II*) ("no monetary award can remedy the fact that [plaintiff] will not be permitted to vote in the precinct of her new residence."); *see also United States v. Georgia*, 892 F. Supp. 2d 1367, 1377 (N.D. Ga. 2012) (entering a preliminary injunction where "the potential deprivation of the ability to vote, the most basic of American citizens' rights, outweigh[ed] the cost and inconvenience" that the state might suffer, which were comparatively minor).

As explained below, injunctive relief is warranted because all four elements strongly weigh in Plaintiffs' favor. Plaintiffs are likely to succeed on the merits. They will suffer irreparable harm if the 2022 elections conducted using constitutionally infirm districts. The balance of hardships weighs in favor of Plaintiffs as well: Alabamians' fundamental right to vote would be infringed absent an injunction, outweighing any burden that Defendant might experience in

11

complying with the requested injunction. And the requested injunction would serve the public interest because protecting the right to vote is unquestionably in the public interest.

### A. Plaintiffs Are Likely To Prevail On The Merits Of Their Claim Of An Unconstitutional Racial Gerrymander.

#### 1. A Racial Gerrymander Exists Where Race Predominates in the Design of a District.

A claim of racial gerrymandering requires "a two-step analysis." *Cooper v. Harris*, 137 S. Ct. 1455, 1463 (2017). "First, the plaintiff must prove that 'race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district.'" *Id.* (quoting *Miller v. Johnson*, 515 U.S. 900, 916 (1995)). "Second, if racial considerations predominated over others, the design of the district must withstand strict scrutiny. The burden thus shifts to the State to prove that its race-based sorting of voters serves a 'compelling interest' and is 'narrowly tailored' to that end." *Id.* at 1464 (citations omitted). Here, the new District 7 closely resembles previous districts undisputedly drawn with race as the predominant factor. No compelling interest requires this; a racial gerrymander of District 7 is unnecessary to comply with the Voting Rights Act. Therefore, the 2021 redistricting plan violates the Constitution.

The Equal Protection Clause of the Fourteenth Amendment "prohibits a State, without sufficient justification, from 'separat[ing] its citizens into different voting

districts on the basis of race.'" *Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 792 (2017) (citing *Miller v. Johnson*, 515 U.S. 900, 911 (1995)). "A racial gerrymandering claim … applies to the boundaries of individual districts." *Ala. Legislative Black Caucus v. Alabama*, 575 U.S. 254, 263 (2015). The Supreme Court has explained that the harms of a racial gerrymander "are personal. They include being 'personally … subjected to [a] racial classification,' as well as being represented by a legislator who believes his 'primary obligation is to represent only the members' of a particular racial group." *Ala. Legis. Black Caucus*, 575 U.S. 263 (quoting *Bush v. Vera*, 517 U.S. 952, 957 (1996) (O'Connor, J.) and *Shaw v. Reno*, 509 U.S. 630, 648 (1993)).

Importantly, the Supreme Court has explained that, even if the state's ultimate aim is a partisan one, the use of race as a proxy for partisanship triggers strict scrutiny:

> [I]f legislators use race as their predominant districting criterion with the end goal of advancing their partisan interests … their action still triggers strict scrutiny. In other words, the sorting of voters on the grounds of their race remains suspect even if race is meant to function as a proxy for other (including political) characteristics.

*Cooper v. Harris*, 137 S. Ct. at 1473 n.7 (citations omitted); *id*. at 1464 n.1 (noting that a plaintiff succeeds in showing that race predominated "even if the evidence reveals that a legislature elevated race to the predominant criterion in order to advance other goals, including political ones"); *see also Vera*, 517 U.S. at 968 ("[T]o

the extent that race is used as a proxy for political characteristics, a racial stereotype requiring strict scrutiny is in operation.").

To prevail on a racial gerrymandering claim, the plaintiff must first show "that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Bethune-Hill*, 137 S. Ct. at 797 (citing *Miller*, 515 U.S. at 916). If the plaintiff shows that race was the predominant factor, "the burden shifts to the State to 'demonstrate that its districting legislation is narrowly tailored to achieve a compelling interest.'" *Bethune-Hill*, 137 S. Ct. at 801 (citing *Miller*, 515 U.S. at 920).

To satisfy the "race as predominant factor" requirement, the plaintiff "must prove that the legislature subordinated traditional race-neutral districting principles … to racial considerations." *Bethune-Hill*, 137 S. Ct. at 801. Further, the fact that the lines in question could have been drawn with race-neutral criteria does not preclude a finding that race was the predominant factor used to draw the district boundaries. *Id*. at 799 ("The racial predominance inquiry concerns the actual considerations that provided the essential basis for the lines drawn, not post hoc justifications the legislature in theory could have used but in reality did not"); accord, *North Carolina v. Covington*, 138 S.Ct. 2548, 2553 (2018) ("The defendants' insistence that the 2017 legislature did not look at racial data in drawing remedial districts does little to undermine the District Court's conclusion—based on evidence

concerning the shape and demographics of those districts—that the districts unconstitutionally sort voters on the basis of race.") (citation omitted).

To prove that race was the predominant factor in a redistricting decision, the plaintiff may rely on "'direct evidence' of legislative intent, 'circumstantial evidence of a district's shape and demographics,' or a mix of both." *Cooper*, 137 S. Ct. at 1464 (citation omitted); *see Davis v. Chiles*, 139 F.3d 1414, 1424 (11th Cir. 1998) ("A court may base such a finding either on circumstantial evidence regarding a district's shape and demographics or on direct evidence of a district-drawer's purpose."). Redistricting maps that violate traditional redistricting principles, for example, may constitute evidence of an unconstitutional racial gerrymander. *See Bethune-Hill*, 137 S. Ct. at 799 ("In general, legislatures that engage in impermissible race-based redistricting will find it necessary to depart from traditional principles in order to do so.").

