FILED
2021 Dec-15 PM 04:53
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 1

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ALABAMA

EVAN MILLIGAN, et al., )
) CIVIL CASE NO.
Plaintiffs, ) 2:21-CV-01530-AMM
VS. ) VIDEO DEPOSITION OF:
JOHN MERRILL, et al., ) RANDY HINAMAN
)
Defendants. )

S T I P U L A T I O N S

IT IS STIPULATED AND AGREED, by and between the parties through their respective counsel, that the deposition of:

RANDY HINAMAN,

may be taken before LeAnn Maroney, Notary Public, State at Large, at the law offices of Balch & Bingham, 105 Tallapoosa Street, Montgomery, Alabama, 36104, on December 9, 2021, commencing at 9:13 a.m.

IT IS FURTHER STIPULATED AND AGREED that the signature to and reading of the deposition by the witness is waived, the deposition to have the same force and effect as if full compliance had been had with all laws and rules of Court relating to the taking of depositions.

IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary for any objections to be made by counsel to any questions, except as to form or leading questions, and that counsel for the parties may make objections and assign grounds at the time of the trial, or at the time said deposition is offered in evidence, or prior thereto.

***

A P P E A R A N C E S

FOR THE MILLIGAN PLAINTIFFS:

MICHAEL L. TURRILL
Attorney at Law
Hogan Lovells US LLP
1999 Avenue of the Stars, Ste. 1400
Los Angeles, California 90067
michael.turrill@hoganlovells.com

BLAYNE R. THOMPSON
Attorney at Law
Hogan Lovells US LLP
609 Main Street, Ste. 4200
Houston, Texas 77002
blayne.thompson@hoganlovells.com

DEUEL ROSS (Via Zoom)
Attorney at Law
NAACP Legal Defense & Educational Fund
700 14th Street N.W., Ste. 600
Washington, DC 20005
dross@naacpldf.org

DAVIN M. ROSBOROUGH (Via Zoom)
JULIE A. EBENSTEIN
Attorneys at Law
American Civil Liberties Union Foundation
125 Broad Street
New York, New York 10004
drosborough@aclu.org

LaTISHA GOTELL FAULKS (Via Zoom)
Attorney at Law
American Civil Liberties Union of Alabama
P.O. Box 6179
Montgomery, Alabama 36106
tgfaulks@aclualabama.org

FOR THE SINGLETON PLAINTIFFS: (Via Zoom)

JAMES URIAH BLACKSHER
Attorney at Law
825 Linwood Road
Birmingham, Alabama 35222
jublacksher@gmail.com

MYRON C. PENN
Attorney at Law
Penn & Seaborn
1971 Berry Chase Place
Montgomery, Alabama 36117
myronpenn28@hotmail.com

ELI J. HARE
Attorney at Law
Dicello Levitt Gutzler
420 20th Street North, Ste. 2525
Birmingham, Alabama 35203
Ehare@dicellolevitt.com

HENRY C. QUILLEN (Via Zoom)
Attorney at Law
Whatley Kallas, LLP
159 Middle Street, Ste. 2C
Portsmouth, New Hampshire 03801
hquillen@whatleykallas.com

FOR THE CASTER PLAINTIFFS: (Via Zoom)

LALI MADDURI
Attorney at Law
Elias Law Group
10 G Street NE, Ste. 600
Washington, DC 20002
lmadduri@elias.law

FOR DEFENDANT JOHN H. MERRILL:

JIM DAVIS
Assistant Attorney General
Office of the Attorney General
501 Washington Avenue
Montgomery, Alabama 36130
jim.davis@alabamaag.gov

FOR THE DEFENDANTS JIM McCLENDON & CHRIS PRINGLE:

DORMAN WALKER
Attorney at Law
Balch & Bingham
105 Tallapoosa Street, Ste. 200
Montgomery, Alabama 36104
dwalker@balch.com

ALSO PRESENT:

Paige Ali, Videographer

Elizabeth Baggett

I N D E X

MR. THOMPSON: 11-197

MR. BLACKSHER: 197-229

E X H I B I T L I S T

| | PAGE |
|---|---|
| Plaintiff's Exhibit 1 - (Depo notice) | 14 |
| Plaintiff's Exhibit 2 - (Subpoena) | 14 |
| Plaintiff's Exhibit 3 - (CV) | 21 |
| Plaintiff's Exhibit 4 - (Declaration) | 25 |
| Plaintiff's Exhibit 5 - (2021 Alabama Congressional Plan, RC 000553) | 92 |
| Plaintiff's Exhibit 6 - (2011 Congressional Districts) | 93 |
| Plaintiff's Exhibit 7 - | 135 |

(5-5-21 Reapportionment Committee Redistricting Guidelines)
Plaintiff's Exhibit 8 - 160
(District 1-7 maps, RC 000556-562)
Plaintiff's Exhibit 9 - 179
(List of 2021 congressional plans)
Plaintiff's Exhibit 10 - 201
(State of AL v. US Department of Commerce Introduction)
Plaintiff's Exhibit 11 - 203
(9-1-21 public hearing transcript excerpt)
Plaintiff's Exhibit 12 - 208
(Whole County Plan)
Plaintiff's Exhibit 13 - 213
(Tuscaloosa and Montgomery Whole)
Plaintiff's Exhibit 14 - 213
(Data table)

I, LeAnn Maroney, a Court Reporter of Birmingham, Alabama, and a Notary Public for the State of Alabama at Large, acting as commissioner, certify that on this date, pursuant to the Federal Rules of Civil Procedure and the foregoing stipulation of counsel, there came before me on December 9, 2021, RANDY HINAMAN, witness in the above cause, for oral examination, whereupon the following proceedings were had:

* * * * *

THE VIDEOGRAPHER: This marks the beginning of the deposition of Randy Hinaman in the matter of Evan Milligan, et al, versus John H. Merrill, et al., Civil Case Number 2:21-CV-01530-AMM filed in the United States District Court for the Northern District of Alabama. The date is December 9, 2021. The time is 9:13 a.m

All attorneys present, will you please state your names and whom you represent.

MR. HARE: Eli Hare on behalf of the Singleton plaintiffs.

MR. DAVIS: Jim Davis for Secretary Merrill.

MR. WALKER: Dorman Walker for the Committee Chairs, Senator Jim McClendon and

Representative Chris Pringle.

MR. PENN: Myron Penn for the Singleton plaintiffs.

MR. TURRILL: Mike Turrill for the Milligan plaintiffs.

MR. THOMPSON: And Blain Thompson for the Milligan plaintiffs.

MR. BLACKSHER: And Jim Blacksher for the Singleton plaintiffs. I'll be asking questions virtually.

MS. MADDURI: Lali Madduri for the Caster plaintiffs.

MR. QUILLEN: Henry Quillen for the Singleton plaintiffs.

MR. ROSS: Deuel Ross for the Milligan plaintiffs.

MR. ROSBOROUGH: Davin Rosborough for the Milligan plaintiffs.

MS. EBENSTEIN: Good morning. Julie Ebenstein for the Milligan plaintiffs.

MS. FAULKS: Good morning. Tish Faulks for the Milligan plaintiffs.

MS. BAGGETT: Good morning. It's Elizabeth Baggett for the Milligan plaintiffs. I'm a law clerk, not an attorney.

THE VIDEOGRAPHER: Court Reporter, will you please swear in the witness.

RANDY HINAMAN,

having been duly sworn, was examined and testified as follows:

THE REPORTER: Usual stipulations?

MR. WALKER: The ones that we've just discussed.

MR. THOMPSON: Yes.

Mr. Walker, did you want to say something before we begin?

MR. WALKER: Yes. I'd like to put on the record that the committee chair, Senator Jim McClendon, and Representative Chris Pringle have asserted their legislative privilege and immunity in this case. Of course, the Court has not yet ruled on that. Thank you.

EXAMINATION BY MR. THOMPSON:

Q. Good morning, sir.

A. Good morning.

Q. Please state your name for the record.

A. Randy Hinaman.

Q. Mr. Hinaman, you understand that you're testifying under oath right now?

A. I do.

Q. Is there anything that might prevent you from understanding my questions or answering truthfully today?

A. No.

Q. Are you being represented by a lawyer today?

A. Dorman Walker with the reapportionment committee.

Q. Are you paying Mr. Walker to be your lawyer today?

A. I am not.

Q. Do you assume that plaintiffs or the State of Alabama is paying Mr. Walker to be your lawyer today?

A. I do.

Q. Have you ever been deposed before?

A. I have.

Q. How many times?

A. Once. Once is all I remember, not counting trial.

Q. And was that in the ALBC versus the State of Alabama lawsuit?

A. Yes, sir.

Q. All right. So I'll go over a few of the key rules.

I think that last deposition was about eight years ago. Is that correct?

A. Yes, sir.

Q. Okay. So I'll be asking questions today. And then after I'm done, there will be several other people asking questions, as well.

If you don't understand a question, just let me know. Is that okay?

A. Yes, sir.

Q. If you answer a question, I will assume that you understood it. Is that fair?

A. Yes.

Q. Also, as you can see, we have a court reporter here who is doing an amazing job typing everything that we say as we go. But it's very important, because she's typing it, that we both speak one at a time. So I'll do my best to wait until you're done answering questions. And if you can do the same, that will help her out a lot. Is that all right?

A. Yes.

Q. And then we'll take a break about every hour. If you need a break before then, just let us know, and we can do that as long as there's not a question pending. Fair?

A. Very well.

(Plaintiff's Exhibits 1&2 were marked for identification.)

Q. I'm handing you what's been marked as Exhibit 1 and Exhibit 2.

MR. THOMPSON: I've got copies for everyone else to the extent you would like one.

Q. This is a copy of the deposition notice and subpoena.

MR. WALKER: Which one is which?

MR. THOMPSON: Exhibit 1 is the notice.

MR. WALKER: Okay.

MR. THOMPSON: And Exhibit 2 is the subpoena.

MR. WALKER: Thanks.

Q. Have you seen a copy of these documents before today?

A. I have.

Q. Both of them?

A. Yes, sir.

Q. Who provided them to you?

A. Dorman Walker.

Q. And when was that?

A. The end of last week. Friday maybe.

Q. All right. You can set those aside.

Without disclosing the content of any discussions that you had with your attorneys, what did you do to prepare for your deposition today?

A. I met with Dorman Walker and Jim Davis and others and did some -- just reviewed numbers and talked about the process we followed.

Q. When did you meet with them?

A. Monday and Tuesday, Monday morning and -- Monday afternoon really and Tuesday morning of this week.

Q. About how long would you say you met with them?

A. I guess about four -- four or five hours on Monday. We also had lunch in there. And three hours on Tuesday.

Q. Did you meet with anyone who was not an attorney?

A. No, I don't believe so.

Q. Did you review any documents in preparation for today?

A. I just reviewed some of the census numbers and the guidelines, the committee guidelines. That would be about it.

Q. Did you review any of the complaints in this lawsuit?

A. No, I didn't.

Q. Did you review any maps?

A. Yeah. I looked -- I looked at the current -- the map that was passed. And I also looked briefly at some of the other maps that were offered to the legislature.

Q. Which other maps did you look at?

A. The Singleton --

MR. BLACKSHER: Randy needs to speak up a little bit, please.

THE WITNESS: Sure.

A. The Singleton maps, the Coleman map, and the Hatcher map, I believe.

Q. Had you reviewed those maps, any of those maps, before preparing for your deposition?

MR. WALKER: Objection to form.

Q. You mentioned that you reviewed several of those maps in preparation for your deposition, correct?

A. Correct.

Q. Before then, had you reviewed any of those maps?

A. I looked at them when they were offered

on the floor of either -- whatever body they were offered in.

Q. Other than in preparation for your deposition last Monday and Tuesday, have you discussed this lawsuit with anyone?

A. No.

Q. Did you do anything else to prepare for your deposition today?

A. I did not.

Q. Are you being compensated by anyone for being here today?

A. I assume I am. I haven't -- I haven't billed anybody yet. But I'm planning to.

Q. And who do you plan to bill for today?

A. The attorney general's office.

Q. How much do you plan to bill the attorney general's office for your time today?

A. $400 an hour.

Q. Is that pursuant to some agreement that you have with the attorney general's office?

A. Well, we really haven't even discussed it, honestly. I guess I'll send them the bill, and we'll see if they pay it.

Q. Fair enough.

Similarly, do you expect to be

compensated in any way to testify at trial?
A. I would assume the same arrangement.
Q. By the attorney general's office, as well?
A. Yes.
Q. All right. Taking a step back and just talking about your background a little bit, can you please state your date of birth?
A. 5-5-57.
Q. What's your address?
A. 33267 River Road, Orange Beach, Alabama, 36561.
Q. Is that your full-time address now here in Alabama?
A. Yes, sir.
Q. You previously lived in Virginia; is that correct?
A. That's correct.
Q. When did you make that move?
A. I bought this property about five years ago. But I really technically moved probably about three years ago.
Q. Do you have a telephone number?
A. Just my cell phone.
Q. What's that number?

A. (703)598-8383.

Q. Do you have an email account?

A. I do.

Q. What is that?

A. Sharh1@comcast.net.

Q. Do you have any other email addresses?

A. I do not.

Q. Have you ever been involved in any other lawsuits?

A. No. I mean, not as a witness or -- no.

Q. What's the highest level of education you've completed?

A. I attended Cornell University.

Q. Was that for undergraduate?

A. Yes.

Q. Did you graduate?

A. I did not.

Q. What did you study at Cornell?

A. Political science. Really they called it government.

MR. WALKER: Called it what?

THE WITNESS: Government. Anywhere else on earth, it would be political science.

Q. And if you don't mind me asking, you said you did not graduate. Is there a reason why?

A. Yeah. In the middle of that, I was offered a position with the Reagan campaign, which was sort of my dream job to work for his presidential race. So I left to take on that responsibility for the national field director for the Reagan Youth Campaign.

Q. How far along had you gotten in your studies when you left?

A. Two years.

Q. Do you have any other -- excuse me. Do you have any educational certificates or anything like that?

A. No.

Q. Do you have any certain specializations in anything?

A. No.

Q. Mr. Hinaman, what do you do for a living?

A. I do political consulting and lobbying.

Q. Where do you work?

A. I work for my own company out of my residence in Orange Beach.

Q. What's the name of that company?

A. R. Hinaman, LLC.

Q. And what is your -- do you have a formal

title within R. Hinaman, LLC?

A. I guess I would be the president of R. Hinaman, LLC.

Q. Are there other employees of that company?

A. There are not.

Q. If you can, explain to me briefly what you do as a political consultant and lobbyist.

A. Sure. On the political consulting front, I usually do -- I consult political campaigns, usually on the federal level, mostly congress, put together the campaign team for various candidates to get elected to those offices.

On the lobbying side, which I'm doing less and less and less of, I did lobbying on the federal level for various companies and organizations.

(Plaintiff's Exhibit 3 was marked for identification.)

Q. I think I can short-circuit our discussion about your background a little bit here. This is Exhibit 3.

MR. THOMPSON: I can get you a copy, as

well, Mr. Walker.

Q. And I'll state for the record that this is a copy of your resume that was shown to you in a prior deposition that you gave on June 25, 2013. I believe this was PX3 in that deposition.

Do you recognize this document?

A. I do.

Q. Does this appear to be a true and correct copy of your resume as of June 25, 2013?

A. It does.

Q. Is this resume up to date?

A. It is not.

Q. What has changed?

A. Well, technically, the name of my company changed because I moved from Virginia to Alabama. Obviously, my address has changed, again because of moving. Obviously, I've had some additional clients since 2013.

Q. Who have your additional clients been?

A. I was afraid you would ask me that.

Congressman Ben Cline, I did his campaign to replace Bob Goodlatte who retired in 2018. Let's see. The American Dental Association is on there.

That's the major one. I can't say there

wasn't another campaign in there.

Q. On here, it says that your company name is Hinaman & Company, Inc. Did that change at some point?

A. Yeah, when I moved. That was an LLC in Virginia. And when I moved to Alabama, I formed a new LLC.

Q. And when was that?

A. Again, approximately about three years ago.

Q. Does a more current version of your resume exist anywhere?

A. Yeah, I'm sure it does.

Q. Is that something that you could produce in this case if you were asked to?

A. Yes.

Q. What experience do you have working with redistricting?

A. Obviously, I drew three of the four maps for Alabama ten years ago, 2011, 2012. I drew the congressional maps and the two legislative maps. I also worked for the republican congressmen in Virginia to draw their map in 2012.

And before that, I worked with Congressman Callahan, who was my -- I was his chief

of staff at one point and then his consultant in Alabama, and helped draw a map in 1992 which was then put into practice by a federal court.

Q. Anything beyond that?

A. No. I mean, I assisted the majority leader of the Virginia senate in some of his efforts on redistricting ten years ago. Actually, it was more like 20 years ago. But I wasn't really the lead on it. I was just assisting his office.

Q. Outside of Alabama and Virginia, have you ever worked in redistricting for any other states?

A. I have not.

Q. How did you get involved in drawing maps originally?

A. Well, my first effort, I guess, was way back in 1992 when the legislature failed to draw a map for congress in Alabama. I was working for Congressman Callahan. And with him and some of the other members of the delegation, we decided that we needed to file a lawsuit to remedy that situation. And so I helped produce a map that was filed with that lawsuit. That was my first endeavor.

Q. Had you ever drawn a map before then?

A. I had not.

Q. So how did they come about saying, "Randy, we want you to draw this map"?
A. I guess we drew straws and I lost.
Q. Fair enough.

(Plaintiff's Exhibit 4 was marked for identification.)

Q. I'm going to hand you another exhibit here. This is being marked as Plaintiff's Exhibit 4. This is also from the ALBC versus Alabama lawsuit. This is a declaration that was signed by you.
And you can see at the top there, there's a date that says this was filed on June 17, 2013, in the Alabama Legislative Black Caucus for the State of Alabama lawsuit. Do you see that?
A. I do.
Q. Do you recognize this document?
A. Not particularly.
Q. If you can, flip to Page 7. Do you see there's a signature?
A. Yes.
Q. And your name?
A. Yes.

Q. Does that appear to be your signature?
A. Yes, sir.
Q. Does this appear to be a true and correct copy of your declaration?
A. Again, it doesn't ring a bill. But I have no reason to believe it isn't.
Q. Take a look at paragraph two. It states, "I have substantial experience in drafting redistricting plans in Alabama, including drawing the congressional plan adopted by the three-judge federal district court in Mobile in 1992 and work on the 2011 congressional plan." Excuse me. "And work on the 2001 congressional plan. In 2011, I developed the redistricting plan for the Alabama congressional delegation. In that work, I worked within the guidelines for redistricting adopted by the reapportionment committee."
Do you see that?
A. I do.
Q. Is that an accurate description of your experience in drafting redistricting plans in Alabama?
A. It is. I mean, I don't know what that -- the sentence on 2001, I did not draft the 2001 plans. But I did work with the leaders in the

legislature who did draft those plans. I didn't want it to imply that I drew those maps. I don't know that it does imply that.

Q. Okay. Well, let's go to the first part there where you said that you -- your experience did include drawing the congressional plan adopted in 1992. Does that mean that you did draw that map?

A. I did, yes.

Q. Is that the map that was used for the Alabama congressional elections in the '90s?

A. Yes, sir.

Q. Did that map serve as the starting point, then, for the congressional map that was drafted for 2001?

A. I didn't draw that map.

Q. You said you worked on drawing that map. What does that mean?

A. The legislature at that time was controlled by the democrats, and I was representing some republican Congressman in just interacting with them. But they -- they drew the map. I was just trying to give our point of view to it.

Q. Are you familiar at all with how that map was drawn in 2001?

A. Vaguely, but not -- not the specifics of

it.

Q. What's your understanding?

A. Well, it was essentially a continuation of the 1992 map, just updated for the most part for population shift.

Q. And you said you were working with the republican legislators?

A. I was working with Congressman Callahan at that point.

Q. Did you have any role whatsoever in drawing that map in 2001?

A. I had no official role other than I was working with the leaders -- the democratic leaders who were working on that map. I would occasionally, you know, talk to them about the changes that were made, and for especially Congressman Callahan's district. But I didn't -- I didn't have control of the process, if that makes any sense.

Q. Do you know who did draw the map?

A. Senator Enfinger, I believe.

Q. Did he --

A. Well, that's who the -- he was the -- I don't know who he hired. That's who I interfaced with. Let's put it that way.

Q. Understood. That was going to be my

next question.

Q. You said you spoke to several members of the legislature. Do you remember who you spoke to?

A. In 2001?

Q. Yes.

A. My primary -- my primary interface on that map was Senator Enfinger.

Q. When you spoke with Senator Enfinger, did you provide any sort of input or recommendations about how the map should be drawn?

A. Only as to how -- he had a draft, I believe, and was talking about the changes he wanted to make in various districts. And my primary focus was the first district because I was working for Congressman Callahan.

So he had come with some suggestions, and we just talked about those. They were not -- I don't think I had any tremendously substantive changes to recommend. So I think it was pretty much what he had drawn, we were comfortable with.

Q. Did you provide any other sort of feedback in drawing the 2001 congressional map beyond what you just mentioned with District 1?

A. I did not.

Q. Do you know if it was a goal in the 2001

congressional map to make sure that District 7 remained a majority black district?

A. I do not.

Q. Do you know if it was considered in 2001 to draw two majority black districts?

A. I do not, no.

Q. Let's go back to the 1992 congressional map. Because you said you did draw that one, correct?

A. Yes, sir.

Q. The 1992 congressional map created the first majority black congressional district in Alabama history; is that correct?

A. I believe so, yes.

Q. And you said you drafted that map?

A. I did.

Q. So you drafted District 7 as it stood in 1992?

A. Yes, sir.

Q. Who asked you to draw that map?

A. I was working for Congressman Callahan and some of the other members of the Alabama delegation.

Q. Did you work with Senator Larry Dixon in drafting the map?

A. Probably, yes.
I will point out that this was 30 years ago. So if you ask me a specific question, it's probably going to be hard for me to answer.
Q. Understood.
Do you remember any other legislators that you worked with directly in drafting the 1992 map?
A. I do not. As you know, the legislature did not ultimately pass a map. So we went -- it was a court action that imposed this map.
Q. Were you asked to create a majority black district in drawing the 1992 map?
A. I guess -- I guess I was, yeah.
Q. Who asked you to do that?
A. I think the -- well, Congressman Callahan and the delegation probably in concert with the NRCC.
Q. Do you know why you were asked to do that?
A. At the time, I believe they thought that was the proper thing to do under the Voting Rights Act.
Q. Did you receive any instructions from the court?

A. No, sir.
Q. Did you draw District 7 with the intent to make it a majority black district?
A. I did.
Q. How did you make sure that District 7 would have a majority black voting age population?
A. I just included areas of high concentration of African American voters.
Q. How did you do that?
A. By assigning counties and precincts that fit that definition.
Q. Did you have a particular percentage of black voters that you were shooting for?
A. I did not.
Q. How did you go about choosing District 7 to be the district that has the majority black voting age population?
A. I don't -- I mean, I think it was a function of geography, I mean, where areas with concentration of black voters were.
Q. And how did you gather that information?
A. Census data.
Q. What specifically?
A. Just the census data from the -- related to population and race.

Q. So when you were drawing it, you were able to pull up and see black voters, white voters in different areas?
A. Yes.
MR. WALKER: Objection to form.
Q. How did you see that information when you were drawing the map in 1992?
A. I'm not sure I understand your question.
Q. Did you use a software to draw the map in 1992?
A. As I remember -- again, it was 30 years ago -- I believe I used the computers at the Alabama reapportionment office to draw the map. So I don't know what their software was, to be honest with you.
Q. What specific racial data did you have in front of you when you were drawing that map?
A. I would have total pop, total African -- total black, and voting age data.
Q. Was that broken down by county, precinct, neighborhood, block?
A. County, precinct, block, yes. Yes, sir.
Q. And I realize it was 30 years ago. How did you go about drawing District 7 in 1992?
A. Again, it was 30 years ago. I don't remember the machinations that went into drawing the

map.

Q. Did you have in your mind a certain black voting age population that you were shooting for?

A. No.

Q. So you just drew general lines and you found that it came to a certain percentage of black voting age population, and you thought that was good?

A. Obviously, I was -- I had in my mind that we wanted it to be majority black district. But in terms of above 50 percent, I didn't have a specific number in mind.

Q. Did you take into account any other characteristics of the black voting age population that you were looking at when you drew that map in 1992?

A. Such as?

Q. For instance, did you look at any socioeconomic factors?

A. I did not.

Q. Did you look at attitudes?

A. I did not.

Q. Interests?

A. (Witness shakes head).

Q. Type of employment?
A. I did not.
Q. Income?
A. I did not.
Q. Educational level?
A. No.
Q. Voter turnout?
A. No.
Q. Election results to assess party affiliation amongst the black voting age population?
A. No, I don't believe so.
Q. When you drew District 7 in 1992, did you determine that to be a community of interest?
A. Yeah. Well, I think it included most of the black belt. I would say they had a community of interest along -- yeah. So yes.
Q. And what was the basis for that determination?
A. Well, geography and like demographics.
Q. And race?
A. And race.
Q. Was race the main factor you considered in drawing District 7?
A. It was a major factor.
Q. Was there a more predominant factor than

race?

A. Other than geography and deviation. Those would be the top -- obviously, things had to be contiguous.

Q. If District 7 did not have a majority black population, would it have passed?

A. Passed what?

Q. Would it have been approved?

A. You're asking me to question what three federal judges would approve?

Q. You were asked to draw a map that had a majority black district, correct?

A. Yes.

Q. If you had turned in a map that did not have a majority black district, would you have done what you were asked to do?

A. You mean turned into Congressman Callahan?

Q. Correct.

A. No. I think our goal was to draw a majority black district.

Q. Why did you draw only one majority black district?

A. That was our -- that was our goal, to draw a district.

Q. Your goal was to draw only one district?
A. Well, I'm not sure at that -- I don't remember the numbers exactly. I'm not sure -- I'm not sure whether it would have been possible to draw two or not. I don't know that it would have.
Q. Did you consider drawing two majority black districts?
A. I did not.
Q. Did anyone suggest to you to draw that?
A. They did not.
Q. Did you review or comment on any other maps that contained two majority black districts at the time?
A. I don't --
MR. WALKER: Objection to form.
A. I don't remember seeing any majority two district maps.
Q. Did you consider race in drawing any of the other districts in 1992?
A. I did not. I mean, other than -- I did not, no.
Q. Skipping ahead to the 2011 congressional map. You also drew that map, correct?
A. Yes. But may I go back just one?
Q. Sure.

A. Obviously, we drew this map -- I drew this map, and it was submitted in a lawsuit. I had no idea what would happen to it from there. So it's not like I -- you know, I didn't know whether the judges would change it or what would happen.

Q. That's a good point. Did the judges change it after you submitted it?

A. I don't -- no, I don't believe they did.

Sorry. Go ahead.

Q. So you stated that you also drew the 2011 congressional map, correct?

A. Yes, sir.

Q. That one is a little bit more recent, ten years ago. Do you recall the general method that you used in drawing that map?

A. Yeah. I mean, essentially it was updating the 2001 map based on demographic changes that had happened over the last ten years and working with the -- all of the -- I was hired by all of the members to update the map and submit a -- submit a map to the legislature for approval.

Q. So correct me if I'm wrong. But generally when you're drawing these maps, it's more of a redrawing than a drawing from scratch. Is that fair to say?

A. That is fair to say.
Q. So the general process is that you will use the existing map from the prior census data and update it with the new census data, correct?
A. That's correct. And obviously, whether it's a congressional map or any other maps, you have officeholders who have an interest in, for the most part, keeping the voters that they've had for the last ten years. So, most of them would not go into a redistricting process looking for wholesale change.
Q. So the 2021 map, for instance, can be traced back to the 2011 map, the 2001 map, and the 1992 map in that order, correct?
A. Yeah. Preserving cores of existing districts was a guideline for the 2021 map.
Q. For instance, the 2001 map used the 1992 map as a starting point, true?
A. I didn't draw that map.
Q. Do you have any other understanding of how that map was drawn?
A. I mean, if you look at it, it looks like it was continuing that map, yes. But I didn't -- the democratic legislature drew that map.
Q. Is it a fair assumption to say that they

probably used the 1992 map in drawing the 2001 map?
A. That's an -- a fair assumption, I guess.
Q. And the 2011 map then that you drew used the 2001 map as its starting point?
A. Yes, sir.
Q. And then the 2021 map that you drew used the 2011 map as its starting point?
A. Yes, sir.
Q. In drawing the 2011 congressional map, did you speak to members of congress?
A. I spoke to all of them, yes, sir.
Q. All seven of the incumbents?
A. Yes.
Q. And what did you speak to them about?
A. We're talking about 2011?
Q. Correct.
A. I spoke to them about the over and under nature of their districts, whether they needed to gain population or lose population. And based on that, where they would like to gain or where they would like to -- where they would be -- you know, like to lose.
And I tried to work with adjacent districts to make sure that if person X wanted to give up this county, that the other person would be

amenable to taking it. So I tried to negotiate a map that everybody was happy with.

Q. Did you consult the state's redistricting criteria in drawing that map?

A. I did.

Q. Did you review election returns in drawing that map?

A. They were part of it, yes.

Q. What data did you have on that?

A. I don't remember if all their races were in there. But I had the latest last three or four state-wide races that were available.

Q. And how did you use that information?

A. I didn't use it all that much. It was a common -- you know, a common question from a member might be, you know, what did the governor get in my district? And if we make this change -- or what did whomever ran for president in the race before that, whoever that was.

But I didn't use it so much in drawing the map. It was more of confirming to them that their district was going to perform similarly to how the previous district had performed electorally.

Q. Did that data give you information on party affiliation?

A. I don't believe so. I think it was just election returns.
Q. Was that aggregate election returns? Or was that by individual counties or precincts? Does that make sense?
A. Yeah. It was precinct-based. But then it was aggregate for counties and then for the districts.
Q. You can look at all of that?
A. Yes.
Q. Understood.
Did you look at any racial polarization data in drawing the 2011 map?
A. I did not.
Q. Did you look at any other voter behavior data?
A. I did not.
Q. Was it a goal in drafting the 2011 congressional map to make sure that District 7 remained a majority black district?
(Zoom interruption.)
A. What is that?
Q. It sounds like we might have a singer.
MR. TURRILL: Someone is off on mute on the line there.

Q. I think we're good now.
A. Can you ask -- I'm sorry. Can you ask that again?
Q. No problem.
Was it a goal in drafting the 2011 congressional map to make sure that District 7 remained a majority black district?
A. Yeah. Obviously, Congresswoman Sewell was one of my -- one of my clients for that map. And she wanted to maintain her majority black district, yes.
Q. When you say that she was one of your clients, what do you mean?
A. She was one of the members of congress who paid me to draw the map.
Q. Did you have a contract with those members of congress?
A. Verbally.
Q. You didn't have a written contract?
A. No.
Q. What was the verbal contract?
A. That they would all put in $10,000 to draw -- each to draw -- pay me to draw this map.
Q. That each individual congressman or woman would put in $10,000?

A. Their campaigns, yes.

Q. Was that the extent of the verbal agreement?

A. It was.

Q. Was it a goal in drafting that 2011 congressional map to make sure that District 7 kept a 60 percent black voting age population?

A. No.

Q. Was there any sort of specific black voting age population percentage that you were shooting for?

A. No.

Q. Were you successful in making sure that District 7 remained a majority black district?

A. We were.

Q. How did you make sure of that?

A. By whatever -- you know, whatever -- and I don't even remember the various counties ten years ago. If you handed me a map, I could probably tell you.

But by what we added county and precinct-wise to make sure it did not dramatically alter the makeup of the district.

Q. Explain that to me a little bit further. So what changes were you making in 2011?

A. Again, I don't even know how much -- I'm going to hazard a guess that District 7 was underpopulated in 2011. I don't remember the exact numbers. It was ten years ago.
But I'm going to guess that it was underpopulated. And so then the discussion with Congresswoman Sewell would be, you know, where -- what areas would we add to your district to get your district to ideal population.
And, obviously, in looking at those areas, we, you know, wanted to make sure that we preserved the majority black district.
Q. I know some of this was discussed in your deposition eight years ago. So I'll try not to tread the same water too much.
But explain to me just a little bit about the process when you were drawing the 2011 congressional map. So did you start with District 7?
A. I probably did start with District 7. I don't really remember, to be honest with you. I mean, I -- you know, I was meeting -- I met with the entire delegation to start. And then we went from there.
But preserving Congresswoman Sewell's

majority black district was a priority for the delegation.

Q. And that was the priority for you, as well?

A. Yes.

Q. Do you remember generally what sort of changes you made to District 7 in 2011?

A. I really don't. I mean, I apologize. But I did so many maps and plans in the last ten years that I don't.

Q. What other maps and plans have you done in the last ten years?

A. Well, we just did four in the last couple of months.

Q. Anything else?

A. Those are the ones that are mostly stuck in my brain.

Q. Are there any others?

A. No.

MR. WALKER: What was the question again?

MR. THOMPSON: He said there were so many maps that he had drawn in the last ten years. And I asked him which ones, and he said just the four that he just did.

A. Well, "drawn" is -- we could find the exact number. But I think in this last legislative session, there were something like 41 various maps and plans that were submitted to the legislature. So while I certainly didn't draw most of those, I did look at them.

So to ask me to go back ten years, it's hard to -- when you have some 41 pieces of 41 maps in your head, it's hard to expand back ten years.

Q. So you reviewed all 41 maps that were submitted?

A. I didn't review them all, but I looked at most of them.

Q. What's the difference between looking at them and reviewing them?

A. Well, reviewing them would take more time. Looking at them would be, okay, this is a -- this is a house map or a senate map or whatever. I just looked at the cover sheet and maybe the overall numbers, but didn't review -- didn't -- some of them were never offered, obviously. So if they weren't offered, I didn't look at them more seriously than that.

Q. Did you review all of the maps that were offered?

A. I looked at --

MR. WALKER: And you're talking about --

Q. We're talking about 2021 now. Did you review all the maps that were offered in the legislature in 2021?

A. Yes, I tried to. Some of -- some of that may have been a very short review because some of those maps were literally submitted 24 hours before they were offered either on the floor or at committee. So it's not like it was a long review.

Q. One more question going back to the 2011 congressional map. Did you consider race -- excuse me. A couple more questions, to be fair.

Did you consider race in drawing any of the other districts other than District 7 in 2011?

MR. WALKER: Congressional.

Q. The congressional map in 2011.

A. Not specifically. I mean, I'm not sure I know what "consider" means. But, obviously, all that information was available on each district. But --

Q. Did you review the racial data for each district when you were drawing the 2011 congressional map?

A. As a matter of course, yeah. I mean,

it's all there.

Q. Explain that.

A. Well, when you finish -- when you draw a map, obviously, you've got seven districts. And you're going to have -- if you look at the, you know, top data for each district, it's going to have race and voting age, black, so forth and so on for each district. It's not like it just only comes up on the majority black district. It would come up on all of them, obviously.

Q. Did you review that data for each district?

A. I looked at it.

Q. What did that data tell you?

A. Nothing specifically.

Q. Did you do anything with that data?

A. I did not.

Q. Did you consider drawing two majority black districts when you drew the 2011 congressional map?

A. I really did not.

Q. Why not?

A. Well, primarily because the people who were paying me to draw these maps preferred the districts similar to how they were.

Q. Did the people that were paying you to draw the map prefer not to have a second majority black district?

A. I don't know about that. But they preferred to have their districts as close to what they had under that map going forward.

Q. Did you discuss with anyone the possibility of creating a second majority black district?

A. I don't believe so.

Q. Were you aware of requests in the legislature in 2011 to create a second majority black district?

A. Again, I don't have a -- I don't have a complete recollection of ten years ago what maps were offered or not offered on the -- I don't want to guess on what was offered and what wasn't offered.

Q. Do you know if it would have been possible to create a second majority black district in 2011?

MR. DAVIS: Object to the form.

MR. WALKER: Objection. Go ahead.

A. I did not do it. So I -- I don't have an opinion on whether it was possible.

Q. To be clear for the timeline, I'm moving ahead now to 2021 for the most recent maps that were drawn.
A. Yes, sir.
Q. And I'm going to refer now to the 2021 congressional map. When I refer to that, I mean the one that was enacted. It was also referred to, I believe, as HB-1 and then ultimately Act 2021-555. Is that fair?
A. Yes, sir.
Q. And I'll refer to that either as the 2021 map or the 2021 congressional map. Is that okay?
A. Yes, sir.
Q. When were you first approached about drawing the 2021 congressional map?
A. That probably would have been the end -- sometime in September or October of 2020.
Q. Of 2020 or 2021?
A. 2020. About a year out, I would say.
Q. Who approached you?
A. Senator McClendon and Representative Pringle on behalf of the republican leadership.
Q. What were you asked to do?
A. They asked me if I would be interested

in drawing all four maps that they -- the congressional, as well as the other maps that needed to be drawn in this session.

Q. And those four would be the congressional, the house and senate for the state legislature, and the board of education?

A. Yes, sir.

Q. Did you agree to draw all four?

A. I did.

Q. When were you officially retained?

A. Around that time, I would think. Like maybe October of 2020.

Q. And who officially retained you?

A. Well, I was working for the two chairs of the -- the house chair, Representative Pringle, and the senate chair, Senator McClendon.

Q. Did you sign a contract?

A. I did.

Q. When did you sign that contract?

A. Again, I don't have that in front of me. But September or October of 2020, I would imagine.

Q. Is the contract with you individually, or is it with your company?

A. It was with R. Hinaman, yes.

Q. And who is the other party that you

contracted with?
A. Citizens for Fair -- Citizens for Fair Representation. Or maybe Alabamians for Fair Representation.
Q. Do you recall which one it is?
A. Not off the top of my head.
Q. Who is Citizens for Fair Representation or Alabamians or Fair Representation? Whichever the name is, who is that group?
A. It's a 501(c)(4) which also paid me to do the map drawing that I did in 2011.
Q. And what's your understanding of why you were contracted by this particular group?
A. Meaning?
Q. As opposed to the State of Alabama, the legislature, anyone else. Why this 501(c)(4) organization?
A. The leadership had set up that (c)(4) for the purpose of drawing districts in 2020 -- 2011 and then continued it for 2021.
Q. So this 501(c)(4) organization was created for the purpose of drawing the redistricting in the state of Alabama?
A. In 2011, that's my understanding, yes.
Q. Do you know if that organization does

anything else?
A. I do not.
Q. The contract that you signed around September, October of 2020, did you draft that contract?
A. I did.
Q. What does the contract call for you to do?
A. It calls for me to work with the two chairs and the leadership of the house and the senate to draw four maps, congressional, state senate, state house, and state board of education. And to the extent practical and possible, meet with the officeholders for those four maps to get their interest in changes and so forth.
Q. In that last part, you said "to meet with the officeholders"?
A. Yes.
Q. Is that basically the incumbents for each of the various districts on each of those maps?
A. Correct.
Q. Do you have a copy of that contract?
A. Not with me. But yes, I do.
Q. Is that something that you could produce if you were requested in this case?

A. Yes.

Q. What were the terms of your compensation in that contract?

A. Four payments spaced out over various months, four payments of $50,000 spaced out over the length of the contract.

I believe when we actually signed the contract back in September or October, we were hoping or planning to do a special session in July. So we didn't at that time know that COVID was going to delay the census numbers and so forth and so on.

So when I started the process at the end of 2020, the theory was we would, you know, probably have a special session in June or July sometime to pass these maps.

