FILED
2021 Dec-27 AM 09:36
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 3

## DAVIS RESPONSE TO DEFENDANT EXPERT REPORTS

1. Both Defendant experts dispute the importance of using "whole county" as both a unit and a concept for purposes of redistricting. In one instance, they argue that county is an historic artifact. Yet, as I pointed out in my report, individuals identify with their counties. When asked about where they live, they might first say their municipality, but that is typically followed by: "I live in "Jefferson County" or "Dallas County" or "Montgomery County." In statewide and Congressional polling, we almost always ask, "In what county do you live?"

The importance of county is evident when we focus on elections. We elect county sheriffs, county commissioners, county judges, county tax collectors, county tax assessors, county board of education members, etc. Political parties in Alabama have county chairs, and with the exception of municipal races, we organize our politics around counties. We report the results of elections using county totals and certifications. The Secretary of State's official counts for voter registration and final election results are presented by county.

It is a traditional measure, where even the Alabama ACT2021-555 plan generally uses whole counties for creating the boundaries in five of the seven districts. Only in the 6th and 7th CDs are counties significantly split.

Thomas Bryan, one of the Defendant experts, spent some time discussing "communities of interest" as another way to examine how individuals identify where they live—their

1

communities. He uses University of Michigan studies to point out that there is no set definition of what constitutes a community of interest—it could be race, it could be religion, it could be economic status, or it could be any other possible link between individuals. It need not be county. He dismisses governmental administrative units as a defining community of interest. Given Bryan's argument (which minimizes the importance of county), it would be possible to district on the basis of income. Residents with higher incomes could be in one congressional district, and those who are less affluent could be in another. In fact, to some extent that explains the history of CD6. In 2019, median household income for current CD6 was $69,072; for current CD7, it is $38,024—almost a 2 to 1 difference (U.S. Census 2019 American Community Survey). While income data are not yet readily available for the newly created 6th CD, the same pattern is likely. The west/southwest portion of Jefferson County, which is largely black—including Birmingham, Fairfield, and Bessemer—remains in the 7th CD. The more rural parts of the county that are white and have lower incomes than the rest of the county are assigned to the 7th CD. The more affluent parts of Jefferson County—Mountain Brook, Vestavia, and Hoover—remain in the 6th. The only income boost for the 7th CD may be the addition of part of Homewood, east of US31, although Homewood residents living west of US31 have higher incomes.

Tradition, unless there is some compelling reason to abandon it, should not be thought of as solely "horse and buggy." I would maintain that "tradition" is alive and well in Alabama.

2. In statewide elections held between 2012 and 2020, results using the "whole county plan"

demonstrate that the Democratic candidates would have won each in both 6th and 7th CDs. Even minor Democratic candidates who lost statewide prevailed in the 6th and 7th CDs. James Fields, a black candidate who ran for lieutenant governor in 2014, lost to Kay Ivey statewide, 63% to 37%; but Fields beat Ivey in the 6th (50.1%) and 7th (52%) CDs. He had a majority of the vote. (Note that those were the slimmest of Democratic margins of the 12 elections held.)

All the modeling in the world cannot overcome actual election results. Moreover, the Defendant concedes that the Democratic crossover vote is anywhere between 10% and 19%. That, in itself, makes the case that Democratic candidates are likely to prevail in both 6th and 7th districts.

In Tables 4 and 8 of Professor Hood's report, final votes for the enacted CD7 are used to confirm the efficacy of his calculations using vote totals, BVAP, and turnout rates. He finds that, for CD7, Democrats would have prevailed in the 2018 gubernatorial contest (Maddox vs. Ivey) with 66.9% of the vote; similarly, in the 2020 Presidential vote, Hood's estimate is 60.7% for Biden. According to Hood, the composition of the Democratic vote ranges from 78% black (2018) to 86% (2020). The white Democratic crossover vote is between 11 and 16 percent. If the Democratic candidate received no white votes, he or she would barely be over 50%. Curiously, Hood did not include an analysis for CD6.

3. Mr. Bryan devotes a section of his report to "core retention" analysis. This relates to redistricting which might dislocate individuals who make up the core of previous district

3

boundaries. I maintain that the 2011 plan did the most to violate the concept of core retention. It was/is an effort to isolate the black vote and concentrate it in the 7th CD. This same process is repeated in the enacted plan. Such concentration may have been justified in the past, but racial gerrymandering is no longer constitutional. CD7 was/is a racially gerrymandered district.

According to the 2020 census, individuals who identify as "white alone," make up 48.8% of the Jefferson County population; "black alone" constitutes 41.7%. The census adds another group—"two or more races" at 4.3%. (This excludes Asians, Native Americans, and Hawaiians/Pacific Islanders.) Presumably, some of this 4.3% is Hispanic/black and/or other blacks who identify themselves as "mixed-race." What the enacted plan does is to take 75% of the black population in Jefferson County and allocate it to the 7th CD. If that is not a disruption of the core vote of Jefferson County, what is?

4. ACT 2021-555 does nothing more than disenfranchise white Democrats. Five-Thirty-Eight analyzed the enacted plan and finds that none of the seven Alabama districts are competitive. In fact, one of the guidelines is not to put incumbents in the same district; so, in many ways the current plan is an incumbent protection plan. But more than that, white Democrats really have no voting power. In six of the seven Congressional districts, Republicans will win every time, and the lone Democrat, who is black, will also win every time.

If one of the marks of democracy is political competition, Alabama has virtually no inter-party

competition. When Alabama was a one-party Democratic state, the old adage that the "primary is tantamount to election" was a good way to understand where political competition is played out—in the primary. It is still applicable. Alabama is now a one-party Republican state, and winning the Republican primary is still "tantamount to election." However, under the Singleton whole county plan, blacks will decide not only who the Democratic nominee will be in both the 6th and 7th CDs but will also decide the winner in the general election. They will depend on the support of a small percentage of white voters to win. That will happen under the whole county plan, if past is prologue, and we have no reason to believe that it is not. Thus, blacks will have the opportunity to elect a candidate of their choice in two congressional districts, instead of just one.

SUBMITTED BY: _____ 12-20-2021
NATALIE M. DAVIS, Ph.D.