# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

**BOBBY SINGLETON et al.,**

      **Plaintiffs,**

v.

**JOHN H. MERRILL, in his official capacity as Alabama Secretary of State, et al.,**

      **Defendants.**

**Case No.: 2:21-cv-01291-AMM**

**Three-Judge Court**

## PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF THEIR RENEWED MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... ii

INTRODUCTION ................................................................................1

ARGUMENT ......................................................................................2

    I.    Undisputed Facts Establish That the Enacted Plan Is an Unconstitutional Racial Gerrymander...................................................2

           A.    The Defendants Admit That Race Predominated in the Creation of District 7 in 1992, and They Do Not Dispute That Subsequent Changes Were Inconsequential .............................3

           B.    A "Least Change" Plan Based on a Racial Gerrymander Is a Racial Gerrymander ..................................................................4

                  1.    The Plaintiffs Are Likely to Meet Their Burden of Proof That Race Predominated in the Creation of District 7 in the 2021 Plan ...................................................................4

                  2.    Reenacting a Gerrymander Does Not Eliminate the Gerrymander ..................................................................8

           C.    Recent Supreme Court Precedents Eliminate Any Argument That the Racially Gerrymandered District 7 Is Narrowly Tailored to Serve a Compelling Interest ..................................11

    II.    The *Singleton* Plaintiffs Have Never Claimed That Their Proposed Plans Are the Only Constitutional Ones, But Those Plans Do Comply with the Constitution and Alabama's Redistricting Principles ..........14

    III.    Equity Requires That Alabamians Have the Opportunity to Vote in Districts That Do Not Segregate Them by Race .................................16

    IV.    A Final Argument................................................................21

CONCLUSION ..................................................................................25

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Perez*,
   138 S. Ct. 2305 (2018)..................................................................... 8, 12, 14

*Alabama Legislative Black Caucus v. Alabama*,
   575 U.S. 254 (2015)...........................................................................23

*Am. Legion v. Am. Humanist Ass'n*,
   139 S. Ct. 2067 (2019).........................................................................5

*Baker v. Carr*, 369
   U.S. 186 (1962)..................................................................................16

*Bartlett v. Strickland*,
   556 U.S. 1 (2009)...............................................................................23

*Bush v. Vera*,
   517 U.S. 952 (1996).............................................................................8

*Cooper v. Harris*,
   137 S. Ct. 1455 (2017)................................................................. passim

*Covington v. North Carolina*,
   283 F. Supp. 3d 410 (M.D.N.C. 2018), *aff'd in relevant part and
   reversed in part on other grounds*, 138 S. Ct. 2548 (2018) ..........................10

*Dillard v. Crenshaw Cty.*,
   640 F. Supp. 1347 (M.D. Ala. 1986)..................................................... 20, 21

*Elrod v. Burns*,
   427 U.S. 347 (1976)............................................................................16

*Fayette County Ga. State Conf. of the N.A.A.C.P. v. Fayette Cty. Bd. of Com'rs*,
   118 F. Supp. 3d 1338 (N.D. Ga. 2015)..........................................................18

*Graves v. City of Montgomery*,
   807 F. Supp. 2d 1096 (M.D. Ala. 2011)........................................................17

*Harper v. Va. Bd. of Elections*,
   383 U.S. 663 (1966)............................................................................16

*Johnson v. Governor of State of Fla.*,
  405 F.3d 1214 (11th Cir. 2005) ........................................................................5

*Johnson v. Mortham*,
  926 F. Supp. 1540 (N.D. Fla. 1996) ..............................................................16

*Miller v. Johnson*,
  515 U.S. 900 (1995)....................................................................................7, 23

*North Carolina v. Covington*,
  138 S. Ct. 2548 (2018)......................................................................... passim

*Northeast Ohio Coalition for the Homeless v. Blackwell*,
  467 F.3d 999 (6th Cir. 2006) .........................................................................16

*Pennhurst State School & Hospital v. Halderman*,
  465 U.S. 89 (1984).........................................................................................15

*Personhuballah v. Alcorn*,
  155 F. Supp. 3d 552 (E.D. Va. 2016) ............................................................10

*Personnel Adm'r of Mass. v. Feeney*,
  442 U.S. 256 (1979).........................................................................................5

*Pileggi v. Aichele*,
  843 F. Supp. 2d 584 (E.D. Pa. 2012)..............................................................17

*Reynolds v. Sims*,
  377 U.S. 533 (1965).......................................................................... 17, 21, 22

*Sch. Dist. of Abington Twp., Pa. v. Schempp*,
  374 U.S. 203 (1963).........................................................................................5

*Shaw v. Reno*,
  509 U.S. 630 (1993)................................................................... 7, 12, 22, 24

*Shelby County v. Holder*,
  570 U.S. 529 (2013).......................................................................................14

*Sims v. Baggett*,
  247 F. Supp. 96 (M.D. Ala. 1965)..................................................................22

*Thornburg v. Gingles*,
    478 U.S. 30 (1986)...........................................................................................24

*Vill. of Arlington Heights v. Metro. Hous. Dev. Co.*,
    429 U.S. 252 (1977)......................................................................................5, 7

*Wesch v. Hunt*,
    785 F. Supp. 1491 (S.D. Ala. 1992),
    *aff'd sub nom. Camp v. Wesh,* 504 U.S. 902 (1992).................... 8, 19, 20, 22

## Other Authorities

David A. Bagwell, *The Mobile City Government Case*, 77 Ala. Law. 94 (2016)...24

https://www.fec.gov/data/candidate/H0AL07086/?cycle=2022&election_full=true
    &tab=spending..............................................................................................20

https://www.fec.gov/data/candidate/H8AL02171/?cycle=2022&election_full=true
    &tab=spending..............................................................................................20

https://www.fec.gov/data/elections/house/AL/05/2022/ .........................................20

