FILED
2022 Jan-14 PM 10:18
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

**BOBBY SINGLETON et al.,**

      **Plaintiffs,**

v.

      **Case No.: 2:21-cv-01291-AMM**

**JOHN H. MERRILL, in his official capacity as Alabama Secretary of State, et al.,**

      **Three-Judge Court**

      **Defendants.**

## *SINGLETON* PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

The *Singleton* Plaintiffs propose the following findings of fact and conclusions of law.

## PROPOSED FINDINGS OF FACT

### The Plaintiffs

Plaintiffs Rodger Smitherman and Eddie Billingsley are Black registered voters who reside in Jefferson County and within the boundaries of Congressional District 7 in both the 2011 and 2021 enacted plans.

- Ex. S1 (Stipulations of Fact) ¶ 24.

Plaintiff Leonette W. Slay is a White registered voter who resides in Jefferson County and within the boundaries of Congressional District 6 in both the 2011 and 2021 enacted plans.

- Ex. S1 (Stipulations of Fact) ¶ 25.

Plaintiff Bobby Singleton is a Black registered voter who resides in Hale County and within the boundaries of Congressional District 7 in both the 2011 and 2021 enacted plans.

- Ex. S1 (Stipulations of Fact) ¶ 26.

Plaintiffs Darryl Andrews and Andrew Walker are Black registered voters who reside in Montgomery County and within the boundaries of Congressional District 2 in both the 2011 and 2021 enacted plans.

- Ex. S1 (Stipulations of Fact) ¶ 27.

**History of Districting in Alabama**

From 1822 until 1965, Alabama drew its Congressional districts with whole counties.

- Ex. S1 (Stipulations of Fact) ¶ 1.

In 1961, the Alabama Legislature passed a bill that divided Jefferson County among four Congressional Districts.

- Ex. S1 (Stipulations of Fact) ¶ 2.

Governor John Patterson vetoed this bill, saying it would "divest the citizens of that county of direct representation in Congress, is ... unthinkable, unwise, above all wrong, and therefore unconstitutional."

- Ex. S1 (Stipulations of Fact) ¶ 3.

In March 1964, a three-judge panel held that Alabama's nine-district scheme for primary elections violated Article I, § 2 of the U.S. Constitution and the Equal Protection Clause in the Fourteenth Amendment.

- Ex. S1 (Stipulations of Fact) ¶ 5.
- *Moore v. Moore*, 229 F. Supp. 435 (S.D. Ala. 1964) (three-judge court).

The Moore court gave the Legislature two years to enact a constitutional redistricting plan.

- Ex. S1 (Stipulations of Fact) ¶ 6.
- *Moore v. Moore*, 229 F. Supp. 435 (S.D. Ala. 1964) (three-judge court).

In August 1964, the Legislature considered a plan that kept all Alabama counties whole, including Jefferson County, even though at 634,864 in the 1960 census, the county's population exceeded the ideal population of the eight Congressional districts at that time, which was 409,250.

- Ex. S1 (Stipulations of Fact) ¶ 7.

Attorney General Richmond Flowers warned that such a large population deviation would not survive federal court scrutiny.

- Ex. S1 (Stipulations of Fact) ¶ 8.

In the 1965 regular session, the Legislature enacted a plan that split Jefferson County among three Congressional Districts.

- Ex. S1 (Stipulations of Fact) ¶ 9.

The *Moore* court declared the plan constitutionally valid, even though it had a maximum population deviation of 13.3%. The Court found it "obvious that [Jefferson County] must be divided between at least two Congressional Districts."

- Ex. S1 (Stipulations of Fact) ¶ 10.
- *Moore v. Moore*, 246 F. Supp. 578, 580–81 (S.D. Ala. 1965) (three-judge court).

Jefferson County was the only county split in the 1965 plan and in the post-1970 census plan.

- Ex. S1 (Stipulations of Fact) ¶ 11.

The post-1970 census plan split Jefferson County among three Districts. The maximum deviation under this plan was 0.8%.

- Ex. S1 (Stipulations of Fact) ¶ 12.

Only Jefferson County and St. Clair County were split in the post-1980 census plan. The ideal size of a district was 556,270, smaller than Jefferson County's population, which was 671,371 in the 1980 census. The maximum deviation among the seven districts was 2.59%.

- Ex. S1 (Stipulations of Fact) ¶ 13.

**The 1992 Plan**

In 1992, seven counties were split for the predominant purpose of drawing one majority-black District.

- Ex. S1 (Stipulations of Fact) ¶ 14.
- *Wesch v. Hunt*, 785 F. Supp. 1491 (S.D. Ala. 1992) (three-judge court), *aff'd sub nom. Camp v. Wesch*, 504 U.S. 902 (1992), *Figures v. Hunt*, 507 U.S. 901 (1993).

Before 1992, the Alabama Legislature had never published any redistricting principles that included a specific maximum population deviation for Congressional districts.

- Ex. S1 (Stipulations of Fact) ¶ 15.

**The 2001 and 2011 Plans**

In the 2000 census, Jefferson County's population rose to 662,285, which was still larger than the size of an ideal Congressional district (635,299). The post-2000 census plan split Jefferson County and seven other counties, maintaining zero population deviation.

- Ex. S1 (Stipulations of Fact) ¶ 16.

In the 2010 census, Jefferson County's population, 658,158, fell below the ideal size of Congressional districts (682,819), making splitting an Alabama county no longer mathematically necessary.

- Ex. S1 (Stipulations of Fact) ¶ 17.

In 2011, the Legislature passed a plan that continued to split Jefferson County. The 2011 plan had zero population deviation.

- Ex. S1 (Stipulations of Fact) ¶ 18.

Both the 2001 and 2011 maps maintained the cores of districts, changing them only to equalize population. The 2011 map largely built off the 2001 map, which itself built off the 1992 map.

- ECF No. 67 (Defendant's Response in Opposition to Plaintiffs' Motions for Preliminary Injunction) at 12 ("Both the 2001 and 2011 maps maintained the cores of districts, changing them only to equalize population. The 2011 map largely built off the 2001 map, which itself

5

built off the 1992 map.").

A goal in drafting the 2011 map was to make sure that District 7 remained a majority-Black district, and the map's drafter, Randolph Hinaman, achieved that goal through race-conscious line-drawing.

- Ex. M11 (Hinaman Tr.) at 43:4–11 ("Q. … Was it a goal in drafting the 2011 congressional map to make sure that District 7 remained a majority black district? A. Yeah. Obviously, Congresswoman Sewell was one of my – one of my clients for that map. And she wanted to maintain her majority black district, yes.").

- *Id.* at 45:20–46:5 ("A. … But preserving Congresswoman Sewell's majority black district was a priority for the delegation. Q. And that was the priority for you, as well? A. Yes.").

- *Id.* at 44:13–15 ("Q. Were you successful in making sure that District 7 remained a majority black district? A. We were.").

- *Id.* at 44:16–23 ("Q. How did you make sure of that? A. … But by what we added county and precinct-wise to make sure it did not dramatically alter the makeup of the district.").

