FILED
2022 Jan-18 PM 03:32
U.S. DISTRICT COURT
N.D. OF ALABAMA

```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ALABAMA
2                      SOUTHERN DIVISION

3

4     BOBBY SINGLETON, et al.,        *
                 Plaintiffs,          *   2:21-cv-1291-AMM
5                                     *   January 5, 2022
      vs.                             *   Birmingham, Alabama
6                                     *   9:00 a.m.
      JOHN MERRILL, in his official   *
7     capacity as Alabama Secretary   *
      of State, et al.,               *
8                Defendants.          *
      ******************************* *
9                                     *
      EVAN MILLIGAN, et al.,          *
10               Plaintiffs,          *   2:21-cv-1530-AMM
                                      *
11    vs.                             *
                                      *
12    JOHN MERRILL, in his official   *
      capacity as Alabama Secretary   *
13    of State, et al.,               *
                 Defendants.          *
14    ******************************* *
                                      *
15    MARCUS CASTER, et al.,          *
                 Plaintiffs,          *   2:21-cv-1536-AMM
16                                    *
      vs.                             *
17                                    *
      JOHN MERRILL, in his official   *
18    capacity as Alabama Secretary   *
      of State, et al.,               *
19               Defendants.          *
      ******************************* *
20

21
            TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
22                     VIA ZOOM CONFERENCE
                           VOLUME II
23           BEFORE THE HONORABLE ANNA M. MANASCO,
                THE HONORABLE TERRY F. MOORER,
24             THE HONORABLE STANLEY MARCUS

25
```

*CHRISTINA K. DECKER, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, AL 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1

2          Proceedings recorded by OFFICIAL COURT REPORTER, Qualified
3      pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies
       and Procedures Vol. VI, Chapter III, D.2.  Transcript
4                  produced by computerized stenotype.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*CHRISTINA K. DECKER, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, AL 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

```
1                            APPEARANCES

2

    FOR THE SINGLETON PLAINTIFFS:
3

    James Uriah Blacksher
4   JAMES U. BLACKSHER, ATTORNEY
    825 Linwood Road
5   Birmingham, AL 35222
    205-612-3752
6   Fax: 866-845-4395
    Email: Jublacksher@gmail.com
7

    Myron C Penn
8   PENN & SEABORN LLC
    53 Highway 110
9   PO Box 5335
    Union Springs, AL 36089
10  334-738-4486
    Fax: 334-738-4432
11  Email: Myronpenn28@hotmail.com

12  Joe R Whatley, Jr
    WHATLEY KALLAS LLP
13  2001 Park Place North Suite 1000
    Birmingham, AL 35203
14  205-488-1200
    Fax: 800-922-4851
15  Email: Jwhatley@whatleykallas.com

16  Henry C Quillen
    WHATLEY KALLAS LLP
17  159 Middle Street Suite 2D
    Portsmouth, NH 03801
18  603-294-1591
    Fax: 800-922-4851
19  Email: Hquillen@whatleykallas.com

20  W Tucker Brown
    WHATLEY KALLAS LLC
21  P.O. Box 10968
    Birmingham, AL 35202-0968
22  205-488-1200
    Fax: 800-922-4851
23  Email: Tbrown@whatleykallas.com

24

25
```

```
 1          Diandra "Fu" Debrosse Zimmermann
            DICELLO LEVITT GUTZLER
 2          420 20th Street North
            Suite 2525
 3          Birmingham, AL 35203
            205-855-5700
 4          Fax: 205-855-5784
            Email: Fu@dicellolevitt.com
 5
            Eli Joseph Hare
 6          DICELLO LEVITT GUTZLER LLC
            420 20th Street North, Suite 2525
 7          Birmingham, AL 35203
            205-855-5700
 8          Fax: 205-855-5784
            Email: Ehare@dicellolevitt.com
 9

10          FOR THE MILLIGAN PLAINTIFFS:

11
            Deuel Ross
12          NAACP LEGAL DEFENSE &
            EDUCATIONAL FUND, INC.
13          700 14th Street N.W. Ste. 600
            Washington, DC 20005
14          (202) 682-1300
            Dross@naacpldf.org
15
            Leah Aden
16          Stuart Naifeh
            Kathryn Sadasivan
17          Brittany Carter
            NAACP LEGAL DEFENSE &
18          EDUCATIONAL FUND, INC.
            40 Rector Street, 5th Floor
19          New York, NY 10006
            (212) 965-2200
20          Laden@naacpldf.org
            Snaifeh@naacpldf.org
21
            Davin M. Rosborough
22          Julie Ebenstein
            AMERICAN CIVIL LIBERTIES
23          UNION FOUNDATION
            125 Broad St.
24          New York, NY 10004
            (212) 549-2500
25          Drosborough@aclu.org
            Jebenstein@aclu.org
```

```
1        Kaitlin Welborn
         LaTisha Gotell Faulks
2        AMERICAN CIVIL LIBERTIES UNION
         OF ALABAMA
3        P.O. Box 6179
         Montgomery, AL 36106-0179
4        (334) 265-2754
         Kwelborn@aclualabama.org
5        Tgfaulks@aclualabama.org

6        David Dunn
         HOGAN LOVELLS US LLP
7        390 Madison Avenue
         New York, NY 10017
8        (212) 918-3000
         David.dunn@hoganlovells.com
9
         Michael Turrill
10       Harmony A. Gbe
         HOGAN LOVELLS US LLP
11       1999 Avenue of the Stars
         Suite 1400
12       Los Angeles, CA 90067
         (310) 785-4600
13       Michael.turrill@hoganlovells.com
         Harmony.gbe@hoganlovells.com
14
         Shelita M. Stewart
15       Jessica L. Ellsworth
         HOGAN LOVELLS US LLP
16       555 Thirteenth Street, NW
         Washington, D.C. 20004
17       (202) 637-5600
         Shelita.stewart@hoganlovells.com
18
         Blayne R. Thompson
19       HOGAN LOVELLS US LLP
         609 Main St., Suite 4200
20       Houston, TX 77002
         (713) 632-1400
21       Blayne.thompson@hoganlovells.com

22

23

24

25
```

```
 1       Sidney M. Jackson
         Nicki Lawsen
 2       WIGGINS CHILDS PANTAZIS
         FISHER & GOLDFARB, LLC
 3       301 19th Street North
         Birmingham, AL 35203
 4       Phone: (205) 341-0498
         Sjackson@wigginschilds.com
 5       Nlawsen@wigginschilds.com

 6

 7       FOR THE CASTER PLAINTIFFS:

 8       Abha Khanna
         ELIAS LAW GROUP LLP
 9       1700 Seventh Avenue, Suite 2100
         Seattle, WA 98101
10       206-656-0177
         Email: AKhanna@elias.law
11
         Aria C Branch
12       ELIAS LAW GROUP LLP
         10 G St NE, Suite 600
13       Washington, DC 20002
         202-968-4490
14       Fax: 202-968-4498
         Email: ABranch@elias.law
15
         Daniel C Osher
16       ELIAS LAW GROUP
         10 G Street NE
17       Suite 600
         Washington, DC 20002
18       202-968-4490
         Email: DOsher@elias.law
19
         Joseph N. Posimato
20       Elias Law Group LLP
         10 G Street, NE; Suite 600
21       Washington, DC 20002
         202-968-4518
22       Email: Jposimato@elias.law

23       Lalitha D Madduri
         ELIAS LAW GROUP LLP
24       10 G Street NE, Suite 600
         Washington, DC 20002
25       202-968-4490
         Email: Lmadduri@elias.law
```

```
 1          Olivia N. Sedwick
            Elias Law Group LLP
 2          10 G Street, NE; Suite 600
            Washington, DC 20002
 3          202-968-4518
            Email: Osedwick@elias.law
 4

 5          Richard P Rouco
            QUINN CONNOR WEAVER DAVIES & ROUCO LLP
 6          Two North Twentieth Street
            2 20th Street North
 7          Suite 930
            Birmingham, AL 35203
 8          205-870-9989
            Fax: 205-803-4143
 9          Email: Rrouco@qcwdr.com

10

11

12          FOR THE DEFENDANT:

13          Andrew Reid Harris
            OFFICE OF THE ATTORNEY GENERAL
14          CONSTITUTIONAL DEFENSE DIVISION
            501 Washington Avenue
15          Montgomery, AL 36130
            334-353-8891
16          Email: Reid.Harris@AlabamaAG.gov

17          Benjamin Matthew Seiss
            ALABAMA OFFICE OF THE ATTORNEY GENERAL
18          P.O. Box 300152
            501 Washington Ave (36104)
19          Montgomery, AL 36130
            334-353-8917
20          Fax: 334-353-8400
            Email: Ben.seiss@alabamaag.gov
21
            Brenton Merrill Smith
22          OFFICE OF THE ATTORNEY GENERAL OF ALABAMA
            P.O. Box 300152
23          501 Washington Avenue
            Montgomery, AL 36130
24          334-353-4336
            Fax: 334-353-8400
25          Email: Brenton.Smith@AlabamaAG.gov
```

1       Edmund Gerard LaCour, Jr.
        OFFICE OF THE ATTORNEY GENERAL
2       501 Washington Avenue
        P.O. Box 300152
3       Montgomery, AL 36104
        334-242-7300
4       Fax: 334-242-4891
        Email: Edmund.Lacour@AlabamaAG.gov
5
        James W Davis
6       OFFICE OF THE ATTORNEY GENERAL
        501 Washington Avenue
7       P O Box 300152
        Montgomery, AL 36130-0152
8       334-242-7300
        Fax: 334-353-8400
9       Email: Jim.davis@alabamaag.gov

10      Misty Shawn Fairbanks Messick
        OFFICE OF THE ATTORNEY GENERAL
11      FOR THE STATE OF ALABAMA
        501 Washington Avenue
12      P O Box 300152
        Montgomery, AL 36130-0152
13      334-242-7300
        Fax: 334-353-8440
14      Email: Misty.Messick@AlabamaAG.gov

15      Alexander Barrett Bowdre
        OFFICE OF THE ALABAMA ATTORNEY GENERAL
16      P.O. Box 300152
        Montgomery, AL 36130
17      334-242-7300
        Fax: 334-353-8400
18      Email: Barrett.Bowdre@alabamaAG.gov

19      Thomas Alexander Wilson
        STATE OF ALABAMA
20      OFFICE OF THE ATTORNEY GENERAL
        501 Washington Street
21      Montgomery, AL 36103
        334-242-7300
22      Fax: 334-353-8400
        Email: Thomas.wilson@alabamaAG.gov

23

24

25

```
1        J Dorman Walker
         BALCH & BINGHAM LLP
2        P O Box 78
         Montgomery, AL 36101
3        334-834-6500
         Fax: 334-269-3115
4        Email: Dwalker@balch.com

5

6

7

8

9        COURTROOM DEPUTY:  Frankie N. Sherbert

10

11       COURT REPORTER:  Christina K. Decker, RMR, CRR

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                            __I N D E X__

2

3   REDIRECT EXAMINATION OF DR. KOSUKE IMAI          283
    BY MS. EBENSTEIN
4   RECROSS-EXAMINATION                              301
    BY MR. SMITH
5   FURTHER REDIRECT EXAMINATION                     305
    BY MS. EBENSTEIN
6

7   RYAN WILLIAMSON                                  306
    DIRECT EXAMINATION                               306
8   BY MR. ROSBOROUGH
    CROSS-EXAMINATION                                336
9   BY MR. DAVIS
    REDIRECT EXAMINATION                             362
10  BY MR. ROSBOROUGH

11

12  SHALELA DOWDY                                    363
    DIRECT EXAMINATION                               364
13  BY MS. CARTER
    CROSS-EXAMINATION                                376
14  BY MR. LACOUR
    REDIRECT EXAMINATION                             414
15  BY MS. CARTER

16

17  WILLIAM S. COOPER                                416
    DIRECT EXAMINATION                               417
18  BY MS. KHANNA
    CROSS-EXAMINATION                                476
19  BY MR. DAVIS
    REDIRECT EXAMINATION                             514
20  BY MS. KHANNA
                                                     527
21  DIRECT EXAMINATION
    BY MR. DAVIS
22  CROSS-EXAMINATION                                530
    BY MR. BLACKSHER
23

24

25

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**P R O C E E D I N G S**

1

2              (In open court.)

3              JUDGE MARCUS:  We will go forward with the redirect

4    examination of Milligan's expert, Dr. Imai.  Thanks very much.

09:01:54 5              MS. EBENSTEIN:  Thank you, Your Honor.

6              REDIRECT EXAMINATION OF DR. KOSUKE IMAI

7    BY MS. EBENSTEIN:

8    Q    Good morning, Dr. Imai.

9    A    Good morning.

09:02:07 10   Q    Do you recall yesterday Mr. Smith asked you whether you

11   appended visual representations of your 30,000 simulated plans

12   to your report?

13   A    So the 37 -- which -- do you have a figure number or?

14   Q    No, just whether you included visual representations of

09:02:26 15  each of your simulated plans?

16   A    Oh.  Yeah.  Yes, I remember that.

17   Q    And you didn't include those plans; is that correct?

18   A    No.  Not in my report.

19   Q    Okay.  But do you recall providing counsel with all of the

09:02:40 20  data the VTD files and the code that you used?

21   A    Yes.

22   Q    To generate your simulations?

23   A    Yes, I do.

24   Q    Okay.  I will represent to you that we shared that data

09:02:51 25  with defendants on December 13th, a few days after the

1   submission of your report.

2        Could your simulations have been reproduced using the VTD

3   files and the code that you provided us?

4   A    Yes.  It can be produced exactly.  And the instruction has

09:03:05  5   been given in that -- in the file that I shared -- it was

6   shared.

7   Q    And you testified yesterday about the importance of

8   transparency and the value you place on open-source publicly

9   available code that anybody can run; is that right?

09:03:21 10   A    That's correct.  So all the packages that are necessary

11   for reproducing the results of my analysis are based on

12   open-source package, which means every package has the code

13   that's open and freely available for download.

14   Q    And had the defendants requested the data in a different

09:03:41 15   format or any other data that you used, I assume that you would

16   have provided that, as well; is that right?

17   A    Yes, of course.  But I have never received such a request.

18   Q    Okay.  You testified yesterday that you have submitted

19   reports in a case in Ohio; is that right?

09:03:58 20   A    Yes, that's correct.

21   Q    And that that's a political gerrymandering case; is that

22   right?

23   A    That's right.

24   Q    The principles and methods for your simulations analysis,

09:04:09 25   would they be just as reliable when used for racial

gerrymandering as they would be for partisan gerrymandering?

A    Yes.  There are complex many parts so depending on state and rules and, you know, the context that needs to be taken into account.  But the ability to isolate the factor, which is the one of the benefits of simulation analysis I emphasized yesterday still remains the case, so whether it's partisanship or race or some other factor we can always try to isolate a particular factor of interest is in a simulation method, and that's one of the most important strengths.

Q    And I assume you would have brought the same specialized skill and rigor to your analysis, whether you are looking at partisan gerrymandering or racial gerrymandering; is that right?

A    Yes.

Q    Mr. Smith asked you yesterday about some of the guidelines factors and those are included in Milligan Plaintiffs' Exhibit 38, 88-23.  I'm going to go through some of the factors that he discussed with you.  First on incumbency, I believe you testified that you placed more than one incumbent on each of your congressional districts in your simulated plans?

A    Yes.  Most one incumbent in each.

Q    You testified about the hard constraints, so every single one of your 30,000 simulated plans only had one incumbent in each district, right?

A    At most one.  So one is -- I think one representative

1    decided to run for the Senate.  So that that -- you know,

2    one person is not included, so one district may have zero

3    incumbent, but at most one, no -- you know, no multiple

4    incumbents.

09:05:58  5    Q    Okay.  And turning to the guideline on population

6    deviation, do you recall defendants' counsel asking you about

7    the .5 percent population deviation in your simulations?

8    A    Yes.

9    Q    And could you explain why .5 population deviation is

09:06:19 10   methodologically sound when you use VTDs as the building blocks

11   for your plans?

12   A    Yes.  Pressing so much larger units than the census

13   blocks.  So it makes sense to have the tolerance that's larger.

14   And in the academic literature, the precincts are the basic

09:06:35 15   units of at least the analysis.  The analyzation of the

16   redistricting plan is a variation.  It's not -- the goal is not

17   to provide official plan that may require lower terms.  So in

18   order to understand the characteristics of the population of

19   alternative plan I could have drawn in the set of rules, we

09:06:59 20   know that the .5 percent the maximum population tolerance is

21   more than enough.

22   Q    And when --

23         JUDGE MARCUS:  One request, counsel, before we

24   proceed.  Let me ask you again for our reporter to go really

09:07:16 25   slowly and take your time.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1          THE WITNESS:  Yes.

2          JUDGE MARCUS:  Thank you, counsel.  You may proceed.

3          MS. EBENSTEIN:  Thank you, Your Honor.

4  BY MS. EBENSTEIN:

09:07:25  5  Q    Dr. Imai, would you expect that population equality or use

6  of census blocks if that was even possible would have changed

7  any of your opinions in your report?

8  A    No.  It has no major impact, no substantive impact on the

9  conclusion of my analysis.

09:07:42 10  Q    And your use of population deviation was a hard

11  constraint, so that applied to every single one of the

12  districts in each of the 30,000 plans; is that right?

13  A    That's correct.

14  Q    Okay.  Moving on to contiguity.  Did you use census data

09:07:59 15  to generate your simulated maps?

16  A    Yes.

17  Q    And as far as you know, does the state use census data to

18  draw their maps?

19  A    Yes.

09:08:10 20  Q    And, in fact, I will note for you that the guidelines

21  require the use of census data for the state to draw their

22  maps.

23          So if there were any issues with the census data when it

24  comes to contiguity, would that occur in the state's enacted

09:08:27 25  map, as well as in your simulated plan?

1   A    It may.  You know, it depends on the problem, I suppose.

2   But any map drawing process whether it's simulation or human,

3   if there's a problem in the underlying data, it could affect

4   the resulting map.

09:08:51 5   Q    Okay.  Moving on to compactness, if my colleague Eric is

6   online, if he could briefly turn to Defendants' -- sorry --

7   Plaintiffs' Exhibit M-1, 88-1 at 23, Figure 8, there at the top

8   of the screen.  I don't believe we looked at this yesterday,

9   but it's included on page 23 of your initial report.  Could you

09:09:16 10  review how you -- what this figure represents, including how

11  you measured compactness?

12  A    Right.  So the compactness is a concept that has competing

13  measurements in the academic literature.  And, you know, the

14  most commonly used measures are the two I used here.  So one is

09:09:37 15 Polsby-Popper score, and one is the fraction of edges kept, and

16  the fraction of edges kept is something that counsel Smith

17  mentioned yesterday from the working paper that I wrote.  And

18  each measure has its own advantage and disadvantages.

19       For example, Polsby-Popper score can be affected greatly

09:10:02 20 by the shape of particular precinct or census block, whatever

21  the building units are.  And so if you live in a coastal area,

22  Polsby-Popper score might be higher -- sorry -- much lower less

23  compact even though it's just a coast line that's not very

24  smooth.

09:10:21 25      So for this reason it's very important to use multiple

```
 1   measures of compactness score when you are evaluating whether
 2   or not your simulated plans or other plans are compact.  So
 3   based on this figure, what you can see is that two measures
 4   essentially give the same answer.  So whether you use the
 5   Polsby-Popper score or the fraction of edges kept, the -- on
 6   average, the simulated plans, which is the dark histogram is
 7   more compact than active.  So these scores the higher the
 8   number is the more compact.  So the one on the right, if the
 9   numbers are higher, more compact.  So you can see that based on
10   the Polsby-Popper score the simulated plan, most of them have
11   higher compactness score than the enacted plan and then same
12   collusion holds in the fraction of edges kept.
13        From this, I concluded that the simulated plan on average
14   more compact than the enacted plan.
15   Q    Okay.  Thank you.  We can take that figure down.
16        Moving on to county boundary splits.  Do you recall
17   Mr. Smith asking you about the treatment of counties and county
18   splits?
19   A    Yes.
20   Q    How do you interpret the criteria for county splits when
21   generating your simulation analysis?
22   A    So according to the guideline, it's supposed to minimize
23   number of counties within each district.  That's I think what
24   the guideline states.
25   Q    Okay.  And did you implement that criterion as you
```

09:10:40 (line 5)
09:11:04 (line 10)
09:11:23 (line 15)
09:11:41 (line 20)
09:12:00 (line 25)

1    understood it?

2    A    Well, the way I implemented it in the algorithm is two

3    ways.  So one, is to just to -- this is a mechanical part of

4    the algorithm, which tries to make sure that the district

09:12:22  5    boundaries for the county boundaries whenever you can.  So this

6    is -- I can describe more details, but basically sequential

7    Monte Carlo algorithm basically imposes that.  Then the second

8    step is I added additional constraints just to make sure to

9    reduce the number of county splits that, you know, make sure

09:12:43 10    that the algorithm prefers all else equal the plans that have

11    fewer county splits.  And as a result in the appendix of my

12    expert report, I show that county splits is much lower under

13    the simulated plan.

14    Q    Okay.  If the map drawer testified that where possible he

09:13:03 15    tried to deal in whole counties and keep counties whole, does

16    that sound similar to what you did when you were accounting for

17    this guideline?

18    A    You know, I think -- I mean, algorithm, so it's -- in a

19    sense, it's a little bit different from the human.  Algorithm

09:13:22 20    look at, you know, the sort of entire state and make sure that,

21    you know, other factors are not compromised by doing so.  But

22    you know, I -- I try to represent mathematically as much as

23    possible that what the guidelines -- I interpreted what the

24    guideline advised.

09:13:44 25    Q    Okay.  Thank you.

1          And moving on to the core of existing guidelines.  You are

2     clear in your report and your direct testimony that you did not

3     consider the cores of existing guidelines; is that right?

4     A     No.

09:13:57  5     Q     And if race predominated in the design of prior plans,

6     would recognizing cores and preserving cores that racial

7     predominance -- sorry.  Let me rephrase that.  If race

8     predominated in the design of prior plans?

9     A     Uh-huh.

09:14:14 10     Q     And you were to adhere to preserving the cores of prior

11     plans, would that mask the effect of race in the current plan?

12     A     Yes, that's possible because I would note -- I would have

13     no way of separating the race as a factor, like isolating the

14     impact of race from what went into the prior plan.

09:14:35 15     Q     Okay.  And Mr. Smith asked you yesterday about whether

16     preserving cores could be operationalized by preserving

17     80 percent of the previous district.  Are you aware of any

18     guideline that requires preserving 80 percent or any other

19     threshold of previous districts?

09:14:55 20     A     No.

21     Q     Okay.  Mr. Smith asked you a series of questions about

22     your race-blind simulation.  If we could just have on the

23     screen Plaintiffs' Exhibit M-1, 88-1 at 10 which is Figure 1 in

24     the boxplot that we discussed yesterday.  Which districts in

09:15:22 25     this boxplot do you consider outliers?

1  A      The clearest outlier is 7.

2  Q      And are there any other outliers here?

3  A      The 2 is also outlier according to the, you know, standard

4  definition in statistics.

09:15:37  5  Q      Okay.  And this is in your race-blind simulation, correct?

6  A      That's correct.

7  Q      Okay.  Does this finding in your race-blind simulation

8  reflect any judgment about whether or not it's proper to draw a

9  particular district, a particular way after the map is adjusted

09:15:54 10  to have one MMD?

11  A      No.  So this is completely race-blind.  So the conclusion

12  on the holds with respect to -- the comparison was race-blind

13  simulation simulated plans.

14  Q      Okay.  And your race-blind analysis does not incorporate

09:16:11 15  the state's guideline, which gives priority to compliance with

16  the Voting Rights Act; is that right?

17  A      Right.  It doesn't.  And that was purpose was, you know,

18  of this race-blind simulation was just to establish as a first

19  step whether race played a predominant factor.

09:16:25 20  Q      And a few questions about your one-MMD simulation before I

21  move back to the race-blind simulation.

22          Your one-MMD analysis tried to account for the fact that

23  the state draws one MMD to comply with the VRA; is that right?

24  A      That's correct.

09:16:39 25  Q      And your simulation found that even in drawing one MMD

```
 1  that looked like the state's MMD, District 7 included a BVAP
 2  population beyond what was necessary to create a majority-black
 3  district; is that right?
 4  A    That's right.
 5  Q    But I believe you said yesterday your analysis did not
 6  consider whether the VRA might require two majority-minority
 7  districts; is that right?
 8  A    No.  No.
 9  Q    And you didn't perform any analysis of maps that include
10  two majority-minority districts, right?
11  A    No.
12  Q    So your analysis wouldn't tell us anything about whether
13  or not containing two MMDs is an outlier or not compared to
14  simulations constrained under two MMDs?
15  A    No.
16  Q    Moving back to the race-blind analysis, and we can take
17  that boxplot off the screen.
18       If you have your report in front of you in case you would
19  like to reference it.  Mr. Smith asked you questions about your
20  race-blind analysis with regard to Jefferson County.  And he
21  referenced paragraph 32 of your report.  That's M-1, 88-1 at
22  12.  And this paragraph is still in your analysis about your
23  race-blind simulations; is that right?
24  A    That's right.
25  Q    Mr. Smith noted that at least eight of the 10,000
```

09:16:53 (line 5)
09:17:07 (line 10)
09:17:22 (line 15)
09:17:38 (line 20)
09:17:54 (line 25)

race-blind simulated plans included more voters from Jefferson
County in District 7 than the enacted plan; is that right?
A    Yeah.  I think so.  I'm not 100 percent sure.  I don't
recall exact number he cited.
09:18:13 Q    Okay.  I will refer you to paragraph 32 of your report,
where he did accurately cite the number that you gave.
Statistically does the inclusion of the Black Voting Age
Population from Jefferson in eight of the 10,000 race-blind
simulated plans affect whether the enacted plan was an outlier?
09:18:34 A    Yes.
Q    How does it affect whether the race-blind simulated plan
was an outlier?
A    So according to the standard, you know, statistical
criteria, the .08 percent, the fact that only the .08 percent
09:18:52 of simulated plans packs as many residents of Jefferson County.
To this extent, that phenomena is a statistical outlier, that
creates a statistical outlier.
Q    Okay.  So it impacts it in showing that it is, in fact,
a statistical outlier.
09:19:05 A    Yes, it is -- yeah.  Sorry about that.
Q    Okay.  Moving on to your conclusions about Montgomery
County in your race-blind simulation.  And this is reflected in
the following paragraph, 33 of your report.  What is the
likelihood that Montgomery County would split at all in a
09:19:25 race-blind simulation?

1  A     Over 97 percent.

2  Q     Over 90 percent that it would stay whole or?

3  A     Stay whole.  Sorry.  Less than 3 percent would be the

4  property that's being split.

09:19:40 5  Q     And statistically, does Mr. Smith's observation that 300

6  of the 10,000 race-blind simulations split Montgomery County

7  change your observation that the treatment of Montgomery County

8  was an outlier in the race-blind analysis?

9  A     No.

09:19:58 10  Q     Does this outcome in the race-blind analysis already

11  reported in your report change your overall opinion in this

12  case at all?

13  A     No.  According to the standards of statistical criteria,

14  this difference is statistically sound.

09:20:16 15  Q     And just to be clear, in the 97,000 simulated plans in

16  which Montgomery County remained whole -- sorry -- 9,700

17  simulated plans in which Montgomery County remained whole, in

18  9,400 of those plans, the whole county was assigned to District

19  2 or 6; is that right?

09:20:36 20  A     That's correct.

21  Q     Is it accurate to say that in your race-blind simulation

22  and without consideration of race obviously, Montgomery County

23  is highly unlikely to be included in District 7?

24  A     Yes.

09:20:50 25  Q     Okay.  Just a few more questions.  If you could turn to --

1    I don't think we need it on the screen.  But in your one-MMD

2    analysis, Milligan Plaintiffs' Exhibit 1, Docket 88-1 at 14,

3    this is Figure 4 that we discussed yesterday regarding the

4    district with the second highest BVAP.

09:21:17  5         Counsel noted that 6 percent of the one-MMD simulated

6    plans included the same number of black voters in CD 2 as the

7    enacted plan; is that right?

8    A    That's correct.

9    Q    And does counsel's observation that 6 percent of the

09:21:33 10   one-MMD simulated plans include 39,000 black voters in District

11   2, as you have already reported or already included in your

12   report, does that change your finding at all that the enacted

13   plan's inclusion of those voters is a statistical outlier?

14   A    No.

09:21:51 15   Q    Have your findings with regard to the BVAP in the second

16   highest BVAP district changed at all after Mr. Smith

17   highlighted those for you?

18   A    Excuse me.  Sorry.  Can you repeat the question?

19   Q    That's all right.  My questions are quite long.  Have your

09:22:05 20   opinions in this report changed at all since yesterday?

21   A    Oh.  No.

22   Q    Okay.  One more line of questions.  You selected the 50 to

23   51 percent BVAP range for your one-MMD simulation.  Based on

24   the definition of majority and counsel's representation to you

09:22:24 25   that such a district would perform, is that what you said

1  yesterday?

2  A    That's right.  So the 50 percent is the, you know, about

3  50 percent is the definition of majority.  And then 51 percent

4  was provided by the counsel as the number that the proportion

09:22:39  5  that would perform that is the black voters' candidate, the

6  candidate of their choice.

7  Q    And you made no judgment about a district of 51 percent

8  BVAP was preferable to a district of 55 percent BVAP; is that

9  right?

09:22:52  10  A    No.  I did not conduct any analysis myself, and I don't

11  possess any opinion on this.

12  Q    Mr. Smith asked you whether selecting 51 percent versus

13  55 percent BVAP accounted for the fact that your one-MMD

14  simulation in District 2 had an average after about five points

09:23:14  15  higher than the BVAP in District 2 of the enacted plan.  Do you

16  recall that conversation?

17  A    I recall that.  Yeah.  I recall that conversation.

18  Q    But in both your initial and your rebuttal reports, the

19  simulations showed that the BVAP in the simulated District 2

09:23:31  20  was as high as nearly 40 percent; is that right?

21  A    That's correct.

22  Q    And any particular -- sorry.  Go ahead?

23  A    Yeah.  Just the maximum number -- I assume that's what you

24  are referring to.

09:23:41  25  Q    Yes.

```
 1   A     Yes.

 2   Q     And in particular, when you accounted for the communities

 3   of interest as defined in the stipulations between the parties

 4   in your rebuttal report, many of your simulations were in the

 5   37 to 39 percent BVAP range for the second highest BVAP

 6   district usually District 2; is that right?

 7   A     Right.  37, 38, you know, there are many more plans in

 8   that range than the one-MMD simulation in the initial report.

 9   Q     And would the 4 percent difference in the District 7 BVAP

10   between your simulated plans and the enacted plans, so the

11   difference between 51 and 55 percent, would that account for

12   the 9.6 percent difference between the enacted plan and the --

13   the highest number of BVAP in the simulated plans in the

14   enacted plan?

15   A     No.

16   Q     And would that 4 percent difference account for the

17   9.8 percent difference between your simulated plans that

18   considered the community of interest and the enacted plan?

19   A     No.

20         MS. EBENSTEIN:  I think those are all the questions I

21   have, Your Honor, if you could just give me one moment to

22   confer with my colleague.

23         JUDGE MARCUS:  Take your time.

24         MS. EBENSTEIN:  Thank you, Your Honor.  Those are all

25   the questions that we have for Dr. Imai.
```

1          JUDGE MARCUS:  Judge Manasco, Judge Moorer, any

2    questions for this witness?

3          JUDGE MANASCO:  None from me.

4          JUDGE MOORER:  None from me.

09:25:31  5          JUDGE MARCUS:  I have just one question for you,

6    Dr. Imai, about something that you just said in response to a

7    question that was put to you this morning.  Ms. Ebenstein was

8    asking you about population deviation.

9          THE WITNESS:  Yes.

09:25:54  10          JUDGE MARCUS:  And you explained that you used a

11    deviation of plus or minus .5 percent in your calculus.  I have

12    that right, correct?

13          THE WITNESS:  That's correct, Your Honor.

14          JUDGE MARCUS:  And then she asked you in substance

09:26:10  15    whether that deviation of plus or minus 5 percent would have

16    any effect on your calculus and the conclusions.

17       I think the way the question was put, she said nothing

18    would change if you used one person deviation rather than plus

19    or minus 5 percent.  Do you remember when she asked you that

09:26:41  20    question?

21          THE WITNESS:  So -- well, I guess --

22          JUDGE MARCUS:  I just want to know -- I guess -- all I

23    want to know is whether using plus or minus .5 percent changes

24    your analysis in any way or your conclusion in any way.

09:27:04  25          THE WITNESS:  It would not affect my conclusion.  It

will -- you know, it will change the maps that I would generate

if I want to impose that constraint using the much finer grain

data census block, or sometimes you would have to even split

the census block that just the population.  But it will not

09:27:25 affect any of my substantive conclusions.

JUDGE MARCUS:  Wouldn't affect them in any way?  I'm

just talking about the conclusions that you recited.

THE WITNESS:  Right.  Conclusion, no.  And I could

explain that if that's preferable.

09:27:40 JUDGE MARCUS:  Sure.  Please.  Feel free to.

THE WITNESS:  Right.  So the reason is that the

.5 percent -- plus minus .5 percent is about 3,500 people.

That's the maximum deviation.  Many of the simulated plans

don't go that far.  So it's much smaller differences than, than

09:28:00 that.  In addition, the usual deviation is not concentrated on

one part of the districts.  So it's usually spread out across.

You can think of it like across the edge of the boundary.  So

any, you know, my conclusion about, for example, Montgomery

County, it would be unaffected because, one, the maximum

09:28:21 deviation possible, even though many of the simulations are

much lower population difference than 3,500 people wouldn't be,

you know, enough to change that conclusion that Figure 1 will

shift maybe slightly, but it won't change greatly.  And it

won't certainly change the statistical conclusion.

09:28:43 And also, you know, most of the analysis I have conducted

1    and many other clinical researchers in the discipline conducted

2    at the precinct level, using a precinct level for congressional

3    redistricting.  We -- you know, we have established that that's

4    a small enough unit to draw decisive conclusions on this type

09:29:06  5    of analysis.

6              JUDGE MARCUS:  Thank you.  Any follow up based on what

7    I asked either, Mr. Smith or Ms. Ebenstein?

8              MR. SMITH:  Your Honor, not based on what you asked,

9    but I do have a few recross I would like to ask.

09:29:19 10              JUDGE MARCUS:  That's fine so long as it bears

11   directly on what is new or different that was brought out.  We

12   don't mean to have re-redirect that covers the same ground

13   unless there's something different or new that she brought out.

14        With that caveat, fire away.

09:29:35 15              MR. SMITH:  Certainly, Your Honor.  Thank you.

16                        RECROSS-EXAMINATION

17   BY MR. SMITH:

18   Q    Good morning, Dr. Imai.

19   A    Good morning.

09:29:41 20   Q    Dr. Imai, I have just a few questions for you.

21        Ms. Ebenstein asked you about the core retention factor.

22   Do you recall that?

23   A    Yes.

24   Q    And if I heard your answer correctly, I think you said

09:29:55 25   that if race -- if you took core retention into account and if

```
 1  race predominated in prior plans, that would mask the use of
 2  race in the current plans; is that right?
 3  A    That could.
 4  Q    So, in other words, Dr. Imai, because you did not take
 5  into account the core retention guideline, you can't say for
 6  sure whether core retention might explain the racial makeup of
 7  any of the districts in the enacted plan; isn't that right?
 8          MS. EBENSTEIN:  Your Honor, I will object that that
 9  misstates his testimony.
10          JUDGE MARCUS:  Why don't you just rephrase the
11  question, Mr. Smith?
12          MR. SMITH:  Sure, Your Honor.
13  BY MR. SMITH:
14  Q    Dr. Imai, if the use of the core retention factor masks --
15  if using that factor in your analysis would mask the use of
16  race in the current plan, then you can't say for sure based on
17  your simulations whether that factor might explain in fact the
18  BVAP of those districts, right?
19  A    So if I understand the question correctly, whether or not
20  the race affected the previous plan is the reason why I find
21  the race predominance predominates the decision of district
22  boundaries on the enacted plan.  Is that the question?  Or are
23  you asking whether if I incorporate the core restriction,
24  whatever that might be, whether the results will change?
25  Q    That is what I am asking, Dr. Imai.
```

1   A     The latter?

2   Q     Yes.  The second.  The second.

3   A     Okay.  So if -- again, I don't know what would happen if I

4   incorporate the core constraint because I have not -- I was not

09:31:46  5   given and I could not find any definition of core, so I was --

6   I didn't do that analysis.  I can't.  I don't want to

7   overstate, you know, what would happen.  I mean the

8   hypothetical analysis.

9         But the reason why I didn't include that was as I stated

09:32:03  10   is because if, you know, I incorporated the core constraint,

11   that means that I would not be able to isolate the race.

12   Q     Dr. Imai, can your analysis tell us whether core retention

13   explains the demographics of any of the enacted districts?

14   A     Retention.  So in order to do that, I would have to know

09:32:30  15   the definition of core constraint.  Like if I want to use a

16   simulation to know whether the core retention explains some of

17   my finding, I would -- I would need the definition of core, and

18   I would incorporate that in my analysis, right, and then see

19   what happens.  But the reason why I didn't do that is because I

09:32:52  20   wanted to isolate the effect of race.

21   Q     Dr. Imai, I am not asking whether you could or not.  I'm

22   asking:  Does your analysis tell us whether core retention

23   actually explains the demographics of the districts?

24   A     Actually explains.  No.  Because that was not goal of my

09:33:10  25   analysis.

```
 1   Q     Thank you, Dr. Imai.
 2         Dr. Imai, if a plan drawn that purported to observe the
 3   same criteria that you observed ended up with two
 4   majority-minority districts, wouldn't that strongly suggest
 5   that race predominated in the drawing of that plan?
 6   A     That plan -- what do you mean by -- sorry.  What do you
 7   mean by that plan?  Like which plan?
 8   Q     If a plan was drawn that purported to observe the
 9   districting criteria that you observed and that plan that was
10   drawn ended up with two majority-minority districts, wouldn't
11   that strongly suggest that race actually predominated in the
12   drawing of that plan with two majority-minority districts?
13   A     I'm sorry.  I don't feel comfortable talking about the
14   hypothetical plan that I don't have in front of me, because in
15   order to evaluate, you know, any plan, I would need to know
16   exactly what the plan is.  And I like to refrain from making
17   any speculative claims about what would I do if I have some
18   plan that's -- that -- don't know what it is.
19         MR. SMITH:  Your Honor, may I have one moment to
20   consult with my colleagues?
21         JUDGE MARCUS:  Sure.
22         MR. SMITH:  Your Honor, nothing further.
23         JUDGE MARCUS:  Thank you.  Ms. Ebenstein, anything
24   further by way of re-redirect?
25         MS. EBENSTEIN:  Your Honor, if I might ask one
```

1    question on re-redirect.

2                    FURTHER REDIRECT EXAMINATION

3    BY MS. EBENSTEIN:

4    Q    Could I ask that Dr. Imai answer the question from

09:35:16  5    Mr. Smith as he first understood it about core districts, which

6    I believe was:  If racial predominance from past plans was

7    carried over into the current plan, would you observe that as

8    racial predominance in the current plan?

9    A    In my analysis?

09:35:37 10    Q    Yes.

11    A    In my analysis that I reported.

12    Q    That you have done so far?

13    A    Yes.  Yes, because I did not consider the core constraint.

14    So any -- any -- the -- my analysis would be able to detect,

09:35:52 15    you know, any way in which the race played a role, including

16    potentially from the previous plan.

17    Q    Thank you.

18              MS. EBENSTEIN:  Your Honor, no additional re-redirect

19    questions.

09:36:05 20              JUDGE MARCUS:  All right.  If there is nothing

21    further, then, we thank you very much, Dr. Imai, and you are

22    excused.

23              THE WITNESS:  Thank you very much.

24              JUDGE MARCUS:  And I -- I take it we will be going on

09:36:16 25    to the next Milligan witness.

```
 1                MR. ROSBOROUGH:  Yes, Your Honor.

 2                MS. CARTER:  Yes, Your Honor.

 3                JUDGE MARCUS:  I'm sorry?

 4                MS. EBENSTEIN:  And I believe my colleague will be

 5      taking direct of that witness.

 6                JUDGE MARCUS:  All right.  That would be

 7      Mr. Rosborough, correct?

 8                MS. EBENSTEIN:  Yes, sir.

 9                JUDGE MARCUS:  Welcome, Mr. Rosborough, and your

10      witness that you are calling now is whom?

11                MR. ROSBOROUGH:  Good morning, Your Honor, Milligan

12      plaintiffs called Dr. Ryan Williamson.

13                JUDGE MARCUS:  Dr. Williamson, if you would raise your

14      right hand.

15                          RYAN WILLIAMSON,

16      having been first duly sworn, was examined and testified as

17      follows:

18                JUDGE MARCUS:  Thank you very much.  If you would

19      state your name for the record, please.

20                THE WITNESS:  Ryan Williamson.

21                JUDGE MARCUS:  Thank you, and counsel, you may

22      proceed.

23                MR. ROSBOROUGH:  Thank you, Your Honor.

24                          DIRECT EXAMINATION

25      BY MR. ROSBOROUGH:
```

```
 1  Q    Good morning, Dr. Williamson.  How are you today?

 2  A    Good morning.  I am doing well.  Thank you.

 3  Q    Good.  Dr. Williamson, can you please tell the Court your

 4  current professional position?

 5  A    I am currently an assistant professor of political science

 6  at Auburn University.

 7  Q    And how long have you held that position?

 8  A    I have been serving in this role since the fall of 2018,

 9  so about three-and-a-half years.

10  Q    Where do you currently live?

11  A    I currently live in Lee County, Alabama.

12  Q    And how long in total have you lived in Alabama?

13  A    Well, I have lived in Lee County since I began in Auburn

14  in 2018.  My family moved to Prattville, Alabama, in Autauga

15  County when I was a small child.  I received all of my K-12

16  education in Autauga County.  After that, I went to the

17  University of Alabama at Birmingham, where I received my

18  undergraduate degrees.  So I have spent the overwhelming

19  majority of my life in the state of Alabama.

20  Q    And, Dr. Williamson, can you please describe your

21  educational background?

22  A    Sure.  As I mentioned, I received my undergraduate degree

23  from the University of Alabama at Birmingham in political

24  science.  After that, I went on to the University of Georgia,

25  where I received my doctorate in political science.
```

1  Q    And what was the focus of your doctoral studies?

2  A    My doctoral studies focused broadly on American politics,

3  but more specifically my dissertation examined the role that

4  rules, laws, and institutional norms played in shaping things

09:38:49  5  like election outcomes.

6  Q    And what type of course work did you engage in as part of

7  your doctoral studies?

8  A    Substantively, I took a number of courses on things like

9  campaign politics, electoral politics, legislative process,

09:39:07  10  American political development.  But I also studied political

11  methodology pretty extensively.  I took courses on research

12  design, probability theory, ordinary least squares, maximum

13  likelihood estimation, geospatial data analysis, Bayesian

14  analysis.  I also participated in the interuniversity

09:39:29  15  consortium for political and social research where I took

16  courses on advanced regression and multidimensional scaling, so

17  I have also studied Statistical Methods For Social Sciences

18  quite extensively.

19  Q    Do you have any professional experience after your

09:39:46  20  doctoral degree other than your current position at Auburn?

21  A    Yes.  Between finishing my doctorate and beginning at

22  Auburn University, I served as a congressional fellow with the

23  American Political Science Association serving in the U.S.

24  Senate committee on rules and administration, which had

09:40:06  25  jurisdiction over things like federal election administration.

And my portfolio included things like the administration of

elections, electoral reforms, and things of that nature.

Q    Dr. Williamson, can you describe your teaching experience

over the past few years?

09:40:25  A    Yes.  I have taught a broad range of courses from

introductory freshman level courses to master's and Ph.D. level

courses focusing on American politics, things like state

politics, voting behavior and representation, election

administration, policy reform, electoral institutions, but I'm

09:40:49  also responsible for teaching the research methods courses,

course for the master's in public administration program at

Auburn University.

Q    How would you describe the focus of your -- or focuses of

your academic research?

09:41:05  A    My research broadly, if I had to describe it succinctly,

would just be I examine how rules influence outcomes.  I focus

on things like the role of institutions, different practices

across the 50 states, and how they are implemented and how they

affect things like the competitiveness of elections, who

09:41:28  decides to run, who ultimately wins, things of that nature.

Q    And what, if any, is your quantitative analysis

experience?

A    I've engaged in a broad range of quantitative analyses.

All of my nearly 30 publications include some level of

09:41:48  quantitative analysis, whether that is descriptive or

1   prediction based, i.e. through regressions, or things of that

2   nature.

3   Q    What experience, if any, do you have regarding

4   redistricting?

09:42:03 5   A    I, as I already mentioned, I -- redistricting was a part

6   of my portfolio while I was serving in the Senate.

7   Redistricting was one component of my dissertation.  But beyond

8   that, I have published about six peer-reviewed academic

9   articles in some of the leading outlets in the field like the

09:42:25 10   *Journal of Politics*, the *Election Law Journal*, *State Politics*

11   *and Policy Quarterly* that focus on how different redistricting

12   practices influence election outcomes.

13   Q    And as part of these publications, have you performed any

14   quantitative analysis in the redistricting context?

09:42:43 15   A    Yes.  As I mentioned, nearly all of my publications have

16   some level of quantitative analysis.  I think there's only one

17   that doesn't include some empirical investigation.  And that is

18   just descriptively the evolution of redistricting over time.

19   Q    And do any of these analyses touch on Alabama?

09:43:06 20   A    Yes.  All of the publications that I have on

21   redistricting, save one, which specifically investigates New

22   York, look at all 50 states, and Alabama is included in that

23   investigation.

24   Q    Dr. Williamson, have you led any trainings regarding

09:43:26 25   redistricting?

A      Yes.   As a part of the relationship Auburn has with the
National Association of Election Officials also referred to as
The Election Center, which has a continuing education program
for election professionals, I lead a number of trainings on
things like the constitutional law of elections, the evolution
of elections.   But specifically, I have led an advanced
training specifically on redistricting and gerrymandering.

Q      And, Dr. Williamson, have you received any awards or
grants related to your work?

A      Yes.   Regarding teaching, I've received multiple teaching
awards at both the University of Georgia while I was there, and
I was a finalist for a university-wide teaching award at Auburn
University.   Regarding my research, I have received nearly
$90,000 in grants from various organizations to support my
research.

          MR. ROSBOROUGH:   Your Honor, at this time, I'm
proffering Dr. Williamson as an expert in quantitative
redistricting analysis.

          JUDGE MARCUS:   Any objection or challenge, Mr. Davis?

          MR. DAVIS:   No objection and no challenge, Your Honor.
Although I would like to make a slight reservation of rights
that is not unique to Dr. Williamson at all.   For all of the
experts for the various groups of plaintiffs, when we stipulate
to their qualifications as an expert, we mean it for purposes
of the preliminary injunction hearing.   As the case progresses,

1    we expect there to be -- there may be more expert reports, and

2    we would reserve our rights to challenge any of those experts

3    later in the case.  But we're stipulating for purposes of this

4    hearing that he should be admitted as an expert.

09:45:09  5              JUDGE MARCUS:  All right.  Anyone else want to be

6    heard on Dr. Williamson's qualifications?

7         Seeing none, the Court will qualify Dr. Williamson for the

8    purposes of this preliminary injunction hearing as an expert in

9    quantitative redistricting analyses.  With that, you may

09:45:30 10    proceed.

11              MR. ROSBOROUGH:  Thank you, Your Honor.

12    BY MR. ROSBOROUGH:

13    Q    Dr. Williamson, what were you asked to analyze in this

14    case?

09:45:37 15    A    In this case, I was asked to analyze the extent to which

16    race played a role in the formation of the federal

17    congressional boundaries in Alabama.

18    Q    And what is your opinion in this case?

19    A    After careful analysis, it is my opinion that race served

09:45:57 20    as a predominant factor in the construction of these district

21    boundaries.

22    Q    And when you say these district boundaries, which

23    districts are you referring to?

24    A    I'm specifically referring to districts 1, 2, 3, and 7.

09:46:13 25    Q    Okay.  We'll discuss each of the specific data points you

1   analyzed in turn, but overall, what type of analyses did you

2   perform in reaching your conclusions?

3   A    Throughout my report, I analyze -- I compare groups across

4   a district line.  I descriptively evaluate the racial

09:46:35  5   composition across a boundary, whether that is a district line

6   within a county or a district line that's -- runs between

7   counties.

8   Q    How did the type of analysis you performed differ, if at

9   all, depending on the districts that you analyzed?

09:46:52 10   A    The analysis did not differ, again, except for that

11   distinction between lines that run through counties, individual

12   counties or separating different counties.

13   Q    Why did you find these analyses useful to determine the

14   role race played in the construction of the district lines?

09:47:12 15   A    I felt this was the most useful analysis in order to just

16   depict the differences that may or may not exist across these

17   lines.  I wasn't making predictions.  I am not offering

18   alternatives.  I'm -- my task was to simply describe a

19   relationship that may exist between racial composition and

09:47:32 20   district lines.

21   Q    Dr. Williamson, are you aware of the redistricting

22   guidelines adopted by the joint legislative committee on

23   reapportionment?

24   A    Yes, I am aware.

09:47:46 25   Q    Did these districting guidelines play any role in your

1   analysis?

2   A     They did not.

3   Q     And why is that?

4   A     These guidelines, though perhaps informative to the

09:48:01 5   construction of the lines, my job was to -- what I set out to

6   do was analyze the relationship between race and those lines.

7   And so my -- the guidelines that were put forth would not

8   change my analysis in any way.

9   Q     Do you believe that considering these guidelines would

09:48:20 10   have changed your conclusions in any way?

11   A     No, I do not believe the guidelines would have changed my

12   conclusions, either.

13   Q     And why is that?

14   A     Again, my analysis would not differ.  My -- I sought to

09:48:34 15   investigate the relationship between the lines as presented and

16   the racial composition of districts.  And so the guidelines

17   were not informative to that calculation.

18   Q     Dr. Williamson, I will represent to you that the

19   defendants have argued that one of their primary objectives in

09:48:54 20   drawing these maps was preserving the cores of existing

21   districts.

22         Other than your analysis of the change between the 2011

23   maps and the current maps, which we'll get to later, why

24   doesn't this principle affect the analysis you performed?

09:49:09 25   A     Whether these lines are drawn from scratch or built around

some existing boundaries, the relationship between race and

those district boundaries is going to be the same.  And,

therefore, that guideline was not informative to the analysis

that I was conducting.

09:49:29  Q    Okay.  Let's turn to the specific analyses that you

performed.

Let's discuss District 7 first.  What was the first step

in your analysis regarding the relationship between race and

district lines for District 7?

09:49:45  A    The first step was identifying the splits.  This map

contains very few splits.  But most split counties I should

say.  And so, therefore, I began by looking at the split

counties -- Jefferson, Montgomery, and Tuscaloosa, which are in

Congressional District 7 and then comparing them to other

09:50:07  counties within the state.

Q    Why did you choose to analyze these splits?

A    Again, there are very few splits, and the majority of

splits are occurring in District 7.  And so it's useful to

understand our -- is there a relationship between race and the

09:50:27  likelihood of living in a split county?

MR. ROSBOROUGH:  I'd like, Mr. Ang, if you could pull

up Exhibit M-2, which has been entered into evidence.  If we

could just go to the first page.  Thank you.

BY MR. ROSBOROUGH:

09:50:44  Q    Dr. Williamson, do you recognize this document?

 1   A     Yes.  This is my report.

 2   Q     Okay.

 3            MR. ROSBOROUGH:  And now, Mr. Ang, could you please

 4   pull up Table 1 on page 3?

09:51:00  5   BY MR. ROSBOROUGH:

 6   Q     Dr. Williamson, Table 1 titled County Black VAP, what does

 7   this represent?

 8   A     This table shows the county-wide Black Voting Age

 9   Population, which I may also refer to as the VAP for the

09:51:17 10   counties that have been split in Congressional District 7.  So

11   you see in the first column, I have listed the counties, and in

12   the second column, I have listed the districts that these

13   counties are split between, whether that's District 7, which is

14   being analyzed, or one of the other districts, whether they be

09:51:35 15   2, 4, or 6.

16   Q     And what does this table show?

17   A     So looking at this table, we are seeing a third column.

18   This is the Black VAP for each of these counties.  41.5 percent

19   for Jefferson, 56.3 for Montgomery County, and 29.5 for

09:51:55 20   Tuscaloosa.  This next column, the median black percentage,

21   this is the median county in Alabama, essentially the middle

22   district, middle county, excuse me, within the state.  And that

23   county's Black VAP just to serve as a point of comparison.

24            And so this last column is the column of interest here.

09:52:15 25   It includes the percentage deviation, essentially just the

```
 1  difference between columns 3 and 4.  And so a positive
 2  deviation denotes that these counties feature a larger Black
 3  VAP, and negative deviation would denote that these counties
 4  feature a lower Black VAP than the median.
09:52:33  5  Q    What did this analysis -- what does this analysis tell the
 6  Court?
 7  A    This analysis shows that the counties that are being split
 8  are substantively -- have substantively higher levels of Black
 9  VAP than the median county within Alabama.  So the splits are
09:52:57 10  occurring in predominantly black counties.
11  Q    Why is that meaningful for your analysis?
12  A    Again, this is -- this establishes early on just a
13  suggestive of a relationship between race and district
14  boundaries.
09:53:16 15  Q    Thank you.  We can take that document down for the moment.
16      Dr. Williamson, what additional analysis did you perform
17  relating to the district splits in Jefferson, Tuscaloosa, and
18  Montgomery counties?
19  A    I then look at the Black VAP within the different segments
09:53:41 20  of those counties, essentially comparing the racial
21  compositions of the districts that are contained within a
22  single county.
23  Q    Why did you run this analysis?
24  A    Again, it's useful to understand if these lines are drawn
09:53:59 25  without respect to race, we shouldn't expect to see meaningful
```

1  differences on opposite sides of a line bisecting a county.  So

2  I wanted to make those comparisons.

3  Q    Dr. Williamson, if you just draw a line bisecting a

4  county, couldn't racial differences just occur by chance?

09:54:17 5  A    Sure.  Any one line drawn through a county, a district,

6  the entire state may depict racial differences on opposite

7  sides.  But we're not talking about one line.  We're talking

8  about a collection of lines.  We're not talking about a random

9  line.  We're talking about a deliberately constructed line.

09:54:39 10  And so I wouldn't consider any one of these an isolation.  It's

11  about looking at all of them.

12  Q    Okay.

13        MR. ROSBOROUGH:  Mr. Ang, could you please pull up

14  Table 2 on page 4 of Dr. Williamson's report?

09:54:55 15  BY MR. ROSBOROUGH:

16  Q    Dr. Williamson, what does this table titled Census Block

17  Black VAP Within County represent?

18  A    Again, we're looking at Jefferson, Montgomery, and

19  Tuscaloosa counties and looking at the different districts that

09:55:11 20  parts of these counties have been drawn into.  So that's the

21  first two columns.

22        Here, I'm looking at the average census block Black Voting

23  Age Population within the county, and then depicting that

24  average here and presented in the third column, and then

09:55:28 25  describing that difference again with a percentage point

1  deviation in that fourth and final column.

2  Q    Let's start with Tuscaloosa.   What does this analysis show

3  regarding Tuscaloosa County?

4  A    So this analysis shows that the part of Tuscaloosa that

09:55:45 5  was drawn into Congressional District 4 featured an average

6  Black VAP by census block of less than 10 percent compared to

7  the part of Tuscaloosa that was drawn in Congressional District

8  7 featured an average Black Voting Age Population of 33.5

9  percent.   And then compared to the county as a whole, we're

09:56:06 10  talking about a nearly 25 percentage point deviation between --

11  between those two segments.

12  Q    What did this analysis find regarding Montgomery County?

13  A    Regarding Montgomery County, we see a similar relationship

14  where the average Black VAP part of the county that is drawn

09:56:27 15  into the district other than CD 7 is noticeably lower than the

16  part of the county that was drawn into Congressional District

17  7.   So, again, we see 41 percent drawn into CD 2, and then

18  75 percent drawn into CD 7.   And then compared to the county as

19  a whole, we see a 34'ish percentage point deviation between

09:56:51 20  these two groups.

21  Q    And what were your -- what did your analyses show about

22  Jefferson County and how the Black Voting Age Population was

23  split between the two districts?

24  A    Again, we see a similar relationship even greater in

09:57:07 25  magnitude.   The part of the county drawn out of Congressional

1    District 7 features a much lower Black VAP, and the part of the
2    county drawn into Congressional District 7 had a much higher
3    average Black VAP compared to the county as a whole.  We're
4    talking about a more than 45 percentage point difference, which
09:57:26 5    is the equivalent of having essentially Cullman County and one
6    part of the county, and say, Barbour County in the other part
7    of the counties split by this congressional district line.
8    Q    Dr. Williamson, for your analysis, why did you choose to
9    focus on average Black Voting Age Population in each census
09:57:54 10   block rather than looking at the county as a whole?
11   A    I focus on this for two reasons.  One, I wanted to be
12   consistent and throughout these later analyses.  But it's also
13   useful in that the census blocks are not necessarily weighted
14   by population.  And so more populace areas, which tend to have
09:58:16 15   higher Black Voting Age Populations are weighted down.  So this
16   actually creates a more conservative test when analyzing these
17   differences.  And so that gives me greater confidence that any
18   relationship that I do uncover is not an artifact of the -- of
19   how the data are constructed or the estimation strategy.
09:58:38 20   Provides me more confidence in my conclusions.
21   Q    How do these deviations by race -- or rather by Voting Age
22   Population by race between the districts in these three
23   counties inform your opinion about Congressional District 7?
24   A    These -- this analysis leads me to conclude that race was
09:58:59 25   indeed a predominant factor in constructing CD 7.

1  Q     Thank you.

2            MR. ROSBOROUGH:  You can take that down, Mr. Ang.

3  Thank you.

4  BY MR. ROSBOROUGH:

09:59:09  5  Q    Dr. Williamson, let's turn to your analysis of District 1,

6  2, and 3.

7       How did you look at the relationship between district

8  lines and Black Voting Age Population here?

9  A    Here, I began with the acknowledgment that, you know,

09:59:27 10  Black Voting Age Population is not randomly distributed

11  throughout the state.  It is instead concentrated in specific

12  group geographic portions of the state.

13            MR. ROSBOROUGH:  And, Mr. Ang, can you please pull up

14  the map on page 6 of Dr. Williamson's report?

09:59:49 15  BY MR. ROSBOROUGH:

16  Q    Dr. Williamson, what does this map represent?

17  A    This map shows -- the title here is Black Voting Age

18  Population by county.  So here we see each county's Black VAP

19  denoted by the proportion with darker shades of gray

10:00:08 20  illustrating higher levels of the Black Voting Age Population.

21  Q    How did this map, if at all, inform your analysis?

22  A    Again, this is useful in illustrating, again, how the

23  Black Voting Age Population is not randomly distributed

24  throughout the state.  It is indeed concentrated in specific

10:00:28 25  portions of the state.

```
 1  Q    Thank you.
 2           MR. ROSBOROUGH:  You can take that down, Mr. Ang.
 3  BY MR. ROSBOROUGH:
 4  Q    Why did you want to learn whether Black Voting Age
 5  Population concentrations with -- within the state -- well,
 6  strike that.
 7        Dr. Williamson, what was the next step in your analysis
 8  here?
 9  A    Given this concentration within the state, I wanted to see
10  if a comparable concentration emerged in the construction of
11  congressional districts.
12  Q    Why is learning whether a comparable construction of Black
13  Voting Age Population within the district, why is that
14  something you wanted to learn as part of your analysis?
15  A    If the concentration of Black Voting Age Population is
16  defused across multiple districts, that would provide evidence
17  of race as a factor in the construction of those boundaries.
18  Q    Okay.  And how did this analysis, if at all, differ from
19  your District 7 analysis?
20  A    Again, the analysis here was focusing on comparison across
21  district boundaries.  And with respect to CD 7, I was making
22  comparisons across district boundaries within the same county.
23  Here, I'm making comparisons across district boundaries in
24  separate counties.
25  Q    Okay.  What was the starting point for the analyses you
```

The timestamps in the left margin are:
10:00:38 (line 5)
10:00:54 (line 10)
10:01:11 (line 15)
10:01:32 (line 20)
10:01:51 (line 25)

1 performed concerning these three districts?

2 A    The starting point was looking at the level of variation

3 in the Black VAP across each of the congressional districts.

4 Q    And what were you looking to analyze there?

10:02:12 5 A    Again, I was looking to examine the variation, trying to

6 ascertain, if at all, there was a -- there might be a

7 relationship between race and the construction of district

8 boundaries based on how variable the Black Voting Age

9 Population was, whether or not, again, that concentration

10:02:34 10 translated into how the districts were drawn.

11          MR. ROSBOROUGH:  Mr. Ang, can you please pull up Table

12 3 from Dr. Williamson's report?

13 BY MR. ROSBOROUGH:

14 Q    Dr. Williamson, what does this table, which is titled

10:02:51 15 Congressional District Black VAP by census block, what does

16 this represent?

17 A    As you see on the far left, I have listed all of the

18 districts, seven districts here, include the average Black VAP

19 by census block in the second column to contextualize the,

10:03:09 20 again, the general overall level of the average Black VAP.

21          Then I also include the standard deviation and

22 interquartile range.  These are broadly speaking just measures

23 of variability.  Imagine a distribution where, you know, if

24 it's very, you know, very thin and piqued, then there's not a

10:03:31 25 lot of variety.  If it's very short and wide, there's a lot of

1    variables.  But, you know, put it, you know, even more simply,

2    a higher standard deviation denotes greater variability, and a

3    lower standard deviation denotes less variability than the

4    average Black VAP.  This is one measure of variability.

10:03:52  5    I employ a second measure of variability, this being the

6    interquartile range.  Here, the number to the left of the colon

7    is the 25th percentile.  So if you were to rank order all

8    census blocks within a district by their BVAP from smallest to

9    largest, that 0 for Congressional District 1 would be the 25th

10:04:14 10   percentile.  And the number on the right would be the 70th --

11   75th percentile.  Excuse me.  So we are looking at the middle

12   50 percent in order to kind of eliminate any outliers that may

13   emerge and provide another measure of variation here.

14   Q    And, Dr. Williamson, I think that was a helpful

10:04:33 15   explanation of the interquartile range.  Can you explain a

16   little more about what precisely standard deviation is?

17   A    Again, the -- there's a distribution that kind of centers

18   around an average.  The standard deviation kind of denotes

19   again how -- how dispersed the data are.  Again, so thinking

10:04:54 20   about, you know, to what percentage of the county -- the

21   district's Black VAP fits between, the average plus or minus

22   that standard deviation.

23   Q    What is the significance of greater variability of Black

24   Voting Age Population between census blocks in a given

10:05:18 25   district?

```
          1   A    Again, thinking about the concentration that we saw in
          2   that earlier map, greater variation as depicted by the standard
          3   deviation in the interquartile range illustrate the connecting
          4   predominantly black counties to other predominantly white
10:05:40  5   counties.  So just providing evidence of a potential
          6   relationship between race and the construction of boundaries.
          7   Q    Was there any comparison between these seven districts
          8   here that you found useful for your analysis?
          9   A    Yes.  I think it's useful to compare Districts 1, 2, and 3
10:06:00 10   to those of 4, 5, and 6.  So starting with 4, 5, and 6, we see
         11   the average Black VAP is much lower.  The standard deviation is
         12   also lower.  You notice it's only between the -- essentially 21
         13   and 28 percentage point range as compared to Districts 1, 2,
         14   and 3 where that range is in the mid 30s.
10:06:21 15        So right away, we see that, you know, there is a
         16   relatively high concentration of predominantly white areas in
         17   the northern part of the state.  And that is translating into
         18   the construction of these districts, and going to be
         19   interquartile range illustrates that well where looking at
10:06:43 20   Congressional District 4, for example, 75 percent of all census
         21   blocks feature 4.5 percent or less Black VAP.  And so we --
         22   that's what a concentrated racial composition would look like
         23   within a district.
         24        Then comparing to Districts 1, 2, and 3, again, as I
10:07:04 25   already mentioned, the standard deviation is, you know, 5 to 10
```

percentage points higher, and the interquartile range is much

broader.  So 25 percent of all census blocks within all of 1,

2, and 3 feature 0 percent Black VAP.  But on the opposite end

of the scale, 25 percent of all census blocks feature at least

10:07:29  40 percent, if not more than 50 percent Black VAP.  And so,

again, the point here is there is a lot more variability in

Districts 1, 2, and 3.

              MR. ROSBOROUGH:  Mr. Ang, you can take that down,

please.  Thank you.

10:07:43  BY MR. ROSBOROUGH:

Q    Dr. Williamson, how does this analysis inform your

conclusion?

A    This is instructive in that describing that there's a

potential for a relationship but based on race, again, thinking

10:07:58  about translating the -- essentially splitting the

concentration of predominantly black counties across multiple

districts.

Q    Dr. Williamson, let's move on to your next analysis.  What

did you next study regarding the defusion of Black Voting Age

10:08:21  Population?

A    In thinking about this, I created two categories of

counties; counties that share a border with another

congressional district, and those that are landlocked, for lack

of a better word, those that are internal to the district that

10:08:36  do not share a border with some adjoining congressional

```
 1   district.
 2   Q    Why did you seek to analyze -- well, let me put it a
 3   different way.  Why was this comparison of districts that
 4   shared a border or -- sorry -- counties that shared a border
 5   with another district versus counties that did not useful for
 6   your analysis?
 7   A    This is useful in that if the lines were drawn without
 8   respect to race, if the lines were not drawn in such a way to
 9   separate predominantly black counties and adjoin them to
10   predominantly white counties, there shouldn't be a relationship
11   between those that share a border and those that do not share a
12   border.
13              MR. ROSBOROUGH:  Mr. Ang, can you please pull up Table
14   4 from Dr. Williamson's report?
15   BY MR. ROSBOROUGH:
16   Q    Dr. Williamson, Table 4 from your report titled Census
17   Block Black VAP Within Districts, what does this table
18   represent?
19   A    This table represents, again, the two categories that I
20   created; no shared border versus those that share a border.  I
21   just want to note that my definition of sharing a border was
22   very conservative.  If a county touched any part of a
23   neighboring county in a different district, it was counting as
24   sharing a border, even if that was more -- it was potentially a
25   touch point continuity.  And so that's why District 1 is not
```

1  included in this analysis, because by that definition, there

2  are -- there's no differentiation between shared borders and

3  unshared borders.

4      With that aside, this depicts the, again, the average

10:10:26  5  census block Black Voting Age Population of the entire county

6  based on these two different bins that I have created for

7  Districts 2 and 3.

8  Q    What did you find here in analyzing District 3, first of

9  all?

10:10:43 10  A    With respect to District 3, we see a more than 4

11  percentage point difference between counties that are internal

12  to the district and counties that border another district with

13  the border counties featuring a higher Black Voting Age

14  Population.

10:11:02 15  Q    And what did you find regarding District 2?

16  A    Regarding District 2, we see the same relationship of with

17  an even greater magnitude.  We see a 13 percentage point

18  difference between counties that share a border with another

19  district and counties within that same district that do not

10:11:20 20  share a border.

21      Again, with the border counties featuring a higher average

22  Black Voting Age Population.

23  Q    What is the significance of this analysis?

24  A    Again, this illustrates how predominantly black counties

10:11:39 25  served as the cut points for dividing congressional districts

1  and the construction of these maps -- this map, I should say.

2  Q    Could the different concentrations of Black Voting Age

3  Population within Districts 1, 2, and 3 and this shared border

4  analysis for Districts 2 and 3 just reflect that some parts of

10:12:01  5  the state of Alabama are just more racially diverse than

6  others?

7  A    There are indeed -- there's necessarily going to be some

8  greater variability.  But, again, we know that there are

9  concentrations within the state that are not translating to

10:12:17 10  comparable concentrations within the congressional districts.

11         MR. ROSBOROUGH:  Mr. Ang, you can take that down.

12  Thank you.

13  BY MR. ROSBOROUGH:

14  Q    Dr. Williamson, collectively, what did you conclude based

10:12:28 15  on these analyses?

16  A    Based on these analyses, I again conclude that race was a

17  predominant factor in deciding how to construct the

18  congressional boundaries.

19  Q    Okay.  Dr. Williamson, what type of analysis did you

10:12:46 20  perform about the ways -- let me rephrase that.

21         What type of analyses about the ways in which specific

22  district splits occurred did you -- in this portion of the

23  state did you perform?

24  A    I then look at the -- just compare, again, the racial

10:13:06 25  distribution of Black VAP within the state from the earlier map

1  with the proposed map, just examining some of the choices made

2  with respect to the districts.

3           MR. ROSBOROUGH:  Mr. Ang, can you please pull up the

4  maps that are side by side from page 8 of Dr. Williamson's

10:13:23  5  report?

6  BY MR. ROSBOROUGH:

7  Q    Dr. Williamson, what are these two maps represent?

8  A    These two maps, the one on the left is the congressional

9  plan as enacted.  And the one on the right is, again, the

10:13:40 10  county Black Voting Age Population with darker shades of gray

11  denoting higher levels of Black VAP.

12  Q    Is there a reason that you place these maps side by side?

13  A    I think it's instructive and serves to well contextualize

14  some of the analysis that preceded this.

10:14:03 15  Q    What did you find as part of this visual analysis?  First,

16  let's start with District 3.

17  A    Starting with District 3, I think one of the things that

18  were most striking to me was the inclusion of Macon and Russell

19  County right here that I have highlighted.  And so you can see

10:14:26 20  that these feature relatively high levels of county Black

21  Voting Age Population.  They are a part of the state that is

22  traditionally referred to as the Black Belt.  And so you have

23  predominantly black counties in the same district as a number

24  of predominantly white counties that are some parts more than

10:14:47 25  150 miles away from each other.

1   Q    Dr. Williamson, what did you find in your visual analysis

2   regarding District 2?

3   A    Regarding District 2, again, the exclusion of Macon and

4   Russell county here, but for Congressional District 2, it's

10:15:06  5   also noticeable the inclusion of Autauga and Elmore here.  And

6   so, again, you have excluded parts of the state traditionally

7   referred to as the Black Belt and included parts of the state

8   that are predominantly white.  And I don't do any analysis

9   about compactness or anything like that.  But just to eyeball

10:15:30 10  it, it is interesting to note that it may make for a more

11  compact district to include Macon and Russell in lieu of

12  Autauga and Elmore -- other necessary stipulations aside.

13  Q    And what did you find in your visual analysis regarding

14  District 7?

10:15:51 15  A    District 7 is particularly striking in that if you were

16  asked to construct a majority-black district, you could well

17  predict where Congressional District 7 was simply by following,

18  you know, this distribution here.

19       And so you see the concentration translating into a

10:16:18 20  district here.  But the comparable concentration in other parts

21  of the state is being diffused across districts 1, 2, and 3.

22  Q    Okay.  How was your visual analyses informed, if at all,

23  by your quantitative analysis?

24  A    Again, this serves to contexualize essentially how these

10:16:41 25  -- this empirical analysis presents on a map just like

1   corroborating that conclusion.

2   Q    Considering all of these analyses together, what did you

3   conclude about the construction of Districts 1, 2, and 3?

4   A    I conclude that race was a predominant factor in deciding

10:17:01  5   how to construct these district boundaries.

6   Q    Is there any reasonable chance that these racial divisions

7   are explained by reasons other than race?

8   A    Any one test or one data point may be attributable to

9   chance.  But looking at the visual analysis, looking at all of

10:17:25 10   the individual tests within each analysis, a consistent and

11   substantively large relationship emerges.  And so it is

12   extremely unlikely that this relationship would exist again, so

13   consistently and so substantially purely to chance.

14   Q    Dr. Williamson, let's switch gears.  What was the final

10:17:49 15   analysis that you performed?

16   A    In my final analysis, I compared the enacted map to the

17   previously enacted map of 2011 looking at the census blocks

18   that were moved in or out of congressional districts.

19   Q    Why did you perform this analysis?

10:18:12 20   A    Yes.  This analysis is instructive to understand the role

21   that race played.  Again, if race was not a factor, we

22   shouldn't see, you know, an appreciable relationship between,

23   you know, essentially who is being moved in and out of

24   different districts.

10:18:31 25        MR. ROSBOROUGH:  Mr. Ang, can you please pull up Table

1  5 from Dr. Williamson's report?

2  BY MR. ROSBOROUGH:

3  Q    Dr. Williamson, Table 5 here is entitled Average Census

4  Block Black VAP.  What does this table represent?

10:18:50 5  A    Again, as you see on the far left, these are the different

6  districts that I look at -- 1, 2, 3, 6, and 7.  The 1, 2, 3,

7  and 7 being the districts I was asked to analyze.  6 being

8  included here for reasons that I can explain later.

9       The second column here the total, again, this is the

10:19:11 10  average census block Black Voting Age Population.  Then from

11  there, I create three categories; moved in, moved out, and

12  those that were kept the same.  These describe census blocks

13  that were either kept in that district between 2011 and 2021,

14  those that were moved out, so if it was moved out of that

10:19:30 15  district between the two maps, and those that were kept the

16  same.  And then I show the average census block Black VAP for

17  each of those three categories.

18  Q    What did you find regarding these districts, in terms of

19  who was moved in and moved out and kept the same?

10:19:47 20  A    Yeah.  So I just want to note up front that there were --

21  I didn't have any census blocks moved into Congressional

22  District 1.  So this test isn't necessarily appropriate for

23  evaluating CD 1.  But looking at 2, 3, and 7, we see

24  substantially larger average Black VAPs moved out than those

10:20:13 25  that were moved in.  And so, for example, within Congressional

1   District 2, the average Black VAP moved in was 31 percent.  And

2   the average black VAP for census blocks moved out of 2 was

3   55.6 percent.

4       A similar relationship exists between moved in and moved

10:20:34 5   out in CD 3 with, you know, about a 15 percentage point

6   difference between the two.  And then again in CD 7 where you

7   see a more than 28 percentage point difference, again, with

8   predominantly black census blocks being moved out of the

9   district.  Sorry.  And to round that off, thinking about, you

10:20:58 10   know, where -- where those blacks census blocks are potentially

11   being moved, we see the opposite relationship emerging in

12   Congressional District 6.

13       Again, we see it already has a, you know, relatively --

14   again, relative to these other districts low Black VAP of

10:21:16 15   18 percent.  Those that were moved out of it were predominantly

16   white areas.  Looking at the move out for CD 6, we see about

17   25 percent.  But almost 50 percent Black VAP for census blocks

18   that were moved in to CD 6.

19   Q    Thanks.

10:21:34 20           MR. ROSBOROUGH:  You can take that down, Mr. Ang.

21   BY MR. ROSBOROUGH:

22   Q    Dr. Williamson, what are -- what is the significance of

23   those findings?

24   A    Again, this is useful in illustrating the defusion of the

10:21:51 25   Black Voting Age Population and the role that race played in

        the construction of the district boundaries.
  2  Q     How do we know that these racial disparities you have
  3  identified are not just occurring by chance or due to some
  4  other factor?
  5  A     Again, I wouldn't consider any one of these points in
  6  isolation as indicative of, you know, a relationship.  But the
  7  -- all of these corroborate all of the other tests in
  8  illustrating the differences between groups illustrating a role
  9  of race as a predominant factor.  And so, again, given the
 10  consistent findings and given the substantially large
 11  differences at times between groups, it is very, very unlikely
 12  to see such a consistent pattern purely by chance.
 13  Q     Based on all of your analyses, what are your opinions
 14  about the role of race in the lines of Districts 1, 2, 3, and
 15  7?
 16  A     Again, after these analyses, I conclude that race indeed
 17  served as a predominant factor in the construction of these
 18  district boundaries.
 19  Q     Thank you, Dr. Williamson.
 20        MR. ROSBOROUGH:  I am ready to pass the witness.
 21        JUDGE MARCUS:  Thank you.  I take it, Mr. Davis, you
 22  will begin your cross?
 23        MR. DAVIS:  Yes, Your Honor.
 24        JUDGE MARCUS:  I'm sorry.  We're picking up something
 25  else from someone else.

1         Okay.  Thank you.  Mr. Davis, you will be doing it for
2    both the Secretary of State and for the intervening defendants?
3    Or is Mr. Walker going to also be asking questions, or maybe --
4              MR. DAVIS:  Mr. Walker -- he's sitting next to me.  He
10:23:45 5    have says he does not expect to have any questions for
6    Dr. Williamson.
7              JUDGE MARCUS:  The only reason I'm asking how long be
8    you be -- maybe this is a convenient time for us to take our
9    first break before you start.
10:23:57 10             MR. DAVIS:  I think it would be.  I doubt I would get
11   us to the lunch hour, but it will more than a few minutes.
12             JUDGE MARCUS:  Why don't we do this.  Let's take a
13   15-minute break at this point.  And then we will come back,
14   Mr. Davis, and begin with your cross-examination.  I have 10:25
10:24:19 15   your time.  So we'll start at about 10:40 or so your time.
16             MR. DAVIS:  Very well.
17             (Recess.)
18             JUDGE MARCUS:  Is everybody available, and can you all
19   hear me okay?
10:41:57 20        Thank you so much.  We had just a little snafu here.
21   We're ready to begin, then, with the cross-examination.
22   Mr. Davis?
23             MR. DAVIS:  Yes, Your Honor.
24                          CROSS-EXAMINATION
10:42:09 25   BY MR. DAVIS:

```
 1  Q    Good morning, Dr. Williamson.

 2  A    Good morning.

 3  Q    My name is Jim Davis.  I represent Secretary Merrill in

 4  this action.

 5       You did not -- if I understand you correctly, you did not

 6  consider Alabama's redistricting guidelines?

 7  A    That is correct.

 8  Q    So that means you did not consider traditional

 9  redistricting criteria such as preserving communities of

10  interest?

11  A    I did not directly assess that, that is correct.

12  Q    And you did not directly assess the traditional

13  redistricting principle of avoiding conflicts among incumbents?

14  A    That was not included in my analysis, that is correct.

15  Q    And is that also true for core preservation and

16  compactness?

17  A    For all redistricting guidelines, my task was to evaluate

18  the relationship between the lines and race.  And so,

19  therefore, regardless of the guidelines, the lines as presented

20  are the same.  And so, therefore, they were not informative to

21  my calculation.

22  Q    But then you did not test whether the principle of core

23  preservation had any explanation for -- was any explanation for

24  where the lines were drawn?

25  A    I did not directly assess that.  Again, whether the maps
```

were drawn from a completely blank slate or derived from some

previous map, the relationship between race and where those

lines lay is the same.  And so, therefore, it was not necessary

to include that in the pursuit of examining the relationship

10:43:52 between race and district boundaries.

Q    Let's test that.

One -- the first opinion that you went through, if I

understood you correctly, was that when you looked at the ways

counties were split, your opinion was that if the racial

10:44:09 demographics were significantly different on one side of the

split than the other, then that led you to conclude that race

was a predominant factor.  Is that a fair summary of your

opinion?

A    That -- I would say, yes, that's generally fair.

10:44:23 Q    I would like to share my screen and show you -- this is a

portion of Defense Exhibit 1, an expert report from Tom Bryan.

This is page 68 of that report.  It is a map that he has

presented.  I will represent to you, Dr. Williamson, that in

this map, Dr. Bryan has shown before and after Alabama's

10:44:51 district.

Do you see, for example, dark lines around District 5 in

the state?

A    Yes.

Q    In the northern part of the state?  Those are the old

10:45:02 district lines, and the little blue here shows where the new

1    district lines.  You can tell -- and Dr. Bryan -- Mr. Bryan

2    will be able to testify about this when it's his turn to

3    testify, Your Honor -- Dr. Williamson, what I represent to you

4    is this shows that before November, the lines were here where

10:45:24  5    the red is, and after redistricting in November, take this part

6    out of District 5.  So you see the before and after.

7         Now, I say that to preface a couple of questions,

8    Dr. Williamson.

9         Do you agree that the line Montgomery County was moved a

10:45:43 10    little north?

11    A    It does appear based on this depiction.  Thank you.  It

12    does appear based on this depiction that the 2021 line is,

13    indeed, north of the 2011 line.

14    Q    Gotcha.  Do you agree -- this is the area of Montgomery

10:46:01 15    County.  Do you agree that District 3, then, was moved out of

16    Montgomery County, and District 2 absorbed the portions of

17    Montgomery County?

18    A    Yes, I see that.

19    Q    Okay.  And here this is Tuscaloosa.  Would you agree that

10:46:19 20    it looks like this line in District 7 in Tuscaloosa County

21    moved a little north?

22    A    Yes.

23    Q    Okay.  Then you see other lines, too, were changed in

24    Jefferson County.

10:46:30 25         Dr. Williamson, do you know whether District 7 was

```
 1  underpopulated or overpopulated after the 2020 census?
 2  A    I -- I have no basis to speak to that.
 3  Q    Okay.  Well, there will be other evidence and other
 4  witnesses who can speak to that.
 5       I want you to assume for me that the evidence shows that
 6  District 7 was underpopulated by 53,000 people.  You know, but
 7  before they sat down to draw the new district lines and they
 8  looked to see which districts had too many people and too few
 9  people based on one person one vote principles, which districts
10  needed to add population and which needed to take away
11  population, District 7 needed to add 53,000 people.
12       Now, if you were a legislator, Dr. Williamson, and you
13  cared about core preservation and you needed to find 53,000
14  people, where do you think the Legislature should have turned?
15       MR. ROSBOROUGH:  Outside the scope of Dr. Williamson's
16  report and direct.
17       JUDGE MARCUS:  Mr. Davis?
18       MR. DAVIS:  I disagree.  Dr. Williamson has said that
19  he can discern the legislator's intent from where they drew the
20  lines.  I want to explore whether there aren't other perfectly
21  rational explanations that when they sit down to districting
22  the real world and had to consider real redistricting criteria
23  whether there's not other explanations other than race for the
24  moves.
25       MR. ROSBOROUGH:  Can I respond briefly, Your Honor?
```

         1              JUDGE MARCUS:  Sure.

         2              MR. ROSBOROUGH:  That's a complete misrepresentation

         3    Dr. Williamson's task.  Nowhere in Mr. Williamson's report or

         4    testimony does he purport to examine the subjective intent of

10:48:19 5    any individual.  He is examining objective circumstantial

         6    evidence of this.  And what Mr. Davis is getting to is

         7    something entirely outside of the scope of his opinions and

         8    report.

         9              JUDGE MARCUS:  Are you able to answer that question,

10:48:34 10   Dr. Williamson?

         11             THE WITNESS:  I am not.  At no point, did I

         12   investigate anything about a legislator's or anyone else's

         13   suggestive intent.  I simply sought to analyze again the

         14   relationship between race and the district lines as drawn.

10:48:50 15             JUDGE MARCUS:  If you want to reframe your question,

         16   Mr. Davis, I will permit you to put it.

         17   BY MR. DAVIS:

         18   Q    I will try something else.  Okay.  So, Dr. Williamson, you

         19   are saying you are not offering an opinion of any person's

10:49:01 20   intent?

         21   A    That is correct.  I am describing a relationship.

         22   Q    Okay.  You said if I understood your testimony on direct

         23   correctly that you -- you formed an opinion that race was a

         24   predominant factor in where the lines occurred?

10:49:17 25   A    That is correct.

342

1  Q    Okay.  Well, somebody drew those lines.  Was it a

2  predominant factor for whom?

3  A    I make no statements and offer no opinions about whose

4  intent or anything like that.  I am -- when I say predominant,

10:49:37 5  I am simply describing a consistent and substantially large

6  relationship between two things, in this case, race and the

7  district lines, as drawn.

8  Q    Okay.  But you're not offering an opinion that any

9  legislator voted for or against these plans based on race?

10:49:58 10 A    I am offering nothing about any individual's thoughts or

11 motivations or anything along those lines.

12 Q    And you did not test whether it might be motivated by

13 other criteria such as core preservation?

14 A    Again, whether core preservation entered into the

10:50:17 15 calculation would not have changed my analysis, and, therefore,

16 would not have changed my conclusions.  I was purely interested

17 in the lines as presented and their relationship with race.

18 Q    Let's explore the thing, then, that you may not have

19 considered.

10:51:00 20     This, Dr. Williamson, another portion of Dr. Bryan's

21 expert report, Defense Exhibit 1, and I want to direct you to

22 page -- let's look at page 71.

23     So I will represent to you, Dr. Williamson, what this map

24 is depicting -- no, I want to go back to page 69.  Yes.  I will

10:51:30 25 represent to you this is a plan presented by Dr. Duchin.  I

```
 1  will represent to you, as well, that what Mr. Bryan has done
 2  here is he's shown the outlines of one of Dr. Duchin's
 3  demonstrative plans, and within the state is color-coded
 4  precincts by the concentration of African-American population.
 5  See this key down at the bottom.  These precincts, which are
 6  between 0 and 10 percent black are colored red.  The 25 is
 7  orange.  Yellow, light green, dark green.  The dark green is
 8  where African-American population is more heavily concentrated,
 9  and the red is where it's least concentrated.
10      Do we understand each other, you think, Dr. Williamson?
11  A    Yes.  Red is lower black population and green is higher.
12          MR. ROSBOROUGH:  I am going to object here.  There's
13  been no basis.
14          JUDGE MARCUS:  We haven't heard the question.
15  Mr. Rosborough, we haven't heard the question yet.  He's showed
16  him the map, and he explained it to him.  Let's hear the
17  question, and then you can interpose your objection.
18          MR. ROSBOROUGH:  Thank you, Your Honor.
19  BY MR. DAVIS:
20  Q    Now, we want to focus in a little bit on Jefferson County.
21  And I know that's made -- Dr. Williamson, first of all, you
22  haven't had a chance to test the accuracy of this map, correct?
23          MR. ROSBOROUGH:  Objection.
24          THE WITNESS:  That is correct.
25          JUDGE MARCUS:  I'm sorry.
```

1        MR. ROSBOROUGH:  Dr. Williamson -- there's been no

2   foundation to establish that Dr. Williamson knows what he is

3   looking at or who Dr. Duchin even is.

4        JUDGE MARCUS:  Why don't you lay the foundation and

10:53:06  5   simply ask him whether he's ever seen this map before,

6   Mr. Davis.

7        MR. DAVIS:  Yes, sir.

8   BY MR. DAVIS:

9   Q    Have you seen this before, Dr. Williamson?

10:53:12 10   A    I have never seen this before.

11   Q    Okay.  Then I would like to at least ask my question then

12   let them object.

13        If -- Dr. Williamson, if this map does show that this

14   district was -- as drawn by Dr. Duchin, this split of Jefferson

10:53:33 15   County, that this area inside the line is more heavily

16   African-American, the green precincts, than this area outside

17   the line, which is red and orange, would you form the same

18   opinion that you expressed about Alabama's plan that race was a

19   predominant factor in the drawing of these lines?

10:53:52 20        MR. ROSBOROUGH:  Objection.  Calls for speculation.

21        JUDGE MARCUS:  Can you answer that question,

22   Dr. Williamson?

23        THE WITNESS:  No, I don't feel comfortable speculating

24   based on just looking at this one part of this one map that I

10:54:05 25   haven't had any time to do anything with.

BY MR. DAVIS:

Q    What more would you need to know -- if you assume, again, that this area on one side of the line is more heavily African-American than the area outside the line, what more would you need to know to form the same opinion about this plan that you expressed about Alabama's plan?

A    My conclusion was not based on any one piece of evidence. I would want to look at the totality of everything in order to ascertain whether or not there was a, you know, substantially large and consistent relationship between these things that could be empirically validated beyond eyeballing a map.

Q    Okay.  Did you form any opinion, then, whatsoever about incursion into Mobile County in assuming that this green does, in fact, depict more heavily African-American area than the area that she did not include in District 2?

A    Again, these -- there's just simply not enough information here for me to reliably draw any conclusions that I would feel comfortable espousing in this setting.

Q    So it's not the split -- are these circumstances that you would consider to be evidence that race was a predominant factor?

A    Could you tell me what you mean by that?  I am not sure I understand the question.

Q    Very well.  I am not asking you now to draw an ultimate conclusion about whether race is a predominant factor.  But

1 based on the analysis that you have applied to Alabama's plan,

2 would you looking at this split of Mobile County consider that

3 split to be evidence that race predominated?

4 A    Simply looking at it, no, I would not count it as

10:56:04 5 evidence.  Again, I would want to more empirically investigate

6 more substantively the relationship that I see there.

7 Q    Okay.  So you cannot look at one county split no matter

8 what the difference is or demographics on either side of the

9 line, that by itself, you are saying is not evidence that race

10:56:24 10 was predominant factor in drawing that line?

11 A    I would not eyeball one map that I have never seen before

12 and draw any conclusions from.

13 Q    You weren't asked to apply your own analysis to the plans

14 that are offered by the Milligan plaintiffs?

10:56:41 15 A    I was asked to analyze the map as enacted.

16 Q    On page 3 of your report, Dr. Williamson, you note that we

17 did not split Madison, Mobile, or Baldwin counties in Alabama's

18 enacted map.  Do you know if any of those counties have ever

19 been split in an Alabama congressional plan?

10:57:20 20 A    I have not chronicled the splits of previous counties, no.

21 Q    I am going to look at page 5 of your report,

22 Dr. Williamson.  At the bottom where you begin part 2, your

23 analysis of Districts 1, 2, and 3, you say there on the first

24 line that you examined the variability of census block Black

10:57:48 25 VAP within congressional districts to further test for

1  allegations of cracking.

2      Remind me.  What do you mean by variability of census

3  block Black VAP?

4  A   Again, I was looking at the range of census block Black

10:58:05  5  VAP within congressional districts as depicted by the standard

6  deviation and interquartile range in the table that follows.

7  Q   Is your analysis suggesting that there's too much

8  diversity in Districts 1, 2, and 3?

9  A   That would be a mischaracterization of what I have

10:58:25 10  presented.

11  Q   Well, the more diverse the precincts are, then the higher

12  the variability of census block Black VAP, right?

13  A   I am simply measuring variability.  I am not making any

14  assessments about too much, not enough, anything related to

10:58:44 15  diversity, like that's simply identifying the level of

16  variability.

17  Q   Well, don't you use this as part as a basis for your

18  opinion that race was a predominant factor in drawing Alabama's

19  congressional districts?

10:59:04 20  A   This was a piece of evidence that served to inform some of

21  my analysis, yes.

22  Q   So if Alabama had instead gone in and sorted voters by

23  race, and said this is a black area, it goes in one district,

24  this is a white area that goes in another, there would have

10:59:22 25  been less variability of census block Black VAP, wouldn't

```
 1  there?
 2  A    I mean, it's impossible to know without analyzing
 3  alternative plans, which I did not do.
 4  Q    Is it impossible to know whether we put every district --
10:59:41 5  every -- excuse me -- every precinct that was more than
 6  50 percent black if we could have put that in one district, you
 7  can tell us, right, whether or not that would have less
 8  variability than you see in Districts 1, 2, and 3?
 9  A    I see.  So you're saying if we assumed, we identified all
10:59:58 10  of the predominantly black blocks and lumped them together,
11  that there would be less variability.  Am I understanding you
12  correctly?
13  Q    Right.
14  A    Yes.  Then, yes.
11:00:09 15  Q    Yes.  Okay.  Well, and with that, then, would that lower
16  variability, would that be evidence that race predominated in
17  drawing the districts?
18  A    Without those data under that plan to analyze, I can't say
19  one way or another.
11:00:24 20  Q    Well, is there any way to achieve lower variability of
21  census block Black VAP other than sorting voters by race?
22  A    Could you ask that question again, please?
23  Q    Sure.  I mean, if -- if you think the high variability is
24  evidence that race predominated, I'm wondering how we lower
11:00:50 25  that number if you think that would result in less evidence
```

```
 1   that race predominated.  And I can't think of a way to do that
 2   other than making race predominant and sorting voters by race?
 3   A    I see.  I believe what I was depicting here, which I think
 4   is a little different than what we are talking about is
 5   providing evidence of predominantly black counties in a
 6   concentrated part of the state connecting them to predominantly
 7   white counties in other parts of the state.  Essentially trying
 8   to identify essentially are the predominantly black counties
 9   serving as cut points across districts.  And so, again, I would
10   not draw any conclusions based on just one test or one piece of
11   evidence in my report.  I was looking to see if a pattern
12   emerged, and then I based my conclusion based on the overall
13   consistency and magnitude of the effect illustrated by those
14   patterns.
15   Q    Would you agree that if the Legislature had sorted voters
16   strictly by race that the end result would be -- for purposes
17   of say District 2, then there would be lower variability of
18   census blocks in District 2?
19   A    So you're asking if District 2 was drawn to be
20   predominantly black, would there be less variability?  Is that
21   your question?
22   Q    Yes.
23   A    Possibly, but I wouldn't definitively state one way or
24   another without looking at the overall construction of the
25   district and how that -- how that relates.
```

```
 1   Q     But you could get lower variability, could you not, if you
 2   ignored everything except race?  We don't care about
 3   compactness, core preservation, avoiding incumbent conflicts,
 4   we are going to look at nothing but race and put black voters
 5   in one district and white voters in another, and the end result
 6   may be lower variability of census block VAP?
 7   A     Maybe, yes.
 8   Q     Your analysis of census block variability, it doesn't tell
 9   us, does it, whether census block with high Black VAP is
10   actually close enough to other such census blocks to be part of
11   the same district?
12   A     I'm sorry.  Could you say that again?
13   Q     Let me see if this helps.  I want you to assume,
14   Dr. Duchin, that this is -- excuse me -- Dr. Williamson, this
15   isn't Dr. Duchin's map.  This is the Alabama's enacted plan.  I
16   want you to assume again this map depicts border precincts that
17   are colored from red to green based on the concentration of the
18   African-American population in that precinct.  If you look at
19   this degree, according to this map, would you agree that
20   Anniston, you see there is an area where there are a larger
21   number of African-American voters?
22   A     Yes, I do see that.
23   Q     Yeah.
24   A     Sorry.
25   Q     Same here for Talladega, correct?
```

1  A     Yes, I see that, that green.

2  Q     Right?

3  A     That smaller green section.

4  Q     The question for you is:  You know, you talk about the

11:04:41 5  variability of District 3.  But did you actually analyze

6  whether African-American voters in Talladega or Gadsden or

7  Anniston close enough to Macon or even Mobile to be a part of

8  the same district?

9  A     I conducted no analysis based on any sort of geographic

11:05:02 10 distance between census blocks.

11 Q     And -- let's see.  Your discussion of border counties,

12 your analysis of which counties appeared on borders of

13 districts, concluded, did you not, that counties on the borders

14 of districts have a higher average Black BVAP than counties

11:05:38 15 that are not on the borders of districts?

16 A     That's correct.

17 Q     Why did you only look at Districts 2 and 3 for that

18 analysis, Dr. Williamson?

19 A     Again, given the strict definition I created of shared

11:05:51 20 border versus no shared border, technically Congressional

21 District 1 all counties border another county even if we're

22 talking about that touch point near the Bay, and so, therefore,

23 I couldn't create two categories based on that -- that

24 definition of shared versus not shared, and so therefore, it

11:06:18 25 was not included.

1  Q     Did you test District 7?  That has interior counties and

2  border counties.

3  A     That's correct.  For this particular section, I was only

4  looking at allegations that 1, 2 -- allegations regarding

11:06:35 5  Districts 1, 2, and 3 and not District 7.

6  Q     Okay.  Now that we have the map up, would it not make a

7  district very compact just to have a district that included

8  counties along the Alabama Georgia line, would it?

9  A     I can't speculate about what compactness would look like

11:06:57 10  under an alternative plan.

11  Q     Okay.  Let's imagine a district runs from Cherokee up to

12  Houston counties that just include these counties on the

13  Georgia line.  You can't tell me whether you think that would

14  be more or less compact than just District 2?

11:07:16 15  A     I actually can't given the relative uniform width of these

16  things, and the compactness would also depend on which measure

17  you used.  And so, for example, a Polsby-Popper would have a

18  pretty low compactness score, I imagine, but a compactness

19  score that only measures the kind of lost space if you placed a

11:07:36 20  rubber band around that would actually produce a relatively

21  compact score.  And so empirically, you would have evidence

22  that it was both compact and non compact.

23  Q     I have --

24         MR. DAVIS:  Your Honor, I really must apologize.  I

11:08:08 25  have written down the wrong number, and it is going to take me

1 just a moment to find it.

2           JUDGE MARCUS:  That's okay.  You take your time,

3 Mr. Davis.  Do you want a break, or do you need a minute or

4 two?

11:08:17 5           MR. DAVIS:  I think I just need a moment.

6           JUDGE MARCUS:  You take your time.

7           MR. DAVIS:  Here we go.

8 BY MR. DAVIS:

9 Q   I represent to you this is a map from Defense Exhibit 1 of

11:08:33 10 Mr. Bryan's report, and it's page 71 of that map, page 71 of

11 that report.  And this is a map where Mr. Bryan is showing us

12 where people live -- not just black, not just white, just

13 concentrations of total population by county.  Would you agree

14 that -- these counties along the Georgia line with the

11:09:03 15 exception of Lee County has lower population than these

16 interior counties according to this map?

17 A   This is the same scale with red being lower and green

18 being higher?

19 Q   Correct.  The red map is showing counties with lower

11:09:19 20 population, and the most populace -- most populace counties are

21 dark green.

22 A   Okay.  Yeah.  So looking at three -- yeah, I see six red

23 counties and seven -- seven more -- so the plurality of

24 counties are between about that 6,000 and 25,000 mark.

11:09:44 25 Q   Right.  Okay.  Now, that's the one I just showed you.

```
 1   This is by county.  This is by precinct.  So I think it will
 2   serve the purpose.  Would you also agree, Dr. Williamson, that
 3   these areas along the border -- no, this is switching to
 4   African-American population, Dr. Williamson.  And it's by
 5   precinct and not by county.
 6       Would you agree that this area along the Alabama/Florida
 7   line according to this map has a lower concentration of
 8   African-American voters than when you move interior in the
 9   state?
10   A    Yeah.  According to this map, it does appear that the
11   southern-most part of the state has a lower Black VAP.
12   Q    Gotcha.  That's true District 3, at least in this northern
13   part of District 3, correct?
14   A    Yes.  I see a lot more red in that part of the state.
15   Q    So unless you draw your districts to hug the state line,
16   you are going to have counties on the border with a larger
17   concentration of African-American voters, won't you?
18   A    I'm sorry.  Could you repeat that?
19   Q    Sure.  Unless you draw your district to hug the state
20   line, you're going to have counties on the border of the
21   districts that have a larger African-American population, would
22   you not?
23   A    Theoretically, I believe that's correct.
24   Q    Do you have any evidence of why the Legislature, in fact,
25   decided to put the lines within certain counties and not in
```

11:10:30 (line 5)
11:10:46 (line 10)
11:11:03 (line 15)
11:11:24 (line 20)
11:11:50 (line 25)

```
 1  other counties?
 2  A     Again, I did not consider or investigate anything beyond
 3  the lines as presented and their relationship with race.
 4  Q     Yeah.  Now, you assessed who was moved in and out of
 5  districts next, correct?
 6  A     Yes.  Yes.
 7  Q     Okay.  Does your analysis suggest that the Legislature was
 8  moving heavily black census blocks into District 7?
 9  A     According to the Table 5, looking at the moved-in category
10  for District 7 that we see an average Black VAP of
11  30.4 percent, and so this table presents predominantly white
12  census blocks being moved into CD 7.
13  Q     Okay.  And you haven't assessed -- your analysis doesn't
14  tell us how many people are moved in and out of these
15  districts, right?
16  A     That is correct.  I do not include numbers about
17  individual populations.
18  Q     I want should share -- this, Dr. Williamson, is --
19              MR. DAVIS:  Oh, Your Honors, I have just been informed
20  that I think earlier -- I am not sure which exhibit this was,
21  but I at one point referred to Defense Exhibit 1, when, in
22  fact, I should have said Defense Exhibit 4, with Your Honors'
23  indulgence.
24              JUDGE MARCUS:  Just so I am clear on that, when you
25  originally referred to Defense 1, I thought you were referring
```

```
 1   to Mr. Bryan's report that you had offered, right?
 2             MR. DAVIS:  Yes.  Yes.  And Mr. --
 3             JUDGE MARCUS:  No, please.  Go ahead.
 4             MR. DAVIS:  And Mr. Bryan's supplemental report is
 5   District 4.  I don't want to take up the Court's time.  By your
 6   leave, I will be prepared maybe later today to state for the
 7   record which exhibits were which that we have reviewed.
 8             JUDGE MARCUS:  Sure.  Sure.  But I take it the thrust
 9   of what you are telling me when you referred to Defense 1, you
10   really meant to be referring to Defense 4, which was the Bryan
11   rebuttal.  Do I have that --
12             MR. DAVIS:  For some of those reports, yes.  Any time
13   when --
14             JUDGE MARCUS:  All right.  Later you can just
15   straighten that out.  We don't have to take the time of your
16   examination of Williamson to do that.
17             MR. DAVIS:  Great.
18   BY MR. DAVIS:
19   Q   So, Mr. Williamson, I want to represent to you that this
20   is fact Defense Exhibit 1, and it is page 23 of Mr. Bryan's
21   first expert report.
22        And I will represent to you that here is performed a core
23   retention analysis that he will explain to the Court when he
24   testifies.  This tells us -- if you look at this left column,
25   District 1, which based on the 2011 plan, those people who were
```

Timestamps: 11:14:07 (line 5), 11:14:26 (line 10), 11:14:38 (line 15), 11:14:52 (line 20), 11:15:13 (line 25)

in old District 1 are now divided among three congressional

districts.

717,000 of them are still in District 1.  739 of them

moved to District 2.  7,783 are now in District 7.

It works the same way for all the districts.

My question to you, Mr. Williamson, is simply this:  When

you were considering whether movement in and out of districts

was evidence that race predominated, did you consider the

volume of people, the number -- total number of people who were

being moved in and out?

A    I did not directly assess the volume of people as I was

simply looking at racial composition instead.

Q    Gotcha.  And so, for example, if you had assessed -- I

know you didn't make a deal out of District 7 in this analysis,

but if it was only 739 people moving from District 1 to

District 2, which would have at least I would argue a de

minimus impact on the district as a whole, that, again, was not

part of your consideration?

A    No.  Again, I was looking at census blocks.  And so the

proportion could have actually been deflated by looking at

census blocks instead of looking at total population.

Q    Just for the Court's benefit, Mr. Bryan went through all

seven districts, and we'll show the same, and he will be able

to talk about that.

JUDGE MARCUS:  He will testify accordingly, but let's

1  just proceed with Dr. Williamson.

2  BY MR. DAVIS:

3  Q    Dr. Williamson, I will represent to you that we had a

4  deposition earlier in this litigation of a gentleman named

11:17:31 5  Randy Hinaman who was hired by legislators to do a draft plan.

6  And he testified that in drawing that plan he wanted to make

7  the area of District 7 in Jefferson County more compact than it

8  was in the District 11 plan.  Do you have any criticism of a

9  decision -- of a decision to make a district more or less

11:17:55 10  compact?

11              MR. ROSBOROUGH:  Objection.  This is outside the scope

12  of Dr. Williamson's report or testimony.

13              JUDGE MARCUS:  I think that that's true, counsel.

14              MR. DAVIS:  I think I am asking him about a possible

11:18:06 15  alternative explanation for how the District 7 lines were

16  drawn.

17              JUDGE MARCUS:  I understand.  I would just rephrase

18  your question if you would.

19              MR. DAVIS:  Okay.

11:18:13 20  BY MR. DAVIS:

21  Q    Well, then, it's the same question:  Did you consider

22  whether the Legislature amended the lines in Jefferson County

23  in order to make District 7 more compact?

24  A    Whether or not the district became more compact, less

11:18:34 25  compact, was the same level of compact, the line still exists,

and the relationship between that line and race is the same.
And so, therefore, the -- whatever motivations exist did not
enter into my analysis, wouldn't have changed it, and,
therefore, my conclusion is the same.

11:18:52  Q     You were at least questioning about the fact that Elmore
County was included with these other counties in District 2; is
that correct?

A     That's correct.

Q     Okay.  Now, you grew up in Prattville, right?

11:19:20  A     That's correct.

Q     That's where I live now.  That's Autauga County next door?

A     Right.

Q     Can you think of no reason other than race that Autauga
and Elmore County might be connected with Montgomery County?

11:19:34  A     There are plenty of potential reasons.  For growing up
there, you and I both know that a number of people work in
Montgomery but maybe live in Autauga or Elmore.

Q     That's right.  I mean, a lot of people live in Wetumpka or
Prattville and work either at the Maxwell Air Force Base or for
11:19:56  state government like I do or any of the other employers in
Montgomery County.  Would you agree?

A     Yeah.  I'm sure there are a number of people who that
describes.

Q     Okay.  Well, might a desire to preserve a community of
11:20:09  interest among these three counties not be an explanation for

1  including Elmore County with District 2?

2  A    Again, I don't wade into intent or communities of interest

3  or anything like that.  I simply set out to identify a

4  relationship, and that's what I have presented.

11:20:31  5  Q    Did you have available to you any information about what

6  members of the congressional delegation thought about their own

7  districts?

8  A    I did not.

9  Q    So if they had told Alabama officials that in their

11:21:09 10  opinion certain areas ought to go together in congressional

11  districts, that was not information you had?

12  A    No.  I did not have that information as -- again,

13  regardless of the formation of the districts, the guidelines,

14  stipulations, whatever they may be, the lines as presented are

11:21:29 15  the same, and I only looked at the lines as presented.

16  Q    Did you consider whether there's any actual connection

17  between, say, voters in Mobile County and voters in Russell

18  County on the far end of the state?

19  A    What do you mean by that?

11:21:49 20  Q    Okay.  Well, if you think the way we drew it, that race

21  predominated in the way Alabama drew its lines, I presume you

22  mean that you think it should have been drawn some other way

23  where race did not predominate.  And one of the ways that's

24  been suggested that we should have done that is to draw

11:22:05 25  districts that connect the African-American portions of Mobile

1    County with counties from the far eastern part of the state.

2        So my question to you is:  Did you in expressing your

3    opinions, make any assessment or evaluation as to whether those

4    voters in downtown Mobile and the eastern Black Belt counties

11:22:26 5    have any actual connection to each other?

6    A    I --

7        MR. ROSBOROUGH:  I am going to object again as

8    completely outside the scope of Dr. Williamson's report and

9    testimony.

11:22:35 10       JUDGE MARCUS:  I think he is being asked whether he

11   considered something or did not consider it.  I think it's a

12   clear and easy question.

13       Do you understand the question, Dr. Williamson?

14       THE WITNESS:  As I understand it, I have been asked to

11:22:50 15   make a subjective assessment of any point.  I just want to

16   clarify that I do not make a subjective assessment of or offer

17   alternatives.  I am not -- I am not the lawyer.  I am not

18   saying what could or should be done.  I am simply describing a

19   relationship.  To that point, no, in describing this

11:23:10 20   relationship, I did not include, you know, this comparison that

21   I have been asked about.

22   BY MR. DAVIS:

23   Q    Do you express any opinion on whether race predominated in

24   drawing the boundaries of District 6?

11:23:23 25   A    No, I do not offer an opinion on District 6.

```
 1  Q     Do you think --
 2              MR. DAVIS:  Your Honor, I think I may be done, but I
 3  would like to confer with my colleagues for a moment.
 4              JUDGE MARCUS:  Sure.  Take your time.
 5              MR. DAVIS:  Thank you for your patience, Your Honor.
 6  I do not have any additional questions for Dr. Williamson at
 7  this time.
 8              JUDGE MARCUS:  All right.  Thank you.  Redirect,
 9  Mr. Rosborough.
10              MR. ROSBOROUGH:  Thank you, Your Honor, just a few
11  questions.
12                          REDIRECT EXAMINATION
13  BY MR. ROSBOROUGH:
14  Q     Dr. Williamson, do you recall a few minutes ago you were
15  asked by Mr. Davis about other reasons that Autauga and Elmore
16  counties might be connected to Montgomery?  Did you recall
17  that?
18  A     Yes, I recall that.
19  Q     And do you recall testifying about individuals who may
20  live in those communities and commute to city center in
21  Montgomery?
22  A     Yes, I do.
23  Q     Would that also be true for people who live in Macon
24  County but are split into District 3?
25  A     That's entirely possible, yes.
```

Timestamps:
11:24:36 (line 5)
11:24:46 (line 10)
11:24:54 (line 15)
11:25:12 (line 20)
11:25:25 (line 25)

```
 1  Q    And might that also be true for individuals who live in
 2  the other part of Montgomery County which has been split into
 3  District 7?
 4  A    Yes, that is theoretically possible, as well.
 5            MR. ROSBOROUGH:  Those are all the questions I have.
 6  Thank you, Your Honor.  Thank you, Dr. Williamson.
 7            JUDGE MARCUS:  Anything further, Judge Manasco, for
 8  this witness?
 9            JUDGE MANASCO:  Nothing for me.
10            JUDGE MARCUS:  Judge Moorer?
11            JUDGE MOORER:  No, sir.
12            JUDGE MARCUS:  Seeing no other questions, we thank
13  you, Dr. Williamson.  And you are excused.
14            THE WITNESS:  Thank you.
15            JUDGE MARCUS:  The next witness for Milligan would be
16  whom?
17            MS. CARTER:  Going to be Shalela Dowdy.
18            JUDGE MARCUS:  Do you want to proceed with her at this
19  point, Ms. Carter?
20            MS. CARTER:  Yes, Your Honor.
21            JUDGE MARCUS:  All right.
22                     SHALELA DOWDY,
23  having been first duly sworn, was examined and testified as
24  follows:
25            JUDGE MARCUS:  Thank you.  If you would be kind enough
```

11:25:43  (line 5)
11:25:54  (line 10)
11:26:05  (line 15)
11:26:26  (line 20)
11:26:30  (line 25)

1   to state your name for the record, please.

2           THE WITNESS:  My name is Shalela Dowdy.

3           JUDGE MARCUS:  Thank you.  And you may proceed,

4   Ms. Carter.

11:26:47  5           MS. CARTER:  Thank you, Your Honor.

6                          DIRECT EXAMINATION

7   BY MS. CARTER:

8   Q    Ms. Dowdy, where were you born?

9   A    I was born in Mobile, Alabama.

11:26:54 10  Q    What year were you born?

11  A    I was born in 1989.

12  Q    What race do you identify as?

13  A    I identify as black or African-American.

14  Q    And where did you grow up?

11:27:10 15  A    I grew up in the city of Prichard, Alabama and Mobile,

16  Alabama.

17  Q    And do you still live in the city of Mobile or Prichard?

18  A    Yes.  I currently live in Mobile, Alabama.

19  Q    What schools did you attend while growing up in Mobile?

11:27:29 20  A    I attended Bessie C Fonvielle Elementary School, Nan Gray

21  Davis Elementary School, Ella Grant Elementary School, and

22  Calloway Smith Middle School and Murphy High School.

23  Q    Where did you go to college?

24  A    I attended undergrad at the United States Military Academy

11:27:50 25  at West Point, and I obtained my graduate degree from the

1    University of Texas at El Paso.

2    Q     What is your professional background?

3    A     I am -- my professional background consists of me

4    commissioning in the United States Army in 2012 as a second

11:28:07  5    lieutenant and matriculated through the ranks to -- I earned

6    the rank of captain which is the rank I currently hold.

7         I was in air dispense artillery officer on active duty

8    where I was responsible for work centered around defending air

9    space and daily Army operations.  I -- while in the Army, I was

11:28:30 10    stationed at Fort Sill, Oklahoma, Fort Bliss, Texas, deployed

11    to the Middle East to Bahrain, and Shaw Air Force Base in South

12    Carolina, while all the time still being a citizen of Alabama

13    and voting within the state.

14         And after six years of active duty, I switched to the

11:28:48 15    Individual Ready Reserves, and my first year out of the Army, I

16    worked as a consultant for Deloitte.  And after a year of that,

17    the pandemic hit.  And I worked for the Alabama Democratic

18    Party.  I did work with the 2020 census.  And for a -- for

19    about four months this year, I worked for the city of Mobile.

11:29:14 20    Q     So Captain Dowdy, what is your current occupation?

21    A     Currently, I am participating in a fellowship, a CROWD

22    fellowship, which stands for Community Redistricting Organizing

23    Working For Democracy with the Southern Coalition of Social

24    Justice.

11:29:32 25    Q     And what kind of work does that organization do?

1  A    SCSJ does work centered around voter advocacy work, and

2  right now, they're also focusing on the redistricting efforts

3  going on in the country.

4  Q    What specifically do you do as a CROWD fellow?

11:29:51 5  A    As a CROWD fellow, I am assigned lower Alabama.  So

6  counties in the first congressional district and other counties

7  in the Black Belt.  And my goal is to -- or my job is to

8  educate local residents on what redistricting is, being that it

9  is something that happens every ten years.  A lot of people are

11:30:11 10  not knowledgeable on redistricting and knowledgeable on how

11  redistricting affects us when we go to the polls and vote.

12      So we're educating people on the redistricting process,

13  what redistricting entails, and also educating them on how they

14  can play a role in the process as average citizens.  So we

11:30:30 15  provide them with testimony, training, update them on what's

16  going on in the state, and so that was our focus in the fall.

17  Now that these maps have been signed, right now, we're focusing

18  on work preparing them to be involved in the redistricting

19  going on with the local municipalities in the state of Alabama.

11:30:50 20  Q    Does your work give you an understanding of issues

21  affecting black communities in Alabama?

22  A    Yes.  The previous work that I have done with the

23  Democratic Party, the work I have done as an organizer with the

24  non-profit.  I am president of the Mobile -- called Stand Up

11:31:06 25  Mobile, and the work that I do now with CROWD provides me with

that background.  I'm able to engage with the citizens above

Mobile and surrounding counties and in the Black Belt.  And

gain an understanding on what they need, what their needs are,

and how we can progress forward.

Q    Captain Dowdy, what congressional district do you live in?

A    I reside in Congressional District 1.

Q    And what is your understanding of Alabama's redistricting

process for congressional districts?

A    My understanding is that the state has a reapportionment

committee that consists of members of both the Alabama State

Senate and the Alabama House from both political parties.  And

the reapportionment committee is chaired by Senator McClendon

and Senator Chris Pringle.  Once the census data was received

by the state, the reapportionment process basically started,

and there were 28 public hearings held across Alabama both in

person.  And which allowed for private citizens in the state to

play a role in the process with our elected officials on any

issues that we saw with the current maps so that these issued

could be rectified with the new maps that would be presented.

     There were 28 public hearings across the state.  And the

citizens of Alabama were allowed to participate both virtually

and in person.  She just through me off a little bit.  And so,

anyways, once the public hearings were done, there was about a

month break, and then the reapportionment committee presented

maps to Alabama Legislature.  And those maps were almost

1   immediately voted on.  So the citizens of Alabama were not able

2   to play a role in talking about or having any discussion on the

3   new maps.  It was as if the process was rushed.  And there was

4   not a lot of transparency.

11:33:19  5       So the new maps were presented -- the people were not able

6   to talk about it if any of the communities of interest were

7   split up.  If there were any other issues that were identified,

8   they were not able to be spoke about from the actual citizens.

9   And so they -- the reapportionment committee and the elected

11:33:41 10  officials, they say that, you know, they're aiming for the

11  process to be transparent, but given the actions that took

12  place, the short turnaround and how fast the maps were passed,

13  it was if they were trying to hinder the citizens from playing

14  a role in the process of the reapportionment.

11:33:57 15  Q    Okay.  Thank you.  Did you participate in that process?

16  A    I did participate in the process.  There was a public

17  hearing held in Mobile.  I participated in person.  I testified

18  about and spoke about all four of the current maps and placed

19  emphasis on the congressional map, and so I spoke about the

11:34:21 20  packing that is evident in District 7, and that with that

21  packing, the black vote is basically diluted.  I spoke about

22  that one district giving black Alabamians one out of seven,

23  which is only 14 percent of representation in Congress when we

24  make up about 27 percent of the population in the state of

11:34:43 25  Alabama.  And so I also advocated that I would think the fair

1  and equitable thing would have been with the new maps for there

2  to be two majority-minority districts where a second

3  African-American could be elected to Congress.

4      I gave this testimony in person.  And I also submitted a

11:35:05 5  written statement to the representative that was present from

6  the state reapportionment committee.

7  Q    By second majority-minority district, do you mean a second

8  black district?

9  A    Yes.  I mean a second black district.

11:35:18 10  Q    Why did you decide to participate in the redistricting

11  process?

12  A    I decided to participate through my work and in engaging

13  with the citizens.  I just realized people do not know how

14  important redistricting is and how it impacts us.  And so I was

11:35:38 15  -- I was provided the opportunity through the fellowship to be

16  able to participate and utilize my voice.  And so I chose to

17  participate because I saw the need.  I see the lack of

18  representation of black Alabamians and decided to participate,

19  and I know when we have these public hearings, sometimes it

11:35:58 20  seems as if they're being done just to say they were done.

21      And so if the legislators see that we are attending and

22  playing a role in the process, it can also put pressure on them

23  to do the right thing.  So that it can be known that, hey,

24  we're watching what you do.  We know our state has a history of

11:36:15 25  diluting the black votes.  So be aware that we are watching and

```
 1  we are here.  So I wanted my presence to be known.  I wanted to
 2  be the voice for those in my community who were not
 3  knowledgeable on the process.  And that's basically why I chose
 4  to participate.
11:36:29  5  Q    So, Captain Dowdy, why is it important that black voters
 6  have a second district?
 7  A    It is important for fair and equitable representation.
 8  Looking at who currently represents me in Congress, I am not
 9  comfortable, and I am not confident that he is adequately
11:36:49 10  representing me based off of bills that he has chosen not to
11  support the build back, better build, bills centered around
12  nursing mothers.  The CARES Act, the other bills, and so these
13  are issues -- we have issues in our community that can be
14  rectified by supporting these bills.  And we don't have the
11:37:11 15  right person in these elected positions who will vote for the
16  things that can help fix the issues we have in our community.
17       Then it shows that they need to -- they need to not
18  necessarily go, but we need to be able to have the opportunity
19  to elect fair -- what are our issues, because not everybody who
11:37:30 20  is elected cares about how the issues in their community.  So
21  when you're able to elect someone who understands you, who
22  comes from your community, then progress can be made.  And so
23  that is why I am advocating for that.  It is necessary that we
24  have a second black district.
11:37:49 25  Q    In your lifetime, do you know of any black person who has
```

```
  1  been elected to Congress outside of District 7?

  2  A     In my lifetime, I am only aware of black representatives

  3  being elected in the Seventh Congressional District.

  4  Q     So and then additionally, the -- the bills that you

11:38:11  5  mentioned, the CARES Act and the infrastructure bill, those are

  6  bipartisan supported bills, correct?

  7  A     Right.  For the most part, they are.

  8  Q     Thank you.  Can you tell us where the black community

  9  resides in Mobile County?

11:38:27 10  A     In Mobile County, the black community resides in the city,

 11  the city of Prichard, the city of Chickasaw, and then we have

 12  some black residents in the northern rural areas of the county,

 13  as well.

 14  Q     As far as you know, what interests do the black community

11:38:45 15  in Mobile County share in common?

 16  A     Some of the interests that we share in common

 17  unfortunately is the interest of dealing with what we -- what

 18  our struggles are.  So we have a high poverty -- a high poverty

 19  rate.  We have issues with being able to afford health care.

11:39:03 20  All the food deserts in the city happen to be in the black

 21  community.

 22        So our struggle is what kind of unifies us and what is our

 23  interest.  The health care -- issues with education.  That's

 24  what kind of unified, and those are what black people have in

11:39:21 25  common, the things they are struggling with.
```

1   Q    Captain Dowdy, can you see and hear me?

2        JUDGE MARCUS:  I think the witness has been cut.

3   Ms. Dowdy, can you hear me?  I think we have lost.

4        THE WITNESS:  I can hear you.

11:39:45 5   JUDGE MARCUS:  You can hear us okay?

6        THE WITNESS:  I can hear y'all.

7        JUDGE MARCUS:  Okay.  Thank you.  You may proceed,

8   Ms. Carter.

9        MS. CARTER:  Thank you, Your Honor.

11:39:53 10  BY MS. CARTER:

11  Q    So, Captain Dowdy, do you specifically have ties to the

12  black community in the Black Belt?

13  A    Yes, I have ties.  My great, great, grandparents

14  originally migrated from the Black Belt area to Mobile for

11:40:09 15  economic and job opportunities.  We have the port.  We have

16  factories down here.  And then outside of that, everybody in

17  the family didn't migrate.  So I still have great aunts and

18  uncles and cousins and family members that do reside in the

19  Black Belt.

11:40:23 20  Q    So black people from the Black Belt commute into Mobile to

21  work in the port?

22  A    There are some people from the northern counties that

23  drive down to work at the ports on the coast of Alabama.

24  Q    In your opinion, what do you think that the Black Belt

11:40:45 25  counties share in common with Mobile County?

1  A    Being that the Black Belt counties have a high black

2  population, what they share in common is the same -- the issues

3  that I mentioned of what unities the black community.  So

4  health care issues -- their health care issues are more extreme

11:41:05  5  in the Black Belt due to the closing of hospitals.  We have

6  access to Mobile.  Our issue is having the ability to afford

7  the health insurance.  And so in the Black Belt, they have

8  issues affording the health insurance, but also getting to the

9  hospitals because of the closing of a lot of rural hospitals.

11:41:22 10  So it's not even the hospitals.  It's even seeking regular

11  daily medical attention that they have issues with because some

12  of the closest doctors' offices are over 50 miles away --

13  comparable to the poverty rate in the black community in

14  Mobile.

11:41:43 15      Health care-wise in the Black Belt, there's a high HIV

16  rate also.  And then the issue with sewage in Lowndes County,

17  which leads to health care issues because they don't have

18  adequate infrastructure to provide themselves with adequate

19  sewage.  And then the issues with education also.  That's what

11:42:02 20  unites the Black Belt with those in Mobile.  And when our

21  family in the Black Belt are struggling, we hear about it.  We

22  try to assist as we can, because when they hurt, we hurt, and

23  it's a family issue.

24  Q    So you mentioned education issues.  How do education

11:42:18 25  issues impact black people in Mobile and the Black Belt more

```
 1  specifically?
 2  A      Those issues -- the issues that we have with education,
 3  the child care issues.  So a lot of people cannot afford child
 4  care.  So the start of education is starting later in life.
 5  And so some people are behind, and then it also leads the other
 6  economic issues later in life because the education is the
 7  issue growing up.  That means you are possibly going to make
 8  less money when you get older, and it continues to -- as
 9  poverty, and it's starting early on because we don't have
10  adequate access to education, and one of those issues because
11  of the economy.
12  Q    And how exactly people do people not have adequate access
13  to education?
14  A      Well, it starts young, so the pre-K -- a lot of the pre-K
15  programs that were around previously no longer are not around.
16  Some of that should be coming back with the Build Back Better
17  plan did get approved.  And so that will be providing funds for
18  child care and whatnot.  But people cannot afford child care.
19  And so you're leaving your kid with family members while you
20  work.  So like I said, the education and the learning process
21  for us in the black community is starting later in life because
22  we don't have the professionals.  If I am leaving my child with
23  a family member, they are not a professional to start the
24  education process.  We are behind basically and playing catch
25  up, and that sometimes puts it in -- contributes to us staying
```

Timestamps: 11:42:37 (line 5), 11:42:53 (line 10), 11:43:13 (line 15), 11:43:31 (line 20), 11:43:47 (line 25)

```
 1  --
 2  Q    And that's an issue in Mobile and the Black Belt?
 3  A    It is an issue in Mobile and the Black Belt because the --
 4  living in poverty is an issue in both locations.
```
11:44:03
```
 5  Q    You mentioned having relatives in the Black Belt.  Where
 6  exactly are they located in that region?
 7  A    I have family in Montgomery, Wilcox County, Monroe,
 8  Escambia, the Dallas County where Selma is located.  Those
 9  regions.  Tuskegee.
```
11:44:24
```
10  Q    And also you mentioned the CARES Act and the Build Back
11  Better Act as being something that if you had -- that you would
12  like more representation on.
13       What specifically about those bills are -- have -- what
14  specifically about those bills affects black voters in Mobile
```
11:44:51
```
15  and in the Black Belt?
16  A    The CARES Act or the Build Back Better plan, one of them
17  had tax credit.  So that's extra money being pumped into the
18  household.  Also the Build Back Better plan has it where the --
19  things like 7 percent of their income will go to child care.
```
11:45:12
```
20  So an example such as that the Build Back Better plan is going
21  to create more jobs and grow the economy framework wise.  And
22  then it is the Build Back Better plan is investing in child
23  care, and also care giving on the back end for those
24  individuals who are elders in our families and in our
```
11:45:33
```
25  community.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1           And then within Build Back Better, there's also health
2   care expansion.

3           MS. CARTER:  Thank you, Captain Dowdy.  No further
4   questions at this time.  I pass the witness.

11:45:46 5           JUDGE MARCUS:  All right.  Mr. LaCour, will you be
6   doing the examination?

7           MR. LACOUR:  I will, Your Honor.

8           JUDGE MARCUS:  All right.  Just a quick question of
9   timing, and you take all the time that you need.  Normally, we
11:45:59 10  would break around noon.  If you can start now and we will see
11  how we go.  Do you have a sense of timing on your examination
12  of Ms. Dowdy?

13          MR. LACOUR:  Your Honor, probably more than
14  15 minutes.

11:46:15 15          JUDGE MARCUS:  Why don't you start, and then you tell
16  us what would be a convenient time to break.

17          MR. LACOUR:  Okay.

18          JUDGE MOORER:  Also, Ms. Dowdy, you probably are
19  nervous, but please speak a little slower.  It is hard for the
11:46:35 20  court reporter to catch everything when you speak quickly.

21          THE WITNESS:  Yes, Your Honor.

22          JUDGE MARCUS:  Thank you, counsel, and you may
23  proceed.

24          MR. LACOUR:  Excellent.

11:46:48 25                      CROSS-EXAMINATION

```
 1  BY MR. LACOUR:
 2  Q    Captain Dowdy, thank you for being with us today.  I am
 3  Edmund LaCour.  I am an attorney for the defendant in this
 4  case, Secretary of State.  I have a few questions for you about
11:46:58  5  some of the testimony you gave today, as well as these
 6  statements you -- and to your declaration that was submitted to
 7  the Court.
 8       First, you stated you were born and raised in Mobile,
 9  correct?
11:47:10 10  A    Yes, I was born in Mobile and raised in Mobile.
11  Q    And would you agree that Mobile is a particularly unique
12  city not -- within the state of Alabama?
13  A    We have a few things that are not found in other parts of
14  the state, so, yes.
11:47:28 15  Q    What sort of things?
16  A    Mardi Gras.
17  Q    And Mardi Gras from school growing up, wouldn't you?
18  A    Yes.
19  Q    Do you know if that's common outside of Mobile?
11:47:44 20  A    It's a Gulf Coast thing, so from New Orleans to Mobile for
21  the most part.
22  Q    Uh-huh.  Have you spent much time in New Orleans?
23  A    I've been there a couple of times.
24  Q    If you were to compare New Orleans to Mobile, and Dothan,
11:48:08 25  Alabama to Mobile, which would you say are more culturally more
```

```
 1   similar?
 2   A    I definitely -- I would really lean towards a mixture of
 3   both.
 4   Q    Okay.
11:48:21  5   A    Yeah.  We have like rural areas of our city.  So that's
 6   why I said a mixture of both.
 7   Q    Okay.  What are some of the other things that you noticed
 8   about Mobile that set it apart within the state beyond Mardi
 9   Gras?
11:48:41 10  A    There really isn't much.  And I have a lot to compare
11   since I was in the military.  So there's not much to say
12   besides we are on the water, so we have an industry that other
13   cities wouldn't have.
14   Q    Yeah.  And the port, it's a major driver of economic
11:48:56 15  activity in Mobile, right?
16   A    It is.
17   Q    And not just for the city of Mobile, but for the county of
18   Mobile?
19   A    For the state.
11:49:03 20  Q    For the whole state.  Correct.
21        Would you agree it's particularly important economic
22   driver for the counties that are centered around Mobile?
23   A    I would say so, because I know people that are both from
24   our state to other states or from the northern counties above
11:49:25 25  us to come down to work in the particular field.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

```
 1   Q     So including Baldwin, Washington, Monroe, and Escambia
 2   counties?
 3   A     Yeah.  Those -- those counties.
 4   Q     Would you say them in particular?
 5   A     Say again.
 6   Q     Would you say those particular counties sort of --
 7   A     I would say that because they're the -- they're -- they
 8   are the closest.  And people are not fond of the south, so,
 9   yeah.
10   Q     Yeah.  Not a lot of folks travel in from where I am in
11   Montgomery down to work at the port on any given day, correct?
12   A     Yeah, no.
13   Q     And when the port is going well, does that benefit
14   Alabamians from all five of those counties?
15   A     When the port is doing well, I would say it benefits the
16   entire -- in particular, the lower half of the state since it's
17   the closest to the port.  So the Black Belt and the Mobile
18   area.
19   Q     And that would include benefits for white and black
20   Alabamians alike, correct?
21   A     Yes, for everyone in the state, no matter their race.
22   Q     Okay.  Now, I wanted to turn to something you said in your
23   declaration.  This is paragraphs 7 and 8.  Do you have that in
24   front of you or would you like me to share it on my screen?
25   A     Can you repeat that?
```

11:49:42  (line 5)
11:49:59  (line 10)
11:50:20  (line 15)
11:50:37  (line 20)
11:50:56  (line 25)

```
 1   Q    I was going to turn to something, a couple of statements
 2   you made in your declaration.
 3   A    Okay.
 4   Q    In particular, paragraphs 7 and 8.  Do you have a copy in
11:51:11  5   front of you, or would it be helpful for me to show that?
 6   A    I do not have it in front of me.
 7   Q    Okay.  Let me pull that up right now.
 8        Okay.  So this is Milligan Exhibit 16.  And I am going to
 9   go down to paragraphs 6 -- or 7 and 8.  I think this tracks
11:51:55 10   along with some of the things you were saying earlier.
11        In particular, you stated, along with other black people
12   in both the city of Mobile and Mobile County, can trace our
13   family roots back to the Black Belt areas of Alabama, and you
14   list some of those counties.
11:52:10 15   A    Right.  You don't have to read it.  I see it.
16   Q    All right.  And then paragraph 8.
17   A    Uh-huh.
18   Q    Closing with, that I guess essentially black people in the
19   city of Mobile and the county of Mobile can trace family roots
11:52:30 20   back to Black Belt areas.  And then black people both in the
21   city and the whiter county of Mobile share history and similar
22   struggles when it comes to combating diversity, fighting
23   inequality in the state of Alabama; is that correct?
24   A    That is correct.
11:52:47 25   Q    Okay.  I will take this off of screen share.
```

1          So then would you agree that black people in the city of

2    Mobile and black people in Mobile County who live outside of

3    the city are part of a community of interest?

4    A    I would say so.  Those in the cities that I named earlier,

11:53:11 5    so Prichard, Chickasaw, Mobile -- and the city of Mobile.

6    Q    Okay.  And what about black people in any other parts of

7    the county?

8    A    For the most part, the black people are kind of in the

9    same area.  Besides the ones that are in the rural part of the

11:53:32 10   county, their numbers are low, but there are African-Americans

11   in the rural parts of Alabama, and I would say they're dealing

12   with the same issues that we are in the urban area of the

13   county.

14   Q    Okay.  So you would say there are part of the community of

11:53:50 15   interest with black Mobilians who live in the city?

16   A    I would say so.  They're dealing with the same issues,

17   health care issues, poverty, whatnot, so, yes.

18   Q    Okay.  Do you think that black people from Mobile city --

19   I will say Mobile city -- when I refer to people from Mobile

11:54:16 20   County, I will mean Mobile people who are not within the city

21   for this particular question.  But do you think people -- black

22   people from Mobile city that have more in common with black

23   people from elsewhere in Mobile County or more in common with

24   black people from Barbour County, which borders the state of

11:54:36 25   Georgia?

```
 1   A     If Barbour County is a Black Belt county?

 2   Q     Would you define it as a Black Belt county?

 3   A     That's like 17 of them, so I don't know every Black Belt

 4   county.

 5         But black people in the Black Belt or black people in the

 6   central lower half of Alabama are all dealing with the same

 7   issues.

 8   Q     Uh-huh.

 9   A     With the poverty and health care, so I would say we do

10   have stuff in common.  We do have similar issues in common.

11   Q     Do you think people in Mobile city and the rest of Mobile

12   County, though, might also have other things in common beyond

13   dealing with those particular issues that you were discussing

14   in your testimony?

15   A     What issues would you be talking about?  Because I focused

16   on the issues that affect their daily -- day-to-day operations

17   in their daily lifestyles, not anything that is pleasure or

18   whatnot, but anything that prevents them from being to live

19   fair, equitably, and comfortably.

20   Q     Oh, how about economic issues?  Those are day-to-day,

21   correct?

22   A     Right.

23   Q     Probably --

24   A     I would say as a whole, the state has a low minimum wage.

25   A low minimum wage affects being able to afford basic things,
```

Timestamps: 11:54:50 (line 5), 11:55:03 (line 10), 11:55:16 (line 15), 11:55:33 (line 20), 11:55:44 (line 25)

383

1  such as health care.  And so the people -- you know, their

2  economic issues are prevalent, and people in Mobile have the

3  same economic issues -- especially if we're following these

4  similar.

11:56:11  5  Q    But would a Mobile County resident, black, white, any

6  race, be more likely to work with a Mobile city resident, or

7  with a Barbour County resident?

8  A    Well, given the distance, I would say Mobile, but we are

9  in a state school board district with counties all the way on

11:56:29 10  the border of Georgia, so we have an interest when it comes to

11  say school board and no one has an issue with that.  So I say

12  it shouldn't be an issue when it comes to another map.

13  Q    All right.  Would residents of Mobile County versus Mobile

14  city, would they be more likely to shop at the same stores and

11:56:51 15  get their news from the same sources than through Mobile County

16  and Barbour County residents?

17  A    Given the location, I would say, yes, the city of Mobile

18  and the county of Mobile residents would shop in the same

19  entities.

11:57:05 20  Q    Okay.  So, then, residents of the county of Mobile might

21  have -- well, I take your point is that there are certain

22  things that Mobile city residents have in common with Barbour

23  County residents, or black Mobile city residents and black

24  Barbour County residents might have in common.  There might be

11:57:27 25  other things that black Mobile County residents have in common

1 with black Mobile city residents that are not shared with black

2 Barbour County residents; is that fair?

3 A    Off the top of my head, I really can't necessarily think

4 of anything -- any major issue that we would have in Mobile

11:57:44 5 that's just uniquely different to just us in the city instead

6 of black people in other areas of our state.

7 Q    Well, let's take -- let's go back to the port for a

8 moment.  If there's a congressional representative from the

9 Gulf, he might be more interested in making sure that the port

11:58:10 10 is deep end and wide end than a congressional representative

11 from Huntsville area who might be more interested in the

12 Redstone Arsenal, for example; is that fair?

13 A    It would be fair if the current representative in the port

14 area hasn't been supporting a wall, and a wall isn't by the

11:58:34 15 Gulf Coast.  So I don't think that could be a good comparison.

16 Q    Could you say that again?

17 A    When I say wall, I'm talking about the wall -- the Texas

18 border wall that has been talked about being built.

19      So that representative who represents us has supported

11:58:49 20 that wall, and that wall has nothing to do with us.  So I don't

21 think the example that you gave would be a fair one for me to

22 -- to converse about.

23 Q    I was speaking more hypothetically, Ms. Dowdy -- or

24 Captain Dowdy.  I apologize.

11:59:10 25 A    Miss is fine.

```
 1  Q     Great.
 2        I mean, hypothetically, you would expect any
 3  representative black or white from the Gulf area to be perhaps
 4  more interested in Gulf issues?
11:59:25  5  A     Right, you would.
 6  Q     Than a representative on the border with Tennessee?
 7  A     Yeah, you would.  But you never know what you will get
 8  sometimes when you elect certain individuals, so you would
 9  think your elected representative would care about your health
11:59:39 10  care, but that isn't being a thing that we're seeing how things
11  are being voted on in D.C.  So I'm real -- I am more of a
12  realistic person and not hypothetical.
13  Q     Do you think there might be any -- some good faith reasons
14  for not supporting the Build Back Better plan?
11:59:56 15  A     Looking at the -- the way it can grow the economy, how it
16  helps the middle class and the working citizens, I don't -- I
17  don't see a reason why you would not support helping Americans
18  when we are battling a pandemic.  People have lost their jobs.
19  You should want to help the working citizens, all Americans, so
12:00:16 20  I don't see the issue -- I can't find a reason why someone
21  should not support it.
22  Q     Would it be fair to say some people might be concerned
23  about the rate of inflation that might -- and how it might be
24  affected by a particularly large federal spending bill?
12:00:35 25  A     I think people should come first, you know.  You choose to
```

```
 1  represent people.  When you are an elected official, you need
 2  to be focused on whether or not the bill in front of you will
 3  help the people who need the help in the district that you are
 4  representing.
```

12:00:53  5    Q     Does inflation affect black people?

      6    A     It probably would affect everybody in America.

      7    Q     Okay.

      8    A     And not just black people.

      9    Q     Okay.  I would tend to agree it would affect everyone.

12:01:15 10          MR. LACOUR:  This might be a good point to stop, Your

11  Honors.

12          JUDGE MARCUS:  All right.  Why don't we do that?  We

13  will take a one-hour break for lunch, and we will come back

14  about five minutes after 1:00, and we will get started at that

12:01:28 15  point.  Ms. Dowdy, I would ask you if you would be kind enough

16  to come on back or really just stay communicating with us

17  because we will start back with you at 1:05 with Mr. LaCour and

18  then again with Ms. Carter.

19      Mr. LaCour, how much more do you think you have with

12:01:49 20  Ms. Dowdy?

21          MR. LACOUR:  Your Honor, it's a little tough to

22  estimate.

23          JUDGE MARCUS:  Just a rough sense of how the rest of

24  the day is likely to play out.

12:02:02 25          MR. LACOUR:  Probably 20 to 30-minute range.

 1        JUDGE MARCUS:  Okay.  And then the next witness for

 2  the Milligan folks, Ms. Carter, would be whom?  Do you know?

 3        MS. CARTER:  I'm not exactly sure.  I would be able to

 4  say after lunch.

12:02:20  5        JUDGE MARCUS:  Okay.  We will just take it as we -- as

 6  we proceed.

 7     Ms. Khanna, was there anything you wanted to add at this

 8  point or?

 9        MS. KHANNA:  Yes.  Thank you, Your Honor.  Just for

12:02:29 10  the Court's information, I believe the plan is after Ms. --

11  Captain Dowdy testifies, the Carter plaintiffs will begin with

12  your their Section 2 witnesses with Mr. Cooper -- sorry -- the

13  Caster plaintiffs.  Apologies.

14        JUDGE MARCUS:  Milligan.  I'm not sure -- are you

12:02:49 15  putting on your experts at that point, or are we going to hear

16  from the Milligan experts Duchin, Liu, and Bagley?

17        MS. KHANNA:  So the plan right now I think is to

18  proceed after this witness to the Section 2 case, which is both

19  Milligan and Caster.  And we are coordinating so that our

12:03:06 20  witnesses will go not necessarily with just Milligan first,

21  then Caster, but interspersed.

22        JUDGE MARCUS:  I got it.  And you are free to put it

23  in any order mixing them however the parties think is most

24  appropriate.

12:03:18 25     All right.  We thank you all.  And we will see you back

1    here let's say at 1:05, and we will pick up the thread with

2    Mr. LaCour.

3         We are in recess until then.  Thank you.

4         (Recess.)

13:04:44  5         JUDGE MARCUS:  Judge Manasco, Judge Moorer, are we

6    ready to proceed?

7              JUDGE MOORER:  Yes, sir.

8              JUDGE MANASCO:  I am.

9              JUDGE MARCUS:  We broke as I said before in the middle

13:08:11 10   of the cross-examination of the Ms. Dowdy by Mr. LaCour.  With

11   that, you may proceed, counsel.  Thank you.

12   BY MR. LACOUR:

13   Q    Your Honor, Captain Dowdy, welcome back.

14        Just briefly.  On your direct testimony, you said that the

13:08:29 15   Build Back Better bill was a bipartisan bill.  What was your

16   basis for that?

17   A    I didn't say bipartisan.  You asked me, and I said from

18   what I'm tracking, it was passed, and some people from both

19   sides -- I don't know the exact number on how many from each

13:08:48 20   side voted for the bill, but I know -- I'm tracking that it

21   might have been members from both sides.  I haven't really

22   looked.  All I cared about was whether or not it had been

23   passed.

24   Q    Are you referring to the small infrastructure bill or the

13:09:03 25   larger Build Back Better plan that has not yet been enacted?

```
 1  A     The Build Back Better plan, the one -- the one that was
 2  recently signed.
 3  Q     Okay.  Do you equate opposition to the Build Back Better
 4  plan as a lack of responsiveness to the needs of Black
 5  Americans?
 6  A     Knowing that health care expansion will be a huge part of
 7  each aspect of the plan, I would say I don't think the black
 8  Americans or those who struggle with being able to afford
 9  health care was adequately taken into consideration.
10  Q     Okay.  And you -- I think you said earlier you lived in
11  South Carolina for a time; is that right?
12  A     Yes.  I was stationed at Shaw Air Force Base from 2017 to
13  2018.
14  Q     Okay.  Are you familiar with who Senator Tim Scott from
15  South Carolina is?
16  A     I've heard the name, but because I have been registered in
17  Alabama to vote my whole life, I kind of -- I paid more
18  attention to the elected officials that I have the ability to
19  elect.
20  Q     Does it sound right that he's someone who identifies as
21  black and also a Republican?
22  A     I do knew that -- I do know -- I know of Tim Scott.  So I
23  don't follow him closely or what he votes for because he's not
24  my elected official.
25  Q     Okay.
```

Timestamps: 13:09:28 (line 5), 13:09:57 (line 10), 13:10:17 (line 15), 13:10:33 (line 20), 13:10:53 (line 25)

1  A    Or represent me.

2  Q    Would it surprise you if I told you that he opposed the

3  Build Back Better plan?

4  A    It would not surprise me, because I do know he is a member

13:11:04 5  of the party who majorityly (sic) opposed the plan.

6  Q    Okay.  You think a congressional, a Republican Congressman

7  can represent the needs of black Alabamians?

8  A    It depends on being able to examine their voting record.

9  And the current -- my current representative is in his first

13:11:34 10  term, but examining his current voting record in Congress, I do

11  not feel that he -- and I could only speak on my person because

12  he -- he is representing me, so I pay attention to who -- who

13  represents my area right now.  I feel like he's not doing an

14  adequate job at representing black Alabamians.

13:11:54 15  Q    Okay.  And do you think a black Congressman could

16  represent the needs of white Alabamians?

17  A    I feel like a -- I feel like a black Congressman could

18  represent both demographics.  There are white Alabamians in

19  District 7, even though it is majority-black.  And I think

13:12:16 20  Terri Sewell does a great job of representing everybody in her

21  district, and I use her because that's the only district we

22  have ever had black representation from.

23  Q    Do you think she adequately represents the needs of

24  Republicans in her district?

13:12:31 25  A    I would say yes.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

```
 1   Q      What makes you say yes?
 2   A      When it comes to basic necessities and what brings comfort
 3   to individuals as a whole, she supports bills that benefit both
 4   black and whites.  So I would say yes.  Black, white, Democrat,
 5   Republican.
 6   Q      What sort of bills?  I'm just curious.
 7   A      The opposite -- she's -- my Congressman did not support
 8   basically.  So Build Back Better, the CARES Act, there was a
 9   bill centered around -- it was Pump, centered around nursing
10   mothers.  She supported that.  My Congressman did not.  So
11   bills such as the ones that I mentioned previously.  Basically
12   everything my elected official voted against, she voted for.
13   Things don't just help Alabamians.  Thankfully they help
14   everybody in our state.
15   Q      All right.  So changing gears a little bit.  You said
16   earlier that you have family ties to the Black Belt, correct?
17   A      Correct.
18   Q      Do you have any family ties to Birmingham?
19   A      I have an aunt and all of her kids, so my cousins and
20   cousins that live in Birmingham.
21   Q      Okay.  Do you have any family ties to Huntsville?
22   A      I do.  I have cousins in Huntsville.
23   Q      Okay.  And do you know other black people in Mobile who
24   have family ties to Birmingham?
25   A      Yes, I do.  A lot of us have relatives who lived in the
```

Timestamps: 13:12:50 (line 5), 13:13:10 (line 10), 13:13:28 (line 15), 13:13:53 (line 20), 13:14:08 (line 25)

```
 1   Black Belts who migrated -- they didn't just migrate to the
 2   port, but also migrated to Birmingham because of the steel
 3   industry and Huntsville and Montgomery.  So we have family.
 4   Myself and my peers, friends, we have family for the most part
13:14:27  5   in the rural parts of the state, along with the other major
 6   cities in Alabama.
 7   Q    Okay.  And earlier, you identified certain interests that
 8   were shared by black people in Mobile and black people in the
 9   Black Belt related to health care, education, correct?
13:14:51 10   A    Correct.
11   Q    Would those same interests be shared by black people in
12   Birmingham or Huntsville?
13   A    I -- my work -- majority of my work has been done in the
14   lower part of the state, given my -- Montgomery.  So I really
13:15:15 15   haven't done much research on Huntsville.  Not even research.
16   I haven't had a lot of time in Huntsville and Montgomery.  I
17   have had time there, but majority of my organizing work has
18   been in the lower central region of the state, just because of
19   accessibility.
13:15:31 20   Q    Do you have reason to think that -- scratch that.
21        So returning briefly to your declaration.  You stated that
22   black people in Mobile and in the Black Belt, quote, share
23   history and similar struggles when it comes to combating
24   adversity and fighting inequality in the state of Alabama.  Do
13:15:54 25   you think there's a similar shared history and similar
```

1  struggles for black people in Birmingham or black people in

2  Huntsville?

3  A    Being that they do have relatives -- I feel comfortable

4  saying people have relatives from the Black Belt area.  There

13:16:11  5  could be similar struggle.  The things I mentioned when it

6  comes to health care and food deserts and education, that's a

7  -- that can go out of other areas.  But like I said, I'm more

8  knowledgeable on the central and lower half because I am

9  assigned to do work in the lower half in the First

13:16:30 10  Congressional District and the surrounding counties in the

11  Black Belt.

12  Q    But do your family members in Birmingham or Huntsville

13  share similar interests to you in terms of these political

14  interests?

13:16:43 15  A    Could you elaborate on the political interests you're

16  talking about?  Because the health care stuff isn't political.

17  That's a human need or a human right.

18  Q    They have similar interests when it comes to health care,

19  education, other human rights?

13:17:04 20  A    Yes, as I think everybody would, black and white.

21  Q    Okay.  And would you say that black people in Mobile form

22  a community of interest with black people in Huntsville, then,

23  based on shared relationships to the Black Belt, shared

24  interests in health care, education, and other poverty-related

13:17:31 25  issues?

```
 1   A    I feel like we would have more family ties to those in the
 2   Black Belt.  So not necessarily Huntsville.  Like the amount of
 3   family I have in Huntsville is the smallest.  I have the least
 4   amount of family in the Huntsville area.  So I would say with
 5   the issues that are going on in my family in the Black Belt and
 6   if it -- it's impacting me in Mobile because they're my family.
 7   I wouldn't necessarily say that that is always the same issue
 8   with Huntsville.  So I'm not knowledgeable of Huntsville
 9   because it's almost six hours away.  I don't spend that much
10   time in Huntsville, so I haven't adequately engaged the people
11   of Huntsville, including family or organizing work.  I have
12   been assigned the areas on the lower part of the state, just
13   because of the distance and the space.
14   Q    Do you have reason to think that black people in
15   Huntsville would not have similar -- to use your language again
16   -- experience combating adversity and fighting inequality in
17   the state of Alabama as -- for black people in Mobile and black
18   people in the Black Belt?
19   A    Are we talking about modern day or just throughout time?
20   Q    Let's just stick to today for now.
21   A    There is -- poverty exists in the black community.  So in
22   the black community, they have --
23        JUDGE MARCUS:  I'm sorry.  You broke up for a second,
24   Ms. Dowdy.  I don't think we heard the last thing that you
25   said.
```

```
 1              THE WITNESS:  With those in Huntsville.  So I don't
 2       feel like I can adequately answer the question.
 3       BY MR. LACOUR:
 4       Q    And sorry.  Could you repeat the -- I think we lost you
13:19:29 5     for a moment.
 6              JUDGE MARCUS:  Why don't we start over, Mr. LaCour.
 7       Ask the question again, and again, we'll take Ms. Dowdy's
 8       answer.  The reason we're doing that is for a moment your
 9       screen froze up, so we were unable to hear a piece of your
13:19:46 10    answer.  With that, why don't you ask the question again.
11              MR. LACOUR:  Sure, Your Honor.
12       BY MR. LACOUR:
13       Q    The question was basically:  Do you have any reason to
14       think that black people in Huntsville would not have a shared
13:20:01 15    history and similar struggles to black people in the Black Belt
16       or black people in Mobile when it comes to --
17              MS. CARTER:  Objection, Your Honor.
18              JUDGE MARCUS:  Let him finish the question.
19       BY MR. LACOUR:
13:20:14 20    Q    -- fighting inequality in the state of Alabama?
21              JUDGE MARCUS:  Ms. Carter?
22              THE WITNESS:  I will say --
23              JUDGE MARCUS:  No, no, no.  Wait one second,
24       Ms. Dowdy.  I think there is an objection from Ms. Carter.
13:20:24 25    MS. CARTER:  Yes, Your Honor.  The question -- the
```

```
 1  question calls for speculation, and it's also asked and
 2  answered.  He's asked --
 3              JUDGE MARCUS:  Well, I think it has been asked and
 4  answered a few times.  We will give you one more shot at it,
 5  Mr. LaCour, and then let's move on.
 6              MR. LACOUR:  All right.  And am I asking it again
 7  because of the lag or?
 8              JUDGE MARCUS:  I think the question has been asked in
 9  a variety of ways and answered in a variety of ways.  I think
10  it has been asked and answered.  What I said was I would give
11  you one more stab at it if you want it.
12              MR. LACOUR:  Okay.
13  BY MR. LACOUR:
14  Q    My question was:  Do you have any reason to think that
15  black people in Huntsville would not have shared interests
16  comparable to the shared interests between black people in
17  Mobile and black people in the Black Belt?
18  A    Like previously stated, I haven't engaged on an in-depth
19  level with the people in Huntsville to hear about what their
20  issues are at the level that I have engaged with those in the
21  Black Belt and lower Alabama region.
22  Q    And you said before that one reason is it's six hours
23  away, correct?
24  A    Correct.
25  Q    So that distance makes it a little bit harder for you to
```

13:20:37 (line 5)
13:20:54 (line 10)
13:21:05 (line 15)
13:21:26 (line 20)
13:21:43 (line 25)

```
 1  know the facts on the ground in Huntsville, correct?
 2  A    It can.  It can.
 3  Q    Now, you said you worked for the Alabama Democratic Party
 4  for a time; is that correct?
 5  A    Correct.  Correct.
 6  Q    Was any of that work on a congressional campaign?
 7  A    Outside of that work was centered around Senator Doug
 8  Jones.  And then outside of that in my personal time, I have
 9  worked on a congressional campaign.
10  Q    Was that in the First District?
11  A    It was in the First District.
12  Q    Okay.  Was that a recent congressional campaign?
13  A    It was 2020 election cycle.
14  Q    Okay.  Were you working with James Averhart?
15  A    Yes.  I was working with James Averhart.
16  Q    Okay.  And he was the Democratic nominee for the --
17  A    He was.
18  Q    -- in the general election to Representative Carl?
19  A    Yes, he was.
20  Q    What sort of work were you doing on the campaign?
21  A    Engaging with the citizens in the counties assigned to the
22  -- to the district.
23       So engaging with them on what their issues were that they
24  would want James Averhart, if elected, to advocate for as their
25  Congressman.  So we did that in some of the Black Belt counties
```

1  -- Monroe County.  Clarke county was in the First Congressional
2  District.  A portion was, but it's not anymore.  So in those
3  districts that those two counties are considered Black Belt
4  counties and the counties that we have and had now -- Escambia,
13:23:43 5  Washington.

6      So engaging with them on what their issues were because
7  being that I didn't permanently live -- I didn't always know
8  what their issues.  So we engaged with them, had conversations.
9  I relayed that information back to the -- back to the
13:24:03 10  candidate.  And then we also assisted those in the communities
11  with voter registration work.  I did voter registration work
12  for those who were not registered or who thought they couldn't
13  vote because of previous things that prevented them from
14  voting.  So engaging them in that manner on issues and voter
13:24:22 15  registration.
16  Q    Did you find any issues that were common to people within
17  those five counties in particular, that they were people
18  interested in?
19  A    Yeah.  It's a repeat narrative, so kind of what I was
13:24:38 20  stating earlier.  People having a lot of medical issues, not
21  having access to the food, and then when you don't -- when the
22  food desert -- you tend to eat unhealthy and that leads to
23  other health issues.  And then they can't get those health
24  issues fixed.  Those are -- it was issues along those lines,
13:24:58 25  things about infrastructure, you know, people complain about

 1  roads.  It was kind of like a similar narrative.

 2  Q    Okay.  And it's easier to get around and actually meet

 3  with all these people because they weren't six hours away,

 4  correct?

13:25:15  5  A    No.  We -- we had to travel almost two hours to Monroe

 6  County.

 7  Q    Right.  But it's a shorter drive from Mobile to Baldwin

 8  County, for example, than it is from Mobile to Madison County,

 9  correct?

13:25:42 10  A    Yes.  But we also have congressional districts that are

 11  that are already in effect that cover multiple counties and

 12  require a multiple-hour drive to include our school board

 13  district.  So we are in a school board district with counties

 14  that are three, maybe three, three-and-a-half hours away so --

13:25:59 15  on the state level, so.

 16  Q    And do you spend a lot of time -- do you know did the

 17  campaign spend a fair amount of time and money getting to know

 18  those particular voters in those particular counties?

 19  A    We did because they were not -- they're in the rural parts

13:26:23 20  of the state, so, yeah, we spent our weekends engaging with

 21  them.

 22  Q    Okay.  Would it have been disruptive to the campaign to

 23  learn a few months before the election that 200,000 of those

 24  voters were no longer going to be voters for District 1 and

13:26:43 25  that 200,000 new voters from somewhere else in the state were

400

```
 1  going to be part of District 1?
 2  A    Not necessarily if you are aware of redistricting and know
 3  that it's something that will occur and lives changed.  So I
 4  wouldn't think it would be that much of an issue.
13:26:58  5  Q    Would it have taken more time and effort to go?
 6  A    It would.  It would.  Because you would have to go engage
 7  new people, so it would, but that's a part of being a
 8  candidate.
 9  Q    Great.
13:27:14 10       Let me see.  Turn to next.
11       We -- so going back to your declaration.  You had stated
12  in paragraph 4, it's a short quote, so I will read it to you,
13  and if you want to see it, I will be happy to pull it up as
14  well.  Upon returning to Alabama, I immediately noticed the
13:27:43 15  lack of representation in many areas of leadership and elected
16  positions in particularly at the congressional level.
17       When did you return to Alabama?
18  A    Around 2018.  But I was always a voting citizen.  When you
19  are on active duty, you can keep your state residency.  So
13:28:05 20  since 18, I've always voted at home.  But being on active duty,
21  you don't get to see -- you don't really get to engage with the
22  candidate, you know.  You see what you can see from afar from
23  what information they put out on their websites and whatnot.
24  So once I returned home and I started organizing, and doing
13:28:24 25  organizing work, and learning more about the democratic
```

1   process, and talking with people in the community and just

2   becoming more aware, you know, being able to be present --

3   because when you are on active duty, you are not present.  Once

4   I was able to come home and realize that what I was looking at

13:28:47 5   wasn't fair representation, once I learned the numbers of how

6   many black people were in the state and the history of us only

7   having District 7, it was -- I was -- my eyes were opened.

8   Q     And so that process began, 2018?

9   A     More so around like 2015 or '16 because I was -- and as a

13:29:12 10   voter officer with my Army unit.  So it required me to be

11   knowledgeable because I was encouraging to -- vote because a

12   lot of service members vote absentee ballot because we're not

13   present at home for election.  So I became more aware around in

14   2015-16 when I was assigned VA voting advocate officer.

13:29:38 15   Q     Okay.  Any time before 2021, did you think about bringing

16   a lawsuit like this one to address that lack of representation?

17   A     Beforehand, I assumed that with people -- more people

18   paying attention to redistricting and more people advocating

19   for a second congressional district through the public hearings

13:30:00 20   that were held and whatnot, I assumed that the state would

21   possibly give us fair representation.  The majority of the

22   public hearings where we had a nice turnout were saying the

23   same thing, came for the same thing.  You know, I had faith in

24   the reapportionment committee would provide that fair and

13:30:20 25   equitable representation, and then when the new maps came out,

```
 1    and it almost looked exactly how it did previously, it's -- I
 2    just decided why not play a role in possibly bringing about
 3    that change and continuing to advocate and partake in a process
 4    of participating in a suit such as this.
13:30:40 5    Q    Okay.  So from 2015-2016, when you are -- to become aware
 6    of this lack of representation problem that you are alleging,
 7    you decided, wait and see a few years until the next census
 8    numbers come out and redistricting happens again; is that fair?
 9    A    Right.  Because at that point, there was no -- I know the
13:31:00 10   maps got redrawn.  But I know that the census data will provide
11    the adequate representation on what the numbers actually look
12    like.  So.  And then the work that I do through CROWD.  So I
13    just became -- being a part of the fellowship really inspired
14    me to be more engaged in the process at the highest level that
13:31:25 15   I possibly can.
16    Q    Based on your experience, your -- the knowledge you have
17    acquired, how long do you think this lack of representation has
18    been a problem?
19    A    I have not -- I haven't looked at the census numbers from
13:31:43 20   2010 and 2000.  So I don't know what the black population
21    number was in 2010.  I was 20 years old at West Point.  So it
22    wasn't on my radar, and I haven't went back and looked.  So I
23    don't know if I can adequately answer how long I feel as if we
24    have not been represented properly.
13:32:04 25   Q    And is the lack of representation really that you're
```

```
 1  referring to the fact that the black population in Alabama is

 2  roughly 27 percent, make up a majority -- a majority in a

 3  congressional district and only 14.3 percent of congressional

 4  districts?

 5  A    Right.  We're not properly represented because we --
13:32:24
 6  because there is only one district where a black candidate can

 7  be elected.

 8  Q    Okay.  And if there were two such districts, that would

 9  represent 28.6 percent of congressional districts in Alabama,
13:32:45
10  correct?

11  A    Correct.

12  Q    Do you contend Alabama did something wrong in 1992 when it

13  drew one majority-black congressional district?

14  A    Not knowing when District 7 came about, I would assume it
13:33:01
15  happened in '92, since you brought it up.

16       If that was -- I don't know when District 7 came about.

17  So did it come about in '92?

18  Q    Yes, it did.

19  A    Okay.  So I would say going from no representation to that
13:33:14
20  First District, I would not say they did anything wrong because

21  it gave black people some opportunity to elect someone who is a

22  part of their community, understands their issues.

23  Q    Okay.  But at some point between 1992 and 20 -- and what

24  date do you think representation was --
13:33:40
25  A    I think it just depends on -- I think that would depend on
```

```
 1   what percentage of Alabama -- what the black percentage of

 2   Alabama looked like in those years.  And I am not aware of what

 3   the numbers are, so I can't adequately state what -- when did

 4   we need the second district.
```
```
13:33:57  5        I will say we're just pushing for one extra district right

 6   now, and it's an issue.  So getting that one issue -- getting

 7   that one district, and now we are aiming for another one, I

 8   think it takes -- you have to take baby steps in processes like

 9   that.  So we are at the next step where it's time to advocate

13:34:17 10  for that second black district.
```
```
11   Q    Does it matter to you how that second majority-black

12   district is composed?

13   A    To me personally, no.  I feel like a second district would

14   be the fair thing to do.  So to me personally, knowing that

13:34:37 15  Birmingham is majority-black, or Jefferson County has a high

16   black population, I know another district can come from that

17   region.  Because of the work I do, I am aware of the

18   demographics in the state.  So at this point, I'm not -- I

19   don't have a preference over where it comes from.
```
```
13:34:54 20  Q    Okay.  If you could get a second majority-black district

21   by joining parts of Mobile with parts of Birmingham and

22   Huntsville, would that lead to fair and equitable

23   representation?

24            MS. CARTER:  Objection, Your Honor, this exceeds the

13:35:10 25  scope.
```

1          JUDGE MARCUS:  One moment.  One moment, Ms. Dowdy.  We

2    have an objection.  Would you state your objection?

3          MS. CARTER:  Yes, sir.  This line of questioning

4    exceeds the scope of direct.

13:35:21  5          JUDGE MARCUS:  Well --

6          MR. LACOUR:  Your Honor, I am trying to determine what

7    she means by fair and equitable and if it means simply

8    proportional representation or if there are other factors that

9    might be relevant in determining whether a particular map is

13:35:34 10   fair and equitable when those are pretty --

11         JUDGE MARCUS:  I will allow the question.  You may

12   proceed.  Just put the question again directly and simply.

13   BY MR. LACOUR:

14   Q    Captain Dowdy, if a second majority-black district could

13:35:48 15   be drawn by joining parts of Mobile with parts of Birmingham

16   and Huntsville, would that lead to a fair and equitable

17   representation?

18   A    Given the work that I have done with organizations across

19   the state, I haven't seen a map that puts Huntsville in a

13:36:11 20   majority-black district, a map that -- that and adequately talk

21   about how to answer that question because all the maps I have

22   seen proposed and seen people talk about that analysis have

23   been done with that maps have not included Huntsville in it.

24   So I'm aware of the Birmingham population of African-Americans

13:36:37 25   to Tuscaloosa, the Black Belt and Mobile, so I haven't seen a

```
 1  map with Huntsville produced and showing the stats.  And so I
 2  don't think I could adequately support a map of the nature that
 3  you're talking about.
 4  Q    And just to drill down on why it is you couldn't support
 5  that map.  Is it simply because you haven't seen one that looks
 6  that way?
 7  A    I haven't seen one.  I haven't -- I haven't done analysis
 8  or -- I don't know what the -- I don't know if the black
 9  population is in the Huntsville area.  And so I've seen maps
10  presented by people who are doing the work that have other
11  areas of the state combined.  And so there's solutions to the
12  problem that we have, and I think those maps that have been
13  presented that do put -- that does not present Huntsville are
14  maps that we should be focused on and consider.  Those are ones
15  that I am knowledgeable on.  So because I don't know
16  demographics of northern Alabama, I don't think I can
17  adequately speak on what a map -- what map if I would support a
18  map that had Huntsville in it for a second black congressional
19  district.
20          MR. LACOUR:  Is Judge Moorer still on?  I don't see
21  him.  I hate to...
22          JUDGE MARCUS:  Yeah.  I think that you're right.  I do
23  not see Judge Moorer on the screen just this past moment.  I am
24  glad that you raised it.
25          Frankie, are you with us?  I guess not.
```

The timestamps in the left margin: 13:37:00 (line 5), 13:37:18 (line 10), 13:37:37 (line 15), 13:37:56 (line 20), 13:38:16 (line 25)

1          THE CLERK:  Yes, sir.  I am here.

2          MS. ADAMS:  Your Honor, this is Kelly Adams.  I'm

3   Judge Moorer's clerk.  I will give him a call.

4          JUDGE MARCUS:  Thank you, Mr. LaCour.  Let's hold up

13:38:48 5   until we get him back on the screen.

6          MR. LACOUR:  Absolutely.

7          JUDGE MARCUS:  Judge Moorer, are you able to hear us

8   okay?  Hi there.  Can you hear us, Judge Moorer?

9          JUDGE MOORER:  I'm sorry.  We had some technical

13:41:23 10  difficulties on our end.

11          JUDGE MARCUS:  No problem at all.  We didn't proceed

12   at all without you.  So there's been no break.  We will proceed

13   with the next question, Mr. LaCour.

14          MR. LACOUR:  Thank you.

13:41:36 15  BY MR. LACOUR:

16   Q    Captain Dowdy, we talked earlier about some of the shared

17   interests, residents of the Gulf counties.  In light of that,

18   if it were possible to create a majority-black congressional

19   district that included all of both Mobile and Baldwin counties,

13:41:53 20  rather than splitting those counties, do you think that would

21   be better for black voters who live and work in the Gulf region

22   than an alternative plan that also creates two majority-black

23   districts, but ends up splitting those counties?

24   A    If a second -- can you -- are you saying that a second

13:42:16 25  black congressional district would be made but Mobile and

1  Baldwin County would be kept together?

2  Q    Correct.  If it were possible to create a second

3  majority-black district while still keeping Mobile and Baldwin

4  counties together, all things being equal, would that be

13:42:32  5  preferable for black voters who live and work in the Gulf

6  region rather than a different map?

7           MS. CARTER:  Objection.

8  BY MR. LACOUR:

9  Q    In which two majority-black districts are created?

13:42:45 10           MS. CARTER:  Objection, Your Honor.

11  BY MR. LACOUR:

12  Q    But Mobile and Baldwin are split?

13           JUDGE MARCUS:  Yes.  Basis.

14           MS. CARTER:  Speculation.

13:42:54 15           JUDGE MARCUS:  Well, I am not sure it's asking her to

16  speculate as to tell us what her preference would be.  But can

17  you sharpen the question a little bit, Mr. LaCour?  It's not

18  really -- I think there's a clause or a piece missing from the

19  question.  Just put your question again, please.

13:43:13 20           MR. LACOUR:  I will try it again, Your Honor.

21  BY MR. LACOUR:

22  Q    Captain Dowdy, all things else being equal between two

23  hypothetical plans that both include majority-black

24  congressional districts, would it be better for black voters to

13:43:32 25  live and work in the Gulf region that all of Mobile and Baldwin

1  counties be kept together versus being split apart?

2  A    I don't think it would matter just because we already have

3  a map that was approved on a state level where Mobile and

4  Baldwin County are in two different districts.  And that would

13:43:53  5  be the state education map.  So I don't think it would matter

6  either way.  We're split on that level, and then we're combined

7  now.  So I don't think -- I don't think it would matter just as

8  long as there's a second majority-black district.

9  Q    Do state board -- I mean, you referred a few times to the

13:44:13 10  state board of education, correct?  Do members of the board

11  have similar responsibilities as members of Congress?

12  A    They're representing Alabamians.  But they're not voting

13  on legislation that impacts the whole country.  They're focused

14  on educational issues to those in Alabama.

13:44:32 15  Q    Correct.  And typically on statewide basis, correct?

16  A    Correct.

17  Q    So they don't have the same opportunity to sort of secure

18  important federal spending for their district, for example?

19  A    I don't -- I haven't worked on a state school board

13:44:59 20  campaign, so I don't know what the duties are.  I'm just going

21  off of maps that have been approved and that a map that looks

22  like what we're fighting for that has already been approved,

23  and so that's why -- if it's fine for citizens to be

24  represented or combined -- if it's fine to combine Mobile and

13:45:17 25  the Black Belt when it comes to education on the state level,

```
 1  why wouldn't it be fine to combine Mobile and the Black Belt on
 2  a congressional level, as well?  And that -- that combination
 3  was done, so that there could be a black school -- a black -- a
 4  district where a black person could be elected.  That's really
 5  why that district is drawn that way.  And so my deal is I don't
 6  see the issue on why we can't work to achieve that on a
 7  congressional level.
 8  Q    But you just said you don't know anything about the duties
 9  of a state board of education member, correct?
10  A    I do not because I haven't worked for a campaign, so.
11  Q    So do you know whether that's really a good comparison
12  with --
13  A    I would say yes.
14  Q    -- Congress?
15  A    The maps were drawn by the reapportionment committee,
16  signed by the governor.  She's representing -- I guess state
17  school board would be -- I don't know if it's -- if college is
18  a road into that, or if it's just K-12, but legislation, so
19  they're representing students or our youth or things concerning
20  education, and there's bills that are passed at a national
21  level concerning education, and our kids are represented by the
22  congressional member, as well.  So I see similarities in there.
23  When it comes down to it, they're representing people in
24  counties that are within our state.
25  Q    And how many members are on the state board of education
```

    1  from the districts?

    2  A    Eight.

    3  Q    And how many congressional districts?

    4  A    Seven.

13:46:48  5  Q    Okay.  Do you know anything about the history of the state

    6  board of education map and how it came to be?

    7  A    I do not.

    8  Q    Okay.  You stated -- let's see.  There's one other -- at

    9  least one other question I had from something you had said in

13:47:12 10  your declaration.  Let me find it.  Bear with me for just a

   11  moment.

   12       So paragraph 9 of your declaration refers to -- says the

   13  issues of education, health care, and the equitable --

   14  distribution of infrastructure have been devastating to the

13:47:55 15  black communities residing in the Black Belt and Mobile.  All

   16  of this in addition to not being able to elect someone who will

   17  fight for the things the black people of Mobile find important,

   18  results in the demographic that I belong to being helpless and

   19  disempowered.

13:48:06 20       So are the members of the demographic you belong to

   21  helpless and disempowered in every congressional district

   22  except for District 7 right now?

   23  A    I can only -- I would say that they're not fairly being

   24  represented.  I will leave it at that.  So when I say like

13:48:29 25  disempowered, it's like the way the maps are drawn right now.

```
 1   If I go -- when I go and vote, I know that at this point given
 2   the demographics of my congressional district, I will not be
 3   able to elect someone for the most part who will advocate for
 4   the needs of my community, the black community.  And being that
13:48:50  5   we know how incumbency work, the same person will more than
 6   likely stay in the seat.
 7        And so given the track record thus far, I don't -- I feel
 8   as if I'm going to vote anyway, but I feel as if my vote holds
 9   no weight because I'm not able to vote for someone who has
13:49:06 10   shown that they care about legislation that impacts those
11   people within the district, and especially those from my --
12   right now I'm focused on the black community.
13   Q    Do you think Republican members of the black community are
14   helpless and disempowered in the First Congressional District?
13:49:25 15   A    Given that I work for the Alabama Democratic Party, and
16   the majority of the black people I engage have been Democrats,
17   I really haven't engaged with the black Republicans, and I do
18   know the number is low.  So I don't -- given my background, I
19   haven't really engaged with that many black Republicans.  It's
13:49:47 20   literally been about two, so... I am not able to speak on that
21   from that I strong knowledge base.
22   Q    Okay.  So you don't know whether black Republicans in the
23   first congressional district are helpless and disempowered?
24   A    No.  Because the ones I have engaged have happened to have
13:50:05 25   been for the most part Democratic.
```

1    Q      But you know a couple of Republicans you said, correct?

2    A      I do.

3    Q      In Alabama?

4    A      I do.

13:50:20  5    Q      Are they helpless and disempowered?

6    A      They happen to not be a part of the majority of the

7    population that live -- that are in poverty.  They are more so

8    like upper middle class, so.

9    Q      Are they still part of the black community?

13:50:40  10   A      They are.  So they would have family members, because some

11   of us make it out, and everybody does not.  So they would have

12   family members who may fit the description that you're talking

13   about.

14          MR. LACOUR:  I think that might be it for me.  If I

13:51:01  15   could just confer with my co-counsel for just a moment.

16          JUDGE MARCUS:  Sure.

17          MR. LACOUR:  Ms. Dowdy.  I thank you for your time.  I

18   pass the witness.

19          MS. CARTER:  Your Honor, may I have about a ten-minute

13:51:30  20   break.

21          JUDGE MARCUS:  You sure can.  We will take a

22   ten-minute break.  I have about 2:50, 2:51.  We will come back

23   at -- or actually it's 1:51 your time.  I'm reading it here on

24   Eastern Standard Time.  We'll come back in about ten minutes, a

13:51:46  25   little past 2:00 o'clock your time in Central Standard Time.

1    Thank you.  We will take a ten-minute break.

2              (Recess.)

3              JUDGE MARCUS:  All right.  I think we are all

4    assembled and everybody here, everybody is tuned in.  Judge

14:02:19 5    Moorer, Judge Manasco, you are able to hear me okay?

6              JUDGE MANASCO:  I can.

7              JUDGE MOORER:  Yes, sir, I can.

8              JUDGE MARCUS:  All right.  Thank you.  Ms. Carter, we

9    are ready for redirect of Ms. Dowdy.

14:02:35 10              MS. CARTER:  Thank you, Your Honor.

11                         REDIRECT EXAMINATION

12   BY MS. CARTER:

13   Q    Captain Dowdy, do black people in the Black Belt celebrate

14   Mardi Gras?

14:02:43 15   A    They travel down to Mobile to celebrate with us.  Our

16   family members do.

17   Q    Do black people from Clarke County communicate to Mobile

18   to work in the port?

19   A    I don't know exactly from what counties people come down

14:02:59 20   from.  And I'm trying to remember where Clarke County is.  I

21   know it's -- it was in the First Congressional District.  I'm

22   not knowledgeable to say on that county.  But counties such as

23   Escambia and Washington County, yes.

24   Q    And is one shared issue for black people in the Black Belt

14:03:23 25   and Mobile access to high speed Internet?

```
 1  A    Yes.  And we saw that during the pandemic.  We -- I'm
 2  aware that that issue in the Black Belt, and then we had that
 3  issue here in Mobile when the schools went virtual, and we
 4  realized a lot of the black households didn't have access to
 5  Internet.
 6             MS. CARTER:  Thank you.  No further questions, Your
 7  Honor.
 8             JUDGE MARCUS:  All right.  Are there any other
 9  questions, Judge Moorer or Judge Manasco?
10             JUDGE MANASCO:  None from me.  Thanks.
11             JUDGE MOORER:  No, sir.
12             JUDGE MARCUS:  Seeing none, we thank you, Captain
13  Dowdy, for coming down here today, and you are excused.
14             THE WITNESS:  Thank you, Your Honor.
15             JUDGE MARCUS:  And who would be the next -- I take it
16  at this point, the plaintiffs both Milligan plaintiffs and
17  Caster plaintiffs are turning to the Section 2 presentation
18  although there's undoubtedly overlap.  Do I have that right,
19  Ms. Khanna?
20             MS. KHANNA:  Yes, Your Honor.  My understanding is
21  from here on out, we are dealing exclusively with the Section 2
22  case, both ours -- Caster plaintiffs and Milligan plaintiffs.
23             JUDGE MARCUS:  So who will be called first?
24             MS. KHANNA:  Mr. William Cooper.  Caster plaintiffs'
25  expert.
```

1          JUDGE MARCUS:  So you are going to put Mr. Cooper on

2    first, and I take it you will go back and forth between you and

3    the Milligan plaintiffs on the Section 2 case.

4          MS. KHANNA:  Yes, Your Honor.  We're trying to present

14:04:56 5    it in as coherent a fashion as possible, but obviously witness

6    availability and issues like that.

7          JUDGE MARCUS:  I understand.  So the way we will

8    proceed is we'll proceed in the same manner we have proceeded

9    earlier.  If there's something particular to the Caster case

14:05:13 10   and the Caster case alone, you can highlight it, and we can

11   turn it at that point over to Judge Manasco.  Otherwise, we

12   will proceed this way.  I take it that's agreeable with you.

13         MS. KHANNA:  Thank you, Your Honor.  Yes.

14         JUDGE MARCUS:  All right.  Let's proceed.  We have

14:05:28 15   Mr. Cooper?

16         MS. KHANNA:  He should be here.

17         JUDGE MARCUS:  Mr. Cooper, welcome.

18                    WILLIAM S. COOPER,

19   having been first duly sworn, was examined and testified as

14:05:43 20   follows:

21         JUDGE MARCUS:  Thank you.  Good afternoon.  And if you

22   would state your full name for the record, please.

23         THE WITNESS:  My name is William Sexton Cooper.

24         JUDGE MARCUS:  Thank you, sir.  And you may proceed,

14:06:00 25   counsel.

1              MS. KHANNA:  Thank you, Your Honor.

2                        DIRECT EXAMINATION

3    BY MS. KHANNA:

4    Q    Good afternoon, Mr. Cooper.

14:06:04 5    A    Good afternoon.

6    Q    You have been retained as an expert for the Caster

7    plaintiffs in this case; is that right?

8    A    That's correct.

9    Q    And you prepared two expert reports in this case?

14:06:16 10   A    I have.

11   Q    Okay.  I would like to call up Caster Plaintiffs'

12   Exhibit 1, please.  Can you please identify this exhibit?

13   A    Yes.  That is the first declaration I filed.  I think it

14   was around the 10th of December.

14:06:36 15   Q    Great.  And if I can now call up Caster Plaintiffs'

16   Exhibit 59.

17   A    And that would be the second declaration filed ten days

18   later.

19   Q    Thank you.  And do you have a printed copy of both of

14:06:57 20   these exhibits in front of you, as well?

21   A    I do.  I have a binder of various documents that you have

22   prepared I guess is a trial exhibit book.

23   Q    I believe -- and if you look through it, is that basically

24   is just your two reports and all of the exhibits attached to

14:07:15 25   them; is that right?

```
 1   A     Exactly.

 2   Q     And just for your awareness and the Court's awareness, I

 3   will be periodically looking to an adjacent screen to looking

 4   at the exhibits and my own notes, but I understand you might be

14:07:29  5   looking down at your report at times, too?

 6   A     Exactly.

 7   Q     All right.  Let's pull up Plaintiffs' Exhibit -- Caster

 8   Plaintiffs' Exhibit 2, please.

 9         This was attached as Exhibit A to your first declaration.

14:07:46 10   Is this your current CV?

11   A     Yes.

12   Q     And does it provide a complete and accurate summary of

13   your background and professional experience?

14   A     I believe it does.

14:07:57 15   Q     Great.  Okay.  I think we can take this down.

16         I will just ask a few questions on your background and

17   expertise without combing over that document, which is, of

18   course, in the record.

19         What is your profession, Mr. Cooper?

14:08:13 20   A     I am a consultant providing demographic analysis and

21   computer mapping analysis.

22   Q     What does that mean?

23   A     Basically, I draw maps, some of them for purposes of

24   elections, others for other kinds of demographic analysis --

14:08:36 25   poverty, households having issues with public utilities, or
```

```
 1    something like that.  It just varies from project to project.
 2    But almost invariably there is a component that involves
 3    mapping.  So that's my key function.
 4    Q    And so do you usually incorporate census data in drawing
 5    those maps?
 6    A    Yes.  Yes.  Almost always.
 7    Q    So is it fair to say that you draw maps for a living?
 8    A    That is fair.  That is basically what I do.  And --
 9    Q    How long have you --
10    A    -- lawns.
11    Q    How long have you been doing this?
12    A    I started using GIS software maybe just a limited amount
13    in graduate school in the '70s actually, but it was off of a
14    mainframe, and stuff was printed out on a piece of paper.  With
15    modern-day technology, I think in late 1989 or maybe early
16    1990, I obtained a copy of a software program called GIS Plus
17    that was developed by the Caliper Corporation in Massachusetts,
18    and they were also the makers of the world-famous Maptitude for
19    redistricting that I still use to this day.
20    Q    So about 30 years?
21    A    30 years, right.
22    Q    Have you been accepted as an expert witness in cases
23    involving redistricting before?
24    A    I have.
25    Q    And about how many?
```

```
 1  A     I think approximately 45.

 2  Q     45 federal court cases?

 3  A     45 federal court cases involving -- I believe almost all

 4  of them would have been Section 2, not all perhaps, but almost

 5  all.

 6  Q     And all of those cases are listed in Caster Plaintiffs'

 7  Exhibit 2 dating back to the '80s; is that right?

 8  A     That's correct.

 9  Q     Have any of the Section 2 lawsuits in which you have

10  served as an expert witness resulted in changes to

11  redistricting plans?

12  A     Many have, at least five at the state level, and 25 or

13  more at the local level.

14  Q     And do you -- what state level plans have you testified in

15  Section 2 cases that resulted in changes to those plans?

16  A     The first state level case I testified in would have been

17  in Tennessee in the early '90s.  And in that case, the issue

18  was regarding the state House, and the end result was that a

19  year or two later, a new African-American majority House

20  district was drawn in west Tennessee.

21  Q     Any other states?

22  A     I was involved in a case in Montana in the '90s to the

23  early 2000s, Native American Section 2 case.  Then later that

24  decade, I also had a case on South Dakota involving the Lakota

25  Sioux and the Cheyenne Sioux.  That resulted in the Court
```

```
 1    finally ordering a plan that I developed as an illustrative
 2    plan as the remedial plan.  I think that would have been around
 3    2008 or 2009 when it was finally court ordered.
 4    Q    And more recently in Mississippi, as well; is that right?
 5    A    That is correct.  In Mississippi in 2019, I testified at a
 6    Section 2 trial involving the Mississippi state Legislature,
 7    the state Senate, and there, as well, the end result has been a
 8    new state Senate district in the Mississippi Delta.
 9    Q    Have you served as an expert in any other Alabama cases?
10    A    I have.  I served as an expert in the Alabama Legislative
11    Black Caucus case which was not a Section 2 case.  I also
12    testified in the judicial case in 2018 involving state court,
13    the Supreme Court, and the appellate courts.  And I testified
14    also in 2017, I believe, in a school desegregation case
15    involving the city of Gardendale and Jefferson County.  The
16    judge relied on some of my maps in her opinion.
17          So I have testified.  I think those are the three times I
18    have testified in federal court in Alabama.
19    Q    In fact, most recently, you actually testified in the
20    Chestnut case, as well, just a couple of years ago; is that
21    right?
22    A    Exactly.  Thanks for refreshing my memory.
23    Q    Absolutely.
24          So have you only done work on behalf of plaintiffs in
25    litigation?
```

```
 1   A     No.  I've worked on behalf of defendants' jurisdictions.

 2   Q     Any in particular?  Any examples?

 3   A     Most recently in the summer of 2020.  I think my first

 4   Zoom trial I testified on behalf of the city of Quincy,

 5   Florida, the Northern District of Florida, in a Section 2 case.

 6   Q     All right.  Do you also provide map drawing consultation

 7   to jurisdictions outside of litigation?

 8   A     Yes.

 9   Q     And which jurisdictions, for example?

10   A     Well, since the release of the 2020 census data, I have

11   provided assistance to the city of Wenatchee, Washington and

12   also to San Juan County, Utah.  In fact, just a couple of weeks

13   ago, the county commission out there adopted the plan that I --

14   a plan that I drew for them.  So there is now a plan in effect

15   for the rest of the decade at the county commission level that

16   I drew.

17   Q     And you have also provided map drawing services for

18   several jurisdictions in Mississippi; is that right?

19   A     That is correct, going back to the late '90s.

20   Q     Thank you.

21         MS. KHANNA:  Your Honor, pursuant to federal rule of

22   evidence 702, I would like to proffer Mr. Cooper as

23   redistricting, demographics, and census data to the Court.

24         MR. DAVIS:  No objection, Judge.

25         JUDGE MARCUS:  I'm sorry.  I couldn't hear you.
```

|   |   |
|---|---|
| 1 | MR. DAVIS:  No objection, Your Honor. |
| 2 | JUDGE MARCUS:  We will qualify the witness as an |
| 3 | expert in those three fields.  You may proceed. |
| 4 | MS. KHANNA:  Thank you, Your Honor. |
| 14:15:00 5 | BY MS. KHANNA: |
| 6 | Q    Mr. Cooper, can you please tell the Court what you were |
| 7 | asked to do in this case? |
| 8 | A    Yes.  I was asked to do two different things.  One, to |
| 9 | determine whether or not the minority population, specifically |
| 14:15:16 10 | the African-American population in Alabama was sufficiently |
| 11 | large in geographically compacted to create a second |
| 12 | majority-black district in central and south Florida, and also |
| 13 | to produce some statistics from the Census Bureaus, |
| 14 | specifically the American Community Survey examining the |
| 14:15:38 15 | socioeconomic well-being of African-Americans as opposed to |
| 16 | non-Hispanic whites in the state. |
| 17 | Q    Did you reach any conclusions regarding whether the black |
| 18 | population in Alabama is sufficiently large and geographically |
| 19 | compact to create an additional majority-black congressional |
| 14:15:55 20 | district? |
| 21 | A    Yes, I did. |
| 22 | Q    And what was that conclusion? |
| 23 | A    It is definitely sufficiently large and sufficiently |
| 24 | geographically compact to create a second majority-black |
| 14:16:08 25 | district based on the 2020 census. |

1  Q     How did you determine that?

2  A     I took the U.S. census data that was released back in

3  August and developed some illustrative plans combining

4  different counties, different parts of south Alabama, and those

14:16:30 5  plans were ultimately part of my first declaration, where I

6  drew I think six illustrative plans.

7  Q     Great.  And did you reach any conclusions regarding

8  whether there were any disparities between black Alabamians and

9  white non-Hispanic white Alabamians on various indicators on

14:16:51 10  socioeconomic well-being?

11  A     Yes.  That's just clearly apparent, I think, to most

12  anyone, and data really brings it out.  Poverty rates are twice

13  as high for African-Americans versus non-Hispanic whites in the

14  state.  College graduation rates are higher for non-Hispanic

14:17:11 15  whites.  One could go on and on.  It's very difficult to find

16  any data point relating to socioeconomic well-being that

17  results in African-Americans at large in the state

18  outperforming whites.

19  Q     All right.  I'd like to turn a little bit to the

14:17:28 20  demographics of the state.

21        Can you please describe at a high level the population

22  growth patterns among different racial groups in Alabama since

23  between the 2010 census and the 2020 census?

24  A     Well, the population in the state that has increased.  And

14:17:45 25  I think I have a table in my declaration.  Specifically,

```
 1  though, the minority population grew.  I don't have the
 2  percentage right off the top of my head.  But I think it's
 3  about 5 or 6 percent.  And the non-Hispanic white population
 4  actually fell by about 1 percent.  And so African-Americans, I
 5  believe, comprise a significant component of the minority
 6  population growth.  But the fastest growing minority population
 7  in Alabama between 2010 to 2020 is actually the Latino
 8  population starting from --
 9  Q    I think you are referring to --
10  A    Oh, starting from a much lower population base.
11            JUDGE MARCUS:  I think the point, Mr. Cooper, that our
12  court reporter is making is that she's had some trouble taking
13  down the testimony.  She wants to get it exactly correct, so as
14  we proceed, just really proceed very slowly for all of us, and
15  we'd be much appreciative.
16       Did you want to put your question again, Ms. Khanna?
17            MS. KHANNA:  No, Your Honor.  I think we actually have
18  it on record now.
19            JUDGE MARCUS:  Okay.
20            THE WITNESS:  I would like to clarify that actually
21  the fastest growing population in the minority community would
22  have been Asian Americans.  Not in terms of absolute numbers,
23  but just in terms of percentages.  It nearly tripled by
24  193 percent.
25  BY MS. KHANNA:
```

14:18:09
14:18:34
14:19:00
14:19:11
14:19:29

```
 1    Q    All right.  And I think that the figure you're referring
 2    to is Figure 1 on page 6 of your report.
 3              MS. KHANNA:  Let's call that up.  That's Caster
 4    Plaintiffs' Exhibit 1, Figure 1.
 5    BY MS. KHANNA:
 6    Q    So what does this figure indicate about the white
 7    population since 2010?
 8    A    Since 2010, it's up by -- it's down by 1 percent, 33,000.
 9    Q    And what about the minority population overall?
10    A    Up by 17 percent or 277,594.
11    Q    And what about the single-race black population, including
12    black Hispanics?
13    A    The single-race black population has increased by 44,851
14    persons or 3.58 percent.
15    Q    And finally, what about the any-part black population?
16    A    It increased by 83,618, or 6.53 percent.
17    Q    Mr. Cooper, what is the difference between single-part
18    black -- the single-race black -- sorry -- and the any-part
19    black metric?
20    A    Well, the single-race black category is just simply -- an
21    enumeration of the number of people when filling out the 2020
22    census form, there's an option to sign as single-race black or
23    black plus one other race, which could be black and white,
24    black and indigenous, black and Asian.  So single race is just
25    for persons who checked black and nothing else.  Any part would
```

14:19:43 (line 5)
14:20:01 (line 10)
14:20:25 (line 15)
14:20:45 (line 20)
14:21:14 (line 25)

1   include those who also identified as having some other racial

2   background in addition to being black.

3   Q    So which metric do you typically use in determining

4   whether the black population is sufficiently large and

14:21:36 5   geographically compact to comprise a majority-black district?

6   A    Well, it would vary from place to place, but primarily

7   nowadays in most parts of the South, I would use any-part

8   black, perhaps elsewhere say in south Florida, I might look at

9   non-Hispanic black just because it's a very large Latino

14:22:00 10   community there.  But for Alabama, I think the appropriate

11   category to examine is the any-part black population.

12   Q    And why do you choose to look at the any-part black

13   population?

14   A    Because households in the 2020 census and individuals have

14:22:15 15   identified as either single-race black or some other part

16   black, and in addition to that, there is case law out there --

17   I am not a lawyer, but the definition has been accepted by the

18   Supreme Court going back to Ashcroft vs. Georgia, and so it

19   seems appropriate to use that definition.

14:22:41 20   Q    So it's your understanding that the Supreme Court has

21   required the use of the any-part black metric in cases such as

22   this; is that right?

23   A    I believe so.  I believe so.  It could vary from place to

24   place, though.  I will point that out.  But it's not something

14:22:59 25   that would be a factor in Alabama where the Latino population

1    is still relatively small, and beyond that probably, 40 percent

2    of the Latino population is noncitizen.  So the key minority

3    population in Alabama is African-American.

4    Q    So, Mr. Cooper, have any courts in Section 2 cases where

14:23:25  5    you have served as an expert used the any-part black metric in

6    determining whether the first *Gingles* precondition has been

7    met?

8    A    My recollection is at least two have.  One in Fayette

9    County, Georgia in 2014 or 2015, NAACP versus Fayette County.

14:23:46 10   And another time in the school board case I was involved in, in

11   Ferguson-Florissant school district outside of St. Louis,

12   Missouri.  And I routinely report the any-part definition.  In

13   some instances, it doesn't become an issue.  But those are two

14   where I think it -- at some level did become an issue when the

14:24:09 15   Court accepted the any-part definition.

16   Q    I'd like to move on to discuss the geographic distribution

17   of the black population in Alabama.  Let's pull up Figure 2 of

18   your report, which is on page 8 of Plaintiffs' Exhibit 1.

19        Can you please describe what this figure shows?

14:24:32 20   A    Yes.  This shows the distribution of the black population

21   by percentage black at the county level.  So naturally, some of

22   the more rural counties in the so-called Black Belt have high

23   percentages of African-American populations.  And, of course,

24   Montgomery County is part of the Black Belt.  And it, too, is

14:24:55 25   almost is roughly 50 percent black, I believe.  It was a very

```
          1  large population.  But in addition to Montgomery County, there
          2  are other counties in the state more urban, including
          3  Jefferson, Tuscaloosa, Mobile, and, of course, Huntsville, as
          4  we've sort of discussed or was discussed this morning.  All of
14:25:13  5  those areas have very large numbers of African-Americans.
          6  Q    Okay.  I am going to pull this one down and pull up Figure
          7  4 of your report, which is on page 11.  I believe this is the
          8  current the 2021 enacted congressional plan; is that right?
          9  A    Yes.
14:25:35 10  Q    Are any of the districts in this plan majority-black?
         11  A    Only one.
         12  Q    Which one is that?
         13  A    District 7.  District 7.
         14  Q    Do you know how much of Alabama's black population is in
14:25:52 15  District 7 under this plan?
         16  A    I believe that I calculated that it was around 14 percent.
         17  Q    Actually, I am going to refer you to paragraph 28 of your
         18  report.  And I think there -- if that refreshes your
         19  recollection, there your report -- the percentage of the
14:26:11 20  statewide black population that resides in District 7?
         21  A    I'm sorry.  Which paragraph?
         22  Q    Paragraph 28.
         23  A    Oh.  Oh.  I'm sorry.  Yes.  You're right.  Of all -- of
         24  all of Alabama's black population, about a third does reside --
14:26:32 25  less than a third in Congressional District 7.
```

1    Q     Great.  Thank you.  We can take that down.

2          In which districts -- so you said less than a third of the

3    black's population resides in majority-black district under the

4    congressional map; is that right?

14:26:48  5    A     Yes.

6    Q     In which districts do the remaining two-thirds of black --

7    of the black population generally reside?

8    A     In Districts 1, 2, and 3.

9    Q     Okay.  Let's pull up -- if we could please pull up Figure

14:27:06 10   5 of your report on page 12 of Caster Plaintiffs' Exhibit 1.

11   A     Yes.

12   Q     What is the Black Voting Age Population of District 7

13   under the enacted plan?

14   A     The percentage is 55.26 percent and in District 7.

14:27:28 15   Q     And what is the Black Voting Age Population of Districts

16   1, 2, and 3 in the enacted plan?

17   A     1 and 3 are at just about 25 percent.  District 2 is just

18   a little bit over 30 percent.

19   Q     So about a quarter to a third of the eligible voters in

14:27:50 20   each of these three districts is black?

21   A     Yes.

22   Q     What is the total black population of those three

23   districts -- Districts 1, 2, and 3 under the enacted plan?  And

24   if it helps, I can refer you to paragraph 29 of your report.

14:28:15 25   A     Oh, oh, okay.  For -- well, for 1, 2, and 3, the total

1  population -- the total black population would be 612,759.

2  Q    How does that number compare to the ideal population for

3  an Alabama congressional district?

4  A    It's almost as large as the ideal district size, which is

14:28:46 5  717,754.

6

7  Q    So taken together, these three districts have enough black

8  population to form nearly an entire congressional district; is

9  that right?

14:28:59 10 A    That's correct.  It's actually -- it would be about

11 85 percent of the congressional district.  And that would mean

12 all the people in that particular 85 percent would be black.

13 So that's a lot of people who are left out.

14 Q    Thank you.  I think we could take this exhibit down.

14:29:20 15 Mr. Cooper, you testified earlier that less than a third of

16 Alabama's black population resides in a majority-black

17 congressional district; is that right?

18 A    Right.

19 Q    How much of Alabama's non-Hispanic white population

14:29:33 20 resides in a majority white district?

21 A    Over 90 percent.

22 Q    92 percent exactly, right?

23 A    Yes.  It sounds right.

24 Q    And that's in paragraph 28 of your report?

14:29:45 25 A    Yes.

1  Q    So according to the 2020 census, what percentage of

2  Alabama's population is black?

3  A    According to the 2020 census, it is -- let me refer back

4  to Table 1.  It's 20 -- 27.16 percent is any-part black.  Was

14:30:16  5  that your question?

6  Q    Yeah.

7  A    Yeah.

8  Q    So over 27 percent of the population is black in the 2020

9  census?

14:30:26 10  A    Yes.

11  Q    What percentage of Alabama's congressional districts are

12  majority-black?

13  A    There's a 14 percent number.  One out of seven.

14  Q    One out of seven.  So if Alabama were to draw a second

14:30:39 15  majority-black district, what percentage of Alabama's

16  congressional districts would be majority-black?

17  A    About 28 percent, roughly in line with the statewide

18  percentage of African-Americans, which is about 28 percent

19  almost, or soon will be if the population continues to grow in

14:30:58 20  the course of a decade.

21  Q    So according to the 2020 census, what percentage of

22  Alabama's population is non-Hispanic white?

23  A    It is 63.12 percent.

24  Q    And what percentage of Alabama's congressional districts

14:31:17 25  are majority white under the enacted plan?

     1   A      Six out of seven, or 70 -- well, six out of seven.  I am
     2   not doing the math right, but it's going to be in the mid 80s.
     3   86 percent, I guess.
     4   Q      I am going to do the math myself.  Is it about
14:31:39  5   85.7 percent; is that right?
     6   A      Yeah.  I rounded it up.
     7   Q      If Alabama were to draw a second majority-black
     8   congressional district, what percentage of Alabama's
     9   congressional districts would remain majority white?
14:31:55 10   A      About 72 percent.
    11   Q      Thank you.  I will move on to the state board of education
    12   plan that you mention in your report; is that right?
    13   A      Yes.
    14   Q      Why do you reference the 2021 Alabama State Board of
14:32:18 15   Education plan?
    16   A      Well, the Alabama State Board of Education plan, the 2021
    17   plan has eight districts, and two of them are majority-black.
    18   One is anchored in Jefferson County, and the other in south
    19   central, Alabama, and includes both Montgomery County and/or at
14:32:40 20   least part of Montgomery County and part of Mobile County.  So.
    21   Q      Let's --
    22   A      Proceed.
    23   Q      Sorry.  Let's pull up the map so that we're all looking at
    24   the same one.  If we could please pull up Plaintiffs' Exhibit 1
14:32:53 25   Figure 9 on page 19.  So, Mr. Cooper, this is the 2021 board of

```
 1  education map; is that right?
 2  A    That's correct.
 3  Q    Do you know when this map was enacted by the Alabama
 4  Legislature?
 5  A    I believe in late October and signed into law in November,
 6  along with the congressional plan.
 7  Q    So this was at the same time as the 2021 congressional
 8  plan; is that right?
 9  A    Yes.
10  Q    And so which of the districts under this plan are
11  majority-black?
12  A    District 4, which is the green district, and the kind of
13  purplish color District 5, which is a district that goes from
14  the western Black Belt Macon County then through part of
15  Montgomery County to Mobile.
16  Q    And is this the first time as far as you're aware that
17  Alabama has had a State Board of Education plan with two
18  majority-black districts?
19  A    No.  There's a long tradition of the configuration very
20  similar to this plan.  I have a map in this declaration showing
21  the 2011 plan, if memory serves, the percentages are about the
22  same.  And the two districts look very similar between 2011 and
23  -- between 2010 and 2020 census.
24       Prior to that, there was a plan adopted in the early 2000s
25  that I reference that had one district that was based on
```

single-race black slightly below 50 percent.  In paragraph 34,
I have 47.61 percent.  That was District 4 in the north, I
think.  And then District 5 in the south was almost 52 percent
single-race black.

14:34:47     And there was litigation in the 1990s.  So I think there
was a court ordered plan in 1996.  And in that plan, District 4
was about 46.6 percent black and voting age, and District 5 was
51.75 percent.  So for 25 years now, there has been two
majority-black school board districts out of eight.

14:35:11  Q    Can you please describe looking at the 2021 board of
education plan, can you describe how District 5 is drawn here?
A    Well, yes.  It's -- it's drawn from Macon and Bullock
County in the east southwest through the Black Belt to Mobile
County and the city of Mobile and north along the Mississippi
14:35:43  line up to Sumter County.  And then at that point, it borders
District 4, which is the second majority-black district that
includes the east -- the western part of the Black Belt,
including Tuscaloosa and part of Jefferson County.
Q    Does District 5 include all of Mobile County?
14:36:08  A    No, it does not.
Q    Does the 2021 State Board of Education plan combine part
of Mobile County with Montgomery County?
A    Yes, it does.
Q    And does it also combine part of Mobile County with
14:36:28  Baldwin County in District 1?

1  A    Yes, it does.

2  Q    What portion of Alabama's black population resides in

3  these two majority-black board of education districts today?

4  A    I believe that it is very close to half of the black

14:36:46 5  population.  I think I have that figure in my declaration.

6  Q    And I can refer you to paragraph 37, if that's easier.

7  A    Yes.  There it is.  51.69 percent.

8  Q    So more than half of the state's black population --

9  sorry.

14:37:06 10  A    No.  Statewide population.  Black population, right.

11  Q    More than half of the state's black population then

12  resides in a majority-black board of education district; is

13  that right?

14  A    Yes.  In either District 4, which is the one in the north,

14:37:20 15  or District 5, which is the one in the central and south part

16  of the state.

17  Q    So what did your review of this plan, the State Board of

18  Education plan, tell you about the possibility of drawing an

19  additional majority-black congressional district?

14:37:35 20  A    Well, it suggests that it would not be at all difficult to

21  get a second black-majority congressional district because

22  there are only -- there are eight districts in the school board

23  plan and seven in the congressional plan.  And the state is now

24  on record as proving a configuration much like this.  So my

14:38:02 25  assumption -- working assumption at the outset was that it

1    would be possible to draw an additional district based on the

2    2020 census data.

3    Q    And that's true even though this is an eight district plan

4    and the congressional map is a seven district plan?

14:38:16 5    A    Right.  Right, because it's not including some areas that

6    have significant black populations in those two districts.

7    Q    Great.  We can take this down now.  Thank you.

8         I want to turn now to the illustrative plans that you

9    produced in your reports.

14:38:37 10        Can you first describe to the Court what an illustrative

11    plan is?

12    A    Well, an illustrative plan is basically what it says it

13    is.  It's just a plan that makes a demonstrative exhibit

14    showing how one might draw a plan given certain sets of

14:39:00 15    parameters.  And so I've drawn a total of seven illustrative

16    plans, each of which has two majority-black districts.

17    Q    So when you assess whether the black population is

18    sufficiently large and geographically compact to allow for the

19    creation of an additional majority-black district, is it

14:39:21 20    necessary to consider race?

21    A    Yes.  One of the traditional redistricting principles is

22    to be aware that you have -- that you are not diluting minority

23    voting strengths when you are developing a voting plan and the

24    underlying districts.  So that is -- it is always a factor that

14:39:42 25    one must consider no matter where you are, or maybe not

1   Vermont, but generally speaking, you have to pay attention to

2   it, particularly in the South.

3   Q    And are there other considerations that you take into

4   account when drawing illustrative plans, as well?

14:39:58  5   A    Several.  All districts have to be reasonably compact,

6   contiguous, and certainly have to be relatively equal in

7   population for congressional districts.  They have to be almost

8   0.  For school board districts, you can be kind of in a plus or

9   minus 5 percent range, probably although some states have more

14:40:22 10   restrictive requirements maybe than Alabama has with respect to

11   the school board.

12   Q    So you reference in your report traditional redistricting

13   principles; is that right?

14   A    Yes.

14:40:33 15   Q    And what are -- without listing them out necessarily, what

16   does that generally refer to?  What does it mean that term?

17   A    Well, it's just a set of objectives, goals, that want you

18   to have in mind when putting together an illustrative plan or

19   what would ultimately become a real plan.  You have to be aware

14:40:55 20   of the underlying demographics of the communities you're

21   working with, and try to produce a plan that is fair and

22   constitutional.  And that's what I believe I have done in the

23   case of the seven illustrative plans that I have drawn for

24   Alabama's congressional plan.

14:41:14 25   Q    And you would consider traditional redistricting

```
 1   principles whether you are drawing an illustrative plan for

 2   litigation or an actual district plan for a jurisdiction; is

 3   that right?

 4   A    That's right.  Yeah.  It's the same.

 5   Q    So what specific traditional districting principles did

 6   you consider in drawing the illustrative plans in this case?

 7   A    Well, I took all of them into consideration.  I examined

 8   the document produced back in May by the Alabama Legislature

 9   outlining the guidelines for redistricting.  But a lot of that

10   just incorporates the general concept of traditional

11   redistricting principles.  So I didn't prioritize any of them.

12   I tried to balance them.

13   Q    And those principles include population equality; is that

14   right?

15   A    Yes.

16   Q    And what else?

17   A    Contiguity.  The districts must be contiguous, either by

18   land or water.  I think the Alabama redistricting guidelines

19   allow contiguity by water and not necessarily not by land or

20   road.

21        And then other factors are compactness.  They have -- the

22   district has to be reasonably compact.  One should also, of

23   course, very important to pay attention to political

24   subdivisions, counties, precinct lines, municipal boundaries,

25   sometimes the latter municipal boundaries can be very difficult
```

```
      1  to contend with in Alabama because there are some odd shapes
      2  out there.  But one should try to keep communities together,
      3  jurisdictions together where possible.  Obviously, if you start
      4  at the county level, which I basically did, so many of the
14:42:53 5  component parts of the congressional plan involve whole
      6  counties that you are automatically including political
      7  subdivisions in toto cities, except maybe in a few rare
      8  instances like in Jefferson County and Hoover, where part of
      9  the city of Hoover dips into Shelby County.  Most of it's in
14:43:17 10 Jefferson County.
     11  Q    I believe you also mentioned in your report the principles
     12  of respect for communities of interest and non dilution of
     13  minority voting strengths; is that right?
     14  A    Yes.
14:43:27 15 Q    So was any one factor of the ones we just mentioned
     16  predominant, the predominant factor when you were preparing
     17  your illustrative plans in this case?
     18  A    Not really.  I feel like I gave them equal weighting.  It
     19  would be possible to prioritize others and come up with
14:43:46 20 different configurations, but perhaps at the expense of one of
     21  the key redistricting principles.  So you could draw very
     22  compact districts, but they might split numerous counties
     23  because they're perfect squares.  Or you draw a district that
     24  is -- two districts that are maybe 60 percent black, but they
14:44:09 25 wouldn't be contiguous.  That, you know, so you have to balance
```

1  it.

2  Q    And did race predominate in your development of any of the

3  illustrative plans?

4  A    No.  It was a consideration.  This is a Section 2 lawsuit,

14:44:23  5  after all.  But it did not predominate or dominate.

6  Q    And you were balancing all the traditional redistricting

7  principles during your development of these plans?

8  A    I believe so.  I believe so.  I was thinking about a lot

9  of different things.  And all of those things kind of come

14:44:41 10  together in one or more of these illustrative plans.

11  Q    Let's talk through what -- how those principles came to

12  be.

13       You mentioned population equality.  How is this principle

14  reflected in your illustrative plans?

14:44:57 15  A    Well, all of these plans have districts that are for all

16  intents and purposes zero deviation plus or minus one person.

17  One of them is minus two in one instance because I didn't want

18  to split a county.  But, you know, there's zero deviation

19  plans.  There's no -- no disputing that.

14:45:17 20  Q    I think you also mentioned respect for political

21  subdivision boundaries in drawing illustrative plans?

22  A    Yes.

23  Q    And how did you follow that principle in drawing the plan?

24  What was your approach?

14:45:28 25  A    Well, I felt like it was important to either meet or beat

1    the county split achievement of the enacted plan.  And I did so
2    in almost all the plans I drew.  The enacted plan splits six
3    counties.  And I think four of the plans I draw split six
4    counties.  One splits five.  And a couple others split seven,
14:45:55 5    although one of those splits is only 15 people in the one -- in
6    one of the plans involves seven county splits.  So arguably,
7    that's not a necessary split and could be left as entirely in
8    Calhoun County instead of splitting Calhoun County.
9    Q    Was it possible to keep the counties whole in drawing
14:46:21 10   these illustrative plans?
11   A    Yes.  I do split a county here and there often just to
12   achieve something very close to zero population deviation.  So
13   it is very easy to draw districts in Alabama for a second
14   majority-black district that is built off of whole counties.
14:46:40 15   There are splits.  One split always.  But for the most part,
16   it's a very reasonable compact shape that you end up with when
17   you draw a plan that is -- contains two majority-black
18   districts.
19   Q    So am I understanding your report correctly when you say
14:47:01 20   that you have to -- you had to split a few counties in order to
21   meet population equality; is that right?
22   A    Oh, yes, you do.  At some point, you have to split a
23   county.  You could, you know, conceivably draw a plan that
24   maybe split four counties and had a higher deviation.  I'm not
14:47:24 25   -- it's very unclear just to how far you can go with a

1  congressional plan above and below zero.  Certainly, though, as

2  long as you're in the low teens, that's a zero deviation plan.

3  Q    And certainly your plans are primarily plus or minus

4  one person; is that right?

14:47:40  5  A    Yeah.  There's -- there are two that are minus two in one

6  of the districts.  And it just did not make any sense at all to

7  go into another county with a split and move one person.  Of

8  course, you couldn't do that because the secret ballot.  So you

9  would end up having to like move 300 people from one county in

14:48:01 10  one precinct into one county and split the other county so you

11  could put 302 in that.  I mean, that's just pointless to do

12  anything other than except a minus two deviation.

13  Q    Mr. Cooper, when you were forced to split a county to

14  achieve population equality, what was your approach in

14:48:22 15  splitting counties?

16  A    Well, I tried to minimize precinct splits.  Often that was

17  not possible.  Again, because I was aiming for zero deviation.

18  So I think one of my plans splits 12 precincts.  And I believe

19  the state splits seven.  So I didn't quite hit their number in

14:48:44 20  that particular metric.  But all of them are drawn to minimize

21  precinct splits.

22      I drew a couple of plans that kept the city of Mobile

23  whole.  And in that case, both of those plans split around 20

24  or so precincts.  That was partly just to follow the city

14:49:04 25  boundaries of Mobile.  So it's not going to create any kind of

1   administrative problem for the city of Mobile because they have

2   city elections there, and they have already got everybody

3   organized by whether they're in the city of Mobile or in the

4   county as a whole for county elections.

14:49:17 5   Q    So when you did have to split precinct boundaries, did you

6   follow other natural geographic boundaries or political

7   boundaries?

8   A    Yes.  I would follow either precinct lines or municipal

9   lines, primary roads, waterways, maybe, in a few instances.

14:49:35 10   Also sometimes in some instances, I followed census block

11   groups, which is an area that has been designated by the Census

12   Bureau as having some commonality.  So that's another

13   geographic reference point that I used.

14   Q    Mr. Cooper, you also considered geographic compactness in

14:49:58 15   drawing your illustrative plans; is that right?

16   A    Yes, I did.

17   Q    What are the most common compactness metrics?

18   A    The most common is just eyeballing it as you draw the

19   plan.  But if you are really obsessive about it, you can

14:50:16 20   constantly get readouts of various compactness scores.  The

21   most widely relied upon are probably the Reock score and the

22   Polsby-Popper score.  So you can get instant -- virtually

23   instant readouts of what the scores are for any district you're

24   drawing as you're drawing them from within the Maptitude

14:50:39 25   program that I used.

```
 1   Q    Can you describe in layman's terms what the Reock score is
 2   measuring?
 3   A    Yeah.  It's basically measuring the extent to which a
 4   district minimizes the area of the district if you circumscribe
 5   that district with a circle.  So if you drew a circle, which
 6   would be a perfect compact score, the Reock score would be 1.8.
 7   Of course, if you drew a circle, you would end up splitting
 8   counties, splitting precincts, splitting most cities.  There
 9   may be a couple in Alabama that are circles.  There are in
10   George.  But, yeah, that would be the perfect score, though,
11   one.
12   Q    Okay.  And how about the Polsby-Popper metric?  What is
13   that measuring on the compactness when you are looking at
14   compactness?
15   A    That looks at the perimeter of the district.  For example,
16   you could have a Reock score that is very close to one because
17   you have drawn a very concentrated area in the district.  But
18   with lots of squiggly lines.  So the Reock score could be very
19   high, but that would be somewhat misleading, very misleading if
20   you looked at the perimeter of the district and relied on the
21   Polsby-Popper measure where it would score quite low.
22   Q    Both of these metrics kind of capture different aspects of
23   compactness; is that fair to say?
24   A    Right.  You have to pay attention to those.  They both
25   tell you a little something.
```

14:50:56   (line 5)
14:51:15   (line 10)
14:51:26   (line 15)
14:51:44   (line 20)
14:51:59   (line 25)

1    Q    So how did you -- what was your approach to drawing --

2    what was your approach to incorporating the compactness

3    principle in drawing your illustrative plans?

4    A    Well, I would occasionally glance at the score, and also I

14:52:13  5    was aware of the score that the state had for their plan.  And

6    so I wanted to make sure that my score was sort of in the

7    ballpark of the state score.  And I think that's generally the

8    case.

9         Some of my plans are somewhat lower, slightly lower, but

14:52:31 10    still certainly within the normal range if you look at

11    districts around the country.  And in one instance, the last

12    plan I drew, illustrative plan 7 is part of my rebuttal

13    declaration, I think my district is actually higher on a mean

14    average score than the state's plan.  And just 1/100th of a

14:52:51 15    point lower on the Polsby-Popper score.  So in that case, I

16    have met the same standard that the state has.  It would be

17    unfair maybe to call it a standard, because they don't specify

18    what a score should be.  It just happens that they had a

19    certain score, and so I looked at that as a possible yardstick.

14:53:09 20    Q    You also considered the principle of contiguity; is that

21    right?

22    A    Yes.  One good thing about Maptitude is -- and all modern

23    day GIS software, but back in the '90s, not the case.  You can

24    get an instant readout as to whether the district is contiguous

14:53:29 25    in its entirety.  So I took that into account.

```
 1   Q      And are all the illustrative plans contiguous?
 2   A      Yes.
 3   Q      You also mentioned in your report communities of interest
 4   as one of the principles you took into account; is that right?
 5   A      Right.
 6   Q      How did you define communities of interest?
 7   A      Well, I -- and in basically working with a computerized
 8   map, and so I consider communities of interest to include
 9   political subdivisions like counties and towns and cities.  I'm
10   also aware that the minority population in and of itself can be
11   a community of interest.  I have some knowledge of historical
12   boundaries.  For example, one of my -- one of my maps here
13   shows what is kind of generally considered to be the Black Belt
14   of Alabama, the group mainly of rural counties plus Montgomery
15   County in the central part of the state.  So I was aware of
16   that historical feature.
17         So, you know, communities of interest can cross over into
18   many different features, but I guess the political subdivision
19   and the importance of recognizing communities of interest in
20   minority populations, those two items were probably top of mind
21   as I was drawing the plan, with respect to communities of
22   interest.
23   Q      Mr. Cooper, you reference the 2021 redistricting
24   guidelines in your report; is that right?
25   A      Yes.
```

14:53:45 (line 5)
14:54:07 (line 10)
14:54:32 (line 15)
14:54:53 (line 20)
14:55:07 (line 25)

```
 1  Q      Did you refer to those guidelines before developing your
 2  plans in this case?
 3  A      I did.
 4  Q      I'd like to pull those up.  If you could pull up please
 5  Plaintiffs' Exhibit 82.  And are these the reapportionment
 6  redistricting guidelines that we were just talking about?
 7  A      Yes.  And there's a very good written description of
 8  communities of interest in the guidelines themselves.
 9  Q      And, Mr. Cooper, I think we have it up on the screen.  I
10  think that's where you will find it.  I don't believe it's in
11  your report.
12         Okay.  If we could turn -- you mentioned the description
13  of communities of interest.  If we could scroll down to I think
14  it's page 2 to 3, section --
15  A      I found it.
16  Q      Where are we -- j(iii).  You see that?
17  A      Yeah.  I got it.  Line 28.
18  Q      Can you please read the text starting, community of
19  interest is defined as an area?  Could you read that?  We will
20  highlight that text there.  Can you please read that out loud?
21  A      Yeah.  Districts shall respect communities of interest,
22  neighborhoods, and political subdivisions to the extent
23  practicable and in compliance with paragraphs A through I, and
24  then the definition.  A community of interest is defined as an
25  area with recognized similarities of interests, including but
```

14:55:19  (line 5)
14:55:44  (line 10)
14:56:00  (line 15)
14:56:14  (line 20)
14:56:32  (line 25)

```
 1  not limited to ethnic, racial, economic, tribal, social,
 2  geographic, or historical identities.  The term communities of
 3  interest may in certain circumstances include political
 4  subdivisions such as counties, voting precincts,
14:56:52 5  municipalities, tribal lands and reservations, or school
 6  districts.
 7  Q     Thank you.  We can take that --
 8  A     Oh.
 9  Q     Certainly, we can keep reading.  If you look at the
14:57:05 10 screen, we have highlighted certain language that I just wanted
11  to focus on for a moment.
12  A     Right.
13  Q     So which of -- when you were -- you said you were -- when
14  you were approaching the communities of interest criterion, you
14:57:14 15 specifically looked at political subdivisions, and such as
16  counties, pre precincts, municipalities; is that right?
17  A     Yes, among other things, that's right.  I was balancing
18  things.
19  Q     And there are multiple ways to define various communities
14:57:30 20 of interest across the state; is that right?
21  A     True.
22  Q     We can take this down.  Mr. Cooper, in your opinion, as
23  somebody who draws electoral districts for a living, do each of
24  the illustrative plans comply with traditional districting
14:57:53 25 principles as the ones we just discussed?
```

```
 1  A    Absolutely.  I think they are all worthwhile plans that
 2  are worth considering as possible remedial plans.
 3  Q    And they all balance the various criterion we just
 4  discussed?
 5  A    Yes.  In my opinion.  I don't think I went to the extreme
 6  in any of them.
 7  Q    Mr. Cooper, how many illustrative plans did you draw in
 8  this case?
 9  A    I drew seven.  Six in my initial declaration and seven in
10  my rebuttal declaration.
11  Q    All right.  I want to talk a little bit about the common
12  features we see among all of the illustrative plans.  And I can
13  -- we can just pull up Illustrative Plan 1, just as a visual
14  aid.  We can pull up Plaintiffs' Exhibit 18.  This is attached
15  as Exhibit G-2 of your report.  You can look it on the screen
16  here.
17  A    Yes.
18  Q    Where is District 7 roughly located across your
19  illustrative plans?
20  A    Well, District 7 is to the north.  And almost always
21  includes -- it always includes Jefferson County, which I think
22  has the largest black population in the state.  And also
23  includes part of Tuscaloosa County and part of the city of
24  Tuscaloosa, as well as the rural counties in the western Black
25  Belt, including, of course, Dallas County where Selma is
```

```
 1  located and Wilcox County.  So it's the western and northern
 2  district.
 3  Q    Where is District 2 generally located in your illustrative
 4  plans?
 5  A    In the south.  Again, also including the western border,
 6  but the southern half -- normally I think most of the plans for
 7  District 2 extend -- all of them start in Mobile County and I
 8  think go as far north as Choctaw.  There may be one that
 9  splits.  I don't recall.  And then west to include Montgomery
10  County all or and in part, or in some instances such as this
11  one, I included districts that go all the way to the Georgia
12  state line, including Russell, Barbour, and Henry.  Some of the
13  plans only go as far as Macon and Bullock.
14  Q    Great.  And can you specifically discuss the configuration
15  of Mobile County in your illustrative plans?
16  A    Well, in the illustrative plans, all of the illustrative
17  plans include a significant portion of the city of Mobile, or
18  in the case of District 6 and 7, all of Mobile.
19       In illustrative plan 1, the only -- the primary area of
20  Mobile that I excluded from District 2 is the waterfront area
21  of Mobile, which is actually a grouping of precincts that are
22  predominantly African-American and I put into District 1 so
23  that there was a transportation route between District 1 and
24  Mobile County and District 1 in Baldwin County.  So you don't
25  need to drive outside of District 1 to get from one part of
```

Timestamps:
14:59:35 (line 5)
14:59:59 (line 10)
15:00:27 (line 15)
15:00:56 (line 20)
15:01:24 (line 25)

```
 1  District 1 to the other.  You have a straight route going
 2  across U.S. 98 and Mobile Bay.  And there are a few precincts
 3  that are split along that route I-10 area coming in to downtown
 4  Mobile.  And that actually is a feature of most of my plans,
 5  except for illustrative Districts 6 and 7 -- illustrative plans
 6  6 and 7, which keep all of Mobile whole, extending it right up
 7  to the waterfront.
 8  Q    This feature of dividing Mobile County, is that something
 9  that you observed in the board of education plan, as well?
10  A    Well, yes.  The board of education splits Mobile County.
11  Q    Are the Black Voting Age Populations of Districts 2 and 7
12  in each of your illustrative plans over 50 percent?
13  A    Yes.
14  Q    And that is any-part black?
15  A    That is any-part black, although I think there are a
16  couple maybe that are also over single-race black, as well.
17  Q    So in your report, you also report the -- let me take down
18  this figure.
19       You also report the non-Hispanic single-race Black Citizen
20  Voting Age Population in your report in your illustrative
21  plans, as well; is that right?
22  A    That is true.  That's the most restrictive definition one
23  could identify because it requires you not only be non-Hispanic
24  black and over 18, but you also must be a citizen.  And it's
25  also four years old.  So given that the black population in
```

1   Alabama is a little bit younger, it's probably historically

2   inaccurate, too.  As those cohorts age, when we see what the

3   non-Hispanic black citizen population is for 2020, it may be a

4   little higher than what I'm reporting because I'm reporting

15:03:34 5   something with a survey midpoint of 2017.

6   Q    So is my understanding -- is my understanding correct that

7   the non-Hispanic single-race Black Citizen Voting Age

8   Population is the most conservative accounting for who -- who

9   is actually a black voter in that district?

15:03:52 10   A    That's correct.

11   Q    And that it's likely even higher than that given there's

12   some time lag between the citizenship data that is available

13   from the Census Bureau?

14   A    Yes.  That's now over four years old.  The 2015-2020 ACS

15:04:10 15   special tabulation, that's the name given to the citizenship

16   report that the Census Bureau normally publishes every year

17   about this time, it was delayed due to the pandemic, and I

18   think it's going to become available later this year.  I don't

19   even think they have set a date yet.  So it probably won't be

15:04:30 20   available until late spring.

21   Q    And are there any other ways that you determined whether

22   black voters make up a majority of Districts 2 and 7 in your

23   illustrative plans?

24   A    Yes.  At the time I drew Illustrative Plans 1 through 6, I

15:04:46 25   did not have access to a contemporary voter registration file

that I could geocode.  But as part of discovery, after

December 10th, I received a statewide voter file, which I

geocoded and was able to confirm that the active voter

registration rate in all districts that I have drawn, 1 through

15:05:09  6 illustrative plans, as well as illustrative 7 in those plans

in Districts 2 and 7, the underlying active voter registration

rate for African-Americans as a component of the total voter

population is over 50 percent.

Q    And in filling out their voter registration forms, do

15:05:31  Alabama voters indicate whether they are any-part black or

single-race black?  How do they indicate their race?

A    Well, I've seen the voter registration application, and

there's just one choice.  You either select black or white or

Asian.  I think those are the three categories.  But you also

15:05:50  have the option to check Hispanic.  But if you are Hispanic

black, you have to make a choice.  You cannot say I am Hispanic

and black and register in that fashion.  You only can check

one.

Q    I am actually going to pull up Plaintiffs' Exhibit 104,

15:06:02  which I believe is the voter registration form we have just

been discussing.  And let's zoom in right there in the middle

left where it says race check one?

A    Yes.

Q    This is what you are referring to; is that right,

15:06:24  Mr. Cooper?

455

 1  A    Right.  Right.  Because Hispanic is actually an ethnicity.

 2  It's not a race.  But in Alabama at least, you can just check

 3  one.  So you have -- if you choose your -- if you choose

 4  Hispanic, then you are not really identifying the race.

15:06:40  5  Q    So you only have -- you can only choose one box here, and

 6  so if somebody checks off black, that's the only you marker

 7  that they have checked?

 8  A    Right.  They have decided they are black, even if they are

 9  Hispanic.

15:06:53 10  Q    Okay.  Can we -- we can pull this down.  If we can pull up

11  your supplemental report, Plaintiffs' Exhibit 59, Figure 4,

12  which is on page 12, what does this figure show?

13  A    That shows the geocoded percentage of African-Americans

14  who reside -- African-American voters -- active registered

15:07:22 15  voters who reside in District 2 or District 7.  And you can see

16  across the board there is a black registered voter majority and

17  all seven plans for both District 2 and District 7.

18  Q    So in each of your illustrative plans, Districts 2 and 7

19  are majority-black using the any-part BVAP metric; is that

15:07:46 20  right?

21  A    Using any-part BVAP metric, using a voter registration as

22  you see here on Figure 4, and also of course, based on the

23  American Community Survey estimates, which are older, but also

24  clearly have shown that the non-Hispanic black citizen

15:08:05 25  population in all seven plans in both Districts 2 and 7 over

1    50 percent.  So there should be no question about that.

2    Q    Okay.  Great.  We can take this down.  Thank you.

3         We've talked a little bit about how Districts 2 and 7 are

4    configured generally across illustrative plans.  What about the

15:08:25 5    remaining congressional districts?

6    A    Well, I drew the other districts to the extent I could in

7    a fashion that was generally following the geographic areas of

8    the state where the enacted plan has a given district.  Of

9    course, because I am drawing a new black majority congressional

15:08:52 10   district that there are differences I can't match up

11   completely.  But I did by and large keep District 5 in the

12   north part of the state in the first six plans I drew very

13   similar, almost identical to the way the state has drawn it,

14   because it's far removed from the areas that were reconfigured

15:09:12 15   to create the second African-American majority districts.  So I

16   was able to keep that one fairly intact.

17        Others changed, but still in the same general part of the

18   state.

19   Q    And District 4, too, is largely kept in the similar

15:09:26 20   configuration as it is under the enacted plan?

21   A    For the first six districts -- first six plans I drew, I

22   took a different approach with the last one, and so District 4

23   is more compact in that plan as is District 5.

24   Q    How do the illustrative plans compare to the enacted plan

15:09:46 25   on the measure of county splits?

A    About the same.  The -- I drew seven plans.  Four of them have exactly the same number of county splits -- six.  One has just five splits.  That's Illustrative Plan 7, and then the other two I think have seven splits, which is the same number the plan had in 2011 enacted plan.  As I mentioned, in one instance, one of the illustrative plan does have seven splits, but it only involves 15 people in Calhoun County, so arguably it would not be necessary to make that split for an enacted plan.  It -- I did it just to get it down to plus or minus one. But that seems unnecessary.

Q    Okay.  Let's talk a little bit about the compactness of the illustrative plan that's compared to the enacted plan.  I will pull up figure 22 of your initial report.  We will pull it up here on the screen, which is on page 36 of Plaintiffs' Exhibit 1?

A    Yes.

Q    What does this table show?

A    It shows compactness scores for various plans that I produced, as well as the enacted plan and also historical congressional plan, the 2011 benchmark plan and the 2011 board of education plan.

When I did this declaration on December 10th, I did not have a block equivalency file for the 2021 congressional plan or for the board of education plan.  And so to avoid some sort of minor discrepancy, I didn't report the compactness scores

1  for the 2021 board of education -- I'm sorry.  I had the

2  congressional plan, but not the board of education plan.  So

3  that's why I did not report 2021 board of education in this

4  one.  But we got the -- we got the updated shape file between

15:11:59  5  December 10 and 20, so that -- and my next declaration, the

6  second declaration, I do report the score for the 2021 board of

7  education plan.  It's about the same.

8  Q    And, Mr. Cooper, in your experience, is there a bright

9  line standard for when a district is considered compact?

15:12:17 10  A    No.  No.  And you really have to go beyond compactness

11  scores and take into account other factors, like odd-shaped

12  counties, odd-shaped cities, odd-shaped precincts.  There just

13  really is not a bright line rule, nor should there be.

14  Q    So how do your illustrative plans compare, or on the -- on

15:12:43 15  these metrics of compactness compared the enacted plan?

16  A    Compared to the enacted plan, a little bit lower.  But

17  there's nothing out of order here.

18       And I was able to pay more attention to compactness in the

19  Illustrative Plan 7 as a result of comments by defendants'

15:13:05 20  expert Mr. Bryan.  And decided to see if I could draw a plan

21  that was more compact than 2021 plan.  And I didn't draw one

22  that was more compact, but it's clearly as compact.

23       So we've met that objective, as well, in Illustrative Plan

24  7.

15:13:24 25  Q    Before we get to Illustrative Plan 7, I know that was in

```
 1  your supplemental report, I believe you wrote in your report
 2  here that your evaluation of these compactness metrics
 3  indicated that the illustrative plans were in the comparable
 4  range as the other Alabama statewide plans including the
 5  enacted congressional plan; is that right?
 6  A    That's right.  That's right.
 7  Q    And you believe that the illustrative plans are comparable
 8  in compactness to the enacted plan?
 9  A    I think so.  I mean, they're not -- they're not scored
10  quite as high, but there is no, you know, you could get a blue
11  ribbon I guess for the best possible plan, in terms of the
12  Reock and Polsby-Popper scores.  But that doesn't mean that all
13  the other plans are losers.  They place.
14  Q    All right.  And you mentioned Illustrative Plan 7.  Let's
15  pull that one up.  Plaintiffs' Exhibit 59, Figure 3.  And so
16  this is the chart that explains the metrics for Illustrative
17  Plan 7 as well as the 2021 board of education plans, Senate
18  plan and House plan, which you have added here, as well,
19  additional statewide plans; is that right?
20  A    Right.
21  Q    So why did you draw Illustrative Plan 7?
22  A    Well, the defendants' expert is really almost obsessed
23  with compactness scores, so I felt like, well, you know, better
24  show that you can do two districts in a seven district plan
25  that have compactness scores that are equal to the 2021 plan
```

1   and not just a few hundredths of a point below.  So that's what
2   I did with Illustrative Plan 7.  A Reock score -- go ahead.
3   Q    I was -- I was going to say the same thing you were.  In
4   fact, the Illustrative Plan 7 actually has a higher Reock score
15:15:12 5   than the enacted plan; is that right?
6   A    It does.  It does.  .41, and the enacted plan is .38.
7   Q    And the Polsby-Popper score is I think 100th of a point
8   different; is that right?
9   A    That's right.
15:15:25 10   Q    And you mentioned the report submitted by Mr. Bryan in
11   this case.  That's the defendants' expert; is that right?  Is
12   that what you are referring to?
13   A    Yes.
14   Q    Was there anything in Mr. Bryan's report change your
15:15:41 15   opinion on whether or not the illustrative plans achieve
16   compactness?
17   A    No, not at all.  He used a methodology really an
18   evaluating plans at least in his initial declaration that was
19   flawed because you can't just add up the numbers.  But, no,
15:15:56 20   nothing there would have changed my mind.
21   Q    Great.  We can take this down.
22        MS. KHANNA:  Your Honor, I know we have been going for
23   a little over an hour.  I am about to start talking about some
24   of the specifics of the illustrative plans.  I would say I have
15:16:15 25   about maybe a half hour left.  And I didn't know if the Court

```
 1  wanted to take a break now.
 2            JUDGE MARCUS:  If you prefer to break at this point
 3  and then pick up?
 4            MS. KHANNA:  I think so.  I think it's probably more
 5  logical stopping point right now.
 6            JUDGE MARCUS:  Okay.  We will -- I have 3:16 Alabama
 7  Central Standard Time.  So we will get started a little past
 8  3:30.  We will take a 15-minute or so break.  Thank you.
 9            MS. KHANNA:  Thank you, Your Honor.
10            (Recess.)
11            JUDGE MARCUS:  Are the parties ready to proceed?
12            MS. KHANNA:  I am.  I wanted to make sure Mr. Cooper
13  is back on, on video.
14            JUDGE MARCUS:  I do not see him.  We have two lawyers
15  and no witness.
16        Mr. Cooper?
17            THE WITNESS:  Yes.  I am here.
18            JUDGE MARCUS:  We hear you but do not see you.
19        Now we are all ready to proceed.  Ms. Khanna, you may
20  proceed with your direct examination of Mr. Cooper.
21            MS. KHANNA:  Thank you, Your Honor.
22  BY MS. KHANNA:
23  Q    Mr. Cooper, I now want to discuss each of the individual
24  illustrative plans in some detail.  Let's start with
25  Illustrative Plan 1.  And we will pull up Plaintiffs'
```

1   Exhibit 18, Caster Plaintiffs' Exhibit 18, which is also

2   attached to your initial report.

3       So can you describe the configuration of District 7 in

4   your Illustrative Plan 1?

15:31:44  5   A    Well, Illustrative Plan 1 places, as do all the plans as

6   all the plans do, Jefferson County in District 7 and then picks

7   up Tuscaloosa County and then several of the rural Black Belt

8   counties starting with Sumter and Perry and Dallas and Wilcox

9   and Hale.

15:32:16 10   Q    And can you describe the configuration of the District 2?

11   Illustrative Plan 1?

12   A    Okay.  In Illustrative Plan 1, as in all plans, Mobile is

13   in the -- Mobile County is in District 2, at least part of it,

14   and then the remaining counties of the western and eastern

15:32:37 15   Black Belt, as well as part of the county of Montgomery.  Like

16   the enacted plan in Illustrative Plan 1, a part of Montgomery

17   County is put into District 3.

18   Q    Okay.  And let's take a look at the statistics for

19   Illustrative Plan 1.  I believe that's at Plaintiffs'

15:33:01 20   Exhibit 17.  Can you see the screen -- see all the numbers on

21   the screen, Mr. Cooper?

22   A    Yes.

23   Q    What is the any-part Black Voting Age Population of

24   District 7 in Illustrative Plan 1?

15:33:15 25   A    53.28 percent.

```
 1   Q    And what is the any-part Black Voting Age Population of
 2   District 2 in Illustrative Plan 1?
 3   A    50.09 percent.
 4   Q    What is the non-Hispanic single-race Black CVAP for
 5   Illustrative Plan 7 in this plan?
 6   A    54.97 percent.
 7   Q    And the same metric for District 2?
 8   A    51.16 percent.
 9   Q    Great.  If we could zoom out from this close-up exhibit.
10        Okay.  Let's turn to Illustrative Plan 2.  That's
11   Plaintiffs' Exhibit 23, which shows the map.
12        So in what way does Illustrative Plan 2 differ from the
13   other illustrative plans?  What's the defining characteristics
14   of this plan?
15   A    Well, Illustrative Plan 2 does one thing that the other
16   plans do not do, and that includes -- that is that I have
17   included predominantly African-American community area of
18   Houston County in the city of Dothan in District 2, and the
19   only other thing that might be different -- actually I guess
20   there is no -- there is no other defining factor.  Basically,
21   the same counties are combined perhaps in a different way.  But
22   it's still District 2 in the south and District 7 in the north.
23   And District 7 in this instance, and I am not sure if in any
24   other of the plans I've drawn actually goes into Lowndes
25   County, which doesn't show up on the label on this map.  It's
```

15:33:36
15:33:56
15:34:16
15:34:49
15:35:10

```
 1   sandwiched between Montgomery and Dallas counties.  And I think
 2   in the enacted plan and most of maybe even in the 2011 plan,
 3   District 7 in the enacted plan did go from Jefferson County all
 4   the way into Lowndes County and even picked up a little bit of
 5   Montgomery.  I have not taken it into Montgomery County, but
 6   this plan does have Lowndes County in District 7.
 7   Q    Let's take a look at the statistics of Illustrative Plan
 8   2, which is Plaintiffs' Exhibit 22, I believe.
 9        What is the any-part Black Voting Age Population of
10   District 7 under Illustrative Plan 2?
11   A    53.79 percent.
12   Q    What is the any-part Black Voting Age Population for
13   District 2 in this plan?
14   A    50.88 percent.
15   Q    What is the non-Hispanic single-race Black Citizen Voting
16   Age Population for District 7 in Illustrative Plan 2?
17   A    55.58 percent.
18   Q    And what about the same metric for District 2 in this
19   plan?
20   A    51.82 percent.
21   Q    All right.  Let's turn to Illustrative Plan 3.  That's
22   going to be Plaintiffs' Exhibit 28.  Look at the map.
23        So, Mr. Cooper, how does Illustrative Plan 3 differ from
24   the other plans?  What are its defining features?
25   A    Illustrative Plan 3 keeps Montgomery County whole.  I
```

1  think the first two we looked at did not keep Montgomery County

2  whole.

3       And, of course, as in all the plans, it includes Mobile

4  County.

15:37:09  5       So District 7 is a northern district in this case.  And

6  includes part of Bibb County and all of Bibb County, part of

7  Tuscaloosa, and the northwestern part of the Black Belt,

8  including Pickens and Sumter county along the Mississippi line.

9  Q    So this map manages to keep Montgomery County whole in

15:37:31 10  District 2; is that right?

11  A    Right.

12  Q    And the enacted plan actually divides Montgomery County;

13  is that right?

14  A    I believe so.

15:37:38 15  Q    Okay.  Let's pull up the statistics for Illustrative Plan

16  3 Plaintiffs' Exhibit 27.  What is the any-part Black Voting

17  Age Population for District 7 in Illustrative Plan 3?

18  A    50.09 percent.

19  Q    What about the same metric for District 2 in Illustrative

15:38:04 20  Plan 3?

21  A    50.27 percent.

22  Q    And what is the non-Hispanic single-race Black Citizen

23  Voting Age Population in District 7 under this plan?

24  A    51.77 percent.

15:38:18 25  Q    And the same metric for District 2?

1   A     Yes.  51.08 percent.

2   Q     Great.  Let's talk about -- let's go to Illustrative Plan

3   4 that's Plaintiffs' Exhibit 33 to look at that map.

4   A     Yes.

15:38:39  5   Q     So how -- you anticipated my question.  But yes.  How

6   would you -- what's different about Illustrative Plan 4

7   compared to the other illustrative plans that you created?

8   A     Well, this plan is different in that I kept Tuscaloosa

9   County whole, as well as the city of Tuscaloosa.

15:38:58 10        The current plan -- the enacted plan the state produced

11   actually splits Tuscaloosa County, of course, but it also

12   splits the city of Tuscaloosa.  So I believe that this is the

13   only plan on the table right now that does not split Tuscaloosa

14   County county or the city of Tuscaloosa.  So that was my

15:39:18 15   variation in this particular plan.  And so District 7 is sort

16   of in the -- again, kind of a northwest quadrant.  And then

17   District 2, as in all plans, includes Mobile County and extends

18   east to Barbour County on the Georgia line and also does have a

19   split in Montgomery County when shares that with District 3.

15:39:45 20   Q     And that split is also reflected in the enacted plan?

21   A     It's not the exact same split, but same general area,

22   true.

23   Q     Okay.  Let's go to statistics Illustrative Plan 4, which I

24   believe is now at Plaintiffs' Exhibit 32.  What is the any-part

15:40:08 25   Black Voting Age Population of District 7 under this plan?

```
 1  A     50.09 percent.
 2  Q     And what is the any-part Black Voting Age Population of
 3  District 2?
 4  A     50.07 percent.
 5  Q     What is the non-Hispanic single-race Black Citizen Voting
 6  Age Population of District in 7 under this plan?
 7  A     52.13 percent.
 8  Q     What is that metric for District 2?
 9  A     50.8 percent.
10  Q     Mr. Cooper, I believe in Mr. Bryan's declaration, he notes
11  that some of the numbers that you report population figures
12  when it comes to Illustrative Plans 4, 5, and 6 were transposed
13  in your report.  Do you recall reading that?
14  A     I do.  Apparently a copy and paste error as I was taking
15  columns from the exhibit and putting it into the declaration, I
16  must have inadvertently copied the wrong plan in the population
17  column.  It does not change the percentages at all.  The
18  numbers that are reported in my declaration exhibits are
19  accurate.  I think that was confirmed by Mr. Bryan.  He spent
20  about three pages discussing this issue, and it's really making
21  a mountain out of a mole hill.
22  Q     So there was a typo in your declaration; is that right?
23  A     Yeah.  Well, you can call it a typo.  It's a copy and
24  paste error.  I just copied a column apparently from the wrong
25  election plan and put it into total population for a plan that
```

1   should have gone in another one.  So that the -- sum of the

2   total population numbers instead of being plus one might be

3   minus one for one district.  It's just not a meaningful error.

4   Q     So but just for the Court's clarification, all of the

15:42:08 5   statistics, all of the numbers in the exhibits to your report,

6   including the one we're looking at right now, those are all

7   accurate?

8   A     Yes.

9   Q     Okay.  All right.  Let's move on to Illustrative Plan 5.

15:42:25 10  That will be Plaintiffs' Exhibit 38 to look at this map.

11        What are the unique details of Illustrative Plan 5

12   compared to the other plans that you produced?

13   A     The key distinguishing factor with Illustrative Plan 5 is

14   that I put Coffee County into District 2, and the current

15:42:50 15  incumbent for District 2 lives in Coffee County.  So this plan

16   demonstrates that you can draw two majority-black districts for

17   the U.S. House in Alabama and protect all incumbents.

18   Q     And so in extending it to Coffee County to capture the

19   current incumbent, did you have to kind of extend District 2 a

15:43:14 20  little bit more southward than you did in any of the other

21   plans?

22   A     Yeah.  At least on the eastern most part of the district,

23   I did.  The border instead of just being Macon and Bullock

24   County actually goes through Pike and all the way down to the

15:43:34 25  -- well, all of Coffee County down to the Geneva County line.

1   So it does extend the eastern border further south.

2   Q     So with respect for the incumbent in that district in

3   particular creates that kind of little foot on the southeastern

4   side of the district?

15:43:47 5   A     Yes.

6   Q     Let's go to the statistics for this plan at Plaintiffs'

7   Exhibit 37.  What is the any-part Black Voting Age Population

8   under Illustrative Plan 5?

9   A     50.09 percent.

15:44:04 10   Q     And the any-part Black Voting Age Population for District

11   2?

12   A     50.24 percent.

13   Q     What is the non-Hispanic single-race Black Citizen Voting

14   Age Population for District 7 in this plan?

15:44:20 15   A     51.65 percent.

16   Q     And what is that metric for District 2 in that -- in this

17   plan?

18   A     51.2 percent.

19   Q     All right.  Let's move on to Illustrative Plan 6.

15:44:41 20   Mr. Cooper, I know in your report you describe each of these

21   plans more fully, and I am just asking for kind of a summary of

22   what the key differences are from one plan to another here.  So

23   I know you have gone into more detail there.  What would you

24   describe as the key difference --

15:44:55 25             JUDGE MARCUS:  Let me stop you for a moment, counsel.

1   What exhibit number is Plan 6?

2            MS. KHANNA:  Thank you, Your Honor.  Apologies for

3   that.  This is Plaintiffs' Exhibit 43.

4            JUDGE MARCUS:  Thank you.

15:45:10  5  BY MS. KHANNA:

6   Q    Mr. Cooper, looking at this map, what would you say are

7   the -- what differentiates this map from some of the other

8   plans you drew?

9   A    Well, this is the first plan that I prepared or presented

15:45:22 10  that actually keeps all of the city of Mobile in District 2.

11  And it also at the same time keeps all of Montgomery County in

12  District 2.  So it does not split Montgomery city or Mobile

13  city.  Both are whole.  And that is the key feature of this

14  particular plan.

15:45:46 15  Q    And so if you recall back to the compactness chart, I

16  believe that Illustrative Plan 6, this one, scored the lowest

17  on the Polsby-Popper metric.  Do you remember that?

18  A    I don't remember exactly, no, but I know that there were

19  lower scores maybe in some of the plans compared to others.

15:46:08 20  Q    Can you explain why this plan would score slightly lower

21  on the Polsby-Popper metric particularly when it comes to

22  District 2?

23  A    Well, I think in the case of keeping Mobile city whole,

24  the city boundary is places kind of irregular shaped.  And so

15:46:27 25  that would have been a factor.  It also -- because I wanted to

```
 1   maintain a way for people to drive from District 1 in Mobile
 2   County into Baldwin County without going to District 2, I left
 3   that opening there in the north end of the county so that you
 4   could cross through on I-65 or one of the state routes without
 5   travelling into District 2.  And I also wanted to make sure
 6   that the incumbent in District 1 stayed in District 1.  And in
 7   doing that, some of the precincts in the east -- west of Mobile
 8   before you get back into District 2 are slightly irregular, so
 9   that may have had something to do with the lower score.
10   Q    So those are regular boundaries that we see are explained
11   by certainly the Mobile city line, city boundary, but also
12   various road ways and other traversals as well as the
13   incumbent?
14   A    Right.  But I have to emphasize again there's nothing out
15   of line with the Polsby-Popper scores in any of these plans.
16   This one happens to be maybe one of the lower ones.  But it
17   matches up fine if you look at districts around the country or
18   even if you look at some of the legislative districts in
19   Alabama.
20   Q    Okay.  Let's move on to the statistics for Illustrative
21   Plan 6.  That's Plaintiffs' Exhibit 42.  And, again,
22   Mr. Cooper, what is the any-part Black Voting Age Population
23   for District 7 under this plan?
24   A    51.09 percent.
25   Q    What is the any-part Black Voting Age Population for
```

1   District 2?

2   A     51.28 percent.

3   Q     What is the non-Hispanic single-race Black Citizen Voting

4   Age Population for District 7?

15:48:27  5   A     52 -- oh.  52.48 percent.

6   Q     And what is the non-Hispanic single-race black CVAP for

7   District 2?

8   A     52.44 percent.

9   Q     All right.  Let's move on to Illustrative Plan 7, which is

15:48:44 10   Plaintiffs' Exhibit 61.  What are the -- what differentiates

11   Illustrative Plan 7 from the others that you created for this

12   case?

13   A     Well, first of all, this plan also keeps the city of

14   Mobile whole and also keeps Montgomery County whole.  So it's

15:49:04 15   like District 6 -- and Illustrative Plan 6 in that sense.  And

16   it also as I've discussed previously has higher compactness

17   scores than the state's plans.  And it also makes changes to

18   the districts in the north.  You can see District 6 is perhaps

19   more compact in this plan than in others.

15:49:27 20       I did change the configuration of this so that it

21   basically just includes the city of Huntsville, which is

22   extends now into Limestone County.  It's not only Madison

23   County.  So I included all the city of Huntsville and the

24   Appalachian counties in District 5.  And District 4 runs from

15:49:47 25   Tuscaloosa north to the Tennessee line.  But it's a more

```
 1   compact shape than exists in the -- in the existing plan.

 2   Because the existing plan if you live in suburban Tuscaloosa,

 3   you can end up in the same district as somebody in, you know,

 4   northwest Alabama really in the mountains.  And so there is a

 5   question there from a geographic standpoint whether that's a

 6   good match up.

 7   Q    Let's pull up the statistics for Illustrative Plan 7

 8   that's Plaintiffs' Exhibit 60.  What is the any-part Black

 9   Voting Age Population for District 7 under this plan?

10   A    51.88 percent.

11   Q    Actually, for District 7, I think that's --

12   A    Oh.  I'm sorry.  50.31 percent.

13   Q    Any-part Black Voting Age Population for District 2?

14   A    51.88 percent.

15   Q    What is the non-Hispanic single-race Black Citizen Voting

16   Age Population for District 7?

17   A    52.12 percent.

18   Q    And for District 2?

19   A    52.92 percent.

20   Q    And in this exhibit, you also include the percent of black

21   registered voters in the district, as well; is that right?

22   A    That's true because this particular plan was produced

23   after we -- that the discovery request was for voting

24   registration files.  So Illustrative Plan 7, which was produced

25   sometime after the 10th of December, I was able to include the
```

The timestamps in the left margin are: 15:50:12 (line 5), 15:50:34 (line 10), 15:50:49 (line 15), 15:51:06 (line 20), 15:51:25 (line 25).

```
 1   registered voter count in this particular plan for all
 2   districts.
 3   Q    And I know we have already shown the figure that shows the
 4   black active registered voters among all the illustrative
 5   plans, but just looking at Illustrative Plan 7 here, this is
 6   both District 7 and 2 are well over 50 percent; is that right?
 7   A    Yes, exactly.
 8   Q    We can take that down.
 9   A    This is current information I must emphasize.  This is the
10   most recent registered voter files they have.  2021
11   information, whereas a slightly lower non-Hispanic CVAP is
12   historical dating to 2017.
13   Q    Thank you.  We can take down this exhibit.  Mr. Cooper, is
14   it fair to say that each of your illustrative plans balances
15   traditional districting principles in different ways?
16   A    Yes.
17   Q    And in your opinion as a map drawer, each of these
18   achieves the goals of population equality, contiguity,
19   compactness, respect for political subdivision boundaries,
20   communities of interest, and non dilution of minority voting
21   strength.  Is that fair?
22   A    Yes.
23   Q    Each of them contains two districts that are
24   majority-black under the any-part Black Voting Age Population
25   metric, the majority non-Hispanic single-race Black Citizen
```

15:51:40 (line 5)
15:51:56 (line 10)
15:52:16 (line 15)
15:52:32 (line 20)
15:52:48 (line 25)

Voting Age Population, and have a majority of black active

registered voters; is that right?

A    Right.  And I believe Illustrative Plan 6 actually has two

districts that are single-race Black Voting Age Population over

15:53:06  50 percent.

Q    I would like to shift gears right now to the socioeconomic

profile in Alabama.

I know all of the figures that we are going to talk about

that you have included here are incorporated in your first

15:53:20 report, I believe at page 37 onward.  What data are these

socioeconomic statistics based on?

A    They're based on the 2019, one-year American Community

Survey.  So the survey instrument went out to households in

2019 and the early part of 2020.  And then the data was

15:53:47 reported in the month of September of 2020.  So it's fairly

recent socioeconomic information, although it predates the

pandemic.  So for that reason, the pandemic has resulted in the

2021 American Community Survey being canceled.  It is not going

to be reported except maybe in some sort of experimental

15:54:12 fashion since the bureau's indicated they are going to do

something with the data.

So this is the most current data available from the

one-year survey, and there won't be any more data available

until the 2021 survey is released, which will be in September

15:54:26 of '22.

1  Q    And just to clarify, the American Community Survey data is

2  administered and produced by the U.S. Census Bureau, correct?

3  A    Yes.

4  Q    So what are your conclusions generally regarding the

15:54:41  5  socioeconomic profile of blacks and whites in Alabama?

6  A    Well, whites outpace blacks in almost every single

7  category.  I'm hard pressed to think of one where there is not

8  a disparity.  And I outline that in my declaration and have a

9  set of charts in the exhibits, which illustrate those

15:55:02 10  disparities and is probably a little easier to get through,

11  just looking at bar charts.

12  Q    And those disparities across -- span across education,

13  income, and other metrics, as well; is that right?

14  A    Yes.

15:55:18 15  Q    Employment?

16  A    Unemployment rates, just the whole nine yards, really.

17  It's not -- it's sad in a way that the disparity is that

18  pronounced.

19  Q    Thank you.

15:55:33 20        MS. KHANNA:  Mr. Cooper, I don't have any further

21  questions at this time.  Your Honor, I pass the witness.

22        JUDGE MARCUS:  Thank you.  Mr. Davis?

23        MR. DAVIS:  Thank you, Your Honor.

24                        CROSS-EXAMINATION

15:55:41 25  BY MR. DAVIS:

```
 1  Q     Hello, Mr. Cooper.

 2  A     Hello.  Long time no see.

 3  Q     Mr. Cooper, if someone identifies as black in filling out

 4  the census, your report does not tell us how that person votes

 5  or consider how that person votes, does it?

 6  A     No.

 7  Q     Are you making any assumptions in your analysis about how

 8  that person votes, knowing nothing about him or her except the

 9  color of the skin?

10  A     I make no assumptions about voting.  That's the job of the

11  Gingles II and Gingles III expert.

12  Q     Is that true as well for someone who identifies as white

13  when filling out the census?

14  A     That's true.  I cannot make any kind of statement one way

15  or the other about an individual voter, no.

16  Q     And then it would be also true for someone who checks both

17  black and white?

18  A     For the -- for the census form, that's true.  Of course,

19  we have the voter registration data, which is limited to only

20  one check, so, that's why I'm confident that all our districts

21  are majority-black.  Of the two that are considered,

22  majority-black.

23  Q     Do you have any understanding, Mr. Cooper, about whether

24  Section 2 requires proportional representation for minority

25  populations?
```

1          MS. KHANNA:  Objection, Your Honor.  That calls for a

2   legal conclusion.

3          JUDGE MARCUS:  I will allow it insofar as he's telling

4   us what may have shaped or motivated him in drawing it.  We

15:57:20 5   will take it.  Overruled.

6          THE WITNESS:  Well, my understanding is it does not

7   require proportional representation.

8   BY MR. DAVIS:

9   Q    Thank you.

15:57:28 10  A    But I'm not a lawyer.

11  Q    If I understood you correctly, Mr. Cooper, you said that

12  when drawing illustrative plans for a Section 2 case, it is

13  necessary to consider race.  Was that your testimony?

14  A    Race in a Section 2 case is always in the background as it

15:57:50 15  really is in most plans one would draw anywhere in the country

16  outside of litigation if you are really following traditional

17  redistricting principles.

18  Q    You say following traditional principals requires you to

19  district on the basis of race?

15:58:04 20  A    You have to make sure that what you are doing is not

21  diluting a subset of the population that is minority in terms

22  of their voting strengths.

23  Q    At some point in the process, but that doesn't mean you

24  have to consider race when drafting a plan, does it?

15:58:19 25  A    Well, it's a traditional redistricting principle, so like

```
 1  compactness or contiguity, you have to be aware of it as you
 2  are drawing a plan.
 3  Q    Even if it's necessary to consider race when drawing an
 4  illustrative plan, that does not mean that it's okay to make
 5  race the most important factor, though, does it?
 6  A    No.  One should try to balance the various traditional
 7  redistricting principles as I believe I have done.
 8  Q    You've drawn many plans in many different jurisdictions,
 9  correct?
10  A    That is correct.
11  Q    When you're drawing plans for a jurisdiction, and I don't
12  mean in litigation, I mean you're being hired by a state or a
13  county or school board or someone to draw their plans, how
14  often do you just start with a blank slate with no
15  consideration of how the districts looked before?
16  A    Almost never.  I would always see what the so-called
17  benchmark plan, the previous plan looked like.
18  Q    Do you most often adjust the benchmark plan as necessary
19  to come within appropriate population deviation?
20  A    Yes.  I mean, I'm always looking at things that need to be
21  changed to comply with traditional redistricting principles
22  and, of course, that would definitely include one person one
23  vote.
24  Q    Sure.  Now, you said that you considered Alabama's
25  districting guidelines, right?
```

15:58:37   (line 5)
15:58:54   (line 10)
15:59:13   (line 15)
15:59:34   (line 20)
15:59:53   (line 25)

A     I did.  I reviewed them.

Q     And you say you complied with our traditional districting
criteria, correct?

A     I believe so.

16:00:04 Q     Okay.

A     Criteria very general, so I think so.

Q     Sure.  Does our guideline not -- do our guidelines not
include the traditional districting criteria of preserving the
core of districts?

16:00:19 A     They do.  And for the six plans I drew that include
District 5 in north Alabama, they're almost identical to the
District 5 that was drawn by the state.  Because I'm also
looking at other factors like the minority population and the
reality that a second majority-black district could be drawn,
16:00:50 the so-called core retention numbers on my plan might not match
the state's.  But that's okay.  That's okay.  I don't think
that's something to be concerned about.

Q     Okay.  Well, we do.  So but our guidelines don't say
preserve the core of District 5, does it?  It says preserve the
16:01:12 core of existing districts?

A     Right.  But if you start with a plan that prima facia may
be violating the Voting Rights Acts, you are going to change
districts.  And because of that, when I set about to create a
second majority-black district, it was clear that I had to
16:01:30 change other districts.  It was not possible just to do a de

```
 1   minumus change.  It required, you know, significant changes to
 2   some of the adjoining districts, and because Districts 2 and 7
 3   basically line up with the rest of the districts in the state,
 4   all the districts except for District 5 have to change.
 5   Q    Does your report express any opinion or your supplemental
 6   report that Alabama's plan violates the Voting Rights Act?
 7   A    Well, I am not a -- I am not a lawyer or a judge, so I
 8   can't make that statement point blank.  But I do believe that
 9   second majority-black district can be created while adhering to
10   the traditional redistricting principles.  Once you take that
11   concept into action, you're going to change the neighboring
12   districts.  And because five of the districts are neighboring,
13   that pretty much just leaves you with the only possibility of
14   protecting core retention in District 5.
15   Q    So is that a no?
16   A    No to what?
17   Q    That your report does not include an opinion that
18   Alabama's plan violates the Voting Rights Act?
19   A    Well, it shouldn't because I'm not a -- I'm not a lawyer.
20   I'm not a judge.  I just drew a plan that demonstrates that in
21   my opinion you can get a second majority-black district.  And
22   flowing from that would be perhaps a judicial decision that
23   would say the enacted plan violates the Voting Rights Act.
24   Q    Did you or did you not consider the traditional
25   districting criteria of preserving the core of districts that
```

Timestamps: 16:01:49 (line 5), 16:02:08 (line 10), 16:02:27 (line 15), 16:02:40 (line 20), 16:03:02 (line 25)

1  is in Alabama's guidelines?

2  A    I believe I did within the constraints of creating second

3  majority-black districts.  I didn't radically change where the

4  districts are located.  And I -- except in District 7, I did

16:03:20  5  change District 5 in that particular plan just to make the

6  point that the state could have drawn a more compact district.

7  But beyond that, I have done a pretty good job of keeping the

8  general areas served by each district except for District 1 in

9  the same part of the state.  You're looking at me like you're

16:03:48 10  appalled.

11  Q    Mr. Cooper I have to apologize.  I will say this to the

12  Court, too.  I am looking for the right -- I promise you -- I'm

13  trying to share my screen, and I'm making sure that I get the

14  right EF up.  I am not meaning to look any way.

16:04:04 15  A    Oh.  I thought you were looking at me in a --

16  Q    No, no.

17        JUDGE MARCUS:  You all like fine to me.  Let's just

18  proceed with the next question, please.

19  BY MR. DAVIS:

16:04:14 20  Q    Mr. Cooper, how does this plan preserve the core of

21  existing districts?  And this is your Illustrative Plan 7.

22  A    Well --

23  Q    Exhibit C-61.

24  A    That's right.  That's one where I did change District 5.

16:04:32 25  I believe it's a more compact district.  It keeps Huntsville

1   whole and does not put a voter in Tuscaloosa in a district

2   that's almost in Chattanooga.  So it's a different

3   configuration.  I'm not saying it has to be this way.  I just

4   thought it would make the point.

16:04:51  5       You could draw District 5 as the state is drawn.  And in

6   all the other plans, I basically have.

7   Q    Mr. Cooper, did you observe traditional redistricting

8   principle of avoiding incumbent conflicts with your peers in

9   Alabama's guidelines?

16:05:09 10  A    I did in Illustrative Plan 5.

11  Q    In your other six, you did not observe that traditional

12  districting criteria, did you?

13  A    However, I would point out those plans could in all cases

14  probably be modified such that the incumbent in district -- in

16:05:32 15  District 2 could be put in District 2 if not by way of a whole

16  county, all of Coffee County, which is really quite populace,

17  certainly it could be split, and the incumbent could be put in

18  District 2.

19  Q    Is it true --

16:05:46 20  A    There would be many options for that.

21  Q    Is it true --

22  A    I want --

23       JUDGE MARCUS:  Just let him finish, please.  You may

24  finish your answer, Mr. Cooper.

16:05:58 25       THE WITNESS:  Oh.  I just didn't want to introduce

```
 1  more than six splits to any plan.  So for that reason, I
 2  didn't, for example, split Coffee County to put the incumbent
 3  in the District 2.  But there would be other variations.  And
 4  there's one on the table now that does that.  So I have
16:06:16  5  protected all incumbents.
 6  BY MR. DAVIS:
 7  Q    Is it true that in six of your seven illustrative plans,
 8  you do not avoid incumbent conflicts?
 9  A    In six of the seven?  But in any of those, I could have
16:06:30 10  probably protected the incumbent and kept a plan in place with
11  two out of seven majority-black districts.  It might have
12  required an extra county split, though.
13  Q    Have you ever lived in Alabama?
14  A    No, I have not.
16:06:50 15  Q    Have you spent any time speaking with Alabama voters or
16  election officials about what local communities of interest may
17  be?
18  A    No.  I mean, I have spoken with folks from Alabama.  But I
19  have not spoken with election officials.
16:07:09 20  Q    What makes you think that you are better able than 140
21  legislators who live in Alabama and represent local districts
22  -- what makes you think you are in a better position than them
23  to balance traditional criteria where they conflict?
24         MS. KHANNA:  Objection, Your Honor.  That
16:07:28 25  mischaracterizes his testimony.  I don't think he's ever said
```

1    he's better able than the legislators.

2              JUDGE MARCUS:  I will let him answer the question.

3    You may answer.

4              THE WITNESS:  I think in the final analysis, even if

16:07:37  5    this case is ruled in our favor, the Legislature will get the

6    first opportunity to develop a remedial plan, and more often

7    than not, that's what happens.  Sometimes it doesn't happen.

8    Like in say South Dakota, when ultimately the Legislature

9    refused to create a majority Native American district, so the

16:07:54 10    judge just finally had to order.  But normally the Legislature

11    will have the opportunity to develop a plan.

12          In fact, in 2019, in Mississippi in the plan I referenced

13    earlier in my testimony, where I was a consultant, and the

14    plaintiffs' expert in a lawsuit, Section 2 lawsuit that created

16:08:13 15    a new state Senate district in the Delta, initially the judge

16    ordered my plan into place.  But then the Legislature came back

17    and said, look, we want to develop a plan.  The judge allowed

18    them do that, and the court ordered plan in the end was a plan

19    developed by the Legislature.  It included a majority-black

16:08:33 20    district, though.

21    BY MR. DAVIS:

22    Q    Mr. Cooper, did I understand you correctly when you said

23    you kept the city of Mobile whole that you split precincts in

24    order to do so?

16:08:52 25    A    Some precincts had to be split in order to get to zero

1    population deviation.

2    Q     Okay.  Did you have to split precincts in order to keep

3    the city of Mobile whole?

4    A     In the configuration that you see in Illustrative Plan 6

16:09:15  5    and 7, I believe I did have to do that in order to meet

6    one person one vote zero deviation.

7    Q     Why couldn't you have made that adjustment somewhere else

8    on the map?

9    A     Well, perhaps I could have, but then that would have

16:09:27 10    introduced another county split.  Yeah.  There are an infinity

11    of plans out there one can draw.  These are just seven

12    illustrative ones.  So I am not saying it couldn't be done.  I

13    just haven't produced such a plan so far.

14    Q     Why did you not produce any plans that kept Mobile County

16:09:46 15    whole?

16    A     I think that more than likely if you keep Mobile County

17    whole it becomes a little problematic to create two

18    majority-black districts.

19    Q     Does it make it impossible?

16:09:59 20    A     Well, maybe not, but it would require a number of other

21    county splits, I think.

22    Q     Did you testify in direct, Mr. Cooper, that in Florida,

23    you have used the measurement of non-Hispanic black instead of

24    any-part black?

16:10:22 25    A     No.  No.  I just said that there may be some places in

```
 1   America where there was a large black Latino population that

 2   perhaps could be isolated for voting purposes.

 3   Q    Okay.

 4   A    But that's not the case in Alabama.

 5   Q    Okay.  I wasn't asking about Alabama.

 6   A    Yeah.  Well, I am.  I'm telling you any-part black is the

 7   definition to use in Alabama.

 8   Q    Okay.  Did you testify that non-Hispanic single-race

 9   citizen black is the most conservative measure that you could

10   use?

11   A    I believe that is the most conservative measure I can use.

12   Q    And you say that number is probably higher now than what

13   you report?

14   A    Yeah.  It's always running behind.  It's always four years

15   old.  So since we're right at the 2020 census, it is somewhat

16   historical.

17   Q    I understand why it's historical.  I don't understand why

18   you say that the number would necessarily be higher now?

19   A    Alabama is a younger population.  So assuming that the

20   younger cohorts between say 14 and 16 age to 18 over a

21   four-year period, the black VAP is probably going to go up.

22   Black CVAP will probably go up.  That's speculative.  I can't

23   say for sure.

24   Q    I want to show you -- this is Exhibit C-1, and it's your

25   report.  I want to go to page 8 of your report.
```

16:10:39
16:11:04
16:11:15
16:11:30
16:12:00

1      Mr. Cooper, do you recognize this map on page 8 of your

2  report?

3  A     Yes.

4  Q     And what are these counties that are outlined in black?

16:12:18 5  A     Those are counties that are identified as part of the

6  historic Black Belt in Alabama.  That definition came from the

7  encyclopedia of Alabama.

8  Q     Have you --

9  A     It references that.

16:12:37 10  Q     Have you ever seen any definition of the Black Belt that

11  includes Mobile County?

12  A     I have not, but I am not an historian.

13  Q     Have you --

14  A     And I would add, if you look at a U.S. map of historical

16:12:59 15  Black Belt counties, it is conceivable that Mobile might show

16  up going further back in time.

17  Q     Have you presented any map in this case that keeps these

18  counties that you have identified together in a single

19  district?

16:13:16 20  A     I have not.

21  Q     In fact, isn't it true that these counties are split among

22  three districts in each of your seven maps?

23  A     Not sure about that.

24  Q     Okay.  In your report, you give a total number of the

16:13:40 25  black voters in Districts 1, 2, and 3, correct?

```
 1   A     I do.
 2   Q     And let's see.  It's around 612,000.  You say is almost
 3   enough to -- to be -- to make up an additional congressional
 4   district?
16:14:00 5   A     Right.
 6   Q     So the 612,000 voters that includes -- this, for the
 7   record, is Defense Exhibit 1, Page 72.
 8         Your 612,000 voters includes these African-American voters
 9   in Mobile in District 1, right?
16:14:33 10  A     True.
11   Q     It would include these black voters in Dothan over in
12   Houston County in the southeast portion of the state?
13   A     Right.
14   Q     It would include voters in Auburn and Talladega and
16:14:46 15  Anniston and Gadsden, as well, right?
16   A     True.  And I don't think you could get all the way to
17   Gadsden or Huntsville with a majority-black district.  You
18   could probably get to Talladega.
19   Q     Are you suggesting that it would be possible to put all of
16:15:04 20  these black voters that you have identified together in a
21   single congressional district?
22   A     Perhaps not in a single plan.  But that's certainly --
23   those are areas excluding Gadsden, excluding Huntsville where
24   one could draw a second majority-black district.  I believe I
16:15:20 25  did that in the trial testimony for the Chestnut vs. Merrill
```

```
 1  case back in 2019.  I think I put Talladega in a majority-black
 2  district.  But obviously, you couldn't go all the way to
 3  Huntsville.
 4  Q    Speaking of Chestnut, you were an expert for the
16:15:37 5  plaintiffs in that case, correct?
 6  A    Yes.
 7  Q    Have you ever seen or read the testimony of Congressman
 8  Bradley Byrne from that case?
 9  A    I believe I may have read a news account, but I have not
16:15:53 10  read his testimony.
11  Q    Okay.  Do you have any knowledge of what Mr. Byrne
12  testified about in that case concerning any differences between
13  the role of a member of the State Board of Education and the
14  role of a member of Congress?
16:16:05 15  A    I did not see his direct testimony on that, but I can
16  understand there would be differences.
17  Q    Okay.  What, if any, is your understanding of what those
18  differences might be?
19  A    I would think that a Congress person probably has more
16:16:25 20  responsibility to get out and meet the voters than someone who
21  is on the board of education.  But that's just my general
22  thought.  I don't have specific knowledge about what the
23  members of the board of education of Alabama do.  Many of them
24  may actually visit lots of schools, so.
16:16:40 25  Q    But you don't know?
```

1  A     No, I don't.  I don't.

2  Q     Okay.  Do you know when the State Board of Education plan

3  was first split?

4        That's not what I meant to ask, Mr. Cooper.

16:16:52  5        Do you know when Mobile County was first split in the

6  Alabama State Board of Education plan?

7  A     I think it may have been in the 1996 court ordered plan.

8  If not, maybe in the 2002 plan.  But I could be wrong.  Maybe

9  it wasn't split until 2011.

16:17:10 10 Q     If -- I want you to assume it was split in 2011 for the

11 first time.  You do know that in the 20 -- in the 2000-decade

12 plan there were two majority-black districts in the State Board

13 of Education plan, correct?

14 A     Well, I -- there were two majority-black districts in the

16:17:38 15 2011 plan.  I believe the plans that were developed and

16 precleared by the Justice Department in 2002 had two districts

17 that were -- one of the districts was not quite majority-black.

18 It was like 48 percent.  That's in my declaration.

19 Q     Do you know how communities of interest are different, if

16:18:04 20 they are, for purposes of a State Board of Education plan

21 versus a congressional plan?

22 A     I don't -- I can't point to something that would be

23 helpful, I don't think.  I'm not sure what you mean.  One is

24 for focusing solely on education -- students in public schools

16:18:29 25 in the state.  The other is responsible for just about

1    everything under the sun that has to do with federal issues.

2    Q     Do you know if board of education members keep offices in

3    their districts?

4    A     I don't think they would, but I could be wrong.  Again,

16:18:49  5    you are asking me a lot about the board of education.  I

6    frankly don't know the responsibilities in full.

7    Q     Do you have an understanding as a demographer and for

8    purposes of instructing you in drawing these illustrative

9    plans, do you have any understanding of what sufficiently

16:19:20 10    compact means, in terms of Section 2?  In other words --

11    A     I do.  And there's no question that I have met those in

12    all seven plans.

13    Q     What is your understanding of what sufficiently compact

14    means?

16:19:32 15    A     That the population is in an area that has clearly defined

16    boundaries that is reasonably shaped and is basically compact,

17    because I'm building it off of whole counties for the most

18    part.  So in my mind, it is reasonably compact.  And that's

19    confirmed by the scores.  You can always fall back on those.

16:19:58 20    If you look at those compactness scores, they match up with the

21    same kinds of scores for the state Legislature.  And if you

22    look at congressional plans around the country, those scores

23    are just fine.  Just take a look at Texas.  That's in my --

24    that's in my declaration.  That's where Mr. Bryan was advising

16:20:18 25    the state House.  And look at the scores in the congressional

1   districts in Texas.  They're down in the low single digits for

2   a congressional district.

3       So don't complain about the scores in my plans that I

4   formed, the illustrative plans.  They are absolutely within a

16:20:35 5   normal range for congressional districts nationwide.  And I

6   have referenced a court report written in 2012 based on the

7   2011 plans that makes that point clear.

8   Q    Mr. Cooper, does your definition of sufficiently compact

9   have any -- does it include in any way whether the voters in

16:20:57 10   your districts are part of the same communities of interest?

11   A    No.  I think community of interest and compactness can

12   vary.  I mean, there's -- the two different things.

13   Q    Okay.  I want to show you your first plan, Exhibit C-18.

14   Now, you say all your plans are consistent with traditional

16:21:28 15   districting criteria, correct?

16   A    In my opinion, yes.

17   Q    Okay.  So is it consistent with traditional districting

18   criteria split Jefferson, Tuscaloosa, Montgomery counties in

19   the way you did in this Illustrative Plan 1?

16:21:43 20   A    Well, first of all, my plan in illustrative -- my District

21   7 in Illustrative Plan 1 is very similar to the way you split

22   Jefferson County in the enacted plan.  I've included all of

23   those precincts that go across the southern tier of Jefferson

24   County all the way over to the Walker County line.  And that's

16:22:05 25   exactly what your plan does.

```
 1          So Jefferson County is fine.  Your plan splits Tuscaloosa
 2   County as does mine in Illustrative Plan 1.  But I have shown a
 3   way that you haven't done to keep Tuscaloosa County whole and
 4   put it all in District 7.
 5   Q    Mr. Cooper?
 6   A    Illustrative Plan 4, maybe.
 7   Q    Mr. Cooper, the question was:  In your opinion, is it
 8   consistent with traditional districting criteria to split
 9   Jefferson, Tuscaloosa, and Montgomery County counties the way
10   that they're split in your Illustrative Plan 1?
11   A    Yes.
12   Q    And is it consistent with traditional criteria for Mobile
13   County to be split the way that it is in your Illustrative Plan
14   1?
15   A    Yes.
16   Q    What traditional districting criteria required you to
17   split Mobile County?
18   A    One person one vote.
19   Q    So there's no way to draw a map with equal population
20   among the seven districts without splitting Mobile County?
21   A    And at the same time adhering to some of the other
22   traditional districting principals, like the non dilution of
23   the minority vote, true, no way.  More problematic.  Maybe
24   there would be a way, but you would also have to split other
25   counties.  So I think this is the best compromise.  Split
```

1  Mobile County.

2  Q    Do you need to split Mobile County to avoid incumbent

3  conflicts?

4  A    I don't understand that question exactly.

16:23:49  5  Q    Is it necessary to split Mobile County to observe

6  Alabama's traditional criteria of not putting incumbents

7  together in the same district?

8  A    Well, I mean, I still don't exactly understand the point

9  that -- of your question.  Obviously, you could put all of

16:24:14 10  Mobile County in a district as you have done and leave District

11  1 as you've done, such that it doesn't go all the way into

12  Coffee County and protect all the incumbents.  Incumbency

13  protection is a factor that one has to take into consideration.

14  But it's not exactly a traditional redistricting principle,

16:24:40 15  partly because incumbents constantly change.

16  Q    Is it necessary to split Mobile County to preserve the

17  core of existing districts?

18  A    Well, as I've said, I don't think core retention really is

19  a particularly significant metric in a *Gingles II* case, *Gingles

16:24:58 20  I* case, because the idea is to create an additional

21  majority-minority district.  And once you do that, you are

22  going to be changing all of the other districts that are

23  adjacent to the minority-majority districts that is created.

24  And in this instance, that's basically the whole plan, except

16:25:15 25  for District 5.

```
 1  Q    Mr. Cooper --
 2  A    Except for District 5.
 3  Q    Mr. Cooper, the question was:  Is it necessary to split
 4  Mobile County to preserve the core of districts?
16:25:30 5  A    I don't understand your question, really.  I mean, there
 6  may be a way to split Mobile County and have a final score on
 7  core retention that is higher than your score.  I don't know.
 8  Q    Let me stop the share and show you know Exhibit C-43.
 9  This is Exhibit C-43 for the record.  It is your Illustrative
16:26:12 10  Plan 6.  I don't think I'm sharing -- I think -- I'm sorry.  I
11  just opened the pdf.  Let's see.
12       Now, I closed it.  I will come back to that.
13       Mr. Cooper, what do voters in Mobile County and say
14  Bullock County the eastern end of the state have in common?  Do
16:26:41 15  you have any opinion about that?
16  A    Voters in Mobile County?
17  Q    Yes.
18  A    And Bullock County?
19       MS. KHANNA:  Objection.  Outside the scope of his
16:26:52 20  report.
21       JUDGE MARCUS:  I am not sure I understand the
22  question.  Could you sharpen that question, then and we will
23  see whether there's an objection.
24  BY MR. DAVIS:
16:26:58 25  Q    You contended, have you not, that your illustrative plans
```

```
 1  comply with traditional districting criteria, correct?
 2  A    Correct.
 3  Q    One of those traditional districting criteria is serving
 4  communities of interest, right?
 5  A    Right.
 6  Q    So you have -- sharing finally your Illustrative Plan 6 is
 7  Exhibit C-43.
 8       You have the opinion about whether these voters in
 9  downtown Mobile are part of the same community of interest of
10  voters in say Bullock and Macon County which are part of the
11  same District 2?
12  A    Well, we heard testimony earlier this afternoon from the
13  Milligan plaintiffs that, in fact, there is a community of
14  interest there because of the history of African-Americans from
15  the Black Belt immigrating to Mobile to look for work or to
16  Birmingham.  The ties are there.  So, yes, I think there is a
17  community of interest.  Bullock County -- those in the Black
18  Belt, and there are lots of folks in Mobile who have relatives
19  and friends in Macon and Bullock.  We are not talking about a
20  foreign country.  My goodness.  What is the connection between
21  somebody in Tuscaloosa and somebody who lives up around
22  Scottsboro, exactly?  Those are really different places.
23  Q    Mr. Cooper, did you have any understanding about the
24  communities of interest in Mobile and Macon and Bullock at the
25  time you drew these illustrative plans?
```

```
 1  A    Yes.  Because I've learned over time that there are
 2  communities of interest, specifically relating to the
 3  African-American population and the Diaspora from the Black
 4  Belt looking for work in the '30s, '40s, and forward.  So, you
 5  know, I do think there's a community of interest there.
 6  Q    Do you have any opinion about whether there's a community
 7  of interest that includes both voters in Houston County and
 8  voters in this wider portion of Mobile County that you include
 9  in District 1?
10  A    They're very well should be.  They live in south Alabama.
11  I suspect maybe -- maybe they're more University of Alabama
12  fans down in Mobile than in the eastern part of the state
13  Auburnland (sic).  But other than that, there's probably not a
14  lot of difference.
15  Q    Is there anything else you would have to add about why you
16  think might be a shared community of interest between voters on
17  the extreme ends of this District 1?
18  A    Because they live --
19  Q    What you have just said?
20  A    They live in south Alabama.  They are going to the same
21  public school system.  The similarities are legion.
22  Q    Thank you.
23       Why would you have this shape Mobile County?
24  A    Real simple.  First of all, I wanted to make sure you
25  could drive from District 1 in Mobile County into Baldwin
```

```
 1  County.  So I left a pathway via I-65 and some secondary roads
 2  from Mobile into Mobile County into Baldwin without splitting
 3  the city of Mobile.  And I left an opening there so that I
 4  could keep the current incumbent in District 1, Representative
 5  Byrne in District 1.  I could have just as easily put him in
 6  District 2 and probably made a more even shape at the edge
 7  there of District 2 as it comes into Mobile County.
 8  Q    Is there any reason down in Mobile County -- do you see
 9  this little pink strip down the middle, which is District 1 and
10  like a fish hook here, why not just go straight across and
11  close this pink part in?
12  A    Can't do it, because Mr. Byrne lives way down there in the
13  south -- southeast, southwest of Mobile almost in Mississippi.
14  And that's why that line is drawn that way.
15  Q    Did you draw any plans that score better than Alabama's
16  plans in either Polsby-Popper -- in Polsby-Popper and Reock?
17  A    Yes.  Illustrative Plan 7 scores higher on Reock and is
18  1/100th of a point lower on Polsby-Popper.  But if you take the
19  methodology that Mr. Bryan has employed, which actually is
20  flawed and add them up, we are on top.  Because as I have
21  indicated, you can't do that.  You have to look at the two
22  results independent of one another.
23  Q    Let me see if I can find your plan 7.
24  A    Look at the mean average, and you will see that our plan
25  is better than yours.
```

1  Q    Now, this is your plan 7, right?

2  A    Right.

3  Q    This is Exhibit C-59.  And that was page 3.  And let's go

4  down to 7, where I think has your scores.  Did your District 2

16:32:56 5  or District 7 in Illustrative Plan 7 score better than District

6  2 or District 7 in the state's plan?

7  A    No.  I look at the mean average.

8  Q    Okay.  So you did not improve the compactness of either

9  District 2 or District 7 in your Illustrative Plan 7?

16:33:13 10  A    I do think those compactness scores are somewhat higher

11  than in the other plans.  .39, .37 for the Reock scores.

12  Except maybe for Illustrative Plan 4 also has high Reock

13  scores, I think.  So I can't emphasize enough that the scores

14  you were seeing with all of the plans but especially with the

16:33:39 15  Illustrative Plan 7 as I have drawn them are perfectly okay in

16  terms of compactness.

17  Q    You improved your average in score -- in plan 7, but you

18  did not at least by any significant margin improve the

19  compactness of Districts 2 or 7, which are your majority-black

16:34:05 20  districts; is that correct?

21  A    No.  I think I did improve them just a little bit.

22  Q    Okay.  Just a little?

23  A    Well, it's -- we can go back and look at the scores, but I

24  think that District 2 and District 7 are maybe 4 or 500 or so

16:34:18 25  points higher in this plan than in the previous plans.

Q    Didn't you -- going back up to the map, didn't you improve
the overall average by reconfiguring Districts 4 and Districts
5?

A    That helped a little bit, too, I believe.

Q    Okay.

A    Also, this plan actually includes Chilton and Autauga in
District 7, so that improved the compactness score a little
bit, as well as, for Districts 2 and 7.

Q    Did you give any consideration?

A    The other plans I have drawn had Chilton and Autauga both
in District 7.

Q    Did you give any consideration how this would affect
communities of interest in the northern part of Alabama?

A    I certainly did.  I thought about it.  Because, you know,
that -- those county lines up there follow the Tennessee River.
So one could make the argument that District 5 should basically
follow the Tennessee River and go all the way over to
Lauderdale County.  I am not sure why you split Lauderdale, but
that's a separate issue.  So that's a point.  And the point I
am making here is that there is another community of interest
in northwest Alabama that revolves around the mountains and,
you know, historical association with Appalachia that doesn't
exactly sit with suburbs of Tuscaloosa.  So all plans are going
to have communities of interest at the congressional level that
vary from one part of the district to another to a certain

1    extent because it's covering the whole state.

2    Q    Mr. Cooper, I would like to share a page out of Defense

3    Exhibit 4, page 78.  Have you had a chance before today to

4    review the report of Tom Bryan?

16:36:06  5    A    I did read it, yes.

6    Q    This is page 78 of his supplemental report, Exhibit 4, and

7    he has loaded your plan number 1, and he has taken the voting

8    precinct the state of Alabama and color coded those by the

9    concentration of African-American population in those

16:36:32 10    precincts.

11         Do you agree first of all, Mr. Cooper, that that's what

12    Mr. Bryan is representing here?

13    A    That seems to be a report showing the percent black and

14    white in precincts, but I can't say that for a fact.  I haven't

16:36:48 15    seen his -- I haven't seen his shape file.  I haven't had a

16    chance to analyze it.  It doesn't seem to be way off.  But I

17    haven't seen the details.

18    Q    Did you split --

19    A    We also play tricks with how you break out the various

16:37:05 20    classifications of race.  0 to 10, 0 to 20.  There are

21    different ways that that might change the map.

22    Q    Did you consider race when drawing this district,

23    Mr. Cooper?

24    A    As part of following traditional redistricting principles,

16:37:26 25    I had to be aware of race.

1  Q      Did you sort voters by race when drawing these districts?

2  A      I don't know what you mean by sort.

3  Q      Did you divide -- did you use race to decide which voters

4  went into District 7 and which ones did not?

16:37:44  5  A      Well, first of all, none of these plans were developed

6  using voter registration data.  So I, you know, you say voters,

7  so, no, I did not.

8  Q      Okay.  Fair enough.  Let me rephrase my question.

9         Did you use race to determine which people went into

16:38:04 10  District 7 and which ones did not?

11  A      Well, to the extent that I know that the configuration

12  that I ended up with resulted in two majority-black districts.

13  But I did not try to maximize Black Voting Age Population.  You

14  know, my plans were intended to balance those.  If I had just

16:38:24 15  wanted to go in there willy-nilly and create two majority-black

16  districts without paying attention to county lines, without

17  paying attention to precinct lines, without paying attention to

18  municipal lines, I could have drawn a fairly compact looking

19  district that would have been higher in Black VAP for both

16:38:41 20  District 7th and District 2.

21         I'm balancing things, and I'm not trying to take things to

22  extreme, so I can't give you a really good -- I can't give you

23  a really good example of what extreme I might have been able to

24  hit.  But these plans in no way maximize Black Voting Page

16:38:59 25  Population in District 2 and 7.  They're drawn principally at

1    the precinct level.  If you drew these plans at the block

2    level, then the percentages would get significantly higher in

3    you were trying to sort or whatever it is you are talking

4    about.

16:39:12  5    Q    You come down into Mobile County in order to include the

6    African-American voters in Mobile in District 2?

7    A    That's right, because it's a significant community of

8    African-Americans.  It's, you know, the second or third largest

9    in the state.  Second largest, I guess.  Well, third, maybe

16:39:31 10    after Mobile -- after Montgomery and Jefferson County.  I would

11    have to double check that.  I think it's in the report.

12    Q    I want to show you now -- let's see.  Defense Exhibit 4,

13    page 86, and this is your Illustrative Plan 5.  Do you agree

14    with that?

16:40:07 15    A    I have no idea.  I have not examined the shape files.  I

16    don't know what he's produced here.  It could well be, but I

17    don't know.  I mean, I don't have -- I don't -- I don't have --

18    I did not have the opportunity to look at any of his work and

19    display it geographically.  Just looking at a pdf file, you

16:40:32 20    can't tell much.

21    Q    Mr. Bryan has labeled it as your plan 5, correct?

22    A    Oh, he has, yes.

23    Q    Yes.  And generally, does it appear to have two

24    majority-black districts such as you included in your

16:40:44 25    illustrative plants?

16:41:03
16:41:17
16:41:30
16:41:41
16:42:05

A Yeah. To the extent that it's possible to make that assessment, that would appear to be the case. It may well that it's Illustrative Plan 5.
Q Yeah. Isn't this the one where you said -- I don't recall. What did you say was the unique feature of your plan 5, Mr. Cooper?
A The unique feature was that I put the incumbent from District 2 into District 2. I put a county -- Coffee County that's about 19 percent white, I believe, something like that.
Q That's right.
A And has a very significant population, I think it's almost like 100,000, a lot of people -- maybe I'm overstating that -- into District 2 so that there would be no incumbent conflicts in that map.
Q Okay.
A If, in fact, this is District 5. And I believe it is, because it does -- it does include Coffee County. You can see that.
Q Do you consider your District 1 in this map to be compact?
A Absolutely. There is no problem with District 1. It's as straight as an arrow across the Florida line and following counties to the north.
Q When you report registered voters or percentage of registered voters in your illustrative plans, are you using all voters or active voters, Mr. Cooper?

```
 1  A    Active.

 2        MS. KHANNA:  Mr. Davis, I'm sorry.  I'm sorry.  I

 3  don't have an objection.  I don't mean to interrupt.  I was

 4  just wondering if maybe Mr. Cooper -- looks like the sun has

 5  gone down in at that room.  I am wondering if he can turn on a

 6  light.

 7        JUDGE MARCUS:  What's happened, Mr. Cooper, is that

 8  the light is dimmed on your portion of the screen, whether

 9  that's because we're in the winter and it's getting dark real

10  soon.

11        THE WITNESS:  Is that better?

12        JUDGE MARCUS:  If you can lighten yourself, the screen

13  up a little bit, that's much better.

14        THE WITNESS:  Okay.

15        JUDGE MARCUS:  Thank you.

16        THE WITNESS:  Yes, sir.

17  BY MR. DAVIS:

18  Q    Do you have available the raw number of active voters in

19  each district in your illustrative plans?

20  A    Yes, I do.

21  Q    Okay.  But you haven't presented those?

22  A    Well, no.  I just presented the -- the percentages for

23  simplicity.

24  Q    So the percentage of active black voters is higher than

25  the percentage of black -- no.  Let me try to start over.  You
```

Timestamps in left margin: 16:42:21 (line 5), 16:42:35 (line 10), 16:42:42 (line 15), 16:42:57 (line 20), 16:43:17 (line 25)

```
       1  first present in your original report the percentage of
       2  African-Americans in your illustrative plans in each district,
       3  right?
       4  A     Right.
16:43:35 5  Q     In the percentage thereof, correct?
       6  A     I'm sorry.  Yeah, yeah, based on the 2020 census and the
       7  Voting Age Population under the 2020 census.  Yeah.  The
       8  registration data has taken into account citizenship.
       9  Q     Gotcha.  But you say -- all right, there's this many
16:43:53 10  African-American voters in District 1 of my plan, and
      11  African-Americans are X percent of all people in this plan.
      12  But as I look at it, the percentage of active registered voters
      13  is higher than the percentage of African-Americans in the
      14  district?
16:44:14 15  A     And there's no surprise at that because there's a
      16  citizenship issue.  And the fact that there is a, you know, a
      17  fairly large portion of the Latino population is noncitizen,
      18  that's where they don't register to vote.  And because the
      19  number as I mentioned in my declaration, the reason why the
16:44:34 20  active registered voter count is even a little bit higher than
      21  the non-Hispanic Voting Age Population percentage, I believe is
      22  probably because the CVAP data is now four-and-a-half years
      23  old.
      24  Q     All right.  You see that data is based on the ACS Survey,
16:44:52 25  right?
```

1  A    Right.  It's estimates.  That's right.  And the voter

2  registration file is not an estimate.

3  Q    But turning to your Citizen Voting Age Population numbers

4  based on the ACS, wasn't everybody expecting Alabama to lose a

16:45:09  5  congressional seat based on ACS estimates?

6  A    Based on -- no.  No.  Nope.  Nope.  Not ACS.  Census

7  Bureau does do a separate survey, cohort survey where they

8  estimate -- they estimated -- I don't remember what the

9  population estimate was -- but because of that estimate for

16:45:32 10  20189, I think, or 2020, it was suggested that Alabama might

11  lose a congressional seat.  I don't think anybody really knew

12  for sure.  It was going to be a close all, and I believe it was

13  a close all.

14      I don't know how much over the population was, but I bet a

16:45:49 15  dollar to a doughnut that if it weren't for the increase in the

16  minority population in Alabama, Alabama would have lost that

17  congressional seat.  But I have to admit that I don't have the

18  numbers in front of me, but I think that would be the case

19  because we're talking about something approaching 100,000

16:46:10 20  people that was contributed by the minority population, in

21  terms of overall population growth in the state between 2010

22  and 2020.

23  Q    You have answered my question.

24  A    Okay.  Good.

16:46:24 25  Q    Turning to the socioeconomic data that you presented, did

```
        1   you review socioeconomic data from any other state?

        2   A     I typically do.  I typically do.  But not for this -- I

        3   don't do it for any specific one.  I did not compare and

        4   contrast Alabama with Connecticut, for example, or Oregon.

16:46:45 5   Q     But you have in other projects looked at similar

        6   socioeconomic data for other states in your career?

        7   A     I typically look at socioeconomic data whenever I'm doing

        8   an election plan.  In fact, I have -- in my -- in my report, I

        9   believe I linked to a web address where you can get ACS charts

16:47:11 10  from the five-year survey for every single county, city, and

       11   even unincorporated places in Alabama if you have a specific

       12   question about some place in the state.

       13   Q     Do -- in looking at data from Alabama and any other states

       14   at any time, are you aware of any state where these unfortunate

16:47:31 15  socioeconomic gaps do not exist?

       16   A     I think most states would have gaps.  So I'm -- probably

       17   -- probably not.  Probably not.  The gaps exist.  I think the

       18   gaps are a bit wider in Alabama and in the South in general.

       19   But they're still there.

16:47:51 20  Q     What is your basis for saying the gaps are wider in

       21   Alabama and in the South in general?

       22   A     Just from having looked at a lot of different localities

       23   and states.  I mean, I have not prepared a report on the

       24   matter, but they're wider between blacks and whites in the

16:48:08 25  South in general, I think.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1    Q     But you don't know, correct?

2    A     I am not -- I am not -- I have not done any kind of

3    analysis that would be something that I would want to testify

4    on here.  You asked me the question, so I am giving you the

16:48:23  5    answer.  But that's as far as I can go.  Just my own gut

6    feeling.  And having looked at a lot of data and a lot places,

7    and in almost every place in the South, blacks do tend to lag

8    behind whites on most key variables in socioeconomics.

9    Q     Mr. Cooper, if you're assessing the -- well, if you're

16:48:52 10    assessing whether the *Gingles* requirements are met for your

11    proposed District 2, just say in plan number 1, which is the

12    more relevant compactness score, the compactness of District 2,

13    or the average compactness of all the districts?

14    A     Well, it's all relevant.  It's all relevant.  And so

16:49:13 15    there's no issue here.  The scores for District 2, District 7

16    are all in the normal range of districts around the country if

17    you just look at the various scores for the various

18    congressional plans.  And I would invite to you take a look at

19    Texas for starters.

16:49:33 20    Q     Mr. Cooper, if you were drawing a map without

21    consideration of race and considering only traditional

22    districting criteria, would you ever draw a map like one of

23    your seven illustrative plans?

24    A     It's conceivable for some other reason.  I don't know.  I

16:49:56 25    mean, that's just -- who knows?

1   Q    Any reason that you know of as you sit here today?

2   A    It could be any.  Possibly.  How would I know?  I mean, a

3   hypothetical, I have no way of answering that.

4                MR. DAVIS:  Your Honor, I am at a stopping point.  And

16:50:14  5   I believe if I have any more questions on Mr. Cooper's reports,

6   they will be very few.  I also intend to at least make a record

7   of an attempt to ask questions about Mr. Cooper's involvement

8   in the whole county plan.  I will represent to you that the

9   parties in the Singleton case have stipulated to the fact that

16:50:34 10   Mr. Cooper drew a first draft of the whole county plan.  I

11   would like to ask maybe three minutes' worth of questions about

12   whether that's true and what his involvement was.  I assume

13   that will reach an objection.  And that will invite an

14   objection.  I thought that I might go ahead and introduce --

16:50:53 15                JUDGE MARCUS:  I take it the concern of the objection

16   is it's not responsive directly to the direct examination, and,

17   therefore, you would have to put him on as your own witness in

18   order to be able to do it.  Is that the problem?

19                MS. KHANNA:  Yes, Your Honor.  We would certainly

16:51:11 20   object on that basis.  It's beyond -- it's also well outside

21   the scope.

22                JUDGE MARCUS:  I mean, what Mr. Davis is simply

23   suggesting is this would be a simple and efficient way.  If he

24   were calling Cooper in his own right, he would ask Cooper these

16:51:28 25   questions.  Admittedly, doing this would be doing it out of

1  order.  You have a right to object, and he has a right to call

2  Cooper on his own to do it as his own witness.  Is that what's

3  going on here, Mr. Davis?

4       MR. DAVIS:  Yes, Your Honor.  I'm happy to completely

16:51:46  5  conclude this -- the Caster report exam.

6       JUDGE MARCUS:  Gotcha.

7       MR. DAVIS:  It just seems inefficient for me to

8  subpoena Mr. Cooper and call him next week for three minutes.

9       JUDGE MARCUS:  If I hear what you are saying, you have

16:52:00 10 completed your cross-examination of Mr. Cooper concerning the

11 subject matter that was covered on direct, that is to say the

12 plans, and the opinions that he's otherwise rendered.  You now

13 have a series of questions that go beyond the four corners of

14 the direct examination, and you're asking for leave to do that

16:52:20 15 now rather than recall him.

16       I'm asking you, Ms. Khanna, do you object?  You have a

17 right to object, in which case, Mr. Davis will subpoena

18 Mr. Cooper, and we will have him back here Friday in his own

19 case, or Monday, perhaps.  I leave that to you.  You are

16:52:39 20 entitled to object to the extent he wants to make him his own

21 witness for his own reasons now.

22       What is your pleasure?

23       MS. KHANNA:  Your Honor, I believe you accurately

24 described our position when it comes to the separation between

16:52:56 25 this case and the Singleton case in which he's seeking to have

1  -- Mr. Davis is seeking to question Mr. Cooper about something

2  entirely separate than the Section 2 case that we're bringing.

3  I do understand that the -- that this -- for logistical reasons

4  that these hearings have been combined to streamline the

16:53:13  5  process, and I don't want to create -- make it any more

6  prolonged or difficult for that reason.

7       JUDGE MARCUS:  The choice is fairly yours, because by

8  law, you have a right to limit him to the four corners of the

9  direct.  If that's how you want to proceed, we will proceed

16:53:28 10  that way.  Mr. Davis will bring Mr. Cooper back and call him as

11  his own witness vis-a-vis Singleton or anything else he wants

12  to do.  That's how you wish to proceed, correct?

13       MS. KHANNA:  Your Honor, I think we actually can do it

14  today as part of this process.  I would agree we should close

16:53:48 15  out the Section 2 analysis first.

16       JUDGE MARCUS:  Okay.

17       MS. KHANNA:  And then move on to that.  I would also

18  request that I be given a chance to ask him questions about the

19  same topics that Mr. Davis raises in that.

16:53:58 20       JUDGE MARCUS:  So what you want to do -- what she is

21  proposing, Mr. Davis, is to conduct her redirect based on your

22  cross.  And then depending on how much time we have left,

23  today, we probably only have a little more than a half hour,

24  you could then call him as your own witness, and it would be

16:54:18 25  taken up separately.  Does that work for you?

```
 1              MR. DAVIS:  Of course.  I think that's perfectly
 2  appropriate.  And I appreciate plaintiffs' counsel's
 3  accommodation to letting me call a witness out of turn.
 4              JUDGE MARCUS:  Okay.  So why don't we do this:  Why
16:54:31  5  don't you go ahead with your redirect examination.  We will
 6  complete Mr. Cooper in so far as you're offering him and the
 7  Milligan people are offering him in support of the Section 2
 8  claim.  And then you can take Mr. Cooper out of order,
 9  Mr. Davis, for your own purposes, in which case, he will be
16:54:52 10  subject to cross-examination by Ms. Khanna, perhaps by counsel
11  for Milligan, as well.  Do I have that right?
12              MR. DAVIS:  Yes, Your Honor.
13              JUDGE MARCUS:  Okay.  That works for you, Ms. Khanna,
14  right?
16:55:08 15              MS. KHANNA:  Yes, Your Honor.
16              JUDGE MARCUS:  Okay.  Why don't you proceed, then,
17  with your redirect examination.
18              MS. KHANNA:  Thank you, Your Honor.
19                       REDIRECT EXAMINATION
16:55:13 20  BY MS. KHANNA:
21  Q    Good afternoon, Mr. Cooper.  I know we talked about how
22  the light seemed to have gone dark in your room.  I don't know
23  if you have a lamp or something else.  I appreciate that you
24  turned the screen on.  Is there something else that you can sue
16:55:28 25  to light up the room just so we can all see you a little
```

1  better?

2  A    Maybe.  I'll try another light.  But I don't have a lot of

3  lights in here.

4          JUDGE MARCUS:  We're looking for all of the

16:55:40 5  illumination that we can get.  I assure you.

6          THE WITNESS:  Well, I hate to disappoint you.  The

7  light bulb is not working.  I can turn on the TV.

8  BY MS. KHANNA:

9  Q    No.  I think that's probably fine.  As long as the Court

16:56:25 10  can see him.

11  A    Maybe if I move closer, does that help?

12          JUDGE MARCUS:  No.  We can see you just fine,

13  Mr. Cooper.  The additional light answers the problem at least

14  as far as I'm concerned.  Let me ask my colleagues.  Judge

16:56:38 15  Manasco and Judge Moorer, are you able to see Mr. Cooper fine

16  on the screen?

17          JUDGE MOORER:  I am.

18          JUDGE MANASCO:  I am.

19          JUDGE MARCUS:  Okay.

16:56:50 20          MS. KHANNA:  Thank you, Your Honor.

21  BY MS. KHANNA:

22  Q    You were asked, Mr. Cooper, during this cross-examination

23  about the redistricting guidelines that you consulted in

24  advance of developing your plans; is that right?

16:56:59 25  A    Yes.

```
 1  Q    I want to pull up those guidelines again.  That's
 2  Plaintiffs' Exhibit 82.  If I recall -- if I figure out where
 3  exactly where we are going to direct -- if we look on the first
 4  page, Roman Numeral II criteria for redistricting, and if you
 5  look for that under -- under subheadings A, B, C -- I believe
 6  the first five subheadings A, B, C, D, and E have to do with
 7  population equality; is that correct?
 8  A    That's correct.
 9  Q    And if we scroll out of that and go to F and G, we see
10  those two criteria have to do with race and the Voting Rights
11  Act in particular; is that right?
12  A    That's true.
13  Q    Would you mind reading those two criterion out loud?
14  A    Districts shall be drawn in compliance with the Voting
15  Rights Act of 1965 as amended.  I think maybe there a little
16  piece there -- a redistricting plan shall have neither the
17  purpose nor the effect of -- I can't see the whole screen.  I'm
18  seeing -- diluting minority voting strength and shall comply
19  with Section 2 of the Voting Rights Act and the United States
20  Constitution.  Now I can see it.
21  Q    Thank you.  Could you also please read subsection G there?
22  A    No district will be drawn in a manner that subordinates
23  race-neutral districting criteria to considerations of race,
24  color, or membership in a language-minority group, except that
25  race, color, or membership in a language-minority group may
```

16:57:42  16:58:02  16:58:17  16:58:36  16:58:54

1    predominate over race-neutral districting criteria to comply

2    with Section 2 of the Voting Rights Act, provided there is a

3    strong basis in evidence in support of such a race-based

4    choice.  A strong basis in evidence exists when there is good

16:59:14  5    reason to believe that race must be used in order to satisfy

6    the Voting Rights Act.

7    Q    Okay.  Good.  So these two criterion that we have on the

8    screen have to do with the Voting Rights Act and the efforts

9    the state must make to -- or must be made to comply with the

16:59:34 10   Voting Rights Act in drawing districts; is that right?

11   A    That's right.  I'm convinced that my plans that I

12   developed, seven illustrative plans do comply with the Voting

13   Rights Act.  Of course, that's for the judge to decide.

14   Q    So we can scroll -- zoom out of this highlight.  And go on

16:59:50 15   to the next page where we see subheading H, and there we see

16   that the criteria discussed contiguity and the district must be

17   reasonably compact; is that right?

18   A    Right.

19   Q    Then we go on to subsection I, and we will see there's

17:00:06 20   several Alabama constitutional requirements that this portion

21   discusses, and those have largely to do with state legislative

22   districts?

23   A    Right.

24   Q    Let's go to sub J, paragraph J.  If we could just look at

17:00:25 25   subparagraph J for a second, that would be great.  Okay.  And

```
 1  here you see this subsection says, The following redistricting
 2  policies are embedded in the political values, traditions,
 3  customs, and usages of the state of Alabama, and shall be
 4  observed to the extent that they do not violate or subordinate
 5  the foregoing policies prescribed by the Constitution and laws
 6  of the United States and the state of Alabama.
 7       Do you see that?
 8  A    Yes.
 9  Q    Okay.  And I believe you were asked about incumbency and
10  other criterion -- incumbency, communities of interest, and
11  core pros vision.  If we could pull this highlight down.  You
12  will see that under subparagraph J, little i, that's where it
13  talks about incumbents and not paring them wherever possible?
14  A    Right.
15  Q    We already looked at the paragraph -- subparagraph (ii)
16  talks about contiguity.  Subparagraph (iii) we have already
17  discussed on your direct about communities of interest.
18  Subparagraph (iv) talks about the number of counties actually
19  in each district.  And then subparagraph (v) is the criterion
20  on preservation of course.  Can you read that criterion,
21  please?
22  A    The Legislature shall try to preserve the cores of
23  existing districts.
24  Q    And you were asked a lot on your cross-examination about
25  core preservation; is that right?
```

17:00:47 (line 5)
17:01:00 (line 10)
17:01:19 (line 15)
17:01:41 (line 20)
17:01:51 (line 25)

1    A    That's right.  I was.

2    Q    Okay.  And if we could look -- we can un-highlight that

3    now and look at subparagraph j(vi) in establishing legislative

4    districts, the reapportionment committee shall give due

17:02:17  5    consideration to all the criteria herein.  However, priority is

6    to be given to the compelling state interests requiring

7    equality of population among districts and compliance with the

8    Voting Rights Act of 1965, as amended, should the requirements

9    of those criteria conflict with any other criteria.

17:02:33  10    Do you see that?

11    A    Yes.

12    Q    Okay.  So what was your -- after you read these

13    guidelines, what was your understanding of the -- we can pull

14    this down.  What was your understanding of the hierarchy of

17:02:46  15    criteria of -- specifically of core preservation when it comes

16    to understanding what the state's redistricting criteria are?

17    A    It cannot supersede the Voting Rights Act by any stretch

18    of the imagination.  From what I understand -- what I

19    understand of redistricting law and traditional redistricting

17:03:06  20    principles.

21    Q    And, again, I'm not asking about your understanding of the

22    law.  I really was asking you of your understanding of the

23    guidelines presented by the state of Alabama?

24    A    Well, yeah.  The guidelines.  They -- the guidelines make

17:03:21  25    it clear, as well.  They were written by a lawyer, probably.

```
 1  Q    Mr. Cooper, these guidelines that governed the
 2  congressional redistricting in Alabama also governed the State
 3  Board of Education redistricting in Alabama; is that right?
 4  A    I believe so.
 5  Q    We can pull -- oh, they are down, right?  Okay.
 6       Actually, let's go back to the guidelines and the
 7  paragraph specifically about communities of interest.  I know
 8  you were asked a lot about communities of interest, as well.
 9  We talked about communities of interest during your direct, as
10  well.
11       But, Mr. Cooper, would you agree that based on this
12  definition, it is -- there are many ways to comprise a
13  community of interest in the state of Alabama; is that right?
14  A    That's true.
15  Q    And, in fact, any individual voter can belong to multiple
16  communities of interest at the same time; is that right?
17  A    Yes.
18  Q    Those communities of interest may conflict with one
19  another at different times; is that right?
20  A    Yes.
21  Q    For instance, one can belong to a one racial community of
22  interest and a different social community of interest.  That's
23  possible, right?
24  A    Yes.
25  Q    Or even multiple social communities of interest?
```

```
 1   A    Yes.
 2   Q    One can belong to one cultural community of interest and a
 3   different economic community of interest if they have to travel
 4   for work to a certain place; is that right?
17:04:56 5  A    Yes.
 6   Q    And I think even yesterday there was, you know, we talked
 7   about a witness who had attended a magnet school, and that's an
 8   example of where one can have one different -- a different
 9   neighborhood community of interest and they maybe an
17:05:09 10 educational community of interest; is that right?
11   A    Yes.  Yes.  I did not hear that testimony, but that's
12   true.
13   Q    Okay.  So now more than -- there's more than one way to
14   define communities of interest and certainly more than one
17:05:23 15 community of interest to which one can belong; is that right?
16   A    Yes.  And that's almost always the case no matter where
17   you draw out the plan.
18   Q    We can take this down.  Thank you.  Mr. Cooper, in your
19   experience evaluating maps, drawing maps, looking at
17:05:48 20 jurisdictions maps, are you aware of any plan that maximizes
21   every single traditional districting criteria?
22   A    No.  The key to drawing a good plan is to balance without
23   maximizing.
24   Q    And, in fact, all redistricting plans require certain
17:06:04 25 trade off between the multiple various district --
```

```
 1  redistricting principles; is that right?
 2  A    Absolutely.
 3  Q    That includes the enacted plan for the state of Alabama's
 4  congressional districts, as well?
 5  A    It should.
 6  Q    For instance, we can't just comply with counties without
 7  also balancing that against one person one vote?
 8  A    That's true.
 9  Q    And protecting --
10  A    Looking for the golden mean.
11  Q    Now, as you noted in one of your maps, extending a
12  district to protect an incumbent could sacrifice compactness in
13  some instances; is that right?
14  A    That's very true.
15  Q    And all of these plans including your illustrative plans
16  and the enacted plan requires different -- demonstrates
17  different ways to balance these varied interests; is that
18  right?
19  A    Yes.  Yes.
20  Q    Mr. Cooper, is it your testimony that any one of the
21  illustrative plans that you drew must replace the enacted plan
22  under -- if the Court were to find a violation of Section 2 of
23  the Voting Rights Act?
24  A    No.  It could.  But it must -- it's not a must.  These are
25  illustrative plans, demonstrative plans.  And different plans
```

1   can be drawn for the remedial plan.  That's more often the

2   case, as I explained earlier a little bit.

3   Q    So your illustrative plans basically provide an example of

4   how one could draw two majority-minority districts, not how one

17:07:45  5   must draw two majority-minority districts?

6   A    That's very true.

7   Q    And whoever ends up drawing a remedial map in the event

8   that plaintiffs were to succeed in their Section 2 claim could

9   choose to balance the various traditional principles that we

17:07:59 10  discussed in the same or different ways as any of your maps; is

11  that right?

12  A    That's true.

13       MS. KHANNA:  Your Honor, I have no further questions.

14  I pass the witness.

17:08:24 15       JUDGE MARCUS:  Any other questions for Mr. Cooper

16  regarding the subject matter we have covered?  Anything from

17  our colleagues?  Judge Manasco, or I think you had a question.

18       JUDGE MANASCO:  I do.

19       Does Judge Moorer have any though?  If he does, I'm happy

17:08:38 20  for him to go.

21       JUDGE MOORER:  No.  Go ahead.

22       JUDGE MANASCO:  Great.  So, Mr. Cooper, I understood

23  you to testify that as much as is possible, you tried not to

24  split counties.  And then after that, you tried not to split

17:08:49 25  precincts; is that correct?  But that some splits were

1 | inevitable.

2 |     THE WITNESS:  I think that's true.  Yes.  I mean, even

3 | state splits seven precincts.  I think the plan -- one of my

4 | plans splits I believe 12 precincts in six counties.

17:09:06 5 |     JUDGE MANASCO:  So my question is:  When you concluded

6 | that you had to split precincts, did you have a consistent

7 | basis for deciding where to put the line, and if you did, what

8 | was it?

9 |     THE WITNESS:  To the extent that I could, I tried to

17:09:24 10 | follow municipal boundaries, or main thoroughfares or census

11 | block groups, which often don't necessarily follow a main

12 | thoroughfare, but they are areas that are designated by the

13 | Census Bureau as having some commonality.  They're smaller than

14 | census tracks.  But a census track could include as many as

17:09:49 15 | eight or nine block groups.  And often times, a block group

16 | would only have a couple of hundred people in it.

17 |     And they're used for certain kinds of analysis because

18 | it's the smallest unit for which the American Community Survey

19 | actually presents an estimate.  So block groups are used for,

17:10:11 20 | for example, determining the percentage of children who might

21 | be eligible for free school lunches or summer food -- the

22 | summer food programs.  Some of the federal poverty programs

23 | actually are designated to identify their areas of service by

24 | block groups.  So that's where the -- that's where the

17:10:37 25 | commonality might come from.  There are socioeconomic features

```
 1   about those block groups that makes them a unit that can be
 2   discerned even if it's not an incorporated entity.
 3            JUDGE MANASCO:  Okay.  So do you recall any instances
 4   when after concluding that you had to split a precinct you
 5   decided where to put the line on the basis of race?
 6            THE WITNESS:  I don't think so.  I mean, I did have to
 7   -- I did split some block groups in some places, but it -- more
 8   than anything, when that happened, it was just trying to get to
 9   zero deviation.  Because precincts in Jefferson County, for
10   example, that are very large, and so they have to be split
11   ultimately to get to zero.  Lost my light.  It's coming back.
12            JUDGE MANASCO:  Great.  Thank you.  That answers my
13   questions.
14            JUDGE MARCUS:  Any follow up based on the questions
15   Judge Manasco has asked, Mr. Davis, or Ms. Khanna?  Let me
16   start with you, Mr. Davis.
17            MR. DAVIS:  No further questions from the defendants,
18   Judge.
19            JUDGE MARCUS:  Ms. Khanna?
20            MS. KHANNA:  No further questions here either.  Thank
21   you, Your Honor.
22            JUDGE MARCUS:  All right.  So this will conclude
23   Mr. Cooper's testimony as your witness and Milligan's witness
24   on Section 2.  We will then turn to out of turn taking
25   Mr. Davis and giving him the opportunity to question Mr. Cooper
```

1    about some other matters that related to Singleton but that did

2    not concern Caster at all on Section 2 or Milligan, for that

3    matter, on Section 2.  My question, Mr. Davis, is really two

4    fold:  How much do you have in terms of timing, and is it your

17:12:32  5    pleasure to begin that now, or would you rather start that when

6    you're fresh in the morning?  Because I don't want to break you

7    in the middle.  I want to give you a chance to put your thing

8    on whole.  So you tell me how you would like to proceed.

9              MR. DAVIS:  I appreciate that, Judge.  And this is not

17:12:51 10    hyperbole, but I can finish this in three to four minutes.  I

11    only want to establish a couple of points.

12              JUDGE MARCUS:  Let's do it, and then we can have any

13    -- who would be doing the cross of Mr. Cooper on these points?

14    I take it counsel for the Singleton plaintiffs?  Do we have

17:13:14 15    them?  Mr. Blacksher?

16              MR. BLACKSHER:  I'm trying to wake up the screen, Your

17    Honor.  Excuse me.

18              JUDGE MARCUS:  No.  That's fine.  He has a few

19    questions that bear upon your case.  So you would have the

17:13:28 20    opportunity to cross-examine Cooper to the extent he was being

21    called by Mr. Davis on his case in chief, and the opportunity

22    would also be there for the Milligan and the Caster lawyers to

23    do that, as well, if you want.  That works for everybody?

24              MR. BLACKSHER:  Yes, Your Honor.

17:13:54 25              JUDGE MARCUS:  Okay.  Let's proceed, Mr. Davis.  So

1  the record is clear, Mr. Davis is calling Mr. Cooper in his

2  defense in his case in chief.

3       MR. DAVIS:   Correct.  And this, Your Honor, is related

4  to the claims brought by the Singleton plaintiffs.

17:14:12  5                    DIRECT EXAMINATION

6  BY MR. DAVIS:

7  Q    Good evening, Mr. Cooper.

8  A    Good evening.

9  Q    We are switching to a different topic from your earlier

17:14:20  10  examination in a different case.  Mr. Cooper, it's been

11  represented to us that you drew the first draft of a whole

12  county plan for the congressional plan for the state of

13  Alabama; is that correct?

14  A    I don't know if it's correct or not.  But I did draw a

17:14:36  15  plan for Jim sometime in the late spring.  Not for pay, just he

16  just asked me, so I did one, and sent it to him.

17  Q    I would like to share with you what has been marked as

18  Singleton Exhibit 69.  And the Singleton plaintiffs have

19  represented that this is a draft whole county plan that you

17:14:58  20  prepared.  Is that correct?

21  A    I don't know exactly.  It looks like one I might have

22  produced.  I do remember doing a plan and sending it to Jim.

23  Q    Okay.

24  A    I did it just as -- you know, it was just an afternoon

17:15:15  25  project, half of an afternoon.  And he asked me to do it, so I

1    did one for him.  Jim and I -- I call Mr. Blacksher Jim because

2    I have become his friend over the years.  So I did this.  I

3    made it clear to him that I was going to likely be engaged by

4    the Caster plaintiffs, although that was not called the Caster

17:15:41  5    case at that point.  So that's the extent of it.  I drew the

6    plan.

7    Q    Mr. Cooper, I'm sorry to interrupt, but I do not mean to

8    ask you to disclose any communications that you had with any

9    lawyers in any of these cases.  I simply wanted to establish if

17:15:56 10   it's true that you were involved.

11        So even if you do not know this is the plan you drafted,

12   is it true that you did draft a whole county plan?

13   A    Yes.  I did a plan for him one afternoon.  I was not a

14   consultant.  I did not get paid.  He just asked me, and I did

17:16:14 15   it.

16   Q    Okay.  It has been represented that you were asked to

17   present a whole county plan that did two things:  It kept

18   counties whole and kept the Black Belt together.  Is that

19   consistent with any recollection you have about this project?

17:16:29 20   A    No.  I just remember doing -- that I should do a whole

21   county plan.

22   Q    Fair enough.

23        Do you recall when drafting this plan whether you looked

24   for any specific combination of counties based on the Black

17:16:44 25   Voting Age Population in those counties?

```
 1  A    I might have, but I was mainly concerned about just making
 2  sure the deviation was as low as possible.  But I was also
 3  cognizant of the black population.  So I don't know the numbers
 4  for that plan, but I am sure that in the process of doing it
 5  because I was trying to comply with some semblance of
 6  traditional redistricting principles that I did pay attention
 7  to that.
 8  Q    Do you recall whether when drafting a whole county plan
 9  you look for any combination of counties that would present a
10  particular likely political outcome?
11  A    I may have received political data from Jim that
12  afternoon.  I don't remember the specifics in terms of what the
13  final result was.  I think I may have gotten some -- some
14  county level data.
15  Q    Then let me ask this my last question to try to do it more
16  succinctly.  Do you recall if you were specifically looking for
17  a plan that had two districts that are likely to elect
18  Democrats?
19  A    No.  I mean, I think I just got presidential contest.  And
20  I'm -- I would discount that.  I am not a political scientist.
21  I would discount that because it's just one election, and also,
22  it did not create two majority-black districts.  So for that
23  reason, I do not support the whole county plan.
24          MR. DAVIS:  Thank you, Mr. Cooper.  I have no further
25  questions.
```

1          JUDGE MARCUS:  Mr. Blacksher?  Cross-examination, if

2     any?

3          MR. BLACKSHER:  So am I on the air?  Yes.

4                         CROSS-EXAMINATION

17:18:26  5     BY MR. BLACKSHER:

6     Q    Mr. Cooper, I first of all, want to apologize for putting

7     you in a conflict position.  I did not mean to do that.

8     A    I understand.

9     Q    But we had no other way to put in evidence of the origins

17:18:44 10    of this plan.

11          MR. BLACKSHER:  And I have no further questions.

12          JUDGE MARCUS:  All right.  Thank you.  Any questions,

13    Ms. Khanna?

14          MS. KHANNA:  No, Your Honor.

17:18:57 15          JUDGE MARCUS:  Any questions for the Milligan

16    plaintiffs of Mr. Cooper as he's being called by Mr. Davis

17    regarding the Singleton whole county plan?

18          MR. ROSS:  No, Your Honor.

19          JUDGE MARCUS:  All right.  Seeing none, is there any

17:19:16 20    redirect that you want from the one comment Mr. Blacksher made?

21          MR. DAVIS:  No, Your Honor.

22          JUDGE MARCUS:  All right.  So I take it we are

23    complete with Mr. Cooper, and we can let him go.  Do I have

24    that right?

17:19:28 25          MR. DAVIS:  Yes.

```
          1            JUDGE MARCUS:  From everybody's perspective,
          2   Ms. Khanna, Mr. Blacksher, the Milligan folks, no one has any
          3   need of Mr. Cooper any further?
          4            MR. BLACKSHER:  Correct.
17:19:39  5            JUDGE MARCUS:  Mr. Cooper, we thank you for your time
          6   and your effort.  And you are excused as a witness at this
          7   time.
          8            THE WITNESS:  Thank you.  Thank you.
          9            JUDGE MARCUS:  When we come back tomorrow -- I don't
17:19:51 10   think we should be starting another witness at this point.  I
         11   have 5:19 Central Standard Time and 6:19 here in south Florida
         12   in the Eastern Standard Time.  Just so I have -- and my
         13   colleagues have a sense of the witnesses as they're coming up
         14   on the Section 2 prosecution, can you tell me, Ms. Khanna, who
17:20:21 15   will be next, and et cetera, just so we have some sense of the
         16   ordering this evening?
         17            MS. KHANNA:  Your Honor, I am not entirely sure.  I
         18   will have to coordinate with the Milligan plaintiffs just to
         19   make sure who is available when, but I think you can be sure
17:20:35 20   that tomorrow we will see the Milligan plaintiffs' *Gingles I*
         21   expert and probably both sets of plaintiffs, Caster and
         22   Milligan's *Gingles II* and *III* experts.
         23            JUDGE MARCUS:  Okay.  You have given us a very good
         24   idea of where we are going.  We will break.  Before we do, I
17:20:52 25   want to thank all of you for your time and effort and patience
```

1  with us.  It's not altogether easy to do it with a split

2  screen, but I think we have been able to hear everybody, and I

3  can say it's been helpful and effective.  I have been able to

4  follow fully as we've proceeded in this way.

17:21:11  5       Mr. Davis, anything further?

6            MR. DAVIS:  Yes, Your Honor.  I wanted to bring to the

7  Court's attention and also let other plaintiffs' counsel know

8  that we should probably talk off the air.  I previously let

9  plaintiffs' counsel know that our expert Tom Bryan, our

17:21:26 10  demographer, is not available next week.  They have graciously

11  agreed that I would be able to call him out of turn.  He will

12  need to finish by like Saturday at noon in order to do a trip.

13  He could start as early as tomorrow afternoon he'll be

14  available, or any time Friday, but he will not be available to

17:21:46 15  continue his testimony on Monday.

16       So if the Court or the other parties have any preference,

17  in exchange for their courtesy, we will gladly do it whatever

18  time fits best for all parties involved.

19            JUDGE MARCUS:  I leave that -- and we leave that to

17:22:00 20  the plaintiffs to work out with you.  I only just have one

21  question that may be helpful in this regard.

22       How long do you think Bryan will be roughly?  And I am not

23  holding you to it.  But just give me a rough idea, because he

24  is an awfully important witness.

17:22:16 25            MR. DAVIS:  He is, Your Honor.  I truly think he's

```
 1    likely to last longer than half a day, because he's testifying
 2    for us about all three cases, and he is likely to be
 3    cross-examined by all three sets of plaintiffs.  I think my
 4    direct examination would be between two and two hours.  And I
17:22:34 5  think -- I will be shocked if all three plaintiffs do not have
 6    cross-examination.
 7            JUDGE MARCUS:  Any idea of how long cross might be,
 8    Ms. Khanna, on Mr. Ross, Mr. Blacksher, of Bryan?  Not that he
 9    said will be a big surprise.  You have had a report and a
17:22:53 10 rebuttal from him.  I'm just trying to get a sense of when it
11    makes the most efficacious way to fit Bryan in whether it's
12    tomorrow or Friday.
13            MS. KHANNA:  So --
14            MR. BLACKSHER:  Go ahead, Abha.
17:23:12 15 MS. KHANNA:  For the Caster plaintiffs, I think we can
16    get it within 45 minutes.
17            JUDGE MARCUS:  And, Mr. Blacksher?
18            MR. BLACKSHER:  In less than an hour, Your Honor.
19            JUDGE MARCUS:  And, Mr. Ross, for Milligan?
17:23:26 20 MR. ROSS:  Your Honor, I believe about an hour.
21            JUDGE MARCUS:  All right.  So I think you're right,
22    Mr. Davis, in your expectations.  You are looking at about
23    three hours of cross and about three hours, maybe a little more
24    on direct.  He'll be the better part of the day as best we can
17:23:48 25 tell.
```

1       Do I have that right?

2              MR. DAVIS:  I think that's probably correct, Judge.

3              JUDGE MARCUS:  Okay.  So when do you want to put him

4    on?  The choices are either to break it up tomorrow or start

17:24:01 5    with him fresh Friday morning and finish him up on Friday so we

6    can accomplish everyone's interests.  I leave that to you,

7    Ms. Khanna, Mr. Ross, and Mr. Blacksher.  You tell me.  I guess

8    it's really we're breaking up the Section 2 case for Milligan

9    and Caster.  So it's your call whether you want him tomorrow or

17:24:29 10   Friday.  But I think you want to just let Mr. Davis know so he

11   can have the witness available either tomorrow or Friday.  Do

12   you know what your pleasure is, or do you need some time to

13   consult about that?

14              MS. KHANNA:  I think it would be probably most

17:24:45 15   efficient for us to huddle up and figure out the timing and

16   availability, but we will certainly let him know.

17              JUDGE MARCUS:  I will leave that to you, and why don't

18   you let Mr. Davis know.

19       But we will accommodate Mr. Bryan one way or the other,

17:24:57 20   Mr. Davis.  Rest assured, he will get on this week.

21              MR. DAVIS:  We are grateful for everyone's

22   accommodation.

23              JUDGE MARCUS:  All right.  Thank you all.  Have a good

24   evening.  And we will see you all back here tomorrow at 9:00

17:25:10 25   a.m. Central Standard Time, 10:00 a.m. Eastern Standard Time.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1    We are adjourned for the day.

2                (Whereupon, the above proceedings were concluded at

3         5:25 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1                          <u>CERTIFICATE</u>

2

3

4        I certify that the foregoing is a correct

5  transcript from the record of proceedings in the

6  above-entitled matter.

7

8

9

10

11                                              <u>01-05-2022</u>

12  Christina K. Decker, RMR, CRR              Date

13  Federal Official Court Reporter

14  ACCR#:  255

15

16

17

18

19

20

21

22

23

24

25