FILED
2022 Jan-18 PM 03:32
U.S. DISTRICT COURT
N.D. OF ALABAMA

```
                 IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF ALABAMA
                         SOUTHERN DIVISION


     BOBBY SINGLETON, et al.,        *
               Plaintiffs,           *   2:21-cv-1291-AMM
                                     *   January 6, 2022
     vs.                             *   Birmingham, Alabama
                                     *   9:00 a.m.
     JOHN MERRILL, in his official   *
     capacity as Alabama Secretary   *
     of State, et al.,               *
               Defendants.           *
     ******************************

     EVAN MILLIGAN, et al.,          *
               Plaintiffs,           *   2:21-cv-1530-AMM
                                     *
     vs.                             *
                                     *
     JOHN MERRILL, in his official   *
     capacity as Alabama Secretary   *
     of State, et al.,               *
               Defendants.           *
     ******************************

     MARCUS CASTER, et al.,          *
               Plaintiffs,           *   2:21-cv-1536-AMM
                                     *
     vs.                             *
                                     *
     JOHN MERRILL, in his official   *
     capacity as Alabama Secretary   *
     of State, et al.,               *
               Defendants.           *
     ******************************



             TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
                        VIA ZOOM CONFERENCE
                           VOLUME III
                BEFORE THE HONORABLE ANNA M. MANASCO,
                  THE HONORABLE TERRY F. MOORER,
                  THE HONORABLE STANLEY MARCUS
```

*CHRISTINA K. DECKER, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, AL 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1

2       Proceedings recorded by OFFICIAL COURT REPORTER, Qualified
        pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies
3          and Procedures Vol. VI, Chapter III, D.2.  Transcript
                   produced by computerized stenotype.
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          <u>APPEARANCES</u>

2

      <u>FOR THE SINGLETON PLAINTIFFS:</u>
3

      James Uriah Blacksher
4     JAMES U. BLACKSHER, ATTORNEY
      825 Linwood Road
5     Birmingham, AL 35222
      205-612-3752
6     Fax: 866-845-4395
      Email: Jublacksher@gmail.com
7

      Myron C Penn
8     PENN & SEABORN LLC
      53 Highway 110
9     PO Box 5335
      Union Springs, AL 36089
10    334-738-4486
      Fax: 334-738-4432
11    Email: Myronpenn28@hotmail.com

12    Joe R Whatley, Jr
      WHATLEY KALLAS LLP
13    2001 Park Place North Suite 1000
      Birmingham, AL 35203
14    205-488-1200
      Fax: 800-922-4851
15    Email: Jwhatley@whatleykallas.com

16    Henry C Quillen
      WHATLEY KALLAS LLP
17    159 Middle Street Suite 2D
      Portsmouth, NH 03801
18    603-294-1591
      Fax: 800-922-4851
19    Email: Hquillen@whatleykallas.com

20    W Tucker Brown
      WHATLEY KALLAS LLC
21    P.O. Box 10968
      Birmingham, AL 35202-0968
22    205-488-1200
      Fax: 800-922-4851
23    Email: Tbrown@whatleykallas.com

24

25

```
 1        Diandra "Fu" Debrosse Zimmermann
          DICELLO LEVITT GUTZLER
 2        420 20th Street North
          Suite 2525
 3        Birmingham, AL 35203
          205-855-5700
 4        Fax: 205-855-5784
          Email: Fu@dicellolevitt.com
 5
          Eli Joseph Hare
 6        DICELLO LEVITT GUTZLER LLC
          420 20th Street North, Suite 2525
 7        Birmingham, AL 35203
          205-855-5700
 8        Fax: 205-855-5784
          Email: Ehare@dicellolevitt.com
 9


10        FOR THE MILLIGAN PLAINTIFFS:

11
          Deuel Ross
12        NAACP LEGAL DEFENSE &
          EDUCATIONAL FUND, INC.
13        700 14th Street N.W. Ste. 600
          Washington, DC 20005
14        (202) 682-1300
          Dross@naacpldf.org
15
          Leah Aden
16        Stuart Naifeh
          Kathryn Sadasivan
17        Brittany Carter
          NAACP LEGAL DEFENSE &
18        EDUCATIONAL FUND, INC.
          40 Rector Street, 5th Floor
19        New York, NY 10006
          (212) 965-2200
20        Laden@naacpldf.org
          Snaifeh@naacpldf.org
21
          Davin M. Rosborough
22        Julie Ebenstein
          AMERICAN CIVIL LIBERTIES
23        UNION FOUNDATION
          125 Broad St.
24        New York, NY 10004
          (212) 549-2500
25        Drosborough@aclu.org
          Jebenstein@aclu.org
```

1        Kaitlin Welborn
         LaTisha Gotell Faulks
2        AMERICAN CIVIL LIBERTIES UNION
         OF ALABAMA
3        P.O. Box 6179
         Montgomery, AL 36106-0179
4        (334) 265-2754
         Kwelborn@aclualabama.org
5        Tgfaulks@aclualabama.org

6        David Dunn
         HOGAN LOVELLS US LLP
7        390 Madison Avenue
         New York, NY 10017
8        (212) 918-3000
         David.dunn@hoganlovells.com
9
         Michael Turrill
10       Harmony A. Gbe
         HOGAN LOVELLS US LLP
11       1999 Avenue of the Stars
         Suite 1400
12       Los Angeles, CA 90067
         (310) 785-4600
13       Michael.turrill@hoganlovells.com
         Harmony.gbe@hoganlovells.com
14
         Shelita M. Stewart
15       Jessica L. Ellsworth
         HOGAN LOVELLS US LLP
16       555 Thirteenth Street, NW
         Washington, D.C. 20004
17       (202) 637-5600
         Shelita.stewart@hoganlovells.com
18
         Blayne R. Thompson
19       HOGAN LOVELLS US LLP
         609 Main St., Suite 4200
20       Houston, TX 77002
         (713) 632-1400
21       Blayne.thompson@hoganlovells.com

22

23

24

25

1       Sidney M. Jackson
        Nicki Lawsen
2       WIGGINS CHILDS PANTAZIS
        FISHER & GOLDFARB, LLC
3       301 19th Street North
        Birmingham, AL 35203
4       Phone: (205) 341-0498
        Sjackson@wigginschilds.com
5       Nlawsen@wigginschilds.com

6


7       FOR THE CASTER PLAINTIFFS:

8       Abha Khanna
        ELIAS LAW GROUP LLP
9       1700 Seventh Avenue, Suite 2100
        Seattle, WA 98101
10      206-656-0177
        Email: AKhanna@elias.law

11

12      Aria C Branch
        ELIAS LAW GROUP LLP
        10 G St NE, Suite 600
13      Washington, DC 20002
        202-968-4490
14      Fax: 202-968-4498
        Email: ABranch@elias.law

15

16      Daniel C Osher
        ELIAS LAW GROUP
        10 G Street NE
17      Suite 600
        Washington, DC 20002
18      202-968-4490
        Email: DOsher@elias.law

19

20      Joseph N. Posimato
        Elias Law Group LLP
        10 G Street, NE; Suite 600
21      Washington, DC 20002
        202-968-4518
22      Email: Jposimato@elias.law

23      Lalitha D Madduri
        ELIAS LAW GROUP LLP
24      10 G Street NE, Suite 600
        Washington, DC 20002
25      202-968-4490
        Email: Lmadduri@elias.law

```
1        Olivia N. Sedwick
         Elias Law Group LLP
2        10 G Street, NE; Suite 600
         Washington, DC 20002
3        202-968-4518
         Email: Osedwick@elias.law
4

5        Richard P Rouco
         QUINN CONNOR WEAVER DAVIES & ROUCO LLP
6        Two North Twentieth Street
         2 20th Street North
7        Suite 930
         Birmingham, AL 35203
8        205-870-9989
         Fax: 205-803-4143
9        Email: Rrouco@qcwdr.com

10

11

12       FOR THE DEFENDANT:

13       Andrew Reid Harris
         OFFICE OF THE ATTORNEY GENERAL
14       CONSTITUTIONAL DEFENSE DIVISION
         501 Washington Avenue
15       Montgomery, AL 36130
         334-353-8891
16       Email: Reid.Harris@AlabamaAG.gov

17       Benjamin Matthew Seiss
         ALABAMA OFFICE OF THE ATTORNEY GENERAL
18       P.O. Box 300152
         501 Washington Ave (36104)
19       Montgomery, AL 36130
         334-353-8917
20       Fax: 334-353-8400
         Email: Ben.seiss@alabamaag.gov
21
         Brenton Merrill Smith
22       OFFICE OF THE ATTORNEY GENERAL OF ALABAMA
         P.O. Box 300152
23       501 Washington Avenue
         Montgomery, AL 36130
24       334-353-4336
         Fax: 334-353-8400
25       Email: Brenton.Smith@AlabamaAG.gov
```

1    Edmund Gerard LaCour, Jr.
     OFFICE OF THE ATTORNEY GENERAL
2    501 Washington Avenue
     P.O. Box 300152
3    Montgomery, AL 36104
     334-242-7300
4    Fax: 334-242-4891
     Email: Edmund.Lacour@AlabamaAG.gov
5
     James W Davis
6    OFFICE OF THE ATTORNEY GENERAL
     501 Washington Avenue
7    P O Box 300152
     Montgomery, AL 36130-0152
8    334-242-7300
     Fax: 334-353-8400
9    Email: Jim.davis@alabamaag.gov

10   Misty Shawn Fairbanks Messick
     OFFICE OF THE ATTORNEY GENERAL
11   FOR THE STATE OF ALABAMA
     501 Washington Avenue
12   P O Box 300152
     Montgomery, AL 36130-0152
13   334-242-7300
     Fax: 334-353-8440
14   Email: Misty.Messick@AlabamaAG.gov

15   Alexander Barrett Bowdre
     OFFICE OF THE ALABAMA ATTORNEY GENERAL
16   P.O. Box 300152
     Montgomery, AL 36130
17   334-242-7300
     Fax: 334-353-8400
18   Email: Barrett.Bowdre@alabamaAG.gov

19   Thomas Alexander Wilson
     STATE OF ALABAMA
20   OFFICE OF THE ATTORNEY GENERAL
     501 Washington Street
21   Montgomery, AL 36103
     334-242-7300
22   Fax: 334-353-8400
     Email: Thomas.wilson@alabamaAG.gov

23

24

25

1    J Dorman Walker
     BALCH & BINGHAM LLP
2    P O Box 78
     Montgomery, AL 36101
3    334-834-6500
     Fax: 334-269-3115
4    Email: Dwalker@balch.com

5

6

7

8

9

     COURTROOM DEPUTY:  Frankie N. Sherbert

10

11

     COURT REPORTER:  Christina K. Decker, RMR, CRR

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>**I N D E X**</u>

MOON DUCHIN                                        549
DIRECT EXAMINATION                                550
BY MR. NAIFEH
CROSS-EXAMINATION                                 608
BY MR. LACOUR
REDIRECT EXAMINATION                              689
BY MR. NAIFEH
RECROSS-EXAMINATION                               693
BY MR. LACOUR


MAXWELL PALMER                                    697
DIRECT EXAMINATION                                698
BY MS. MADDURI
CROSS-EXAMINATION                                 730
BY MR. WILSON


THOMAS BRYAN                                      769
DIRECT EXAMINATION                                769
BY MR. DAVIS

**P R O C E E D I N G S**

1                  (In open court.)

2                  JUDGE MARCUS:  Good morning.  Do we have counsel for

4  Milligan?

5                  MR. NAIFEH:  Good morning, Your Honor.  This is Stuart

6  Naifeh for the Milligan.

7                  JUDGE MARCUS:  Good morning to you.  And for

8  Singleton?

9                  MR. BLACKSHER:  For Singleton, Your Honor, Jim

10  Blacksher is here.  I am sure there are others, too.

11                  JUDGE MARCUS:  Good morning to you.  And for Caster?

12                  MS. KHANNA:  Good morning, Your Honor, Abha Khanna for

13  the Caster plaintiffs.

14                  JUDGE MARCUS:  Good morning.  And for the Secretary of

15  State?

16                  MR. LACOUR:  Good morning, Your Honor.  Edmund LaCour

17  for the Secretary of State.

18                  JUDGE MARCUS:  And for -- I see we have Mr. Davis.

19  Good morning to you.

20                  MR. DAVIS:  Good morning, Your Honor.  Mr. Walker is

21  in the building, and he is logging on as we speak.  But he is

22  here and ready to proceed.

23                  JUDGE MARCUS:  So we are ready to proceed as far as

24  both you and Mr. Walker are concerned?

25                  MR. DAVIS:  Yes, Your Honor.

08:59:59 (line 5)
09:00:08 (line 10)
09:00:20 (line 15)
09:00:26 (line 20)
09:00:40 (line 25)

1    JUDGE MARCUS:  Okay.  Thanks very much.  When we broke

2  late yesterday in the evening, you were going to reconnoiter

3  amongst yourself and tell us the order in which you chose to

4  proceed on behalf of the plaintiffs.  Have you reached a

09:01:01 5  conclusion, and can you share with us the order of the day

6  today?

7    MR. NAIFEH:  Good morning, Your Honor.  The order that

8  we have agreed upon is that the plaintiffs, the Caster and the

9  Milligan plaintiffs will call their *Gingles* witnesses, the

09:01:21 10  *Gingles I, II, and III,* and then the defendants will call

11  Mr. Bryan.  And then we will proceed with our Senate factors

12  experts when Mr. Bryan concludes his testimony.

13    JUDGE MARCUS:  On *Gingles I, II, and III*, how many

14  experts and witnesses do you have, Mr. Naifeh?

09:01:40 15    MR. NAIFEH:  We have the Milligan plaintiffs,

16  *Gingles I* expert, Dr. Duchin, and then there are -- Caster and

17  Milligan each have a *Gingles II and III* expert.  So three

18  experts total.

19    JUDGE MARCUS:  Three experts.  And do you think we

09:01:53 20  will get to Mr. Bryan today, or does that look like a pipe

21  dream?

22    MR. NAIFEH:  From the plaintiffs' perspective, we

23  think it's possible we could get to Mr. Bryan toward the end of

24  the day.

09:02:08 25    JUDGE MARCUS:  I just wanted to make sure, though,

1  that Mr. Davis and Mr. Walker have a chance to have a full day

2  to get Bryan on.  I only say that if you spill over into

3  tomorrow with *Gingles I, II, and III,* I want to make sure that

4  we have a chance for Bryan to be heard.  That won't be a

09:02:29  5  problem for you, Mr. Naifeh?

6        MR. NAIFEH:  I don't believe so, Your Honor.  We

7  expect that we will get through all of the *Gingles* experts

8  today.  And Mr. Bryan, if we don't get to him today, he would

9  still have all day tomorrow.

09:02:43 10        JUDGE MARCUS:  So I take it, Mr. Davis, Bryan is set

11  up for either late today or all day tomorrow starting in the

12  morning?

13        MR. DAVIS:  Yes, Your Honor.  Whether we begin today

14  and finish tomorrow or whether we begin tomorrow, we will be

09:02:57 15  ready to go.

16        JUDGE MARCUS:  Thanks very much, and you may proceed,

17  counsel, with your next *Gingles* witness.

18        MR. NAIFEH:  The Milligan plaintiffs would like to

19  call Dr. Moon Duchin.

09:03:06 20                    MOON DUCHIN,

21  having been first duly sworn, was examined and testified as

22  follows:

23        JUDGE MARCUS:  Would you be kind enough to state your

24  name for the record.

09:03:23 25        THE WITNESS:  Sure.  My name is Moon Duchin, and I am

1 a professor of mathematics and a senior fellow in the College

2 of Civic Life at Tufts University.

3          JUDGE MARCUS:  Welcome to you.  Thank you very much.

4 And, counsel, you may proceed.

5                    DIRECT EXAMINATION

6 BY MR. NAIFEH:

7 Q    Good morning, Dr. Duchin.  Can you tell us your

8 educational background?

9 A    Sure.  I have undergraduate degrees in mathematics and

10 women's studies from Harvard University.  And then a master's

11 and Ph.D. in mathematics from the University of Chicago.

12 Q    We touched on this already, but what is your current

13 professional position or positions?

14 A    I did, yes.  I am a professor at Tufts University and hold

15 several affiliated positions there, but in particular as I just

16 mentioned, I am a senior fellow in the Civics College at Tufts.

17 Q    Do you have any other affiliations at Tufts University?

18 A    I do.  I've been directing the program in science

19 technology and society, and I hold a collaborating faculty

20 position in the Department of Race, Colonialism, and Diaspora

21 Studies.

22 Q    And are you affiliated with an entity called the MGGG lab?

23 A    That's right.  I'm the principal investigator of a lab

24 that's part of the College of Civics.  It's called the MGGG

25 redistricting lab and it's an interdisciplinary lab whose staff

        1  has been up to 20 people.

        2  Q     What does MGGG stand for?

        3  A     That stands for Metric Geometry and Gerrymandering Group.

        4  And what that reflects is that I use my mathematical specialty,

09:05:08 5  which is called metric geometry, to try to understand

        6  redistricting.

        7  Q     And you are a full professor at Tufts University?

        8  A     I am.

        9  Q     And how long have you been a professor at Tufts?

09:05:20 10 A     I've been on the faculty since 2011.

        11 Q     How long have you been a full professor?

        12 A     Full professor, about a year.

        13 Q     As a math professor and principal investigator at the MGGG

        14 lab, what does your research focus on?

09:05:41 15 A     I have a few research specialties in pure mathematics, but

        16 particularly as part of the lab, we look at geometry and

        17 computation and how these help you understand redistricting.

        18 Q     So have you done research on issues related to

        19 redistricting and can you describe some of that?

09:06:11 20 A     I have --

        21 Q     I will try to speak more --

        22 A     Actually, can everyone hear me okay?

        23        JUDGE MARCUS:  We can hear you fine.  Again, if

        24 everyone will take their time and speak up loudly and slowly so

09:06:22 25 our court reporter can get everything down.  She transcribes

1  everything as we go forward, but it's a little bit more

2  difficult since we're proceeding wholly remotely.

3       So, counsel, take your time.  Dr. Duchin, take your time.

4          THE WITNESS:  You bet.

09:06:43 5  BY MR. NAIFEH:

6  Q     Do you need me to repeat the question?

7  A     Oh, please do.

8  Q     Okay.  Can you describe some of your research on issues

9  related to redistricting?

09:06:56 10 A     Yes.  I'd be happy to.

11      I have at this point over a dozen peer-reviewed research

12  papers focused on issues of redistricting.  Those appear in

13  venues like foundations of data science, the election law

14  journal, statistics in public policy, political analysis, and

09:07:20 15 so on.

16      In addition, I've done work supporting line drawing bodies

17  in states around the country.

18  Q     And are you familiar with the scholarly literature on

19  census, racial and ethnic categories?

09:07:37 20 A     I am.  I have researched and taught courses covering the

21  history of the census, focused on the U.S. Census Bureau.

22  Q     Okay.  And can you describe your background working with

23  demographic data?

24  A     Sure.  I -- the heart of all of the data work that I do

09:08:03 25 uses the data set that comes from the U.S. census, namely --

1    especially the decennial census data and the -- what we call

2    PL 94-171.  And also a number of other useful data products

3    from the bureau.

4        I recently was the principal investigator of a grant from

09:08:26  5    the national science foundation, a million dollar grant to

6    study what I called network science of census data.  One of the

7    leading experts in the nation on the disclosure avoidance

8    systems that are used in the census, particularly what is

9    called differential privacy, which was instituted this year.

09:08:49 10    Or in this census, I should say.

11    Q    Given your background, what expertise did you bring to

12    bear in formulating the opinions in this case?

13    A    Knowledge of census data, knowledge of redistricting, and

14    of balancing the principles involved in redistricting,

09:09:09 15    particularly metrics such as compactness.

16    Q    Other than for this case, have you prepared redistricting

17    plans?

18    A    I have.

19    Q    Can you describe your experience preparing redistricting

09:09:23 20    plans?

21    A    Yes.  I've prepared plans widely for demonstrative

22    purposes.  For example, my lab has partnered with a non-profit

23    organization called More Equitable Democracy to examine various

24    redistricting situations around the country, and to consider

09:09:46 25    the question of whether districts or alternative systems such

1   as rank choice might perform better.

2         In the context of those studies, I looked at places from

3   the Chicago City Council to Terrebonne Parish, Louisiana; Jones

4   County, North Carolina; King County, Washington; localities

09:10:11 5   really around the country where demonstrative plans were part

6   of the work.

7         In addition, I was the redistricting expert consultant for

8   the Massachusetts State Senate in this cycle, where I helped,

9   in particular, to draw the voting rights district in that body.

09:10:32 10   I consulted for the people's maps commission in Wisconsin in

11   this cycle, where I drew demonstrative plans for Congress,

12   State Senate, and State House.

13         Those are a few examples of work around the country.

14   Q    Thank you.  And have you previously testified as an expert

09:10:53 15   witness in federal court?

16   A    Not in a federal court.

17   Q    In state court?

18   A    I did earlier this week in North Carolina.

19   Q    Okay.  And in that case did the Court allow you to testify

09:11:07 20   as an expert witness?

21   A    They did.

22   Q    Okay.

23         MR. NAIFEH:  Your Honor, I would like -- Your Honors,

24   I would like to tender Dr. Duchin as an expert witness in

09:11:17 25   redistricting, applied mathematics, quantitative redistricting

```
 1   analysis and demography and use of census data.

 2            JUDGE MARCUS:  Why don't you go a little bit more

 3   slowly so our court reporter can take it down.  You started out

 4   with an expertise in redistricting.  What do you have after

 5   that?

 6            MR. NAIFEH:  Applied mathematics, quantitative

 7   redistricting analysis, and demography and use of census data.

 8            JUDGE MARCUS:  Is there any challenge to Dr. Duchin's

 9   qualifications in those six or seven areas that have been

10   outlined?

11            MR. LACOUR:  None from the defendants, Your Honor.

12            JUDGE MARCUS:  All right.  Seeing no objection, we

13   will qualify Dr. Duchin as an expert in each of the areas,

14   Mr. Naifeh, that you have identified.

15            MR. NAIFEH:  Thank you, Your Honor.

16   BY MR. NAIFEH:

17   Q    Dr. Duchin --

18            JUDGE MARCUS:  You may proceed with your examination

19   of your expert witness.

20            MR. NAIFEH:  Thank you, Your Honor.

21   BY MR. NAIFEH:

22   Q    Dr. Duchin, did you prepare any reports in this case?

23   A    I did.  I believe three submissions in all.

24   Q    And do you have copies of those reports in front of you

25   today?
```

09:11:33
09:11:53
09:12:09
09:12:17
09:12:30

```
 1  A    I do, on the computer.

 2  Q    And what were the questions you were asked to opine on in

 3  this case?

 4  A    The principle question that I was asked to study was the

 5  question of whether it is possible to draw two majority-black

 6  districts out of the seven congressional districts in Alabama

 7  while maintaining the traditional redistricting principles to a

 8  very high degree.

 9       Once I determined that it was possible to draw two

10  majority-black districts, I was asked to produce plans that

11  demonstrate that possibility and my report contains four such

12  plans.

13  Q    And what tests did you apply to determine whether it is

14  possible to create two majority-black districts in Alabama's

15  congressional plan?

16  A    The best proof of possibility is proof by example.  And so

17  being able to furnish four plans demonstrates that it is

18  possible to do so.

19  Q    And can you summarize what conclusion you reached with

20  regard to whether it is possible to draw a congressional plan

21  that includes two majority-black districts in Alabama?

22  A    I concluded that it is possible.

23  Q    In preparing your reports did you have occasion to

24  consider the congressional redistricting plan adopted by the

25  state of Alabama last fall?
```

09:12:46 (line 5)
09:13:08 (line 10)
09:13:26 (line 15)
09:13:45 (line 20)
09:14:12 (line 25)

1  A    I did do so.

2  Q    Okay.  And is it okay if I refer to that plan as HB-1?

3  A    Yes.

4  Q    Do you understand what I am referring to?

09:14:24  5  A    I do.  I believe I call it that in my reports.

6  Q    And I'd like to turn to demographics of Alabama.  But

7  before we talk specifically about Alabama, can you please tell

8  us about how race is categorized in census data?

9  A    Yes.  Today on the U.S. census, on the short form that's

09:14:49  10  used in the decennial census, respondents are faced with six

11  choices -- well, respondents are faced with choices that the

12  census categorizes into six racial groups or categories.

13  Particularly the respondents are faced with certain yes-no

14  questions.  There's a check box answer to the question "are you

09:15:16  15  white".  There's a check box answer to the question "are you

16  black or African-American," and so on.

17       Because there are six categories, those can be responded

18  to in any of a large number of ways, particularly it would be

19  two to the sixth or 64 different combinations, except that the

09:15:39  20  a respondent cannot elect none of the racial categories.  So

21  that makes 63 different ways that the census categorizes the

22  racial responses.

23       There's a separate ethnicity question, which is another

24  yes-no question effectively, asking respondents if they are

09:15:58  25  Hispanic or not.

1      So for racial and ethnic combinations that doubles the

2  number of possibilities to 126.  Quite a lot of ways to

3  identify.

4  Q     And just to be clear, when you say there are these check

09:16:16  5  boxes, someone completing the census form can check more than

6  one box.  Is that your testimony?

7  A     That's right.  This was a change adopted by the Office of

8  Management and Budget in the 1990s, where it became possible

9  for the first time in recent history to elect multi-racial

09:16:37 10  identities explicitly.

11  Q     And so the census does the census allow people to identify

12  themselves as both black and another race?

13  A     It does.  You could choose black and white; black, white

14  and Asian, and so on.

09:16:55 15  Q     And does the census allow people to identify themselves as

16  both black and Hispanic?

17  A     It does.

18  Q     And also black and non-Hispanic?

19  A     That's correct.

09:17:05 20  Q     And does the census categorize those who have selected

21  black and another race or ethnicity?

22  A     Could you ask that again, please?

23  Q     Sure.  Is there a category that includes people who have

24  identified themselves as black in addition to another race or

09:17:31 25  ethnicity?

```
 1  A     Well, the way that I've constructed black in my reports,
 2  which some call any part black and which I believe Mr. Bryan
 3  calls all black, it is to take everyone who answered yes to the
 4  yes-no question "are you black".  And so that's the most
 5  expansive possible construction of black.
 6       It takes, again, everyone who answered yes to the
 7  question.  That means that it includes people who identify as
 8  black in combination with other races.  That means that it
 9  includes people who identify as Hispanic or not.  As long as
10  they answered yes to the question "are you black".
11  Q     And what is -- is there a more narrow definition of black
12  that is sometimes referred to when referring to census data?
13  A     There are.  There are several more restrictive
14  constructions.  The most restrictive would be what is sometimes
15  called black alone, or non-Hispanic black alone.  And that
16  would be those who select black, no other race, and the
17  non-Hispanic ethnicity.  So that would, of course, be the
18  narrowest possible construction.  Some call that single-race
19  black also.
20       I would note that there are other possibilities in between
21  those two extremes, between the most restrictive and the most
22  expansive.  For instance, the Department of Justice issued
23  guidance with a fairly complicated definition that includes
24  single race for non-Hispanic respondents, includes single-race
25  black, black and white, and then a fraction of all the
```

1  multi-racial black identities.  So I would call that a more

2  complicated construction that's intermediate between the

3  narrowest and broadest.

4  Q    And you testified in this case you relied on the any part

09:19:44 5  black or the broadest definition of black; is that right?

6  A    I did, as my principle construction.

7  Q    Okay.  And why did you use that category in this case?

8  A    I believe there are multiple reasons to do so, but the

9  simplest is the one that I have already emphasized, which is

09:20:01 10  that respondents were asked are you black.  And I included all

11  those who answered yes.

12       There are other reasons, particularly looking at the

13  history of the census that I believe that to be a justified

14  practice.  And I could give an example, if that's of interest.

09:20:22 15  Q    Please do.

16  A    Sure.  So, for instance, earlier in the Twentieth Century,

17  in the 1930s, there had been several multi-racial black

18  categories on the census, particularly Mulatto, Quadroon, and

19  Octoroon.  These were all census categories up through the 1920

09:20:49 20  census.  They were eliminated in the 1920s and only black then

21  appeared on the 1930 short form.

22       But the instructions that the bureau issued to its

23  enumerators explicitly told the enumerators to take everyone

24  who previously would have belonged to a multi-racial black and

09:21:11 25  white category and to enumerate them as Negro without

1   distinction.  Those are the instructions to enumerators from

2   1930.  The instructions went on to say that individuals who

3   were multi-racial should be identified according to the

4   non-white parent.

09:21:31  5        So this is an example.  There's a lot to say about the

6   history of the census.  This is an explicit example that made

7   clear that those earlier multi-racial identities that were

8   meant to be understood as under the umbrella of black

9   population.

09:22:00 10  Q    Dr. Duchin, did you examine Alabama's demographics for

11  this case?

12  A    Yes, I did.

13  Q    And as of the 2020 census, what parts of Alabama have the

14  highest concentrations of black residents?

09:22:13 15  A    Of course you can find black residents all over the state.

16  But in particular, there are two kinds of locus of black

17  population that are notable.  One is urban and one is rural.

18        First, in terms of urban population, the largest cities in

19  Alabama have very long-standing and significant black

09:22:40 20  population.  In particular, of the five most populous cities in

21  Alabama, four are majority black by population with Mobile

22  slipping just under a majority when you turn to voting age

23  population.  So urban concentrations of black voters are an

24  important locus of population in the state.

09:23:05 25        On the other hand, of course, Alabama has a significant

 1   rural black population, particularly notable is the Black Belt,

 2   which traditionally consists of 18 core counties that span

 3   across the state, with sometimes a few more counties, maybe

 4   five, added secondarily more towards the west.

09:23:30  5       So those counties -- I know you have been hearing about

 6   the Black Belt already in this trial.  But the -- are

 7   characterized by many counties with small population that are

 8   rural that are historically agricultural.  And then I

 9   understand to have a shared economic interest.

09:23:51 10       So that's a second important locus of black population, is

11   that rural population and particularly the Black Belt.

12   Q    And in the HB-1 plan, which district has the highest

13   concentration of black voters?

14   A    That would be District 7 by far.

09:24:12 15   Q    What is the any part Black Voting Age Population in

16   District 7?

17   A    Okay.  Here we could pull up my report, if you'd like.  I

18   also have it in front of me.  And so --

19   Q    Can you just tell the Court?

09:24:30 20   A    Certainly.  HB-1 has just over 55 percent BVAP, again, by

21   my construction in District 7.

22   Q    And how does that compare with other districts in HB-1?

23   A    There's a fairly steep drop-off to the next district,

24   District 2, with about 30 percent BVAP.

09:24:54 25   Q    And then beyond District 2?

1  A     Then we see District 1 and 3 near 25 percent, 25,

2  26 percent.

3         MR. NAIFEH:  And, Mr. Ang, can you pull up Figure 1 on

4  page 3 of Dr. Duchin's report?  That's Exhibit M-3,

09:25:16  5  Document 88-3.

6  BY MR. NAIFEH:

7  Q     Dr. Duchin, do you recognize this diagram?

8  A     I do.

9  Q     And what does it show?

09:25:29 10  A     So on the left, we see this plan that we're calling HB-1,

11  which is the newly enacted congressional plan.  And the colors

12  show you the different districts.  And I've kept county lines

13  so that we can be aware of how those fall.

14         On the right, we see the outlines of the same districts,

09:25:53 15  but now overlaid with what's called a choropleth.  It's just a

16  shaded representation of where black population is in the

17  state.  So this is BVAP shown in these orange tones on the

18  right-hand side.

19  Q     And you just used the term BVAP.  Can you explain to the

09:26:15 20  Court what that means?

21  A     Yes.  Sorry.  BVAP stands for the Black Voting Age

22  Population that I've been describing.

23  Q     And in this case that means that any part Black Voting Age

24  Population?

09:26:29 25  A     That's correct.  That's the default construction

```
 1   throughout my reports, although I do note other possibilities.
 2   Q    And how does HB-1 divide the state's black population into
 3   the seven congressional districts?
 4   A    Well, what I see when I look at particularly this figure
 5   on the right is hallmarks of what is often called packing and
 6   cracking.  So we can see that in District 7.  Now, that's that
 7   light blue district, and then you can find the corresponding
 8   district on the right.  You see that really the great majority
 9   of the precincts that are included in the district are heavily
10   black by population share -- by voting age population share.
11   And this creates a district with an elevated BVAP overall.
12        On the other hand, when you look around that to the south
13   and east in districts 1, 2, and 3, you see what is sometimes
14   called cracking.  In particular, when you look at those
15   dividing boundaries between those districts, you can see that
16   they go right through some of these loci of black population,
17   thereby splitting up a population that could have been numerous
18   and geographically compact enough to form a district.
19   Q    About what portion of Alabama's black population resides
20   in Congressional District 7?
21   A    In Congressional District 7, I think that would be
22   about -- about a third of Alabama's black population.
23        MR. NAIFEH:  Thank you, Mr. Ang.  We can take that
24   exhibit down.
25
```

09:26:50 (line 5)
09:27:16 (line 10)
09:27:41 (line 15)
09:28:06 (line 20)

BY MR. NAIFEH:

Q    Going back to the questions you were asked to consider, were you able to develop any illustrative plans demonstrating whether it's possible to create two majority-black districts in Alabama?

A    Yes.  My report includes plans that I called plan A, B, C, and D.

Q    And did you use any software to develop the illustrative plans?

A    I did.  I used software in a few ways.  As a first step, as an exploratory step, I used algorithms developed in my lab to create -- to generate large numbers of different possibilities that would show me if it was possible to find two majority-black districts.  And I found that it was possible. My randomized algorithms found plans with two majority-black districts in literally thousands of different ways.

     Convinced that that was possible, I then turned to drawing by hand.  And I would emphasize that the role of the maps found by the exploratory algorithms was just then inspiration. Seeing that it was possible and with some of the ideas about how it was possible, I then started with a blank slate and drew by hand.

     I will say a little bit more about that.  The hand drawing was done first with the second software package developed in my lab.  And here, let me mention that all these software packages

1    are public, open source, available for inspection by the public

2    and by counsel at any time.

3         So the second package is called Districtr.  And in it

4    members of the public can draw their own plans.  And we use

09:30:27  5    Districtr -- I use Districtr to draw plans at the level of VTDs

6    or precincts.  We haven't talked about those yet.  But those

7    are the units of census geography that look a lot like the

8    precincts that people vote in.

9         So the second stage was to draw at the VTD level.  And

09:30:47 10    then finally, to balance population, I used finer tools, and in

11    particular, we have a number of Python packages that we use to

12    see the demographics down to the block level, and to understand

13    the properties of plans.

14    Q    And you mentioned Python.  That is the -- is that a

09:31:11 15    programming language?

16    A    Python is a common open source programming language.  And

17    it permits many packages, such as what are called Pandas for

18    working with large data frames and GeoPandas for working with

19    Geo-spatial data.  I would say that Python is the language of

09:31:33 20    choice in data science.

21    Q    Is Python frequently used in redistricting?

22    A    I would say that it is.

23    Q    You mentioned that when you hand drew plans, you started

24    from a blank slate.  So just to clarify, does that mean --

09:31:53 25    did you -- did you start from an existing plan?

1  A    No.  Only used some of the concepts I had seen in plans

2  that were found by the exploratory algorithms, but literally

3  started with an empty map of the state when drawing.

4  Q    Okay.  And what kind of data did you use to develop the

09:32:18  5  illustrative plans?

6  A    Again, here, as in my research, by far the largest data

7  set is the one from the U.S. Census Bureau, called the

8  PL 94-171.  That is block level demographic data that the

9  bureau was directed to compile specifically for redistricting

09:32:40  10  purposes.  That is the express function of this data set.

11      In addition, there are number of other highly useful

12  Census Bureau products, such as their TIGER/Line Shapefiles

13  that give you the geographical units.  Their American Community

14  Survey, which is an annual survey from which we extract

09:33:03  15  information about Citizen Voting Age Population and so on.

16  Q    Okay.  Are these the same types of data that you would

17  normally use to create a redistricting plan?

18  A    Definitely.

19  Q    And you mentioned census geography such as census blocks.

09:33:26  20  What are census blocks?

21  A    Okay.  So the census maintains a geographical hierarchy of

22  units, which has a central spine with six levels.  It starts at

23  the nation, as you would expect, subdivides into states, from

24  states to counties, within counties the next unit is called

09:33:51  25  census tracts.  Those divide into block groups which divide

1   into blocks.

2        So blocks are the smallest units of census geography.

3   They're sometimes called the pixels of redistricting.  They're

4   the littlest units that you can use as building blocks.  There

09:34:10  5   are a great number of them.  In the 2010 census there were over

6   11 million census blocks in the nation.  They range in

7   population from 0.  They're a substantial number of census

8   blocks 0 population to typically a few hundred people, although

9   sometimes you will find census blocks with much larger

09:34:32 10   population, such as if there are group quarters like prisons or

11   dormitories.  So that is a brief description, I hope, of census

12   blocks.

13   Q    And you also mentioned VTDs.  Can you tell us what a VTD

14   is, what VTD stands for and what a VTD is?

09:34:52 15   A    Sure.  There's a redistricting data program, an office

16   within the Census Bureau, and they undertake every 10 years to

17   communicate with the states and collect information on the

18   boundaries of precincts, which are, as we all probably know,

19   units of election administration that are maintained typically

09:35:17 20   at a local level.

21        And so the bureau collects this information and compiles

22   them into a product called VTDs.  They say that stands for

23   voting district, but most people call them voting tabulation

24   districts, VTDs.  And so you should think of those as the

09:35:36 25   Census Bureau's version of local election administration units.

That makes them particularly useful for redistricting because

since they're in the census hierarchy, we can accurately

measure demographics, but they're also well-coordinated with

local elections, local election administration.

09:36:00 5  Q    And did you use beyond the information from the Census

Bureau, did you use any other information or consult any other

information when preparing the illustrative plans in this case?

A    I did.  And some other sources are listed in my report.

But in particular, I consulted the enacted plans from the

09:36:22 10 state, which I obtained from the state's web sites.  I looked

in particular at the congressional plan, of course.  But also,

for example, at the school board of education plan prepared by

the state, enacted.

Q    And did you consult the state's redistricting guidelines?

