FILED
2022 Jan-18 PM 03:32
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

BOBBY SINGLETON, et al., *
Plaintiffs, * 2:21-cv-1291-AMM
* January 7, 2022
vs. * Birmingham, Alabama
* 8:30 a.m.
JOHN MERRILL, in his official *
capacity as Alabama Secretary *
of State, et al., *
Defendants. *
******************************
*
EVAN MILLIGAN, et al., *
Plaintiffs, * 2:21-cv-1530-AMM
*
vs. *
*
JOHN MERRILL, in his official *
capacity as Alabama Secretary *
of State, et al., *
Defendants. *
******************************
*
MARCUS CASTER, et al., *
Plaintiffs, * 2:21-cv-1536-AMM
*
vs. *
*
JOHN MERRILL, in his official *
capacity as Alabama Secretary *
of State, et al., *
Defendants. *
******************************

TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
VIA ZOOM CONFERENCE
VOLUME IV
BEFORE THE HONORABLE ANNA M. MANASCO,
THE HONORABLE TERRY F. MOORER,
THE HONORABLE STANLEY MARCUS

***CHRISTINA K. DECKER, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, AL 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

Proceedings recorded by OFFICIAL COURT REPORTER, Qualified pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies and Procedures Vol. VI, Chapter III, D.2. Transcript produced by computerized stenotype.

APPEARANCES

FOR THE SINGLETON PLAINTIFFS:

James Uriah Blacksher
JAMES U. BLACKSHER, ATTORNEY
825 Linwood Road
Birmingham, AL 35222
205-612-3752
Fax: 866-845-4395
Email: Jublacksher@gmail.com

Myron C Penn
PENN & SEABORN LLC
53 Highway 110
PO Box 5335
Union Springs, AL 36089
334-738-4486
Fax: 334-738-4432
Email: Myronpenn28@hotmail.com

Joe R Whatley, Jr
WHATLEY KALLAS LLP
2001 Park Place North Suite 1000
Birmingham, AL 35203
205-488-1200
Fax: 800-922-4851
Email: Jwhatley@whatleykallas.com

Henry C Quillen
WHATLEY KALLAS LLP
159 Middle Street Suite 2D
Portsmouth, NH 03801
603-294-1591
Fax: 800-922-4851
Email: Hquillen@whatleykallas.com

W Tucker Brown
WHATLEY KALLAS LLC
P.O. Box 10968
Birmingham, AL 35202-0968
205-488-1200
Fax: 800-922-4851
Email: Tbrown@whatleykallas.com

Diandra "Fu" Debrosse Zimmermann
DICELLO LEVITT GUTZLER
420 20th Street North
Suite 2525
Birmingham, AL 35203
205-855-5700
Fax: 205-855-5784
Email: Fu@dicellolevitt.com

Eli Joseph Hare
DICELLO LEVITT GUTZLER LLC
420 20th Street North, Suite 2525
Birmingham, AL 35203
205-855-5700
Fax: 205-855-5784
Email: Ehare@dicellolevitt.com

FOR THE MILLIGAN PLAINTIFFS:

Deuel Ross
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th Street N.W. Ste. 600
Washington, DC 20005
(202) 682-1300
Dross@naacpldf.org

Leah Aden
Stuart Naifeh
Kathryn Sadasivan
Brittany Carter
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
Laden@naacpldf.org
Snaifeh@naacpldf.org

Davin M. Rosborough
Julie Ebenstein
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St.
New York, NY 10004
(212) 549-2500
Drosborough@aclu.org
Jebenstein@aclu.org

Kaitlin Welborn
LaTisha Gotell Faulks
AMERICAN CIVIL LIBERTIES UNION
OF ALABAMA
P.O. Box 6179
Montgomery, AL 36106-0179
(334) 265-2754
Kwelborn@aclualabama.org
Tgfaulks@aclualabama.org

David Dunn
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
(212) 918-3000
David.dunn@hoganlovells.com

Michael Turrill
Harmony A. Gbe
HOGAN LOVELLS US LLP
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
(310) 785-4600
Michael.turrill@hoganlovells.com
Harmony.gbe@hoganlovells.com

Shelita M. Stewart
Jessica L. Ellsworth
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, D.C. 20004
(202) 637-5600
Shelita.stewart@hoganlovells.com

Blayne R. Thompson
HOGAN LOVELLS US LLP
609 Main St., Suite 4200
Houston, TX 77002
(713) 632-1400
Blayne.thompson@hoganlovells.com

Sidney M. Jackson
Nicki Lawsen
WIGGINS CHILDS PANTAZIS
FISHER & GOLDFARB, LLC
301 19th Street North
Birmingham, AL 35203
Phone: (205) 341-0498
Sjackson@wigginschilds.com
Nlawsen@wigginschilds.com

FOR THE CASTER PLAINTIFFS:

Abha Khanna
ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
206-656-0177
Email: AKhanna@elias.law

Aria C Branch
ELIAS LAW GROUP LLP
10 G St NE, Suite 600
Washington, DC 20002
202-968-4490
Fax: 202-968-4498
Email: ABranch@elias.law

Daniel C Osher
ELIAS LAW GROUP
10 G Street NE
Suite 600
Washington, DC 20002
202-968-4490
Email: DOsher@elias.law

Joseph N. Posimato
Elias Law Group LLP
10 G Street, NE; Suite 600
Washington, DC 20002
202-968-4518
Email: Jposimato@elias.law

Lalitha D Madduri
ELIAS LAW GROUP LLP
10 G Street NE, Suite 600
Washington, DC 20002
202-968-4490
Email: Lmadduri@elias.law

Olivia N. Sedwick
Elias Law Group LLP
10 G Street, NE; Suite 600
Washington, DC 20002
202-968-4518
Email: Osedwick@elias.law

Richard P Rouco
QUINN CONNOR WEAVER DAVIES & ROUCO LLP
Two North Twentieth Street
2 20th Street North
Suite 930
Birmingham, AL 35203
205-870-9989
Fax: 205-803-4143
Email: Rrouco@qcwdr.com

FOR THE DEFENDANT:

Andrew Reid Harris
OFFICE OF THE ATTORNEY GENERAL
CONSTITUTIONAL DEFENSE DIVISION
501 Washington Avenue
Montgomery, AL 36130
334-353-8891
Email: Reid.Harris@AlabamaAG.gov

Benjamin Matthew Seiss
ALABAMA OFFICE OF THE ATTORNEY GENERAL
P.O. Box 300152
501 Washington Ave (36104)
Montgomery, AL 36130
334-353-8917
Fax: 334-353-8400
Email: Ben.seiss@alabamaag.gov

Brenton Merrill Smith
OFFICE OF THE ATTORNEY GENERAL OF ALABAMA
P.O. Box 300152
501 Washington Avenue
Montgomery, AL 36130
334-353-4336
Fax: 334-353-8400
Email: Brenton.Smith@AlabamaAG.gov

Edmund Gerard LaCour, Jr.
OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
P.O. Box 300152
Montgomery, AL 36104
334-242-7300
Fax: 334-242-4891
Email: Edmund.Lacour@AlabamaAG.gov

James W Davis
OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
P O Box 300152
Montgomery, AL 36130-0152
334-242-7300
Fax: 334-353-8400
Email: Jim.davis@alabamaag.gov

Misty Shawn Fairbanks Messick
OFFICE OF THE ATTORNEY GENERAL
FOR THE STATE OF ALABAMA
501 Washington Avenue
P O Box 300152
Montgomery, AL 36130-0152
334-242-7300
Fax: 334-353-8440
Email: Misty.Messick@AlabamaAG.gov

Alexander Barrett Bowdre
OFFICE OF THE ALABAMA ATTORNEY GENERAL
P.O. Box 300152
Montgomery, AL 36130
334-242-7300
Fax: 334-353-8400
Email: Barrett.Bowdre@alabamaAG.gov

Thomas Alexander Wilson
STATE OF ALABAMA
OFFICE OF THE ATTORNEY GENERAL
501 Washington Street
Montgomery, AL 36103
334-242-7300
Fax: 334-353-8400
Email: Thomas.wilson@alabamaAG.gov

J Dorman Walker
BALCH & BINGHAM LLP
P O Box 78
Montgomery, AL 36101
334-834-6500
Fax: 334-269-3115
Email: Dwalker@balch.com

COURTROOM DEPUTY: Frankie N. Sherbert

COURT REPORTER: Christina K. Decker, RMR, CRR

798

**I N D E X**

| | |
|---|---|
| DIRECT EXAMINATION OF THOMAS BRYAN CONTINUED<br>BY MR. DAVIS | 800 |
| CROSS-EXAMINATION<br>BY MS. KHANNA | 877 |
| CROSS-EXAMINATION<br>BY MR. DUNN | 1014 |
| CROSS-EXAMINATION<br>BY MR. BLACKSHER | 1073 |
| FURTHER REDIRECT EXAMINATION<br>BY MR. DAVIS | 1098 |

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**P R O C E E D I N G S**

(In open court.)

JUDGE MARCUS: Good morning to everyone. I take it counsel are ready to proceed for the Secretary of State. Mr. Davis, you are ready to proceed?

MR. DAVIS: We are, Your Honor.

JUDGE MARCUS: You have your witness, Mr. Bryan, here. And we have Ms. Khanna for the Caster plaintiffs, Mr. Blacksher for Singleton, Mr. Dunn for Milligan. So we are ready to proceed with the direct examination.

Before we did, there's one thing I wanted to raise with you. Judges Moorer, Manasco and I took a look at scheduling and we wanted to make one brief change in the scheduling order that we have already entered.

We had asked the parties to submit proposed findings of fact and conclusions of law within 5 days of the completion of the preliminary injunction hearing, whether the hearing ends on Tuesday or Wednesday, I am not quite sure. You will take whatever time you need to do it and do it right.

But we are going to accelerate the time for filing those proposed findings of fact and conclusions of law, and we would ask you to submit them to the Court no later than the end of next Friday, January 14th. So we are not talking about the end of business, but really at the end of the day.

So by the end of next Friday, we will ask you to submit

any proposed findings of fact and conclusions of law. But we wanted to give you at least seven or eight days notice of that, which is why we decided to share that change with you this morning.

08:33:16 Having said that, we're ready to proceed, Mr. Davis, with your witness. You may proceed on your direct. Thank you.

DIRECT EXAMINATION OF THOMAS BRYAN CONTINUED

BY MR. DAVIS:

Q Thank you, Your Honor. Good morning, Mr. Bryan.

08:33:30 A Good morning.

Q Mr. Bryan, did you assess the whole county plan presented by the Singleton plaintiffs?

A I did.

Q I will share with you Defendants' Exhibit 1. This is 08:33:49 page 53 of your first report. Is this the whole county plan that you assessed?

A This looks correct, yes.

MR. DAVIS: And I will say for the benefit of the court and the other parties, we will first go through 08:34:02 Mr. Bryan's Singleton report, then his analysis of the Hatcher plan, and third, his supplemental report.

It will be a bit slow going through the Singleton plan because for each analysis Mr. Bryan will be explaining what he did. There will be no need to repeat that for the Hatcher and 08:34:20 the for the other two reports. Those will go more quickly.

JUDGE MARCUS: Thank you, Mr. Davis. And, again, you take the time you need.

MR. DAVIS: Thank you, Your Honor.

BY MR. DAVIS:

08:34:30 Q What do the Singleton plaintiffs do with counties in this map that they presented, Mr. Bryan?

A My assessment is that the plaintiffs used whole county geography, that is, they did not split counties or conform to any other piece of administrative geography beside counties.

08:34:55 They used the -- can we bring the exhibit up please?

Q Of course.

A Thank you. They used the 67 counties, and then appears to have built seven different districts by aggregating whole county units in a unique way to generate a plan that I believe 08:35:27 ended up -- because of the use of whole counties -- had approximately a 2.5 percent population deviation.

Q Okay. Are you aware of any requirement in Alabama law that requires Alabama to keep counties whole in this congressional plans?

08:35:45 A I am not aware.

Q Are there any states that keep counties whole in their congressional districts? And I should say states with more than one congressional districts.

A Yes. Thank you for that.

08:35:58 Our research showed that we are certain that there are

08:36:21 08:36:39 08:36:57 08:37:14 08:37:36

two. We examined the redistricting rules for all of the states and note for certain that Iowa uses counties, and that West Virginia uses them.

There are other states that may use counties for other types of redistricting, but not for the entire state.

Q So other than Iowa and West Virginia, other states, to the best of your knowledge, that have more than one congressional district split at least some counties?

A That is correct, to the best of my knowledge. I wouldn't assume there may not be some other state out of all of them that we may have missed, but we believe for certain that Iowa and West Virginia at a minimum have them. But it's a very uncommon practice.

Q Remind us what a community interest is to your way of thinking.

A Sure. Yeah. It's a group of people, a collection of people, and they can generally be thought of as being geographically defined, a universe of people with often times similar, you know, attitude, beliefs, behaviors, things that help define them as staying in common.

As Dr. Duchin testified yesterday, a point which I agree, that those communities of interest can oftentimes work in conflict with each other. There is no uniform widely known right or prevailing community of interest over any other. It's a subjective and difficult concept to try and apply to

redistricting.

Q Do you have any opinion as a demographer on the relative importance of counties as a community of interest as opposed to say some type of economic bond?

08:37:56 A In different states, different communities of interest can mean different things. The plaintiffs mentioned in their complaint, they refer to Georgia, and Georgia is a unique state insofar as it has I think 159 counties. It has many, many more units of county geography.

08:38:24 So it's both more relevant and easier to use counties in that case in that state just because that is a more prevailing and easier to use a piece of geography than it may be in a state like Alabama where counties at one point a long time may have been used to define districts in the state, but they are 08:38:44 no longer. And it is, in fact, difficult, it is more difficult to use counties in a state like Alabama because there are relatively fewer counties to use to do redistricting.

Q Are counties as important as -- are these important today as they were 50 or a hundred years ago?

08:39:02 A Yeah. I would say no. I wrote at some length about the origins and uses of counties and there's obviously still legacy use of counties in the administration of the state, but there are other prevailing communities of interest today. We could say such as economic bonds, social bonds, bonds within cities 08:39:26 or other pieces of geography that prevail over counties as a

community of interest. I think that's reflected by the long recent history in Alabama of not using them. They use other things instead.

Q Do the Singleton plaintiffs ever say why they consider counties so important that you saw in your review of their complaint?

A I read the complaint carefully, and I did not see a strong argument for why. It just -- the -- my interpretation of the report is that they said that their defense was that they were used historically and they want to use them now. But I didn't see a strong defense of why they should be used over other communities of interest.

Q You said review of the report. Did you mean review of the complaint?

A Yes, that's correct.

Q Thank you. What does a demographer mean by core retention?

A Yeah. So core retention for a demographer in the process of redistricting is a quantitative method that we use to measure the degree to which a district is changed in the process of redistricting.

Typically, we will begin with a count of the population of the districts that we are going to redistrict, and we will make an assessment of how many people are in those districts currently using the most recent decennial census data.

The exercise of core retention then goes on to measure how much those districts are changed and how population are moved among them forensically from one district to another to the person to make an assessment of how many people are displaced, and how many people are retained in the what we would call the core district. That gives us the ability to see how much retention and how much displacement there is in the process of redistricting.

Q In your experience as a demographer working on plans in different jurisdictions, is it common for folks to desire to preserve the core of previous districts?

A It is common. It is one of the NCSL standards. It's one of the standards in the Georgia, the reapportionment guidelines. And they are numbers that we look carefully at, no matter what redistricting plan that we are working on. It's an important consideration and something that you think hard about for the continuity of representation.

Q Did you assess how well or poorly Alabama did preserving the core that 2011 districts in its new plan?

A Yes, I did.

Q Is that reflected in this Figure 5.1 on page 22 of Defense Exhibit 1?

A Yes, it does. Figure 5.1 shows the percent of the population that was retained in the original seven districts through the process of redistricting.

The blue line shows the percent of the total population that was retained. And then given the nature of this case, that there is an interest consideration of the black population and the impact to the black population. We extended this analysis to do a core retention of the black-alone population incremental to the total population.

And the purpose of that analysis was to determine whether there was a significant disproportionate impact on the black population through the process of redistricting. It's -- from a demographer's point of view, you would always want to know if there's been a disproportionate impact on a population that's different from everybody else.

Q Okay. So would it be a fair interpretation of this map, looking here at District 1 on the left side, that this blue line means that between 2011 and 2021 Alabama retained 98.8 percent of the population of old District 1 in new District 1?

A That's correct.

Q And then 98.6 percent of the black population of old District 1 in new District 1?

A That's correct. Virtually identical. It would be no -- what I would refer to as differential impact to the black population with the core retention of District 1.

Q Okay. Let's look at the next page, your Table 5.1.

A Yes.

Q This is page 23 of Defense Exhibit 1.

Interpret this table for us, Mr. Bryan. Maybe start with District 1 and show us what you are telling us in this table.

A Sure. Thank you.

08:44:47 In the first column, what we have done is we've made an identifier for the what I will call the base district or the original district that was subjected to the redistricting process. Then what I've done in the second column is I have identified districts with population that were changed from the 08:45:11 first or the original base district that we did redistricting on.

So in District 1, as we look and read across the rows, you can see base District 1, new District 1, the total population was 717,754. When you read the second line, you can see there 08:45:37 was a very small number, 739 people, that were moved into District 2.

And then lastly, there were approximately 7,800 people who were moved into District 7.

We can see here this last line where it says one total 08:45:55 where it says 726,276 that was the total population that we started with when we began the redistricting process. That number at the top, again, 717,754, that is the target population for the districts in the redistricting plan.

As you continue to the right, you see the same analysis 08:46:21 for the total, except for the black-alone population. In this

case, there was 185,771 thousand blacks who were originally in District 1 who remained in District 1. Again, a small number were moved into District 2, and also a small number -- a relatively small number were moved into District 7.

08:46:43 This analysis continues down with each district showing the pieces that were retained and the pieces that were moved into different districts.

If you look at District 4, for example, District 4 was moved into five different pieces. District 5 was split into two different pieces, and so forth.

08:47:01

This gives us the forensic ability to see exactly how many of what kind of people were moved between different districts and the redistricting process.

Q Okay, Mr. Bryan, did you assess how well the Singleton plan did with core retention?

08:47:24

A I did.

Q Then we'll refer you to your Figure 5.2 that is on page 24 of Defense Exhibit 1.

A Thank you.

08:47:33

Q Tell us what your Figure 5.2 shows, please.

A Sure. Thank you.

In Figure 5.2, we show a chart that is consistent with the state of Alabama chart that we just walked through. So in this case, if you look at District 1, it would say that 94.1 percent of the total population was retained in District 1 and also

08:47:58

92.5 percent of the black population.

So consistent with the Alabama plan, this plan has a very high level of core retention in District 1. This plan also has somewhat high retention in District 5. We know this already, but when we start looking at the other districts that were changed in the redistricting process, you can see that there was a signi -- two features -- a significantly lower amount of core retention by district, and also a significantly higher impact to the black population separate from the total population.

Q What do you mean by higher impact to the black population?

A Yes. So, for example, if you examine in this chart District 2, District 2 would show that 66 percent of the total population was retained; that is, their continuity of representation is ensured.

By comparison, only 50 percent of the black population in District 2 were retained. So that is there were approximately 16 percentage points more of black population who lose their continuity of representation in this plan for the blacks compared to the total.

That same feature plays through if you look at District 4. But in that case, it is even more severe. There's 63 percent of the total is retained. Again, much lower than the State of Alabama's plan, but then you look at the black population, 33.7 percent, there was, you know, over -- nearly a 70 percent

displacement of blacks, preventing their continuity of representation in District 4.

Q Thank you.

And the next page, page 25, Table 5.2. What is Table 5.2?

08:50:17 A Yeah. Table 5.2 is a companion to the earlier table we just walked through. This table shows the comparison of the existing districts with the Singleton plan as opposed to the distribution that you would have arrived at with the state of Alabama plan.

08:50:36 Q Thank you.

Mr. Bryan, what does a demographer mean by incumbency protection?

A Yeah. The way we think about incumbency protection is through the lens of generally accepted rules for traditional

08:50:57 redistricting principles, which is that, again, part of continuity of representation, you generally want to avoid pitting incumbents that may have a longstanding relationship and a deep knowledge of their constituency from having to run against each other and compete and losing the knowledge or

08:51:17 experience that may come with that representation.

Q If the state ignores incumbency protection, would that give the majority party the ability to get rid of political rivals by making their opponents run against each other, putting them in the same districts?

08:51:36 A It is possible. And we have seen that happen even

recently.

Q Did you assess how Alabama's plan did with incumbency protection?

A I did.

08:51:47 Q What did you find?

A I found that there was no pairing of incumbents.

Q Did you assess whether the Singleton plan created any incumbent conflict?

A Yes. There was a set of paired incumbents in the

08:52:05 Singleton plan. I don't have the name of the pair in front of me, but it should be in my report.

Q You assess that on page 27 of your report.

A Yeah. This is correct. So the plaintiffs plan pairs Palmer/Rogers in a proposed District 3 leaving District 7

08:52:24 unrepresented. I would know that that pairing, which you can see in the very center of the map, those two incumbents are literally right on the edge of the border there between District 3.

Q Thank you.

08:52:46 So the Singleton plan does have a district with two incumbents in the same district?

A It does. Yes. And it would be very difficult from here to have adapted this plan to avoid that. You can see that the location of the pairing next to the number 3 on the map is

08:53:05 still quite a ways away -- geographically is quite a ways away

from anywhere in District 7 where another incumbent would have to be so that you would not pair incumbents.

Q Thank you. You present some alternative whole county plans in your report, do you not?

08:53:27 A I do, yes.

Q And would those be available for viewing in the map appendices of Defense Exhibit 1?

A Yes, they would.

Q Did you find any combinations of counties in alternative

08:53:41 whole county plans that avoids incumbent conflicts?

A Yes, we did. We did not pursue that as an objective of it, but there were, I believe, at least -- at least two different ways which you could group counties to comply with that tradition of redistricting principle.

08:54:04 Q Okay. What does it mean to a demographer for a district to be compact?

A Yeah. As Dr. Duchin discussed yesterday, she shares a point of view with which I agree, is that it features geographic compactness and would not have a necessary or

08:54:30 extraneous other pieces of the geography that would perhaps stick out or impose into it that would make it unusual, unwieldy, or have an uncommon geographic feature that may be for some other redistricting purpose. It's a -- generally a benefit to have geographically compact districts.

08:54:55 Q I want to go to Page 45 of Defense Exhibit 1.

A Yeah.

Q What are some of the ways that demographers measure compactness of a district?

A Sure. It's important to know that compactness is an area of mathematics. It's an area of analytics where there is no agreement. There's not a right way. There is a very famous article, a great paper by Dr. King of Harvard that says compactness is just -- you'll know it when you see it, right?

So there have been several very prominent, very good mathematicians that have tried to tackle this problem by looking at things such as, you know, the ratio of the area of a district to a circle that circumscribes it or outer bounds it, right?

So as Dr. Duchin said yesterday, there's two very common -- and I agree, there are two most common methods. Those would be Polsby-Popper and the Reock scores they use to assess the compactness of a plan.

Q Just briefly in layman's term, how does the Polsby-Popper measurement work?

A Yeah. So basically it's taking the ratio of the -- I want to get my language exactly right here because there is some precision in the mathematics. Polsby-Popper is the ratio of the area to the area of the circle whose circumference equals the perimeter of the district.

Q Okay.

08:57:07

A It's a lot of words, but it's just a distillation of some mathematics that say it's the ratio of this area to a circle. And as Dr. Duchin pointed out, the circle is kind of the optimal feature, and things that you elongate or go outside of a circle would be detrimental to its compactness.

Q And there's a Schwartzberg measure?

08:57:26

A Yes. Which this is a close companion measure to the Polsby-Popper. The Schwartzberg method that I use is actually an adaptation of the historic, probably the more well known, the original mathematic derivation of the Schwartzberg method, but we can talk about that if you'd like.

08:57:49

Q Sure. Well, the plaintiffs have said -- some of the plaintiffs' experts have said that they disagree with the way you presented Schwartzberg measurements. So what is your response to that?

A They're correct. The pure mathematics of Schwartzberg are different than what I presented. What I present for Schwartzberg is what I would call an adaptation, a useful adaptation of that method.

08:58:03

08:58:27

The Schwartzberg method will generate results that can go from 1, you know, in theory, to infinity. And so what we do, in order to make the Schwartzberg number more comparable, compatible, easier to interpret compared to other measures, is we rescale that to a value that's between 0 and 1. It is not conventional, but I am not the first one who has used it.

08:58:51 When we did that adaptation of the Schwartzberg method, we did rigorous statistical tests to see how it compared with its companion measure, the Polsby-Popper. And the statistical test that we ran suggested that it was so consistent with our findings for Polsby-Popper, we probably didn't even need it.

So it's a useful metric, it's an interesting metric. But no matter whether you use the original mathematic derivation of it or our adapted method of it, the outcome is the same. And it would be exactly consistent with the statistics we had with

08:59:16 Polsby-Popper, which Dr. Duchin, I believe, suggested we match our conclusions there exactly.

Q When we discussed your qualifications yesterday afternoon, you said, did you not, that you have experience in statistical transformation?

08:59:31 A Yes, I do.

Q Okay. And is that what you were doing here, converting the Schwartzberg scale to use the same scale as other compactness measures?

A Yes. Yes, it is.

08:59:45 Q Thank you. That's enough of the measures.

Let's look -- you measured compactness of the Alabama plan and the Singleton plans, did you not?

A I did.

Q Let's turn to page 29 of Defense Exhibit 1. Actually,

09:00:15 let's move on to the next page.

What scores are you showing here in Table 5.4 on page 30 of Defense Exhibit 1?

A All right. Thank you.

The table you see here is color coded. The Christmas tree coloring of red to green shows the red scores being the lowest scores, the green scores being the highest scores.

There's two different ways that I summarize the statistics in this table. The first is by summing each column. So for Polsby-Popper as you add up these different values we would get a score of 1.55. You sum up my adapted Schwartzberg, it's 3.28. Reock is 2.67. The convex hull is 5.01.

So these are numbers that you would then take for this plan and then say, ah, let us compare these with the sum of the figures for another plan and then we can come to a useful determination, if in aggregate, one plan is more compact than another plan, right?

The other way that I summarize these data is by row. And the reason that I do this is because it's very difficult to just look at all of these different numbers and say, with all these different fractions, which one in aggregate -- which district in aggregate is better than another. So I emphasize there is no one right way of doing it. This is how I've done it. It has been useful to judges and courts and experts and to informed discussions about in general which plans in which districts perform better than the other.

09:02:29 There was criticism of this approach by Dr. Duchin in her rebuttal report saying that this, from a pure mathematics standpoint, is not pure, if you will. I mean, it's subject to some variation, perhaps different interpretations because of different distributions of numbers within here.

09:02:51 So I would like to acknowledge and concede that, yes, there is no one perfect way to aggregate or summarize different methods for individual districts, but I would argue it as one useful way in general to be able to see which ones are better, and in general which ones are worse.

The reason that we provide all of the data for all of the districts for all of the methods is so that the readers, the experts, the courts, can look and see for individual methods what those numbers are for each one individually.

09:03:10 This prevents us from having the perception that we are trying to hide any information. We're trying to be fully transparent and share everything we know and fully document how we got there because there is no known or agreed upon way to summarize or tabulate these data.

09:03:29 Q Have you found these totals that you present to be a useful way to judge the compactness of the district or a plan?

A Yes. In summary, it's a very useful way just to look at a glance and say which ones are higher or which ones are lower. They do not have the mathematic precision that Dr. Duchin points out, but that does not detract from the fact that they

09:03:57

09:04:15

09:04:33

09:04:45

09:05:04

09:05:23

have utility in helping a reader quickly see which ones are higher or which ones are lower.

If you go into the individual methods, the Polsby-Popper, Schwartzberg, Reock, convex hull, and you look at those individually, you will find that they will generally follow the same pattern as this number does in aggregate. This number tries to take a lot of different information and put it together in one summary statistic. But, again, we leave all of the information here for the reader. So if they know, familiar with these different methods, they're more than welcome to look at those and focus on those individually as well.

Q You present measurements for the Singleton plan, do you not?

A Sure. Yes.

Q And is that in Table 5.5 on the bottom of page 30 of Defense Exhibit 1?

A Yes, that is correct.

Q How does the compactness of the Singleton plan compare to the compactness of Alabama's 2011 plan -- excuse me -- 2021 plan?

A Sure. Yes. Thank you.

So when we -- when we compare tables 5.4 and 5.5, what I would look here to is the sum. Basically, the row at the bottom of each one of these tables to say is there a difference or not.

And so when we look at Polsby-Popper and Schwartzberg, as I said earlier, the adapted Schwartzberg score is very, very close. You can look at the rank order of them and the sum, and you can see that there's basically no difference in Polsby-Popper for the enacted plan compared to the Polsby-Popper for Singleton.

09:05:39

Similarly, as you would expect, the Schwartzberg score or adapted Schwartzberg score is within 1/100th as well. So by those two measures you would say the Alabama plan and the Singleton plan here would be comparable.

09:05:57

Some of these other measures, the Reock, for example, which is the other measure that Dr. Duchin presents in her work, would show -- the Reock score here would show higher for the Alabama plan. And then a fourth method that I find useful, it's not always used in redistricting, but it's still a very useful measure of compactness, called convex hull. The convex hull measure here also scores the Alabama plan higher than the Singleton plan.

09:06:19

Q Thank you. Did you assess the demographics of the Singleton plan?

09:06:38

A Yes, I did.

Q Let's go to page 15 of Defense Exhibit 1.

A Great.

Q Table 4.1. What, if anything, did you note by reviewing the total population of the districts in the Singleton plan?

09:07:00

A Yes. As we noted earlier, because the plan was built with counties and was not built down to the degree where you had one person of deviation, you see a reflection, a manifestation of that two-and-a-half percent deviation here.

09:07:27 So you see a low score here of -- a low population of 709,514 in District 2. And then I think the high -- the high population figure here, the watermark, is 727,206.

Q Okay. What does it mean for voters if there's population deviation among the districts?

09:07:54 A Sure. So this is a core tenent that -- related to one person, one vote. And the idea here, you know, part of the reason we have a census, part of the reason we go and check and see what the population is every 10 years is so that we can balance the population equally in each district.

09:08:18 The impact of balancing that population is important because per one person, one vote, you want to have each individual citizen's vote count as closely as possible, if not exactly the same amount as the citizen next to them. You would seek to have as close to an equitable one person, one vote as 09:08:41 possible.

Q If I am in a district with a hundred people, does my vote count the same as -- of somebody in a district with 50 people?

A No.

Q If a plan has 2.5 percent deviation today, does that mean 09:09:01 that the deviation will remain at 2.5 percent over the course

of the decade that the districts are used?

A Yes. I would say regardless of what a deviation is now, whether at 0 or 2 or 5, my experience is that no matter what, invariably, that that deviation can and will grow over time, and that is almost a universal truth in demography.

Q And you told us yesterday, did you not, that you have experience in estimating population shifts?

A I do.

Q Did you assess how the deviation of the Singleton plan in Alabama's 2021 plan are likely to change over the course of the coming decade?

A Yes, I did.

Q Tell us what you're showing us in Figure 5.7 of Page 33 of Defense Exhibit 1.

A Thank you.

In performing this analysis, I independently ran a series of rigorous population projections at the county level. I projected the county population by year, out to the year 2030. I then aggregated those county-level projections into the districts that are represented in the Singleton plan.

I then compared that with population projections that I built using the exact same methodology for the Alabama plan.

The outcome of this is that the Alabama plan, starting obviously at 0.0 percent deviation in 2020, you can see it starts going up almost immediately. You can see by 2021 the

current number, the Alabama plan would already have 1.4 percent deviation, but the 2.5 percent deviation in the plaintiffs' plan, we estimate to already be 2.9 percent.

09:11:31 If you follow those trends of the population projections out over time, our estimate is that the total deviation by the year 2030, if you stick with the Alabama plan, would only be 7.2 percent. And that number is a very common amount of deviation that you would find at a time of redistricting -- 7, 6, 5 percent, those are the kinds of numbers of deviation we commonly find.

09:11:56 By comparison, if you start a plan already handicapped with a 2.5 percent deviation to begin with, what will happen is that deviation is going to grow in a -- much more likely to grow higher and higher than a plan that started with zero deviation to begin with.

09:12:16 So in this regard, I would strongly advocate this analysis as a way to understand and represent the utility of the district plan over the course of the decade. Not just the year that it begins, but for all the years that this plan is supposed to support the people of Alabama.

09:12:38
Q So if Alabama -- just to sum this up -- if Alabama were to adopt the Singleton plan today --
A Right.
Q -- what do you estimate the total deviation to be among congressional districts by the end of the decade?
09:12:53

A 11.6 percent.

Q Did you form the same analysis, Mr. Bryan, for the alternative plans, the whole county plans that you drew?

A Yes, I did.

09:13:10 Q Tell us what you're showing us in Figure 5.8 on Page 34 of Defense Exhibit 1.

A Sure. Thank you.

So in this map, we just show a variety of lines. It looks a little messy. But basically, we're showing the different potential outcomes, given some different combinations of the plans that we came up with built on counties. And we did not -- we did not design these plans to optimize the forecasts. All the forecasts were done after the plans were designed.

As you can see, there's some plans that start high and end even higher. And there are some plans -- Plan 4, for example, that starts low. That one even gets better for a time before it goes up. But the outcome is that if you are starting with a zero percent deviation to begin with, as we see in the green line, that you are going to end up with the lowest deviation over the course of the whole decade compared to any other way you would build this with counties.

Q Gotcha. This might be a good time to talk about the alternative plans in general.

Did you draw any of the alternative whole county plans with any particular goals in mind, other than trying to achieve

minimum deviation?

A No, we did not. There is many, many ways that you could draw the plans based on counties to the point where they became, for example, hopelessly not compact, irregular or perhaps that they may have really large deviations.

So my analysis here and my determination to cut this off, whatever, 13 different plans, was subjective. It was a point where there wasn't any incremental benefit from destroying more and more plans. It would be inferior to these combinations that we had already come up with.

Q Well, just looking at the left side of Figure 5.8, did you draw some whole county plans that had lower deviation than the Singleton plan at the beginning?

A Yes.

Q And did you draw some that had greater deviation than the Singleton plan at the beginning?

A Yes. They were both higher and lower than the Singleton plan.

Q From your estimates, Mr. Bryan, did you find any whole county plans that would, by the end of the decade, present lower deviation than Alabama's 2021 plan?

A No. There was one, Plan 4, that is close, but at the end, the Alabama plan, because of its zero deviation starting point, prevails as having the lowest overall deviation for the entire decade of their utility.

Q Mr. Bryan, Singleton plaintiffs allege, do they not, that if their plan were in use, that two of those districts in past elections would have voted for the Democratic candidate? Do you understand that to be the case?

09:16:36 A I understand that to be the case, yes.

Q And I want to refer you now to page 37 --

A Great.

Q -- of your report. What are you showing us in Figure 5.10? And, again, that is page 37 of Defense Exhibit 1.

09:17:05 A Thank you.

What we tried to do here is create a data visualization that enabled the reader to be able to quickly and easily see what the rank order of the political performance would be in each district under each plan.

09:17:24 So, for example, if you read this vertically, the number to the highest, this is percent Republican voting. The number at the highest is the highest percent Republican district in that plan. The numbers at the bottom represent the lowest Republican performing plans. And those were plans where 09:17:43 consistent with the plaintiffs' assertion of the use of black registered voters in the 40 percent range as being a performing district, we looked for versions of this plan that had either one or two districts that had Democratic performing districts in that range, the 40 to 45 percent range.

09:18:07 Q So this is just a hypothetical plan. You're just showing

us how to read a chart here, correct?

A Yep. It's just a -- it's a setup because it's a lot of information. Yep.

Q Now, your alternative plans, do you find that if you keep counties whole that it's necessarily the case that you will end up with two districts likely to elect a Democratic candidate?

A No. That, in fact, was not the case, and that's not surprising to me.

Q Okay. Let's look at Figure 5.1.

A Okay.

Q On page 38 of Defense Exhibit 1.

A Sure.

Q Explain this chart for us, please.

A Sure. So on the left, we have the distribution of seven districts for the plaintiff plan. You can see a seven dots there ranked from lowest to highest. And, you know, the plaintiffs, I believe it's page 26 of their complaint, talk about the percent black registered voters. This is a little bit -- little bit different way of looking at the information.

Here we're looking at the percent Republican votes in the 2018 governor's race, as there's nothing magical about that race. We looked at some other races and findings were consistent.

So what this would say is that if you look to the left, the plaintiff plan would show there would be two strong

Democrat performing districts and five Republican ones.

As you read across the right, you will see some of my different alternate plans, that there are some cases where there are one and some cases where there are two Democrat performing districts. And then you can see on the far right, the state of Alabama plan has one very strong performing Democratic district.

Q Let's be clear. You are not a political scientist, are you, Mr. Bryan?

A No.

Q And have you prepared any estimates of how these districts are likely to perform in the future?

A I have not, and I have no idea. I wouldn't know how to do that.

Q Okay. So let's -- just to make sure we're all on the page, this one here is one of your alternative plans, correct?

A That is correct.

Q And this plan number 1, is it true that what you're showing -- in this plan there's one district where in the 2018 governor's race a majority of voters supported the Democratic candidate?

A That's correct.

Q And there are six districts in that hypothetical -- in that plan that supported the Republican candidate in the 2018 gubernatorial election?

A That is correct.

Q Of the 13 plans that you drew, how many resulted in two districts that supported the Democratic candidate in that one election?

09:21:13 A I believe there were two districts that had two Democrat.

Q Okay. The Singleton plan had two districts that were over 40 percent African-American Voting Age Population; is that correct?

A Can you please say the question again?

09:21:41 Q Sure. Is it true, Mr. Bryan, that the Singleton plan has two districts that had over 40 percent African-American Voting Age Population?

A Yeah. There is, I believe, two, or perhaps one more, three. I'm going off of memory, but, yeah, there were a couple. 09:22:00

Q I understand. Let's look at your Figure 5.13.

A Sure.

Q Page 39.

A Yep.

09:22:13 Q Defense Exhibit 1.

A Yeah.

Q Tell us what you're showing us in this chart.

A Sure. So this is a similar data visualization as we just saw with the political performance, except that now what we are doing is looking at the percent black population for each one 09:22:30

of the plans by district under each one of these different scenarios.

So as we start to the left, no surprise. We can see kind of two dots above the line for the plaintiff plan and then as you read across to the right, then you can see that there's, you know, several districts here where there are one district in my alternative plans that are above 40 percent, and there's a couple instances here where there were two above 40 percent.

At the end of this data visualization on the far right, you can see the state of Alabama plan, and that has one black district that's up in 50, mid-50 percent range.

Q Got it.

So looking at plaintiffs' plan, is it true that this chart tells us that in the Singleton plan there is a district with approximately -- looks like 48, 49 percent African-American --

A Yeah.

Q -- population?

A 48.8.

Q Now, I may have used imprecise language. Are you telling us what the total black population is in the district, or the total Black Voting Age Population in the district?

A I am going off of memory. I believe this is the total population. I want to be cautious. I don't recall precisely, but I think it's the total population.

Q That will be made clear in the language of your report,

would it not have?

A Yeah.

Q Yeah. Yeah. We won't dig around for that.

Out of the alternative whole county plans you drew, how many plans had two districts that were more than 40 percent single-race black?

A Yeah.

Q Oh, no, no, no. You said all black. So how many had more than two districts that were over 40 percent all black?

09:24:44 A Looks like we have three here.

Q Okay.

A I may have said two, but, yeah, I think there is three in here. But out of -- it's three out of 13. So the majority of them only have one.

09:24:58 Q Mr. Bryan, if a court were to order that Alabama had to keep counties whole in this congressional plan, would that, in your view, eliminate the possibility of racial gerrymandering?

A No.

Q Why not?

09:25:19 A Because we're able to demonstrate that there are different ways of combining counties to achieve different political and racial outcomes.

Q Okay. And to go back, to be clear, when you were drawing your alternative plans, were you purposely trying to either be sure to draw the districts with certain minority population or

to avoid doing so?

A The characteristics of the districts had no bearing, except that we sought to identify combinations that achieved the lowest population deviations. And at that point, we stopped until we got to the plaintiff about 5 or 6 percent deviation and then we did no more. I had no idea what the characteristics were when I drew them.

Q If a state wanted to keep counties whole in its congressional plan --

A Uh-huh.

Q -- could it racially gerrymander by choosing which counties to group with other counties based on the minority population in those counties?

A You could choose to do that.

Q I wanted to go back to Defense Exhibit 1 and have you explain to us some of the maps that you have presented in the appendices of your report.

A Sure.

Q Let's look at Map Appendix 18 on Page 71 of your report. Tell us what you are making in this map, Mr. Bryan.

A Sure. So this map has two -- what I will refer to as layers. So we have one layer. There's an outline that's shown in blue. And that is the outline of the 2021 plans for Alabama.

And then what we see with the different color shading from

red to orange, yellow, light green, dark green, are progressively higher and higher number of population for the counties.

Q Thank you. So we can look at this map and tell immediately which counties are the most populous in the state, then; is that right?

A Sure. Yes.

Q And you can spot areas that have low total population?

A Easily, yes.

09:28:00 Q Okay. Pick District 7, for example, in the state '21 plan.

A Yep.

Q Where is most of the population coming from that's in District 7?

09:28:12 A I am going to refer to my report, if I may.

Q Sure. Yes.

Maybe I could ask a clearer question.

A Sure.

Q Which counties in District 7 are the most populous?

09:28:34 A Yeah. If I may, I just would like to refer to -- there's another map adjacent to this in my report.

Q Okay. Do you want me to go to --

A Yeah, can you.

Q This one?

09:28:52 A Yeah. That -- that's much more helpful.

So, yeah, in Jefferson, like we'd look up into the central part of the state, it's -- this is the -- this is obviously black alone. Just looking for the district identifiers here. I didn't put it on the earlier maps. But, yes, so if you want to go back up, you can see that there's a lot of population distributed around the west -- the southern and western part. There's a lot of small population counties that populate the rest of District 7.

09:29:11

Q Sure. But we're looking -- we're looking here on this map on Page 71 of your report, just where -- where there are lots of people --

09:29:29

A Yeah.

Q -- no matter what the race is.

A Yeah. Around -- obviously, you look at the Birmingham area, right in the center, sort of the majority of all the population is that's driving 7 and the intersection with 6.

09:29:41

Q Gotcha.

Now, let's go to the next page at the map we looked at briefly.

A Thank you.

09:29:55

Q Page 72 of your report Defense Exhibit 1.

A Yep.

Q Tell us what this map depicts.

A Sure. So this is a map. It's a companion map to what we just saw earlier. As we discussed yesterday, there is another

09:30:12

layer of geography that can be used to measure and analyze and report population data, and those are called VTDs or voting tab districts. They are close companion to voting precincts, right? So it's a very useful way, a smaller level of geography that gives us greater granularity, clearer pictures of where the populations are.

In this case, what I have done is calculated the percent black-alone Voting Age Population by VTD. In this case, the red areas show where there are low percentages of black alone. Orange shows progressively higher and yellow higher yet. The green areas, the dark green areas show where there are the highest concentrations of black population by VTD in the state.

Q Thank you, Mr. Bryan.

What on the map do you show on page 73 of Defense Exhibit 1? Tell us what's in this map.

A Yeah. So this map, again, it's a companion to the earlier county-level map showing Voting Age Population by VTD. And, again, it just shows a more granularity, for example, in District 7, the high concentration of population driving District 7.

Q Thank you.

You prepared similar maps for the Singleton plan, did you not?

A I have.

Q Let's look at some of those. We'll go to page 75 of your

report, Map Appendix 21. Tell us what's in this map.

A No, this -- this map shows the outline of the Singleton plan. And it shows the percent black population by county relative to the boundaries of the Singleton plan.

09:32:17 Q Okay. Let's go to the next page, 76 of Defense Exhibit 1.

What are you showing us here?

A Yeah. So this map then would show the Voting Age Population by county relative to the Singleton plan.

Q Okay. So this map -- this district in the middle, I don't

09:32:49 remember which number district this is in the Singleton plan, the one that includes Jefferson County, Bibb, Hale and Perry, I believe. The vast majority of the total population of this district is coming from Jefferson County, is it not?

A Yeah. Virtually all of it, yes.

09:33:08 Q Okay. This other district that includes some of the Black Belt in Tuscaloosa County, looks like a significant amount of the total population of that district comes from Tuscaloosa and Montgomery counties. Would you agree with that?

A Yes.

09:33:28 Q Okay.

A Yeah.

Q Now, let's go to page 77 of Defense Exhibit 1. And tell us, Mr. Bryan, what you are showing us in this map, which is Map Appendix 23.

09:33:42 A So yes. So this map shows the percent black alone of the

Voting Age Population by VTD in relationship to the boundaries of the Singleton plan.

Q Thank you, Mr. Bryan.

Let's turn now to your next report, Defense Exhibit 2. You prepared a report for the Milligan and Caster cases, did you not?

A I did.

Q Let's -- district -- excuse me. Defense Exhibit 2 is that report, correct?

A That is correct. Yes.

Q Yes. Okay. Did you assess the Hatcher plan in this report?

A I did.

Q Okay. And for the Court's benefit, is the Hatcher plan the plan that was presented in the Milligan plaintiffs' complaint? To the best of your knowledge. If you need to review something, Mr. Bryan, let me know. The names may be confusing.

I will represent to you that the plan presented the Milligan complaint was also introduced into the legislature by Senator Hatcher?

A Yeah. That's my understanding, correct.

Q So if it confuses you for me to call it either the Hatcher plan or the Milligan plan, let me know and we will get on the same page with the language.

09:36:02 09:36:21 09:36:39 09:37:04 09:37:24

A I am clear.
Q I want to share Defense Exhibit 75 and ask you is that the Hatcher plan that you assess in your report that was submitted as Defense Exhibit 2?
A This -- it appears to be. This is not my map. But this appears to be the same map.
Q Thank you.
Now, this is somewhat different from the various plans presented by Dr. Duchin and Mr. Cooper as demonstrative plans, is it not?
A It is.
Q Okay. How does the general structure of this plan compare to the various demonstrative plans you've reviewed?
A Sure. So the key features of this plan, the first major difference is this is not a county-based plan. It has geography that builds their districts going all the way down to the block level. My observation is they generally used -- the authors of these plans used VTDs, but there were cases in order to achieve precise population balance where those VTDs were split and blocks were used.
As a more general observation I have here, the most impactful changes are that there are changes to where the boundaries of District 7 are drawn, I have up and around the Birmingham area. We can look around Birmingham relative to where the existing districts are.

We can kind of see where these plaintiffs' plans went, with regards -- and relative to and with regards to the existing plan. But I also think importantly that we can see that there's been a really significant change in District 2, insofar as it now kind of stretches from the far, you know, western to the eastern side of the state. And then also extends southward dividing Mobile and Baldwin counties.

Q All right. Let's go back then to your report and look in more detail at your assessment of this Hatcher plan.

Did you assess the demographics of the Hatcher plan?

A Yes.

Q I will refer to page 12 of Defense Exhibit 2. And tell us what you saw in reviewing the demographics of the districts in the Hatcher plan.

A Yes. Thank you.

My first observation, just as I discussed with the last plan, was to look at the total population in Table 4.1. It appears that the Hatcher plan is able to achieve a plus and minus 1 percent deviation. That is the low is 717,753, high 717,755.

As I read across this table, I see that the percent black population of the districts were 51.3 percent -- 51.5 percent for black alone in District 2 and 53.4 all black, or any-part black. And in District 7, there's a stronger black majority in that district with 54.3 percent black alone, and 55.8 percent

all black or any-part black.

Q Okay. What do you mean when you say this next to last column going left to right, black alone?

A The black-alone population?

09:39:57 Q Correct. How -- what do you mean by the term black alone versus the term you use in the next column, all black?

A Sure. So the black-alone population, the way that I define it and the way I think it's commonly defined in demography is that, as Dr. Duchin mentioned yesterday, there's 09:40:17 the option to check if you are black in the census form, as there is options to check if you are any number of other races, including white, Asian, American Indian, Native Hawaiian, Pacific Islander, and so forth.

The way that the Census Bureau then follows up, they ask a 09:40:38 question about what they call ethnicity or Hispanic origin. And so Hispanic origin is as a separate construct. It's a separate concept from race.

Hispanic is not race. So for every race you can pivot that to say whether that race is by Hispanic or not. So there 09:40:59 are Asian Hispanics. There are Native Hawaiian Hispanics. There are black Hispanics.

So when we look at the black-alone population, I think of that as being the most limiting -- that's the smallest possible number, the lowest guardrail. If you were to say what number 09:41:20 can you be really, really sure there is this number of blacks

at a bare minimum, this is the number you would refer to because this number does not refer to black in combination with anything else, not even Hispanic.

Q Okay. Some experts have used the language single-race black and any-part black.

A Sure.

Q Is single-race black the same as black alone, as you understand it? Are you talking about the same thing?

A I -- not knowing their work, but hearing their characterization of the definition, my belief is that we are using the same definition.

Q Gotcha.

And any-part black, is that as far as you know, the same as what the term you use, all black?

A That is my understanding.

Q Why do you present both measures in your report, Mr. Bryan?

A Yeah. So I'm not a political scientist. But I have worked with political scientists for many years on these projects. And the input that I have gotten from them is that it is beneficial for them to have these numbers so they are able to understand the size and the characteristics of the black population in context.

From a demographic perspective, for me it's beneficial because having reviewed numerous reports from numerous other

experts, it is very common that other experts either do not know or do not understand the definition of the black population and will use numbers that they find in reports and documents or references that they themselves do not know or understand.

09:43:13

So for the benefit of my reports, personally from my analytics, it is beneficial for me to have both of these numbers so we know what the lowest possible number is that blacks can be, as well as the greatest possible numbers.

09:43:29

When we're talking about a Voting Rights Act case, it is beneficial to know what both of those are. Because in different kinds of cases and in different venues, some of those numbers will serve different purposes for different parts of the case.

09:43:44

Q Okay. You refer to the use of black alone or single-race black as being more defensible in Voting Rights Act cases.

A That's correct.

Q What do you mean by that?

A So, again, I am not a political scientist, but I have worked closely with political scientists for many, many years in the cases. And so I refer to my experience with them that when they ask me for the number, size, location of the population, that they need to make claims about the political cohesion or the political performance of that population, the political scientists that I have worked with have told me that

09:44:04

09:44:25

it is easier to defend the political performance, the political voting behavior of the more homogenous, smallest, most cohesive black population.

It was notable to me yesterday, I believe I heard a political scientist in this case refer to the fact that he had been using the black-alone population for his political analytics.

So it's a common thing to use those. I have no opinion whether one is right or wrong or better or worse. I simply refer to my experience and what has been asked of me by political scientists.

Q Let's move on now, Mr. Bryan, to a discussion of communities of interest.

Have you ever been hired to draw a plan for a state or geographical area that was unfamiliar to you?

A Frequently I do work across the United States and am oftentimes called upon to participate in cases, either critiquing plans or drawing new plans for areas that I have never been before.

Q When you're put in that position, do you consider it important -- do you consider it important to educate yourself about communities of interest in the area before you draw the plan?

A I'd say it's very important. It's a leading criteria. The rules that many states use and the NCSL advocates is

knowing what those communities of interest are.

It's one criteria that, obviously, if you are going to serve the people as in this case, the great people of the state of Alabama, it is in the best interest of me as an expert to know what I can, familiarize myself.

09:46:22

Q So what are some things you might do to educate yourself about the communities of interest in an area that is new to you?

A Sure. So, typically, what I would do is I would find people who are experts, people who are residents, maybe people who used to work as representatives for the areas, used to have experience with the political system, state and local officials, or people who I personally know who may be able to give me valuable insights on what's actually going on in a state like Alabama. And in the case of Alabama, that's exactly what I did.

09:46:44

09:47:06

Q Now, I won't pull this up, but you have a notebook with our exhibits in it. I would ask you to look at Defense Exhibit 171.

We provided you with copies of the testimony of Jo Bonner and Bradley Byrne from the Chestnut litigation, did we not?

09:47:25

A Yes, you did.

Q And is that --

A I am looking at it.

Q Yeah. Is Defense Exhibit 171 the testimony that we

09:47:36

provided you with?

A Yes.

Q Okay. Did you review it?

A Yes.

09:47:45 Q What were your impressions from that testimony in terms of whether it offered any information of value to you as a demographer?

A I mean, I think it was as good of information as you could possibly get in knowing and understanding social, economic,

09:48:09 geographic characteristics of an area.

The Byrne/Bonner testimony talked in some detail especially about District 1 and about the details and characteristics of Mobile and Baldwin that were detailed, factual and insightful and very beneficial for my understanding

09:48:31 of that area.

Q As a demographer, did you find that testimony persuasive if you were considering whether or not there is a community of interest around the Gulf Coast counties?

A It was very compelling in discussing the socioeconomic

09:48:54 political cohesion of the area. I am hard pressed to think of another document or testimony that I could refer to that would be any more enlightening than what the Byrne and Bonner testimony provided.

Q Okay. Now, of course, they weren't purporting to be

09:49:14 discussing every possible community of interest in the state of

Alabama, were they?

A For sure, no.

Q Yeah. But in terms of that one community of interest, did you find that information that would be valuable to you if you were retained to draw a congressional plan for the state of Alabama?

09:49:29

A Yes, definitely.

Q When you draw plans, Mr. Bryan, do you assume as a demographer that all the white voters in the jurisdiction have one set of interest and all the black voters in a jurisdiction have a different set of interests?

09:49:47

A I would never consider that.

Q Would you consider that to be an appropriate approach to redistricting?

A Definitely not.

09:49:57

Q Are you aware, Mr. Bryan, that some of the witnesses for the plaintiffs have mentioned the Black Belt in Alabama as a community of interest?

A I am aware.

Q Are you familiar with the general area that most people consider to be the Black Belt?

09:50:20

A I am generally familiar.

Q When a community of interest is identified to you as a demographer, Mr. Bryan, do you understand that to be an argument that the area should be included in one district or

09:50:42

split among several?

A Again, when you are discussing communities of interest, there can be different competing overlapping communities of interest. But generally if you have one community of interest that is very important and prevails and especially if you are presenting a competitive plan that advocates for significant deviation from an existing plan, I would be looking for the degree to which a plan kept a community of interest whole.

Q We'll talk more about the plans presented by Mr. Cooper and Dr. Duchin shortly. But to the best of your knowledge, do any of the plans you've reviewed in this case, whether it is the Hatcher plan, the plans presented by Dr. Duchin or the plans presented by Mr. Cooper; do any of those keep the Black Belt counties in a single district?

A No.

Q I want to share my screen again.

Look at a different part of your report that we have submitted as Defense Exhibit 2.

I want to go to page 24 of that report.

Mr. Bryan, did you do a core retention analysis of the Hatcher plan that is discussed in Defense Exhibit 2?

A I did.

Q Well, let's see. This is actually --

A I believe that's the existing Alabama map.

Q That's the existing plan. Yeah. Look at Figure 5.2 on

page 24. Tell us what we see in that chart, what you're analyzing and what you are showing us.

A So this is the core retention of the Hatcher plan. We see in this case that there was a -- as we know from the design of the plan and see visually, that Districts 1 and 2 were significantly impacted.

We can see that there's relatively low retention, approximately 59 percent in District 1, less than half of that with black retention in District 1. So in this case, the continuity of representation is significantly detrimental to the black population in District 1.

In District 2, District 2 kind of becomes a core, a locus of population where you need to move other population around in order to improve the black performance there. And that is why in this case, the what -- the non-black or the total population is significantly lower than the black population. Because white and other non-black populations had to be moved out of it in order to enable its black performance.

Some of the other districts -- District 3, for example, has somewhat good and balanced retention. In Districts 4 and 5, I think these are very consistent. There was not much change made up in those districts, so their core retention is very good. Again, there was some difference, lower performing core retention in District 6 with a notable differential impact to the black population.

And then, again, in District 7, I think there was less impact there, and there was comparable performance of core retention there between black and the total population.

Q Which plan does better with preserving the core of existing districts? The Hatcher plan or Alabama's 2021 plan?

09:54:47

A It's -- the core retention overall for the Alabama plan is significantly higher. I don't remember the exact number. It may have been a million more people perhaps, or retained in their core districts in the Alabama plan than in the Hatcher plan.

09:55:10

Q And which plan shows more distinction between how white and black persons are treated, in terms of core retention?

A Sure. There's obviously significantly more differential impact of the subpopulations in the Hatcher plan than in the total plan. There's virtually no differential impact in the Alabama plan between total and black.

09:55:33

Q Table 5.2 appears on page 26 of your report. And let's just say for the record, I'm referring to the filing page number. Actually, the page number that originally appeared on Mr. Bryan's report is page 25. I may have been a little sloppy going through these reports and which one I was referring to. Hopefully by stating which table precisely we're looking at will be clear.

09:56:06

In Table 5.2 of Defense Exhibit 2, Mr. Bryan --

A Yes.

09:56:25

Q -- would you tell us what you are showing us here?
A Yes. So this is a core retention analysis of the existing plan because where we started all of our core retention analysis with the Hatcher plan. And as you can see looking at District 1, there were 426,386 people from the original existing District 1 who remained there. And then there was significant displacement, as we know, with the development of District 2. There was 285,000 people that got moved into District 2.
Q Okay. So this is similar to a chart that we reviewed when you were analyzing the Singleton plan.
A Yes. Yes. This is the exact same analytic technique.
Q Okay. I am going to move to your discussion of incumbency.
A Sure.
Q What does the Hatcher plan do with avoiding incumbent conflicts? And I will refer you to page 28 as is shown on the top of the page of Defense Exhibit 2.
A Yes. Thank you. So interestingly, there's actually two pairs here. So the plaintiffs' plan pairs the Moore -- Representatives Moore and Carl. In District 1 you can see that down in the south, that they're not on the edge, they're not on the border of the districts, they're wholly contained inside of District 1, leaving District 2 unrepresented.

And then it goes on, as we saw in several plans, that

Sewell and Palmer were both in District 6, leaving District 7 unrepresented.

So the two districts -- Districts 2 and Districts 7 here are left without any incumbent representation at all.

09:58:51 MR. DAVIS: Your Honors, I'm quite content to continue for a little longer. I am about to move into a slightly different subject, as we're going to discuss compactness.

JUDGE MARCUS: I think this might be a convenient point. We wanted to give our reporter a break after about an hour and a half, and we are -- we are just about at that point.

09:59:04

So this would be a good breaking point. Let me just ask you a quick question: What's your sense on the balance of your examination of Mr. Bryan?

MR. DAVIS: My best judgment, Judge Marcus, would be that I have about an hour to go. It could be a little less.

09:59:25

JUDGE MARCUS: Okay. Why don't we do this -- I have exactly 10:00 o'clock Central Standard Time or almost 10:00 o'clock, 9:59, and almost 11:00 o'clock Eastern Time. Why don't we take a 15-minute break, and we will pick up, then, at 10:15 Central Standard Time? Thank you all. We will take a short break.

09:59:49

(Recess.)

JUDGE MARCUS: Do you have an order in which the cross-examination is going to proceed? Have the plaintiffs settled on that?

10:17:31

MS. KHANNA: Yes, Your Honor. The Caster plaintiffs will cross-examine Mr. Bryan first, and I believe then Milligan. And then Singleton.

JUDGE MARCUS: Okay.

10:17:42 MR. DUNN: That's my understanding, as well, Your Honor.

JUDGE MARCUS: Mr. Blacksher, that's your understanding, as well?

MR. BLACKSHER: Yes, Your Honor. That's why I was worried about bumping up against Mr. Bryan's timeline since I am at the tail end.

JUDGE MARCUS: Don't worry. You will have all the time you need.

MR. BLACKSHER: Thank you.

10:17:58 JUDGE MARCUS: Mr. Davis, let's proceed. Thank you.

BY MR. DAVIS:

Q Mr. Bryan, did you assess the compactness of the Hatcher plan?

A I did.

10:18:09 Q I will share page 31 of Defense Exhibit 2.

Your scores of the Hatcher plan appear in Table 5.5.

A That's correct.

Q Okay. Tell me -- summarize how the Hatcher plan's compactness scores compare to Alabama's 2021 plan. Does it perform better, worse, the same?

10:18:38

A Yeah. Sure. Sure. So again, there are two different ways that you can summarize compactness. You can summarize it for the plan as a whole, and then you can summarize it by district.

10:19:03 And as we discussed earlier and as Dr. Duchin has pointed out, the total metric here is just a layman's simple summary statistic to help us understand relatively for one plan versus another plan how a district performs.

So when we look at the Alabama plan versus the Hatcher 10:19:26 plan, pretty much across the board as we look at the Polsby-Popper, the adapted Schwartzberg score, the Reock scores, and the convex hull scores, if you look at all four of these different measures, you see that the Alabama plan is much higher. It performs much, much better.

10:19:52 There's -- in one area, it's around District 4, I believe, where there is a little bit lower score for the state of Alabama. You can see that my total score for the state of Alabama there, low at 1.6. Similarly, around District 6, also at about 1.55, those two relatively low areas.

10:20:22 Those are driven by some physical features at the intersection of these districts. I refer to it as the Bankhead Lake area. There's a lot of water features, a lot of curvy lines and things in those districts, just by their physical features, less compact. And that is part of the reason that 10:20:39 when you compare those specific districts with the couple of

         comparable districts in the Hatcher plan, you may see a couple of instances there where the Hatcher plan is not as low, just because it does not have boundaries that exactly follow those physical features. But in aggregate, across the board, every measure that you would look at would say the Alabama plan is superior, sometimes significantly so to the Hatcher plan.

10:21:01

Q Got it. But the Court, if it wants to look at Table 5.4 and 5.5 and compare the scores for each district in the Hatcher plan and the state's plan; is that right?

10:21:24 A Right.

Q Okay. Let's look at some of the maps you prepared for the Hatcher plan, Mr. Bryan. I want to turn now to Page 44 of your report, Page 44 according to the filing information on the top of the page.

10:21:45 What do we see in this map, Mr. Bryan? This Map Appendix 5?

A Sure.

Q Tell us what you are showing us in this map.

A Sure. So this is a -- this is consistent with some of the other maps that we've produced for different plans. It's an outline of the Hatcher plan, and it shows the percent black alone by -- let's see -- this is actually mislabeled. This is a black alone by county map. So I would disregard the label within the map and refer to the map appendix, the title of the map. This is black alone by VTD -- by county.

10:22:07

10:22:33

Q Thank you.

Now, this District 2 -- you see my cursor moving, I take it, on the screen?

A Yes, I see.

10:22:49 Q District 2, which takes part of Mobile County and then goes east, and District 7 which includes this finger into Jefferson County, those are the two majority-black districts in the Hatcher plan, are they not?

A That's correct.

10:23:01 Q Is there any county in the state that is more than 40 percent black population that is not included in either District 7 or District 2 in the Hatcher plan?

A There's only two pieces that I see. There's, again, in Jefferson, there's a little portion of the district that goes 10:23:28 outside of 7. And then, I think similarly, you move your cursor down and over to the right, that county with 79 percent goes just over the edge. And that's slightly split by district, as well.

But other than that, yeah. And 43 right there. Other 10:23:48 than that, there's no other 40 percent or greater wholly contained counties in any other districts.

Q Let's move to the next map, Map Appendix 6. What are you showing us here?

A Yeah. So this would be the Voting Age Population by 10:24:06 county overlaid with the Hatcher plan, again showing the high

concentrations of population in Jefferson County and Mobile and Baldwin counties.

Q Where does it appear, according to this map, that District 7 is getting most of the people that populate this district? Most of the people, regardless of race.

A Yeah. The biggest piece would be coming from the area in Jefferson County.

Q And where would District 2 be getting most of its total population?

A It's a little less clear here because you've -- it is intersecting the Mobile and the Baldwin counties to the southwest. But there is another also another populous county in north central -- 177,427, right in there. So that's a corner, just given that we have 700-and-some thousand population, that county would be contributing disproportionately to the overall plan.

Q Yeah. This is Montgomery County, correct?

A Yeah. Correct. It's not labeled on my map, but, yeah, I believe that's correct.

Q Let's look at Map Appendix 7 on the next page.

A Sure.

Q What do we see here, Mr. Bryan?

A Yeah. So this is the -- this is the plan that shows the percent black alone by the VTDs overlaid with the Hatcher plan.

Q Okay. What, if anything, is indicative to you of the map

drawers' intention when you look at the splits of, say, Jefferson County, here between 7 and 6, and Mobile County between Districts 2 and 1?

A Sure. I'll be careful to put myself in the mindset or speak for the intention of the map drawer. I will speak more so to the appearance or the outcome of the map, if that is all right.

Q Assume that's what I asked. Is this any appearance here that jumps out to as an a demographer?

A Yes. I would be more precise if I focus on that than intent.

As you follow the new District 2 starting kind of over on the eastern edge of the state near the border, near where Columbus is, and you see that the northern edge of District 2 starts tracing from east to west across the central part of the state, you can see easily that that line almost precisely exactly follows the contours of the very highest black population VTDs -- can literally go from one to the next and look on the northern edge of that line and see what I call the yellow, red, you know, 10 percent, 20 percent black, and then you go below that line and you immediately see a 60 percent or more black. It is literally like the dividing line of black and much less black population.

As you follow that boundary around to the central part of the state through the Black Belt, District 2 turns south and

goes down towards Mobile and Baldwin counties. You can see that the map -- and the map that District 2, the boundaries of it go down around Mobile. I think we have another map that may show it in more detail. But we can illustrate that in this plan the boundaries of District 2 went around Mobile, not following a city boundary or any other administrative boundaries. It just followed the edge of where black population was and was not.

Similarly, in District 7, you can see that it captures large portions, very carefully captures large portions of black populations. And as you go into Birmingham, Jefferson County, you can see that it nearly perfectly outer bounds only the exact black population VTDs in the northeast corner of Birmingham.

Q Why don't we go ahead and look at some of the close-up maps that you prepared.

Let's look at Map Appendix 9?

A Right.

Q What do we see here, Mr. Bryan?

A Sure. So the dark line, if you can see carefully enough it's kind of dark black and a purple line. That's the existing district boundaries.

The --

Q Let me interrupt you. By existing, do you mean the 2011 plan?

10:29:16
10:29:43
10:30:07
10:30:35
10:30:54

A Yes.
Q Okay.
A Thank you.

The existing 2011 district plan. And what I have done here is I have overlaid, again, with a blue outline where the Hatcher plan boundaries are. And if you look, what the Hatcher plan does, is it kind of follows closely along where the existing districts were, but then I have shown with little blue dots here where the Hatcher plan did what we call an outer bound. That is it went beyond the existing districts and grabbed just the precincts that had the highest concentrations of black population.

You can see that there are plenty of VTDs surrounding Birmingham that are colored yellow and orange, reflecting lower black population concentrations. And the plan just really prioritized -- appears to have prioritized making sure that it got the highest black concentration VTDs into the plan.
Q Thank you.

Let's look at the next map, Map Appendix 10.
A Sure.
Q What are you showing us with this map, Mr. Bryan?
A Yeah. So one of the -- in just looking at the data for the new Alabama plan, what I suspected we were going to find is that there were some VTDs -- I did not know where, but there would be some VTDs where there was black population that would

be disgorged, displaced, moved out to other districts.

This was the 5 percent of, you know, several thousand blacks that we had talked about earlier today. And I found this part of Birmingham to be the area where that displacement took place. I know that was not the intent of the mapmaker. It's an effect of their efforts to draw a more compact plan.

MR. DUNN: Your Honor, could I ask that he not testify or try to testify as to the intent of the mapmaker? I don't know how he can possibly do so.

JUDGE MARCUS: I think the point is well taken. I don't think that was the thrust of your question in any event, Mr. Davis.

MR. DAVIS: That's correct.

MR. DUNN: I don't think it was a problem with the question, Your Honor, but I think it's a problem with the answer.

JUDGE MARCUS: I understand, Mr. Dunn. So Mr. Bryan, focus specifically on the question as it's put by Mr. Davis, if you would. He's asking about appearance rather than intent.

BY MR. DAVIS:

Q Yeah. Let me rephrase, Mr. Bryan, and ask you what moves do you see were made in this part of Jefferson County between the 2011 and the 2021 plan?

A So there is a black and white line across the middle of the map. And above that black and white line, there are

several squares, as opposed to the circles I mentioned earlier. Those squares identify high black concentration VTDs. Those high black concentration VTDs have previously been in the existing plan or in, as you can see by the location of the new line, those black VTDs are no longer contained in District 7.

The black line has the geometry effect of making the boundaries of the district here more compact and more simple.

Q Thank you.

Now, let's look at Map Appendix 11, it will be the last map in the Hatcher plan.

A Yep.

Q Tell us what we see here.

A Right. So this is a view of the Hatcher plan. You can see in the northern parts, just a little bit of the existing 2011 congressional plan. And so what we're looking at here is a close-up of where the boundaries of District 2 go down into Mobile County in the population that is added to District 2 in this plan.

And what we can see is that in the areas surrounding the intersections of District 1 and District 2, that there is lots of VTDs that have very low black populations. This is represented by red, orange, and yellow areas.

And what we see here is that with this plan, District 2 extends down into Mobile, again, not following any other administrative or physical geography and grabs only the pieces

of Mobile shown in dark black, which represent the highest concentration of black population in the county.

Q These dark green precincts, you mean?

A Yes. As you can see, especially in eastern Mobile, the line goes down. There's very low black population to the right edge of that line. There's very high black population to the left edge of the line. And if it was one black VTD, I could pass it off as happenstance. But there's obviously several of those here illustrating that.

Q Thank you.

Now, Mr. Bryan, I want to refer you to page 32 of your report, going by the filing number.

A Yes.

Q What is your conclusion, if any, from your analysis of the Hatcher plan?

A In looking at the changes that were made in the two districts that sought to be black majority districts, they appear to be racial gerrymanders because of the way that the lines were drawn to precisely include just black populations and to precisely exclude non-black populations.

MR. DUNN: Your Honor, again, he is straying over into testifying about intent. I object to that and move to strike the last answer to the extent it does that.

JUDGE MARCUS: Overruled. He said there appeared to be racial gerrymandering, including blacks in one way,

excluding whites in the other way.

I didn't take it as bearing on intent. Overruled. You may proceed.

BY MR. DAVIS:

10:36:32
Q Mr. Bryan, did you review the reports that were submitted in this case by Mr. Bill Cooper and Dr. Moon Duchin?

A I did.

Q And does your analysis appear in a report supplemental report that's been marked as Defense Exhibit 4?

10:36:51
A Yes.

Q Okay. Did you review the demographics of the plans that Dr. Duchin submitted?

A I did.

Q And this is a summary of one of her plans on page 27 of Defense Exhibit 4.

10:37:17

A That is correct.

Q Okay. Do Dr. Duchin's plans include two majority-black districts?

A By both metrics of black alone and all black or any-part black, they do. I would like to acknowledge that I have done an analysis comparing my all black with the any-part black from her reports, and I believe that our statistics are representing her plans match precisely between both of our analyses insofar as the all black and any-part black.

10:37:35

10:37:55
Q Do Dr. Duchin's plans present majority-black districts

when you consider only Voting Age Population?

A In that case, the answer would be it depends.

In the -- in this particular -- would you like me to speak to Duchin plan D, what I see on the screen?

10:38:22 Q That would be fine. Let's -- for the record and for the Court's benefit, you present the demographics of all of her plans, correct?

A Yes, I do.

Q And that begins in the appendix of your -- in Defense

10:38:42 Exhibit 4, it begins on page 25 of Defense Exhibit 4. Then you see each of her plans addressed in turn, correct?

A Yes.

Q Why don't we ap dress this plan, her plan A?

A Great.

10:38:57 Q Tell us whether Dr. Duchin's plan A presents majority-black districts of Voting Age Population?

A It does. By both black alone and any-part black.

Q And what about her plan B?

A In this plan, the black-alone statistics do not rise to

10:39:22 meet the majority threshold. The percent all black, any-part black statistics in this case do rise to the 50 percent or greater majority threshold.

Q Okay. And C?

A Yes. So in this particular case, District 2 does not rise

10:39:46 to the majority threshold for black alone, but it does rise to

majority threshold for all black or any-part black.

District 7 in her plan would be a majority, whether black alone or all black.

Q Okay. And, now, what about plan D or plan 4?

A Yeah. So consistent with plan C, in District 2, there's by black alone, it would be a minority, would not rise to the majority threshold. By all black, it is a fair majority of 50.05 percent. With District 7, they look solid majorities at 50.55 percent black alone and 51.7 for all black or any-part black.

Q Okay. And next in your report, on the next page, page 28 --

A Yes, sir.

Q -- you start to present demographics of the plans that Mr. Cooper offered?

A Right. That's correct.

Q All right. Let's look at his plan 1?

A Right.

Q Does it contain two majority-black districts when you consider Voting Age Population?

A Yes. In District 2, by the black-alone measure, it does not, but by all black it does. In District 7, both by all -- by black alone and all black, they are definitive black majority districts.

Q Great.

District -- excuse me. What about plan 2, does it have two majority-black districts considering Voting Age Population?
A Yes, sir. As with one, black alone in District 2 is not a majority, all black is. And District 7, again, has majority by both black alone and all black or any-part black.
10:41:35
Q What about for plan 3?
A In this particular plan, neither District 2 nor District 7 would rise to the 50 percent threshold. The all black definition would achieve a majority in District 2 of 50.3 percent, and would achieve a bare majority, 50.09 percent in District 7.
10:42:00
Q Plan 4?
A Yeah. In this case as well, by the black-alone measure, Districts 2 and District 7 would not be a majority by black alone, but would be a majority under all black, District 2, a fair majority, 50.07, and District 7 at 50.09.
10:42:22
Q What about Cooper plan 5?
A Yeah. So, again, in this case, just as with some of the other plans Cooper has presented, the percent black-alone statistic, you would not rise to a majority in Districts 2 or 7, but you would rise to a majority -- more definitive majority in this plan with 50.2 percent all black in District 2 and 50.09 percent in District 7.
10:42:49
Q Finally, Cooper plan 6.
10:43:10
A Sure. Again, in this case, similar to the previous plans,

neither his District 2 or 7 rise to be a majority. They're close, but are not a majority by the black-alone measure, but both of them are majority districts by the all black or any-part black measure.

10:43:31 Q Okay. By the way, Mr. Bryan, did you find similarities between the plans presented by Dr. Duchin and Mr. Cooper with the Hatcher plan that we discussed earlier?

A There were general similarities, yes.

Q You assess -- did a core retention analysis of the plans 10:43:59 that Dr. Duchin and Mr. Cooper presented, did you not?

A Yes, I did.

Q Just generally -- we will not go through all ten plans.

A Okay.

Q Tell us generally how they performed with core retention.

10:44:13 A Sure. And thank you for that.

The performance of the core retention for the Duchin plans are similar with the Hatcher and with many of the features of the Cooper plans as well. We see especially in District 1 the total population's core retention is relatively low, 64 percent 10:44:34 core retention of the blacks is much lower at 32.5 percent. This is consistent with what we found in District 6 as well. And just reflects the significant rearranging of the black population for the effort to create two black majority districts.

10:44:54 Q Okay. So your core retention analyses begin appearing on

page 34?

A Yes.

Q If the Court wishes to find details about your analysis, could they find parts of this sort for each of the plans presented by Dr. Duchin and Mr. Cooper?

10:45:14

A There will be -- there are details of the plans and the core retention throughout my report, yes.

Q So is it true for all of the plans presented by Dr. Duchin and Mr. Cooper that they performed more poorly than Alabama's plan in core retention and in the differential treatment of black voters?

10:45:37

A That is true in both regards. The core retention of the total population in the different Duchin and Cooper plans were -- for the total population were in the 50 percent to 60 percent range, compared with the 90 percent for the state of Alabama plans.

10:45:58

And then the performance of the black core retention was lower, obviously, because of the rearranging of the black population. So those numbers were more commonly in the 50 percent and sometimes lower range.

10:46:18

Q Did you assess whether the plan submitted by Dr. Duchin and Mr. Cooper created any incumbent conflicts?

A I did.

Q And what did you find?

A I found that the evidence in the Duchin plans was that

10:46:35

there was not any regard to incumbency in the drawing of the plans. So, for example, in plan A, there is an instance where Representative Sewell, Representative Palmer, Representative Rogers are all one district, and Representatives Moore and Carl are in District 1's, leaving three districts unrepresented.

10:47:04

There were similar pairings in each of her plans. And there was also pairings in Cooper's plans, as well.

Q Thank you. And can the Court find details of your analysis on page 16 of Defense Exhibit 4?

10:47:23

A Yes.

Q Before we turn to compactness, Mr. Bryan, the transcript will show us precisely what was said, but I believe yesterday I heard Dr. Duchin say or refer to as minority opportunity to elect as a traditional districting principle. Perhaps to be more clear, she said protecting or preserving minority opportunity to elect.

10:47:50

Would you consider any of those things to be a traditional districting principle?

A I have not ever heard that as a traditional or contemporary redistricting principle and I would not agree with that.

10:48:07

Q Thank you.

Did you assess compactness of the plans submitted by Dr. Duchin and Mr. Cooper?

A Yes.

10:48:21

Q Okay. And in your analyses we found beginning on page 57 of Defense Exhibit 4, right?
A Yes.
Q Let's look at Dr. Duchin's plan A. How does the average score for the entire plan compare to Alabama's plan?
A Generally her plans outperform the Alabama plan across all these metrics.
Q Do each of her districts perform better than Alabama's? Not each plan, but each districts within the plan.
A Right. Right. This was something that I noted in her report. Dr. Duchin presented the summary statistics that you see below in each one of her plans for Polsby-Popper and, I believe, Reock. She did not in her original report present information on the compactness by district.

I understand she may have in a subsequent report, but I did not see that report or those findings. I refer here only to my own observations and findings from my analysis.

My findings and observations in my analysis is that in the districts that were more heavily focused on in order to achieve the two black majority population districts that she said she was seeking to achieve, those districts' compactness suffer tremendously. They're much lower because they had to be drawn in a very specific way, disregarding other traditional redistricting principles in order to achieve her objective.

So you can see here in Districts 1 and 2 in particular,

10:50:26 10:50:47 10:51:10 10:51:30 10:51:43

that the compactness scores for her plans in these areas were low. And it's understandable, given what she was seeking to achieve there.

What is notable to me, though, is that compactness was sacrificed in this part of the plan, but compactness was prioritized -- appeared to be prioritized in the drawing of other parts of her plan.

So, for example, if you look at Districts 4 and Districts 5, the area that you see in my charts as being highlighted in bright green, those areas were drawn in such a way to significantly improve compactness. It impacted the core retention of those areas for sure, but it sacrificed core retention for the benefit of compactness.

So the overall outcome, the summary statistic of Dr. Duchin's compactness analysis really, I think, masks some important details, which is that compactness took different roles in different parts at different times of the design of her districts.

Q In Districts 1 and 2 in Dr. Duchin's plans, are those the districts that appear in the southernmost part of the state?

A Yes, I believe so.

Q And are 4 and 5 the districts in Dr. Duchin's plan that appear in the northernmost portion of Alabama?

A Yes, I believe so.

Q You present similar analyses of Mr. Cooper's districts, do

you not?
A Right. Yes, I do.
Q And how did the compactness of Mr. Cooper's plans compare to the state of Alabama's?
10:51:57 A Generally, they were poorer performing compactness compared to the state of Alabama.
Q I will represent to you, Mr. Bryan, that Mr. Cooper presented an additional plan in a supplemental report. Was that available at the time you prepared this report?
10:52:15 A No.
Q So you have not analyzed districts -- Cooper's plan number 7 in this report, correct?
A I am aware of the report. I have not analyzed the report.
Q Thank you.
10:52:36 Let's look now at some of the maps you prepared.
Showing you now Map Appendix 5, which appears on page 68 of Defense Exhibit 4. Would you tell us what this map shows us, Mr. Bryan?
A Sure. So this map shows, again, kind of the dark
10:53:04 outlines, the dark contours here. Those are the outline of existing historic 2011 congressional districts. And then there is a lighter green outline that shows the outline of Duchin plan A overlaid with the existing historic Alabama plan.
Q Thank you.
10:53:30 So you can see the lines here of the 2011 Alabama plan and

Dr. Duchin's plan A, correct?
A Yes, that is correct.
Q Then next, in Map Appendix 5A. What do you present?
A Can we go back to the previous map for a moment?
10:53:51 Q Yes.
A Okay. And so I want to make an additional comment here on compactness.
Q Yes.
A Districts 4 and 5 in the northern part of the state really 10:54:09 have nothing to do with the objective of achieving two black majority districts, which I heard and understand to have been the overriding objective of the plan.
So in looking at this map, in looking at the existing Districts 4 and 5 and the new Districts 4 and 5, I do not see 10:54:33 any other reason for the new Districts 4 and 5 as being drawn except for potentially for the purposes of compactness. They were unrelated to the objective of the black majority district drawing.
I just wanted to state that as an observation.
10:54:51 Q In the various plans you have reviewed, whether it's the Hatcher plan or Mr. Cooper's plan or Dr. Duchin's plan, have you seen any of them draw African-American population from say the northernmost third of the state in order to populate their majority-minority districts?
10:55:10 A I have not.

Q Okay. Let's go on now, then, to Map Appendix 5A.
A Yes, sir.
Q Tell us what you are showing us in these maps.
A Sure. Yeah. So this -- this map presents Dr. Duchin's -- can you please zoom out? Thank you.

This map shows Dr. Duchin's plan A outlined in black outline overlaid with the percent black-alone Voting Age Population by VTD in Alabama.
Q Okay. And did you present the same two maps --
A Sure.
Q -- for each of the plans presented by Dr. Duchin and Mr. Cooper? First the map comparing the 2011 plan with whichever plan plaintiffs' expert is presenting, followed by a map of defendants' experts plans overlaid with VTDs color coded by concentration of African-American population?
A Yes, that's the process.
Q So those will all appear in the map appendices should the Court wish to review them for any plan?
A Yes.
Q I will refer you to page 19, Defense Exhibit 4, Mr. Bryan.

Tell us, as a demographer, what is your overall conclusion after analyzing the plans presented by Dr. Duchin and Mr. Cooper?
A I think there's really two key takeaways.

The first one is that they use -- they're able to use

sub-county geography in order to achieve a balanced population, and more often than not, to achieve a black majority population in two districts. Again, it's depending on the definition, the exact plan. But generally, that's what they were able to accomplish.

10:57:42

In achieving that, there were other traditional redistricting principles that were generally sacrificed. And by that, I mean there were cases where there is less compactness, the core retention is sacrificed significantly.

10:58:07

So, therefore, the continuity of representation because of the cracking and packing of the incumbents and then the -- mostly based on the -- mostly based on the incumbents, but also based on the core retention analysis, there is a significant impact to the continuity of representation in these plans.

10:58:31

And so I would say on the whole, that there were numerous traditional redistricting principles that were traded off, sacrificed in the pursuit of these other goals.

Q I want to go back to the map we were reviewing a moment ago. Map Appendix 5A.

10:59:07

A Sure.

Q In which -- Dr. Duchin's plan A.

Mr. Bryan, as a demographer, as one who is drawn and critiqued many redistricting plans, are you aware of any redistricting criteria that would lead a map drawer to draw this congressional map than by Dr. Duchin's plan A?

10:59:33

 A I'm not aware of a traditional or combination of traditional redistricting principles that would lead this to be drawn in this precise way.

Q Okay. Are you aware of any need that Mobile County in order to follow the traditional districting criteria of compactness triggers?

A Can you please restate the question?

Q Yes, of course.

Would a desire to make districts compact lead a map drawer to split Mobile County?

A No.

Q No. Would a desire to preserve communities of interest preserve -- lead a map drawer to split Mobile County?

A No. My research would suggest it would not.

Q Do you need to split Mobile County in order to avoid putting incumbents in the same district?

A No.

Q Do you need to split Mobile County to preserve the core of existing districts?

A No.

Q Do you need to split Mobile County to equalize population among the districts?

A No.

Q Your experience as a demographer, Mr. Bryan, do you see anything that would lead a map drawer to draw this map other

than a desire to divide voters by race in order to draw two majority-black districts?

A I do not.

Q Would you give the same answers if we went through each of these maps of Dr. Duchin's and Mr. Cooper's plans?

A Yes.

Q Mr. Bryan, in your opinion, as a demographer, have the Caster and Milligan plaintiffs proven that it is possible to draw two majority-black districts without splitting Jefferson and Mobile counties along racial lines?

A No.

Q In your opinion, as a demographer, have the plaintiffs proven that it is possible to draw two majority-black congressional districts in Alabama without sacrificing traditional districting criteria?

A No.

MR. DAVIS: Your Honor, may I have a moment to consult with my colleagues?

JUDGE MARCUS: You sure can.

(Counsel confers with co-counsel.)

MR. DAVIS: We have no further questions for Mr. Bryan at this time, Judge Marcus. Thank you.

JUDGE MARCUS: All right. Thank you very much. We will take a break for lunch now and reconvene at 1:10 Central Standard Time. It's a little less than an hour and 10 minutes

from now. That would be 2:10 eastern time. Do I have that right?

MR. DUNN: No. I think it's 12 -- 11:00 Central.

JUDGE MARCUS: I'm sorry. So we're -- right now you are 11:00 o'clock Central Standard Time. So we really do have some time to proceed with cross. Are you ready to proceed, Ms. Khanna?

MS. KHANNA: I am, Your Honor.

JUDGE MARCUS: All right. Let's proceed with cross-examination.

MS. KHANNA: If you will give me one moment.

JUDGE MARCUS: Do you want a short break, a 5-minute break?

MS. KHANNA: I think I can jump in. Just give me two seconds to get my notes in order.

All right. I think I am ready to go.

JUDGE MARCUS: Thank you. You may proceed.

CROSS-EXAMINATION

BY MS. KHANNA:

Q Good morning, Mr. Bryan.

A Good morning.

Q My name is Abha Khanna. I don't think we have met before, and I met with, I think, the Caster plaintiffs in this case.

A It's a pleasure to meet you. Thank you.

Q Same here. So you produced two reports in the cast -- in

the Caster case; is that right?

A Yes.

Q And that was the first one, I believe is marked Defendants' Exhibit 2 on December 10th, and the second marked Defendants' Exhibit 4 on December 20th; is that right?

11:04:53

A That sounds right.

Q And just to clarify. You have not seen any of the Caster plaintiffs' expert reports at the time you submitted your first report in this Caster case; is that right?

11:05:09

A I don't believe so.

Q And you had not seen any of Mr. Cooper's illustrative plans at the time you first submitted or submitted your first report in this case; is that right?

A No, I did not see either Mr. Cooper or Dr. Duchin's plans until later in the case.

11:05:25

Q So only -- so later in the case is -- during your supplemental report, that's the only time --

A Yeah.

Q -- where you actually analyzed any of Mr. Cooper's plans; is that right?

11:05:37

A Yeah. Uh-huh.

Q Did you provide any response or analysis regarding Dr. Palmer's expert report on racially polarized voting?

A No. I have no -- I am not a political scientist. I offer no opinion on any of the political science related reports.

11:05:58

Q And you don't provide anything to refute Dr. Palmer's conclusions regarding the performance of black-preferred candidates in any of Mr. Cooper's illustrative plans; is that right?

11:06:10 A No.

Q You also don't dispute any of Mr. Cooper's analyses on socioeconomic disparities between blacks and whites in Alabama?

A No.

Q And nor do you address any of the conclusions in

11:06:27 Dr. Bridgett King's report relating to the history of discrimination in Alabama?

A No.

Q So you have been retained as an expert on behalf of the Secretary of State in this case; is that right?

11:06:40 A Yes.

Q When were you first retained?

A I do not know the exact date that I was retained. Is that something I can consult with my colleagues to get an exact date? Is that necessary? It's --

11:06:59 Q I don't need an exact date.

A -- three months this fall, you know. I apologize. I don't have the precise date. It's been probably about three months ago when I was originally contacted on the case.

Q Do you know if it was before or after the congressional

11:07:24 plan for Alabama was adopted and enacted on November 4th?

11:07:47
11:07:59
11:08:15
11:08:35
11:08:47

A I would have had conversations about the case before the enacted plan, but I could not have begun the work on the plan until after that date.

Q And do you know if it was before or after mid August, when the census data was released?

A It would have been after mid August.

Q Mr. Bryan, this is your first time testifying in a federal court; is that right?

A That's correct.

Q Or in any court?

A Yes.

Q So in your report, and I think several times during your testimony as well, you mentioned that we observed this or you referred to our analysis. Did anyone else assist you in preparing your analysis in this case?

A I have -- I own a company and I have an analyst and a director of analytics that help me execute some of the technical parts of my analytics.

Q So when you refer to we or our conclusions, are you referring to anyone other than your own analyses and conclusions?

A The conclusions, the interpretation of those are mine and mine alone.

Q And I believe you mentioned during your direct examination that you're not a political scientist, but you have often

11:08:56

worked with political scientists?
A That's correct.
Q Consulted --
A Yeah.
Q Were there any political scientists that you consulted in preparation for your work in this case?
A Not that I consulted for my work, no. There is another political scientist who is working on the case, but my work was not done in correspondence with his work in this case.

11:09:19

Q I am going to turn to your census demography analysis. I am looking at page 5 of your supplemental report. Here you include -- I think we can pull it up as well.
A Yeah. Thank you.
Q I think here you include -- you see at the top?

11:09:46

A Yeah.
Q The title Census Race Definitions; is that right?
A Yeah, that's correct.
Q Okay. And if I am reading correctly in the first paragraph of -- on this page, you say here that you were -- you

11:09:59

tried to define and document the true black population of the two black districts in each of plaintiffs' illustrative plans?
A Yeah, that's correct. Uh-huh.
Q And you also note that it was unclear why here plaintiffs refer to undocumented voting strength statistics rather than

11:10:20

census Black Voting Age Population.

Did I read that correctly?

A Yeah. That's correct.

Q Can you explain what you mean by undocumented voting strength statistics?

11:10:32 A Yeah. Typically, in cases like this, when we're measuring the performance, the racial performance and characteristics of a district, we would use the decennial census data that are used by law to define, draw, and characterize a district.

I typically would not use, at least for the design and 11:10:54 characterization of a plan, would not ever use the voting strength or voting characteristics or voting behavior. We typically leave that to the political scientists to focus on that.

So when the plaintiffs have a chance and they have the 11:11:13 opportunity to characterize the plan by the race data that is from the census and use voting data instead, that was inconsistent to me. I understood it, but it was inconsistent.

Q So was it your position that Mr. Cooper used undocumented voting strengths statistics in creating any of his or 11:11:39 evaluating any of his illustrative plans in his report?

A I just -- insofar as it's undocumented, I didn't see where they came from. I have no -- because we don't use those in our analysis, I have no ability to verify those. And we did not analyze those, so I can't speak to those statistics or why he 11:11:58 used them.

Q Can you explain what specific statistics you are referring to in Mr. Cooper's report?

A I cannot. I would have to go -- pull up a copy of his report and look at it in some detail to answer that. But I would stand by my assertion that we would focus exclusively on the census data that is the public law data and not on any voting related data for the design and characterization of a plan.

Q But it's your understanding that Mr. Cooper used voting strengths statistics in his illustrative plans or in his reports?

A Yeah. Among other things, yes.

Q And can you give me an example of what a voting strength statistic would be?

A Yeah. I would have to pull up his report to make a specific reference to it, but it's generally a characterization of the number or the percent of the population that by race voted in a particular way.

Q So your understanding of voting strength statistics is something that measures the voting behavior of individual voters in the state; is that right?

A Yeah. I would be very cautious since I am not a political scientist and I do not study those statistics or use those statistics in my analysis, I would not want to represent myself as someone who has deep expertise in voting strength by race

and recognize it. I know what it is, but I am not an expert in it and I don't use that in my analysis.

Q Do you dispute that Mr. Cooper used census data in constructing or in evaluating his illustrative plans as reported in his expert reports?

11:13:39

A He did use some census data, yes.

Q Used some census data?

A Beg your pardon?

Q Did you say he used some census data?

11:13:50

A He did, in some cases correctly, and some cases incorrectly, but, yes, he has tables of census data in his report.

Q Do you have an example of a place where he has used census data incorrectly?

11:14:06

A Yeah. May I refer to a part of my report?

Q Sure.

A Thank you. I am reading from my report.

In his plan 4, he reports the total population incorrectly.

11:14:40

In plan 5, he reports total population by district incorrectly.

He reports the -- in plan 5 VAP population incorrectly. While those numbers were incorrect, his reported percent VAP black and percent white were reported correctly. So his tables had internal inconsistencies.

11:15:04

Let's see. In his plan 6, the VAP population 18 plus is reported incorrectly. And his VAP 18 plus population is also reported incorrectly. So there were places where there was inconsistencies within and across his different census tables. I was able to identify with my analysis of the census data.

11:15:28

Q I understand. Thank you for the clarification.

A Thank you.

Q Were you present or were you in trial -- in our Zoom trial when Mr. Cooper testified?

11:15:41

A I was not. I was not present and I do not know anything about his testimony.

Q So you didn't hear him explain that the figures that you just talked about in his report were actually typographical errors that are accurate in the exhibits attached to his report?

11:15:59

A No.

Q Did you measure the -- did you evaluate the data as reflected in the exhibits, the detailed exhibits attached to Mr. Cooper's report?

11:16:08

A No. I didn't examine any subsequent exhibits. And in this business, if it's an error, it's an error. Whatever the explanation or the root cause of it is, it is either right or it's wrong. And when I refer to his report, I saw the numbers and they were not correct.

11:16:23

Q So you are familiar, I imagine, that when Mr. Cooper

submitted his first report, he included with it a number of detailed exhibits with charts, tables, and maps, correct?

A Yeah. I recalled that there are those exhibits, yes.

Q Those were not subsequent to his initial reports, those were alongside his report?

A Yeah. I am recalling. I believe so.

Q And you did not review those exhibits in evaluating his plans; is that correct?

A I only reviewed the detailed -- the maps and the census data characteristics of his plans.

Q I just want to make sure I am clear.

A Yeah.

Q When you discuss the data in his report, you only looked at his written report, the declaration, not the exhibits detailed, the census data, the maps that were attached to that report?

A Right.

Q And the same would be true of his supplemental report, you reviewed only his report, but not any of the exhibits attached to it?

A I mean, I -- I reviewed the -- all of the pages that were in his supplemental report, but focused on the data. Again, I did not examine his plan 7. I didn't have time to when I was preparing here.

Q Okay.

A Thank you.

Q Going back to the quote that you have on page 5 of your report, Defendants' Exhibit 4, where you say it's unclear why the plaintiffs referred to undocumented voting strength statistics rather than census Black Voting Age Population.

JUDGE MARCUS: Let's take our time and read it more slowly if you would, Ms. Khanna.

MS. KHANNA: My apologies. I certainly will.

BY MS. KHANNA:

Q So you see --

JUDGE MARCUS: You want to read from 3, Census Race Definition?

MS. KHANNA: I'm not sure I understand. I can read the highlighted language again.

JUDGE MARCUS: I thought you were reading some of it. I may have misunderstood.

MS. KHANNA: I probably was. I will say it again.

BY MS. KHANNA:

Q So here, Mr. Bryan, where you say, It is unclear why here plaintiffs refer to undocumented voting strength statistics rather than census Black Voting Age Population. Did I read that right?

A Yeah. That seems to be right.

Q You don't dispute that the census reports the any-part Black Voting Age Population, do you?

A Reports it in great detail of course, yes.

Q So the any-part Black Voting Age Population reported in Mr. Cooper's plan is, in fact, census Black Voting Age Population under your definition, correct?

11:19:21 A It's a definition.

Q Do you understand that to be census Black Voting Age Population as you used that term here?

A When I refer to census Black Voting Age Population, I refer to it in the context that I discussed earlier, which is a 11:19:44 range of values from black alone to any-part black or all black, depending on the analysis and the context, including some internal definitions within that, that the DOJ advocates, such as black alone or black plus white. I do not refer to any one specific precise Black Voting Age Population here. I just 11:20:09 refer to it in the context of census data that describes Black VAP.

Q Okay. Thank you for that clarification.

A Yes. For sure.

Q If we can go to -- turn to page 6 of this report. 11:20:22 Defendants' Exhibit 4.

Here you observed the different absolute numbers and percentages of the black-alone population and then the black alone in combination population, correct?

A Yeah, that's correct.

11:20:35 Q And I believe you touched on this with Mr. Davis, but do

these categories correspond to what we've also talked about as the single-race black population and the any-part black population?

A Yes. That's correct. That's consistent.

11:20:49 Q And you note that -- let me see -- you note in the first paragraph here that the latter category, the any-part black population is 1,364,736 people. Did I read that correctly?

A Yeah, that's correct.

Q And that comprises 27.2 percent of the population?

11:21:19 A That's correct.

Q And you also say that this represents an additional 68,574 blacks, compared to the number of people in the black-alone category?

A That's correct.

11:21:33 Q And those 68,000 people comprise about 5.08 percent of the total Alabama black population?

A Yes, that is correct.

Q Mr. Bryan, you don't dispute, do you, that those 68,574 blacks are, in fact, black, do you?

11:21:58 A Black is a measure of self identification. There are people who identify themselves as being black and black alone. And there's people who can self identify as being black and black in combination with other races.

I do not have any experience or knowledge of the

11:22:22 identification of people in combination with other races. What

they may answer is their prevailing characteristic. All I know is those people identify as at least being some part black.

Q So all of those 68,574 people identify as black?

A As one of their racial characteristics, yes.

11:22:47 Q And as you state here, the total Alabama black population is 1,364,736, that more inclusive figure, correct?

A That is correct, yes. And that's a very interesting number in demography a number that has changed dramatically in the last decade, which is why it has it has particular relevance in the redistricting case today.

11:23:13

Q And as in the next paragraph, you also provide that the Alabama Black Voting Age Population is 1,014,372 people correct?

A That looks correct, yes.

11:23:35 Q And that's inclusive of black alone and anyone else who identifies themselves as black?

A That's right.

Q Let's turn to the next paragraph down here, and specifically there is a sentence here where you say, and I will read it out loud, The alone definition is one of the most consistently used history -- one -- sorry -- is the one most consistently used historically in VRA cases?

11:23:51

A Yeah.

Q Because A, a multi-race classification did not exist prior to 2000; and, B, the alone definition has been most defensible

11:24:08

 from the political science *Gingles II* voting behavior perspective?

A Yeah.

Q Did I read that correctly?

11:24:17 A That is correct.

Q Okay. I want to break this down into its component parts.

A No problem.

Q Let's talk first about the subject subheading A here.

In 2000, the U.S. Census Bureau added the option for

11:24:31 people to choose more than one race on their census form; is that right?

A That's correct.

Q And before that, an individual had to select one and only one race?

11:24:40 A That's right.

Q So are you suggesting here that because there was no any-part black category before 2000, we should not count the any-part black category in 2021, even though the census now calculates that figure and has for the last two decades?

11:25:01 A I want to be careful and precise with my language here.

I'm not advocating that any one measure should or should not be used for the purpose of *Gingles II* or for how a political scientist would use it, and there's nothing in history that would create a precedent for if and how different

11:25:26 definitions should be used today. I base my comment on my

experience and working with professional political scientists, and when we ask me for demographic data for the purpose of doing their work, their characterization to me is that there is a race group that is race alone, it is easier for them, and it is more defensible for them to try and do their political science work for a homogenous racial population than a more heterogenous more probably defined racial population. And that is what -- the comment that I make is based on that experience.

Q And, again, was there any particular political scientist who you were directing this information in your report?

A I have worked with multiple political scientists throughout my career. And I have heard this is a frequent request and frequent feedback to me in their work.

Q Did any particular political scientist request this information for your report in this case?

A The political scientist in this case was Trey Hood. I did not provide my data to him directly, but I assume that it made its way to him. I worked with Mr. Trey Hood in the past.

Q You would agree that the Voting Rights Act protects African-American voting strengths -- voting rights; is that right?

A Yes, that's what it does.

Q That was before 2000?

A Yes. Since its inception.

Q And it's certainly true today?

A Yep.
Q So let's say we have a black Alabama resident who is both black and Asian. Let's say before the 2000 census when they had to choose one race, they selected black?
11:27:29 A Right.
Q You would agree that the person -- that person would be considered black for purposes of Section 2 of the Voting Rights Act?
A At that time, yes.
11:27:39 Q Okay. So let's say that after the 2000 census, they now have the option to choose more than one race, they choose both black and Asian, which is an accurate representation of their heritage, correct?
A Yep.
11:27:55 Q Is it your position that that person would no longer be considered black for purposes of the Voting Rights Act?
MR. DAVIS: Your Honor, I'd like to pose an objection to this question. Ms. Khanna is asking how Mr. Bryan would view this one thing, but asking him whether a person is of 11:28:12 which race for purpose of the Act, I believe is calling for a legal conclusion from Mr. Bryan. And he does not purport to be an attorney.
JUDGE MARCUS: Ms. Khanna, are you asking for a legal conclusion?
11:28:22 MS. KHANNA: I am not, Your Honor. I am really trying

to understand what Mr. Bryan considers to be black under this -- under the various classifications before and after 2000.

JUDGE MARCUS: I think you should rephrase your question. The objection is sustained as to the form.

11:28:35

MS. KHANNA: Thank you, Your Honor.

BY MS. KHANNA:

Q Is it your position, Mr. Bryan, that this person would -- should -- would no longer be considered black when evaluating whether a -- whether a district that includes this person is majority black?

11:28:55

A Again, I would leave that to an interpretation by the political scientists, and I would also defer an interpretation to the guidance that was recently provided by the Department of Justice. The Department of Justice's recent guidance -- I don't have it in front of me -- but advocates starting with the race alone, and then expands that definition procedurally to include black and -- black and white. And then as a next extension to black in combination with any other races. I'm not an attorney, and I am not a political scientist. I do not know what the triggers are for each one of those steps in the progression to the different definitions, and I am not in a position to state whether one definition is right or wrong.

11:29:17

11:29:41

Q Thank you. I appreciate that.

A Thank you.

11:29:58

Q Is it your position, Mr. Bryan, that the effect of adding the multi-race option to the census in 2000 would be to shut out individuals from belonging -- multi-race individuals from belonging to any racial group?

11:30:16 A Since I worked at the Census Bureau during the development of that question, I can say that that is not the case. The objective of adding race was to -- as part of the question development program in the 1990s was to try and give people in a rapidly developing more dynamic more diverse universe that we 11:30:44 live in the United States the opportunity to self identify whatever they were.

Now, that did not decide or preclude how that data would end up being used in law or how that data would end up being used by political scientists. At the time, the intent of that 11:31:00 question was to afford people the opportunity to identify personally as accurately as possible all the different things that they possibly could self identify that they were.

Q Understood.

I want to move to the second -- the part B quote that we 11:31:17 read from your report.

A Great.

Q This is where you state that, The alone definition has been most defensible from a political science/*Gingles II* voting behavior perspective?

11:31:29 A Yeah.

Q As you mentioned several times, you are not a political scientist, correct?

A No. No.

Q And you are not offering an opinion in this case on the *Gingles II* voting behavior?

A Definitely not.

Q You don't cite any political scientist for this statement that the black-alone definition is most defensible, correct?

A No. There's no literature that I refer to, only my personal experience with numerous cases and interacting with political scientists.

It is also grounded in just basic demographic analytic concept, which is that any time you have a group that is more homogeneous, uniform in their characteristics, it is easier to analyze and understand their attitudes, their beliefs, their behaviors, and the rest of their characteristics. Yes, it is a universal demographic truth that the more homogenous population you have the better job you can do with that.

The more that you add heterogeneity to this homogenous population, that is people with different characteristics, they may have part or one characteristics, but then they have parts of other characteristics, whether it's in political law or sociology or anthropology, it is harder and harder the more heterogeneity you add to a group to understand consistently and reliably their attitudes, beliefs, and behaviors.

Q So the testimony you just provided about attitudes and behaviors of various voting groups, that's just your opinion; is that correct?

A That's correct.

11:33:06 Q That's not informed by any specific expertise that you have in voting behavior or political science, correct?

A Has no grounding in my own personal experience with voting behavior. It's only what the expertise provided to me by political scientists I work with.

11:33:24 Q So when you say in your report that the black alone is most defensible, you were just basing that on your own beliefs and observations?

A No. I have been in cases where plaintiffs have presented a black-majority population that was 49 percent black, for 11:33:49 example, black alone, and only achieved majority status of greater than 50 percent by adding the black in combination with other races. And some of those cases where you don't quite have a black majority because you only have black alone of less than 50 percent have turned into what I have witnessed to be 11:34:15 hard fought battles.

Q You don't cite any of the cases in your report, do you?

A No, that wasn't the point of my report.

Q But when you characterized the use of the black-alone figure as most defensible, you are basing this on some cases, 11:34:29 perhaps, some information that you have that you have not

cited, correct?

A That's correct.

Q You don't point to a single case in your report that has used the black-alone definition in determining whether the first *Gingles* precondition is satisfied, do you?

A No. And to me, it doesn't matter. This is the land of the political scientists, and it's a reflection of my experience with them. I don't advocate one as being right or wrong. The breadth -- this is a secondary passing comment about the facts of my professional experience in this field. The reason that I present black alone and black in combination is to provide full, complete, context and understanding of the race alone and race in combination to help me better understand plaintiffs' representation of the black population, which is almost always not documented, inaccurate, or incomplete. That is why we do the complete job that we do. Not to try and prove a point about *Gingles II*.

Q I really appreciate that clarification. And I understand.

A Thank you.

Q What you just mentioned, that that was just a passing comment in your report. I am sure you understand that we have -- I need to ask you: You wrote in your report that this is the most defensible, and as I understand you saying now, you actually don't mean to be concluding whether one is defensible -- one use of a metric is defensible or better; is

that right?

A That is correct. I am not -- I am definitely not making a judgment that one is right or wrong or better or worse.

Q And you have cited -- or can cite no authority whether it's legal precedent, demographics, and political science that the notion that the black-alone definition is the most defensible, correct?

A No. Personal experience.

Q You mentioned the DOJ guidance, and we can turn to that now.

A Sure.

Q Because you do -- you quote that paragraph on page 6 of your supplemental report.

A Yeah.

Q This is from the DOJ's guidance under Section 2 of the Voting Rights Act for redistricting in method of electing government bodies?

A That's right.

Q And if I am reading it correctly, this guidance provides for two steps in determining who belongs in which racial category for purposes of Section 2 of the Voting Rights Act, correct?

A Yes. This is -- that's right. That's their guidance. That's correct.

Q So let's just walk through this. Can you please read

aloud the first two sentences of the block quote DOJ guidance that you report?

A Yeah. The department's initial review based on allocation, any response that includes white and one of the five other race categories identified in the response.

11:37:21

I should state that while that is the guidance, the incremental white to black population, for example, is almost always very small and is rarely used. But this is the guidance, yes.

11:37:49

Q And can you please read the second sentence of that paragraph, as well?

A Sure. Yeah. My pleasure.

Thus, the total numbers for black, Asian, American Indian, Alaska native, native Hawaiian or some other race reflect single race in combinations with minority and white.

11:38:06

Q I'm sorry. Were you reading right from the DOJ guidance there?

A I'm sorry?

Q I'm looking specifically at the block quote that you include in your report.

11:38:26

A Yeah. Uh-huh. That's what I was reading.

Q Okay. And it says that the total numbers of black African-American as well as the other minority groups?

A Yep.

11:38:36

Q Reflect the total of the single-race responses and the

11:38:49
11:39:08
11:39:27
11:39:42
11:39:58

multiple responses in which an individual selected a minority race and white race. Correct?

A That's correct.

Q So just to make sure I'm understanding this first step correctly under the DOJ's initial review, they count the total number of black population to mean the number of people who identified as single-race black, plus those who identified as both black and white; is that right?

A That's right.

Q And that's just step one?

A Yes.

Q So already step one, we have the DOJ would count more than just the black-alone category?

A I would say in a DOJ VRA case, this is the guidance that they would use, and my experience many of these cases do not follow the DOJ guidance. But in a DOJ VRA case, yes, this is their road map.

Q And this is the guidance you thought was important to provide as authority in your report, correct?

A Well, it's important context to know what all the different rules are, provide all the information for how people think about race. And that's the purpose of this section of my report, to provide all the information to give clear ideas of what the different rules are, depending on what the work is you're trying to accomplish.

11:40:14
11:40:31
11:40:42
11:41:04
11:41:18

Q Okay. Great. Can you read the second part, the last two sentences of that block quote from the DOJ guidance, which I think goes on to the second step?

A Yeah. So where I see there's significant numbers to such responses, the department will as, as required by OMB allocate those responses on an iterative basis to each of the component single-race categories for analysis.

Q And the sentence before that says that the department will then move to the second step in its application of the census data by reviewing the other multiple-race category?

A Right.

Q Which is comprised of all multiple-race responses consisting of more than one-minority race?

A Yep.

Q So under the second step, where there are significant numbers of people who indicated they belonged to more than one racial group, they will then be allocated to each component racial group; is that right?

A They get allocated. They didn't get all just allocated just to black.

Q So the person who identifies as both black and Asian, as I understand this guidance, would -- the second step be allocated to the black category and to the Asian category. Is that your understanding, as well?

A That is my understanding. I do not know the exact

allocation algorithm that the DOJ or the Census Bureau would use to do that. It's --

Q But based on the guidance that you have quoted in your report, you would agree that the DOJ's guidance provides authority for the use of the any-part black metric?

11:41:41

A There is authority for the use of it for sure. It's one of many different scenarios that can play out in this type of analysis in these types of cases.

Q And I believe in this -- in the same passage that you just read, the DOJ notes that this calculation of how it determines the black population or any minority population --

11:42:05

A Uh-huh.

Q -- is required by both OMB guidance and judicial opinions; is that right?

A That -- yes, that is true. That does not mean that all redistricting cases end up relying on these definitions. That's different.

11:42:18

Q But, in fact, the DOJ guidance does cite one judicial opinion in particular; is that right?

A I am in complete agreement with that. That is one universe, and this is the rules that apply in that universe, and I agree with you enthusiastically.

11:42:35

Q That is *Georgia v. Ashcroft*?

A I beg your pardon?

Q That case it cites is *Georgia vs. Ashcroft*?

11:42:48

11:43:03
11:43:10
11:43:26
11:43:42
11:44:08

A I do not have the cite in front of me. I'm sorry. I can't speak to that.
Q That's okay.
Well, I am just looking at your report, and at the end of the DOJ guidance, you have a footnote that cites to *Georgia vs. Ashcroft*?
A Okay.
Q Am I --
A I believe you.
Q Am I saying that correctly -- I think it's on the screen.
Do you see on the -- in your report on page 6?
A Yes.
Q Footnote 11?
A Yeah. I see that. Yep.
Q Actually, can we also -- can also pull up the DOJ guidance itself, just to make sure we're speaking about the same document? This is the document -- this is the document that you quoted in your report; is that right?
A Yeah, I believe so. Yes, that's correct.
Q If we can just scroll to page 13 of this document. I'm sorry. Maybe it's -- actually, yes. Starting on page 12.
A Yeah, that's probably where I got that reference from there.
Q Okay. Great.
A Good. Yeah. Thank you.

Q So the DOJ specifically cites to *Georgia v. Ashcroft* 539 U.S. 461, page 473, footnote 1; is that right?
A Yes.
Q And that's the same cite that you include in your report?
11:44:25 A Yeah.

MS. KHANNA: Your Honor, I don't believe this has actually been marked as an exhibit. I am happy to mark it as plaintiffs' exhibit. I believe we are on 105 and offer it into evidence.

11:44:39 JUDGE MARCUS: Just so I have this right, Plaintiff Caster 105 is the Justice Department's guidelines, right?

MS. KHANNA: Yes, Your Honor.

JUDGE MARCUS: Are you offering that?

MS. KHANNA: I am offering that into evidence right 11:44:55 now.

JUDGE MARCUS: Any objection?

MR. DAVIS: No objection from the Secretary of State, Your Honor.

JUDGE MARCUS: Anyone else have any objection?

11:45:03 Seeing none, we will receive Plaintiffs' Caster 105 in the cases before us.

MS. KHANNA: Thank you, Your Honor. And we can take this down.

BY MS. KHANNA:

11:45:23 Q So have you read the *Georgia v. Ashcroft* opinion that you

 cite in your report?

A Have I read what?

Q The *Georgia v. Ashcroft* judicial opinion from the U.S. Supreme Court that you cite in footnote 11 of your report?

A Yeah, not for a long time. Probably been -- it's been many years.

Q Did you read it in preparation for your report?

A No.

Q If we could just pull up that case and specifically, if you could go to footnote 1.

This is a long footnote. I won't make you read it all out loud. But I will represent to you that it's basically about the question about what metric of black to use in a given case where different parties are advocating for different metrics. Here it was the United States and the state of Georgia.

Could you please read out loud starting with, Moreover in the beginning of the -- in the middle of the footnote?

MR. DAVIS: Can I request that if Ms. Khanna would like something read into the record that she do so, and then I'm sure Mr. Bryan would be happy to comment on whether or not you read it correctly. He's been talking an awfully lot this morning.

JUDGE MARCUS: I leave it to you, Ms. Khanna. Do you want to read it or him?

MS. KHANNA: I would actually prefer that he read it

just to make sure we're both understanding.

JUDGE MARCUS: Okay. Make sure you have underscored the portion that you want him to read so he can see that and we can all see that clearly. You are asking him to read from footnote 1 of *Georgia vs. Ashcroft*, correct?

MS. KHANNA: Yes, Your Honor. Yes.

JUDGE MARCUS: Mr. Bryan, do you see the highlighted portion she's asking you to read?

THE WITNESS: I do.

JUDGE MARCUS: Would you read it aloud for us, please?

THE WITNESS: Yes, sir. Moreover, the United States does not count all persons who identify themselves as black.

BY MS. KHANNA:

Q Can you please keep reading to the end of the footnote, as well?

A It counts those who say they are black, those who say they are black and white, but it does not count those who say they are both black and a member of another minority group. Using the United States' numbers may have more relevance if the case involves a comparison of different minority groups. References. Here, however, the case involves an examination of only one minority group's effective exercise of the electoral franchise. In such circumstances, we believe it is proper to look at all individuals who identify themselves as black.

Q Thanks. Thank you for reading that.

So you would agree that the present Section 2 case as you understand it involves an examination of only one minority group's effective exercise of the electoral franchise?

A I'm sorry. Can you restate the question?

11:48:23 Q Do you understand that the present Section 2 case involves the examination of only one minority group's effective exercise of the electoral franchise?

A That's correct, yes. That's my understanding.

Q We are not comparing the voting strength of one minority group to another minority group?

11:48:40

A No. Not that I know of. But, again, I am not focused in my report, my analysis, or my expertise on voting strength. So I am a little bit out of my sandbox going there.

Q You didn't see anything in the reports -- Mr. Cooper's report to which you responded that suggests that plaintiffs were trying to build a minority coalition district or compare black voting strength or Hispanic majority district or anything like that, correct?

11:48:59

A I did not. I found that it was relevant to be able to present both black alone, as well as the black alone in combination to provide useful context for where different plaintiffs' plans fell because there were so many of them that by one measure were just above and by another measure were just below 50 percent.

11:49:18

So for the benefit of the Court, I thought it useful for

11:49:33

them to see and understand where those numbers fell using different definitions. I leave it to the Court and other experts to decide which definition is most appropriate for this case.

11:49:48 Q And just to clarify, you know, in these circumstances, as reflected by the Supreme Court's guidance in the case that you cite in your report, it is proper to look at all individuals who identify themselves as black, correct?

A In this case, that is what that says. I do not have an

11:50:08 opinion of whether that is the appropriate measure for this case or not.

Q Okay.

MR. DAVIS: I will withdraw an objection.

JUDGE MARCUS: I'm sorry. Did we get the full answer

11:50:22 to the question?

MS. KHANNA: I believe we did.

JUDGE MARCUS: All right. Thank you.

THE WITNESS: Thank you, Your Honor. What else?

BY MS. KHANNA:

11:50:31 Q Let's see. Let's turn back to your report, and if we go to page 9 of your supplemental report, you -- this is where you discuss Mr. Cooper's plans; is that right?

A Yes. That looks correct.

Q And you state here that your first order of business was

11:50:56 to assess Mr. Cooper's statement that he is able to create two

majority-black districts?

A Yes, that's what he alleged that he was doing, so my goal was to analyze the degree to which he accomplished that.

Q And we can zoom out from that. But for the remainder of that page and to the next page, you then go on to report the black-alone figure for District 2 in each of his illustrative plans, correct?

A I believe in the analysis we provide an analysis of both black alone and in combination measures.

Q I think you're right when it comes to the tables that you include in your appendix. But I'm -- just want to clarify if we can look at the text on page 9. For instance, let's start with the second paragraph.

For Cooper plan 1, I show in Cooper demographic characteristics Table 3.10. You see that sentence there?

A Yeah. I got it.

Q Am I right that you only report the black-alone figure for District 2 in Mr. Cooper's illustrative plan here?

A In that case, yes, that's correct.

Q But for District 7, you report both the black alone and the black in combination figure, the more inclusive figure?

A Yeah. I think that that is an important point because what this says is that in District 2, it's a minority reported as black-alone majority as alone in combination, whereas the distinction here is that in District 7 it is a majority by both

definitions. And it's a strong defensible majority by both definitions. So I think it's important to highlight that.

No matter which definition you use, that plan has -- or that district in that plan has a strong defensible black majority population, no matter which population is used.

11:52:58

Q When you say strong and defensible majority-black population, I don't see those terms here. What does that refer to?

A Yeah. Typically, there is no hard and fast rule for what a majority defensible strong majority is. The courts, to my knowledge, the expertise in the field don't have a strong over/under number. I have done a significant amount of statistical analysis in this area, and when I look at numbers that are 50.01 percent, 50.02 percent, 50.03, so forth, those types of plans, when you do statistical analysis on them, you can find that they ought -- the chances -- the statistical probabilities of them really being a majority, sometimes can be questionable, certainly when you put together multiple districts with those small majority fractional majority populations. But in my experience, when you have districts that have 52 percent or 53 percent, certainly in a black-alone district, I have never seen anyone argue that those may or may not be a black majority district. It's a subjective threshold.

11:53:14

11:53:37

11:53:59

Q When you say strong and defensible, you are talking about whether or not the demographic figure is accurate?

11:54:23

A Whether that -- whether that number is representing a black majority district or not. And I have seen numbers -- when the number is 50.01 percent, then there is usually lots of dialogue around that about whether that really is a majority or not. If it's -- well by the law 50 plus -- 50 percent plus one person is the law, but those types of numbers very close to 50 percent elicit much more conversation about whether it's a black majority than a 52 or 53 percent district would.

Q Just to be --

A I have never heard that debated.

Q Just to be clear, you provide no opinions, conclusions, or analysis about whether any of the illustrative plans that you reviewed in this case provide strong defensible majority-black populations, do you?

A I'm just explaining that as my opinion and response to your questioning. It's not appropriate in this report to say -- to defend one as being strongly defensible or not. I simply state the facts.

Q So as you noted, you do, in fact, include both the any-part black figure and the black-alone figure in your tables in the appendix to your report, correct?

A Yeah, that's correct.

Q And just to -- and you also have now testified that you are offering no opinion that use of the any-part black figure is wrong in this case, correct?

A No, it is -- it is neither right nor wrong. It is one of two numbers that gives the Court and the experts useful context for where the numbers that plaintiffs' plans lie.

Q If we can scroll back or go back to your report, page 5, at the top, and, again, at the first paragraph here?

A Right.

Q You note that in this section you will try to define and document the true black population of the two black districts in plaintiffs' alternative plans?

A Yeah. That's correct.

Q But at no point in your report do you conclude that the true black population in Alabama is defined as only the single-race black population?

A Yeah. That's correct. What I'm seeking to do, for example, referring to Dr. Duchin's work, where she does nicely document what her population is, I appreciate the accuracy and the clarity of her analysis. She is very transparent that her work represents all-part black, and that's great. Very frequently other plaintiffs don't. And in reading through the bodies of work that I have looked at as part of this case in Singleton, Caster, and looking at other work, for example, that Cooper has done, there are many instances where it is not clear what the black population is that they're referring to.

So part of my exercise is to do the analysis and the research to make sure I know that when I see a number that says

this district is 50 percent black or 55 percent black, because those are not oftentimes not documented, I take it as my responsibility as the demographic expert to find out what those true black populations are that they are referring to. It is much of benefit for clarity and the definition. It is not a judgment of which is right or wrong.

Q And I just want to make sure that we are talking about this case and the reports in this case. You mentioned plaintiffs generally maybe even Mr. Cooper's reports in other cases. Is it your position that Mr. Cooper did not clarify in his report where and when he was using the any-part black calculation?

A No. In this particular report, it's -- he provides two columns of data that show what his numbers are. But given my experience with tables that I have reviewed for Mr. Cooper and errors I have found in those tables, I felt it was important to make sure that those numbers were correct. And as I found out in my analysis, in some cases they were not. So it was still a worthwhile exercise even though he represented them as being all black or any-part black or black alone. It's still a useful purposeful exercise because it uncovers things like this.

Q And when you went back to check those figures, you would agree that using the any-part black metric as stated in the -- as approved by the Supreme Court and the Department of Justice,

 each of Mr. Cooper's maps have two majority-black districts, correct?

A I -- in any-part black metric, yes, I agree with that.

MR. DAVIS: Before you continue, Ms. Khanna, I apologize for interrupting. But, Your Honors, our expert has been going for some time now. I don't mean to interrupt Ms. Khanna's flow, but I would ask her and the Court if we might be able to take a break before too long at the appropriate time.

JUDGE MARCUS: Fair enough. What's your sense, Ms. Khanna -- I don't want to break you in the middle of a thread. But you tell me what would be a convenient time to break.

MS. KHANNA: I'm happy to break here, Your Honor. I think we've kind of closed out this portion of his report, and we can move on to the next topic after lunch.

JUDGE MARCUS: You have closed the loop on this? On -- and we will take a break, and then you will come back with the balance of your cross; is that right?

MS. KHANNA: Yes, Your Honor.

JUDGE MARCUS: If I hear you right. All right. I have 12:00 o'clock Central Standard Time. I want to be sure I am right. It's 1:00 o'clock here in south Florida.

We will reconvene in one hour, which will be 1:00 o'clock Central Standard Time, 2:00 o'clock Eastern Standard Time.

Thank you all. We will be in recess until that time.

(Recess.)

JUDGE MARCUS: I think we have everybody assembled. Ms. Khanna, you're in the midst of your cross, and you may proceed with Mr. Bryan. Thank you.

MS. KHANNA: Thank you, Your Honor.

BY MS. KHANNA:

Q Good afternoon, Mr. Bryan.

A Hi, Abha.

Q Before the break, we spoke about the any-part black metric versus the single-race black metric; is that right?

A That's correct. Mr. Cooper also.

Q Mr. Cooper also reported in his reports the non-Hispanic single-race black Black Voting Age Population for each of the districts in his illustrative plans. Do you recall that?

A I did see those statistics, yes.

Q You don't address that metric at all in your discussion of the demographic data?

A That is correct.

Q And you do not contest the use of CVAP, Citizen Voting Age Population data in evaluating whether plaintiffs have satisfied the first *Gingles* precondition, do you?

A I would say that the -- the PL census data would be the data of record for the purposes of establishing *Gingles I*, not CVAP. The CVAP would be more appropriate for assessing voting

strength particularly in populations such as Hispanic populations, which may have lower citizenship rates as a minority population.

Q Okay. If we could go to your first report in the -- in this case, in the Caster case, Defendants' Exhibit 2. Let's go to page 3.

A Great. Thank you.

Q Here, about four lines down?

A Yeah.

Q Note that in 2015 you served in a leadership role in writing an amicus brief to the U.S. Supreme Court in the *Evenwel* case; is that right?

A That's correct. I worked with a team of demographers and Census Bureau experts to write that brief, but I was one of the lead authors.

Q That brief was specifically about the use of CVAP data in redistricting; is that correct?

A That's correct, yes.

Q If we could call up that brief?

A There it is.

Q There it is. You see your name?

A I remember it real well.

Q That's the brief to which you are referring?

A Yes, ma'am.

MS. KHANNA: And I don't believe this has been marked

as an exhibit yet. I would like to mark this as Plaintiffs' Exhibit -- Caster Plaintiffs' Exhibit 106 and offer it into evidence.

JUDGE MARCUS: Was marked for identification. You may proceed.

13:04:58

MS. KHANNA: I would also like to offer it into evidence, Your Honor. Or would you like me to lay the foundation first?

JUDGE MARCUS: Is there an objection?

13:05:06

MR. DAVIS: Your Honor, if it's okay, I would like to hear how Ms. Khanna intends to use this. I certainly have no objection to it being was marked for identification. Whether in evidence, I would like to hear how she intends to use it to see if we can assess if it's relevant.

13:05:22

JUDGE MARCUS: Fair enough. Lay the foundation if you would.

MS. KHANNA: Will do. Thank you, Your Honor.

BY MS. KHANNA:

Q Mr. Bryan, this brief, if you would look -- let's go to page 15 of this brief.

13:05:35

A Great.

Q Toward the bottom of page 15, you write that the U.S. Supreme Court's recent Section 2 cases have accepted CVAP as the yard stick when assessing minority voting strength; is that right?

13:06:00

A In the middle of the census for districting litigation, yes.

Q Okay.

A Not for the purposes of the decennial census based political redistricting exercise.

13:06:17

Q Interesting. If we could go to page 70. The very top of page 17, you write, Likewise, in *Bartlett v. Strickland*, the Court and litigants relied on CVAP to evaluate the first *Gingles* requirement. Did I read that correctly?

13:06:37

A Yeah, that looks right.

Q And you note in the footnote that that case, like this one, involved a Section 2 claim on behalf of black voters, correct?

A Yes, in that litigation it was true. Yeah.

13:06:55

Q And that was litigation -- it was a Section 2 litigation based on the in 2011; is that right? I'm sorry. 2009?

A It was not a -- if I recall correctly, it was not part of a state redistricting exercise. It was post-redistricting litigation.

13:07:18

Q To your understanding?

A Yes, that's correct.

Q Is it your understanding that the *Bartlett v. Strickland* case is the Supreme Court precedent on how to establish the first *Gingles* precondition?

13:07:36

A For Voting Rights Act litigation? Yes. I would draw a

distinction between that and drawing districts based on the decennial census data.

Q But for Section 2 Voting Rights Act cases, that is the governing case?

13:07:58 A Yes. I would frequently -- I frequently would use and report both the decennial census data the total population as well as the CVAP data, which is an exercise we actually pursued in the *Evenwel* case.

Q Okay. You further recognize in this brief that these

13:08:19 numbers can make a significant difference sometimes, correct?

A It can for a lot of reasons. Some based in what they're measuring, and some based in their accuracy.

Q So if we look at the bottom of page 18 of this brief toward the top of page 19, here you say, Every fraction of a

13:08:41 percentage point is of intense interest to the political players in this process.

A Yeah.

Q They trust that CVAP is a reliable data source for this sensitive work.

13:08:53 Did I read that correctly?

A That's -- yeah. That's how it is used. There's obviously always debate and questions about the accuracy of the data every time that it's used, but that -- the number is used as it is. And for that purpose, yes, every tenth of a percent is of

13:09:09 interest to parties in cases like this. That's true.

Q But in this report, in this case, you don't question or debate the accuracy of the CVAP data reported in Mr. Cooper's plans?

A I will say this about that: The ACS, which is a survey that I participated in the development of almost 20 years ago is a survey that's called a continuous measurement survey. And that survey is designed to fill in information that was historically given by the long form, the one-in-six long form sample many years ago.

13:09:25

13:09:47

And so that survey is in some sense renewed. There are many parts of it that are updated and refined and enhanced during the decennial and immediately following the decennial census.

It is my experience, having been part of the development of the American Communities Survey, and using it intensively for many years, that the farther and the farther that you get away from that base decennial year, the poorer and poorer quality that ACS data is going to be. This is widely known in the demographic community.

13:10:07

13:10:27

So by the time you get to the ACS file that we are using today, which is what we would call the 2015 to 2019 file, it's a five-year data file, this file is the furthest out from the last decennial census of any ACS data that will be available. And soon, in the next year or two, it will be renewed again and re-grounded in the reality that it's the current census.

13:10:52

13:11:12 In my analysis of a recent very large-scale intense redistricting exercise that was the Texas Legislature, I studied the CVAP data for the state, and I studied the decennial census for the state intensively. And my findings in this very large sample of ACS data, compared to the decennial census data was that there were dramatic numerous significant differences in what the ACS reported was the Citizen Voting Age Population and what the decennial census said was a companion Voting Age Population.

13:11:34 The differences were so significant and so vast that it is my professional opinion that using the current ACS CVAP data which is based in 2010 census concurrently with the 2020 decennial census is both an unnecessary exercise, and I also think that it's a very risky one because the data from the ACS 13:11:58 now, nine years out from the last census, are at a much more perilous state than they were in *Strickland* only one year out from the census.

Q That opinion that you just expressed is not an opinion you expressed anywhere in your reports in this case, correct?

13:12:13 A It's not in this report, but I have written about it. I have presented on it, and I have discussed it extensively in the professional community.

Q You were presented with Mr. Cooper's illustrative plans and his report?

13:12:28 A Yeah.

13:12:45
13:13:00
13:13:20
13:13:44
13:13:56

Q As well as his calculation of the non-Hispanic single-race black Citizen Voting Age Population of the districts in those illustrative plans, correct?

A I saw that. I was aware that that was in the report. That's correct.

Q You provided an analysis of the racial demographics in Mr. Cooper's plans, correct?

A I did.

Q You had the opportunity to find or dispute or address in any way his assessment of the Citizen Voting Page Population demographics in this plan?

A I did not feel it was appropriate or necessary. And if I did, I wouldn't have had the time to anyways.

Q You did not include any discussion or response on the Citizen Voting Age Population in your report, correct?

A I did not.

Q If we can go back to the brief shortly, the *Evenwel* brief that we just mentioned, let's go to the top of page 20.

Here you write, in short, CVAP is now an indispensable feature in voting rights litigation under Section 2. Did I read that correctly?

A Yeah, that's correct for sure.

Q We can take this down.

A I would derive distinction between voting rights litigation and certainly voting rights litigation late in the

decade versus using decennial census data which are required by law. ACS data are not required by law for purposes of redistricting. So I do not know or understand why Mr. Cooper or anyone would choose to use ACS for the development of a redistricting plan.

13:14:15

Q You don't draw that distinction in your brief to the Supreme Court in *Evenwel*, correct?

A The inference when I say the ACS CVAP data is instrumental for litigation, if I had meant that ACS data was critical for redistricting, I would have said so. And it's not, so I did not.

13:14:32

Q You just said that it's critical for evaluation in a Section 2 Voting Rights Act case?

A Yeah. Typically, post-redistricting litigation, especially as it pertains to Hispanics, as was the case in *Evenwel*. It's especially important measuring one person one vote and voting strength. And I strongly agree with that. For that purpose, it's absolutely instrumental. It is not instrumental. It is not required by law. Law doesn't say anything about using CVAP data to develop a political redistricting plan. And I do not ever see it done, and I don't do it.

13:14:46

13:15:03

Q So the distinction you're drawing is that the law does not require the use of CVAP data for a legislature drawing a congressional plan. Is that what you are saying?

13:15:20

A     It's not required that.  That's -- the purpose of the
decennial census is for the purpose of apportionment and for
redistricting.  The purpose of the ACS is not for political
redistricting or for apportionment.

13:15:36  Q     But the in the *Evenwel* brief you agree that the use of
CVAP data is relevant, at the very least, in Section 2 Voting
Rights Act lit indication, correct?

A     Yes.  I would agree.  And when this case goes, I am sure
that that will have some role in it.  I don't believe it has a
13:15:58 role now.  I would emphasize that because black citizenship,
especially in the state of Alabama, is so high that we would
typically as demographers look at black CVAP, Black VAP as
being virtually indistinguishable.  In fact, when I am looking
at the number of black Hispanics in the state of Alabama, I see
13:16:23 8,000 black Hispanics out of 1.3 million.  So my assertion that
they are indistinguishable I think is fair and valid.

        When you look at Section 2 Voting Rights Act claims with
Hispanics, those citizenship rates can and do vary wildly,
which is why the ACS CVAP data is so particularly important in
13:16:45 those cases, particularly pertaining to Hispanics.  It's
virtually irrelevant for the purposes of assessing blacks.  It
adds virtually no incremental value and can be deceiving as
what I believe I see in Mr. Cooper's report in representing
Black VAP because it is so far antiquated based on the 2010
13:17:11 census data versus data that we literally have right now about

what's really going on here in the state of Alabama.

Q Mr. Bryan, you do not dispute in your reports that each of Mr. Cooper's illustrative plans contain two districts that are majority-black according to the non-Hispanic single-race black Citizen Voting Age Population metric, do you?

13:17:31

A I have no way of knowing because I did not run that analysis myself. If his numbers are right, which they have been in some cases; in this case, been shown not to be, I don't know. I can't give an opinion.

13:17:42

Q And you didn't offer an opinion on that?

A And I do not offer an opinion, no.

Q And you certainly didn't dispute it in your report, correct?

A Don't dispute it. Don't know. No opinion.

13:17:52

Q Okay. Let's turn to your supplemental report. Let's go back now to page 4 of that and your discussion of traditional redistricting principles.

A Yeah. Great.

Q So here, you quote a passage from the Congressional

13:18:23

Research Service listing common redistricting principles; is that right?

A Yeah. The congressional service here is talking more about the importance of it. And I use the NCSL more as an inventory of the ones that are most important.

13:18:40

Q But you specifically quote on page 4 a passage from the

Congressional Research Service regarding traditional redistricting principles, right?

A Yeah. That's correct. And as I was asked in direct why there is -- what is important about using traditional redistricting principles, part of my opinion in that exam was elaborating on this, why it's a common set of rules, enhancing fairness, minimizing gerrymandering, and so forth. That's why this is more of an explanation of why we have the traditional redistricting principles that we do and why we use them.

13:19:06

Q Let's highlight the quote that you include, the block quote that you include in your report, starting with, Many of the rules?

13:19:27

A Yeah. Great.

Q Will you please read that out loud to the Court?

A Many of the rules or criteria for drawing congressional boundaries are meant to enhance fairness and impact of gerrymandering. These rules, standards, or criteria include assuring population equality among districts within the same state; protecting racial and language minorities from vote dilution, while at the same time not promoting racial segregation; promoting geographic compactness and contiguity when drawing districts; minimizing the number of split political subdivisions and communities of interest within congressional districts; and preserving the historical stability in the cores of previous congressional districts.

13:19:45

13:20:15

13:20:39

Q Thank you. I believe -- I believe you testified on direct that you have never heard of minority voting rights protection used as a traditional redistricting principle. Did I hear that right?

13:20:57 A I have not seen the use of minority voting rights as a principle drawing to a minority voting right target certainly in subordination of any other traditional redistricting principle.

Q The very paragraph that you cite in your report as an 13:21:24 authority in your discussion of traditional redistricting principles specifically includes as the second criterion protecting racial and language minorities from vote dilution, correct?

A Yes, that's part of the process. Sure. That can be a 13:21:50 part of the process.

Q Okay. So the redistricting principles listed here in this paragraph include in the following order: Population equality, non-dilution of racial minority voting strength, compactness, contiguity, minimizing political subdivision splits, minimizing 13:22:15 community of interest splits, and core preservation.

Am I reading that the same way you are?

A Yeah. I would not literally take those in order as most important to least important. Population equality is certainly the most important. In look at protecting racial and language 13:22:35 minorities, I think it's very easy to fall into a trap of very

detailed subtle nuances in language, what that exactly means.

Protecting race or protecting voting strength is an extremely broad area. And exactly how you draw boundaries or if you draw boundaries towards those is a very murky area.

13:22:57 Q But you would agree with me that I read right, I singled out the individual criteria listed in this paragraph in the order listed in this paragraph; is that right?

A I don't necessarily agree with the order. It's an inventory. This is so often the case. I would agree with the

13:23:15 legal requirement, the population equality is the first, balancing one person, one vote for sure.

Q So you may not agree with the order as it's presented here in the paragraph that you cite in your report, but do you agree that I accurately represented the individual criteria in the

13:23:37 order they are listed in this paragraph?

A Yeah. That's true.

Q If we could turn to page 11 of your second report. This is Defendants' Exhibit 4, again, page 11. Okay. Here is where you begin your analysis of Mr. Cooper's illustrative plans?

13:24:02 A Right.

Q Using just three redistricting principles; is that right?

A Yeah, that's correct.

Q And those three principles that you chose to analyze are in this order: Core retention, incumbency, and compactness?

13:24:21 A It's because that order or that -- there's no particular

meaning to that order, but those three were used subsequent to the establishment that they were legal plans with equally balanced population that would support one person, one vote. So checking that box, I moved on to these other issues.

13:24:42 Q I'm sorry. Can you explain that one more time? I am not sure I understood.

A Yes. I -- there was no need to do an in-depth analysis of the equitable distribution of population because it's factual at face value. I looked at it. It is -- there's no need to do 13:25:02 a deep dive or a detailed analysis on whether they did a -- the traditional redistricting principle of equally balancing population was met or not.

It was at face value, it is evident that it was. So there's no need to create a section and write in detail about 13:25:24 if and how it was. It was.

Q Okay. We can take down the exhibit. Just to make sure --

A Thank you.

Q Just to make sure I understand. As you just testified, you offer no analysis of Mr. Cooper's plans with respect to 13:25:41 population equality, correct?

A No.

Q You offer no conclusion that Mr. Cooper's plans failed to abide by population equality, correct?

A No, the total population numbers that I reviewed in his 13:25:55 tables and that I confirmed suggest that he meets that

criteria.

Q Okay. You also provide no analysis of non-dilution of racial minorities in either the enacted plan or any of Mr. Cooper's plan, correct?

13:26:10 A No.

Q And you certainly offer no conclusion that Mr. Cooper's plans failed to abide by the principle of non-dilution of minority voting strength?

A No. I have no opinion.

13:26:25 Q You also provide no analysis of the traditional redistricting principle of contiguity in any of Mr. Cooper's illustrative plans, correct?

A That is correct.

Q And you offer no conclusion that Mr. Cooper's plans failed 13:26:42 to abide by the principle of contiguity?

A Yeah. That, again, is a fact that was self-evident and I found that to be true and not an item to write a detailed analysis on. The only analysis or time when I did focus on that was on Dr. Duchin's report where there was an instance of 13:27:08 non-contiguity.

It was immaterial, an easy mistake and trivial. Had no material impact on the outcome, but it was simply one worth noting. Because there was no such issue with contiguity in Mr. Cooper's plan, I did not raise it as an issue to analyze.

13:27:25 Q You also provide no analysis of the extent to which

Mr. Cooper's plan split political subdivisions; is that right?
A Yes, that's correct.
Q You offer no conclusion that Mr. Cooper's plans failed to minimize political subdivision splits?
13:27:44 A I'm sorry. You broke up for a moment. Can you please repeat?
Q I can. Can you hear me now?
A Yeah, I can hear you. I got you. No worries.
Q And you offer no conclusion that Mr. Cooper's illustrative
13:27:58 plans failed to minimize political subdivision splits?
A I did not, no.
Q So in that paragraph from the congressional -- what was it, the Congressional Research Service --
A Right.
13:28:16 Q -- on traditional redistricting principles, that paragraph did not even mention the word incumbents, correct?
A That was does not. That's why I used that in conjunction with the authoritative list provided by the NCSL. Some different organizations may provide different lists.
13:28:41 Incumbency is a very widely used one for sure.
Q But not used in the list that you quoted first in your analysis of traditional redistricting principles?
A Yeah. That's why I thought it was important to provide the context, the importance that the Congressional Research
13:28:59 Service provided, and then the inventory of NCSL, so we would

have a thorough, comprehensive, exhaustive view of what the authoritative agencies on this would say about the matter.

Q Okay. So --

A It was just the completeness. I'm sorry.

13:29:15 Q Okay. Thank you.

JUDGE MARCUS: Just slow down. Allow each of you to finish your answer and your question so the reporter can get it down. And equally important so that Judges Manasco, Moorer and I can receive it. So just take your time, please.

13:29:36 MS. KHANNA: Yes, sir. Thank you, Your Honor.

THE WITNESS: Yes, sir. Thank you.

BY MS. KHANNA:

Q Let's turn to core retention which is the first principle that you analyze in this report.

13:29:47 A It is. Thank you.

Q Is it fair to say that your analysis prioritizes core retention above other criteria?

A I don't think that's accurate. The order in which I present my information or the details that I present are not 13:30:07 proportionate to their importance. Core retention is a very complex, detailed, hard analysis to run. It just is. And in order to deeply understand it, in order to execute it, you have to do a lot of detailed work.

The fact that there is a lot of pages and a lot of charts 13:30:30 and a lot of tables only reflects the complexity of the

analysis, not necessarily the relative importance of it.

The outcome of it, I would say is important, not just because there are significant differences in core retention in the plans, but also because there is a significant differential impact to a minority population.

13:30:51

And as an expert, this is something that I am trained to look at because there are cases where minority populations -- and I am not suggesting this was the case here -- but it is the risk and certainly the perception that if you are moving populations and breaking their continuity of representation, if you do that disproportionately to a minority population, that you should pay particular care and attention in studying where and why and how that happens to ensure that you are protecting their continuity of representation as much as the rest of the population.

13:31:12

13:31:34

Q So as the map drawer you would want to make sure that you are protecting the voting rights of minority populations in particular?

A I would argue that the motivation is less to ensure that you are protecting them more so to deeply understand and measure them and understand it and know where and why and what the tradeoffs are if you are making significant changes to an existing districting plan.

13:31:55

It's not to judge and say that you should do it, or you should not do it. It's more of an identification, a

13:32:14

quantifiable measure to say it is happening so that you can remediate it and understand it, deal with it and acknowledge whether it's a necessary tradeoff or not.

Q Mr. Bryan, are you familiar with the redistricting guidelines adopted by the Alabama reapportionment committee to govern this redistricting cycle?

A Yes, ma'am, I am. I have them available as an exhibit right next to me.

Q Okay. Great. Let's pull them up so we can all be looking at the same thing?

A Thank you.

Q Caster plaintiffs' Exhibit 82.

A I am just looking to make sure these are the same as what I am looking at.

Q Sure.

A They are. Yes, ma'am. The documents -- this is a consistent document with what I have. Thank you.

Q Okay. So if we look under Roman Numeral II, we see the criteria for redistricting.

A Yes.

Q Under which the committee lists all the criteria, correct?

A That's right. Yes, ma'am.

Q I will -- I won't make you sit here and read all the criteria.

A That's all right. I will. It's okay.

Q I know we've all done it a few times now.
A It's okay.
Q But as you review this document, do you agree that the first five of those criteria, subsections A through E, all have to do with population equality?
A Let me pause one moment. Yes, I agree with that.
Q And then the next two criteria, subsections F and G, pertain to the Voting Rights Act, correct?
A That's correct, yeah.
Q Then if we move on to paragraph H, this paragraph provides that districts should be contiguous and reasonably compact?
A Yes, that's correct.
Q Then paragraph I addresses various requirements embedded in the Alabama State Constitution --
A That's right.
Q -- largely for state legislative districts, correct?
A Yes. Yes. That's correct. May I add, on page 3 there was a sentence that says the legislature shall try to preserve the cores of the existing districts. I would -- what I was looking at earlier was that statement because to me that almost is a -- is a part of the conversation about minimizing population, deviations, balance populations. It's just -- it's a little bit out of place in this document to me, to me it would also be kind of tied in some sense to those first requirements you brought up.

Q Okay.

A Sorry for interrupting.

Q No. I think you actually are anticipating some of my questions as well. So let's actually first go to paragraph J.

13:35:34 A Okay, let's do.

Q And we can highlight that paragraph for your ease of reference.

This is --

A 21 J. Yeah. I may be -- okay. Yeah, I see.

13:35:52 Q Okay? And paragraph J appears before the paragraph that you just mentioned about core preservation, correct?

A I believe so, yes.

Q Can you please read paragraph J out loud?

A Yeah. The following redistricting policies are embedded 13:36:07 in the political -- if you don't mind, I am going to read off of mine because your face is actually covering that half of the paragraph. I apologize.

The following redistricting policies are embedded in the political values, traditions, customs, usages of the State of 13:36:24 Alabama and shall be observed to the extent they do not violate or thwart any foregoing policies prescribed by the Constitution of the United States and the State of Alabama.

Q Okay. And the custom --

A There we go.

13:36:40 Q -- and the custom of avoiding contest between incumbents

and core retention are included as subparagraphs to that paragraph J; is that right?

A Yes, that's correct.

Q So you would agree -- I'm sorry. Go ahead?

13:36:58 A No, please, ma'am, after you.

Q You would agree, wouldn't you, that under Alabama's redistricting guidelines, compliance with the Voting Rights Act expressly trumps the criteria that you chose to focus on, core retention and incumbency.

13:37:17 MR. DAVIS: I object, Mr. Bryan. Just one second. I think this is asking for a legal conclusion if you're asking for Mr. Bryan's statement as to whether as a matter of law one has priority over another.

JUDGE MARCUS: No, I don't think the question was 13:37:33 asking him to tell us what the law is and he's not equipped to do that. I think the question was simply asking him to focus on the language used in the Alabama Legislature's guidelines. And asked specifically whether these two interests -- core retention being one and incumbency protection in the plan are 13:38:00 listed as subordinated to the Voting Rights Act at least insofar as the legislature has expressed its view on these priorities.

He's not here to tell us whether something is more or less importantly as a matter of law so much as she's just asking him 13:38:19 to read from the form. Do I have the essence of the question?

MS. KHANNA: That's correct, Your Honor.

JUDGE MARCUS: All right. Do you understand the question, Mr. Bryan? Or do you want her to repeat it?

THE WITNESS: No. I believe I understand the question. I would like to say two things about this.

First, I look at the universe of traditional redistricting principles from the state of Alabama as a refinement. An improvement, something very specific to the state of Alabama that's a subset of the congressional redistricting service and of the NCSL. And it adds tremendous value and clarity in the direction of the redistricting exercise for the state.

I am reluctant to offer an opinion that says because of the order that these are written or how they are written that one is necessarily more important than another.

In assessing the state of Alabama's plan, it is my understanding and was my expectation that any care, any concern, any regard for Voting Rights Act compliance was accommodated and taken care of and considered in the drawing of the plan.

I was not asked to and I did not expect to offer an opinion on if or how much the plan did or did not comply with the Voting Rights Act. I acknowledge it's a high and important criteria. It is not one that was part of my opinion.

The other items that I investigated were areas that I felt were important and areas that I have expertise in, and that I

was able to offer an expert opinion in. I am not in the position to say which of these is more or less important than the other if I understand Ms. Khanna's question.

BY MS. KHANNA:

13:40:17 Q Thank you for the clarification. And to be clear, I am not asking you what you believe to be most important when it comes to evaluating or drawing these plans.

But you did evaluate this document --

A Yes.

13:40:29 Q -- in preparation of your report, correct?

A I did, yeah.

Q And you would agree that according to these guidelines as provided by the Alabama reapportionment committee, compliance with the Voting Rights Act expressly trumps the criteria that

13:40:47 you chose to focus on?

A I am careful to answer around the word chose to focus on. I did not deliberately choose not to focus on the degree to which this plan complied with the Voting Rights Act.

Q Then maybe I can refine my question. You would agree that

13:41:12 under these guidelines, compliance with the Voting Rights Act expressly trumps compliance with a core retention principle, correct?

A I am not an authority to prioritize or offer an opinion on which traditional redistricting criteria are more important

13:41:41 than the other. I can offer an opinion that compliance with

the Voting Rights Act is a big and important criteria and is one of the highest criteria that we must consider, along with equalizing population.

I am not in a position to exactly rank order that with other traditional redistricting criteria.

Q And, again, Mr. Bryan, I am not asking you, again, to tell me what you believe is most important. I understand you don't have -- you are not offering that opinion.

But I'm asking you to -- about the guidelines in front of you right now --

A Right.

Q -- that you reviewed in preparing your report. Under these guidelines as you read them, the Voting Rights Act -- compliance with the Voting Rights Act expressly trumps core retention, correct?

A The requirement for Voting Rights Act compliance, in order of this document, is written before core retention. I do not take that as a literal interpretation that that means or how much more it means just by its placement in this document, that it is more important or how much more important it is.

The Voting Rights Act compliance was not part of my analysis because I took it at face value that a plan that I was presented with to analyze had already taken that into consideration. I was -- so if that were the case, then -- I'm sorry. Go ahead.

Q So when you evaluated this document in preparing your report in this case --
A Yes.
Q -- you did not understand it to be saying whether the -- 13:43:36 whether compliance with the Voting Rights Act was more or less important than compliance with a core preservation principle?
A Yeah. I think that's very fair and helpful. Thank you.
Whether it was or was not, if there was a question or a concern about whether the state's plan was compliant with the 13:44:01 Voting Rights Act or not, I was not presented with that question. I was not presented with that task. It was not part of my analysis. But retroactively I can say in looking at the state's plan with the percent black in District 7 that is consistent with the last redistricting exercise, yes, there is 13:44:25 at least one district that is a majority-black district.
But other than that as a thought exercise, my analysis did not go any farther than that. I was not asked to go any farther than that and explore the scenarios or dive into the Voting Rights Act.
13:44:44 Q Just to clarify -- the question I am asking you is about your reading of the guidelines in front of you --
A Yeah.
Q Right now. In preparation for your report, when you read these guidelines --
13:44:58 A Yes.

Q    -- you did not understand them to provide any kind of

hierarchy of criteria of the ones that they list here; is that

right?

A    I didn't, except for the very first sentence, which says

they must equalize population.  That's common in a list of

priorities to cite the legal requirement first.  After that,

the prioritization of VRA, core retention, contiguity, these

things I found in a variety of sort orders in different

documents like this in my experience.  So I am careful not to

prioritize -- literally prioritize one over the other just

because the order that they're presented in the document.

     And I apologize.  I am not trying to be obtuse or

difficult.  I'm just reflecting on my understanding and

interpretation of the document.  I'm trying to answer as best

as I can.

Q    I completely understand.  And I just want to make sure

that we're both reading the guidelines the same way.

A    Thank you.  And it may be.  It may be the case that the

authors of this and the state's interpretation of this in

developing their plan was to do these in rank order and that's

how they arrived at the plan they did.  I don't know.

Q    We can take the guidelines down.

A    Thank you.

Q    Mr. Bryan, are you familiar with how plaintiffs in

Section 2 cases are required -- or generally show that they can

satisfy the *Gingles* first precondition?

A Yes. I have participated in many cases where they do that and we do that ourselves on both sides of these cases.

Q So plaintiffs in Section 2 cases have to demonstrate that a new majority-minority district could be drawn, correct?

A That's correct, yes. With other criteria.

Q One that does not already exist in the map on -- being challenged?

A I'm sorry. I don't understand the question. Can you please repeat it?

Q Sure. So you understand that the plaintiffs -- any plaintiffs in any Section 2 case have to demonstrate that a new majority-minority district could be drawn, and that new majority-minority district is a district that does not exist in the plan that they're challenging under Section 2, correct?

A It may or may not be an adaptation of an existing plan or it may be an entirely new plan as is frequently the case in cases changing at-large voting districts to district-based voting districts.

So the answer is it would be depend on what kind of case it was. But, yes, they would have to show a plan had a majority-minority and be -- satisfy the other major criteria. I agree with that, yes.

Q They have to draw a new plan, correct?

A Yes, ma'am. Yes.

Q One that's different than the existing plan that they're challenging?

A Frequently, if it is an adaptation of an existing district-based plan, that would be the case, again, if it's an at-large plan, then it would frequently be drawn from scratch. And that oftentimes happens.

Q So in a case such as this one, where the plaintiffs are challenging an existing district-based plan?

A Yes.

Q You would -- you would agree that by design, the first *Gingles* precondition requires plaintiffs to present plans that look different from the enacted plan in this regard?

A If they were seeking to design a plan to a new standard that required two districts instead of one district, then, yes, they would have -- if that were the objective, setting aside whether that is a legal objective or not, then, yes, the existing plan would need to be adapted and this is my opinion and understanding that so long as that adaptation does not make race prevail in the design of the districts, then that is a reasonable thing to do.

Q Do you know how many majority-minority districts were included in the 2011 Alabama congressional plan?

A The -- there was -- you're asking about congressional?

Q Yes.

A Yeah. There was -- I believe there was one and there is

one again today, the 7th, I believe.

Q Right. So you -- in fact, you characterized the enacted plan, the 2021 plan, as a least changed plan, correct?

A Yes, I did. And that's frequently -- a common use 13:50:04 language in the design of plans like this, where you see minimum boundary changes necessary to comply with the law. That's a -- one of several strategies to design a map.

Q It looks pretty similar, the 2021 plan to the 2011 plan.

A Yes. In some regards, I would characterize it as an 13:50:22 improvement. They reduced the -- the degree to which the black population was concentrated in District 7, and, in appearances, they improved compactness and were able to successfully rebalance the population.

So there's many traditional redistricting criteria that 13:50:42 they appear to have succeeded in fulfilling in the design of that plan.

Q Both the 2021 plan and the 2011 plan included one majority-black district, correct?

A That's my understanding, yes.

13:50:58 Q And you're aware that the Caster plaintiffs in this case are seeking the creation of or an additional majority-black district, correct?

A Yes, that is my understanding throughout all these -- all the plaintiffs, not just the Caster, were all seeking two 13:51:15 plans -- two districts.

Q And that additional black district does not exist in the 2021 plan, of course?
A Sure, yeah.
Q And it did not exist in the 2011 plan, correct?
13:51:29 A That's correct, yes.
Q You would agree that if a plan adds a majority-minority district that wasn't there before, the core retention of that plan will be less than a plan that retains the same number of majority-minority districts as the previous plan?
13:51:49 A Yes. That can often times be the case. And as an expert, when you are analyzing situations like that, we would look for the degree to which core retention is changed as part of that process.

If you are able to adapt an existing plan, and, again, 13:52:11 this is -- it's subjective, but if you are able to adapt an existing plan and still not create a significant detriment to, for example, compactness or significantly change core retention or significantly change the geographic boundaries in, you know, materially in a different direction to cover areas that just 13:52:34 have never been in one district before, those would be areas where I would look at closely because the effort to create the second district significantly impacted the rest of the traditional redistricting principles.

And that's within we start looking at whether these other 13:52:54 criteria were subordinated or perhaps even ignored for the

        singular pursuit of the drawing of those two black districts.

Q And the traditional districting principle in this part of the analysis that you focus on is core preservation, correct?

A Yes. There were, again, I think three main ones. It was incumbency, core retention and the compactness analysis. Those were the kind of three that we looked carefully at it as a result of this effort to draw two districts.

Q Okay. Let's go back to your report, Defendants' Exhibit 4, page 15.

A Yes. Great. 4, 5, 6, yeah. This is preceded by several other pages of for context core retention of other Cooper plans and Duchin plans.

Q Right. And I am actually going to focus on the paragraph at the bottom of these tables?

A Great. Okay.

Q And here you write, This superior record for the state's plan reflects the advantage of a least change approach --

A Yes.

Q -- simply adjusting existing boundaries where necessary, instead of completely redrawing all districts, as plaintiffs did.

Did I?

A Yes.

Q Read that correctly?

A That is correct, yes.

Q You would agree, Mr. Bryan, wouldn't you, that if the plan under review violates the Voting Rights Act, any advantages of a least change approach, as you call it, would be superseded by the need to comply with federal law?

13:54:45 A I can't offer an opinion on that.

Q You do not offer an opinion on the relative advantages of a least change approach compared to one that includes an additional black -- majority-black district?

A Yeah. The -- the judgment of that is outside of my scope, 13:55:13 and I have no opinion on which one of those is more or less important in the design of a plan.

Q You also --

JUDGE MARCUS: I'm sorry. You can finish your answer, please.

13:55:26 THE WITNESS: No. Thank you. I'm done, sir.

JUDGE MARCUS: All right. Thank you.

BY MS. KHANNA:

Q You also write here that the differences in core retention shows that the significant incremental loss of continuity of 13:55:40 representation is borne disproportionally by Alabama's black population; is that right?

A Yes. That is correct.

Q We can take down the report and so we can see each other better.

13:55:56 A And it is -- factually, it is true.

13:56:14
13:56:40
13:57:00
13:57:17
13:57:32

Q Okay. We can take down the exhibits. Thanks.
A Okay. No problem.
Q As I understand that conclusion of yours, your position is that black voters are primarily the ones who suffer from a loss of continuity of representation in the illustrative plans; is that right?
A Suffer is a strong word. They are disproportionately impacted, sometimes significantly disproportionately impacted.
Q You -- you conclude that they are disadvantaged on this metric of continuity of representation in the illustrative plans, correct?
A Yeah. It's the concept of continuity of representation, whether it is through paired incumbents or through losses shown by core retention analysis, would say that losing your representation is a disadvantage. It's just -- I represent that not as a professional political scientist, but as a basic core tenent of redistricting in my layman's knowledge of the idea.
Q So black voters disproportionately bear that loss of continuity of representation. That's your interpretation, correct?
A That's accurate, yeah. That would be my assessment.
Q Did you consult any -- did you consult any black voters in forming that conclusion?
A I did not speak to any black Alabama voters and I would

believe the impact to black voters of the understanding of the impact to the black voters outside of the simple linear interpretation of less representation is worse than more -- continuous representation.

13:58:00 I would leave the details of those analyses and the interpretation to our political scientist, Trey Hood. I think he could speak very nicely to that.

Q So your report shows that Mr. Cooper's illustrative plans 1 through 6 retain less of the core of District 2 than the enacted plan; is that right?

13:58:23

A I believe in virtually all of the districts, the retention is lower by district, as well as an aggregate.

Q So Mr. Cooper's District 2 in his illustrative plans is less similar to the 2011 version of District 2 under the Alabama congressional map, correct?

13:58:45

A You mean insofar as compared to the enacted Alabama map? Yes.

Q Yes.

A Yes. Yeah. Okay. Thank you for the clarity.

13:58:58 Yeah. The statistics would show that the percent retention -- I'm going off the top of my head -- would have been in the 90 percent for both black and total population in the Alabama plan and, again, I don't have Mr. Cooper's chart in front of me, but they were much lower -- 30s, 40, 50 percent. I can't speak to the exact number. Yes. Lower.

13:59:19

Q You would agree that under the 2011 plan, black voters were not a majority of the Voting Age Population in District 2?
A Sorry. Could you say the question again, please?
Q Sure. Under the 2011 congressional plan, District 2 was not a majority-black district, correct?
13:59:43
A I do not know whether it was at the time of enactment. I know that as of the 2020 census, the enacted plan, District 2 was not a majority district. That's correct.
Q Do you know whether black voters had an opportunity to elect their preferred candidates in District 2 under the previous plan?
14:00:03
A I do not know.
Q Do you believe that the current representative of District 2 is the candidate of choice among black voters?
A I do not know the answer to that. That would be in the scope of our political scientists and outside my expertise.
14:00:18
Q So is it your position that black voters in District 2 are better off remaining in a district in which they have continuity of representation than in a district where they would form a majority of the Voting Age Population?
14:00:43
A Good question. I would step back and make my assessment more broadly across all districts, which is to say, in general, unless there is an in-depth detailed analysis of a specific district that shows whether or not a specific minority group is satisfied with their representative and want the continuity of
14:01:03

representation, in general, unless you do that and you look at this measure of continuity of representation and core retention holistically, the starting position is there is a disadvantage to populations who lose their continuity of representation until and unless it is shown that there is some reason that there needs to be a change in that continuity and the change benefits them more than the continuity that they lose.

Did I say that in a clear way? Does that make sense?

Q I believe so. I --

A Okay. Thank you.

Q I just want to make sure -- I am going to go back to the transcript to make sure my question was clear.

A Yeah. I want to make sure I got it right for you.

Q I am going to restate the question as I'm reading it in the transcript just to make sure we're speaking about the same thing.

A Sure.

Q Is it your position that black voters in District 2 are better off remaining in a district in which they have continuity of representation than in a district where they would form a majority of the Voting Age Population?

A So I cannot answer that question specific to District 2. I can say holistically for all districts, if there is a population that loses their core retention, and particularly if there is a minority population that disproportionately bears

the brunt of a loss of their core retention, then there would be need to be additional in-depth analysis of a specific district, such as the one you're leading to, District 2, to deeply understand whether the tradeoff, because of an understanding of whether the representation is representation they want or not, is real. And it's something they want.

It's hard to tell without knowing holistically, but the starting point is until that analysis is done, the assumption is if you have great loss of representation, you need to be able to go on and show that there is some benefit for the significant loss of representation that we're measuring.

I did not do that analysis. I simply measured how much core retention there is and set the stage for how much of a difference there is for the new plans, the plaintiff plans, compared to the enacted Alabama plan. And I can quantify that difference.

Q Okay. Great. I think you just answered my next question, which is you did not provide any analysis of the tradeoffs between the advantages on one metric and the disadvantages on another?

A No. I really -- that's outside of my scope and my expertise.

Q Okay. Great. Let's go to your incumbency analysis, which is the next --

A Thank you.

Q The next criterion on which you analyze the illustrative plans. And I think we can turn to page 16 of your report.

A Yes, ma'am.

Q In this top paragraph here at the end of that paragraph, 14:04:20 you say that the Duchin and Cooper plans do not -- you're referring to the previous sentence -- you said that they pack incumbents. Do you see that? What do you mean by --

A Do not -- that might be -- it says do not unpack -- it should read Duchin and Cooper plans do not unpack incumbents as 14:04:44 follows. It may not say do not and unpack.

The crux of the statement is that the Duchin and Cooper plans pack incumbents.

Q Okay. Great. Can you explain to me what you mean by packing incumbents?

14:05:02 A Yes. I use that not as a precise scientific term. You could also say as pairing incumbents, grouping incumbents. It's the practice of putting more than one incumbent in a different -- in a district and leaving other districts unrepresented.

14:05:26 Q So I think on your direct testimony, you mentioned -- I think you even used the term cracking and packing incumbents. Does that sound right?

A It was convenient language. It may not have been appropriate to use that redistricting context, but the idea is 14:05:39 that in the practice of redistricting, if you put multiple

incumbents in one district, you're pairing them, and then in other districts that you leave abandoned, you can be leaving them -- you're leaving them essentially without any representation or certainly no continuity of representation. So I apologize for the confusion in the language.

Q No. I appreciate that because as you know in Section 2 cases, the words packing and cracking do have certain connotations.

A Yeah. Thank you for the critique.

Q So when you talk about packing incumbents, what you mean is pairing incumbents?

A Yes, ma'am.

Q Okay. And it's your opinion that the Alabama enacted plan respects incumbents, correct?

A Yes. We performed an independent analysis. We put the incumbents to the best of our ability where we understand their residences are. We overlaid the existing Alabama plan. And our analysis suggests that none of the incumbents -- there is not more or less than one incumbent in any given district.

We did not find that in our analysis of other plaintiff plans.

Q You can take down the exhibit.

A Great. Thank you.

Q Maybe you have already answered this question. But can you explain why do you believe that protecting incumbents is an

important redistricting principle?

A Yeah. That's a great question and an important one.

You know, in representation, representation of a population, historically there's a lot of evidence to suggest that a representative, political representative, whether it's local, county, state, or even a U.S. representative, that those representatives over time and only with time have the opportunity to deeply learn, know and understand the geography that they represent, their constituency, the economy, the demographics, the characteristics of the area that they represent.

And so if you have a situation where you have a representative and you turned that representative over four years, every time, no matter what, and you don't give an incumbent the time to build that long tenure and relationship with their constituency and the deep knowledge of the geography they represent, you kind of put yourself in an environment where whoever the new freshman representative is, is spending all the time in the first term learning their constituency and learning all these valuable things, that they don't ever have time to go actually leverage that deep penetrating insight and knowledge of their constituency to benefit them.

Terms can frequently run out before they have even gotten started. And it's a generalization, but it's I believe it's a fair one.

Q So if I understood your testimony correctly, you believe that the longer an incumbent has served in their district, the better able they are to know about the needs of their constituents?

14:09:26 A Generally, it is true. And the decision as to whether or not an incumbent should remain and represent the values, beliefs, and the needs of their people with policy should be in the hands of the people.

The decision as to whether an incumbent should or should 14:09:45 not continue representation of their constituency should not be decided as part of a redistricting practice that can pit multiple incumbents that may both be doing a very good job against each other and one of them losing all of that experience and representation just because of the design of a 14:10:07 plan.

Q And just so I'm clear, the your position in your testimony about the benefits of protecting incumbents, is that -- that's not based on your demographic expertise, is it?

A No, that is not.

14:10:23 Q That's just your personal opinion?

A Again, I would base that on my knowledge and experience in working with the political scientists that I work with on my case and my general knowledge of the Democratic system.

Q All right. So it's based on your knowledge working with 14:10:40 political scientists, but it's not based on any political

science expertise that you bring to bear on the issue?

A I certainly agree with that. It's my responsibility as a demographer and an expert in these cases to at least have some amount of knowledge about each one of these traditional redistricting criteria and I think I have enough of that to be able to represent my knowledge and why it's important.

Q And if I understand --

A Expertise. Sorry. Go ahead.

Q And if I understand your testimony correctly, you -- your position is that more senior members of Congress are better able to serve their districts than more junior members; is that fair?

A That would be a general statement. I would not pick on any particular freshman or tenured Congressman in that at all. I'll tread carefully.

Q I am not trying to trap you in that, don't worry.

A No problem. Thank you. But in general, yes, if people have been around longer and they know their constituency and know the halls of Congress, then they are probably going to do a good job for their people.

Q Sounds good. Let's actually turn to your incumbency analysis of Mr. Cooper's plans.

A Thank you.

Q On page 16 of your supplemental report, Defendants' Exhibit 4.

A Yeah. There's both Duchin and Cooper on this one.

Q I am going to leave it to the Milligan plaintiffs' counsel to discuss Dr. Duchin's plans, but I will focus on just that last bullet point.

14:12:19 A Okay, great.

Q That's the one that addresses Mr. Cooper's plans, correct?

A Yeah. Yeah.

Q And there you conclude that Mr. Cooper's plans 1, 2, 3, 4 and 6 pair incumbents; is that right?

14:12:36 A Yeah, I believe that's the case. Again, we did our best job to join where we believe the representatives to be with our best, most accurate knowledge of the boundaries of his plans.

Q So you don't make any mention of Mr. Cooper's Illustrative Plan 5 in this analysis, correct?

14:12:56 A Yeah. I don't believe that plan 5 -- I will be careful here. Mr. Cooper did not present a boundary file for plan 5. My team had to build it.

I don't remember honestly whether when we did our incumbency analysis whether plan 5 is omitted because we did

14:13:21 not have a plan 5 for Mr. Cooper or because plan 5 manages to not pair any incumbents. It is one of those two. I honestly do not remember which -- in the rapid sequence of events, which one of those two it was that --

Q So --

14:13:38 A -- did not pair.

Q -- your -- so your understanding is that Mr. Cooper did not provide a shapefile for Illustrative Plan 5?
A Yeah, we did not. I'm sorry for interrupting.
Q But he did provide that -- those shapefiles for the other illustrative plans; is that correct?
14:13:57
A Yes, ma'am. And to be precise, when we realized we did not have a plan 5 shapefile, my team, who are experts in this, were able to build a plan 5 from what is known as his block correspondence file. So we did have it. I just don't know if that's why it's not mentioned in this piece or not.
14:14:16
Q Did you ever request the block shape -- the shapefile or the block equivalency file for Mr. Cooper's Illustrative Plan 5 and note that it was missing?
A Yeah. No. We actually did not. There was no time for that. We were able to build it very quickly and put it into -- put it into practice before we would have gotten the file from Mr. Cooper.
14:14:34
Q Do you feel like you had an opportunity to evaluate Mr. Cooper's Illustrative Plan 5 in writing your report in this case?
14:14:53
A Yes, ma'am. We did. And I believe that our creation of the plan 5 was accurate because the statistics that we were able to generate that were -- we were able to get those to foot back to some of Mr. Cooper's statistics for plan 5, so I believe we did an accurate job with that. I just don't know
14:15:12

whether we had the incumbencies before or after we drew that.

Q Isn't it true, Mr. Bryan, that Mr. Cooper's Illustrative Plan 5 does not pair any incumbents?

A I don't know the answer to that. It is possibly true.

14:15:35 Q If we assume for the moment that Mr. Cooper's Illustrative Plan 5 does not pair any incumbents, you would agree that by your definition, it respects incumbents, correct?

A If that is the case, then, yes, I would agree with that statement.

14:15:54 Q Okay. In your bullet point here, you note that Mr. Cooper's illustrative plans 1, 2, 3, 4, and 6 pair just one set of incumbents; is that right?

A That is correct. Moore -- they were the same for each plan, Moore and Carl.

14:16:20 Q The incumbents from Districts 1 and 2?

A Yes. Correct.

Q Okay. We can take down the exhibit.

And I believe you just mentioned this, but do you know who the current representative of District 2 is?

14:16:36 A I think they may have been just in the last exhibit. I don't know off the top of my head. I'm sorry.

Q I will represent to you that the current representative of District 2 is Barry Moore.

A Moore. Okay. Yeah. That sounds correct.

14:16:52 Q And Mr. Moore was just newly elected in 2020, correct?

 A I don't know the answer to that.

MR. DAVIS: Pardon me, Ms. Khanna, excuse me, Judges. If it would be possible sometime in the near future when it's convenient, Ms. Khanna, to have a brief recess.

14:17:14 JUDGE MARCUS: Sure.

MR. DAVIS: It's a little early.

JUDGE MARCUS: I understand. We are usually going to go about 90 minutes per break. Ms. Khanna, do you want to just take the next 10 minutes and we will break, or what's your

14:17:26 pleasure?

MS. KHANNA: If I could just finish up on this incumbency, please, I will be happy to take a break then.

JUDGE MARCUS: You sure can.

MR. DAVIS: Thank you.

14:17:35 BY MS. KHANNA:

Q So you don't know when Mr. Moore was elected to congressional District 2, right?

A No. No. And when people were elected had no bearing in my incumbency analysis. It was they are representative. They

14:17:50 are in or they are out. It's as black and white as that.

Q But you did -- you did testify that one of the reasons you believe that incumbency protection is important is because the longer that an incumbent has served a district, the better able they are to serve that district; is that right?

14:18:08 A Yeah. Yes, that's absolutely true, for sure.

14:18:27

14:18:47

14:19:06

14:19:23

14:19:40

Q So it would be relevant to your opinion on that score that whether or not the incumbent in District 2, which is paired in Mr. Cooper's Illustrative Plans 1, 2, 3, 4, and 6, has served for a long time or was newly elected in 2020, correct?
A Yeah. I would say it makes -- it would make some difference, and not one that I can quantify, whether they have been a long-serving representative or not, but I would say that certainly if you look at the events of the past two years in our great nation, that anyone who has been through that experience has learned a lot about their districts, their state and the role that they have on Capitol Hill.
Q So I take it you do not or do you know who represented District 2 before Congressman Moore?
A No.
Q I will represent to you that Representative Martha Roby represented District 2 for over -- for a decade prior to that.
A Great. Okay.
Q Do you know who the current representative of District 1 is?
A No. The names of the representatives by district were not a relevant part of my analysis. It was binary. Are they paired or are they not paired.
Q I'm sorry. I don't mean to quiz you on it.
A No. It's okay. Go ahead.
Q I know I took down the exhibit, but in the last bullet

point of your incumbency analysis, you note that Representatives Moore and Representatives Carl in Districts 1 and 2 are the ones that are paired in Mr. Cooper's plans.

A I believe so. That's -- I would have just taken those names from the file when I performed the analysis.

14:19:58

Q So the representative of District 1 that you mentioned in your analysis is Representative Jerry Carl; is that right?

A I believe so.

Q And Mr. Carl was also newly elected in 2020, correct?

14:20:15

A I don't know.

Q But you are familiar with who represented District 1 before Mr. Carl; is that right?

A I -- I will -- if we want to just go quickly through this, I do not know the election history by district for the state of Alabama. So we could go one by one, or I can just tell you I don't know who was the preceding U.S. representatives in any of the districts or how long they served for. It was a binary, black or white exercise.

14:20:35

Q I believe in your report you do refer to the testimony of Representative Bradley Byrne; is that right?

14:20:53

A Yeah. There was, you know, relevant to the conversation about communities of interest and part of my education on communities of interest, especially in Alabama, and I'm sorry -- in Mobile and Baldwin counties, yeah, there was some pre -- there were two previous representatives there that I

14:21:15

relied on, some of their testimony in a previous case to help me learn better about what the Mobile-Baldwin County environment was. That is true. But, again, how long those two representatives served for, what the circumstances of their departure are, I don't -- I don't know the answer to that.

Q Okay. I will represent to you that Bradley Byrne was the representative of CD 1 prior to Mr. Carl.

A Sounds good.

Q So, Mr. Bryan, is it your position that it is important for continuity of representation to ensure that both of the incumbents of Districts 1 and 2 remain in their districts?

A I'm sorry. I may have lost your audio for just a moment at the end of your statement. Can you please restate so I make sure I get all of it?

Q I sure can. And I just wanted to make sure. Can everybody hear me now?

JUDGE MARCUS: We hear you fine. Just put the question again, please.

BY MS. KHANNA:

Q Mr. Bryan, is it your position that it is important for continuity of representation to ensure that both of the incumbents of Districts 1 and 2 remain in their districts, even though they have served less than one year in office?

A My opinion is that any representative who has had any amount of time in office is more seasoned and has more tenure

and experience with their constituency than one who has had none. And I don't differentiate Districts 1 and 2 versus any others. I say incumbency and continuity of representation is a theme that is important, and any amount of experience is valuable and important. And certainly pitting even two freshmen representatives against each other will assure that some -- even limited number of years of experience in the House are going to be lost that are going to then be replaced.

Q Okay.

MS. KHANNA: I believe that closed up my questions on the incumbency please, Your Honor. If this is a good place to break, I'm happy to break now.

JUDGE MARCUS: We will take our 15-minute break at this point. We will come back and pick up the thread of your cross-examination. Thank you.

(Recess.)

JUDGE MARCUS: Are the parties ready to proceed? Ms. Khanna, you may proceed.

MS. KHANNA: Thank you, Your Honor and actually, before I ask my next line of questions, I just wanted to make sure that I offered into evidence the *Evenwel* brief that we had it marked for identification earlier. I would offer it as plaintiffs' exhibit -- Caster Plaintiffs' Exhibit 106 into evidence.

JUDGE MARCUS: Any objection?

MR. DAVIS: Judge, obviously no objection to it being marked to an impeachment exhibit to memorialize the conversation, but it's been so long since I have seen it, I don't know what else may be in it that we didn't talk about it before.

14:38:54

JUDGE MARCUS: Why don't you do this: At your leisure, take a look at it, and then come back Monday and let us know. We have the opportunity to redact it and just receive those portions that the bore directly on the questions and answers, if you would like, as well. But we will reserve on that, Mr. Davis and Ms. Khanna, just to give the Secretary of State's counsel a chance to review it because it was a long brief filed with the Supreme Court. I know it was used fundamentally for the purposes of impeachment.

14:39:09

We will leave that issue open and you come back and let us know on Monday your pleasure, Mr. Davis.

14:39:30

MR. DAVIS: Thank you, Judge.

JUDGE MARCUS: Ms. Khanna, you may proceed.

MS. KHANNA: Thank you, Your Honor.

BY MS. KHANNA:

14:39:41

Q Mr. Bryan, let's turn to your compactness analysis.

A Thank you.

Q That's the third criteria on which you evaluate Mr. Cooper's plans.

Mr. Bryan, when we went over the redistricting

14:39:52

guidelines -- I won't pull them up again -- but those provide that districts should be composed of reasonably compact geography; is that right?

A Yes.

14:40:07 Q Your report does not set out any threshold or standard by which to judge whether a map is considered reasonably compact; is that right?

A There are no such standards. Dr. Duchin elaborated on this yesterday. It can depend on numerous factors and there's 14:40:26 no commonly accepted numbers. It's relative from one plan to another.

Q Great. So no objective standard about when a district or a map is objectively compact versus non-compact?

A It's typically regarded as a relative comparing those 14:40:46 statistics from one plan to another plan, not universally in the business.

Q And you're not aware of any requirement that illustrative plans in a Section 2 case be as compact or more compact than the enacted plan, are you?

14:41:02 A I am not aware.

Q So your compactness analysis with respect to Mr. Cooper's illustrative plans is contained on pages 17 through 19 on your supplemental report and Appendix 5 to that report; is that right?

14:41:24 A Okay.

Q In the interest of time, I won't pull that up to show you. You can peruse that if you have the report in front of you.

JUDGE MARCUS: If you need it on the board, you just let us know, Mr. Bryan.

14:41:37 MR. DAVIS: I will stipulate Ms. Khanna gave the correct page number.

JUDGE MARCUS: Okay. Great.

THE WITNESS: Great. Sounds good.

JUDGE MARCUS: My concern, Mr. Davis, was not that she gave the right one, but that he might not recall everything in it without seeing it.

14:41:48

THE WITNESS: Your Honor, I have the compactness scores right here next to me if you would like me to refer to them.

14:41:58 JUDGE MARCUS: I leave it up to you and counsel. You may proceed, Ms. Khanna.

THE WITNESS: Thank you, sir.

MS. KHANNA: Thank you, Your Honor.

BY MS. KHANNA:

14:42:04 Q Mr. Bryan, I will be sure to direct you to any specific portion of that analysis as we go through it.

Your analysis contained in your report, your compactness analysis consists entirely of the numerical metrics of compactness on a number of different measures; is that right?

14:42:21 A That is correct.

Q Your compactness analysis does not contain any analysis of the contours of specific districts in Mr. Cooper's illustrative plans; is that right?
A I'm sorry. I do not understand the question.
14:42:38 Q When you are evaluating the compactness of Mr. Cooper's illustrative plans --
A Uh-huh.
Q -- you evaluate them solely based on their metrics, the Reock score, the Polsby-Popper score, the Schwartzberg score,
14:42:57 and the convex hull score?
A Yes, that's correct.
Q You do not analyze any of the specific contours of the districts actually drawn other than their compactness scores?
A Yes. As a practice in compactness, except for
14:43:17 diagnostics, you would not go analyze any specific contour or detail or part of a district. There's one number that represents the plan.
Q You provide no analysis to the extent to which county or city or VTD boundaries informs the compactness of a given
14:43:39 district in Mr. Cooper's illustrative plans?
A I do not. But the decision to comply with county boundaries or other boundaries that they create better compactness or poorer compactness, as was the case with some districts in Alabama, is solely at the discretion of the drawer
14:44:03 of the plan.

Q And you don't provide any analysis of the extent to which highways and rivers inform the compactness of any given district in Mr. Cooper's illustrative plans?

A Not in Mr. Cooper's plan. I do offer some analysis of that in other plans where it was relevant, for example, in the Alabama plan where there was some districts with lower compactness scores. Those were a result of some geographic features. I found no strong prevailing geographic features that in particular hindered Mr. Cooper's compactness scores.

Q Well, you don't provide any analysis at all of the geographic or political boundaries of his districts as it relates to their compactness?

A I did not identify any features -- specific features of the plan that were specifically very detrimental, and I defer to Mr. Cooper's expertise and judgment in drawing plans that are either compact or not compact.

Q Toward the end of your direct examination with Mr. Davis, I believe he asked you some questions about whether plaintiffs illustrative plans draw lines that appear to you to be based on race or other traditional districting principles. Am I recalling that correctly?

A That is correct.

Q But at no point in your report do you provide any analysis of the way in which specific districts in Mr. Cooper's illustrative plans are configured outside of their objective

compactness scores.

A Except insofar as to acknowledge how they were precisely drawn to exclude white population and include black population to achieve the majority district status that he was seeking.

14:45:54 Q Can you point me to where in your supplemental report you speak about that topic in Mr. Cooper's illustrative plans?

A It may be in the map -- just give me a moment, let me see if I can track it.

Q Sure.

14:46:58 A It appears I may not have written text about that finding. I would refer to the map of the Cooper's plans to support my observation.

I cannot quickly find text if I wrote any about the observations because, as I stated earlier on my direct with 14:47:19 Mr. Davis, the performance in the outline of these plans were very consistent with the Hatcher plan, which I did document the degree to which it followed these boundaries exactly. And in looking at the Cooper plans, as I am now, one after the next, the degree to which they follow black populations and exclude 14:47:41 white populations around Birmingham and Mobile are consistent with every one of the other plaintiff plans that I reviewed. So I'll stick with that.

Q And that analysis that you just provided, including the analysis in response to Mr. Davis's questions are not 14:47:59 actually --

JUDGE MARCUS: I am not sure we heard the whole question. I'm sorry. Ms. Khanna? Have we frozen up completely? Mr. Davis, can you hear me? Judge Manasco?

MR. DAVIS: I can hear you, Your Honor. I just believe Ms. Khanna's screen has frozen momentarily.

14:48:26

MR. DUNN: I think it's Ms. Khanna's screen that's frozen, Your Honor.

MR. DAVIS: There she is. She is back.

JUDGE MARCUS: Ms. Khanna?

14:48:40

Hi, Ms. Khanna. I think we lost you for a moment.

MS. KHANNA: I apologize, Your Honor.

JUDGE MARCUS: That's all right. Why don't you start over and ask your question again.

MS. KHANNA: Can everybody hear and see me now?

14:48:51

JUDGE MARCUS: We hear you fine.

MS. KHANNA: Thanks. Give me one second to reconfigure my screen. It closed out for a second.

JUDGE MARCUS: Sure.

BY MS. KHANNA:

14:49:22

Q Okay. I am not sure where I got cut off, but my question was the analysis that you just provided about --

A Yeah.

Q -- about how the lines were drawn in Mr. Cooper's illustrative plans --

14:49:34

A Yeah.

Q -- is not an analysis that we will find anywhere written in your report about Mr. Cooper's illustrative plans, correct?
A No. I think that part of the report and the analysis was pretty light and I think that I was mostly led by the fact that 14:49:52 his plan and Dr. Duchin's plan, all of these plans were following a very similar pattern. And if you look at the map, you will see that they do the same thing as in other plans that we documented, where we show it follows precisely where black population is and is not -- I concede that that analysis and 14:50:11 that finding is not -- does not appear to be written up in my summary of findings.
Q You provide no analysis in any of the text about the configuration of the districts in Mr. Cooper's plans outside of their objective compactness scores, core preservation scores 14:50:28 and incumbency protection scores?
A Yes. My observation about their consistency in performance in including or excluding black populations is as I am reciting to you right now, looking at the maps that I drew.
Q But not an opinion you expressed in your report?
14:50:45 A Yes, ma'am, that's correct.
Q And at no point in your report do you offer any conclusions or opinions as to the apparent basis of any individual line drawing decisions in Mr. Cooper's illustrative plans?
14:50:59 A I did not. Yep. That's correct.

Q So your report analyzes Mr. Cooper's Illustrative Plans 1 through 6, correct?
A That's correct.
Q And just to clarify, it does not provide any analysis of the compactness of Mr. Cooper's Illustrative Plan 7 since you did not have that plan in front of you when you wrote your supplemental report?
A Yeah, that's correct.
Q So you offer no opinions or conclusions on Illustrative Plan 7, including its compactness, correct?
A I do not. And if there is significant evidence of a revelatory or new different plan that is a breakthrough in this case, then I probably would have been alerted to that and I was not.
Q Okay. Have you actually reviewed Illustrative Plan 7?
A No.
Q Before your testimony today?
A No.
Q You have not even seen that plan?
A It's in my e-mail somewhere. I have not had a chance to review it. I'm sorry.
Q So among Mr. Cooper's Illustrative Plans 1 through 6, if I am reading your report correctly, and I am referring you to page 18 of your report, you conclude that Illustrative Plan 4 has compactness scores that you believe are comparable to the

enacted plan; is that right?

A May I refer to my report?

Q Please do.

A Thank you.

14:52:22 Q Page 18 is specifically where I am looking.

A Okay. Great. I see on page 18 the enacted plan compactness scores. Is what you are referring to? Yeah. That's it. Yeah. Terrific. Yes. Yes. I recognize this. Yep.

14:52:50 Q And in the paragraph, the last paragraph on page 18, you note that only Cooper plan 4 has comparable scores to the other plans. Am I reading that correctly?

A Yes. That looks like what that says.

Q And there you further conclude that Mr. Cooper's

14:53:11 Illustrative Plans 1 to 3 and 5 and 6 have inferior compactness scores to the Duchin plans; is that right?

A Yes. That is correct. Dr. Duchin's plans, because of the additional compactness she drew into Districts 4 and 5, outperform in total Mr. Cooper's plans.

14:53:33 Q Okay. If we go to the next page to your conclusion paragraph on page 19 of your report.

A Yep.

Q There you say, My analysis of compactness shows that Dr. Duchin's plans perform generally better on average than the

14:53:51 enacted state of Alabama plans --

A Yes.

Q -- although some districts are significantly less compact than Alabama's and significantly better than Bill Cooper's plans. Did I read that correctly?

14:54:03 A Yeah. This would be the -- what I would call the -- when I say in aggregate, that's literally the summary across all districts within the plans. That is correct, yes.

Q So your conclusion as to the compactness of Mr. Cooper's plans here is how they fare relative to Dr. Duchin's plans; is 14:54:26 that right?

A It is and also relative as you see in the top two lines to the 2011 existing and 2021 exact -- enacted.

Q But the statement here about the Duchin plans being significantly better than Mr. Cooper's plans, that does not 14:54:49 apply to Mr. Cooper's Illustrative Plan 4, which you said was comparable, correct?

A That is the only plan that was remotely close in compactness, as you can see in this Table 3, to the other plans. And then, in that regard, in Polsby-Popper and 14:55:10 Schwartzberg, it is comparable, and Reock, it was not. Convex hull, it was. So there's one plan where three of the four metrics were almost comparable with the enacted plans.

Q And that conclusion, of course, does not apply to Illustrative Plan 7, which you haven't reviewed in this case?

14:55:33 A No, ma'am. I cannot offer an opinion.

Q Okay. We can take down the exhibit. Mr. Bryan, at no point in your report do you offer any opinion or conclusion that any of Mr. Cooper's illustrative plans are not reasonably compact, do you?

14:55:52 A I have no opinion on what is reasonable and what is not reasonable. There's no such standard in the industry. I present it in relative terms to other potential options that the state of Alabama could consider for their redistricting solution.

14:56:14 Q Let's move on to your discussion of communities of interest.

I believe that the three traditional redistricting principles on which you evaluated Mr. Cooper's plans were the ones we just discussed -- core preservation, incumbency and

14:56:30 compactness; is that right?

A Uh-huh.

Q Your supplemental report does not analyze any of Mr. Cooper's illustrative plans based on communities of interest, correct?

14:56:39 A There's only one major finding of communities of interest in the -- the Hatcher, the Duchin and the Cooper plans, which is the disruption of the community of interest in Mobile and Baldwin counties.

Q And that analysis of communities of interest is included

14:57:00 in your first report, correct, not your second?

A Yes, ma'am, correct.

Q You had not reviewed any of Mr. Cooper's plans at that time?

A No. But they are -- given the consistency of those plans with the original plan, I would make the same assessment and generalize my findings on the Mobile community of interest to Cooper and Duchin's plans.

Q So if I am looking at the same conclusion paragraph that we just discussed in your supplemental report, you say that the plans provided by Mr. Cooper have generally similar features and performance as the Hatcher plan; is that right?

A That's correct, yes.

Q What do you mean by performance?

A So I mean performance insofar as the demographic characteristics of it, the compactness of it, the impact to incumbency, the traditional redistricting principles that we assessed Hatcher with were the same ones that we looked at the Cooper and the Duchin plans.

Geographically speaking, the performance of the plans were similar geographically insofar as they change the boundaries around Birmingham. They extend to District 2, all the way to the eastern -- generally to the eastern edge of Alabama and also pushed the district down into Mobile and Baldwin counties. Geographically that's what I -- in a very high level what I would mean in terms of geographic performance.

Q So your analysis of the Hatcher plan is entirely included in your first report; is that right?
A Yes, ma'am.
Q And there are a few features of the Hatcher plan that you thought it was important to emphasize in your first report?
A Yes.
Q So one of the features that you emphasize in your first report -- and I am referring specifically to Defendants' Exhibit 2 at page 6 for your reference.
A Okay.
Q You note that the Hatcher plan contains numerous county splits; is that right?
A Yes. It was not a county-based plan.
Q We can take down the exhibit. I just wanted to make sure we were looking at the right document.
You never mentioned the number of county splits in Mr. Cooper's plans in either of your reports, correct?
A No, I did not.
Q The Hatcher plan, in fact, splits 13 counties; is that right?
A That sounds right.
Q Mr. Cooper's plans -- illustrative plans, however, most of them split only six counties, isn't that right?
A That sounds right.
Q The same number as the enacted plan?

A Could be.

Q And that number -- and six is, of course, fewer than half of the number of splits in the Hatcher plan, correct?

A Based still -- I did not differentiate how many different counties were split except to say that they were. There was no split counties in the Singleton plan. There were some -- more number of counties that were split in these other plans. It's my understanding Hatcher had more, but they all had some.

Again, to emphasize, I did not do a detailed split geography analysis. I just saw what I saw while I was doing my York in these other areas.

Q But when you were evaluating the Hatcher plan in your first report, you believed it was important to note that it split numerous counties, correct?

A Yeah. I think that was a fair observation, given that plan was presented subsequent to a plan that was purported to have no county splits at all. So in the context of the previous plaintiffs' plan, I thought it was important to note and emphasize that only insofar as the differences from the no county split plan that had been presented earlier.

Q And for Mr. Cooper's plans that split six counties like the enacted plan, you don't contend that those plans include numerous county splits, correct?

A That's an object -- a subjective statement to say whether it's numerous or many. There are less numerous than there is

in the other plan. I am sure there are plans and other ways of doing this where there could be less than six county splits as well.

I don't have an opinion as to whether Mr. Cooper, in the development of his plans, optimized not splitting counties or not. This is the type of thing, again, I look for when I do my compactness analysis and whether you use counties as whole pieces of geography are generally reflected in whether you have good compactness scores or not.

In his case, even though he split fewer counties than in Hatcher, he still ended up with poorer compactness scores because of the way his districts are configured.

Q You also note in your evaluation of the Hatcher plan that it does not respect incumbents because it pairs two sets of incumbents; is that right?

A That's correct. Yes. I am not looking at the exhibit, but I recall that to be true.

Q And just so you make sure you have all the information in front of you, I am looking specifically at page 27 of Defendants' Exhibit 2, your first report in this case.

A Do you have it?

Q I sure can. I can pull it up.

A I have it. Yes. So, yes, the Alabama enacted plan respects incumbents. There's really not a mention in the plaintiff plan about incumbents, but I noted that the

plaintiffs' plan pairs, like I said, Moore and Carl in 1, leaves 2 unrepresented. Pairs Sewell and Palmer in 6, leaving 7 unrepresented.

Q So the Hatcher plan pairs four incumbents, two sets of incumbents, right?

15:03:59

A Yes, that's correct. Two pairs, leaving two districts unrepresented.

Q Mr. Cooper's plans, however, only pair one set of incumbents where they pair incumbents, correct?

15:04:11 A That is correct.

Q Mr. Cooper's Illustrative Plan 5 actually pairs no incumbents; is that right?

A Again, I am uncertain. I -- if -- you are stating that as a known fact, I cannot confirm that right now. I believe you if you say it's true.

15:04:29

Q If we assume that it's true, you would agree that in that respect Mr. Cooper's plans are not similar to the Hatcher plan?

A I would say that the difference is whether a plan pairs incumbents or does not pair incumbents. I don't do degrees of measure of how badly they do it. The fact that Duchin's plans pair them even more is notable, but the differentiating point is whether you do so or if you do not do so, not how badly you do so.

15:04:48

But if Mr. Cooper would like credit for having fewer pairs, but still paired incumbents, then I will concede that.

15:05:09

Q So it's your understanding that the question for whether or not -- whether or not a plan respects incumbents, is whether it pairs any incumbents or doesn't pair any incumbents, not the number of incumbents?

15:05:33 A If there are competing plans that pair incumbents, if there is, in this case, one pair of incumbents or two pairs of incumbents as the case may be, I would not draw a distinction that that means by inference that one plan is somehow superior in traditional redistricting principles than the other. It may 15:05:56 garner a nod or some small benefit, but the fact that they still split them is the major problem.

Q Mr. Bryan, you recently submitted an expert report in the Wisconsin Supreme Court; is that right?

A I did.

15:06:15 Q And that expert report was in support of a redistricting map put forward by the Wisconsin legislature; is that right?

A That is correct.

Q If we could call up that report. This is the report that we have been discussing from Wisconsin; is that right?

15:06:46 A Yes. This is my report.

Q If we could turn to page 6 of that report.

A Great.

Q I believe on page 6 you conclude that the Wisconsin Legislature has proposed assembly plan, was able to conform 15:07:14 with numerous traditional redistricting principles including

avoiding pairing incumbents; is that right?

A That is correct.

Q And, in fact, the assembly plan that you said respects incumbents or avoids pairing with incumbents in fact did pair six incumbents; is that right?

15:07:33

A Yes. Yes. That was mathematically impossible not to do that. It was not optional in the case of Alabama. All of these plans pair incumbents unnecessarily.

Q But --

15:07:51

A Please.

Q You would agree that the Wisconsin plan that you endorsed pairs incumbents, correct?

A It -- by necessity, by mathematic necessity, it did, yes.

Q You believe that it avoided pairing incumbents in conformance with traditional redistricting principles?

15:08:08

A The plan avoided in every instance except where it was mathematically impossible not to avoid it, it did successfully avoid pairing incumbents. The PMC plan and now the other plaintiffs' plans submitted in that case have dozens of pairs by comparison and there is strong evidence that there is partisan politics that are playing into those pairings because many of them are Republican pairs in those plans. So not only were they not necessary, but they also appear to have a partisan bias.

15:08:36

15:08:54

The Wisconsin plan from the legislature did not have a

partisan bias. In fact, they paired two of their own Republican representatives in this, in one of those plans. And, again, it is by mathematic necessity, not out of choice.

Q So when you evaluate -- we can take down the exhibit.

15:09:15 When you evaluated incumbent pairings in Wisconsin, you did look at who, in fact, the incumbents were that were being paired, as well as then provide an analysis?

A We were asked by counsel for the legislature to look at the party affiliations of the representatives that were paired

15:09:38 and my team of experts did, in fact, analyze that and present findings that were accepted in that report.

Q And when -- I'm sorry. When you say accepted in that report, has the Court accepted that report or those findings?

A My belief that they have. I have been busy with a few

15:09:58 other things the last few days.

Q I understand.

A Yeah.

Q And in your analysis in that Wisconsin report, you believed it was important to note that the plan that you were

15:10:13 endorsing or that you are supporting in your expert report paired fewer incumbents than other plans?

A The -- there was two points, one was the number of the pairs, and then the other was pointing out the significant partisanship of the pairs that were coming from the plaintiffs

15:10:34 in that case. And, yeah, that was -- in conversations with

 experts and counsel, that became a decisive point in the analysis and the reason that I fulfilled that.

Q All right. Let's go back to the Hatcher plan that you discussed in your first report in this case.

15:10:55 If we look to Defendants' Exhibit 2, page 16. We can pull that up so that everyone is looking at the same thing. Here up in the top paragraph you say --

A Yes.

Q -- no effort was made to try and conform the boundaries of 15:11:27 District 2 to the existing city boundary of Mobile; is that correct?

A Yes. I looked at this carefully. The municipal boundaries of Mobile are complex, and, nevertheless, the boundaries of the plan slices through them. I do not have a 15:11:45 count of how many sometimes it splits the boundaries of Mobile. Conventionally, if you were going to make this big of a deviation in a plan to go grab a piece of geography that is out of bounds, such as Mobile, you would do so by trying to include administrative geography such as the city boundaries.

15:12:03 This -- the boundaries of the Hatcher plan, the Duchin plans and the Cooper plans in my analysis do not make appear to make any effort to conform to any other administrative geography, rather only to try and capture the most densely black population of Mobile.

15:12:23 Q Just to be clear. The sentence that's highlighted on the

screen right now is from your first report?

A Yes.

Q And it refers only to the Hatcher plan, correct?

A Yes, ma'am. That is correct. Yes.

15:12:34 Q You had not seen any of the Cooper plans at the time you wrote this report?

A No. My statement reflects subsequent observations of the other plaintiff plans. I'm sorry. Retract.

Q Okay. Let's pull up Mr. Cooper's Illustrative Plan 6 and

15:12:53 let's specifically look at District 2. That's going to be Plaintiffs' Exhibit 44. This was included as an exhibit to Mr. Cooper's first report.

And if I recall your previous testimony, you did not review any of the exhibits attached to Mr. Cooper's reports; is

15:13:14 that right?

A No, my analysis was based on the information that I received -- the electronic information I received that I used in my geographic information system to perform an analysis that would be in essence a replication of this map that I'm seeing

15:13:33 now. I did not use or refer to this exact map. I referred to my own company's representation of this map in my analysis.

Q Okay. But looking at Mr. Cooper's illustrative plan, his map right here, you would agree that, in fact, District 2 does keep the city of Mobile whole by conforming to municipal

15:13:56 boundaries, correct?

15:14:21

15:14:41

A It's difficult to see where that boundaries of the city of Mobile are in this map. I can't give an opinion. It may be the case, but I can't tell from this map. But whether the map contains it is -- would be a misleading statement because you can have a geography that can outer bound a city and capture numerous pieces of irregular geography around it. Because it contains it does not mean it follows it. And the benefit of following administrative geography in redistricting is because it captures pieces of administrative geography that enable that district to represent people with similar administrative geography and policy interests and concerns.

So stating that this outer bounds, the city of Mobile does not necessarily mean that that means that it's an accurate capture of Mobile.

15:14:56

A visual examination of this plan shows a highly irregular draw into the county of Mobile anyway. So some other thing was happening when Mr. Cooper drew this in this very unusual and unique way, into the otherwise very geometrical simple geography of Mobile.

15:15:18

Q So you don't know sitting here today whether that -- the drawing of District 2 in Mobile County conforms to the boundaries of the city of Mobile; is that right?

A I -- it may -- I want to be precise with my language. That district may outer bound, that is, fully contain the city of Mobile. I do not believe just looking at this map, which is

15:15:38

not precise, whether it exactly follows the boundaries of the city of Mobile or not. I don't believe that it is. But I cannot say that definitively.

Q You would agree that if it does exactly follow the boundaries of the city of Mobile, that would make a significant difference between its configuration and the Hatcher plan that you criticize; is that right?

A If this exactly followed the city boundaries of Mobile, that would certainly give it some credence, but that does not change the highly irregular features and the draw that was made to go into Mobile County. There's no way a map drawer could look at this draw and not avoid the highly irregular draws in and out and around the county.

Q So when you were evaluating whether a district looks irregular, you are doing that without respect to whether or not it's following municipal boundaries; is that right?

A In this particular case, Mobile is only a part of Mobile County and so my visual observation of this draw is showing significant irregularities that are clearly outside of the city of Mobile here.

Q So your understanding is this district -- the district lines of CD 2 do not conform with the city of Mobile boundaries; is that right?

A I am not able to say with certainty whether they do or do not. It does not visually appear to, given my knowledge of the

area. I would have to see something much more detailed to be able to prove that or not.

My assessment is that the draw in Mobile County in this case appears, given the geometric simplicity of the county, that there was some motivation to draw a highly irregular boundary within the county. And not all of that -- not -- it is not possible to that all of those irregularities were determined simply by the municipal administrative unit of geography known as the city of Mobile.

15:17:37

15:17:54

Q And you mentioned there were motivations, but you, of course, have no knowledge, information or opinion about any of the motivations, correct?

A I don't know what the motivations were. All I know from my own analysis and maps are that the lines that go down into Mobile across all these different plans, I am speaking generally, not to any one particular plan, go down into Mobile and surgically go into and out of white VTDs and black VTDs, including the black ones and excluding the white ones.

15:18:10

If that was the motivation, I would believe that a mapmaker would have just gone into Mobile and taken the whole county. Otherwise there is no reason to have gone in here and so surgically and forensically grabbed just very precise pieces of the city of Mobile, which we know to be the most densely black portion of the county.

15:18:29

15:18:44

Q And, again, your testimony about which pieces of the city

 15:19:02

of Mobile may or may not be included in District 2 --

A Right.

Q -- is not about this district that we're looking at right now, you're speaking generally about some of the illustrative plans?

A Yes, ma'am.

Q And about the Hatcher plan?

A That, too.

Q Let's turn -- let's actually look at your depiction of Mr. Cooper's Illustrative Plan 6. And I think that's going to be at page 88 of your supplemental report. Defendants' Exhibit 4. Does this look familiar to you?

15:19:10

A It does, yes.

Q This is your depiction of Mr. Cooper's Illustrative Plan 6 color coded by the concentration of black population; is that right?

15:19:31

A Yep, that is correct.

Q And sitting here today, you can't tell me whether the District 2 boundaries depicted in this map conform to the city of Mobile boundaries; is that right?

15:19:45

A I cannot determine that from this map. I could in a matter of minutes if it's an important point, but I cannot tell from this whether it definitively is or is not.

Q But you can tell from this map that Mr. Cooper's District 2 includes a lot of those red and orange VTDs on your

15:20:08

illustration here; is that right?

A Are you speaking specifically to the area around what we're going to characterize as the area around Mobile city?

Q I'm actually -- I'm looking at a southwest corner of this map.

15:20:36

A Okay.

Q Maybe we can zoom in on it.

A Sure. Yeah.

Q If I am understanding your testimony correctly, you criticize the Hatcher plan and apparently some other plans for excluding white VTDs and including black VTDs into District 2; is that right?

15:20:57

A That's correct. And just -- this is not one of my close-in maps. I am not sure I have a close-in map of Cooper, but even with this grainy picture, you can see that there was a -- basically a fish hook where the district was run down the western edge of the state, excluding lots of red, orange, yellow, you know, low black concentrated VTDs and then wrapping around very low population areas in the south corner and reaching up to grab, as you can see the line of the boundary of the district, grabs just the green areas exactly around the city of Mobile.

15:21:22

15:21:45

If this plane was not motivated by grabbing just that population, I would have expected the drop to go geometrically just simply straight down from the north and just capture one

15:22:07

irregular geometrically continuous space, rather than this highly irregular draw, fish hooking around just to grab this black population in this corner of Mobile.

Q And when you analyze this plan, you did not know whether those boundaries of District 2 were decisions that Mr. Cooper made or the lines of the city of Mobile, correct?

A Yes. I -- I looked at the city boundaries of Mobile compared to many of these plans and I cannot give a forensic accounting off the top of my head. Every one that I looked at of the plaintiffs' plans did not conform to the municipal boundaries. If this happens to be one instance where Mr. Cooper got in one that does in some sense follow the municipal boundaries, it may be the case. But it doesn't look like it from here.

Q And you would agree looking at Mr. Cooper's District 2 in Mobile County, along the west side it includes red and orange VTDs and along the bottom it includes multiple red and orange VTDs before it goes up in that fish hook; is that right?

A It's my understanding that these are very -- that is correct. It is my understanding those are low population geographies that were used with the intention of connecting District 2 around and up into a much higher population and dense black population around Mobile.

Q Again, you use the word intention and I just want to clarify. You don't opine on the intent behind any of these

illustrative maps, correct?
A That is correct. I do not know the intention. I can see the effects of an effort to maintain the contiguity of District 2. It was drawn in such a way -- virtual -- you can see it virtually goes down to a one-lane road on the western border before it expands again and circles up to grab that green high dense black population.
So the appearance is that the effort was to draw and connect District 2 as efficiently as possible to get access to that black population in Mobile. The appearance, if I may.
Q You are drawing inferences of an effort based on the appearance of the district; is that right?
A Yes. The population to the north of Mobile in this map has more population, and, again, this is my independent opinion and observation, that if Mr. Cooper had drawn this district straight down into Mobile with this configuration, that he would not necessarily have been able to achieve the black majority. He may have only -- again, it's an opinion, may have only been able to achieve this by connecting that area in Mobile with very low population, admittedly low black population VTDs in order to get there.
Q That's not an opinion you express anywhere in your report, correct?
A That's correct. Yeah. This is just an observation looking at the map and then studying this with other maps as I

observed these draws to go get Mobile.

Q We can take down this exhibit.

You mentioned already that you did not look at Mr. Cooper's Illustrative Plan 7 submitted alongside his supplemental report; is that right?

A Yes, that's correct.

Q So you don't know if Illustrative Plan 7 kept the city of Mobile whole in District 2, correct?

A Do not.

Q Turning back to your first report on your analysis of the Hatcher plan. You criticize the Hatcher plan on page 20 of that report for expanding the existing boundaries around Birmingham in a very nearly exact way to only add heavily black VTDs and to avoid less black VTDs; is that right?

A Yes, ma'am.

Q Birmingham is in the center part of Jefferson County; is that right?

A Yes, that is correct.

Q And you know from your experience in mapping and evaluating these maps that the western portion of Jefferson County is the heavily white portion of Jefferson County; is that right?

A More so, for sure, yes.

Q And the Hatcher plan, as you recall, does not extend to the western boundary, the western border of Jefferson County?

A Yes. I recall that. I am going from memory, but I believe that's true.

Q Okay. Let's pull up Mr. Cooper's Illustrative Plan 1, and specifically District 7 in that plan.

15:27:58 This is plaintiffs' exhibit -- Caster Plaintiffs' Exhibit 20. This was included in the exhibits to Mr. Cooper's report and those again are exhibits that you had not reviewed in preparing your own report, correct?

A Yes. Yes, that's correct.

15:28:19 Q So do you see here how Mr. Cooper's configuration of District 7 includes the western portion of Jefferson County?

A Yes, I do.

Q And in the interest of time, I'm going to represent to you that it does this in at least three other illustrative plans 15:28:40 that Mr. Cooper provides. Does that sound right, based on your memory or your evaluation of these plans?

A It sounds about right.

Q So in that respect you would agree that Mr. Cooper's illustrative plans, including this one, differ from the Hatcher 15:28:56 plan, correct?

A There are -- without a doubt there are some similarities and some differences between the plans. When I talk about them being similar, it is a very high level, again, focusing on some similarities and how adjustments were made in parts of 15:29:15 Birmingham, some similarities in how District 2 gets stretched

and some similarities in how Mobile ends up getting wrapped in, seemingly unavoidably, to create a second black majority-minority district.

Beyond that, details such as whether we go into the western side of Jefferson County or not to me are smaller details and nuances that, of course, yes, we see that in Duchin's plan as well, but there are details like that that -- subtle differentiations between the plans, but I subordinate those in my analysis to the larger ones that actually drive the concentration of black populations in these two districts.

Q When you were evaluating the Hatcher plan you believed it was important to note that in Jefferson County the plan included the heavily black areas of Jefferson County around Birmingham, and excluded the heavily white areas in Jefferson County, correct?

A My analysis showed that to be the case and we provided an exhibit with some detailed maps that illustrate that to be true.

Q In the Hatcher plan?

A Yes, ma'am.

Q You did not similarly assess the extent which Mr. Cooper's plans included the heavily black portions of Jefferson County and excluded the heavily white portions of Jefferson County, correct?

A I did not. To be precise, I did not include that in my

report, but the degree that his plan goes up into and around Pinson and Gardendale, even though I can't see the exact boundary compared to my maps, yes, there are places where his maps draw captures black population in the north east corner of Jefferson County and in some cases there, excludes adjacent white VTD -- more predominantly white VTDs. It's not easy to illustrate that from this map, but it is true.

15:31:05

Q Let's go to your map, and I don't have that at the ready, which map we're looking at.

15:31:26

But the one that you say would show the BVAP or the black concentration. Do you know what map we're looking at in your report for that?

A One of the Hatcher.

Q Oh, I'm sorry. I want to look specifically at Illustrative Plan 1 as depicted in your report. Mr. Cooper's Illustrative Plan 1.

15:31:49

A Plan 1.

MR. DAVIS: Ms. Khanna, I have that -- turned to that map. Would you like me to share the page number?

15:32:12

MS. KHANNA: That would be great. Thank you, Mr. Davis.

THE WITNESS: 78.

BY MS. KHANNA:

Q Excellent. Can you --

15:32:16

A 78 in my report.

Q Let's pull that up, page 78 of Defendants' Exhibit 4. Thank you, Mr. Davis. Thank you, Mr. Bryan.

A Yeah, that's correct.

Q Okay. Make sure I'm looking at that. So you would -- sorry. Go ahead.

15:32:30

A This map shows my point that when you look at the northeast corner of District 7 in Birmingham, you don't really even have to zoom in to see that where the black line is drawn, everything outside the black line is the lower density black population and very carefully everything inside the black line as part of District 7 is green to dark green, high density black population.

15:32:53

Q You can see here that the western portion of Jefferson County, which is the heavily white portion of Jefferson County is included in Mr. Cooper's illustrative District 7 in a way that it was excluded in the Hatcher plan, correct?

15:33:19

A Yes, I believe that to be true. Each variation of District 7 would need to include some white population, somewhere in order to get up to the exact population threshold, whether Mr. Cooper does it here, Dr. Duchin does it somewhere else, or Hatcher does it somewhere else, isn't really material or as material to me as the fact that each of these plans goes very carefully to get exactly the black population out of Birmingham necessary to create a black majority district. Wherever the white people are after that to balance out the

15:33:44

15:34:03

population is less relevant.

Q It's less relevant where the white people are. Is that what you just said?

A Yeah. When you are devising a plan for a black majority, the most important thing to ensure that you are going to get your 50 percent black majority is making sure you have an enumerator that has sufficient number of -- with geographically compact black population. And the only way to do that is to make sure you build an enumerator with this large core concentration of black people in and around Birmingham.

Q But you made a point of criticizing the Hatcher plan for including heavily black VTDs and avoiding less black VTDs, correct?

A Yes. That's correct.

Q You would agree that where a district includes less black VTDs, under your own analysis of the Hatcher plan, that would be relevant, correct?

A I'm sorry. Could you restate the question?

Q Sure. I know that was not clear. If I understand your testimony correctly, you are now saying it's more important to look at whether a district includes the heavily black VTD s, not the heavily white VTDs, correct?

A Well, it's a comprehensive analysis. You have to end up looking at all of them. But if you are looking at a plan to say whether you form an opinion or an assessment of whether a

draw was made for the purpose of including or excluding black population, because you are trying to draw a black majority district, it is most relevant to look at where and how those lines were drawn, and if there are highly segregated black and white populations in different VTDs, such as there are in northeastern Birmingham, it's relevant to note that when the map drawer had a choice, she or he drew a line in a very exact way, just to include -- make sure just to include as efficiently as possible all the dense black heavily populated VTDs there that they needed to make sure District 7 got over 50 percent on the whole.

Q It's also relevant to evaluate the extent to which that map drawer included heavily white VTDs in the same district, correct?

A Yeah. And they would have to somewhere in the plan. And I agree that there's probably some differences in where Duchin -- and Dr. Duchin and Mr. Cooper and Hatcher acquired that white population to get to the total, where to me it is less important where they got it. They all had to somewhere. Mr. Cooper chose to get it here in western Jefferson County and that's fine.

Q So you would agree that in creating a district that is majority black, a map drawer would have to include some portions that are heavily black and some portions that are heavily white?

15:37:31 15:37:47 15:38:09 15:38:31 15:38:52

A I would agree with the assessment they would have to get some portions -- the most important is they would have to get half the population black, no matter how you define it, whether the remainder is white, Asian, Native Hawaiians, multi-race is less relevant. It doesn't necessarily need to be expressly non-Hispanic white population, but it's frequently the case.

Q But some portions would be heavily black, some portions will not be heavily black --

A That's correct. Yeah. I like that better.

Q We can take down the exhibit. Mr. Bryan, in your initial report in this case, pages 16 to 17, you discussed this community of interest that you have spoken about between Mobile and Baldwin counties; is that right?

A Yes, that is correct.

Q And that entire discussion is based on the trial testimony of former Representatives Bonner and Byrne from the Chestnut case; is that right?

A In my report, I rely heavily on that testimony, but I independently spent time looking at some of the history of Mobile and Baldwin, the development of that area and the evolution of their relationship together, just personal history research in background. So I rely in Byrne and Bonner in my report. I also did personal learning research on the area as well.

MR. DUNN: Your Honor, I object -- I was trying to let

Mr. Bryan finish.

I object to everything after the last three words and move to strike. It's not responsive and it's completely outside of the scope of his report or his expertise.

15:39:05 JUDGE MARCUS: Let's move on. Denied. But let's try, Mr. Bryan, to answer the question as it's asked. If there's something else, it will be brought out on redirect by Mr. Davis, I'm quite sure.

You may proceed, counsel.

15:39:25 THE WITNESS: Yes, Your Honor.

MS. KHANNA: Thank you, Your Honor.

BY MS. KHANNA:

Q Your analysis of the community of interest between Mobile and Baldwin counties as presented in your report relies
15:39:35 exclusively on the trial testimony of former Representatives Bonner and Byrne; is that correct?

A My testimony in the report did rely on that testimony by Byrne and Bonner, yes.

Q And to the extent you looked at anything outside of that
15:39:52 testimony, you have not cited any of that information in your report?

A Yes.

Q On page 17 of your report, and we can pull that up -- this is Defendants' Exhibit 2, page 17. You state toward the
15:40:12 bottom, Due to time constraints, I will rely on this history,

evidence and testimony as my defense of why Mobile and Baldwin counties are an inseparable COI. Did I read that correctly?

A Yes, that is correct.

Q You can pull this down.

15:40:29 Just to be clear, that history, evidence and testimony that you note there is the Bonner and Byrne trial testimony that you cite in your report, correct?

A That is correct.

Q It's nothing more than that, there's nothing more that you

15:40:47 cite in your report, correct?

A I read all of the testimony and selected those as illustrative and valuable examples that I base my conclusions on.

Q When you discuss, quote, My defense of why Mobile and

15:41:07 Baldwin counties are an inseparable community of interest, why did you feel it was the need to mount your defense about the community of interest between Mobile and Baldwin counties?

A As with any expert working on a case, trying to deeply know and understand how and why maps are drawn as they are, I

15:41:34 felt it was personally important to deeply understand what the environment is and whether there was cause or reason to divide those or if there was any benefits or drawbacks to drawing the map in that way because it deviated significantly from the way that the map has been drawn in that corner of the state for a

15:41:55 long time. I believe the 1970s, if I am not mistaken.

So the purpose of that was to ensure that I had an understanding and was able to say that those were or were not a community of interest.

If I had found no evidence that Baldwin and Mobile counties were a community of interest, let alone potentially a strong community of interest, then I would not have had as strong of a personal offense, certainly I don't have the expertise to say that it's unreasonable to try and draw a district down into capture that population in Mobile the way it was done in the plaintiffs' plans.

Q Were you instructed by counsel to provide a defense of a community of interest between Mobile and Baldwin counties, or did you arrive at an independent conclusion that this was a community of interest worth protecting?

A I arrived at that conclusion on my own, given the significant change from the existing plan. I felt it important to go investigate that and determine on my own, independently form an opinion of whether that was a community of interest or not.

Q That was the only community of have you saw fit to investigate?

A Given that that part of the state was the most significant departure from the existing plan and knowing that particular area did have a very strong social and economic tie around that area, that's the one I found to be most compelling and most

notable if it was going to be split.

There are other counties that were split, particularly around the edges of the Black Belt that were lower population, less social connection, less economic connection, that it did not appear in my expert opinion to make a difference or split a particular community of interest in other parts of the plan the way that it did in Mobile and Baldwin counties.

15:43:57

Q You are not from Alabama, correct?

A Certainly, no. I am a Virginia boy.

15:44:12

Q You have never lived in either Mobile or Baldwin counties?

A No, ma'am.

Q So your understanding of that community of interest that you discussed between Mobile and Baldwin counties is based on the lay witness testimony of Representatives Bonner and Byrne that you were provided by counsel in this case, correct?

15:44:31

A Primarily, yes.

Q That's the entirety of your expert -- the basis of your expert opinion in this case?

A Yes.

15:44:41

Q Did you also review the trial testimony of anybody else in the Chestnut trial regarding the differences or similarities between Mobile and Baldwin County?

A Not that I recall.

Q So you did not review the testimony of Lakeisha Chestnut regarding her understanding of the differences between Mobile

15:45:02

and Baldwin counties; is that right?

A I did not, no. That was certainly not a lack of interest. It was more expediency in trying to get whatever I could as fast as I could for the preparation of my expert report.

15:45:23 Q You were not provided with that testimony; is that right?

A I don't recall.

Q What about this trial and this case? Did you review Dr. Bagley's supplemental report on the similarities or differences between Mobile and Baldwin counties?

15:45:48 A Yeah. There was a supplemental report by Bagley that was provided. I reviewed it briefly.

Q And did you hear Captain Dowdy testify earlier in trial about the differences between Mobile and Baldwin counties?

A I don't recall that I did.

15:46:04 Q Did you review any evidence regarding the differences between Mobile and Baldwin counties when you were providing your expert report in this case?

A Yeah, of course. In reviewing the history and the development of the relationship of those counties to each 15:46:38 other, I learned a great deal about the evolution at the time when Mobile County and Baldwin County were, in fact, separate because of the day there, there was less transportation, less communication, less connective tissue between those two geographies, and they have since grown because of development 15:46:59 of infrastructure to be much more closely related than they

were historically.

I would characterize my analysis of the community of interest of Mobile and Baldwin, frankly, to be more focused on the excision, extraction of Mobile, the city of Mobile from Mobile County probably more so than, you know, whether or not the corner of Baldwin County is connected in District 2 to Mobile County or not. It's really the focus on the grab of the city of Mobile, the black population of Mobile that caught my attention.

15:47:22

15:47:41

Q The evidence you reviewed in determining your analysis of this community of interest was the lay witness testimony of two witnesses who believed there was a community of interest between Mobile and Baldwin County, correct?

A Yes.

15:47:59

Q You did not review any evidence, any contrary evidence from any other witnesses on this issue, correct?

A No.

Q My last point, Mr. Bryan, you conclude in the passage we just looked at that Mobile and Baldwin counties are an inseparable community of interest; is that right?

15:48:21

A That is the conclusion I arrived at from my research, yes.

Q So it's your belief that those two counties cannot be separated in a congressional plan, correct?

A That is the conclusion I draw from the evidence that I reviewed, yes.

15:48:40

Q Is it your understanding that the Alabama Legislature believed that those two counties were inseparable?

A I do not know.

Q You would agree there was no mention of Mobile or Baldwin counties in the redistricting guidelines that we have gone over, correct?

A I don't believe there were any specific descriptions of secret communities of interest that could or could not be broken in the guidelines, no.

Q Precisely. They don't mandate that Mobile -- the Mobile Baldwin community of interest stay together or any other particular community of interest stay together, correct?

A They do not specify, no.

Q And certainly if the reapportionment committee believed that a particular community of interest was so inviable, they could have said as much in their guidelines, correct?

A They could have said so. My interpretation and analysis says that given that those two counties have been together for some 50 years now through multiple redistricting cycles, if there was a need, an interest, value in separating them, that may have come up in the past and it has not. And my research suggests that these counties are closer, have grown closer socially and economically throughout that 50-year time period.

So with no evidence that any splits have been attempted before for any reason, is my conclusion, especially given the

expert testimony that I reviewed that those two districts are something that historically have been retained and the evidence I reviewed says there's close consecutive tissue that suggests suggests that they should remain retained.

15:50:42 Q I think you just said based on the expert testimony you reviewed. You did not review any expert testimony --

A Byrne and Bonner.

Q Correct.

A Yes.

15:50:50 Q You would agree that the redistricting community guidelines do, in fact, express certain criteria that are inviable, correct?

A Yes. That's correct.

Q And what are those?

15:51:04 A Well, complying with the law, making sure that you've got equitable population for sure.

Q And also complying with the Voting Rights Act, right?

A Yes, ma'am.

Q Thank you, Mr. Bryan, I have no --

15:51:23 JUDGE MARCUS: I did not hear the answer to that question. Maybe it was me. Did you answer that question, Mr. Bryan?

THE WITNESS: Yes, sir. The answer was in the affirmative, that is correct. The Voting Rights Act it would be the other inviable role.

15:51:35

        JUDGE MARCUS: All right. Thank you very much. Did that conclude it for you, Ms. Khanna?

MS. KHANNA: It does, Your Honor. Thank you, Mr. Bryan. I pass the witness.

15:51:47 JUDGE MARCUS: All right. Mr. Dunn, do you need a break or do you want to get started? What's your pleasure?

MR. DUNN: I know it's late, but I think we could probably --

THE WITNESS: Could I just -- 5 minutes to grab a drink of water and I can --

15:52:00

JUDGE MARCUS: Absolutely.

MR. DUNN: We could use at least five.

JUDGE MARCUS: We will absolutely take a short break for you, Mr. Bryan and for all of us.

15:52:12 Quick question: Just help me as I think through the rest of the afternoon.

I ask the question not to cut you off, but just to get some sense, because I know Mr. Blacksher is to use my baseball lingo on deck. So tell me how long you think you will be as you go forward and you take the time you need.

15:52:32

MR. DUNN: Ms. Khanna covered a lot of things that I intended to cover. I really have to do this on the fly. I will be an hour. I will try not to be more than an hour and a half, but it will be an hour, and we are looking at 5:00 o'clock. I'm sorry.

15:52:50

JUDGE MARCUS: Okay. And then we will follow with you, Mr. Blacksher. Thanks very much and we will take as much time as you need to examine the witness. We will take a five-minute break at this point. Thank you.

15:53:06 (Recess.)

JUDGE MARCUS: Thank you. I think we have everybody. I thought we did. We are going to begin with the cross-examination of Mr. Dunn of Mr. Bryan.

Mr. Dunn, you may proceed. Thank you.

11:03:41 CROSS-EXAMINATION

BY MR. DUNN:

Q Thank you, Judge Marcus.

Good afternoon, Mr. Bryan. Can you hear me?

A Yes, sir. Good afternoon.

15:59:46 Q Okay. If at any point in my examination my questions aren't clear, you don't understand me, please indicate that. We have a virtual connection. I know it's been a long day, but I will try and be as clear and succinct as I can.

Let me start with your background a little bit.

16:00:10 In your reports, you describe yourself as a demographer and a political redistricting expert; is that correct?

A Yes, that is accurate.

Q But then, Mr. Davis, when he qualified you, also talked about statistical transformation?

16:00:31 A Yeah.

Q Which of those expertises that you referred to your report includes statistical transformation?
A Yes, sir. It's -- statistical transformation is an area of data science and analytics. And in this particular case, because of questions around the calculation of the Schwartzberg compactness measure, I felt it reasonable to qualify myself as having background and experience in a specific area of mathematics that was relevant to my use of the adaptation of the Schwartzberg measure.

16:00:52

16:01:11

It's a subset and I believe less relevant part of my background and expertise than the top line demography and political redistricting experience.
Q Okay. But so that's only related to the reformation of Schwartzberg in connection with compactness, right?
16:01:29
A Yeah. Yeah. That really doesn't have applicability anywhere else.
Q And it's in addition to the areas of expertise that are referred to in your report?
A Yes, sir.
16:01:38
Q Okay. Mr. Davis also mentioned predicting population shifts.
A Yes, sir.
Q Where does that fit?
A Part of my background and experience starting with my work at the Census Bureau was developing population estimates and
16:01:55

population projection techniques. In this case, in Singleton in particular, it was important to me that when I saw that the use of counties was going to introduce some amount of population deviation, that I help the Court and I help the experts and I help counsel understand that the impact of having even a small population deviation at the beginning of the decade after redistricting is not the end of the consequences.

The consequences of even a small deviation of population in a plan starting right now has far-reaching longstanding significant consequences.

My experience in developing peer-reviewed professional population estimates and projections, the relevance is that I was able to use that expertise to develop those projections to help the Court and help counsel understand what I would expect to be the deviation at the end of 10 years compared to a plan such as the state of Alabama's, which would be starting with zero deviation.

Q Okay. So that area of expertise doesn't have anything to do with your testimony vis-à-vis the Milligan case or specifically Dr. Duchin's work, right?

A Yes, sir, that's correct. It's relevant to Singleton.

Q Then I will let Mr. Blacksher worry about it.

Is there any other expertise you claim or utilized in connection with this case other than what you have testified about and we have discussed?

A No, I don't believe so.
Q Okay. And you didn't bring to bear any other areas of expertise in drafting your reports in this case, did you?
A No, I don't believe so.
16:03:51 Q Now, demography is the statistical study of human populations; is that right?
A Yes, sir.
Q And that's the area you have experience and training in, right?
16:04:04 A Yes, it is.
Q And it focuses specifically on issues of size, density, and distribution of statistical characteristics, is that fair?
A That is the core of the study. It can expand into other areas of sociology, economics, other spaces. But you have the
16:04:26 core correct.
Q Okay. And your formal educational training is in that area; is that correct?
A It's one part of my training, yes.
Q And what is the -- can you describe the expertise you have
16:04:41 in political redistricting?
A Sure. So I have worked --
Q I don't want to know the experience. I want to know the scope of what you think that means.
A Yeah. So the scope of that for me and my area of
16:04:57 expertise has been the -- what I call in data science terms,

     it's called CMAR -- Collect, Manage, Analyze and Reporting of Data. And that's demographic data relevant to redistricting.

I have expertise in collecting demographic data, the management, the analysis, and the reporting of demographic data and conclusions of those demographic data to support districting and political redistricting cases. I've leveraged that expertise in both small area and large area, drawing whole plans and defending plans and critiquing plans in my career.

16:05:23

Q Okay. Anything else?

16:05:43 A No, sir.

Q Okay. You have two master's degrees; is that correct?

A Yes, sir.

Q One is in management and information systems, right?

A That is correct.

16:05:56 Q And the other one is in statistics?

A It is in urban studies and planning with a core of demography in statistics.

Q And that completed your education; is that right?

A I have one other degree, a chief information officer certification from the GSA. That's the extent of my professional formal higher education and training.

16:06:13

Q And you haven't studied history since you were an undergraduate, right?

A I study history every day, but for my professional training, no, not since my undergrad.

16:06:27

Q And not in any formal matter? I mean, we all read the papers and keep ourselves informed of all sorts of things.
A Of course.
Q And by the same token, you don't consider yourself to be a political scientist, even though you may keep yourself informed of developments and government?
A That is correct and the relationships, professional and personal, that I maintain with people in redistricting who do political work for sure.
Q I will come to that.
And you never formally studied sociology, anthropology or political science, right?
A I did not study the anthropology or political science. I have studied sociology as part of my undergraduate and graduate coursework, but I would not characterize myself as a sociology expert.
Q That's exactly what I was going to answer. I appreciate your anticipating my question.
Did you ever study the history of the U.S. census?
A I have some knowledge and experience of the census. I would not consider myself to be Margo Anderson, the nation's census historian.
Q Do you have knowledge of how the census operated before the time you were first involved with it in the 1990s?
A I have some understanding of it, yes.

Q And what was -- where did you get that information?
A It was experience working as the director of the Oregon state data center, and that responsibility compelled me to know and understand the source of the census data statistics that were used to support the state data center. It was learning on the job.
Q Okay. Let me shift gears. Who retained you in this case?
A The Secretary of State, and I have been working with Mr. Jim Davis of the Attorney General's Office.
Q So it was Mr. Merrill himself who retained you? Secretary Merrill actually was involved in your hiring; is that your testimony?
A I would defer to the exact contractual agreement with -- and ask Mr. Jim Davis to answer that question what the sequence of retention was.
Q Well, I am not asking about the sequence of retention. I am asking about who was the person who hired you?
A Jim Davis.
Q Okay. And he's the counsel who questioned you this morning?
A Yes. Yes.
Q When did he hire you? I think you said sometime in the fall, right?
A Yeah. It was about probably about three months ago.
Q And you have a written retainer agreement?

A I do.

Q Does that describe the scope of what you were hired to do?

A There were two retainers. There was an emergency retainer and then there was an ongoing retainer. And, yes, both those documents described the scope of my work as being demographic analysis and critique of plans, areas I have written about.

Q Demographic analysis of what?

A Yes. The characteristics of the original Alabama plan, the enacted Alabama plan. And at the time, the Singleton plan, anticipating that there were going to be other plaintiff plans. So the anticipation was to be able to understand and characterize the demographic features and performance of those plans.

Q What came to be the Duchin and Cooper plans?

A And, yes, certainly with time. Then there were Duchin and Cooper plans were introduced as well. And so I -- even with the compressed timeframe, I did my best to apply the same type of analytics to those plans as I did to the earlier Singleton plan.

Q I understand that and we will get to what you did. I'm just working on the scope right now, okay?

A Yes, sir.

Q In your reports, did you identify all of the information that you relied upon in order to form the opinions you expressed?

A I believe I did.
Q Okay. And you identified the sources that you used to obtain that information; is that correct?
A Yes, I did.
16:10:54
Q Did you obtain any information at all directly from any legislators in Alabama?
A No, I did not.
Q Have you ever met a legislator in Alabama?
A No, I have not had the pleasure.
16:11:13
Q So you are not -- your clients don't include the intervenors in this case who are such legislators, right?
A That's right.
Q And you have never met the co-chairs of the legislative reapportionment committee?
16:11:27
A No, I have not.
Q And what you know about -- what you relied upon in your court in reference about what former Congressman Bonner and former Congressman Byrne said came from reading testimony that Mr. Davis provided to you, right?
16:11:44
A That's correct.
Q So you have never met any federal legislators or Congress representatives either, in connection with this work, right?
A No, I have not.
Q Have you ever met any legislators in Alabama or congressional representatives from Alabama in any other work in
16:11:57

your life?

A No, I have not.

Q Okay. Before this case, had you done any work in connection with Alabama?

A Yes, I have.

Q When was that?

A It was earlier in 2021. I was connected to Mr. Davis in the Attorney General's Office with an interest in understanding the impact of a new innovative Census Bureau system called differential privacy. It's a new method of disclosure avoidance. I was asked to provide demographic expertise and assessment of the impact of differential privacy on the census data that would be used by the State of Alabama for the purpose of redistricting. And that work was completed in March, April, May of 2021.

Q So before 2021, did you have any experience working in Alabama?

A No.

Q Had you ever been to Alabama for professional reasons?

A Just for conferences and other personal relationships.

Q You have friends that live in Alabama?

A Not currently.

Q Okay. Now, you say at page 5 of your report that the plan at issue in this case was drawn in compliance with the published criteria for redistricting. Do you remember saying

that?

A The plan -- which plan are you referring to? Is that the --

Q Well, I was going to ask you -- I apologize for having cut you off. I will try not to do it again.

16:13:52

A Which is the plan that you are referring to? I don't recall the exact language.

Q Okay. You referred, I believe, to the plan at issue. It's on page -- do you have a copy of your report?

16:14:10

A I do. It's the Singleton report?

Q I think it's the Singleton report, yeah.

A Okay. The plan at issue could have been the enacted Alabama or it could be the Singleton plan. There was a lot at issue.

16:14:30

JUDGE MARCUS: The question, counsel, is are we referring to the first report Mr. Bryan did and relates simply to the Singleton plan, or are we referring to the second plan? I think -- I think on the screen --

MR. DUNN: There are three plans. Hold on a second.

16:14:56

BY MR. DUNN:

Q Yep. I'm actually referring to your report in the Merrill and Caster cases. It's D-2, I believe.

A All right.

Q And you said -- yes, that's it right there. If you look at the screen, you will see plans were drawn in compliance with

16:15:11

the published criteria for redistricting. Does that refresh your recollection?

A Yes. Yes.

Q Okay. And what plans were you referring to when you said that?

16:15:36

A This was the Alabama congressional plan.

Q Okay. And then yesterday you testified in response to Mr. Davis's question that the Legislature's 2021 plan was legal and compliant. Do you remember giving that testimony?

16:15:56

A Yes, I do.

Q Okay. So first of all, when you said that those plans were drawn in compliance with published criteria for redistricting --

A Uh-huh.

16:16:11

Q -- what published criteria did you mean?

A This would have been the reapportionment committee redistricting guidelines.

Q And you consider it within your expertise to be able to form an opinion as to that?

16:16:23

A If these were the guidelines that were used for the drawing of the plan, I have an ability to look at those guidelines and look at certain of them, not all of them, but certain of them, such as minimum population deviation, one person, one vote, compactness, yeah, I have expertise to speak to several, but not all of the criteria that were

16:16:49

published and what I understand to be used for the drawing of the plan.

Q But some of them you don't have expertise to opine about?

A Yes, that's correct.

16:17:01 Q Okay. And then you said the plan was legal and compliant?

A Right.

Q What's your basis to form an opinion about whether the plan was legal?

A Because when I looked at the minimum population deviation 16:17:15 and equalizing population, it met that criteria. That's the legal criteria as I said earlier. I don't have a basis to form an opinion of whether it was compliant with the Voting Rights Act. I took that as fact that that plan as it was submitted by the experts who drew the plan that it was. I am not a Voting 16:17:37 Rights Act expert.

Q So in giving that testimony and writing that language, you made an assumption of compliance with the Voting Rights Act; is that what you are saying?

A Yes. And other things that are outside, I did not make a 16:17:51 complete inventory of which of these were in my expertise or outside, but for the areas of my expertise, the plan conformed with those areas with which I am an expert.

Q So we can modify the language that I referred to, to say to the extent of your expertise, that was your conclusion, 16:18:07 right?

A That's fair.

Q Good. Do you know who drew the plan?

A I do not.

Q So you never communicated directly with whoever the drawer of the plan was?

16:18:21

A I don't even know their name.

Q And nobody ever gave you any information on what the drawers' activities were or qualifications were, or anything else about him or her or them?

16:18:37

A Literally do not know anything about the -- whoever put the map together.

Q Did you ask for any of that information?

A No, I did not. I think it would have been inappropriate and would have interfered with my expert assessment of the plan.

16:18:55

Q Now, you also said yesterday that race was not looked at in drawing the legislature's plan. Do you remember saying that?

A That's what I was told, yes.

16:19:10

Q Oh, so the only way you know that is because somebody told you that?

A Yes.

Q Who told you that?

A Counsel.

16:19:20

Q So you feel comfortable testifying under oath as to things

counsel told you?

A If counsel tells me that race was not a factor in drawing it and the mapmaker did not consider that in the drawing of the maps, I have no reason not to believe that. I was not part of the map drawing process, but if things are said about the drawing of the maps, then, yes I have to take that in faith that that's what happened.

Q Are there any other things in your report that you don't know personally, but you relied on Mr. Davis to tell you?

A I would say that the testimony, for example, presented by Byrne and Bonner was an illustrative example of information that I was looking for to build my expertise that was provided by Mr. Davis.

Q Okay. Anything else?

A Not off the top of my head. There may be some things, but not that I recall.

Q And the published criteria that you refer to are the guidelines, I think there are at least two exhibits previously. I have Exhibit 4. I think they were Exhibit 82; is that right?

A The exhibit I have is M-28.

Q Okay. I got the numbers reversed. M-28. And those are the May 5th, 2021, guidelines; is that right?

A Yes, sir, that's correct.

Q And that document contains criteria for redistricting that are contained in Section 2; is that correct?

A That is correct.

Q And do you understand that to be the governing document that lays out the requirements for the development of redistricting plans in Alabama?

16:21:20 A It is my understanding, yes.

Q And those criteria apply --

JUDGE MANASCO: Your Honor, can I interrupt. Just one moment. I think we may have a technical difficulty. I can't see Judge Moorer anymore, and it may just be my screen because 16:21:36 he's a small -- there he is. Okay. I just wanted to make sure he was with us.

MR. DUNN: No point in having this examination if we don't have all the judges present, Judge Manasco, I really appreciate you pointing that --

16:21:52 JUDGE MANASCO: These little tiny blocks and if somebody moves just a few inches, they slip out of their block.

MR. DUNN: Thank you.

JUDGE MARCUS: For the record, I am -- have been monitoring the screens fastidiously, and I have seen Judge 16:22:07 Moorer from the corner of the screen, from time to time he's moved over to the left side of the screen. And you can only just see a portion of his arm. But I do want this record to be crystal clear that I have observed Judge Moorer at every moment of this testimony.

16:22:27 With that, you may proceed, Mr. Dunn.

MR. DUNN: Thank you very much, Judge Marcus.

BY MR. DUNN:

Q So we were talking about the criteria for redistricting which are Exhibit M-28 in evidence, Mr. Bryan. And the question that I started to ask you was whether the criteria that are set forth in Section 2 of that document apply as to all redistricting in Alabama?

A You mean all redistricting insofar as the legislature, the senate and State Board of Education?

Q Yes.

MR. DAVIS: Pardon me. I have no objection. I want to make sure Mr. Bryan has a copy of the document we are talking about if he wishes --

Thank you.

JUDGE MARCUS: I think he does.

THE WITNESS: Yes, sir.

MR. DUNN: And I want to make sure that he has it, too, Mr. Davis, so I am glad you pointed that out. Thank you. I would put it up, but I'm just really trying to move along as fast as we can and not burden us with exhibits except to the extent that I have to. But I am happy to put it up if that would be of assistance.

BY MR. DUNN:

Q If I mention any documents, Mr. Bryan, you don't have or you need to refresh yourself with the language, you just let me

know and we will put them up, okay?
A Yes, sir. That sounds great.
Q Thank you. I appreciate that.
A Thank you, sir.
16:23:51 Q Okay.
A In reading the document, it states at the beginning of the document it's the intention of the provision to include from use census data, da da da. The inference of this document is the criteria for redistricting as it is for all of the plans.
16:24:10 I only used this for the purpose of assessing the congressional plans. I did not assess the legislative, senate, or State Board of Education plan.
So I do not have a basis for stating factually whether these criteria were used for the development of those plans or
16:24:26 not.
Q Well, you have seen in the course of this case some reference to the State Board of Education districts and the redistricting for that, right?
A I have to be honest. I have only heard about that work
16:24:42 and seen it and noted it peripherally. I have had no State Board of Education work as part of this case whatsoever.
Q Do you know that the State Board of Education districts were restricted as a result of the 2020 census in Alabama?
A That's the -- about the extent of my awareness. That's
16:25:00 what the legislature and senate -- yes.

Q Okay. So I want to go one step further. Do you understand that that redistricting that was done was done in accordance with the guidelines that are Exhibit M-28?

A I assume that they were.

16:25:13 Q Okay. Now, is it a fact that these guidelines require compliance with the Voting Rights Act?

A Yes.

Q And do you understand the fundamental issues that brings us here to this proceeding is the question of whether they do

16:25:38 so?

A Yes.

Q So just to be clear. You have no opinion at all as to whether the congressional plans at issue here, the 2021 redistricting plan, does or does not comply with the Voting

16:25:58 Rights Act?

A I do not have an opinion, no.

Q Now, in your report at page 8, and this is D-2. Do you have that?

A Yes, sir.

16:26:17 Q Maybe we should put this up?

A Census --

JUDGE MARCUS: Bear with me. What you want to do is put up on the screen what you are referring to, Mr. Dunn. Could you tell us -- this is Defendant Exhibit D-2, the report

16:26:38 of Mr. Bryan. Is this just for my help? Report 1 or report 2?

I guess this is the second one, right?

MR. DUNN: Judge Marcus, there are actually three.

JUDGE MARCUS: I understand. But is this the second or the third of the three?

16:26:52 MR. DUNN: This is the second. This is -- this is the first report in Merrill and Caster.

JUDGE MARCUS: Gotcha. Thanks very much.

BY MR. DUNN:

Q Mr. Bryan, can you confirm that the document we're looking 16:27:06 at that's D-2 in evidence is the first one you wrote in the Merrill and Caster cases?

A Yes, sir.

Q Okay. Good.

MR. DUNN: Mr. Davis, we all agree?

16:27:12 MR. DAVIS: We do.

JUDGE MARCUS: Let's proceed, counsel.

BY MR. DUNN:

Q Now, in this report, you refer to criteria that are set forth in by the Congressional Research Service on page 8; is 16:27:45 that correct?

A Yes.

Q Given that Alabama had specifically set forth its own criteria in the redistricting guidelines, why did you choose to refer to the more generic Congressional Research Service 16:28:05 reports instead of Alabama's own guidelines?

A Yes. My intent in providing this information, as it was with all the reports, was to provide a complete picture, a context, a national view of what traditional redistricting principles are. It is to ground the reader, ground the Court, ground the counsel in what traditional redistricting principles are, and why they are important.

16:28:27

The intent here was to provide this larger scale background and context of what these things were, and then to funnel that information down into specifically what the rules in Alabama were. I was not challenging or changing the rules for Alabama or trying to contravene them in any way. It was simply background and context of what they generally are and their relevance.

16:28:50

Q So certainly nothing in the Congressional Research Service report would override or modify the specific criteria that Alabama has articulated in its guidelines, right?

16:29:09

A No, sir.

THE COURT REPORTER: Please do not talk over each other.

Q To the extent that I did that, I apologize. I will try to let you finish your answer before I ask my next question.

16:29:28

You had a lot of discussion on Ms. Khanna's cross-examination about the definition of black and what you used as the definition of what you call true black. Do you recall that discussion?

16:29:57

A The use of the word true in my report refers to my effort to identify plaintiffs' reported black populations. Oftentimes, I do not know what the black populations are that they refer to. I frequently see plaintiffs and other experts refer to black populations that are either incorrect or may not have a proper definition or reference.

My goal to identify what I refer to as the true black population is not to pick one that is right or is wrong, but rather to provide a set of guardrails, an in-depth understanding of what the definitions are and then to try to help the experts and the work that I see in the plaintiffs' reports to know exactly what the black populations are that they are using in their analysis.

That is the context of what I refer to as true.

Q Did you think there was any ambiguity or uncertainty in the definition of black that Dr. Duchin used in her work?

A Dr. Duchin is exceptionally attentive to those details and it's much appreciated. There's no lack of clarity at all.

Q So you didn't need to clarify the definition in analyzing her work, did you?

A I think specific to her plans, no. In general, in my experience in doing this work, this problem comes up repetitively and it's an effort I make in my work to make sure that there is clarity no matter what, however well or not well someone may represent their work.

The other reason that I do this, as I mentioned earlier, is not with the case of Dr. Duchin, but in the case of Mr. Cooper, errors can and are made in this. And so my effort is to define my math and to double-check my math and make sure that the data in his reports are, in fact, what they say that they are. And that was the intent of my effort here.

16:32:05

Q Okay. But as to Dr. Duchin, that was not an issue or a problem, right?

A No. Dr. Duchin did a fine job.

16:32:17

Q By the way, did you hear her testimony?

A I heard most of it, yes.

Q Okay. What other testimony in this case have you been able to observe?

A I heard the testimony earlier today, but yesterday the -- my focus was really on Duchin's work. I did not hear any of Mr. Cooper's testimony. I had not arrived in Montgomery in time for that.

16:32:40

Q Okay. So you heard the Milligan expert, but not the Caster expert testify?

16:32:57

A Yes, sir.

Q And you said you heard some other testimony yesterday?

A Yeah. There was a political scientist that spoke for some time, although that was less relevant, while interesting, it was less relevant to my work.

16:33:11

Q Now, did you rely in your work on information that was

provided to you by any political scientists?

A None of my work was informed by a political scientist. I performed work, demographic, data science and analytic work that was subsequently provided to the political scientists for a small portion of their work.

16:33:43

Q What political scientist?

A I believe his name is Dr. Trey Hood.

Q And how do you know that your work was provided to Dr. Hood?

16:33:55

A Through conversations with counsel, Jim Davis. There was a request for some information about the VTD boundaries, location of voters in Washington County, which is an area of expertise on my team.

Q Is it correct that you have not, however, communicated with Dr. Hood in connection with any of the work in your report?

16:34:20

A That's correct -- yeah, that's correct.

Q And you haven't relied on anything that he had previously told you?

16:34:28

A No.

Q And you knew Dr. Hood before; is that correct?

A That's correct.

Q You worked with him before?

A Yeah. There have been cases, sure.

16:34:37

Q Any other political scientists?

A Not on this case.

Q Let me withdraw that.

A No.

Q There are no other political scientists you have communicated with in connection with the preparation of your reports, right?

A No.

Q And you are not relying on anything that any other political scientist told you or information they provided to you previously in connection with your report; is that right?

A Only insofar as that I am aware from a political science perspective what the preferences of the political scientists I work with are in terms of defining the race groups for the purpose of their *Gingles II* analyses.

That's the only extent to which I have used any previous knowledge of working with my political scientists in this case. It's just that historic knowledge and relationship.

Q So going back to where we were before, you understand there's a choice in defining the black population that you made, correct?

A I do not make the choice. I prepare the variety of options that are available. And I provide that option in my analysis for my own critique of plaintiff plans and I also provide those options to political scientists who may use that information for their analyses.

16:36:32
16:36:53
16:37:16
16:37:31
16:37:45

Q So it's your testimony that you did not express a preference for single-race black over any-part black in your report and your work in this case?

A I do not have a preference. There is not a right or a wrong way. Both of the ways that you can measure this have significant value and importance in these cases. I believe my statement with regard to the single-race is my understanding, again, from my experience with political scientists that more homogeneous groups are easier to characterize and to analyze and to defend than more heterogeneous groups. And that is no way a judgment or ranking of one particular method over the other.

Q And you don't have any expertise to express a preference for which should be used in connection with the analyses that are at issue in this case; is that right?

A I certainly do not. No, that's correct.

Q And you do understand, I take it, that Dr. Duchin made a choice different from the one you're now talking about, that she used any-part black, right?

A Yeah. Yeah. That's correct. And there's -- there can be reasons individual experts may do that, and I know those and respect those. It's a fine choice if that's appropriate for them.

Q So when you critiqued her work --

A Uh-huh.

Q -- in terms of whether the districts that she proffered were majority black on the basis of your analyses, you didn't mean to express a judgment as to what definition of black was appropriate for that?

16:38:03 A No. And that's why I do my analyses of these types of plans consistently, same way every time, is that I present both of the statistics in my assessment and my summary, just simply state factually whether they do or do not rise to meet a majority-minority threshold under one criteria or another. 16:38:26 There is no judgment or assessment of it failing or succeeding based on one or the other. It's a simple factual black and white observation.

Q And to cut to the chase with Dr. Duchin's work, you found that even using the sole-race black criteria, one of her plans 16:38:49 qualified as a majority-black plan in both of the districts that she identified, correct?

A Yes, that's correct.

Q And if you use the any-part black test, you confirmed her analysis that all of her plans did so?

16:39:05 A Yes, that's correct.

Q And you understood that her plans, the four plans she presented were representative plans, right?

A Yes.

Q That were designed specifically to cross the majority 16:39:18 threshold and demonstrate the possibility that in Alabama you

could design a plan that contained two majority-black districts, right?

A Yes. She was clear that was her intent, the direction and intention of her efforts, yes.

16:39:35 Q And using her definition, she fully succeeded?

A She appears to have, yes.

Q Great. And by the way, when we talk about majority, do you understand that the definition of majority is anything above 50 percent?

16:39:49 A It's as a demographer following the law, it is literally 50 percent plus one person.

Q Thank you. Let me return to the committee guidelines.

I take it you did review those in connection with your report?

16:40:06 A Yes, I did.

Q And you relied upon them in your report?

A Yes, I did.

Q Could we put them back up, please? And I would like to call your attention to Section 2(g)of the guidelines, if I

16:40:27 could, Mr. Bryan. Could we highlight that, please? Are you familiar with this subsection?

A I am familiar with it, but it was less relevant to my area of expertise and my area of analysis in the case.

Q Well, it says specifically that considerations of race,

16:41:01 color, or membership in a language minority group -- I'm sorry.

Let me back up.

No district shall be drawn in a manner that subordinates race-neutral districting criteria?

A Right.

16:41:16 Q Those are the criteria that are discussed below in this document, right?

A That is correct.

Q So they should not be subordinated to issues of race or color, except race, color or membership in a language minority 16:41:35 group may predominate over race-neutral districting criteria to comply with Section 2 of the Voting Rights Act. Do you see that?

A Yes, sir. Correct.

Q So do you understand that if districts need to be reshaped 16:41:49 in order to comply with Section 2 of the Voting Rights Act, that other criteria need to yield to those requirements?

A I understand that that is the requirement. It is outside the scope of my expertise to determine whether one district or two black majority-minority districts were necessary to comply 16:42:15 with the requirement.

Q But if two districts were required, the plan the legislature adopted only contained one, right?

A Can you please rephrase the question?

Q You know the plan the legislature adopted in 2021?

16:42:36 A Yes.

Q Only contains one majority-black district?

A Correct.

Q So if two districts are required in order to comply with the Voting Rights Act, then this section would apply and race-neutral criteria would have to yield to whatever is needed to be done to comply with the Voting Rights Act; is that correct?

A Not being an expert in that space, this would be my literal interpretation of this -- that statement would be correct.

MR. DAVIS: I would like to lodge an objection for the sake of completeness of the transcript. Mr. Dunn only read part of the section. I just wish to note that there is more to the sentence regarding the guidelines reference to Section 2 of the Voting Rights Act.

JUDGE MARCUS: You will have every opportunity to explore it on redirect.

You may proceed, sir.

BY MR. DUNN:

Q And then as Ms. Khanna discussed with you, there are certain criteria that are identified in subsection J. Mr. Ang, can we go down to subsection J?

And the -- specifically -- no, let's go back to the whole page, please. Because what I want to establish is that subsection J is where considerations of contest between

incumbents and communities of interest are placed in the guidelines; is that right?
A Yes.
Q And those criteria cannot be used to subordinate or impair the requirements that are stated above them, can they?
16:44:32
A Yes, that's correct, that's my understanding.
Q And minimization of the number of counties is also a subsection J criteria, right?
A Yes, it is.
16:44:49
Q And so is core preservation?
A Yes, correct.
Q So the same rules of priority apply with respect to them, correct?
A Yes.
16:44:58
Q And subsection G says specifically that the criteria in paragraph J are not listed in order of importance, right?
A I do not see -- I apologize. I do not see Section (g). Yes.
Q But the requirement --
16:45:27
A I do.
Q -- the requirements for contiguity and compactness are way up above all of this, and they have priority; is that your understanding?
A That's my understanding.
16:45:40
Q Thank you.

Now, if we could go back to your report, which is Exhibit D-2 on page 8, you list traditional districting principles. And you list preservation of communities of interest and continuity of representation above compactness and contiguity. Do you see that?

A Yeah. I would be -- caution the reader not to read this literally as a hierarchal prioritization of these rules. It's more of an inventory.

Q Okay. Let's talk about compactness for a little bit if we could.

A Okay.

Q You say at page 28, at the top of your discussion on compactness in D-2, that compactness is a measure to ensure that districts do not deviate from being reasonably shaped and is intended as a deterrent to gerrymandering; is that correct? Did I read that right?

A Yeah. That's the goal, for sure.

Q But as I think you have indicated previously, measuring compactness is a complicated subject?

A Very.

Q And there are no objective criteria for what is a compact district versus a not compact district?

A There are not. It's typically regarded as a relative measure within one set of plans for a specific state for a specific redistricting exercise versus another set of plans for

16:48:01
16:48:12
16:48:33
16:48:56
16:49:12

the same state for the same redistricting exercise.
Q And even though there are no objective standards, there are benchmarks or standard measures that you say are used by demographers regularly to measure and compare compactness; is that a fair characterization?
A Yes, sir, that is correct.
Q And you picked four particular measures of compactness to use; is that right?
A Yes, I do.
Q And two of those measures are measures that were also used and referenced by Dr. Duchin; is that right?
A That is correct.
Q And then she had an additional criteria. Are you familiar with that criteria?
A Yes. It's the -- it's an innovative technique she has developed and I believe it is the block edge technique. I think it reflects how quickly this area is evolving and how much change there is and how we are examining these things right now. I commend her work to come up with new techniques to do this as well as possible.
Q And then you also used what's referred to as the Schwartzberg score to measure --
A Yes, sir that's correct.
Q -- compactness. But you modified the Schwartzberg score in your analysis; is that correct?

A Yes, sir.

Q And in adapting the Schwartzberg score, what did you do?

A So the Schwartzberg score is different than many of the other generally accepted techniques. The scores that you would have for Reock, for example, for Polsby-Popper, for convex hull, I mean, there's dozens of these techniques. And virtually all of them give you values that rank from zero to 1, right?

16:49:43

What's both powerful, but as well difficult about the Schwartzberg score is it's a number that can stretch to infinity, right? And so if you look at that score, most people, certainly not me, can look at a score of 100,000 or a hundred million or a billion or whatever the number may be and quickly say, oh, there is how much better a million is than a billion. Our brains are just not wired to be able to do that quickly.

16:50:02

16:50:25

So other experts, other analysts adapted a version of Schwartzberg that basically just divided it by 1 and turned it into a fraction and rescaled it between zero and 1. And largely the purpose of that is to help people look and say, ah, I know what the difference is between .5 and .6 or .5 and .7, right? It's much easier to do than trying to figure out the difference between million and a billion.

16:50:47

So when we did that adaptation of Schwartzberg, one of the ways that we quality controlled it and assessed it was to do

16:51:10

       what is called a regression analysis. That is we compared it with one of the techniques Dr. Duchin advocated, the Polsby-Popper score, and what we found is that our adaptation had almost a perfect correlation to the Polsby-Popper score. 16:51:31 That is as conceptually the mathematics, if you knew them, it would sound, look, feel the same, and the math that we did proved that it was the same.

So the outcome, or the effect is you're just duplicating the Polsby-Popper score. Through this experience, even though 16:51:48 we have shared this metric out with other judges and courts in the past and it's beneficial, I have learned something from this, that it doesn't really matter if you add Schwartzberg into this combination of different methods or you don't. The Polsby-Popper basically serves the same function as the 16:52:08 Schwartzberg score does. The adaptation makes no difference whatsoever in the ranking or the performance overall of the compactness, and would not change any of my conclusions whether you included it or excluded it.

Q And that's demonstrated because if you look at the tables 16:52:27 in your appendix, when you present the compactness of various districts, the coloring and measurement in Polsby-Popper and Schwartzberg are absolutely identical.

A That's exactly right, yes.

Q Okay. So effectively, what you did was to create a 16:52:44 benchmark that mirrored Polsby-Popper, so in your tables where

you are Schwartzberg and Polsby-Popper what you really have is Polsby-Popper and then a proxy that's exactly like Polsby-Popper again?

A Very closely, yes, sir, that's a great analysis.

16:52:59 Q Good. Then I'll stop there. Let me ask you one more question. In Appendix 3, where you talk about compactness measures in D-2, you reference a set of diagrams and discussion of the various benchmarks and you give an Internet site for your source. Do you see that, this is page 34?

16:53:31 A Yes. I am familiar. This is one illustrative.

Q What you referenced is an unpublished student paper; isn't that right?

A Yes, but the map is the same, regardless of wherever you looked. It could be a high school paper or it could be a Harvard mathematician paper. The math is the same. 16:53:50

Q The math may be the same, but certainly an unpublished student paper is not something that ordinarily an expert in the field would rely upon, is it?

A I rely on the math no matter what the source is.

16:54:07 Q That wasn't my question.

A I understand. For the purposes of having a visual illustration of these scores, I am not aware of any site that has a better quick easy visual representation of these, what the impact of these difference compactness measures are.

16:54:30 If the purpose was to go into the ancient mathematic roots

of these, I would refer to a different source.  If I want

somebody to be able to look at one of these methods and

understand in 30 seconds how they work, I would send them to

this site.

16:54:45  Q     My question is general isn't it the case that experts

skilled in the area will refer to published professional

peer-reviewed papers, not to student works?

A     They could certainly do that.  I would challenge anyone

going into, for example, a wonderful document such as

16:55:09  Dr. Duchin's 2018 geometry report on these different measures

to figure out how these measures work through that paper in

hours, let alone 30 seconds.  The benefit of this is quick and

intuitive way to understand how they work.

Q     Would you agree that the models and the plans that

16:55:41  Dr. Duchin has proffered score as well or better than the plan

the state adopted for compactness?

A     There are two levels to this answers.  In aggregate, they

do.  By in order to understand compactness, you have to

understand the details that make up that overall score.

16:56:11       In Duchin's original report, and I did not see her

subsequent report, in Duchin's original report all she provided

us was the top line summary statistic.  This is the average

score for Polsby-Popper, the average score for Reock.

       What she did not show in the original report was that if

16:56:29  you look at the individual districts that comprise those

scores, the districts that make up her two majority-minority districts perform much worse in terms of compactness because they had to be drawn in a very specific and one might say convoluted way in order to be able to capture just the black populations necessary to make the majority.

16:56:53

She made up for that in some sense in other districts that did not need to be adjusted in the north. Those will be Districts 4, for example, and Districts 5. So by going into those districts that did not need to be adjusted for the purpose of this case and making them very geometrically compact, which is a great benefit, it belies the fact that underlying that is a couple of districts that are very poor in terms of compactness, and those are her majority-minority districts, and they are in some sense offset or accounted for by making adjustments in areas where it's just not relevant.

16:57:10

16:57:33

Q Aren't all districts in a plan relevant?

A For the purpose of drawing a majority-minority district, you have to draw those in a specific way in order to achieve her objective.

If she wanted to go on and make adjustments elsewhere, she could have chosen to or did not choose to. The fact is when she drew her plan, she selectively used one criteria for one part of her plan and used a different criteria for a different part of her plan.

16:57:55

Q What -- what difference in criteria do you claim she

16:58:16

applied?

A So in the northern districts, in 4 and 5, she used compactness and optimized and sought clearly -- she has said in her algorithm that sought to optimize compactness in her northern districts. You didn't have do that to get, you know, what she said was her primary goal of two majority-minority districts.

16:58:36

So in those northern districts, she used compactness. In her southern districts, where she wanted to optimize for black population, said, well, compactness doesn't matter. She said as much, all I want to do is make sure that I get two black districts.

16:58:50

So what is unconventional that the plan is that while she did achieve her two black majority districts, she did that using one set of criteria there and then tried optimize a different set of criteria somewhere else in the state. It's the result of those efforts why she achieved an overall better compactness than the state of Alabama plan.

16:59:05

Had the state of Alabama sought to generalize and make their northern districts more compact -- they didn't have to, they sought a least change plan -- but if they had sought to do that they could have just as easily met or exceeded the compactness scores of Dr. Duchin. The state deliberately decided not to sacrifice core retention, not to change any more than necessary just for the sake of compactness.

16:59:24

16:59:44

Losing continuity of representation just so you say you made something that looks more like a circle is not a tradeoff the State of Alabama decided to make.

Q No district in any one of Dr. Duchin's plans has a lower compactness score than the lowest score in the state's plan, does it?

A I need to refresh my memory by looking at my report.

Q Going to tell us what you are looking at?

A Yeah. I am looking at my report, the supplemental Cooper and Duchin report. This would be Document 76-4.

All right. I am looking at it.

Q This is Exhibit D-4; is that correct?

A There's a compactness Table 2 for the Alabama enacted. And then there's an Appendix 5.1, 4.2, 4.3, and 4.4.

So in looking at the Alabama enacted plan for Polsby-Popper, the Polsby-Popper score in District 1 compared to the Polsby-Popper score for Duchin in District 1, the state's Polsby-Popper score is higher. District 2 is higher, District 3 is the same. Districts 4 and 5, as I mentioned earlier, are less. District 6, Duchin is higher, and District 7, Duchin is higher. So there are some districts from the state plan that are higher by district, and some districts where the Duchin plan are higher.

JUDGE MARCUS: You will have to speak into the machine as you face away and look at the other screen. Your voice gets

muted and we have some difficulty.

So take your time and speak right into that machine so we can hear you and our court reporter can get it down accurately. Thank you.

17:02:16 THE WITNESS: Yes, sir.

I compared the results of Polsby-Popper briefly just now. And looked at different districts for the state of Alabama plan, which was what I believe I'm being asked and comparing those different district scores by Polsby-Popper with one of

17:02:36 the Duchin plans, Duchin plan A. And the results are that there are some districts where Duchin's plans are better, notably 4 and 5. There are some plans where the compactness is not as good. That would be in Districts 1 and 2, I believe. I can present other findings if you would like me to.

17:02:56 BY MR. DUNN:

Q No, that's fine.

Isn't it the case that Dr. Duchin attempted to optimize compactness to the extent possible every where while creating a majority-minority district? Didn't you hear her testify to

17:03:14 that?

A I heard her concede that in District 2 that it was not compact because of the need to make it a black district. That's why it was elongated and was not a compact district.

Q When you say it was elongated, you mean it stretched from

17:03:31 one side of the state to the other?

A That's correct. And that was her explanation of why it had an inferior compactness score, because she wanted to prioritize blackness.

Q Compared to other districts, you're talking about?

17:03:43 A That's correct.

Q There is no such thing, as you told us, of an inferior or superior compactness score in the objective.

A Relative to the other districts in her plans, certainly it had a lower score and she explained why.

17:03:55 Q In the 2021 plan adopted by the legislature, how many districts stretched from state border to state border east to west?

A Just not sure there is one. Perhaps 5 at the very top, District 5.

17:04:18 Q Yes.

A Yes, at the very top the narrowest part of the state, 5 would go from east to west.

Q And District 4, no?

A Yes, diagonally. Yes, it would.

17:04:30 Q And I was about to say, it not only goes from east to west border to border, it goes diagonally, not straight across?

A Yes, that's correct.

Q And in Dr. Duchin's plan A, she, too, has two districts that stretch from border to border, Districts 1 and District 2,

17:04:48 right?

A Yes. Yes. Those are -- are newly created east to west districts. So I would concede that the same lower compactness scores in the Alabama plan for Districts 4 and 5, which Duchin sought to remedy at the expense of core retention and incumbency are the same types of scenarios that you see play out in her Districts 1 and 2.

Q And in summary, in your rebuttal report you concluded -- this is page 18 -- quote, Dr. Duchin's plans A to D, all four of them, almost always score better than the enacted Alabama plan on average; is that correct?

A That is correct. Yes.

Q And, in fact, the only time Dr. Duchin's plans did not outscore the enacted plan was plan C, and only on the calculation under Reock, right?

A I believe that to be the case, yes.

Q So other than that for compactness, each of the Duchin plans had an equal or higher scores when the benchmarks on average were compared to the enacted plan?

A Yes. Yes, it was clear that was prioritized over other traditional redistricting principles in her address, that's correct.

Q Okay. I think I would like to move on to another subject.

Let's talk about communities of interest, if we could. On page 14 of D-4, you talk about communities of interest, I think. I'm sorry. No. It's on page 14 of D-2. I'm sorry. I

have the wrong report.

A Yeah. That looks correct. Got it.

Q Okay. Now, you start here with a quotation, but you don't say what source you are quoting from.

17:07:31 A That's from the University of Michigan center for urban study and local policy. It's on the front page of their website.

Q Why did you quote a University of Michigan definition of communities of interest when the Alabama guidelines themselves contain a definition?

17:07:56

A Yeah. So, again, I think that this was one of the cases where as an expert in the space I try to provide what I think is the best definition, the best information is in national context. And then I would supplement that, refine it, and tailor it based on what the Alabama specific or any other state specific guidance is.

17:08:16

I think that this definition from CLOSUP is a particularly clear and useful definition and a good starting point to educate anyone who is interested in what is a community of interest is.

17:08:36

Q But the finishing point in terms of Alabama needs to be the Alabama guidelines, Exhibit M-28, and they contain a specific definition of communities of interest, don't they?

A Yeah.

17:08:53 Q Look at J-3 on page 2, please.

JUDGE MARCUS: Let him answer the question. I'm sorry. Before you go on, to just refine it. Had you finished your answer?

THE WITNESS: Yes.

17:09:03 JUDGE MARCUS: Okay. I'm sorry.

THE WITNESS: Thank you.

BY MR. DUNN:

Q So let's look at M-28, if you would. A community of interest is defined as an area with recognized similarities of 17:09:24 interest, including, but not limited to ethnic, racial, economic, tribal, social, geographical, historical identities; is that right?

A That is correct. Yes.

Q Do consider that to be in any way fundamentally different 17:09:43 from the University of Michigan definition you quoted?

A No. It's specific refinements, specific to Alabama. It's not in conflict.

Q Now, do you consider yourself to be an expert in identifying communities of interest within a state that meet 17:10:00 that definition?

A I would not consider myself a nationally recognized expert in communities of interest. I'm knowledgeable of them. I've researched them and used them extensively in my practice.

Q Are there demographics that one looks at to determine 17:10:17 communities of interest?

17:10:39

A There certainly would be. Those can be characterized by specific age groups, income groups, employment groups, different types of family structure. For example, that those are some of many different communities of interest that combine a group of people together.

Q Racial composition?

17:10:59

A That can be one, although my experience is that there can be racial populations that have significant differences and even conflicts within the same racial groups, so one must be thoughtful and careful about generalizing, just based on race alone.

Q I didn't say race alone. I said are they demographics about race that are relevant to whether a particular area is a community of interest?

17:11:13

A Sure. In using race to define -- in using race to define a community of interest, it would be foolhardy just to assume one group defined as a specific race is somehow uniformly a community of interest. So a similar attitude, beliefs, and behaviors.

17:11:35

Q I wasn't suggesting that it would, but certainly racial characteristics and commonality are specifically within the definition --

A Yes.

Q -- in Alabama and otherwise, right?

17:11:44

A Yes.

Q And there are demographic statistics that could be looked at to inform you about that?
A Certainly.
Q And all the other things you mentioned, right?
17:11:58 A Yes.
Q Did you look at any of those statistics in connection with your work in this case?
A I did.
Q Did you mention that in your report?
17:12:08 A I did not decompose subtle differences in black populations within the Black Belt, for example, no.
Q Well, you seem to be preoccupied with racial statistics. I'm talking about age, income, employment, social, including racial statistics. All of those statistical categories, did
17:12:41 you look --
A Yes.
Q -- at that group of statistics to determine what communities of interest exist in Alabama?
A Yes. So I looked at age characteristics, socioeconomic
17:12:56 status, income, types of employment and race and found that for sure, there are differences in demographic characteristics in different parts of the state of Alabama, but those being one of many different communities of interest, I did not see an instance, where, for example, differences in age structure, for
17:13:23 example, or racial structure prevailed to a degree where they

would override other communities of interest.

So I is not find it worthwhile to try and contribute information on demographic communities of interest that would not have had a material outcome in the findings.

17:13:45 Q Well, is there anything at all in any of your reports that talks at all about your use of any statistical analysis in connection with communities of interest?

A Not a statistical analysis, no.

Q Okay. What nonstatistical analysis did you do?

17:14:08 A I think the primary nonstatistical analysis I did was covered in my earlier cross in discussing the area around Mobile and Baldwin.

Q And as to the area around Mobile and Baldwin, your due diligence efforts consisted solely of reading the testimony of two former congressmen that Mr. Davis provided you; is that right?

17:14:31

A That's correct. Yes.

Q And you didn't even read the testimony of other people in that case?

17:14:40 A I would not say that that was an act of negligence. It was an act of not sleeping for three weeks preparing this testimony.

Q So you had plenty of time to read Bonner and Byrne, but you didn't have any time to read Chestnut. Is that your testimony? Is that your testimony?

17:14:57

A I did not -- yes.

Q Okay. Did you talk to anybody -- did you talk to anybody about the Mobile Baldwin community of interest that you found so important? And I will exclude Mr. Davis for the moment.

17:15:23 A No.

Q Okay. And did you investigate any other communities of interest besides Mobile or Baldwin?

A Yes. I particularly in places where districts crossed administrative pieces of geography such as counties. I 17:15:50 explored and investigated places where that happened to see if there were any significant communities of interest there. Cities, for example, that were going to get split by the boundaries. I didn't find any else where that seemed to be relevant.

17:16:08 I acknowledged existing splits of Jefferson County and those splits just exist in various degrees and various different ways in the different plans now. So there was no other additional findings of a significant change in a community of interest that I found besides what I explored in 17:16:27 Mobile.

Q I wasn't talking about changes. I was talking about whether you even identified other communities of interest.

A Yes, I did.

Q Which other communities of interest do you discuss in your 17:16:40 report?

A As I just suggested, I explored other communities of interest to find any that may have been material and have an impact on the borders, or the definition of what one of the districts may have been, or why it was different than another district. And I did not find any other communities of interest that seemed to have had a significant impact on the boundaries that were decided upon.

All the plaintiff boundaries and the state boundaries were decided either by least change for the state, or were driven by the need for county boundary changes, or other changes unrelated seemingly to any significant community of interest elsewhere in the state.

Q Did you give any consideration to whether the Black Belt is a community of interest?

A I did. I looked at that carefully. And it was notable and interesting to me that in those 18 -- I think there's different definitions, 18 or 19 counties that within the Black Belt many of the plaintiff plans seemed to cut the Black Belt into different pieces. Two pieces. I think there were some cases I saw it was cut into three pieces in different plaintiff plans, as well.

So I acknowledged it as a community of interest, but it does not seem to be one that prevailed in the development of these plans.

Q Okay. Mr. Bryan, I know it's getting late, but you have

really got to listen to my question. Do you agree the Black Belt is a community of interest?
A Yes.
Q Okay. It's a rural area throughout, is it not?
17:18:12 A Yes, predominantly, yes.
Q It's heavily agricultural?
A Yes.
Q It has lower income levels than other parts of the state?
A Definitely.
17:18:22 Q Lower education levels?
A Yep.
Q Lower infrastructure?
A My understanding.
Q And a shared history?
17:18:32 A Yes.
Q And it's racially significant because that's where -- those counties as you pointed out in your own work have significantly higher percentages of blacks than other counties, right?
17:18:44 A They do.
Q Now, is it -- so -- and one of the things that Dr. Duchin's models perform is to aggregate the Black Belt more than the existing plan or the 2011 plan, isn't that correct?
A It appears so.
17:19:07 Q So you would say on communities of interest with respect

to the Black Belt community that her plan is better than the state's plan, right?

A I don't have enough detailed knowledge of every part of the Black Belt to say where she split the Black Belt results in a better performing Black Belt. They're split and the precision of where they were split does not give me, with my knowledge, the ability to assess whether it is a better or worse combination of a split of the Black Belt than any other plan.

Q Well --

A Fewer splits are generally better.

Q And she had fewer splits?

A Yep.

Q Okay. Have you reviewed Dr. Duchin's supplemental report dated December 27th?

A I believe I have.

Let me make sure I have got the right one. Is this the rebuttal report to me.

Q No. This is the supplemental report that talks about the voter registration data.

A Oh, no, I did not. I'm sorry for my confusion. I apologize.

Q Okay. Are you aware -- did anybody make you aware that Dr. Duchin prepared and submitted a supplemental report that analyzed her plans using voter registration data?

A Not until very recently. I would say I became aware of it perhaps in the last week or two.

Q Okay. But you haven't examined her analysis in that regard?

17:20:43 A No, I have not.

Q Are you aware that voter registration data can be used for the purpose of determining whether a plan contains districts that are majority black?

A It could, yes.

17:20:55 Q Okay. But as to her -- and would you consider it reasonable or appropriate as a demographer to use such data?

A It's a tool that can be used, yes.

Q But you haven't done any analysis of her use of that data; is that correct?

17:21:16 A No, I have not.

Q So you have no opinion on whether she did a good job, bad job or whatever else, in that regard?

A No.

Q Mr. Bryan, did you provide testimony and expert opinion in

17:21:43 connection with a case called Harding versus County of Dallas?

A I believe I did. It's been a number of years.

Q It's on your CV, I believe, as item 16. Does that help refresh your recollection?

A Nope. It is. Yep. I'm sorry. I'm deeply focused on

17:22:05 this case right now. I don't remember the details on that case

on the top of my head. What would you like to know?

Q Do you remember that you sponsored a plan, an alternative plan to comply with the VRA in that case?

A I honestly -- I do not recall the details of that plan right now. I'm sorry.

17:22:24

Q Do you recall that the plan you sponsored in that case preserved only 40 to 60 percent of the cores in the two districts that were at issue?

A No, I don't recall the circumstances or what the priority of core retention was of that case at that time. I'm sorry.

17:22:40

Q Would you agree with me generally that when you adjust the districts in a plan in order to create an additional new district to comply with the VRA, that is going to have an adverse effect on core retention by definition?

A It can and sometimes severely for sure.

17:23:00

Q And isn't that the reason that Dr. Duchin's plans suffer in terms of core retention, because she created a new second majority-black plan?

A It appears to be the consequence of her effort to create the second majority plan. There is a relationship for sure.

17:23:25

MR. DUNN: Your Honor, I think I've reached about the end, but if I could have a 5-minute break to --

JUDGE MARCUS: Sure. Why don't we --

MR. DUNN: We have been going quite a while. I know it's late.

17:23:43

                    JUDGE MARCUS: That's quite all right. Why don't we take actually a 15-minute break. We will finish up with you, or you may have nothing more, and then, Mr. Blacksher, we will start with you. Will that be okay?

17:23:55 MR. BLACKSHER: That will be fine. Thank you, Your Honor.

JUDGE MARCUS: All right. We will take a 15-minute break at this point. Thank you all.

(Recess. )

17:40:08 JUDGE MARCUS: I take it we have everybody assembled.

Mr. Dunn, did you have anything further for Mr. Bryan?

MR. DUNN: Yeah. Just a couple of questions. I will try and be as brief as possible, Your Honor.

JUDGE MARCUS: Sure.

17:40:21 BY MR. DUNN:

Q Okay. Mr. Bryan, in identifying communities of interest, you said one of the things you would do would be to meet with congressional, state and local elected officials to help you identify communities of interest; is that right?

17:40:35 A As a general practice, I would try to do that. I didn't have the opportunity to do that this time.

Q Okay. Elected officials may have different views on the communities of interest than their constituents, though, wouldn't they?

17:40:50 A It's possible, yes, but I try to get and process and

manage the information that I get from these people in the most objective and fair way possible.

Q Elected officials tend to be focused on the people who they think will vote for them, right?

17:41:09 A Yes. But I do not necessarily limit my education about communities of interest just to people who are elected officials. You don't really get a chance to go pick and choose every kind of random person knowledgeable about communities of interest in an area when you go into a case, but I do my best to get what information I can when I can get it. 17:41:27

Q How about community organizers? Do you think they would be people to talk to?

A They would for sure be community organizations. The most valuable source of information in Central Virginia where I come from is a community organization known as CARITAS, and they 17:41:40 care for drug and alcohol impacted people, homeless people, people who have lost their jobs, and I think they're one of the very best sources of information about what is going on locally and what the community needs are.

17:41:57 Q And did anybody tell you about the testimony in this case of Captain Dowdy in that regard?

A I'm not aware of that testimony.

Q Okay. Now, you focused in your report with respect to community of interest on the Mobile-Baldwin community, right?

17:42:14 A Primarily, yes, that's correct.

17:42:33 17:42:47 17:43:07 17:43:21 17:43:38

Q And you focused particularly on its coastal nature and the Port of Mobile, correct?
A That's correct.
Q Are you aware that the largest industry in Mobile is health care?
A Yeah. I understand there's a transportation, manufacturing, aerospace, health care, there's a variety of industries that are down there that flesh out that economy, for sure.
Q Okay. I know it's late. But my question was are you aware that the largest industry employer in Mobile is health care?
A I believe it's the largest or one of the largest, yes.
Q That doesn't have anything to do with the port?
A Right.
Q Or the waterways?
A Right. And certainly the provision of health care in an area such as a peninsula is something that would be very relevant and important. If you had a health care system and you had a congressional district that cuts straight across the middle of it, it would obviously impact policy decisions for one district opposed to another district, right through the middle of Mobile would impact the provision of health care from an organization like that.
Q Mr. Bryan, it's very late. The only question I asked was

whether health care as an industry has anything to do with the port?
A Yes. Does the health care have anything to do with the port? Only insofar as providing health care for port workers and their families.
17:43:51
Q Got it. The second largest industry is retail. Did you know that?
A It's one of the major industries, sure, as with any urban area, yes.
17:44:04
Q And retail isn't specifically related to the port or the coastline either, is it?
A Not insofar -- except insofar as it provides economic support for the people who work there.
Q And you also said that -- I'm quoting, the county, meaning Mobile County, is a national leader in training and workforce development. Do you remember saying that?
17:44:22
A Yes. I've heard that. It's a big part of that area, sure.
Q Where did you get that information?
17:44:36
A From the testimony that I told you earlier that I got most of my information about that area from.
Q So the only thing you know about Mobile County as a training and workforce development area is what you read in the testimony of Bonner and Byrne; is that right?
17:44:52
A Uh-huh. Additionally the information I collected on my

own, knowing about its transportation manufacturing aerospace, medicine. Those are the areas.

Q You collected? You collected information about training and workforce development?

17:45:08 A It's -- in reading the testimony and going on to Wikipedia, it's not hard to find information about what is the primary drivers of the economy in Mobile and Baldwin counties.

Q And what are the largest training and workforce development programs in Mobile?

17:45:22 A I'm sorry. I didn't have the opportunity to go in-depth and learn every one of those individually. I'm sorry. In this case, it was a matter of learning it was an economic area of interest, not to do a deep dive economic analysis or what the drivers were.

17:45:37 Q Do people from the Black Belt migrate to Mobile for work?

A My understanding is that there is a majority of the people that migrate to Mobile for work will come from more likely Baldwin County.

Q That wasn't my question. My question was do people 17:45:59 migrate from the Black Belt to Mobile?

A It's possible. I don't know the exact number.

Q You didn't explore that issue, did you?

A No. No. Doing migrate and intra-Black Belt migrational analysis in Mobile-Baldwin and Black Belt counties was not in 17:46:14 the scope of the work.

17:46:31

17:46:49

17:47:05

17:47:21

17:47:59

MR. DUNN: No further questions, Your Honor.

JUDGE MARCUS: Thank you. Our next examiner would be Mr. Blacksher. Are you ready to go forward at this point? Would that be fine with you?

MR. BLACKSHER: Yes, Your Honor.

JUDGE MARCUS: All right. And as we do, if anyone needs a break, let me know. And depending on how long Mr. Davis's redirect would be, it would be our intention to take a half hour break after Mr. Blacksher and before you proceed, unless you want to just go right through. But as we do this, Mr. Bryan, if at any point you need to take a break, you just let us know and we will be happy to accommodate you.

THE WITNESS: Thank you, Your Honor.

JUDGE MARCUS: Thank you all.

And Mr. Blacksher, you may proceed.

CROSS-EXAMINATION

BY MR. BLACKSHER:

Q Good evening, Mr. Bryan. I'm Jim Blacksher, one of the Singleton plaintiffs. And I am going to ask you a little bit about your report which causes you to shift gears from interrogation about Voting Rights Act issues to racial gerrymander issues in the Singleton case.

I am going to try to share my screen here. Did that work?

A I do see a highlighted screen, sir, yes. Thank you.

Q This is your Singleton report, which is marked as

Exhibit D-1. And I'm on page 17, where I've highlighted some language that I want to refer to, to begin the questioning, where you say, For the purposes of independent comparison and context, I attempted to develop additional Alabama redistricting plans using the plaintiffs' method of whole counties. Our goal was to determine whether the plaintiffs' plan was the only way to develop Alabama congressional districts using whole counties.

The only way of knowing whether their exact use of whole counties is the best remedy to a questionable harm, I need to know the breadth of outcomes possible with plaintiffs' proposed remedy. Is it the strategy and methodology of using whole counties that provides the needed potential relief, or is it the exact combination of counties they propose?

So you're asking the right questions, it seems to us, Mr. Bryan. And let me go to three side-by-side maps.

MR. BLACKSHER: Your Honor, I would like to have this demonstrative marked as Singleton Exhibit 70.

JUDGE MARCUS: Singleton 70 is marked for ID.

BY MR. BLACKSHER:

Q On the left, you can see is the 2011 plan. In the middle is the 2021 plan that was enacted in the October/November session. And on the right is the Singleton whole county plan.

So Mr. Bryan, as you know and as you say in your complaint, the plaintiffs allege that District 7 in the 2011

plan, was racially gerrymandered, and that it was -- the gerrymander was accomplished by splitting the county boundaries of Montgomery County, Tuscaloosa County, Jefferson County and Clarke County so as to add black population to District 7 to the extent possible.

You are aware that that's the allegation in the complaint -- in the amended complaint as you read it, correct?

A Yes. Yes, sir. I'm clear that's the allegation.

Q Okay. And the allegation further of the amended complaint is that to remedy that racial gerrymander, the legislature should have and the Court may have to go back to traditional districting principles, which in Alabama, the complaint alleges, historically is the use of whole counties.

Therefore, the using the allegations of the amended complaint, the first step in eliminating the gerrymander would be to restore whole these four counties. Do you agree with that?

A That would be one approach, yes.

Q Okay. Well, that was the approach that is alleged in the complaint. I am not going to try to argue with you about what's best legally or anything else. I'm just trying to get into your report about how you examined what we did.

All right.

A Yes, sir.

Q So I -- if you make whole Clarke County, Tuscaloosa

County, Jefferson, and Montgomery, the first thing you notice -- and I'm sure you have -- is that when you make Jefferson County whole, you've got yourself an almost perfect congressional district with one county. It's about 43,000 persons short of being an ideal district size, correct?

17:52:52

A That's correct.

Q And that pretty much -- that pretty much limits the opportunities for connecting other counties with Jefferson in order to reach 717,754 people, more or less. And so the plan that the amended complaint settled on was to link it with these rural counties south of Jefferson County, correct?

17:53:23

A That is correct.

Q Bibb, Perry and Hale.

Once that is done, once Jefferson County's made whole, obviously, District 7 will need to find additional population elsewhere because that's a whole bunch of folks that are taken out of District 7. Almost 200,000, right?

17:53:48

A Yes.

Q And so what the plaintiffs proposed was to, first of all, you are get a little bit more, you get about 42,000 out of making Tuscaloosa County whole, and then you go over and you add all of Montgomery County, and Macon and Bullock County, two other Black Belt counties, and then proceeding further south, counties elsewhere in the Black Belt or bordering the Black Belt, that's what this plan does, correct?

17:54:10

17:54:34

A Yes.

Q Okay. And once that was done, it had little -- it had some effect on Mobile County because in the 2011 plan, Mobile County and Baldwin County in District 1 were connected with Washington and Monroe counties, and to gain population for 7, Washington and Monroe County went into the plaintiffs' proposed whole county plan. Do you see that?

A Yes.

Q And that meant District 1 had to expand eastward along the Florida border to pick up Covington County.

That's going to create a problem for District 2, correct?

A It would, yes.

Q And in fact, it pushed District 2, which was all down here in the southeastern part of the state that we call the Wiregrass, it pushed District 2 and the Wiregrass part farther up the Georgia/Alabama border through Barbour, which is a Black Belt county, Russell, Lee, Chambers, Tallapoosa, Elmore.

Well, anyway, I'm just trying to, first of all, set the stage here by examining what the plaintiffs' amended complaint alleged was a proper way to remedy their alleged racial gerrymander of the 2011 plan. And then I want go and look at the way you have explored the questions you asked.

Are there other ways to do this using whole counties, okay?

A Yes.

Q All right. Let's go down to page 31. I'm sorry, page 32 of your report.

A I'm referring to my report here, so...

Q 27, 28, 29, 31, 32.

17:57:08 A There it is.

Q There you go. There's the table that summarizes the alternative plans using whole counties that you attempted to draw.

So they're labeled a little confusingly, but S-1, S-2, 1, 17:57:34 2, 3, 4, 5, 1-B, 2-B, 3-B, down to 6-B.

The next column is deviation. Now, when it says deviation, that's maximum deviation, correct?

A That is correct.

Q And remind the Court what maximum deviation means.

17:57:52 A So that would be the number of percentage points above and below zero deviation as represented by what percentage of the population deviates from a perfect deviation both above and below the perfect target of 717,754 people.

Q So to get maximum deviation, you simply take the district 17:58:23 that's most overpopulated and add that percentage to the district that's least populated and those two percentage added arithmetically is the maximum deviation?

A That is correct.

Q Excuse me. The third column, incumbents safe, question 17:58:43 mark. When you mean safe, do you mean are they in a district

with some other incumbent or is there some other measure you're using here?

A Yes. This is an indicator of whether the incumbents are paired or are not. In District 2, as to District 3, the incumbents are all in their own districts. In the Alabama plan they're in their own districts. The remainder have two or more incumbents paired.

Q Okay. The fourth column says 2018 election, governor. And I remember from your direct examination that you just selected this as one of many election returns over the past decade that you scanned and thought that this was representative of what those other election results look like; is that correct?

A Yes, sir.

Q All right. This column then says, first of all, the number of and percent of D districts, that means Democratic districts?

A Yes.

Q And you picked Democratic districts because the undisputed testimony, including the testimony of Trey Hood is soon -- soon to be, appears that in Alabama, black voters support -- over 90 percent of the black voters, I think you said 92 percent, at some point support Democratic candidates; is that correct?

A I did not listen to the testimony of Trey Hood, but that is a fact that I believe to be true.

Q Okay. I'm sorry. Getting ahead.
All right. So if you go to the first alternative district that you drew, it says it produces -- it produces one Democratic district; is that correct?
18:00:57 A That's correct.
Q And your report says that you computed the -- the performance data, the election return performance data by going to the precinct level, getting the election results and then aggregating them at the county level; is that correct?
18:01:24 A That's correct.
Q And I guess you might have done that because you were also trying to ascertain what the performance -- the election performance results would be in the plans -- the plan enacted by the state, which cuts county boundaries, and, therefore, you have to go to the precinct level. Is that why you did that?
18:01:45
A Yeah, exactly.
Q Rather than just using the election returns for the whole county that you can get right off the Secretary of State's website?
18:01:56 A That is correct.
Q Okay. But they should be the same. These should -- the data you used should correspond with the election returns for each county in Districts 6 and 7 of the proposed whole county plan, right?
18:02:13 A Yes.

Q Okay. And then this percentage here, 41.3, what does that mean?
A You know, I think the label here where it says percent D, this may actually be the percent Republican, which reflects that the majority, the percent majority Democrat in that district -- I'm trying to think. I'm sorry, James. Let me just think a minute.
Q I think it's --
A It is the percent Democrat. It is the percent Democrat in those districts. That's correct. Percent Democrat.
Q I think somewhere in this report you say it represents the percent of BVAP in that district?
A Yeah. There's two. There's one -- the first column is percent Democrat and the second one is percent BVAP. So the second -- the last column there shows the percent BVAP and what the BVAP percentages are in those districts -- in those different alternative districts.
Q Okay. And the 41.3 is what?
A That's the percent -- the number of what we would call the number of the at least Democrat influenced districts and the percent Democrat in those districts. So there would be one Democratic district. In the plaintiff plan there would be two, 41 -- that are over 40 percent. 41.4 and 44 percent. I believe numbers that closely relate to the percent of registered back voters and also to the Democratic performance

in those districts.

Q Well, I mean, in order to have one performing Democratic district, the election returns had to show a majority for the Democratic candidate, right?

18:04:21 A Yeah. I think that that -- the analysis of the number is just my own analysis.

Q So the 41.3 might be percent Republican, you say?

A I really apologize. I'm flooded with numbers right now. I would have to look at my table. I apologize. But I believe

18:04:44 that's the case.

Q All right. And then the last column, the number and percent of black districts greater than 40 percent?

A Yes, sir.

Q How did you land on 40 percent as a metric?

18:05:00 A Yeah. That was an arbitrary number. It's a cutoff number. And I kind of base that on the report that showed the percent black registered voters in the analysis of the complaint, I believe was about 42 or 43 percent. That was the lower of the two thresholds for BVAP population in the

18:05:29 plaintiff districts.

So I used that as kind of an arbitrary cutoff to say what would the number have to be in order to be a candidate black influenced district in one of my candidate plans.

Q Yeah. And if 43.0 percent in your alternative district

18:05:51 S-1 --

A Yes.

Q -- is the BVAP in that district, in that one district that performs?

A Right.

Q Okay? Excuse me. That BVAP figure is really sort of superfluous, isn't it? Once you determine that the district went Democrat, it really doesn't matter what the black percentage was, does it?

A Yeah. That's correct. So the assessment here when you look at the number of Democrat districts and then the black percentage there, it's not a coincidence that those numbers look very similar as you go down through the analysis.

Q The feature of drawing districts using whole counties is that instead of focusing on the race of the voters, the geographic dispersion of the demographics, or anything else, you simply have to look at what the total population is once the districts -- the counties are aggregated. And if whether or not -- if you are looking at whether or not it conforms with the Voting Rights Act, you would want to know whether or not candidates favored by blacks are able to win in that district, correct?

A That is correct.

Q Okay.

A I want to state for the record that I am not a political scientist. And my analysis here of the political performance

of the districts was purely diagnostic and not a reflection of my expertise in that area.

Q That's great. And I'm not holding you to that. I just want to understand and let the Court understand what you have found in this experiment that you undertook.

I'm going to go down to the maps now.

A Thank you.

Q And since I'm not clever, I can't separate out this table we were just looking at. We are going to -- I have it in front of me. Any chance you can get it in front of you?

A I've got a copy of the maps in front of me.

Q I mean a copy of the table. I am going to have the maps up on the screen.

A Yep. Hang on a minute. I've got it. Okay. Yeah. I have the percent black and then the -- also have the percent Democrat --

Q Okay.

A -- tables in front of me.

Q And the table, on the second column where you have maximum deviation, your plans all the way down to Plan Number 5 are supposedly -- are listed as being smaller in deviation than the 2.47 percent maximum deviation in the whole county plan, the Singleton whole county plan?

A I think that's right.

Q Okay.

A Yeah. Found it.
Q Okay. So if -- if the Singleton map drawer was trying to minimize the maximum deviation when he was aggregating counties into districts, these plans down to Number 5 would indicate options he might have taken to get even a smaller maximum deviation, right?
A Yes. Those are possible scenarios with lower deviation.
Q Okay. So let's look at them one at a time.
Here is plan S -- well, that's the plaintiffs' plan.
A Yeah.
Q S-1. Okay.
A Right.
Q S-1 says it's a maximum deviation of 0.6 percent and it's got one performing district.
Now, let's stop right now. That one performing district is a Jefferson County district, right?
A Yes.
Q I mean, there ain't no way you can keep Jefferson County whole and not have one Democratic performing district, right?
A Yes.
Q Okay. And, in fact, all of your -- all of your alternative plans either connect Jefferson County with -- in this case it's with Greene instead of Perry, but --
A Yeah.
Q -- the rural counties to the south, or you've got two

further down we will get to that connect it with Blount.

But the Blount ones -- when you connect it with Blount it goes over the 2.47 maximum deviation to the plaintiffs' one.

All right. So let's look at this one. This is 0.6 percent. And to achieve this, you've got in addition to the Jefferson County district, you have got a district something or other here. What is the Greene district number? 7. That's the --

18:11:05

A 7. Right.

18:11:25

Q So you had to connect -- you had to take 7 all the way up to Lauderdale County. You had to take the District 7 representative up to Tennessee, right?

A Yes.

Q Okay. And that's on one end. And on the other end you've got to take him over to the Georgia border.

18:11:46

A Yes.

Q So tour the whole state. So you did not provide in your report any core analyses for these alternative plans like you did for all the ones you just testified about; is that right?

18:12:08

A Yeah. That's correct. I presented these, you know, really just as scenarios to say was it possible under any circumstance no matter what -- except with regards to the deviation -- was there any way to use the county-based method to combine counties in any other way. And in some of those ways, those combinations end up with a good mathematic outcome,

18:12:32

but are ridiculous looking maps, I will concede.

Q This one is not compact and it just destroys the core, right?

A It would, yes.

Q Okay.

A County-based, small deviation is pretty much the two criteria we used here.

Q Okay. Then we go to S-2, plan S-2, and it is a 1.0 percent maximum deviation, again with just one Democratic performing district. And that is the Jefferson County district.

A Yes. Yes.

Q Now, this plan is not quite as ridiculous, is it?

A It's -- I will agree.

Q But it does make a hash out of the Black Belt. I mean, you have got Black Belt counties Wilcox, Lowndes and Montgomery hooked up all the way up north to Cherokee County. And you have got whatever this purple district is, 4? District 4? Okay. It doesn't matter.

JUDGE MARCUS: Let's focus the questions specifically, if you would, Mr. Blacksher.

MR. BLACKSHER: Am I taking too long with the questions?

JUDGE MARCUS: No. I think if you cut it down and make it shorter, it will be easier to get an answer from him.

MR. BLACKSHER: Okay. Okay.

BY MR. BLACKSHER:

Q Let me just put it this way: This -- isn't it true that this plan also, S-2, violates the traditional districting requirements of preserving the core in compactness?

18:14:23

A Are you -- it is definitely not optimized for compactness or for core retention. It was optimized for balancing population and maintaining counties as building blocks and minimizing the deviation. That's it.

18:14:47

Q Okay. Alabama plan 1 is next. And this one is 2.1 percent maximum deviation. Both S-2 and S-1, by the way, prevent any incumbents from being paired. These are the two --

JUDGE MARCUS: Is that a question, Mr. Blacksher?

MR. BLACKSHER: It's a leading question, Your Honor.

18:15:13

JUDGE MARCUS: All right. Let's get a question mark at the end of it and let's get an answer.

MR. BLACKSHER: I'm -- I'm trying to speed things up by saying isn't that what it shows.

THE WITNESS: Yes.

18:15:25

BY MR. BLACKSHER:

Q Okay. Once again, isn't it true that this plan has to split up the Black Belt?

A Yes.

Q Isn't it true that this plan has to take District 2 and run it almost the entire eastern boundary of the state of

18:15:46

 Alabama?

A Yes.

Q So this plan 1 is also a failure when it comes to preserving cores or compactness, right?

18:16:01 A On those metrics, yes.

Q Okay. Plan 2 is 2.1 percent. It also has only one and it's the Jefferson County district. And I'm just going to move -- I know the Court is tired and doesn't --

JUDGE MARCUS: I am not tired in the slightest,

18:16:27 Mr. Blacksher. The problem I'm having is that it is a compound question stringing together three concepts. I think it would be easier if you just crisply refine the question to each issue unless you need a broader explanation for the question.

BY MR. BLACKSHER:

18:16:48 Q How about if I ask does this plan work for you, Mr. Bryan?

A I can help this by saying that virtually all of these plans violate core retention and compactness and are simply illustrations of different combinations of counties that can minimize deviation. Those were the only two objectives for any

18:17:14 of them. And they will all virtually fail if you hold them to any other criteria.

They were simply designed to illustrate all the different possible combinations of counties that you could possibly achieve if we use the plaintiffs' proposed methods of building

18:17:28 on counties. Because the building of counties subordinates in

the report and the complaint that I saw, it subordinates the other traditional redistricting principles. And that is why we took the liberty of creating these options.

Q But to go back to the District 7 composite of three maps, 18:17:49 it is true, isn't it, that the plaintiffs' proposed plan preserves the core of District 6, which is Jefferson County, and pre serves the core of District 7, which is the Alabama Black Belt?

A Yes, that appears to be so.

18:18:06 Q Okay. I wanted to go down to -- I will skip down to Plan Number 5, because your -- your chart says that the maximum deviation for this plan is 0.7 percent. And it's much closer to the plan that the plaintiffs -- it's in the plaintiffs' amended complaint.

18:18:38 Can you -- I need you to recheck that 0.7 percent because I tried to check the maximum deviations in your table, but since I -- I don't have Maptitude, I'm using a poor man's Maptitude. I'm using Dave's redistricting map. Are you familiar with Dave's?

18:19:01 A Yes, I am very familiar.

Q Okay. So let me just show you that when I put -- and by the way, excuse me. That's the wrong thing. Here we go.

This is your plan 5, as I inserted it into Dave's. And isn't the reapportionment committee through counsel, 18:19:31 Mr. Walker, provided everybody with the block equivalency files

for most of these plans. But I did not use any block equivalency files here. I just built it to look like your plan 5, all right?

JUDGE MARCUS: Mr. Bryan, do you understand what he has done here?

18:20:00

THE WITNESS: Yes.

JUDGE MARCUS: That's the predicate for his next question.

THE WITNESS: It appears as if he has replicated my plan and may have a deviation that's somewhat different than the plan that was reported by my analytic team. It's possible. We can certainly look at where and why there may be a population deviation that's different.

18:20:07

JUDGE MARCUS: I don't think that was the question. So bear with his questions if you would.

18:20:25

BY MR. BLACKSHER:

Q The question is: Is it possible that your deviation is, in fact, 5.99 percent?

A If -- it's possible. We created a limit for the deviation in our plans of not more than 6 percent. So it's possible that the name of one of the plans slipped from -- given that there was 13 of them -- that one slipped from one plan to another plan. But at no instance were these combinations greater than 6 percent total deviation.

18:20:43

Q Let me go to plan 1-B. Alabama plan 1-B is 2.5 percent

18:21:01

maximum deviation and has two performing Democratic districts -- Jefferson County, of course. And district -- well, the one that's marked purple here.

A Be 4, I believe.

18:21:41 Q You have labeled it 4 out of -- I would have thought it would be more 7. It's usually where 7 is, right?

So --

JUDGE MARCUS: Bear with me. I may be the only one who missed it, but I did not get your answer, Mr. Bryan.

18:21:58 THE WITNESS: Yes, that is correct.

JUDGE MARCUS: All right. Thank you.

BY MR. BLACKSHER:

Q So when you compare plan -- Alabama plan 1-B with the plaintiffs' proposed whole county plan, the only major 18:22:12 difference, isn't it, is that you have substituted Greene County for Perry County? Or did I miss something?

A It's possible, yeah.

Q Okay. So this -- this shows that as long as you keep the Black Belt whole and you keep Jefferson County district whole, 18:22:37 you are going to come up with something around 2.5 percent, right?

A Yes, that would be my conclusion.

Q Okay. The other plan that had two performing black districts was District 5-B. Go down to it.

18:22:58 And once again, it comes very close to the plaintiffs'

plan, except that you have got Clarke County and Washington County in District 1, right?

A Yes.

Q Okay. But, again, both these plans -- this plan 5-B has a maximum deviation of 6.0 percent, right? So my question to you, based on your alternative plans, isn't it true that the plan proposed in the plaintiffs' complaint, the whole county plan that they proposed, is, for practical purposes, as low a population deviation you can get with the whole counties and still make some kind of districting sense for Alabama.

A You have the criteria of making some districting sense, yes, that's a fair assessment.

Q Let me go down finally -- I am going to go down to one other place in your report that I need to ask a question about, and it's on page 40. And this is the page where you are talking about racial composition and where --

A Sure.

Q -- you say that you paused to reflect on the possibility that the Singleton plan is a racial gerrymander.

Now, going over these -- what is the evidence you cite here for -- that suggests that it's a racial gerrymander?

A The evidence is that District 6 was extended in the only direction and in the only way to capture as much black population as is possible to get it to a point -- I'm reading here -- of semi-equitability with race and political

performance as District 7.

It was drawn in such a way, and the only way that it could possibly have achieved the same performance. There's no other direction or way District 6 could have been extended beyond Birmingham.

18:26:05

So the evidence that I submit is that if there's only one way to do it and that was the only way and that was the only way that the plan was drawn to try and get District 6 up to this competitive district, that that could be argued to be a gerrymander as well.

18:26:24

Q Even though it's the only way to achieve population equality, substantial population -- practicable equality?

A There are -- if we -- go ahead.

Q If you are going to make Jefferson County whole, it's got to go in that direction unless it goes up to Blount County and has a bigger deviation, right?

18:26:48

A Yeah. So there's -- another option, but they are limited, I can see.

Q In fact, the gerrymander in all the maps that the Court has seen, both in the Voting Rights Act case and this case, all have one focal point and that is Jefferson County, isn't that correct?

18:27:07

A It is true, yes.

Q It is Jefferson County that drives redistricting in the state of Alabama when it comes to congressional districts?

18:27:22

A Yes.

Q To split or not to split. That is the question, right?

A Right.

Q There are several places you say, for example, on page 20, that in order to -- let me just use this as a way to demonstrate the argument.

Isn't it true that what your exercise shows is that when you do employ whole counties to draw congressional districts in Alabama, it will constrain the ways in which the districts can be gerrymandered?

JUDGE MARCUS: Do you understand the question, Mr. Bryan?

THE WITNESS: I am sorry. I didn't hear that posed in --

JUDGE MARCUS: All right.

THE WITNESS: -- as a question. If the argument is does it -- does it limit the ways in which it can be gerrymandered, I would say yes. Does it prevent gerrymandering as a method and preclude it and stop it, I would say no.

BY MR. BLACKSHER:

Q There's probably nothing in the world that can prevent gerrymandering. My question was whether it definitely constrains the options for either incumbent gerrymandering, racial gerrymandering, or partisan gerrymandering, whatever; is that correct?

A It restricts those dimensions of redistricting.

Q You point in several places -- page 20, page 31, page 40 -- I have got written right down here on page 40 that without -- you say the argument is made that the black -- blah blah blah -- without counties as the determining factor, I could argue that there are innumerable geographic combinations besides those constrained by counties that could potentially meet and even exceed the performance touted by plaintiffs if that was their objective.

18:29:48

18:30:06

What -- first of all, that concedes that until you start cutting the county boundary, you have some constraints on what your options are for gerrymandering, right?

A Well, the constraints are not limited just to gerrymandering, but to other traditional redistricting principles. They also prevent you from optimizing compactness. It also has an impact on core retention and it certainly has an impact on deviation, the limitations of using county alone are not limited simply to the impact of gerrymandering.

18:30:25

Q My question simply was about gerrymandering, okay?

A It limits the gerrymandering.

18:30:47

Q Okay. And you have said elsewhere in the report in order to identify other communities of interest as a basis for drawing districts, you have to go to the sub-county level; isn't that correct?

A As we discussed earlier, there are numerous communities of

18:31:08

interest across Alabama. Some I focused on more than others, but there are many -- if you were to use the Black Belt as an example as a community of interest, it spans across multiple different counties and even when that is the case, the Black Belt and almost every plaintiff plan we have looked at today still ends up getting split by different plaintiff plans.

Q Let me go to page 31. I have highlighted this language here, the number of alternative plans using sub-county geography such as voting precincts or even census blocks is immeasurable.

A Yes.

Q Okay. So what we can say about using whole counties is at least those alternatives are relatively measurable?

A I would agree, yes.

Q Okay. So the question is -- I know you are not a lawyer, but the question that this plan that the plaintiffs drew whether or not it's -- it can be adopted by the legislature or by a court is, A, whether it complies with one person, one vote, and, B, whether it complies with the Voting Rights Act, right?

A Those would be the key questions, yes.

Q Okay. I think I am about through, Judge, if you will just give me a second.

JUDGE MARCUS: You take your time. I think something has popped up on the screen here, Mr. Blacksher. It looks like

e-mails I don't think belong on this screen.

MR. BLACKSHER: No, they don't. I'm chatting with my colleagues to see if they had any more questions for me.

JUDGE MARCUS: No. I understand. You take your time. Let me know if you want to take a short break.

MR. BLACKSHER: What I need to do is stop sharing the screen. There. That's much better. I'm sorry, Your Honor.

JUDGE MARCUS: That's all right.

MR. BLACKSHER: I have no further questions.

JUDGE MARCUS: All right. Mr. Davis, tell me about your pleasure, do you need a break or do you want to roll right through?

MR. DAVIS: I am at the court's pleasure. Unless Mr. Bryan needs a break, I'm happy to proceed.

JUDGE MARCUS: How are you doing?

THE WITNESS: I am ready to go, Your Honor.

JUDGE MARCUS: How long do you expect that you will be on your redirect?

MR. DAVIS: Between 10 and 15 minutes, Your Honor.

JUDGE MARCUS: Okay. Fire away.

REDIRECT EXAMINATION

BY MR. DAVIS:

Q Mr. Bryan, when we talk about incumbent protection, even if incumbents are not paired, voters still retain the ability to vote out a representative if they're unhappy with the

            representation, right?

A That is correct.

Q I want to look at the Singleton Report 1 and take care of a couple of issues. Let's see if we can't clear something up. I am going to look at page 38.

Can you see your Figure 5.11?

A Yeah. Those numbers were percent Republican.

Q I see it.

A They may have been labeled percent Democrat in the other table, but, yeah, that's correct. Those correspond to percent Republican. Thank you for the clarification.

Q So if we go back up to page 32, look at Table 5.6. The numbers we see in the one, two, three, fourth column, for plan 1, 41.3 percent, that's the percent of the Republican vote in that district?

A That's correct. Yes.

Q And that means that a majority of voters in that district during that 2018 election supported the Democrat?

A That's correct, yes.

Q Mr. Blacksher -- excuse me -- Mr. Bryan, did you receive shapefiles or block allocation files for all of the plans that you have assessed?

A Can you please be specific to which plan or are you referring to all of the plaintiff plans that we worked on?

Q Thank you. I meant all of the plaintiffs' plans that you

look -- that you address in the reports that we've talked about today.

A Yeah. So I have received shapefiles and/or block allocation files for all of the plans, including the state of Alabama plans.

18:36:45

Q Explain to us what you do with a shapefile or block allocation file.

A Sure. What I would do with a shapefile is I would use it in two ways. There's two different layers of geography that we use in our geographic information systems. One is what we would call a block file. This is the file that has the most granular units of geography for the state. They're called census blocks. They're at the bottom of the spine, as you will, for census geography.

18:37:01

Those blocks, the way they come from the Census Bureau do not have any demographic data associated with them at all. So part of my practice as a demographic expert is to join the demographic data that we have from the census with those blocks.

18:37:19

So just because I receive a block assignment file from a plaintiff or from the State of Alabama does not mean that I have all the census data that I need to perform my analysis.

18:37:36

Q Fair enough. But if you have the block allocation file or shapefile --

A Right.

18:37:53

Q -- does that allow you to load one of the plaintiffs' plans on to your system?

A Indeed it does. That brings me to the second layer that we use, which are what we call an outline shapefile. It's just basically whatever the perimeter or the boundary is of that so we can ascertain which blocks belong in which districts to perform our analysis.

Q Okay. So in all of these tests you have run on the different plaintiffs' plans in your report, did you run those by looking at the plaintiffs' reports and exhibits, or did you run those by loading the plaintiffs' plans on to your system and performing the tests on your demographic software?

A All of those plans were independently run, tested, and quality controlled on my own system, and then compared where possible with the exhibits presented by the plaintiffs.

Q Thank you.

In our discussion of the youth of single-race black or any-part black, Mr. Bryan, now, you present both metrics in your report, correct?

A I do, yes.

Q Are you intending to question any person's self-identity?

A I would never.

Q Are you offering an opinion to this Court in this lawsuit as to whether the Court should or should not use any specific measure?

A I do not.
Q Are you offering opinion as to whether any measurement is correct or incorrect?
A I do not.
18:39:21 Q Okay. Now, in redistricting cases -- and you have been a part of many different redistricting cases, correct?
A Yes, I have.
Q Including Section 2 cases?
A Yes, I have.
18:39:33 Q So you understand, do you not, that you demographers do your thing, that's generally related to the *Gingles I*?
A We did.
Q And that addresses among other things whether you can get to 50 percent plus 1 in a single member district; is that
18:39:52 correct?
A In my area of analysis, I prepare and present both of those numbers in support of Section 2 claims.
Q Right. There are other folks, political scientists, who do other parts of the analysis, is that your understanding?
18:40:10 A That is correct.
Q And they're addressing voting behavior, would you agree?
A I would agree.
Q And that's not what you do?
A It is not.
18:40:19 Q Okay. So you're looking at whether the minority

population is a majority and the political scientists are looking at how the minority population votes. Is that a fair summary -- maybe very generalized, but is that a fair summary of what you experts are doing?

18:40:36 A It is accurate and it characterizes the division of labor between our two professions.

Q And do you consider it important whether -- or relevant to your analysis as to whether when you guys, demographers, are talking about whether the minority populations are majority, 18:40:55 whether you are looking at the same minority population as the political scientists guys who are addressing voting behavior?

A Those are -- oftentimes they turn out to be two different numbers and may be used the same way or in different ways by the courts. I have seen as in testimony in this case that 18:41:16 black alone was used as a measure by a political scientist. I see other cases sometimes where it's used alone in combination.

Similarly, for *Gingles I*, different courts, different circumstances will call upon the use of black alone or Hispanic or alone in combination. They are not necessarily 18:41:38 intrinsically intertwined or dependent on each other.

Q Mr. Bryan, would you consider the one person, one vote requirement to be a legal requirement that applies any time a plan is drawn or as a traditional districting criteria?

A I would consider it to be a legal requirement and then 18:42:00 conformance with that legal requirement is reflected in the

plan drawn by the state of Alabama and most of the other plaintiff plans that were presented.

Q And would you as a demographer consider the laws prohibiting racial discrimination to be a legal requirement that applies whenever a plan is drawn, or a traditional districting criteria that you might balance with other traditional criteria?

A They're laws. Laws are laws.

Q Is there a traditional districting criteria of a requirement to draw every possible majority-black district no matter how non-compact it might be, or how much it butchers communities of interest?

A There is not a requirement to my knowledge.

Q If non --

JUDGE MARCUS: Just -- will you stop? I think Mr. Dunn is trying to interpose an objection. I see him speaking, but he is muted. So we cannot hear him. We cannot hear you, Mr. Dunn, because you have your microphone muted.

MR. DUNN: Can you hear me now, Your Honor?

JUDGE MARCUS: I sure can.

MR. DUNN: I am sorry. I apologize.

JUDGE MARCUS: We did not hear what you were saying.

MR. DUNN: I was trying to object to this line of questioning. He is asking him to testify to things that are obviously legal conclusions and way beyond the scope of cross.

JUDGE MARCUS: The objection is sustained. If you would like to refrain your question, you may, Mr. Davis.

MR. DAVIS: Very well. I do not know to which objections Mr. -- which questions Mr. Dunn's objection apply to.

18:43:54

JUDGE MARCUS: I think the very last one seemed to call for some kind of legal analysis or conclusion.

To the extent that was the thrust, Mr. Bryan's opinion might be interesting, but it's of no help to us in this case because he has not been qualified as an expert on the law.

18:44:09

MR. DAVIS: Very well.

BY MR. DAVIS:

Q Mr. Bryan, as a demographer, do you understand there to be a traditional districting criteria that requires a jurisdiction to draw any possible majority-black district no matter how non-compact that district might be?

18:44:25

A I'm not aware.

Q I believe you agreed that if a party is required to show that -- or is required to present a plan that includes an additional majority-black district than in the previous plan, that that's going to impact that plan's core retention score. Did you agree with plaintiffs' counsel on that point?

18:44:52

A I agree.

Q Is it not still true that the amount of displaced voters and the larger impact of core retention scores can be

18:45:11

instructive as to show you how much the traditional districting criteria policy of core retention must be sacrificed in order to draw that additional majority-black district?

MR. DUNN: Your Honor, I know it's really late, but he is just testifying. He's leading the witness. He has got to let the witness testify and not make speeches. I object. This is really inappropriate.

18:45:30

JUDGE MARCUS: I will take the answer. Overruled.

Mr. Bryan, do you understand the question?

18:45:47

THE WITNESS: Please state the question again.

BY MR. DAVIS:

Q I'll try. Mr. Bryan, in any -- in assessing any of these plaintiffs' plans, does the amount of -- does the core retention score -- can it be instructive to tell us how much the traditional districting policy of core retention has to be sacrificed in order to draw an additional majority-black district?

18:46:12

JUDGE MARCUS: Do you understand the question, Mr. Bryan?

18:46:22

THE WITNESS: Yes, Your Honor, I do.

JUDGE MARCUS: All right. You may answer.

THE WITNESS: I would say that the core retention analysis and I think particularly the differential core retention analysis showing how much more a minority population is impacted than the population as a whole would be the metric

18:46:36

that one would use to assess what the consequences are to core retention if you are going to seek some other goal besides compactness or core retention as your primary goal. I agree.

BY MR. DAVIS:

18:47:01 Q We've spoken of common features that we might see in the Hatcher plan and in Dr. Duchin's plan and in Mr. Cooper's plans. So I want to point out some things, and you tell me if those are common features of all of these plans.

Do they all split Mobile County?

18:47:20 A Yes.

Q Do they all join the inner city part of Mobile County, the part is more African-American with the counties in the western Black Belt?

A Yes.

18:47:34 Q I misspoke. I said the county -- I meant the counties in the eastern?

A Eastern. I understood. Yes. It is correct in the eastern. To some cases not all the way to the eastern border but eastern through the Black Belt for sure.

18:47:48 Q And do all of these plans join the less African-American portions of Mobile County with the Wiregrass counties along the Florida line?

A Yes, they do.

Q Sometimes all the way out to Houston County, correct?

18:48:04 A All the way.

Q In the report that you prepared for the State of Wisconsin, I believe it was the Wisconsin Legislature, Mr. Bryan, was it possible in that matter to draw a map that avoided any incumbent conflicts?

18:48:23 A It was not mathematically possible.

Q Is it your belief that the plan that you were testifying about does as good a job as is possible in Wisconsin of avoiding incumbent conflicts?

A It did.

18:48:39 Q Have we asked you to express an opinion in this case of the legislature's intent in passing these plans?

A No.

Q Do you have some understandings of what has occurred in depositions in this case? Just based on information that we shared with you.

18:49:07 A Some, but not all.

Q But we have not asked you to express an opinion as to whether that is correct, would you agree with that?

A Yes.

18:49:20 Q From your review of Dr. Duchin's plans and Mr. Cooper's plans, do you believe as a demographer that it is necessary to sacrifice compactness to some extent to draw two majority-black districts in Alabama?

A Yes.

18:49:47 Q You conceded that you're not some national expert in

communities of interest, but as a demographer, have you become familiar over the years with the concept of community of interest?

A Yes.

Q And have you gained an ability -- how to assess and weigh communities of interest against one another?

A I have some ability. It is a subjective difficult exercise that is frequently very specific to the areas that we are analyzing and can be a changing target.

Q Mr. Bryan, if Dr. Duchin's plans split the Black Belt three ways, I mean, among three different districts, and if the Alabama plan splits the black plan three ways among three different districts, can you say whether one plan does better than the other, in terms of treating the Black Belt as a community of interest?

A I cannot.

Q I believe you recognized, Mr. Bryan, that a community organizer can be a valuable source of information about communities of interest?

A I agree.

Q Would you, nonetheless, need to review any specific testimony from a community organizer before you can make a judgment about whether that specific testimony is reliable and sensible from a demographer's standpoint?

A That would be preferable and the more information a

demographer or an expert has in understanding the expert opinions that are being provided to help inform them, the better.

MR. DAVIS: One moment, if I may, Your Honor.

18:51:48 JUDGE MARCUS: Sure.

MR. DAVIS: Thank you, Mr. Bryan. Your Honor, I have no further questions on direct.

JUDGE MARCUS: Thank you, Mr. Davis. Judge Manasco, do you have questions?

18:52:07 JUDGE MANASCO: I do. I have two things I would like to ask about. Mr. Bryan, so I heard you say several times -- I believe it began in your conversation with Ms. Khanna for the Caster plaintiffs, and continued in your examination by Mr. Dunn, the Milligan plaintiffs, that you are reluctant to 18:52:28 opine that any one particular redistricting principle ought to be placed in a hierarchy above the others, setting aside one person, one vote, which I understand you regard as a legal requirement, not a traditional redistricting principle. Did I understand that correctly?

18:52:48 THE WITNESS: Correct.

JUDGE MANASCO: So will you look with me at the last page, please, of your rebuttal report in Milligan and Caster. I think it's Defense Exhibit 4 on page 19. Just let me know when you're there.

18:53:18 THE WITNESS: Would this be the document, Your Honor?

JUDGE MANASCO: That's it. So the next to last sentence says, My analysis of compactness shows the that Dr. Duchin's plans perform generally better on average than the enacted state of Alabama plans.

18:53:41 THE WITNESS: That's correct.

JUDGE MANASCO: Although some districts are significantly less compact than Alabama's and significantly better than Bill Cooper's plans.

THE WITNESS: That's correct.

18:53:52 JUDGE MANASCO: The last sentence says, In the hierarchy of redistricting criteria priorities, I assess the benefit of this accomplishment as being more than offset by the significant detrimental impact to the continuity of representation.

18:54:12 THE WITNESS: That is correct.

JUDGE MANASCO: So what I'm trying to understand is, do you or don't you put the traditional districting principles into a hierarchy as part of your analysis, and if you do, help me understand where the hierarchy comes from; and if you don't, 18:54:32 my question would be do you adhere to the last sentence of your rebuttal report.

THE WITNESS: Thank you, Your Honor. I would answer this as follows: I do not follow a rule that says any one in any given instance higher or lower than any other one. I 18:54:49 assess all of these redistricting criteria concurrently,

simultaneously watching what for the benefits and the drawbacks are of applying one particular redistricting criteria over or under another.

What is unique about the Duchin plan is that compactness 18:55:08 is selectively applied only in part of the plan and is not applied in part of the plan where she is seeking to optimize two black populations. In the area where she significantly changes, manipulates the districts, that being Districts 4 and 5, if I recall correctly, there is no other reason for 18:55:27 compactness to be changed or for those districts to be changed except solely for the purpose of compactness.

And it is my assessment that if a district -- in that case, if a district is significantly changed and the continuity of representation of that district is significantly disrupted 18:55:47 just for the sake of saying that the long historic bonds of a group of people that have been represented in the same area by the same representative for a long period of time, that, to me, is not a fair or good tradeoff.

You're sacrificing the continuity of representation of 18:56:07 these people just to say that your district looks more like a circle so that you can say it looks like a circle.

So in that instance, in that tradeoff, my professional assessment is that the fact that it looks more like a circle is not worth the tradeoff due the significant damage to continuity 18:56:23 of representation. That is not a hard and fast rule and

there's no fixed hierarchy that plays universally across all of those judgments.

JUDGE MANASCO: Understood. Okay. So for my second question, I want to return to the conversation about the metric for measuring the Black Voting Age Population and whether it should be any-part black or black alone. And I think you and Ms. Khanna for the Caster plaintiffs discussed the Georgia versus Ashcroft citation in your first report in Milligan and Caster. You don't have to refer to it specifically. I'm just going to ask you a general question about it.

THE WITNESS: Thank you.

JUDGE MANASCO: No problem. I know it's been a long day. And I took your testimony to be that in the course of preparing your analytics and in your report that you might rely on data analysis prepared by team members who worked for and with you in this kind of enterprise. Is that correct?

THE WITNESS: Yes, I do, and they're my direct supervision.

JUDGE MANASCO: Okay. And I heard you say that you had reviewed the Ashcroft decision some time ago, but not directly in the course of preparing this report.

THE WITNESS: Yes.

JUDGE MANASCO: And I assume your data analysts would not be doing that kind of work, they would be --

THE WITNESS: They had nothing to do with that.

18:58:02 JUDGE MANASCO: Okay. Is there any other material that is cited in any expert report you have prepared and filed that you did not personally review or have one of your team members review in connection with the preparation of the report?

THE WITNESS: Nope.

JUDGE MANASCO: Thank you.

JUDGE MARCUS: Judge Moorer? Any questions?

JUDGE MOORER: Yes, sir.

18:58:14 Mr. Bryan, there's no perfect redistricting plan that's possible to be drawn anywhere, is there?

THE WITNESS: No, Your Honor.

JUDGE MOORER: And every ten years, virtually, every state is going to make some changes to their redistricting to take into account population shifts and whatnot, right? 18:58:30

THE WITNESS: Yes, Your Honor.

JUDGE MOORER: And every plan is going to involve tradeoffs of compactness.

THE WITNESS: They always do, Your Honor.

18:58:43 JUDGE MOORER: Incumbency.

THE WITNESS: Yes.

JUDGE MOORER: And incumbency, when two incumbents are pitted in the same district because of redistricting, is something that incumbents can solve themselves if they want to by moving to another district, right? 18:58:58

THE WITNESS: If they choose to do so, yes.

JUDGE MOORER: Or staying in a district and running against whomever.

THE WITNESS: That is their choice, yes, Your Honor.

18:59:12 JUDGE MOORER: And no matter the incumbent, there's no rule that other people who are not incumbents cannot run and win against incumbents.

THE WITNESS: That's correct, Your Honor.

JUDGE MOORER: Whether that incumbent is pitted against somebody else who might be an incumbent or not. 18:59:29

THE WITNESS: Yes, Your Honor.

JUDGE MOORER: And sometimes people who were incumbents before run against current incumbents and win, don't they?

18:59:44 THE WITNESS: Yes, Your Honor, they do.

JUDGE MOORER: Do you know if the state looked at whether they could draw two minority districts when they were going through the redistricting process.

THE WITNESS: Allow me to restate the question to make sure I'm clear. You asked if -- 19:00:15

JUDGE MOORER: Let me ask you a more clear question.

THE WITNESS: Thank you, Your Honor.

JUDGE MOORER: Did the state map drawer as far as you know look at and draw potentially districts that would include two minority districts? 19:00:35

THE WITNESS: Your Honor, I have already testified that I have no knowledge of who the map drawer is, what their process was or what the iterations were that they went through and would be inappropriate for me to know so.

19:00:50 JUDGE MOORER: Okay. That's fine. I don't think I have any other questions.

JUDGE MARCUS: Thank you. I have one for you, Mr. Bryan.

You testified earlier that one of the areas of expertise 19:01:12 that you had was in estimating population shifts.

THE WITNESS: Yes, Your Honor.

JUDGE MARCUS: And you testified about that in a specific context when you were looking at population deviations and how they grew over a ten-year decennial period, right?

19:01:32 THE WITNESS: Yes, Your Honor.

JUDGE MARCUS: Did you review and is there anything in any of your reports that projected population splits based on race going back in time and going forward? For example, we know from this record what the African-American population was, 19:01:57 say, circa 1992, and then we have numbers in the year 2000 from the census and years in 2010 and 2020.

And if you look at those, you see a drop in the white population if the numbers I saw in one of these reports is right from roughly 73 percent to 63 percent of the Voting Age 19:02:24 Population. And conversely, the African-American population

grew somewhere between three and four from, say, 23 to 27, something roughly like that. That's in the record, right?

THE WITNESS: We performed no such population projections by race for the purpose of this analytic exercise, Your Honor.

JUDGE MARCUS: Okay. So you didn't make any projection from '21 to '31?

THE WITNESS: No, Your Honor.

JUDGE MARCUS: That's all I wanted to know. Thank you very much.

Any follow-up questions by any of the lawyers? Let me start with you, Ms. Khanna, and then turn to Mr. Dunn, and then finally Mr. Blacksher, and Mr. Davis, we will give you the last word because he's your witness.

Ms. Khanna? I'm sorry. You are muted. He did not hear you. Fire away. Thank you.

MS. KHANNA: Nothing from me, Your Honor. I would like to thank Mr. Bryan and the Court for its patience today.

THE WITNESS: Thank you, Ms. Khanna.

JUDGE MARCUS: Do you have anything further that you would like to ask, Mr. Dunn?

MR. DUNN: No. I think we have all had enough for today, Your Honor.

JUDGE MARCUS: Mr. Blacksher, anything further to follow up on anything the judges asked?

1118

MR. BLACKSHER: No, Your Honor.

JUDGE MARCUS: All right. Thank you much. Finally, Mr. Davis?

MR. DAVIS: No questions from me, Your Honor.

19:03:51 JUDGE MARCUS: All right. I thank you all.

We will adjourn for the day. We will reconvene Monday morning at 9:00 o'clock the usual time we had set, Central Standard Time. That would be 10:00 a.m. Eastern Standard Time.

Thank you all. We are in recess.

19:04:17 (Whereupon, the above proceedings were concluded at 7:04 p.m.)

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Christina K. Decker, RMR, CRR — 01-07-2022

Christina K. Decker, RMR, CRR — Date

Federal Official Court Reporter

ACCR#: 255