### 2. Race Predominated in the Creation of District 7, Resulting in a Racial Gerrymander.

The Defendants have stipulated that race was the predominant factor when the district court adopted District 7 in 1992. ECF No. 47 ¶ 14. As described above, the court in *Wesch* accepted the parties' stipulation that the district's population should be at least 65% Black, and it chose a plan that split an unprecedented number of counties in order to include their relatively Black areas while excluding relatively White ones. Although the court reviewed other aspects of the plans it considered,

such as "the desirability of preserving compactness, cores of all districts, communities of interest, and political subdivisions," *Wesch*, 785 F. Supp. at 1499, these were secondary to the overriding objective that the district be at least 65% Black.

Secretary Merrill has admitted that race also drove Alabama's redistricting plans after the 2000 and 2010 censuses as well. These plans, which left District 7 largely intact,[5] were drawn allegedly to avoid retrogression—in other words, to keep the Black population high enough to avoid running afoul of the preclearance requirement of Section 5 of the Voting Rights Act. *See supra* pp. 6–7. Thus, both the 2001 and 2011 plans were racial gerrymanders as well.

### 3. The 2021 Plan Carried Forward and Made No Attempt to Remedy the Racial Gerrymander.

As Mr. Hinaman testified, the 2021 plan started with the 2011 plan and added or subtracted population from each district to maintain population equality, subject to the political desires of the Congressional delegation. No attempt whatsoever was made to remedy the racial gerrymander inherent in the 2011 plan. Of the residents of the previous District 7, about 90% will remain in the new District 7. The "eye test" also indicates that the districts are largely the same: they still carve up

---

[5] The most notable exception was the transfer of Lowndes County and a portion of western Montgomery County to District 2 following the 2000 census. Am. Compl. (ECF No. 15) at 28 (2002 map). Lowndes County and another portion of western Montgomery County returned to District 7 following the 2010 census. *Id.* at 9 (2011 map).

Montgomery, Tuscaloosa, and Jefferson Counties in similar ways that result in a high concentration of Black voters in the district. In fact, 74% of the Black population in District 7 comes from those three counties. ECF No. 47 ¶ 20.[6] These observations are consistent with the evidence that the new redistricting plan was designed largely to preserve existing districts. Strict scrutiny applies to the Legislature's decision to adopt it. *Cooper v. Harris*, 137 S. Ct. at 1464.

To be sure, the new District 7 is not identical to the previous one. Many precincts have been added because the population needed to be increased by about 53,000. The "finger" that reaches into Jefferson County has been blunted somewhat by moving the Center Point area into District 6 and adding other Jefferson County precincts to District 7, but Mr. Hinaman testified that this change was made to increase to compactness of the district. Ex. 1 (Hinaman Tr.) at 132:29–19. Nevertheless, the new District 7 is mostly the same as the previous one.

The Defendants may argue that these marginal changes to District 7 defeat its status as a racial gerrymander. The best response is from Secretary Merrill himself: "The answer to the question of how much racial gerrymandering is okay is 'zero.'" *Chestnut* Br. at 11. The vast majority of the district is drawn the way it is because of a racial gerrymander; most of the people in the district are there primarily because

---

[6] The portion of Jefferson County in District 7 is 62.8% Black, compared to 27.6% for the rest of the county. ECF No. 47 ¶ 21. There are wide disparities in Tuscaloosa County (37.0% v. 8.3%) and Montgomery County (80.7% v. 50.2%) as well. *Id.* ¶¶ 22–23.

of their race. Adding voters to the district (which was required anyway to maintain population equality) and moving a small fraction of voters out of the district does not change that fact. District 7 will constitute a racial gerrymander until the Legislature or this Court redraws it using traditional districting principles that comply with the Constitution. As Secretary Merrill said, "The DOJ-required discrimination of 1992 cannot excuse new discrimination in 2021." *Id.* at 12.

>    **4.    The Racially Gerrymandered District 7 Is Not Narrowly Tailored to Further a Compelling State Interest.**

As Secretary Merrill has conceded, whether or not compliance with the Voting Rights Act may have justified packing Black voters into a single Congressional district in 1992, it cannot justify further perpetuating the packed majority-Black District 7.[7] The new District 7 maintains a BVAP of approximately 54%—far higher than might be necessary to comply with the Voting Rights Act.

Here, the Legislature simply ignored the Supreme Court's decision in *Cooper v. Harris*, which held that a Congressional redistricting plan does not violate the Voting Rights Act just because it does not have a District with a BVAP majority. North Carolina contended that to avoid a Voting Rights Act violation it had to add

---

[7] In fact, it is Secretary Merrill's position—with which Plaintiffs do not agree—that compliance with the Voting Rights Act can *never* be a compelling state interest that justifies a racial gerrymander. *Chestnut* Br. at 8 ("The Fourteenth Amendment trumps a statute, and it is not okay to violate a voter's Constitutional rights through racial sorting even if Congress purports to require it.").