Q. You said you started the process around the end of 2020. What do you --

A. Well, when I signed the contract.

Q. You also said that there was -- the contract called for four payments of $50,000. Is that four separate payments of 50,000 each, for a total of --

A. Yes, sir.

Q. -- 200,000?

A. Yes, sir.

Q. Have you been fully paid at this point?

A. I have.

Q. Was any part of your compensation contingent on anything?

A. No. However, the -- just to be clear on the payment, because the time frame of the project changed -- I mean, when we initially signed the contract, the theory was, again, we would have the census data in March and we would pass a plan in July. Obviously, that didn't happen.

So my timeline for when I was supposed to get those four payments I modified so that they didn't have to pay me before I had actually even had census data. So we changed the timeline. But yes.

Q. Were you able to do any work on the maps before you got the census data?

A. Yeah. We -- especially the state-wide ones such as congress and state board of education. We had to -- we had the estimates, county estimates, from the census bureau. I guess it would have been the 2019 numbers.

So it was possible to look at them and say, okay, this district is likely to be under, this district is likely to be over, which on the congressional level allowed me to start meeting with

members before we had the official census data which we didn't get until the end of August.

Q. So you didn't get the official census data until the end of August. But you had unofficial estimates from the census before then?

A. Correct.

Q. And when did you receive those unofficial results?

A. I don't -- I don't know when the 2019 numbers were updated. But I'm going to say around the end of -- somewhere around the end of 2020. But I don't know that exactly.

Q. Did you begin working on the congressional map before you received the official census data?

A. Yes, sir.

Q. When did you begin working on that map?

A. In earnest probably in May of 2021.

Q. What do you mean "in earnest"?

A. Well, meeting with members and talking substantively about potential changes.

Q. Before we get into the specifics of that, just on your compensation real quick, were you paid or retained by anyone else?

A. No. I mean, I assume you mean relative

to redistricting.

Q. Certainly. You've received other payments --

A. Yes.

Q. -- for other --

A. Consulting.

Q. Correct.

So you stated that you began drawing the 2021 map in earnest in May of 2021. Did you do anything else in preparation for drawing the maps before that date?

A. No. I mean, I had conversations with members of the congressional delegation. And as you may -- may know, there was considerable concerns/discussion about whether Alabama would have seven members of congress or six.

And until we really knew the answer to that -- which I think we were told by the census bureau in April, sometime in April what the answer to that question was -- there really wasn't much -- I didn't -- my position with the congressmen was it would not make sense to work on a map until we knew how many districts we were going to have.

Because, obviously, working on a six-person map where somebody would be paired with

somebody was not going to be a lot of fun. And there was no need to do that if we didn't ever have to.

Q. Certainly. So the census bureau informed --

A. All the states, I think, in April of how many -- how many members of congress they would have. And then that allowed me to set up meetings and work off of the estimates of 2019 to talk about whether your district was over or under and so forth.

Q. And you began those meetings around May of --

A. I went to DC with the goal to meet with everybody in May, yes, sir.

Q. So you said you went to DC. So I assume that you're referring to meetings with the congressional members.

A. Yes.

Q. Did you meet with any other -- for instance, did you meet with anybody in the Alabama state legislature in the spring of 2021?

A. Well, I met with the two co-chairs to talk about my plan to how to -- you know, how to move forward on the congressional, that we would

wait until we knew how many districts the state would have. And then I would go to Washington and meet with the members and start formulating a plan from there to hopefully reach some consensus on a map.

Q. Before you received word from the census bureau that there were going to be seven districts in Alabama again, did you do anything else in furtherance of drawing the 2021 congressional map?

A. I did not.

Q. When did you actually begin redrawing the 2021 congressional map?

A. After my May round of meetings in Washington.

Q. You say after then. Would that have been in May? Or June, July?

A. I think the end of May, beginning -- again, this was all based on estimates. We did not have the real census data. So I just -- I probably roughed out a map sometime in May or June based off of the estimates, knowing full well they were not going to be completely accurate.

Q. From the time that you started drawing the 2021 congressional map until it was completed, about how much time did you spend in terms of hours

on drawing that map?

A. I have no idea. I guess I would make a bad lawyer.

Q. Well, I don't want you to guess.

When was the map completed for the 2021 congressional?

A. Complete. When was I done with what I was doing with it?

Q. Correct.

A. Probably the Friday before the week we went into session. So whatever that -- October 23rd or -- I'm making up that date. Whatever the Friday before we went into session was.

Q. And you're referring to the special session that was called in the fall of 2021?

A. Correct.

Q. Going back to how much time it took you in terms of hours. Would you say that you spent more than 100 hours drawing the congressional map in 2021?

A. Well, if you're including meetings and discussions about it, yeah, probably.

Q. Would you say you spent more than 150 hours?

A. I don't know. I just -- I don't really

have a -- I didn't think of it in terms of hours. My contract didn't -- my contract was just you were going to draw these four maps. And whether it took 123 hours or 217 was irrelevant to what I was doing.

Q. Right. I'm just trying to get an idea about how long it took you. I know there were months involved.

But how much time you were actually spending on this in that time frame, would you say it took you more than 200 hours?

A. I have no way of even guessing that. I really -- I apologize, but I don't.

Q. Were you doing other things work-wise between May 2021 and -- when was the special session? Was it in October?

A. October of 2021, yes.

Q. Between May 2021 and October 2021, were you doing anything else work-wise other than drawing these four maps?

A. Not very much because it was an off-year, obviously. I had clients that I did things for, obviously, in 2020, working up to the November 2020 election. But -- and I still had an ongoing relationship with some of -- a couple of my clients. But there wasn't a lot of work that needed

to be done in the off-year.

Q. Were you working full 40-hour weeks during that entire time?

A. By and large, yes.

Q. Did you take any trips or personal vacation time during that time period?

A. Well, it was during COVID. So I didn't travel a whole lot. But it was a crazy time, as you all remember.

Q. Did you take any time off?

A. Sure.

Q. About how long did you take off?

A. I don't know. A couple of weeks.

Q. And in that -- you had mentioned that you weren't able to begin redrawing the congressional map before you received the census estimates in April of 2021. Does that apply to all --

A. Before I received how many districts we had in April of 2021.

Q. Correct. Does that --

A. I think we had the census estimates before that. I'm saying we just didn't know how many districts there were.

Q. Fair enough. Thank you for the

clarification.

Does that apply to all four of the maps that you were drawing?

A. No. That's obviously the -- the only one that the census determined how many members there would be would be -- was congress.

Q. Because you said you had unofficial census data on, I guess, population prior to that?

A. By county, yes.

Q. And did you use that unofficial data for the other maps?

A. I used it -- I used it to start working with the state school board members.

It was less effective at the senate and house levels, virtually useless at the house level because it was mostly county data at the beginning. And so most house districts are not made up of full counties, obviously. So it was less valuable in those maps and more valuable in the statewide maps.

Q. When did you begin drawing the state house and senate maps in 2021?

A. I did not start on a house map until we actually had all of our census data at the end of August. I had roughed out a few of the rural senate districts based on some of the estimates. But it

wasn't particularly effective.

So I would -- I would really say I didn't seriously start drawing those maps until August of 2021.

Q. And what about the board of education map?

A. The board of education I was doing simultaneously to congress because that was obviously a statewide map. And the county numbers were more usable in that type of map than they were in a 105-member state house map.

Q. So you began drawing the board of education map around --

A. The same times as congress.

Q. Which was around May of 2021?

A. Correct. I think I started meeting with those members in May, as well.

Q. We've been going about an hour. Do you want to take a break?

A. Sure.

THE VIDEOGRAPHER: We're off the record. The time is 10:17 a.m.

(Recess was taken.)

THE VIDEOGRAPHER: We are back on the record. The time is now 10:35 a.m.

Q. Mr. Hinaman, when we left off, we were talking about the preparation that you did starting to get into the beginnings of drawing the 2021 map.

Prior to May 2021, did you anything in furtherance of drawing the 2021 congressional map?

A. Other than reviewing the 2019 census estimates by county, no.

Q. And what did you do when you were reviewing the --

A. I was trying to get a feel for what districts would be underpopulated and what districts would be overpopulated based on those estimates.

And while the estimates in the end didn't turn out to be obviously particularly close to the actual numbers, in order -- they were -- they were close in that they did predict the three districts that would be under and the four districts that would be over.

So it was helpful to pay attention to that when I started to do my round of meetings with the members of congress.

Q. Did you do anything else prior to May 2021 in furtherance of drawing the 2021 congressional map?

A. No. I mean, obviously, I -- at some

point in that time frame, the reapportionment committee met and passed their guidelines. Obviously, I reviewed those and how they would impact the drawing of the maps. But that was -- that was about the May time frame, as well. It may have been early May rather than later May.

Q. You met with members of congress in DC in May of 2021, correct?

A. Yes.

Q. Was that the first thing that you did after the census data came out in 2021?

A. Well, the data --

Q. Let me take a step back there.

You said that prior to May 2021, the only thing that you had done was review some of the unofficial census data to get a feel for underpopulation, overpopulation?

A. Yes.

Q. Then the census bureau announced around April 2021 that there will be seven congressional districts again in Alabama?

A. Correct.

Q. Was the next step that you did flying to DC to meet with the congressional members?

A. Yes. And that was, again, after

guidelines had been passed in early May.

The only other thing in there, obviously I had talked -- before we knew seven to six, I had talked to, obviously, all of the offices, the congressional offices, about what my -- what our proposed timeline was going to be based on the fact that the census data was delayed, and that hopefully we would be able to set up a round of meetings in May and then we would get our data in August or whatever, and then we would fine tune it from there.

Q. So those were more of administrative coordination discussions?

A. Yes, sir.

Q. You flew to DC, you said, in May of 2021 to meet with the congressional members. Did you meet with each -- all seven congressional members?

A. I met with five in person, one by Zoom. And one of the members declined to meet because they were more interested in running for a different office, I guess.

Q. Which member was that that declined to meet?

A. Mo Brooks. I met with his chief of staff, but I did not meet with Congressman Brooks directly.

Q. You met with each of the other congressional members?
A. Five in person and one by Zoom.
Q. Who was the one you met with by Zoom?
A. Congresswoman Sewell. She was back in Alabama on a personal matter. So I met with her by Zoom.
Q. Did you meet personally with Congressman Sewell by Zoom?
A. Yes.
Q. And when was that?
A. During the May trip. Is that what you're asking me?
Q. Correct. Because you went to DC to meet with some of them.
A. Yes. And she was not in DC because of a personal matter. So we did a Zoom call.
Q. You were in DC when you had the Zoom call?
A. And she was in Birmingham, I believe.
Q. Was it just one call that you had with Congressman Sewell?
A. During that trip, just one call.
Q. Have you had other meetings with Congressman Sewell?

A. I've had other Zoom meetings with her. Microsoft Teams, technically. But yes, Zoom meetings.

Q. Have you had any in-person meetings with Congressman Sewell?

A. No, I don't think I did this time. I mean, as -- in-person meetings were rather difficult. It was actually May when I went to -- the house office buildings were actually closed and didn't allow visitors. So meeting anybody in person was a bit challenging during that time.

I would have met with her in person on that trip had she been in town. But she was not. But the other members that I met with were all off-campus, so to speak, because we couldn't go to -- I couldn't go to their offices.

Q. As far as Congressman Brooks goes, you said you met with somebody from his staff?

A. I met with his chief of staff, yes.

Q. And what did you discuss with these representatives when you met with them in May of 2021?

A. I discussed the over and under nature of their district. And if their district was underpopulated based on the estimates, I said, you

know, "Where would you envision picking up population?" If you were over populated, "What areas of your district would you envision potentially losing?"

Q. Did you discuss anything other than population changes with them?

A. Population changes and potential timelines and when we might get the real census data.

Q. Anything else that you discussed with them?

A. That was about it.

Q. What did you do next after meeting with the representatives in May of 2021?

A. I took -- took back that information and looked at it in terms of a map, and then waited for the real census data to come to see where we really were.

Q. You said you took back that information. What sort of information did you get from these meetings?

A. When somebody said if I need to lose 10,000, I would like to lose them in county X or place Y or whatever.

Q. And so you said you took that

information. And then what did you do with it?

A. Tried to rough it out in an estimated map, but again knowing that it was going to change because the estimates were not going to be completely accurate.

And, again, I didn't want to -- if there was a conflict somewhere between some -- two members wanted county X, I didn't really want to litigate that until we had real numbers because it may become irrelevant when it turns out that their district was 10,000 off of what the estimate said.

So I tried not to get into any negotiations at that point.

Q. Were there some disputes in the recommendations and requests that you received?

A. Minorly, yeah.

Q. Were there specific counties that more than one representative wanted?

A. Yeah. I mean, for example, the 1st District was going to be over. The 1st District was going to be overpopulated, and it was going to have to lose some. And the 1st District congressman wanted to probably lose some to the 2nd in Monroe, but the 2nd District congressman wanted to gain some from the 1st in Escambia, just things like that.

They were not major.

But, again, it really wasn't worth the point of negotiating it fully until we knew the real numbers. Because as it turned out, it only ended up being 739 people, and it wasn't particularly important which county it was in the scheme of 717,000 voters or citizens in a district.

Q. You said you then took that information from those meetings with the representatives and roughed out a map. What does that mean?

A. It means I took the -- we had the estimates on Maptitude at the state reapportionment office. And I just roughed without -- I mean, I didn't get anywhere close to zero deviation because there was no point in it.

I just generally roughed out based on what we had discussed in DC, knowing that it was all going to change when we got the real numbers. But just explored some of the potential.

Q. And to be clear, for somebody that doesn't draw maps, what does "roughed out" mean?

A. Meaning assigned various counties to districts just in an effort to get things closer to the ideal population.

Q. Kind of playing with the numbers, just

kind of seeing what works as a preliminary standpoint, I guess?

A. Yes. And just to be clear, that was all on total population. Because I certainly didn't have the ability or trust the internals of any of those -- I mean, I wouldn't have trusted like BVAP or anything else to the extent it wouldn't have made any sense to look at it at that point.

Q. Did you have any data on the black voting age population at that --

A. I don't know what the estimates had. But I didn't even look at it because I knew it wasn't going to be significant to what we were doing.

Q. Did you do anything else before you received the official census data in August of 2021?

A. No.

Q. Did you review any other materials in that time frame before August 2021?

A. Obviously, I reviewed the guidelines and had discussions with the two chairs of how we will proceed once we get the data in terms of all the maps.

Q. What were those discussions like?

A. Just mostly timing and how we would --

how we would go forward. And hopefully we could get some consensus on the state school board members and some consensus with the congressional members.

And, obviously, the house map I couldn't do anything with until we got the real numbers. The senate map I could do next to nothing with. I mean, I could look at a few of the more rural districts because they were whole counties. But once you got into major metropolitan areas, I couldn't come up with too many suggestions for that then.

Q. Other than Pringle and McClendon, did you meet with any other members of the Alabama legislature?

A. I don't believe so at that time.

Q. And "that time" being before August 2021, correct?

A. Correct.

Q. Did you review any election returns in that time frame?

A. I did not.

Q. Did you review any voter registration info in that time frame?

A. I did not.

Q. Did you review any voter primary participation data in that time frame?

A. No, sir.
Q. And then in August 2021, you received the official census data, correct?
A. Correct.
Q. What did you do once you received that data?
A. Well, the State received it.
Q. And then ultimately it was passed on to you, correct?
A. Well, it was -- I used the state computer. So their -- that data was then given to Maptitude. This is my understanding. I did not do any of this.
That data was given to Maptitude, and Maptitude turned it into their workable -- put it into their program and sent it back to the State. And the State loaded it into their computers, which all took another week. And then I was able to manipulate it on -- use it on a computer at that point.
Q. So walk me through that. So Maptitude is a software on a computer, correct?
A. Yes.
Q. A map-drawing software?
A. Correct.

Q. Is it the same software that you had used previously in drawing maps?
A. I used it in 2011, yes, sir.
Q. Did you ever use it before then?
THE WITNESS: I used it in 2011. The State used ESRI.
A. Excuse me?
Q. Did you use it before 2011?
A. I don't think so.
Q. And you were clarifying with Mr. Walker that you used in 2011 --
A. Yeah. In 2011, I had a computer, and I had Maptitude on it. The State used -- the State of Alabama used a different software, I think, called ESRI.
THE REPORTER: Called what?
A. ESRI.
Q. Can you spell that?
A. I don't know.
MR. WALKER: E-S-R-I, all capital letters.
Q. And what is ESRI?
A. It's just a -- it's similar to Maptitude software for using the census data.
Q. So in 2011, you drew the map using your

own computer and your own software?
A. Correct.
Q. Was that then imported into ESRI for the State?
A. Yes, sir.
Q. The file types can be imported from one to the other?
A. Yes, sir.
Q. Then in 2021, you did not use your own computer and software, correct?
A. That's correct.
Q. You used the State's computers and software?
A. Entirely.
Q. Where was that physically?
A. In the reapportionment office at the state house, Room 317.
Q. So any time that you wanted to actually work on redrawing the map, you had to --
A. Physically be there.
Q. How often --
A. Sorry. I didn't mean to finish your sentences.
Q. That's fine. And we're doing a pretty decent job. But let's try to remember to let each

other finish so that the court reporter can type everything down.

How often -- starting in August 2021, how often would you go to the -- what did you say it was? The reapportionment office?

A. Reapportionment office.

Q. How often would you go to the reapportionment office after August 2021?

A. Once the -- once the material was loaded into the computer, which was probably the last week of August maybe, I was there once or twice a week for the next week or so. And then after that, I was there four or five days a week until we were through the special session. I basically lived in Montgomery. For all intents and purposes, I lived in Montgomery for a couple of months.

Q. From, say, the beginning of September through the end of October?

A. Yeah. Certainly Labor Day until the end of October.

Q. Would you work on weekends, as well?

A. Rarely. I mean, once we got very close to the session, yes. But not -- not normally.

Q. Of the four maps you were -- you were working on all four maps in that time frame, right,

starting in August 2021 through October 2021?

A. Yes.

Q. And all four maps, you were doing the same process using the State's computers and using Maptitude, correct?

A. Correct.

Q. Were there any of those maps that took a significantly larger portion of your time to draw?

A. Well, obviously, including meetings with members. 105 house members are significantly more meetings than, you know, seven for congress and eight for school board.

So, obviously, the house map probably took a lot longer just in terms of meeting with 105 different -- I didn't meet with everybody. But the vast majority of 105 people -- and sometimes more than once -- took a lot longer than meeting with seven congressmen, for example.

Q. In addition to meeting, I assume that drawing 105 districts probably takes a lot more of your time to do than just drawing seven. Is that fair?

A. That's fair.

Q. If you had to put very rough percentages on the amount of time you spent on the congressional

map versus the other ones, about how much of your time would you say you spent?

A. Now you're -- now you're making me a lawyer again. And I'm not good at this.

I really -- I don't really know how to do that. I mean, you would be correct that the majority -- I mean, I put more time into the house map than I put into the state school board and the congressional. But I really don't have a way to quantify that.

Q. Did you put more time into the senate map, as well?

A. Yeah. Obviously, it's 35 members versus seven or eight. It just takes longer to do the meetings and follow-ups and so forth.

Q. And the state school board --

A. Is eight members.

Q. Eight members. Did that take you about the same amount of time to draw as the --

A. Yeah.

Q. Sorry. Let me make sure that I can finish.

Did drawing the state school board map take you about the same amount of time as it did for drawing the congressional map, given that they have

about the same number of districts?
A. Yes.
Q. Going back to the software, this Maptitude software, you said that it took about a week for the census information to be uploaded; is that correct?
A. Yeah, that's what I said.
Q. What does that mean?
A. Again, this was not part of my responsibility. But the State got the data, as I understood it, and gave it to Maptitude. Maptitude translated it into their software and sent it back to the State to be loaded on the State computer.
But, again, this is all my secondhand knowledge of what was going on. I was not doing this.
Q. From your perspective, once you arrived around the end of August looking at Maptitude and the software, you were able to see what information has been uploaded, correct?
A. Well, once it's -- yeah. Once it's uploaded, yes.
Q. What sort of information is -- was available to you on the Maptitude software regarding the districts?

A. Once it's all loaded in, I have, you know, total population and voting age population and race down to the block level.
Q. Is there any other information that's available to you in Maptitude?
A. I don't believe so.
Q. Did you, yourself, upload any additional information into Maptitude?
A. I did not.
Q. Did you review any other data in preparing the maps?
A. I did not.
Q. Did you meet with anyone between August 2021 and the time that you submitted the maps before the special session in furtherance of drawing the 2021 congressional map?
A. Well, I met with virtually all of the officeholders.
Q. You met with each of the seven congressional representatives again?
A. Oh, yeah. I had Zoom calls with -- with them. And then -- are you talking just congressional now, or all of it?
Q. Focusing on the 2021 congressional map.
A. Yes.

Q. Who did you meet with to discuss the drawing of the map between August 2021 and when you submitted the map in the week before the special session?

A. Once we had the real data, I went back and had Zoom calls with all of the members of congress or their -- or their chief of staff to talk about what the differences were from the estimates versus the actual census data and to reiterate, you know, what we discussed in May, what was still operable and what maybe needed to be slightly revised based on what our thoughts were.

Then after those round of Zoom calls, I went back and drew a proposed map. Which I then did another round of calls, Zoom calls with, to look at the final -- semifinal, final version, I guess.

Q. In those meetings, did you discuss anything with the representatives other than changes that needed to be made for population deviation?

A. No.

Q. How many meetings would you say you had with each of the representatives in that time frame?

A. It varied. For example, Mo Brooks would be zero because he again was not interested to participate. Others took, you know, three, four,

five phone calls. Some were one or two.

In the final end, Representative Palmer decided not to do the final call. So I didn't have a final call with him. But everybody else, I had at least two, if not more.

Q. Were all of the meetings with the representatives from August 2021 through the special session by Zoom?

A. Yes.

Q. When you had those meetings, would you share your screen to be able to show what the map looks like?

A. Exactly, yes.

Q. Did you discuss with each of the representatives the map as a whole or just their specific districts?

A. Their specific districts and an adjacent district if there was some change there.

Q. You stated for the 2011 congressional map that you were actually hired by the seven congressional representatives, correct?

A. Correct.

Q. That was not the case for 2021, correct?

A. That's correct.

Q. Why not?

A. That was not my -- the leadership decided that they would, you know, hire me through the 501(c)(4), which -- which is how they hired me for legislative. I did the legislative maps in 2021, and I guess they preferred that model over the other one. I don't know. That was their choice, not mine.

Q. Did you receive any other instructions or requests from the congressional representatives other than changes to make to account for population deviation?

A. No.

Q. Did you meet with any members of the Alabama state legislature to discuss the 2021 congressional maps?

A. Just -- just the two co-chairs, two chairs.

Q. And that's --

A. Senator McClendon and Representative Pringle.

Q. What did you discuss with Senator McClendon and Representative Pringle?

A. I would just update them on our progress and discussions with various members. And to the extent that there were conflicts like the one I

described between the 1st and the 2nd, I just updated on that in case they were to receive a call from somebody, they would know what was happening.

Q. In these meetings with Senator McClendon and Representative Pringle, were you pretty much just providing information to them?

A. Yeah, pretty much.

Q. Did you receive any feedback or particular requests from them about how to draw the map?

A. No.

Q. Beyond anything that you were told from the congressional -- U.S. congressional representatives, were you given any instructions or requests about how to draw the 2021 congressional map from anyone?

A. No.

Q. And how many times did you meet with Representative Pringle and Senator McClendon in preparation for drawing the 2021 congressional maps?

A. I don't -- I mean, this was during the course in time when they were also in town doing meetings with their colleagues. So maybe I updated them every other week. It was rather -- I mean, it wasn't a formally structured we meet every Tuesday

at 10:00 o'clock. It was just when they were both there or singularly there, I would just give them a quick update.

Q. Were these updates by phone or email or in person?

A. Usually in person.

Q. Were there ever communications by email with them?

A. No.

Q. Did you attend any of the public hearings in preparation for the 2021 congressional maps?

A. I didn't. They were happening simultaneously with me being in Montgomery. And I would occasionally walk in the room while they were happening to talk to somebody else or whatever. But I didn't officially attend them.

Q. There were a few that you walked into the room while they were going, you said?

A. Well, they were being done in an adjacent room, and I occasionally walked in. And I would also occasionally -- either the co-chairs or Dorman Walker or somebody would come back and update me as to something somebody said if they thought it was significant to my drawing.

Q. Do you recall what any of those sort of comments would have been?

A. Yeah. For example -- and this was already in process, so it wasn't a tremendous shock. But there were comments, for example, in the Montgomery meeting that they didn't want to be split into three districts as they were in 2001, that they would prefer Montgomery not -- probably they preferred it not to be split at all. But if it were going to be split, to certainly not three ways and have it be two, which was a feature of a map I was already working on. But things like that.

Q. Do you remember any other specific feedback that you received from the public hearings?

A. Just areas like the Shoals area wanted to be kept as intact as possible. And people in Madison and Morgan wanted to be -- they thought there was obviously a lot of community of interest between those areas in north Alabama. People in Baldwin and Mobile wanted to be kept together. There was a lot of community of interest between those counties. Things like that.

Q. When you refer to "the Shoals area," you're referring to Muscle Shoals?

A. Yes.

Q. Any other specific feedback that you recall receiving from the public hearings?
A. Not on congressional. There was a lot of feedback on state maps that we also talked about.
Q. And did you ever personally sit in on any of these hearings or hear anything that was being said personally?
A. I did for ten-minute snippets occasionally when I was waiting to talk to somebody in that room.
Q. Did you gather anything from the time that you spent in the hearing personally?
A. Nothing other than observations that I relayed to you a minute ago.
Q. You mentioned that Montgomery County, the public hearings provided feedback that they didn't want to be split. Do you remember why that was?
A. I think -- I think both in Montgomery County and most any county when you have split counties or split precincts, there's confusion as to who somebody's -- who their representative may be.
And it was a -- it was obviously a guideline of the committees on all these maps to try to split less precincts and less counties.

Q. Do you know when Montgomery County was originally split?

A. Originally split?

Q. Correct.

A. No. I mean -- no, I don't.

Q. The first map you drew was in 1992. Was Montgomery County already split prior to that?

A. I have no idea. I'm sorry. I don't even remember the map I drew, whether it was split, to be honest with you.

Q. Did any of the information that you received from the public hearings impact the way you drew the 2021 congressional map?

A. No, other than things like I said, not splitting Montgomery three ways, putting as much of the Shoals area together, keeping Mobile and Baldwin together, keeping Madison and Morgan together.

Q. Was that something that you specifically made changes to your map to accommodate?

A. No. Most of those features were already happening. It just -- I kept it in mind. For example, when -- we eventually had to split Lauderdale County between 5 and 4. And when we were doing that, I was trying to keep Florence and Muscle Shoals together as much as possible when we were

doing that split. So yes, it was in my mind when we were, for example, doing that split.

Q. Other than the accommodations for the Lauderdale, Muscle Shoals area, did any of the public feedback that you received from the public hearings tangibly impact a change that you made on the map?

A. Not so much a change. But it did -- it did confirm that our theory of putting -- not splitting Montgomery three ways was a worthy goal. And I worked to get Congressmen Rogers to agree to come out of Montgomery County because he was partially in Montgomery County.

Q. Since we're talking about it, this may help a bit.

(Plaintiff's Exhibit 5 was marked for identification.)

Q. I'm handing you Exhibit 5. I don't want this to be a memory test for you. So this is a copy of the 2021 --

A. I've had enough -- I've had enough of those already.

Q. This is a copy of the 2021 congressional

map. Do you recognize this?
A. I do.
Q. Does this appear to be a true and correct of the 2021 congressional map?
A. It does.
Q. We were talking about Montgomery County here not wanting to be split.
A. Three ways, yes.

(Plaintiff's Exhibit 6 was marked for identification.)

Q. I'm also going to hand you what's being marked as Plaintiff's Exhibit 6 for your reference. This is a copy of the 2011 congressional map.
So looking at Montgomery County, it looks like in -- well, first off, Plaintiff's Exhibit 6, does that appear to be a true and correct copy of the 2011 congressional map, to your knowledge?
A. It does.
Q. We were -- and you used this 2011 congressional map as the starting point in drafting the 2021 congressional map, correct?
A. I used the cores of the existing

districts as a starting point, yes.

Q. Is that different from using this map as the starting point?

A. I don't know. I don't think so.

Q. When you began drawing the 2021 congressional map, you didn't start from scratch, right?

A. No. Correct.

Q. You started using the 2011 congressional map?

A. Correct.

Q. Looking at Montgomery County, so that was split into three districts in 2011; is that right?

A. That's correct.

Q. Do you know why that was split into three districts at the time?

A. Not specifically, other than, obviously, it had been -- Congressman Mike Rogers in the 3rd District had had an office in Montgomery, that part of Montgomery County, and had represented it for a while and probably didn't -- didn't want to lose that base of support and financial support and so forth.

Q. In the 2011 congressional map, District

7 reaches into a portion in the middle of Montgomery County. Do you know why it does that?

A. To gain population for that district.

Q. Was District 7 reaching into a portion of Montgomery County in the prior 2001 congressional map?

A. I don't know.

Q. Do you remember if Montgomery County -- do you remember if District 7 reached into a portion of Montgomery County in the 1992 congressional map that you drew?

A. I do not remember, no. I'm sure somebody has a map and could tell me. But I don't know.

Q. So it looks like from the 2011 congressional map to the 2021 congressional map, you were able to take District 3 out of Montgomery so that it's not split three ways anymore and is only split two ways; is that correct?

A. That's correct.

Q. Is there a reason why it still needed to be split into two different districts?

A. Yeah. I mean, obviously, the 7th District was underpopulated. So if you took it all the way out of Montgomery, then you would have to

add a number of different counties to make up that population.

Q. Well, it looks like District 7 also includes only a portion of Tuscaloosa County and Jefferson County, correct?

A. That's correct.

Q. So could you not have taken more of either Tuscaloosa County or Jefferson County and then been able to leave Montgomery County as being solely in one district?

A. Well, yeah, it would have been possible certainly in Jefferson. I don't know about Tuscaloosa. I don't think actually -- I think there are many more people in the 7th District portion of Montgomery than there are in the 4th District portion of Tuscaloosa. But yes, certainly in Jefferson that would have been possible.

But as you know, they -- these all have to fit back together at the end. So what might have been a perfect map for somebody in Montgomery may not have created a perfect situation for whatever member represented Jefferson or wherever.

Q. Did you consider moving -- did you consider making Montgomery County solely District 2?

A. I did not.

Q. Why not?

A. Because, again, I didn't think it -- while that may look like geographically not a very large area, it has a considerable number of voters in it. And it would have been hard to take that out of 7 and make up the population somewhere else.

About the only place, as you pointed out, to do that might have been Jefferson. But, again, we have two representatives in Jefferson County right now. And it would have been hard to eliminate one from that process.

Q. Is there anything in particular about this specific portion of Montgomery County that's in District 7 that makes it a community of interest or something that ties it into District 7 versus District 2?

A. Not necessarily. I mean, obviously, geographically it's next to -- it's adjacent to Lowndes County.

Q. Did you look at racial data in including that portion of Montgomery County in District 7?

A. I didn't. When we started doing -- I didn't initially. When we started filling in this -- all these discussions we've had up until now have all been based on total pop. I didn't look at race

at all on the computer when we were adding folks to these districts or subtracting folks from these districts.

So at this point, I've basically just been looking at total pop and where do you get the total pop to get the districts back to ideal population. So at that point, there was no discussion of race. It was all a discussion of total pop.

Q. You say "at this point." Where are we talking in the timeline?

A. Up until -- up until we finished the map.

Q. Finishing the map being the week before the special session?

A. Correct.

Q. So is it your testimony that you did not look at race at all in 2021 before submitting the maps to the special session?

A. No, I did not look at it up until the week before we submitted the maps, when at that point we did turn on race and look at the racial breakdowns in the various maps.

Q. Why did you look at the racial breakdown that week before the special session?

A. Well, to -- obviously, we wanted to see what the, you know, outcomes of our changes were.
Q. What do you mean?
A. We wanted to see what -- the changes we had made to get the population balanced among all these districts, if it changed any of the, you know, racial makeup of the districts.
Q. Why did you want to know that?
A. Well, one of our guidelines is to comply with the Voting Rights Act.
Q. And you say "we wanted." Who is "we"?
A. The two co-chairs, myself, and legal counsel.
Q. "Legal counsel" being Mr. Dorman --
A. Yes.
Q. -- Walker?
A. Yes.
Q. And prior to that week before the special session, it's your testimony that you did not look at any of the racial data at all for any of the districts in drawing the 2021 congressional map?
A. That's correct.
Q. What data did you look at?
A. Just -- just total pop and geography.

Q. Anything else?
A. That's it.
Q. Other than modifying the existing district lines to account for population changes, did you make any other changes from the 2011 congressional map?
A. I'm not sure I follow that.
Q. You made changes to the 2011 congressional map for the 2021 map based on changes in population, correct?
A. Correct.
Q. Did you make any changes based on any other factors?
A. Are we talking -- we're talking the 2021 map?
Q. Correct. So in drawing the 2021 map, you made certain changes from the prior map based on changes in population, correct?
A. Correct.
Q. Did you make any changes based on any other factors?
A. No. I didn't make any changes. Obviously, where members lived was a consideration. I certainly would be mindful -- when I was moving a precinct in Jefferson County, for example, I

couldn't move Congresswoman Sewell out of her district, for example. But I didn't make any changes based on that.

Q. Other than population data and race data starting the week before the map was submitted, did you review any other data about the constituents or the districts when drawing the 2021 map?

A. I did not.

Q. If any changes were made to the 2021 map, would you have been the one to physically make those changes on the computer?

A. Yes.

Q. Was there anyone else who physically sat on the computer and made any changes for the 2021 map?

A. I don't believe so. I mean, Donna Loftin, who heads the reapportionment office, certainly was capable of doing that. But I don't believe she ever -- she's not really authorized to change a map, I guess, without me asking her to.

Q. Do you know if she made any changes?

A. I don't believe she did, no.

Q. Did anyone else assist you in drawing the map?

A. Nobody assisted me in drawing the map.

Q. When did you have a -- when did you first have an initial draft map completed?
A. Using the real data? I mean, not an estimate.
Q. Did you have an initial draft made from the estimates?
A. I had a -- I roughed -- again, it wasn't -- it wasn't something that would have -- it wasn't to zero deviation. It was just roughed-out counties.
So yes, when I came back from my May meetings, I roughed out a map using the estimates on Maptitude just to get a feel for what areas needed to be added and subtracted from various districts.
But, again, it was -- it was not -- it was not to deviation and it was knowing that the estimates were going to be off by thousands, if not tens of thousands, which they turned out to be.
Q. When was that draft completed?
A. The end of May.
Q. Did you save a copy of that draft?
A. No.
Q. After that, when was the next draft using official data completed?
A. After my round of calls in September.

So probably mid -- mid to late September would have been the next draft. And then I did a round of calls to go over those maps and make any last changes before the last week.

Q. A round of calls being the calls that you discussed with the U.S. congress representatives?

A. Yes.

Q. Did you make any further changes to the draft based on any feedback you received from those calls?

A. Very minorly. Congresswoman Sewell, I had split a precinct in Montgomery County that she did not want split. So I put it back together and split in a different -- an adjacent precinct. But very, very minorly.

Q. What precinct was that?

A. It was the Acadome precinct. I had split the university into two different districts, and she, I think wanted it all in her district. So I put that back together.

Q. Do you know why she wanted that all in her district?

A. I don't. I mean, other than that was one of her principles in this redistricting process.

She felt strongly about picking up facilities and universities and things rather than just random citizens.

Q. And what precinct did you take out from District 7 in exchange?

A. Well, it was a split at an adjacent precinct. Whitfield, I think, was the name of it.

Q. How do you choose that precinct?

A. It just was adjacent to it.

Q. That was the only factor?

A. That was the only factor.

Q. So you had the draft completed, you said, mid September?

A. Yeah. And just to give a more complete answer, I also had to do a -- change the split a little bit in Lauderdale based on conversations with Congressman Adderholt. I had conversations with Representative -- Congressman Moore's representative, Bill Harris, about he would have preferred a change in Monroe rather than the way I did it in Escambia.

So they were each -- not every district. But a number of districts had these little minor things that we talked through at that point.

Q. Beyond any minor changes -- and I assume

this is more kind of a precinct-by-precinct type change that you're referring to there, correct?

A. Yes, sir.

Q. Beyond that, were there any changes that you made based on those calls that you would consider to be significant changes?

A. No.

Q. So once you had the draft completed in mid September and then had the calls with the various representatives to go over that, then you made whatever minor changes you could based on that feedback.

When did you have the next draft completed?

A. Going into the last -- the next to last week of October. And in some of these -- as you well know, with congressional schedules, it's not like I had seven congressmen lined up to talk to me at 9:00 o'clock on a Monday morning. This took over a course of weeks. I would, you know, schedule, and move and change for voting schedules and all the wonderful things that go on with dealing with congressmen.

Q. And in that same time frame, you were also drawing three other maps?

A. Correct.
Q. And meeting with all of the representatives and senators and all of that?
A. Yes, sir.
Q. Was there any other drafts that you had other than the first one that you made using the unofficial data in the summer of 2021, the next draft that you made using the official data in mid September 2021, and then the draft that you had based on the congressional representatives' feedback that was completed the week before the special session in October of 2021? Were there any other drafts that you made of the 2021 congressional map?
A. No.
Q. Between those last two drafts that we discussed, between September 2021 and the special session, did you meet with anyone else to discuss the redrawing of the 2021 map, congressional map, other than the seven representatives and Senator McClendon and Representative Pringle?
A. And legal counsel.
Q. Anyone else?
A. No.
Q. At that time, did you consider Mr. Walker to be your attorney?

A. I considered him to be the reapportionment committee's attorney.

Q. Did you consider him to represent you personally?

A. I don't know how to answer that. I didn't -- I didn't feel I needed representation at that point personally.

Q. Did you have any sort of retention agreement with Mr. Walker or his office?

A. No.

Q. Once you had the draft completed of the 2021 congressional map the week before the special session, who did you provide it to?

A. Well, obviously, all of the members saw their districts. But they didn't really see the rest of the map. The members of congress saw their district, but they didn't really -- and adjacent districts. But they didn't really see the rest of the map.

I think at that last week, I went through that map with Representative Pringle and Senator McClendon and Dorman Walker. Obviously, Donna Loftin, who runs the office, was in the background during most of this.

Q. What sort of feedback did you receive

when you met with Senator McClendon and Representative Pringle about the draft map?

MR. WALKER: I'm going to object to attorney-client privilege to the extent that I was present in the room and we were having an attorney-client communication. If you had any communications with them that I was not present, you may answer the question.

A. There were -- they just looked at the map. There was nothing substantive in terms of a response.

Q. And are you going to refuse to answer any questions that I were to ask you that would involve any discussions that you had where Mr. Walker was present?

MR. WALKER: I would instruct him not to answer those questions if other conditions indicating it was an attorney-client privilege were present.

Let me -- let me clarify that for you. If I believed we had a conversation that was an attorney-client privilege, I would -- I would instruct him not to answer the question. I don't think that all the conversations I had with him were covered by the privilege.

MR. THOMPSON: When you say you don't think that all of the conversations you had with him, do you mean nonsubstantive conversations like lunch and dinner?