James A. Gardner, *Partitioning and Rights: The Supreme Court's Accidental
    Jurisprudence of Democratic Process*, 42 Fla. St. L. Rev. 61, 67–69 (2014)
    ........................................................................................................................22

Pamela S. Karlan, 67 *The Alabama Foundations of the Law of Democracy*, Ala. L.
    Rev. 415 (2015) ............................................................................................24

## INTRODUCTION

The Defendants have narrowed the scope of this dispute through what they do not argue. They do not argue that the predominant purpose behind the design of District 7 in 1992 was anything but race (in fact, they stipulate that it was). They do not argue that the Alabama Legislature made significant changes to that district in 2001, 2011, or 2021. They do not argue that the Voting Rights Act requires the State to maintain District 7 the way it is. And they do not argue that the *Singleton* Plaintiffs' Whole County Plan or its alternatives violate the Constitution or the Voting Rights Act, or that they fail to account for Alabama's traditional redistricting principles. Thus, on the "likelihood of success on the merits" requirement for a preliminary injunction, the question is simple: can a Legislature reenact an admitted racial gerrymander without identifying any compelling interest for doing so? A host of Supreme Court opinions say "no."

In light of the Legislature's straightforward violation of Alabama voters' constitutional rights, a preliminary injunction is required. The Legislature has time to remedy the violation, and if it does not, the *Singleton* Plaintiffs' plans are ready to go. The Defendants' concern that some extra work will be required pales in comparison to the harm that will be suffered by Alabamians who must vote because they were classified by race.

## ARGUMENT

### I.  Undisputed Facts Establish That the Enacted Plan Is an Unconstitutional Racial Gerrymander.

In a case involving racial gerrymandering, a plaintiff can meet its burden of proof by showing that the shape and demographics of a district alone indicate that race was the predominant factor in the district's creation. In 1992, a racially gerrymandered District 7 was created for the predominant purpose of concentrating Black voters into a single Congressional district. This is undisputed. Since then, the Alabama Legislature has reenacted essentially the same district after every census; the Defendants do not claim that the shape or demographics of District 7 in 2021 differ from the 1992 version in any material way. Because the new District 7 is essentially the same as a district that was admittedly racially gerrymandered, it is racially gerrymandered as well.

A racial gerrymander is unconstitutional unless the defendant can prove that it was narrowly tailored to address a compelling interest. Here, the Defendants do not claim that any compelling interest justifies District 7 as it was enacted in 2021. They point out that the State may have had a compelling interest in keeping District 7 gerrymandered after previous censuses, but the force of those arguments evaporated in the decade before the 2021 plan was enacted, when the Supreme Court held in case after case that the Voting Rights Act justifies racial gerrymandering only in narrow circumstances the Defendants do not invoke here.

A.   **The Defendants Admit That Race Predominated in the Creation of District 7 in 1992, and They Do Not Dispute That Subsequent Changes Were Inconsequential.**

As the *Singleton* Plaintiffs have described, and as the Defendants have not disputed, the 1992 version of District 7 reached into Birmingham, southern Tuscaloosa County, and western Montgomery County to draw Black residents into the district, while leaving the relatively White population of Jefferson, Tuscaloosa, and Montgomery Counties in other districts. ECF No. 57 at 5. The Defendants have stipulated that these counties were split "for the predominant purpose of drawing one majority-Black district." ECF No. 47 at 3 ¶ 14. Drawing district lines with race as the predominant factor is the definition of a racial gerrymander. *Cooper v. Harris*, 137 S. Ct. 1455, 1463 (2017).

The Defendants have advanced a few reasons why they believe the 2021 plan was not a racial gerrymander, but none of them is that changes to District 7 since 1992 altered the district enough to defeat its original status as a gerrymander. The Defendants do not shy away from the striking resemblance between District 7 in 1992 and 2021. Their own brief asserts, "Both the 2001 and 2011 maps maintained the cores of districts, changing them only to equalize population. The 2011 map largely built off the 2001 map, which itself built off the 1992 map." ECF No. 67 at 12. According to the Legislature's map-drawer, the 2011 map was the starting point for the 2021 map, and District 7 was altered to increase its population. *Id.* at 14–15

3

(summarizing testimony of Randolph Hinaman). Their own expert describes the 2021 plan as a "least change approach." ECF No. 54-1 at 22. The Defendants do not claim that the blunting of the Jefferson County "finger," or any other change to District 7, was significant enough to remove District 7 from the category of "racial gerrymander."

### B. A "Least Change" Plan Based on a Racial Gerrymander Is a Racial Gerrymander.

The Defendants argue that the 2021 plan cannot be a racial gerrymander because (according to them) the Legislature relied on traditional districting principles like preserving the cores of districts and protecting incumbents, without considering race. ECF No. 67 at 29–34. Starting with a prior map and making adjustments based on population changes, they claim, is unobjectionable because it is a common practice. But the idea that a racial gerrymander ceases to be a racial gerrymander when it is reenacted squarely contradicts both *Cooper v. Harris*, 137 S. Ct. 1455 (2017), and *North Carolina v. Covington*, 138 S. Ct. 2548 (2018). It misconceives both the proof required to state a claim of racial gerrymandering, and the nature of the claim itself.

### 1. The Plaintiffs Are Likely to Meet Their Burden of Proof That Race Predominated in the Creation of District 7 in the 2021 Plan.