- *Id.* at 44:24–45:12 ("Q. Explain that to me a little bit further. So what changes were you making in 2011? A. … And so then the discussion with Congresswoman Sewell would be, you know, where – what areas

would we add to your district to get your district to ideal population. And, obviously, in looking at those areas, we, you know, wanted to make sure that we preserved the majority black district.").

**The 2021 Plan**

In May 2021, the Legislature's Reapportionment Committee adopted a set of "Redistricting Guidelines." The very first guideline is that districts must comply with the United States Constitution. For Congressional districts, "minimal population deviation" and compliance with Section 2 of the Voting Rights Act were considered mandatory. Other guidelines were to be observed "to the extent that they do not violate or subordinate the foregoing policies prescribed by the Constitution and laws of the United States and of the State of Alabama." These included avoiding contests between incumbents, respecting communities of interest,[1] minimizing the number of counties in each district, and preserving the cores of existing districts. Thus, if there is a conflict between the Equal Protection Clause of the United States Constitution and other goals such as protecting incumbents and preserving the cores of districts, the Equal Protection Clause must be remedied at the expense of those goals.

---

[1] "A community of interest is defined as an area with recognized similarities of interests, including but not limited to ethnic, racial, economic, tribal, social, geographic, or historical identities. The term communities of interest may, in certain circumstances, include political subdivisions such as **counties**, voting precincts, **municipalities**, tribal lands and reservations, or school districts." (emphasis added). Ex. M28 (2021 Redistricting Guidelines) at 2–3.

- Ex. M28 (2021 Redistricting Guidelines) at 1–3.

Mr. Hinaman, who had drafted the 2011 plan, was retained to draw the 2021 plan. He was retained not by the State of Alabama, but by a private organization called Citizens for Fair Representation or Alabamians for Fair Representation (Mr. Hinaman could not recall the exact name).

- Ex. M11 (Hinaman Tr.) at 52:25–53:6.

Although Mr. Hinaman was provided with the Redistricting Guidelines, no member of the Legislature had any substantive involvement with the creation of the 2021 map. Mr. Hinaman provided updates to the Chairs of the Reapportionment Committee, but they gave him no feedback.

- Ex. M11 (Hinaman Tr.) at 86:13–87:17.

- Ex. M12 (Pringle Tr.) at 32:11–19 (testifying that he worked with other members of the Alabama House on their districts, but he left congressional districts to Mr. Hinaman).

- *Id.* at 88:7–12 (testifying that he did not know if public input influenced the congressional plan because "that map was drawn by Mr. Hinaman and in conjunction with the members of congress").

- Ex. M13 (McClendon Tr.) at 70:5–7 ("[A]s far as the congressional districts go, I can't give you a single example because I simply wasn't involved in that process.").

8

Mr. Hinaman "'used [the] 2011 congressional map'—or, 'the cores of the existing districts'—as his 'starting point in drafting the 2021 congressional map.'"

- ECF No. 67 (Defendant's Response in Opposition to Plaintiffs' Motions for Preliminary Injunction) at 14 (quoting Hinaman deposition testimony).

Mr. Hinaman met with Alabama's U.S. House members or their staffs to discuss the 2021 map. He informed them how much population each district would need to gain or lose to achieve population equality. He discussed their requests for changes to the shape of their districts, and he generally attempted to accommodate these requests.

- Ex. M11 (Hinaman Tr.) at 68:14–73:19, 84:1–85:18, 102:23–105:7.

Mr. Hinaman did not attempt to remedy the racial gerrymander of District 7. He did blunt the "finger" that extends into Jefferson County and add new precincts in Homewood southwestern Jefferson County, but he testified that he did so in the interest of making the district more compact.

- Ex. M11 (Hinaman Tr.) at 132:2–19.

Mr. Hinaman did not substantially alter the race-based splits of Tuscaloosa County (between Districts 4 and 7) or Montgomery County (between Districts 2 and 7).

- *Compare* Ex. M21 (2011 Plan) *with* Ex. M22 (2021 Plan).

- Ex. M11 (Hinaman Tr.) at 127:4–22 (changes to District 5 required District 4 to lose "a few precincts in Tuscaloosa").

- *Id.* at 123:24–125:14 (Maxwell Air Force Base in Montgomery County was moved from District 2 to District 7).

Compared to the 2011 plan, the 2021 map represents a "least change approach." About 90% of the total population and 90% of the Black population of the 2011 version of District 7 remained there in 2021.

- ECF No. 67 (Defendant's Response in Opposition to Plaintiffs' Motions for Preliminary Injunction) at 63 (the 2011 and 2021 plans show "extraordinary similarity," and the "Legislature and map-drawer [were] interest in effecting the least changes possible").

- Ex. D1 (Bryan *Singleton* Report) at 22.

- Hearing Tr. (Volume IV) (Bryan) at 779:18–22 ("And what I see in this plan is that it largely represents what I would call a least-changes plan. There are no wholesale significant changes in the geography except what appears to be necessary in order to achieve one person one vote balance population requirements.").

After drafting his map, Mr. Hinaman reviewed the racial makeup of its districts. He assumed that if District 7 had a Black Voting Age Population of less than 50%, he and the Reapportionment Committee's counsel would have looked for

a basis to add Black people to the district.

- Ex. M11 (Hinaman Tr.) at 195:9–196:5.

Representative Sewell told Mr. Hinaman that she would prefer to have a majority-Black district. After drawing his map, Mr. Hinaman reported to Representative Sewell that District 7 had a Black Voting Age Population of 54.22%.[2]

- Ex. M11 (Hinaman Tr.) at 118:4–119:22.

District 7 in HB1, which was enacted as Act 2021-555, (the "2021 plan") retains all or part of the same fourteen counties contained in District 7 in the 2011 plan, including the majority-Black rural counties, Sumter, Greene, Hale, Perry, Marengo, Dallas, Wilcox, and Lowndes.

- Ex. S1 (Stipulations of Fact) ¶ 19.

303,168 people, or 74.0% of the 409,643 Black population in District 7 in the 2021 plan, come from three counties that were split in the 1992 and 2011 plans: Jefferson, Tuscaloosa, and Montgomery.

- Ex. S1 (Stipulations of Fact) ¶ 20.[3]

---

[2] Representative Sewell's statement is not offered to prove the truth of the matter asserted, i.e., that she preferred to have a majority-Black district. It is offered only to show its effect on Mr. Hinaman, who testified that he attempted to accommodate the preferences of the Congressional delegation. *United States v. Rivera*, 780 F.3d 1084, 1092 (11th Cir. 2015) (statements "offered only to show their effect on the listener" are not hearsay).

[3] The Defendants stipulated that these figures are correct if "Black" means "Black alone or in combination with other races, including Hispanic." The Defendants did not stipulate that this

Of the 294,027 people in the part of Jefferson County in District 7 in the 2021 plan, 62.8% are Black. Of the 380,694 people in the rest of Jefferson County, all of which is assigned to District 6, 27.6% are Black.

- Ex. S1 (Stipulations of Fact) ¶ 21.

Of the 184,266 people in the part of Tuscaloosa County in District 7 in the 2021 plan, 37.0% are Black. Of the 42,770 people in the rest of Tuscaloosa County, all of which is assigned to District 4, 8.3% are Black.