09:36:42 15 A    I did.  I did consult the state's redistricting

guidelines.

Q    You mentioned the State Board of Education plan.  What

did -- why did you obtain information from the State Board of

Education plan?

09:36:54 20 A    The board of education plan was of particular interest to

me because it's an eight-district plan.  We've already heard

that the congressional district plan has seven districts.  But

the board of education plan has two that are majority-black.

So I was particularly interested to see how the state would con

09:37:17 25 instruct a second majority-black district.

1  Q    And were there other features in the State Board of

2  Education plan that were relevant in drawing the illustrative

3  plans in this case?

4  A    One of the things that you'll notice across my plans is

09:37:38 5  the -- having to do with Mobile County and with the city of

6  Mobile.  And I was interested to see how that would be handled

7  in a second majority-black district.  And so I looked to the

8  board of education for an example.

9  Q    Is it your regular practice to look at the redistricting

09:37:58 10  plans for other governmental bodies in determining how to draw

11  an illustrative plan for a different set of districts?

12  A    Yes.  Definitely.  I would call that a standard practice

13  of mine.

14  Q    Okay.  And you mentioned the Census Bureau's American

09:38:20 15  Community Survey or ACS.  What did you use ACS data for?

16  A    In this case, I only used ACS data to estimate what's

17  called BCVAP or Black Citizens Voting Age Population as

18  described in my report.  I suppose I should clarify.  Not only

19  Black Voting Age Population, but the Citizens Voting Age

09:38:46 20  Population of various groups.

21  Q    Okay.  How did you use the data and the information that

22  you mentioned to create the illustrative plans?

23  A    Well, as we discussed, my main question was whether I

24  could make plans that had two majority-black districts while

09:39:10 25  showing great respect for the other additional districting

1  principles.  And so the main way that all this data was used

2  was, in fact, many of the redistricting principles touch on

3  census and demographic data.  But in particular, I needed to

4  make sure that the districts I was creating would be over

09:39:34  5  50 percent black.

6  Q    Okay.  And just sort of mechanically, how do you create a

7  redistricting plan using census data?

8  A    Well, as I described, when drawing, I started out with the

9  Districtr program, which lets you select a paint brush like

09:39:57 10  tool and start to color in the VTDs of the state.  You can also

11  turn on a feature that captures whole counties.  And because

12  county preservation is important, as I'm sure we'll discuss, I

13  tried to take whole counties into a district whenever possible.

14        So typically the way you complete a plan is by first

09:40:23 15  drawing with the largest units counties in this case, getting

16  to a place of very coarsely balanced population, and then going

17  to the next smaller units to tune and balance.  And so in this

18  case, from counties, the next units would be VTDs.

19        You can draw a very reasonably balanced plan, a 1 percent

09:40:49 20  balanced plan at the VTD level.  But since, as I'm sure we'll

21  discuss, it's the standard practice to balance congressional

22  districts much more tightly.  At the last stage, you then break

23  those VTDs down to blocks in order to tune the population.

24        Is that what you had in mind?

09:41:09 25  Q    Thank you.  Yes.  That's helpful.

1   A    Okay.

2   Q    And so you -- is it fair to say that you drew your

3   illustrative plans at the census block level?

4   A    In the end, yes.  I found that it was necessary to break

09:41:30  5   some VTDs in order to balance the population.  And so I did so

6   at the block level, yes.

7   Q    Okay.  And when you tune to the block level and see VTDs

8   and then tune the population of block level, how do you decide

9   where to split precincts?

09:41:55  10   A    Right.  So when splitting precincts -- so, first, I tried

11   to keep as many counties whole as possible but had to break

12   some counties.  And then when you decide which precincts to

13   split, those would typically be within the already split

14   counties.

09:42:17  15       By far, the largest consideration when splitting precincts

16   is one of balancing the population.  And so by far, the primary

17   consideration is the total population of those blocks so that

18   you can find just the right sizes to balance the population.

19   Q    And when splitting precincts to balance the population and

09:42:43  20   selecting blocks to balance the population, do you ever decide

21   where to split the precinct on the basis of race?

22   A    I would describe the priority order this way:  When you

23   have to split a VTD looking to balance population, as I just

24   said, by far, the first thing that I look at is the total

09:43:03  25   population of the blocks.  After that, the next consideration I

1  had was compactness, trying to make kind of less eccentric and

2  more regular boundaries between districts.

3       I -- over the course of the many draft maps made, I did

4  sometimes look at race of those blocks, but really, only to

09:43:32 5  make sure that I was creating two districts over 50 percent.

6  Beyond ensuring crossing that 50 percent line, there was no

7  further consideration of race in choosing blocks within the

8  split VTDs.

9  Q    Are you familiar with traditional redistricting

09:43:54 10  principles?

11  A    Yes, I am.

12  Q    And what are they?

13  A    Okay.  Well, there are many.  But I would identify what I

14  call a big six.

09:44:07 15      So let me very briefly outline them.  First is population

16  balance, or one person one vote.  And we've discussed that

17  already.  That's the idea that we should balance total

18  population across the districts in a plan.  The next and also a

19  federal requirement is minority electoral opportunity.  And

09:44:32 20  that's through the lens of the Voting Rights Act of 1965, as

21  well as equal protection in the constitution.

22      So those are two nonnegotiable federal requirements.

23      Next, I might list two that are fairly easy to measure.

24  And those -- although not unambiguous, but still readily

09:44:57 25  quantifiable, and those are compactness and contiguity.  And

```
 1  then we come to two that are a little bit I would say harder to
 2  measure, but nonetheless very important.  And that's respect
 3  for political boundaries.  By that, we usually mean a priority
 4  on keeping intact the counties, cities, and towns generally the
 5  municipalities, of a state.  And finally, respect for
 6  communities of interest.
 7  Q    And did you consider those principles when developing the
 8  illustrative plans?
 9  A    I certainly did.
10  Q    Did you also consider the redistricting guidelines adopted
11  by the state's reapportionment committee?
12  A    I did.
13        MR. NAIFEH:  And, Mr. Ang, can you please pull up
14  Milligan Exhibit 28?  This is Document 88-23.
15  BY MR. NAIFEH:
16  Q    The committee's guidelines include additional criteria
17  beyond those you just mentioned?
18  A    They do.  And if we look at this, we can see the whole
19  first page concerns itself with population and minority
20  opportunity to elect and equal protection.  And then if we go
21  on to the next page, that very next on the list is contiguity
22  and compactness, which I've mentioned.  At that point, this
23  document gets to Alabama state constitutional requirements,
24  which repeat some of the previously listed concepts, and cite,
25  you know, once again cite contiguity population balance,
```

09:45:24
09:45:39
09:45:51
09:46:14
09:46:45

1    discuss the number of districts.

2         After that, we get to J, which within J, we introduce

3    other principles that are frequently discussed in

4    redistricting, such as consideration for incumbency.  This is

09:47:09 5    where communities of interest are cited.  And if we advance to

6    the next page, we will see in part (v) of part j. mention of

7    preservation of the cores of existing districts.

8         I would note that in my reading of this, I noticed in part

9    G here that the criteria identified within j. are stipulated

09:47:39 10   not to be listed in priority order.

11        To me, the reading that I took from this, and I think the

12   reasonable reading is that the ones listed before part j.

13   should be regarded to take precedence.  And so I did take this

14   document quite seriously in listing the federal requirements

09:48:05 15   first, followed by compactness and contiguity with concepts

16   like incumbency consideration and core preservation clearly

17   lower ranked.

18   Q    So in your understanding, the committee guidelines create

19   a higher hierarchy of certain principles over others?

09:48:25 20  A    I think they do.  And I think they do so in a manner

21   consistent with what I see in numerous other states.

22   Q    Thank you.

23        MR. NAIFEH:  Thank you, Mr. Ang.  We can take this

24   exhibit down.

09:48:36 25  BY MR. NAIFEH:

```
 1  Q    Dr. Duchin, is it possible that different traditional
 2  redistricting criteria might conflict with one another?
 3  A    Yes.  It's not just possible, it's common place.  The
 4  criteria are often intention.  And to give just a few examples
 5  of that, I think it's clear from what I said a moment ago that
 6  exact population balance requires you to break up units and so
 7  its intention with respecting political boundaries pretty
 8  clearly.
 9       Another classic frequently observed example is that
10  compactness can be intention with communities of interest.  If
11  you have a well-identified community with important shared
12  interests that itself is residentially located in kind of
13  elongated configuration, then you have a choice to make because
14  keeping that community whole might come at a cost to
15  compactness of your district.  That's a frequently observed
16  instance among many where the principles can be in conflict.
17  Q    In your experience, is it common to have to make trade
18  offs to -- in observing different redistricting principles?
19  A    Absolutely.  I would say -- go so far as to say that
20  redistricting is all about those trade offs.
21  Q    When you prepared the illustrative plans in this case, did
22  you use -- sorry.  I've got that covered.
23       Did you -- are the illustrative plans you developed the
24  only potential plans for a seven-member congressional district
25  in Alabama?
```

Timestamps: 09:48:56 (line 5), 09:49:17 (line 10), 09:49:40 (line 15), 09:50:04 (line 20), 09:50:20 (line 25)

1  A    Certainly not.

2  Q    Are the illustrative plans that you developed in this case

3  the only potential plans for a seven-member congressional

4  redistricting plan in Alabama?

09:50:39 5  A    They're far from the only plans.  They're far from -- as

6  you heard me say before, far from the only ones with two

7  majority-black districts.  I've seen thousands of examples, and

8  I know that overall, the universe of possibility in Alabama is

9  in the many trillions of trillions.  So we're talking about

09:51:02 10  very large number of possible plans over all.

11  Q    And so just to follow up on that, if you had a different

12  set of redistricting -- of priorities among the redistricting

13  principles, you could draw -- you would draw a different plan

14  that still contained two majority-minority districts; is that

09:51:25 15  right?

16  A    That's absolutely true.  And so as you heard me say a

17  moment ago, after the -- what I took to be nonnegotiable

18  principles of population balance and seeking two majority-black

19  districts, after that, I took contiguity as a requirement and

09:51:48 20  compactness as paramount following the guidelines.

21      It would be completely reasonable to take plans like mine

22  to take districts, something like my Districts 2 and 7, which

23  then kind of forces District 1 to look more or less as it does.

24  But with the remaining four districts, there's quite a lot of

09:52:13 25  latitude.  You could adopt, then, a priority on maintaining

1   district cores, and easily produce a plan that performs better

2   in that regard, but you would do so at a cost particularly to

3   compactness.

4        So there are certainly trade offs.  And I took the reading

09:52:36  5   of the guidelines to put a very high priority on counties and

6   compactness.  But while retaining two majority-black districts,

7   many other choices could be made.

8   Q    And in seeking to draw two majority-minority districts,

9   was your goal to maximize the Black Voting Age Population in

09:52:58 10   those two districts?

11   A    Certainly not.  We've seen from the state that it's

12   possible to have a substantially higher BVAP in a district, and

13   I can tell you that it's possible, while having two districts

14   to still have a substantially higher BVAP in a district, that

09:53:19 15   was simply not my goal.

16   Q    And were there times in drawing the illustrative plans

17   when you made the decisions that had the effect of reducing the

18   Black Voting Age Population in one of the minority-majority

19   black districts in order to satisfy other redistricting

09:53:35 20   principles?

21   A    Definitely.  I took, for example, county integrity to take

22   precedence over the level of BVAP once that level was past

23   50 percent.

24        MR. NAIFEH:  Mr. Ang, can you please bring up Exhibit

09:53:56 25   M-3?  This is Document 88-3, and turn to page 7.

1          Dr. Duchin -- Mr. Ang, could you zoom in on the table?

2    BY MR. NAIFEH:

3    Q    Dr. Duchin, please take a look at Table 3, which is

4    labeled, Demographics Broken Out As a Comparison of Black and

09:54:22  5    White Population.

6    A    Yes.

7    Q    What does this table show?

8    A    This table shows the BVAP, the WVAP, BCVAP, and WCVAP.  In

9    other words, the black and white shares of Voting Age

09:54:38 10    Population and Citizen Voting Age Population by district in

11    each plan.

12    Q    And in each plan, that includes in the enacted plan HB-1?

13    A    That's right.  HB-1, as well as my plans A through D.

14    Q    Okay.  And turning down on the table labeled BVAP at the

09:54:59 15    top left, what does this table show?

16    A    This shows that -- as I said earlier, HB-1 has one

17    majority-black district, and then drops off to around

18    30 percent while my plans A through D all have two districts

19    over 50 percent black.

09:55:17 20    Q    And what definition of black is used to calculate these

21    percentages?

22    A    Yes.  So here still I'm using that expansive definition

23    that's sometimes called any-part black.

24    Q    And then looking over to the table at the top right

09:55:36 25    labeled BCVAP, what does this table show?

1  A     So this is the black share of Citizen Voting Age

2  Population.  I will note that sometimes in voting rights

3  enforcement, we look to Citizens VAP, CVAP, because it's taken

4  to be a closer proxy to the electorate because citizens are

09:56:00  5  eligible to vote.  And so here I look at BCVAP and find that it

6  -- generally similar that HB-1 still has only one

7  majority-black district, and all four of my plans by this way

8  of counting still have two.

9  Q     And in the BCVAP table, which definition of black was used

09:56:29  10  to calculate BCVAP?

11  A     So here I'll just say very briefly, I used the ACS to

12  calculate the citizenship share of adults for each racial group

13  and then applied that to the any-part black population.

14  Q     So, again, using -- it uses any-part black to estimate the

09:56:53  15  citizenship share of each district?

16  A     To be exactly precise, the share, the rate of citizenship

17  does not use any-part black because it's done from the ACS,

18  which doesn't have the ability to count any-part black, so that

19  citizenship rate is used with a single-race black definition,

09:57:18  20  and then is applied to the any-part black map of the state.

21  Q     Okay.

22  A     This is described in detail in the appendix to this

23  report.

24  Q     Okay.  And using the any-part black category for BVAP, are

09:57:36  25  there two districts in each of your four plans that contained

1  majority-Black Voting Age Population?

2  A    Yes.  I will just confirm by either of these ways of

3  counting there are two majority-black districts in each of my

4  four plans.

09:57:49 5  Q    And which districts are those?

6  A    Those are consistently District 2 and District 7.

7         MR. NAIFEH:  Thank you, Mr. Ang.  We can take this

8  exhibit down.

9  BY MR. NAIFEH:

09:58:03 10  Q    Did you investigate black population in your redistricting

11  plans using any measures other than any-part black?

12  A    I did, particularly in response to Mr. Bryan's report.  I

13  constructed the narrowest definition of Black Voting Age

14  Population, and demonstrated that my plan A is still

09:58:31 15  majority-black, even by the narrowest construction.

16         MR. NAIFEH:  Mr. Ang, can you please bring up Exhibit

17  M-7 at page 3?  This is Document 88-7.

18         THE WITNESS:  Thank you.

19  BY MR. NAIFEH:

09:58:45 20  Q    And so using the narrowest definition of black, do any of

21  your illustrative plans contain two majority-black districts?

22  A    Yes.  Plan A does.  As you see here, it's just over

23  50 percent, but I believe the standard to be 50 percent plus

24  one person, and so by that standard, both CD 2 and CD 7 are

09:59:13 25  majority-black, even by the very narrowest possible

1  construction that census data permits.

2  Q     Thank you.

3        MR. NAIFEH:  And, Mr. Ang, you can take that down.

4  BY MR. NAIFEH:

09:59:27 5  Q     And other than those census categories, any-part black and

6  single-race black, did you consider any other measures of the

7  black population in evaluating your plans?

8  A     I did.  It was communicated to me by counsel that defense

9  expert report suggested that it would be useful to look at

09:59:46 10  voter registration data.  And so I did.

11        A voter registration file was provided to me by counsel.

12  I then geocoded it myself.  By that, I mean used a service to

13  obtain latitude and longitude coordinates for each of the

14  3.7 million people in the voter registration file.  That's

10:00:11 15  quite a data task.

16        I will briefly say, once we have those positions, we can

17  identify the census blocks that every registered voter lives

18  in, and with that, because the form asks people to identify

19  their race, and it gives them only the option to do so with the

10:00:34 20  single racial category, we can see what people -- what voters

21  in Alabama, what registered voters in Alabama, when asked to

22  choose a single racial designation, chose black.

23  Q     Okay.  And did you -- after allocating each registered

24  voter to a congressional district in your illustrative plans,

10:01:04 25  did you determine the black population, black registered voter

1  population in each district?

2  A    I did.  And what I found is that if you look at all of the

3  addresses, all of the people in the voter registration

4  database, or if you restrict to the ones designated as active

10:01:26  5  registered voters, either way, the District 2 and District 7 in

6  my plans are actually more -- by a more substantial margin are

7  majority-black by this way of counting.

8  Q    And that's in all four plans?

9  A    All four plans.

10:01:44 10  Q    And that's true whether you include inactive voters or

11  active voters?

12  A    That's correct.  It's true of the full database or the

13  subset designated as active.

14  Q    And do you have an understanding of what happens if

10:01:59 15  someone although they're instructed to choose only one race,

16  chooses more than one option in the race for ethnicity

17  category?

18  A    Yes.  I understand from the state's information that if

19  despite being told to choose only one, if a voter when

10:02:21 20  registering selects more than one, then they're classified as

21  others and not as, for instance, black.  And that means that

22  the individuals that are categorized as black truly selected

23  black and no other option.

24  Q    Okay.  And did you include individuals designated other

10:02:45 25  when you were determining the black population according to the

```
 1  voter registration data in your congressional plans?
 2  A    I did not.  I only took the ones designated black divided
 3  by the total number of people registered in that district.
 4  Q    And did you have the opportunity to analyze the registered
10:03:05 5  voter population in the enacted plan, HB-1 plan?
 6  A    I did.
 7  Q    And what percentage of registered voters in Congressional
 8  District 7 in the enacted plan self identify as black?
 9  A    From memory, it's over 59 percent.  But I suppose we could
10:03:23 10  bring that up if we want to get the exact number.
11  Q    We will take your word for it that it's about 59 percent.
12       Okay.  So now I'd like to ask you -- you have an opinion
13  whether the Black Voting Age Population in Alabama is
14  sufficiently numerous to constitute a majority of voters in two
10:03:48 15  of seven congressional districts?
16  A    I do.  But actually, before I get to that, let me mention
17  one thing I skipped a moment ago.  It's worth saying that HB-1
18  has District 7 up at over 59 percent, but still has District 2
19  far from a majority.  So it's still the case by voter
10:04:10 20  registration that HB-1 only has one majority-black district,
21  just for the record.
22  Q    Okay.  Let me ask the last question I asked again.
23  A    Yes, please.
24  Q    Do you have an opinion as to whether the Black Voting Age
10:04:24 25  Population in Alabama is sufficiently numerous as to constitute
```

```
 1  the majority of voters in two of seven congressional districts?
 2  A    I do.
 3  Q    And what is that opinion?
 4  A    It is.  It is possible.  It is sufficiently numerous.
 5  Q    And what is the basis of that opinion?
 6  A    The basis is demonstrative plans that are over 50 percent
 7  black in two districts.
 8  Q    And specifically, can you describe which demonstrative
 9  plans you're referring to?
10  A    My demonstrative plans A through D which are over
11  50 percent black by Voting Age Population in Districts 2 and 7.
12  Q    And using the single-race black definition, do you have an
13  opinion as to whether it's possible to -- whether the black
14  population in Alabama is sufficiently numerous to constitute a
15  majority of voters in two congressional districts out of seven?
16  A    I do.  This is demonstrated by my plan A, which even by
17  the very most restrictive definition has a majority of Black
18  Voting Age Population in Districts 2 and 7.
19  Q    And do you have an opinion whether using voter
20  registration data the black population in Alabama is
21  sufficiently numerous to constitute a majority in two of seven
22  congressional districts?
23  A    I do.  And that opinion is that it is true, and it's true
24  by larger margins.
25  Q    Now, I'd like to turn to the traditional redistricting
```

10:04:39 (line 5)
10:04:54 (line 10)
10:05:16 (line 15)
10:05:37 (line 20)
10:05:53 (line 25)

principles and the other factors you considered, and first, I

would like to ask you about contiguity?

A    Yes.

Q    You testified that one traditional principle is

contiguity.  Can you explain what it means for a district to be

contiguous?

A    Sure.  In the simplest terms, a contiguous district is

connected.  That is, it is one connected piece.  In slightly

more technical terms, for a district that's made out of blocks,

contiguity means that it's possible to get from anywhere in the

district to anywhere else in the district in a path going

through blocks that does not leave the district.

Q    Okay.  And do the redistricting committee's guidelines

discuss contiguity?

A    They do.

Q    And what do the committee guidelines say about how

contiguity is measured in Alabama?

A    They specify that contiguity through water is allowed.

They specify that they do not include what's called point

contiguity.  And that would be where you have two blocks that

meet only at a corner.  So, in other words, you need adjacency

along an edge or a boundary of positive length to count as

connected.  And they also rule out what's called long-lasso

contiguity, where you essentially have a thread by which a

district remains contiguous.

Q    And do the illustrative plans that you created for this

case contain contiguous districts?

A    They do.  There's a slightly more complicated story there.

     In my initial submission, I included plans which, as

10:07:53 Mr. Bryan noted in his rebuttal report, had a small number of

blocks, census blocks, that were misassigned in the sense that

they created small islands.

     As he correctly noted, it was easy to infer which

districts those were meant to belong to.  And so the

10:08:17 consequences for population were very small.  But I did submit

corrected plans which fixed those small block islands and

rebalanced the population.

     So the plans now in evidence are contiguous by every

definition, are population balanced to the one-person standard,

10:08:42 and have all the same properties described in the report.

Q    And after correcting the illustrative plans for those

stray blocks identified by Mr. Bryan, are the districts in your

plan all contiguous?

A    They are all contiguous by every definition and with every

10:09:03 caveat identified in the guidelines.

Q    After correcting the illustrative plans to correct those

stray census blocks, did you change any of your opinions on the

questions you were asked about in this case?

A    I did not.  And in particular, I will note the changes

10:09:23 were so small that not a single number in my report needed to

1  be updated.  So the report stands exactly as written, with

2  respect to the corrected plans.

3  Q    Okay.  Just to drill down on that a little bit.

4      Did correcting the noncontiguous blocks identified by

10:09:42 5  Mr. Bryan change the percentage of any-part Black Voting Age

6  Population in any of the districts in your plans?

7  A    No, not to the number of decimal places that were

8  included.

9  Q    So it may have changed the absolute numbers a tiny amount?

10:09:58 10  A    Certainly.

11  Q    But not the percentages?

12  A    In one case, the stray blocks contained no population at

13  all, and in all cases, the population was under 100 people,

14  which is not enough to change any of the conclusions at any

10:10:15 15  level in the reports.

16  Q    And did correcting the noncontiguous blocks identified by

17  Mr. Bryan change the percentage of non-Hispanic single-race

18  Black Voting Age Population in Illustrative Plan A?

19  A    No.  Again, to be perfectly clear, not at the level, not

10:10:42 20  to the number of decimal places reported in the report.

21  Q    And did correcting the noncontiguous blocks identified by

22  Mr. Bryan change the percentage of black registered voters in

23  any district in any of your illustrative plans?

24  A    No, not to the number of decimal places included in the

10:11:01 25  report.

```
 1   Q     And did you recalculate the registered voter percentage

 2   after correcting the noncontiguous blocks?

 3   A     I did.

 4   Q     And was it the same?

 5   A     To the level of precision included in the report, it's

 6   identical.  In fact, I would add just as a matter of

 7   mathematics, one can easily confirm that with the number of

 8   people at question, it could not have changed any of those

 9   numbers to the number of decimal places included in the report.

10   Q     I'd like to turn to population equality.  You testified

11   earlier that another redistricting principle you adhered to in

12   developing the illustrative plans was equal population?

13   A     Correct.

14   Q     What does it mean for the population to be equal in a

15   congressional plan?

16   A     A majority of U.S. states, but not all 50, balance their

17   congressional plans to one person top to bottom deviation, with

18   respect to total population from the decennial census.  And my

19   initial set of plans, every plan was within one person of ideal

20   -- of rounded ideal size.  And that's also true in the

21   corrected plans where there's one person top to bottom

22   deviation in all four.

23   Q     Okay.  And so Mr. Bryan says that after reassigning stray

24   blocks there was a greater deviation.  Did you correct for that

25   deviation after -- when correcting for your -- correcting your
```

10:11:14 5
10:11:35 10
10:11:54 15
10:12:21 20
10:12:41 25

1    plans for those stray blocks?

2    A    I did.  So the corrections reassigned the blocks and then

3    rebalanced the population, as I said.

4    Q    Okay.  And so do you have an opinion about whether

10:12:59  5    plaintiffs' illustrative plans adhere to the equal population

6    principle?

7    A    They do, even by the strictest possible -- mathematically

8    possible population equality.

9    Q    Okay.  So you testified earlier that you took into account

10:13:18 10    geographical compactness when you developed your illustrative

11    plans.  How do you pleasure compactness?

12    A    Yes.  Well, this is one of the areas of my specialization.

13    So there are vast number of metrics in the literature.  I've

14    counted more than 35 in the political science and geography,

10:13:44 15    scholarly literature, for measuring compactness.

16         But by far, the most common in redistricting is the use of

17    what's called the Polsby-Popper score.  And particularly, the

18    average Polsby-Popper score over the districts in a plan.

19         That's one of three compactness metrics that I selected to

10:14:07 20    highlight in my reports.

21    Q    And what were the other two?

22    A    The next most common in redistricting is a metric called

23    Reock.  It's R-E-O-C-K.  And it's a metric that asks how

24    different the shape is from the smallest circle that can

10:14:30 25    contain it.  So like Polsby-Popper, which compares area to

1    perimeter, both Reock and Polsby-Popper depend on the contour

2    or the outline of the district.  So I sometimes refer to them

3    as contour-based metrics.  So a second metric would be to take

4    the average Reock score over the districts in a plan.

10:14:56   5        I also chose to highlight a third metric, which I think is

6    becoming more popular in redistricting.  And that is a discrete

7    metric called cut edges.  In this case, block cut edges.  It

8    looks as how the units, the blocks are separated from one

9    another in the plan.

10:15:15  10    Q    Okay.  And is any single -- any one of those quantitative

11    measures of compactness dispositive as to whether a given

12    district or a plan is -- can be called compact?

13    A    No.  And I would note the interesting thing for someone

14    like me who studies geometry, the interesting thing is that

10:15:37  15    these metrics really do measure different things so that for

16    any 2 of the 35 metrics, it's fairly easy to come up with a

17    plan, an example, the shape that looks compact by one of the

18    metrics, not so compact by the other.

19        And so they really do measure somewhat different things.

10:15:58  20    And there's a choice of emphasis when you're talking about

21    compactness.

22        For the purposes of this case, I focused on that average

23    Polsby-Popper score that I mentioned before because it is, by

24    far, the most common in redistricting.

10:16:15  25    Q    And why did you in this case focus on the Polsby-Popper

1   score?

2   A    So as I just mentioned, it's the most common.  And so that

3   was the choice of focus.  But I can also mention what

4   Polsby-Popper focuses on is how erratic the boundaries are of a

10:16:40 5   district.  And so it does have a relationship to how the

6   districts look to the eye.

7   Q    And did you calculate compactness measures for each

8   district or for the whole plan?

9   A    I did both.  In the report, I give the average scores, but

10:17:02 10   my back-up materials contain scores for every district in the

11   plan.

12   Q    And why did you calculate average scores for the whole

13   plan, or why did you choose to report those in your report?

14   A    Well, it's a standard way to make one plan comparable with

10:17:21 15   another.  If you report the set of -- in this case, seven

16   numbers, some will be higher, some will be lower.  And so a

17   standard way to make them comparable, which is reasonable for

18   my point of view, is to average the numbers.

19   Q    Okay.  And so in this case, did you calculate an average

10:17:46 20   compact Polsby-Popper score for each illustrative that you

21   created?

22   A    I did.  I computed the scores for plans A through D and

23   for HB-1.

24   Q    And did you have occasion to compare the Polsby-Popper

10:18:03 25   scores for your illustrative plans to the HB-1 plan?

A    I did.  All four of my plans are significantly more
compact than the state's enacted plan by this common metric,
the average Polsby-Popper score.  And perhaps it's worth
mentioning also significantly more compact than the enacted
plan from ten years ago.

Q    And did you have also have occasion to compare the
district level Polsby-Popper scores in the illustrative plans
to the HB-1 plan?

A    I did.  In my plans, it is consistently the case that
Congressional Districts 1 and 2 are the least compact.  That's
because they're elongated in an east to west fashion.

     Giving them scores of roughly, if memory serves -- we can
pull up the numbers, but if memory serves, roughly .15.  I will
note that those scores, which are my least compact districts,
are comparable to and in some cases better than the least
compact district in the current enacted plan and the enacted
plan from ten years ago.

Q    Okay.  And is there a particular reason why Congressional
Districts 1 and 2 have lower compactness scores in your plans?

A    There is.  As I'm sure we'll discuss, District 2 is
elongated in east to west fashion in order to contain as much
as possible of the Black Belt.  That Black Belt of 18 counties,
it was an express goal of mine to keep that as much as possible
within majority-black districts.

     By doing that, because of the way the population is

        1   distributed in the state, it creates District 1 to the south,

        2   which is also very elongated east to west.

        3       So the goal of securing representation in a majority-black

        4   district for the Black Belt is what creates those relatively

10:20:17  5   low, but clearly still acceptable compactness scores in

        6   Districts 1 and 2 in my plans.

        7   Q    Okay.  And although they're lower than other districts in

        8   your plan, in your opinion, are Congressional District 1 and

        9   Congressional District 2 reasonably compact in all of your

10:20:39 10   illustrative plans?

       11   A    Yes.  I think they are.  And I'll just repeat they're

       12   comparable to or better than the least compact districts in the

       13   state's enacted plan that was voted through recently, as well

       14   as the state's enacted plan from ten years ago.

10:21:00 15   Q    And turning now to communities of interest, you testified

       16   earlier that another redistricting principle you bore in mind

       17   when drawing your illustrative plans was communities of

       18   interest?

       19   A    Yes.

10:21:19 20   Q    How do you define a community of interest?

       21   A    Well, in this case, the Alabama guidelines have language

       22   concerning communities of interest that I found to be apt and

       23   to be continent with definitions in other states.

       24       If I recall correctly, the shared interests that

10:21:40 25   constitute a community per the guidelines include common

economics, common racial and ethnic characteristics, common

history, common culture and so on.  These are some of the --

and if we want to -- that's a paraphrase, but I would be happy

to take a look if we wanted to pull that out in order to be

more precise.

Q    And in this case, what information did you consider when

trying to preserve communities of interest?

A    I will note that in some states the state or a

state-affiliated office undertook a community of interest

collection process from the public in which members of the

public, including legislators were invited to identify

communities through mapping software.

I'm not aware of any such effort in Alabama.  And I did

check the state's redistricting website to see if any such

thing had been undertaken.

Not finding a collection process like that, it's hard to

develop a metric around public testimony.  And so I relied on

two examples, two kinds of communities of interest that I have

already alluded to.  And one is the cores of cities in Alabama,

which I believe clearly meet the definition of a community of

interest provided in the guidelines.  And the second is the

Black Belt across the state, which I also believe clearly to

meet the definition provided in the guidelines.

Q    Okay.

            MR. NAIFEH:  And, Mr. Ang, can you pull up exhibit

|  |  |
|---|---|
| 1 | M-28?  This is again the redistricting guidelines |
| 2 | Document 88-23. |
| 3 | Mr. Ang, can you scroll down?  I believe it's the third |
| 4 | page.  Back up one. |
| 10:24:00 5 | THE WITNESS:  There we are. |
| 6 | BY MR. NAIFEH: |
| 7 | Q It's at the bottom of page 2.  Is that the definition that |
| 8 | you were referring to earlier? |
| 9 | A Yes.  And so recognized similarities of interests, |
| 10:24:11 10 | including but not limited to ethnic, racial, economic, tribal, |
| 11 | social, geographic, or historical identities. |
| 12 | Exactly. |
| 13 | Q And it says there at the bottom that it can include? |
| 14 | A It can include in certain circumstances political |
| 10:24:29 15 | subdivisions, such as counties. |
| 16 | MR. NAIFEH:  And can you go on to the next page, |
| 17 | Mr. Ang? |
| 18 | THE WITNESS:  Great.  Counties voting precincts, |
| 19 | municipalities, tribal lands and reservations, or school |
| 10:24:44 20 | districts. |
| 21 | MR. NAIFEH:  Thank you, Mr. Ang. |
| 22 | BY MR. NAIFEH: |
| 23 | Q And does -- in your understanding, does the community of |
| 24 | interest principle mean that an entire congressional district |
| 10:24:59 25 | must form a single community of interest? |

```
 1  A     No.  And I think that's sometimes a common
 2  misunderstanding.  I don't think that respect for communities
 3  of interest means that every district should itself be a single
 4  unitary community.  That wouldn't work because communities can
 5  be of all sizes and are not necessarily the exact size of
 6  congressional districts, which after all, are very large, over
 7  700,000 people.
 8         Instead, I believe that what it means is that communities
 9  should be taken into account when you draw so that either
10  they're kept whole within a district, or if it's appropriate,
11  split among several in a way that amplifies their opportunity
12  to be heard by their representative.
13  Q     So, in other words, there may be more than one community
14  of interest in a given congressional district?
15  A     There certainly will, without fail, be more than one
16  community of interest within a congressional district.
17  Q     And are the criteria for or the definition of community of
18  interest, is that an objective definition?
19  A     Well, as it's written in law or in guidelines like these,
20  it's, of course, somewhat vague.  There have been efforts to
21  try to make it more concrete and more quantifiable, that
22  usually start with a public collection process, as I mentioned
23  a little earlier.
24  Q     So when you are serving the public about their communities
25  of interest, is it possible that different people might
```

10:25:20 (line 5)
10:25:39 (line 10)
10:25:59 (line 15)
10:26:21 (line 20)
10:26:43 (line 25)

1  identify with different communities of interest?

2  A     It is a certainty.  When you ask people about their

3  communities, the nature of community is that you will get many

4  different kinds of account.  Some of them will be continent and

10:26:58  5  will allow you to create a kind of small consensus so that you

6  have a community supported by the testimony of many people.

7  But inevitably, on even more than what some of the other

8  principles, there are trade offs, because communities can and

9  will overlap.  So sometimes it's impossible to preserve one

10:27:23 10  without breaking another.  So even within this principle, there

11  are trade offs to consider.

12  Q     When developing your illustrative plans in this case, what

13  communities of interest did you consider?

14  A     So the two communities of interest that I prioritized are

10:27:40 15  the two that I mentioned earlier, which are urban cores and the

16  18 counties that constitute the rural Black Belt.

17       I will mention that I am aware that there are many, many

18  other important and salient communities in Alabama, and I

19  prioritized these two that I believe to clearly and

10:28:05 20  unambiguously correspond to the language in the guidelines.

21  Q     And in your opinion, do the illustrative plans respect

22  communities of interest?

23  A     Yes.  My plans A through D are designed to do so.  And one

24  way that they do so is by taking upwards of 16 out of the 18

10:28:29 25  Black Belt counties in each case and keeping those in

1    majority-black districts.

2    Q    And you mentioned also that municipalities or counties or

3    other political subdivisions can also constitute a community of

4    interest.  Did -- in your opinion, do the illustrative plans

10:28:51  5    respect those communities of interest?

6    A    They do.  There's a marked respect not only for counties,

7    which I think is unmistakable in the plans, but also for

8    municipalities.

9         And I will note there that because the technical

10:29:08 10   boundaries of municipalities can be very erratic, that on a

11    community level, it's often that urban core that's most salient

12    from a community.

13    Q    You also testified the guidelines -- the redistricting

14    committee's guidelines include as an additional criteria the

10:29:36 15   cores of prior districts?

16    A    Yes.

17    Q    What does preserving the cores of prior districts mean?

18    A    Informally, it means that new districts should resemble

19    the previous districts.  Often, that's measured in one of two

10:29:53 20   ways; by looking at the area overlap or the territorial overlap

21    between a new district and its corresponding its counterpart in

22    the older plan, or by looking at the population that's either

23    retained or displaced.

24    Q    And do the illustrative plans preserve the cores of prior

10:30:17 25   districts?

```
 1  A     No.  I would characterize my Illustrative Plans A through
 2  D as not particularly preserving the cores of the prior
 3  districts.
 4  Q     And why is that?
 5  A     I judge it to be impossible to have as high of a core
 6  preservation as, for instance, you see in the newly enacted
 7  plans, while also having two majority-black districts.  Just to
 8  expand on that briefly, since the older plan has one
 9  majority-black district, and then a significant drop off to,
10  you know, about 30 percent, it's again mathematically
11  impossible to create two majority-black districts without a
12  significant level of population reassignment from one District
13  to another.  Because I regard the protection of minority
14  electoral opportunity to be a nonnegotiable federal
15  requirement, that necessitates a significant level of core
16  displacement.
17  Q     Okay.  And so that -- and then in the outside of those two
18  majority-black districts, were there -- can you explain why
19  your plans don't preserve cores to the extent it's of the
20  enacted plan?
21  A     Yes.  Absolutely.
22        So I read the guidelines to put core displacement as a
23  priority below compactness and the preservation of counties, in
24  particular compactness.  And so I would note that one could
25  take my illustrative plans, retain something very much like my
```

Time stamps in left margin:
10:30:30 (line 5)
10:30:54 (line 10)
10:31:19 (line 15)
10:31:39 (line 20)
10:32:01 (line 25)

1   Districts 2 and 7 and therefore District 1, and with the

2   remaining four districts, one could adopt a different

3   prioritization.  And indeed if core preservation were elevated

4   at that point, it would be quite easy to reconfigure those four

10:32:25  5   districts to more resemble the previous enacted plan.  I will

6   just note that you would be doing so expressly at the cost of

7   compactness.

8   Q     So, in other words, you read the guidelines as requiring

9   compact districts more than core preservation, but if you read

10:32:44 10   them the other way, you could preserve cores to a greater

11   extent than you did?

12   A     I think it's difficult to read them another way, but if

13   you elected to prioritize cores over compactness, you certainly

14   could do so, and that would greatly improve those displacement

10:33:02 15   numbers in my plan while maintaining two majority-black

16   districts.