Black voters to districts that were 48% and 43% BVAP until they exceeded 50%. The Supreme Court rejected this argument and held that the 50% BVAP Districts were unconstitutional racial gerrymanders, because there was enough white crossover voting in the 48% and 43% BVAP Districts to provide black voters an equal opportunity to elect the candidates of their choice. 137 S. Ct. at 1465–66.[8]

Under *Cooper v. Harris*, to establish a Voting Rights Act violation, all three preconditions in *Thornburg v. Gingles*, 478 U.S. 30 (1986), must be satisfied. First, a "minority group" must be "sufficiently large and geographically compact to constitute a majority" in some reasonably configured legislative district. *Id.* at 50. Second, the minority group must be "politically cohesive." *Id.* at 51. And third, "a district's white majority must 'vote[] sufficiently as a bloc' to usually 'defeat the minority's preferred candidate.'" *Cooper v. Harris*, 137 S. Ct. at 1470 (quoting *Gingles*, 478 U.S. at 51).

Plaintiffs' proposed Whole County Plan, which was introduced in the Legislature but rejected, shows that the third *Gingles* precondition is not satisfied. That plan contains two districts with Black registered voter percentages of 49.9%

---

[8] Attorney Dorman Walker, who represents the Intervenor-Defendants in this case, made this mistake at a recent public hearing at Lurleen B. Wallace Community College, stating, "The Voting Rights Act, section two, requires the drawing of a majority minority district -- and I'll just say a minority black district is what it's going to be in Alabama -- if it's possible to do so." Ex. 2, Public Hearing Tr. at 24; *see also* Ex. 3 (Counsel's Talking Points) at RC 045527 (indicating erroneously that the Whole County Plan violates the Voting Rights Act because no district has a BVAP over 50%).

and 42.3% in which Black voters' preferred candidates would have prevailed in previous elections, many by substantial margins. Am. Compl. (ECF No. 15) at 29–31 ¶¶ 42–43. The Defendants have stipulated that the following candidates received more votes in those two districts in elections since the 2010 census. ECF No. 47 ¶ 28.[9]

| Year | Office | Candidate |
|------|--------|-----------|
| 2012 | President | Barack Obama |
| 2014 | Lieutenant Governor | James Fields |
| 2014 | Auditor | Miranda Joseph |
| 2017 | U.S. Senate | Doug Jones |
| 2018 | Lieutenant Governor | Will Boyd |
| 2018 | Auditor | Miranda Joseph |
| 2020 | President | Joe Biden |
| 2020 | U.S. Senate | Doug Jones |

The Defendants have also stipulated that Representative Terri Sewell, who is Black, received 72.4% of the votes in her 2010 election, when the BVAP of her district was 59.75%, and that she received 75.8% of the votes in her 2012 election, when the BVAP of her district was 60.55% (using 2010 census figures). *Id.* ¶¶ 29–30. Therefore, crossover voting allowed Representative Sewell to outperform her district's BVAP by about 12 to 15 percentage points. Given the prevalence of

---

[9] The Defendants' expert M.V. Hood, III creates a statistical model in which, given certain assumptions about the demographic makeup of District 7 in the Plaintiffs' Whole County Plan and voter turnout, Joe Biden would have received only 49.13% of the votes in that district in the 2020 Presidential election. ECF No. 54-4 at 11. He never explains why a model is superior to simply looking at actual election returns, in which Biden won 54% of the votes in that district. In any event, Plaintiffs are not required to show that the preferred candidate of Black votes would always prevail—only that White bloc voting does not usually defeat that candidate.

crossover voting, it cannot be said that "a district's white majority … [votes] sufficiently as a bloc' to usually 'defeat the minority's preferred candidate.'" *Cooper v. Harris*, 137 S. Ct. at 1470 (quoting *Gingles*, 478 U.S. at 51); *accord North Carolina v. Covington*, 138 S.Ct. 2548, 2550 (2018) ("A group of plaintiff voters, appellees here, alleged that the General Assembly racially gerrymandered their districts when—in an ostensible effort to comply with the requirements of the Voting Rights Act of 1965—it drew 28 State Senate and State House of Representatives districts comprising **majorities** of black voters. The District Court granted judgment to the plaintiffs, and we summarily affirmed that judgment.") (emphasis added) (citation omitted).

In *Abbott v. Perez*, the Supreme Court cited *Cooper v. Harris* when it held that Texas had not shown good reasons to draw a racially gerrymandered District without showing that doing so was necessary to create an opportunity for minority voters to elect their preferred candidates: "North Carolina argued that its race-based decisions were necessary to comply with § 2, but the State could point to 'no meaningful legislative inquiry' into 'whether a new, enlarged' district, 'created without a focus on race, ... could lead to § 2 liability.'" 138 S. Ct. 2305, 2334–35 (quoting *Cooper v. Harris*, 137 S. Ct. at 1471). Mr. Hinaman, who drafted the 2021 plan, testified that he was unaware of the Legislature performing any racial polarization analysis to justify the creation of a majority-minority district. Ex. 1

21

(Hinaman Tr.) at 167:23–168:1. In fact, based on his testimony, it appears that the Legislature relied entirely on the advice of counsel for the Reapportionment Committee that Section 2 of the Voting Rights Act required a majority-minority district. Ex. 3 (Counsel's Talking Points) at RC 045527. Under *Abbott v. Perez*, such conclusions, with no basis in analysis, cannot save a racial gerrymander.[10]