MR. WALKER: Certainly that would be included. What I'm saying is there -- I can think of times when he and I were speaking, although I may not know exactly what we were talking about, when there were other people in the room who were not within the privilege. And we may have been talking about the map. I just don't know.

But there were certain times when I reviewed with him specifically the map. And I would contend that that's covered by the attorney-client privilege.

MR. THOMPSON: Understood. And you would instruct him not to answer on those.

MR. WALKER: Yeah.

Q. And would you follow that instruction?

A. Yes.

Q. So walk me through the timeline, then, once you provided the draft to Senator McClendon and Representative Pringle. What happened with the map at that point?

A. I mean, once it was finalized and they

made no changes to it, it was submitted to be drawn up into a bill and prepared to be presented at the -- be sent out to the members of the reapportionment committee the following Monday and then voted on in committee on Tuesday.

Q. Were there any changes made to the map by the reapportionment committee?

A. No.

Q. Were there any changes made to the map after it was submitted to the legislature?

A. No.

Q. So the version of the map that you completed the week before the special session is identical to the version of the map that was ultimately enacted that we've marked as Exhibit 5, Plaintiff's Exhibit 5, correct?

A. Correct.

Q. Did you save any drafts of the 2021 congressional map?

A. No, sir. The way Maptitude works is it just -- every time you make a change, it saves -- it saves the map at that point. So previous iterations don't -- don't really exist.

Q. Did you print out any copies of any drafts?

A. No.

Q. Do you have any notes that you took or used while drafting the 2021 congressional map?

A. No. I mean, I'm sure I had a scrap of paper somewhere that said Congressman Moore would rather split Escambia and Congressman Carl would rather split Monroe. But they were -- all these things were so -- there were not very many of them. There weren't too may. I didn't need notes to remember that.

Q. Do you have any of those notes saved?

A. No.

Q. If you needed to modify the maps now, do you have any estimate of about how long that would take you to do?

A. Modify in what way?

Q. For instance, are you familiar with what this lawsuit is about?

A. Well, it's three different lawsuits, if I understand it correctly.

Q. What is your understanding of the three different lawsuits?

A. I think two of the -- well, two of the lawsuits I think would have preferred two majority black districts. And the Singleton lawsuit would

have preferred sort of a whole county map with two -- I would call them influence districts.

THE REPORTER: What districts?

A. Influence districts

Q. Would that be the same as -- I've heard "opportunity district." Would "influence district" and "opportunity district" be about the same?

A. Yes, sir.

Q. And what's your understanding of what an influence district or opportunity district is?

A. It would be a district that would be less than a majority of BVAP, but still have a substantial population of minorities that could potentially impact the election of a candidate of their choice.

Q. And when we say "minorities" here specifically, are we referring to the black voting age population?

A. Primarily here in Alabama, you would be referring to the black voting age population.

Q. So if in this case the court were to find that the maps do not comply with the Voting Rights Act or the 14th Amendment and they needed to be modified, do you expect that you would be the one that would be asked to make those modifications?

A. I don't have a crystal ball. I can't predict the future.

Q. Is that something that's covered in your contract?

A. It is not.

Q. If you were asked to modify the map to make changes to comply with the Voting Rights Act or the 14th Amendment, in that situation, do you have any estimate about how long it would take you to do that?

A. No. I mean, asked by whom?

Q. The Alabama state legislature, the courts, Mr. Walker, any of us.

A. No. I mean, I -- conceptually, I guess that would depend on what the court deemed changes were.

Q. Is that something that you think you could complete within a month?

A. I would hope so. I don't know.

Q. Is it something you think you could complete within a week?

A. You're asking me a hypothetical about something that hasn't happened, and I don't have a clue what the changes would be.

Q. When you met with Congressman Sewell,

did you receive any specific instructions from her about how to draw District 7?

A. No, not specifically. Again, it was more of -- our initial meetings were more of here is what the estimates show, here is -- you're obviously -- the district is going to be underpopulated. Let's talk about areas where you may -- may pick up population to get closer to the ideal.

As I said earlier, she was interested in facilities and universities and some companies and military, like Maxwell, and so forth. So she was interested in things above and beyond just picking up additional voters or citizens. So we talked about that briefly.

And then we just went through the most likely areas where she could pick up additional population. And the most likely in my mind, again, to present to her as options were counties that were split.

For example, Clarke County was -- under this map, the 2011 map, was split between 7 and 1. We know 1 is going to be over. We knew -- at the beginning, we didn't know how much. But we knew 1 would be over, and we knew 7 would be under.

So a logical thing, in my mind anyway, would be let's put Clarke County back together. And whatever population that is, let's put that into 7.

And also we talked about some of the changes that would happen that would cascade to her from north Alabama. As we knew, District 5 would be over. The only place District 5 can go to is to District 4 because it's the only district adjacent to it. And that would then put District 4 over. And one of the options was for her to pick up some more of District 4 in Tuscaloosa. So we talked about that.

And then we talked about potential changes in Jefferson, another area where she could pick up additional population.

Q. You mentioned that she wanted universities in her district. What were the names of the universities she wanted?

A. She wanted to make sure that whatever changes we made in Tuscaloosa, we kept the University of Alabama in her district. She was interested in picking up Maxwell Air Force Base in Montgomery, if that was a possibility.

As I discussed earlier, I had split a precinct that had a university in Montgomery. And

she wanted that in her district not split. So we talked about things like that.

Q. Do you remember the name of that university in Montgomery?

A. Yeah, I do. I'm blanking on it at the moment. Alabama -- is it State?

MR. WALKER: Alabama State, ASU.

A. ASU. ASU. Sorry.

Q. Other than those things that you just discussed, did you receive any other instructions or feedback from Congressman Sewell about how to draw District 7?

A. No, not at that time. We did -- in the next round of those talks after we had real numbers, we did talk about some of the changes in Jefferson.

In this -- in the 2011 map, some of the precincts of Homewood -- I think there were three or four Homewood precincts. Some were in her district, and some were in 6. She thought that maybe it might make sense for all of them to be in one district. She would be happy if they were hers, which I did.

So we talked about a few things like that in the next round of discussions.

Q. Did you discuss anything else with her about how to draw her map?

A. No.

Q. Did you discuss race at all with Congressman Sewell?

A. No.

Q. Did she give you any instructions or requests about a certain black voting age population percentage that she wanted in District 7?

A. She did not, other than I think there was -- we both assumed, and I think she would confirm, that she wanted a majority -- a majority black district for her district.

And she also, I should add -- there was one other thing. When we initially asked every member for their home addresses so we made sure we had them inside their own districts, she actually sent in two addresses, knowing that only one of them was her official home address.

One of them was also her home -- her mother's home or whatever in Dallas County. And she wanted -- would prefer that both of those addresses be inside her district. So that was one request she made.

Q. Was that an accommodation you had to change the map to --

A. No. They were -- it was already

happening. They both were -- they both under this map were in her district, and they both under this map were in her district.

Q. Going back to your prior statement, you said that you didn't discuss race with Congressman Sewell; is that correct?

A. Not at that point.

Q. Did you at some point?

A. In the last week, she did ask what was the BVAP of my -- her district.

Q. And what did you tell her?

A. I told her it was 54.22.

Q. And what did she say?

A. She didn't -- I mean, she was comfortable with that, I guess. She didn't comment further. She didn't ask me to make any changes, I guess, if that's what you're asking me.

Q. You said before then that you both assumed that she wanted a majority black population. What are you basing that off of?

A. I don't even know if it's an assumption. I think she -- I think she did say that, that she would prefer to continue to have a majority black district.

Q. You think she said that, or you know she

said that?
A. I think she -- yeah, I think -- I think she said that.
Q. But you don't know for certain?
A. I'm pretty confident she said that, yes.
Q. Are you certain that she said that?
A. I'm pretty confident she said that.
Q. Just to be clear, pretty confident, but not 100 percent certain, fair?
A. Sure.
Q. Did she say anything about any sort of percentage of black voting age population that she wanted in District 7?
A. No.
Q. Did you discuss race with any of the other representatives?
A. I did not.
Q. So Congressman Sewell was the only Congressman you discussed race with?
A. Well, she's the only one who asked at the end of the process what her black -- black voting age population was.
Q. Other than the U.S. congressional representatives and Senator McClendon and Representative Pringle, did you speak with any other

Alabama legislators or their staff about the 2021 congressional maps?

A. No. Maybe -- maybe right before we went to the floor, I think I probably had a conversation with the pro tem and speaker just briefly to say that the members of congress were reasonably in agreement on this map. But it was just sort of a pro forma discussion, not about the details of the map.

Q. Did you speak with anyone else?

A. No.

Q. Did you correspond with anyone by email regarding the redistricting process?

A. No.

Q. Did you make any recommendations to the committee, the reapportionment committee, about how the map should be drawn beyond just providing them a copy of the map?

A. No.

Q. Did the reapportionment committee make any requests or recommendations to you about how the map should be drawn or changed?

A. None other than the guidelines they passed.

Q. Did you receive any requests or

instructions about how to draw the 2021 congressional map from anyone else that we haven't discussed yet?

A. No.

Q. Did you receive any feedback from anyone else that we haven't discussed yet about the way that the 2021 congressional map was drawn?

A. No. I'm assuming you're including chiefs of staff as a subset of a congressman.

Q. Certainly. No one other than the congressmen or their chiefs of staff or anyone else that we've discussed?

A. Right.

MR. THOMPSON: Dorman, I think we've been going a little over an hour. We're approaching that lunch time. We could go a little bit longer, or we could go ahead and break now. What do you prefer?

MR. WALKER: I'm happy with whatever y'all want to do.

MR. THOMPSON: Are you hungry, sir?

THE WITNESS: Not overly. But I'm happy to --

MR. WALKER: I usually go to lunch at 11:30. So I'm happy to take a lunch break.

MR. THOMPSON: Let's -- let's take a lunch break, then.

MR. WALKER: All right.

THE VIDEOGRAPHER: We're off the record. The time is 11:42 a.m.

(Lunch break was taken.)

THE VIDEOGRAPHER: We are back on the record. The time is 12:57 p.m.

Q. Mr. Hinaman, before we broke for lunch, we had discussed some of the conversations that you had with the seven U.S. congressmen. Do you recall that?

A. Yes.

Q. And we went into some specifics about your discussions with Congressman Sewell. Or Congresswoman Sewell. Excuse me. I would like to discuss some of the specifics with the other representatives. So I just kind of want to go down the line.

So starting with Representative Carl in District 1, can you tell me what specifics you recall from your discussions with him?

A. Yes. But just to be clear, are we -- you just want -- over the whole time frame, just capsulize it? Or are you talking about a specific

time frame?
Q. At any point in the discussions you had with them in drawing the 2021 congressional map.
A. Okay. So essentially from May to October?
Q. Correct.
A. Okay. Yeah. So we talked about Clarke County which was split, of course, between 7 and District 1. And we talked that the 1st District would likely be over or was over after we got the real numbers, and that one of the solutions to that would be putting Clarke County back together and be putting it in 7.
And then whatever else the overage was, which turned out to be 739 people, that we would take those out of either -- initially we said Monroe or Escambia. And as it turned out, we fine tuned it to Escambia. And that's where we made that change.
And those are basically the discussions with the 1st District congressman.
Q. Did he have any objections to putting all of Clarke County in District 7?
A. He did not.
Q. All right. Tell me what specifics you recall from your discussions with Congressman Moore

in District 2.

A. Well, we talked again about making Montgomery County only split between 7 and 2 and getting the 3rd District out of Montgomery County, which was good because 2 was under anyway. So they needed to pick up some people.

Initially I said, well, depending on what the numbers are, we might need to split off a little bit of Elmore to balance out 3 if we're not splitting Montgomery. But as it turned out, we didn't have to do that. We did -- we did make some changes to 3 in Coosa and Chilton, but we made no further changes in the 2nd.

We talked a little bit about the Escambia and Monroe thing. Again, he would have preferred not to have picked up another county. But unfortunately, that was not in the cards by 739 people. So he needed to -- he did end up picking up Escambia.

And we talked about just geographically making the 7th District a little more compact in Montgomery from where the 2011 lines were versus to what they are now in the 2021 plan.

And at the end of it -- I mean, we had some discussions about Maxwell going into the 7th,

which surprisingly he wasn't too excited about initially, but at the end was comfortable with I think primarily because there was some talk of another BRAC, base closing commission.

And Congressman Moore probably thought it would be helpful to have Terri representing part -- that part of Maxwell that she would have, and he represents another part of Maxwell, the annex, in his district. So two congresspeople fighting that was maybe better than one.

Q. Where is Maxwell?

A. Maxwell is in the northern little part of Montgomery County here that was -- in 2011 was in the 2nd, but is now in the 7th.

Q. With Congressman Sewell, especially in the area you were just discussing there, it had gotten as granular was this college or whatnot. Did you have discussions to that detail with either of the two representatives in District 1 or 2?

A. No, other than the Maxwell, Maxwell annex thing we just talked about with Congressman Moore. He wanted to make sure he still had one of them. And he has the annex one, which is further west in Montgomery, but not the actual base itself.

Q. Do you know why he wanted that in his

district?

A. Again, so they had two voices on base closing issues rather than one.

Q. Do you recall anything else specifically from your discussions with Congressman Moore?

A. No.

Q. How about Congressman Rogers in District 3?

A. Well, we talked briefly. There was a little piece of Cherokee County that was split off in the last redistricting, which was really somewhat needless. So we talked about putting that back together.

We talked about again him getting out of Montgomery County so that it would only be split two ways instead of three. And then we talked about what that might mean in terms of where he would pick up.

Coosa had been in the 3rd in some earlier maps, meaning 2001 or sometime back in the past. So he was fine picking up Coosa County from 6. And then for population -- obviously, population reasons, he needed a little more than that. So we took, I think, like 12,000 people from Chilton and put it into 3 to get his population to where it

needed to be.

Q. Anything else you recall?

A. No.

Q. What about Congressman Adderholt in District 4?

A. Yeah, I talked to him numerous times. Part of it is, obviously, he was going to pick up a lot of folks from the 5th district. And there was initial discussion on which end of the 5th, should we take them from Jackson County or should we take them from Lauderdale, and how was the best way to do that.

And we had a couple of different discussions about that, and finally decided that putting the Shoals -- Muscle Shoals area back together as much as possible in Lauderdale was the preferable way to do that. And that's what we talked about.

And then, obviously, that required him to lose some of Tuscaloosa, a few precincts in Tuscaloosa, to make up for -- to get the population to equal out.

And also he had a little chunk of Blount County, as well, from 6. And we talked about making Blount whole again and not splitting it between two

congressional districts.

Q. Did you have any discussions with him about which specific areas of Tuscaloosa to include or not include?

A. A little bit. I mean, we talked about the precincts, the next most likely geographical precincts to add into 7. We talked about them. It was sort of obvious geographically where he had to go next. So there wasn't much discussion about it.

Q. How did you choose the precincts you chose other than geography?

A. Well, that's -- population and geography were the only two ways to choose them.

Q. Do you recall anything else, specifics about your conversations with Congressman Adderholt?

A. No. And then at the end -- as I said, I had splint a precinct in Lauderdale to get to zero deviation in District 5, and he referred a different precinct split. So I changed it to the one he preferred. So that was -- that was one of the final changes at the end that we made.

Q. Moving on to Congressman Brooks in District 5. What do you recall from those conversations?

A. Well, there weren't any because

Congressman Brooks decided not to meet -- this is my presumption -- because he was running for the senate and had less interest in how this was going to come out.

I did meet the first time with his chief of staff just to talk about keeping Morgan and Madison together. But that was -- that was about it.

Q. What was the discussion there about keeping Morgan and Madison together?

A. The community of interest. And a number of people that, obviously, live in northern Morgan work in Huntsville, in Madison County, and so forth, and thought it was a good combination to keep them whole and together.

Q. Other than that first meeting -- and I guess that would have been back in May --

A. May.

Q. -- of 2021 with the chief of staff for Congressman Brooks, did you meet with anybody else on behalf of Congressman Brooks or his office?

A. No. I called his chief of staff back once we had, you know, roughed out a -- gotten the math from the real data. And he -- he didn't call me back. I called him a couple of times. And I

assumed that meant he was less interested in how this was going to go.

Q. And then finally, what about Congressman Palmer in District 6? What do you recall about those conversations?

A. Well, I talked to him about again putting Blount back together and giving that all to him. I talked to him -- in the meantime, he had -- he had initially, I thought, lived in Jefferson County. And then he had moved to Shelby.

So I talked a little bit about making sure I had the right home address for him. Because I initially thought he still lived in Jefferson, but he didn't. So we did have the right address in Shelby. So that was fine.

I talked about he may loose Coosa to the 3rd and a little part of Chilton. He was comfortable with that. And I talked to him about some of the changes in Jefferson in the 7th District where geographically I was trying to make the 7th District's footprint in Jefferson more compact by adding western Jefferson and shortening the district on the top. And I wanted him to be aware of that.

But as I said earlier, we had initial meetings and even a follow-up call. But when the

final map was done, meaning that last week of October, he -- he allowed as how he didn't really want to -- his chief of staff told me that the congressman did not really want to talk about it, that he was convinced we were going to go to court, and he didn't really see a need to discuss it.

Q. Who was that that told you that?

A. Congressman Palmer's chief of staff.

Q. And when was that discussion?

A. That was in mid October.

Q. And why did he say that he was convinced that this was going to go to court?

A. I don't know. He was -- the chief of staff said that -- the chief of staff said that he had been told, I think, by the NRCC that this map was going to go to court, and that Congressman Palmer had decided to not discuss it further.

Q. Did you ask him why he thought it was going to court?

A. No. I accepted his answer.

Q. Did you have any idea about why this would go to court based on that discussion?

A. No.

Q. And you didn't care to ask?

A. It was his opinion. I didn't think it

was relevant to what I was doing.

Q. Jefferson County, the way it's split in the 2021 congressional map, is not exactly a straight line. How did you decide which areas of Jefferson County would move from District 6 to District 7?

A. I was looking geographically to widen the face of the protrusion into Jefferson -- if you want to call it that, into Jefferson County. I was looking to not split precincts. Those are all, except for one that's split for deviation -- well, two, technically. One Congressman Sewell -- Congresswoman Sewell lives in and another one.

But I was trying not to split precincts. I was picking whole precincts. And I was trying to make the district more compact, meaning widen it as it goes into Jefferson County and eliminate some of the longer, further-away ones at the northern part of the county.

Q. So how does that process work when you're choosing which precincts to pick up? Are you just kind of choosing at random geographically as you move up and seeing what works? Or are there other factors at play that you're considering?

A. No, that's exactly it, seeing what works

numerically and making something, in my mind, look more compact geographically.

Q. Are there any other factors or data that you're considering when you're choosing which precincts to include?

A. No. I mean, other than -- we had that discussion about Homewood where she allowed that -- we had split a couple of Homewood precincts, some on one side of her line in 7 and some on the other side in 6, and thought it might be good to group them all together.

Q. You mentioned that there were two precincts that were split for deviation purposes, one of which Congressman Sewell lives in you said. What were those two precincts?

A. The names?

Q. Do you recall?

A. I do not.

Q. This isn't a memory test. I just --

A. I do not.

Q. Okay.

A. And the reason it's not one -- I was trying to make the split just solely in one precinct. But unfortunately the census blocks didn't cooperate very much. And when I got to where

I got to geographically in the one -- the precinct she lived in, I was hoping I could pick up the right number of populations.

But unfortunately I hit a situation where there was like a 550 block next to it, and that was too many. So that was not going to work. So I had to split another precinct to get to zero deviation.

Q. Do you recall anything else specifically from your discussions with Congressman Palmer or his chief of staff in furtherance of drawing the 2021 congressional map?

A. No.

Q. And I think we discussed this earlier. But in any of those discussions with any of those congressmen, Congressmen Carl, Moore, Rogers, Adderholt, Brooks, Palmer, did race ever come up in your discussions with any of them or their staff?

A. No.

I mean, I'll amend that slightly. I do think in the final when I went through with everybody, I think maybe Congressman Moore's district director, Bill Harris, who I was talking to, may have asked, "Can you tell me what the BVAP of the 2nd District is now?" I think I probably

gave him that number.
Q. And when was that?
A. In the last -- that last week when we turned race on.
Q. You gave him the --
A. He asked --
Q. -- black voting age population?
A. Yeah. He asked what the BVAP for that district was, and I gave him that number.
Q. Was there any further discussion about it?
A. No.

(Plaintiff's Exhibit 7 was marked for identification.)

Q. I'm handing you what's been marked as Plaintiff's Exhibit 7. This is a copy of the reapportionment committee redistricting guidelines that was produced in this lawsuit. The Bates number at the bottom is RC 043723, and it's dated May 5th 2021.
Do you see that?
A. I do.
Q. Do you recognize this document?

A. I do.
Q. What is this document?
A. These are the guidelines that were approved by the reapportionment committee for drawing the four maps.
Q. Were you provided a copy of these redistricting guidelines before you drafted the 2021 congressional map?
A. I was.
Q. Who provided it to you?
A. The two co-chairs, probably with Dorman Walker, as well. I'm not sure who handed it to me.
Q. And when was that?
A. It would have been around the time it was passed, May 5th.
Q. What --
A. Which very importantly happens to be my birthday.
Q. That is an important note. Thank you for letting me know. Happy belated birthday.
A. Thank you.
Q. What were you told when you were provided these guidelines?
A. I was told these were the guidelines for drawing the four maps that you've been contracted to

draw, and to follow them to the best of my abilities.

Q. Anything else that you recall?

A. No.

Q. And did you, in fact, follow these guidelines in drawing the 2021 congressional map?

A. I did.

Q. Let's take a look at the criteria that's listed here. So starting on Page 1, you see Line 10 there. It says Section II, Criteria for Redistricting.

A. Yes, sir.

Q. I want to talk through these with you. So Sections II a and b both state that the congressional district should equalize total population and have minimal population deviation.

Do you see that?

A. I do.

Q. What does minimal population deviation mean to you?

A. I took that to mean for the congressional districts, that that was -- they should be zero for six of the districts and plus one for the remaining district because the population was not divisible by seven. So six were to zero

deviation, and one should be plus one.

Q. Which district did you choose to be the plus one deviation?

A. I knew you would ask me that. I don't -- I would have to look. I think it was the 6th maybe. I would have to look at a map. I don't have numbers. I'm sorry.

Q. Was it District 7?

A. No, I don't think so. I think it was 2 or 6, but I can't remember which.

Q. And what did you do to make sure that your map complied with that zero deviation for six of the districts and plus or minus one for the other?

A. I moved -- I split seven precincts down to the census block level to get to zero deviation for six of the districts and plus one for the seventh one.

Q. Did anyone tell you that zero percent deviation was required or that there was a certain cutoff that you had to reach to satisfy this criteria?

MR. WALKER: Objection to form. You can answer.

A. I was told that it was literally zero

deviation, meaning zero -- not percent, but zero people except for the one that had to be plus one.

Q. Is that plus one person?

A. Yes.

Q. Understood.

A. Sorry. Plus one person.

Q. And who told you --

A. Dorman Walker, legal counsel.

Q. Section II c looks like it's about legislative and board of education districts. So I don't think that would apply to the congressional map. Is that correct?

A. Correct.

Q. Section II d says that the plan must comply with the one person, one vote principle of the Equal Protection Clause of the 14th Amendment of the United States Constitution.

Do you understand what the one person, one vote principle is?

A. I think I do.

Q. What's your understanding?

A. Again, that's so no -- so people have equal representation, the representatives in those, in the congressional case, should be representing the same number of people.

Q. So that goes back to the population deviation?

A. Correct.

Q. And where does that understanding come from?

A. Where does my understanding come from? I'm sure if I had any questions about it, I asked legal counsel.

Q. So other than what you just discussed doing for Sections II a and b in adjusting for the population, did you do anything else to make sure that your plan complies with the one person, one vote principle?

A. No.

Q. Section II e looks like it just states that a plan that does not comply with the population requirements above will not be approved.

Is there anything additional you needed to consider here for this section e beyond what we've already discussed?

A. I don't believe so.

Q. Section II f states, "Districts shall be drawn in compliance with the Voting Rights Act of 1965 as amended. A redistricting plan shall have neither the purpose nor the effect of diluting

minority voting strength, and shall comply with Section 2 of the Voting Rights Act and the United States Constitution."

Are you familiar with the Voting Rights Act of 1965?

A. I'm not a lawyer, but I'm familiar with it.

Q. What is your understanding?

A. Well, that the -- a plan should not have the intent or purpose of discriminating against any minority population.

Q. Where does that understanding come from?

A. Just conversations with legal counsel and others during the process.

Q. Are you familiar with Section 2 of the Voting Rights Act?

A. Again, I'm not a lawyer. But vaguely.

Q. Have you ever read Section 2 of the Voting Rights Act?

A. I'm not sure I have.

Q. What is your understanding of what Section 2 requires?

A. Where there -- I guess my understanding of it, a layman's understanding of it, would be where there's a sufficient and compact enough

population of -- minority population to create a district, a congressional district in this case, that a district should be drawn if it's compact and sort of meets the Gingles, I guess, requirements, compact, contiguous population.

Q. Where there would be a majority black district?

A. Right, and would have the opportunity to elect a candidate of their choice.

Q. And does that understanding come from the same sources, conversations with counsel?

A. Yes, sir.

Q. What did you do to make sure that your plan complies with Section 2 of the Voting Rights Act?

A. Again, once it was done and we turned on race, we talked about it. No one asked me to make any other changes. And I talked to legal counsel and, I guess, concluded that it satisfies Section 2 of the Voting Rights Act.

Q. Anything else?

A. No.

Q. Did you personally make a determination that your plan does not have the purpose or effect of diluting minority voting strength?

A. I'm -- I'm not a lawyer, so I don't know that I can make that -- I don't know that it's my job to make that distinction. But I don't believe it discriminated against anyone.

Q. Did you do anything to make that determination yourself?

A. Other than talk to legal counsel, no.

Q. Other than potentially legal counsel, did you have discussions with anyone else about whether your plan complied with Section II of the Voting Rights Act?

A. No.

Q. In making the determination, whether that's through conversation with legal counsel or not, about whether your plan complies with this policy, did that require you to review the racial makeup of the districts?

A. Well, yeah. I mean, race -- at that point, we had turned race on. So the BVAPs and numbers were available.

Q. And you say they were available. So then you had to review them, as well, to make sure that everything was in compliance with this policy?

A. Well, we -- the numbers were then revealed or available, and we discussed the various

numbers related to the map.

Q. Did you have anyone other than Mr. Walker or someone with his firm analyze your map at any point to confirm that it complies with Section 2 of the Voting Rights Act?

A. I did not.

Q. Do you know if anyone reviewed the map to determine whether it complies with Section 2 of the Voting Rights Act, other than potentially Mr. Walker and his firm?

A. I do not, no.

Q. And other than what we've discussed already, did you do anything else to make sure that your plan complies with Section 2 of the Voting Rights Act?

A. I did not.

Q. Moving on to the next criteria, Section II g. This one is a little longer.

It states, "No district will be drawn in a manner that subordinates race-neutral districting criteria to considerations of race, color, or membership in a language-minority group, except that race, color, or membership in a language-minority group may predominate over race-neutral districting criteria to comply with Section 2 of the Voting

Rights Act, provided there is a strong basis in evidence in support of such a race-based choice. A strong basis in evidence exists when there is good reason to believe that race must be used in order to satisfy the Voting Rights Act."

Do you see that?

A. I do.

Q. What is your understanding of what that section requires?

A. My understanding of what that section requires is that's why -- when we made all of our changes to the districts by adding or subtracting population, that's why race was not on. We did it based on total population. And then at the end of the process, we did turn race on to look at various districts.

And because we were doing a number of these maps at the same time, there were a couple of instances in the other maps where we did look at race to add to a district. But that did not come into play in congressional.

Q. What, if anything, did you do to make sure that specific congressional districts complied with this policy?

A. I made sure that when I added -- I used

traditional redistricting principles of total pop and geography considerations to add and subtract to these districts, and that that was not based on race.

Q. Flip the page to Page 2. The next section is Section 2 h, and it states that districts must be composed of contiguous and reasonably compact geography.

What is your understanding of what this section requires?

A. Yeah, obviously contiguous counties and/or precincts had to be adjacent, to be hooked together, to form a district. You couldn't have part of Madison County tied to Mobile or something crazy like that.

And to the extent possible, I was trying to, when changing things inside a county as Jefferson, I was trying to make -- or Montgomery, for that matter, tried to make districts more geographically compact so they were not as spread out.

Q. Beyond what you just mentioned with Montgomery -- sorry. Was that Jefferson County?

A. And Montgomery, too.

Q. And Montgomery County. Beyond that,

what did you do to make sure that your plan complies with this policy?

A. That's about it.

Q. Moving on to the next section, Section II i. It lists several requirements of the Alabama Constitution. I'm not going to read all of them here.

Did you consider these factors in drawing your map?

A. I did.

Q. It appears, just by looking at them, that most of them do not apply to the congressional map. Rather, they talk about Alabama senate and Alabama house. Is that right?

A. Correct.

Q. How did you consider these factors here under Section II i in drawing the congressional map?

A. Well, I don't know how far down this list -- I don't know how far down this list you're counting.

Q. It looks likes II i. It's from Line 3 down to Line 20 on Page 2 of Exhibit 7.

A. As you say, most of them don't really apply. They are all -- all districts will be single-member districts, they're contiguous. That's

already basically been covered in other things we've discussed.

Q. Anything else that you had to take into account to comply with this policy?

A. I don't think so.

Q. Section II j starting at Line 21 there. Section II j lists six redistricting policies. Do you see that?

A. Uh-huh.

Q. Sorry. Can you answer verbally?

A. Yes. Sorry.

Q. That's fine.

Did you consider these redistricting policies when drawing your map?

A. I did.

Q. How?

A. Well, I wanted to make sure that no -- to the extent possible that no incumbents were put together, which they were not, in the congressional map. While continuity by water was allowed, I was trying to not use that. Which I don't think we did.

I don't know how far down your --

Q. I can walk through them with you. That might make more sense.

First off, did anyone explain to you

what these policies mean?

A. No. I'm sure if I had a question, I would have asked legal counsel. But I don't remember asking.

Q. Similarly, did anyone explain to you how to apply these policies in drawing the map?

A. No.

Q. What is your understanding of the priority amongst these various policies?

A. I think the only two that are paramount to the rest of them would be one person, one vote and the Voting Rights Act.

The rest of them are somewhat -- can occasionally be in conflict. And it depends on the various situations where one might trump the other or vice versa.

You may have two incumbents that live very close to one another. Maybe they need to be split apart. That may make the districts not quite as compact as you would like. But one of those -- you know, you couldn't put the two incumbents together. So sometimes they are in conflict, and you have to resolve that.

Q. Other than the two you just mentioned, one person, one vote and the Voting Rights Act, did

you place any greater importance on one of these policies over the other?

A. No.

Q. Let's walk through these. So the first policy under Section J starting on Line 25 there states, "Contests between incumbents will be avoided whenever possible."

What's your understanding of what this requires?

A. That when -- certainly when possible, I would not put incumbents in the same district.

Q. What did you do to make sure that you complied with that?

A. Retrieved -- made sure that we retrieved all of the home addresses and looked to where they were and made sure two of them were not in the same district.

Q. You might have answered this earlier. But did you have to make any modifications to your map to comply with this?

A. Not the congressional map.

Q. This factor applies equally to both parties, correct?

A. Certainly, yes.

Q. So you applied it equally to all

incumbents, both the republicans and to the democrat, correct?

A. Correct.

Q. The second policy there, Section II j(ii) starting on Line 26, states -- I don't know why I'm having trouble pronouncing the word. "Contiguity by water is allowed, but point-to-point contiguity and long-lasso contiguity is not."

What is your understanding of what that policy requires?

A. I'm not sure I even know what long-lasso contiguity is, to be honest with you.

But point-to-point, occasionally you can have a precinct or a census block that connects to the next one just by one point in space. And that's not -- under their guidelines, not allowable in terms of connecting them together.

Again, on the congressional map, it didn't come into play very much because I tried not to split -- I only split seven precincts and tried not to have situations where census blocks were -- weren't any -- weren't close to any of those options there.

Q. Did you have to do anything else to make sure your plan complied with this policy?

A. No.

Q. Did you have to make any modifications to your map to comply with this policy?

A. I did not.

Q. The third one -- the third policy, which is Section II j(iii,) states, "Districts shall respect communities of interest, neighborhoods, and political subdivisions to the extent practicable and in compliance with paragraphs a through i."

What is your understanding of what this policy requires?

A. It requires -- like I said earlier, in areas; for example, Mobile and Baldwin which wanted to stay together or Madison and Morgan that had specific communities of interest, it was to keep areas together that have similar -- and, obviously, there are lots of different communities of interest. So I tried to keep areas, to the extent possible, together.

Obviously, this comes into conflict with county lines, precinct lines, other things. So it's not always -- and everybody has -- a number of people have different views of what communities of interest are. So it's certainly not always possible to keep all of them together.

Q. What is your definition of a community of interest?

A. My definition of community of interest, it can be geographic, it can be economic, where people work, it can be racial, it could be geography, it could be people on the bay, for example, for Mobile and Baldwin counties. A host of -- a host of communities of interest.

Q. What do you consider to be communities of interest in Alabama?

A. All those things I just listed.

Q. Is there any sort of particular communities of interest that are well established or a list of any of these? Or is this just something that is subjectively known but doesn't really exist in writing anywhere?

A. I don't know of a definitive list of all the communities of interest in Alabama.

Q. Are there any specific communities of interest that come to mind for you right now?

A. No, other than the ones I listed. I mean, precincts can be -- counties are, I guess, communities of interest sometimes. I mean, it's -- there are a whole host of things.

Q. It sounds like communities of interest

can be somewhat fluid. Is that fair to say?
A. It is fair to say.
Q. One area, say, where we're sitting right now in Montgomery, could be part of three, four, five, six different communities of interest depending on what factors you're looking at?
A. Yeah, whether they're economic or racial or social or everybody roots for the same football team, I suppose.
Q. Do they?
A. No.
Q. I see. I see. That would be a community of interest perhaps.
Are you familiar with the black belt? You mentioned that earlier.
A. I am.
Q. What is the black belt?
A. It's a group of mostly rural counties that have a -- for the most part have a majority black population.
Q. Do you know what counties are in the black belt?
A. I'm not sure I can list every one. But yeah, in general, I do.
Q. What counties would you say are in the

black belt?

A. I would say Sumpter, Greene, Choctaw, Marengo, Hale, Perry, Dallas, Wilcox, Lowndes, I guess Macon and Bullock. Some would say Montgomery.

Q. Do you consider the black belt to be a community of interest?

A. I do.

Q. So in drawing your map, what did you do to make sure that your plan complies with this policy, that it respected communities of interest?

A. Again, I mean, because there are so many different communities of interest, they're not -- I mean, no plan is going to respect all of them. So there are trade-offs.

There are also -- you know, the entire black belt I imagine if you made into a congressional district would accomplish -- would hit up against other one person, one vote issues and other issues in here, as well. So they are sometimes in conflict. So you can't -- you can't satisfy all communities of interest.

Q. Did you have to make any specific modifications to your map to make sure that you were respecting communities of interest?

A. No. Although, again, I tried to keep,

for example, the Muscle Shoals area together in the -- in the 4th District when we split Lauderdale. Not that it was at issue, but the people in Mobile and Baldwin very much wanted to be together because they share the bay. But that didn't require a change. It just is a . . .

Q. Other than the modification for the Muscle Shoals community, are there any other specific modifications that you felt like you made in drawing the 2021 map?

A. No, not specifically.

Q. Does your map split any communities of interest?

A. Oh, I'm sure it does. I mean, all maps split some communities of interest.

Q. And part of that is because of what we just discussed, that communities of interest can mean lots of different things?

A. To different people, I'm sure.

Q. Looking at the bottom of Section II j(iii,) that third policy, it gives a definition. It says, "The term communities of interest" -- excuse me.

It says, "A community of interest is defined as an area with recognized similarities of

interests, including but not limited to ethnic, racial, economic, tribal, social, geographic, or historical identities. The term communities of interest may in certain circumstances include political subdivisions such as counties, voting precincts, municipalities, tribal lands and reservations, or school districts."

Did you review any ethnic, racial, tribal, or other similar data to identify communities of interest?

A. I did not.

Q. Moving to the next policy, the fourth policy, Section II j(iv.) It states, "The legislature shall try to minimize the number of counties in each district."

I think that's pretty self-explanatory. But what is your understanding of what that policy requires?

A. Yeah, that's sort of a compactness thing. I was trying to keep the fewest number of counties necessary to -- and it's not always -- there are other -- the next one down says "preserving cores of existing districts."

I mean, some of these things come into conflict. But to where possible, I tried to deal in

whole counties, keeping counties whole, and the minimum number to reach the ideal population.

Q. Did you have to make any specific modifications to your map to comply with that policy?

A. No. Although it does come into effect when people were talking about adding -- where you split a -- for example, the Escambia County split, you know, where does that go.

I was trying to keep districts so that not all of the splits were in the same district and the number of counties in a particular district didn't grow a lot. Because for a congressional office, that takes on local governments and more work. So I tried to be mindful of that when looking at it.

Q. Other than trying to be mindful of that, did you have to make any specific changes?

A. No.

Q. You referenced it just now. The next policy, the fifth policy, Section II j(v) states, "The legislature shall try to preserve the cores of existing districts."

What is your understanding of what that policy requires?

A. That's basically the cores of the -- of existing districts or the counties that make up the majority of those districts, to keep them together in the same district.

Obviously, incumbents have a preference to not have to add folks they haven't represented when they can continue to keep the folks they have been representing.

Q. What, in your mind, is the core of an existing district?

A. The core of an existing district is basically -- I view it as geography. It's the county -- the key counties that make up the current district, current as in 2001.

Q. Where --

A. Or 2011 I mean.

Q. Where does that understanding come from?

A. I don't know. That understanding comes from what the cores of a district are.

Q. Your understanding of what a core of a district is comes from --

A. I mean, that's what the definition of those words are to me anyway.

Q. Did you have some sort of metric to use when determining what the core of an existing

district is?

A. I did not.

Q. Does maintaining the core of districts require considerations of racial data?

A. I don't think it does, no.

(Plaintiff's Exhibit 8 was marked for identification.)

Q. I'm handing you what's been marked as Plaintiff's Exhibit 8. This is a document that was produced in this lawsuit. The Bates number in the corner is RC 00056. It's a seven-page document. Each page has one of the seven congressional districts from the 2021 congressional map.

Do you see that?

A. I do.

Q. Have you seen this document before?

A. I have not.

Q. And you can take a look through it if you don't believe me. But these are the seven -- these are maps of each of the seven congressional districts in the 2021 map that you drew; is that correct?

A. Yes, sir.

Q. Looking at page one here, District 1, show me on here where the core of District 1 is.
A. Well, the core of District 1 to me would be Mobile and Baldwin counties.
Q. Flipping over to -- and why do you consider those two --
A. Well, that's --
Q. -- to be the core?
A. Those are the two predominant counties. They have the vast majority of the population in the district.
Q. Flipping the page to District 2. What do you consider to be the core of District 2?
A. The core of District 2 is a little more complicated than that, I guess. You have the Wire -- you have Dothan, which is Houston County, you have the Wiregrass region, you have Montgomery, and then you have Autauga and Elmore on top -- of top of them.
Q. And why do you consider those counties to be the core of this district?
A. Again, that's where the majority of the population is. And they've been for the most part consistently inside the 2nd District for a considerable period of time.