The Defendants maintain that a claim of racial gerrymandering turns only on a legislature's intent. ECF No. 67 at 32. Proceeding from that premise, they turn to

decisions about intent in the context of zoning,[1] sex discrimination,[2] government endorsement of religion,[3] and felon disenfranchisement.[4] They engage little, however, with how intent is proven in cases of racial gerrymandering. There, "the plaintiff may make the required showing through 'direct evidence' of legislative intent, 'circumstantial evidence of a district's shape and demographics,' or a mix of both." *Cooper v. Harris*, 137 S. Ct. at 1464. Therefore, the shape and demographics of a district alone can prove that the legislature intended to make race the predominant factor in allocating voters to districts.

In some cases, it may be difficult to determine legislative intent from the shape and demographics of a district. Here, the task is easy because the Defendants do not dispute that the shape of District 7 is driven by race. Race admittedly predominated in the district's creation in 1992, and its shape has not meaningfully changed since. If any district can justify a finding of intent through circumstantial evidence of its shape and demographics, it is one undisputedly similar to a prior iteration that the Defendant has stated in court was "a racial gerrymander." *Chestnut v. Merrill*, No.

---

[1] ECF No. 67 at 30 (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Co.*, 429 U.S. 252 (1977)).
[2] *Id.* at 40–41 (citing *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256 (1979)).
[3] *Id.* at 41 (citing *Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067 (2019), and *Sch. Dist. of Abington Twp., Pa. v. Schempp*, 374 U.S. 203 (1963)).
[4] *Id.* at 42 (citing *Johnson v. Governor of State of Fla.*, 405 F.3d 1214 (11th Cir. 2005) (en banc)).

2:18-CV-00907-KOB (N.D. Ala. Oct. 28, 2019), ECF No. 101 at 11 ("*Chestnut Br.*").[5]

While the shape and demographics of District 7 suffice to show a racial gerrymander, there is direct evidence of racial targets as well. While the map drawer, Mr. Hinaman, testified that he did not look at race until he was done with the map, he also testified that before the special session began, he examined the racial breakdown of the new districts because "[w]e wanted to see … if it changed any of the, you know, racial makeup of the districts." ECF No. 57-1 at 98:24–99:7. "We," according to Mr. Hinaman, meant himself and the counsel for the Reapportionment Committee, Dorman Walker. *Id.* at 99:11–17. The reason for wanting to examine the racial makeup of the districts, Mr. Hinaman stated, was that "one of our guidelines is to comply with the Voting Rights Act." *Id.* at 99:8–10. During the reapportionment process, Mr. Walker publicly stated (incorrectly) that the Voting Rights Act "requires the drawing of a majority-minority district." ECF No. 57-2 at 24. On November 1, 2021, the day the Alabama House passed the plan that was later enacted, Mr. Walker sent Representative Pringle, the co-chair of the Reapportionment Committee a set of talking points about the League of Women Voters Plan (which was introduced as the Singleton Whole County Plan), arguing

---

[5] While the 1992 plan was a court-ordered plan, that does not change the fact that it was gerrymandered by race. The Legislature was well aware that race drove the shape of District 7 when it reenacted similar plans in 2001, 2011, and 2021. See Part I.B.2 below.

that it was problematic because "Section 2 of the Voting Rights Act requires the Legislature to draw a majority-Black district when it's possible to do so, generally speaking," and the League of Women Voters Plan "has no majority-Black district." ECF No. 57-3 at RC 045527. In other words, when it came time to vote on a plan, the Reapportionment Committee's counsel was sharing talking points advocating for the adoption of one plan and rejection of another based on an explicit racial target of 50%-plus. Such targets are plainly unconstitutional. *Cooper v. Harris*, 137 S. Ct. at 1468–69.[6]

The Defendants erroneously contend that the *Singleton* Plaintiffs must prove that the Legislature acted with "racially *discriminatory* intent," citing *Arlington Heights v. Metropolitan Housing Authority*, 429 U.S. 252, 265 (1977). ECF No. 67 at 30 (emphasis added). They misunderstand the nature of the harm caused by racial gerrymandering in the *Shaw* jurisprudence; it is not a traditional discrimination claim. *Miller v. Johnson*, 515 U.S. 900, 911 (1995) ("*Shaw* recognized a claim analytically distinct from a vote dilution claim.") (cleaned up). The harm caused by racial gerrymandering in the *Shaw* context is not the kind of practical disadvantage

---

[6] The Defendants contend that the *Singleton* Plaintiffs have misread *Cooper v. Harris* and "attempt to invoke *Cooper* to force the State to engage in a pervasively race-based process that would dismantle District 7 and draw another new district with an explicit racial target." ECF No. 67 at 34–35. The *Singleton* Plaintiffs do not understand what this means. The portion of their brief to which the Defendants refer explains that the Legislature had no reason to believe that continuing the prior racial gerrymander was necessary to comply with the Voting Rights Act. ECF No. 57 at 18–22. The *Singleton* Plaintiffs did call for the alteration of the current District 7 to eliminate the racial gerrymander, but they never proposed an "explicit racial target" for the new district.

suffered by identifiable class of voters due to vote denial or dilution; rather, it is what the Court has labeled an "expressive harm." *Bush v. Vera*, 517 U.S. 952, 984 (1996). By reinforcing the perception that elected officials should represent primarily the members of one racial group, this expressive harm "would seem to play no favorites, but to fall on every citizen and every representative alike." *Id.* at 1053–54 (Souter, J., dissenting). So long as it continues to separate voters on the basis of race, the racial gerrymander does not diminish its expressive harm over time as might happen in the case of past discriminatory intent.[7]