- Ex. S1 (Stipulations of Fact) ¶ 22.

Of the 65,519 people in the part of Montgomery County in District 7 in the 2021 plan, 80.7% are Black. Of the 166,435 people in the rest of Montgomery County, all of which is assigned to District 2, 50.2% are Black.

- Ex. S1 (Stipulations of Fact) ¶ 23.

**The Singleton Plans**

Before the Legislature voted on a districting plan, James Blacksher (counsel for the *Singleton* plaintiffs) and Louis Hines (of the Center for Leadership and Public Policy at Alabama State University) submitted three alternative plans. The first kept counties whole and had a maximum population deviation of 2.47% (the "Whole County Plan"). The second followed the Whole County Plan but made splits in three

definition of "Black" is appropriate or the one that the Court should consider. Ex. S1 (Stipulations of Fact) ¶ 20 n.3.

counties to reduce the maximum population deviation to 0.69% (the "Narrow Deviation Plan"). The third followed the Whole County plan but made splits in six counties to reduce the population deviation to zero (the "Zero Deviation Plan"). These plans were introduced in the Legislature by Senator Bobby Singleton.

- Ex. S70 (Stipulations of Fact) (available at ECF No. 70) ¶¶ 9–10, 12–14.

- Ex. D124 (Political Subdivision Splits Between Districts) (Narrow Deviation Plan).

- Ex. D134 (Political Subdivision Splits Between Districts) (Zero Deviation Plan).

When the Whole County Plan was first drafted, before 2020 census data became available, the only instructions to the map drawer were to keep counties whole and to attempt to keep the Black Belt communities together.

- Ex. S45 (Draft Whole County Plan)

- Ex. S70 (Stipulations of Fact) (available at ECF No. 70) ¶¶ 2–3.

The Black Belt, named for the color of its soil, is well recognized as a community of interest.

- *Milligan v. Merrill*, ECF No. 53 (Joint Stipulated Facts for Preliminary Injunction Proceedings) ¶¶ 60–61 (explaining the origin of the term "Black Belt" and listing the counties of the Black Belt).

13

- Hearing Tr. (Volume VII) (Byrne) at 1705:1–5 ("Q. And the Black Belt is generally an area whose counties are generally majority black, right? A. It's actually called the Black Belt because of the soil. The soil is dark and rich there, so it's not called the Black Belt [because] of race or ethnicity.").

- Hearing Tr. (Volume VII) (LaCour) at 1875:7–1876:7 ("I would not dispute" that the Black Belt is a community of interest.).

After 2020 census data became available, the draft Whole County Plan was changed to lower the maximum deviation from above 5% to 2.47% by swapping counties in the northern part of the state. The districts ultimately numbered Districts 6 and 7 in the Whole County Plan were unaffected.

- Ex. S45 (Draft Whole County Plan).

- Ex. S22 (Whole County Plan).

- Ex. S70 (Stipulations of Fact) (available at ECF No. 70) ¶ 9.

- Ex. S70 (Stipulations of Fact) (available at ECF No. 70) ¶¶ 2–3.

The Defendants' expert Thomas Bryan agreed that the Whole County Plan has the smallest possible population deviation for a plan that keeps counties whole and "still make[s] some kind of districting sense for Alabama." It is possible to draw maps with smaller deviations without splitting counties, but they are "ridiculous looking" and "will all virtually fail if you hold them to any other criteria."

- Hearing Tr. (Volume IV) (Bryan) at 1086:20–1087:1, 1089:15–21, 1093:4–12.

The *Milligan* Plaintiffs' expert Moon Duchin testified that achieving zero deviation in Alabama requires splitting at least six counties (unless a county is split among more than two districts). The *Singleton* Zero Deviation Plan therefore splits the minimum number of counties to achieve zero deviation.

- Hearing Tr. (Volume III) (Duchin) at 626:10–627:8.

Counties are integral to the civic life of Alabama. Elections are administered at the county level, and the Secretary of State reports results at the county level as well. Alabamians elect county sheriffs, county commissioners, county judges, county tax collectors, county tax assessors, and county boards of education. Political parties organize at the county level. Counties cluster individuals around a sense of community, and ordinary citizens identify themselves by the county in which they reside.

- Ex. S3 (Davis Rebuttal Report) at 1–2.

- Hearing Tr. (Volume I) (Davis) at 79:21–81:16.

According to the Defendants' witness former Representative Bradley Byrne, for purposes of representation in Congress, it is better for a county not to be split across districts.

- Hearing Tr. (Volume VII) (Byrne) at 1742:10–1743:4 ("I think it's

15

better for a county to have one congressman and not to be split up.").

- *Id.* at 1743:5–1744:5 (testifying that it would be better not to split Tuscaloosa and Montgomery Counties; "You start splitting counties like that, and that county loses its influence.").

Reuniting Jefferson County in particular is important because it gives Black Jefferson County voters, who are currently packed into the Seventh District, greater control over issues affecting Jefferson County. "It brings the folks who live in Jefferson County together for political and for cultural purposes."

- Hearing Tr. (Volume I) (Davis) at 88:6–13.

The Defendants' expert Thomas Bryan testified that keeping counties whole limits the opportunity to perform racial gerrymandering.

- Hearing Tr. (Volume IV) (Bryan) at 1095:7–1096:1.

In Alabama elections, the candidate of choice for Black voters in a general election is the Democrat. Experts in this case estimated the share of Black voters who vote for the Democratic candidate at approximately 92% (Bryan), 93%–96% (Liu), and 97%–99% (Hood).

- Hearing Tr. (Volume IV) (Bryan) at 1079:19–25.

- Ex. M4 (Liu Report) at 9.

- Ex. D5 (Hood Report) at 4–11.

In the Plaintiffs' Whole County Plan, the following Democratic candidates

received more votes than their opponent in the general election in the counties in

Districts 6 and 7:

| Year | Office | Candidate |
|------|--------|-----------|
| 2012 | President | Barack Obama |
| 2014 | Governor | Parker Griffith |
| 2014 | Lieutenant Governor | James Fields |
| 2014 | Auditor | Miranda Joseph |
| 2016 | President | Hillary Clinton |
| 2016 | U.S. Senate | Ron Crumpton |
| 2017 | U.S. Senate | Doug Jones |
| 2018 | Governor | Walt Maddox |
| 2018 | Lieutenant Governor | Will Boyd |
| 2018 | Auditor | Miranda Joseph |
| 2020 | President | Joe Biden |
| 2020 | U.S. Senate | Doug Jones |

- Ex. S1 (Stipulations of Fact) ¶ 28.

The Defendants' expert M.V. Hood created a model to estimate how Districts

6 and 7 in the Whole County Plan would have performed in the 2018 gubernatorial

election and the 2020 presidential election. In both districts in both races, the

candidate of choice for Black voters, who was the Democrat in both races, received

more votes than the Republican candidate. Dr. Hood did not analyze the results of

any primary elections in Districts 6 and 7, but he acknowledged that his analysis of

general election results showed that Black Democratic voters outnumbered White

Democratic voters by margins of more than two to one (at a minimum) and more

than eight to one (as a maximum).