17   Q     And you also testified earlier that protecting minority

18   voting strength is a traditional redistricting criteria.  What

19   does it mean to protect minority voting strength for avoid

10:33:28 20   dilution of minority voting strength?

21   A     Well, in the context of *Gingles I* demonstration, it means

22   to draw districts that have a majority of -- in this case,

23   Black Voting Age Population while still being maximally

24   respectful to the other traditional principles.  In other

10:33:48 25   words, in other words, what's at issue here is the opportunity

1  to elect candidates of choice.

2  Q    And what do the illustrative plans do to unable that

3  opportunity?

4  A    Well, in particular, here they pass the threshold of

10:34:08 5  50 percent plus 1, so they create two majority-black districts

6  in which I believe together with the evidence of other experts

7  we can see there will be a clear opportunity to elect

8  candidates of choice.

9  Q    And so based on what you have told us so far today, did

10:34:33 10  you form an opinion as to whether the black population in

11  Alabama is sufficiently numerous and geographically compact to

12  comprise a majority of voting age population in two

13  congressional districts?

14  A    I did.  As we heard, there were two majority-black

10:34:48 15  districts, and the plan as a whole is highly respectful of

16  other traditional districting principles, and in particular, is

17  highly compact.  The compactness of the plan is itself a

18  demonstration that the population is compact enough to do so.

19  Q    And are the illustrative plans the only potential remedy

10:35:10 20  for vote dilution in Alabama's congressional plan?

21  A    They are far from the only possible remedy, and I leave it

22  to the Court to determine whether majority-black districts are

23  necessary as a remedy.  And here, they're clearly demonstrated

24  to meet the *Gingles I* requirement.

10:35:27 25

1            MR. NAIFEH:  Thank you, Dr. Duchin.  I have no more

2     questions at this time.

3            JUDGE MARCUS:  All right.  It looks to me like this

4     might be a convenient time for our break.  I have 10:35 your

10:35:42 5     time in Alabama Central Standard and 11:35 in Eastern Standard

6     Time.  We'll take a 15-minute break.

7        I take it, Mr. LaCour, you are going to conduct the bulk

8     of the cross, or the cross for the Secretary of State?

9            MR. LACOUR:  That's correct, Your Honor.

10:36:03 10            MR. NAIFEH:  Your Honor, actually, there was one more

11     issue I wanted to raise with Dr. Duchin.

12            JUDGE MARCUS:  Sure.  Let's go back so you can finish

13     your direct, and then we'll break.  Fire away.

14            MR. NAIFEH:  Mr. Ang, can you please bring up

10:36:21 15     Exhibit 48, M-48, that's Document 92-1?  And I will note for

16     the Court and for the record that this is one of the exhibits

17     that defendants have objected to, and I would like to lay the

18     foundation for getting it admitted.

19            JUDGE MARCUS:  Sure.

10:36:49 20     BY MR. NAIFEH:

21     Q    Dr. Duchin, on the screen is the document that has been

22     marked as exhibit M-48.

23            MR. NAIFEH:  Mr. Ang, could you scroll through?  I

24     think it's three pages.

10:37:06 25     BY MR. NAIFEH:

```
 1   Q     Dr. Duchin, do you recognize this document?

 2   A     I do.

 3   Q     And can you tell me what it is?

 4   A     This is a supplemental report that I filed whose focus is

 5   the voter registration numbers that I described earlier.

 6   Q     And is this a complete copy of that report that you

 7   executed on December 27th?

 8   A     Yes.  It's quite a short report.

 9   Q     Okay.  And it contains the information you have already

10   testified to concerning your analysis of voter data.  Is that

11   what you stated a moment ago?

12   A     Yes.  With a bit more precision about the process, it

13   contains exactly the same information.

14   Q     Okay.

15         MR. NAIFEH:  I would like to move Milligan Plaintiffs'

16   M-48 into evidence.

17         JUDGE MARCUS:  Let me hear from the state.

18   Mr. LaCour, I take it there was an objection on timeliness

19   ground?

20         MR. LACOUR:  There was, Your Honor.

21         JUDGE MARCUS:  Then the judges will be able to confer

22   amongst themselves and give you a ruling.  I take it you would

23   want a ruling on this before you commence your cross?

24         MR. LACOUR:  That would be -- that would be helpful,

25   Your Honor.
```

1          JUDGE MARCUS:  Okay.  Let's go right to the argument.

2      Tell me about timeliness.  They admit it's slightly off

3  the time base.  You tell me why we should hold them to that in

4  the context of the exigencies of the time boundaries we have

10:38:45  5  all been operating under.

6          MR. LACOUR:  I think for that same reason, Your Honor,

7  it's we are also trying to prepare for -- we were also trying

8  to prepare for the hearing and trying to prepare witnesses,

9  trying to get ready for numerous cross-examinations, and we had

10:39:04 10  two reports from Dr. Duchin already, received a third report.

11  There's not a whole lot of time to really dig in.  So I mean

12  our objection is strictly on the timeliness grounds.  And

13  that's essentially our argument.

14          JUDGE MARCUS:  Let me ask you just a question or two

10:39:21 15  about that.

16      This report was prepared and received on the 27th of

17  December.  That was about ten days ago.  I take it, it has been

18  given to and reviewed by Mr. Bryan, your expert.

19          MR. LACOUR:  I -- I have not been working as closely

10:39:46 20  with Mr. Bryan, so if someone else is out there in the Zoom

21  world who could chime in, I'd welcome --

22          JUDGE MARCUS:  I wanted to make sure there has been --

23  bear with me.  I wanted to make sure that Mr. Bryan had the

24  opportunity to review the supplemental report of Dr. Duchin,

10:40:08 25  which was dated 27 December.

1          MR. LACOUR:  I have no reason to think he has not had
2     that opportunity.  But, Jim, if you are on, you might be able
3     to provide a definitive answer.
4          MR. DAVIS:  Your Honor, if I may step in a moment.
10:40:29 5          JUDGE MARCUS:  You sure can.
6          MR. DAVIS:  I can respond to your question.  Mr. Bryan
7     has not reviewed this supplemental report, but we do not deny
8     that we had the opportunity to provide it to him.  This report
9     was just not focused in on the areas that Mr. Bryan discusses
10:40:48 10    and that he will discuss in his testimony.  So he has not
11    reviewed it, but we do not dispute that we have had since the
12    27th to provide it to him, had we felt the need to do so.
13         JUDGE MARCUS:  Okay.  Thank you much.  Anything
14    further on this issue from, Mr. Naifeh, from you or from
10:41:07 15    Mr. LaCour, Mr. Davis?  If not, we will take it under at
16    advisement and give you a ruling shortly.
17         MR. NAIFEH:  This is Stuart Naifeh for the plaintiffs.
18    I just want to note that there was no objection to Dr. Duchin
19    testifying about the same information that is contained in this
10:41:23 20    report.  So that, you know, if there had been a concern that
21    they had not had -- if that information was outside the scope
22    or anything like that of her initial reports, that objection
23    has now been waived.
24         JUDGE MARCUS:  Anything further, Mr. LaCour?
10:41:40 25         MR. LACOUR:  Nothing further at this time, Your Honor.

1          JUDGE MARCUS:  Okay.  It is now by my count 11:41.  We

2     will -- 10:41 your time, 11:41 my time.  We will reconvene at

3     12:00 o'clock Eastern Standard, 11:00 o'clock Central Standard

4     Time.  We will be in recess until about 11:00 or 12:00 o'clock

10:42:09  5     respectively.  Thank you.

6          (Recess. )

7          JUDGE MARCUS:  Do we have everybody assembled?  We

8     have counsel for the state, Mr. LaCour?

9          MR. LACOUR:  Yes, Your Honor.

11:00:53 10          JUDGE MARCUS:  And we have counsel for the Milligan

11     plaintiffs, who is conducting the examination of Dr. Duchin,

12     correct?

13          MR. NAIFEH:  Yes, Your Honor.

14          JUDGE MARCUS:  So are we ready to proceed, folks?  I

11:01:04 15     just wanted to make sure.

16          MR. NAIFEH:  Milligan plaintiffs are ready to proceed.

17          JUDGE MARCUS:  Mr. LaCour, are you ready to proceed?

18          MR. LACOUR:  Yes, Your Honor.

19          JUDGE MARCUS:  Before we start the cross-examination,

11:01:17 20     we note the objection to M-48, which was the supplemental

21     expert report of Dr. Duchin filled on the 27th of December.

22     The objection that was interposed was on the grounds of it

23     being untimely by some seven days.

24          The objection is overruled.  We will permit and receive

11:01:45 25     M-48, the supplemental report of Duchin into the record.  A

1    series of reasons lead us to that conclusion.  I have counseled

2    with my colleagues about the matter.  And we believe that, one,

3    there was more than sufficient time over the last 10 or 11 days

4    to make what use of it that you might.  And it was your call,

11:02:15 5    Mr. LaCour, whether to show it or not to Dr. Bryan.

6         Two, under the Federal Rules of Civil Procedure Rule

7    6(b)(1)(B), the Court has the power to extend a time for a

8    sufficient reason.  We're satisfied, given the exigencies of

9    the time and the compressed nature of the discovery that

11:02:45 10   there's ample reason to excuse the failure to timely file the

11   report of Dr. Duchin.

12        Third, it's worth observing that, in effect, she had

13   already testified about the substance of the supplemental

14   report on direct examination without any objection.  So the

11:03:11 15   substance of it has already been come in.  Theoretically, we

16   could strike that for the record.  But for the reasons that

17   I've stated, we're not prepared to do that.

18        The objection is overruled.  M-48 is received.  And with

19   that, you may proceed with your cross.  Thank you, Mr. LaCour.

11:03:32 20        MR. LACOUR:  Thank you, Your Honors.

21                    CROSS-EXAMINATION

22   BY MR. LACOUR:

23   Q    Dr. Duchin, thank you for being with us.  May name is

24   Edmund LaCour.  I represent defendant Secretary of State of

11:03:45 25   Alabama John Merrill.

1   A     Hello.

2   Q     I would like to start with a couple of statements from

3   pages 7 and 9 of the reports.  It's pretty brief, so I don't

4   pull it up on the screen unless you would like me to.

11:03:57  5        You note that Black Voting Age Population in Alabama is

6   about 26 percent.  Black Alabamians make up a majority in only

7   14.3 percent of congressional districts in the state.  And that

8   White Voting Age Population is about 65.5 percent, meaning

9   that, quote, proportional representation for white voters would

11:04:20 10  be between 4.4 and 4.6 of Alabama's seven seats in the U.S.

11   house, correct?

12   A     Correct.

13   Q     So you are stating the enacted map does not result in

14   proportional representation for white and black Alabamians?

11:04:34 15  A     Well, to be careful, that depends on, of course, how

16   people vote.  But it's certainly the case that majority-white

17   districts are present in the enacted plan super proportionally

18   with respect to population.

19   Q     So if more white Alabamians voted differently, would

11:05:04 20  blacks be proportionally represented in Alabama?

21   A     Certainly.  As I just said, everything depends on how

22   people vote.  I'm sorry.  Am I understanding the question

23   correctly?

24   Q     I was just trying to figure out what -- through the import

11:05:23 25  was of your observation that while black Alabamians make up

```
 1  26 percent of the state, white Alabamians, 65.5, white
 2  Alabamians hold 4.4 to 4.6 congressional -- you would expect --
 3  it seems like you're suggesting you would expect 4.4 to 4.6 of
 4  congressional seats to be majority white districts and
 5  something higher than 14.3 percent of districts to be majority
 6  black.  So to clarify, no, that's not what that meant?
 7  A    It's mentioned with respect to the traditional
 8  understanding that in applying voting rights, one doesn't seek
 9  to go past the level of proportionality.  Not that it's an
10  expectation, but that it has sometimes functioned de facto as a
11  ceiling in voting rights law.
12  Q    And if one of your illustrative plans or another plan that
13  created two majority-black districts was either enacted by the
14  Legislature imposed by a court, black Alabamians would then be
15  a majority in what, 28.6 percent of congressional districts?
16  A    That sounds about right.  Two out of seven should be about
17  that.
18  Q    Okay.  Which would be greater than proportional
19  representation?
20  A    I believe so we just said the population proportion is
21  about 26 to 27 percent black.  I believe that projects out to
22  1.8, 1.9 seats, something like that.  And so two would be the
23  closest.  Since we can't have fractional seats in the end, two
24  would be the closest to that number.
25  Q    Right.  And I mean, wouldn't you agree that generally in
```

Timestamps (left margin): 11:05:52 (line 5), 11:06:19 (line 10), 11:06:40 (line 15), 11:06:57 (line 20), 11:07:18 (line 25)

1  congressional districting in the United States, even with very

2  neutral redistricting processes observed, seldom produce

3  proportional results?

4  A    To clarify, that results are not typically proportional.

11:07:38  5  That's the question?

6  Q    Correct.

7  A    I agree that I've looked at all states with significant

8  populations of minority groups and that often the

9  representation it's close, but falls short of proportionality.

11:07:58  10  That's correct.

11  Q    Even with a neutral redistricting process, correct?

12  A    It's hard to speak to the details of the processes in all

13  the states.

14  Q    In 2019, you published a study on congressional districts

11:08:13  15  in Massachusetts, didn't you?

16  A    I did.  In the *Election Law Journal*.

17  Q    Yeah.  It was fairly interesting.

18  A    Thank you.

19  Q    Is it fair to say that you found that even though

11:08:23  20  Massachusetts Republican candidates often received between 30

21  and 40 percent of the two-way vote share in statewide elections

22  in Massachusetts, you wouldn't expect to see a map 30 percent

23  of the Commonwealth's nine congressional seats for the GOP?

24  A    Actually, it's even stronger than that, the finding.  Can

11:08:44  25  I briefly describe it?

1  Q    That would be great.

2  A    Thanks.

3       The finding is that over a ten-year span, about a third of

4  Massachusetts voters select a Republican in statewide contests.

11:08:59 5  But it's not only unlikely, it is on the nose mathematically

6  impossible to draw a congressional district in Massachusetts

7  that would have Republican majority.  And so the finding is one

8  of impossibility, which is expressly not the case in Alabama,

9  as we saw in my testimony.

11:09:18 10  Q    And we will get to it in just a moment.  I think I found

11  it interesting you said -- does this sound like an accurate

12  quote?  There are more ways of developing a valid districting

13  than there are particles in the galaxy.  Every single one of

14  them would produce a 9-0 Democratic delegation?

11:09:35 15  A    It's surprising, but true that it's literally impossible

16  to draw a Republican district in those conditions merely as a

17  matter of the political geography of where people live.

18  Q    Right.  Because -- that is also because of certainly

19  traditional districting criteria that are observed in the

11:09:56 20  Commonwealth, correct?

21  A    You would actually surprised how strong the result is.

22  Even if you let go of contiguity, you still can't draw such a

23  district.  It's quite a strong finding.

24  Q    Uh-huh.  And that's in part because you don't have many

11:10:11 25  parts of Massachusetts that are majority Republican, right?

```
 1  A    Exactly.  As we describe it in the paper, it's that
 2  Republicans while plentiful in Massachusetts are really spread
 3  evenly throughout the state.  That's exactly right.
 4  Q    Uh-huh.  They're well integrated with their Democratic
 5  brothers and sisters?
 6  A    I would call it uniform.  And as I have said in the past,
 7  it seems like Republican voters are a third of the state, a
 8  third of every town, and maybe a third of every household.
 9  Q    Got it.
10       So return to Alabama.  If all we knew, and just speaking
11  hypothetically here, if all we knew was that black Alabamians
12  made up 26 percent of the state, and that they formed
13  majorities in only 14.3 percent of the congressional districts,
14  that wouldn't tell us very much about the fairness of the
15  representation in the map, would it?
16  A    Absolutely.  That's -- that's precisely -- I agree with
17  you.  That's what's shown in that Massachusetts paper is that
18  you have to look at what's possible.
19  Q    Right.  And again, going off this sort of blank
20  hypothetical slate, would it be kind of surprising if the
21  minority group, political or racial, made up a greater than
22  proportional -- made up a majority in a higher percentage of
23  districts than they are composed within the state?
24  A    Sure.  That happens all the time.  If I understood -- let
25  me make sure I understood you.
```

11:10:30  5
11:10:44 10
11:11:05 15
11:11:23 20
11:11:48 25

614

1    Q    I guess I'm trying to say, would it surprise you to -- if

2    let's say in Massachusetts, well hypothetical state of

3    Columbia.  You have got 30 percent of people in the green

4    party.  Would -- and 70 percent of people are Libertarians.

11:12:09 5    Would it be surprising for a congressional district to produce

6    majority green party districts in 35 percent of the districts

7    allotted to that hypothetical state?

8    A    So the population share went to 35 percent, my

9    understanding?

11:12:29 10    Q    The population share is 30, and they end up with

11    majorities in 35 percent of the districts.

12    A    It's hard to know whether to characterize that as

13    surprising, because I'd need to know a lot more about the

14    situation.  But what I take to be the point is that it can

11:12:47 15    often happen that the representation share is different from

16    the population share.  That's certainly true.

17    Q    Does it often skew a little in favor of the majority and a

18    little against the minority?

19    A    That is frequently observed, although, I've just come back

11:13:05 20    from testifying in North Carolina, as I mentioned earlier,

21    where there are maps in play that -- that actually tend to give

22    majority representation to a minority of the votes.  That can

23    also happen.

24    Q    That evidence, in your mind, that they're not following

11:13:23 25    neutral something criteria?

```
 1  A     It really need to be assessed on a case-by-case basis.

 2  Q     In North Carolina, where you testified, did you take that

 3  as evidence that neutral districting criteria were not being

 4  followed?

 5  A     There's so much other evidence in play there, that I

 6  wouldn't want to attribute it to a single piece of evidence.

 7  Q     But did that support the theory that something was afoot,

 8  either racial or political?  I'm not sure what the theory of

 9  the case is.

10  A     Right.  I think I can say that it supported a conclusion

11  of a partisan intent on my part.

12  Q     Okay.  Do you know how many counties are in Alabama

13  altogether?

14  A     I don't have the number in front of me.

15  Q     Would 67 sound right?

16  A     That sounds about right, yes.

17  Q     And do you know how many of them are majority-black?

18  A     Not off the top of my head.

19  Q     If I told you it was around 11, would that sound -- that

20  sound right?

21  A     I can work off of that assumption in the following

22  questions.

23  Q     I want to pull up a map real quick that I think is --

24  might be helpful.

25  A     Thank you.
```

Line timestamps:
- Line 5: 11:13:36
- Line 10: 11:13:56
- Line 15: 11:14:14
- Line 20: 11:14:31
- Line 25: 11:14:44

```
 1   Q    All right.  So can you see this map now, Dr. Duchin?
 2   A    I can.  Yes.
 3   Q    I will represent to you this is Defendants Exhibit -- I
 4   believe this is Defendants' Exhibit 2, page 38.  Mr. Bryan
 5   prepared this.  And he purports to show the counties in
 6   Alabama, and then marks them for black alone Voting Age
 7   Population by county.  Do you see that?
 8   A    I do.
 9   Q    And so does my cursor show up on your screen?
10   A    I see it.
11   Q    The little hand?
12   A    Yes.
13   Q    So we have got the Black Belt counties kind of running
14   sort of in this -- I think this is Pickens County here and
15   running down this direction.  And many of them are
16   majority-black voting age.  But some of them just barely.  And
17   some of them below majority.  Is that fair?
18   A    I accept that representation.
19   Q    Okay.  All right.  Back out of that.  And I think you
20   reported that the Black Belt as a whole has only about 300,000
21   black residents.  Does that sound right?
22   A    We'd have to look at the numbers, but I remember it to be
23   over 300,000.
24   Q    Okay.  If your report said -- make sure I'm quoting the
25   chapter and verse.  Happy to pull this up.
```

Line timestamps: 11:15:19 (line 5), 11:15:40 (line 10), 11:15:47 (line 15), 11:16:13 (line 20), 11:16:35 (line 25)

1      You said -- this is page 10 of your report Milligan
2  Exhibit 3.  The Black Belt region has over 300,000 black
3  residents?
4  A    Correct.
5  Q    All right.  So something else I wanted to touch on from
6  page 2 of your report.  You said that because Alabama's
7  any-part black population is 27.16 percent, the total
8  population group is, quote, large enough to constitute
9  majorities of three out of seven congressional districts
10  because it takes about 7.2 percent of the population, to
11  constitute the majority in a district.  Is that correct?
12  A    Yes.
13  Q    Okay.  Geographic constraints explain why you cannot draw
14  a map with three majority-black congressional districts,
15  correct?
16  A    Where you cannot, is that what you said?
17  Q    Correct.  Yeah.  Why you could not?
18  A    Agreed.  It's the exact same principle that we just
19  discussed in Massachusetts.  The numbers alone don't tell you.
20  You have to look at what's possible.
21  Q    Uh-huh.  So you didn't have any maps that tried to unite
22  black voters in Huntsville with black voters in Birmingham and
23  Dothan, correct?
24  A    I'm sorry.  Are you asking if I attempted precisely to
25  follow those goals?

1   Q    You didn't present -- did you try to draw any maps that

2   looked like that, that united black voters from the northern

3   most of the state to the southernmost part of the state?

4   A    Well, that was certainly never an express goal to unite

11:18:20  5   voters from the very north and voters from the very south.

6   Q    So question:  Do you know if any of the plans your

7   algorithm generated produced maps that look like that?

8   A    But, again, I think you mean that contain districts

9   spanning all the way from north to south; is that right?

11:18:44 10   Q    That united black voters in Huntsville?

11   A    Right.

12   Q    You focused on in your report and Mobile?

13   A    I certainly never saw a district connecting Huntsville to

14   Mobile.

11:18:54 15   Q    Okay.  And why was that?

16   A    Well, it's hard to say why to an empirical question.  I

17   never saw such a district.

18   Q    Okay.  And returning to your math about 7.2 percent of the

19   state's population being all that's needed to draw a majority

11:19:16 20   district, by that math, and this is lawyer math, would it take

21   only about 50.4 percent of voters statewide to form a majority

22   in each of the seven congressional districts?

23   A    Right.  So since we've been discussing this Massachusetts

24   paper, this is what we call an arithmetic or numerical test.

11:19:41 25   It's just are the numbers sufficient.  So that's all that it

```
 1  looks at is numbers alone, and the point of discussing that is
 2  to say that that's not sufficient for redistricting.  You need
 3  to not only look at the numbers, but also look at the
 4  geography.
```
11:19:57  5  Q    Right.  But mathematically, if we were to discard
```
 6  traditional redistricting criteria, it would be possible to
 7  draw -- there are a majority of whatever group if that group
 8  made up 50.4 percent of voters statewide?
 9  A    Yes.  I'm sorry.  I didn't mean to talk over you at all.
```
11:20:19 10  Q    Oh, not at all.
```
11  A    That's right.  If you have a bare majority statewide, it
12  is theoretically possible to recapitulate that majority in each
13  district.  Each district could be a microcosm of the state.
14  That is theoretically possible, although difficult to achieve
```
11:20:37 15  in practice.
```
16  Q    But that did happen in Massachusetts in a sense?
17  A    Well.
18  Q    They have a larger than 50 percent majority?  I apologize.
19        JUDGE MARCUS:  Let's just take our time.  Let
```
11:20:57 20  Mr. LaCour finish his question, Dr. Duchin, before you give him
```
21  an answer.  And, Mr. LaCour, let Dr. Duchin answer completely
22  before you proceed with the question.
23        Thank you.  Let's take the next question.
24  BY MR. LACOUR:
```
11:21:14 25  Q    Dr. Duchin, would it sound about right if I told you that

| | |
|---|---|
| 1 | Republican presidential candidates in Alabama have obtained |
| 2 | over 60 percent of the vote in the last three general statewide |
| 3 | elections? |
| 4 | A    Yes.  I know that to be true. |
| 11:21:29 5 | Q    Okay.  So a map in which Republicans make up a majority in |
| 6 | all seven districts are mathematically possible in Alabama? |
| 7 | A    That does not follow.  Because now you said a map that |
| 8 | does.  So you've brought geography into the question. |
| 9 | Q    So traditional districting principles might inhibit that |
| 11:21:51 10 | result, but mathematically it could potentially be possible? |
| 11 | A    I'm just going to keep distinguishing so that I can be |
| 12 | careful.  Numerically, it would be possible. |
| 13 | Q    Okay.  And a guideline for redistricting like core |
| 14 | retention of districts might help explain why the 2021 map |
| 11:22:14 15 | includes only six majority Republican districts instead of |
| 16 | seven, even though it was enacted by a majority Republican |
| 17 | House and majority Republican state Senate? |
| 18 | A    Certainly.  If core retention is prioritized over minority |
| 19 | electoral opportunity, that would be an explanation. |
| 11:22:33 20 | Q    Or if core retention was prioritized over partisan |
| 21 | interest, correct? |
| 22 | A    I don't believe I've been discussing partisan interest at |
| 23 | all, and it wasn't part of my analysis. |
| 24 | Q    Okay.  Fair enough. |
| 11:22:49 25 | On the second page of your report, again, this is Milligan |

1    Exhibit 3, you state -- you were asked to draw plans that

2    establish that it's possible to create two majority-black

3    districts in a map that maintains population balance,

4    reasonable compactness, respect for local boundaries -- I will

11:23:17 5    start over.  I apologize for -- let me start over.

6         So on page 2, you state, I was asked --

7              JUDGE MARCUS:  Just so that I am clear, you are

8    referring to page 2 of what?  Of the Exhibit M-3?

9              MR. LACOUR:  Yes, Your Honor.

11:23:38 10             JUDGE MARCUS:  Thank you.

11   BY MR. LACOUR:

12   Q    You state, I was asked to draw plans, establish that it is

13   possible to create two majority-black districts in a map that

14   maintains population balance, reasonable compactness, respect

11:23:55 15   for boundaries, and other traditional redistricting principles.

16   In particular, I was instructed to emphasize Polsby-Popper

17   inspirometric definition of compactness.  What do you mean by

18   emphasize the Polsby-Popper definition of compactness?

19   A    Sure.  I mean that in two ways.  One, that compactness is

11:24:21 20   important, that I took it to be a very highly ranked priority.

21   And, two, that within the ways of measuring compactness, I

22   selected that metric for emphasis.  Does that make sense?

23   Q    Yes.  Let's see.

24        So did you give compactness more weight than some of the

11:24:49 25   other traditional districting principles?

1   A    I did.  I would clarify or expand that I took population

2   balance and minority electoral opportunity to be nonnegotiable

3   requirements, and after that, took contiguity and compactness

4   to be highest ranked following the Alabama guidelines.

11:25:15  5   Q    Okay.  I'd like to touch on that.  I mean, you also stated

6   on page 2 -- I will go ahead and pull this up.

7        I may have too many windows.  I apologize.

8            JUDGE MARCUS:  Take your time.

9   BY MR. LACOUR:

11:25:52 10   Q    All right.  Are we looking at -- this is Milligan

11   Exhibit 3.  I am going back to page 2.  So this final

12   paragraph.

13            JUDGE MARCUS:  Just so we're clear for the record,

14   this is Dr. Duchin's one of her reports, right?

11:26:21 15            MR. LACOUR:  Right.

16   BY MR. LACOUR:

17   Q    This is your initial report, Dr. Duchin, Milligan

18   Exhibit 3.  You said, These two majority districts can be drawn

19   without sacrificing traditional districting principles like

11:26:31 20   population balance, contiguity, respect for political

21   subdivisions like counties, cities and towns, or the

22   compactness of districts, and with heightened respect for

23   communities of interest.

24        Now, you don't reference what I think you refer to as one

11:26:44 25   of your six districting criteria, correct.

```
 1  A    Let's see.  One, two, three, four, five and so, of course,
 2  this doesn't include what was in bold in the previous sentence,
 3  which is minority electoral opportunity.
 4  Q    Correct.  So I didn't -- when I had read this initially, I
 5  did not read that as one of the goals that was necessarily
 6  informing the drawing of the maps, but so -- but you did state
 7  before that was one of your nonnegotiable criteria, correct?
 8  A    Correct.  I would call it the principle goal, and as you
 9  heard, the principle assignment in this case was precisely that
10  question.
11  Q    So that -- how did that work with the other five criteria?
12  A    Great.  So the question is one of possibility as I have
13  highlighted repeatedly.  And so though you have trade offs
14  among the principles, the goal was to create two majority-black
15  congressional districts while balancing the other principles as
16  well as possible.  Is that responsive?
17  Q    It's helpful.  I think so.
18       So you talked before about keeping counties whole versus
19  strict compliance of one person one vote.  And it's almost
20  impossible -- likely impossible in most plans to do both,
21  correct?
22  A    Correct.  Fundamental trade offs exist.
23  Q    So when you decided to strictly add here to one person one
24  vote, that criteria took precedence over keeping counties
25  whole?
```

1  A    That's right.  Counties are split in order to comply with

2  one person one vote.

3  Q    Okay.  Why did you decide to comply so strictly with

4  one person one vote?

11:29:10  5  A    The practice as I mentioned earlier in a majority of U.S.

6  states is to attain de minimus population deviation.  And

7  that's regarded as dominant practice in the field.  And so I

8  undertook to achieve that level of balance.

9  Q    If Alabama's guidelines had provided greater deviation

11:29:45 10  that made that possible of the 2021 map, or if the 2011 map had

11  allowed for greater deviation, would you have potentially

12  allowed yourself more deviation?

13  A    I still think that as a matter of federal law, it's safest

14  to minimize the population deviation.

11:30:05 15  Q    Okay.  Did you choose to stick with the strict one person

16  one vote approach for your plans because that's what the

17  guidelines mandate?

18  A    But not specifically, although it's -- it is compatible

19  certainly with the language in the guidelines.

11:30:25 20  Q    Okay.  Next, contiguity.  I mean, you adhered fully to the

21  state's contiguity principle, correct, with the caveat, that

22  they're the stray blocks that we have -- that you discussed

23  earlier, correct?

24  A    That's right.  So if we're talking about the corrected

11:30:48 25  plans, I believe those to comply fully and to the letter with

1    the state's description of the contiguity guideline.

2    Q    Okay.  And earlier on, you had mentioned that one of the

3    first steps you took in determining whether two majority-black

4    districts could be drawn in Alabama was -- both computers, if

11:31:14  5    you will, and an algorithm to generate numerous maps; is that

6    right?

7    A    That's correct.

8    Q    And my limited understanding is that what is that with

9    these algorithms, you can plug in certain constraints, correct,

11:31:38 10    or certain conditions to make a map, to make it more likely

11    some types of maps will be either spit out by the algorithm,

12    and certain types of maps will not be produced by the

13    algorithm; is that fair?

14    A    Yes, that's right.  Our algorithmic code base allows for

11:32:00 15    both constraints in the form of thresholds and also allows you

16    to program a preference for a certain kind of district over

17    another.

18    Q    Okay.  So do you -- going back to one person one vote.

19    Was that one of the constraints you put in place on the front

11:32:19 20    end, say only give me maps that give me minimal deviation?

21    A    To be precise, the constraint was 1 percent from ideal

22    size.

23    Q    Okay.  And by there being less constraining of a

24    constraint than minimal deviation, does that produce a greater

11:32:40 25    number of maps -- greater number of possible maps?

1    A    There's no question.  In particular, since as I mentioned

2    earlier, those runs were done at the whole precinct level, at

3    the VTD level, I believe it to be either impossible or

4    statistically nearly impossible to get one person balanced from

11:33:05  5    whole precincts on a random basis.

6    Q    Okay.  Is contiguity one of the constraints you plugged in

7    at the outset?

8    A    Absolutely.  The algorithm enforces contiguity at the VTD

9    level.

11:33:22 10    Q    Right.  Next in the guidelines, you noted that they call

11    for districting plans that respect communities of interest,

12    neighborhoods and political subdivisions, and you stated and --

13    I'm sorry.  I will pull this up.  Make sure I'm quoting you

14    accurately here.  Or at least giving the correct page numbers.

11:33:52 15    This is again from your report page 53.3, you stated -- in

16    order to make seven finely population tuned districts, it's

17    necessary to split at least 6 of Alabama's 67 counties into

18    two pieces.  Does that sound right?

19    A    Okay.  To be precise, yes.  You have to split six if you

11:34:25 20    are splitting them two ways.  It's possible to split fewer than

21    six if you allow for more pieces.  At the extreme, you could

22    imagine just a single county split if it's got seven pie wedges

23    in it.

24    Q    Got it.  So there need to be at least six county splits?

11:34:44 25    A    No.

```
 1   Q      Let me rephrase that.
 2   A      Sorry.
 3   Q      At least six times, a county must be split to get the
 4   one person one vote minimal deviation that we're looking for,
11:34:56  5   right?
 6   A      I think a precise way to phrase it would be that there
 7   have to be at least six additional county pieces as a way of
 8   phrasing.
 9   Q      And that's simple math that counties rarely line up where
11:35:13 10   -- you're unlikely to have a county that's exactly 717,000
11   whatever people in it to form that one perfect district, so you
12   are going to probably have to split it at least a little to
13   equalize it, right?
14   A      That's the idea, yes.
11:35:28 15   Q      Okay.  And I think you said earlier today that you tried
16   to take whole counties into a district whenever possible; is
17   that right?
18   A      Definitely.
19   Q      But you did have to break some counties.  And first, I
11:35:48 20   guess to return -- like what did you mean by whenever possible?
21   You didn't just mean six counties, six county pieces, correct?
22   A      Right.  The way I would characterize that is that in the
23   process of drawing, particularly when you start with a blank
24   slate, you encounter decision junctures at many points in the
11:36:16 25   process.  And at each of those decision junctures, I would try
```

1  to keep a county whole, when possible.  But in the course of

2  drawing, there are many such decisions to make.

3  Q    You said that you did give it a -- you said very high

4  priority for minimizing those splits, right?

11:36:37 5  A    For preferring lower numbers of splits, definitely.

6  Q    Okay.  Briefly, I want to talk about splits in your VTDs.

7  I think you said you had sort of a priority for how you did

8  that or how you determined which VTDs and precincts?  To make

9  it look cleaner in the transcript, you had a priority for which

11:37:14 10  precincts you would decide to split; is that fair?

11  A    I would say it a little differently.  Is that as I

12  described earlier, I split VTDs late in the process.

13  Q    Uh-huh.

14  A    And I described a little bit the way of deciding where to

11:37:32 15  do so.

16  Q    Okay.  And at least one of the things you looked at was to

17  make sure that you were still creating two districts of over

18  50 percent Black Voting Age Population, correct?

19  A    Yes.  That was high up on the list in my assignment.

11:37:51 20  Q    Okay.  Did that same consideration drive any of your

21  decisions to split counties?

22  A    Do you mean of whether to split counties or where to split

23  counties?

24  Q    I would say let's start first with how many counties you

11:38:17 25  split?

```
 1  A    Okay.  I have four demonstrative or illustrative plans,
 2  and they split different numbers of counties.  If I recall
 3  correctly, my plan D splits only five.  And so there's a series
 4  of decisions embodied differently in those different plans.
11:38:50 5  Those plans respect various kinds of decisions at those
 6  junctures I referenced earlier about which priorities to
 7  emphasize.  So plan D splits the fewest counties, and others
 8  are better by the lights of the traditional principles in the
 9  guidelines in other ways.
11:39:11 10  Q    Okay.  Just so we're all working off the same page, I will
11  share my screen again, and hopefully this will go smoothly for
12  us.
13        So we're looking at page 5 of your report.  Milligan
14  Exhibit 3.  And here we see eight splits in counties for plan
11:39:54 15  A, seven for plan B, nine for plan C, and five for plan D,
16  correct?
17  A    That's correct.
18  Q    And for plan D, while there are five counties that are
19  ultimately divided up, do you recall the -- that's the plan
11:40:13 20  that splits Jefferson County between three different districts
21  or among three different districts?
22  A    Definitely.  That's how it's possible to get just five
23  counties that are split.
24  Q    Okay.  And now is a good time to do a broad overview of
11:40:34 25  the maps.  I have sort of compiled them together in this
```

          1    document.  So I won't have to switch among so many different --

          2              JUDGE MARCUS:  Mr. LaCour, take your time and speak up

          3    so our reporter can get it all, please.

          4              MR. LACOUR:  Yes, Your Honor.  I apologize.

11:40:49   5              JUDGE MARCUS:  That's okay.  Just take your time.

          6    Keep your voice up so she can get it all down.

          7              MR. LACOUR:  Absolutely.

          8    BY MR. LACOUR:

          9    Q    So this document has a few excerpts from your report and a

11:41:05  10    couple of Tom Bryan's reports together just so we don't have to

         11    be jumping in between.  But I will identify each page for the

         12    record so you know what we're looking at, and I am also happy

         13    to do it a slower way and toggle between documents if you think

         14    it would be preferable.  But I'm hoping to be moving things

11:41:24  15    along for everyone.

         16         Here, this comes from Milligan Exhibit 3, your report,

         17    Dr. Duchin, page 4.  Does this look like the four maps that you

         18    drew for this litigation?

         19    A    Yes, it does.

11:41:40  20    Q    Okay.  Next, go to page 8 of what is actually the same

         21    report.  It reports the any-part Black Voting Age Population

         22    for HB-1, which is the 2021 enacted map plan A, plan B, plan C,

         23    plan D.  Those numbers look correct to you?

         24    A    This does look to be an accurate copy of my report.

11:42:10  25    Q    And then we have talked about splits already.  Something

else we were looking at earlier.  I think this came from page 3
of your report.  Again, Milligan Exhibit 3.  And this shows the
shaded colors, essentially which precincts have a little higher
percentage of black population within Alabama, correct?

11:42:47  A    Yes.

Q    Great.  So the next document borrows from page 3 and puts
it for everyone's benefit up against a similar analysis --
well, I will represent to you is a similar analysis that Tom
Bryan prepared for the defendants from Defendants' Exhibit 2.
11:43:10 This is his initial report on page 40.  Did you have a chance
to look at Mr. Bryan's report?

A    I did.

Q    Okay.  Does this map look familiar to you?

A    Yes.  And it looks -- now that you have put them side by
11:43:26 side, quite similar to mine, I am happy to say.

Q    Yeah.  That's -- we're all working off of similar facts.

I think he is measuring black alone Voting Age Population.
Do you recall if your measurements were any-part black or black
alone?