### B.  Plaintiffs Will Suffer Irreparable Harm Absent An Injunction.

In the absence of the requested injunction, Plaintiffs will suffer irreparable harm. "An injury is irreparable 'if it cannot be undone through monetary remedies.'" *Scott*, 612 F.3d at 1295 (quoting *Cunningham v. Adams*, 808 F.2d 815, 821 (11th Cir. 1987)). Recognizing this well-settled principle of law, courts considering motions for preliminary injunctions have repeatedly found that state actions infringing on the right to vote constitute irreparable injury. *See, e.g., Fayette County Ga. State Conf. of the N.A.A.C.P. v. Fayette Cty. Bd. of Com'rs*, 118 F. Supp. 3d 1338, 1347–18 (N.D. Ga. 2015) (Batten, J.) (holding that plaintiffs established irreparable harm if forced to vote using an election system that would dilute their votes); *Cox I*, 324 F. Supp. 2d at 1368 (holding that the defendant's refusal to accept

---

[10] As Secretary Merrill has conceded, Section 5 of the Voting Rights Act also cannot justify racial gerrymandering in order to produce a majority BVAP district. *Chestnut* Br. at 12 ("Today, with Section 5 effectively tabled, Alabama has more liberty to draw its districts differently."); *id.* ("Racial gerrymandering is therefore never permissible."); *see Ala. Legislative Black Caucus v. Alabama*, 575 U.S. 254, 279 (2015) (holding that it was erroneous for the Legislature and the district court to focus on the question, "How can we maintain present minority percentages in majority-minority districts?").

plaintiff's voter registration in her precinct of residence, preventing her from voting in an upcoming election, constituted irreparable injury); *see also Dillard v. City of Greensboro*, 870 F. Supp. 1031, 1035 (M.D. Ala. 1994) (in denying defendant's motion for a stay pending appeal of the district court's injunction remedying a violation of Section 2 of the Voting Rights Act, holding that "monetary remedies would be inadequate compensation for the plaintiffs").

Here, Plaintiffs will suffer irreparable harm if the 2022 election is conducted under the unconstitutional maps for District 7, which would infringe Plaintiffs' "right to full and effective participation in the political processes." *Reynolds v. Sims*, 377 U.S. 533, 561–62 (1965). Because monetary remedies are inadequate to compensate for that injury, irreparable injury to their voting rights will ensue absent an injunction. *E.g., Fayette County*, 118 F. Supp. 3d at 1347–48; *Cox I*, 324 F. Supp. 2d at 1368; *Dillard v. Crenshaw County*, 640 F. Supp, at 1347, 1363 (M.D. Ala. 1986); *Harris v. Graddick*, 593 F. Supp. 128, 135 (M.D. Ala. 1984).

Moreover, the Supreme Court has long recognized that "[t]he right to vote freely for the candidate of one's choice is of the essence of a democratic society and any restrictions on that right strike at the heart of representative government." *Reynolds*, 377 U.S. at 555; *see Williams v. Rhodes*, 393 U.S. 23, 30 (1968) ("[T]he right of qualified voters … to cast their votes effectively … rank[s] among our most precious freedoms."); *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886) (the right to

vote is "preservative of all rights"). In recognition of this fundamental principle, courts have repeatedly held that an infringement on the right to vote constitutes irreparable injury. *E.g., Dillard*, 640 F. Supp. at 1363; *Harris v. Graddick*, 593 F. Supp. 128, 135 (M.D. Ala. 1984).

### C.     The Balance of The Equities Weighs In Favor of Plaintiffs.

The irreparable injury that Plaintiffs will suffer absent an injunction outweighs any harm Defendant will suffer if the requested injunction is granted. Plaintiffs will suffer irreparable injury to their fundamental right to vote absent an injunction. *See Williams v. Rhodes*, 393 U.S. 23, 30 (1968) ("the right of qualified voters ... to cast their votes effectively ... rank[s] among our most precious freedoms."); *see also Scott,* 612 F.3d at 1295 (citation omitted). By contrast, any potential harm Defendant would face under the requested injunction would be substantially less, particularly in light of the schedule this Court has set to avoid any interference with relevant pre-election deadlines.

"If the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury, either by returning to the last uncontested status quo between the parties, by the issuance of a mandatory injunction, or by allowing the parties to take proposed action that the court finds will minimize the irreparable injury." *Fayette County*, 118 F. Supp. 3d at 1349 (quoting *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 576

(5th Cir. 1974)). Indeed, "once a State's legislative apportionment scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan." *Reynolds*, 377 U.S. at 585. Although the requested injunction may "require additional efforts" on the part of Defendant, conducting the election using a constitutional plan that complies with the Voting Rights Act—by way of either the State adopting its own constitutional plan or by adopting Plaintiffs' Whole County Plan (or one of Plaintiffs' alternative plans)— would not be "impossible or unduly burdensome" before January 28, 2022. *See Fayette County*, 118 F. Supp. 3d at 1348. Additionally, if Defendant argues that the requested injunction would impose costs and burdens on the State, such burdens "cannot begin to compare with the further subjection of the [voters] to denial of their right, to full and equal political participation." *Dillard*, 640 F. Supp. at 1363.

Under the requested injunction, Defendant would not have to postpone any candidate qualifying dates or other pre-election deadlines. As the Court knows, Alabama law requires candidates seeking nomination in a party primary to declare their candidacies no later than 116 days before the primary election. Ala. Code § 17-13-5(a). In 2022, that deadline is January 28.[11] Moreover, the Alabama Legislature

---

[11] The Alabama Secretary of State Administrative Calendar is located at the following link: https://www.sos.alabama.gov/sites/default/files/Admin%20Calendar%20-2022%20-%2020211012.pdf.

will be in regular session beginning on January 11, 2022.[12] Following the January 4 hearing on Plaintiffs' motion for a preliminary injunction, the Court should determine if there is time to give the Legislature the opportunity to adopt new, constitutional districts in time to give potential candidates sufficient notice before the January 28 deadline. The Court should not risk giving the Legislature "a second bite of the apple" if doing so would "further draw out these proceedings and potentially interfere with the 20[22] election cycle." *North Carolina v. Covington*, 138 S. Ct. 2548, 2554 (2018). Because time is of the essence, the Court should also order that if the Legislature does not timely adopt new, constitutional districts, the Court will adopt one of the Plaintiffs' race-neutral plans until such time as the Legislature adopts its own plan that complies with the Constitution. This remedy respects both the Legislature's prerogative to conduct redistricting and the constitutional right of Alabama citizens to vote in Congressional districts untainted by racial gerrymandering.