Q. Moving the page to District 3, the same question. What do you consider to be the core of District 3?
A. The core of District 3 would be Calhoun and St. Clair. And then obviously more down, Lee and Russell, which are very fast-growing counties, especially Lee County. That would be the core of the district to me.
Q. And why do you say that?
A. Again, it's the vast majority of the population. It's also -- those areas have been pretty much continuously in the 3rd District.
Q. Turning the page to District 4, same question. What do you consider to be the core of District 4?
A. The core of District 4 would be sort of the Winston, Walker, Cullman area, and then northern Tuscaloosa which was only added ten years ago but certainly plays a key role in the district now. And then sort of Marshall, Etowah, again large population, have been in the district a considerable amount of time.
Q. Is your answer for why those are the core based on population again?
A. Population, yeah.

Q. Flipping the page to District 5, same question. What's the core there?

A. The core would be Madison and Morgan and Limestone, which is now rapidly growing, as well. Again, population, and they've been in that district for a considerable period of time.

Q. Any other reasons?

A. No.

Q. Turning the page to District 6, same question.

A. District 6, obviously Shelby and then Jefferson because of population would be, in my mind, the core of that district.

Q. Any other reasons?

A. No. It's population primarily.

Q. Finally flipping the page to District 7. What would you consider to be the core of District 7?

A. I would say the core of District 7 is the black belt counties that we talked about earlier from Choctaw through to Lowndes, and then also the portions of Tuscaloosa and Jefferson.

Q. What are the reasons for considering those to be the core?

A. Again, population and that they've been

in that district for a long period of time.

Q. And going through each of these counties that you consider to be the core of each district, is that a determination that you made? Or is that something that you were told by someone else?

A. That's a determination I made.

Q. Have you discussed what you consider to be the core of each of these districts with anyone else?

A. I may have discussed it with legal counsel. But I don't have a specific recollection of the discussion.

Q. Has anyone ever told you before what the core of each district is?

A. No.

Q. Looking back at the policy that we were referencing here about preserving the cores of each of the districts, what did you do to make sure that your plan preserved the core of each of these districts?

A. I kept the areas we referenced by district inside that district.

Q. Did you have to make any specific modifications to comply with this?

A. No.

Q. Where did this policy rank in comparison to the other policies?
A. It was equal to all except one person, one vote and the Voting Rights Act.
Q. We're almost through the criteria here. The last policy, Section II j(vi) states, "In establishing legislative districts, the reapportionment committee shall give due consideration to all the criteria herein. However, priority is to be given to the compelling state interests requiring equality of population among districts and compliance with the Voting Rights Act of 1965, as amended, should the requirements of those criteria conflict with any other criteria."
That sounds to be pretty much what you just said to me, correct?
A. Correct.
Q. To your knowledge, was there any conflict between the five policies we just discussed and the requirements regarding equality of population?
A. No. I mean, obviously, there can be conflicts between one person, one vote and communities of interest and one person, one vote and how many counties are in a district. But not on

that level, I guess. You would have to ask me that one again.

Q. And did you run into any of those conflicts? Did you have to make any modifications based on any sort of conflict like that in drawing the map?

A. Well, I mean, I didn't run into them. But, I mean, I kept those in mind when we were doing our initial additions or subtractions to the plan.

Q. Same question. To your knowledge, was there any conflict between those five policies we just discussed and the requirements under the Voting Rights Act of 1965?

A. No. As I stated, when I added population to the 7th district, for example, I was not looking at race. So there was no conflict with any of it to the Voting Rights Act.

THE REPORTER: There was no conflict what?

A. With any of those to the Voting Rights Act.

Q. I don't think it's another policy. But looking down here at the bottom, g, the last section under the criteria. Section g states that the six policies we just discussed in paragraphs j(i)

through (vi) are not listed in order of precedence, and in each instance where they conflict, the legislature shall at its discrimination determine which takes priority.

Were you given any instruction on which policy should take priority over the others?

A. No, other than section 6 that says clearly one person, one vote and the Voting Rights Act. But other than that, no.

Q. Is there anything else in Exhibit 8, which is the reapportionment committee redistricting guidelines, that you considered other than the criteria we just discussed in Section II?

A. No.

Q. In looking back at these criteria in Exhibit 8, Section II, were these the main factors that you considered when drawing the 2021 congressional map?

A. They were.

Q. Did you consider any other factors when drawing the 2021 congressional map?

A. I did not.

Q. Are you aware of any racial polarization analysis that was done on any of the districts on the 2021 congressional map?

A. I'm not.

Q. What is your understanding of what a racial polarization analysis entails?

A. I think it -- I've never done one, and I'm not an expert. But my understanding -- a layman's understanding of it, it is an analysis of performance of how a district would perform in terms of electing a candidate of choice for a minority candidate.

Q. Do you know why a racial polarization analysis was not conducted?

A. I do -- that was -- I do not.

Q. Did you ever suggest one?

A. I did not.

Q. Why not?

A. It wasn't under my purview.

Q. What do you mean?

A. It wasn't part of my -- I was asked to draw four maps and submit them to the legislature.

Q. Did anyone ever talk to you about a racial polarization analysis?

A. Counsel. We talked -- we've talked about --

MR. WALKER: Objection to form.

Q. Without going into any discussion that

you had with Mr. Walker, did anyone else ever talk to you about any racial polarization analysis being done for the 2021 congressional map?

A. No.

MR. THOMPSON: For the record, Counsel, I have a copy here of the joint stipulated facts that were agreed to by counsel and filed this past Friday. I only have one copy.

MR. WALKER: Do you want me to get a copy made, copies made?

MR. THOMPSON: We can. I just have a question about one of these. So if it works, I can just read it into the record and show the witness.

MR. WALKER: That's fine.

Q. Paragraph 62 of -- for your knowledge, sir, this is a document titled Joint Stipulated Facts for Preliminary Injunction Proceedings. And this was a document of stipulated facts that the parties in the three lawsuits here have agreed to. Does that make sense?

A. Yes.

MR. DAVIS: Actually, there are differences. What one set of counsel agreed to with us may not be exactly what another set of counsel agreed to with us. So you might want to clarify for

the record in which case those stipulations are.

MR. THOMPSON: This is the Milligan plaintiffs versus Merrill stipulations.

Q. All right. Paragraph 62 in this -- and I'll read it to you, and then I can show it to you.

It states, "In recent litigation, Secretary Merrill stated that CD 7," which is Congressional District 7, "appears to be racially gerrymandered, with a finger sticking up from the black belt for the sole purpose of grabbing the black population of Jefferson County. Defendant does not believe that the law would permit Alabama to draw that district today if the finger into Jefferson County was for the predominant purpose of drawing African American voters into the district." And that's from Secretary of State Merrill's pretrial brief in Chestnut v. Merrill.

And I'll show that to you. Just let me know when you've had a chance to look at it.

A. Okay.

Q. Do you agree with Secretary Merrill that District 7 appears to be racially gerrymandered?

MR. DAVIS: Object to the form.

MR. WALKER: Object to the form.

MR. DAVIS: Which District 7? What

year?

MR. THOMPSON: I believe this was in reference to the 2011 --

MR. WALKER: Right.

MR. THOMPSON: -- congressional map. Correct?

MR. DAVIS: I just want to make sure it's clear if, in fact, you're asking him about the 2011 district, that y'all are on the same page.

MR. THOMPSON: Thank you.

Q. So do you agree with Secretary Merrill that District 7 in the 2011 Alabama congressional map appears to be racially gerrymandered?

A. Well, again, I'm not a lawyer nor an expert. But I think it's clear there is a racial component to the finger that goes into Jefferson County.

Q. And why do you say that?

A. Well, I think because of shape and size and what have you. And, again, I haven't done -- I haven't looked at it specifically. But I imagine, obviously, the majority of the folks inside that finger, for lack of a better word, are probably African American and the majority of folks on the outside probably aren't.

Q. And you drew the original District 7 back in 1992, we discussed, right?
A. Correct.
Q. So you drew that original, for lack of better terms, finger that extends into District 6?
A. Yeah. And I'm not sure it looked exactly like that. But yes, I did.
Q. And why did you draw that long finger extension into District 6?
A. Well, it partially probably had to do with where the incumbent lived at that point. But also to create a majority black district.
Q. Moving ahead to the 2021 congressional map. Were you asked to do anything to District 7 so that it does not appear to be racially gerrymandered?
A. I wasn't asked to do anything. But when I was looking at adding population to District 7, I was hoping -- my goal was to make it more compact and geographically comprehensible in terms of, for example, Jefferson County. So that's why I was adding west Jefferson County and gaining population there.
Q. Did you do anything specifically in drawing the 2021 congressional map to modify it so

that District 7 does not appear to be racially gerrymandered?

A. I don't know how to answer that other than I tried to make it more geographically compact in shape.

Q. Other than that, did you make --

A. And not -- and not split precincts. Which I think a number of precincts were split in this version.

Q. Other than trying to make it geographically compact and not splitting precincts, did you make any other changes for that purpose?

A. No.

MR. WALKER: Just so the record is clear, the witness' reference to "this version" was to the 2011 version.

A. When I said they were split. Is that what you're talking -- yeah.

MR. THOMPSON: Thank you.

Q. And I'm referring to when you were drawing the 2021 map now. So thank you for the clarification.

Did you specifically make any changes in drawing the 2021 map to ensure that District 7 does not appear to be racially gerrymandered?

A. No, other than -- other than making the district more compact and more geographically contiguous.

Q. Anything else?

A. And not split precincts.

Q. Anything beyond that?

A. No.

Q. Do you know if District 7 would still be majority black without that finger sticking up into Jefferson County?

A. I do not.

Q. Have you looked at that?

A. No. But, of course, it's not really a finger anymore. It was basically the southwestern part of the county.

Q. In drawing the 2021 congressional map, were you asked to consider anything about race when drawing District 7?

A. No.

Q. Did you consider anything about race when drawing District 7?

A. No.

Q. And you say "No." That was before the week before you submitted this to the special session, correct?

A. Correct. But even once we turned race on, nobody asked me to make any changes to District 7 or any other district.
Q. And did you make any changes to District 7 at that point?
A. No.
Q. Did you look at the racial makeup of certain neighborhoods that week before the special session?
A. I did not.
Q. Did you take into account any of the other characteristics of the black voting age population when drawing District 7?
A. Help me with that one.
Q. Similar to what I asked before. Did you take into account different socioeconomic factors within the black voting age population?
A. No, sir, I did not.
Q. Attitudes?
A. No, sir.
Q. Interests?
A. No.
Q. Type of employment?
A. No.
Q. Income?

A. No.

Q. Educational level?

A. No.

Q. Favorite football team?

A. No.

Q. Voter turnout?

A. No, sir.

Q. Election results to assess party affiliation?

A. No.

Q. Were you asked to consider anything about race when drawing any of the other districts?

A. I was not.

Q. Did you consider anything about race when drawing Districts 1 through 6?

A. I did not.

Q. Did you consider whether it would be possible to create a second black majority district when drawing the 2021 congressional map?

A. I did.

Q. When did you make that -- when did you consider that?

MR. WALKER: I'm going to asset the attorney-client privilege.

THE REPORTER: I'm sorry?

MR. WALKER: I'm asserting the attorney-client privilege in response to that question.

MR. THOMPSON: To the question of when?

MR. WALKER: He can answer when.

Q. When did you consider whether making a -- excuse me. Let me ask the question again.

When did you consider whether it would be possible to create a second majority black district?

A. After we got the final census results. So early September.

Q. Did anyone ask you to consider that?

MR. WALKER: Objection.

MR. THOMPSON: Was that an instruction not to answer, or just an objection?

MR. WALKER: I think he can tell you that I asked him to consider that.

Q. I'll go ahead and let you --

A. Dorman Walker asked me to take -- to look at it, yes.

Q. Did you attempt to draw such a plan?

MR. WALKER: Objection. I instruct the witness not to answer. It's privileged.

Q. Beyond your discussion with Mr. Walker,

did you discuss with anyone else the possibility of creating a second majority black district?

A. I did not.

Q. Do you agree that it would be possible to create a second majority black district in Alabama?

MR. DAVIS: Object to the form.

MR. WALKER: Same objection.

THE WITNESS: Does that mean I'm not supposed to answer?

MR. WALKER: It's an objection to the form of the question.

A. I think it would be possible. It's a question of whether -- how many counties and precincts you feel comfortable splitting to do so and how -- what the shape and size and scope of it would be.

Q. Would it be possible to create a second majority black district and still comply with the reapportionment committee redistricting guidelines?

A. I would not think so.

Q. Why not?

A. Well, I can't say every -- some of the plans that were submitted that did that either paired incumbents or disallowed cores of districts

or made an inordinate number of splits or had 20 counties in a congressional district or some other thing that was not positive in our guidelines.

Q. You said some of the other plans that were submitted. I know we referenced this way back earlier there morning --

A. Yes.

Q. -- that there were, you said, approximately 41 plans that were offered at some point in the special --

A. Not congressional. All the -- all the whole. That was all. That was legislative, that was everything.

Q. Understood. This may help.

(Plaintiff's Exhibit 9 was marked for identification.)

Q. I'm marking Plaintiff's Exhibit 9. This is another document that was produced in this lawsuit. It's Bates number RC 000007. And I will represent to you that the file name for this document is Congressional Plans Introduced in 2021 Special Session.

Have you seen this document before?

A. I don't think I have.

Q. Does this appear to be a list of the congressional plans that were introduced in the 2021 special session?

A. It does.

Q. Did you review any of these maps?

A. I looked at most all of them, yes.

Q. Earlier today you made a distinction between looking at and reviewing.

A. Well, because a couple of these plans I know were put into the system very, very late in the process. So my quote, unquote review of them may have been ten minutes.

Q. Which plans were those?

A. Well, Senator Coleman's plan. Senator Hatcher's plan, I think, came in very late. A couple of these others which are full plans, obviously, but they were more amendments. Like Waggoner and Barfoot were done on the last day. So I looked at them, but I didn't have very long to look at them.

Q. Did you have an opportunity to review the Holmes congressional plan?

A. Yeah. Again, that was basically a change for Congressman Moore when we were discussing

the whole Escambia versus Monroe thing. So it was -- it was not really a whole -- it was a whole plan. But the changes were very specific to Congressman Moore. So yes, I'm familiar with it.

Q. Did you have an opportunity to review the Faulkner congressional plan two?

A. I did. Those were changes that were primarily in Jefferson County. Again, the vast majority of the plan was the same this as the Pringle plan. So I was familiar with those changes.

Q. You may or may not know the answer to this. There's only one Faulkner plan listed here, but it's numbered two. Do you know if there was a Faulkner plan one?

A. I don't know. I don't know.

Q. It seems to be like the school prank where you number the pigs one, two, and four.

A. One would guess there would be a one. But I don't -- I don't know that.

MR. WALKER: I think that's the best extraneous comment in a deposition I've ever heard.

Q. Understood.

Then did you review the Singleton congressional plans? And there's three of those here.

A. The first one, the whole county plan, I did because that was a plan that was submitted to public hearings along the way and had been in the office for quite a while. So yes, I did. I did have more time to look at that one, yes.

Q. And that's plan one, the --

A. Plan one, yeah, SB-10. Yes, sir.

Q. I'm sorry. Go ahead.

A. Yes, plan one, SB-10.

Q. And are you aware that that one was submitted by the League of Women Voters?

A. Yes, sir.

Q. And there is also two other plans, plan two and plan three. Did you have an opportunity to review those?

A. Much more quickly. I mean, they were offshoots of the initial plan that just changed deviation for the most part.

Q. I want to walk through those, the Holmes plan, the Faulkner plan, and the Singleton plan.

Starting with the Holmes plan, why did you review that one?

A. I reviewed that because that was put in essentially for Congressman Moore because he did not want to pick up another county. And instead of

splitting Escambia between 1 and 2, he wanted to split Monroe between 1 and 7 so that District 7 would pick up an additional county and he would not, and then make the corresponding change in Montgomery to offset the 739 people that were needed to get 1 to zero deviation. To my knowledge, those were the only changes.

Q. You had had conversations with Congressman Moore when you were creating your map, correct?

A. Correct.

Q. Were these changes in the Moore -- excuse me.

Were these changes in the Holmes plan changes that you did not want to or did not for some reason make in the 2021 map that you drew?

A. That's correct.

Q. And why did you not make those changes?

A. Because I didn't think it was fair to put the majority of split counties into the 7th District.

Q. Why not?

A. I just didn't think any one district should have to have four split counties when other districts only had one.

Q. Was that the only reason you didn't make those changes?
A. Primarily. I didn't think it was a good -- first of all, it's 739 people. It's not really -- you couldn't make a case that Congressman Moore was going to lose re-election over gaining 739 republicans in Escambia County.
So I was not concerned about what it did to his district. I was concerned about the fairness issue of putting all of the splits in one congressional district.
Q. Were there any other reasons why you didn't incorporate those changes in the Holmes plan into your map?
A. That was -- that was the primary reason.
Q. Were you asked by anybody to review the Holmes congressional plan?
A. Well, when it was offered on the floor -- I'm not sure where it was offered. The house floor maybe. This doesn't say on here.
But whatever chair where that was being offered asked me to, I'm sure, tell him what I knew about the Holmes plan.
Q. What did you tell him?
MR. WALKER: You can tell him.

THE WITNESS: I thought you didn't want me to --

MR. WALKER: You can tell him.

A. I told him that I didn't -- I didn't think that was a good change to our map because, again, it put all of -- not all. But put another split into the 7th District. Which I didn't think it was equitable to put most of the splits in one congressional district.

Q. Did you tell him anything else?

A. That's basically it.

Q. Did you provide any evaluations or recommendations regarding that map?

A. Other than voting it down, no. I suggested they not vote for it.

Q. Moving to the Faulkner congressional plan two.

A. Yes.

Q. Why did you review that map?

A. That was the change where I had put Homewood back together that made a few people in Jefferson County, I guess, unhappy.

So representative Faulkner, who is from Jefferson County, had a map that took the three Homewood precincts out of District 7 and put them

into District 6, and took four precincts in the Center Point area, which is the northern end of District 7, and put those back into District 7. So I reviewed those changes.

Q. Similar to before, were you asked by anybody to review that plan?

A. I was. And whatever -- again, I think these were offered in the house. So I think it probably would have been Representative Pringle that asked me for a quick analysis of what the plan changes were.

Q. And what did you tell him?

A. I told him that it moved the Homewood area into District 6, and it took those four precincts at the northern end of district -- who were in District 7 and added them back into District 7.

And I allowed as how I didn't think that was really a good thing to do because it eliminated some of my geographical compactness of what I was trying to do when we were adding in western Jefferson and not extending the quote, unquote finger further north into Jefferson County.

Q. To your knowledge, did any of the changes from your plan to the Faulkner plan have to

do with any racial factors?

A. I don't know -- I mean, I don't know about the motivations of who drew the Faulkner plan.

Q. Are you aware of any racial considerations that were taken in account in drawing the Faulkner plan?

A. I'm not.

MR. WALKER: Objection to form. You may answer.

Q. What about the Singleton plan? Why did you review that plan?

A. Well, that was one that -- the initial Singleton plan was one that was offered at a number of public -- virtually every public hearing, I believe. It had been in existence for quite a while.

So I looked at it for what it -- you know, for what it was doing. And I had a little more time to look at it, actually, than some of these other ones that came in at the last minute.

Q. Do you know what feedback there was from the public hearings on the Singleton plan?

A. Not specifically. I really don't.

Q. Did you ever hear of any public feedback on the Singleton plan?

A. Not that comes to mind, no.

Q. Were you asked by anybody to review the Singleton plan?

A. Again, I was when it was offered in the house or senate -- I guess it was offered on the senate floor maybe first. Whichever chair of wherever it was offered, I was asked to comment on it.

Q. And what did you tell that chairperson?

A. Well, the initial Singleton plan was not a zero deviation plan. So it really didn't meet our guidelines. I also think it paired a couple of incumbents, if I'm remembering the plan correctly, in the 3rd District. I think it put in -- put maybe Shelby County in the 3rd. So it would have paired Gary Palmer and Mike Rogers. And it wasn't to zero deviation. Also, it didn't have a majority black district in it.

Q. Was that an issue to you, that there's not a majority black district?

A. Yeah. Well, it -- it was an observation that it did not have a majority black district.

Q. Does that matter for any particular reason to you?

A. Well, it matters -- again, I'm not a

lawyer. But I suppose there would be some question to how well it comported with Section 2 of the Voting Rights Act. But, again, that wasn't my major concern with it.

Q. There were two subsequent Singleton plans, plan two and three.

A. Yeah.

Q. Both of which you stated -- and it describes here in Exhibit 9 as having adjustments for population deviation.

Were there any other changes in Singleton plan two and three other than changes to deviation, to your knowledge?

A. Not to my knowledge. And, again, I looked at -- I didn't look at these plans extensively. But to my knowledge, it was just a change in deviation.

Q. Were those other observations that you made to Singleton plan one regarding incumbents being paired up against each other, a lack of a black majority district, any other observations you made, were any of those addressed with Singleton plan two or three?

A. Not that I'm aware of.

Q. Were you asked by anybody to review

Singleton plan two and three?

A. Again, in whatever body they were offered in, the chair would have asked me about them, yes.

Q. Do you recall what recommendations or observations you provided?

A. Basically the same ones. The narrow deviation, again while a more narrow deviation, was not to zero deviation. And I think it still paired the incumbents. And as I remember, the BVAPs on the districts were very similar between -- among the three. So I don't think it changed any of those things.

Q. You also mentioned that you looked at briefly the Coleman plan, Hatcher plan, Waggoner plan, and Barfoot --

A. Yeah.

Q. -- plan.

A. Yes, sir.

Q. Did you make any observations from your looking at or review of those?

A. No. Well, the Barfoot plan was sort of just the senate version of the Holmes plan making the change for Representative Moore.

The Wagner plan was basically Faulkner

and Barfoot put together or Barfoot and Holmes put together. It also made the Moore change, but made the Faulkner change in Jefferson County. So they were just sort of different versions or compilations of those two things.

Q. I'm going to stop you right there because I think there's -- it looks like there's two Waggoner plans here. Which one are you referring to, three or one?

A. Three was the combination. One -- one was essentially the Faulkner version of the plan, only in a -- drawn up by a senator or offered by a senator.

Q. And I interrupted you there. I think the only other plan we haven't discussed yet is the Hatcher plan.

A. Right. And, again, that came in, if I remember correctly, the night before it was offered on the floor. So I really looked at it for literally ten minutes before whoever -- wherever it was offered. I guess on the senate side. So I didn't do a very deep analysis of the Hatcher plan.

Q. For each of these plans that you said you just looked at briefly, the Coleman plan, the Waggoner plans, the Barfoot plan, and the Hatcher

plan, is it a similar response as you had to the other ones, that you were asked to look at those by whoever was presenting them on the floor?

A. Whoever was managing the time, the time on the floor.

Q. And as to each of those, do you recall what your feedback was?

A. Yeah. I mean, obviously, the Waggoner plan was the same as the Faulkner plan. So I didn't think it was a good change. And the Barfoot plan was essentially the same as the Holmes plan. So I didn't think that was a good change. And the Waggoner three was just a compilation of the two of them added together, which didn't do anything to move the bar.

Q. What about the Coleman plan?

A. The Coleman plan, again, I didn't look -- didn't have a chance to look at very much. I believe it paired two incumbents in 1, in District 1, Carl and Moore. And it certainly didn't respect the cores of districts because I think it had District -- District 7 went from Mobile to Tuscaloosa maybe.

Anyway, again, I didn't spend a lot of time on either of those, looking at either of those

plans.

Q. What about the Hatcher plan?

A. The Hatcher plan I think was obviously a two black district plan.

THE REPORTER: Two?

A. Two black district plan. I do think it -- I think it paired incumbents, but maybe I'm wrong. Again, geographically it was not very compact. I think it went from Mobile to Russell essentially on one of the black districts.

So I didn't think it -- I didn't think it followed our guidelines very well in terms of compactness.

Q. Other than compactness --

A. And splits. I think it also had like 13 county splits, where the Pringle plan had six. I think it split a lot more precincts.

Q. Other than compactness and splitting precincts, was there any other reason that you felt that the Hatcher plan did not comply with the guidelines?

A. Those were the main issues.

Q. Were there any other issues?

A. I don't think so.

Q. And with the Singleton plan, were there

any reasons why you felt that the Singleton plan did not comply with the redistricting guidelines?
A. Yeah. Well, the initial Singleton plan was not to zero deviation. It did pair incumbents again in the 6th -- in the 3rd District, it had two incumbents together, Moore and -- not Moore. Palmer and Mike Rogers.
Q. Any other reasons?
A. And, again, it didn't have a majority black district.
Q. Speaking of that, when you drew your map -- which on this table, I would assume that's the Pringle congressional plan. Correct?
A. Yes, sir.
Q. When you drew the 2021 congressional map -- remind me. Did you start with drawing District 7?
A. No. Actually, I started -- I started with District 5 because I knew it had to spill into 4. And I had to do that before I could do much else there.
Q. What order did you go in for drawing the districts after that?
A. I basically moved down -- moved down the state. I did 5 to 4. And then the changes that 4

-- putting Cherokee back together in 3, putting Blount back together in 6, corresponding changes in Tuscaloosa in 7. I basically worked down the map from there.

Q. And you stated that you did not look at the racial data in drawing the 2021 map until the week before the special session, correct?

A. Correct.

Q. When you did review the racial data, if it had shown that District 7 was below 50 percent black voting age population, what would you have done?

A. I would have talked to legal counsel about what steps to take at that point.

Q. Do you believe that you would have needed to make modifications to make the black voting age population percentage higher than 50 percent?

MR. WALKER: Object to the form, calls for speculation.

Q. You can answer.

A. I'm sorry. Say that again.

MR. THOMPSON: Can I have the question read back?

(Record read.)

A. I think if it had come back under 50 percent, in consultation with legal counsel, I assume we would have, under the guidelines, looked for a basis and evidence to see if one existed to add African Americans to the district.

Q. Did you draw any other maps other than -- let me take a step back.

Did you draw any other congressional maps other than the HB-1 Pringle congressional plan that was ultimately enacted?

A. This cycle -- I don't know what time frame we're talking about.

Q. I'll try again. Sorry.

In drawing the 2021 congressional maps, through that process you drew the map that was ultimately enacted, correct?

A. Yes, sir.

Q. Did you draw any other maps in that cycle --

MR. WALKER: I'm going to --

Q. -- for the congressional plan?

MR. WALKER: -- object to the extent that -- and you may not be intending to. You're asking him whether he tried to draw a two majority black district --

Q. I'm just asking if you drew any other maps at all.

MR. WALKER: And my instruction to you is if you did anything at the instruction of me alone, then that would not be part of your answer.

A. Other than that, no.

Q. I've gone a little over an hour there, but I wanted to finish up. I think I'm done with my questions for now. So I think we'll take a break and then allow some other folks to ask you some questions. Is that fair?

A. That's fair.

THE VIDEOGRAPHER: We are off the record. The time is 2:28 p.m.

(Recess was taken.)

THE VIDEOGRAPHER: We are back on the record. The time is now 2:47 p.m.

MR. THOMPSON: At this time, I'm going to pass the questions to Mr. Blacksher.

EXAMINATION BY MR. BLACKSHER:

Q. Good afternoon, Mr. Hinaman.

A. Good afternoon.

Q. So it was Dorman Walker who told you you were required to achieve zero population deviation; is that right?

MR. WALKER: Object to the form.

Q. You know, I'm having -- I've had trouble hearing you throughout. So I'm going to have to ask you to speak up a little louder.

What was your last response?

MR. WALKER: Are you talking to me, Jim?

MR. BLACKSHER: The witness didn't respond? That was you?

MR. WALKER: That was I who said "Object to the form." He doesn't make objections.

MR. BLACKSHER: Oh, you said objection?

MR. WALKER: Yes.

Q. Okay. I'm going back to what you said in your examination, your direct examination, I guess we call it, where you said you were advised that you needed to use zero deviation in your plan. Is that right?

A. That's correct. Under two criteria for redistricting, B, "Congressional districts shall have minimal population deviation."

I was told by counsel that that was zero for six districts and plus one for one district.

Q. And when you say "by counsel," you mean -- well, I didn't ask you. Were you advised by lawyers other than Dorman Walker?

A. No.

Q. So it was Dorman who told you that minimal deviation means zero deviation?

A. That's correct.

Q. Okay. So you also drew the plan in 1992. And did you read the opinion of the court in West v. Hunt, the 1992 opinion that adopted your plan?

A. I'm sure I did in 1992 or '93. But I sure don't remember it today.

Q. You don't recall -- well, let me ask you this: Did counsel tell you or remind you that in that decision, the three-judge court said that because it was a court-approved plan, a court-ordered plan, it felt constrained to have perfect or zero deviation. But that if the legislature had drawn the plan itself, it would have had greater leeway with respect to deviation?

MR. WALKER: Objection.

Q. Do you recall reading that?

MR. WALKER: Jim, you've asked that question several ways. And one -- it could be interpreted in one way to be whether or not I gave him advice on that. If that's what you're asking, I object to that.

Q. Okay. So if you read the West v. Hunt opinion -- let me ask this question -- do you recall the court saying that it felt compelled, because it was a court-ordered plan, to use zero deviation?

A. I do not. As I said, I probably read it 30 years ago. I certainly don't remember what it said today.

Q. Were you advised to use zero deviation by anybody -- any lawyers in Washington, say, connected with the republican party, the RNC or -- what was that other organization that you used letters for? NRRC or something?

A. No. In terms of the -- are you talking about the 2021 plan?

Q. The 2021 plan, yes.

A. No, I did not speak to anybody at the NRCC or the RNC or anybody in Washington other than members of congress and their staffs.

Q. Okay. NRCC, what does that stand for?

A. National Republican Congressional Committee.

Q. Okay. But they didn't give you any instructions or any advice about zero deviation?

A. No, sir.

Q. What about the members of congress in

the Alabama delegation? Did they give you any instructions to use zero deviation?

A. No, sir.

MR. BLACKSHER: Eli, did I print out a copy of the passage from State of Alabama versus U.S. Department of Commerce that you can show him?

MR. HARE: Let me see here.

MR. BLACKSHER: It's got a highlighted section in it.

MR. HARE: Yes.

MR. BLACKSHER: Okay. Can you mark that as -- what did you say, PX 10?

MR. HARE: Right. It's PX 10.

(Plaintiff's Exhibit 10 was marked for identification.)

MR. BLACKSHER: And show that to Mr. Hinaman

Q. That, Randy, is the document that was filed by the State of Alabama, as you can see, in Montgomery's federal court against the census bureau and styled 21-211.

And would you please read the highlighted part in Paragraph 116 of the State's

complaint?

A. The part --

Q. Read it into the record.

A. I must admit highlighting in it in blue makes it rather hard to read. But nevertheless.

"Even at the higher census geography of Alabama's congressional districts, the November 2020 demonstration data indicated that the differential privacy algorithm skewed the data enough to create population deviation on a level that courts have found in other contexts to violate the supreme court's equal population jurisprudence."

Q. Thank you.

And under that language is a table that shows what the State thought were errors caused by differential privacy in the demonstration. And they were congressional districts.

Did counsel tell you that the State of Alabama thought that the zero deviation requirement was using flawed data, in their opinion?

MR. WALKER: Objection to form. And I instruct the witness not to answer.

Q. Okay. Are you going to follow counsel's advice not to answer my question, Mr. Hinaman?

A. I am.

Q. So aside from what counsel told you, were you aware that the State of Alabama took the position in federal court that the -- that the 2020 census, because of differential privacy, would not be reliable enough to use for zero -- for separating people at that level?

A. I was not.

MR. BLACKSHER: Eli, if you can find that passage from the public hearing at Northeast Alabama Community College.

MR. HARE: I've got it right here.

MR. BLACKSHER: And mark that as Exhibit 11, please.

(Plaintiff's Exhibit 11 was marked for identification.)

MR. BLACKSHER: And show that to Randy, to Mr. Hinaman.

Q. As you can see, this is a transcript of the reapportionment committee's hearing on September 1 at Northeast Alabama Community College. And I've printed out Page 12 and highlighted it.

Would you read the highlighted statement of one Toni McGriff who lives in Dutton? Would you

read into that into the record, please?

MR. WALKER: You haven't highlighted the whole statement. You've highlighted Lines 5 through 16. Is that what you want him to read?

MR. BLACKSHER: Yes, the highlighted lines, please.

A. "Most of Jackson County, particularly all of Jackson County -- practically all of Jackson County is in Congressional District 5. But there is a tiny little sliver of southern Jackson County that's in 4. And I understand about trying to get everything equalized in terms of population. But the very few people who live there very frequently think they're in District 5 and do not know who to vote for. And I would ask that you consider that when you are redistricting so that you don't have that tiny little sliver out of that county. It is in a section called Macedonia. Senator Livingston would know where I'm talking about, I'm sure."

Q. Thank you.

So did anyone on the reapportionment committee, the chairs or counsel, show you or tell you about that testimony?

MR. WALKER: Objection as to what he may have been told my counsel. Otherwise, he may answer

the question.

A. I was not familiar with that testimony. But I did, of course, put Jackson County back together.

Q. You sure did. And who paid the price for that? Lauderdale County?

A. Well, you're comparing 17 people to 43,000 or something. I'm not sure that's a fair comparison. But yes.

Q. Was it 17 people in Jackson County?

A. I'm making up that number. You're comparing a few people to many tens of thousands. But nevertheless.

Q. In most of the cases on the 2021 plan, the enacted plan, for example, down in Escambia County where you had to put the eastern slice of Escambia into 2?

A. Yeah, 739 people.

Q. 739 people. Do you think that they're going to share the sentiment of Mr. Toni McGriff in Jackson County?

A. They may very well.

Q. And what I'm saying, what I'm trying to point out, can't we agree that most of these tiny splits to achieve zero population result in people

being basically separated from their home county and put in a district where they really don't have much influence at all over the member of congress, right?
A. In the Escambia County case, I would agree with that. Although looking at the map, there aren't many examples of that. Because most of the other splits in the enacted map are much larger segments of folks.
Q. Okay. Now, you said that you began working on the congressional plan in May at some point; is that correct, when you found out that Alabama would have seven seats in congress apportioned to it?
A. Yes, once we found out seven. And also the guidelines were passed on May 5th. I started work thereafter.
Q. And you were using estimated census data to sort of rough out what that plan might look like; is that correct?
A. That's correct.
Q. And those estimated census data were only available for whole counties, right?
A. I believe that's the case, yes.
Q. So you were having to work with whole counties. And when the final census data came out,

you simply had to adjust with the correct 2020 legacy data; is that correct?

A. That's correct. Although while the estimates captured the flavor of the changes that happened over the last ten years, meaning four districts were over and three districts were under and the estimates properly identified those districts, they didn't really capture the magnitude of it.

Because I think the estimates had the 7th District being 30,000 and some odd number under when it ended up being 54, and it had the 5th District being something like 23,000 over when it was really 43.

So while it captured the over/under nature of the districts, it didn't -- it didn't do a particularly good job of capturing the ultimate numbers.

Q. Did you attempt drawing a whole county plan at that point in May of 2021?

A. No. I just -- no.

Q. Why not?

A. Well, I don't even consider it a plan. I mean, I was just lumping together -- and I do think I was able to split. I just don't think the

answers were very accurate on what Maptitude had for estimates.

So I didn't -- I didn't -- I lumped some counties together and I split some larger counties based on precincts, knowing that those numbers were not going to be very accurate, and then waited until we got the real numbers.

Q. Okay. And when you got the real numbers, did you attempt to draw a whole county plan?

A. I did not.

Q. And why did you not attempt to do that?

A. No one asked me to do that. And, again, my understanding of our guidelines would be that that would not have followed the proper deviation.

Q. Take a look at our whole county --

MR. BLACKSHER: Can you mark a copy -- I don't think it's been passed around yet -- just so we can be talking from something, the same thing?

MR. HARE: This will be Plaintiff's Exhibit 12.

(Plaintiff's Exhibit 12 was marked for identification.)

Q. So think along with me, Mr. Hinaman, about how you might have attempted to reproduce your starting point of the plan, which was the 2011 plan, right?

A. Yes, sir.

Q. And if you were going to attempt to take the 2011 plan and create whole districts and you start with Congressional District 7, then you would try to make Jefferson, Tuscaloosa, and Montgomery whole. And that's what this plan does, doesn't it?

A. It does.

Q. You would have attempted to keep as much of the black belt together as you could. And that's what this plan does, doesn't it?

MR. WALKER: Objection. I'm not sure, Jim, the way you're phrasing your questions, what you're asking him. You seem to be telling him what he would have been doing and then -- I'm just confused.

MR. BLACKSHER: I'm asking leading questions, Counsel. Is that all right?

MR. WALKER: Well, you're allowed to ask leading questions. I just didn't understand what you were doing. So go ahead, if that's what you want to do.

MR. BLACKSHER: Can you read the question back, please, Court Reporter? I'm sorry.

(Record read.)

MR. WALKER: Objection to form.

A. It does, I guess. Hale and Perry I think would be considered part of the black belt, and that's in a different district. But by and large, you're correct, yes.

Q. Switching gears for a minute. When you met with Congresswoman Sewell, do I understand you to say that she -- your testimony was that Congresswoman Sewell wanted to keep her district the way it is, adjusted for the population deviation known; is that correct?

A. I would phrase it this way: I met with Congresswoman Sewell and told her her district was 54,000 under. And I gave her some options of where it made, in my opinion anyway, sense to gain folks to make up that 54,000 difference. And then we worked through that on the map. That's how I would phrase it.

Q. Did Congresswoman Sewell tell you she was opposed to attempting to draw two districts in which blacks could elect candidates of their choice?

A. She did not. She didn't offer an

opinion, to my knowledge, on that issue.

Q. Say again.

A. She didn't offer an opinion on that, to my knowledge.

Q. And you didn't ask her about it?

A. I did not.

Q. Were you aware of all of the nongovernmental organizations and grass roots organizations in Alabama who have been urging the legislature to draw two districts from which blacks can elect candidates of their choice?

A. I'm not sure that I was that aware of it in our initial meetings in May. Obviously, once public hearings were held and your whole county plan came out and so forth and so on, I was obviously more aware of it at that point.

Q. Okay. So what you're saying is that you simply sat down with Ms. Sewell and made suggestions on how to increase -- get 53,000 and some odd additional population in District 7, correct?

A. That's correct, and keeping her existing -- the core of her existing district together.

Q. And didn't I hear you say you suggested that one option might be to making Tuscaloosa County and Montgomery County whole; that is, swapping the

population in Montgomery -- in Tuscaloosa County, north Tuscaloosa County, with a population that extends into Montgomery County?

A. I didn't offer that.

Q. What did -- you said something in your earlier examination about considering that option.

A. If I did, I didn't mean to. I did not consider that option.

Q. You did not consider that option?

A. No, I did not.

Q. Why not?

A. Because I started with her existing cores of districts and I looked at what she needed to gain, and I suggested areas that she may wish to gain in. And we worked through the map and made those changes.

Q. Well, I mean, was the -- is the little -- the extension of District 7 that goes into Montgomery County part of the core of that district, in your opinion?

A. It may be now. It probably wasn't at the -- obviously, I don't think it existed at the beginning. It's a lot of people. I mean, I don't know the exact number. We can obviously look it up. But it's --

Q. Well, I can tell you that based on the data that Dorman Walker and the reapportionment committee provided to us, the population of District 7 in Montgomery County is 62,519.