### 2. Reenacting a Gerrymander Does Not Eliminate the Gerrymander.

While the Defendants urge the Court to focus exclusively on the intent of the 2021 Legislature, the Supreme Court has held that a racial gerrymandering claim does not disappear when a new legislature reenacts old lines. After finding two North Carolina State House districts to be unconstitutional racial gerrymanders, a district

---

[7] The Defendants' confusion about the intent element in the context of racial gerrymandering is made explicit in their answers to the amended complaint: "Paragraph 6 is largely unintelligible, as Plaintiffs claim to bring a claim that Alabama classified voters on the basis of race without sufficient justification, yet they say it is 'not a claim of discrimination.' *Bartlett v. Strickland* speaks for itself." ECF No. 48 at 2; ECF No. 49 at 2. Racial gerrymandering and racial discrimination are two separate causes of action in the *Singleton* Plaintiffs' amended complaint, and they seek a preliminary injunction based only on the claim of racial gerrymandering. ECF No. 15 at 38, 45 (two causes of action); ECF No. 57 ("This motion seeks preliminary relief with respect only to Count I of the Amended Complaint, i.e., racial gerrymandering."). Their confusion shines through again in their discussion of "taint" with respect to racial *discrimination* claims in *Abbott v. Perez*. ECF No. 67 at 42. The *Singleton* Plaintiffs' gerrymandering claim does not turn on whether the *Wesch v. Hunt* court was "tainted" with discriminatory intent, but whether it ordered a racial gerrymander (it did), whether the Legislature reenacted that gerrymander (it did), and whether the Voting Rights Act justifies the continued gerrymander (it doesn't).

court ordered the Legislature to draw new maps. When the Legislature did so, the defendants asserted that the new maps mooted the plaintiffs' claims. The Supreme Court stated,

> The defendants misunderstand the nature of the plaintiffs' claims. …
> [I]t is the segregation of the plaintiffs—not the legislature's line-
> drawing as such—that gives rise to their claims. … [T]hey argued in
> the District Court that some of the new districts were mere
> continuations of the old, gerrymandered districts. Because the plaintiffs
> asserted that they remained segregated on the basis of race, their claims
> remained the subject of a live dispute, and the District Court properly
> retained jurisdiction.

*North Carolina v. Covington*, 138 S. Ct. at 2552–53. Even if the 2021 Alabama Legislature had the noblest of intentions when it reenacted the 2011 racial gerrymander (which itself traces back to the 1992 racial gerrymander), that is of cold comfort to the voters who "remained segregated on the basis of race." *Id.*

Even if the Legislature did not consider race when reviewing the proposed 2021 plan (an assertion by the Defendants that is belied by map-drawer's testimony and the talking points sent from the Reapportionment Committee's counsel to its chair), that would not launder the driving purpose of the shape of District 7: to concentrate Black voters into a single district. In *North Carolina v. Covington*, it was undisputed that the legislature "instructed its map drawers not to look at race when crafting a remedial map." 138 S. Ct. at 2553. Nevertheless, the plaintiffs were entitled to relief because of "sufficient circumstantial evidence that race was the predominant factor governing the shape of those four districts." *Id.* As the *Singleton*

9

Plaintiffs have described, the circumstantial evidence that race predominated in the shape of District 7 is undisputed. Therefore, it would be immaterial if the 2021 Legislature did not consider race when perpetuating the racially gerrymandered District 7.[8]

In addition, some ostensibly race-neutral redistricting principles, such as preserving the cores of existing districts and avoiding races between incumbents, are not race-neutral when their starting point is a racially gerrymandered map. "[E]fforts to protect incumbents by seeking to preserve the 'cores' of unconstitutional districts … ha[s] the potential to embed, rather than remedy, the effects of an unconstitutional racial gerrymander …." *Covington v. North Carolina*, 283 F. Supp. 3d 410, 431 (M.D.N.C. 2018), *aff'd in relevant part and reversed in part on other grounds*, 138 S. Ct. 2548 (2018); see also *Personhuballah v. Alcorn*, 155 F. Supp. 3d 552, 561 n.8 (E.D. Va. 2016) ("In any event, maintaining district cores is the type of political consideration that must give way to the need to remedy a Shaw violation."). And that is what happened here: despite holding dozens of public hearings about

---

[8] The Defendants attempt to distinguish *North Carolina v. Covington* on the grounds that the court was reviewing a remedial plan enacted in response to a prior order holding that some districts were racially gerrymandered. ECF No. 67 at 45 n.11. *Covington*, however, is even closer to Alabama's situation than cases in which a court is evaluating a new plan. Here, the 2011 plan was undisputedly a continuation of the 1992 plan, which was undisputedly created for racial purposes and which the Secretary of State had called a racial gerrymander. The issue is not whether the Legislature had an obligation to avoid creating a majority-minority district, as the Defendants claim, but whether it had an obligation not to readopt a majority-minority district that had been created through racial gerrymandering.

redistricting, the Legislature allowed the real map-drawing process to take place in a series of closed-door meetings between the map drawer and members of Congress, who had an incentive to keep the plan largely unchanged for political reasons. When the Defendants assert that "[t]he State followed the traditional redistricting criteria of retaining the core of its existing districts" in 2021, ECF No. 67 at 1, they are saying that the Legislature embedded the effects of the racial gerrymander.

### C. Recent Supreme Court Precedents Eliminate Any Argument That the Racially Gerrymandered District 7 Is Narrowly Tailored to Serve a Compelling Interest.