- Ex. D5 (Hood Report) at 8, 9, 11, 12.

17

- Hearing Tr. (Volume VI) (Hood) at 1491:16–1493:3.

Dr. Hood estimated the results for elections that had already happened and for which actual results were readily available. For each of the elections he modeled for Districts 6 and 7 in the Whole County Plan, he underestimated the Democratic candidate's actual performance, despite finding that the Democratic candidate would have prevailed every time.

- *Compare* Ex. D5 (Hood Report) at 13 (modeled results) *with* Ex. S2 (Davis Report) at ECF Pages 26–27 (actual results).

In the 2010 election for District 7 Representative, Democratic candidate Terri Sewell received 136,696 votes (72.4%), Republican candidate Don Chamberlain received 51,890 votes (27.5%), and write-in candidates received 138 votes (<0.1%). According to Alabama's preclearance submission to the Department of Justice in 2011, the Black population of District 7, using 2010 census figures, was 62.83% of the total population of the district, and the Black Voting Age Population was 59.75% of the Voting Age Population.

- Ex. S1 (Stipulations of Fact) ¶ 29.

In the 2012 election for District 7 Representative, Democratic candidate Terri Sewell received 232,520 votes (75.8%), Republican candidate Don Chamberlain received 73,835 votes (24.1%), and write-in candidates received 203 votes (<0.1%). According to Alabama's preclearance submission to the Department of Justice in

2011, the Black population of District 7, using 2010 census figures, was 63.57% of the total population of the district, and the Black Voting Age Population was 60.55% of the Voting Age Population.

- Ex. S1 (Stipulations of Fact) ¶ 30.

The Defendants' expert Thomas Bryan agreed that any district including all of Jefferson County would be a "Democratic performing district."

- Hearing Tr. (Volume IV) (Bryan) at 1085:13–20.

The Plaintiffs' expert Natalie Davis expressed confidence that Black voters will choose the Democratic nominee in Districts 6 and 7 in the Whole County Plan, and that there is enough White crossover voting to give Black voters the opportunity to elect the candidate of their choice in the general election.

- Hearing Tr. (Volume I) (Davis) at 85:25–87:3.

Senator Singleton, who is the Senate Minority Leader and has held elective office since 2000, believes that Democrats have an opportunity to win under the Whole County Plan.

- Hearing Tr. (Volume I) (Singleton) at 40:9–12.

In light of the performance of Democratic candidates in Districts 6 and 7 of the Plaintiffs' Whole County Plan from 2012 to 2020, Dr. Hood's analysis, the testimony of Mr. Bryan, Dr. Davis, and Senator Singleton, and Representative Sewell's significant outperformance compared to the Black Voting Age Population

of her district, Black voters would have at least an equal opportunity to elect candidates of their choice in Districts 6 and 7 of the Plaintiffs' Whole County Plan.

**The Legislature's Rejection of the *Singleton* Plans And Adoption of the 2021 Plan**

Before enacting the 2021 plan, the Legislature performed no meaningful inquiry into whether the Voting Rights Act required the creation of a majority-Black district.

- *Milligan v. Merrill*, ECF No. 53 (Joint Stipulated Facts for Preliminary Injunction Proceedings) ¶ 97 ("No racial-polarization analysis was conducted for CD 7.").

- *Id.* ¶ 98 ("No racial-polarization analysis for any districts was provided to Committee members before or during the meeting.").

- Ex. M11 (Hinaman Tr.) at 167:23–168:1 ("Q. Are you aware of any racial polarization analysis that was done on any of the districts on the 2021 congressional map? A. I'm not.").

- Hearing Tr. (Volume VI) (Hood) at 1478:14–16 ("Q. You didn't present this analysis to the Alabama Legislature before it enacted the 2021 plan, did you? A. No. It was – I didn't have it done, no."

Before the 2021 Plan was enacted, the Chairs of the Reapportionment Committee, Senator Jim McClendon and Representative Chris Pringle received

"talking points" from Mr. Hinaman and Reapportionment Committee counsel Dorman Walker stating that the Voting Rights Act required a majority-minority district, without providing any analysis explaining why that would be the case. The talking points advised voting against the plan supported by the League of Women Voters (the Singleton Whole County Plan) because it violated Section 2 of the Voting Rights Act by not including a majority-minority district.[4] In other words, the chairs of the relevant committee were given guidance that established a specific racial threshold for a Congressional district of more than 50% Black Voting Age Population.

- Ex. M29 (Talking Points) at 4.

- Ex. M12 (Pringle Tr.) at 135:15–137:6.

- Ex. M13 (McClendon Tr.) at 19:13–20:9.

Both Representative Pringle and Senator McClendon testified that they used these talking points in debate on redistricting.

- Ex. M12 (Pringle Tr.) at 115:21–118:12 ("I was using my talking points" in debate on the House floor regarding whether racial polarization analysis was required for districts with Black Voting Age Population above 51%.)

- Ex. M13 (McClendon Tr.) at 19:6–8 (referring to the talking points as

---

[4] As described below, this guidance was legally erroneous.

"the bullet points we used on the floor, in my case on the floor of the senate").

Senator McClendon testified that he would not vote for the Whole County Plan because it did not have a majority-minority district.

- Ex. M13 (McClendon Tr.) at 96:12–97:11.

From Senator Singleton's perspective, the plan the Legislature adopted was "absolutely" a foregone conclusion regardless of the alternatives he offered.

- Hearing Tr. (Volume I) (Singleton) at 74:3–7.

**Equitable Considerations in Adopting a New Plan**

The deadline for candidates to qualify for the primary elections is January 28, 2022, two weeks from the filing of this Proposed Findings of Fact and Conclusions of Law.

- Ex. D7 (Helms Declaration and Administrative Calendar) at 12.

The deadline for absentee ballots to be printed and ready is March 30, 2022, over ten weeks from the filing of this Proposed Findings of Fact and Conclusions of Law.

- Ex. D7 (Helms Declaration and Administrative Calendar) at 12.
- Hearing Tr. (Volume VII) (LaCour) at 1897:3–5 ("The critical deadline is Mar[c]h 30th. And I will tell why it's because that's when you[r] absentee ballots need to be printed and ready to go.").

- *Id.* at 1897:5–6 (claiming the actual date of "the election beginning" is the March 30, 2022 deadline for absentee ballots to be printed, but incorrectly stating that the absentee ballot deadline is seven weeks away when it was actually eleven weeks away).

The State of Alabama's primary elections are scheduled for May 24, 2022, over eighteen weeks from the filing of these Proposed Findings of Fact and Conclusions of Law.

- Ex. D7 (Helms Declaration and Administrative Calendar) at 14.

On October 28, 2021, the Alabama Legislature began a special session on redistricting, in which legislators considered proposals from the Reapportionment Committee for Alabama's (1) seven Congressional districts; (2) eight state Board of Education districts; (3) thirty-five state Senate districts; and (4) one hundred five state House of Representatives districts.

- *Milligan v. Merrill*, ECF No. 53 (Joint Stipulated Facts for Preliminary Injunction Proceedings) ¶ 179.