11:43:47 A    I believe this to be any-part black, which is the
population basis that I use in my reports except where
otherwise noted.

Q    Okay.  But generally, the maps look fairly similar in
distribution of black Alabamians?

11:44:06 A    They do.  And I would comfortably speculate that the

1  difference, the visible difference between black alone and

2  any-part black would be minimal in a map of this kind.

3  Q    Okay.  I'd like to turn to plan A then.  So this is plan

4  A, which, again, comes from Milligan Exhibit 3, page 4.  I also

11:44:35 5  have from Tom Bryan's supplemental report, which is Defendants'

6  Exhibit 4, Page 69, his analysis that relays the lines from

7  your plan A across the sort of race shaded precincts from the

8  map we were looking at just a moment ago.

9       Do you see that?

11:44:59 10  A    I do.

11  Q    And for everyone's benefit, I have added up here the

12  number of county splits and the any-part Black Voting Age

13  Population for your District 2, which I take is this tan

14  colored district in the southern part of the state and District

11:45:22 15  7, which is the light blue sort of in the central western part

16  of the state.  Is that fair?

17  A    Yes.  That all looks reasonable.

18  Q    Okay.  The first -- I may have shown this a little earlier

19  this morning.  But well, actually, this is a little bit of a

11:45:41 20  different question.

21       Focusing on number of splits, what -- do you recall what

22  factor led you to split two more districts than necessary in

23  this particular plan?

24  A    I think you mean two more counties.

11:45:58 25  Q    Yes.  I apologize.  Two more counties?

1  A     No problem.  Just trying to be clear.

2  Q     Thank you.

3  A     The -- every time you draw, you are balancing the

4  different priorities against each other.  And so it's hard to

11:46:16  5  truly whether it was consideration of municipalities, which

6  aren't visible in this map, or whether it was physical

7  geography or some other feature.  But I am testifying that the

8  choice of which counties to split was made in a balance of all

9  and only the criteria that had been discussed.

11:46:44  10  Q     And one of those criteria was to ensure two black majority

11  congressional districts?

12  A     That was the question that I was asked to address.

13  Q     Okay.  So that factor might explain why if we zoom in here

14  between -- I will call the green district, District 4.  Do you

11:47:13  15  recall if -- District 5 used to be up at the top in the enacted

16  plan, and 4 beneath it.

17       Do you recall when you sort of reshuffled them if you put

18  4 off to the northwest and 5 to the northeast?

19  A     I think the numbers are correct as they're reported.  In

11:47:34  20  Mr. Bryan's figure, would show those to be 4 and 5.

21  Q     Great.  I just want to be sure.

22       So if you were to close off this county split here, you

23  could do that potentially.  That would mean you would need more

24  population for the rest of District 4 because it would be

11:47:58  25  losing population District 5, correct?

1   A     Are you done?  Sorry.

2   Q     Yes.

3   A     Yes.  If you took that split county and colored it all, I

4   think you were saying the pink color, magenta color, yes, you

11:48:18 5   would lose green population or population for the green

6   district and would have to gain it elsewhere in order to

7   balance.

8   Q     Okay.  And if you were not going to split another county

9   to gain that population, there's only one place you could

11:48:35 10   really look at more population for District 4, correct?

11   A     If I'm understanding your question right, it's true that

12   the only two split counties in 4 as I have drawn it are

13   Jefferson County where your hand currently is.

14   Q     Uh-huh.

11:48:55 15   A     And that northern county whose name I can't currently

16   remember.

17   Q     Okay.  So if you had to come down to Jefferson County to

18   get more population for District 4 -- I am going to zoom in.

19   It appears that if you were going to be in population from

11:49:18 20   around here, you would losing some black population from

21   District 7, correct?

22   A     There's now a fairly intricate counterfactual.  But I

23   think it's responsive to your question to say that the

24   construction of District 7 definitely looks at race so as to

11:49:43 25   ensure that it's majority black.

1  Q    Okay.  And would it also be fair to say that the principle

2  of splitting fewer counties was subordinated to the principle

3  of getting two majority-black districts in Alabama?

4  A    It's true that I regard the federal requirements of

11:50:18  5  population balance and minority electoral opportunity to be

6  nonnegotiable and, therefore, higher ranked.

7  Q    Okay.  You know whether you could draw a plan like plan A

8  that has only six splits in counties instead of eight and that

9  still meets that nonnegotiable criteria of two majority-black

11:50:48 10  districts?

11  A    I think what makes that a difficult question to answer is

12  that it's hard to say what makes one plan like another, but I

13  would say that I made an effort here, really a strong effort to

14  balance all of the principles that we have named.

11:51:06 15  Q    Okay.  I just mention -- let's see.  And do you know

16  roughly how many voting age are within any given district on

17  average?  Would it be right to say it's about 560,000?

18  A    I know it to be between 500 and 600,000 because there you

19  are taking those 700 sum and restricting to adults.  So that

11:52:03 20  sounds correct.

21  Q    Okay.  I just want to defer decision.  Let's switch

22  screens I'm sharing real quick just to show you I'm not leaving

23  you.

24          MR. NAIFEH:  Your Honor, I would like to request that

11:52:22 25  that demonstrative be marked as an exhibit.

```
 1              MR. LACOUR:  No objections.

 2              JUDGE MARCUS:  All right.  Why don't you put a number

 3    on it?  That would be Defense Exhibit 2 for identification, if

 4    I have it right.  Do I have that right, Mr. LaCour?  The only

11:52:39  5    other exhibit we marked for identification was the one you used

 6    for impeachment yesterday.

 7              MR. LACOUR:  Yes, Your Honor.  I believe that is

 8    correct.  But if --

 9              JUDGE MARCUS:  That's just a number.  You give me any

11:52:52 10    number you want, and we can move along.

11              MR. LACOUR:  We will go with Exhibit 2.

12              JUDGE MARCUS:  Defense Exhibit 2 for identification.

13    You have may proceed.  Thank you.

14    BY MR. LACOUR:

11:53:06 15    Q    Turning to Defense Exhibit 4.  There we go.  And page 25

16    on the -- so this is Tom Bryan's supplemental report.  Have you

17    had a chance to review this report, Dr. Duchin?

18    A    Yes.  I believe so.

19    Q    Okay.  And he reports your plan A that -- looking at Table

11:54:00 20    3.2 that District 2 has a Voting Age Population-- an 18-plus

21    number, 560,170; is that right?

22    A    It's true that that's what is written here.

23    Q    Okay.  We'll ask for you to assume that he has his numbers

24    right, and I'm sure if he doesn't, we will hear about it later

11:54:29 25    when he testifies.
```

1       And he reports 562,303 for District 7; is that correct?

2   A    Yes, he does.

3   Q    And we will go ahead and run through on to the next page.

4   District 2, 559,000 and some change; District 7, 762,630; for

11:55:04  5   plan C, 558,296 for District 2; and for your District 7 in plan

6   C, 562,107.  To close it out, for plan 4 or plan B District 2,

7   560,550; and for plan D District 7, 562,391.  Did I recount all

8   of those correctly, Dr. Duchin?

9   A    I agree that that's what's written here.

11:55:42 10   Q    Okay.  And if those numbers are correct, then that would

11   mean that 1 percent of a district's Voting Age Population would

12   be about 5,600 people, give or take, a few dozen; is that

13   right?

14   A    Yeah.  That looks to be about right.

11:56:07 15   Q    Okay.

16   A    I should probably be careful, though.  If there are any

17   precise calculations to do, I wouldn't want to have do those on

18   the spot, but would hope to have some time to sit and be

19   careful, make sure everything is done correctly.

11:56:29 20   Q    Correct.  I'll try to keep the math as simple as possible

21   for these purposes.

22       Returning just one more time to your plan A.  Are you

23   aware of any traditional districting criteria that could

24   explain two additional county splits?

11:57:00 25   A    Sure.  Easily.  We've heard, for instance, about

```
      1  communities of interest, and an effort to preserve those,
      2  whereas I said before, to keep municipalities whole could
      3  certainly be a reason in particular in Alabama as in many
      4  states, there are municipalities that cross over county lines.
11:57:24 5  Q    Okay.
      6       MR. LACOUR:  Your Honor, as I see, it is almost the
      7  lunch hour.  It might be a good time to stop.  I am going to
      8  have a little more to go.
      9       JUDGE MARCUS:  Whatever works for you.  Give me some
11:57:40 10  idea, Mr. LaCour, how much do you think you have on cross, and
      11  we will have a sense of how many other witnesses we will get to
      12  today.
      13       MR. LACOUR:  Your Honor --
      14       JUDGE MARCUS:  This is not to limit you.  You take all
11:57:55 15  the time you need.
      16       MR. LACOUR:  Say probably another 45 minutes to an
      17  hour.  I hate to overpromise and under-deliver.  But whichever
      18  way --
      19       JUDGE MARCUS:  Thanks for giving me your estimate.  We
11:58:10 20  are not holding you to it.
      21       It's just a little before 12:00 Central Standard, 1:00
      22  o'clock Eastern Standard.  We'll break for one hour for lunch.
      23  We'll reconvene 1:00 o'clock Central Standard, 2:00 o'clock
      24  Eastern Standard.  We'll ask you, Dr. Duchin, if you would be
11:58:32 25  kind enough to stick with us as we proceed into the afternoon.
```

1        Thank you all.  And we will be in recess until 1:00 and

2    2:00 respectively.

3            (Recess.)

4            JUDGE MARCUS:  Okay.  Mr. LaCour, you are ready to

13:01:04  5    proceed with Dr. Duchin on your cross.

6            MR. LACOUR:  And, Your Honor, thank you.

7            JUDGE MARCUS:  Thank you.  And you may proceed.

8            MR. LACOUR:  Thank you.

9    BY MR. LACOUR:

13:01:15 10    Q    Dr. Duchin, welcome back.  I hope you had a nice lunch.

11    We will pick up where we left off.  I am going to share my

12    screen again and start with plan B at this time.  Can you see

13    that now?

14    A    Yes, I can.

13:01:37 15    Q    So question here:  So we have got seven county splits

16    instead of the bare minimum six that would be needed if all we

17    were trying to do was equalize population; is that correct?

18    A    No.  As we heard, you can get under six if you're willing

19    to tolerate more pieces.

13:01:56 20    Q    Splits of like -- we will stipulate when we say county

21    splits, we're referring to splits of counties.  Would that be

22    the more accurate --

23    A    No.  So the number of split counties can -- I'm sorry.  I

24    don't mean to be -- I want to be accurate.  The number of split

13:02:19 25    counties can get below six, but if you are going to split them

1  only two ways, then six is the minimum.

2  Q    Okay.  So number of two-way county splits is one greater

3  here than would be necessary if all you were trying to do was

4  equalize population; is that fair?

13:02:39  5  A    I'm sorry.  Yes, that's fair.

6  Q    I'd like to draw your attention, then, to District 2 in

7  the southwest corner.  And I just for the record, I'm showing

8  Milligan Exhibit 3 at page 4, plan B, as well as Defendants'

9  Exhibit 4 at Page 71.

13:03:00  10      So we have got a split here between what is 2 and 7.  Do

11  you recall why you didn't close this county on the west side of

12  CD 2 and maybe give up some of this county on the east side of

13  CD 2, or vice versa, close one of them?  Because it appears you

14  can sort of work your way around, right, and equalize across

13:03:33  15  those four districts here, right?

16  A    Let's see.  I think that's Clarke County, if I remember

17  right?

18  Q    I think that's right, yes.

19  A    So this is one of really innumerable choices that you face

13:03:48  20  when drawing.  And I think it's probably fair to say that I

21  tried this the other way, which has ripple effects in several

22  other places, and that the top of my consideration was to

23  balance the principles that we have described.

24  Q    Okay.  But the principle of equal population would not

13:04:11  25  require four splits among these four districts, right?  It

```
 1  would only require three splits among these four districts?
 2  A    The nature of that and of all the requirements is that it
 3  interacts with the others to produce the choices that you see.
 4  Q    Uh-huh.  Could it -- I mean, tell me if I'm reading this
 5  all correctly.
 6       Generally speaking, if we were to close this off here
 7  (indicating)?
 8  A    Uh-huh.
 9  Q    By expanding 2 out this way, that means we would need to
10  expand 7 into Jefferson County if we were going to avoid
11  splitting another county, correct?
12  A    I think it's fairly complicated, but this is one of the
13  reasons that I provided multiple demonstrative maps, and you
14  can see that Clarke County is whole in District 2 in some of my
15  other demonstratives.  So that might be a good place to look to
16  explore that counterfactual.
17  Q    Okay.  But generally speaking, as a map drawer, I mean, it
18  does work a bit like a puzzle, right?  So if you push a little
19  here, it's going to -- if you are going -- it's like moving
20  population clockwise in this instance, right?  That's going to
21  require population continue moving in some direction in CD 7
22  unless you're going to break into a new county, correct?
23  A    Well, I can say that moving population clockwise is
24  certainly not how I was thinking about it as I was drawing.
25  But I take your more general point to be that a choice made in
```

1  one place has ripple effects in other places.  And I

2  emphatically agree with that.

3  Q    Okay.  And so if you picked up -- if -- I guess that would

4  mean District 7 would lose some of this population here

13:06:22 5  (indicating), which is generally kind of in this area, which

6  you see some yellow and some orange and a little bit of green

7  in that area of Clarke County on the map, correct?

8  A    It's hard to say, but I don't have any reason to doubt

9  you.

13:06:37 10  Q    Okay.  And then if you were going to -- new voters for

11  District 7 from Jefferson County -- just going to zoom in here

12  -- there's not much green left to take from around here,

13  correct?

14  A    Well, you're describing a chain of reasoning that frankly

13:07:02 15  doesn't resemble my process, so it's hard for me to follow

16  along and agree or disagree in a principled way.

17  Q    Okay.  But if you are going to try to make some changes to

18  this map to give more weight to the minimizing of splits in the

19  counties, you were basically handed this map, that would be one

13:07:36 20  way to do it, right, if you close off Clarke here (indicating),

21  pick up some more people from Jefferson County here, then you

22  have got Shelby County here (indicating), where we could come

23  in, pick up some more people, and then you would come down to I

24  believe this is Barbour County?

13:07:54 25  A    That's right.

1   Q    Pick up a few more people here, get the one person one

2   vote, correct?

3   A    We are deep into speculative territory that I don't feel

4   comfortable kind of commenting on, on the spot.

13:08:12  5   Q    Okay.  Do you see a reason why -- just purely

6   mathematically would not be possible to remove one of those

7   county splits from this four-district area if you were setting

8   aside all the other traditional districting criteria that you

9   apply?

13:08:36 10   A    Oh, on the contrary, I think you could, and that's

11   reflected in my other demonstratives.

12   Q    Okay.  Would it be that the -- sort of the nonnegotiable

13   criteria of ensuring that two majority-Black Voting Age

14   Population districts were created explains why there are four

13:08:58 15   splits in counties in this four-district area rather than just

16   three splits in this four-district area?

17   A    So at the risk of being repetitive, it's -- there's a

18   balancing of that relatively long list of criteria.  And in

19   this map, there's seven splits, and the map is better in some

13:09:22 20   other ways, but I also have a demonstrative plan with as few as

21   five counties that are split.

22   Q    Okay.  But I think the question was -- I mean, you have

23   got four splits in the four-district area.  You would only

24   really need -- mathematically, is it true there would only --

13:09:43 25   it's potentially you could get that down to only three if you

1   weren't worried about balancing the other factors?

2   A    Well, I think my best and fullest answer would be that I

3   do believe other prioritizations of criteria are possible while

4   retaining two majority-black districts.  And that in particular

13:10:07  5   as I think I mentioned in direct, if you kept something very

6   much like my District 2 and 7 and, therefore, 1, you have a

7   great deal of latitude with the other four districts to reorder

8   the priorities as you might see fit.

9   Q    But maybe with this particular configuration of 2 and 7,

13:10:29 10   you wouldn't have latitude down to just six splits in the

11   counties; is that fair?

12   A    Sorry.

13   Q    I'm sorry.  Go ahead.

14   A    Thanks.  That's not something I'm prepared to answer in a

13:10:42 15   speculative fashion looking at the map.  But something I could

16   certainly sit down with mapping software and explore.

17   Q    And I'll just point you here.  CD 7, this was from your

18   report, and we looked at these numbers earlier.  I am happy to

19   go back if you want to double check them.  But I put down that

13:11:05 20   it was 50.24 percent any-part Black Voting Age Population, and

21   if I think we said that 1 percent of Voting Age Population of a

22   typical district is about 5,600 people, so we're talking less

23   than 2,000 people would be your margin for CD 7, correct?  So

24   does that sound right?

13:11:32 25   A    What exactly is the question?  Is the question about

```
 1  removing 2,000 people?
 2  Q    If you removed -- so if you removed 1,000 black people of
 3  voting age from CD 7 and you replaced them with 1,000 non-black
 4  people of voting age, that would bring your number down below
13:12:02  5  50 percent, correct?
 6  A    I don't think 1,000 would be enough from the numbers you
 7  were quoting before.  It sounded like maybe a few thousand
 8  would, but, again, I'd want some time to sit down and get those
 9  numbers just right.
13:12:16 10  Q    Okay.  In any event, the margins are at least -- the
11  margins are somewhat slim for CD 7, fair enough?
12  A    I think that the standard is 50 percent plus one person.
13  But 50.24 is certainly less than, say, 51 percent.
14  Q    Uh-huh.  I will move on to plan C.  Zoom out just a
13:12:52 15  little.  Can you see that?
16  A    I can.
17  Q    Okay.  And as with the other plans, the map on the left
18  comes from Milligan Exhibit 3 page 4.  That's your initial
19  report.  The map on the right that corresponds to it is from
13:13:11 20  Tom Bryan's supplemental report, Defendants' Exhibit 4 at page
21  73.
22       So here we've got District 2, and I think this comes from
23  page 8 of your report that shows that it is at 50.06 percent
24  Black Voting Age Population, which by my math, equates to about
13:13:40 25  350 people of voting age?  Does that sound sort of in the
```

1  ballpark?

2  A    I think you're asking is it true that .06 percent of the

3  voting page population of a district is a few hundred people?

4  Q    Uh-huh.

13:13:56 5  A    That sounds reasonable to me.

6  Q    Okay.  Great.

7    My question here -- we have nine splits in this particular

8  map.  I wanted to first ask about the ones here in the

9  southwest corner of the map.  What traditional districting

13:14:19 10  principles led you to draw that sliver through Washington and

11  Clarke counties?

12  A    Well, I don't specifically recall that decision juncture,

13  but I can imagine that one possibility might have been the

14  compactness of District 7.

13:14:39 15  Q    Okay.  What leads you to say that, just looking at the map

16  here?

17  A    Well, again, if we're looking at the Polsby-Popper

18  measure, or indeed at the Reock measure, in either of those

19  cases, the idealized shape is a circle.

13:15:04 20  Q    Uh-huh.

21  A    And I can see that this -- it's conceivable -- since you

22  are asking me, I think, to speculate, it's conceivable that

23  this decision was made in order to produce a somewhat rounder

24  District 7.

13:15:17 25  Q    Okay.  And would another way to do that be to sort of

1  borrow from that hydraulic analogy, move counterclockwise now

2  to maybe pick up some of this intrusion into Jefferson County,

3  and then in the process, make these counties whole?

4  A     There are honestly innumerable choices that you face

13:15:49  5  that's really only one of many conceivable ways to balance the

6  decision in a different manner.

7  Q     Okay.  And so there are numerous ways you could have also

8  potentially made either of these counties whole either as part

9  of District 7 or as part of District 2, correct?

13:16:12 10  A     That's correct.  And I think that you will find some

11  examples in the other illustrative plans.

12  Q     Okay.  And you think one reason that there are nine splits

13  in counties in this plan as opposed to six splits in counties

14  is because of your -- the weight you gave to -- I apologize to

13:16:48 15  flip around there -- was because of the weight you gave to the

16  criteria of ensuring two majority-black congressional

17  districts?

18  A     There's no question.  And I have consistently acknowledged

19  that I took minority electoral opportunity to be a

13:17:09 20  nonnegotiable principle sought in these plans.

21      I will mention here you're also seeing in some of these

22  decisions a high priority on compactness and, of course, on

23  contiguity.

24  Q     And we'll get to that in a minute.

13:17:30 25      Turning next to plan B --

         1              MR. NAIFEH:  Before we move on to plan B, I want to

         2    make sure that all of these demonstratives are being marked.

         3    So I think we had one for plan B and one for plan C.

         4              JUDGE MARCUS:  Did you want to mark this one B?  This

13:17:54 5    is plan B?

         6              MR. NAIFEH:  This is D.  We also saw B and C.

         7              JUDGE MARCUS:  So you are asking him to mark B and C

         8    as well as D?

         9              MR. NAIFEH:  Yes, Your Honor.

13:18:05 10             JUDGE MARCUS:  Any objection to doing that,

        11    Mr. LaCour?  Because what you are showing is not exactly the

        12    exhibit as it appears in Milligan 3.  Plan C, B, and A are what

        13    existed, except you typed in some stuff at the top, right?

        14             MR. LACOUR:  Exactly.  No objections, Your Honor, for

13:18:24 15   plan B.

        16             JUDGE MARCUS:  Why don't we do this:  Why don't we

        17   just mark your modifications to Duchin's plans B, C, and D as

        18   Defendants' identification 3, 4, and 5?  If I have the numbers

        19   right, I think that works.

13:18:41 20             MR. LACOUR:  Yes, that's exactly right.

        21             JUDGE MARCUS:  Does that work for you, counsel?

        22             MR. NAIFEH:  Yes, Your Honor.

        23             JUDGE MARCUS:  All right.  So the record is clear, the

        24   exhibits being shown to Dr. Duchin by Mr. LaCour are

13:18:59 25   Illustrative Plans A, B, C, and D, which have been modified to

```
 1  typing at the top of the page, county splits, and the

 2  percentage of APBVAP in each of Districts 2 and 7.  Is that

 3  right?

 4           MR. NAIFEH:  In addition, they have also added a map

 5  from Defendants' Exhibit 4.

 6           JUDGE MARCUS:  That's on the other part of it.  The

 7  other part of the page includes a defendants' exhibit from the

 8  report of the supplemental report of Mr. Bryan.  With that

 9  caveat, exhibits 3, 4, 5 -- would it be 3, 4, 5, and 6,

10  Mr. LaCour, the four of them?

11           MR. LACOUR:  I believe it's 2 --

12           JUDGE MARCUS:  We have already marked -- okay, so it's

13  3, 4, and 5 are marked as defendants' exhibits for

14  identification.  You may proceed.  Thank you.

15           MR. LACOUR:  Great.

16  BY MR. LACOUR:

17  Q    Dr. Duchin, we now come to plan D.  Thank you for your

18  patience.

19       This is one that splits Jefferson County among three

20  different districts, correct?

21  A    That's correct.

22  Q    Do you recall what percentage of Jefferson County's black

23  residents ended up in your version of CD 7 and what percent

24  were placed into CDs 4 and CD 6?

25  A    I don't think I ever calculated those percentages
```

```
 1  anywhere, including in my reports, but I can tell you that
 2  consideration here is to keep the core of the city of
 3  Birmingham as whole as possible.  It's worth pointing out that
 4  the city boundaries here are especially contorted, and so it's
 5  very difficult, as in the state's plan, to keep the city
 6  completely whole.  The city core it's easier to do so.
 7  Q    Okay.  And with that caveat, I mean, does it appear here
 8  -- I am zooming in a bit, and I'm sorry it's a little granary
 9  -- on Tom Bryan's version of your plan D, does it appear that
10  race predominates in how these particular lines are drawn
11  between District 4, District 6, and District 7?
12  A    Frankly, it's just really hard to tell.
13         MR. NAIFEH:  Objection to the form of the question.
14  It calls for a legal conclusion.
15         JUDGE MARCUS:  Why don't you reframe the question if
16  you could, Mr. LaCour?
17  BY MR. LACOUR:
18  Q    Dr. Duchin, looking at the shapes of these lines that
19  separate District 4, District 6, and District 7, is it the race
20  of the population included within District 7, does it appear to
21  be a factor that was used for drawing this particular line?
22  A    Okay.  So it's very hard to tell just legitimately as a
23  question of the image resolution.  But it looks to me that I
24  can see those green colored precincts on both sides of the
25  District 4, District 7 dividing line.  At least, that's my best
```

13:20:55 (line 5)
13:21:24 (line 10)
13:21:45 (line 15)
13:22:07 (line 20)
13:22:38 (line 25)

1    effort to narrate what I am seeing in this illustration.  And I

2    think you would say that if the line was drawn in some

3    predominantly race conscious way, you might expect to see that

4    green population included in District 7.  But as I have

13:23:00  5    testified, I only looked at race when drawing specific boundary

6    lines to make sure that I was retaining the majority-black

7    character of the districts that I was drawing.

8    Q    Okay.  And have you split any precincts in Jefferson

9    County in this particular map?

13:23:22 10    A    I think it's very likely practically certain, because as I

11    said before, all the population balancing was done by splitting

12    precincts in those counties that had already been split.

13    Q    Okay.  Do you recall the racial makeup of the parts of the

14    precincts placed in District 7 versus in another district?

13:23:46 15    A    Well, I certainly don't specifically recall that and never

16    computed it.  But I will continue to maintain that the race

17    consciousness of selections was only in the service of

18    retaining the majority-black character of the districts as I

19    drew.

13:24:06 20    Q    Okay.  Take a break from the screen sharing for just a

21    moment.

22          I would like to move on to compactness, and I am going to

23    share the screen again.

24          Going back to Milligan Exhibit 3 and -- okay.  So we've

13:24:44 25    got some compactness scores here on page 6 of your report.  I

 1  believe we discussed some of these this morning, or you

 2  discussed some of these this morning with counsel for the

 3  Milligan plaintiffs; is that correct?

 4  A    Yes.  This is the section that discusses compactness, and,

13:25:06  5  yes, we discussed it earlier today.

 6  Q    Okay.  And then to summarize, on the average Reock score,

 7  the state's plan does the best of any of the five plans here,

 8  correct?

 9  A    That's correct.

13:25:25 10  Q    Your plans on average do better than the Polsby-Popper

11  score -- on the Polsby-Popper test?

12  A    That's correct.  All four illustrative plans are more

13  compact than HB-1 on Polsby-Popper.

14  Q    Okay.  And then one of your four plans is more compact

13:25:47 15  under the block cut edges approach, and the other three are

16  less compact; is that correct?

17  A    That's correct.

18  Q    Now, these metrics also be applied on a

19  district-by-district basis, correct?

13:26:08 20  A    No.  Block cut edges is a plan-wide score, but the other

21  two are averaged over the districts.

22  Q    Okay.  And so for Polsby-Popper, for example, if a

23  district were shaped like a salamander would score lower on

24  Polsby-Popper than a district shaped like a square, right?

13:26:33 25  A    Yes.  And there I think you're referring to the original

```
 1  gerrymander, which was Gary's salamander and, yes, that's part
 2  of the history of compactness is the idea that reptilian
 3  districts are less compact.
 4  Q    I thought you would get the reference.
 5        In your view, what's the lowest Polsby-Popper score a
 6  district could have and still be considered geographically
 7  compact?
 8  A    Well, as I have actually written widely, I think
 9  Polsby-Popper scores are highly context dependent.  I will be
10  very brief.  I won't -- I promise not to give a whole lecture.
11  But in particular, they're subject to what some people have
12  called the coast line penalty.  And so, for instance, if you're
13  redistricting in Maryland, you can have a district that's quite
14  functionally compact with a Polsby-Popper score of 10 percent.
15  And so it really depends.  You know, on the other hand, if you
16  are in Iowa, it's much -- there's much less reason that you
17  might draw a district that's considered reasonably compact
18  while still having a very low score.
19  Q    Okay.  Now, you were retained to show that two
20  sufficiently compact majority-black districts could be drawn in
21  Alabama, correct?
22  A    Perhaps more broadly as a *Gingles I* expert.
23  Q    Right.  But you don't report a compactness score anywhere
24  in your three reports for any of the majority-black districts
25  that you drew, correct?
```

Timestamps: 13:26:59 (line 5), 13:27:18 (line 10), 13:27:41 (line 15), 13:28:02 (line 20), 13:28:21 (line 25)

|  | 1 | A     That's true.  I'm sure those numbers are in my backup |
|---|---|---|

A     That's true.  I'm sure those numbers are in my backup

materials, but I didn't highlight them individually in the

report.

Q     Okay.  You think that district-by-district information

13:28:35 might be relevant for determining whether you sufficiently

compact districts that are majority-black could be drawn in

Alabama?

A     To be clear, actually, I don't think that's the language

of *Gingles I*, which asks instead whether the minority

13:28:55 population is sufficiently compact to enable the drawing of

majority-minority districts.

Q     Correct.  But for the minority population to be

sufficiently compact, they would need to be compact within a

district, correct?

13:29:11 A     I think the prevailing interpretation is that to witness

the sufficient compactness is to draw an entire plan that's

highly conformant with the traditional districting principles.

And so I think the overall compactness of the plan is part of

how that has traditionally been assessed.

13:29:36 Q     You had a plan, however, that let's just say had seven

districts.  Six of them were perfect circles.  And the seventh

snaked or salamandered (sic) all around the circles, that could

return an average score that in theory looked decent, correct?

A     A few observations about that hypothetical.  You are, I

13:30:09 think, correctly observing that circles don't pack, they don't

```
      1  fit together nicely to make a whole.  And so it's certainly
      2  true that if you had several circular districts you would also
      3  have to fill up that negative space with something that would
      4  not be very compact.
13:30:25 5  Q    Uh-huh.  And that seventh filler district would not be
      6  compact, correct, even if it was part of an overall plan that
      7  scored well on average compactness score, correct?
      8  A    Yes, if I am understanding you right.  I think that is the
      9  nature of averages that one thing can be lower, other things
13:30:51 10 can be higher, and then there's a balance between the low and
     11  the high in the nature of an average.
     12  Q    So your scores -- the scores you report don't tell us
     13  whether the majority-black Districts 2 and 7 that you drew
     14  scored better than the District 2 and District 7 that were
13:31:12 15 enacted by the Legislature, correct?
     16  A    Well, I did review the district-by-district compactness
     17  scores in Mr. Bryan's report.  And I do agree with them to the
     18  number of digits that he included.  And so I can report having
     19  reviewed and confirmed those numbers that the least compact
13:31:36 20 districts in my plans, which are, I think, invariably not
     21  Districts 2 and 7, but Districts 2 and 1, those are always the
     22  least compact districts in my plans.  Those have lower
     23  compactness scores than the other districts.
     24       On Polsby-Popper, I am sure we can look at the exact
13:32:02 25 numbers, but from memory, I believe them to be around
```

1  15 percent, which I will note is comparable to or better than

2  the least compact districts in the state's enacted plan from

3  this cycle and from the last cycle, as well, where districts

4  got as low as .13.

13:32:19 5  Q    You think that those district-by-district scores would be

6  relevant, however, to an overall compactness analysis at

7  *Gingles I?*

8  A    Yes.  I'm trying to make sure I understand.  Yes.

9  Individual district scores are how you get the average.  And I

13:32:41 10  think it's legitimate to look at the scores individually and

11  together, as we are now doing.

12  Q    All right.  We'll return to your maps probably not the

13  last time.  I will be honest.  But let's go again to Exhibit 3,

14  Milligan Exhibit 3, page 4.

13:33:12 15       So did you testify earlier that Districts 4 and 5 in your

16  maps were drawn to make them more compact than they had been

17  earlier?  Scratch that.

18       Now, Districts 4 and 5 in each of these maps doesn't bear

19  great resemblance to Districts 4 and 5 in the 2021 map,

13:33:46 20  correct?

21  A    That's true.  The enacted map, in fact, has elongated

22  districts in the north of the state as I do in the south.

23  Q    Nor do they bear much resemblance to the 2011 map that was

24  passed by the Legislature, correct?

13:34:02 25  A    That's right.  It is similar in that respect.

1    Q    Why was it important to you to restructure Districts 4 and

2    5 in your maps when neither of them were adjacent to the new

3    majority-black district you were drawing down in the south of

4    the state?

13:34:22  5    A    Oh, I hope the reason is quite clear.  It's because, as I

6    said, I regarded compactness to be a priority higher ranked in

7    the state guidelines and more broadly than the preservation of

8    district cores.

9         But to answer that fully, I think it's worth noting that

13:34:45 10   you can retain the majority-minority districts and make other

11   choices with those four while still keeping *Gingles I* in place.

12   Q    You didn't produce a map for the Court, though, that tried

13   to do that, did you?

14   A    That's right.  Because of my reading, that compactness was

13:35:06 15   higher ranked.

16   Q    And why -- did you say it was something in the guidelines

17   that led you to prioritize compactness over cores of districts?

18   A    I did.

19   Q    Can you remind me exactly what that was, or I can perhaps

13:35:32 20   pull up the guidelines, if that will be helpful?

21   A    I'm happy to do it broadly, and then we can pull them up

22   if you would like to quote directly.

23        But as I showed when we reviewed the guidelines together

24   earlier, the first page discusses population equality and

13:35:51 25   minority opportunity to elect hand in hand with equal

1    protection.  Immediately after that are listed compactness and

2    contiguity.  Several parts lower is section J, which lists

3    several criteria, including district cores, and then it is

4    specified that within j., the priorities are unranked, which

13:36:18 5    leads me to conclude in a manner that comports with practice in

6    every other state that I've seen that the federal requirements

7    and compactness and contiguity are to be considered higher

8    ranked than district cores, and for that matter, the

9    consideration of incumbency.

13:36:38 10   Q    Okay.  I am going to pull up the guidelines.  I just want

11   to make sure we're looking at the same thing.

12        This is Milligan Exhibit 28 and -- so I think you're

13   referring here -- starting on page 2 at line 21, was it based

14   in part on -- if I am getting you wrong, I apologize -- on this

13:37:23 15   line here saying, The following redistricting policies are

16   embedded in the political values, traditions, customs and

17   usages of the state of Alabama, and shall be observed to the

18   extent that they do not violate or subordinate the foregoing

19   policies prescribed by the constitution and laws of the United

13:37:37 20   States and of the state of Alabama?

21   A    That's right.  I think that it's clear both from that

22   language and from part g. on the next page.  There it is.  So

23   you see clearly here that it is specified that within j.,

24   there's no order of precedence to be inferred.  And I think the

13:38:07 25   plain reading of that is that, in the larger structure of the

1  document, there is an order of precedence to be inferred.

2  Q    Okay.  Is compactness listed in j.?

3  A    No.  It -- indeed, this is my point.  It comes before j.

4  If you flip back to the previous page, you will see that

13:38:29 5  compactness is listed up in h.

6  Q    Okay.  And then to go back to page 3, it says -- and to g.

7  The criteria identified in paragraphs j(i) through (vi) are not

8  listed in order of precedence, and in each instance where they

9  conflict, the Legislature shall at its discretion determine

13:38:52 10  which takes priority.

11      Do you read that to mean that if there's a conflict among

12  the j. criteria and the Legislature gets to decide, and any

13  other criteria trumps the j. criteria when there's a conflict?

14  A    The ones that are listed earlier, I would say that this

13:39:16 15  indicates that the j. criteria are subordinate to the ones that

16  are listed earlier.

17      And I would add to that, that it's my understanding -- not

18  being an attorney -- it's my understanding that these

19  guidelines are not part of state law, but describe the practice

13:39:35 20  that the Legislature uses to draw lines.

21  Q    Okay.  Your position, looking in here at the beginning of

22  j. refers to constitution and laws of the united States and the

23  State of Alabama, your position is not that compactness is a

24  constitutional requirement, correct?

13:39:58 25  A    That's correct.

1  Q    Or that compactness is required by federal law or Alabama

2  law?

3  A    I can't speak to whether it's considered to be part of

4  Alabama law, not being an expert in Alabama law.

13:40:13  5  Q    Fair.

6  A    But I am aware that it's not considered to be federal law.

7  Q    Okay.  Did you look at Alabama practice, either in this

8  past redistricting cycle or past decades to see whether it

9  looked like the Legislature has been giving compactness that

13:40:37  10  level of priority as opposed to core retention?

11  A    My principle means of learning about Alabama practice was

12  a study of the enacted plans from 2021 and from 10 years

13  earlier in 2011.  And as one often does, when trying to

14  understand redistricting priorities, I did infer some

13:41:07  15  priorities and interpretations from the properties of those

16  plans.

17  Q    And was respect for core retention one of the guiding

18  principles that you were able to infer from looking at the 2011

19  map as opposed -- or when compared to the 2021 map?

13:41:29  20  A    Oh, I certainly agree that core retention seems to have

21  been highly prioritized in the creation of the 2021 plan.

22  Q    Let's see.  Turning now to communities of interest.

23        You referred this morning to the fact that there has not

24  been a sustained effort to map out or quantify all the

13:42:05  25  different communities of interest that might be present in the

```
 1  state of Alabama; is that correct?
 2  A    Oh, I think that goes farther than my statement.  I just
 3  said I wasn't aware of a state effort, and that I had checked
 4  the state's redistricting website to confirm that.
13:42:26 5  Q    Did you look at past maps to see if you could infer from
 6  them any communities of interest?
 7  A    Well, I think it would be quite difficult to read
 8  backwards to reverse engineer, you might say, communities of
 9  interest from a map, particularly since, as I said this
13:42:52 10  morning, I don't think that each district itself constitutes a
11  unitary community.
12       But I did get some ideas about splittings from the state's
13  earlier plans, and as I mentioned, from the state's current
14  board of education plan.
13:43:11 15  Q    Did you get any ideas about -- the opposite of
16  splittings -- keepings together, if you will, from the past
17  maps?
18  A    Did I get any ideas about areas that were kept together,
19  sure.  By observation I could see some areas that hadn't been
13:43:34 20  split.  I'm trying to stay with the spirit of your question.
21  Q    Okay.  For example, how far back did you look at past maps
22  from -- past congressional maps from Alabama?
23  A    As I've testified, I focused on the last two, on the maps
24  from 2011 and 2021.
13:43:58 25       I have definitely reviewed some older maps, but that would
```

1    be longer ago and farther from the current process.

2    Q    Okay.  So you couldn't say, for example, if two gulf

3    counties, Mobile and Baldwin, have been together in the same

4    district for half a century or not?