### D.   The Injunction Would Not Be Adverse To The Public Interest.

Finally, the requested injunction would not be adverse to public interest. Plaintiffs and the citizens of Alabama have a fundamental right to "to cast their votes effectively." *Williams v. Rhodes*, 393 U.S. 23, 30 (1968) Additionally, "the

---

[12] *Id.*

protection of 'franchise-related rights is without question in the public interest,'" and in such a situation, public interest is "best served by ensuring … that all citizens … have an equal opportunity to elect the representatives of their choice." *Fayette County*, 118 F. Supp. 3d at 1349 (quoting *Cox II*, 408 F.3d at 1355). Plaintiffs' requested injunction would protect their franchise-related rights by allowing them to participate in elections using constitutionally drawn districts and ensure that citizens of Alabama have an equal opportunity to elect the representatives of their choice; thus, the requested injunction would be in the public interest. On the contrary, allowing the 2022 election cycle to proceed with the racially gerrymandered District 7 map does not further any public interest.

## II.     The Plaintiffs' Plans Are a Constitutional and Sensible Remedy for the Racial Gerrymander.

This Court should enjoin the use of the current Congressional plan, and give the Legislature an opportunity to enact a new, constitutional plan. Two questions remain, then. First, how can the Legislature know whether a particular plan is constitutional? Second, if the Legislature fails to enact a constitutional plan (or any plan at all) in time for candidates to meet the January 28 deadline, what plan should govern the 2022 elections? The Plaintiffs' proposed plans answer both questions. First, while the Court cannot direct the Legislature to adopt any particular plan, it can hold that the Plaintiffs' three plans are constitutional and in compliance with the Voting Rights Act, which would give the Legislature useful guidance and the

27

assurance that it has options the Court will accept. Second, the Court should order that one of the Plaintiffs' three plans will govern the 2022 elections if the Legislature does not enact a constitutional plan by January 28.

The Court-ordered plan should:

(1) restore Alabama's traditional districting principle of using whole counties as the building blocks of districts;

(2) remedy the racial gerrymander of  District 7 and modify other districts to the extent they are impacted by the changes to District 7; and

(3) ensure that the remedial plan complies with Section 2 of the Voting Rights Act.

The *Singleton* plaintiffs are the only parties who have proposed plans that would satisfy these standards for remedying a racial gerrymander. The *Milligan* plaintiffs contend that two majority-black districts are required by the Voting Rights Act, not by the Supreme Court's racial gerrymandering jurisprudence. The *Singleton* plaintiffs agree that the Voting Rights Act can require violating traditional districting principles, here whole counties, to create one or more majority-black districts where all the *Gingles* requirements are met and there is no other way to provide Black voters an equal opportunity to elect candidates of their choice. But in the particular circumstances of this case, where preserving whole counties can yield crossover districts that demonstrably perform to provide Black voters the opportunity to elect

their preferred candidates, the most recent Supreme Court decisions foreclose the ability of the State to enact, or for this Court to adopt, majority-black districts.

The *Singleton* plaintiffs understand why some Black Alabamians would advocate the creation of majority-black districts that (may or may not) afford them a measure of electoral autonomy. But the members of the Senate Black Caucus who sponsored SB 10 and support the instant action are convinced that the interests of the African-American community will be better advanced by unpacking the concentration of Black voters in one Congressional district and seeking to form cross-racial electoral coalitions. Whatever the merits of these policy choices, this Court is bound by Supreme Court precedents, which squarely favor effective crossover districts that follow traditional districting standards.

The League of Women Voters and the *Singleton* Plaintiffs have done their best since the 2020 census data were released in August to engage the Legislature and the public in identifying and correcting the racial gerrymandering in the 2011 Congressional plan. The Whole County Plan was vetted favorably in most of the public hearings held by the Reapportionment Committee last September. The Legislature was formally put on notice of its constitutional obligation to remedy the 2011 racial gerrymander on September 27, 2021, when the Complaint in this action was filed. The Legislative leadership decided to ignore these warnings. They simply rubber-stamped the "least change" plan the Congressional Delegation handed them.

Mr. Hinaman never attempted to draw new districts with whole counties and was instructed by counsel for the Reapportionment Committee to maintain zero population deviation. Ex. 1 at 198:13–199:4. The Committee Chairs were apparently (mis)informed by counsel that all three Whole County plans introduced by Senators Smitherman and Singleton did not comply with the Voting Rights Act, Ex. 3 (Counsel's Talking Points) at RC 045527, and they were never considered.

So the Whole County Plan and its narrow deviation and zero deviation modifications are the only remedial plans that have been proposed and discussed by anyone. The reports of the State's experts, Trey Hood and Tom Bryan, were prepared after the 2021 plan was enacted and were never considered by Mr. Hinaman or the Legislature. Those reports confirm that Districts 6 and 7 in the Whole County Plan perform as opportunity districts. The alternative maps attached to Mr. Bryan's report demonstrate how the Whole County Plan may be the only way to eliminate the splits in Jefferson, Tuscaloosa, and Montgomery Counties, avoid splitting up the Black Belt, and limit the ripple effect on other districts beyond what is necessary to remedy the racial gerrymander in District 7.