A. Okay.

Q. And the population of the portion of Tuscaloosa County that's in District 4, the northern part of Tuscaloosa County, is 42,770. So there's about a 20,000 difference between those two split counties making them whole in District 7.

MR. BLACKSHER: So I'm going to ask Eli, if he would, to mark up those two documents that show -- that are labeled Plan Tuscaloosa and Montgomery Whole and show it to Mr. Hinaman.

MR. HARE: I'm going to mark them as -- the map as Plaintiff's 13, and then the chart or the data sheet as Plaintiff's 14, Jim.

(Plaintiff's Exhibits 13&14 were marked for identification.)

Q. I'll tell you, Mr. Hinaman, that I did this with Dave's Redistricting app. Are you familiar with Dave's Redistricting app?

A. I've heard of it. I've never used it.

Q. Okay. And I did exactly what I just suggested. I made -- took Montgomery County completely out of District 7, and I put all of Tuscaloosa County into District 7. And that 20,000 difference I got out of Jefferson County.

Otherwise, it looks pretty close to the map that you ended up drawing and that was enacted. But, of course, would you -- would agree that it otherwise (inaudible) the one that you drew?

A. Yeah. Obviously, there's a split in Blount and a split in Etowah that I don't have. But yeah.

Q. Well, this is a good point. When you talk about making changes in District 7 like I just did with Dave's, you end up requiring changes in several of the surrounding districts.

I mean, for example, because District 6 lost population to District 7, I elected to get some population out of Blount. And that ended up splitting Blount.

A. Right.

Q. And because Montgomery County went into District 2, I ended up having to do a little split of Elmore County, right?

A. Yes, sir.
Q. And on up the line, if you will. But, of course, I didn't have to interfere with the split you made in Lauderdale County. And these are -- and this is not zero deviation.
If you look to the left in that table, you will see that there are as many as 471 people in District 2 who are going to have to be -- I'm sorry. District 3 who are going to have to be taken out, right?
A. Yeah. I'll take -- I can't find that number on this sheet. But I'll take your word for it.
Q. Well, it's on the map.
A. Oh, I'm sorry. Yeah, I see it. Thank you. I was looking on the corresponding number sheet. Sorry.
Q. The point I want to make here is isn't it true when you're drawing maps and you get to 471 people who have to be moved in order to get to zero deviation, you go down to the block level, right?
A. Most times, yeah. Precincts aren't going to have an exact number or that small a number.
Q. And I'll represent to you that I

didn't -- this is drawn with precincts. So you're going to have to split some precincts, right?
A. Yes, sir.
Q. But that usually can be done after you have achieved the goal you set out to in broader terms in your districting scheme, right?
A. Sure.
Q. There are a lot of ways that you can split precincts or counties in order to achieve this -- this sacred zero deviation objective. And yet you didn't consider this option at all when you were going over the plan with Congresswoman Sewell; is that correct?
A. That's correct.
Q. She did not -- she did not have an option to consider this arrangement, right?
MR. WALKER: Objection to form.
A. Obviously, she could have said how about if I get all of Tuscaloosa County and come out of Montgomery? Which she said neither.
Q. Well, I wonder if the reason she said neither is because it turns out that doing that reduces the BVAP, the black voting age population, to 49.79 percent?
MR. WALKER: For CD 7?

THE REPORTER: For what?

MR. WALKER: CD 7.

Q. Do you see that in the statistical table?

A. Yes, sir, I do.

Q. So would that have been a problem for Terri Sewell based on what she was telling you were her objectives?

A. I don't know specifically. I don't think she considered this map. So I can't -- I don't really know how to answer your question.

Q. Okay. Did you and Congresswoman Sewell discuss the whole county plan, the League of Women Voters' whole county plan?

A. We did not. I don't think it -- in our initial meetings, I don't think it existed. Or at least I was not aware of it. I don't think she was. So we really did not.

Q. It didn't exist in May, but it did exist before you finalized the plan that became HB-1, right?

A. Correct.

Q. And September 1, 2021, was the first public hearing of the reapportionment committee. And the League of Women Voters was the first

witness at the first hearing offering that plan; isn't that correct?

A. I wasn't at that hearing. But I'll take your word for it.

Q. So you're telling us that the whole county plan offered by the League of Women Voters was never discussed at all when you were communicating with Congresswoman Sewell?

A. I don't believe it -- maybe it was discussed at the very end about what other plans are out there. We may have had a minor discussion about -- frankly, I think at that point in time yours would have been the only other publicly acknowledged congressional plan. So she may have mentioned it. But we didn't have a very healthy discussion about it. Let's put it that way.

Q. What do you mean not healthy?

A. Very long, very detailed. She was asking what other plans have you heard about. And I think at that point, yours was the only one that was public at that point in time.

Q. Did she tell you she would object to that plan?

A. We didn't have that detailed a discussion about it.

Q. So we don't know -- we don't know whether Congresswoman Sewell would be happy with the whole county plan or not; is that correct?
A. I do not know, no. You may know.
Q. Sir?
A. I don't know. I mean, you may have talked to her about it. I don't have any knowledge of it directly.
Q. I understand.
Can you take another look at the whole county plan map, please?
A. Yes, sir.
Q. And compare it -- and compare it with the map of the 55 -- 555 plan, HB-1, the enacted plan.
A. Yes, sir. Exhibit 5.
Q. If the court wanted to -- was drawing a remedial plan in this case, just for the sake of argument, it had reached the point where it was going to draw its own plan, and it wanted to change the whole county plan to look more like the plan that the legislature enacted, that would simply be a matter of changing the array between Districts 5 and 4, correct?
A. No. I mean -- well, first of all,

Terri Sewell doesn't even live in District 7 under your whole county plan. She lives in District 6.

Q. I'm sorry. I'm not being clear, and my question was not understood by you.

I'm just asking if the court wanted to change the array -- if it was drawing a court-ordered plan and it wanted to make the whole county plan 5 and 4 look more like the whole -- like the 5 and 4 districts in the enacted plan, it would simply be a matter of balancing out the populations between 4 and 5, correct, splitting some counties as needed?

A. Yeah. Obviously, 4 has changes in Tuscaloosa and St. Clair that are different than the enacted plan.

Q. Every -- every change has a ripple effect, right?

A. Yes, sir.

Q. All right. But there would be no problem in putting Lauderdale, Colbert, and Franklin in CD 4 and moving Morgan County back up into CD 5 if the court wanted to do that and made the splits necessary to bring it into population equality; isn't that correct?

A. Yeah. These hypothetical the court

wants to change things are hard for me. But yes, I guess that's correct.

Q. I'm looking at the map of the plan you drew in 1992 that was adopted by the three-judge court in West versus Hunt. Did that map ever get shown to you today, or not?

A. It has not been shown to me today.

MR. BLACKSHER: Okay. I'm looking at it in the amended complaint. I don't know if anyone has a copy there that they can show Mr. Hinaman or not.

But do you recall, Mr. Hinaman, that the plan you drew in 1992 included all of the same counties that are in the plan you drew in 2021?

A. I'm not sure I -- I'm not sure I know what that -- I'm not sure I know what you mean by that.

Q. The plan that you drew in 1992 had Clarke split, it had Pickens split, Tuscaloosa and Jefferson split, and Montgomery County split.

Now, your plan in 2021 leaves Pickens whole, correct?

A. Correct, and Clarke whole.

Q. And Clarke whole. But Tuscaloosa, Jefferson, and Montgomery are still split?

A. Yes, sir.

Q. So your 2021 plan, the plan you drew and that was enacted by the legislature in 2021, preserves the core of the 1992 plan that you drew; is that correct?

A. It's -- it's correct. But you've missed a few steps along the way, obviously. Because as we discussed earlier in the deposition testimony, it more preserves the cores of the 2011 districts, which I guess by chain preserve some of the 2001 districts, which the legislature preserved some of the 1992 districts, if that made any sense.

In other words, I did not use the 1992 map as the starting point for my 2021 map.

Q. No. You used the 2011 plan, correct?

A. Correct.

Q. And isn't it true that the 2002 plan and the 2011 plan preserved the cores -- the core of the 1992 plan?

A. For the most part.

Q. Can we sum up your testimony about how you went about drawing the 2021 enacted plan by saying that you drew the plan so that it satisfied what each incumbent member of the Alabama congressional delegation wanted? That was your

primary guideline, right?

A. Well, that was a part of it. My primary guidelines were the guidelines given to me by the reapportionment committee, and then based off of the subsequent population shifts over the last ten years to repopulate or take away from, depending on the over/under of each district, population, and geography to reach the required guidelines of zero deviation and preserving the cores of districts.

And, of course, where possible -- and we've had a couple of minor cases where it wasn't, as we discussed with Representative Moore and so forth. But preserving what the incumbents would have -- would like to accomplish, as well.

Q. But your testimony is that nobody else but the members of the Alabama congressional delegation had any input into the decisions you made about how to draw that plan; isn't that correct?

A. That's pretty much correct, yes, sir.

Q. No member of the Alabama legislature's reapportionment committee, including its chairs, had any input into that plan; isn't that correct?

A. They had all the input they wanted

into the plan. But they chose to allow the members of congress to talk about what areas they wanted to gain and lose underneath the guidelines that they had already passed.

Q. And, in fact, in 19 -- let's see. Excuse me.

In 2011, that's what the legislature did, as well. They simply deferred to what the congressional delegation wanted in redrawing that plan, right?

A. No, that's not -- that was the goal I had. But that's not what happened. When we got -- as you may remember, when we got to the senate floor, there were some members of the senate who may have wanted to run in one district or another who moved some things around.

My map -- my initial map in 2011 didn't even have the 4th District in Tuscaloosa. It had the 6th District in Tuscaloosa.

So there were numerous changes made on the senate floor and probably subsequently the house floor from the map that the members and I worked on, members of congress and I worked on.

Q. But that didn't happen in 2021?

A. It did not happen in 2021. The map

that came out of -- the map that I gave to the chairs that was offered at the reapportionment committee was not amended through the process. So it was identical to what was passed into law and signed by the governor.

Q. Okay. So let me just go over -- I think I'm about finished here. I want to make sure I understand what your testimony is.

You considered no other plans that did not have a zero deviation; is that correct? You never considered drawing a plan that did not have a zero deviation?

A. That's correct. My understanding and -- my understanding of the guidelines required us to be at zero deviation.

Q. And you understood, didn't you, that Jefferson County was now at a population level that was smaller than an ideal congressional district and, therefore, no longer needed to be split? You were aware of that, weren't you?

A. I'm aware of it. I'm not sure I focused on it. But what you say is true.

Q. It wasn't -- it wasn't a priority for you to try to make Jefferson County whole? That's what you're saying?

A. That's correct.

And, frankly, when I started the meetings, I didn't even -- at the time I started the meetings -- subsequently I realized it. But at the time I started the meetings, I actually thought that both Representative -- Congresswoman Sewell and Congressman Palmer both lived in Jefferson County. As I turned out, he had -- Representative Palmer had moved over the last few years into Shelby.

But at the time, I would have thought that that wasn't possible under our guidelines. Because when I started the process, I thought they both lived in Jefferson County.

Q. But, in fact, you found out that Congressman Gary Palmer lives about three blocks south of the Jefferson County line in Shelby County, and Congresswoman Sewell lives about a mile away from where Palmer lives. But she's on the Jefferson side of the line in Lake Cyrus, right?

A. That's correct, yeah.

Q. But I also understood you to say that Congresswoman Sewell considered making her residence, for purpose of redistricting, Dallas County. Am I correct?

A. I'm not sure I would phrase it that way.

When asked what residence -- when asked for her residence address so it could be put in the computer so that we would make sure she was inside her district, she gave us both her address where she votes at, which is obviously Jefferson County, and her ancestral home. I don't know the right way to phrase it. Where she grew up in Dallas County.

Q. She grew up in Selma, right?

A. Yes. Yes, sir.

Q. Okay. And you're aware, aren't you, that there is no residency requirement for members of congress, aren't you?

A. I am aware. I'm also aware it's exceedingly difficult to get elected when you're outside of your district. It makes a rather good TV spot.

Q. So even though congress -- Congressman Palmer still lives in the city of Birmingham, he's in that part that extends into Shelby County, he would not feel comfortable representing the Birmingham area again; is that right?

A. I don't know that. He may feel

perfectly comfortable. But I've -- I've seen in other races where, you know, the fact that somebody doesn't reside in their district is not a positive when you get around to campaigning.

Q. Okay. I think I'm about done here. I need one more look at my notes.

That's it. Thank you very much, Mr. Hinaman.

A. Thank you.

MS. MADDURI: This is Lali Madduri for the Caster plaintiffs. We don't have any questions.

MR. THOMPSON: I think that's all the questions that I have at this time, too. So on behalf of all the plaintiffs, I'll pass the witness at this time.

MR. WALKER: Let us have a few minutes.

THE VIDEOGRAPHER: We're off the record. The time is 3:34 p.m.

(Recess was taken.)

THE VIDEOGRAPHER: We are back on the record. The time is 3:39 p.m.

MR. WALKER: We have nothing to ask Mr. Hinaman. So I guess we're done. Thank you

very much, everyone.

THE VIDEOGRAPHER: This ends the deposition of Randy Hinaman. The time is now 3:40 p.m.

(DEPOSITION ENDED AT 3:40 P.M.)

STATE OF ALABAMA )
JEFFERSON COUNTY )

I hereby certify that the above proceedings were taken down by me and transcribed by me using computer-aided transcription and that the above is a true and correct transcript of said proceedings taken down by me and transcribed by me.

I further certify that I am neither of kin nor of counsel to any of the parties nor in anywise financially interested in the result of this case.

I further certify that I am duly licensed by the Alabama Board of Court Reporting as a Certified Court Reporter as evidenced by the ACCR number following my name found below.

So certified on December 9, 2021.

__________________________
LeAnn Maroney, Commissioner
ACCR# 134, Expires 9/30/25
505 North 20th Street, Suite 1250
Birmingham, AL 35203

Exhibits

**EX 0001 Randy Hinaman 120921** 7:13 14:7,13
**EX 0002 Randy Hinaman 120921** 7:15 14:7,15
**EX 0003 Randy Hinaman 120921** 7:17 21:19, 24
**EX 0004 Randy Hinaman 120921** 7:19 25:6, 10,11
**EX 0005 Randy Hinaman 120921** 7:21 92:17, 20 110:15,16 219:16
**EX 0006 Randy Hinaman 120921** 7:23 93:10, 14,18
**EX 0007 Randy Hinaman 120921** 7:25 135:14, 18 147:22
**EX 0008 Randy Hinaman 120921** 8:3 160:7,11 167:10,16
**EX 0009 Randy Hinaman 120921** 8:5 179:16, 19 189:9
**EX 0010 Randy Hinaman 120921** 8:7 201:15
**EX 0011 Randy Hinaman 120921** 8:10 203:12, 13,15
**EX 0012 Randy Hinaman 120921** 8:12 208:21, 23
**EX 0013 Randy Hinaman 120921** 8:14
**EX 0014 Randy Hinaman 120921** 8:16

$

**$10,000** 43:22,25
**$400** 17:18
**$50,000** 55:5,20

(

**(c)(4)** 53:18

0

**000007** 179:21
**00056** 160:13
**043723** 135:21

1

**1** 14:7,13 29:23 114:22,23,24 122:21 123:9 125:19 137:9 161:1,2,3 176:15 183:1,2,5 192:19,20 203:22 217:23
**1&2** 14:3
**10** 137:9 201:12,13,15
**10,000** 71:23 72:11
**100** 61:19 119:9
**105** 80:10,14,16, 20
**105-member** 65:11
**10:00** 88:1
**10:17** 65:22
**10:35** 65:25
**11** 203:13,15
**116** 201:25
**11:30** 121:25
**11:42** 122:5
**12** 203:23 208:21,23
**12,000** 126:24
**123** 62:4
**12:57** 122:8
**13** 193:15 213:16
**13&14** 213:19
**14** 213:17
**14th** 112:23 113:8 139:16
**150** 61:23
**16** 204:4
**17** 25:15 205:7, 10
**19** 224:5
**1965** 140:24 141:5 165:13 166:13
**1992** 24:2,17 26:11 27:7 28:4 30:7, 11,18 31:7, 13 33:7,10, 23 34:17 35:12 37:19 39:14,17 40:1 91:6 95:10 172:2 199:6,7,9 221:4,13,18 222:4,12,13, 19
**1st** 72:19,20,22, 25 87:1

123:9,20

## 2

**2**
14:7,15 96:24 97:16 124:1,3,5 125:19 138:9 141:2,15,18, 22 142:14,19 144:5,8,14, 25 146:5,6 147:22 161:12,13,14 183:1 189:2 205:17 214:24 215:8

**20**
24:8 147:22 179:1

**20,000**
213:9 214:4

**200**
62:10

**200,000**
55:24

**2001**
26:13,24 27:14,24 28:11 29:4, 22,25 30:4 38:17 39:13, 17 40:1,4 89:7 95:5 126:20 159:14 222:11

**2002**
222:17

**2011**
23:20 26:12, 13 37:22 38:11 39:13 40:3,7,9,15 42:13,18 43:5 44:5,25 45:3,17 46:7 48:11,15,17, 23 49:19 50:12,21 53:11,19,24 77:3,5,8,11, 12,25 85:19 93:15,19,22 94:9,13,25 95:15 100:5, 8 114:22 116:16 124:22 125:13 159:16 171:3,9,12 173:16 209:3,7 222:9,15,18 224:7,17

**2012**
23:20,23

**2013**
22:4,9,18 25:16

**2018**
22:23

**2019**
56:21 57:9 59:9 66:6

**2020**
51:18,19,20 52:12,21 53:19 54:4 55:13,17 57:11 62:22, 23 202:7 203:3 207:1

**2021**
9:7,17 39:12,16 40:6 48:3,5 51:2,5,12, 16,19 53:20 57:18 58:9 59:22 60:9, 12,24 61:5, 15,20 62:14, 16,17 63:17, 20 64:21 65:4,15 66:3,4,5,23 67:8,11,14, 20 68:14 70:22 71:14 74:16,19 75:16 76:2 78:9 79:3,8 80:1 83:14, 16,24 84:2 85:7,23 86:5,14 87:15,20 88:11 91:13 92:22,25 93:4,24 94:5 95:16 98:18 99:21 100:9, 14,16 101:7, 9,14 106:7, 9,12,13,16, 18 107:12 110:18 111:3 120:1 121:1, 7 123:3 124:23 129:19 132:3 134:11 135:22 136:7 137:6 156:10 160:15,23 167:17,21,25 169:3 172:13,25 173:21,24 174:16 176:19 179:23 180:3 183:16 194:15 195:6 196:14 200:14,15 205:14 207:20 217:23 221:14,21 222:2,3,14, 22 224:24,25

**2021-555**
51:8

**21**
148:6

**21-211**
201:23

**217**
62:4

**23,000**
207:13

**23rd**
61:11

**24**
48:8

**25**
22:4,9 150:5

**26**
151:5

**2:21-CV-01530-AMM**
9:14

**2:28**
197:14

**2:47**
197:17

**2nd**
72:23,24 87:1 124:13 125:14 134:25 161:24

## 3

**3**
21:19,24 95:17 124:9, 12 126:8,25 147:21 162:1,3,4 195:1 215:9

**30**
31:2 33:11, 22,24 200:6

**30,000**
207:11

**317**
78:17
**33267**
18:11
**35**
81:13
**36561**
18:12
**3:34**
228:20
**3:39**
228:23
**3:40**
229:4,6
**3rd**
94:19 124:4 126:19 130:17 162:12 188:14,15 194:5

**4**

**4**
25:6,11 91:23 115:8, 9,11 127:5 162:13,15,16 194:20,25 204:11 213:7 219:24 220:8,9,11, 13,21
**40-hour**
63:2
**41**
47:3,8,10 179:9
**42,770**
213:8
**43**
207:14
**43,000**
205:8
**471**
215:7,19
**49.79**
216:24
**4th**
96:15 156:2 224:18

**5**

**5**
91:23 92:17, 20 110:15,16 115:6,7 128:18,23 163:1 194:19,25 204:3,9,14 219:16,23 220:8,9,11, 22
**5-5-57**
18:9
**50**
34:12 195:10,17 196:1
**50,000**
55:21
**501(c)(4)**
53:10,16,21 86:3
**53,000**
211:19
**54**
207:12
**54,000**
210:17,19
**54.22**
118:12
**55**
219:14
**550**
134:5
**555**
219:14
**5th**
127:8,9 135:21 136:15 206:15 207:12

**6**

**6**
93:10,14,18 116:19 126:22 127:24 130:4 132:5 133:10 138:10 163:9,11 167:7 172:5, 9 176:15 186:1,14 195:2 214:19 220:2
**60**
44:7
**62**
169:15 170:4
**62,519**
213:4
**6th**
138:5 194:5 224:19

**7**

**7**
25:21 30:1, 17 32:2,5,15 33:23 35:12, 23 36:5 42:19 43:6 44:6,14 45:2,19,20 46:7 48:15 95:1,4,9 96:3 97:6, 14,15,21 104:5 114:2, 22,25 115:3 116:12 117:7 119:13 123:8,13,22 124:3 128:7 132:6 133:9 135:14,18 138:8 147:22 163:16,18,19 170:7,8,22, 25 171:12 172:1,14,18 173:1,24 174:8,18,21 175:3,5,13 183:2 185:25 186:3,16,17 192:22 194:17 195:3,10 209:8 211:20 212:18 213:4,10 214:3,4,15, 19 216:25 217:2 220:1
**703 598-8383**
19:1
**717,000**
73:7
**739**
73:5 123:15 124:17 183:5 184:4,6 205:18,19
**7th**
95:23 96:14 124:21,25 125:14 130:19,20 166:15 183:20 185:7 207:11

**8**

**8**
160:7,11 167:10,16

**9**

**9**
9:7,17 179:16,19 189:9
**90s**
27:10
**93**
199:9
**9:00**
105:19
**9:13**
9:17

**A**

**a.m**
9:17
**a.m.**
65:22,25 122:5
**abilities**
137:2
**ability**
74:5
**able**
33:2 56:15 63:15 68:8 76:18 82:19 85:11 95:17 96:9 207:25
**above**
9:8 34:12 114:13 140:17
**Acadome**
103:18
**accepted**
131:20
**accommodate**
91:19
**accommodation**
117:23
**accommodations**
92:3
**accomplish**
155:17 223:15
**account**
19:2 34:14 86:10 100:4 148:4 175:11,16 187:5
**accurate**
26:20 60:22 72:5 208:1,6
**achieve**
197:24 205:25 216:9
**achieved**
216:5
**acknowledged**
218:14
**Act**
31:23 51:8 99:10 112:23 113:7 140:23 141:2,5,16,19 142:15,20 143:11 144:5,9,15 145:1,5 149:12,25 165:4,12 166:13,17,21 167:9 189:3
**acting**
9:3
**action**
31:11
**actual**
66:15 84:9 125:24
**add**
45:8 96:1 117:12 128:7 145:20 146:2 159:6 196:5
**added**
44:21 102:14 145:25 162:18 166:14 186:16 192:14
**Adderholt**
104:17 127:4 128:15 134:17
**adding**
98:1 130:22 145:12 158:7 172:18,22 186:21
**addition**
80:19
**additional**
22:18,19 83:7 114:14,17 115:15 140:18 183:3 211:20
**additions**
166:9
**address**
18:10,13 22:16 117:17 130:12,14 227:4,6
**addressed**
189:22
**addresses**
19:6 117:14,16,20 150:15
**adjacent**
40:23 85:17 88:21 97:18 103:15 104:6,9 107:17 115:8 146:12
**adjust**
207:1
**adjusted**
210:13
**adjusting**
140:10
**adjustments**
189:9
**administrative**
68:11
**admit**
202:4
**adopted**
26:10,16 27:6 199:7 221:4
**advice**
199:24 200:23 202:24
**advised**
198:15,24 200:8
**affiliation**
35:10 41:25 176:9
**afraid**
22:20
**African**
32:8 33:17 170:15 171:24 196:5
**afternoon**
15:11 197:21,22
**age**
32:6,17 33:18 34:3,8,15 35:10 44:7,10 49:7 74:10 83:2 112:18,20 117:6 119:12,22 135:7 175:12,17 195:11,17 216:23
**aggregate**
42:3,7

**ago**
13:2 18:21, 22 23:10,20 24:7,8 31:3 33:12,22,24 38:14 44:19 45:4,14 50:15 90:14 162:18 200:6

**agree**
52:8 92:11 170:21 171:11 178:4 205:24 206:5 214:8

**agreed**
169:7,19,23, 25

**agreement**
17:19 44:3 107:9 120:7

**ahead**
37:22 38:9 50:23 51:2 121:17 172:13 177:19 182:8 209:24

**Air**
115:22

**Alabama**
9:2,3,16 12:13,22 18:11,14 22:16 23:6, 20 24:2,10, 18 25:11,16, 17 26:9,14, 22 27:10 30:13,22 33:12 53:15, 23 58:15 59:21 60:8 67:21 69:6 75:12 77:14 86:14 89:19 112:19 113:12 115:6,21 116:6,7 120:1 147:5, 13,14 153:10,18 170:12 171:12 178:6 201:1,5,21 202:19 203:2,10,22 206:12 211:9 222:24 223:17,22

**Alabama's**
202:7

**Alabamians**
53:3,8

**ALBC**
12:21 25:11

**algorithm**
202:9

**allow**
70:10 197:10 224:1

**allowable**
151:16

**allowed**
56:25 59:8 131:2 133:7 148:20 151:7 186:18 209:22

**alter**
44:23

**amazing**
13:14

**amenable**
41:1

**amend**
134:20

**amended**
140:24 165:13 221:9 225:3

**Amendment**
112:23 113:8 139:16

**amendments**
180:18

**American**
22:23 32:8 170:15 171:24

**Americans**
196:5

**amount**
80:25 81:19, 24 162:22

**analysis**
167:24 168:3,6,11, 21 169:2 186:10 191:22

**analyze**
144:3

**ancestral**
227:8

**and/or**
146:12

**annex**
125:8,21,23

**announced**
67:19

**answer**
13:10 31:4 58:17,19 104:15 107:5 108:8,12,17, 23 109:17 131:20 138:24 148:10 162:23 173:3 177:5,16,24 178:10 181:11 187:9 195:21 197:5 202:22,24 204:25 217:11

**answered**
150:18

**answering**
12:2 13:18

**answers**
208:1

**anybody**
17:13 59:21 70:10 129:20 184:16 186:6 188:2 189:25 200:9,16,17

**anymore**
95:18 174:14

**anyone**
15:18 17:5, 10 37:9 50:7 53:16 57:24 83:13 87:16 101:13,23 106:17,22 120:10,12 121:2,5,11 138:19 143:4,9 144:2,7 148:25 149:5 164:8,13 168:20 169:1 177:13 178:1 204:21 221:10

**apart**
149:19

**apologize**
46:8 62:12

**app**
213:23,24

**appears**
147:11 170:8,22 171:13

**applied**
150:25

**applies**
150:22

**apply**
63:17 64:2 139:11

147:12,24 149:6
**apportioned** 206:13
**approached** 51:15,21
**approaching** 121:15
**approval** 38:21
**approve** 36:10
**approved** 36:8 136:4 140:17
**approximately** 23:9 179:9
**April** 58:19 59:6 63:17,20 67:20
**area** 89:15,23 91:16 92:4 97:4 115:14 125:16 127:15 154:3 156:1,25 162:17 186:2,14 227:24
**areas** 32:7,19 33:3 45:8,11 71:3 75:9 89:15, 19 102:13 114:7,17 128:3 132:4 152:13,16,18 162:11 164:21 212:14 224:2
**argument** 219:19
**around** 52:11 54:3 55:16 57:10, 11 59:12 65:13,15 67:19 82:18 136:14 208:18 224:16 228:4
**arrangement** 18:2 216:16
**array** 219:23 220:6
**arrived** 82:17
**asked** 23:15 30:20 31:12,15,19 36:11,16 46:24 51:24, 25 112:25 113:6,11 117:13 119:20 134:24 135:6,8 140:7 142:17 149:3 168:18 172:14,17 174:17 175:2,15 176:11 177:18,20 184:16,22 186:5,10 188:2,7 189:25 190:3 192:2 199:21 208:13 227:3,4
**asking** 10:9 13:4,6 19:24 36:9 69:13 101:20 113:22 118:17 149:4 171:8 196:24 197:1 199:24 209:17,20 218:19 220:5
**asserted** 11:15
**asserting** 177:1
**assess** 35:9 176:8
**asset** 176:23
**assigned** 73:22
**assigning** 32:10
**assist** 101:23
**assisted** 24:5 101:25
**assisting** 24:9
**Association** 22:23
**assume** 12:12 13:10 17:12 18:2 57:25 59:16 80:19 104:25 194:12 196:3
**assumed** 117:9 118:19 130:1
**assuming** 121:8
**assumption** 39:25 40:2 118:21
**ASU** 116:7,8
**attempt** 177:22 207:19 208:9,12 209:6
**attempted** 209:2,12
**attempting** 210:23
**attend** 88:10,17
**attended** 19:13
**attention** 66:19
**attitudes** 34:22 175:19
**attorney** 10:25 15:19 17:15,17,20 18:3 106:25 107:2
**attorney-client** 108:4,6,18, 22 109:14 176:24 177:2
**attorneys** 9:18 15:4
**August** 57:2,4 64:24 65:4 68:9 74:16,19 75:15 76:2 79:3,8,11 80:1 82:18 83:13 84:2 85:7
**Autauga** 161:18
**authorized** 101:19
**available** 41:12 48:20 82:24 83:5 143:20,21,25 206:22
**avoided** 150:6
**aware** 50:11 130:23 167:23 182:10 187:4 189:24 203:2 211:7,12,16 217:17 225:20,21 227:13,16

B

**back**
18:6 24:17 30:7 37:24 39:13 47:7,9 48:11 55:8 61:17 65:24 67:13 69:5 71:15,19 76:16 82:3, 12 84:5,14 88:23 96:19 98:6 102:11 103:14,21 115:2 118:4 122:7 123:12 126:12,20 127:15 129:17,22,25 130:7 140:1 164:16 167:15 172:2 179:5 185:21 186:3,16 195:1,2,24 196:1,7 197:16 198:13 205:3 210:2 220:21 228:22
**background**
18:7 21:23 107:24
**bad**
61:3
**Baggett**
10:23,24
**balance**
124:9
**balanced**
99:5
**balancing**
220:10
**Baldwin**
89:20 91:16 152:13 153:7 156:4 161:4
**ball**
113:1
**bar**
192:15
**Barfoot**
180:19 190:16,22 191:1,25 192:10
**base**
94:23 115:22 125:4,24 126:2
**based**
38:17 40:19 60:18,20 64:25 66:12 68:6 70:25 73:16 84:12 97:25 100:9, 12,17,20 101:3 103:10 104:16 105:5,11 106:10 131:22 145:14 146:3 162:24 166:5 208:5 213:1 217:7 223:4
**basically**
54:19 79:14 98:4 123:19 148:1 159:1, 12 174:14 180:24 185:11 190:7,25 194:24 195:3 206:1
**basing**
118:20
**basis**
35:17 145:1, 3 196:4
**Bates**
135:20 160:12 179:21
**bay**
153:6 156:5
**Beach**
18:11 20:22
**began**
58:8 59:12 65:12 94:5 206:9
**begin**
11:11 57:13, 17 60:11 63:15 64:20
**beginning**
9:12 60:17 64:16 79:17 114:24 212:23
**beginnings**
66:3
**behalf**
9:20 51:23 129:21 228:15
**behavior**
42:15
**belated**
136:20
**believe**
15:20 16:15 22:5 26:6 28:20 29:12 30:14 31:21 33:12 35:11 38:8 42:1 50:10 51:8 55:7 69:20 75:14 83:6 101:16,19,22 140:21 143:3 145:4 160:21 170:12 171:2 187:15 192:19 195:15 206:23 218:9
**believed**
108:21
**below**
195:10
**belt**
35:15 154:14,17,22 155:1,5,16 163:20 170:10 209:13 210:6
**Ben**
22:21
**best**
13:17 127:11 137:1 181:20
**better**
125:10 171:23 172:5
**bill**
17:14,16,22 26:5 104:19 110:2 134:23
**billed**
17:13
**Birmingham**
9:2 69:20 227:21,24
**birth**
18:8
**birthday**
136:18,20
**bit**
16:12 18:7 21:23 38:13 44:24 45:16 70:11 92:15 104:16 121:16 124:9,14 128:5 130:11
**black**
25:16 30:2, 5,12 31:13 32:3,6,13, 16,20 33:2, 18 34:3,7,

11,15 35:10, 15 36:6,12, 15,21,22 37:7,12 42:20 43:7, 10 44:7,9,14 45:12 46:1 49:7,9,19 50:3,8,13,20 74:9 111:25 112:17,20 117:6,11 118:19,23 119:12,21 135:7 142:6 154:14,17, 20,22 155:1, 5,16 163:20 170:10,11 172:12 174:9 175:12,17 176:18 177:9 178:2,5,19 188:17,20,22 189:21 193:4,6,10 194:10 195:11,16 196:25 209:13 210:6 216:23

**blacks**
210:24 211:10

**Blacksher**
10:8 16:11 197:19,20 198:7,11 201:4,8,11, 18 203:8,12, 18 204:5 208:17 209:20 210:1 213:11 221:8

**Blain**
10:6

**blanking**
116:5

**block**
33:20,21 83:3 134:5 138:16 151:14 215:21

**blocks**
133:24 151:21 226:16

**Blount**
127:23,25 130:7 195:2 214:12,20,21

**blue**
202:4

**board**
52:6 54:12 56:18 64:13 65:5,7,12 75:2 80:12 81:8,16,23 139:10

**Bob**
22:22

**body**
17:1 190:2

**bottom**
135:21 156:20 166:23

**bought**
18:20

**BRAC**
125:4

**brain**
46:17

**break**
13:22,23 65:19 121:17,25 122:2,6 197:9

**breakdown**
98:24

**breakdowns**
98:23

**brief**
170:17

**briefly**
16:7 21:7 114:15 120:5 126:9 190:15 191:24

**bring**
220:23

**broader**
216:5

**broke**
122:9

**broken**
33:19

**Brooks**
68:23,24 70:17 84:23 128:22 129:1,20,21 134:17

**buildings**
70:9

**Bullock**
155:4

**bureau**
56:20 58:19 59:4 60:7 67:19 201:22

**BVAP**
74:6 112:12 118:10 134:24 135:8 216:23

**BVAPS**
143:19 190:10

**C**

**Calhoun**
162:4

**call**
54:7 69:17, 19,21,23 85:3,4 87:2 112:2 129:24 130:25 132:9 198:15

**Callahan**
23:25 24:19 28:8 29:15 30:21 31:17 36:18

**Callahan's**
28:16

**called**
19:19,21 55:20 61:15 77:14,16 129:22,25 204:18

**calls**
54:9 83:21 84:6,13,15 85:1 102:25 103:3,5,11 105:5,9 195:19

**campaign**
20:2,6 21:12 22:22 23:1

**campaigning**
228:4

**campaigns**
21:11 44:1

**candidate**
112:14 142:9 168:8,9

**candidates**
21:13 210:24 211:11

**capable**
101:18

**capital**
77:20

**capsulize**
122:25

**capture**
207:8

**captured**
207:4,15

**capturing**
207:17

**cards**
124:17
**care**
131:24
**Carl**
111:6 122:20 134:16 192:20
**cascade**
115:5
**case**
9:14 11:16 23:15 54:25 85:23 87:2 112:21 139:24 142:2 170:1 184:5 206:4,23 219:18
**cases**
205:14 223:12
**Caster**
10:12 228:11
**Caucus**
25:16
**caused**
202:15
**CD**
170:7 216:25 217:2 220:21,22
**cell**
18:24
**census**
15:23 32:22, 24 39:3,4 55:11 56:9, 14,16,20 57:1,3,5,15 58:18 59:4 60:6,19 63:16,22 64:5,8,23 66:6 67:11, 16,19 68:7 71:8,17 74:16 76:3 77:24 82:5 84:9 133:24 138:16 151:14,21 177:11 201:22 202:6 203:4 206:17,21,25
**Center**
186:2
**certain**
20:14 34:2,7 100:17 109:12 117:6 119:4,6,9 138:20 157:4 175:8
**certainly**
47:5 58:2 59:4 74:4 79:19 89:10 96:12,16 100:24 101:18 109:5 121:10 150:10,24 152:24 162:19 192:20 200:6
**certificates**
20:11
**certify**
9:4
**chain**
222:10
**chair**
11:13 52:15, 16 184:21 188:6 190:3
**chairperson**
188:9
**chairs**
9:25 52:14 54:10 74:21 86:17 204:22 223:23 225:2
**challenging**
70:11
**chance**
170:19 192:18
**change**
23:3 38:5,7 39:11 41:17 72:3 73:18 85:18 92:6,8 101:20 104:15,20 105:2,21 110:21 117:24 123:18 156:6 180:25 183:4 185:5,20 189:17 190:24 191:2,3 192:10,12 219:20 220:6,16 221:1
**changed**
22:13,15,16 56:7,14 99:6 120:22 128:19 182:17 190:12
**changes**
28:15 29:12, 19 38:17 44:25 46:7 54:15 57:21 71:6,7 84:18 86:10 91:19 99:2,4 100:4,5,8,9, 12,17,18,20, 22 101:3,9, 11,14,21 103:4,9 104:25 105:4,6,11 110:1,6,9 113:7,15,24 115:5,14,20 116:15 118:16 124:12,13 128:21 130:19 142:18 145:12 158:18 173:12,23 175:2,4 181:3,7,10 183:7,12,14, 15,18 184:2, 13 186:4,11, 25 189:11,12 194:25 195:2 207:4 212:16 214:15,16 220:13 224:20
**changing**
146:17 219:23
**characteristics**
34:15 175:12
**chart**
213:16
**Cherokee**
126:10 195:1
**Chestnut**
170:17
**chief**
23:25 68:23 70:19 84:7 129:5,19,22 131:3,8,13, 14 134:11
**chiefs**
121:9,11
**Chilton**
124:12 126:24 130:17
**Choctaw**
155:2 163:21