For the reasons above, the 2021 plan is a racial gerrymander. But is it an *unconstitutional* racial gerrymander? It is, unless the plan can survive strict scrutiny: "The burden thus shifts to the State to prove that its race-based sorting of voters serves a compelling interest and is narrowly tailored to that end." *Cooper v. Harris*, 137 S. Ct. at 1464 (cleaned up). Here, the Defendants have put all their eggs in the "it's not a gerrymander at all" basket; they identify no compelling interest that would justify a racial gerrymander in the year 2021, much less attempt to show that the racial gerrymander is narrowly tailored. Therefore, if District 7 is a racial gerrymander, it is unconstitutional.

Although that should end the matter, the Defendants argue that that the Legislature is entitled to reenact District 7 in perpetuity—even if it is a racial gerrymander—because it *used to* serve a compelling interest: compliance with an

interpretation of the Voting Rights Act that the Supreme Court has since rejected. The Defendants are wrong.

While compliance with the Voting Rights Act has been assumed to be a compelling state interest, *id.*, Supreme Court precedent has eliminated any argument that either Section 2 or Section 5 of the Voting Rights Act continues to justify a district created for the purpose of ensuring a Black supermajority and reenacted in substantially similar form ever since. Just one year after the 1992 plan was adopted, the Supreme Court held unconstitutional North Carolina's "redistricting legislation that is so extremely irregular on its face that it rationally can be viewed only as an effort to segregate the races for purposes of voting, without regard for traditional districting principles and without sufficiently compelling justification." *Shaw v. Reno*, 509 U.S. 630, 642 (1993). Although *Shaw* cast doubt on the constitutionality of the 1992 plan, the Legislature substantially reenacted the racially gerrymandered plan, as Defendant Merrill has claimed, "in order to comply with Section 5's anti-retrogression requirement." *Chestnut Br.* at 11–12. But in 2013, the Supreme Court held that Alabama was no longer covered by Section 5. *Shelby County v. Holder*, 570 U.S. 529 (2013). The Supreme Court then held that creating a majority-minority district is not required to comply with Section 2 of the Voting Rights Act unless the defendant can show good reasons otherwise (a showing the Defendants do not attempt to make here). *Cooper v. Harris*, 138 S. Ct. at 1470–71; *Abbott v. Perez*, 138

S. Ct. at 2334–35. It also held that reenacting a previous district does not moot a constitutional challenge to that district. *North Carolina v. Covington*, 138 S. Ct. at 2552–53. By 2021, there was no plausible argument that a Legislature could rely on the Voting Rights Act to rubber-stamp the continuation of a racially gerrymandered district.

The Defendants deride the idea that the Supreme Court's elimination of their only possible compelling interests creates a "springing Fourteenth Amendment violation based on the *original* creation of that district." ECF No. 67 at 44–45. While "springing Fourteenth Amendment violation" is a clever turn of phrase, it does not quite capture the real issue here: when the Supreme Court dictates what the Fourteenth Amendment requires, are States bound to follow those requirements, even if they used to be different? The Defendants answer that question in the negative, through the following argument:

> Even if racial considerations predominated in 1992, and even if any of that intent could be imputed to the 2021 Map … , Plaintiffs have not actually argued that the 1992 Map violated the Equal Protection Clause. And indeed, it would be a tough argument to make considering that the 1992 Map was imposed by a federal court.

*Id.* at 42–43. This is an all-purpose argument for ignoring changes in binding law. Edit a few words and Alabama gets to keep its segregated schools:

> Even if racial considerations predominated in [the assignment of Black children to segregated schools prior to *Brown v. Board of Education*], and even if any of that intent could be imputed to the [continued segregation of schoolchildren], Plaintiffs have not actually argued that

13

the [segregation of schoolchildren prior to *Brown v. Board of Education*] violated the Equal Protection Clause. And indeed, it would be a tough argument to make considering that [segregation] was [allowed] by a federal court [in *Plessy v. Ferguson*].

After the Supreme Court held that Alabama was not covered by Section 5 in *Shelby County v. Holder*, that state legislatures must have a good reason to believe that a majority-minority district is required by Section 2 in *Cooper v. Harris* and *Abbott v. Perez*, and that reenactment of an unconstitutional district does not moot the unconstitutionality in *North Carolina v. Covington*, it was clear that any basis for maintaining districts based on race was gone, and that the Legislature would have to do more than rubber-stamp a "least change" plan. Maintaining those districts without even attempting to identify a compelling state interest was a choice: a choice to ignore binding Supreme Court precedent.

**II.    The *Singleton* Plaintiffs Have Never Claimed That Their Proposed Plans Are the Only Constitutional Ones, But Those Plans Do Comply with the Constitution and Alabama's Redistricting Principles.**

The Defendants argue that the *Singleton* Plaintiffs "cite no provision of Alabama law for the proposition that congressional districts *must* be drawn with whole counties." ECF No. 67 at 45. The *Singleton* Plaintiffs' position is not so absolute: two of the *Singleton* Plaintiffs' three plans make minor splits to counties to improve population equality. Moreover, the *Singleton* Plaintiffs' claim to preliminary injunctive relief is based not on Alabama law, but federal law:

14

Alabama's racial gerrymander violates the United States Constitution, this Court should provide a remedy if the Legislature does not, and the *Singleton* Plaintiffs' three plans "Are *a* Constitutional and Sensible Remedy for the Racial Gerrymander." ECF No. 57 at 27 (emphasis added). Their motion did not say that their plans were "the only" permissible remedy. Nor did the *Singleton* Plaintiffs ask the Court to order the Legislature to adopt any particular plan; instead, they asked the Court to give the Legislature a safe harbor by holding that their plans are constitutional and comply with Alabama's traditional redistricting principles. *Id.* at 27–28.[9] Only if the Legislature fails to adopt a constitutional plan do the *Singleton* Plaintiffs ask the Court to impose the Whole County Plan or one of its alternatives.