- Hearing Tr. (Volume VII) (LaCour) at 1896:10–12.

On November 3, 2021, the Legislature approved the 2021 plan and sent it to Governor Kay Ivey.

- *Milligan v. Merrill*, ECF No. 53 (Joint Stipulated Facts for Preliminary Injunction Proceedings) ¶ 182.

On November 4, 2021, Governor Ivey signed the 2021 plan into law.

- *Milligan v. Merrill*, ECF No. 53 (Joint Stipulated Facts for Preliminary Injunction Proceedings) ¶ 182.

Thus, the Legislature and the Governor were able to enact a new plan within a week of the beginning of the special session.

- *See supra.*

The *Singleton* Plaintiffs filed their Amended Complaint on November 4, 2021.

- ECF No. 15.

*Wesch v. Hunt*, which ordered the splitting of seven counties, was decided less than three months before the 1992 primary election.

- *Wesch v. Hunt*, 785 F. Supp. 1491, 1491 (S.D. Ala. 1992) (three-judge court) (decided March 9, 1992).

- Ala. Code § 17-6-6 (1990) ("Presidential preference primaries and primary elections, except special primary elections, held at the expense of the state or counties, shall be held on the first Tuesday in June.").

Implementing the Whole County Plan would be trivial for county election officials because every voter in a county will live in the same Congressional district.

- Hearing Tr. (Volume VII) (LaCour) at 1897:11–1898:9 (citing Ex. D7 (Helms Declaration)).

24

For the Narrow Deviation Plan, 13,847 residents of three counties would be placed into a Congressional district different from the majority of residents of those counties. This figure represents less than 0.3% of the population of Alabama. Moreover, some of these residents are not registered voters and would not have to be reclassified.

- Ex. D124 (Political Subdivision Splits Between Districts) (Narrow Deviation Plan).

For the Zero Deviation Plan, 26,830 residents of six counties would be placed into a Congressional district different from the majority of residents of those counties. Of these, 17,694 people live in a county where voter reassignment is performed manually. This figure represents less than 0.4% of the population of Alabama. Moreover, some of these residents are not registered voters and would not have to be reclassified.

- Ex. D134 (Political Subdivision Splits Between Districts) (Zero Deviation Plan).

- ECF No. 67 (Defendant's Response in Opposition to Plaintiffs' Motions for Preliminary Injunction) at 126 (listing counties where voter reassignment is performed manually).

When Mr. Hinaman asked Members of Congress for their home addresses to ensure that they were placed in their own districts, Representative Sewell listed two

addresses, one in Birmingham and one in Selma. Under the Whole County Plan and its alternatives, Birmingham is in District 6 and Selma is in District 7.

- Ex. M11 (Hinaman Tr.) at 117:13–22.

- Ex. S22 (Whole County Plan).

A candidate for the U.S. House of Representatives must be an inhabitant of the state in which they are running on Election Day, but the candidate need not live in his or her district.

- U.S. Const. art. I, § 2.

## PROPOSED CONCLUSIONS OF LAW

### Jurisdiction and Standing

This three-judge District Court has jurisdiction to decide this challenge to the constitutionality of Congressional districts under 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4), 1357, and 2284, and 42 U.S.C. §§ 1983 and 1988.

The *Singleton* Plaintiffs have standing to bring their claim for racial gerrymandering. A plaintiff has standing to challenge a legislature's action if he or she lives in a racially gerrymandered district or has been subjected to a racial classification. *United States v. Hays*, 515 U.S. 737, 744–45 (1995). All Plaintiffs live in District 7 or a district whose border with District 7 was drawn with race as the predominant factor.

### Analysis of a Claim of Racial Gerrymandering

A claim of racial gerrymandering requires "a two-step analysis." *Cooper v. Harris*, 137 S. Ct. 1455, 1463 (2017). "First, the plaintiff must prove that 'race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district.'" *Id.* (quoting *Miller v. Johnson*, 515 U.S. 900, 916 (1995)). "Second, if racial considerations predominated over others, the design of the district must withstand strict scrutiny. The burden thus shifts to the State to prove that its race-based sorting of voters serves a 'compelling interest' and is 'narrowly tailored' to that end." *Id.* at 1464 (citations omitted).

To prove that race was the predominant factor in a redistricting decision, the plaintiff may rely on "'direct evidence' of legislative intent, 'circumstantial evidence of a district's shape and demographics,' or a mix of both." *Cooper*, 137 S. Ct. at 1464 (citation omitted); *see Davis v. Chiles*, 139 F.3d 1414, 1424 (11th Cir. 1998) ("A court may base such a finding either on circumstantial evidence regarding a district's shape and demographics or on direct evidence of a district-drawer's purpose.").

A legislature's use of race-blind criteria for redistricting does not preclude a finding that race predominated in the creation of a district. In *North Carolina v. Covington*, it was undisputed that the legislature "instructed its map drawers not to look at race when crafting a remedial map." 138 S. Ct. 2548, 2553 (2018). Nevertheless, the plaintiffs were entitled to relief because of "sufficient

circumstantial evidence that race was the predominant factor governing the shape of those four districts." *Id.*

In a racial gerrymandering case, a plaintiff need not establish racially discriminatory intent on the part of the legislature. Gerrymandering is not a traditional discrimination claim. *Miller v. Johnson*, 515 U.S. 900, 911 (1995) ("*Shaw* recognized a claim analytically distinct from a vote dilution claim.") (cleaned up). The harm caused by racial gerrymandering is what the Supreme Court has labeled an "expressive harm." *Bush v. Vera*, 517 U.S. 952, 984 (1996). Therefore, discriminatory intent, or lack thereof, is irrelevant if a legislature enacts a plan that separates voters based on their race. *North Carolina v. Covington*, 138 S. Ct. at 2552–53 ("[I]t is the segregation of the plaintiffs—not the legislature's line-drawing as such—that gives rise to their claims. … [The Plaintiffs] argued in the District Court that some of the new districts were mere continuations of the old, gerrymandered districts. Because the plaintiffs asserted that they remained segregated on the basis of race, their claims remained the subject of a live dispute …."); *Harris v. McCrory*, 159 F. Supp. 3d 600, 604 (M.D.N.C. 2016) ("[T]he Court notes that it makes no finding as to whether individual legislators acted in good faith in the redistricting process, as no such finding is required."), *aff'd sub nom. Cooper v. Harris*, 137 S. Ct. 1455 (2017); *Page v. Va. State Bd. of Elections*, 2015 WL 3604029, at *8 (E.D. Va. June 5, 2015) ("Nevertheless, the good faith of the

legislature does not excuse or cure the constitutional violation of separating voters according to race.") (internal quotation marks omitted).

When race predominated in the creation of a district, a legislature may not constitutionally perpetuate that district by appealing to traditional redistricting principles like preserving the cores of districts or protecting incumbents. "[E]fforts to protect incumbents by seeking to preserve the 'cores' of unconstitutional districts … ha[s] the potential to embed, rather than remedy, the effects of an unconstitutional racial gerrymander …." *Covington v. North Carolina*, 283 F. Supp. 3d 410, 431 (M.D.N.C. 2018), *aff'd in relevant part and reversed in part on other grounds*, 138 S. Ct. 2548 (2018); *Personhuballah v. Alcorn*, 155 F. Supp. 3d 552, 561 n.8 (E.D. Va. 2016) ("In any event, maintaining district cores is the type of political consideration that must give way to the need to remedy a *Shaw* violation.").