13:44:18  5    A    I couldn't.  Not with a high degree of certainty.  But I'm

6    willing to believe that that's true at the congressional level.

7    It's certainly the case that Mobile County is split in the

8    current State Board of Education map, and that parts of Mobile,

9    city and county, are connected to parts of the Black Belt.

13:44:45 10    Q    I will have a few questions for you about a map in a

11    moment.  But returning to communities of interest.  You said in

12    your report that it was possible to identify several clear

13    examples of communities of interest of particular salients to

14    black Alabamians.

13:45:06 15        Am I recounting your testimony from this morning correctly

16    that the two you focused on were preserving the cores of urban

17    areas and preserving just the core of the Black Belt?

18    A    I would say -- the way I described it is retaining as much

19    of the Black Belt as possible in majority-black districts.

13:45:30 20    Q    Okay.  Now, the Black Belt counties with the exception,

21    perhaps, of Montgomery, do not contain those large urban

22    centers that you were referring to, correct?

23    A    That's right.  I would say Montgomery is the clearest

24    exception.

13:45:50 25    Q    Okay.  So did you take into account any other communities

1   of interest?

2   A    The only two kinds that I considered were the two that you

3   just cited.

4   Q    Okay.  And it's possible there are communities of interest

13:46:18  5   that are relevant to white and black Alabamians alike, correct?

6   A    No question about that.  In particular, I think urban

7   cores are relevant to black and white Alabamians alike.

8   Q    Were you able to infer from looking at the 2011 and 2021

9   maps how the Legislature has applied the community of interest

13:46:43 10   factor in the past?

11   A    Well, as I've said --

12             MR. NAIFEH:  Asked and answered.

13             JUDGE MARCUS:  I think it has been.  Sustained.

14   BY MR. LACOUR:

13:46:57 15   Q    You know, could community of interest consideration

16   explain why Mobile and Baldwin counties were kept together in

17   2021?

18   A    Did you say could it or did it explain?

19   Q    Could it?

13:47:09 20   A    Could it.  Certainly could.

21   Q    Could a community of interest explain why the Wiregrass

22   counties were kept together in the 2021 map?

23   A    It certainly could.

24   Q    Okay.  And similar question, could communities of interest

13:47:26 25   considerations explain why Madison and Morgan counties were

```
 1  kept together in the 2021 --

 2            MR. NAIFEH:  Objection here to this line of

 3  questioning.  It's calling for speculation.

 4            JUDGE MARCUS:  Okay to answer if she can give it to

 5  us.

 6            THE WITNESS:  I'm willing to concede that it could,

 7  but I was unable to find any systematic description of what

 8  communities were considered.  I would have indeed been very

 9  happy to find such a description.

10  BY MR. LACOUR:

11  Q    Could you describe the nature of your inquiry into how

12  that guideline might have been applied?  I think you said you

13  looked for anything the state had put together.  Did you do

14  anything further?

15  A    No, that's all that I did to ascertain whether there had

16  been a state publication or a state collection process.

17  Q    Okay.  Now, I think you said earlier it was an express

18  goal of yours to keep the Black Belt counties in majority-black

19  districts to the extent you could.  Is that fair?

20  A    Yes.

21  Q    And is it fair to say that you testified this morning

22  that's part of the reason why your compactness scores for CD 1

23  and CD 2 were lower, correct?

24  A    That's right.  Oops.  Sorry.

25  Q    Go ahead.
```

13:47:42 (line 5)
13:47:53 (line 10)
13:48:09 (line 15)
13:48:40 (line 20)
13:49:01 (line 25)

    1   A    That's right.  The elongated east to west nature of the

    2   Black Belt itself is the reason that CD 2 is also elongated in

    3   east to west fashion and because that's close to the south of

    4   the state, that ends up prescribing elongation for District 1,

13:49:26  5   as well.

    6   Q    Okay.  So the goal of a majority-black district or rather

    7   the goal of two majority-black districts that held most of the

    8   counties in the Black Belt took precedence over compactness in

    9   District 2?

13:49:43 10   A    No.  I can't agree with that.  In my understanding of what

   11   by Alabamalites should be considered reasonably compact, I used

   12   the state's plan as a guide where the least compact district

   13   from 10 years ago had a score, a Polsby-Popper score of .13.

   14   All of my districts are more compact than that.  So I think I

13:50:10 15   was able to maintain reasonable compactness by Alabama

   16   standards in my entire plan.

   17   Q    Now, none of your plans put all 18 Black Belt counties

   18   into one district, correct?

   19   A    That's correct.  Although if -- I'm sorry.

13:50:30 20   Q    No.  Go ahead.

   21   A    If I remember right, at least one plan puts all 18 Black

   22   Belt counties into either District 2 or District 7.

   23   Q    I'm not a hundred percent certain that's correct.  But we

   24   can --

13:50:51 25   A    I am confident --

```
 1  Q     We can turn to the maps?
 2  A     Sure.  By memory, that's plan D.
 3  Q     Okay.  And -- well, I've got plan D here, so... and
 4  Milligan Exhibit 3, page 4.  So I believe this is also a Black
 5  Belt county, correct, where at least some of it is in
 6  District 3?
 7  A     Indeed, that's right.  And that should be Russell, I
 8  think.
 9  Q     I believe --
10  A     Which --
11  Q     Correct.
12  A     In plan C then.  Russell is whole and is included in CD 2
13  as is the rest of the Black Belt included in either CD 2 or
14  CD 7.
15  Q     Pickens in CD 3 in plan C is CD 4, correct?
16  A     So that is not one of the 18 counties traditionally
17  identified with the Black Belt, although I agree with you that
18  sometimes is included on secondary lists.
19  Q     Going to page 10 of your report.  I think you list here
20  among the 18 Black Belt counties, Pickens county, correct?
21  A     That's true that's listed there and not exactly sure which
22  one it is from memory in the map.  But I will accept your
23  representation if you're saying that it's excluded in plan C.
24  Q     Our count was that the 18 counties were split among at
25  least three districts in each map, but we can certainly compare
```

Timestamps in left margin:
13:51:22 (line 5)
13:51:32 (line 10)
13:51:46 (line 15)
13:52:20 (line 20)
13:52:53 (line 25)

1  and contrast that later.

2  A    Sure.  I would be happy to do that later.

3  Q    I want to get back to -- so do you recall if there was a

4  reason why all 18 counties were not placed into just two

13:53:21 5  districts instead of three?

6  A    Well, again, with apologies for repetition, one is

7  balancing as a mapmaker.  Quite a formidable number of

8  different priorities, and it's possible that that goal was only

9  attained in 17.5 counties, which is I think what we see in

13:53:43 10  plan B, 17.5 out of 18.

11      I would submit that that's quite a ways towards the goal

12  of securing representation in majority-black districts

13  throughout the Black Belt.  And to that I would only add one

14  could certainly get all 18, but it would come at a cost to

13:54:06 15  other principles as we keep hearing.

16  Q    Would it potentially come at a cost to two majority-Black

17  Voting Age Population districts?

18  A    So now I think you're asking is it possible to get all 18

19  into Districts 2 and 7 in a plan where those remain

13:54:29 20  majority-black, right?

21  Q    Right.

22  A    I am confident that that's possible.  But it would require

23  either more county splits or less compactness and more likely

24  both.

13:54:41 25  Q    Okay.  So if your goal was to get most of the Black Belt

1  counties both together and into majority-black districts, would

2  it be fair to say the community of interest you were trying to

3  keep together was not so much the Black Belt as it was just

4  black people more generally?

13:55:05  5  A    No, I don't think so.  I don't think anywhere here or ever

6  have I identified black people, full stop, as a community of

7  interest.  Communities of interest, in my understanding, are

8  primarily geographical.  And so that would not qualify.

9  Q    Okay.  I will take this down.

13:55:37 10      Okay.  Do you recall from the guidelines a statement we

11  were looking at just a moment ago that says contest between

12  comments will be avoided whenever possible?

13  A    That's right.  If I recall, that's in that section j. that

14  we discussed.

13:56:00 15  Q    Right.  And you didn't address incumbents anywhere in your

16  report, did you?

17  A    That's right.  I did not, although I did obtain a list of

18  incumbent addresses while forming the plans.  Those were not

19  part of the primary plan drawing.  I did look at the number of

13:56:24 20  districts pairing incumbents at the end, although that's not

21  included in the report.

22  Q    Okay.  So you know whether the maps place one incumbent in

23  each district or whether they put multiple incumbents in some

24  districts?

13:56:42 25  A    From memory, I think it's the case in all four of my

```
 1   illustrative plans that there were two districts with multiple
 2   incumbents, either two incumbents or in some cases even three.
 3   Q    Okay.  And if Tom Bryan's supplemental report indicated
 4   that between four and five incumbents in two different
 5   districts --
 6   A    That's consistent -- sorry.
 7        JUDGE MARCUS:  Let him finish the question.  Was there
 8   a question there, Mr. LaCour?  If there was, let me hear it,
 9   please.
10   BY MR. LACOUR:
11   Q    Yeah.  So if Tom Bryan's report, Defense Exhibit 4 at page
12   16 indicated that your plan places four and five incumbents in
13   districts with each other.  Do you have any reason to doubt
14   that conclusion?
15   A    No.  On the contrary, I agree with that conclusion, that
16   there are either two districts with two incumbents making four
17   overall, or one with two and one with three making five
18   overall.
19   Q    And you said you didn't consider incumbents at the outset
20   of your map drawing process?
21   A    That's correct.
22   Q    Did you consider them at any point in your map drawing
23   process?
24   A    I did look at the end state the finalization stage to see
25   whether it would be possible to reduce the incumbency
```

```
1   pairing -- not to reduce incumbency itself.  And I -- I
2   determined that it would be possible, for instance, to keep
3   Representative Sewell in District 7, which she has represented,
4   and I believe that my plan D does so.  That was accomplished
5   with little cost to the other principles.
6       I also satisfied myself that it would be possible to
7   further reduce the incumbency pairing and indeed to reduce it
8   to no pairing at all if we are willing to sacrifice the
9   higher-ranked principles of compactness, and certainly
10  contiguity, but also if we are willing to sacrifice the county
11  integrity.
12  Q   And there's a lot to be accomplished if you sacrificed
13  contiguity, correct?
14  A   Yes.  Although as we heard in the Massachusetts example,
15  not everything.
16  Q   Not everything.  You don't think it's possible to draw a
17  geographically -- or basically you don't think it's possible to
18  draw a map that is as compact as the maps you have produced as
19  the other criteria to the extent you've applied them also
20  avoids pairing incumbents and results in two majority-black
21  districts?
22  A   I think what I'm comfortable saying is that to reduce
23  pairing of incumbents all the way to zero could still be
24  accomplished with two majority-black districts, I think that it
25  can, but at significant cost to the other principles.  If I
```

1  could add one thing.

2  Q    Please.

3  A    Just to illustrate some of the tradeoffs that that

4  requires, I note in my report that two incumbents actually live

14:00:05 5  not only in the same county, but a few highway exits apart.

6  And so it's clear that to keep those incumbents in different

7  districts, of course one has to split that county.  That's just

8  a small illustration that it can literally require sacrifice to

9  the other principles in order to raise the priority on

14:00:31 10  incumbent protection.

11  Q    One second.  I apologize.

12       Okay.  Turning to back to core retention.  So you looked

13  at the 2011 map and you looked at the 2021 map.  Before you got

14  started drawing your own illustrative maps.  And you said

14:01:12 15  earlier that it -- you could infer that core retention might

16  have been important to the 2021 Legislature.  Is that fair?

17  A    In fact I inferred that it was.

18  Q    Okay.  I think you testified earlier today that it is

19  impossible to have as high a core preservation as the 2021 map

14:01:36 20  has while having two majority-black districts; is that correct?

21  A    Yes, I believe that to be a simple matter of numbers.

22  Q    Okay.  When you were gearing up your algorithm, did you

23  try to preserve some degree of the core of districts in drawing

24  your first few thousand maps or --

14:01:59 25  A    That was -- I'm sorry.

```
 1  Q     Sorry.  Go ahead.

 2  A     That was not a consideration.

 3  Q     Okay.  What preservation like some of the other criteria

 4  -- I mean, it could be a matter of degree.  Would you agree?

 5  A     Yes, I would.

 6  Q     So you could try to preserve 80 percent of the cores of

 7  districts or on average try to preserve 80 percent of the cores

 8  of districts as one of your goals, correct?

 9  A     You could adopt that as a goal.  That's the question?

10  Q     Yes.

11  A     Yes, you could.

12  Q     And could your algorithm pull that in as constraints or as

13  a preference in producing maps?

14  A     Yes, I have done that in the past in other states.

15  Q     Okay.  But not in this case, correct?

16  A     I did not include that in this case.

17  Q     Core retention is a traditional redistricting principle,

18  correct?

19  A     Well, I would say that like incumbency consideration, it

20  is expressly encouraged in some states and is prohibited in

21  others as a consideration making it somewhat less traditional.

22  Q     But it's not uncommon for a legislature when it sets down

23  to draw a new set of maps to start with the old set of maps,

24  correct?

25  A     That requires me to speculate about process.  Although I
```

1   do think it's a reasonable inference.

2   Q    Okay.  In any event, it was inference you made in Alabama

3   for 2021, correct?

4   A    That's right.

14:03:51 5   Q    So you mentioned the State Board of Education map a few

6   times today.  And you said that was informative for you in

7   drawing your illustrative plans?

8   A    I considered it.  I wouldn't put it high up on the list of

9   considerations, but at some point in the line drawing process I

14:04:26 10  became curious just how that second majority-black district was

11  formed.

12  Q    Uh-huh.

13  A    And so I looked to that map to give me a sense of

14  priorities that the state had in drawing it.

14:04:43 15  Q    Okay.  In trying to draw a congressional map in

16  understanding the state's priorities, do you think the way the

17  state drew its 2021 congressional map would be a more

18  informative source, or the way it drew its 2021, eight-member

19  State Board of Education map?

14:05:00 20  A    I treated them both as highly informative.

21  Q    Okay.  Do you think one would be more informative than the

22  other?

23  A    That's hard to say.  I mean, we are talking about a

24  congressional plan, but if the question that you're seeking to

14:05:20 25  answer is how to make a decision that is not present in the

1   congressional plan, then I think you would find the board of

2   education plan to be more informative.

3   Q    Okay.  Do you know when the State Board of Education map

4   in Alabama first featured a split in Mobile County?

14:05:44 5   A    In other words, do I know what it looked like in 2011?  Is

6   that the substance of the question?

7   Q    Yes.

8   A    I don't actually know that.

9   Q    I am going to show you Defendants' Exhibit 26.

14:06:13 10       So this is defense Exhibit 26.  I will represent to you

11   that this is the State Board of Education map that was drawn

12   after the 2000 census?

13   A    Right.

14   Q    Do you see here Mobile County is not divided up in this

14:06:28 15   map, correct?

16   A    I thought you were just asking about the 2011 plan, but

17   this one is 20 years old, just to be clear, yes?

18   Q    Yes.  And I'll -- I am going to move from this to the '21

19   map and bring us all the way to the present.

14:06:45 20   A    Understood.

21   Q    So you see Mobile County is not split.  Is that fair?

22   A    That is fair.

23   Q    And it's in a district with Baldwin County and I believe

24   that's Escambia?

14:06:58 25   A    I accept that.

1  Q     We have got District 5 that covers a great portion of the

2  Black Belt; is that correct?

3  A     It is correct.

4  Q     Okay.  And 2011, Alabama would still have been subject to

14:07:19 5  Section 5 of the Voting Rights Act, correct?

6  A     Certainly true.

7  Q     Okay.  So before enforcing a new State Board of Education

8  map, Alabama would need to obtain preclearance of that map

9  either from the Department of Justice or from a federal

14:07:35 10  district court in Washington, D.C., correct?

11  A     Yes, that's my understanding.

12  Q     And that process typically required a covered jurisdiction

13  like Alabama to prove that its new districts did not result in

14  retrogression.

14:07:52 15        MR. NAIFEH:  Object here that this is calling for

16  legal conclusions.

17        JUDGE MARCUS:  What is it you are trying to get her to

18  tell us, whether it amounts to retrogression as a matter of law

19  under the Voting Rights Act?  If you are asking for that, that

14:08:06 20  calls for a legal conclusion and her expertise does not include

21  that.

22        MR. LACOUR:  I'm asking --

23        JUDGE MARCUS:  Let me finish, please.  If you are

24  asking something else, Mr. LaCour, please let me know what that

14:08:17 25  would be.

1          MR. LACOUR:  I was asking simply as historical matter

2     in 2011 if we wanted to -- if Alabama wanted a new map to take

3     effect, they would need to show the DOJ typically that this new

4     map would not have a retrogressive effect when compared to the

14:08:38  5     baseline old map.

6          JUDGE MARCUS:  If you are asking her to tell us what

7     would have had a clear justice as a matter of retrogression.

8          MR. LACOUR:  No, Your Honor, it's simply whether the

9     state --

14:08:54 10          JUDGE MARCUS:  It's probably me, but I am not getting

11     the question.

12          MR. LACOUR:  The question basically was to pass

13     preclearance, the state would typically need to satisfy either

14     the U.S. Department of Justice or the district court for the

14:09:11 15     District of Columbia that its new policy or its new map in this

16     instance was not retrogressive.

17          MR. NAIFEH:  That is a legal question and it's also

18     outside the purview of the court.

19          JUDGE MARCUS:  The objection is sustained.

14:09:30 20     BY MR. LACOUR:

21     Q    You did say earlier, Dr. Duchin, though, that Section 5

22     did apply to Alabama in 2011; is that right?

23     A    That's right.  The Shelby County decision was in 2013 as I

24     recall.

14:09:42 25     Q    I'd like to show you next Defendant's Exhibit 27.

1          This is a complaint that the state filed in the district
2    court for the District of Columbia in 2011 seeking preclearance
3    of its 2011 State Board of Education districts, as well as, I
4    believe, its congressional districts.
14:10:23 5          MR. NAIFEH:  Objection.  This is -- there's no
6    foundation that she's ever considered this document or for the
7    content that Mr. LaCour is describing.
8          JUDGE MARCUS:  Let me ask you:  Was that one of the
9    exhibits you objected to?  27?
14:10:37 10          MR. NAIFEH:  We don't have an objection to the exhibit
11    coming in, but I have an objection --
12          JUDGE MARCUS:  The reason I raised that --
13          MR. NAIFEH:  -- characterization of the exhibit on the
14    record without asking the question.
14:10:47 15          JUDGE MARCUS:  The reason I raised the question is I
16    understood that the Milligan plaintiffs objected to the 2011
17    plan, the complaint in Alabama, the holder on the grounds that
18    the documents from the litigation between the State of Alabama
19    and the DOJ were not relevant.  You are not interposing that
14:11:13 20    objection?
21          MR. NAIFEH:  Well, we -- I am -- I object to the
22    relevance unless he can lay a foundation for its relevance.  So
23    if he wants to lay a foundation for its relevance.
24          JUDGE MARCUS:  Can you tell me, Mr. LaCour, just
14:11:27 25    briefly what it is you want to do with this?

1              MR. LACOUR:  So we've heard from Dr. Duchin that she

2     found it persuasive that the State Board of Education map has

3     split Mobile in order to form a second majority-minority

4     district and that that might be some evidence that the

14:11:47 5     Legislature used that as or maybe needed to preserve a

6     community of interest, or as the -- otherwise, like generally

7     fine with splitting Mobile.  I think if you see the 2001 map we

8     were looking at earlier, or together, the 2011 when the census

9     was drawn -- when the census was complete, District 5 which was

14:12:17 10     heavily Black Belt lost a lot of population and then to avoid

11     retrogression, the least evidence suggests that to avoid

12     retrogression, that is why Mobile was split and added -- City

13     of Mobile was added to Section 5.  And --

14              JUDGE MARCUS:  Let me stop you at that point.  All of

14:12:43 15     that may be true.  But if we unpack it piece by piece, just ask

16     your question and see where we are going to go.

17         Just take it piece by piece if you want to get into this

18     and I can address each objection as you go along.

19              MR. LACOUR:  Sure.

14:13:00 20     BY MR. LACOUR:

21     Q    So, Dr. Duchin, you looked at the 2001 map with me a

22     moment ago for the State Board of Education.

23     A    Yes.

24     Q    And District 5 covered a large portion of the Black Belt;

14:13:14 25     is that correct?

```
 1   A     Yes.
 2   Q     Does it surprise you to learn between the 2000 census and
 3   2010 census that district lost a great deal of population when
 4   compared to other districts in the State Board of Education
 5   map?
 6   A     That would not particularly surprise me to learn.
 7   Q     And thus, if the state were to try to maintain a
 8   comparable black population within District 5, they would need
 9   to go somewhere to get that population, correct?
10   A     That's one way of putting it.
11   Q     Maybe not the most eloquent way of putting it.
12         Could that explain why District 5 thus was expanded into
13   Mobile city in the 2011 map for the State Board of Education?
14             MR. NAIFEH:  Object.  It calls for speculation.
15             JUDGE MARCUS:  Objection is sustained.
16   BY MR. LACOUR:
17   Q     Very well.
18             JUDGE MARCUS:  So you understand it, Mr. LaCour, you
19   are asking Dr. Duchin to tell us to the extent she knows why it
20   is that the state redrew the boundary lines the way they did
21   between '01 and '11.  And I'm not sure that you have laid any
22   foundation that she has any knowledge of doing that.  The
23   objection is sustained.  Let's move on.
24             MR. LACOUR:  Absolutely.
25   BY MR. LACOUR:
```

1  Q    Okay.  So we are getting close to the end, Dr. Duchin.  I

2  appreciate your patience with me today.

3       Returning to something you said near the beginning.  You

4  talked about how you used your -- the algorithm and algorithmic

14:15:15  5  computer system to generate a large number of maps.

6  A    Yes.

7  Q    And you had certain constraints put in on the front end

8  when you started generating those maps.  And I believe you said

9  minimum population deviation, I think, was it plus or minus

14:15:34 10  1 percent?

11  A    Yes.

12  Q    And contiguity was baked in, as well, correct?

13  A    Correct.  The algorithm always enforces contiguity at the

14  VTD level and the population deviation threshold can be

14:15:52 15  specified by the user.

16  Q    Okay.  What other constraints did you program in at the

17  outset before you started generating maps?

18  A    The only other constraints -- okay.  So I doubt that you

19  want to hear specifics, but if you do, I'm happy to expound on

14:16:15 20  any of this, so let me know.

21       The algorithm in general has a strong preference for

22  compactness that's, as you said, baked in.  It doesn't have to

23  be set by the user.  The way that districts are formed, it's

24  done in a manner that generally strongly favors compactness,

14:16:34 25  particularly by the cut edges definition that I described

```
 1   earlier.
 2         The only other constraint that was added in that early
 3   algorithmic -- in fact, not a constraint, but an algorithmic
 4   preference, was to prefer plans in which there would be a
14:16:54  5   second majority-minority district.  And I can explain how that
 6   was done, if you would like to hear.
 7   Q    That would be great.
 8   A    Sure.  So if you look at the BVAP in all seven districts
 9   of a plan, we used what's called an objective function.  In
14:17:13 10  other words, a function that sets a goal.  And that function
11   credited a point to a plan with a majority-minority district
12   and then took the BVAP in the second district, second highest
13   BVAP, and added it to that.  So that, for example, a plan with
14   one district at 52 percent and a second at 47 percent would get
14:17:39 15  a 1.47 score.
16         Am I making sense so far?
17   Q    As much sense as you will make to me.
18   A    Thanks for saying.  I appreciate that.
19         So -- and then the way the algorithm is what's called a
14:17:58 20  mark-off chain, and it randomly proposes a new district
21   configuration and then flips what you can think of as a
22   weighted coin, and so the probability of acceptance was higher
23   if that score was greater.  And in that way, an algorithm like
24   that can be shown -- there's -- my lab has published papers on
14:18:16 25  this topic.  An algorithm like that can be shown to do a good
```

1  job at finding plans that are worthy of consideration in

2  *Gingles I* direction.

3  Q    Okay.  But you did not run the algorithm without that

4  strong preference for two majority-black districts, then, did

14:18:40 5  you?

6  A    I did, in fact.

7  Q    Okay.  How many maps were generated when you did that?

8  A    In fact, I have a publication where I do that in Alabama.

9  And in that paper, we generated 2 million districting plans for

14:18:59 10  Alabama, which I think we'll agree is quite a few.  And we

11  found some with one majority-black district, but never found a

12  second with a majority-black district in 2 million attempts.

13  But, again, that's without taking race into account in any way

14  in the generation process.

14:19:19 15  Q    Okay.  So if you programmed into the algorithm traditional

16  districting criteria that did not include race, and you

17  generate 2 million maps, not one of them would have two

18  majority-black districts in it?

19  A    Well, I have to say that I regard minority opportunity to

14:19:42 20  elect as an important traditional principle.  So I don't know

21  of a way to talk about the traditional principles that is truly

22  race blind.

23  Q    Would -- I think you -- would you characterize a map,

24  then, that -- assuming for a second that principle of

14:20:10 25  avoiding -- put it as minority vote dilution or creating

```
     1  minority opportunity, how would you state the principle?  I
     2  want to make sure I'm stating ate as you would.
     3  A    Minority opportunity to elect, I have called it, or
     4  minority electoral opportunity.
14:20:27 5 Q    Okay.  So if we remove that sort of more race focused
     6  minority opportunity to elect factor from the process and you
     7  run your 2 million maps, if you were to get a map that had two
     8  majority-minority districts that was manmade, that would
     9  suggest as an extreme outlier, correct, if it was purporting to
14:21:00 10 apply the same traditional race blind districting principles?
    11  A    Just -- as someone who uses that term professionally quite
    12  a bit, I think that's a misuse of the term.
    13  Q    How so?
    14  A    So the term extreme outlier implies a probability
14:21:21 15 distribution in which you're in the tails.  If -- I don't
    16  understand any way to construct a probability distribution that
    17  reflects the traditional principles and is race blind.  As I've
    18  said, I think it's part and parcel, in fact, of the
    19  nonnegotiable federal level principles.  And so I don't know of
14:21:42 20 a way to talk about the traditional principles as a package
    21  that is race blind.
    22  Q    Okay.  So you offered no opinion in -- I'm sorry.  Please
    23  finish if --
    24  A    Well, I only was going to say that I don't mean to be
14:21:57 25 resisting the question.  I am trying to characterize it in
```

          1   language I am comfortable with.

          2   Q    Yeah.  This is helpful.

          3        So you don't offer any opinion, then, in this case as to

          4   whether you could get -- whether it's possible to draw two

14:22:14  5   majority-minority districts in Alabama that respect traditional

          6   districting criteria in a race blind way?

          7   A    It is certainly --

          8             MR. NAIFEH:  Objection.  That mischaracterizes what

          9   she said.

14:22:31 10             JUDGE MARCUS:  Let's finish the question.  Before you

         11   answer, Dr. Duchin, give us a chance.  I am not sure I heard

         12   the entire question.  The objection came in at the tail end of

         13   the question.  Let's ask it crisply and then we will hear the

         14   objection.

14:22:48 15             MR. LACOUR:  Thank you, Your Honor.

         16   BY MR. LACOUR:

         17   Q    So Dr. Duchin, you said before that you don't really know

         18   how to take into account traditional districting criteria

         19   without also including that more race focused criteria of

14:23:03 20   ensuring minority representation, correct?

         21   A    I do know how to run algorithms that are race blind, but I

         22   don't know how to think of those as answering to the

         23   traditional principles.  They equally -- just to illustrate, I

         24   can also run algorithms that don't equalize populations and let

14:23:25 25   some districts get ten times as big as others.  But then I

          1    think we've departed from the traditional principles.

          2    Q    Okay.  So you offer no opinion, then, in this case,

          3    though, as to whether it's possible to draw according to all

          4    traditional redistricting criteria minus that one -- the race

14:23:48  5    focus criteria of two majority-black districts in the state of

          6    Alabama?

          7    A    That question I can certainly answer.

          8         It is possible, because the world of possibility includes

          9    my demonstrative maps, which could be arrived at through a

14:24:07 10    random process.  So it is certainly possible.

         11    Q    Okay.  But when you applied a random process in that study

         12    you referenced earlier and you drew 2 million maps, not one of

         13    them came back looking anything like one of the four

         14    illustrative maps, at least when it comes to Black Voting Age

14:24:30 15    Population in two districts?

         16    A    Well, I can't answer whether one of them had a

         17    majority-black district and a second that was 49.999, in which

         18    case it could closely resemble one of the ones that I drew.

         19    But I can say that my understanding is that race consciousness

14:24:51 20    is expressly permitted in order to achieve minority electoral

         21    opportunity, and in particular, in order to draw majority-black

         22    districts, stands to reason that one must consider race.  And I

         23    think the study that I referenced showing that it is hard to

         24    draw two majority-black districts by accident shows the

14:25:15 25    importance of doing so on purpose.

```
 1  Q    So -- okay.  Sorry.  One moment, please.  Are you familiar
 2  with Dr. Imai -- I'm -- try to say his first name -- I know
 3  I'll get it wrong.  Dr. Kosuke Imai?
 4           THE WITNESS:  It's Kosuke and certainly his -- he and
 5  I have talked for many years about the development -- or for
 6  districting algorithms.
 7  BY MR. LACOUR:
 8  Q    Okay.  He also engages in extreme outlier analysis,
 9  correct?
10  A    He does.
11           MR. NAIFEH:  I am going to object.  This is outside
12  the scope of direct and outside the scope of her opinions in
13  this case.
14           JUDGE MARCUS:  Are you asking her to comment on
15  Dr. Imai's opinion?
16           MR. LACOUR:  Your Honor, she said a moment ago that
17  she would reject the --
18           JUDGE MARCUS:  I'm asking you whether you are asking
19  her to comment about Dr. Imai's opinions.
20           MR. LACOUR:  Not to question his opinions, but to see
21  if her -- his opinions might affect her opinion of what is
22  possible when it comes to drawing majority-black districts in
23  Alabama.
24           JUDGE MARCUS:  You might ask if she is familiar with
25  his opinion in this case.
```

14:25:50   (line 5)
14:26:02   (line 10)
14:26:13   (line 15)
14:26:23   (line 20)
14:26:44   (line 25)

```
 1  BY MR. LACOUR:
 2  Q    Dr. Duchin, you are familiar with Dr. Imai's opinions in
 3  this case?
 4  A    Absolutely not.  In fact, I only very recently learned
 5  that he was a witness in this case at all.
 6  Q    Okay.  Would it surprise you if I told you that he drew
 7  30,000 sample maps?
 8         MR. NAIFEH:  Objection.
 9         JUDGE MARCUS:  Let him finish the question,
10  Mr. Naifeh.  Please.
11  BY MR. LACOUR:
12  Q    Would it surprise you if I told you that he ran an
13  algorithm that produced 30,000 sample congressional maps in the
14  state that adhered to certain traditional districting criteria,
15  including incumbency which I know your maps did not, and that
16  of the 30,000 maps, not one of them came back with two
17  majority-black districts?
18         JUDGE MARCUS:  The objection is sustained.
19         MR. LACOUR:  Okay.  Let me just have one moment to
20  confer with my colleagues.
21         JUDGE MARCUS:  Sure.  Take your time.
22      (Mr. LaCour confers with co-counsel.)
23  BY MR. LACOUR:
24  Q    Two quick final questions, and then I can let you go.
25         So if you were to learn that Alabama split Mobile County
```

The timestamps in the left margin are: 14:26:54 (line 5), 14:27:14 (line 10), 14:27:31 (line 15), 14:27:57 (line 20), 14:28:24 (line 25).

1  and State Board of Education plan in order to comply with

2  Section 5 would that affect how instructive the State Board of

3  Education plan's current construction might be in how you

4  were -- design draw your second majority-black district for

14:28:48  5  Congress?

6  A    I think it would not affect my feeling that it's quite

7  informative, and if I could expand on that, I would say that

8  would be the exact kind of decision juncture that would be most

9  informative for me.  That is if in order to increase the black

14:29:11 10  population in the district, they found themselves with a choice

11  to make about what to split, their choice about how to do that

12  would then be helpful for me in understanding something about

13  their priorities.

14  Q    Okay.  Then -- all right.  I think that is all I have got.

14:29:36 15  Thank you for your patience and for your time today.

16  A    Thank you so much.

17           JUDGE MARCUS:  All right.  Thank you.  You have some

18  redirect, counsel?  How long would that be?  Because I wanted

19  to -- we have gone about an hour and a half and I want to make

14:29:48 20  sure I give our court reporter a break.

21           MR. NAIFEH:  I think now is -- we do have some

22  redirect.  I think now is a good time for a break and it should

23  be very --

24           JUDGE MARCUS:  Give me some reference rough sense of

14:30:00 25  timing on redirect.

```
 1              MR. NAIFEH:  I think 20 minutes.

 2              JUDGE MARCUS:  And then the next witness for the

 3    plaintiffs will be?

 4              MR. NAIFEH:  Dr. Palmer for the Caster plaintiffs.

14:30:13  5     JUDGE MARCUS:  All right.  Thank you.  We will take a

 6    15-minute break.  That will take you to about a quarter to 3:00

 7    Central Standard Time, a quarter to 4:00 Eastern Time.

 8         Thank you.

 9              (Recess.)

14:45:43 10     JUDGE MARCUS:  I think we are all assembled.  I wanted

11    to make sure Judge Manasco, Judge Moorer, ready to proceed?

12              JUDGE MOORER:  I am.

13              JUDGE MARCUS:  Thank you both.  Mr. LaCour,

14    Mr. Naifeh, are you ready to proceed with the balance of the

14:45:59 15   examination of Dr. Duchin?

16              MR. NAIFEH:  Yes, Your Honor.

17              JUDGE MARCUS:  Mr. LaCour, are you ready?

18              MR. LACOUR:  Yes, Your Honor.

19              JUDGE MARCUS:  You may proceed with your redirect.

14:46:09 20                   REDIRECT EXAMINATION

21    BY MR. NAIFEH:

22    Q    Dr. Duchin, Mr. Ang, can you bring up Milligan Exhibit 28?

23    I want to refer you back to the redistricting guidelines from

24    the reapportionment committee.  Is it your understanding that

14:46:29 25   these guidelines cover the State Board of Education?
```

```
 1   A      Yes.  That's definitely my understanding.
 2   Q      And I refer you to paragraph C.
 3   A      Thank you.  That is made explicit there in paragraph C.
 4   Q      Okay.  And do the redistricting principles prioritize
14:46:53 5   compliance with the Voting Rights Act in your understanding?
 6   A      Yes.  I see it mentioned here on the first page.  In
 7   Section F.
 8   Q      And, in fact, that comes right after one person one vote,
 9   isn't that correct?
14:47:06 10  A      That's right.  As I characterized it, earlier I think
11   population balance and minority opportunity to elect/equal
12   protection are the only criteria that are discussed on the
13   first page.
14   Q      And Mr. Ang, can you go to the next page?
14:47:32 15         In looking at paragraph j(iii) at the bottom of the page,
16   does the redistricting guidelines distinguish what counts as a
17   community of interest for purposes of the board of education
18   plan as opposed to any other type of plan the committee right
19   be drawing?
14:47:53 20  A      They do not.  And my reading is that they apply verbatim
21   and with equal force to congressional plans and to the State
22   Board of Education.
23         MR. NAIFEH:  Thank you, Mr. Ang.  And could you next
24   pull up Caster Exhibit 1 page 19?  And this is an exhibit in
14:48:19 25  the Caster case.  I am happy to move it into evidence in this
```

```
 1  case if the Court thinks it's necessary.

 2          JUDGE MARCUS:  I think it has already been received.

 3  I may be mistaken about that.

 4  BY MR. NAIFEH:

 5  Q    I just really want to use it as a demonstrative.

 6          JUDGE MARCUS:  Why don't you mark it as Plaintiffs'

 7  Exhibit -- Plaintiff Milligan Exhibit 1 for identification.

 8          MR. NAIFEH:  And I -- thank you.  Plaintiffs' --

 9  marked as Plaintiffs' Exhibit 1 for purposes of identification.

10      And Mr. Ang, can you zoom in on the map?

11  BY MR. NAIFEH:

12  Q    And this is the State Board of Education map, I believe,

13  Mr. LaCour showed you this a moment ago or a version of this.

14  In this plan is Jefferson County split?

15  A    Yes.  I can see that Jefferson County is split and if I'm

16  reading the colors correctly, it touches three districts.

17  Q    Thank you, Mr. Ang.

18          MR. LACOUR:  For the record, I showed a different

19  version of the map -- sorry to interject -- but I believe I

20  showed the 2001 version.  This I believe is the 2021.

21          JUDGE MARCUS:  Yes, I think that's right.  Just so

22  that we're clear, this is the '21 version adopted by the state

23  Legislature for the BOE.

24          MR. NAIFEH:  Yes, Your Honor, that is what this.

25          JUDGE MARCUS:  All right.
```

14:48:31 — line 5
14:48:50 — line 10
14:49:13 — line 15
14:49:32 — line 20
14:49:50 — line 25

1              MR. NAIFEH:  Apologize.

2              JUDGE MARCUS:   I just want to make sure we are zeroing

3    in on the right map at the right time.

4              MR. NAIFEH:  Thank you.  Thank you, Mr. Ang.  You can

14:50:04 5    take it down.

6    BY MR. NAIFEH:

7    Q    Mr. LaCour asked you about communities of interest and

8    which ones you considered.  You mentioned the Black Belt and in

9    the course of urban areas.  Did you also consider counties and

14:50:21 10   municipalities to be communities of interest in some cases?

11   A    Yes.  It's fair to say -- well, certainly they're called

12   out as such in the guidelines.  But it's fair to say that I was

13   also considering those under separate cover as the conforming

14   to political boundaries.  And so in a way they get double

14:50:48 15   billing, both as communities of interest and as political

16   boundaries.

17   Q    Okay.  And Mr. LaCour asked you about avoiding incumbent

18   pairings and you testified that, one, that you believed it was

19   possible to create a plan with two majority-minority districts

14:51:09 20   that did not pair any incumbents, but at the cost of certain

21   other redistricting principles.  Is that -- am I stating that

22   accurately?

23   A    Yes, exactly.

24   Q    And you could draw a plan that avoided any incumbent

14:51:23 25   pairings and still contain two majority-minority districts

1  without sacrificing the principle of contiguity, isn't that

2  right?