Specifically, if Jefferson County is kept whole, it lacks only 43,033 persons to reach the ideal district size of 717,754. That limits the counties that can be joined with Jefferson to the rural counties to its south. Mr. Bryan demonstrates how joining Jefferson with Blount County, population 59,134, increases the maximum deviation.

30

Walker County's population of 65,342, would further increase the District 6 deviation if joined with Jefferson County. Keeping Jefferson County whole means Shelby, Chilton, and Coosa Counties must be removed from District 6. The Whole County Plan puts all three of these counties in District 3. The Whole County Plan keeps whole all counties other than Jefferson that were in District 7 in the 2011 plan and adds the Black Belt counties of Macon and Bullock, along with Monroe, Conecuh, Butler, and Crenshaw Counties (which are sometimes included in lists of the Black Belt counties) to reach population equality.

All three of Plaintiffs' proposed plans are constitutional and comport reasonably well with the redistricting principles adopted by the Legislature. Those principles, adopted for the 2020 redistricting cycle, include the following:

- Congressional districts shall have minimal population deviation.

- Plans must comply with the one person, one vote principle of the Equal Protection Clause of the 14th Amendment of the United States Constitution.

- Plans must comply with the Voting Rights Act.

- Districts must be contiguous and reasonably compact.

- Districts must respect communities of interest, which may include counties and municipalities.

- Contests between incumbents will be avoided when possible.

- The Legislature shall try to preserve the cores of existing districts.

Ex. 4. Mr. Hinaman, the drafter of the 2021 plan, testified that minimizing population deviation and complying with the Voting Rights Act were his "paramount" responsibilities, and that the rest of the items on the list should be followed when possible, but they might conflict with each other. Ex. 1 at 149:8–16. The Plaintiffs' plans adhere to these principles without racial gerrymandering. They adhere to the principle of "one person, one vote," they respect county and municipal boundaries, they preserve communities of interest, they preserve the cores of the 2011 districts to the extent possible without perpetuating the unconstitutional racial gerrymander, and, unlike some of the alternative plans offered by the Defendants' expert, they attempt not to destroy the shapes of districts outside District 7.

### A.   The Plaintiffs' Plans Comply with the Supreme Court's "One Person, One Vote" Jurisprudence.

Plaintiffs' Whole County Plan preserves county boundaries (as every plan did from 1822 to 1965) while keeping population deviation low. Am. Compl. (ECF No. 15) at 29–32 ¶¶ 42–45. At 2.47%, Plaintiffs' proposed Whole County Plan has a smaller maximum population deviation than the 2.59% maximum deviation Alabama adopted in 1981, and a much smaller deviation than the 13.3% maximum deviation approved in 1965 by the three-judge district court in *Moore v. Moore*, 246 F. Supp. 578 (S.D. Ala. 1965). That said, the Supreme Court held in *Tennant v. Jefferson County Commission*, 567 U.S. 758 (2012), a case involving legislatively

drawn Congressional districts, that higher deviations were constitutionally permissible for the sake of preserving whole counties, even without the need to remedy a racial gerrymandering violation. Remedying a racial gerrymander, which the Alabama Legislature was obligated to do here, provides even greater justification for higher population deviations. In *Karcher v. Daggett*, another case that did not involve the more demanding racial gerrymandering standards, the Court suggested that acceptable population deviations for a Congressional redistricting plan can be determined by identifying those alternative plans which produce the lowest population deviations while respecting the state's policy of preserving political subdivisions. 462 U.S. 725, 739–40 (1983). *See also Kirkpatrick v. Preisler*, 394 U.S. 526, 532 (1969) ("the simple device of transferring entire political subdivisions of known population between contiguous districts would have produced districts much closer to numerical equality"). "The showing required to justify population deviations is flexible, depending on the size of the deviations, the importance of the State's interests, the consistency with which the plan as a whole reflects those interests, and the availability of alternatives that might substantially vindicate those interests yet approximate population equality more closely. By necessity, whether deviations are justified requires case-by-case attention to these factors." *Id.* at 741. Given Alabama's long history of preserving county boundaries when possible, and

the need to remedy a racial gerrymander, this Court should hold that the Plaintiffs' Whole County Plan is constitutional.

A court-ordered plan is "held to higher standards of population equality than legislative ones," *Abrams v. Johnson*, 521 U.S. 74, 98 (1997), but the Supreme Court has repeatedly declined to specify exactly what those standards are. This Court could justifiably adopt the Whole County Plan, even though its 2.47% maximum deviation is significantly higher than the 0.35% overall deviation in the court-ordered Congressional plan approved by the Supreme Court in *Abrams*. Georgia's 159 counties were "ample building blocks for acceptable voting districts without chopping any of those blocks in half." 521 U.S. at 99. Alabama's 67 counties are larger than Georgia's counties, so as building blocks they necessarily yield higher deviations. A deviation of 0.79% was found constitutional in West Virginia's legislatively enacted whole county plan. "if a State wishes to maintain whole counties, it will inevitably have population variations between districts reflecting the fact that its districts are composed of unevenly populated counties. Despite technological advances, a variance of 0.79% results in no more (or less) vote dilution today than in 1983, when this Court said that such a minor harm could be justified by legitimate state objectives." *Tennant*, 567 U.S. at 764.