**choice**
86:6 112:15 142:9 145:2 168:8 210:24 211:11
**choose**
104:8 128:10,13 138:2
**choosing**
32:15 132:21,22 133:4
**chose**
128:11 224:1
**Chris**
10:1 11:14
**chunk**
127:23
**circumstances**
157:4
**citizens**
53:2,7 73:7 104:3 114:14
**city**
227:21
**Civil**
9:5,14
**Clair**
162:5 220:14
**clarification**
64:1 173:22
**clarify**
108:20 169:25
**clarifying**
77:10
**Clarke**
114:21 115:2 123:7,12,22 221:19,23,24
**Clause**
139:16
**clear**
51:1 56:5 73:20 74:3 119:8 122:23 171:8,15 173:15 220:3
**clearly**
167:8
**clerk**
10:25
**clients**
22:18,19 43:9,13 62:21,25
**Cline**
22:21
**close**
50:5 66:14, 16 73:14 79:22 149:18 151:22 214:6
**closed**
70:9
**closer**
73:23 114:8
**closing**
125:4 126:3
**clue**
113:24
**co-chairs**
59:23 86:16 88:22 99:12 136:11
**Colbert**
220:20
**Coleman**
16:14 190:15 191:24 192:16,17
**Coleman's**
180:15
**colleagues**
87:23
**college**
125:17 203:10,22
**color**
144:21,23
**combination**
129:14 191:10
**come**
25:1 29:16 49:9 71:17 75:9 88:23 92:12 129:3 134:17 140:4,6 141:12 142:10 145:20 151:19 153:20 157:24 158:6 159:17 196:1 216:19
**comes**
49:8 152:20 159:18,21 188:1
**comfortable**
29:20 118:15 125:2 130:18 178:15 227:23 228:1
**comment**
37:11 118:15 181:21 188:7
**comments**
89:2,5
**Commerce**
201:6
**commission**
125:4
**commissioner**
9:3
**committee**
9:25 11:13 12:8 15:24 26:17 48:10 67:2 110:4, 5,7 120:16, 20 135:19 136:4 165:8 167:11 178:20 200:21 204:22 213:3 217:24 223:4,23 225:3
**committee's**
107:2 203:21
**committees**
90:24
**common**
41:15
**communicating**
218:8
**communication**
108:6
**communications**
88:7 108:7
**communities**
152:7,15,17, 23 153:8,9, 13,18,19,23, 25 154:5 155:10,12, 21,24 156:12,15, 17,22 157:3, 10 165:24
**community**
35:13,15 89:18,21 97:14 129:11 153:1,3 154:13 155:6 156:8,24 203:10,22
**compact**
124:21 130:21 132:16 133:2 141:25 142:3,5 146:8,20 149:20 172:19 173:4,11 174:2 193:9
**compactness**
157:19 186:20 193:13,14,18

**companies** 21:16 114:11
**company** 20:21,23 21:5 22:15 23:2,3 52:23
**compare** 219:13
**comparing** 205:7,12
**comparison** 165:1 205:9
**compelled** 200:3
**compelling** 165:10
**compensated** 17:10 18:1
**compensation** 55:2 56:3 57:23
**compilation** 192:13
**compilations** 191:4
**complaint** 202:1 221:9
**complaints** 16:1
**complete** 50:15 61:7 104:14 113:18,21
**completed** 19:12 60:24 61:5 102:2, 19,24 104:12 105:8,14 106:11 107:11 110:13
**completely** 60:22 72:5 214:3
**compliance** 140:23 143:23 152:9 165:12
**complicated** 161:15
**complied** 138:12 143:10 145:23 150:13 151:25
**complies** 140:12 142:14 143:15 144:4,8,14 147:1 155:9
**comply** 99:9 112:22 113:7 139:15 140:16 141:1 144:25 148:4 150:20 152:3 158:4 164:24 178:19 193:20 194:2
**component** 171:16
**comported** 189:2
**composed** 146:7
**comprehensible** 172:20
**computer** 76:11,19,22 77:12 78:1, 10 79:10 82:13 98:1 101:11,14 227:5
**computers** 33:12 76:17 78:12 80:4
**concentration** 32:8,20
**conceptually** 113:14
**concern** 189:4
**concerned** 184:8,9
**concerns/ discussion** 58:15
**concert** 31:17
**concluded** 142:19
**conditions** 108:17
**conducted** 168:11
**confident** 119:5,7,8
**confirm** 92:9 117:10 144:4
**confirming** 41:21
**conflict** 72:7 149:14, 22 152:20 155:20 157:25 165:14,19 166:5,11,16, 18 167:2
**conflicts** 86:25 165:23 166:4
**confused** 209:19
**confusion** 90:21
**congress** 21:12 24:18 40:10 43:14, 17 56:18 58:16 59:7 64:6 65:8,14 66:21 67:7 80:11 84:7 103:6 107:16 120:6 200:18,25 206:3,12 224:2,23 227:15,20
**congressional** 23:21 26:10, 12,13,15 27:6,10,13 29:22 30:1, 7,11,12 37:22 38:11 39:6 40:9 42:19 43:6 44:6 45:18 48:12,16,17, 24 49:19 51:6,12,16 52:2,5 54:11 56:25 57:14 58:13 59:18, 25 60:9,12, 24 61:6,19 63:16 66:5, 24 67:20,24 68:5,15,16 69:2 75:3 80:25 81:9, 25 83:16,20, 23,24 85:19, 21 86:9,15 87:13,15,20 88:11 90:3 91:13 92:25 93:4,15,19, 23,24 94:6, 9,25 95:5, 10,16 99:21 100:6,9 105:17 106:10,13,18 107:12 110:19 111:3 119:23 120:2 121:2,7 123:3 128:1 132:3 134:12 136:8 137:6, 15,22 139:11,24

142:2 145:21,23 147:12,17 148:19 150:21 151:18 155:17 158:13 160:14,15,22 167:18,21,25 169:3 170:8 171:5,12 172:13,25 174:16 176:19 179:2,11,23 180:3,23 181:6,24 184:11,17 185:9,16 194:13,15 196:8,9,14, 21 198:19 200:20 202:7,17 204:9 206:10 209:8 218:14 222:25 223:17 224:9 225:18

**congressman**
22:21 23:25 24:19 27:20 28:8,16 29:15 30:21 31:16 36:17 43:24 68:24 69:8,22,25 70:5,17 72:22,24 94:19 104:17,18 111:5,6 113:25 116:11 117:3 118:5 119:18,19 121:9 122:15 123:20,25 125:5,15,21 126:5,7 127:4 128:15,22 129:1,20,21 130:3 131:4, 8,16 132:12 133:14 134:10,22 180:25 181:4 182:24 183:9 184:5 226:7, 16 227:20

**congressmen**
23:22 58:21 80:18 92:11 105:18,23 121:11 122:11 134:16

**congresspeople**
125:9

**Congresswoman**
43:8 45:7,25 69:5 101:1 103:12 122:16 132:13 210:10,12, 16,22 216:12 217:12 218:8 219:2 226:6, 18,23

**connected**
200:10

**connecting**
151:17

**connects**
151:14

**consensus**
60:4 75:2,3

**consider**
37:6,18 48:12,14,19 49:18 96:23, 24 105:6 106:24 107:3 140:19 147:8,16 148:13 153:9 155:5 161:6, 13,20 162:2, 14 163:17 164:3,7 167:20 174:17,20 176:11,14, 17,22 177:6, 8,13,18 204:15 207:23 212:8,9 216:11,16

**considerable**
58:14 97:4 161:25 162:21 163:6

**consideration**
100:23 165:9

**considerations**
144:21 146:2 160:4 187:5

**considered**
30:4 35:22 107:1 167:12,17 210:6 217:10 225:9,11 226:23

**considering**
132:24 133:4 163:23 212:6

**consistently**
161:24

**constituents**
101:6

**Constitution**
139:17 141:3 147:6

**constrained**
199:15

**consult**
21:10 41:3

**consultant**
21:8 24:1

**consultation**
196:2

**consulting**
20:19 21:9 58:6

**contained**
37:12

**contend**
109:14

**content**
15:3

**Contests**
150:6

**contexts**
202:11

**contiguity**
151:7,8,12

**contiguous**
36:4 142:5 146:7,11 147:25 174:3

**contingent**
56:4

**continuation**
28:3

**continue**
118:23 159:7

**continued**
53:20

**continuing**
39:23

**continuity**
148:20

**continuously**
162:12

**contract**
43:16,19,21 52:17,19,22 54:3,5,7,22 55:3,6,8,18, 20 56:8 62:2 113:4

**contracted**
53:1,13 136:25

**control** 28:17
**controlled** 27:19
**conversation** 108:21 120:4 143:14
**conversations** 58:12 104:16,17 108:24 109:2,3 122:10 128:15,24 130:5 141:13 142:11 183:8
**convinced** 131:5,11
**cooperate** 133:25
**coordination** 68:12
**Coosa** 124:12 126:19,21 130:16
**copies** 14:8 110:24 169:10
**copy** 14:10,18 21:25 22:3,9 26:4 54:22 92:21,25 93:15,19 102:21 120:18 135:18 136:6 169:6,8,10 201:5 208:17 221:10
**core** 159:9,11,20, 25 160:3 161:2,3,8, 13,14,21 162:2,4,7, 14,16,24 163:2,3,13, 17,19,24 164:3,8,14, 19 211:22 212:19 222:4,18
**cores** 39:15 93:25 157:23 158:22 159:1,19 164:17 178:25 192:21 212:13 222:9,18 223:10
**Cornell** 19:13,18
**corner** 160:13
**correct** 13:2 16:21, 22 18:17,18 22:9 26:4 30:9,13 36:12,19 37:23 38:11, 22 39:4,5,14 40:16 54:21 57:6 58:7 61:9,16 63:21 65:16 67:8,22 69:14 75:16, 17 76:3,4,9, 22,25 78:2, 10,11 80:5,6 81:6 82:6,20 85:21,22,23, 24 91:4 93:4,18,24 94:8,11,15 95:19,20 96:5,6 98:16 99:23 100:10,11, 16,18,19 105:2 106:1 110:16,17 118:6 123:6 139:12,13 140:3 147:15 150:23 151:2,3 160:24 165:16,17 171:6 172:3 174:25 175:1 183:10,11,17 194:13 195:7,8 196:16 198:18 199:4 206:11,19,20 207:1,2,3 210:8,14 211:20,21 216:13,14 217:22 218:2 219:3,24 220:11,24 221:2,22,23 222:5,6,15, 16 223:20, 21,24 225:10,13 226:1,21,25
**correctly** 111:20 188:13 191:18
**correspond** 120:12
**corresponding** 183:4 195:2 215:16
**counsel** 9:6 99:13,14 106:21 139:8 140:8 141:13 142:11,18 143:7,8,14 149:3 164:11 168:22 169:5,7,23, 24 195:13 196:2 198:21,23 199:12 202:18 203:1 204:22,25 209:21
**counsel's** 202:23
**counties** 32:10 42:4,7 44:18 64:18 72:17 73:22 75:8 89:22 90:21,25 96:1 102:10 114:19 146:11 153:7,22 154:18,21,25 157:5,15,21 158:1,12 159:2,13 161:4,9,20 162:6 163:20 164:2 165:25 178:14 179:2 183:20,24 206:22,25 208:4 213:10 216:9 220:12 221:14
**counting** 12:20 147:20
**county** 33:19,21 40:25 44:21 56:19 64:9, 16 65:9 66:7 71:23 72:8 73:6 90:15, 20 91:1,7,23 92:12,13 93:6,16 94:12,21 95:2,5,8,10 96:4,5,8,9, 24 97:10,13,

19,21 100:25 103:13 112:1 114:21 115:2 117:19 123:8,12,22 124:3,4,16 125:13 126:10,15,21 127:10,24 129:13 130:10 132:2,5,9, 17,19 146:14,17, 23,25 152:21 158:8 159:13 161:16 162:7 170:11,14 171:17 172:21,22 174:10,15 181:8 182:1, 25 183:3 184:7 185:22,24 186:23 188:15 191:3 193:16 204:7,8,9, 10,17 205:3, 6,10,16,21 206:1,4 207:19 208:9,16 211:14,24,25 212:1,2,3,19 213:4,7,8 214:2,4,5, 23,25 215:4 216:19 217:13,14 218:6 219:3, 11,21 220:2, 8,21 221:20 225:17,24 226:8,14,17, 18,25 227:8, 10,22

**couple** 46:14 48:13 62:24 63:13 79:16 127:13 129:25 133:8 145:18 180:10,17 188:12 223:12

**course** 11:16 48:25 87:22 105:20 123:8 174:13 205:3 214:8 215:3 223:11

**court** 9:1,15 11:1, 16 13:13 24:3 26:11 31:11,25 79:1 112:21 113:15 131:5,12,16, 19,22 199:6, 13 200:3 201:22 203:3 210:2 219:17 220:5,22,25 221:5

**court's** 202:12

**court-approved** 199:14

**court-ordered** 199:15 200:4 220:7

**courts** 113:13 202:10

**cover** 47:19

**covered** 108:25 109:14 113:3 148:1

**COVID** 55:10 63:7

**crazy** 63:8 146:15

**create** 31:12 50:12, 20 142:1 172:12 176:18 177:9 178:5,18 202:9 209:7

**created** 30:11 53:22 96:21

**creating** 50:8 178:2 183:9

**criteria** 41:4 137:8, 10 138:22 144:17,21,25 165:5,9,14 166:24 167:13,15 198:18

**crystal** 113:1

**Cullman** 162:17

**current** 16:6 23:11 159:13,14

**cutoff** 138:21

**cycle** 196:11,19

**Cyrus** 226:20

**D**

**Dallas** 117:19 155:3 226:24 227:10

**data** 32:22,24 33:15,18 39:3,4 41:9, 24 42:13,16 48:22 49:6, 11,14,16 56:9,14,16 57:1,4,15 60:19 64:8, 10,16,23 67:11,12,16 68:7,9 71:9, 17 74:9,16, 22 75:25 76:3,6,11,14 77:24 82:10 83:10 84:5,9 97:20 99:20, 24 101:4,6 102:3,24 106:7,8 129:24 133:3 157:9 160:4 195:6,9 202:8,9,20 206:17,21,25 207:2 213:2, 17

**date** 9:4,16 18:8 22:11 25:15 58:11 61:12

**dated** 135:21

**Dave's** 213:23,24 214:16

**Davin** 10:17

**Davis** 9:22 15:6 50:22 169:22 170:23,25 171:7 178:7

**day** 79:19 180:19

**days** 79:13

**DC** 59:14,16 67:7,24

68:14 69:14, 16,18 73:17
**deal** 157:25
**dealing** 105:22
**December** 9:7,16
**decent** 78:25
**decide** 132:4
**decided** 24:20 85:3 86:2 127:14 129:1 131:17
**decision** 199:13
**decisions** 223:18
**declaration** 25:12 26:4
**declined** 68:18,21
**deemed** 113:15
**deep** 191:22
**Defendant** 170:11
**deferred** 224:8
**defined** 156:25
**definition** 32:11 153:1, 3 156:21 159:22
**definitive** 153:17
**delay** 55:11
**delayed** 68:7
**delegation** 24:20 26:15 30:23 31:17
45:23 46:2 58:13 201:1 222:25 223:18 224:9
**democrat** 151:2
**democratic** 28:13 39:24
**democrats** 27:19
**demographic** 38:17
**demographics** 35:19
**demonstration** 202:8,16
**Dental** 22:23
**Department** 201:6
**depend** 113:15
**depending** 124:7 154:6 223:7
**depends** 149:14
**deposed** 12:16
**deposition** 9:12 13:1 14:10 15:5 16:17,20 17:4,8 22:4, 5 45:14 181:21 222:8 229:3,6
**described** 87:1
**describes** 189:9
**description** 26:20
**detail** 125:18
**detailed** 218:18,24
**details** 120:8
**determination** 35:18 142:23 143:6,13 164:4,6
**determine** 35:13 144:8 167:3
**determined** 64:5
**determining** 159:25
**Deuel** 10:15
**developed** 26:14
**deviation** 36:2 73:14 84:19 86:11 102:9,16 128:18 132:11 133:13 134:8 137:16,19 138:1,3,12, 16,20 139:1 140:2 182:18 183:6 188:11,17 189:10,13,17 190:8,9 194:4 197:24 198:16,20 199:3,16,18 200:4,8,23 201:2 202:10,19 208:15 210:13 215:5,21 216:10 223:9 225:10,12,15
**difference** 47:14 210:19 213:9 214:5
**differences** 84:8 169:23
**different** 33:3 68:19 77:14 80:15 94:2 95:22 96:1 103:15, 19 111:19,22 127:13 128:18 152:17,23 154:5 155:12 156:18,19 175:16 191:4 210:7 220:14
**differential** 202:8,16 203:4
**difficult** 70:8 227:17
**diluting** 140:25 142:25
**dinner** 109:4
**direct** 198:14
**directly** 31:7 68:25 219:8
**director** 20:5 134:23
**disallowed** 178:25
**disclosing** 15:3
**discriminated** 143:4
**discriminating** 141:10
**discrimination** 167:3
**discuss** 50:7 70:20 71:5 84:1,17 85:14 86:14, 21 106:17

116:24 117:2 118:5 119:15 122:17 131:6,17 178:1 217:13

**discussed**
11:8 17:5,21 45:13 70:23 71:10 73:17 84:10 103:6 106:16 115:24 116:10 119:19 121:3,6,12 122:10 134:14 140:9,20 143:25 144:12 148:2 156:17 164:7,10 165:19 166:12,25 167:13 172:2 191:15 218:7,10 222:8 223:13

**discussing**
125:16 180:25

**discussion**
21:23 45:6 98:8 120:8 127:9 128:9 129:9 131:9, 22 133:7 135:10 164:12 168:25 177:25 218:11,16,25

**discussions**
15:4 61:22 68:12 74:21, 24 86:24 97:24 108:14 116:23 122:15,22 123:2,19,25 124:25 125:18 126:5 127:14 128:2 134:10,15,18 143:9

**disputes**
72:14

**distinction**
143:3 180:8

**district**
9:15,16 26:11 28:17 29:14,23 30:1,2,12,17 31:13 32:2, 3,5,15,16 33:23 34:11 35:12,23 36:5,12,15, 21,23,25 37:1,17 41:17,22,23 42:19,20 43:6,7,11 44:6,14,23 45:2,8,9,12, 18,20 46:1,7 48:15,20,23 49:6,8,9,12 50:3,9,13,20 56:23,24 59:10 70:24 71:3 72:10, 20,22,24 73:7 85:18 94:20,25 95:3,4,9,17, 24 96:3,10, 14,15,24 97:14,15,16, 21 100:4 101:2 103:20,23 104:5,22 107:17 112:6,7,10, 11 114:2,6 115:6,7,8,9, 11,17,21 116:1,12,18, 20 117:7,11, 21 118:2,3, 10,24 119:13 122:21 123:9,20,22 124:1,4,21 125:9,19 126:1,7 127:5,8 128:18,23 130:4,19,22 132:5,6,16 134:23,25 135:9 137:15,24 138:2,8 142:2,3,7 144:19 145:20 146:13 150:11,17 155:17 156:2 157:15 158:11,12 159:4,10,11, 14,19,21 160:1 161:1, 2,3,11,12, 13,14,21,24 162:1,3,4,8, 12,13,15,16, 19,21 163:1, 5,9,11,13, 16,17,19 164:1,3,14, 22 165:25 166:15 168:7 170:8,13,15, 22,25 171:9, 12 172:1,5, 9,12,14,18 173:1,24 174:2,8,18, 21 175:2,3, 4,13 176:18 177:10 178:2,5,19 179:2 183:2, 21,23 184:9, 11 185:7,9, 25 186:1,3, 14,15,16 188:14,18, 20,22 189:21 192:19,22 193:4,6 194:5,10,17, 19 195:10 196:5,25 198:22 204:9,14 206:2 207:11,13 209:8 210:7, 12,16 211:20,22 212:18,20 213:4,7,10 214:3,4,15, 18,19,24 215:8,9 220:1,2 223:7 224:15,18,19 225:18 227:6,18 228:3

**District's**
130:21

**districting**
144:20,24 216:6

**districts**
29:13 30:5 37:7,12,19 39:16 40:18, 24 42:8 48:15 49:4, 19,25 50:5 53:19 54:20 58:23 60:1,7 63:19,24 64:17,25

66:11,17 67:21 73:23 75:7 80:20 82:1,25 85:16,17 89:7 94:1, 13,17 95:22 98:2,3,6 99:6,7,21 101:7 102:14 103:19 104:23 107:15,18 111:25 112:2,3,4 117:15 128:1 137:22,23 138:13,17 139:10 140:22 143:17 145:12,16,23 146:3,6,19 147:24,25 149:19 152:6 157:7,23 158:10,23 159:2,3 160:3,15,23 164:8,18,20 165:7,12 167:24 176:12,15 178:25 183:25 190:11 192:21 193:10 194:23 198:19,22 202:7,17 207:6,8,16 209:7 210:23 211:10 212:13 214:17 219:23 220:9 222:10,11,12 223:10

**divisible** 137:25

**Dixon** 30:24

**document** 22:6 25:19 135:25 136:2 160:11,13,18 169:16,18 179:20,23,25 201:20

**documents** 14:18 15:21 213:12

**doing** 13:14 21:14 61:8 62:4, 13,18 65:7 74:14 78:24 80:3 82:15 87:22 91:24 92:1,2 97:22 101:18 132:1 140:10 145:17 166:8 187:18 209:18,24 216:22

**Donna** 101:16 107:23

**Dorman** 9:24 12:7 14:24 15:6 88:23 99:14 107:22 121:14 136:11 139:8 177:20 197:23 198:25 199:2 213:2

**Dothan** 161:16

**draft** 26:24 27:1 29:11 54:4 102:2,5,19, 21,23 103:2, 10 104:12 105:8,13 106:8,9 107:11 108:2 109:22

**drafted** 27:14 30:15, 17 136:7

**drafting** 26:8,21 30:25 31:7 42:18 43:5 44:5 93:23 111:3

**drafts** 106:5,13,15 110:18,25

**dramatically** 44:22

**draw** 23:23 24:2, 17 25:2 27:7,15 28:19 30:5, 8,20 32:2 33:9,13 36:11,20,22, 25 37:1,4,9 39:19 43:15, 23 47:5 49:3,24 50:2 52:8 54:11 62:3 73:21 80:8 81:19 87:9,15 114:2 116:11,25 121:1 137:1 168:19 170:13 172:8 177:22 196:6,8,18, 24 208:9 210:23 211:10 219:20 223:19

**drawing** 24:14 26:9 27:6,16 28:11 29:22 31:13 33:1, 7,16,23,25 35:23 37:6, 18 38:15,23, 24 40:1,9 41:4,7,20 42:13 45:17 48:14,23 49:18 51:16 52:1 53:11, 19,22 58:8, 10 60:9,23 61:1,19 62:18 64:3, 20 65:3,12 66:3,5,23 67:4 77:2 80:20,21 81:23,25 83:15 84:2 87:20 88:25 94:5 99:21 100:16 101:7,23,25 105:25 123:3 134:11 136:5,25 137:6 147:9, 17 148:14 149:6 155:8 156:10 166:5 167:17,21 170:15 172:25 173:21,24 174:16,18,21 175:13 176:12,15,19 187:5 194:16,22 195:6 196:14 207:19 214:7 215:19 219:17 220:6 222:22

225:11
**drawn**
24:24 27:24 29:10,20 39:21 46:23 47:1 51:3 52:3 110:1 120:17,22 121:7 140:23 142:3 144:19 191:12 199:17 216:1
**dream**
20:3
**drew**
23:19,20 25:3 27:2,21 34:6,16 35:12 37:23 38:1,10 39:24 40:3,6 49:19 77:25 84:14 91:6, 9,13 95:11 160:23 172:1,4 183:16 187:3 194:11,15 196:15 197:1 199:5 214:10 221:4,13,14, 18 222:2,4, 23
**due**
165:8
**duly**
11:4
**Dutton**
203:25

**E**

**E-S-R-I**
77:20
**earlier**
114:10 115:24 126:20 130:24 134:14 150:18 152:12 154:15 163:20 179:6 180:8 212:6 222:8
**early**
67:6 68:1 177:12
**earnest**
57:18,19 58:9
**earth**
19:23
**eastern**
205:16
**Ebenstein**
10:19,20
**economic**
153:4 154:7 157:2
**education**
19:11 52:6 54:12 56:18 65:5,7,13 139:10
**educational**
20:11 35:5 176:2
**effect**
140:25 142:24 158:6 220:17
**effective**
64:14 65:1
**effort**
24:16 73:23
**efforts**
24:6
**eight**
13:2 45:14 80:12 81:14, 17,18
**either**
17:1 48:9 51:11 88:22 96:8 123:16 125:18 178:24 192:25
**elect**
142:9 210:24 211:11
**elected**
21:13 214:19 227:17
**electing**
168:8
**election**
35:9 41:6 42:2,3 62:23 75:18 112:14 176:8
**elections**
27:10
**electorally**
41:23
**Eli**
9:20 201:4 203:8 213:12
**eliminate**
97:11 132:17
**eliminated**
186:19
**Elizabeth**
10:24
**Elmore**
124:9 161:18 214:25
**email**
19:2,6 88:4, 7 120:12
**employees**
21:4
**employment**
35:1 175:23
**enacted**
51:7 110:15 196:10,16 205:15 206:7 214:8 219:14,22 220:9,15 222:3,22
**end**
15:1 51:17 55:12,17 57:2,4,11 60:17 64:23 66:13 79:18, 19 82:18 85:2 96:19 102:20 119:21 124:18,24 125:2 127:9 128:16,21 145:14 186:2,15 214:16 218:10
**endeavor**
24:23
**ended**
73:4 207:12 214:7,20,24 229:6
**ends**
229:2
**Enfinger**
28:20 29:7,8
**ensure**
173:24
**entails**
168:3
**entire**
45:23 63:3 155:15
**Entirely**
78:14
**envision**
71:1,3
**equal**
127:22 139:16,23 165:3 202:12

**equality** 165:11,20 220:24
**equalize** 137:15
**equalized** 204:12
**equally** 150:22,25
**equitable** 185:8
**errors** 202:15
**Escambia** 72:25 104:21 111:6 123:17,18 124:15,19 158:8 181:1 183:1 184:7 205:15,17 206:4
**ESRI** 77:6,15,17, 22 78:3
**essentially** 28:3 38:16 123:4 182:24 191:11 192:11 193:10
**established** 153:13
**establishing** 165:7
**estimate** 72:11 102:4 111:14 113:9
**estimated** 72:2 206:17, 21
**estimates** 56:19 57:5 59:9 60:18, 21 63:17,22 64:25 66:7, 12,13 70:25 72:4 73:12 74:11 84:8 102:6,12,17 114:5 207:4, 7,10 208:2
**et al** 9:13,14
**ethnic** 157:1,8
**Etowah** 162:20 214:12
**evaluations** 185:12
**Evan** 9:13
**eventually** 91:22
**everybody** 41:2 59:15 80:15 85:4 134:22 152:22 154:8
**everyone** 14:9 229:1
**evidence** 145:2,3 196:4
**exact** 45:3 47:2 212:24 215:23
**exactly** 37:3 57:12 85:13 109:8 132:3,25 169:24 172:7 214:1
**examination** 9:8 11:18 197:20 198:14 212:6
**examined** 11:4
**examples** 206:6
**exceedingly** 227:17
**exchange** 104:5
**excited** 125:1
**excuse** 20:10 26:12 48:12 77:7 122:16 156:23 177:7 183:13 224:6
**exhibit** 14:7,13,15 21:19,24 25:6,9,10 92:17,20 93:10,14,18 110:15,16 135:14,18 147:22 160:7,11 167:10,16 179:16,19 189:9 201:15 203:12,15 208:21,23 219:16
**Exhibits** 14:3 213:19
**exist** 23:12 110:23 153:15 217:19,20
**existed** 196:4 212:22 217:16
**existence** 187:15
**existing** 39:3,15 93:25 100:3 157:23 158:23 159:2,10,11, 25 211:21,22 212:12
**exists** 145:3
**expand** 47:9
**expect** 17:25 112:24
**experience** 23:17 26:8, 21 27:5
**expert** 168:5 171:15
**explain** 21:7 44:24 45:16 49:2 148:25 149:5
**explored** 73:19
**extending** 186:22
**extends** 172:5 212:3 227:22
**extension** 172:9 212:18
**extensively** 189:16
**extent** 14:9 44:2 54:13 74:7 86:25 108:4 146:16 148:18 152:8,18 196:22
**extraneous** 181:21

**F**

**face** 132:8
**facilities** 104:1 114:11
**fact** 68:6 137:5 171:8 224:5 226:15 228:2

**factor**
35:22,24,25 104:10,11 150:22
**factors**
34:20 100:13,21 132:24 133:3 147:8,16 154:6 167:16,20 175:16 187:1
**facts**
169:6,17,18
**failed**
24:17
**fair**
13:11,25 17:24 25:4 38:25 39:1, 25 40:2 48:13 51:9 53:2,3,7,8 63:25 80:22, 23 119:9 154:1,2 183:19 197:11,12 205:8
**fairness**
184:9
**fall**
61:15
**familiar**
27:23 111:17 141:4,6,15 154:14 181:4,10 205:2 213:24
**far**
20:7 70:17 147:18,19 148:22
**fast-growing**
162:6
**Faulkner**
181:6,12,14 182:20 185:16,23 186:25 187:3,6 190:25 191:3,11 192:9
**Faulks**
10:21
**Favorite**
176:4
**feature**
89:11
**features**
91:20
**federal**
9:4 21:11,16 24:3 26:11 36:10 201:22 203:3
**feedback**
29:22 87:8 89:14 90:1, 4,16 92:5 103:10 105:12 106:10 107:25 116:11 121:5 187:21,24 192:7
**feel**
66:10 67:16 102:13 107:6 178:15 227:23,25
**felt**
104:1 156:9 193:19 194:1 199:15 200:3
**fewest**
157:20
**field**
20:5
**fifth**
158:21
**fighting**
125:9
**file**
24:21 78:6 179:22
**filed**
9:15 24:22 25:15 169:7 201:21
**filling**
97:23
**final**
84:16 85:2, 3,4 128:20 131:1 134:21 177:11 206:25
**finalized**
109:25 217:20
**finally**
127:14 130:3 163:16
**financial**
94:23
**find**
47:1 112:22 203:8 215:11
**fine**
68:10 78:24 123:17 126:21 130:15 148:12 169:14
**finger**
170:9,13 171:16,23 172:5,8 174:9,14 186:23
**finish**
49:3 78:22 79:1 81:22 197:8
**finished**
98:12 225:7
**Finishing**
98:14
**firm**
144:3,10
**first**
24:16,23 27:4 29:14 30:12 51:15 67:10 91:6 93:17 102:2 106:6 129:5, 16 148:25 150:4 182:1 184:4 188:6 217:23,25 218:1 219:25
**fit**
32:11 96:19
**five**
15:15 18:20 68:17 69:3 79:13 85:1 154:5 165:19 166:11
**flavor**
207:4
**flawed**
202:20
**flew**
68:14
**flip**
25:21 146:5
**flipping**
161:5,12 163:1,16
**floor**
17:1 48:9 120:4 184:19,20 188:6 191:19 192:3,5 224:14,21,22
**Florence**
91:24
**fluid**
154:1
**flying**
67:23

**focus**
29:13
**focused**
225:22
**Focusing**
83:24
**folks**
98:1,2 127:8 159:6,7 171:22,24 197:10 206:8 210:18
**follow**
100:7 109:19 137:1,5 202:23
**follow-up**
130:25
**follow-ups**
81:15
**followed**
15:8 193:12 208:15
**following**
9:9 110:4
**follows**
11:5
**football**
154:8 176:4
**footprint**
130:21
**Force**
115:22
**foregoing**
9:5
**form**
16:18 33:5 37:15 50:22 138:23 146:13 168:24 170:23,24 178:7,12 187:8 195:19 198:1,10 202:21 210:4 216:17
**forma**
120:8
**formal**
20:25
**formally**
87:25
**formed**
23:6
**formulating**
60:3
**forth**
49:7 54:15 55:11 59:11 81:15 94:24 114:12 129:13 211:15 223:14
**forward**
50:6 59:25 75:1
**found**
34:7 202:11 206:11,14 226:15
**four**
15:15 23:19 41:11 46:13, 25 52:1,4,8 54:11,14 55:4,5,20,21 56:12 62:3, 19 64:2 66:17 79:13, 24,25 80:3 84:25 116:18 136:5,25 154:4 168:19 181:17 183:24 186:1,14 207:5
**fourth**
157:12
**frame**
56:6 62:9 67:1,5 74:19 75:19,22,25 79:25 84:22 105:24 122:24 123:1 196:12
**Franklin**
220:21
**frankly**
218:12 226:2
**frequently**
204:13
**Friday**
15:1 61:10, 12 169:8
**front**
21:10 33:16 52:20
**full**
60:21 63:2 64:17 180:17
**full-time**
18:13
**fully**
56:1 73:3
**fun**
59:1
**function**
32:19
**further-away**
132:18
**furtherance**
60:9 66:5,23 83:15 134:11
**future**
113:2

G

**gain**
40:19,20 72:24 95:3 210:18 212:14,15 224:3
**gaining**
172:22 184:6
**Gary**
188:16 226:16
**gather**
32:21 90:11
**gave**
22:4 82:11 135:1,5,9 199:23 210:17 225:1 227:6
**gears**
210:9
**general**
34:6 38:14 39:2 154:24
**general's**
17:15,17,20 18:3
**generally**
38:23 46:6 73:16
**geographic**
153:4 157:2
**geographical**
128:6 186:20
**geographically**
97:3,18 124:20 128:8 130:20 132:7,22 133:2 134:1 146:20 172:20 173:4,11 174:2 193:8
**geography**
32:19 35:19 36:2 99:25 128:11,12 146:2,8 153:6 159:12 202:6 223:8
**gerrymandered**
170:9,22 171:13 172:16 173:2,25

**get all**
216:19
**getting**
124:4 126:14
**Gingles**
142:4
**give**
27:22 40:25 41:24 88:2 104:14 117:5 165:8 200:22 201:1
**given**
76:11,14 81:25 87:14 165:10 167:5 223:3
**giving**
130:7
**goal**
29:25 36:20, 24 37:1 42:18 43:5 44:5 59:14 92:10 172:19 216:5 224:11
**goes**
70:17 132:17 140:1 171:16 212:18
**going**
25:9 28:25 31:4 41:22 45:2,5 48:11 49:5,6 50:6 51:5 55:10 57:10 58:23 59:1 60:7,22 61:17 62:3 65:18 68:6 72:3,4,20,21 73:18 74:13 82:3,15 88:19 89:10 93:13 102:17 105:15 108:3,12 114:6,23 118:4 121:15 124:25 127:7 129:3 130:2 131:5,12,16, 19 134:6 147:6 155:13 164:2 168:25 176:23 184:6 191:6 196:20 197:18 198:3,13 202:23 205:20 208:6 209:6 213:11,15 215:8,9,23 216:2,12 219:20
**good**
10:19,21,23 11:19,20 34:9 38:6 43:1 81:4 124:5 129:14 133:10 145:3 184:3 185:5 186:19 192:10,12 197:21,22 207:17 214:14 227:18
**Goodlatte**
22:22
**government**
19:20,22
**governments**
158:14
**governor**
41:16 225:5
**grabbing**
170:10
**graduate**
19:16,25
**granular**
125:17
**grass**
211:8
**greater**
150:1 199:18
**Greene**
155:2
**grew**
227:9,11
**group**
53:9,13 133:10 144:22,24 154:18
**grow**
158:13
**growing**
163:4
**guess**
15:15 17:22 21:2 24:16 25:3 31:14 40:2 45:2,5 50:17 56:20 61:2,4 64:8 68:20 74:2 84:16 86:5 101:20 113:14 118:15,17 129:17 141:23 142:4,19 153:22 155:4 161:15 166:1 181:18 185:22 188:5 191:21 198:15 210:5 221:2 222:10 228:25
**guessing**
62:11
**guideline**
39:16 90:24 223:1
**guidelines**
15:24,25 26:16 67:2 68:1 74:20 99:9 120:23 135:19 136:3,7,23, 24 137:6 151:16 167:12 178:20 179:3 188:12 193:12,21 194:2 196:3 206:15 208:14 223:3,9 224:3 225:14 226:12

**H**

**Hale**
155:3 210:5
**hand**
25:9 93:13
**handed**
44:19 136:12
**handing**
14:6 92:20 135:17 160:10
**happen**
38:3,5 56:10 115:5 224:24,25
**happened**
38:18 109:23 113:23 207:5 224:12
**happening**
87:3 88:13, 16 91:21 118:1
**happy**
41:2 116:21 121:19,22,25 136:20 219:2
**hard**
31:4 47:8,9 97:5,10 202:5 221:1

**Hare**
9:20 201:7, 10,13 203:11 208:20 213:15
**Harris**
104:19 134:23
**Hatcher**
16:15 190:15 191:16,22,25 193:2,3,20
**Hatcher's**
180:16
**hazard**
45:2
**HB-1**
51:8 196:9 217:21 219:14
**head**
34:25 47:9 53:6
**heads**
101:17
**healthy**
218:15,17
**hear**
90:6 187:24 211:23
**heard**
112:5 181:21 213:25 218:19
**hearing**
90:12 187:14 198:3 203:9, 21 217:24 218:1,3
**hearings**
88:11 89:14 90:2,6,16 91:12 92:6 182:3 187:22 211:14
**held**
211:14
**help**
13:19 92:15 175:14 179:14
**helped**
24:2,22
**helpful**
66:19 125:6
**Henry**
10:13
**high**
32:7
**higher**
195:17 202:6
**highest**
19:11
**highlighted**
201:8,25 203:23,24 204:2,3,5
**highlighting**
202:4
**Hinaman**
9:7,12 11:3, 22,23 20:17, 24 21:1,3 23:3 52:24 66:1 122:9 197:21 201:19 202:24 203:19 209:1 213:14,22 221:11,12 228:8,25 229:3
**hire**
86:2
**hired**
28:23 38:19 85:20 86:3
**historical**
157:3
**history**
30:13
**hit**
134:4 155:17
**Holmes**
180:23 182:19,21 183:14 184:13,17,23 190:23 191:1 192:11
**home**
117:14,17, 18,19 130:12 150:15 206:1 227:8
**Homewood**
116:17,18 133:7,8 185:21,25 186:13
**honest**
33:14 45:21 91:10 151:12
**honestly**
17:22
**hooked**
146:12
**hope**
113:19
**hoping**
55:9 134:2 172:19
**host**
153:7,8,24
**hour**
13:23 17:18 65:18 121:15 197:7
**hours**
15:15,17 48:8 60:25 61:18,19,24 62:1,4,10
**house**
47:18 52:5, 15 54:10,12 64:15,17,21, 22 65:11 70:9 75:4 78:17 80:10, 13 81:7 147:14 184:20 186:8 188:5 224:22
**Houston**
161:16
**hungry**
121:21
**Hunt**
199:7 200:1 221:5
**Huntsville**
129:13
**hypothetical**
113:22 220:25

**I**

**idea**
38:3 61:2 62:5 91:8 131:21
**ideal**
45:9 73:24 98:6 114:9 158:2 225:18
**identical**
110:14 225:4
**identification**
14:4 21:20 25:7 92:18 93:11 135:15 160:8 179:17 201:16 203:16 208:24 213:20
**identified**
207:7
**identify**
157:9
**identities**
157:3
**II**
137:10,14

139:9,14 140:10,15,22 143:10 144:18 147:5,17,21 148:6,7 151:4 152:6 156:20 157:13 158:21 165:6 167:13,16