Because the *Singleton* Plaintiffs have not asked the Court to order the Legislature to do anything other than enact a plan that complies with the United States Constitution, the questions of Article III jurisdiction and Eleventh Amendment immunity the Supreme Court addressed in *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 106 (1984), are beside the point. The *Singleton* Plaintiffs' amended complaint advocates a Whole County Plan as a remedy to be

---

[9] The *Singleton* Plaintiffs explained why their plans are not racially gerrymandered and follow traditional redistricting principles, such as compactness, preserving communities of interest, and protecting incumbents and preserving the cores of existing districts (to the extent possible without perpetuating the gerrymander). ECF No. 57 at 35–40. The Defendants have not disputed any of this. The Defendants sometimes refer to "Plaintiffs'" maps as racially gerrymandered, but this is presumably limited to the *Milligan* and *Caster* Plaintiffs; the Defendants do not offer any evidence or argument that the *Singleton* Plaintiffs' plans are racially gerrymandered.

adopted by the Court, not the subject of an order aimed at the Legislature; the prayer for relief does not ask the Court to order the Legislature to do anything. ECF No. 15 at 42 ¶ 67; *id.* at 46–48. In any event, the allegations of the amended complaint are not the basis for the *Singleton* Plaintiffs' motion for a preliminary injunction; the motion rests on the evidentiary record, stipulated facts, and the arguments in its own memorandum of law. Even if snippets of the amended complaint arguably imply that the Legislature must adopt a plan that does not split counties (and the *Singleton* Plaintiffs do not concede that they do), those statements are immaterial to the motion before the Court, which makes no such claim.

### III.   Equity Requires That Alabamians Have the Opportunity to Vote in Districts That Do Not Segregate Them by Race.

The balance of equities tips strongly in favor of Plaintiffs. Deprivation of a fundamental right, such as limiting the right to vote in a manner that violates the Equal Protection Clause,[10] constitutes irreparable harm. *Johnson v. Mortham*, 926 F. Supp. 1540, 1543 (N.D. Fla. 1996) (citing *Elrod v. Burns*, 427 U.S. 347, 373–74 (1976)); *see also Northeast Ohio Coalition for the Homeless v. Blackwell*, 467 F.3d 999, 1012 (6th Cir. 2006) ("There is a strong public interest in allowing every registered voter to vote."). "[O]nce a State's legislative apportionment scheme has been found to be unconstitutional, it would be the unusual case in which a court

---

[10] *See, e.g.*, *Harper v. Va. Bd. of Elections*, 383 U.S. 663 (1966); *Baker v. Carr*, 369 U.S. 186 (1962).

would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan." *Reynolds v. Sims*, 377 U.S. 533, 585 (1965).

The Defendants' contention that "the election machinery wheels [are] in full rotation and can't be stopped" and, thus, enjoining them from using the 2021 Map would "throw the current election into chaos," is undermined in several ways. ECF No. 67 at 135, 147. First, the election has not started and, indeed, this Court has expedited this case on a schedule specifically intent on not disrupting the current election cycle or pre-election deadlines. Under the requested injunction, the State would not have to postpone any candidate qualifying dates or other pre-election deadlines. Several of the cases relied upon by the Defendants involve instances where, unlike here, the injunction sought would have the effect of delaying the election. *See, e.g., Graves v. City of Montgomery*, 807 F. Supp. 2d 1096, 1112 (M.D. Ala. 2011) (finding the election machinery wheels were in full rotation where at the time the action was filed "barely more than one working day remained under the eight-day period for candidates to qualify to run for city council, and only six weeks remained until election day."); *Pileggi v. Aichele*, 843 F. Supp. 2d 584, 596 (E.D. Pa. 2012) (noting that the requested relief would have the effect of postponing the primary election during a Presidential election year).

Second, the Defendants' argument for that there is not enough time for "the State to exercise its sovereign prerogative and craft an appropriate remedy" is

equally flawed. Although the requested injunction may "require additional efforts" on the part of the State, conducting the election using a constitutional plan—by way of either the State adopting its own constitutional plan or by adopting Plaintiffs' Whole County Plan (or one of Plaintiffs' alternative plans)—would not be "impossible or unduly burdensome" in the weeks before January 28, 2022. *See Fayette County Ga. State Conf. of the N.A.A.C.P. v. Fayette Cty. Bd. of Com'rs*, 118 F. Supp. 3d 1338, 1348 (N.D. Ga. 2015). The Legislature went into special session on October 28, 2021 and approved the 2021 plan less than a week later on November 3, 2021. Additionally, the Alabama Legislature is familiar with and has considered several plans already that do not violate the Voting Rights Act and the U.S. Constitution, including the Plaintiffs' Whole County Plan. The Legislature has had months to consider these plans, and it has been on notice for months that it might have to draw new districts, depending on the outcome of this suit. The Legislature will be in regular session beginning on January 11, 2022, providing adequate time to implement a constitutional plan well in advance of January 28, 2022.

Even if the Alabama Legislature did not have enough time to implement a new map, a position the *Singleton* Plaintiffs reject, that would still not prevent the Court from implementing an interim plan that did not violate the U.S. Constitution.