Alabama's own redistricting guidelines do not permit the Alabama Legislature to preserve the cores of districts or protect incumbents if doing so would violate the Equal Protection Clause of the United States Constitution. Ex. M28 (2021 Redistricting Guidelines) at 2–3 (Legislature should preserve cores of districts and protect incumbents "to the extent that [these objectives] do not violate or subordinate the foregoing policies prescribed by the Constitution and laws of the United States"). Therefore, if the Legislature begins with a plan that is an unconstitutional racial gerrymander, it cannot readopt that plan with insubstantial changes in order to

protect incumbents or preserve the cores of the gerrymandered districts.

A legislature is not entitled to assume that the Voting Rights Act requires the creation of a majority-minority district without a "meaningful legislative inquiry" into "whether a plaintiff could establish the *Gingles* preconditions—including effective white bloc-voting—in a new district created without those measures." *Cooper v. Harris*, 137 S. Ct. at 1471. It is undisputed that the Alabama Legislature performed no such analysis here, and instead simply assumed that a majority-minority district was required. Thus, the Legislature's belief that a majority-minority district was required "rested not on a 'strong basis in evidence,' but instead on a pure error of law." *Cooper v. Harris*, 137 S. Ct. at 1472 (quoting *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 278 (2015)); *accord Abbott v. Perez*, 138 S. Ct. 2305, 2334 (2018).

### Race Undisputedly Predominated in the Creation of the 1992 Plan.

The Defendants have stipulated that race was the predominant purpose for splitting counties to draw one majority-Black district in the plan adopted in *Wesch v. Hunt*, 785 F. Supp. 1491 (S.D. Ala. 1992) (three-judge court), *aff'd sub nom. Camp v. Wesch*, 504 U.S. 902 (1992), *Figures v. Hunt*, 507 U.S. 901 (1993). The *Wesch* court accepted, without analysis, the parties' stipulation that a district with a Black population of at least 65% should be created in order to ensure compliance with Section 2 of the Voting Rights Act. *Id.* at 1498–99.

The Supreme Court summarily affirmed two orders of the three-judge district court in *Wesch v. Hunt*, but neither appeal turned on whether it is constitutional to separate voters by race when drawing Congressional districts. The first appeal, by Governor Hunt, complained that the district court had failed to adopt a plan passed by the Legislature that also used race as the predominant factor in creating a supermajority-Black district. Jurisdictional Statement, *Figures v. Hunt*, 1992 WL 12012173, at *2–3 & n.1 (June 5, 1992). The second appeal, by the plaintiffs, challenged the district court's decision not to modify its plan to comply with guidance from the Justice Department that a second majority-Black district must be created. *Id.* at *3–5. Each time the appellants were asking the Supreme Court to order the district court to engage in more race-based line drawing, and each time the Supreme Court refused.

**The 2001 And 2011 Plans Were Racial Gerrymanders Because They Undisputedly Carried Forward the Race-Driven Lines of the 1992 Plan**

The Defendants have stated, "Both the 2001 and 2011 maps maintained the cores of districts, changing them only to equalize population. The 2011 map largely built off the 2001 map, which itself built off the 1992 map." ECF No. 67 (Defendant's Response in Opposition to Plaintiffs' Motions for Preliminary Injunction) at 12. The shape and demographics of a district alone can prove that race predominated in the creation of a district, and the Defendants have not disputed that

the shape and demographics of the 2001 and 2011 plans are materially similar to the shape and demographics of the 1992 plan, in which race admittedly predominated. Therefore, the 2001 and 2011 plans meet the definition of a racial gerrymander as set forth in *Cooper v. Harris*. Moreover, Mr. Hinaman provided direct evidence that he used race in drafting the 2011 plan to achieve an explicit racial target: more than 50% black population in District 7.

**The Racial Gerrymander Became Unconstitutional No Later Than 2017, and the Legislature Was Obligated Not to Perpetuate It in 2021.**

While the moment at which the 1992 plan and its successors became unconstitutional could be a matter of debate, it was no later than 2017.

From its inception, the 1992 plan admittedly split counties for predominantly racial purposes. In 1993, the Supreme Court made clear that drawing lines for predominantly racial purposes constitutes a racial gerrymander. *Shaw v. Reno*, 509 U.S. 630, 649 (1993) (a reapportionment statute can be challenged under the Equal Protection Clause if it "rationally cannot be understood as anything other than an effort to separate voters into different districts on the basis of race"). The Court held, however, that a racial gerrymander is may be constitutional if it "is narrowly tailored to further a compelling governmental interest." *Id.* at 658.

Following *Shaw*, the Court assumed that complying with the Voting Rights Act is a compelling interest. *Cooper v. Harris*, 137 S. Ct. at 1464. Therefore, if the

1992 plan, the 2001 plan, or the 2011 plan had been challenged as an unconstitutional racial gerrymander, the defendants could have argued that racial gerrymandering is required to prevent vote dilution under Section 2, or retrogression under Section 5. Whether or not those defenses would have prevailed, they undoubtedly would have been colorable.

In 2013 and 2017, the Supreme Court eliminated the grounds on which the racial gerrymander could be defended. In 2013, the Court held the coverage formula in Section 4 of the Voting Rights Act, which subjected Alabama to Section 5, unconstitutional. *Shelby County v. Holder*, 570 U.S. 529 (2013). As Secretary Merrill explained in 2019, "Today, with Section 5 effectively tabled, Alabama has more liberty to draw its districts differently." Ex. S40 (*Chestnut* Pre-trial Brief) at 12. And in 2017, the Court held that Section 2 cannot save a racial gerrymander unless the legislature has made a "meaningful legislative inquiry" and developed a "strong basis in evidence" that Section 2 requires the creation of a majority-minority district. *Cooper v. Harris*, 137 S. Ct. at 1471–72. After these cases were decided, Defendant Merrill conceded that District 7 is racially gerrymandered, and stated that he "does not believe that the law would permit Alabama to draw that district today if the finger into Jefferson County was for the predominate [sic] purpose of drawing African American voters into the district." Ex. S40 (*Chestnut* Pre-trial Brief) at 11.

While the Alabama Legislature may not have been obligated to go into special

session in 2017 to remedy a racially gerrymandered plan that was now clearly unconstitutional, it certainly was obligated not to substantially reenact that plan in 2021 without any basis to conclude that the Voting Rights Act required its perpetuation. The Defendants have not met their burden to show that the racial gerrymander of District 7 was narrowly tailored to achieve a compelling interest, and in fact have disclaimed such an argument. Hearing Tr. (Volume VII) (LaCour) at 1854:24–1855:1 ("Our argument here is not that the VRA justifies the drawing of this map in – drawing of CD 7 currently."). Therefore, the Legislature's reenactment of the racially gerrymandered District 7 was indefensible under the Voting Rights Act.