3  A    That's correct.  I should have specified.

4  Q    Okay.  And Mr. LaCour also asked you about the preserving

14:51:44 5  the cores of prior districts, and he specifically asked you

6  about whether an 80 percent core retention threshold could be

7  met.  Are you aware of any threshold in the redistricting

8  guidelines about the extent to which cores should be preserved

9  in creating a new plan in Alabama?

14:52:03 10  A    First, just to correct the record, I think I was asked

11  whether an 80 percent threshold could be sought.  I don't think

12  I was asked whether it could be met, just to be perfectly

13  clear.  Either way, I have seen nothing of the kind in the law

14  or in the redistricting guidelines.

14:52:21 15  Q    And are you aware of any such threshold in any other as a

16  redistricting principle in any other source?

17  A    No.  Of the numerous states and localities that I have

18  worked in, I have never seen a prescribed percentage for core

19  retention.

14:52:39 20  Q    Thank you, Dr. Duchin.  And that's all of the redirect

21  that I have.

22        JUDGE MARCUS:  Mr. LaCour, anything further for

23  Dr. Duchin?

24        MR. LACOUR:  Yes.  I will keep it very brief.

14:52:54 25              RECROSS-EXAMINATION

BY MR. LACOUR:

Q    So talking about the thresholds and there's no threshold number in the guidelines, correct, when it comes to core retention?

14:53:05  A    I strongly think no.  We could pull it up, but I'm confident that there is no --

Q    You are correct about that, I believe, but --

Now, when you were talking about compactness scores and where you were making sure your CDs 1 and 2 came in, you said 14:53:24 that you looked at some of the least compact in terms of the enacted map as maybe not as a safe harbor, but at least as some guide for where you were pegging your scores for CDs 1 and 2, correct?

A    I think the right way to say it would be since as I 14:53:46 mentioned every state has a different state geography, I did look at those minimum scores in the state's plan to get an idea of what might be called reasonable compactness in an Alabama context.

Q    Did you consider looking at the lowest core retention 14:54:04 score of any of Alabama's districts to get a sense of what might reasonably be considered to be core retention?

A    I did not because, as I said, I judged that even the minimum, you know, if -- any statistic connected to core retention in the state's enacted plan that I would not be able 14:54:28 to achieve corresponding statistics while creating a second

1  majority-black district.

2  Q    Okay.  And you don't know whether State Board of Education

3  plan -- let me rephrase that.

4       You don't know whether the current 2021 State Board of

14:54:46 5  Education plan's District 5 was drawn to include a community of

6  interest or rather to meet some other objective like preserving

7  the core of existing districts, do you?

8  A    I think we've established and I'm happy to repeat that I

9  don't know anything directly about any of the process or

14:55:08 10 conditions under which the plan was drawn.

11 Q    Okay.

12           MR. LACOUR:  That's all I have got.

13           JUDGE MARCUS:  All right.  Thank you again.  Any

14 re-redirect?

14:55:18 15          MR. NAIFEH:  No, Your Honor.

16           JUDGE MARCUS:  Any questions, Judge Manasco or Judge

17 Moorer?

18           JUDGE MANASCO:  None from me.

19           JUDGE MOORER:  None from me.

14:55:30 20          JUDGE MARCUS:  All right.  Thank you, Dr. Duchin.  And

21 you are excused.

22      And you may proceed with your next witness.  I take it

23 this will be someone that you're putting on, Ms. Khanna, for

24 Caster?

14:55:48 25          MS. KHANNA:  Caster plaintiffs are putting on the next

witness, Dr. Palmer, and I will defer to my colleague Lali
Madduri for that.  I think there is one -- just scheduling
matter we wanted to raise, Mr. Ross, with Mr. Ross on the rest
of the afternoon before we get there.

14:56:04      JUDGE MARCUS:  Sure.

MR. ROSS:  Yes, Your Honor.  Sorry.  Your Honor, the
plaintiffs -- Caster and Milligan plaintiffs would like to put
on Mr. Bryan after Dr. Palmer finishes with the understanding
that, you know, Mr. Bryan will take most of a day.  We just
14:56:26  wanted to make sure that we had as much time as possible with
him.  Dr. Liu is available tomorrow and Monday.  And so we
just -- given the time it took to finish the -- Dr. Duchin's
testimony we think it's better to try to put Mr. Bryan on now.

JUDGE MARCUS:  Okay.  So you don't want to call Palmer
14:56:47  now, you want to give -- who is calling Bryan?

MR. ROSS:  I'm sorry.  Judge Marcus, just to be clear,
we would like to call Dr. Palmer now because we believe it will
be short, but we would like Mr. Bryan to go on afterwards.

JUDGE MARCUS:  Does that work for the State?

14:57:05  MR. DAVIS:  Whatever.  We're ready for Dr. Liu which
was what was represented would go first next.  We are set up
for that.  If that's a problem for plaintiffs, we will do it --
I frankly think it unlikely we would finish two more experts
today before Mr. Bryan anyway, so yeah, that's whatever.

14:57:24  JUDGE MARCUS:  I think what he is simply asking is he

```
 1   wants to make sure you have enough time with Mr. Bryan.
 2              MR. DAVIS:  I appreciate that.
 3              JUDGE MARCUS:  You have got the whole day tomorrow.
 4   We have set that for you.
 5              MR. DAVIS:  Yeah.  Right.  We are going to have enough
 6   time whether Dr. Liu goes next or whether Mr. Bryan goes next.
 7   I don't see the big deal, but we can change the order if we
 8   need to.
 9              JUDGE MARCUS:  Okay.  So if I have this right,
10   Mr. Ross, you want to put on Palmer first, finish with Palmer,
11   and then turn to Bryan.  Do I have that right?
12              MR. ROSS:  Yes, Your Honor.
13              JUDGE MARCUS:  And Bryan would be called in
14   Mr. Davis's case in chief, rather than by you as a hostile
15   witness.  Do I have that right?
16              MR. ROSS:  Yes, Your Honor.  Yes, Your Honor.
17              JUDGE MARCUS:  Okay.  So let's proceed with
18   Dr. Palmer.  And then we will see how much time we have left,
19   Mr. Davis, to proceed accordingly.
20         Dr. Palmer, would you raise your right hand please.
21                       MAXWELL PALMER,
22   having been first duly sworn, was examined and testified as
23   follows:
24              JUDGE MARCUS:  Thank you.  If you would be kind enough
25   to state your name for the record.
```

```
 1              THE WITNESS:  Maxwell Palmer.
 2              JUDGE MARCUS:  Thank you.  And counsel, you may
 3    proceed with your direct examination.
 4                        DIRECT EXAMINATION
 5    BY MS. MADDURI:
 6    Q     Thank you, Your Honor.  Good afternoon, Dr. Palmer.
 7    A     Good afternoon.
 8    Q     You've been retained as an expert for the Caster
 9    plaintiffs in this case; is that correct?
10    A     Yes.
11    Q     And you have prepared one expert report?
12    A     Yes.
13    Q     Let's briefly pull that up.  It's Plaintiffs' -- Caster
14    Plaintiffs' Exhibit 79.
15          Dr. Palmer, can you identify this document as your report?
16    A     Yes.  This is my report for this case.
17    Q     Okay.  And we can pull it down.
18          Do you have a copy of your report with you?
19    A     I do.
20    Q     Is your CV included in your report?
21    A     Yes.
22    Q     And is your CV a complete and accurate summary of your
23    background and professional experience?
24    A     It is.
25    Q     I will briefly ask you a few questions about your
```

background and expertise.  Can you first summarize your

educational background?

A    I received my bachelor's degree in mathematics and

government and legal studies from Bowdoin College in Maine, and

my Ph.D. in political science from Harvard University.

Q    Where are you currently employed?

A    I'm currently an associate professor of political science

at Boston University.

Q    Are you tenured?

A    Yes.

Q    What classes do you teach?

A    I teach courses on American politics and political

methodology, including introduction to American politics,

Congress, American political institutions, data science, and

formal theory.

Q    And what are your principle areas of research?

A    My research mostly focuses on American political

institutions, Congress, redistricting, and local and urban

politics.

Q    Have you been accepted as an expert witness in cases

involving redistricting before?

A    Yes.

Q    Have you ever been rejected as an expert by any court?

A    No.

Q    Is the list of cases in which you have served as an expert

1    included in your report on pages 1 and 2?

2    A     Yes.

3    Q     And in approximately how many of those cases have you

4    provided a racially polarized voting analysis?

15:01:09 5    A     In several of them, including *Bethune Hill vs. Virginia,*

6    *Thomas v. Bryant, Chestnut v. Merrill*, *Dwight v. Raffensperger,*

7    *Bruni v. Hughs*, *Texas Alliance for Retired Americans v. Hughs*.

8          I believe that's all of them.

9    Q     Have courts previously credited and relied on your

15:01:30 10   analyses?

11   A     Yes.

12   Q     And I think you listed this case, but just to confirm.

13   Have you previously served as an expert in the state of

14   Alabama?

15:01:40 15   A     Yes.  In *Chestnut v. Merrill*.

16   Q     Did the Court accept you as an expert in that case?

17   A     Yes.

18   Q     And what kind of analysis did you conduct there?

19   A     I performed racially polarized voting analyses for parts

15:01:57 20   of Alabama, as well as analyzed the performance of some

21   illustrative maps in that case.

22          MS. MADDURI:  Your Honor, at this time Caster

23   plaintiffs would like to proffer Dr. Palmer as an expert in

24   redistricting and data analysis.

15:02:15 25          JUDGE MARCUS:  Redistricting and data analysis.  Do I

1  have that right?

2           MS. MADDURI:  Yes, Your Honor.

3           JUDGE MARCUS:  Is there any challenge or need to voir

4  dire, Mr. Wilson?

15:02:28  5           MR. WILSON:  There is not, Your Honor.

6           JUDGE MARCUS:  All right.  We will qualify and receive

7  Dr. Palmer as an expert in redistricting and in data analysis.

8  Thank you.  You may proceed.

9           MS. MADDURI:  Thank you, Your Honor.

15:02:41 10  BY MS. MADDURI:

11  Q    Dr. Palmer, let's now discuss the work that you performed

12  in this case.

13           First, what were you asked to do?

14  A    I was asked to offer an expert opinion on the extent to

15:02:53 15  which voting is racially polarized in parts of Alabama, and I

16  was also asked to analyze the performance of the

17  majority-minority districts in the plaintiffs' illustrative

18  maps.

19  Q    At a high level, what did you conclude with regard to

15:03:09 20  whether there is racially polarized voting in the areas of

21  Alabama that you examined?

22  A    I find very strong evidence of racially polarized voting

23  across the focus area which I defined to be the first, second,

24  third, sixth and seventh congressional districts under the

15:03:27 25  newly enacted map.  I find that black and white voters

 1   consistently support different candidates.

 2       I also find that voting -- strong evidence of racially

 3   polarized voting within each of those five individual

 4   congressional districts, as well.

15:03:43  5   Q    Okay.  After determining that there are high levels of

 6   racially polarized voting in the areas you studied, what did

 7   you conclude about whether black voters' preferred candidates

 8   are able to win elections in those areas?

 9   A    I found that black preferred candidates are generally

15:04:03 10   unable to win elections in the focus area and in four of the

11   five congressional districts.

12   Q    Okay.  And we'll discuss that all in detail first.

13       What did you at a high level conclude about the

14   performance of plaintiffs' demonstrative majority-minority

15:04:22 15   districts in the Caster plaintiffs' illustrative plans?

16   A    I find that black preferred candidates are able to win

17   elections in both of the majority-minority districts in all the

18   maps I analyzed.

19   Q    Okay.  Let's begin now and start with the racially

15:04:39 20   polarized voting analysis.

21       First, what is racially polarized voting as you understand

22   it?

23   A    Racially polarized voting is when voters of different

24   racial or ethnic groups prefer different candidates.

15:04:55 25   Q    Is there -- is it always the case that each racial group

1   you examine has a preferred candidate?

2   A    No.  Sometimes a group is split between two or more

3   candidates and it is not some clear preferred candidate for

4   that group.

15:05:14 5   Q    In past cases, have you conducted a racially polarized

6   voting analysis and found that there was no racially polarized

7   voting?

8   A    Yes.  For example, in *Bethune Hill vs. Virginia,* I looked

9   at racially polarized voting across about a dozen districts for

15:05:33 10   the House of Delegates there.  And I found in some districts

11   there was racially polarized voting and in others districts

12   there was not.

13   Q    Okay.  At a high level, how do you go about examining

14   racially polarized voting?

15:05:45 15   A    So I use an analytical approach called ecological

16   inference, which seeks to estimate the percentage of voters

17   from each racial or ethnic group that I look at that votes for

18   each candidate for each election that I study.

19        And what this ultimately yields is an estimate for each

15:06:11 20   ethnic group or racial group supporting each candidate.  And

21   then I can look to see if large majorities of the members of

22   those groups are supporting the same candidate or not.  For

23   example, we might find that 80 or 90 percent of the voters of a

24   group are also voting the same candidate, in which case I can

15:06:31 25   identify a candidate of choice for that group.  Or you might

1    find that that group is roughly split between two candidates,

2    say 40, 50 percent for each candidate and then there's not a

3    clear candidate of choice for that group.

4         And so I first do that for each group that I analyze and

15:06:45 5    then I look to see if the voters are -- of each group have the

6    same candidate of choice, assuming they have one or when they

7    have one, or if they have different candidates of choice.  When

8    I find that each group has a candidate of choice and they are

9    different, that's evidence of racially polarized voting.

15:07:02 10   Q    Okay.  And I think you listed these already, but what were

11   the geographic areas of Alabama that you examined for your

12   analysis?

13   A    I defined the focus area as the first, second, third

14   sixth, and seventh congressional districts under the newly

15:07:18 15   enacted map.  And I analyzed that focus area as a whole and

16   each of those individual districts.

17   Q    What is the reasoning behind the districts that form what

18   you refer to as the focus area?

19   A    I define that set of districts as a focus area because

15:07:37 20   that was where I was told the new majority-minority districts

21   under the illustrative maps would be drawn from.

22   Q    And what elections did you examine in the course of your

23   analysis?

24   A    I looked at statewide general elections from 2012 through

15:07:56 25   2020, as well as the special election for U.S. Senate in 2017.

1    Q      Did you also look at some elections from 2012 and 2014?

2    A      Right.  Yes, that's right.  I looked at 2012 and 2014

3    elections, as well.

4    Q      Okay.  And you mentioned ecological inference as part of

15:08:17  5    your racially polarized voting analysis.  If I refer to that as

6    EI, will you understand what I mean?

7    A      Yes.

8    Q      Okay.  So what is EI?

9    A      So EI is a technique to estimate voting patterns from

15:08:33 10    aggregate data.  And the challenge that we have is that because

11    of the secret ballot we don't get to see how any individual

12    votes.  We only get to see aggregate data, by which I mean that

13    at the individual county or precinct level we can see the total

14    votes cast for each candidate at some unit of geography and we

15:08:55 15    can also see how many voters there are in that area by race or

16    how many people live in that area by race, as well, using

17    either the voter file or different types of census data.

18          So we don't get the individual level data, just the

19    aggregate.  And what ecological inference does is it's an

15:09:15 20    algorithm that tries to estimate the percentages of each group

21    supporting each candidate by looking at patterns across many

22    different counties or precincts.

23    Q      Would you say that EI is the best available method for

24    assessing racially polarized voting?

15:09:32 25    A      Yes.  There's a few different methods.  My understanding

```
 1  is that ecological inference is the one currently preferred by
 2  courts.
 3  Q    Okay.  So it's your understanding that courts regularly
 4  rely on EI analyses to determine whether there is racially
 5  polarized voting in a particular geographic area?
 6  A    Yes.
 7  Q    Is EI also regularly used by scholars and experts to
 8  examine racially polarized voting?
 9  A    Yes, it's widely used.
10  Q    What kind of results does an ecological inference analysis
11  produce?
12  A    The ultimate results that I present in my report are
13  estimates for each election and just to be clear, we do the
14  same ecological inference analysis separately for every
15  election and geography that I analyze so it's many different
16  runs of this model.  And for each one, we get an estimate for
17  each group of the percent of that group voting for each
18  candidate, as well as a confidence interval, a measure of
19  uncertainty about the estimate.
20  Q    Okay.  And what are the groups that you examined here?
21  A    I look at three demographic groups.  Non-Hispanic black,
22  non-Hispanic white and then others, which include Hispanic,
23  Asian, Native Americans and everybody else.
24  Q    Roughly what percentage of voters fall into that other
25  category?
```

15:09:49 (line 5)
15:10:05 (line 10)
15:10:26 (line 15)
15:10:45 (line 20)
15:11:06 (line 25)

```
 1   A     I think about 5 percent or a little less.
 2   Q     Okay.  And you performed at three different racially
 3   polarized voting analyses in your report, right?
 4   A     Yes.
 5   Q     What were they?
 6   A     I -- -- I looked at precinct level election data for 2016,
 7   '17, '18, and '20 using precinct level election results and
 8   Citizen Voting Age Population data to measure demographics from
 9   the U.S. Census Bureau.
10         I then do a second analysis just for 2020, where I have
11   some data on voter turnout by race.  And then for 2012 and 2014
12   I didn't have precinct level data available, and so I do a
13   county level analysis there, using county level election
14   results and county level data on voter registration by race
15   provided by the state.
16   Q     And are the results of your three analyses consistent with
17   each other?
18   A     Yes.  Across every election and all three analyses I find
19   strong evidence of racially polarized voting.
20   Q     Okay.  Let's first discuss that first precinct analysis
21   that you described for 2016 to 2020.
22         Overall, what did you find for that analysis?
23   A     So I find strong levels of racially polarized voting in
24   the focus area as a whole across all 12 elections from 2012 to
25   2020 that I look at.  I find there's a clear black preferred
```

```
 1   candidate in every election.  I find that white voters also
 2   have a clear candidate of choice, which is the opponent of the
 3   black preferred candidate in each election.
 4       On average I find that black voters support their
 5   candidate of choice, about 92 percent of the vote.  And that
 6   white voters strongly oppose this candidate, only about
 7   15 percent of white voters support the black candidate of
 8   choice in each election.
 9   Q   Okay.  Let's now turn to -- turn to your report and look
10   at that analysis.
11       So let's call up Caster Plaintiffs' Exhibit 79, which is
12   your report.  And we will turn to Figure 3 on page 6.
13       Dr. Palmer, what is does this figure show?
14   A   This figure presents the results of the racially polarized
15   voting analysis using counties and Citizen Voting Age
16   Population data for the focus area.
17       So each row of the figure represents a different election
18   as labeled on the left.  And then there's three key pieces of
19   information to take from each election on this thing.
20       First, if you look at the solid blue dot on the right,
21   that represents the average -- the estimated percent of black
22   voters voting for the black preferred candidate.  And we see
23   there it's relatively high, generally in the low 90 percent
24   range.
25       Behind each dot there's some little horizontal and
```

1    vertical lines and those represent the balance of the

2    confidence interval showing relatively precise estimates here.

3        Then on the left-hand side we see the open circles which

4    represent the percent of white voters voting for the black

15:14:43 5   preferred candidate, again with confidence intervals behind

6    them.  We see very low levels of support for the black

7    preferred candidate, generally in the teens.

8        And so that shows us the cohesion within each group, a

9    clear black preferred candidate and then a clear white

15:15:00 10  preferred candidate in opposition to that black one.  And then

11   the distance between them shows that high degree of

12   polarization.

13   Q    I want to clarify one thing.  I think you said that you

14   used county level data for this analysis, but I believe it's

15:15:21 15  precinct level analysis; is that right?

16   A    I apologize.  I have misspoke.  This is all precinct-level

17   data.

18   Q    Thanks.

19       And so just -- and in sum, what does Figure 3 tell us

15:15:36 20  about racially-polarized voting in these elections?

21   A    It shows that voting is highly polarized between black and

22   white voters and that this pattern is consistent across every

23   election that I analyze.

24   Q    Is there a part containing the precise numbers for the

15:15:52 25  election particularly within Figure 3?

1  A     Yes.  It's all located in Table 2 of my report.

2  Q     Okay.  Let's turn to Table 2, which is on page 12 of your

3  report.  And we are still on Caster plaintiffs' Exhibit 79.

4        This table is entitled ecological inference results --

15:16:11  5  estimated voted share of black preferred candidates -- precinct

6  level election data with Citizens Voting Age Population --

7  focus area.

8        What does this table show?

9  A    This table shows the results that I plotted that I graphed

15:16:28  10  in the figure that we just looked at.  These are the numbers

11  that come out of the ecological inference analysis.  And so,

12  again, each row is a separate election that I analyze, and then

13  we have three sets of numbers; first, for black voters, then

14  white voters, and then for the other category.

15:16:47  15       And within each set of numbers, you will see first a

16  percentage, and that's the estimate, the percent of that group

17  voting for the black preferred candidate.  And then in

18  parenthesis after that are the upper level bounds, the range of

19  the confidence interval.  So that represents the -- the

15:17:05  20  horizontal line that I plotted behind each figure we just

21  looked at.

22       So just as one example in the 2016 election for U.S.

23  President, I estimate that 90.8 percent of black voters voted

24  for the black preferred candidate with a confidence interval of

15:17:25  25  that estimate ranging from 89.5 too 92.1 percent.  And then for

```
 1   white voters in that same election, I estimate that
 2   10.3 percent of white voters voted for the black preferred with
 3   a confidence interval of 9.5 to 11.12 percent.
 4   Q    Did you run the same racially-polarized voting analysis on
15:17:45 5   a district-by-district basis?
 6   A    I did.
 7        JUDGE MARCUS:  That's our court reporter, Mr. Palmer.
 8   Take your time.  We want to make sure our court reporter gets
 9   it all accurately, and go slowly.  Thanks very much.
15:18:03 10        THE WITNESS:  Thank you.
11   BY MS. MADDURI:
12   Q    So what were the results of your analysis on a
13   district-by-district basis?
14   A    I find the same results at the individual district level,
15:18:23 15   a strong pattern of racially-polarized voting across every
16   election in every district.
17   Q    Okay.  Let's turn to Figure 5 on page 8 of your report,
18   which is, again, Plaintiffs' Exhibit 79.
19        This figure is entitled racially-polarized voting
15:18:42 20   estimates by race -- congressional districts.
21        What does this figure show?
22   A    This figure shows the results of my analysis in a slightly
23   different way.  I don't label each individual election here
24   just because I can't fit all the labels.  But each point, each
15:19:01 25   separate dot corresponds to one of the 12 estimates for each of
```

1   the elections that I look at.

2       The dark blue dot across the top represents the percentage

3   of black voters voting for the black preferred candidate.  And

4   what this shows is that across all five congressional

15:19:17 5   districts, there's a clear black-preferred candidate in every

6   election getting well more than 80 percent of the vote in each

7   contest.  And then the open circles along the bottom shows a

8   percentage of white voters voting for the black-preferred

9   candidate and showing that those levels of support are

15:19:37 10  generally very low, in some places, less than 10 percent, in

11  others, ranging into the 30 percent range.  And what we see is

12  polarization in every single election across all five

13  congressional districts.

14  Q    Does your report contain the precise numbers in this

15:20:01 15  figure?

16  A    Yes.  These are -- there's a separate table for each

17  congressional district.  Table 4 through Table 8.

18  Q    Okay.  And what conclusions did you draw based on your

19  2016 to 2020 precinct analysis?

15:20:20 20  A    I find strong evidence of racially-polarized voting in the

21  focus area as a whole and in each of the five congressional

22  districts.

23  Q    Okay.  Let's next talk about your second precinct level

24  analysis for 2020.  Why did you conduct that analysis?

15:20:39 25  A    I really did it as a check using a different data source

1    on my previous analysis.  So the precinct level analysis I just

2    discussed used Citizen Voting Age Population data for each

3    precinct.

4        And an alternate data source would be to use the voter

15:21:04  5    file, which in Alabama includes the race of each individual

6    voter and look at the number of actual voters by race who

7    turned out to vote.

8        I did not have the full voter file available to me as of

9    the election date, but the Redistricting Data Hub, which is a

15:21:23 10   public website that publishes a lot of useful data for

11   redistricting analyses put out data on precinct level voter

12   turnout by race from L2, which is a commercial data vendor.

13   And so I was able to do a second analysis this way, and the

14   advantage here is I don't have to account for turnout.  I'm

15:21:46 15   only looking at actual voter and not the whole precinct

16   population or Citizen Voting Age Population.

17   Q    And what did you find based on the second analysis?

18   A    I found very similar results with the exact same

19   conclusions, strong evidence of racially-polarized voting.  And

15:22:08 20   just be clear, I was only able to do this for the 2020

21   elections.  I didn't have that data for previous elections.

22   But in these two elections where I was able to do that

23   analysis, I find strong evidence of racially-polarized voting

24   in the focus area and in each of the five congressional

15:22:24 25   districts.

714

```
 1  Q    Are the exact details of that analysis contained in Table
 2  9 of your report?
 3  A    Yes.
 4  Q    And at a high level to confirm, is the methodology that
 5  you described that you used for the 2016 to 2020 precinct level
 6  analysis the same methodology you used for the second 2020 only
 7  analysis?
 8  A    Yes.  I still use ecological inference.  It's all still
 9  set up the same way, produces the same kind of results.  It's
10  just different data on the population within each precinct.
11  Q    Let's now turn to your county level analysis.  And why did
12  you do this?  Why did you do this analysis?
13  A    I wanted to look at a longer range of elections, but I did
14  not have precinct level data available for 2012 or 2014.
15  Q    Okay.  And you -- for the county level analysis, you
16  examined only the focus area as a whole and not each individual
17  congressional district; is that right?
18  A    Yes.  There aren't enough units.  There aren't enough
19  counties within each congressional district alone to do that
20  analysis.
21  Q    Okay.  Let's turn to Figure 4 on page 7 of your report,
22  which is Caster Plaintiffs' Exhibit 79.
23       What does this figure show?
24  A    This figure shows the results of the county level
25  analysis.  And it's exactly like Figure 2.  Each row is an
```

15:22:42 (line 5)
15:23:00 (line 10)
15:23:25 (line 15)
15:23:42 (line 20)
15:24:05 (line 25)

1    election.  The dark blue dots on the right show the percentage

2    of black voters voting for the black-preferred candidate, and

3    the open circle on the left show the percentage of white voters

4    voting for the black-preferred candidate.  One thing you can

15:24:23  5    notice here is that the confidence interval, those horizontal

6    lines behind each point are significantly wider because they

7    have much less data at the county level to work with than the

8    precinct level to work with.  However, the conclusions are the

9    same.  There is a clear black-preferred candidate in every

15:24:41 10    election, and white voters are strongly opposed to that

11    black-preferred candidate because there's a high level of

12    racially-polarized voting in every election here.

13    Q    Okay.  And just to confirm, at a high level of the

14    methodology that you previously described for the 2016 to 2020

15:25:01 15    precinct-level analysis, the same methodology that you used for

16    the county-level analysis?

17    A    Yes.

18    Q    And does your report contain the precise numbers that are

19    depicted in Figure 4?

15:25:18 20    A    Yes.  It's all in Table 3.

21    Q    Okay.  And to just close this county-level analysis off,

22    are the results consistent with your two precinct-level

23    analyses?

24    A    They are.  Across all three analyses, I find strong

15:25:39 25    evidence of racially-polarized voting.

```
 1  Q    Okay.  First, we can take down the figure.  Thanks.
 2       After you determined that the analyzed elections
 3  demonstrated the racially-polarized voting, what did you do
 4  next?
 5  A    I next looked at each election within the focus area and
 6  within each of the congressional districts to determine if the
 7  black-preferred candidate were able to win those elections.
 8  Q    Is this part of the analysis commonly referred to as
 9  Gingles III?
10  A    Yes.
11  Q    Okay.  How do you conduct this part of your analysis?
12  A    I look at the boundaries for the focus area for the
13  districts and look at all the precincts that fall within those
14  boundaries to identify the past election results that would
15  have occurred sort of within those boundaries, and I add up
16  those past election results.  I aggregate them up to the level
17  of the district or focus area.  So I am just using past
18  election results and adding up the number of votes within each
19  area.
20  Q    Okay.  Let's turn to Table 1 on page 12 of your report,
21  which is Exhibit 79.  The table is entitled, Election Results
22  in the Focus Area -- Vote Share of Black-Preferred Candidates.
23       What does this table show?
24  A    This shows the results of this analysis.  Each number in
25  the table corresponds to the vote share of the black-preferred
```

1    candidate in each election within each of the geographies

2    listed across the top of the table.  And this is of the

3    two-party vote.  So the other candidate would get 100 minus

4    each of these numbers.

15:27:34  5         So, for example, in 2016, U.S. President, the

6    black-preferred candidate received 39.5 percent of the vote in

7    the focus area.

8         And then the numbers to the right show the percentage the

9    black-preferred candidate received in each of the congressional

15:27:50 10   districts.

11   Q    Okay.  And just to be clear, when you mention the vote

12   share and the focus area, these are not actual vote shares

13   statewide that the candidates received in these elections,

14   right?

15:28:02 15  A    No.  These are not the statewide vote shares.  They're the

16   vote shares within these particular geographies.

17   Q    Okay.  And what did you find about whether black voters

18   were able to elect their preferred candidates in the focus area

19   as a whole?

15:28:17 20  A    Black voters are generally not able to elect their

21   preferred candidates in the focus area across these 12

22   elections.  The black-preferred candidate won only one.

23   Q    And what election did the black voters preferred candidate

24   win?

15:28:34 25  A    The 2017 special election for U.S. Senate.

```
 1  Q     And who were the candidates in that election?
 2  A     The black-preferred candidate was Doug Jones.  And the
 3  white-preferred candidate was Roy Moore.
 4  Q     What, if anything, do you know about Roy Moore?
 5  A     My understanding is that Roy Moore is a uniquely
 6  controversial figure in Alabama politics, that he was elected
 7  to the state Supreme Court, I believe twice, and then ran a
 8  very controversial campaign in 2017 for U.S. Senate where he
 9  was accused of sexual misconduct.
10  Q     Okay.  And did the black-preferred candidate win the 2017
11  election in all of the districts in the focus area?
12  A     No.  The black-preferred candidate in that election lost
13  in the First, Second, Third, and Sixth Congressional Districts.
14  And only won in the Seventh Congressional District.
15  Q     Okay.  What about for the other 11 elections?  How did the
16  black-preferred candidate perform in each individual district?
17  A     In the First, Second, Third, and Sixth Districts, the
18  black-preferred candidate lost all 12 elections.
19        And in the Seventh Congressional District, the
20  black-preferred candidate won all 12 elections.
21  Q     Is it your understanding that Congressional District 7 is
22  a majority-black district?
23  A     Yes.
24  Q     Is it also your understanding that the other districts 1,
25  2, 3, and 6 in the focus area are majority-white districts?
```

15:28:51 (line 5)
15:29:13 (line 10)
15:29:36 (line 15)
15:29:55 (line 20)
15:30:09 (line 25)

```
 1   A     Yes.

 2   Q     And we can take down the figure.

 3         Did you also examine which group's preferred candidate won

 4   in the eight elections that you analyzed for 2012 and 2014?

 5   A     I did.  Across the eight elections that I analyzed at the

 6   county level, and I could only look at this for the focus area,

 7   the black-preferred candidate won only once.

 8   Q     Okay.  And what can you tell us about the election where

 9   the black-preferred candidate was able to win?

10   A     The black-preferred candidate was only able to win the

11   2012 election for Chief Justice of the Supreme Court, where the

12   white-preferred candidate was again Roy Moore.

13   Q     What are your overall conclusions regarding whether

14   black-preferred candidates are able to win elections in the

15   focus area?

16   A     Black-preferred candidates are largely unable to win

17   elections in the focus area with the exception of the Seventh

18   Congressional District.

19   Q     Okay.  Earlier we briefly discussed your testimony in

20   Chestnut v. Merrill in 2019.  And I think you already confirmed

21   this, but in that case, you also examined racially-polarized

22   voting; is that right?

23   A     Yes.

24   Q     Okay.  Did you also look at some congressional elections

25   in that case?
```

15:30:31 (line 5)
15:30:50 (line 10)
15:31:11 (line 15)
15:31:25 (line 20)
15:31:39 (line 25)

```
 1  A     I did.

 2  Q     Which ones?

 3  A     I believe I looked at the 2018 congressional elections in

 4  the district, which were the old districts, you know, in use at

 5  the time for that case.

 6  Q     And would that have been for Congressional Districts 1, 2,

 7  and 3 that existed as they were in 2018?

 8  A     Yes.

 9  Q     What were the results of your racially-polarized voting

10  for those elections?

11  A     I found that in those congressional elections voting was

12  highly polarized.

13  Q     Okay.  And were the findings largely consistent with your

14  findings here?

15  A     Yes.

16  Q     And I think you confirmed that you found that the voting

17  was racially polarized.  Did you find that the black-preferred

18  candidate was defeated in the elections that you looked at?

19  A     In the First, Second, and Third Districts, yes.

20  Q     Okay.  Let's just briefly pull out Plaintiffs' Exhibit 83.

21  Do you recognize this document?

22  A     Yes.  This is my expert report from Chestnut v. Merrill.

23  Q     Okay.  Thank you.

24        Let's now turn to your analysis of the functionality of

25  the majority-minority districts in six of the Caster
```

Timestamps:
15:31:55 (line 5)
15:32:08 (line 10)
15:32:19 (line 15)
15:32:34 (line 20)
15:33:00 (line 25)

```
 1  Plaintiffs' illustrative maps.  What did your functionality
 2  analysis examine?
 3  A    I looked at the two majority-minority districts, which are
 4  always Districts Number 2 and Number 7 and the performance of
 5  the black-preferred candidate in those districts under those
 6  six maps.
 7  Q    How did you perform this analysis?
 8  A    I do this in the same way I do the performance analysis or
 9  the ability-to-win analysis that we just discussed.  I identify
10  the precinct that fall into each of these new districts or into
11  these illustrative districts and aggregate the election results
12  up to the district level and look at which candidate received
13  the most votes or calculate the percent of the votes received
14  by each candidate.
15  Q    And what you are your findings about whether
16  black-preferred candidates would be able to win in Plaintiffs'
17  illustrative majority-black districts?
18  A    I find that across the six maps I analyzed,
19  black-preferred candidates are able to win every election in
20  both the Second and Seventh Congressional District looking at
21  the same 12 elections from 2016 to 2020 that we have already
22  looked at.
23  Q    Okay.  Let's turn to Figure 7 of your report.
24       This is page 11 of Exhibit 79.  The table is entitled
25  Election Results in the Focus Area Vote Shares of
```

1   Black-Preferred Candidates.

2        What does this figure show?

3   A    This figure shows the results of that analysis.  And so

4   each of the six maps is its own separate plot.  Each row is a

15:34:46 5   different election.  And then the blue dots here correspond to

6   the vote share of the black-preferred candidate in the Second

7   Congressional District, and the open circles correspond to the

8   vote share of the black-preferred candidate in the Seventh

9   Congressional District.  And then at the 50 percent point,

15:35:03 10   there's a dark vertical line.  And so the fact that each of

11   these points is to the right of that 50 percent line shows that

12   the black-preferred candidate are getting a majority of the

13   vote across every election in both the Second and Seventh

14   Congressional Districts in all six maps.

15:35:20 15   Q    Do you recall on average what percentage of the votes of

16   black-preferred candidate is winning in CD 2 under plaintiffs'

17   illustrative maps?

18   A    I think they -- it's an average of at least 57 percent of

19   the vote and higher in some of the maps.

15:35:44 20   Q    And what's the average for the black-preferred candidate

21   in CD 7?

22   A    At least 65 percent of the vote and, again, higher in some

23   of the maps.

24   Q    Okay, Dr. Palmer, I would now like to briefly discuss with

15:36:04 25   you a different topic.  After you submitted your report, an

```
 1    expert for the state, Dr. Hood, submitted the report that

 2    offers a few criticisms of your analysis, and I would like to

 3    ask you about those now.

 4         Have you reviewed Dr. Hood's report that was submitted on

 5    December 20th?

 6    A    I have.

 7    Q    Okay.  Dr. Hood notes that you relied on CVAP population

 8    from the census, and states that this introduced a, quote,

 9    force of potential error, end quote, into your analysis.

10         Does Dr. Hood's criticism raise any concerns for you?

11    A    No.

12    Q    Why not?

13    A    Using Citizen Voting Age Population data, which is forced

14    from the American Community Survey, which is a survey conducted

15    by the U.S. Census Bureau every year, is very common practice

16    in this field.  It's widely used by political scientists, in

17    peer-reviewed published academic work, as well as by expert

18    witnesses.  And this is reliable high-quality data.

19    Q    Does Dr. Hood conduct any analyses using that same data?

20    A    I don't recall, and I don't have his report in front of

21    me.

22    Q    Okay.  That's fine.

23         Is there any reason to believe that there are systemic

24    errors in the CVAP data that you used that could bias your

25    analysis in any way?
```

```
 1  A     No.

 2  Q     Dr. Hood also criticized your use of data from the

 3  Redistricting Data Hub.  Specifically, he expresses concerns

 4  that the Redistricting Data Hub was, quote, not able to

 5  replicate joining election data and precinct boundaries because

 6  they did not have precinct boundary data for every election.

 7  Does this criticism raise any concerns for you about your

 8  analysis?

 9  A     No.

10  Q     Why not?

11  A     So this data, the precinct level data I rely on, I

12  downloaded from the Redistricting Data Hub.  And as I

13  mentioned, this is just a public website that aggregates many

14  different sources, or collects and publishes many different

15  sources of relevant redistricting data.

16        But the actual data that they're using here in which I

17  talk about in my report is assembled by a group called the

18  Voting and Election Science Team, or VEST, which is a group of

19  academics I think based at the University of Florida who do the

20  really hard and difficult work of assembling precinct-level

21  data, matching up shapefiles the geographic boundaries of each

22  precinct with election results.  And this is a really time

23  consuming and difficult task.  And one of the many things they

24  do is they go to individual states or individual counties and

25  request maps of the precincts that they actually can absolutely
```

1  get the precinct boundaries.  And this is challenging and very

2  time consuming.

3       And so their data is widely used by academics in

4  peer-reviewed published work, and it's highly reliable.