The 0.36% and 0.11% deviations in Districts 6 and 7 of the *Singleton* Plaintiffs' Whole County Plan are clearly close enough to the *Abrams* deviations to

34

pass muster in a court-ordered plan. The districts at the northern and southern ends of Alabama account for the 2.47% maximum deviation, and it is those counties that would have to be divided to reach a lower overall deviation. That is what the narrow deviation and zero deviation modifications of the Whole County Plan do.

Singleton Congressional Plan 2, Ex. 5, divides Franklin County, placing 7,984 residents in District 4, leaving the other 24,129 Franklin County residents in District 5. Down south, 4,005 residents of Covington County are moved into District 2, leaving behind 33,565 of their neighbors. And only 1,858 persons in Crenshaw County are moved into District 2, leaving behind 11,336 in District 7. *See id.* Singleton Congressional Plan 3 divides six counties to achieve zero deviation. Ex. 6.

## B.   The Plaintiffs' Plans Respect Communities of Interest, Including Counties and Municipalities, as Much as Possible.

From 1822 to 1965, Alabama's Congressional districts always followed county lines. And from 1965 to the beginning of the racial gerrymandering era in 1992, only two counties were ever split, and even then by necessity because Jefferson County's population was larger than that of an ideal district. For the first time in decades, it is possible to return to the traditional principle of creating districts without splitting county boundaries, which is what the Plaintiffs' Whole County plan does. On this score, it vastly outperforms the enacted plan, which split six counties and three of the state's five largest municipalities. Plaintiffs' modified plans make minor splits to equalize population (in three counties in one plan and six in the zero-

deviation plan), but do not divide major municipalities (except where small parts of those municipalities cross county lines).

The Plaintiffs' plans' Seventh District also respect the integrity of the Black Belt, which Mr. Hinaman testified is a community of interest. The Plaintiffs' plans include 13 of the 18 "core" Black Belt counties and 4 of the 5 other Black Belt counties in a single district.[13] The enacted plan splits the Black Belt apart; District 7 contains 10 of the core Black Belt counties and part of another, as well as a single other Black Belt county. Thus, the Plaintiff's plans hold the Black Belt together better than the enacted plan.

The Plaintiffs' plans Sixth District restores the historical association of Bibb, Perry, and Hale Counties with each other, and with Jefferson County. In nearly every plan from the creation of Hale County in 1867 to the racial gerrymander of 1992, Bibb, Perry, and Hale Counties were in the same district. Ex. 7 (Historical Maps). Before Jefferson County became large enough to have its own district, it shared a district with all three counties (in the 1891 plan) and Bibb and Perry County (in the

---

[13] The name 'Black Belt' is primarily derived from the dark, rich layer of topsoil that runs across the width of roughly twelve counties in central Alabama, which made the region extremely fertile for cotton farming." Zachary L. Guyse, Note, Alabama's Original Sin: Property Taxes, Racism, and Constitutional Reform in Alabama, 65 Ala. L. Rev. 519, 532 (2013). The Defendants stipulated in *Milligan* that "[t]he Black Belt includes the core counties of Barbour, Bullock, Butler, Choctaw, Crenshaw, Dallas, Greene, Hale, Lowndes, Macon, Marengo, Montgomery, Perry, Pickens, Pike, Russell, Sumter, and Wilcox. Clarke, Conecuh, Escambia, Monroe, and Washington counties are sometimes included within the definition of the Black Belt." No. 21-cv-1530-AMM, ECF No. 53 ¶ 61.

1901 plan). *Id.* Now that Jefferson County's population once again requires that it be included with other counties, the Plaintiffs' plans follow the Legislature's previous plans.

### C. The Plaintiffs' Plans Are About as Compact as the Enacted 2011 and 2021 Plans.

The Defendants' expert Thomas Bryan has calculated four different compactness scores for the enacted 2011 plan, the enacted 2021 plan, and the Plaintiffs' Whole County Plan. ECF No. 54-1 at 29–30. The Whole County Plan outperforms both enacted plans on two of the scores and underperforms on the other two. *Id.* Therefore, the Whole County Plan serves the goal of compactness about as well as the other plans without being racially gerrymandered.

### D. The Plaintiffs' Plans Preserve the Cores of Existing Districts to the Extent Possible Without Perpetuating the Racial Gerrymander.

The Legislature's redistricting principles state, "The Legislature shall try to preserve the cores of existing districts." Ex. 4 at 3. The Defendants' expert Mr. Bryan extols the "least change approach" of the 2021 enacted plan, taking the Plaintiffs to task for insufficiently "preserving the core of existing districts." ECF No. 54-1 at 21–26, 41. The enacted 2021 plan, Mr. Bryan says, "registers consistently and significantly higher levels of core retention for both total and Black population than the Singleton plan." *Id.* at 24.

37

The goal of preserving the cores of districts is sensible—unless those districts have been racially gerrymandered. In that case, "preserving the core of existing districts" is just a euphemism for retaining the racial gerrymander. "[E]fforts to protect incumbents by seeking to preserve the 'cores' of unconstitutional districts … ha[s] the potential to embed, rather than remedy, the effects of an unconstitutional racial gerrymander …." *Covington v. North Carolina*, 283 F. Supp. 3d 410, 431 (M.D.N.C. 2018), *aff'd in relevant part and reversed in part on other grounds*, 138 S. Ct. 2548 (2018); *see also Personhuballah v. Alcorn*, 155 F. Supp. 3d 552, 561 n. 8 (E.D. Va. 2016) ("In any event, maintaining district cores is the type of political consideration that must give way to the need to remedy a *Shaw* violation."). Plaintiffs' plans admittedly do not preserve the cores of existing districts as well as the Legislature's enacted plan. But, as a remedy for the racially gerrymandered 2011 plan, that is a virtue, not a vice.