**imagine** 52:21 155:16 171:21

**immunity** 11:15

**impact** 67:4 91:12 92:6 112:14

**imply** 27:2,3

**importance** 150:1

**important** 13:16 73:6 136:19

**importantly** 136:17

**imported** 78:3,6

**imposed** 31:11

**in-person** 70:4,7

**inaudible** 214:9

**include** 27:6 128:3,4 133:5 157:4

**included** 32:7 35:14 109:6 221:13

**includes** 96:4

**including** 26:9 61:21 80:9 97:20 121:8 157:1 223:23

**Income** 35:3 175:25

**incorporate** 184:13

**increase** 211:19

**incumbent** 172:11 222:24

**incumbents** 40:12 54:19 148:18 149:17,21 150:6,11 151:1 159:5 178:25 188:13 189:19 190:10 192:19 193:7 194:4,6 223:14

**indicated** 202:8

**indicating** 108:18

**individual** 42:4 43:24

**individually** 52:22

**influence** 112:2,4,6,10 206:3

**info** 75:22

**information** 32:21 33:6 41:13,24 48:20 71:15, 19,20 72:1 73:8 82:5, 19,23 83:4,8 87:6 91:11

**informed** 59:5

**initial** 102:2,5 114:4 127:9 130:24 166:9 182:17 187:12 188:10 194:3 211:13 217:16 224:17

**initially** 56:7 97:23 117:13 123:16 124:7 125:2 130:9, 13

**Injunction** 169:17

**inordinate** 179:1

**input** 29:9 223:18, 24,25

**inside** 117:15,21 146:17 161:24 164:22 171:22 227:6

**instance** 34:19 39:12, 17 59:21 111:17 167:2

**instances** 145:19

**instruct** 108:16,23 109:17 177:23 202:22

**instruction** 109:19 167:5 177:15 197:3,4

**instructions** 31:24 86:8 87:14 114:1 116:10 117:5 121:1 200:23 201:2

**intact** 89:16

**intending** 196:23

**intent** 32:2 141:10

**intents** 79:15

**interacting** 27:20

**interest** 35:13,16 39:7 54:15 89:18,21 97:14 129:3, 11 152:7,15, 17,24 153:2, 3,8,10,13, 18,20,23,25 154:5,13 155:6,10,12, 21,24 156:13,15, 17,22,24 157:4,10 165:24

**interested** 51:25 68:19 84:24 114:10,13 115:22 130:1

**interests** 34:24 157:1 165:11 175:21

**interface** 29:6

**interfaced** 28:23

**interfere** 215:3

**internals** 74:5

**interpreted** 199:23

**interrupted** 191:14
**interruption** 42:21
**introduced** 179:23 180:3
**involve** 108:14
**involved** 19:8 24:14 62:7
**irrelevant** 62:4 72:10
**issue** 156:3 184:10 188:19 211:1
**issues** 126:3 155:18,19 193:22,23
**iterations** 110:22

**J**

**j(i)** 166:25
**j(ii)** 151:5
**j(iii,)** 152:6 156:21
**j(iv.)** 157:13
**j(v)** 158:21
**j(vi)** 165:6
**Jackson** 127:10 204:7,8,10 205:3,10,21
**Jefferson** 96:5,8,12, 17,22 97:8,9 100:25 115:14 116:15 130:9,13,19, 21,22 132:2, 5,8,9,17 146:18,23 163:12,22 170:11,14 171:16 172:21,22 174:10 181:8 185:22,24 186:22,23 191:3 209:9 214:5 221:20,25 225:17,24 226:7,14,17, 20 227:7
**Jim** 9:22,25 10:8 11:13 15:6 198:6 199:21 209:16 213:17
**job** 13:14 20:3 78:25 143:3 207:17
**John** 9:13
**joint** 169:6,16
**judges** 36:10 38:5,6
**Julie** 10:19
**July** 55:9,14 56:10 60:16
**June** 22:4,9 25:15 55:14 60:16, 20
**jurisprudence** 202:12

**K**

**keep** 91:24 129:14 152:15,18,25 155:25 157:20 158:10 159:3,7 209:12 210:12
**keeping** 39:8 91:16, 17 129:6,10 158:1 211:21
**kept** 44:6 89:16, 20 91:21 115:20 164:21 166:8
**key** 12:25 159:13 162:19
**kind** 73:25 74:1 105:1 122:18 132:22
**knew** 58:17,22 60:1 68:3 73:3 74:12 114:23,24,25 115:6 138:4 184:22 194:19
**know** 13:8,24 26:23 27:3 28:15,19,23 29:25 30:4 31:9,19 33:14 37:5 38:4 40:21 41:15,16 44:17 45:1, 7,11,13,22 48:19 49:6 50:4,19 53:25 55:10, 13 57:9,12 58:14 59:24 61:25 62:6 63:13,23 71:1 74:11 77:19 80:11 81:5 83:2 84:10,25 86:2,6 87:3 91:1 94:4,16 95:2,7,14 96:12,18 99:2,6,8 101:21 103:22 105:17,20 107:5 109:8, 11 113:19 114:23,24 118:21,25 119:4 125:25 129:23 131:13 136:20 143:1,2 144:7 147:18,19 148:22 149:21 151:5,11 153:17 154:21 155:15 158:9 159:18 168:10 170:19 173:3 174:8 179:5 180:11 181:11,13, 15,19 187:2, 18,21 196:11 198:2 204:14,19 212:24 217:9,11 219:1,4,6 221:9,15,16

227:8,25 228:2
**knowing** 60:21 72:3 73:17 102:16 117:16 208:5
**knowledge** 82:15 93:20 165:18 166:10 169:15 183:6 186:24 189:13,14,16 211:1,4 219:7
**known** 153:15 210:14

L

**labeled** 213:13
**Labor** 79:19
**lack** 171:23 172:4 189:20
**Lake** 226:20
**Lali** 10:11 228:10
**lands** 157:6
**language** 202:14
**language-minority** 144:22,23
**large** 9:3 63:4 97:4 162:20 210:8
**larger** 80:8 206:7 208:4
**Larry** 30:24
**late** 103:1 180:11,16
**latest** 41:11
**Lauderdale** 91:23 92:4 104:16 127:11,16 128:17 156:2 205:6 215:4 220:20
**law** 10:25 170:12 225:4
**lawsuit** 12:22 16:2 17:5 24:21, 23 25:12,17 38:2 111:18, 25 135:20 160:12 179:21
**lawsuits** 19:9 111:19, 22,24 169:19
**lawyer** 12:5,10,14 61:3 81:4 141:6,17 143:1 171:14 189:1
**lawyers** 198:25 200:9
**layman's** 141:24 168:6
**lead** 24:9
**leader** 24:6
**leaders** 26:25 28:13
**leadership** 51:23 53:18 54:10 86:1
**leading** 209:20,23
**League** 182:11 217:13,25 218:6
**Leann** 9:1
**leave** 96:9
**leaves** 221:21
**Lee** 162:5,7
**leeway** 199:18
**left** 20:4,8 66:1 215:6
**legacy** 207:2
**legal** 99:12,14 106:21 139:8 140:8 141:13 142:18 143:7,8,14 149:3 164:10 195:13 196:2
**legislative** 11:15 23:21 25:16 47:2 86:4 139:10 165:7 179:12
**legislators** 28:7 31:6 120:1
**legislature** 16:8 24:17 27:1,18 29:3 31:9 38:21 39:24 47:4 48:5 50:12 52:6 53:16 59:22 75:13 86:14 110:10 113:12 157:14 158:22 167:3 168:19 199:17 211:10 219:22 222:3,11 224:7
**legislature's** 223:22
**length** 55:6
**letters** 77:21 200:12
**letting** 136:20
**level** 19:11 21:11, 16 35:5 56:25 64:15 83:3 138:16 166:1 176:2 202:10 203:6 215:21 225:17
**levels** 64:15
**likes** 147:21
**Limestone** 163:4
**limited** 157:1
**line** 42:25 122:19 132:4 133:9 137:9 147:21,22 148:6 150:5 151:5 215:2 226:17,20
**lined** 105:18
**lines** 34:6 100:4 124:22 152:21

204:3,6
**list**
147:19 153:14,17 154:23 180:2
**listed**
137:9 153:11,21 167:1 181:12
**lists**
147:5 148:7
**literally**
48:8 138:25 191:20
**litigate**
72:8
**litigation**
170:6
**little**
16:12 18:7 21:23 38:13 44:24 45:16 104:16,23 121:15,16 124:9,14,21 125:12 126:10,23 127:23 128:5 130:11,17 144:18 161:14 187:18 197:7 198:4 204:10,17 212:17 214:24
**live**
129:12 149:17 204:13 220:1
**lived**
18:16 79:14, 15 100:23 130:9,13 134:2 172:11 226:7,14
**lives**
132:13 133:14 203:25 220:2 226:16,18,19 227:21
**living**
20:18
**Livingston**
204:18
**LLC**
20:24 21:1,3 23:5,7
**loaded**
76:17 79:9 82:13 83:1
**lobbying**
20:19 21:14, 15
**lobbyist**
21:8
**local**
158:14
**Loftin**
101:17 107:23
**logical**
115:1
**long**
13:24 15:13 48:10 62:6 63:12 111:14 113:9 164:1 172:8 180:20 218:18
**long-lasso**
151:8,11
**longer**
80:14,17 81:14 121:16 132:18 144:18 225:19
**look**
16:9 26:7 34:19,22 39:22 42:9, 12,15 47:6, 22 49:5 56:22 74:8, 12 75:7 84:15 97:3, 20,25 98:18, 20,22,24 99:20,24 133:1 137:8 138:5,6 145:15,19 160:20 170:19 175:7 177:21 180:21 182:5 187:19 189:15 192:2,17,18 195:5 206:18 208:16 212:24 215:6 219:10,21 220:8 228:6
**looked**
16:5,7,25 47:12,19 48:1 49:13 71:16 108:9 150:15 171:21 172:6 174:12 180:7,20 187:17 189:15 190:14 191:19,24 196:3 212:13
**looking**
34:16 39:10 45:10 47:14, 17 82:18 93:16 94:12 98:5 132:7, 10 147:11 154:6 156:20 158:15 161:1 164:16 166:16,23 167:15 172:18 180:9 190:21 192:25 206:5 215:16 221:3,8
**looks**
39:22 85:12 93:17 95:15 96:3 139:9 140:15 147:21 191:7 214:6
**loose**
130:16
**lose**
40:19,22 71:22,23 72:22,23 94:22 127:20 184:6 224:3
**losing**
71:4
**lost**
25:3 214:19
**lot**
13:19 59:1 62:25 63:8 80:14,17,20 89:18,21 90:3 127:8 158:13 192:24 193:17 212:23 216:8
**lots**
152:17 156:18
**louder**
198:4
**Lowndes**
97:19 155:3 163:21
**lumped**
208:3
**lumping**
207:24
**lunch**
15:16 109:4

121:16,24,25 122:2,6,9

**M**

**Macedonia** 204:18
**machinations** 33:25
**Macon** 155:4
**Madduri** 10:11 228:10
**made** 28:16 46:7 64:17 74:7 84:19 91:19 92:6 99:5 100:8,17 101:9,14,21 102:5 105:5, 11 106:6,8, 13 110:1,6,9 115:20 117:14,22 123:18 124:12 128:21 145:11,25 150:14,16 155:16 156:9 164:4,6 169:10 179:1 180:8 185:21 189:19,22 191:2 210:18 211:18 212:15 214:2 215:4 220:22 222:12 223:19 224:20
**Madison** 89:17 91:17 129:7,10,13 146:14 152:14 163:3
**magnitude** 207:8
**main** 35:22 167:16 193:22
**maintain** 43:10
**maintaining** 160:3
**major** 22:25 35:24 73:1 75:9 189:3
**majority** 24:5 30:2,5, 12 31:12 32:3,6,16 34:11 36:5, 12,15,21,22 37:6,12,16 42:20 43:7, 10 44:14 45:12 46:1 49:9,18 50:2,8,12,20 80:16 81:7 111:24 112:12 117:10 118:19,23 142:6 154:19 159:3 161:10,22 162:10 171:22,24 172:12 174:9 176:18 177:9 178:2,5,19 181:9 183:20 188:17,20,22 189:21 194:9 196:24
**make** 18:19 29:13 30:1 32:3,5 40:24 41:17 42:5,19 43:6 44:6,16,22 45:11 58:22 61:2 81:21 86:10 96:1 97:6 100:5, 12,20,22 101:2,10 103:3,9 110:21 112:25 113:7 115:19 116:20 118:16 120:15,20 124:11 125:22 127:21 130:20 132:16 133:23 138:11 140:11 142:13,17,23 143:2,3,5,22 144:13 145:22 146:18,19 147:1 148:17,24 149:19 150:12,19 151:24 152:2 155:9,22,23 158:3,18 159:2,13 164:18,23 166:4 169:20 171:7 172:19 173:4,6,10, 12,23 175:2, 4 176:21 183:4,16,18 184:1,5 190:20 195:16 198:10 209:9 210:19 215:18 220:7 225:7,24 227:5
**makes** 28:18 97:14 202:5 227:18
**makeup** 44:23 99:7 143:17 175:7
**making** 44:13,25 61:12 81:3 96:24 124:2, 21 127:24 130:11 133:1 143:13 174:1 177:6 190:23 205:11 211:24 213:10 214:15 226:23
**managing** 192:4
**manipulate** 76:19
**manner** 144:20
**map** 16:6,14,15 23:23 24:2, 18,22,24 25:2 27:7,9, 12,13,15,16, 21,24 28:4, 11,14,19 29:7,10,22 30:1,8,11, 15,20,25 31:8,10,11, 13 33:7,9, 13,16 34:1, 16 36:11,14 37:23 38:1, 2,11,15,17, 20,21 39:3, 6,12,13,14, 16,17,18,19, 21,23,24 40:1,3,4,6, 7,9 41:2,4,

7,21 42:13, 19 43:6,9, 15,23 44:6, 19 45:18 47:18 48:12, 17,24 49:4, 20 50:2,6 51:6,12,16 53:11 57:14, 17 58:9,22, 25 60:5,9, 12,20,24 61:1,5,19 63:16 64:22 65:6,9,10, 11,13 66:3, 5,24 71:16 72:3 73:10 75:4,6 77:25 78:19 80:13 81:1,8,12, 23,25 83:16, 24 84:2,3,14 85:11,15,20 87:10,16 89:11 91:6, 9,13,19 92:7 93:1,4,15, 19,23,24 94:2,6,10,25 95:6,10,13, 16 96:20 98:13,14 99:22 100:6, 9,15,16,17 101:5,7,10, 15,20,24,25 102:2,12 106:13,18 107:12,16, 19,21 108:2, 10 109:11, 13,23 110:6, 9,12,14,19, 22 111:3 112:1 113:6 114:22 116:16,25 117:24 118:2,3 120:7,9,17, 18,22 121:2, 7 123:3 131:1,15 132:3 134:12 136:8 137:6 138:6,12 139:12 144:1,3,7 147:9,13,17 148:14,20 149:6 150:20,21 151:18 152:3 155:8,23 156:10,12 158:4 160:15,23 166:6 167:18,21,25 169:3 171:5, 13 172:14,25 173:21,24 174:16 176:19 183:9,16 184:14 185:5,13,19, 24 194:12,16 195:3,6 196:15 206:5,7 210:20 212:15 213:16 214:7 215:14 217:10 219:11,14 221:3,5 222:14 224:17,22,25 225:1

**map-drawing**
76:24

**maps**
16:4,7,9,14, 16,17,20,24 23:19,21 24:14 27:2 37:12,17 38:23 39:6 46:9,11,23 47:3,8,10,24 48:4,8 49:24 50:15 51:2 52:1,2 54:11,14,20 55:15 56:15 58:10 62:3, 19 64:2,11, 19,21 65:3 67:4 73:21 74:23 77:2 79:24,25 80:3,7 83:11,14 86:4,15 87:20 88:12 90:4,24 98:19,21,23 103:3 105:25 111:13 112:22 120:2 126:20 136:5,25 145:18,19 156:14 160:22 168:19 180:6 196:6,9,14, 18 197:2 215:19

**Maptitude**
73:12 76:12, 14,15,21 77:13,23 80:5 82:4, 11,18,24 83:5,8 102:13 110:20 208:1

**March**
56:9

**Marengo**
155:3

**mark**
201:11 203:12 208:17 213:12,15

**marked**
14:4,6 21:20 25:7,10 92:18 93:11, 14 110:15 135:15,17 160:8,10 179:17 201:16 203:16 208:24 213:20

**marking**
179:19

**marks**
9:11

**Maroney**
9:1

**Marshall**
162:20

**material**
79:9

**materials**
74:18

**math**
129:24

**matter**
9:13 48:25 69:6,17 146:19 188:23 219:23 220:10

**matters**
188:25

**Maxwell**
114:12 115:22 124:25 125:7,8,11, 12,20

**Mcclendon**
9:25 11:14 51:22 52:16 75:11 86:19, 22 87:4,19 106:20 107:22 108:1 109:22 119:24

**Mcgriff**
203:25 205:20

**mean**
19:10 24:5 26:23 27:7, 17 32:18,19 36:17 37:20 38:16 39:22 43:13 45:22 46:8 48:18, 25 51:6 56:7 57:19,25 58:12 66:25 70:7 72:19 73:10,13,21 74:6 75:6 78:22 79:22 81:6,7 82:8 87:21,24 91:5 95:23 97:17 99:3 101:16 102:3 103:24 109:3,25 111:4 113:11,14 118:14 124:24 126:17 128:5 133:6 134:20 137:20,21 143:18 149:1 153:22,23 155:11,13 156:14,18 157:24 159:16,22 165:22 166:7,8 168:17 178:9 182:16 187:2 192:8 198:23 207:24 212:7,17,23 214:18 218:17 219:6,25 221:16

**meaning**
53:14 73:22 126:20 131:1 132:16 139:1 207:5

**means**
48:19 73:11 199:3

**meant**
130:1

**meantime**
130:8

**meet**
15:9,18 54:13,16 59:14,20,21 60:3 67:24 68:15,16,18, 22,24 69:8, 14 75:12 80:15 83:13 84:1 86:13 87:18,25 106:17 129:1,5,20 188:11

**meeting**
45:22 56:25 57:20 65:16 70:10 71:13 80:14,17,19 89:6 106:2 129:16

**meetings**
59:8,12,17 60:13 61:21 66:20 68:8 69:24 70:1, 3,4,7 71:21 73:9 80:9,11 81:15 84:17, 21 85:6,10 87:4,23 102:12 114:4 130:25 211:13 217:16 226:3,4,5

**meets**
142:4

**member**
41:15 68:21 96:22 117:14 206:3 222:24 223:22

**members**
24:20 29:2 30:22 38:20 40:10 43:14, 17 57:1,20 58:13,16 59:7,18 60:3 64:5,13 65:17 66:21 67:7,24 68:15,16,18 69:2 70:14 72:7 75:2,3, 12 80:10 81:13,17,18 84:6 86:13, 24 100:23 107:14,16 110:3 120:6 200:18,25 223:17 224:1,14,22, 23 227:14

**membership**
144:22,23

**memory**
92:21 133:19

**mentioned**
16:19 29:23 63:14 90:15 115:16 133:12 146:22 149:24 154:15 190:14 218:15

**Merrill**
9:14,23 170:3,7,17, 21 171:11

**Merrill's**
170:16

**met**
15:6,13 45:22 59:23 67:2,7 68:17,23 69:1,4,6 70:12,14,18, 19,21 83:17, 19 108:1 113:25 210:10,15

**method**
38:14

**metric**
159:24

**metropolitan**
75:9

**Microsoft**
70:2

**mid**
103:1 104:13 105:9 106:8 131:10

**middle**
20:1 95:1

**Mike**
10:4 94:19 188:16 194:7

**mile**
226:18

**military**
114:12

**Milligan**
9:13 10:5,7, 15,18,20,22,

24 170:2
**mind**
19:24 34:2, 10,13 91:21 92:1 114:18 115:1 133:1 153:20 159:9 163:13 166:8 188:1
**mindful**
100:24 158:15,17
**mine**
86:7
**minimal**
137:16,19 198:20 199:3
**minimize**
157:14
**minimum**
158:2
**minor**
104:23,25 105:11 218:11 223:12
**minorities**
112:13,16
**minority**
141:1,11 142:1,25 168:8
**minorly**
72:16 103:12,16
**minus**
138:13
**minute**
90:14 187:20 210:9
**minutes**
180:13 191:20 228:18
**missed**
222:7
**Mo**
68:23 84:23
**Mobile**
26:11 89:20 91:16 146:14 152:13 153:7 156:3 161:4 192:22 193:9
**model**
86:5
**modification**
156:7
**modifications**
112:25 150:19 152:2 155:23 156:9 158:4 164:24 166:4 195:16
**modified**
56:12 112:24
**modify**
111:13,16 113:6 172:25
**modifying**
100:3
**moment**
116:6
**Monday**
15:10,11,16 17:4 105:19 110:4
**Monroe**
72:23 104:20 111:7 123:16 124:15 181:1 183:2
**Montgomery**
79:15,16 88:14 89:6,8 90:15,19 91:1,7,15 92:10,12,13 93:6,16 94:12,20,21 95:1,5,8,10, 17,25 96:9, 15,20,24 97:13,21 103:13 115:23,25 116:4 124:3, 4,10,22 125:13,24 126:15 146:18,23, 24,25 154:4 155:4 161:17 183:4 209:9 211:25 212:1,3,19 213:4,14 214:2,23 216:20 221:20,25
**Montgomery's**
201:22
**month**
113:18
**months**
46:14 55:5 62:7 79:16
**Moore**
111:5 123:25 125:5,22 126:5 134:16 180:25 181:4 182:24 183:9,12 184:5 190:24 191:2 192:20 194:6 223:13
**Moore's**
104:18 134:22
**Morgan**
89:17 91:17 129:6,10,12 152:14 163:3 220:21
**morning**
10:19,21,23 11:19,20 15:10,11 105:19 179:6
**mother's**
117:19
**motivations**
187:3
**move**
18:19 59:25 101:1 105:21 132:5,23 192:15
**moved**
18:21 22:15 23:5,6 130:10 138:15 186:13 194:24 215:20 224:16 226:9
**moving**
22:17 51:1 96:23 100:24 128:22 144:17 147:4 157:12 162:1 172:13 185:16 220:21
**municipalitie s**
157:6
**Muscle**
89:24 91:24 92:4 127:15 156:1,8
**mute**
42:24
**Myron**
10:2

## N

**name**
11:21 20:23 22:14 23:2 25:24 53:9 104:7 116:3 179:22

**names**
9:19 115:17 133:16
**narrow**
190:7,8
**national**
20:5 200:20
**nature**
40:18 70:23 207:16
**necessarily**
97:17
**necessary**
157:21 220:23
**need**
13:23 59:2 71:22 111:9 124:8 131:6 149:18 228:6
**needed**
24:21 40:18 52:2 62:25 84:11,19 95:21 102:13 107:6 111:13 112:23 124:6,18 126:23 127:1 140:18 183:5 195:16 198:16 212:13 220:12 225:19
**needless**
126:12
**needs**
16:11
**negotiate**
41:1
**negotiating**
73:3
**negotiations**
72:13
**neighborhood**
33:20
**neighborhoods**
152:7 175:8
**never**
47:21 168:4 213:25 218:7 225:11
**night**
191:18
**nongovernmental**
211:8
**nonsubstantive**
109:3
**north**
89:19 115:6 186:23 212:2
**Northeast**
203:9,22
**northern**
9:16 125:12 129:12 132:18 162:17 186:2,15 213:8
**Notary**
9:2
**note**
136:19
**notes**
111:2,9,11 228:6
**notice**
14:10,13
**November**
62:23 202:7
**NRCC**
31:18 131:15 200:17,19
**NRRC**
200:12
**number**
9:14 18:23,25 34:13 47:2 82:1 96:1 97:4 104:23 129:11 134:3 135:1,9,20 139:25 145:17 152:22 157:14,20 158:2,12 160:12 173:8 179:1,21 181:17 187:13 205:11 207:11 212:24 215:12,16,23,24
**numbered**
181:13
**numbers**
15:7,24 37:3 45:4 47:20 55:11 56:21 57:10 65:9 66:15 72:9 73:4,18,25 75:5 116:14 123:11 124:8 138:7 143:20,24 144:1 207:18 208:5,7,9
**numerically**
133:1
**numerous**
127:6 224:20

**O**

**oath**
11:24
**object**
50:22 108:3 170:23,24 178:7 195:19 196:22 198:1,9 199:25 218:22
**objection**
16:18 33:5 37:15 50:23 138:23 168:24 177:14,16,23 178:8,11 187:8 198:11 199:19 202:21 204:24 209:15 210:4 216:17
**objections**
123:21 198:10
**objective**
216:10
**objectives**
217:8
**observation**
188:21
**observations**
90:13 189:18,21 190:6,20
**obvious**
128:8
**obviously**
22:16,17 23:19 34:10 36:3 38:1 39:5 43:8 45:10 47:21 48:19 49:4,10 56:10 58:24 62:21,22 64:4,18 65:9 66:14,25 67:3 68:2,4 74:20 75:4 80:9,13 81:13 89:18 90:23 94:18 95:23 97:17 99:1 100:23 107:14,22

114:6 126:22 127:7,19 129:12 146:11 152:16,20 159:5 162:5 163:11 165:22 171:22 180:18 192:8 193:3 211:13,15 212:22,24 214:11 216:18 220:13 222:7 227:7

**occasionally**
28:14 88:15, 21,22 90:9 149:14 151:13

**October**
51:18 52:12, 21 54:4 55:8 61:11 62:15, 16,17 79:18, 20 80:1 105:16 106:12 123:5 131:2,10

**odd**
207:11 211:19

**off-campus**
70:15

**off-year**
62:21 63:1

**offer**
210:25 211:3 212:4

**offered**
16:8,25 17:2 20:2 47:21, 22,25 48:4,9 50:16,17,18 179:9 184:18,19,22 186:8 187:13 188:4,5,7 190:3 191:12,18,21 218:6 225:2

**offering**
218:1

**office**
17:15,17,20 18:3 24:9 33:13 68:20 70:9 73:13 78:16 79:5, 6,8 94:20 101:17 107:9,23 129:21 158:14 182:4

**officeholders**
39:7 54:14, 17 83:18

**offices**
21:13 68:4,5 70:16

**official**
28:12 57:1, 3,14 74:16 76:3 102:24 106:8 117:17

**officially**
52:10,13 88:17

**offset**
183:5

**offshoots**
182:17

**okay**
13:4,8 14:14 27:4 47:17 51:13 56:23 123:4,7 133:21 170:20 198:13 199:5 200:1,19,22 201:11 202:23 206:9 208:8 211:17 213:5 214:1 217:12 221:8 225:6 227:13 228:5

**once**
12:19 74:22 75:8 76:5 79:9,11,22 80:17 82:17, 21 83:1 84:5 105:8 107:11 109:22,25 129:23 142:16 175:1 206:14 211:13

**one**
13:17 14:9, 12 22:25 24:1 30:8 36:22 37:1, 24 38:13 43:9,12,14 48:11 51:7 53:5 64:5 68:17,18 69:3,4,21,23 72:18 78:6 85:1 86:6,25 96:10 97:11 99:9 101:10 103:25 106:6 112:24 115:10 116:20 117:13,16, 18,21 119:20 121:10 123:11 125:10,22,23 126:3 128:19,20 132:11,12,13 133:9,14,22, 23 134:1 137:23 138:1,3,13, 17,18 139:2, 3,6,15,18,19 140:12 142:17 144:18 149:11,15, 18,20,25 150:1 151:15 152:5 154:3, 23 155:18 157:22 160:14 161:1 165:3,4,23, 24 166:2 167:8 168:4, 13 169:8,12, 23 175:14 181:12,14, 17,18 182:1, 5,6,7,9,10, 22 183:23,25 184:10 185:8 187:12,13 189:19 191:8,9,10 193:10 196:4 198:22 199:22,23 203:25 208:13 211:24 214:9 218:20 224:15 228:6

**ones**
11:7 46:16, 24 56:18 81:1 132:18 153:21 187:20 190:7 192:2

**ongoing**
62:24

**operable**
84:11

**opinion**
50:25 131:25 199:6,7 200:2 202:20 210:18

211:1,3 212:20
**opportunity** 112:6,7,10 142:8 180:22 181:5 182:14
**opposed** 53:15 210:23
**option** 211:24 212:6,8,9 216:11,16
**options** 114:19 115:10 151:22 210:17
**oral** 9:8
**Orange** 18:11 20:22
**order** 39:14 66:15 145:4 167:1 194:22 215:20 216:9
**organization** 53:17,21,25 200:11
**organizations** 21:17 211:8, 9
**original** 172:1,4
**originally** 24:15 91:2,3
**outcomes** 99:2
**outside** 24:10 171:25 227:18
**over/under** 207:15 223:7
**overage** 123:14
**overly** 121:22
**overpopulated** 66:12 72:21
**overpopulation** 67:17

**P**

**p.m.** 122:8 197:14,17 228:20,23 229:4,6
**page** 25:21 137:9 146:5 147:22 160:14 161:1,12 162:1,13 163:1,9,16 171:9 203:23
**paid** 43:15 53:10 56:1 57:24 205:5
**pair** 194:4
**paired** 58:25 178:25 188:12,15 189:20 190:9 192:19 193:7
**Palmer** 85:2 130:4 131:17 134:10,17 188:16 194:6 226:7,9,16, 19 227:21
**Palmer's** 131:8
**paper** 111:5
**paragraph** 26:7 169:15 170:4 201:25
**paragraphs** 152:9 166:25
**paramount** 149:10
**part** 27:4 28:4 39:8 41:8 54:16 56:3 82:9 94:20 125:6,7,8,12 127:7 130:17 132:18 146:14 154:4,19 156:16 161:23 168:18 174:15 182:18 197:5 201:25 202:2 210:6 212:19 213:8 222:20 223:2 227:22
**partially** 92:13 172:10
**participate** 84:25
**participation** 75:25
**particular** 32:12 53:13 87:9 97:12 153:12 158:12 188:23
**parties** 150:23 169:19
**party** 35:9 41:25 52:25 176:8 200:10
**pass** 31:10 55:15 56:9 197:19 228:15
**passage** 201:5 203:9
**passed** 16:6 36:6,7 67:2 68:1 76:8 120:24 136:15 206:15 208:18 224:4 225:4
**past** 126:21 169:7
**pay** 17:23 43:23 56:13 66:19
**paying** 12:9,13 49:24 50:1
**payment** 56:6
**payments** 55:4,5,20,21 56:12 58:3
**pending** 13:25
**Penn** 10:2
**people** 13:6 49:23 50:1 73:5 80:16 89:16, 19 96:14 109:9 123:15 124:6,18 126:24 129:12 139:2,22,25 152:23 153:5,6 156:3,19 158:7 183:5 184:4 185:21 203:6 204:13 205:7,10,12, 18,19,25 212:23 215:7,20
**percent** 34:12 44:7 119:9 138:19

139:1 195:10,18 196:2 216:24
**percentage** 32:12 34:7 44:10 117:7 119:12 195:17
**percentages** 80:24
**perfect** 96:20,21 199:16
**perfectly** 228:1
**perform** 41:22 168:7
**performance** 168:7
**performed** 41:23
**period** 63:6 161:25 163:6 164:1
**permit** 170:12
**Perry** 155:3 210:5
**person** 40:24,25 68:17 69:3 70:10,12 88:5,6 139:3,6,15, 18 140:12 149:11,25 155:18 165:3,23,24 167:8
**personal** 63:5 69:6,17
**personally** 69:8 90:5,7, 12 107:4,7 142:23
**perspective** 82:17
**phone** 18:24 85:1 88:4
**phrase** 210:15,21 227:1,9
**phrasing** 209:16
**physically** 78:15,20 101:10,13
**pick** 114:8,17 115:10,15 124:6 126:17 127:7 132:21 134:2 182:25 183:3
**picked** 124:16
**Pickens** 221:19,21
**picking** 71:1 104:1 114:13 115:22 124:18 126:21 132:15
**piece** 126:10
**pieces** 47:8
**pigs** 181:17
**place** 71:24 97:7 115:7 150:1
**plaintiff's** 14:3 21:19 25:6,10 92:17 93:10, 14,17 110:16 135:14,18 160:7,11 179:16,19 201:15
203:15 208:20,23 213:16,17,19
**plaintiffs** 9:21 10:3,5, 7,9,12,14, 16,18,20,22, 24 12:12 170:3 228:11,15
**plan** 17:14,16 26:10,12,13, 14 27:6 56:9 59:24 60:3 124:23 139:14 140:12,16,24 141:9 142:14,24 143:10,15 144:14 147:1 151:25 155:9,13 164:19 166:9 177:22 180:15,16,23 181:3,6,9, 10,12,14 182:1,2,6,7, 9,13,14,17, 20,21 183:14 184:13,17,23 185:17 186:6,10,25 187:3,6,10, 11,13,22,25 188:3,10,11, 13 189:6,12, 19,23 190:1, 15,16,18,22, 23,25 191:11,15, 16,22,24,25 192:1,9,10, 11,16,17 193:2,3,4,6, 16,20,25
194:1,3,13 196:9,21 198:16 199:5,8,14, 15,17 200:4, 14,15 205:14,15 206:10,18 207:20,23 208:10 209:3,7,10, 14 211:14 213:13 216:12 217:13,14,20 218:1,6,14, 23 219:3,11, 14,15,18,20, 21 220:2,7, 8,9,15 221:3,13,14, 18,21 222:2, 4,15,17,18, 19,22,23 223:19,24 224:1,10 225:11
**planning** 17:13 55:9
**plans** 26:9,21,25 27:1 46:9,11 47:4 178:24 179:4,9,23 180:3,10,14, 17 181:24 182:13 189:6,15 191:8,23,25 193:1 218:10,19 225:9
**play** 132:24 145:21 151:19
**playing** 73:25

**plays**
162:19
**please**
9:18 11:2,21 16:12 18:8 201:24 203:13 204:1,6 210:2 219:11
**point**
23:4 24:1 27:13,22 28:9 31:2 38:6 39:18 40:4,7 56:1 67:1 72:13 73:3,15 74:8 76:20 93:23 94:1,3 98:4, 7,10,22 104:24 107:7 109:24 110:22 118:7,8 123:2 143:19 144:4 151:15 172:11 175:5 179:10 186:2 195:14 205:24 206:11 207:20 209:3 211:16 214:14 215:18 218:12,20,21 219:19 222:14
**point-to-point**
151:7,13
**pointed**
97:7
**polarization**
42:12 167:23 168:3,10,21 169:2
**policies**
148:7,14 149:1,6,9 150:2 165:2, 19 166:11,25
**policy**
143:16,23 145:24 147:2 148:4 150:5 151:4,10,25 152:3,5,11 155:10 156:21 157:12,13,17 158:5,21,25 164:16 165:1,6 166:22 167:6
**political**
19:19,23 20:19 21:8, 9,10 152:8 157:5
**pop**
33:17 97:25 98:5,6,9 99:25 146:1
**populated**
71:2
**population**
28:5 32:6, 17,25 34:3, 8,15 35:10 36:6 40:19 44:7,10 45:9 64:8 71:2,6, 7 73:24 74:4,10 83:2 84:19 86:10 95:3 96:2 97:6 98:7 99:5 100:4, 10,18 101:4 112:13,18,20 114:8,18 115:3,15 117:6 118:19 119:12,22 126:22,25 127:21 128:12 135:7 137:16,19,24 140:1,11,16 141:11 142:1,5 145:13,14 154:20 158:2 161:10,23 162:11,21, 24,25 163:5, 12,15,25 165:11,21 166:15 170:11 172:18,22 175:13,17 189:10 195:11,17 197:24 198:20 202:10,12 204:12 205:25 210:13 211:20 212:1,2 213:3,6 214:19,20 216:23 220:23 223:5,8 225:17
**populations**
134:3 220:11
**portion**
80:8 95:1,4, 9 96:4,14,16 97:13,21 213:6
**portions**
163:22
**position**
20:2 58:21 203:3
**positive**
179:3 228:3
**possibility**
50:8 115:23 178:1
**possible**
37:4 50:20, 25 54:13 56:22 89:16 91:25 96:11, 17 127:16 146:16 148:18 150:7,10 152:18,24 157:25 176:18 177:9 178:4,13,18 223:11 226:12
**potential**
57:21 71:7 73:19 115:13
**potentially**
71:4 112:14 143:8 144:9
**practicable**
152:8
**practical**
54:13
**practically**
204:8
**practice**
24:3
**prank**
181:16
**precedence**
167:1
**precinct**
33:20,21 100:25 103:13,15, 17,18 104:4, 7,8 115:25 128:17,19 133:24 134:1,7 151:14 152:21

**precinct-based** 42:6
**precinct-by-precinct** 105:1
**precinct-wise** 44:22
**precincts** 32:10 42:4 90:21,25 116:17,18 127:20 128:6,7,10 132:10,14, 15,21 133:5, 8,13,15 138:15 146:12 151:20 153:22 157:6 173:7,8,11 174:5 178:15 185:25 186:1,15 193:17,19 208:5 215:22 216:1,2,9
**predict** 66:16 113:2
**predominant** 35:25 161:9 170:14
**predominate** 144:24
**prefer** 50:2 89:8 117:20 118:23 121:18
**preferable** 127:17
**preference** 159:5
**preferred** 49:24 50:5 86:5 89:9 104:20 111:24 112:1 124:16 128:20
**preliminary** 74:1 169:17
**preparation** 15:22 16:20 17:3 58:10 66:2 87:20 88:11
**prepare** 15:5 17:7
**prepared** 110:2
**preparing** 16:17 83:11
**present** 9:18 108:5, 7,15,19 114:19
**presented** 110:2
**presenting** 192:3
**preserve** 158:22 222:10
**preserved** 45:12 164:19 222:11,18
**preserves** 222:4,9
**preserving** 39:15 45:25 157:23 164:17 223:9,14
**president** 21:2 41:18
**presidential** 20:4
**presumption** 129:2
**pretrial** 170:17
**pretty** 29:19 78:24 87:5,7 119:5,7,8 157:16 162:12 165:15 214:6 223:21
**prevent** 12:1
**previous** 41:23 110:22
**previously** 18:16 77:2
**price** 205:5
**primarily** 49:23 112:19 125:3 163:15 181:8 184:3
**primary** 29:6,13 75:24 184:15 223:1,3
**principle** 139:15,19 140:13
**principles** 103:25 146:1
**Pringle** 10:1 11:14 51:23 52:15 75:11 86:20, 22 87:5,19 106:20 107:21 108:2 109:23 119:25 181:10 186:9 193:16 194:13 196:9
**print** 110:24 201:4
**printed** 203:23
**prior** 22:4 39:3 64:8 66:4,22 67:14 91:7 95:5 99:18 100:17 118:4
**priority** 46:1,3 149:9 165:10 167:4,6 225:23
**privacy** 202:9,16 203:4
**privilege** 11:15 108:4, 18,22,25 109:10,15 176:24 177:2
**privileged** 177:24
**pro** 120:5,8
**probably** 18:21 31:1, 4,17 40:1 44:19 45:20 51:17 55:13 57:18 60:19 61:10,22 72:23 79:10 80:13,20 89:8 94:22 103:1 120:4 125:5 134:25 136:11 171:23,25 172:10 186:9 200:5 212:21 224:21
**problem** 43:4 217:6 220:20
**Procedure** 9:5
**proceed** 74:22
**proceedings** 9:9 169:17
**process** 15:8 28:18

39:2,10 45:17 55:12, 16 80:4 89:4 97:11 103:25 119:21 120:13 132:20 141:14 145:15 180:12 196:15 225:3 226:13

**produce**
23:14 24:22 54:24

**produced**
135:20 160:12 179:20

**program**
76:16

**progress**
86:23

**project**
56:6

**pronouncing**
151:6

**proper**
31:22 208:15

**properly**
207:7

**property**
18:20

**proposed**
68:6 84:14

**Protection**
139:16

**protrusion**
132:8

**provide**
29:9,21 107:13 185:12

**provided**
14:23 90:16 109:22 136:6,10,23

145:1 190:6 213:3

**providing**
87:6 120:17

**public**
9:2 88:10 89:14 90:2, 16 91:12 92:5 182:3 187:14,22,24 203:9 211:14 217:24 218:21

**publicly**
218:13

**pull**
33:2

**purpose**
53:19,22 140:25 141:10 142:24 170:10,14 173:12 226:24

**purposes**
79:15 133:13

**pursuant**
9:4 17:19

**purview**
168:16

**put**
11:12 21:12 24:3 28:24 43:22,25 76:15 80:24 81:7,8,11 103:14,21 115:2,3,9 126:25 148:18 149:21 150:11 180:11 182:23 183:20 185:6,8,20, 25 186:3