18

In *Wesch v. Hunt*,[11] Alabama's congressional primaries were set to be held June 2, 1992, while the qualifying deadline for candidates was sixty days prior to the primary, or April 3, 1992. *Id*. Because the *Wesch* Court was "bound by the Constitution not to permit . . . elections under the existing districts,"[12] the Court adopted a redistricting plan "to be used in the conduct of congressional elections for the State of Alabama in the event the Alabama Legislature fail[ed] to have precleared a redistricting plan in time for the conduct of those elections without delay under applicable state and federal laws." *Id.* at 1499. Similarly, this Court is well within its bounds to issue an interim plan—by adopting the *Singleton* Plaintiffs' Whole County Plan or one of Plaintiffs' alternative plans—that may be used for the 2022 election cycle in the event that the Alabama Legislature is unable to select a plan that complies with the Voting Rights Act and the United States Constitution.

The Defendants further argue that the requested injunction is inequitable by stating that certain officials, specifically Barry Moore and Terri Sewell, have expended significant resources, which would prove wasted if some of their voters were moved to a different district. ECF No. 67 at 138–39. However, the only time and resources potentially affected would be those expended after November 3, 2021,

---

[11] 785 F. Supp. 1491, 1494 (S.D. Ala.), *aff'd sub nom. Camp v. Wesch*, 504 U.S. 902, 112 S. Ct. 1926, 118 L. Ed. 2d 535 (1992), and *aff'd sub nom. Figures v. Hunt*, 507 U.S. 901, 113 S. Ct. 1233, 122 L. Ed. 2d 640 (1993)
[12] *Id*. at 1497.

when the 2021 plan was approved. During that time, all officials and candidates were on notice of the legal challenges to the constitutionality of the 2021 plan. *See* ECF No. 15 (amended complaint filed Nov. 4, 2021). Further, the disbursement spending figures cited by the Defendants pre-date the special session,[13] and thus would have been spent regardless of what plan the Legislature adopted.

Finally, the Defendants' contention that the requested injunction would be burdensome on county administrators to update voter registrations does not tilt the balance of equities in their favor. "[T]he administrative burden on the [on the State] cannot begin to compare with the further subjection of the [State's] black citizens to denial of their right, to full and equal political participation." *Dillard v. Crenshaw Cty.*, 640 F. Supp. 1347, 1363 (M.D. Ala. 1986). In *Wesch v. Hunt*, the court radically altered existing districts less than three months before the primary election. As of today, the 2022 primary election is just under five months away, and many counties can update their voter registration files electronically. While complying with the Constitution may take some work on the State's part, there is no evidence that it will throw the election into chaos.

---

[13] The information the Defendants cite from the Federal Election Commission website only covers disbursements made through September 30, 2021. *See, e.g.,* https://www.fec.gov/data/elections/house/AL/05/2022/ (For District 5 candidates); https://www.fec.gov/data/candidate/H0AL07086/?cycle=2022&election_full=true&tab=spending (For Terri Sewell); https://www.fec.gov/data/candidate/H8AL02171/?cycle=2022&election_full=true&tab=spending (For Barry Moore).

As the United States Supreme Court has stated, "it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan." *Reynolds*, 377 U.S. at 585. Thus, in the "usual" case, a preliminary injunction will issue to enjoin an invalid elections system where, as here, the State's election machinery is not "already in gear." The general election is over eleven months away. The primary election is not until May 24, 2022. Neither of these deadlines are in any jeopardy of being delayed by the requested injunction. The only imminent deadline is January 28, 2022, which is the deadline for candidates to declare their candidacy. Due to this Court's expeditious scheduling with the upcoming deadlines in mind, that deadline is also not in jeopardy, especially considering the Alabama Legislature approved the 2021 plan in less than a week, and they will be in session in the weeks prior to the deadline, providing adequate time to approve a race-neutral plan weeks in advance of January 28, 2022. The only hardship the State would suffer under the requested injunction is that the relief would "require additional efforts" of the State, while Plaintiffs, and Black Alabamians, stand to suffer denial of their right to full and equal political participation. *See Dillard*, 640 F. Supp. at 1363.

## IV.    A Final Argument

For generations, Alabama drew its Congressional districts with whole counties. As professor James Gardner has shown, most other states did so as well,

because the purpose of districts was to represent local political communities.[14] Chief Justice Warren's majority opinion in *Reynolds v. Sims* stated that the whole-county requirements in the Alabama Constitution for reapportioning state legislative districts still applied and should give way only as necessary to achieve substantial population equality. 377 U.S. 533, 580–81 (1964). On remand from the Supreme Court, the three-judge court led by Judge Frank Johnson reemphasized the importance of whole counties, pointing to their constraint on gerrymandering. *Sims v. Baggett*, 247 F. Supp. 96, 100–01 (M.D. Ala. 1965). The three-judge court in *Wesch v. Hunt* acknowledged the anti-gerrymandering purpose of whole counties in Congressional redistricting as well. 785 F. Supp. 1491, 1498 (S.D. Ala. 1992).

Alabama continued to keep counties whole in Congressional districts, splitting only Jefferson, the one county too populous for an ideal district, until 1992 when *Wesch* approved cutting many county lines for the sole purpose of producing a supermajority Black District 7 to comply with what the parties stipulated the Voting Rights Act required. A year later, *Shaw v. Reno* announced Fourteenth Amendment principles that called into question the *Wesch* racial gerrymander. 509 U.S. 630 (1993) Nevertheless, the State of Alabama invoked Section 5 of the Voting Rights Act to perpetuate the *Wesch* gerrymander when Congressional districts were

---

[14] James A. Gardner, *Partitioning and Rights: The Supreme Court's Accidental Jurisprudence of Democratic Process*, 42 Fla. St. L. Rev. 61, 67–69 (2014).

redrawn after the 2000 and 2010 censuses.