### The Defendants' Reliance on *Abbott v. Perez* and *Easley v. Cromartie* Is Misplaced.

The portion of *Abbott v. Perez* on which the Defendants have relied is inapposite to the *Singleton* Plaintiffs' claims, legally and factually. In *Abbott*, the district court invalidated districts adopted by the Texas Legislature in 2013 based on plans developed by the court itself, solely because the Texas Legislature had not cured the "taint" of a previous legislature that had enacted different, discriminatory districts. 138 S. Ct. 2305, 2318 (2018). The *Singleton* Plaintiffs' gerrymandering claim, however, does not rely on some free-floating "taint" from a previous legislature that could invalidate otherwise lawful districts, but because the shape and

demographics of District 7 undisputedly show that it separates voters by race. As described above, the Legislature's good faith or lack thereof is irrelevant. Moreover, direct evidence, including the talking points used by the Reapportionment Committee Chairs on the floor of the Alabama House and Senate, shows that the Legislature's selection of its plan and rejection of Senator Singleton's plan was based on an explicit racial target: District 7 was understood to be required to be more than 50% Black, without any "meaningful legislative inquiry" or "strong basis in evidence" for such a target.

The portion of *Abbott v. Perez* that more closely corresponds to the *Singleton* Plaintiffs' claims is Part IV.B, which affirmed a finding of racial gerrymandering on the merits. 138 S. Ct. at 2334–35. There, it was undisputed that a district's lines were drawn the way they were because of race, and the Court rejected the Legislature's evidence that race-based line drawing was necessary to satisfy Section 2 of the Voting Rights Act. *Id.* Here, the Alabama Legislature carried forward, with minimal changes, district lines undisputedly drawn for predominantly racial purposes. It is the carrying forward of race-driven lines, not the carrying forward of any taint or ill intent, that makes District 7 a racial gerrymander. And the Defendants have disclaimed any argument that the Voting Rights Act justifies those lines. Therefore a finding of racial gerrymandering here is consistent with *Abbott v. Perez*.

The Supreme Court's statement in *Easley v. Cromartie* that "the Constitution

does not place an affirmative obligation upon the legislature to avoid creating districts that turn out to be heavily, even majority, minority" also is inapposite to the *Singleton* Plaintiffs' claims. 532 U.S. 234 (2001). District 7 did not just "turn out" to be majority-minority; it was admittedly designed predominantly for that purpose in 1992, and the shape of that district admittedly has been reenacted without substantial change. And while direct evidence of the 2021 Legislature's intent is not required to prove a racial gerrymander, direct evidence shows that the Whole County Plan was rejected because it did not have a majority-minority district.

**The Whole County Plan or Its Alternatives Are the Best Remedy.**

In the event that the Legislature does not remedy the racial gerrymander itself in time for the 2022 primary election, the Whole County Plan, the Narrow Deviation Plan, or the Zero Deviation Plan should be ordered.

The Whole County Plan returns to Alabama's bedrock redistricting principle of keeping counties whole, which Alabama followed without exception until Jefferson County became too large to constitute a district and still comply with the one person, one vote standard. As an effort to remedy the racial gerrymander in the 2011 plan, the Whole County Plan obviously does not preserve the cores of existing districts and protect incumbents as well as the 2021 plan does. Those traditional redistricting criteria have little or no weight when the previous plan was a racial gerrymander. The Defendants have not identified any other traditional redistricting

principle on which the Whole County Plan falls short of the 2021 plan.

No one has plausibly suggested that the Whole County Plan or its alternatives constitute a racial gerrymander. The Defendants have stipulated that the instructions to the map-drawer were to keep counties whole and preserve the Black Belt, which the Defendants admit is a community of interest. The Defendants' expert testified that the maximum population deviation of the Whole County Plan is the minimum that can be achieved without abandoning traditional redistricting principles or creating ridiculous shapes.

The Whole County Plan complies with Section 2 of the Voting Rights Act by including two crossover districts that provide black voters a demonstrably effective opportunity to elect candidates of their choice. *Cooper v. Harris*, 137 S. Ct. at 1471–72; *see Bartlett v. Strickland*, 556 U.S. 1, 23 (2009) ("a legislative determination, based on proper factors, to create two crossover districts may serve to diminish the significance and influence of race by encouraging minority and majority voters to work together toward a common goal. The option to draw such districts gives legislatures a choice that can lead to less racial isolation, not more.").

The maximum population deviation of the Whole County Plan, which is slightly less than 2.5%, is permissible because it results from a race-neutral redistricting principle: the preservation of whole counties. The Supreme Court has held that "if a State wishes to maintain whole counties, it will inevitably have

population variations between districts reflecting the fact that its districts are composed of unevenly populated counties." *Tennant v. Jefferson County Comm'n*, 567 U.S. 758, 764 (2012).[5]

In the alternative, the maximum population deviation of the Narrow Deviation Plan, which is 0.69%, is permissible because the plan keeps 64 of Alabama's 67 counties whole, and the deviation is lower than the deviation the Supreme Court approved in *Tennant* (0.79%). "Despite technological advances, a variance of 0.79% results in no more (or less) vote dilution today than in 1983, when this Court said that such a minor harm could be justified by legitimate state objectives." *Tennant*, 567 U.S. at 764.

In the alternative, the Zero Deviation Plan satisfies the one person, one vote rule under any standard, while splitting the fewest possible counties to do so.[6]

---

[5] There is a suggestion in *Karcher v. Daggett*, 462 U.S. 725 (1983), that a Congressional redistricting plan that uses whole counties to reach population equality may satisfy the Court's deviation standard. "[R]esort to the simple device of transferring entire political subdivisions of known population between contiguous districts would have produced districts much closer to numerical equality. … Thus the District Court did not err in finding that appellees had met their burden of showing that the Feldman Plan did not come as nearly as practicable to population equality." *Id.* at 739–40 (citations omitted). The Court went on to say, "we are willing to defer to state legislative policies, so long as they are consistent with constitutional norms, even if they require small differences in the population of congressional districts." *Id.* at 740 (citations omitted). The Court has approved a court-ordered plan with a maximum population deviation of 0.35% that was drawn by using whole counties as building blocks. *Abrams v. Johnson*, 521 U.S. 74 (1997).

[6] There is tension between the Supreme Court's standards for avoiding an unconstitutional racial gerrymander and minimizing population deviations in Congressional districts. "[T]he Court recognized that the one-person, one- vote jurisprudence does little to prevent the effects associated with political gerrymandering." *Larios v. Cox*, 300 F. Supp. 2d 1320, (N.D. Ga. 2004) (three-judge court) (citing *Karcher v. Daggett*, 462 U.S. 725, 734 n.6 (1983)). As the Defendants' expert

**The Remaining Preliminary Injunction Requirements—Irreparable Injury, Balance of Harms, and Public Policy—Are Met Here.**

Under the current enacted plan, Plaintiffs, Black Alabamians, and the public would be deprived of their fundamental right to vote in a manner that violates the Equal Protection Clause. *See, e.g., Harper v. Virginia Board of Elections*, 383 U.S. 663 (1966); *Baker v. Carr*, 369 U.S. 186 (1962); *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("Any loss of constitutional rights is presumed to be an irreparable injury."). Such a deprivation of their fundamental right constitutes irreparable harm. *Johnson v. Mortham*, 926 F. Supp. 1540, 1543 (N.D. Fla. 1996) (citing *Elrod*, 427 U.S. at 373–74); *Williams v. Rhodes*, 393 U.S. 23, 30 (1968) ("the right of qualified voters ... to cast their votes effectively ... rank[s] among our most precious freedoms."); *see also Northeast Ohio Coalition for the Homeless v. Blackwell*, 467 F.3d 999, 1012 (6th Cir. 2006) ("There is a strong public interest in allowing every registered voter to vote."). "[O]nce a State's legislative apportionment scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan." *Reynolds v. Sims*, 377 U.S. 533, 585 (1965).