15:39:25  5       And what the Redistricting Data Hub does and what Dr. Hood

6  comments on is they just look at the data and produce a

7  validation report that says, could we independently on our own

8  reproduce these same numbers?  And the answer here is no,

9  because Redistricting Data Hub doesn't have the same

15:39:42  10  shapefiles, those same files that the VEST group got from each

11  county to reproduce that work.  They note that in their own

12  validation report.  They say in that same report that Dr. Hood

13  cites that this is to be expected, given the way that the data

14  was assembled.

15:39:58  15       So the Redistricting Data Hub team doesn't have any

16  concerns about this data, and I don't have any concerns about

17  this data.

18  Q    Can you briefly explain the difference between a VTD and a

19  precinct and how that data is merged, which is what I believe

15:40:15  20  you were explaining the VEST team did?

21  A    The VEST team is actually doing something one step

22  earlier.  They are collecting precinct boundaries from states

23  and counties and merging that with precinct-level election

24  results produced by individual states and counties after each

15:40:34  25  election.

1    And that in itself can be very difficult because the names

2    of the precincts or the way they're identified in the systems

3    that tabulate those are the ways they're reported don't always

4    match up cleanly with the shapefiles that are available.

15:40:49 5    For example, the state might report a precinct name, but

6    the county may provide a shapefile with ID numbers for each

7    precinct instead.  And this is a challenge that I had to handle

8    in Alabama in 20 -- in 2019 in *Chestnut vs. Merrill,* where I

9    assembled some precinct-level data from Alabama precincts and

15:41:09 10   election results myself.

11   So that's a different challenge.

12   To answer the other part of your questions, voting

13   tabulation districts are the census equivalent, the U.S. Census

14   equivalent of precinct boundaries.  And they're based on data

15:41:26 15  provided to the Census Bureau from each state.  And because

16   precincts change over time, voting tabulation districts or VTDs

17   are often a good unit of analysis for redistricting work,

18   because we can look at the election data or demographics over

19   time, looking at a constant geographic unit instead of looking

15:41:47 20  at precincts which might vary in number or location and shape

21   over time within each county or state.

22   Q    Okay.  I think Dr. Hood's next criticism is related to

23   what you just described.

24   So he suggests that there may be mismatches between

15:42:04 25  VTD-shaped files on Redistricting Data Hub and the actual

```
 1   precinct boundaries for Alabama counties.

 2        He specifically points to Washington County as such an

 3   error.  Does Dr. Hood's criticism give you any cause for

 4   concern?

 5 A   No.  I think this stems from sort of the interchangeable

 6   use of the term precinct and VTD in my report.  So in my

 7   report, I discuss precinct-level analyses.  But as I note in --

 8   on page 3, the data I'm using -- or actually Voting Tabulation

 9   District-level data, where the VEST team has taken precinct

10   level data and reallocated it to match the new geographies that

11   correspond to U.S. Census, reaggregate it to voting tabulations

12   district boundaries instead.  And so Dr. Hood has in his report

13   two maps:  One of VTD and one of precincts.  And the source

14   data from the VEST team, the precinct-level data they provide

15   looks exactly like Dr. Hood's maps.  Those maps are identical.

16   And then using very standard algorithms and approaches for

17   aggregating data from one geography to another, they then

18   transform that data to Voting Tabulation District data and

19   publish that, as well.  So I have both versions of that data.

20   I'm using Voting Tabulation District for simplicity.

21        And for 2017, where that Voting Tabulation District data

22   was not provided by the Redistricting Data Hub, I assembled

23   that in the same way myself using the exact same code and

24   process that the Redistricting Data Hub used.

25 Q   Finally, Dr. Hood also criticizes your use of data derived
```

1    from a commercial vendor that I think you mentioned called L2.

2    Specifically, he suggests that L2's data contains discrepancies

3    that, quote, could make a difference in a district

4    functionality analysis, end quote.  Does Dr. Hood's speculation

15:44:13  5    give you any cause for concern?

6    A    No.

7    Q    Why not?

8    A    Because I don't use this data at all in any functionality

9    analysis that I do.  My functionality analysis relies entirely

15:44:25  10    on past election results.

11    Q    Do any of the criticisms that Dr. Hood makes of your

12    report cause you to doubt or change any of your conclusions?

13    A    No.

14    Q    Did Dr. Hood also perform a racially-polarized voting

15:44:41  15    analysis?

16    A    Yes.

17    Q    What methodology did Dr. Hood use as you understand it?

18    A    Dr. Hood also uses ecological inference.

19    Q    And what geographic areas did Dr. Hood examine?

15:44:56  20    A    I know he did this for the Seventh Congressional District

21    and I believe for some others, as well, but I am not positive.

22    Q    Okay.  Where the geographic areas examined overlap between

23    your analysis and Dr. Hood's analysis, how did Dr. Hood's

24    results compare with yours?

15:45:17  25    A    So for the Seventh Congressional District where Dr. Hood

1   does ecological inference using 2020 presidential election

2   results and 2018 gubernatorial election results, we find the

3   same conclusions.  He also finds strong evidence of

4   racially-polarized voting in that district.

15:45:38   5   Q      Okay.

6          MS. MADDURI:  Thank you, Dr. Palmer.  Those are all

7   the questions that I have for you at this time.  I will pass

8   the witness to Mr. Wilson.

9          JUDGE MARCUS:  Thank you very much.

15:45:53   10          Before we start, Mr. Wilson with your cross, I just want

11   to ask if our reporter's doing okay.

12          Mr. Wilson, fire away.

13          MR. WILSON:  Thank you, Judge Marcus.  And I apologize

14   for the confusion.  Can I actually ask for a very quick break

15:46:28   15   right now?

16          JUDGE MARCUS:  You sure can.  You sure can.  We will

17   take -- how much time do you need?  You tell me.

18          MR. WILSON:  Shouldn't be more than five minutes or

19   so.

15:46:37   20          JUDGE MARCUS:  Let's take a ten-minute break at this

21   point, and we will reconvene with your cross.  Quick question:

22   What's your timing on the cross because we're somewhere --

23   they're debating whether Mr. Bryan will come next or whether

24   their other expert on *Gingles II* and *III* will come next.

15:46:58   25          MR. WILSON:  Understood, Your Honor.  It's a little

```
 1  bit.
 2           JUDGE MARCUS:  Let me just preface it by saying,
 3  again, you take all the time you need to do your cross.
 4           MR. WILSON:  Thank you, Your Honor.  There are some
 5  questions that we have that remain about the analysis itself,
 6  and that could take a little longer, even though Ms. Madduri
 7  did ask a few questions about the analysis, too, so it's
 8  difficult to speculate, but I would think hopefully under
 9  45 minutes.
10           JUDGE MARCUS:  Let's just -- we will play it by ear.
11  You take your time.  We will take a ten-minute break at this
12  point.  Thanks.
13               (Recess.)
14           JUDGE MARCUS:  Judge Moorer, are we ready to begin?
15           JUDGE MOORER:  Yes, sir, we are.
16           JUDGE MARCUS:  Thanks so much.  Mr. Wilson, you may
17  continue with your cross of Dr. Palmer.
18                       CROSS-EXAMINATION
19  BY MR. WILSON:
20  Q    Dr. Palmer, how are you?
21  A    Good.  Thank you.
22  Q    Good.  Glad to hear it.
23       So now, Dr. Palmer, because we didn't have a chance to do
24  a deposition in this litigation, some of the methodological
25  questions that I ask might be very basic, and it's just stuff
```

The timestamps shown in the left margin: 15:47:10 (line 5), 15:47:36 (line 10), 15:56:47 (line 15), 15:56:57 (line 20), 15:57:12 (line 25).

```
 1  that I'm unfamiliar with.  So apologies in advance if I missed
 2  an obvious explanation.
 3       But I am going to try to understand your report.  Is that
 4  fair?
15:57:25  5  A    Yes.
 6  Q    And you still have your report in front of you?
 7  A    I do.
 8  Q    Thank you.  So I will probably refer to that fairly
 9  frequently if you wouldn't mind keeping it handy.
15:57:40 10       Now, Dr. Palmer, you have conducted racial-polarization
11  analysis in Voting Rights Act litigation before; is that
12  correct?
13  A    Yes.
14  Q    And can you explain when you generally find that
15:57:53 15  racially-polarized voting has occurred?
16  A    Can you be more specific?
17  Q    Sure.  Under what conditions do you find
18  racially-polarized voting occurs when you're analyzing
19  different populations or minority groups?
15:58:12 20  A    It entirely depends on the groups I'm looking at and the
21  dynamics of the elections in those places.
22  Q    Okay.  I think I might be asking a more basic question.  I
23  apologize.
24       Is it fair to say that racially-polarized voting occurs
15:58:30 25  when, say, black voters and white voters support different
```

```
 1  candidates?
 2  A     Yes.
 3  Q     Okay.  And is it fair to say, then, your analysis is
 4  looking at results?
15:58:43 5  A     Election results?  Yes.
 6  Q     Yeah.  Yes.  Thank you.
 7        So, in other words, your analysis is not examining why
 8  voters are voting the way that they're voting; is that right?
 9  A     That's correct.  I do not look at why voters make the
15:59:02 10  choices they do, just the choices that they are making.
11  Q     Thank you, Dr. Palmer.
12        And how do you determine whether a racial group supports a
13  particular candidate?
14  A     So first I run the ecological inference algorithm, and I
15:59:22 15  look at the results.  And if a large majority of that group is
16  supporting the same candidate, then I would say that's the
17  group's candidate of choice.
18  Q     And, Dr. Palmer, when you say a large majority, what do
19  you mean?
15:59:41 20  A     So there's not an exact cutoff, but generally I think of
21  it as, you know, well above 50 percent, and often I look at the
22  confidence interval and would like to see a confidence interval
23  that's also above -- or well below 50 percent, either way, far
24  away from 50 percent.  So, for example, if I were to estimate
16:00:03 25  that a group supported a candidate, let's say, 60 percent of
```

1    the vote, but with a big confidence interval say going down to

2    45 percent, I would not have confidence that that group had a

3    candidate of choice.

4    Q    Understood.  And so when you say well above 50 percent, is

16:00:22 5    that 55 percent?

6    A    Generally higher, but I don't have an exact cutoff.

7    Q    Do you know whether any experts in your field have exact

8    cutoffs for what they consider to be a significant majority

9    such that it produces a candidate of choice among a racial

16:00:46 10    group?

11    A    I don't know.

12    Q    And have you observed any consistent numbers in your own

13    past practice or litigation you've been involved in of when you

14    generally find that a significant majority prefers a candidate

16:01:09 15    such that it is their candidate of choice?

16    A    Typically, I find one of two results for the most part.

17    Q    Uh-huh.

18    A    Either there's a relatively high vote share, for a

19    group -- a certain candidate, say 70 percent range or higher.

16:01:35 20    Q    Okay.

21    A    And so I don't have to worry about sort of that fine line,

22    or that group's sort of towards the middle and split.  And

23    often when a group is split, there's going to be a relatively

24    large competent table.  We are going to be more uncertain about

16:01:49 25    that group's voting behavior.

1        So those are sort of the more typical results that I find.

2   Q    Got it.  Thank you, Dr. Palmer.

3        So there really is no bright line for racially-polarized

4   voting that you are aware of?

16:02:02 5   A    That's right.

6   Q    Okay.  And for your racial polarization analysis in this

7   case, you analyzed 12 elections; is that right?

8   A    I look at 12 elections at the precinct level and an

9   additional eight elections at the county level.

16:02:22 10   Q    Okay.  And did your report contain information about any

11  congressional elections?

12  A    No.  There have been no congressional elections under

13  these enacted maps.

14  Q    Uh-huh.  And all of these elections that you analyzed are

16:02:41 15  statewide elections, right?

16  A    Yes.

17  Q    So am I correct that when you used in the racial

18  polarization context the term, endogenous election, refers to

19  elections for the particular office at issue?

16:02:59 20  A    Yes.

21  Q    And your report does not contain any endogenous elections,

22  right?

23  A    There have been no endogenous elections held under these

24  under these new districts, but as I talked about earlier, I did

16:03:15 25  examine endogenous elections under the old map for 2018 in

1  *Chestnut v. Merrill* and found the exact same pattern.

2  Q    Okay.  And under the old map, you could have looked at

3  congressional elections, and you did in *Chestnut v. Merrill*,

4  then, right?

16:03:32 5  A    Yes.

6  Q    Okay.  And do you think that analysis would be relevant to

7  what you are testifying about today?

8  A    It's relevant in that I find the same consistent pattern.

9  Q    Uh-huh.

16:03:46 10  A    But simply endogenous elections at these geographies are

11  not available.

12  Q    Right.  But they're available for geographies that look

13  similar to these geographies; is that right?

14  A    I don't have the old and new maps in front of me to sort

16:04:01 15  of compare the changes.

16  Q    Okay.  Fair enough.

17      Did you discuss any primary elections in your report?

18  A    No.

19  Q    Did you analyze any primary elections when conducting any

16:04:17 20  research for your report, so, analyze primary elections that

21  may not have made it into the final cut?

22  A    No.

23  Q    Are you aware of any racial polarization expert reports

24  offered for the purposes of litigation that have included

16:04:35 25  information about primary elections?

1   A     Yes.

2   Q     Can you think of any reasons why racial polarization

3   experts might prefer to look at primary elections rather than

4   general elections?

16:04:49  5   A     I prefer to look at general elections.

6   Q     I apologize if my question wasn't clear.  Can you think of

7   any reasons why racial polarization experts might prefer to

8   look at primary elections rather than general elections?

9   A     I don't know.

16:05:09  10   Q     Do you think that primary elections could have advantages

11   over general elections for the purposes of racial polarization

12   analysis insofar as primary elections could more effectively

13   hold partisanship constant?

14   A     I disagree that that would be an advantage.

16:05:33  15   Q     Do you think that looking at primary elections for the

16   purposes of racial polarization analysis could more effectively

17   try to hold partisanship constant?

18   A     I think -- I don't think so.  I think that general

19   elections where the most -- the largest number of voters and

16:05:58  20   much larger number of voters participate give us a better

21   measure of racial polarized voting.

22   Q     Okay.  Maybe my question is a little bit unclear.  What

23   I'm trying to tease out, and I'm sure I am not doing a good job

24   is, you know, when I think about a general election, I think

16:06:16  25   one confounding variable about why voters vote the way that

```
 1  they do could be partisanship as opposed to race.  Is that

 2  fair?

 3  A    I disagree that it's a confounding variable.  Whereas we

 4  talked about earlier, we're not trying to understand why voters

 5  vote the way they do.

 6  Q    Uh-huh.

 7  A    We're trying to look at how they vote.  And racial

 8  polarized voting doesn't require understanding why.  It only

 9  requires understanding how they vote and the choices that

10  voters make.

11  Q    Fair enough, Dr. Palmer.

12       So if someone were interested in trying to figure out why

13  voters vote the way that they do, do you think that there could

14  be an advantage to analyzing primary elections insofar as those

15  primary elections might hold partisanship more constant than

16  general elections?

17  A    Can you repeat the question?

18  Q    Sure.  So insofar as someone was trying to figure out why

19  voters vote the way that they do, do you think that there could

20  be an advantage in looking at primary elections rather than

21  general elections because primary elections could hold

22  partisanship more constant?

23            MS. MADDURI:  Objection.  Calls for speculation, and

24  it's beyond the scope of Dr. Palmer's report.

25            JUDGE MARCUS:  If you can answer the question, I will
```

16:06:37 (line 5)
16:06:51 (line 10)
16:07:07 (line 15)
16:07:26 (line 20)
16:07:44 (line 25)

        1   allow it.  You may proceed, Dr. Palmer, with your answer.
        2   Overruled.
        3           THE WITNESS:  I think you're asking a research
        4   question about if primaries have that advantage.  I don't know
16:07:58 5   the answer to that question.
        6   BY MR. WILSON:
        7   Q    Are you aware of any racial polarization experts who have
        8   concluded the primary elections would have that advantage over
        9   general elections?
16:08:13 10  A    I don't know.
       11   Q    Fair enough.
       12           Now, Dr. Palmer, I would like to ask you a little bit
       13   about the data sources that you used.
       14           Could we turn to page 2 of your report, please?  And if
16:08:30 15  it's easier -- it looks like you have it in front of you.  But
       16   if you would like, I can put it up on the screen.  Just let me
       17   know.
       18           On page 2 of your report, you have a section called data
       19   sources and elections analyzed, right?
16:08:46 20  A    Yes.
       21   Q    And in this section, you explain where you got the data
       22   that you used for racial polarization analysis, right?
       23   A    Yes.
       24   Q    And you write in paragraph 11, I analyzed
16:09:03 25  racially-polarized voting using two different data sources,

1   correct?

2   A     That's correct.  But I believe that should be three when

3   you include the county level data, as well.

4   Q     Thank you.  You are well ahead of me, Dr. Palmer.  I was

16:09:16  5   going to ask about that for my own edification.

6         So the first bullet point, you described the sources that

7   you used to determine precinct level election results and data

8   on Citizen Voting Age Population or CVAP by race for the 2016,

9   2018, and 2020 general elections, and the 2017 special election

16:09:38 10   for Senate, right?

11   A     Yes.

12   Q     And as you describe it, in the first bucket, you used

13   data, quote, assembled by the voting and election science team,

14   right?

16:09:49 15   A     Yes.

16   Q     And I think Ms. Madduri may have asked you about the

17   voting and election science team.  But can you tell me just one

18   more time who they are or what that group is?

19   A     It's a group of academics at least partially based at the

16:10:08 20   University of Florida who do the really hard and time-consuming

21   work of matching up precinct shapefiles to election results.

22   Q     Thank you, Dr. Palmer.

23         And so does the Secretary of State provide the voter

24   registration and voter history data that the VEST uses?

16:10:28 25   A     I don't believe that they use that data.  They use the

1  election results, the actual counts of the number of votes cast

2  for each candidate, which is from the Secretary of State.

3  Q    Okay.  Okay.

4       Got it.  And what specific data then did the voting and

16:10:51 5  election science team assemble?

6  A    They take the election results, which are lists for every

7  precinct of every election and the number of votes received by

8  each candidate, and then they match those results to geographic

9  data, to a shapefile, which is a map --

16:11:11 10  Q    Uh-huh.

11  A    -- of the precincts at the time of the election.  And this

12  is -- this sounds like something that should be easy, but in

13  practice in many states, it's not because the counties that

14  might administer the precinct boundaries might identify

16:11:33 15  something differently than the state system for reporting

16  election results.

17  Q    I have no doubt that that's difficult.

18       Is that a task that you have ever undertaken yourself?

19  A    Yes, many times.  Including in *Chestnut v. Merrill* in

16:11:49 20  2019, I sought to do this for Alabama, and I was provided

21  shapefiles for I believe most, if not all, the counties in the

22  focus area that I used at the time, which was a different focus

23  area in that case, and voter files which identified by

24  precincts and election results, and I had significant

16:12:13 25  challenges matching up that data such there were some counties

```
 1  I could not include in my analysis even with additional data
 2  and requests from the state at the time.  And that's all
 3  documented in that report.
 4  Q    And so why did you not repeat that process in this case?
 5  A    I knew from past experience that it's a very -- very
 6  time-consuming task.  And the VEST data was not -- I do not
 7  belief was available at the time of my previous report, but was
 8  now available.  So if somebody else had already completed this,
 9  you know, very difficult time-consuming task, I can rely on
10  their data set.
11  Q    Fair enough.  Thank you.  And next you described the data
12  as having been, quote, updated to use 2020 VTDs and distributed
13  on the Redistricting Data Hub, right?
14  A    Yes.
15  Q    I'm sure this is a very basic question, but what does it
16  mean to update the Secretary of State's data to use 2020 VTDs?
17  A    So it's updating the VEST data, which is based on election
18  results from the Secretary of State.  And essentially, it's
19  transforming one geography, one set of boundaries into another.
20  And the way that this is typically done is you look at census
21  blocks or block groups, so very small units within each
22  precinct, and precinct would be made up of many such, and
23  aggregate the data down to go from precinct level to census
24  block level.  And then apply the -- and then for the aggregate
25  back up based on which census blocks are in which VTDs instead.
```

16:12:32  (line 5)
16:12:54  (line 10)
16:13:06  (line 15)
16:13:30  (line 20)
16:13:53  (line 25)

```
 1  So it's a way of estimating vote shares at a different
 2  geographic level based on data from the precinct level data.
 3  Q    Thank you.
 4       And then you quote distributed this updated information on
 5  the Redistricting Data Hub; is that right?
 6  A    This data was distributed.  I did not distribute it.
 7  Q    Okay.
 8  A    I downloaded it from Redistricting Data Hub.
 9  Q    Okay.  My mistake.  Thank you.
10       And does distribute meaning anything statistically special
11  here, or does that just mean that Redistricting Data Hub had
12  the information and it was provided?
13  A    Yes.  I could have said published.
14  Q    Published.  Okay.  Thank you.  And am I right, you write
15  then that you, quote, merged the distributed data with the
16  Citizen Voting Age Population data from the U.S. Census'
17  American Community Survey; is that right?
18  A    Yes.
19  Q    And so what is it to merge the distributed data?
20  A    So what I was able to download from the Redistricting Data
21  Hub was VTD level election data, that is, the number of votes
22  cast for each candidate in each election within that unit of
23  geography and then a map, the actual boundaries of that
24  geography, and that's it.  There's no data on the people who
25  live there.  So I guess the data on the people who live there
```

1   from the Census Bureau, and the American Community Survey is

2   the annual product of the U.S. Census Bureau, unlike the

3   decennial census, and it's the only government source for data

4   on citizenship.  So that's where -- that's our source for

16:15:42  5   Citizen Voting Age Population, and there's a special version of

6   the ACS, the American Community Survey, put out every year by

7   the Census Bureau of those Citizen Voting Age Population tables

8   that are designed for this use for use in redistricting the

9   voting rights cases.

16:16:04  10       And so that data is at a different geographic level.  It's

11   at the census block level is the small population or geographic

12   level for that data.  So I figure out which census blocks fall

13   into which voting tabulation districts, and then add up the

14   Citizen Voting Page Population for each group to get VTD level

16:16:25  15   population data to go with the VTD level election data.

16       So it's all just -- all the data comes from different

17   places.  There's no one place that has it all together.  And

18   the bulk of my work on these cases of putting all this together

19   in a way that works to make sense in checking it and validating

16:16:44  20   it.

21   Q    Thank you, Dr. Palmer.

22       Am I right that ACS data are survey results?

23   A    Yes.  But a very, very large scale survey conducted by the

24   Census Bureau, not say -- a very different kind of survey that

16:17:00  25   you might think about a public opinion survey that's looking at

1  a few hundred people.

2  Q    Sure.  Thank you for that.  And these data are as you said

3  different from the decennial census data, right?

4  A    Yes.

16:17:11  5  Q    And decennial census data are also referred to as, am I

6  right, PL-94 data?

7  A    The PL-94 is one way in which the census data is published

8  and distributed I believe primarily for redistricting.  It's

9  the first -- it's sort of the first release of the census data,

16:17:32  10  the one that came out last summer for this redistricting cycle.

11  There's many, many other forms in which the U.S. census data is

12  also produced.

13  Q    Okay.  And the PL 94 data, then, were available when you

14  conducted this analysis; is that right?

16:17:46  15  A    Yes.

16  Q    Okay.  And correct me if I'm wrong, but does ACS data --

17  does it allow you to control for both single-race black or you

18  could call it black alone and any-part black racial

19  demographics?

16:18:05  20  A    There's a few different racial categories within the

21  Citizenship Voting Age Population data.  I used single-race

22  non-Hispanic black.  I believe there is some different

23  multi-racial categories in there, but I am not sure what

24  exactly they are right now.

16:18:27  25  Q    Thank you, Dr. Palmer.

        1       So I think that answered my next question.  But you chose
        2   single-race black -- excuse me.  You chose single-race
        3   non-Hispanic black for your analysis; is that right?
        4   A    Yes.
16:18:40 5   Q    Thank you.
        6       And then I think the second bullet point, you described
        7   the sources that you used to determine, quote, precinct-level
        8   election results and data on actual voter turnout by race for
        9   the 2020 general elections; is that right?
16:18:56 10  A    Yes.
        11  Q    And so, again, this data was assembled by the voting and
        12  election science team; is that right?
        13  A    The election results were also from the voting election
        14  science team.
16:19:10 15  Q    I'm sorry.  Was that a -- sorry.  Was that a
        16  clarification?
        17  A    Yes.  The data -- this full data set was assembled by me.
        18  Q    Okay.
        19  A    The election half of it came from the voting election
16:19:28 20  science team.  The voter turnout side of it came from the data
        21  vendor L2.
        22  Q    Understood.  Thank you, Dr. Palmer.
        23      And I did want to ask you about that.  So you say the
        24  actual turnout rate -- excuse me -- actual turnout by race was
16:19:45 25  calculated by the Redistricting Data Hub using a commercial

1  voter file provided by the data vendor L2, right?

2  A    Yes.

3  Q    Do you know how L2 determines actual turn out by race?

4  A    So L2 gets the voter files from the state, and then they

16:20:07 5  modify the race data a little bit.  So Alabama includes

6  self-identified race in the voter file, so L2 can start with

7  that.  And then for people where it's unknown or missing, they

8  can do some modeling to try to estimate the race of those

9  people.  So it's going to be a little bit different than the

16:20:25 10  one provided by the state, but I did not have access to a state

11  voter file.

12  Q    Understood, Dr. Palmer.

13       And the information that L2 got from the state would have

14  come from the Secretary of State; is that right?

16:20:38 15  A    I believe so.

16  Q    Okay.  And to the best of your knowledge, that's the

17  Secretary of State's voter registration.  And is it a voter

18  history file or product?

19  A    Yes.  I don't know in Alabama if it's one big file or if

16:20:57 20  it's produced as two separate files.  But a typical voter file,

21  you're going to have a list of every registered voter, and then

22  either within that same list or some other table, a list of

23  every election that each voter voted in, at least within some

24  period of recent years.

16:21:12 25  Q    Thank you, Dr. Palmer.

         1        And do you know how the Secretary of State categorizes

         2   race in its voter registration or voter history files?

         3   A    I believe that it comes from the voter registration forum

         4   where voters are asked to identify their own race by selecting

16:21:31 5   I box from a list.

         6   Q    And do you know whether voters can select multiple boxes

         7   such that they could be multi-racial under the Secretary of

         8   State's data?

         9   A    I don't know.

16:21:48 10  Q    Do you know whether the Secretary of State's data includes

        11   a box that voters can check that says black?

        12   A    I believe it does.  I know I looked at the -- in *Chestnut*

        13   *v. Merrill*, I was working directly with the voter files, but

        14   it's been some time since I looked at that form.

16:22:10 15  Q    Sure.  And do you know, then, what happens if a voter

        16   selects two different racial groups?

        17   A    I don't know.

        18   Q    Okay.  If it's the case that a voter identifies only as

        19   black, is it -- excuse me -- let me rephrase the question.

16:22:35 20       If a voter only selects black on the voter registration

        21   form, is it fair in your view to say that they identify as

        22   single-race black?

        23   A    I don't know.  I don't know how a multi-racial voter would

        24   choose to fill out that form.

16:22:56 25  Q    If they could select multiple boxes, if they consider

1  themselves to be multi-racial, are they declined to select

2  multiple boxes and select only black, is it fair to assume that

3  they identify as single-race black?

4          MS. MADDURI:  Objection.  Calls for speculation.

16:23:18 5  Outside the scope.

6          JUDGE MARCUS:  Can you answer that question,

7  Dr. Palmer?

8          THE WITNESS:  I think for the purposes of voter

9  registration, they are at times choosing to identify themselves

16:23:28 10  as single-race black.

11          JUDGE MARCUS:  All right.  You may proceed,

12  Mr. Wilson.

13          MR. WILSON:  Thank you, Judge.  Thank you, Dr. Palmer.

14  BY MR. WILSON:

16:23:44 15  Q    So if we could move to the third bullet.  You state that

16  you used data, quote, downloaded from the website of the

17  Alabama Secretary of State to find county level election

18  results and data on voter registration by race for the 2012 and

19  2014 general elections, right?

16:24:02 20  A    Yes.

21  Q    Okay.  Do you recall who was running in these elections?

22  A    The -- I remember the name of some of the candidates, but

23  certainly not all of them.

24  Q    Okay.  And how did the 2012 and 2014 election data feature

16:24:25 25  in your analysis?

```
 1  A    In Figure 4 and I believe it's Table 3 where I used the
 2  county level data to estimate racially-polarized voting at the
 3  county level.
 4  Q    Okay.  And you were getting the data on voters' race from
 5  the Secretary of State for this analysis, right?
 6  A    Yes.
 7  Q    And so per our previous question and answer, you would say
 8  that this is, then, single-race data; is that right?
 9         MS. MADDURI:  Objection.  Misstates the testimony.
10         JUDGE MARCUS:  I think you can answer the question.
11  Did Mr. Wilson have it right or not, Dr. Palmer?
12         THE WITNESS:  It's self-identified racial data, which
13  I believe if they can only check one box, I believe we consider
14  that single-race data.
15  BY MR. WILSON:
16  Q    Right.  Yeah.  Thank you, Dr. Palmer.  I appreciate that.
17  And I apologize if my question was unclear.
18       So is it fair to say, then, that the single-race black
19  metric underlies part of your racial polarization analysis?
20  A    Yes.  I used single-race non-Hispanic black in the Citizen
21  Voting Age Population.  And to be fair, that's reflected on the
22  voter file of the other analyses.
23  Q    Okay.  So to the extent that single -- that -- excuses me.
24  Let me rephrase.  To the extent that the single-race black
25  metric is reflected in the second and third analyses that you
```

1  refer to, you would say that you used single-race black for all

2  of your analysis; is that right?

3  A    Yes.

4  Q    Thank you, Dr. Palmer.

16:26:15  5      The Secretary of State provides voter registration data in

6  which -- excuse me.  I'm sorry.

7      I think we actually already covered some of this.

8      So we talked about Dr. Hood's rebuttal report a little bit

9  earlier.  You talk about that report with Ms. Madduri; is that

16:26:54 10  correct?

11  A    Yes.

12  Q    And you did have a chance to look at this report, right?

13  A    Yes.

14  Q    And, Dr. Palmer, do you have that report in front of you?

16:27:02 15  A    I do not.

16  Q    Okay.  I will try to share my screen here.  Am I sharing

17  my screen here with you, Dr. Palmer?

18  A    Yes.

19  Q    Thank you.

16:27:36 20      In paragraph 2 of Dr. Hood's supplemental report, he

21  specifically notes the Redistricting Data Hub's data.

22          JUDGE MARCUS:  I'm sorry to interrupt you, but could

23  you tell us what number this is among your exhibits?

24          MR. WILSON:  Of course.  I'm sorry.  This is

16:27:54 25  Defendants' Exhibit 6.

```
 1              JUDGE MARCUS:  Thanks.
 2    BY MR. WILSON:
 3    Q    Dr. Palmer, in paragraph 2 of Dr. Hood's supplemental
 4    report, he specifically notes that the Redistricting Data Hub's
16:28:15 5   data appears to have several problems; is that right?
 6    A    He -- I don't think that's right.  He notes a comment in a
 7    validation report that they were not able to replicate joining
 8    election data.  That's in paragraph 2, but he doesn't say that
 9    that necessarily means there's a problem.
16:28:37 10  Q    Fair enough.  Thank you, Dr. Palmer.  And he notes that
11    it's unclear from his report, and he is referring to your
12    report, how much time Professor Palmer engaged in to validate
13    the quality of data housed on the Redistricting Data Hub
14    website.  Did I read that correctly?
16:28:51 15  A    You did.  I didn't report the amount of time I spent
16    validating the data.  In my report though, I spent considerable
17    time doing so.
18    Q    Can you describe that process for us?
19    A    Sure.  So to start with, the best data, which is the one I
16:29:14 20  believe he -- Dr. Hood is discussing here, I looked at the
21    individual records.  I looked at the totals of the county and
22    state levels to make sure that the total numbers made sense.
23    Where possible, I looked at a lot of maps of the data to make
24    sure that the units made sense, as well.  And most
16:29:38 25  significantly, because this data was updated from precinct
```

1  level to VTD level, I looked at the exact process that was

2  done.  And in fact for 2017, where it was not done, I

3  implemented that same code myself to update the data.  So I

4  really -- by the end of the process, I really understood how

16:29:56 5  they assembled their data, why it looked the way it did, how it

6  was organized, and how to recreate parts of that process

7  myself.

8  Q    Thank you, Dr. Palmer.

9       And can you estimate about how long this process took you,

16:30:09 10  if you recall?

11  A    I don't know exact.  It happened, you know, ever several

12  different steps of my analysis.  You know, I looked at the

13  initial data, understood it, and then as I worked through the

14  analysis, I did continual validation checks, especially around

16:30:26 15  merging.  When I am merging -- I have to merge these files

16  together, different data sources, you know, merging takes a lot

17  of time and validation to make sure nothing is getting missed

18  or merging correctly.

19  Q    Understood.  Thank you.  Dr. Palmer.  If we could look at

16:30:45 20  Paragraph 3, and I believe Ms. Madduri asked you a little bit

21  about this earlier.

22       Now, Dr. Hood notes that by his finding, at least, the L2

23  data consistently underestimated the percentage of white

24  voters, and the percentage of other voters was consistently

16:31:11 25  overestimated by L2 on an average of about 4 -- a little over

 1  4 percent for both; is that right?

 2  A    That's what Dr. Hood reports, yes.

 3  Q    Right.  Right.  Yeah.  Just asking about his report here.

 4       And do you dispute that conclusion?

16:31:27  5  A    I -- I have not compared the baseline registration number

 6  Dr. Hood is making the comparison to, but I do find small

 7  differences, as well.

 8  Q    He also notes that the percentage of black voters was

 9  overestimated by L2 in some counties and underestimated in

16:31:52 10  others, right?

11  A    Yes.

12  Q    And did you find those same conclusions?

13  A    I did.  And we should expect this.  Right?  We should

14  expect the estimates are going to be slightly different than

16:32:09 15  other data sources.  And if we're estimating data, and I also

16  talk about in my report how the voter file I had access to is

17  dated a little bit later than the actual election.  As there's

18  some uncertainty, we should expect that numbers will be a tiny

19  bit too high in some and a tiny bit too low in others.  That

16:32:29 20  seems completely reasonable to me for estimated data.

21  Q    Thank you, Dr. Palmer.

22       And do you agree with Dr. Hood's conclusion that while

23  these discrepancies in the L2 turnout data may not appear to be

24  all that sizeable, they certainly could make a difference in a

16:32:45 25  district functionality analysis where the racial composition of

1   the district in question is evenly divided?

2   A    They could make a difference in a functionality analysis

3   conducted using this data.  But my functionality analysis did

4   not use this data.  They can make no difference to my

5   functionality analysis.

6   Q    Understood, Dr. Palmer.  And why would this be a problem

7   to use L2 data as Dr. Hood has described it for functionality

8   analysis?

9   A    Well, it -- first of all, it might be a problem.  We don't

10  know.  It depends potentially I would expect on the results of

11  the functionality analysis and, you know, how close the

12  district might be to 50 percent.  I believe that Dr. Hood's

13  functionality methodology could use data like this, but that's

14  a different approach to functionality than what I take in my

15  report where I rely just on the actual past election results.

16  I don't do any modeling on the results.  I just aggregate them

17  up to the new geographic units.

18  Q    Understood, Dr. Palmer.  But do you think, then, that the

19  problem with modeling and the estimates that models produce can

20  pose a problem for functionality analysis?  Again, not saying

21  that this is what you did here, but in a different

22  functionality analysis, could using estimates pose the problem

23  that Dr. Hood describes?

24  A    I suppose it's entirely dependent on the analysis and the

25  estimates and what we're doing.  It's not the way I have done

```
 1  this analysis.  I find that difficult to answer.
 2  Q    Fair enough.  So if we could actually turn, then, and I am
 3  going to go back to your report, and, Dr. Palmer, do you still
 4  have your report in front of you?
 5  A    I do.
 6  Q    Give me a second to stop sharing.  Hopefully that worked.
 7       So on page 9 of your report, you offer your expertise
 8  regarding the, quote, performance of the majority-minority
 9  districts in the illustrative maps; is that correct?
10  A    Yes.
11  Q    And so the record is clear, these are referring to the
12  Caster plaintiffs' illustrative maps?
13  A    Yes.
14  Q    Is that right?  Thank you.  Did you draw those maps,
15  Dr. Palmer?
16  A    No.
17  Q    Do you know who drew those maps?
18  A    I believe it was Mr. Cooper.
19  Q    Can you briefly describe how you conducted this analysis?
20  A    I was provided shapefiles, that is, geographic mapping
21  files for each of the six maps by plaintiffs' counsel.  And I
22  then take that, and I merge that with the election data that's
23  also -- has spatial data in it, the election results,
24  essentially that VEST election data we have been talking about.
25  And so for each district, I look and see which precincts are
```

Timestamps in left margin:
16:34:45 (line 5)
16:35:05 (line 10)
16:35:20 (line 15)
16:35:35 (line 20)
16:36:01 (line 25)

1    contained in that district.  And then I aggregate.  I add up

2    all the votes for each candidate in each election within each

3    district and say, well, if these are the precincts that voted

4    in this election, this is who would have won, or those are the

16:36:22  5    vote shares that would have resulted.

6    Q    Just so I'm tracking, Mr. Cooper part of what he provided

7    you then would be the racial populations of the proposed

8    districts, and then is it fair to say you applied the

9    statistical patterns of racial voting that you had determined

16:36:40 10    to those populations?  Is that --

11    A    No.  No.  That's incorrect.

12    Q    Okay.

13    A    I don't -- I don't know if I was provided the racial data.

14    If it was included, it was not something that I looked at or

16:36:51 15    factored into my analysis.  I suppose I had it to know which

16    was the majority-minority district, but I did not actually use

17    those numbers in my analysis.  What you are describing is an

18    approach that I believe was used by Dr. Hood in his initial

19    report.  I'm not doing that.  I'm not looking at the

16:37:09 20    demographics of these places.  I am not looking at turnout by

21    race.  I'm just taking the actual election results for the

22    physical places that fall within these new districts.  I'm

23    looking at the actual votes cast.