### E.    The Plaintiffs' Plans Protect Incumbents to the Extent Possible Without Perpetuating the Racial Gerrymander or Radically Redrawing Districts.

The Legislature's guidelines also call for avoiding contests between incumbents where possible, and Mr. Bryan criticizes the Plaintiffs' plans for putting Representatives Mike Rogers and Gary Palmer in the same district. ECF No. 54-1 at 27. In racially gerrymandered plans, however, protecting incumbents at all costs works the same was as preserving the cores of districts: it perpetuates the

gerrymander. Four Supreme Court Justices have stated that whether "the goal of protecting incumbents is legitimate, even where, as here, individuals are incumbents by virtue of their election in an unconstitutional racially gerrymandered district ... is a questionable proposition." *Easley v. Cromartie*, 532 U.S. 234, 262 n.3 (2001) (Thomas, J., dissenting) (noting that question was not presented to the Supreme Court or district court and, therefore, that the Court had not addressed it). Lower courts have agreed. *Covington*, 283 F. Supp. 3d at 431 ("[E]fforts to protect incumbents by seeking to preserve the 'cores' of unconstitutional districts … ha[s] the potential to embed, rather than remedy, the effects of an unconstitutional racial gerrymander …."); *Vera v. Richards*, 861 F. Supp. 1304, 1336 (S.D. Tex. 1994), *aff'd sub nom. Bush v. Vera*, 517 U.S. 952 (1996) ("Incumbent protection is a valid state interest only to the extent that it is not a pretext for unconstitutional racial gerrymandering."); *Ketchum v. Byrne*, 740 F.2d 1398, 1408 (7th Cir. 1984) ("Since it is frequently impossible to preserve white incumbencies amid a high black-percentage population without gerrymandering to limit black representation, it seems to follow that many devices employed to preserve incumbencies are necessarily racially discriminatory."); *see Jeffers v. Clinton*, 756 F. Supp. 1195, 1200 (E.D. Ark. 1990) ("The desire to protect incumbents, either from running against each other or from a difficult race against a black challenger, cannot prevail if the

result is to perpetuate violations of the equal-opportunity principle contained in the Voting Rights Act.").

Plaintiffs would have liked to protect all incumbents, but Mr. Bryan's own report shows how difficult it is to 1) remedy the racial gerrymander, 2) protect incumbents, and 3) preserve the general shape of the Congressional districts outside the gerrymandered area. Mr. Bryan devised thirteen alternative plans that kept counties whole and had a reasonably low population deviation. ECF No. 54-1 at 32. Of these, only two avoided pairing any incumbents. *Id.* at 27, 32. And both of those plans bear little resemblance to the 2011 plan. *Compare id.* at 27 (Figures 5.5 and 5.6) with Am. Compl. (ECF No. 15) at 9 (2011 plan). The Plaintiffs' plans do not completely upend the structure of Districts 1, 4, and 5 just to protect an incumbent, as the alternative plans do. *Compare* Am. Compl. (ECF No. 15) at 31 (Whole county Plan) *with id.* at 9.

In short, on all the redistricting criteria laid out by the Legislature, the Plaintiffs' plans are superior or comparable to the enacted 2021 plan, except when necessary to remedy the racial gerrymander. And the Plaintiffs' plans have the added benefit of not being unlawful.

## CONCLUSION

Alabama's District 7 perpetuates an admitted racial gerrymander, without serving any compelling interest. Therefore, it cannot and should not be the basis for

the 2022 election. The Court should adopt Plaintiffs' Whole County Plan (or in the alternative, one of Plaintiffs' other proposals), which would go into effect on January 28, 2022 if the State does not adopt its own constitutional plan in time for candidates to declare before that deadline.

Dated: December 15, 2021                    Respectfully submitted,

*/s/ James Uriah Blacksher*
James Uriah Blacksher
825 Linwood Road
Birmingham, AL 35222
Tel: (205) 612-3752
Fax: (866) 845-4395
Email: jublacksher@gmail.com

*/s/ Joe R. Whatley, Jr.*
Joe R. Whatley, Jr.
WHATLEY KALLAS, LLP
2001 Park Place North
1000 Park Place Tower
Birmingham, AL 35203
Tel: (205) 488-1200
Fax: (800) 922-4851
Email: jwhatley@whatleykallas.com

*/s/ Henry C. Quillen*
Henry C. Quillen
(admitted *pro hac vice*)
WHATLEY KALLAS, LLP
159 Middle Street, Suite 2C
Portsmouth, NH  03801
Tel: (603) 294-1591
Fax: (800) 922-4851
Email: hquillen@whatleykallas.com

*/s/ Myron Cordell Penn*
Myron Cordell Penn

41

PENN & SEABORN, LLC
1971 Berry Chase Place
Montgomery, AL 36117
Tel: (334) 219-9771
Email: myronpenn28@hotmail.com

*/s/ Diandra "Fu" Debrosse Zimmmermann*
Diandra "Fu" Debrosse Zimmermann
Eli Hare
DICELLO LEVITT GUTZLER
420 20th Street North, Suite 2525
Birmingham, AL 35203
Tel.: (205) 855.5700
Email: fu@dicellolevitt.com
        ehare@dicellolevitt.com

*Counsel for Plaintiffs*