188:14 191:1 205:3,16 206:2 214:3 218:16 227:4

**putting**
91:15 92:9 123:12,13,21 126:12 127:15 130:7 184:10 195:1 220:20

**PX**
201:12,13

**PX3**
22:5

**Q**

**quantify**
81:10

**question**
13:7,10,25 29:1 31:3 33:8 36:9 41:15 46:20 48:11 58:20 108:8,23 149:2 162:2, 14 163:2,10 166:10 169:12 177:3,4,7 178:12,14 189:1 195:23 199:22 200:2 202:24 205:1 210:2 217:11 220:4

**questions**
10:9 12:2 13:4,6,18 48:13 108:13,17 140:7 197:9, 11,19 209:16,21,23 228:12,14

**quick**
57:23 88:3 186:10

**quickly**
182:16

**Quillen**
10:13

**quite**
149:19 182:4 187:15

**quote**
180:12 186:22

**R**

**race**
20:4 32:25 35:20,21,22 36:1 37:18 41:18 48:12, 14 49:7 83:3 97:25 98:8, 18,22 101:4 117:2 118:5 119:15,19 134:17 135:4 142:17 143:18,19 144:21,23 145:4,13,15, 20 146:4 166:16 174:17,20 175:1 176:12,14

**race-based**
145:2

**race-neutral**
144:20,24

**races**
41:10,12 228:2

**racial**
33:15 42:12 48:22 97:20 98:22,24

99:7,20 143:16 153:5 154:7 157:2, 8 160:4 167:23 168:3,10,21 169:2 171:15 175:7 187:1, 4 195:6,9

**racially**
170:8,22 171:13 172:15 173:1,25

**ran**
41:18

**random**
104:2 132:22

**Randy**
9:7,12 11:3, 22 16:11 25:2 201:20 203:18 229:3

**rank**
165:1

**rapidly**
163:4

**Rarely**
79:22

**RC**
135:21 160:13 179:21

**re-election**
184:6

**reach**
60:4 138:21 158:2 223:8

**reached**
95:9 219:19

**reaches**
95:1

**reaching**
95:4

**read**
141:18 147:6 169:13 170:5 195:24,25 199:6 200:1, 5 201:24 202:3,5 203:24 204:1,4 210:1,3

**reading**
199:20

**Reagan**
20:2,6

**real**
57:23 60:19 71:8,17 72:9 73:3,18 75:5 84:5 102:3 116:14 123:11 129:24 208:7,8

**realize**
33:22

**realized**
226:4

**reapportionment**
12:7 26:17 33:13 67:1 73:12 78:16 79:5,6,8 101:17 107:2 110:3,7 120:16,20 135:19 136:4 165:8 167:11 178:20 203:21 204:21 213:2 217:24 223:4,23 225:2

**reason**
19:25 26:6 95:21 133:22 145:4 183:16 184:1,15 188:24 193:19 216:21

**reasons**
126:23 163:7,14,23 184:12 194:1,8

**recall**
38:14 53:5 89:1 90:2 122:11,22 123:25 126:4 127:2 128:14,23 130:4 133:17 134:9 137:3 190:5 192:6 199:11,20 200:2 221:12

**receive**
31:24 57:7 86:8 87:2,8 107:25 114:1 116:10 120:25 121:5

**received**
57:14 58:2 60:6 63:16, 19 72:15 74:16 76:2, 5,7 89:14 91:12 92:5 103:10

**receiving**
90:2

**recent**
38:13 51:2 170:6

**recess**
65:23 197:15 228:21

**recognize**
22:6 25:19 93:1 135:25

**recognized**
156:25

**recollection**
50:15 164:11

**recommend**
29:19

**recommendations**
29:9 72:15 120:15,21 185:13 190:5

**record**
11:13,21 22:2 65:21, 25 122:4,8 169:5,13 170:1 173:14 195:25 197:14,17 202:3 204:1 210:3 228:20,23

**redistricting**
23:18 24:7, 11 26:9,14, 16,21 39:10 41:4 53:22 58:1 103:25 120:13 126:11 135:19 136:7 137:11 140:24 146:1 148:7,13 167:11 178:20 194:2 198:19 204:16 213:23,24 226:24

**redrawing**
38:24 60:11 63:15 78:19 106:18 224:9

**reduces**
216:23

**refer**
51:5,6,11 89:23

**reference**
93:14 171:3 173:15

**referenced** 158:20 164:21 179:5
**referencing** 164:17
**referred** 51:7 128:18
**referring** 59:17 61:14 89:24 105:2 112:17,20 173:20 191:8
**refuse** 108:12
**regarding** 82:24 120:13 165:20 185:13 189:19
**region** 161:17
**registration** 75:21
**reiterate** 84:9
**related** 32:24 144:1
**relationship** 62:24
**relative** 57:25
**relayed** 90:14
**relevant** 132:1
**reliable** 203:5
**remained** 30:2 42:20 43:7 44:14
**remaining** 137:24
**remedial** 219:18
**remedy** 24:21
**remember** 12:19 29:3 31:6 33:11, 25 37:3,16 41:10 44:18 45:3,21 46:6 63:9 78:25 89:13 90:17 91:9 95:8,9, 12 111:10 116:3 138:10 149:4 190:10 191:18 199:10 200:6 224:13
**remembering** 188:13
**remind** 194:16 199:12
**replace** 22:22
**repopulate** 223:6
**reporter** 9:1 11:1,6 13:14 77:16 79:1 112:3 166:18 176:25 193:5 210:2 217:1
**represent** 9:19 107:3 179:22 215:25
**representatio n** 53:3,4,7,8 107:6 139:23
**representativ e** 10:1 11:14 51:22 52:15 72:18 85:2 86:19,22 87:5,19 90:22 104:18,19 106:20 107:21 108:2 109:23 119:25 122:20 185:23 186:9 190:24 223:13 226:6,8
**representativ es** 70:21 71:14 73:9 83:20 84:18,22 85:7,15,21 86:9 87:14 97:9 103:7 105:10 106:3,19 119:16,24 122:18 125:19 139:23
**representativ es'** 106:10
**represented** 12:5 94:21 96:22 159:6
**representing** 27:19 125:6 139:24 159:8 227:23
**represents** 125:8
**reproduce** 209:2
**republican** 23:22 27:20 28:7 51:23 200:10,20
**republicans** 151:1 184:7
**request** 117:21
**requested** 54:25
**requests** 50:11 72:15 86:9 87:9,15 117:6 120:21,25
**require** 143:16 156:5 160:4
**required** 127:19 138:20 197:24 223:8 225:14
**requirement** 202:19 227:14
**requirements** 140:17 142:4 147:5 165:13,20 166:12
**requires** 141:22 145:9,11 146:10 150:9 151:10 152:11,12 157:18 158:25
**requiring** 165:11 214:16
**reservations** 157:7
**reside** 228:3
**residence** 20:22 226:24 227:3,4
**residency** 227:14
**resolve** 149:23
**respect** 152:7 155:13 192:20 199:18

**respected** 155:10
**respecting** 155:24
**respond** 198:8
**response** 108:11 177:2 192:1 198:5
**responsibility** 20:5 82:10
**rest** 107:16,18 149:11,13
**result** 205:25
**results** 35:9 57:8 176:8 177:11
**resume** 22:3,9,11 23:12
**retained** 52:10,13 57:24
**retention** 107:8
**retired** 22:22
**retrieved** 150:14
**returns** 41:6 42:2,3 75:18
**revealed** 143:25
**review** 15:21 16:1,4 37:11 41:6 47:12,20,24 48:4,7,10,22 49:11 67:15 74:18 75:18, 21,24 83:10 101:6 143:16,22 157:8 180:6, 12,22 181:5, 23 182:15,22 184:16 185:19 186:6 187:11 188:2 189:25 190:21 195:9
**reviewed** 15:7,23 16:16,19,23 47:10 67:3 74:20 109:13 144:7 182:23 186:4
**reviewing** 47:15,16 66:6,9 180:9
**revised** 84:12
**right** 11:24 12:24 13:20 15:2 18:6 62:5 79:25 94:7, 14 97:10 120:3 121:13 122:3 123:24 130:12,14 134:2 142:8 147:14 153:20 154:3 170:4 171:4 172:2 191:6, 17 197:25 198:17 201:13 203:11 206:3,22 209:4,21 214:22,25 215:10,21 216:2,6,16 217:21 220:17,19 223:1 224:10 226:20 227:9,11,24
**Rights** 31:22 99:10 112:23 113:7 140:23 141:2,4,16, 19 142:14,20 143:11 144:5,9,15 145:1,5 149:12,25 165:4,12 166:13,17,20 167:8 189:3
**ring** 26:5
**ripple** 220:16
**River** 18:11
**RNC** 200:10,17
**Road** 18:11
**Rogers** 92:11 94:19 126:7 134:16 188:16 194:7
**role** 28:10,12 162:19
**room** 78:17 88:15, 19,21 90:10 108:5 109:9
**roots** 154:8 211:8
**Rosborough** 10:17
**Ross** 10:15
**rough** 72:2 80:24 206:18
**roughed** 60:20 64:24 73:10,13,16, 21 102:7,12 129:23
**roughed-out** 102:9
**round** 60:13 66:20 68:8 84:13, 15 102:25 103:2,5 116:14,23
**ruled** 11:16
**rules** 9:5 12:25
**run** 166:3,7 224:15
**running** 68:19 129:2
**runs** 107:23
**rural** 64:24 75:7 154:18
**Russell** 162:6 193:9

S

**sacred** 216:10
**sake** 219:18
**sat** 101:13 211:18
**satisfied** 222:23
**satisfies** 142:19
**satisfy** 138:21 145:5 155:21
**save** 102:21 110:18
**saved** 111:11

**saves**
110:21,22
**saying**
25:1 63:23 109:6 200:3 205:23 211:17 222:23 225:25
**says**
23:2 25:15 137:10 139:14 156:22,24 157:22 167:7
**SB-10**
182:7,9
**schedule**
105:20
**schedules**
105:17,21
**scheme**
73:6 216:6
**school**
64:13 75:2 80:12 81:8, 16,23 157:7 181:16
**science**
19:19,23
**scope**
178:16
**scrap**
111:4
**scratch**
38:24 94:6
**screen**
85:11
**seats**
206:12
**second**
50:2,8,12,20 151:4 176:18 177:9 178:2, 5,18
**secondhand**
82:14
**Secretary**
9:22 170:7, 16,21 171:11
**section**
137:10 139:9,14 140:15,19,22 141:2,15,18, 22 142:14,19 143:10 144:5,8,14, 17,25 145:9, 10 146:6,10 147:4,17 148:6,7 150:5 151:4 152:6 156:20 157:13 158:21 165:6 166:23,24 167:7,13,16 189:2 201:9 204:18
**Sections**
137:14 140:10
**see**
13:13 17:23 22:23 25:14, 17,21 26:18 33:2,6 71:17 82:19 99:1,4 107:15,18 131:6 135:23 137:9,17 145:6 148:8 154:12 160:16 196:4 201:7,21 203:20 215:7,15 217:3 224:5
**seeing**
37:16 74:1 132:23,25
**segments**
206:8
**self-explanatory**
157:16
**Selma**
227:11
**semifinal**
84:16
**senate**
24:6 47:18 52:5,16 54:11,12 64:14,21,24 75:6 81:11 129:2 147:13 188:5,6 190:23 191:21 224:13,14,21
**senator**
9:25 11:13 28:20 29:7,8 30:24 51:22 52:16 86:19, 21 87:4,19 106:19 107:22 108:1 109:22 119:24 180:15 191:12,13 204:18
**senators**
106:3
**send**
17:22
**sense**
28:18 42:5 58:22 74:8 116:20 148:24 169:20 210:18 222:12
**sentence**
26:24
**sentences**
78:23
**sentiment**
205:20
**separate**
55:21
**separated**
206:1
**separating**
203:5
**September**
51:18 52:21 54:4 55:8 79:17 102:25 103:1 104:13 105:9 106:9, 16 177:12 203:21 217:23
**seriously**
47:22 65:3
**serve**
27:12
**session**
47:3 52:3 55:9,14 61:11,13,15 62:15 79:14, 23 83:15 84:4 85:8 98:15,19,25 99:19 106:12,17 107:13 110:13 174:25 175:9 179:24 180:4 195:7
**set**
15:2 53:18 59:8 68:8 169:23,24 216:5
**seven**
40:12 49:4 58:16 60:7 67:20 68:3, 16 80:11,18, 21 81:14 83:19 85:20

105:18 106:19 122:11 137:25 138:15 151:20 160:14,21,22 206:12,14
**seven-page** 160:13
**seventh** 138:18
**several** 13:6 16:19 29:2 147:5 199:22 214:17
**Sewell** 43:8 45:7 69:5,9,22,25 70:5 101:1 103:12 113:25 116:11 117:3 118:6 119:18 122:15,16 125:15 132:12,13 133:14 210:10,12, 16,22 211:18 216:12 217:7,13 218:8 219:2 220:1 226:6, 18,23
**Sewell's** 45:25
**shakes** 34:25
**shape** 171:19 173:5 178:16
**share** 85:11 156:5 205:20
**Sharh1@ comcast.net.** 19:5
**sheet** 47:19 213:17 215:12,17
**Shelby** 130:10,15 163:11 188:15 226:10,17 227:22
**shift** 28:5
**shifts** 223:5
**Shoals** 89:15,23,24 91:16,25 92:4 127:15 156:1,8
**shock** 89:4
**shooting** 32:13 34:3 44:11
**short** 48:7
**short-circuit** 21:22
**shortening** 130:22
**show** 85:11 114:5 161:2 169:13 170:5,18 201:6,18 203:18 204:22 213:13,14 221:10
**shown** 22:3 195:10 221:6,7
**shows** 202:15
**side** 21:14 133:9 191:21 226:20
**sign** 52:17,19
**signature** 25:22 26:1
**signed** 25:12 54:3 55:7,18 56:7 225:5
**significant** 74:13 88:25 105:6
**significantly** 80:8,10
**similar** 49:25 77:23 152:16 157:9 175:15 186:5 190:11 192:1
**similarities** 156:25
**similarly** 17:25 41:22 149:5
**simply** 207:1 211:18 219:22 220:10 224:8
**simultaneousl y** 65:8 88:14
**singer** 42:23
**single-member** 147:25
**Singleton** 9:21 10:2,9, 14 16:10,14 111:25 181:23 182:20 187:10,13, 22,25 188:3, 10 189:5,12, 19,22 190:1 193:25 194:1,3
**singularly** 88:2
**sir** 11:19 12:23 13:3,9 14:22 18:15 26:2 27:11 30:10, 19 32:1 33:21 38:12 40:5,8,11 51:4,10,14 52:7 55:23, 25 57:16 59:15 68:13 76:1 77:3 78:5,8 105:3 106:4 110:20 112:8 121:21 137:12 142:12 160:25 169:16 175:18,20 176:7 182:7, 12 190:19 194:14 196:17 200:24 201:3 209:5 215:1 216:3 217:5 219:5,12,16 220:18 222:1 223:21 227:12
**sit** 90:5
**sitting** 154:3
**situation** 24:21 96:21 113:8 134:4
**situations** 149:15 151:21

**six-person**
58:25
**size**
171:19 178:16
**skewed**
202:9
**Skipping**
37:22
**slice**
205:16
**slightly**
84:11 134:20
**sliver**
204:10,17
**small**
215:23
**smaller**
225:18
**snippets**
90:8
**social**
154:8 157:2
**socioeconomic**
34:20 175:16
**software**
33:9,14 76:22,24 77:1,14,24 78:1,10,13 82:3,4,12, 19,24
**sole**
170:10
**solely**
96:10,24 133:23
**solutions**
123:11
**somebody's**
90:22
**sort**
20:3 29:9,21 44:9 46:6 71:20 82:23 89:1 107:8, 25 112:1 119:11 120:7 128:8 142:4 153:12 157:19 159:24 162:16,20 166:5 190:22 191:4 206:18
**sounds**
42:23 153:25 165:15
**sources**
142:11
**south**
226:17
**southern**
204:10
**southwestern**
174:14
**space**
151:15
**spaced**
55:4,5
**speak**
13:17 16:11 40:10,14 70:15 119:25 120:10 198:4 200:16
**speaker**
120:5
**speaking**
109:7 194:11
**special**
55:9,14 61:14 62:14 79:14 83:15 84:3 85:7 98:15,19,25 99:19 106:11,16 107:12 110:13 174:24 175:8 179:10,24 180:4 195:7
**specializations**
20:14
**specific**
31:3 33:15 34:13 44:9 72:17 85:16, 17 89:13 90:1 97:13 114:1 122:25 128:3 145:23 152:15 153:19 155:22 156:9 158:3,18 164:11,23 181:3
**specifically**
32:23 48:18 49:15 91:18 94:18 109:13 112:17 114:3 126:4 134:9 156:11 171:21 172:24 173:23 187:23 217:9
**specifics**
27:25 57:22 122:14,17,21 123:24 128:14
**speculation**
195:20
**spell**
77:18
**spend**
60:25 192:24
**spending**
62:9
**spent**
61:18,23 80:25 81:2 90:12
**spill**
194:19
**splint**
128:17
**split**
89:6,9,10 90:17,20,21, 25 91:2,3,7, 9,22 92:1,2 93:7 94:13, 16 95:18,19, 22 103:13, 14,15,19 104:6,15 111:6,7 114:20,22 115:24 116:1 123:8 124:3, 8 126:10,15 128:19 132:2,10,11, 14 133:8,13, 23 134:7 138:15 149:19 151:20 156:2,12,15 158:8 173:7, 8,17 174:5 183:2,20,24 185:7 193:17 207:25 208:4 213:10 214:11,12,25 215:4 216:2, 9 221:19,20, 25 225:19
**splits**
158:11 179:1 184:10 185:8 193:15,16 205:25 206:7 220:23
**splitting**
91:15 92:10 124:10 127:25 173:11 178:15 183:1 193:18

214:21 220:11
**spoke** 29:2,3,8 40:11,17
**spot** 227:19
**spread** 146:20
**spring** 59:22
**St** 162:5 220:14
**staff** 24:1 68:24 70:18,19 84:7 120:1 121:9,11 129:6,19,22 131:3,8,14 134:11,18
**staffs** 200:18
**stand** 200:19
**standpoint** 74:2
**start** 45:18,20,23 56:25 60:3 64:12,22 65:3 94:6 194:16 209:8
**started** 55:12,16 60:23 65:16 66:20 94:9 97:22,23 194:18 206:15 212:12 226:2,3,5,13
**starting** 27:12 39:18 40:4,7 66:2 79:3 80:1 93:23 94:1,3
101:5 122:20 137:9 148:6 150:5 151:5 182:21 209:3 222:14
**state** 9:3,19 11:21 12:13,22 18:8 22:2 25:17 52:5 53:15,23 54:11,12 56:18 59:22 60:1 64:13, 20 65:11 73:12 75:2 76:7,10,16, 17 77:6,13 78:4,17 81:8,16,23 82:10,13 86:14 90:4 113:12 116:6,7 137:14 165:10 170:16 194:25 201:5,21 202:15,18 203:2
**state's** 41:3 78:12 80:4 201:25
**state-wide** 41:12 56:17
**stated** 38:10 58:8 85:19 166:14 170:7 189:8 195:5
**statement** 118:4 203:24 204:3
**states** 9:15 24:12 26:8 59:6 139:17
140:15,22 141:3 144:19 146:6 150:6 151:5 152:6 157:13 158:21 165:6 166:24 170:6
**statewide** 64:19 65:9
**statistical** 217:3
**stay** 152:14
**step** 18:6 67:13, 23 196:7
**steps** 195:14 222:7
**sticking** 170:9 174:9
**stipulated** 169:6,16,18
**stipulation** 9:6
**stipulations** 11:6 170:1,3
**stood** 30:17
**stop** 191:6
**straight** 132:4
**straws** 25:3
**strength** 141:1 142:25
**strong** 145:1,3
**strongly** 104:1
**structured** 87:25
**stuck** 46:16
**studies** 20:8
**study** 19:18
**styled** 201:23
**subdivisions** 152:8 157:5
**subjectively** 153:15
**submit** 38:20,21 168:19
**submitted** 38:2,7 47:4, 11 48:8 83:14 84:3 98:21 101:5 110:1,10 174:24 178:24 179:5 182:2,11
**submitting** 98:18
**subordinates** 144:20
**subpoena** 14:11,16
**subsequent** 189:5 223:5
**subsequently** 224:21 226:4
**subset** 121:9
**substantial** 26:8 112:13
**substantive** 29:18 108:10
**substantively** 57:21
**subtract** 146:2
**subtracted** 102:14
**subtracting** 98:2 145:12
**subtractions** 166:9

**successful**
44:13
**sufficient**
141:25
**suggest**
37:9 168:13
**suggested**
185:15 211:23 212:14 214:2
**suggestions**
29:16 75:10 211:18
**sum**
222:21
**summer**
106:7
**Sumpter**
155:2
**support**
94:23 145:2
**suppose**
154:9 189:1
**supposed**
56:11 178:10
**supreme**
202:11
**sure**
16:13 21:9 23:13 30:1 32:5 33:8 37:2,3,4,25 40:24 42:19 43:6 44:6, 13,16,22 45:11 48:18 63:11 65:20 81:21 95:12 100:7 111:4 115:19 117:14 119:10 125:22 130:12 136:12 138:11 140:7,11 141:20 142:13 143:22 144:13 145:23,25 147:1 148:17 149:2 150:12,14,16 151:11,25 154:23 155:9,23 156:14,19 164:18 171:7 172:6 184:19,22 199:9,10 204:19 205:5,8 209:15 211:12 216:7 221:15,16 225:7,21 227:1,5
**surprisingly**
125:1
**surrounding**
214:17
**swapping**
211:25
**swear**
11:2
**Switching**
210:9
**sworn**
11:4
**system**
180:11

**T**

**table**
194:12 202:14 215:6 217:4
**take**
13:22 20:4 26:7 34:14 47:16 63:5, 10,12 65:19 67:13 81:18, 24 95:17 97:5 104:4 111:15 113:9 121:25 122:1 123:16 127:10 137:8 148:3 160:20 167:6 175:11,16 177:20 195:14 196:7 197:9 208:16 209:6 215:11,12 218:4 219:10 223:6
**taken**
65:23 96:7 122:6 187:5 197:15 215:10 228:21
**takes**
80:20 81:14 158:14 167:4
**taking**
18:6 41:1
**talk**
28:15 59:9, 24 84:7 88:16 90:9 105:18 114:7 116:15 125:3 129:6 131:4 137:13 143:7 147:13 168:20 169:1 214:15 224:2
**talked**
15:8 29:17 68:3,4 90:4 104:24 114:14 115:4,11,13 116:2,22 123:7,9 124:2,14,20 125:21 126:9,12,14, 16 127:6,18, 24 128:5,7 130:6,8,11, 16,18 142:17,18 163:20 168:22 195:13 219:7
**talking**
18:7 29:12 40:15 48:2,3 57:20 66:2 83:22 92:14 93:6 98:11 100:14 109:8,10 122:25 134:23 158:7 173:18 196:12 198:6 200:13 204:19 208:19
**talks**
116:14
**tangibly**
92:6
**team**
21:12 154:9 176:4
**Teams**
70:2
**technically**
18:21 22:14 70:2 132:12
**telephone**
18:23
**tell**
44:19 49:14 95:13 118:11 122:21 123:24 134:24 138:19

177:17 184:22,24,25 185:3,10 186:12 188:9 199:12 202:18 204:22 210:22 213:1,22 218:22

**telling**
209:17 217:7 218:5

**tem**
120:5

**ten**
23:20 24:7 38:14,18 39:9 44:18 45:4 46:9, 12,23 47:7,9 50:15 162:18 180:13 191:20 207:5 223:6

**ten-minute**
90:8

**tens**
102:18 205:12

**term**
156:22 157:3

**terms**
34:12 55:2 60:25 61:18 62:1 71:16 74:22 80:14 108:10 126:17 151:17 168:7 172:5,20 193:12 200:13 204:12 216:6

**Terri**
125:6 217:7 220:1

**test**
92:21 133:19

**testified**
11:4

**testify**
18:1

**testifying**
11:24

**testimony**
98:17 99:19 204:23 205:2 210:11 222:9,21 223:16 225:8

**thank**
11:17 63:25 136:19,21 171:10 173:19,21 202:13 204:20 215:15 228:7,9,25

**Thanks**
14:17

**theory**
55:13 56:8 92:9

**thing**
31:22 67:10, 15 68:2 115:1 117:13 124:15 125:21 157:20 179:3 181:1 186:19 208:19

**things**
36:3 62:13, 22 72:25 73:23 89:12, 22 91:14 104:2,24 105:22 111:8 114:13 116:2,9,22 146:17 148:1 152:21 153:11,24 156:18 157:24 190:13 191:5 221:1 224:16

**think**
13:1 21:22 29:18,19 31:16 32:18 35:14 36:20 42:1 43:1 47:2 52:11 58:18 59:6 60:17 62:1 63:22 65:16 70:6 77:9,14 90:19 94:4 96:13 97:2 103:20 104:7 107:20 108:24 109:2,6 111:23,24 113:17,20 116:17 117:8,9 118:22,25 119:2 120:4 121:14 125:3 126:24 131:15,25 134:14,21, 22,25 138:5, 9 139:11,20 148:5,21 149:10 157:16 160:5 166:22 168:4 171:15,19 173:8 177:17 178:13,21 180:1,16 181:20 183:19,23 184:3 185:5, 7 186:7,8,18 188:12,14 190:9,12 191:7,14 192:10,12,21 193:3,6,7,9, 11,15,17,24 196:1 197:8, 9 204:14 205:19 207:10,25 208:18 209:1 210:6 212:22 217:10,15, 16,17 218:12,20 225:7 228:5, 13

**third**
152:5 156:21

**Thompson**
10:6 11:9,18 14:8,13,15 21:25 46:22 109:1,16 121:14,21 122:1 169:5, 11 170:2 171:2,5,10 173:19 177:4,15 195:23 197:18 228:13

**thought**
31:21 34:8 88:24 89:17 116:19 125:5 129:14 130:9,13 131:18 133:10 185:1 202:15,19 226:5,11,13

**thoughts**
84:12

**thousands**
102:17,18 205:12

**three**
15:16 18:22 23:9,19 36:9

41:11 66:16 84:25 89:7, 10 91:15 92:10 93:8 94:13,17 95:18 105:25 111:19,21 116:17 126:16 154:4 169:19 181:24 182:14 185:24 189:6,12,23 190:1,12 191:9,10 192:13 207:6 226:16

**three-judge**
26:10 199:13 221:4

**tied**
146:14

**ties**
97:15

**time**
9:17 13:17 17:17 27:18 31:21 37:13 47:17 52:11 55:10 56:6 60:23,25 61:17 62:8,9 63:3,6,8,10 65:22,25 67:1,5 70:6, 11 74:19 75:14,15,19, 22,25 78:18 79:25 80:8, 21,25 81:2, 7,11,19,24 83:14 84:22 87:22 90:11 94:17 105:24 106:24 110:21 116:13 121:16 122:5,8,24 123:1 129:5 136:14 145:18 161:25 162:22 163:6 164:1 182:5 187:19 192:4,25 196:11 197:14,17,18 218:12,21 226:3,5,11 228:14,16, 20,23 229:3

**timeline**
51:1 56:11, 14 68:6 98:11 109:21

**timelines**
71:8

**times**
12:18 65:14 87:18 109:7, 12 127:6 129:25 215:22

**timing**
74:25

**tiny**
204:10,17 205:24

**Tish**
10:21

**title**
21:1

**titled**
169:16

**today**
12:3,6,10,14 13:5 14:19 15:5,22 17:8,11,14, 17 170:13 180:8 199:10 200:7 221:6, 7

**told**
58:18 87:12 118:12 131:3,7,15 136:22,24 138:25 139:7 164:5,13 185:4 186:13 197:23 198:21 199:2 203:1 204:25 210:16

**Toni**
203:25 205:20

**top**
25:14 36:3 49:6 53:6 130:23 161:18

**total**
33:17,18 55:22 74:4 83:2 97:25 98:5,6,9 99:25 137:15 145:14 146:1

**town**
70:13 87:22

**traced**
39:13

**trade-offs**
155:14

**traditional**
146:1

**transcript**
203:20

**translated**
82:12

**travel**
63:8

**tread**
45:15

**tremendous**
89:4

**tremendously**
29:18

**trial**
12:20 18:1

**tribal**
157:2,6,9

**trip**
69:12,23 70:13

**trips**
63:5

**trouble**
151:6 198:2

**true**
22:8 26:3 39:18 93:3, 18 215:19 222:17 225:22

**trump**
149:15

**trust**
74:5

**trusted**
74:6

**truthfully**
12:3

**try**
45:14 78:25 90:24 157:14 158:22 196:13 209:9 225:24

**trying**
27:22 62:5 66:10 91:24 130:20 132:14,15 133:23 146:16,18 148:21 157:20 158:10,17 173:10 186:21 204:11 205:23

**Tuesday**
15:10,11,17

17:4 87:25 110:5
**tune** 68:10
**tuned** 123:17
**turn** 66:14 98:22 145:15
**turned** 36:14,17 73:4 76:15 102:18 123:15,17 124:10 135:4 142:16 143:19 175:1 226:8
**Turning** 162:13 163:9
**turnout** 35:7 176:6
**turns** 72:10 216:22
**Turrill** 10:4 42:24
**Tuscaloosa** 96:4,8,13,16 115:11,20 127:20,21 128:3 162:18 163:22 192:23 195:3 209:9 211:24 212:1,2 213:7,8,13 214:4 216:19 220:14 221:19,24 224:18,19
**TV** 227:19
**twice** 79:11
**two** 20:9 23:21 26:7 30:5 37:5,6,12,16 49:18 52:14 54:9 59:23 72:7 74:21 85:1,5 86:16 89:11 95:19, 22 97:9 99:12 103:19 106:15 111:23,24 112:2 117:16 125:9,19 126:2,15 127:25 128:13 132:12 133:12,15 136:11 149:10,17, 21,24 150:16 161:6,9 181:6,13,17 182:13,14 185:17 189:5,6,12, 23 190:1 191:5,7 192:13,19 193:4,5,6 194:5 196:24 198:18 210:23 211:10 213:9,12
**type** 35:1 65:10 79:1 105:1 175:23
**types** 78:6
**typing** 13:14,16

**U**

**U.S.** 87:13 103:6 119:23 122:11 201:6
**Uh-huh** 148:9
**ultimate** 207:17
**ultimately** 31:10 51:8 76:8 110:15 196:10,16
**undergraduate** 19:14
**underneath** 224:3
**underpopulated** 45:3,6 66:11 70:25 95:24 114:7
**underpopulation** 67:17
**understand** 11:23 13:7 33:8 111:20 139:18 204:11 209:23 210:10 219:9 225:8
**understanding** 12:2 28:2 39:20 53:12, 24 76:12 111:21 112:9 139:21 140:4,6 141:8,12,21, 23,24 142:10 145:8,10 146:9 149:8 150:8 151:9 152:10 157:17 158:24 159:17,18,20 168:2,5,6 208:14 225:13,14
**understood** 13:11 28:25 31:5 42:11 82:11 109:16 139:5 179:14 181:22 220:4 225:16 226:22
**unhappy** 185:22
**United** 9:15 139:17 141:2
**universities** 104:2 114:11 115:17,18
**university** 19:13 103:19 115:21,25 116:4
**unofficial** 57:5,8 64:7, 10 67:16 106:7
**unquote** 180:12 186:22
**update** 38:20 39:4 86:23 88:3, 23
**updated** 28:4 57:10 87:2,23
**updates** 88:4
**updating** 38:17
**upload** 83:7
**uploaded** 82:5,20,22
**urging** 211:9
**usable** 65:10

**useless**
64:15
**Usual**
11:6

V

**vacation**
63:6
**vaguely**
27:25 141:17
**valuable**
64:18,19
**varied**
84:23
**various**
21:12,16 29:13 44:18 47:3 54:20 55:4 73:22 86:24 98:23 102:14 105:10 143:25 145:15 149:9,15
**vast**
80:16 161:10 162:10 181:8
**verbal**
43:21 44:2
**verbally**
43:18 148:10
**versa**
149:16
**version**
23:11 84:16 110:12,14 173:9,15,16 190:23 191:11
**versions**
191:4
**versus**
9:13 12:21 25:11 81:1, 13 84:9
97:15 124:22 170:3 181:1 201:5 221:5
**vi**
167:1
**vice**
149:16
**VIDEOGRAPHER**
9:11 11:1 65:21,24 122:4,7 197:13,16 228:19,22 229:2
**view**
27:22 159:12
**views**
152:23
**violate**
202:11
**Virginia**
18:16 22:15 23:6,23 24:6,10
**virtually**
10:10 64:15 83:17 187:14
**visitors**
70:10
**voices**
126:2
**vote**
139:15,19 140:13 149:11,25 155:18 165:4,23,24 167:8 185:15 204:15
**voted**
110:4
**voter**
35:7 42:15 75:21,24 176:6
**voters**
32:8,13,20 33:2 39:8 73:7 97:4 114:14 170:15 182:11 217:25 218:7
**Voters'**
217:14
**votes**
227:7
**voting**
31:22 32:6, 17 33:18 34:3,8,15 35:10 44:7, 10 49:7 74:10 83:2 99:10 105:21 112:17,20,22 113:7 117:6 119:12,22 135:7 140:23 141:1,2,4, 16,19 142:14,20,25 143:11 144:5,9,14, 25 145:5 149:12,25 157:5 165:4, 12 166:12, 17,20 167:8 175:12,17 185:14 189:3 195:11,17 216:23

W

**Waggoner**
180:19 190:15 191:8,25 192:8,13
**Wagner**
190:25
**wait**
13:17 60:1
**waited**
71:16 208:6
**waiting**
90:9
**walk**
76:21 88:15 109:21 148:23 150:4 182:19
**walked**
88:18,21
**Walker**
9:24 11:7, 10,12 12:7, 9,13 14:12, 14,17,24 15:6 16:18 19:21 22:1 33:5 37:15 46:20 48:2, 16 50:23 77:10,20 88:23 99:16 106:25 107:9,22 108:3,15,16 109:5,18 113:13 116:7 121:19,24 122:3 136:12 138:23 139:8 144:3,10 162:17 168:24 169:1,9,14 170:24 171:4 173:14 176:23 177:1,5,14, 17,20,23,25 178:8,11 181:20 184:25 185:3 187:8 195:19 196:20,22 197:3,23 198:1,6,9, 12,25

199:19,21 202:21 204:2,24 209:15,22 210:4 213:2 216:17,25 217:2 228:17,24
**want**
11:10 25:2 27:2 50:16 61:4 65:19 72:6,8 89:6 90:17 92:20 94:22 99:8 103:14 121:20 122:18,24 131:3,4 132:9 137:13 169:9,25 171:7 182:19,25 183:15 185:1 204:4 209:25 215:18 225:7
**wanted**
29:12 34:11 40:24 43:10 45:11 72:8, 18,23,24 78:18 89:15, 17,20 99:1, 4,11 103:20, 22 115:16, 18,19 116:1 117:7,10,20 118:19 119:13 125:22,25 130:23 148:17 152:13 156:4 183:1 197:8 210:12 219:17,20 220:5,7,22 222:25

223:25 224:2,9,15
**wanting**
93:7
**Washington**
60:2,14 200:9,17
**water**
45:15 148:20 151:7
**way**
18:1 24:16 28:24 62:11 81:9 91:12 95:25 104:20 110:20 111:16 121:6 127:11,17 132:2 179:5 182:3 199:23 209:16 210:13,15 218:16 222:7 227:2,9
**ways**
89:10 91:15 92:10 93:8 95:18,19 126:16 128:13 199:22 216:8
**week**
15:1,12 61:10 76:18 79:10,11,12, 13 82:5 84:3 87:24 98:14, 21,25 99:18 101:5 103:4 105:16 106:11 107:12,20 110:13 113:21 118:9 131:1 135:3 174:24 175:8 195:7

**weekends**
79:21
**weeks**
63:2,13 105:20
**went**
31:10 33:25 45:23 59:14, 16 61:11,13 69:14 70:8 84:5,14 107:20 114:16 120:3 122:14 134:21 192:22 193:9 214:23 222:22
**west**
125:24 172:22 199:7 200:1 221:5
**western**
130:22 186:21
**whatnot**
125:17
**whatsoever**
28:10
**Whichever**
53:8 188:6
**white**
33:2
**Whitfield**
104:7
**wholesale**
39:10
**whomever**
41:18
**widen**
132:7,16
**Wilcox**
155:3
**Winston**
162:17
**Wire**
161:15

**Wiregrass**
161:17
**witness**
9:7 11:2 16:13 19:10, 22 34:25 77:5 121:22 169:13 177:24 178:9 185:1 198:7 202:22 218:1 228:15
**witness'**
173:15
**woman**
43:25
**Women**
182:11 217:14,25 218:6
**wonder**
216:21
**wonderful**
105:22
**word**
60:6 151:6 171:23 215:12 218:4
**words**
159:23 222:13
**work**
20:3,20,21 26:11,12,15, 25 30:24 40:23 54:9 56:15 58:22 59:9 62:25 78:19 79:21 129:13 132:20 134:6 153:5 158:15 206:16,24
**work-wise**
62:13,18
**workable**
76:15

**worked**
23:22,24 24:11 26:15 27:16 31:7 92:11 195:3 210:20 212:15 224:23

**working**
23:17 24:18 28:6,8,13,14 29:14 30:21 38:19 52:14 57:13,17 58:24 62:22 63:2 64:12 79:25 89:12 206:10

**works**
74:1 110:20 132:23,25 169:12

**worth**
73:2

**worthy**
92:10

**writing**
153:16

**written**
43:19

**wrong**
38:22 193:8

**Y**

**y'all**
121:20 171:9

**yeah**
16:5 20:1 23:5,13 31:14 35:14, 16 38:16 39:15 42:6 43:8 48:25 56:17 61:22 72:16,19 77:12 79:19 81:13,20 82:7,21 83:21 87:7 89:3 95:23 96:11 104:14 109:18 116:5 119:2 123:7 127:6 135:8 143:18 146:11 154:7,24 157:19 162:25 172:6 173:18 180:24 182:7 188:21 189:7 190:17 192:8 194:3 205:18 214:11,13 215:11,15,22 220:13,25 226:21

**year**
51:20 171:1

**years**
13:2 18:20, 22 20:9 23:9,20 24:7,8 31:2 33:11,22,24 38:14,18 39:9 44:18 45:4,14 46:10,12,23 47:7,9 50:15 162:18 200:6 207:5 223:6 226:9

**Youth**
20:6

**Z**

**zero**
73:14 84:24 102:9 128:17 134:7 137:23,25 138:12,16, 19,25 139:1 183:6 188:11,16 190:9 194:4 197:24 198:16,21 199:3,16 200:4,8,23 201:2 202:19 203:5 205:25 215:5,20 216:10 223:9 225:10,12,15

**zoom**
42:21 68:17 69:3,4,7,9, 17,19 70:1,2 83:21 84:6, 13,15 85:8