The Defendants' expert Tom Bryan wrongly accuses the *Singleton* Plaintiffs of advocating a "bright line" whole-county rule. ECF No. 54-1 at 6–7. Whole counties are relevant to Congressional redistricting only to the extent they are the most important "traditional districting principle" the *Shaw* cases require this Court to consider when determining whether there is unconstitutional racial gerrymandering. *Miller v. Johnson*, 515 U.S. 900, 916 (1995). But other bright lines have been sought after for years by Alabama's redistricters. The Supreme Court in *Alabama Legislative Black Caucus v. Alabama* held that the State's map-drawers erroneously thought that Section 5 of the VRA had a bright-line requirement to maintain the size of black majorities in its House and Senate districts.[15] Now that Alabama is no longer bound by Section 5, it has erroneously adopted a bright-line, majority-black rule for complying with Section 2 of the VRA.

Some legislatures thought they found a bright line in *Bartlett v. Strickland*, which held that Section 2 plaintiffs must prove there are available compact districts with Black voter majorities. 556 U.S. 1 (2009). The *Bartlett* majority acknowledged that the statutory language of Section 2 does not demand a majority, and it frankly

---

[15] 575 U.S. 254, 275 (2015) ("Section 5, which covered particular States and certain other jurisdictions, does not require a covered jurisdiction to maintain a particular numerical minority percentage. It requires the jurisdiction to maintain a minority's ability to elect a preferred candidate of choice. That is precisely what the language of the statute says.").

conceded it was driven by the felt need for a "workable standard[]." *Id.* at 17. It located this bright-line standard in Justice Brennan's majority opinion in *Thornburg v. Gingles*, which says the minority group must "constitute a majority" to satisfy the first of the three *Gingles* factors. *Id.* at 11 (quoting *Gingles*, 478 U.S. 30, 50–51 (1986)). In one of the accidents of history, Justice Brennan was quoting a law review article by two of the lawyers who represented the plaintiffs in *City of Mobile v. Bolden*. 478 U.S. at 50 n.17 (quoting James Blacksher and Larry Menefee, *From Reynolds v. Sims to City of Mobile v. Bolden*, 34 Hastings L.J. 1, 55–56 (1982)). The article proposed a judicially manageable standard for a Fourteenth Amendment challenge to at-large elections that did not require proof of intentional discrimination, and it specified Black majorities. *Gingles* inserted that proposed constitutional standard into the Voting Rights Act.[16]

The *Bartlett* majority acknowledged its bright-line majority requirement was bumping up against the Court's *Shaw* jurisprudence: "Our holding also should not be interpreted to entrench majority-minority districts by statutory command, for that, too, could pose constitutional concerns." 556 U.S. at 23–24. It was left for Justice Kagan in *Cooper v. Harris* to explain the distinction between the Black voting-majority standard Section 2 plaintiffs must satisfy and the standards the State must

---

[16] *See* Pamela S. Karlan, *The Alabama Foundations of the Law of Democracy*, Ala. L. Rev. 415, 429-30 (2015); David A. Bagwell, *The Mobile City Government Case*, 77 Ala. Law. 94, 103 (2016).

meet to justify a racial gerrymander in the name of complying with the Voting Rights Act. 137 S. Ct. at 1472. The latter standards, which Defendants must satisfy here, demand they demonstrate that perpetuating the 1992 racial gerrymander is necessary to provide Black voters an effective opportunity to elect candidates of their choice. But, when the *Singleton* plaintiffs filed their complaint and presented the State with evidence that eliminating the gerrymander would actually increase the number of opportunity districts, even though they lacked Black voter majorities, the drafters and their state-appointed counsel claimed to be bound by the majority-black requirement *Bartlett* placed on Section 2 plaintiffs. Thus Plaintiffs' appeal to the Legislature fell on deaf ears. Their only recourse is to seek enforcement of the Supreme Court's latest redistricting standards in this Court.

## CONCLUSION

The *Singleton* Plaintiffs' motion for a preliminary injunction should be granted.

Dated: December 27, 2021                Respectfully submitted,

                                        */s/ James Uriah Blacksher*
                                        James Uriah Blacksher
                                        825 Linwood Road
                                        Birmingham, AL 35222
                                        Tel: (205) 612-3752
                                        Fax: (866) 845-4395
                                        Email: jublacksher@gmail.com


                                        */s/* Joe *R. Whatley, Jr.*
                                        Joe R. Whatley, Jr.

W. Tucker Brown
WHATLEY KALLAS, LLP
2001 Park Place North
1000 Park Place Tower
Birmingham, AL 35203
Tel: (205) 488-1200
Fax: (800) 922-4851
Email: jwhatley@whatleykallas.com
          tbrown@whatleykallas.com

*/s/ Henry C. Quillen*
Henry C. Quillen
(admitted *pro hac vice*)
WHATLEY KALLAS, LLP
159 Middle Street, Suite 2C
Portsmouth, NH 03801
Tel: (603) 294-1591
Fax: (800) 922-4851
Email: hquillen@whatleykallas.com

*/s/ Myron Cordell Penn*
Myron Cordell Penn
PENN & SEABORN, LLC
1971 Berry Chase Place
Montgomery, AL 36117
Tel: (334) 219-9771
Email: myronpenn28@hotmail.com

*/s/ Diandra "Fu" Debrosse Zimmmermann*
Diandra "Fu" Debrosse Zimmermann
Eli Hare
DICELLO LEVITT GUTZLER
420 20th Street North, Suite 2525
Birmingham, AL 35203
Tel.: (205) 855.5700
Email: fu@dicellolevitt.com
          ehare@dicellolevitt.com

*Counsel for Plaintiffs*

26