---

demographer acknowledged, the preservation of whole counties in Alabama constrains gerrymandering.

In comparison, any burdens on Defendants and harms to the State to correct the constitutional violation are minimal. Unlike instances where courts have determined that it is too late to interfere because "the election machinery wheels [are] in full rotation,"[7] the 2022 election has not yet begun. The deadline for candidates to qualify for the primary elections is January 28, 2022, the deadline for absentee ballots to be printed and ready is March 30, 2022, and the primary election is to be held on May 24, 2022. Given that the Alabama legislature previously convened in a Special Session and approved the 2021 plan six days later, there is sufficient time to consider and approve a map that is constitutional within the relevant administrative calendar deadlines.[8]  In the event that the Legislature does not remedy the racial gerrymander itself in time for the 2022 primary election, the Whole County Plan, the Narrow Deviation Plan, or the Zero Deviation Plan should be ordered. *See Wesch v. Hunt*, 785 F. Supp. 1491 (S.D. Ala. 1992) (three-judge court), *aff'd sub nom. Camp v. Wesch*, 504 U.S. 902 (1992), *Figures v. Hunt*, 507 U.S. 901 (1993).

---

[7] *See Graves v. City of Montgomery*, 807 F. Supp. 2d 1096, 1112 (M.D. Ala. 2011) (finding the election machinery wheels were in full rotation where at the time the action was filed "barely more than one working day remained under the eight-day period for candidates to qualify to run for city council, and only six weeks remained until election day.").

[8] If needed, the qualification deadline could be shifted to assure constitutionally compliant maps are applied in the 2022 congressional elections. *See Wright v. Sumter Cty. Bd. of Elections*, 979 F.3d 1282, 1286 (11th Cir. 2020) (affirming a remedial order that altered election dates); *United States v. Dallas Cty. Comm'n*, 850 F.2d 1433, 1437 (11th Cir. 1988) (tolling a qualification period until the entry of a remedial plan); *see also Larios v. Cox*, 305 F. Supp. 2d 1335, 1343 (N.D. Ga. 2004) (noting the court's authority to extend election-related deadlines).

Additionally, any burden on county administrators to update voter registrations, or inconvenience to candidates who have campaigned for the last two months in unconstitutional districts does not tilt the balance of equities in the State's favor. "[T]he administrative burden on the county cannot begin to compare with the further subjection of the county's black citizens to denial of their right, to full and equal political participation." *Dillard v. Crenshaw Cty.*, 640 F. Supp. 1347, 1363 (M.D. Ala. 1986). "[S]overeignty lies with the people . . . inconvenience to legislators elected under an unconstitutional districting plan resulting from such legislators having to adjust their personal, legislative, or campaign schedules to facilitate a [constitutional redistricting] does not rise to the level of a significant sovereign intrusion." *Covington v. North Carolina*, 270 F. Supp. 3d 881, 895 (M.D.N.C. 2017) (three-judge court). "[T]he harm [Plaintiffs] would suffer by way of vote dilution outweighs the harm" or other potential inconveniences to Defendants. *Ga. State Conf. of the NAACP v. Fayette Cty. Bd. of Comm'rs*, 118 F. Supp. 3d 1338, 1348 (N.D. Ga. 2015). Candidates for the U.S. House need not live in the districts in which they are running, and Representative Sewell in particular will be less affected because she listed residences in Birmingham and Selma when the 2021 plan was in development.

The only true hardship Defendant has identified that the State would suffer by not proceeding with the enacted plan is that the injunctive relief would "require

additional efforts" of the Defendant. Meanwhile, Plaintiffs, and all other Alabamians in the racially gerrymandered districts, stand to suffer denial of their fundamental right to equal protection of the laws. *See Dillard*, 640 F. Supp. at 1363. Defendant's administrative burdens pale in comparison to the harms Plaintiffs would suffer by moving forward with the enacted plan. Defendant has not shown any legitimate interest in perpetuating the deprivation of Plaintiffs' fundamental rights.

In any event, imposing the Whole County Plan or its alternatives will not create an insurmountable barrier to election administration.[9] The burden of reassigning voters under the Whole County Plan is trivial, as all voters in a county will be in the same Congressional district. The burden or reassigning voters under the Narrow Deviation Plan and Zero Deviation Plan will be minimal, as these plans will split just three or six counties, and they will place less than 0.3% or 0.4% of Alabama's residents in districts different from those in which the majority of county residents live.

Dated: January 14, 2022            Respectfully submitted,

*/s/ James Uriah Blacksher*
James Uriah Blacksher
825 Linwood Road
Birmingham, AL 35222
Tel: (205) 612-3752

---

[9] Just today, the Ohio Supreme Court invalidated that state's Congressional districts because they violate a prohibition on partisan gerrymandering in the Ohio Constitution. *Adams v. Dewine*, ___ N.E.3d ___, 2022 WL 129092 (Jan. 14, 2022). Yet Ohio's primary election is three weeks earlier than Alabama's. Ohio Secretary of State Election Calendar, https://www.ohiosos.gov/publications/2022-elections-calendar/.

Fax: (866) 845-4395
Email: jublacksher@gmail.com

Joe R. Whatley, Jr.
W. Tucker Brown
WHATLEY KALLAS, LLP
2001 Park Place North
1000 Park Place Tower
Birmingham, AL 35203
Tel: (205) 488-1200
Fax: (800) 922-4851
Email: jwhatley@whatleykallas.com
     tbrown@whatleykallas.com

*/s/ Henry C. Quillen*
Henry C. Quillen
(admitted *pro hac vice*)
WHATLEY KALLAS, LLP
159 Middle Street, Suite 2C
Portsmouth, NH 03801
Tel: (603) 294-1591
Fax: (800) 922-4851
Email: hquillen@whatleykallas.com

Myron Cordell Penn
PENN & SEABORN, LLC
1971 Berry Chase Place
Montgomery, AL 36117
Tel: (334) 219-9771
Email: myronpenn28@hotmail.com

Diandra "Fu" Debrosse Zimmermann
Eli Hare
DICELLO LEVITT GUTZLER
420 20th Street North, Suite 2525
Birmingham, AL 35203
Tel.: (205) 855.5700
Email: fu@dicellolevitt.com
     ehare@dicellolevitt.com

*Counsel for Plaintiffs*