24        So let's say a district contains some set of precincts, I

16:37:30 25    add up all the votes cast for each candidate in those

1    precincts, and say, okay, this candidate would have gotten X

2    votes, add it all up, this candidate got Y votes, and now here

3    is the vote share and who won.  There's no modeling done

4    whatsoever in my functionality analysis.

16:37:46 5    Q    Understood.  That's very helpful.  Thank you, Dr. Palmer.

6         And we have discussed a procedure -- a statistical

7    procedure called ecological inference throughout your

8    examination; is that right?

9    A    Yes.

16:38:05 10   Q    And that is the statistical method that your

11   racial-polarization analysis relies on; is that right?

12   A    Yes.

13   Q    And it's fair to say that ecological inference allows you

14   to estimate how groups vote?

16:38:26 15   A    That's the general goal of the analysis.

16   Q    Fair enough.  That's the goal of the analysis.  The goal

17   of ecological inference is to determine how groups vote, right?

18   A    Yes.

19   Q    And ecological inference, then, does not explain why

16:38:45 20   groups vote the way that they do?

21   A    That's correct.  That's not the goal.

22   Q    And so your report shows that white Alabamians tend to

23   vote Republican; is that right?

24   A    I don't believe that's shown in my report, but I believe

16:39:01 25   that to be true.

```
 1   Q     You don't believe that that's shown in your report?
 2   A     I don't think I talk about parties in my report.
 3   Q     Do you talk about candidates in your report?
 4   A     In a few places, yes.
16:39:15  5   Q     Are you aware of the parties to which the candidates
 6   belonged in the elections that you examined, Dr. Palmer?
 7   A     Yes.
 8   Q     And did the white candidates of choice belong to the
 9   Republican Party?
16:39:34 10   A     Yes.
11   Q     Thank you.
12         Did you investigate whether white Alabamians tends to vote
13   Republican because of some sort of racial bias?
14   A     No.  That would be looking at why voters vote the way they
16:39:52 15   do, which is not part of this analysis.
16   Q     Right.  And ecological inference could not tell you that;
17   is that right?
18   A     That's right.
19   Q     And did you come to any conclusion about the party for
16:40:03 20   whom black Alabamians tend to vote?
21   A     They tend to vote for Democratic candidates.
22   Q     And based on your report, do black Alabamians tend to
23   block vote to a greater or lesser extent than white Alabamians?
24   A     It depends on the election, but potentially a slightly
16:40:34 25   greater extent in some elections, but not in all of them.
```

```
 1  Q    Okay.  And I think you have already said this, but the
 2  racial-polarization analysis you conducted can't explain why
 3  black Alabamians tend to vote for Democrats, can it?
 4  A    That's right.  That's not the intent of this analysis.
```
16:40:59
```
 5  Q    Uh-huh.  So is it fair, then, to say that someone using
 6  ecological inference cannot say whether people cast votes
 7  because they like a candidate as opposed to because they
 8  dislike another candidate?
 9  A    I suppose so.  We just simply see they prefer one
```
16:41:25
```
10  candidate to another.
11  Q    Right.  And so, for example, Dr. Palmer, are you familiar
12  with the concept of a protest vote?  Have you heard that term
13  before?
14  A    Yes.
```
16:41:37
```
15  Q    And would it be fair to say that a protest vote occurs
16  when someone votes really because they dislike a certain
17  candidate and so they are going to vote for someone else?
18  A    I think that's reasonable.
19  Q    Okay.  So a protest vote would be like I oppose this
```
16:41:57
```
20  candidate, and I don't care.  I'm just going to cast a vote
21  that opposes this person, right?
22  A    Yes.  You're describing a reason why somebody might cast
23  their vote a certain way, which is not the purpose of this
24  analysis.
```
16:42:10
```
25  Q    Right.  So ecological inference then you would agree can't
```

1  show whether groups are voting for one candidate or against

2  another; is that right?

3  A    I'm not sure that's something that we can ever separate.

4  It's showing that they prefer one candidate to another is the

16:42:36  5  same thing as showing they don't prefer the other candidate.

6  So I am not sure we can say like versus dislike, everything is

7  relative.

8  Q    Okay.  Fair enough.  I am going to try to share something

9  again.

16:42:53 10      And I believe if I do this correctly, Dr. Palmer, am I

11  sharing your report?  Are you able to see your report in the

12  record?  This is Caster Exhibit 79.

13      So I would like to go down to page 5 and paragraph 17 of

14  your report.  You wrote that in paragraph 17, White voters are

16:43:34 15  highly cohesive in voting in opposition to the black candidate

16  of choice in every election.

17      Did I read that correctly?

18  A    Yes.

19  Q    And in paragraph 16, you also refer to black voters as

16:43:49 20  supporting their candidates of choice, right?

21  A    Yes.

22  Q    I think earlier in your direct examination, you referred

23  to white voters as opposing black-preferred candidates.  Do you

24  recall that?

16:44:05 25  A    Yes.

```
 1  Q    Okay.  But you agree that ecological inference can't
 2  actually confirm that white voters are voting because they
 3  affirmatively oppose black-preferred candidates; is that right?
 4  A    I'm not sure I understand that.  I use the terms as a
 5  relative term.  A black voter supporting their candidate of
 6  choice is the same thing as a black voter opposing the white
 7  candidate of choice.  And vice versa.  These are just relative
 8  measures of support.  I don't use these labels to denote that
 9  one party is voting, you know, in a -- because they like
10  candidates, whereas the other is voting dislike or vice versa.
11  We're purely looking at relative relevance.
12  Q    So to vote for or against someone in a binary election,
13  you would say that those are basically synonymous, or at least
14  is that how you intend to use them in your report?
15  A    Yes.  I think that anything else is trying to get at why
16  people vote the way they do, and here, it's just what is your
17  ranking of these candidates, who are you choosing to vote for.
18  Q    Understood.  Thank you, Dr. Palm ever.
19       So in paragraph 18 in the final sentence, you write, Every
20  election, black voters have a clear candidate of choice, and
21  white voters are strongly opposed to this candidate.  Did I
22  read that correctly?
23  A    Yes.
24  Q    And so what does it mean for white voters to be strongly
25  opposed this candidate?
```

 1  A    They are voting -- they are strongly or cohesively voting

 2  for the opponent of the black candidate.

 3  Q    So to be clear, then, your analysis is not suggesting that

 4  white voters have a particularly -- individually have a

16:46:00  5  particularly strong opposition.  What you mean by strongly

 6  opposed is that white voters by a large margin are voting for

 7  the white-preferred candidate; is that right?

 8  A    Yes.

 9  Q    Okay.  And because these are synonymous terms, you could

16:46:19 10  have rewritten the last sentence of paragraph 18 to say that

11  white voters have a clear candidate of choice, and black voters

12  are strongly opposed to this candidate; is that right?

13  A    Yes.

14  Q    And what do you mean when you say that black voters are

16:46:42 15  strongly opposed to the white-preferred candidate?

16  A    In that case, large majorities of black voters are voting

17  against the white-preferred candidate.

18  Q    Would this be evidence that black Alabamians vote for

19  racist reasons?

16:46:58 20  A    No.  Once again, we're never getting at intent in this

21  analysis.  We're never getting at reasons -- reasons for voting

22  in this analysis.

23  Q    Would this analysis support the inference that black

24  Alabamians are voting for racist reasons?

16:47:15 25  A    No.  This analysis provides no evidence about why people

```
 1  vote the way they do.
 2  Q    Okay.  I think just a couple more questions, Dr. Palmer.
 3  I appreciate your patience.
 4       In your view, Dr. Palmer, does block voting approximate
 5  racial animus?
 6            MS. MADDURI:  Objection.  Asked and answered.
 7  Dr. Palmer has explained his response to this in numerous
 8  different ways.
 9            JUDGE MARCUS:  We will take it one more time.
10  Overruled.
11            THE WITNESS:  Can you repeat the question, please?
12  BY MR. WILSON:
13  Q    Of course.  Thank you.  Dr. Palmer, does block voting
14  approximate racial animus?
15  A    I don't think evidence of block voting says anything about
16  racial animus.
17  Q    Thank you, Dr. Palmer.
18       So is it fair to say that even where racial polarization
19  in voting is high, partisanship or political platforms may
20  explain the different voting preferences of different races?
21            MS. MADDURI:  Objection.  Asked and answered.
22            JUDGE MARCUS:  I think he has asked and answered this
23  question a number of times.  If I heard him right, Mr. Wilson,
24  he said that he can tell you nothing about the why question,
25  just the how question.  And I think you have probed that in any
```

16:47:45 (line 5)
16:47:57 (line 10)
16:48:08 (line 15)
16:48:28 (line 20)
16:48:52 (line 25)

1   number of different ways.

2       So can we move on, please?

3           MR. WILSON:  Of course, Judge Marcus.  Thank you.  I

4   will move along.

16:49:04 5   BY MR. WILSON:

6   Q    Dr. Palmer, you've served as an expert witness or

7   litigation consultant on numerous cases involving voting

8   restrictions; is that right?

9   A    Yes.

16:49:20 10   Q    Did any of these numerous cases require you to analyze

11   whether racially-polarized voting existed where a majority of

12   white voters supported the Republican Party?

13   A    I'm sorry.  Can you repeat the question?

14   Q    Sure.  Did any of these numerous cases require you to

16:49:45 15   analyze whether racially-polarized voting existed where a

16   majority of white voters supported the Republican Party?

17   A    Yes.

18   Q    I apologize.  I'm still sharing, and I don't need to be.

19   So let me stop that.

16:50:07 20       And in these cases where a majority of white voters

21   supported the Republican Party, did you ever conclude that

22   elections were not racially polarized?

23   A    I don't believe so.

24   Q    Dr. Palmer, are you aware of any parts of Alabama where

16:50:29 25   African-Americans predominantly support the Republican Party?

```
 1   A     I don't know.

 2   Q     Are you aware of any parts of America in which

 3   African-Americans predominantly support the Republican Party?

 4   A     I don't know.

 5   Q     Do you know whether at the national level African-American

 6   voters tend to vote for the Democratic Party?

 7   A     They do.

 8   Q     Does this mean that as far as you're aware, voting will be

 9   racially polarized any place in America with both black voters

10   and Republican-leaning white voters?

11         MS. MADDURI:  Objection.  Calls for speculation.

12   Outside the scope of Dr. Palmer's report.

13         JUDGE MARCUS:  Overruled.  You may answer if you can.

14         THE WITNESS:  Can you repeat that, please?

15         MR. WILSON:  Sure, Dr. Palmer.

16   BY MR. WILSON:

17   Q     Sure.  I asked you earlier whether you are aware that

18   African-American -- whether you are aware if African-American

19   voters throughout the country tend to vote for the Democratic

20   Party, and the answer was yes, right?

21   A     Yes.

22   Q     And so my question, then, is:  Does mean that as far as

23   you're aware, voting will be racially polarized any place in

24   America with both black voters and Republican-leaning white

25   voters?
```

Timestamps: 16:50:43 (line 5), 16:51:08 (line 10), 16:51:23 (line 15), 16:51:36 (line 20), 16:51:52 (line 25)

```
 1  A    I suppose it first depends on what you mean by Republican
 2  leaning.  If it's say 80, 90 percent of white voters are
 3  Republican like here in Alabama, then we are likely to find
 4  that it's likely to be polarized.  We can't always detect it.
 5  It depends on the data, whether we can identify
 6  racially-polarized voting.  I think that's a separate question,
 7  whether it exists.
 8       If, you know, when you say white voters tend to support
 9  the Republican Party and it's something like 55 percent of them
10  are Republican, I would not classify that as racially-polarized
11  voting.
12  Q    Fair enough.  Have you ever heard of racial polarization
13  existing where a majority of white voters supported Democrats?
14  A    I don't believe so in at least the recent era.
15  Q    Thank you for that clarification.
16       So is it true, then, that to the best of your knowledge,
17  racial polarization has only been found to exist where whites
18  tend to vote for Republicans?
19  A    I believe that's been my finding in my reports.
20  Q    Are you aware of any reports that have come to the
21  opposite conclusion?
22  A    I don't believe so.
23       MR. WILSON:  And, Your Honor, if I may have one moment
24  to confer with my counsel?
25       JUDGE MARCUS:  You sure can.
```

16:52:14  (line 5)
16:52:28  (line 10)
16:52:47  (line 15)
16:53:09  (line 20)
16:53:30  (line 25)

1              MR. WILSON:  I think that's all we have.  Thank you

2       for your time.

3              JUDGE MARCUS:  Thank you.  We have redirect,

4       Ms. Madduri?

16:53:50  5              MS. MADDURI:  No, Your Honor.

6              JUDGE MARCUS:  No further questions, then, that anyone

7       has for Dr. Palmer?  Judge Manasco, Judge Moorer, any

8       questions?

9              JUDGE MANASCO:  None from me.

16:54:05 10              JUDGE MOORER:  None.

11              JUDGE MARCUS:  Thank you, Dr. Palmer.  You are

12       excused.

13         What is your pleasure, folks, at this point?  And let me

14       raise one other thing with you as you tell me your pleasure.

16:54:21 15         Judges Manasco, Moorer, and I discussed earlier the

16       prospect and preference if it's agreeable with all of you to

17       begin tomorrow morning at 8:30 Central Standard Time rather

18       than 9:00 o'clock Central Standard, and it would be 9:30

19       Eastern Time so we can get an earlier start on Dr. Bryan's

16:54:52 20       testimony tomorrow.  Does that work -- do any of you have any

21       problem with that?  I see none.

22              MR. DAVIS:  No.

23              JUDGE MARCUS:  What is your pleasure, then, at this

24       point?  You have about 25, 30 minutes left in the schedule we

16:55:11 25       had set.  I don't know that it makes sense to start anybody

1  now.  You tell me what your pleasure is.

2          MR. DAVIS:  Your Honor, for Secretary Merrill, I do

3  not have a preference.  If the Court would like, if I could

4  have about three minutes to go downstairs where Mr. Wilson just

16:55:25  5  was and get set up, and Mr. Bryan will take my place here.

6  We're happy to get 30 minutes out of the way.  We're happy to

7  wait until the morning.  Up to the other parties and the Court.

8          JUDGE MARCUS:  So you are happy to start with Bryan

9  right now is what you are saying?

16:55:40 10          MR. DAVIS:  Whatever the parties and the Court prefer.

11          JUDGE MARCUS:  Let me turn to your colleagues for each

12  of the plaintiffs.  What is your pleasure, Ms. Khanna, and

13  Mr. Ross?  Do you prefer we start him tomorrow morning, or

14  would you just as soon have him start today?

16:55:57 15          MS. KHANNA:  Your Honor, I think we'd just as soon

16  have him start today if there's time.

17          JUDGE MARCUS:  Mr. Ross, do you have the same view?

18          MR. ROSS:  Yes, Your Honor.

19          JUDGE MARCUS:  All right.  Since you have all agreed,

16:56:10 20  then why don't we take a few minutes, Mr. Davis, give you a

21  chance to bring Mr. Bryan up, and we'll get started in about

22  five minutes.

23          Thank you.

24          (Recess.)

17:03:05 25          JUDGE MARCUS:  Are the parties ready to proceed?

```
 1                    MR. DAVIS:  We're ready.

 2                    MS. KHANNA:  Yes, Your Honor.

 3                    JUDGE MARCUS:  I take it you are calling Mr. Bryan at

 4      this point.

17:03:13 5          MR. DAVIS:  We are, Your Honor.

 6                    JUDGE MARCUS:  All right.  Thank you.  Mr. Bryan, if

 7      you would raise your right hand, we will swear you in at this

 8      point.

 9                            THOMAS BRYAN,

17:03:19 10     having been first duly sworn, was examined and testified as

11      follows:

12                    JUDGE MARCUS:  If you would be kind enough to state

13      your name for the record.

14                    THE WITNESS:  Thomas Mark Bryan, B-R-Y-A-N.

17:03:38 15         JUDGE MARCUS:  Thank you, sir.  You may proceed.

16                    MR. DAVIS:  Thank you, Judge.

17                          DIRECT EXAMINATION

18      BY MR. DAVIS:

19      Q    Good evening, Mr. Bryan.

17:03:45 20    A    Good evening, sir.

21      Q    What is your profession?

22      A    I am a professional demographer.

23      Q    Do you have an educational background in demography or

24      related to the field?

17:03:58 25    A    Yes.
```

1    Q    What degrees do you hold related to the field?

2    A    I have an undergraduate degree in history from Portland

3    State University.  I have a master's degree in urban studies

4    from Portland State University.  I have a master's degree in

17:04:14 5    management in information systems technology from George

6    Washington University.

7    Q    And do you have experience in the area of redistricting?

8    A    Yes, I do.  I have worked for approximately 20 years as an

9    expert.  I have performed analysis, developmental plans,

17:04:39 10    critiquing of plans of approximately 50 political districting

11    or redistricting exercises, and approximately 150 school

12    redistricting exercises during that time.

13    Q    So have you been hired by any jurisdictions to draw plans?

14    A    Yes, I have.

17:05:00 15    Q    At what levels have you either drawn plans or assisted in

16    drawing plans?

17    A    I have drawn plans or assisted in the drawing of plans at

18    all levels of geography.  I have participated in either the

19    litigation of plans or the drawing of plans at the state level

17:05:21 20    this year in four different states.  I have also participated

21    in the drawing -- or the critique of the drawing of plans at

22    the local level, county level, and small areas over the course

23    of my entire career.

24    Q    And do you have experience, Mr. Bryan, in studying and

17:05:43 25    critiquing a plan that someone else has drawn?

```
 1   A     Yes, I do, extensively.

 2   Q     Do you have experience with databases combining

 3   demographic and election data?

 4   A     I do.  I have significant background and experience in

 5   census data.  I used to be an employee of the Census Bureau.

 6   And I am familiar with their databases and their techniques

 7   based on my employment there.  I leveraged that experience and

 8   background to use those data in combination with other data

 9   sets, in some cases, political data for the benefit in some

10   instances of supporting political scientists in their roles in

11   cases such as this.

12   Q     What is the field of statistical transformation,

13   Mr. Bryan?

14   A     Statistical transformation, it's an area of looking at

15   data that, you know, may or may not make sense or may or may

16   not be useful in the forum that they're actually reported in.

17   And so we as statisticians, demographers, and analysts have to

18   take the opportunity to do work with data that we're presented

19   in order to change it into a form that's more readily usable or

20   easily interpretable by our audience.

21   Q     Thank you.  And do you have experience, then, in

22   statistical transformation as you have described it?

23   A     Yeah.  Yes, we do.  It's a common practice in demography.

24   There is a wide variety of different ways we can do it and

25   circumstances under which we would do it in order to make data
```

17:06:01
17:06:23
17:06:39
17:06:59
17:07:15

1    more useful or interpretable by our audience.

2    Q    Are you experienced to predicting population shifts?

3    A    Yes, I am.  I have been published.  I am the author of the

4    section on population estimates and projections in a book

17:07:35  5    called The Methods and Materials of Demography.  It's commonly

6    referred to in the field as the Bible of demography.

7        I have experience in writing peer-reviewed journals,

8    papers, and sections of other books with coauthors that I

9    commonly work with in this space.  It was also an area in which

17:07:56 10    I was professionally trained and developed expertise when I

11    worked at the Census Bureau.

12    Q    Thank you.  And when did you work at the Census Bureau?

13    A    It was approximately 1998 to 2001, during the course of a

14    decennial census and during the development of the American

17:08:16 15    Community Survey.  Thank you.

16    Q    You should have a copy of a notebook with our exhibits in

17    it, Mr. Bryan, at least available to you.  Would you take a

18    look at Defense Exhibit 3 and tell us if that is a copy of your

19    CV?

17:08:29 20    A    Yes.  I have that document.

21    Q    Thank you.  I just wanted to identify it for the record.

22        MR. DAVIS:  At this time, Your Honors, we move to

23    tender Mr. Bryan as an expert in redistricting, demography,

24    statistical transformation, and predicting population shifts,

17:08:46 25    which Mr. Bryan can explain is also known as applied

1    demography.

2            JUDGE MARCUS:  Any objections from counsel for the

3    plaintiffs?

4            MR. BLACKSHER:  No.

17:08:56  5        MS. KHANNA:  No objection, Your Honor.

6            JUDGE MARCUS:  And for the Milligan folks, any

7    objection?  I'm sorry.  We can't hear you in New York because

8    you are muted.  You are still muted, so we can't hear you.  Get

9    someone to help him unmute.

17:09:27 10       He would be for Milligan or for --

11           MR. DUNN:  Did that help?

12           JUDGE MARCUS:  That's perfect.  Thank you.

13           MR. DUNN:  Thank you, Your Honor.  I take it you can

14    see and hear me.

17:09:38 15       JUDGE MARCUS:  I can.  If you would just state your

16    name and who you represent.

17           MR. DUNN:  I'm sorry.  Yes, my name is David Dunn.  I

18    am with Hogan Lovells, and I will be representing the Milligan

19    plaintiffs for this witness.  We don't have an objection, Your

17:09:49 20   Honor, except we'd like to reserve the right to ask some

21    questions on cross-examination that would go to the scope and

22    the weight potentially of the witnesses's testimony if that's

23    acceptable.

24           JUDGE MARCUS:  You are perfectly free to do that.

17:10:05 25       For the Singleton folks, I am not sure that you are going

1   to do any cross here, but I just wanted to give you that

2   opportunity.  And if you were going to exercise it, whether you

3   had any objection to qualifying Mr. Bryan as an expert in the

4   fields Mr. Davis specified.

17:10:25  5        MR. BLACKSHER:  We have no objections to his being

6   qualified in those fields, Your Honor, and, yes, we would like

7   the opportunity to cross-examine him.  We will need at least an

8   hour.  I have agreed with counsel for the Milligan and Caster

9   plaintiffs to go last, so I'm sort of putting my marker down

17:10:45 10   now.  Before Mr. Bryan leaves for parts unknown, I need an hour

11   left for me, please.

12        JUDGE MARCUS:  You will have the opportunity to

13   cross-examine him as fully as you deem appropriate.

14        Having said that, Mr. Bryan is accepted as an expert,

17:11:04 15   Mr. Davis, in the fields that you have specified, and you may

16   proceed with your examination.

17        MR. DAVIS:  Thank you.

18   BY MR. WILSON:

19   Q    Mr. Bryan, are you familiar with traditional redistricting

17:11:14 20   principles?

21   A    Yes, I am.

22   Q    Where do you look to find out what those are?

23   A    The most common source that I look to nationally as the

24   starting point if I am going to get kind of the ground truth

17:11:29 25   nationwide would be an organization called NCSL, National

1  Conference State Legislature, widely regarded as the kind of

2  go-to organization for information like that.  They've got a

3  variety of different traditional districting principles that

4  are in common use throughout the United States.

17:11:51  5  Q    Thank you.  Tell us what some of those traditional

6  districting principles are one by one and describe them,

7  please, just in brief fashion?

8  A    Yeah, sure, of course.

9       Some of the guidance that they recommend that I see

17:12:06 10  followed in different cases in the United States are things

11  such as compactness, contiguity.  I think as Dr. Duchin

12  described earlier, there is a variety of different types of

13  contiguity, and we strongly advocate that.

14       Preservations of geographic, political subdivisions,

17:12:27 15  preservations of communities of interest, what we would call

16  COIs.  They also recommend things such as not pairing

17  incumbents.  They don't want to unnecessarily put incumbents

18  that may already represent a constituency, pit them against

19  each other in an election.

17:12:50 20       There are some other emerging principles, maybe not

21  necessarily traditional or existing principles, but there's

22  kind of a movement more recently to do things like try to

23  remove partisanship, for example, or introduce this concept of

24  proportionality into the redistricting process.

17:13:10 25       Those are pretty much the scope of the most widely used

1   and referred to traditional principles.

2   Q     These emerging principles you mentioned, addressing

3   partisanship and proportionality, what kind of proportionality

4   do you mean?

17:13:27 5   A     Basically coming up with neutral like data science based

6   ways of balancing population and kind of prioritizing less

7   emphasis on other redistricting principles.  It's not an area

8   that's widely used, and it's not an area that I understand is

9   being used -- leveraged in the Alabama case.

17:13:47 10   Q     I know that a couple of states that have new districting

11   commissions to draw districts for different bodies, the states

12   have -- may say that we prefer that if 30 percent of the

13   statewide vote went Democrat, then we would prefer 30 percent

14   of the state legislative seats be Democrat.  Is that the kind

17:14:11 15   of proportionality you are talking about?

16   A     Yeah, that's correct.

17   Q     What about preserving the core of districts?  Is that a

18   recognized traditional districting principle?

19   A     Sure.  Sure.  Yeah, it is.  It's, you know, kind of a part

17:14:26 20   of a tenet what we would call continuity of representation.

21   Making sure that you don't pair incumbents kind of follows

22   under that same principle assuring that if there is a community

23   of interest population that's been represented by a particular

24   representative, he or she has a chance of continuing that

17:14:48 25   representation.  And then obviously, ensuring as you

```
 1  redistrict, the degree to which you keep districts whole and
 2  don't change them unnecessarily to meet changing criteria is
 3  important to ensuring that continuity of representation.
 4  Q    Why should a map drawer observe traditional districting
 5  criteria, Mr. Bryan?
 6  A    I think that these are very well-established criteria.
 7  They're long standing, and they give us a common of set of
 8  rules and guidelines that when we go through this extremely
 9  important difficult process of redistricting, they are a bit of
10  guidance that we can use and we can all refer to.  And whether
11  you agree on whether one may be more important or less
12  important than another one, at least, all the parties that are
13  involved know what those different principles are and have a
14  common rule book to play by.
15  Q    You know, in -- can you give us an estimate of how many
16  times you have been retained to draw a plan or assist in
17  drawing a plan?
18  A    Yes.  My estimated in the 20 years of doing this for the
19  purpose of districting and political redistricting is
20  approximately -- the number of cases I have work on is
21  approximately 50.  If you were to say what are the number of
22  plans that I have drawn or attempted to draw underneath those
23  cases, they would be in the hundreds.  As you have seen in this
24  case, some of the other plaintiffs have brought, you know,
25  experts that have drawn, four, five, six, ten different maps,
```

Timestamps: 17:15:17 (5), 17:15:40 (10), 17:15:56 (15), 17:16:17 (20), 17:16:37 (25)

1    you know, just for this one particular case.

2         So there is a number of cases versus how many maps are

3    drawn are two different metrics.

4    Q    When somebody hires you and says, you know, Mr. Bryan, we

17:16:52 5    want you to help us draw new districts for our local school

6    board or for our county commission or for our state Senate, do

7    you usually start with a blank outline of the jurisdiction, or

8    do you start from the previous plan?

9    A    Yeah.  So the first thing that I would do is since I do

17:17:17 10   redistricting across the United States, I work in many

11   different states that have the different prioritization of the

12   different principles.  But more often than not, the starting

13   point for doing redistricting or political redistricting is to

14   begin with the plan that's in place, again, trying to conform

17:17:37 15   with the principle of continuity of representation.  And then I

16   would typically seek to learn about communities of interest,

17   the political landscape, the priorities of the policy makers,

18   and try and help best understand how we can adopt that plan to

19   be best suited to the new demographic reality after we have a

17:18:03 20   census.

21   Q    Thank you.  In the course of your work in this case, have

22   you had an opportunity to assess the plan passed by the

23   Legislature last November, the congressional plan?

24   A    I have had an opportunity to assess the plan, yes.

17:18:15 25   Q    Okay.  I would like to show you -- this is Defense

1    Exhibit 1.  Is this a copy of the report that you provided in

2    Singleton versus Merrill?

3    A    Yes.  It appears to be.

4    Q    Okay.  I want to refer you to page 67 of that report.

17:18:46 5          Is this the plan passed by the Alabama Legislature and

6    signed by the governor just a couple of months ago?

7    A    Yes, that's correct.

8    Q    I want to now look at the next page, page 68?

9    A    Sure.

17:19:04 10   Q    Would you please explain to the Court what are you showing

11   us with this map?

12   A    Sure.  There is a dark outline, a heavy dark outline, and

13   that shows the outline of the existing plan.  There is another

14   outline sometimes layered underneath it because there's a lot

17:19:34 15   of continuity of these districts that shows what the

16   adjustments were to the existing plan and what the differences

17   are of the existing plan to the new plan.

18          And what I see in this plan is that it largely represents

19   what I would call a least-changes plan.  There are no wholesale

17:19:59 20   significant changes in the geography except what appears to be

21   necessary in order to achieve one person one vote balance

22   population requirements.

23   Q    I see.  And what does this show us that the Legislature

24   did with District 5 in the northern part of the state?

17:20:16 25   A    Sure.  So it appears that he took District 5, which ran

1    east to west and slightly reduced the size of that to reduce

2    the population there, and this would suggest that perhaps the

3    -- relative to the rest of the state, there may have been more

4    population there than in some other parts of the state where

17:20:40 5    boundaries had to be expanded to add population.

6    Q    I see.  And what does it mean when district has to give up

7    geography?  What does that tell us about whether the district

8    was underpopulated or overpopulated after the 2020 census?

9    A    Sure.  Typically, if you are going to reduce the

17:21:01 10    geography, that means that it was overpopulated, and that

11    excess population needs to be moved to other districts that may

12    have been more equitably populated or perhaps underpopulated.

13    Q    And then if a district had to expand in geography, does

14    that mean it was underpopulated or overpopulated?

17:21:21 15    A    Yes, that's typically the interpretation, that's correct.

16    Q    Yeah.  Okay.  What do you see that the Legislature did

17    with District 7 in this map?

18    A    Yes, sir.  District 7 is -- it's a very interesting

19    district.  I see looking at the existing outline where it goes

17:21:42 20    up into Birmingham.  It has this narrow thread kind of pushing

21    up to the northeast, and then kind of similarly to the south,

22    kind of the south central part of it.  There was some irregular

23    geography down there, as well.  And what -- from this map alone

24    without knowing the characteristics in any of the population,

17:22:05 25    which were not taken into my understanding is we're not taking

```
 1  into account in the drawing of the map, I can see that the

 2  outline, the boundaries of District 7 seem to have been what's

 3  called generalized.  They have been simplified.  In laymen's

 4  terms, you could say they were cleaned up.  And that was

 5  probably in an effort to improve the compactness of the

 6  district while they adjusted it in an effort to balance its

 7  population.

 8  Q    District 7 was underpopulated after the 2020 census,

 9  correct?

10  A    That's my understanding, yes.

11  Q    Yes.  This area in the southern part, is it correct that

12  the Legislature undid what was previously a split of Clarke

13  County?

14  A    I cannot speak to that.

15  Q    Fine.  You probably don't have the right information in

16  front of you at the time.

17  A    I did not.  I am aware of the Birmingham changes.

18  Q    Sure.  Did you assess the demographics of the 2021 plan?

19  A    I did.

20  Q    And we are going to turn now to page 16 of your report.

21  This is still Defense Exhibit 1.

22       Is this where you present the demographic of the new

23  congressional plan passed by the Alabama Legislature?

24  A    Yes.  These are four tables showing the total population,

25  the Voting Age Population, for the existing plan and then --
```

Timestamps in left margin: 17:22:26 (line 5), 17:22:41 (line 10), 17:22:57 (line 15), 17:23:11 (line 20), 17:23:37 (line 25)

1    the for the new plan, so four tables of data representing the

2    seven districts in total.

3    Q

4        I see.  So you on this page, page 16 of D-1 --

17:23:52  5    A    Yes.

6    Q    -- you addressed demographics of both the new

7    congressional districts and the previous congressional

8    districts?

9    A    That's correct.

17:23:59 10    Q    What do you see here about how the demographics changed,

11    if they did, in District 7?

12    A    What's very interesting about this, I would note first

13    that the plan is legal and compliant.  When I look in Table 4.3

14    under total population, I can see that the deviation there is

17:24:19 15    all within one person.  It's a first thing as an expert that I

16    would always check for.

17        The next thing that I would look at is what was the

18    population at the time of the census of what the existing plan

19    was.  That is, how much did the existing districts and the

17:24:35 20    existing plan need to change in order to get that equitably

21    balanced population we see in Table 4.3.

22        So as you can see, in Table 4.5, that is our starting

23    point.  And as you can see after ten years of the census, the

24    population is unbalanced.  This is why we have a law saying

17:24:58 25    that we need to redistrict.

1        Some of these districts, such as District 1, District 3,
2   District 5, overpopulated.  And then there are some districts,
3   such as District 7 in particular, District 2, to a lesser
4   degree, that are underpopulated.

17:25:17 5        In the process of redistricting, District 7 needed to have
6   its population increased from 664,611 up to 717,754.

7        What is notable to me as I assess this plan is I go over
8   and I look at the composition of that population change.  So I
9   examine what I have referred to as the black-alone population
17:25:48 10  or what I have referred to as all black.  Others are referred
11  to as any-part black population, because it gives us a
12  comprehensive, a thorough view of the change in the population
13  that drove the rebalancing during the redistricting process.

14       What I noticed as I examined this was that as you will see
17:26:10 15  in District 7, Table 4.5, if you read across, there's
16  approximately 404,000 blacks that were in the existing District
17  7, approximately 415,000 if you look at any-part black or the
18  all-black population.

19       If you go back up to Table 4.3, what is noticeable is that
17:26:38 20  those black populations who existed at the time of the census
21  were actually reduced as part of the process of redistricting.

22       Now, it's my understanding that race did not have a
23  factor, in fact, wasn't even looked at as part of the process.
24  But as part of the process of drawing new balanced compact
17:27:02 25  districts, it is, in fact, an artifact of that process that the

black population was reduced by approximately 5,000 give or

take if you were looking at black alone or the all-black

population.

    The results of that is that the percent black in District

7 was reduced from 62.4 percent to 57.1 percent.  It was

effectively -- even though that was not the objective of

drawing District 7, that is an outcome of it.

    So that outcome was driven further by the fact that the

map drawer, who I do not know, had to add approximately 50,000

people to that district in order to make it whole.  And the

vast majority of the people who were added had to have been

non-black population, which were overwhelmingly white but some

Asian, Hispanics, native and Pacific islanders, and other

smaller populations that were put together in order to drive

the balancing of the population.

Q    Let's try to put that together, Mr. Bryan.  Back to 4.5,

just to make sure a couple of points that you made are clear

for the record.

    This chart shows what the population was in the old

district lines but with 2020 census data; is that correct?

A    Yes, sir.

Q    Okay.  So we know -- well, what after the 2020 census was

the ideal population of the 7 congressional districts in

Alabama?

A    So seven, it's fractional because you can't divide it

```
 1  exactly, but it's 717,754.  So you think you have one layer
 2  with 755.  It takes into account the fractions.
 3  Q    Gotcha.  So we can look at your Table 4.5 and with some
 4  addition and subtraction figure out how much each district
 5  needed to shrink or grow by population?
 6  A    Yes.
 7  Q    Okay.  And you found that after the redistricting process
 8  the number of African-Americans in District 7 went down?
 9  A    That's correct.  And in no matter which way you measure
10  whether it is black alone or any-part black, there is less
11  black population in District 7 than was there before.
12            MR. DAVIS:  At this point, Your Honor, I am about to
13  move to an assessment -- to Mr. Bryan's assessment of the
14  Singleton plan, a new subject.  I am happy to continue as long
15  as the Court would like.  If you wish to break at our usual
16  time, I am about to enter into a new subject area.
17            JUDGE MARCUS:  Well, this is about 5:30.  This would
18  be our usual time.
19       So we will pick up the thread tomorrow morning.  But we
20  will pick up the thread at 8:30 Central Standard Time, so you
21  will get an extra half hour in tomorrow.
22       Quick question, just so I have some sense:  Rough sense,
23  about how much time you have with Mr. Bryan, Mr. Davis,
24  remaining?
25            MR. DAVIS:  Your Honor, my best guess would be two to
```

1  two-and-a-half hours.  That might be long.  There's so much

2  that he has to go through with the three cases.

3          JUDGE MARCUS:  I understand.  We are not holding you

4  to it.  I am just trying to get a sense of whether we

17:30:28 5  realistically will be able to finish tomorrow.

6      Ms. Khanna, how long do you think you will be?

7          MS. KHANNA:  I still think we will probably be about

8  an hour on our cross.

9          JUDGE MARCUS:  Okay.  And, Mr. Dunn, what's your sense

17:30:42 10  to the extent you have?

11          MR. DUNN:  I would say an hour to an hour-and-a-half,

12  Your Honor.

13          JUDGE MARCUS:  And, Mr. Blacksher, you needed an hour,

14  you said.

17:30:51 15          MR. BLACKSHER:  Yes, Your Honor.

16          JUDGE MARCUS:  So by my count, we have about

17  five-and-a-half to six-and-a-half hours in all.  But we'll see

18  where we go.  I only say that so that you may have time for the

19  Singleton and Caster folks to put someone else on, on Friday

17:31:17 20  later in the afternoon.  You may want to just have them lined

21  up.  And we'll just take it from there.

22      With that, I thank you.  Unless there's anything else --

23          MR. DUNN:  Your Honor, I just had one small thing,

24  because I think Mr. Bryan has only testified once before.

17:31:34 25  Could I ask the Court to caution him that overnight he should

```
 1  not discuss his testimony with anyone whatsoever?

 2          JUDGE MARCUS:  Sure.  I understand, Mr. Bryan

 3  understands the rules, and I know the lawyers do.

 4      With that, I thank you --

 5          MR. DUNN:  Okay.  Great.

 6          JUDGE MARCUS:  With that -- Judge Manasco?

 7          JUDGE MANASCO:  Judge Marcus, I was just going to let

 8  everybody know that Frankie will open the Zoom at 8:00 a.m.

 9  tomorrow since we will be begin court at 8:30 so people can

10  start being allowed in at 8:00.

11          JUDGE MARCUS:  All right.  With that, I thank you all.

12  Have a good evening, and we will see you back here at 8:30

13  Central Standard Time tomorrow.

14          (Whereupon, the above proceedings were concluded at

15      5:32 p.m.)

16

17

18

19

20

21

22

23

24

25
```

1                          <u>CERTIFICATE</u>

2

3

4          I certify that the foregoing is a correct

5     transcript from the record of proceedings in the

6     above-entitled matter.

7

8

9

10

11   <u>01-06-2022</u>

12   Christina K. Decker, RMR, CRR                Date

13   Federal Official Court Reporter

14   ACCR#:  255

15

16

17

18

19

20

21

22

23

24

25