FILED
2022 Jan-18 PM 03:32
U.S. DISTRICT COURT
N.D. OF ALABAMA

1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ALABAMA
2                     SOUTHERN DIVISION

3

4     BOBBY SINGLETON, et al.,        *
                Plaintiffs,           *    2:21-cv-1291-AMM
5                                     *    January 11, 2022
      vs.                             *    Birmingham, Alabama
6                                     *    9:00 a.m.
      JOHN MERRILL, in his official   *
7     capacity as Alabama Secretary   *
      of State, et al.,               *
8               Defendants.           *
      ******************************** *
9                                     *
      EVAN MILLIGAN, et al.,          *
10              Plaintiffs,           *    2:21-cv-1530-AMM
                                      *
11    vs.                             *
                                      *
12    JOHN MERRILL, in his official   *
      capacity as Alabama Secretary   *
13    of State, et al.,               *
                Defendants.           *
14    ******************************** *
                                      *
15    MARCUS CASTER, et al.,          *
                Plaintiffs,           *    2:21-cv-1536-AMM
16                                    *
      vs.                             *
17                                    *
      JOHN MERRILL, in his official   *
18    capacity as Alabama Secretary   *
      of State, et al.,               *
19              Defendants.           *
      ******************************** *
20

21

               TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
22                      VIA ZOOM CONFERENCE
                            VOLUME VI
23           BEFORE THE HONORABLE ANNA M. MANASCO,
                THE HONORABLE TERRY F. MOORER,
24              THE HONORABLE STANLEY MARCUS

25

                   CHRISTINA K. DECKER, RMR, CRR
                   Federal Official Court Reporter
                       101 Holmes Avenue, NE
                       Huntsville, AL 35801
               256-506-0085/ChristinaDecker.rmr.crr@aol.com

1

2     Proceedings recorded by OFFICIAL COURT REPORTER, Qualified
      pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies
3         and Procedures Vol. VI, Chapter III, D.2.  Transcript
                  produced by computerized stenotype.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          <u>APPEARANCES</u>

2

   <u>FOR THE SINGLETON PLAINTIFFS:</u>
3

   James Uriah Blacksher
4  JAMES U. BLACKSHER, ATTORNEY
   825 Linwood Road
5  Birmingham, AL 35222
   205-612-3752
6  Fax: 866-845-4395
   Email: Jublacksher@gmail.com
7

   Myron C Penn
8  PENN & SEABORN LLC
   53 Highway 110
9  PO Box 5335
   Union Springs, AL 36089
10 334-738-4486
   Fax: 334-738-4432
11 Email: Myronpenn28@hotmail.com

12 Joe R Whatley, Jr
   WHATLEY KALLAS LLP
13 2001 Park Place North Suite 1000
   Birmingham, AL 35203
14 205-488-1200
   Fax: 800-922-4851
15 Email: Jwhatley@whatleykallas.com

16 Henry C Quillen
   WHATLEY KALLAS LLP
17 159 Middle Street Suite 2D
   Portsmouth, NH 03801
18 603-294-1591
   Fax: 800-922-4851
19 Email: Hquillen@whatleykallas.com

20 W Tucker Brown
   WHATLEY KALLAS LLC
21 P.O. Box 10968
   Birmingham, AL 35202-0968
22 205-488-1200
   Fax: 800-922-4851
23 Email: Tbrown@whatleykallas.com

24

25

Diandra "Fu" Debrosse Zimmermann
DICELLO LEVITT GUTZLER
420 20th Street North
Suite 2525
Birmingham, AL 35203
205-855-5700
Fax: 205-855-5784
Email: Fu@dicellolevitt.com

Eli Joseph Hare
DICELLO LEVITT GUTZLER LLC
420 20th Street North, Suite 2525
Birmingham, AL 35203
205-855-5700
Fax: 205-855-5784
Email: Ehare@dicellolevitt.com

FOR THE MILLIGAN PLAINTIFFS:

Deuel Ross
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th Street N.W. Ste. 600
Washington, DC 20005
(202) 682-1300
Dross@naacpldf.org

Leah Aden
Stuart Naifeh
Kathryn Sadasivan
Brittany Carter
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
Laden@naacpldf.org
Snaifeh@naacpldf.org

Davin M. Rosborough
Julie Ebenstein
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St.
New York, NY 10004
(212) 549-2500
Drosborough@aclu.org
Jebenstein@aclu.org

1       Kaitlin Welborn
        LaTisha Gotell Faulks
2       AMERICAN CIVIL LIBERTIES UNION
        OF ALABAMA
3       P.O. Box 6179
        Montgomery, AL 36106-0179
4       (334) 265-2754
        Kwelborn@aclualabama.org
5       Tgfaulks@aclualabama.org

6       David Dunn
        HOGAN LOVELLS US LLP
7       390 Madison Avenue
        New York, NY 10017
8       (212) 918-3000
        David.dunn@hoganlovells.com

9
        Michael Turrill
10      Harmony A. Gbe
        HOGAN LOVELLS US LLP
11      1999 Avenue of the Stars
        Suite 1400
12      Los Angeles, CA 90067
        (310) 785-4600
13      Michael.turrill@hoganlovells.com
        Harmony.gbe@hoganlovells.com
14
        Shelita M. Stewart
15      Jessica L. Ellsworth
        HOGAN LOVELLS US LLP
16      555 Thirteenth Street, NW
        Washington, D.C. 20004
17      (202) 637-5600
        Shelita.stewart@hoganlovells.com
18
        Blayne R. Thompson
19      HOGAN LOVELLS US LLP
        609 Main St., Suite 4200
20      Houston, TX 77002
        (713) 632-1400
21      Blayne.thompson@hoganlovells.com

22

23

24

25

1    Sidney M. Jackson
     Nicki Lawsen
2    WIGGINS CHILDS PANTAZIS
     FISHER & GOLDFARB, LLC
3    301 19th Street North
     Birmingham, AL 35203
4    Phone: (205) 341-0498
     Sjackson@wigginschilds.com
5    Nlawsen@wigginschilds.com

6

7    FOR THE CASTER PLAINTIFFS:

8    Abha Khanna
     ELIAS LAW GROUP LLP
9    1700 Seventh Avenue, Suite 2100
     Seattle, WA 98101
10   206-656-0177
     Email: AKhanna@elias.law

11

12   Aria C Branch
     ELIAS LAW GROUP LLP
     10 G St NE, Suite 600
13   Washington, DC 20002
     202-968-4490
14   Fax: 202-968-4498
     Email: ABranch@elias.law

15

16   Daniel C Osher
     ELIAS LAW GROUP
     10 G Street NE
17   Suite 600
     Washington, DC 20002
18   202-968-4490
     Email: DOsher@elias.law

19

20   Joseph N. Posimato
     Elias Law Group LLP
     10 G Street, NE; Suite 600
21   Washington, DC 20002
     202-968-4518
22   Email: Jposimato@elias.law

23   Lalitha D Madduri
     ELIAS LAW GROUP LLP
24   10 G Street NE, Suite 600
     Washington, DC 20002
25   202-968-4490
     Email: Lmadduri@elias.law

1    Olivia N. Sedwick
     Elias Law Group LLP
2    10 G Street, NE; Suite 600
     Washington, DC 20002
3    202-968-4518
     Email: Osedwick@elias.law
4

5    Richard P Rouco
     QUINN CONNOR WEAVER DAVIES & ROUCO LLP
6    Two North Twentieth Street
     2 20th Street North
7    Suite 930
     Birmingham, AL 35203
8    205-870-9989
     Fax: 205-803-4143
9    Email: Rrouco@qcwdr.com

10

11
12   <u>FOR THE DEFENDANT</u>:

13   Andrew Reid Harris
     OFFICE OF THE ATTORNEY GENERAL
14   CONSTITUTIONAL DEFENSE DIVISION
     501 Washington Avenue
15   Montgomery, AL 36130
     334-353-8891
16   Email: Reid.Harris@AlabamaAG.gov

17   Benjamin Matthew Seiss
     ALABAMA OFFICE OF THE ATTORNEY GENERAL
18   P.O. Box 300152
     501 Washington Ave (36104)
19   Montgomery, AL 36130
     334-353-8917
20   Fax: 334-353-8400
     Email: Ben.seiss@alabamaag.gov
21
     Brenton Merrill Smith
22   OFFICE OF THE ATTORNEY GENERAL OF ALABAMA
     P.O. Box 300152
23   501 Washington Avenue
     Montgomery, AL 36130
24   334-353-4336
     Fax: 334-353-8400
25   Email: Brenton.Smith@AlabamaAG.gov

Edmund Gerard LaCour, Jr.
OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
P.O. Box 300152
Montgomery, AL 36104
334-242-7300
Fax: 334-242-4891
Email: Edmund.Lacour@AlabamaAG.gov

James W Davis
OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
P O Box 300152
Montgomery, AL 36130-0152
334-242-7300
Fax: 334-353-8400
Email: Jim.davis@alabamaag.gov

Misty Shawn Fairbanks Messick
OFFICE OF THE ATTORNEY GENERAL
FOR THE STATE OF ALABAMA
501 Washington Avenue
P O Box 300152
Montgomery, AL 36130-0152
334-242-7300
Fax: 334-353-8440
Email: Misty.Messick@AlabamaAG.gov

Alexander Barrett Bowdre
OFFICE OF THE ALABAMA ATTORNEY GENERAL
P.O. Box 300152
Montgomery, AL 36130
334-242-7300
Fax: 334-353-8400
Email: Barrett.Bowdre@alabamaAG.gov

Thomas Alexander Wilson
STATE OF ALABAMA
OFFICE OF THE ATTORNEY GENERAL
501 Washington Street
Montgomery, AL 36103
334-242-7300
Fax: 334-353-8400
Email: Thomas.wilson@alabamaAG.gov

1     J Dorman Walker
      BALCH & BINGHAM LLP
2     P O Box 78
      Montgomery, AL 36101
3     334-834-6500
      Fax: 334-269-3115
4     Email: Dwalker@balch.com

5

6

7

8

9     COURTROOM DEPUTY:  Frankie N. Sherbert

10

11    COURT REPORTER:  Christina K. Decker, RMR, CRR

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*CHRISTINA K. DECKER, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, AL 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1                              **I N D E X**

2

3    DR. M.V. TREY HOOD, III                           1378
     DIRECT EXAMINATION                               1379
4    BY MR. SMITH
     CROSS-EXAMINATION                                1415
5    BY MS. GBE
     CROSS-EXAMINATION                                1444
6    BY MS. MADDURI
     CROSS-EXAMINATION                                1477
7    BY MR. QUILLEN
     REDIRECT EXAMINATION                             1494
8    BY MR. SMITH

9
     BRIDGETT KING                                    1499
10   DIRECT EXAMINATION                               1500
     BY MR. OSHER
11   CROSS-EXAMINATION                                1533
     BY MR. BOWDRE
12   REDIRECT EXAMINATION                             1610
     BY MR. OSHER
13

14   MARCUS E. CASTER                                 1618
     DIRECT EXAMINATION                               1619
15   BY MR. OSHER
     CROSS-EXAMINATION                                1638
16   BY MR. WALKER

17

18

19

20

21

22

23

24

25

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1           **P R O C E E D I N G S**

2                   (In open court.)

3           JUDGE MARCUS:  Good morning to everyone.  I hope you

4    didn't have to stay up too late as I did to watch

09:00:47  5    Georgia/Alabama last night.

6        With that, are the parties ready to proceed?  We are in

7    the middle of the presentation of the plaintiffs' case, but we

8    were going to accommodate the defense and take Dr. Hood out of

9    turn, if I had that right.

09:01:06 10       Do I have that right, Mr. Smith?

11           MR. SMITH:  That's right, Your Honor.

12           JUDGE MARCUS:  And the plaintiffs were agreeable to

13    that, and they are ready to proceed, I take it?

14           MR. BLACKSHER:  Yes, Your Honor.

09:01:20 15           JUDGE MARCUS:  All right.  And for Milligan and

16    Caster, I take it there's agreement on this order of

17    proceeding, as well.

18           MS. MADDURI:  Yes, Your Honor.

19           MS. GBE:  Yes, Your Honor.

09:01:31 20           JUDGE MARCUS:  Thank you very much.  And your next

21    witness, Mr. Smith, would be.

22           MR. SMITH:  Your Honor, Secretary of State calls

23    Dr. Trey Hood.

24           JUDGE MARCUS:  All right.

09:01:39 25                   DR. M.V. TREY HOOD, III,

```
 1  having been first duly sworn, was examined and testified as
 2  follows:
 3              JUDGE MARCUS:  Thank you very much.  And if you would
 4  state your name, your full name for the record, I would be much
 5  appreciative.
 6              THE WITNESS:  Certainly, Your Honor.  It's M.V. Hood,
 7  III.
 8              JUDGE MARCUS:  Dr. Hood, thanks very much, and
 9  Mr. Smith, you may proceed with your direct.
10              MR. SMITH:  Thank you, Your Honor.
11                        DIRECT EXAMINATION
12  BY MR. SMITH:
13  Q    Good morning, Dr. Hood.
14  A    Good morning.
15  Q    Dr. Hood, have you been retained as an expert in this
16  case?
17  A    Yes.
18  Q    And have you prepared expert reports as part of this case?
19  A    Yes.
20  Q    And do you have copies of those reports handy?
21  A    I have printed copies of the reports in front of me, yes.
22  Q    Great.  I will be referring to those periodically.  And
23  for the Court's benefit, those are Defendants' Exhibit 5 and 6,
24  the initial and rebuttal reports.
25       So, Dr. Hood, your initial report, Exhibit 5, if you turn
```

09:01:57
09:02:08
09:02:12
09:02:22
09:02:41

```
 1   to page 20 of that report based on the ECF header in the top
 2   right corner, is that a copy of your CV?
 3   A    Yes.
 4   Q    And is your CV a complete and accurate summary of your
 5   background and professional experience?
 6   A    Yes.
 7   Q    Dr. Hood, if you would, could you briefly summarize your
 8   educational background for the Court?
 9   A    Certainly.  I've got three degrees in political science, a
10   B.S. from Texas A&M, an M. A. From Baylor University, and a
11   Ph.D. from Texas Tech University.
12   Q    And how are you employed, Dr. Hood?
13   A    I am currently a professor of political science and
14   director of the SPIA Research Center at the University of
15   Georgia.
16        I have been at the University of Georgia since 1999.
17   Q    And what classes do you teach?
18   A    I teach a variety of classes in American politics.  Right
19   now, I'm teaching a class in southern politics.  I teach
20   introductory sections of American government.  I have taught
21   undergraduate methods courses.  I teach a survey research
22   internship course right now, as well.  So I have taught a
23   variety of classes in American politics and policy over the
24   years.
25        I have taught graduate classes in southern politics and
```

09:03:13 (line 5)
09:03:28 (line 10)
09:03:47 (line 15)
09:04:05 (line 20)
09:04:23 (line 25)

1   election administration, as well.

2   Q    And do you conduct empirical social science search?

3   A    Yes.  Almost all of the research I have conducted in my

4   career as a social scientist has been empirical in nature.

09:04:46  5   Q    And do you have any principal areas of research?

6   A    Generally, American politics and policy; more

7   specifically, southern politics and election administration

8   again.

9        I sort of specialize in voting behavior, public opinion,

09:05:08 10   southern politics, racial politics, and election

11   administration.  Sometimes people call it election sciences

12   today, but the study of how elections are carried out.

13   Q    Thank you, Dr. Hood.

14   A    Sort of the mechanical process for how elections are

09:05:25 15   carried out.

16   Q    Thank you, Dr. Hood.  And have you received any external

17   grants to study issues related to those areas of research?

18   A    I have received grants over the years from the Pew

19   Charitable Trust, from the National Science Foundation.

09:05:40 20   Recently, we received a grant to study absentee by-mail

21   balloting in the 2020 election during the pandemic.  I also for

22   the -- I believe it's the Center For Election Innovation and

23   Research, we received a grant to conduct research on behalf of

24   the Secretary of State's office in Georgia looking at the

09:06:01 25   implementation of a new ballot marking voting system that the

1   state implemented in 2020.

2   Q     And, Dr. Hood, turning to page 2 based on the ECF header

3   of your report, do you include a list of the cases in which you

4   have served as an expert in the last five years?

09:06:22 5   A     Yes.

6   Q     And approximately how many cases is that?

7   A     Looks like 15.

8   Q     And have you been accepted as an expert witness in cases

9   involving redistricting before?

09:06:35 10   A     Yes.

11   Q     Have courts previously credited and relied on your

12   analysis?

13   A     Yes.

14   Q     Have you previously served as an expert in the state of

09:06:46 15   Alabama?

16   A     Yes.

17   Q     And did the Court accept you as an expert in that case?

18   A     Yes.

19          MR. SMITH:  Your Honors, at this time, we would tender

09:06:59 20   Dr. Hood as an expert in the fields of political science,

21   empirical social science research, and for the matters

22   discussed in his reports.

23          JUDGE MARCUS:  Is there any challenge to his

24   qualifications from any of the parties, Milligan, Singleton

09:07:18 25   Caster?

1          MR. QUILLEN:  Not from Singleton, Your Honor.

2          MS. GBE:  Not from Milligan, Your Honor.

3          JUDGE MARCUS:  And Caster?

4          MS. MADDURI:  No, Your Honor.

09:07:29  5          JUDGE MARCUS:  Thank you.  You may proceed.

6     Dr. Hood is accepted as an expert in the fields you have

7 delineated, Mr. Smith.

8          MR. SMITH:  Thank you, Your Honor.

9 BY MR. SMITH:

09:07:38 10 Q    Now, Dr. Hood, turning on to page 3 of your report.  And

11 just generally, can you describe the scope of what you were

12 asked to do?

13 A    Certainly.  It was fairly narrow.  I was asked to provide

14 in this particular case a functional analysis for District 7,

09:08:02 15 as it was drawn in 2021 and for District 6 and 7 in the

16 Singleton Plan.

17     And I also wrote a short section on conservative white

18 support for minority Republican candidates.  And that was about

19 it.

09:08:22 20 Q    Thank you, Dr. Hood.

21     And could you briefly summarize the steps you took to

22 carry out your functionality analysis?

23 A    So that begins on page 2 of my report, or page 3, as it's

24 stamped.  That's where the district functionality analysis

09:08:44 25 start.  And I went through a number of steps that are outlined

| | |
|---|---|
| 1 | for each one of these districts as encompassed.  So would you |
| 2 | like me to walk through an example, or... |
| 3 | Q    Yes.  Let me share my screen. |
| 4 | And if I could, this is your report, Exhibit 5. |
| 09:09:27 5 | And so does your functionality analysis, the first one |
| 6 | starts on page 4 or 5 based on the stamp, right? |
| 7 | A    Correct.  Correct. |
| 8 | Q    And why don't you walk us through what we're seeing here? |
| 9 | A    Okay.  So I guess to back up for just a second, the first |
| 09:09:42 10 | thing we have to do is collect some data.  I collected voting |
| 11 | data for the 2018 gubernatorial election and the 2020 |
| 12 | presidential election from the Alabama Secretary of State's |
| 13 | office at the precinct level.  And I also collected data from |
| 14 | the Alabama Secretary of State's office on registration and |
| 09:10:07 15 | turn out by race.  And, again, that can be aggregated at the |
| 16 | precinct level, which is what I did. |
| 17 | So I combine those sources of data, as well.  What we have |
| 18 | to do is come up with an estimate of how the different racial |
| 19 | groups are voting for the different candidates, and that's the |
| 09:10:30 20 | first part of what we see here in Table 1.  I used a commonly |
| 21 | accepted method in the social sciences and in court proceedings |
| 22 | called ecological inference to petition the vote by race for |
| 23 | these various candidates.  That's what you see.  The results of |
| 24 | that are what you see in Table 1. |
| 09:10:53 25 | So the confidence intervals are down below that bracket, |

1  below the point estimates.

2      So, for instance, it's estimated that 98.6 percent of

3  African-Americans in Alabama in this particular district as is

4  drawn voted for Democrat Joe Biden.

09:11:16  5      So and you can just read across the table here.  So that's

6  the results of my ecological inference estimates for CD 7.  I

7  call it enacted CD 7.  It was the district passed by the

8  Legislature in 2021.

9  Q    And then, Dr. Hood, once we have those estimates, what's

09:11:40 10  the next step in the analysis?

11  A    Well, the next step I undertook was to go back and look at

12  -- so I got this data from the reapportionment office, the

13  legislative reapportionment office in Alabama.  And these are

14  just the VAP or the Voting Age Population numbers for this

09:12:02 15  particular district.  But the percent in the literal number of

16  people over there to the right in Table 2 so we can see that

17  this district, as drawn, was 54.22 percent Black VAP, which

18  equates to 308,006 voters in this case.

19      So I am going to use those data in a subsequent step.  You

09:12:30 20  can see that these numbers of voters in Table 2 to the far

21  right are then inserted down in the left column of Table 3.  So

22  those are the exact same numbers.

23      And then, again, having previously collected the turnout

24  registration data, we can calculate turnout by race using those

09:12:55 25  data to come up with an estimate of how many black, white, and

1  other voters we would have in this district.  So that's what's

2  going on there.  Those are the turnout percentages that I

3  calculated in Table 3 in the middle column.  I am multiplying

4  those by the number, the VAP numbers in the left-hand column to

09:13:19  5  get the number of voters in the right-hand column.  So that's

6  just multiplication of that fraction.

7      So I am trying to get an idea of what the electorate in

8  this district that's just been drawn might look like.

9  Q    And, Dr. Hood, could you explain briefly how you got this

09:13:38 10  turnout percentage figure?

11  A    So like most states, Alabama has voter registration

12  database.  Unlike most other states, except for a handful,

13  Alabama does have information on the race of registrants in

14  this database.

09:13:58 15      Like other states, Alabama calculates or puts together a

16  voter history database, which tells you whether someone turned

17  out to vote in the gubernatorial election or not.  So you can

18  combine these two databases together in order to figure out,

19  you know, what -- how many people turned out and who were these

09:14:19 20  people.

21      So, and again, you can't do that in most states, but we

22  can do that in Alabama.  Most states just don't track

23  registrant data by race.

24  Q    Thank you, Dr. Hood.

09:14:34 25      And then once you have the turnout percentage, what's the

1  next step after that?

2  A     So then you've got the number of voters that we

3  calculated, and we are going to take the number of voters in

4  Table 2 to the far right-hand column and then multiply those by

09:14:54  5  the breakdown we get in Table 1 for the vote totals.  So we are

6  going to de-aggregate the data based on how these racial groups

7  are voting, and then we are going to reaggregate the data

8  together to figure out what percent Democratic vote there was,

9  what percent Republican vote there was, and what percent other

09:15:19  10  vote there was in this case.

11  Q     And then that reaggregation, is that what we say in Table

12  4?

13  A     Yes.  That's the last step.  So you've put these various

14  data sources and calculations together and add them up, and

09:15:44  15  then, again, divide by the electorate, and the estimate is that

16  in this given district based on the election analysis from the

17  2020 presidential election, the Democratic vote percentage

18  would be 60.75 percent.  The Republican vote percentage would

19  be 37.24 percent.

09:16:07  20      So this gives us some idea, hopefully, of how this

21  district might function in a future election based on these

22  previous election results.

23  Q     So this table shows us how based on your analysis it

24  appears that the enacted District 7 would function in a

09:16:29  25  hypothetical future election?

```
 1   A    Yes.  Yes.  You know, we've never had an election run in
 2   this particular district, obviously.  So we're having to use
 3   previous election results to make an inference about the
 4   future.
 5   Q    And, Dr. Hood, I am not going to run through each of the
 6   steps again, but then you repeat the same analysis, but using
 7   data from the 2018 gubernatorial election?
 8   A    The exact same analysis is repeated except the election is
 9   different.  We use -- I use the 2018 gubernatorial election,
10   and the process is repeated also for the other Districts 6 and
11   7 in the Singleton plan.  And I believe -- so I go through the
12   steps again, the exact same steps for each one of these as
13   outlined in the district that we just talked about.  And I
14   think -- let's see.  To make things easier on myself, there's a
15   summary table on page 14 stamped -- yes.  So that's just a
16   summary of the results, the estimated Democratic vote share
17   that were produced by these analyses that were carried out.
18   Q    And so were there any differences in the methodologies in
19   how you calculated the vote shares for these particular
20   districts?
21   A    No.  The exact same process was repeated again and again
22   for each one of these districts.
23   Q    Can you briefly summarize the results of what you found
24   after performing this functionality analysis?
25   A    Sure.  For enacted CD 7, based on the 2018 gubernatorial
```

09:16:42 — line 5
09:17:07 — line 10
09:17:33 — line 15
09:18:07 — line 20
09:18:25 — line 25

data, the estimated vote share for the Democratic candidate
would be 66.86 percent.  Based on the 2020 presidential
election, it would be 60.75 percent.

Then CD 6 for the Singleton plan, my estimate from the
2018 gubernatorial election would be 52.28.  Then for the 2020
presidential election, it would be 52.03.

Then for CD 7 in the Singleton plan from the gubernatorial
election, it would be 55.48.  And for the 2020 presidential
election, it would be 49.13.

Q    And, Dr. Hood, I would like to back up just a little bit
based on that last stat, and Table 20, could you summarize what
you see from the vote shares for this particular election?
This is on page 12.

A    Okay.  What's the question?

Q    Can you just summarize the vote shares from this table,
for this hypothetical election?

A    Okay.  For CD 7 and from the Singleton plan, let's see.
That would be based on the presidential vote from 2020, the
Democratic vote share would be 49.13.  Again, the estimated
Democratic vote share.  The estimated Republican vote share
would be 48.92, and the independent candidates or the other
candidate would have received 1.94 percent.

Q    Thank you, Dr. Hood.  So in each of these elections that
you analyzed, the Democratic candidate received more votes than
the Republican candidate?

1    A    Yes.

2    Q    What is your opinion as to whether Singleton District 6

3    would function in an actual election?

4    A    Would it function in terms of producing a Democratic

09:20:54  5    majority?  Is that fair?

6    Q    Yes.

7    A    Okay.  Quite possibly.  One of the estimates from the 2020

8    presidential election was only 52 percent.  The other was

9    higher at 58 percent.  So it's quite possible it might.  Again,

09:21:13  10    I raised some other questions.  There are some things to think

11    about at the end of this section that we can talk about, but

12    it's -- it's more Democratic leaning, I would say, than CD 7

13    under the Singleton plan certainly, which at least one estimate

14    fails to produce a Democratic majority.

09:21:38  15    Q    So, Dr. Hood, in your opinion, would the Singleton

16    District 6 and 7 consistently elect the black candidate of

17    choice?

18    A    Well, I have got some questions about 7, whether it would

19    consistently do so.  There would be a higher probability in 6,

09:21:59  20    but, again, if we are closer to 50 percent, again, there's some

21    things that we have to consider.  One, you know, using EI

22    estimates, those estimates or those point estimates come with a

23    margin of error around them.  If the point estimate is truly

24    towards the lower end of that margin of error, that will lower

09:22:25  25    the Democratic vote share.  And then also issues with

1  differential privacy.  I mean, we are drawing districts to be a

2  certain percentage, or once we draw the district, we can look

3  at the numbers and see what the racial percentage is, but

4  because of differential privacy concerns put in place by the

09:22:46 5  Census Bureau, we're not exactly sure, and there's no way to

6  know exactly what the racial percentage in the district

7  actually is.

8  Q    And, Dr. Hood, could you explain a little bit what you

9  mean by differential privacy?

09:23:02 10  A    Right.  So below the -- so I have got a section in the

11  report, which is on pages 14 and 15 and is stamped, and in

12  order to avoid -- or in order to protect privacy, I guess is

13  the way to put it, the Census Bureau introduces noise into the

14  data at lower levels of geography below the state level,

09:23:33 15  including down to the block level, which is where we usually

16  draw districts.  And so it's very hard to tell exactly what the

17  racial percentage of a district might be because of the

18  differential privacy put in place by the Senate or the

19  disclosure avoidance system is what they might call it, so...

09:23:59 20  Q    And, Dr. Hood, when you say they put noise into it, into

21  the data, what do you mean by that?

22  A    Well, what they have done is they have made it impossible

23  essentially for someone outside the Census Bureau to know what

24  the true racial numbers are down to the block level.  You know,

09:24:24 25  they will aggregate -- these numbers will aggregate and be

```
 1  correct at the state level, but below that level, there is

 2  noise that's been introduced into the data that makes it

 3  impossible for someone to know with certainty exactly what

 4  those numbers are, someone on the outside of the Census Bureau.

 5  Q    Thank you, Dr. Hood.  And Dr. Hood, in your opinion, would

 6  the enacted District 7 consistently elect the black candidate

 7  of choice?

 8  A    It should, yes.  It's over 60 percent in both of those

 9  elections I looked at.

10  Q    And, Dr. Hood, you mentioned racially-polarized voting at

11  times in this section.  What do you mean by that phrase?

12  A    Well, what we're looking for, again, this sort of gets to

13  prong 2 of the Gingles test or the Gingles analysis, does the

14  minority group -- in this case, we could just talk about

15  African-Americans in Alabama, did they have a clearly defined

16  candidate of choice, you know, and does that -- if so, does

17  that clearly defined candidate of choice differ from the white

18  majority or the white-voting block?  Whites may or may not be

19  in the majority depending on the district configuration, but do

20  they have -- do whites have a different clearly defined

21  candidate of choice from the black community?  That's another

22  way of talking about if that's the case that there is

23  racially-polarized voting.  You have one group, one racial

24  group voted in one direction, and another racial group voting

25  in another direction.
```

09:24:44 5
09:25:02 10
09:25:30 15
09:25:52 20
09:26:12 25

1  Q     Do you draw any conclusions based on that about the intent

2  of those voters?

3  A     Not intent.  It's just is the pattern there or not, the

4  statistical pattern.

09:26:31 5  Q     So you don't offer any opinion in your report about the

6  intent of any voters in voting the way they do?

7  A     I do not, no.

8  Q     And, Dr. Hood, did you perform any functionality analyses

9  of primaries in your report?

09:26:47 10  A     No, I did not.

11        The turnout in registration databases that I was using in

12  my report, I could not get copies of those databases around the

13  time of the primary elections.  So I did look into that, but

14  from the Secretary of State's office, those data were not

09:27:11 15  available to me.

16  Q     Thank you, Dr. Hood.

17        And, Dr. Hood, I want to turn to Section 4 of your report

18  starting on page 16, White Support For Minority Republican

19  Candidates.  Dr. Hood, have you researched white support for

09:27:35 20  minority Republican candidates?

21  A     Yes.  A co-author and myself wrote a peer-reviewed

22  published article on this topic.

23  Q     And what did you find in that research?

24  A     Well, we were looking at general election outcomes, and we

09:27:49 25  were comparing -- so general election outcomes for

1  gubernatorial and U.S. Senate elections, and we used survey

2  data to see if white conservatives would support black

3  Republican candidates at the same rate as white Republican

4  candidates.

09:28:07 5       And, in fact, we found that that was the case.  And

6  sometimes white conservatives' support for Republican minority

7  candidates was even higher than for white Republican candidates

8  in these particular elections.

9  Q    And what sorts of elections were you looking at?

09:28:28 10 A    These were general elections for U.S. Senate and Governor.

11 Q    Have you examined any instances of Republican support for

12 minority candidates in Alabama?

13 A    Well, I give an example.  I do have one example here from

14 pretty recent history, where Paschal, a black Republican, was

09:28:52 15 elected from a state House district in Shelby County, Alabama.

16 Q    And what do you find significant about that election?

17 A    Well, you know, given the racial composition of the

18 district, which is -- which was -- was, I guess you could say

19 since it's in the past 84.1 white VAP, no candidate's going to

09:29:16 20 win without majority-white support in that district.  And

21 Paschal does end up winning that seat.  So he obviously had the

22 support of white voters in that particular district.

23 Q    And, Dr. Hood, are you aware of the criticisms of some of

24 the other experts in this case that you should have considered

09:29:39 25 the 2016 GOP primary in this section?

1  A     Yes.

2  Q     And do those criticisms give you any concern?

3  A     Well, it doesn't nullify this example or the work that I

4  did -- the published work I did in this article, certainly.

09:29:54  5  And it's just one example where, of course, the example being

6  Ben Carson running in the Republican presidential primary race.

7  He does not win.  That doesn't necessarily give me pause or

8  nullify the findings in this particular section, as I have laid

9  them out here.

09:30:16  10  Q     Thank you, Dr. Hood.

11        And, Dr. Hood, I am going to share my screen with you.

12  Can you see this document, Document 68 on the front?

13  A     Yes.

14        MR. SMITH:  For the Court's benefit, this was

09:30:44  15  initially submitted as 68 and was subsequently renumbered as

16  S-44.

17        JUDGE MARCUS:  In the record now, it's S-44, correct?

18        MR. SMITH:  That's right, Your Honor.

19        JUDGE MARCUS:  Thank you.

09:30:57  20  BY MR. SMITH:

21  Q     And, Dr. Hood, do you recognize this document?

22  A     Yes.

23  Q     And do you have a copy of it with you there?

24  A     Yes, I do.

09:31:08  25  Q     And, Dr. Hood, turning to page 14 of that report, page 14,

```
 1   as the bottom number gives it.  It's hard to tell from the
 2   stamp what page it is.  It's the --
 3   A     Okay.  Gotcha.
 4   Q     Section 6, black voting patterns?
 5   A     Okay.
 6   Q     Would you briefly summarize what you're asked to do in
 7   this section of the report?
 8   A     In this section of the report, I was asked to look at
 9   black voting patterns, and I did so using survey data.  And I
10   compared black voting patterns in Alabama to black voting
11   patterns in another 20 states, both in the South and outside of
12   the South that had a black population of at least 10 percent or
13   greater.  So I used a large-scale social science survey that's
14   been going on for a number of years called the -- used to be
15   called the CCES.  Now, it's called the Comparative Election
16   Study.  I also used the exit polls that are produced by the
17   news consortiums after each general election, or during each
18   general election.
19         So I collected data on presidential vote shares,
20   gubernatorial vote shares and U.S. Senate.  And in some cases,
21   I had data on U.S. House races, as well.
22   Q     And, Dr. Hood, let me back up and ask sort of more of a
23   threshold question.  Was this a report that you submitted as
24   part of the Chestnut v. Merrill case?
25   A     It was, yes.
```

09:31:39
09:31:55
09:32:18
09:32:41
09:32:58

1  Q    And that's been -- that was about two years ago, right?

2  A    At least.  Pre-pandemic.  Pre-pandemic, for sure.

3  Q    And have you had an opportunity to review this document

4  recently?

09:33:17  5  A    I did look back over it, yes.

6  Q    Thank you, Dr. Hood.

7       So in this first section, the 20 states you listed, do

8  they include southern states?

9  A    Oh, certainly.  Yes.

09:33:34 10  Q    And northern states, as well?

11  A    Yes.

12  Q    And midwestern states?

13  A    Yes.  Again, it's on page 14, Arkansas, Connecticut,

14  Delaware, Florida, Georgia, Illinois, Louisiana, Maryland,

09:33:50 15  Michigan, Mississippi, Missouri, New Jersey, New York, North

16  Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Texas,

17  and Virginia.

18  Q    Thank you, Dr. Hood.

19       And, Dr. Hood, on page 15, based on the number at the

09:34:21 20  bottom, do you go over the results of what you find based on

21  one of these sets of data?

22  A    Yes.  Are you looking specifically at Table 9 or 10?

23  Q    Well, what are we seeing in Table 9?

24  A    So those are the comparison of black voting patterns in

09:34:45 25  these 20 states.  And it is just sort of summarized there.  So

```
         1  across all races on average, the Democratic vote share from
         2  black voters was 91.1 percent; specifically for presidential
         3  elections, it was 93.6 percent; for gubernatorial elections,
         4  89.3; and for U.S. Senate, it was 90.1.
09:35:13 5  Q    So based -- the use of this survey data allow you to make
         6  inferences about black voting patterns?
         7  A    Certainly, yes.  That -- the inference being and not
         8  really a surprise to me that overwhelmingly the black
         9  communities supports Democratic candidates at 90-plus percent.
09:35:38 10 Q    And what years did you review in conducting this analysis?
        11  A    2008 through 2018.
        12  Q    And this 90.1 percent figure, does it include Alabama?
        13  A    No.  Alabama's down below in Table 10.
        14  Q    And so what figure did you find for Alabama?
09:36:00 15 A    The comparable figure the average of the averages across
        16  all these races for Alabama was 94.3 percent.
        17  Q    And in your opinion, are those comparable rates of turnout
        18  -- or of support?  Excuse me.
        19  A    Vote share, yes, certainly.  Again, 90-plus percent in
09:36:19 20 Alabama, 90-plus percent in these other 20 comparison states.
        21  Q    And, Dr. Hood, in Tables 11 and 12, did you repeat this
        22  analysis, but using the CCES data?
        23  A    Yes.  So different data source, again the CCES -- or what
        24  was called the CCES, now the CES is a large-scale survey,
09:36:45 25 public opinion survey, so...
```

```
 1  Q     And what did you find?
 2  A     Well, very similar numbers.  91.5 percent to the
 3  comparison states and 90.9 percent.  So a little bit lower for
 4  Alabama, but not much, a couple of points.  So for Alabama,
 5  it's 94 percent with one data set and 91 percent with the
 6  other.
 7  Q     So did you find any significant differences in black
 8  support for Democratic candidates in Alabama and black support
 9  for Democratic candidates in other states?
10  A     No.
11  Q     And that includes states outside the South?
12  A     Yes.
13  Q     And throughout the country?
14  A     Yes.  Yeah.
15  Q     So on average, both in Alabama and throughout the country,
16  black voters support Democratic candidates at rates of above
17  90 percent?
18  A     Correct.
19  Q     So, Dr. Hood, given these high levels of support for
20  Democratic candidates among black voters, as far as you are
21  aware, would voting be racially polarized any place in America
22  with both black voters and where white voters tend to vote for
23  Republicans?
24  A     Well, if you had -- I mean, so from these data, we can
25  certainly infer that almost always the preferred candidate of
```

1   choice for the black community is going to be a Democratic

2   candidate.

3        So if you had on the other side say a majority of white

4   conservatives comprising that electorate, then, yes, that

09:38:26 5   community's preferred candidate of choice is probably going to

6   be a Republican.

7        So from my previous statement about what is

8   racially-polarized voting, yes, that would probably result in

9   racially-polarized voting.

09:38:40 10  Q    Dr. Hood, in the recent era, have you ever heard of racial

11  polarization existing where a majority of white voters

12  supported Democrats?

13  A    Well, in that hypothetical, it wouldn't be possible, I

14  don't think, because if you had a majority of white voters

09:38:59 15  supporting the Democratic candidate, then again, at least from

16  this data, a majority of African-American, more than a majority

17  would support the Democratic candidate, as well.  They would

18  both have the same preferred candidate of choice, both racial

19  groups.  Hence, you wouldn't have racially-polarized voting.

09:39:19 20  Q    Dr. Hood, to the best of your knowledge in the modern era,

21  has racial polarization only been found to exist where whites

22  tend to vote for Republicans?

23  A    Well, I think that would have to be almost a necessary

24  precondition.  Again, if a majority of whites are voting

09:39:42 25  Democratic, you are not going to end up with a situation where

1  you have racially-polarized voting.

2  Q    Thank you, Dr. Hood.

3       And now I am going to turn to Section 7 of your *Chestnut*

4  report on page 17.  And what analysis did you perform here?

09:40:00 5  A    I was asked to do a comparison.  And, again, I am looking

6  at Alabama, and I am using the same 20 states that we just

7  talked about that all had a black population of at least

8  10 percent or greater.

9       And here I am doing just a number of racial comparisons

09:40:21 10  between whites and blacks in these different states on quite a

11  few different metrics.

12      So things like education, poverty rate, home ownership,

13  infant mortality, you know, there are quite a few comparisons

14  between blacks and whites in these 21 states, 21 including

09:40:45 15  Alabama.  And the results of these comparisons --

16              JUDGE MARCUS:  Was there --

17              MS. GBE:  Yes, Your Honor.  This is Harmony Gbe on

18  behalf of the Milligan plaintiffs.  I wanted to object to this

19  line of questioning because it goes beyond the scope of

09:41:02 20  Dr. Hood's report, and it's basically speculation.

21              JUDGE MARCUS:  Mr. Smith, I take it you're proffering

22  Dr. Hood now beyond the issues of racial polarization and

23  offering him as an expert on the Senate Factors 1 to 8 or 1 to

24  9.  Is that where we are going?

09:41:24 25              MR. SMITH:  Well, Your Honor, we have offered him as

an expert in political science and on empirical social science

research, and this is part of a report that he did in a

previous case that employed those methods to find some of those

factors.  But, yes, it would be relevant to the --

09:41:39    JUDGE MARCUS:  You are offering him -- I understand

that he has the expertise as a general matter to opine beyond

simply racial polarization, and you are offering this for the

Senate Factors.

My question -- I have that right, correct?

09:41:59    MR. SMITH:  Yes.

JUDGE MARCUS:  The objection is that in this case, the

report he had offered did not go into *Gingles I* through *VII*,

and they were unaware that you were proffering him to provide

expert opinion on Senate Factors 1 to 8; that you have gone

09:42:22 beyond the scope with the oral testimony of what his expert

report covered, that you're introducing a new basic kind of

analysis covering a different area.

MR. SMITH:  Well, Your Honor, the Singleton --

JUDGE MARCUS:  Is that a fair statement?  I guess

09:42:41 they're saying they simply were unaware, perhaps, that Dr. Hood

would be opining about the Senate Factors here.

MR. SMITH:  Well, Your Honor, I don't think that can

be the case.  The Singleton plaintiffs put this exhibit in

evidence, and it's already been received.  It was listed on

09:42:59 Milligan's own second amended exhibit list to that nature.  And

the Caster plaintiffs have offered a transcript of Dr. Hood's

testimony from *Chestnut*.  I think that if this evidence is

going to be in the record, then Dr. Hood should be allowed to

testify about it on direct.

09:43:17  JUDGE MARCUS:  Counsel?

MS. GBE:  Your Honor.

JUDGE MARCUS:  Is it true that the Singleton put this

into evidence in the first place, and Caster put his testimony

into evidence in the second?

09:43:30  MS. GBE:  I believe that that's true, Your Honor.  But

we --

JUDGE MARCUS:  Why would it be -- I guess why would it

be unfair and why would it go beyond the scope of the

plaintiffs' case to allow him to talk about a report that the

09:43:47  plaintiffs actually put in albeit in another case?

MS. GBE:  Well, Your Honor, a lot of the facts that

Dr. Hood is testifying to are irrelevant to this case.  For

example, the exit poll information was not considered in his

expert report.  And it's just as we stated earlier, outside of

09:44:08  the scope of what he provided in his report.  So we think it

shouldn't be allowed.

JUDGE MARCUS:  The objection is overruled.  You may

proceed, Mr. Smith.  And you may, of course, cross-examine him

on anything that he says, as may the Caster folks, and as may

09:44:26  Singleton.

1          You may proceed, Mr. Smith.

2               MR. SMITH:   Thank you, Your Honor.

3     BY MR. SMITH:

4     Q    So, Dr. Hood, the comparison states you're using here,

09:44:36 5    they're the same as were in the last set?

6     A    Yes, that's correct.  Alabama and the other 20 states we

7     talked about previously.

8     Q    And, Dr. Hood, just to kind of illustrate, we won't go

9     through each table, but looking at Table 13, can you explain

09:44:57 10   what data you used and how you analyzed it as --

11    A    I used different data sources for different metrics.   In

12    this case, I am using the Census Bureau data from the American

13    Community Survey, which is very commonly used for this kind of

14    thing to look at educational attainment rates by race for these

09:45:20 15   states.

16    Q    And what do you find based on this table?

17    A    This, for instance, looking at the Alabama line up at the

18    top there, this is the percentage of whites and blacks in

19    Alabama over on the left that have received a high school

09:45:43 20   degree or equivalency degree.  So 87.7 percent of whites in

21    Alabama have a high school education or equivalency versus

22    81.6 percent of black Alabamians.  So the difference between

23    those, literally just the difference, the subtraction is

24    6.1 percent.

09:46:02 25        So in this case, a positive difference would indicate that

1  education attainment by the white community is higher than that

2  for the black community.

3      And then you can see I've listed the congruent statistics

4  for each one of these comparison states.  And then the average

09:46:25 5  for the 20 states -- not for Alabama, but the average for the

6  20 states at the bottom there.  And then over on the right-hand

7  columns, it's the same process, except here we're looking at

8  who's obtained at least a college degree or higher by race.

9      So, again, positive differences would mean that the white

09:46:48 10  community had a higher educational attainment rate, at least on

11  this particular metric, than the black community.

12  Q    And, Dr. Hood, are the difference for Alabama and the

13  average, is there any significance as to whether it's larger or

14  smaller?

09:47:08 15  A    Well, one can make that comparison, certainly.  The data

16  are here.  You know, what struck me across all the comparisons

17  I did on these particular metrics is that the disparity rate

18  between whites and blacks in Alabama as well as all these other

19  states was there.  So I don't think there was a single instance

09:47:35 20  where the disparity rate was higher for whites than it was for

21  blacks on any of these metrics that I looked at.

22  Q    So in this table specifically, you find that there's a gap

23  between -- did you find that there is a gap between white and

24  black residents of Alabama in educational attainment?

09:47:54 25  A    Yes, I did.

```
 1  Q    And did you find that a similar gap existed in each of the
 2  other 20 states that you reviewed?
 3  A    Yes, I did.
 4  Q    And, Dr. Hood, I think you mentioned you performed a
 5  similar analysis for several other characteristics?
 6  A    Yes.  Quite a number.  I mean, it's not an exhaustive
 7  list.  I mean, we could keep coming up with different
 8  comparisons, but I compared a number of sort of commonly used
 9  sociodemographic characteristics.
10  Q    And, Dr. Hood, I am not going to have you run through the
11  methodology again.  Would you just flip through this report and
12  tell the Court what those other characteristics you looked at
13  were?
14  A    Certainly.  Table 14 looks at the proportion of the
15  state's population that are receiving food stamps.  Table 15
16  looks at median household income.  Table 16 looks at per capita
17  income.  Table 17 looks at the poverty rate.  Table 18, home
18  ownership.  Table 19, unemployment rates.  And Table 21, infant
19  mortality rates.
20  Q    And, Dr. Hood, was there any characteristic in any state
21  that you reviewed where you did not find a gap?
22  A    I don't believe so.  I believe there was -- there was
23  always this gap present.
24  Q    And, Dr. Hood, is that true both in Alabama and all of the
25  20 comparison states that you reviewed?
```

Line timestamps: 09:48:05 (line 5), 09:48:25 (line 10), 09:48:42 (line 15), 09:49:10 (line 20), 09:49:29 (line 25)

1   A      Yes, it is.

2   Q      Is that true both in northern and southern states?

3   A      It is.

4   Q      And is it true in both red states and blue states?

09:49:42   5   A      Yes, it is.

6   Q      All right.  Dr. Hood, I would like to turn to your

7   supplemental report in this case, and this is what's been

8   marked as Defendants' Exhibit 6.

9          Dr. Hood, could you briefly summarize what you were doing

09:50:06 10   in this supplemental report?

11   A      Well, it's pretty brief.  Its looks like it's

12   two-and-a-half pages long.  So it's just -- was a quick

13   response, if you will, to reports that were issued in this case

14   by Professor Liu and Professor Palmer.

09:50:27 15   Q      And, Dr. Hood, starting with number one on page 2 of this

16   report, based on the header, what was your concern with

17   Dr. Palmer's report there?

18   A      Well, Point 1 talks about CVAP or Citizen Voting Age

19   Population data that Professor Palmer at least relied on for

09:50:51 20   part of his report.  I just point out some things, in terms of

21   the fact that CVAP data are from the American Community Survey,

22   which is a survey.  It's not an enumeration.  So there's some

23   degree of error, you know, with these particular data, and it's

24   also impossible to desegregate CVAP data down to the block

09:51:16 25   level.  It's just not available.  You can desegregate it down

1  to the block group level.  So then if you want to desegregate

2  it to the -- at the block level, because you have a districting

3  plan that's at the block level, drawn at the block level, and

4  you are trying to reaggregate around blocks, you have to

09:51:37 5  partition the CVAP data from block groups to blocks.  And in

6  doing so, you have to make some assumptions to partition those

7  data.

8  Q    And, Dr. Hood, what is the significance of that, of having

9  to make assumptions about the data?

09:51:55 10  A    Well, I mean, you are -- any time you make an assumption,

11  you don't know for certain if it's right or wrong for one

12  thing.

13  Q    And, Dr. Hood, how does this data compare with the data

14  that you used in this case for your analysis?

09:52:09 15  A    Well, again, I relied primarily on voting data, you know,

16  voting results data from the Secretary of State's office and

17  registration and turnout data from the Secretary of State's

18  office, as well.  Those are population level data, if you will.

19  Those should be -- you should have the entire count for each

09:52:37 20  precinct and then be able to join those data with the

21  registration and turnout data by a precinct, as well.

22  Q    So in other words, those are actual results as compared to

23  estimates?

24  A    Yes.  They're not estimates, certainly.

09:52:54 25  Q    Okay.  Thank you, Dr. Hood.

1    And then turning to paragraph 2, could you briefly
2  describe what problems you're outlining here with Dr. Palmer's
3  report?
4  A    Well, I just raise some questions here.  Professor Palmer
09:53:08  5  relied on data from something called the Redistricting Data Hub
6  website.  And they report themselves this organization, this
7  group, that they didn't have, you know, complete data to be
8  able to check every county in Alabama.
9        And so, again, it just raises questions about whether or
09:53:34  10  not the data from the redistricting web hub -- excuse me -- the
11  Redistricting Data Hub website are correct or not.
12  Q    And did you do any investigation into the VTD versus
13  precinct issue?
14  A    Right.  So they're relying on VTDs, the Redistricting Data
09:54:02  15  Hub website.  So, for instance, in Alabama, in Washington
16  County, you know, from what I understand from talking to
17  election officials there, the map to the right is the precinct
18  map, which is not the map to the left, which is the VTD map.
19        Now, you know, you can run algorithms and convert election
09:54:29  20  data or voting data from precincts to VTDs.  I am not saying
21  you can't do that.  But, again, you are making assumptions when
22  you do that.
23        I just stuck with the precincts in that case because that
24  was the unit -- the geographic unit where these votes were
09:54:47  25  collected and tabulated.

1410

1  Q    And, Dr. Hood, these two figures from your report, is this

2  the comparison of the Redistricting Data Hub VTDs and what you

3  found to be the precincts based on confirming with Washington

4  County officials?

09:55:04 5  A    Yes.  That's my -- yes, correct.

6  Q    And, Dr. Hood, just so we're clear, so Dr. Palmer, if he

7  transformed the data, even if he had the data, would that raise

8  any questions for you about the quality of the data?

9  A    Well, to be fair, I don't think Dr. Palmer did the

09:55:24 10  transformations.  I think the -- this group hosting this

11  website made transformations.  But, yes, you are making

12  assumptions, again, when I don't think it's necessary to make

13  assumptions.

14  Q    Thank you, Dr. Hood.

09:55:42 15      And in Point 3, could you summarize what your criticism of

16  Dr. Palmer here is?

17  A    Well, in another part of Professor Palmer's report, he

18  says he relies on data from a private vendor known as L2, which

19  I am familiar with.  I use L2 for survey data for telephone

09:56:03 20  numbers, so I am pretty familiar with L2.

21      And he says he uses L2 racial data.  L2's racial data is

22  modeled.  It's estimated.  And, again, in Alabama, we don't

23  really need to do that because the Secretary of State's office

24  has the registration turnout numbers by race.

09:56:25 25      And so I did a little bit of an investigation here

comparing L2's racial numbers to the state's racial numbers.
And basically, in a nut shell, what I found was at the county
level, L2 consistently underestimated the percentage of white
voters by about 4 percent, overestimated the percentage of
09:56:53 other voters by about 4 percent, and then either underestimated
or overestimated, depending on the situation, the county level
for black turnout.

     So all that to say L2's numbers, which are estimates,
really are not the same thing as the state's numbers, which are
09:57:13 not estimates.

Q    And, Dr. Hood, this is Caster Plaintiffs' Exhibit 79, and
this is Dr. Palmer's report.  And is this paragraph that goes
from page 3 to page 4, is that, Dr. Hood, where you understand
Dr. Palmer to be talking about his use of L2 data?

09:57:38 A    Well, that's where he mentions it, yes.

Q    And so you understand, based on this, that he is using L2
data to calculate turnout by race or somehow otherwise using
it?

A    Seems to be using L2 data to make inferences about turnout
09:57:59 by race is what I would say, from what's written there.

Q    Thank you, Dr. Hood.

     And turning to Point 4, could you describe what issues you
raise about Professor Liu's report?

A    In Point 4, I just have some questions about Professor
09:58:22 Liu's estimated turnout percentages.

        1      He includes these in his report, and you can estimate

        2   turnout by race using ecological inference.  You certainly can

        3   do that.  He doesn't explain exactly what he does to get these

        4   numbers.  They're just listed in his report.  And I have got

09:58:44  5   questions because consistently, you know, if those are -- if

        6   those are his estimated turnout numbers by race in his report,

        7   black turnout is consistently higher than white turnout, his

        8   estimates are.  And we know from the Secretary of State's

        9   office from those data that typically white turnout is just

09:59:12 10  slightly higher than black turnout in Alabama.

       11      So I just have questions about that.

       12   Q    And approximately, where does Dr. Liu predict that black

       13   turnout would be compared to white turnout?

       14   A    Well, it's scattered throughout his report in each one of

09:59:33 15  these -- most of these tables in his report from what I

       16   remember have a turnout estimate by race.

       17      So it's just sort of scattered throughout his report.

       18   Q    And, Dr. Hood, turning to Point 5, could you summarize the

       19   issue that you raise in Point 5?

09:59:53 20  A    Well, here, I am raising some questions about Professor

       21   Liu using any-part Black VAP and his functional analyses.  I

       22   don't use any-part black typically.  I certainly don't use -- I

       23   just use single-race categories in my academic research.  But

       24   if you are going to include, for instance, any-part black with

10:00:22 25  black, you have to make sure that that group of voters, the

```
 1   any-part group of voters, is going to vote cohesively -- or is
 2   voting cohesively with the parent racial category, if you will.
 3   Q    And, Dr. Hood, you mentioned the racial categories that
 4   you use in your academic work.  And I think you mentioned
 5   single race.  Why do you use that category?
 6   A    Well, I, you know, for one, we have a lot of different
 7   racial categories -- could you repeat the question so I can get
 8   my mind wrapped back around things?
 9   Q    Of course, Dr. Hood.
10        Dr. Hood, I think you mentioned that you use single-race
11   categories in your own academic research, and I was just asking
12   why that is.
13   A    Right.  So, you know, usually we are relying on people to
14   self identify themselves, certainly in the census, for
15   instance, or in a survey as a racial category or an ethic
16   category in the case of Hispanics.
17        And when you have -- but it's certainly possible to
18   identify as more than one racial or ethnic category today, as
19   well.  But, again, if you have a group of people who are just
20   identifying as, say, African-American, or non-Hispanic white or
21   Hispanic or Asian, there's little question there about how you
22   can analyze them as a group.
23        On the other hand, if you start to include people who are
24   say, African-American and then African-American plus Hispanic,
25   or African-American plus white, you have sort of multiple
```

1    racial or ethnic categories.  Again, it raises questions about

2    whether those individuals are really cohesive with the parent

3    racial category there.

4    Q    And, Dr. Hood, do you know whether there's any empirical

10:02:46  5    research that would show whether the multi-racial category

6    votes cohesively with the single-race non-Hispanic black

7    category?

8    A    I'm not aware of any.  I'm not saying there's not been,

9    but I am not aware of any.

10:03:01 10    Q    Thank you, Dr. Hood.

11            MR. SMITH:  Your Honor, may I have just one moment to

12    confer with my colleagues?

13            JUDGE MARCUS:  Sure.

14            MR. SMITH:  Nothing further at this time, Your Honor.

10:03:19 15    We pass the witness.

16            JUDGE MARCUS:  All right.  Thank you.

17    Cross-examination.  What order did you want to take them?

18    Singleton first, and then go on to Milligan and Caster, or did

19    you have some order?

10:03:32 20            MS. GBE:  Good morning, Your Honor.  This is Harmony

21    Gbe again on behalf of the Milligan plaintiffs.  Plaintiffs

22    have agreed on Milligan going first for cross, and then the

23    Caster plaintiffs, and then the Singleton plaintiffs.

24            JUDGE MARCUS:  All right.  Thanks very much, and you

10:03:45 25    may proceed.

```
 1              MS. GBE:  Thank you very much.
 2                        CROSS-EXAMINATION
 3   BY MS. GBE:
 4   Q     Good morning, Dr. Hood.
 5   A     Good morning.
 6   Q     I'm going to ask you a few questions on behalf of the
 7   Milligan plaintiffs, all right?
 8   A     Yes, ma'am.
 9   Q     So as you testified, this isn't the first time that you
10   have been retained as an expert to provide testimony in a
11   voting case, correct?
12   A     Correct.
13   Q     In fact, you have served as an expert in several voting
14   cases, right?
15   A     Correct.
16   Q     And in most of those cases, were you retained by the
17   state?
18   A     In a majority, yes.
19   Q     Have you ever been denied permission to offer an expert
20   opinion in a case?
21   A     Could you be a little more specific?
22   Q     In a voting rights case.
23   A     Has my testimony been excluded in a case?  Is that fair?
24   Q     Yes.  Sure.
25   A     Yes.  Once, in the first case I testified in, yes.
```

```
 1  Q     And do you remember the name of that case?

 2  A     Billups vs. Common Cause.  I was testifying on behalf of

 3  Common Cause about Georgia's voter ID law.

 4  Q     And do you remember the year of that case?

 5  A     Ooh.  Not specifically, to be honest with you.  Like 2006.

 6  I mean, again, I'm -- that's a guess.

 7  Q     Okay.  So let's -- actually, one more follow-up question.

 8        Do you remember the scope of your expert testimony in that

 9  case?

10  A     Yes.  I was testifying on behalf of Common Cause about

11  implementation of Georgia's photo ID law.

12  Q     I see.

13  A     It may have been 2005.  I -- somewhere around that time

14  period.

15  Q     And why were you excluded in that case?

16  A     I'd have to go back and look.

17  Q     So you don't remember sitting here?

18  A     I haven't looked at that in quite some time.

19  Q     So let's turn to your expert testimony and reports in this

20  case and talk about the functionality analysis that you

21  conducted.

22        So you conducted a district functionality analysis looking

23  at Districts 6 and 7 of the whole county map proposed by the

24  Singleton plaintiffs, correct?

25  A     Correct.
```

Timestamps in left margin: 10:05:00 (line 5), 10:05:27 (line 10), 10:05:45 (line 15), 10:06:10 (line 20), 10:06:25 (line 25)

1  Q     You didn't conduct a functionality analysis for the maps

2  proposed by the Milligan plaintiffs, correct?

3  A     Correct.

4  Q     And you stated in your report that time didn't permit you

10:06:38  5  to analyze the Milligan maps; is that right?

6  A     Well, time, and I wasn't specifically asked to do so.

7  Q     You weren't specifically asked by defense counsel?

8  A     Correct.

9  Q     So your purpose in conducting the functionality analysis

10:06:56 10  was to fulfill the third prong of the *Gingles* test, right?

11  A     Second and third, to be comprehensive.

12  Q     To fulfill the second and third --

13  A     Yes.

14  Q     -- prongs of the *Gingles* test?

10:07:10 15  A     Yes.

16  Q     And your goal was to analyze whether black-preferred

17  candidates are likely to win in a majority-white congressional

18  district, correct?

19  A     Well, I would say with the proviso that the white

10:07:29 20  community's not always in the majority in some of these

21  examples we're talking about.  I mean, that is the way the

22  *Gingles* test describes.

23  Q     Right.  So it is the *Gingles* test that you are trying to

24  determine whether a black-preferred candidate is likely to win

10:07:49 25  than a majority-white congressional district, correct?

1    A    Well, again, I would just say would a black-preferred

2    candidate of choice win in a given election -- a given

3    district, as drawn?  I mean, again, you know, that includes

4    what is the white community doing as a voting block.  I'm just

10:08:14  5    saying the white voting block in some of these examples like in

6    the enacted plan is not in the majority, though.

7    Q    Okay.  So in your report, you lay out three steps that you

8    need to take to conduct functionality analysis, right?

9    A    Well, there may be more than three.  Are you referring to

10:08:39  10    a specific part of the report that we could look at?

11    Q    Sure.  Do you -- you do have a copy of your report in

12    front of you, correct?

13    A    Yes, I do.

14    Q    So if you can turn to page 3.

10:08:51  15    A    Okay.

16    Q    Starting at page 3.  You explained that when you conduct a

17    functionality analysis, you first need to estimate the manner

18    in which various racial groups are voting, right?

19    A    That's correct.

10:09:03  20    Q    And then you go on to talk about a second step where you

21    calculate turnout by race, correct?

22    A    Well, I didn't -- to be very specific, I didn't make those

23    calculations.  I used data that were available in this case.

24    Sometimes you do have to estimate turnout by race.  But I

10:09:26  25    didn't have to estimate that in the case of Alabama.  But I

 1   made use of those data.

 2   Q    Okay.  So there were no calculations involved with the

 3   second step.  You just took the numbers directly from the

 4   Secretary of State; is that right?

10:09:42  5   A    Well, I did some data manipulations, but there weren't --

 6   beyond simply determining, okay, at the precinct level, what

 7   was the number of whites, African-Americans, and other voters

 8   that turned out to vote.  I didn't do anything beyond that.

 9   Q    So what do you mean exactly by data manipulation?

10:10:07 10   A    Well, these are databases.  And so records are

11   individuals.  And you have to -- I had to aggregate these

12   individuals into the respective voting precincts.

13   Q    So you did -- you didn't manipulate the data by

14   aggregating it?

10:10:29 15   A    That's fair, yes.  I am saying these weren't estimates I

16   produced, though.

17   Q    Understood.  Okay.  The third and final step of your

18   functionality analysis involved calculating the racial

19   breakdown for the Voting Age Population, correct?

10:10:44 20   A    Well, I didn't calculate that step at all.  I mean, those

21   numbers just simply came from Alabama's reapportionment office.

22   Q    Okay.  So, Dr. Hood, you conducted a racially-polarized

23   voting or RPV analysis for each of the elections you looked at,

24   right?

10:11:10 25   A    As part of the functionality test, yes, that's correct.

1   Q    And you concluded that RPV is present in District 7 of the

2   enacted plan, correct?

3   A    Yes.

4   Q    In fact, there was RPV in both of the two elections that

10:11:22 5   you analyzed in District 7 of the enacted plan, right?

6   A    Correct.

7   Q    You also conducted an RPV analysis on the Singleton

8   plaintiffs' proposed District 6 and 7, correct?

9   A    Correct.

10:11:38 10   Q    And there you also concluded that RPV is present in the

11   Singleton plaintiffs' proposed District 6 and 7, correct?

12   A    Correct.

13   Q    So in your report, as part of your functionality analysis,

14   you conclude that RPV is present with black voters

10:11:57 15   overwhelmingly supporting the Democratic candidate, and more

16   than a majority of white voters casting a ballot for the

17   Republican candidate, correct?

18   A    Correct.

19   Q    You would agree that if there is a high degree of RPV in

10:12:11 20   Alabama, then white block voting will usually result in the

21   defeat of black-preferred candidates in white majority

22   districts, right?

23   A    I would just say the general principle hypothetically,

24   yes, that's -- there is a high probability of that.  You would

10:12:29 25   have to run the exact numbers to see, but that's usually --

```
 1  Q    But it's likely?
 2  A    That's usually the condition that underlies, you know,
 3  prong 3, or the reaching prong 3 of the Gingles test.
 4  Q    Along those same lines, if there is an insufficient number
 5  of black voters to constitute a majority in a Democratic
 6  primary, the black community may be unable to elect their
 7  preferred candidate, correct?
 8  A    That's a possibility, yes.
 9  Q    Is it more likely?
10  A    Well, it just depends on, you know, if the white community
11  in a Democratic primary has a different preferred candidate of
12  choice than the African-American community.  Based on that
13  hypothetical, then, yes, that could happen.
14  Q    Have you read Dr. Liu's initial and rebuttal reports in
15  this case?
16  A    Yes.
17  Q    And did you listen to Dr. Liu's testimony yesterday?
18  A    I did not.
19  Q    Okay.  Are you generally familiar with the conclusions
20  reflected in Dr. Liu's reports?
21  A    Well, generally, yes.
22  Q    You and Dr. Liu both agree that RPV exists in Alabama,
23  correct?
24  A    I think we both found evidence of that, yes.
25  Q    And you and Dr. Liu also agree that black-preferred
```

Timestamps:
10:12:51 (line 5)
10:13:07 (line 10)
10:13:31 (line 15)
10:13:41 (line 20)
10:13:57 (line 25)

 1  candidates are usually defeated in white majority congressional

 2  districts in Alabama, correct?

 3  A   Well, I didn't do that particular analysis.  You know,

 4  again, I did a functional analysis of these districts which had

10:14:17 5  not seen -- none of these districts have ever seen an election

 6  in that district configuration.

 7  Q   So you wouldn't agree that a black-preferred candidate is

 8  likely to be defeated in a white majority congressional

 9  district in Alabama?

10:14:32 10  A   I would say, again, there's certainly a probability of

11  that.

12  Q   You and Dr. Liu both agree that the ecological inference

13  method is an appropriate way to conduct an RPV analysis,

14  correct?

10:14:47 15  A   I think we both agree on that, yes.

16  Q   In your supplemental report and you testified a bit about

17  this, this morning, you questioned Dr. Liu's use of any-part

18  Black Voting Age Population in his functionality analysis,

19  right?

10:15:05 20  A   Correct.

21  Q   So for your functionality analysis, you used single-race

22  black VAP for the black racial group measurement, correct?

23  A   Correct.

24  Q   And it is your view that single-race black is a more

10:15:21 25  appropriate racial group measurement than, for example,

1423

1  any-part black, correct?

2  A    That's fair, yes.

3  Q    So earlier today, you testified that there was no

4  empirical evidence that multi-racial people, including -- but

10:15:40  5  also identify as black vote cohesively with a group that is

6  single-race black, correct?  Is that an accurate statement of

7  your testimony?

8  A    I think the statement was I wasn't aware of any research.

9  I am not denying that any exists.

10:15:57 10  Q    So are you aware of any professional studies or research

11  that shows that they -- actually, strike that.  Let me

12  rephrase.

13      Are you aware of any professional studies or analyses that

14  show that voters who report themselves as multi-racial

10:16:13 15  including black vote any differently than those who report

16  themselves as single-race black?

17  A    Well, again, I am not aware of any studies on that topic

18  period, you know, showing one direction or the other.  I'm not

19  saying that they may not exist.  I'm not aware of any.

10:16:31 20  Q    And have you conducted any independent research to verify

21  your understanding of how multi-racial blacks vote versus

22  single-race blacks?

23  A    I have not conducted any research myself on that

24  particular question.

10:16:50 25  Q    And for this particular case, you didn't conduct any

```
  1   analysis along those lines, correct?
  2   A    No.
  3   Q    Do you know defendants' demographer in this case,
  4   Mr. Bryan?
10:17:03  5   A    A little bit, yes.
  6   Q    Have you worked with Mr. Bryan before this case?
  7   A    Not -- we published an article together, an academic
  8   article.  But, no, I have not worked directly with Mr. Bryan in
  9   a legal sense before on a case.
10:17:27 10   Q    Did you speak to Mr. Bryan in connection with this case,
 11   or your expert analysis offered in this case?
 12   A    Not in my analysis.  I did speak to Mr. Bryan, yes.
 13   Q    But it wasn't related to your expert analysis?
 14   A    No.
10:17:45 15   Q    Did Mr. Bryan seek your input at all for his portion of
 16   the analysis?
 17   A    No.
 18   Q    Okay.  So, Dr. Hood, now let's discuss the two elections
 19   that you analyzed in this case.
10:18:04 20        In your functionality analysis, you looked at the 2020
 21   presidential election and the 2018 gubernatorial races,
 22   correct?
 23   A    Correct.
 24   Q    When conducting an RPV analysis, it's important to
10:18:17 25   consider the race or ethnicity of the candidates running for
```

```
 1  election, correct?
 2  A     It can be, yes.
 3  Q     So, Dr. Hood, I am going to show you an article now that
 4  you cite to in your expert report.  I am going to ask my
 5  colleague, Mr. Ang, to pull up the article.  If you could make
 6  it a bit bigger, that would be helpful.  Thank you?
 7         MS. GBE:  Your Honor, permission to mark this article
 8  for ID as Milligan Plaintiffs' 51.
 9         JUDGE MARCUS:  Okay.
10  BY MS. GBE:
11  Q     Dr. Hood, do you recognize this article?
12  A     I do.
13  Q     It's an article that you coauthored entitled From Legal
14  Theory to Practical Application.  And it was published in the
15  Social Science Quarterly, correct?
16  A     Correct.
17  Q     And you currently serve on the editorial board for the
18  Social Science Quarterly, correct?
19  A     I do.
20  Q     And from what you can tell, this is a true copy of the
21  article that you coauthored, correct?
22  A     It looks to be.
23         MS. GBE:  Your Honor, I would like to move for
24  Exhibit 51 to be admitted into evidence.
25         JUDGE MARCUS:  Any objection?
```

Timestamps (left margin): 10:18:31 (line 5), 10:18:56 (line 10), 10:19:11 (line 15), 10:19:19 (line 20), 10:19:34 (line 25)

```
 1              MR. SMITH:  No objection, Your Honor.
 2              JUDGE MARCUS:  Without objection, plaintiff Milligan
 3    51 is received.
 4              MS. GBE:  Thank you, Your Honor.
 5    BY MS. GBE:
 6    Q    So in this article, if we can turn to page 546.  Thank
 7    you.
 8         So, Dr. Hood, in this article, you discuss how to conduct
 9    a Section 2 vote dilution analysis, and you described the
10    appropriate approach to analyzing RPV as follows.  So you say,
11    One must also consider the race/ethnicity of the candidates
12    running for election.  Of the elections available for analysis,
13    the more relevant are those that feature a minority candidate
14    from the racial/ethnic group suing the jurisdiction in
15    question.
16         Did I read that correctly, Mr. Hood?
17    A    Yes.
18    Q    But neither of the elections you chose to analyze for your
19    report in this case directly feature a minority candidate,
20    correct?
21    A    That's correct.
22    Q    And you are aware that there have been elections in
23    Alabama in the recent past that did involve a minority
24    candidate, correct?
25    A    Yes.
```

1   Q    But you chose not to analyze those elections in your work

2   for this case, right?

3   A    Well, yes, I did.

4   Q    Okay.

10:20:59 5         MS. GBE:  If we could take that language down,

6   Mr. Ang.  Thank you.

7   BY MS. GBE:

8   Q    So moving on to the ecological inference you did or EI,

9   you used EI to conduct your RPV analysis, correct?

10:21:15 10  A    Correct.

11  Q    And the EI method is a commonly used method in your field

12  of expertise; isn't that right?

13  A    Yes, it is.

14  Q    And you used census data for your EI calculations, right?

10:21:30 15  A    No.

16  Q    What kind of data did you use for your EI calculations?

17  A    Again, I used precinct level vote returns from the

18  Secretary of State's office in Alabama and turnout and

19  registration data at the precinct level from the Alabama

10:21:47 20  Secretary of State's office.

21  Q    Did you use census data in any part of your analysis?

22  A    The only part of my analysis that used census data was the

23  latter part of the functionality analysis that starts out and

24  says, as drawn in 2021, this district is -- this percent BVAP,

10:22:11 25  this percent white Voting Age Population percent, other voting

1   age population.  It's not -- I guess you could say it's part of

2   my analysis in a functional sense.  I didn't use those data,

3   the census data for any of my EI estimates, though.

4   Q    Okay.  Did -- you used the EI pack or package to conduct

10:22:37  5   your analysis, correct?

6   A    Yes.

7   Q    And the IE pack is a commonly used software package in

8   your field, correct?

9   A    Yes.

10:22:44 10   Q    It provides reliable and accurate estimates for RPV

11   analysis, correct?

12   A    Yes.

13   Q    You are aware that Dr. Liu also used the EI method for his

14   analysis, correct?

10:22:56 15   A    Correct.

16   Q    The R by C procedure in the EI pack allows someone to

17   estimate racial turnouts, correct?

18   A    You can, yes.

19   Q    And you relied on the EI pack to generate the data you

10:23:11 20   used for your racial estimates in this case, correct?

21   A    For the racial vote estimates, correct, yes.

22   Q    The R by C procedure in the EI pack also allows for racial

23   vote estimates for candidates, correct?

24   A    Well, I thought that's what you had just said.

10:23:33 25   Q    Oh, okay.

1    A    In a slightly different way.

2    Q    Okay.  We can just move on.

3         So in the R code in your replication folder, showed that

4    you ran an R operation, which would have given you an estimated

10:23:51 5    racial turnout and racial vote total; is that accurate?

6    A    Yes.

7    Q    So in Dr. Liu's rebuttal report, Dr. Liu noted that he

8    requested a detailed explanation for the method you used for

9    arriving at the racial breakdown and turnout by race you

10:24:09 10   present in Tables 1 and 2 of your report.  But you did not

11   provide Dr. Liu with that detailed explanation of your

12   methodology, did you?

13   A    I believe I did.  I sent quite a number of messages

14   through counsel about what I had done.  And it was explained in

10:24:27 15   my report.

16   Q    So you --

17   A    I don't -- I am not really sure where the disconnect is on

18   this particular point.  Because, again, in terms of racial

19   turnout, I'm not using estimates.  I'm using the actual data.

10:24:45 20   Q    But you recall receiving specific questions from Dr. Liu

21   about your methodology using the voter registration data,

22   correct?

23   A    And I responded to those, yes.  I didn't know who they

24   were from, but I responded.

10:25:00 25   Q    You provided those responses to defense counsel?

```
 1  A    Yes.

 2  Q    Now, let's talk about your opinions about Republican

 3  support for minority candidates as explained in your report.

 4       So you claim that white conservatives support minority

 5  Republican candidates at the same rates or significantly higher

 6  rates than Anglo GOP nominees, correct?

 7  A    That part is a little more than a claim.  I think I

 8  hopefully substantiated that through social science research.

 9  That's from the published article.

10  Q    Right.  So in support of that claim, you cite to an

11  article titled, True Colors, White Conservative Support For

12  White Republican Candidates, correct?

13  A    Yes, that's fair.

14  Q    And the True Colors article analyzes the success of

15  nonwhite candidates as a group, but does not specifically

16  analyze black candidates, correct?

17  A    Well, there is some African-American candidates in that

18  group of minority Republican candidates.

19  Q    But the article doesn't provide any specific discussion of

20  white Republican willingness to vote for black candidates,

21  right?

22  A    No, only to the extent to which black minority -- black

23  Republican candidates are included in the group of minority

24  Republican candidates, if you will.

25  Q    And the article isn't based on any elections conducted in
```

1  the state of Alabama, correct?

2  A     Correct.

3  Q     The only example of black Republican candidates' success

4  in Alabama that you cite to in your report is that of

10:26:48 5  Representative Paschal, correct?

6  A     Correct.

7  Q     But you didn't conduct an RPV analysis on Representative

8  Paschal's election to determine the degree of racial support

9  for his candidacy, right?

10:26:59 10  A     I did not.  Again, in that case, given the very high rate

11  of white VAP in that district, I don't think it's possible for

12  any candidate to win without majority-white support.

13  Q     But you didn't conduct an RPV analysis to confirm your

14  hypothesis, correct?

10:27:18 15  A     That's correct.

16  Q     In fact, you did not conduct an RPV analysis on a single

17  election involving a black Republican candidate in Alabama,

18  right?

19  A     That's correct.

10:27:28 20  Q     Are you aware that Representative Paschal is the first

21  Republican elected to the Alabama Legislature in 140 years?

22  A     Yes, I read that.

23  Q     And Representative Paschal won the Republican runoff

24  election in 2021 by a very close margin, correct?

10:27:47 25  A     Yes.  I think I documented that.

Q     In fact, there were only 63 votes between Representative
Paschal and his opponent Leigh Hulsey, correct?

A     Well, you if you're representing that's what it says in my
report, then I will take your word for it.

10:28:08  Q     Would you like me to pull up the --

A     I can just flip over here real quick and look.

            MS. GBE:  Mr. Ang, if you can pull up --

            THE WITNESS:  I am not saying you're not correct.

BY MS. GBE:

10:28:20  Q     Not a problem.  We can just pull up Defense 5, Dr. Hood's
initial report and turn to page 15 I think we -- so the
reference is footnote 12, but I don't think -- I think we have
just the link to the Secretary of State's website.

      So let's not go through that part.

10:29:01      But you do recall that it was a close election, right,
Dr. Hood?

A     From my recollection, yes.  I couldn't give you the vote
count from my memory.

Q     Understood.  And that election took place in Shelby
10:29:16 County, right?

A     Correct.

Q     Okay.  And you testified earlier today that Shelby County
has about an 84 percent white Voting Age Population, correct?

A     Well, that district itself in Shelby County, yeah.

10:29:31  Q     And are you aware that turnout in Representative Paschal's

1  race was very low?

2  A    Well, I don't know that I looked at turnout specifically.

3  Q    So you don't have any information about which category of

4  voters turned out to elect Representative Paschal?

10:29:55  5  A    Well, again, as I said, the inference here the assumption

6  is that no one can win in that district without a majority

7  support of the white vote.  In reference to your question you

8  asked about did I run an ecological inference on that

9  particular race, the answer was no.

10:30:16  10  Q    You would agree, Dr. Hood, that white support of a black

11  Republican candidate in a statewide election will provide a

12  relevant basis to analyze white Republican support for black

13  candidates, right?

14  A    Well, yeah, that could be one piece of data looked at,

10:30:38  15  certainly.

16  Q    So, Dr. Hood, as we talked about a bit earlier, you -- you

17  have served as an expert in several voting cases, correct?

18  A    Correct.

19  Q    And some of those cases include redistricting cases?

10:30:56  20  A    Yes.

21  Q    So you are generally familiar with the traditional

22  redistricting principles, correct?

23  A    Correct.

24  Q    And you would agree that maintaining the core of existing

10:31:10  25  districts is a redistricting guideline in several states,

1    including Alabama, correct?

2    A    Yes, from my understanding, yes.

3    Q    You agree, however, that an interest in core preservation

4    as a redistricting consideration does not supersede compliance

10:31:27  5    with Section 2 of the Voting Rights Act, correct?

6    A    Okay.  So this is -- I am going to have to provide some

7    context to this answer.  This is a little complicated, or it

8    can be.

9         Redistricting can be essentially an iterative process some

10:31:47 10    sometimes.  So you start out drawing a district.  You can even

11    draw a district race blind using traditional redistricting

12    criteria.  And then later you might look at the racial

13    composition of the district and do some functional analyses.

14    If it's determined that an adjustment may need to be made based

10:32:08 15    on Section 2 or a potential Section 2 violation, at that point,

16    Section 2 comes into play.

17         Now, you know, again, this is my understanding that the

18    traditional redistricting criteria are somewhat encompassed in

19    prong 1 of the *Gingles* test, right?  So at that point, you

10:32:31 20    know, if you needed to add just hypothetically say Black VAP to

21    the district because of the Section 2 issue, you can do that.

22    So at that very point, that would sort of supersede other

23    criteria, but you can't -- you can't just lay aside the other

24    criteria at that point because, again, those criteria are, from

10:32:54 25    my understanding, encompassed in prong 1.

```
 1          So there may be -- I guess to answer your question -- I am
 2     trying to answer your question, trying to be succinct -- there
 3     may be a case where the Section 2 is invoked to deal with a
 4     particular problem.  And at that point in time, you are going
10:33:15  5     to perhaps have to add or subtract various racial groups from
 6     the district.  But you can't just ignore the other traditional
 7     redistricting criteria.
 8     Q    Right.  So you can't ignore them completely, but you would
 9     agree that Section 2 does trump a lot of those traditional
10:33:35 10    redistricting criteria?
11     A    Well, I wouldn't say completely trump.  I mean, you can't
12     just go from a district that's fairly compact to one that's
13     completely un-compact just because you're trying to remedy a
14     Section 2 issue, is what I would say.
10:33:56 15    Q    So you testified earlier today, and we went through it a
16     bit extensively, that you provided expert opinion in the
17     Chestnut case, correct?
18     A    Correct.
19          MS. GBE:  So if we can pull up some of the language
10:34:14 20    from that opinion, Mr. Ang.
21          So, Your Honor, permission to mark this document for ID as
22     Milligan Plaintiffs' 52.
23          JUDGE MARCUS:  Yes.  That's the opinion by Judge
24     Bowdre in the Chestnut case, correct?
10:34:36 25         MS. GBE:  Correct.
```

BY MS. GBE:

Q     So the opinion references some of the statements you made
in that case.  And if you can read the highlighted portions for
us.

A     You would like me to read it?

Q     Yes, please.

A     Okay.  A later expert witness for the defendant, Dr. Trey
Hood also stated that, regardless, an interest in core
preservation could not trump compliance with Section 2 of the
VRA as a redistricting consideration.

Q     So you would agree that an interest in core preservation
as a redistricting consideration does not trump compliance with
Section 2 of the Voting Rights Act, correct?

A     Correct.  I would say it could be -- it would have to
would be subsumed at some point.

Q     So in addition to *Chestnut* --

      MS. GBE:  I am sorry, Mr. Ang, you can take that down.
Thank you.

BY MS. GBE:

Q     In addition to *Chestnut*, you have provided expert opinions
in other voting cases, correct?

A     Correct.

Q     Did any court ever criticize or reject your expert opinion
in a voting case?

A     Well, I have been qualified as an expert in, I think, or

1  testified in more than 25 cases now.  Certainly, some courts

2  have given more weight to my testimony than other courts.  I

3  mean, that's true.

4  Q   Dr. Hood, you served as an expert in a case called *Veasey*

10:36:07  5  *v. Perry*, correct?

6  A    Correct.

7  Q    And that case was pending before a district court in

8  Texas, correct?

9  A    Correct.

10:36:13 10  Q    And that case involved allegations that Texas voter ID law

11  was unconstitutional and violated the VRA, correct?

12  A    Correct.

13  Q    And in that case, you analyzed whether that voter ID law

14  would affect voter turnout, correct?

10:36:30 15  A    That was one of the things I did, yes.

16  Q    Isn't it true that the Court afforded, quote, little

17  weight to your opinions in that case?

18  A    I believe so, from what I remember.

19  Q    Okay.  Let me -- let's look at the opinion to refresh your

10:36:50 20  recollection.

21         MS. GBE:  Mr. Ang, if you would pull up *Veasey*,

22  please?  And we can mark this as --

23      Your Honor, permission to mark this for ID as M-53.

24         JUDGE MARCUS:  Yes.

10:37:06 25         MS. GBE:  Thank you.

BY MS. GBE:

Q    So, Dr. Hood, there is a portion of the *Veasey* opinion.
Can you please -- can you please read the highlighted passage
describing the reasons why the Court gave little weight to your
opinion in that case?

A    On the cross-examination, plaintiffs pointed out a
multitude of errors, omissions, and inconsistencies in
Dr. Hood's methodology, report, and rebuttal testimony, which
Dr. Hood failed to adequately respond to or explain.  The Court
thus finds Dr. Hood's testimony and analysis unconvincing and
gives it little weight.

Q    So the *Veasey* court did not find your expert opinion in
that case reliable, correct?

A    Well, it gave it little weight, yes.

Q    And, Dr. Hood, you served as an expert in another case
called *Northeastern Ohio Coalition vs. Husted*, correct?

A    Yes.

Q    And that case was before the Southern District of Ohio,
correct?

A    Yes.

Q    And in that case, the Court ruled that certain portions of
Ohio's SNT and provisional voting regimes were
unconstitutional, correct?

A    I believe so, from what I remember, yes.

Q    Much of your expert report and opinion testimony in that

1  case focused on the Senate Factors and your criticism of the

2  opposing expert, I believe his name was Dr. Timberlake.  You

3  criticized Dr. Timberlake's regression analysis.  Do you recall

4  that?

10:38:35 5  A    Yes.

6  Q    Again, the Court in that case found your expert opinion

7  largely unhelpful, correct?

8  A    From what I recall, yes.

9  Q    Okay.

10:38:47 10      MS. GBE:  Mr. Ang, can you pull up *Husted*, please?

11  BY MS. GBE:

12  Q    So this is the language from the *Husted* opinion, and I

13  will just read that to go through it quickly.

14      The Court gives little weight to Dr. Hood's opinion that

10:39:05 15  the rejection of provisional ballots for trivial errors is

16  unlikely to occur under the new law because the board's review

17  provisional and absentee ballots and screen out trivial errors

18  from substantive errors, which he defines as errors that,

19  quote, preclude the board from being able to identify who the

10:39:25 20  voter is.

21      The *Husted* court then goes on to say on the next page, In

22  sum, Dr. Hood's testimony and report were in large part

23  irrelevant to the issues before the Court and also reflected

24  methodological errors that undermine his conclusions.  Other

10:39:45 25  courts have found likewise.  As such, the Court finds his

```
 1   contribution of limited value.
 2        Do you recall that, Dr. Hood?
 3   A    Well, now that you have read that, yes.
 4   Q    So the Husted court like the Veasey court found your
 5   expert opinion unreliable, correct?
 6   A    Well, it says limited value, yes.
 7   Q    Just one more case that I would like to go through with
 8   you.
 9        You served as an expert in the case called Florida v.
10   United States, right.  Do you recall that?
11   A    Yes.
12   Q    So that case was also before a three-judge court in the
13   District Court for the District of Columbia, correct?
14   A    Yes, I believe so.
15   Q    And in that case, Florida, the state, sought Section 5
16   preclearance of changes to its election laws, including a
17   change in early person -- early in-person voting, as well as a
18   change in voting procedures for voters who were moving in
19   between counties, correct?
20   A    Correct.
21   Q    Your expert opinion in the Florida case focused primarily
22   on the early voting changes, correct?
23   A    Yes.
24   Q    And the Court in that case also rejected your expert
25   analyses and conclusions, correct?
```

```
 1  A     I think they gave them little weight, yes.
 2  Q     Okay.
 3            MS. GBE:  Mr. Ang, if you could pull up the relevant
 4  language from the Florida case.
 5            MR. SMITH:  Your Honor, I would like to object to
 6  this.  He's already said they gave him little weight.  I'm not
 7  sure that this has any impeachment value.
 8            JUDGE MARCUS:  No.  I will allow it.  Overruled.
 9            MS. GBE:  Thank you, Your Honor.
10            JUDGE MARCUS:  What's the name of the case, counsel?
11            MS. GBE:  The case is Florida vs. U.S.  And if,
12  Mr. Ang, if you could pull up the first page the caption for
13  the Court's reference.  Right there in the bottom, the -- I
14  guess the bottom right of the screen.  There you go.
15            JUDGE MARCUS:  Thank you.
16            MS. GBE:  Okay.  Now, Mr. Ang, if you could go to the
17  relevant sections.  Thank you.
18  BY MS. GBE:
19  Q     So the Florida court, with regards to your expert opinion,
20  Dr. Hood, specifically found, quote, in finding that
21  African-American voters in the covered counties will be
22  disproportionately affected by the reduction in early voting
23  days under the new law, we reject the contrary opinions of
24  Florida's expert witness, Professor Hood.  We do so because the
25  analysis underlying his conclusions suffers from a number of
```

10:41:29 (line 5)
10:41:39 (line 10)
10:41:55 (line 15)
10:42:10 (line 20)
10:42:29 (line 25)

1      methodological flaws.

2          The Court then goes on to say, We reject other

3      calculations in Professor Hood's expert report because we agree

4      with the intervenors' expert that in several instances,

10:42:46  5      Professor Hood inappropriately pools together groups of

6      dissimilar data, which is not methodologically appropriate.

7          Finally, the Court says on again the following page,

8      Professor Hood also frequently lumps African-Americans and

9      Hispanics into a single category of minorities, which

10:43:04 10      misleadingly flattens the data, because unlike

11      African-Americans, Hispanic voters use early voting at about

12      the same rate as whites.

13          Did I read that accurately, Dr. Hood?

14      A      I believe so.

10:43:19 15      Q      So, again, this is another example of a court that did not

16      find your opinion particularly helpful, correct?

17      A      Fair.

18      Q      And there are still other courts that have criticized and

19      rejected your findings in voting cases, correct?

10:43:36 20      A      Yes.

21      Q      Okay.

22              MS. GBE:   Your Honor, if I could have a few minutes

23      before proceeding?  I think I'm pretty much -- I'm wrapping up.

24              JUDGE MARCUS:   We will take just a moment or two,

10:43:49 25      sure.

```
 1            MS. GBE:  Thank you.
 2       Okay.  No further questions, Your Honor.
 3            JUDGE MARCUS:  All right.  Thank you.  Before we
 4  proceed to the next cross-examination, this might be a
10:44:19  5  convenient point for us to take a 15-minute break.
 6       Who is the next examiner?  That would be for Caster?
 7            MS. MADDURI:  That's right, Your Honor.
 8            JUDGE MARCUS:  Ms. Madduri.  Thanks.  We will take a
 9  15-minute break, Mr. Hood, and we will get started at 11:00
10:44:51 10  o'clock Central Standard Time.
11            (Recess.)
12            JUDGE MARCUS:  I take it the parties are ready to
13  proceed with cross-examination, Ms. Madduri?
14            MS. MADDURI:  I am ready, Your Honor.
11:00:40 15            JUDGE MARCUS:  All right.  Mr. Smith, we are all set?
16            MR. SMITH:  Your Honor, if I could make one quick
17  point before we start.
18       We, again, appreciate the plaintiffs allowing us to call
19  Dr. Hood out of turn, and that's because he is traveling this
11:00:51 20  afternoon.  And so I just wanted to make the Court aware of
21  that.
22       If we could finish Dr. Hood's testimony before we break
23  for lunch, I think that would be preferable from our end.
24            JUDGE MARCUS:  We will do everything we can to do
11:01:05 25  that.
```

1    Dr. Hood, thanks for bearing with us.  We will try and get

2 you out of here as quickly as we can.  But you take your time,

3 Ms. Madduri, in your cross-examination.  And, of course,

4 Mr. Quillen, you will have every opportunity to cross-examine

11:01:22 5 Dr. Hood, as well.

6         MR. QUILLEN:  Thank you.

7         JUDGE MARCUS:  With that, let's proceed, Ms. Madduri.

8         MS. MADDURI:  Thank you, Your Honor.

9                    CROSS-EXAMINATION

11:01:31 10 BY MS. MADDURI:

11 Q    Dr. Hood, it's nice to see you again.

12 A    Yes.  Good afternoon.  Well, here, good afternoon.  Sorry.

13 Q    No problem.  Dr. Hood, your second report addresses the

14 reports issued by plaintiffs' expert Dr. Maxwell Palmer and

11:01:47 15 Dr. Liu; is that right?

16 A    Yes.

17 Q    Okay.  You provide no response to the expert reports of

18 Dr. Bridgett King regarding the history of voting related

19 discrimination in Alabama or the other Senate Factors; is that

11:02:01 20 right?

21 A    Correct.

22 Q    And you do not respond to Mr. Cooper's expert report

23 regarding whether plaintiffs are able to satisfy the first

24 *Gingles* precondition; is that correct?

11:02:12 25 A    Correct.

1445

1    Q    And you don't respond to Mr. Palmer's -- I'm sorry --

2    Mr. Cooper's conclusion that there are racial disparities

3    across key indicators of socioeconomic well-being in Alabama

4    between white Alabamians and black Alabamians either generally

11:02:31  5    or in the enacted Congressional Districts 1, 2, 3, 6, and 7,

6    correct?

7    A    Correct.

8    Q    Okay.  Dr. Palmer's report concluded that voting is

9    racially polarized in Congressional Districts 1, 2, 3, 6, and

11:02:47 10    7, both individually and combined, correct?

11    A    From my memory, that's correct.

12    Q    Okay.  And you don't dispute Dr. Palmer's conclusions that

13    black voters in the areas he examined vote for the same

14    candidates cohesively, correct?

11:03:04 15    A    No.

16    Q    Okay.  And you don't dispute Dr. Palmer's conclusion that

17    black Alabamians and white Alabamians in the areas he examined

18    consistently preferred different candidates, correct?

19    A    Correct.

11:03:19 20    Q    And you don't dispute Dr. Palmer's conclusion that the

21    candidates preferred by white voters in the areas that he

22    looked at regularly defeat the candidates preferred by black

23    voters, correct?

24    A    Correct.

11:03:32 25    Q    Dr. Palmer also conducted a district functionality

1  analysis for the majority-black districts in Mr. Cooper's

2  illustrative plans, correct?

3  A    Yes.

4  Q    Dr. Palmer concluded that Mr. Cooper's illustrative

11:03:55 5  majority-black CD 2 and 7 would on average elect

6  black-preferred candidates with 57 percent and 65 percent of

7  the vote respectively.  Do you recall that?

8  A    Not those exact figures, no.

9  Q    Do you recall that to roughly be the case?

11:04:11 10  A    Well, I recall the pattern.  I mean, I just don't remember

11  the exact figures sitting here.

12  Q    Okay.  But you don't offer any -- you don't offer anything

13  to dispute Dr. Palmer's conclusions on the functionality of

14  plaintiffs' illustrative black majority districts, correct?

11:04:31 15  A    Correct.  I didn't do any tests on those districts, so...

16  Q    Okay.  Let's now turn to your discussion of the Citizen

17  Voting Age Population or CVAP data, which you discuss in your

18  second report.  CVAP data is collected from an annual survey

19  conducted by the U.S. Census Bureau, correct?

11:04:56 20  A    Correct.

21  Q    That's called the American Community Survey, correct?

22  A    Correct.

23  Q    And that is commonly referred to as the ACS?

24  A    Yes.

11:05:05 25  Q    Okay.  Experts in political science have regularly used

 1  CVAP data attained through the ACS, correct?

 2  A    I'm sure they do for a variety of purposes.

 3  Q    Okay.  And that same CVAP data is regularly relied upon in

 4  peer-reviewed publications, right?

11:05:22  5  A    I am sure it is, yes.

 6  Q    Okay.  The decennial census does not collect any

 7  citizenship information, correct?

 8  A    That is correct.

 9  Q    So the data file that's used for redistricting that you

11:05:36 10  mentioned in your report, which was called the PL 94-171 file,

11  that doesn't contain any citizenship information, right?

12  A    That is correct.

13  Q    The ACS is the only Census Bureau source for Citizen

14  Voting Age Population, right?

11:05:56 15  A    Yes.

16  Q    And you and Dr. Palmer both examined racially-polarized

17  voting in enacted CD 7, right?

18  A    Yes.

19  Q    Okay.  I think you testified that you used voter

11:06:07 20  registration and turnout data from the state of Alabama, right?

21  A    That part of it, yes.

22  Q    And Dr. Palmer used CVAP data from the Census Bureau,

23  right?

24  A    From my understanding of his report, yes.

11:06:21 25  Q    At least for part of his analysis, he used CVAP data,

1  right?

2  A    Right.  Right.  I don't think for all of it, but for part

3  of it, yes.

4  Q    Okay.  Thank you.

11:06:31  5       And you and Dr. Palmer found very similar levels of

6  racially-polarized voting in CD 7 despite using different data,

7  right?

8  A    I think the directionality was certainly the same.

9  Q    Is it your --

11:06:48  10  A    Again, I can't remember his exact numbers sitting here.

11  Q    Sure.  Sure.  Is it your recollection that there were any

12  major discrepancies in your findings versus Dr. Palmer's

13  findings for the level of racially-polarized voting in CD 7?

14  A    Well, the substantive pattern was there in either

11:07:05  15  analysis.

16  Q    I couldn't quite hear?

17  A    The substantive pattern was there in his analysis as well

18  as my analysis.

19  Q    The substantive pattern being high levels of

11:07:19  20  racially-polarized voting?

21  A    Yeah.  The presence of racially-polarized voting, yes.

22  Q    Okay.  So that was consistent between both of your

23  findings?

24  A    Correct.

11:07:27  25  Q    Okay.  Can we pull up your second report, which is

```
 1    Defendants' Exhibit 6, and turn to page 2.
 2         Okay.  So in paragraph 1 of that page, you observed that
 3    CVAP data comes from a survey, meaning they are -- you said,
 4    quote, estimates which come with a margin of error, end quote;
11:07:59  5    is that right?
 6    A    Yes.
 7    Q    Okay.  But you don't calculate or report that margin of
 8    error, do you?
 9    A    The margin of error for the CVAP data?
11:08:11 10    Q    Correct.
11    A    Correct.  I'm just stating that it exists.
12    Q    Okay.  And you don't claim that that alleged margin of
13    error in any way undermines Dr. Palmer's analysis or
14    conclusions regarding racially-polarized voting, correct?
11:08:25 15    A    Not specifically, no.  Again, it just -- that's a
16    statement that these are survey data.  They're not enumeration
17    level data, and so they come with a margin of error.
18    Q    Okay.  But you don't claim that that margin of error
19    affects Dr. Palmer's analysis or conclusion in any meaningful
11:08:48 20    way, correct?
21    A    Well, I couldn't claim that without doing the analysis.
22    I'm just raising a question here.
23    Q    Okay.  And you didn't do that analysis, right?
24    A    That's correct.
11:08:58 25    Q    Okay.  I think later in that paragraph you also note that,
```

1  quote, the CVAP data come from the ACS -- that come from the

2  ACS are only available down to the block group level.

3  Districting plans that are drawn at the block level would

4  require one to disaggregate the CVAP data to that level.

11:09:24  5       Did I read that right?

6  A    Yes.

7  Q    You go on to say, While this can be done, one is required

8  to make a number of assumptions about the manner in which the

9  CVAP block group data should be disaggregated to the respective

11:09:37  10  blocks in the group, and that this process may, in turn, also

11  introduce another source of potential error.  Correct?

12  A    Correct.

13  Q    Okay.  But you didn't identify any such errors in

14  Dr. Palmer's analysis or data, right?

11:09:49  15  A    Well, not specifically, no.  Again, this is just raising a

16  concern.

17  Q    Okay.  And you don't claim that the fact that CVAP data

18  requires disaggregating data undermines Dr. Palmer's conclusion

19  regarding racially-polarized voting, correct?

11:10:08  20  A    Not necessarily, no.

21  Q    Okay.  We can move on, and we can take this exhibit down.

22  Thank you.

23       Okay.  You also comment on data Dr. Palmer obtained from

24  the Redistricting Data Hub; is that right?

11:10:31  25  A    Correct.

1  Q    Okay.  Are you aware that the data Dr. Palmer obtained

2  from the Redistricting Data Hub was prepared by an organization

3  called the Voting and Election Science Team?

4  A    Yes.

11:10:45  5  Q    Are you familiar with the Voting and Election Science

6  Team?

7  A    Just a little.

8  Q    Okay.  Are you aware of the fact that the Voting and

9  Election Science Team is a group of scholars that are based at

11:10:58 10  multiple universities, including the University of Florida?

11  A    Yes.

12  Q    Are you aware that among other things they assemble

13  precinct level election data by collecting and matching

14  shapefiles, which contain the geographic boundaries of each

11:11:13 15  precinct with election results at the precinct level?

16  A    Where the shapefiles were available, yes, I understand

17  that.  I am pointing out that there are some counties in

18  Alabama shapefiles apparently were not available according to

19  their own website.

11:11:30 20  Q    Okay.  But you are aware that the VEST Team goes to both

21  states and counties to request the maps of precinct so they can

22  be sure that they have the right precincts, right?

23  A    Right.  I mean, they make requests.  That doesn't mean

24  they're always fulfilled, though, is what I am saying.

11:11:50 25  Q    Are you aware that generally their data is widely used by

1  academics and peer-reviewed published work?

2  A    No, I am not.  I am not saying it's not.  I'm just not

3  aware.

4  Q    Okay.  Dr. Hood, what is a VTD?

11:12:08 5  A    Voting Tabulation District.

6  Q    And what is a precinct?

7  A    A precinct is an actual geographic unit where people go

8  and vote.  There's usually a polling place encompassed in the

9  precinct.  Sometimes precincts and VTDs are the same.  And

11:12:26 10  sometimes they're not.

11  Q    And precincts will often change over time while VTDs

12  remain constant; is that right?

13  A    Well, if you make the VTDs stay constant.

14  Q    Are VTDs, as you understand them, the U.S. Census

11:12:46 15  equivalence of precincts?

16  A    I think that -- I think that's fair, yes.  They're

17  equivalent.  They are not necessarily exactly the same.

18  Q    But the boundaries of VTDs and precincts sometimes don't

19  match up, right?

11:13:04 20  A    Yes, that's correct.  Sometimes a VTD, for instance, might

21  be comprised of two or three precincts, for instance.  It

22  varies, you know.

23  Q    Okay.  And you provide I think an example of what we're

24  discussing a mismatch of sorts between precincts and VTD

11:13:25 25  boundaries in your report, right?

```
 1  A     Well, I believe it is, yes.
 2  Q     Okay.  Why don't we look at that?  So that's page 3 of
 3  your second report, which is Defendants' Exhibit 6.
 4        And if you can zoom in on the figures so you can see them
11:13:44 5  a little better.
 6        Okay.  So on the left, Figure 1 is labeled Washington
 7  County, Alabama VTDs, correct?
 8  A     Correct.
 9  Q     Okay.  And on the right, the figure is labeled, Washington
11:13:56 10  County, Alabama precincts, right?
11  A     Correct.
12  Q     Okay.  So the fact that there's a mismatch between the
13  precincts and the boundaries, that's not really surprising or
14  irregular, correct?
11:14:11 15  A     They may not match up, no.
16  Q     And it would be reasonable to expect that, given the fact
17  that precincts and VTDs often don't match up?
18  A     Not always, that's correct.
19  Q     Okay.  Are you familiar with the process by which scholars
11:14:31 20  and others take precinct level data and reallocate it to match
21  VTD boundaries?
22  A     Yes, generally speaking, yes.
23  Q     Okay.  And you would agree that that's something that
24  scholars and experts do pretty regularly, right?
11:14:47 25  A     Scholars do that, yes.  I guess my point with this is if
```

1 Washington County is using the map on the right with the green

2 boundaries, then that's where the original vote data is

3 captured, then I'm just going to stick with that.  I am not

4 going to make assumptions in de-allocating those data to VTDs.

11:15:12 5 Q    But you would agree that that is doable and a process that

6 scholars regularly engage in, right?

7 A    You can do it.  Again, if you have the precinct data,

8 though, that's the most accurate data available.

9 Q    Okay.  Do you have any reason to believe that the process

11:15:31 10 of -- that this process biased Dr. Palmer's data in any way?

11 A    I don't know one way or the other, to be honest.

12 Q    Okay.  You didn't do that analysis?

13 A    Correct.

14 Q    Were you present when Dr. Palmer testified this week?

11:15:49 15 A    Yeah.  Yeah.

16 Q    Okay.  Would it surprise you to hear that Dr. Palmer

17 testified that for Washington County, the VEST Team precinct

18 level map is identical to the precinct level map that you

19 present in your report?

11:16:04 20 A    Well, I took -- I looked at the VEST data, and their map

21 was the VTD map from my -- from what I remember.  You know, I

22 wouldn't present this if I didn't think there had been a

23 mismatch.

24 Q    Okay.  So as I understand it, you're presenting the VEST

11:16:24 25 data for the VTDs in Washington County here on the right in

```
 1  Figure 1, right?

 2  A    Right.

 3  Q    Okay.  Did you review the precinct boundaries in the VEST

 4  data, which is also available on Redistricting Data Hub?

 5  A    But they were using the VTD boundaries for their data.

 6  That's my understanding of it, at least.  And I looked at their

 7  map files, and they're using the VTDs, not the precincts.

 8  Maybe they have a precinct-shaped file.  I'm not saying they

 9  don't.

10  Q    So are you describing the process -- are you saying -- are

11  you describing the process by which I guess the resulting VTD

12  file would be after that reallocation process happened that we

13  discussed?

14  A    Yes.  It must have been.

15  Q    Okay.  And you didn't review the original precinct values

16  that the VEST used; is that right?

17  A    I couldn't find those data.  I am not saying they're not

18  on the website somewhere.  I couldn't find it.

19  Q    Okay.  I'd like to pull up plaintiffs -- what will be

20  Plaintiffs' Exhibit 107, which I'd like to mark for

21  identification purposes.  I'd like to show you that along side

22  Figure 2 in your report, which is Defendants' Exhibit 6, and,

23  again, this is page 3.

24       Dr. Hood, it sounds like you were not able to find this

25  map on the Redistricting Data Hub website, correct?
```

Timestamps in left margin: 11:16:40 (line 5), 11:16:59 (line 10), 11:17:15 (line 15), 11:17:37 (line 20), 11:18:00 (line 25)

1   A    I never ran across that, no.

2   Q    Okay.  I will represent to you that this is the VEST

3   Team's precinct level map for Washington County.

4        Does it appear to match the precinct level map that you

11:18:16 5   obtained from Washington County?

6   A    Looks like it from what I can tell.

7   Q    Okay.  And, Dr. Hood, you don't claim the fact that

8   Washington County VTDs don't match Washington County's precinct

9   in any way undermines Dr. Palmer's conclusions regarding

11:18:45 10 racially-polarized voting, correct?

11  A    Well, not necessarily.  I didn't conduct that analysis

12  again.  I am questioning or raising questions I think are

13  pertinent about the VEST data.

14  Q    Okay.  But you don't actually make any claims about the

11:19:03 15 facts that Washington County VTDs don't match Washington

16  County's precincts undermine Dr. Palmer's conclusions in any

17  way, correct?

18  A    Well, I didn't perform that analysis, so in fairness, yes.

19  Q    And you are not claiming that the fact that it may be the

11:19:26 20 case that multiple of Alabama's counties VTDs don't match up

21  with precincts in any way undermines Dr. Palmer's conclusions,

22  right?

23  A    It all depends on -- no, not necessarily.  Again, it all

24  depends on the due diligence that this VEST Team undertook to

11:19:40 25 ensure that they had the right precinct geographies for these

1    counties which is sometimes not an easy thing.  So...

2    Q    Okay.  But you haven't identified any mistakes that the

3    VEST Team made in that regard, correct?

4    A    No.  I'm just pointing out the fact that even they admit

11:20:03  5    that they were unable to obtain precinct geography files for

6    all the counties in Alabama.  I mean, they state that in their

7    report.

8    Q    Do you mean that the Redistricting Data Hub states that?

9    A    Yes.  That's -- yes.

11:20:16 10    Q    So you don't mean that the VEST Team has ever stated that,

11    correct?

12    A    Well, fair enough.  But I mean, you know, from my

13    understanding, the VEST Team puts the data on the Redistricting

14    Data Hub website, right?

11:20:33 15    Q    That's right.

16    A    So that would be -- I think it's fair to say the VEST Team

17    and/or the Redistricting Data Hub website, either one, they

18    seem to be the same entity essentially.  That's just where

19    they're storing or housing their data.

11:20:48 20    Q    Is it your understanding that those entities are the same

21    entity?

22    A    Not the same entity.  What I am saying is that's certainly

23    the VEST Team stores their data on redistricting on that

24    website, right?

11:21:08 25    Q    My understanding is that they distribute it publicly using

1    that website because it's -- it provides access to the public.

2    A    Right.  I think we're talking past each other a little bit

3    here at this point.

4        I mean, again, to the extent to which -- whoever it is

11:21:29 5    that's assembling these redistricting data don't have proper

6    precinct-level shapefiles at the county level raises questions,

7    and they specifically state in a report on the Redistricting

8    Data Hub website that they were unable to obtain precinct-

9    level shapefiles for all counties in Alabama.

11:21:50 10    Q    You mean that the Redistricting Data Hub says that they

11    were unable to obtain precinct-level shapefiles for every

12    county, correct?

13    A    Well, right.  But I am assuming that they were unable to

14    obtain that because the VEST Team was unable to obtain that.

11:22:06 15        Again, I don't know if we're talking past each other now

16    or not, but --

17    Q    Okay.  I can ask you a different question.

18        So you have made no claims about whether the VEST Team

19    obtained county-level precinct maps from counties, correct?

11:22:21 20    A    Well, again, I'm not trying to be argumentative or

21    anything.  But I don't know -- if the VEST team is collecting

22    these data, if they're running the data and housing it on this

23    website, then it's not really this Redistricting Data Hub

24    website that's collecting the data.  It's really the VEST Team.

11:22:50 25    Q    Okay.  And you're not aware of what process the VEST Team

1 went through to collect their data, correct?

2 A    Well, I'm sure they went about, you know, using publicly

3 available sources where possible, and then contacting state and

4 local election officials in other cases.  I mean, that's what

11:23:10 5 has to happen for anyone, so...

6 Q    Okay.  Understood.  And the fact that the figure on the

7 right on the screen right now is the VEST precinct data would

8 suggest that they engaged in the same process you did for

9 Washington County and requested the precinct map from that

11:23:25 10 county, correct?

11 A    Well, if that is the map they had for Washington County,

12 then, yes, they have the right precinct map.

13 Q    Okay.  Let's now -- we can go ahead and take this down.

14      Let's next discuss the -- your comments on the L2 data

11:23:48 15 that Dr. Palmer used for one portion of his analysis.

16      And you note that there may be some discrepancies in the

17 L2 data, correct?

18 A    Well, my point is that the L2 racial data are estimates.

19 They're modeled on algorithms.

11:24:08 20 Q    Okay.  And you note that those discrepancies, they're not

21 all that sizeable, correct?

22 A    Well, one group was overestimated, another group was

23 underestimated, and a third group was both under and

24 overestimated.  I guess my point being, again, in Alabama given

11:24:30 25 that the state records racial data in their registration

```
 1   database, we don't have to use estimates.  The most accurate
 2   data are the data that the state has.
 3   Q    Okay.  But you write that the discrepancies that you just
 4   identified are not all that sizeable, right?
 5   A    Do I use the words not all that sizeable?
 6   Q    Yeah.  I can point that to you if that would be helpful.
 7   A    Okay.  That's fine.  Thank you.
 8   Q    I'm sorry.  Do you want me to point you to that language?
 9   A    Yeah.  I don't remember using those exact words.
10        Okay.  I see it.  Yeah.  Yes.
11   Q    Okay.  And --
12   A    Thank you.
13   Q    Of course.  I'm sorry to speak over you.  I will make sure
14   not do that.
15        You also go on to speculate that these discrepancies,
16   quote, could make a difference in a district functionality
17   analysis where the racial composition of the district is -- in
18   question is evenly divided, correct?
19   A    Sure.
20   Q    Okay.  And you don't make any claims that these
21   discrepancies affect racially-polarized voting in Alabama,
22   right?
23   A    No.  I am just raising the question there.
24   Q    Okay.  You're aware that Dr. Palmer conducted a district
25   level functionality analysis for Mr. Cooper's illustrative
```

 1   majority-black districts, right?

 2   A    Yes.

 3   Q    You are also aware that Dr. Palmer did not use L2 data for

 4   that functionality analysis, right?

11:26:15  5   A    I just -- I honestly don't remember one way or the other.

 6   Q    Okay.  If Dr. Palmer did not use the L2 data for his

 7   functionality analysis, any minor discrepancies in the L2 data

 8   couldn't possibly affect that functionality analysis, correct?

 9   A    Well, I agree.  If he was not using those data, then no.

11:26:39 10   You couldn't affect things.

11   Q    Okay.  Okay.  Let's move on to talk about something else

12   now.

13        In your first report, you observed that Representative

14   Paschal who is black was elected to the Alabama State House in

11:26:58 15   2021 as a Republican, right?

16   A    Correct.

17   Q    Okay.  You also noted that he came in second in the first

18   Republican primary contest, right?

19   A    The initial contest, yes.

11:27:09 20   Q    Okay.  Do you know how many people voted in that primary?

21   A    No.

22   Q    Would it surprise you to learn --

23   A    I don't have it in my report, so I don't know the answer

24   to that sitting here.

11:27:24 25   Q    Okay.  Would it surprise you to learn that it was about

1  3,000 people?

2  A    No.  It was a special election, I believe.

3  Q    Okay.  And Representative Paschal got about 27 percent of

4  the vote in that first primary, right?

11:27:42 5  A    Well, I don't have that figure in my report.  I'm not

6  saying that's incorrect.  I just don't have that figure.

7  Q    Okay.  If he had gotten 27 percent of the vote, that would

8  be about 800 people who voted for him, right?

9  A    Correct.

11:28:16 10  Q    Okay.  And then the rest of the voters all voted for

11  somebody else in the primary, then, right?

12  A    If that's accurate, then, yes.

13  Q    Okay.  And one of those candidates that I do think you

14  discussed is Ms. Hulsey.  I'm probably mispronouncing her name.

11:28:35 15  A    I think it's Hulsey.

16  Q    Hulsey.  Okay.  Sorry about that.  She was one of the

17  candidates in that first primary, right?

18  A    Yes.

19  Q    And are you aware that all of the other candidates in that

11:28:50 20  primary were white?

21  A    Yes.

22  Q    Okay.  And since neither Representative Paschal nor Ms.

23  Hulsey got 50 percent of the vote in that first primary, they

24  went into a runoff?

11:29:10 25  A    That's correct.

1  Q     Do you know how many people voted in the runoff?

2  A     I don't have the figure in my report.

3  Q     Okay.  Would it surprise you to learn that it was about

4  2,900 people?

11:29:20  5  A     No.

6  Q     Okay.  And in that election, Representative Paschal beat

7  Ms. Hulsey by I think somewhere around 65 votes, right?

8  A     It was close.  I mean, I don't know the exact number.

9  Q     Does that sound about right?

11:29:40 10  A     I mean, he got 51.1 percent of the vote.  I have that.  So

11  it was close.

12  Q     Okay.  So it's about 2 percent of the vote he won by; is

13  that right?

14  A     Yes.

11:29:52 15  Q     Okay.  Are you aware that about 3,700 people voted in that

16  election?

17  A     Not -- I mean, I don't remember that fact sitting here.

18  Q     Okay.  Any reason to disagree?

19  A     No.  I'm not disagreeing.  I just don't have that in my

11:30:11 20  report.

21  Q     That's fine.  And you already testified that you didn't

22  conduct any kind of racially-polarized voting analysis on that

23  election, right?

24  A     Correct.

11:30:22 25  Q     Okay.  So you don't provide us with any information about

1  whether voting in that election was actually racially

2  polarized, right?

3  A    Well, I didn't do an analysis, no.  But, again, the

4  district's 84 percent white.

11:30:38 5  Q    The district's 84 percent white, but only about 3,700

6  people voted in that election, right?

7  A    Correct.

8  Q    Okay.  And we don't actually know whether there was a

9  candidate of choice for either black voters or white voters,

11:30:53 10  right?

11  A    I didn't run the analysis, so I can't state that, correct.

12  Q    Okay.  So it's possible that black voters preferred

13  candidate was Paschal, correct?

14  A    It's possible, yes.

11:31:09 15  Q    And it's possible white voters didn't have a preferred

16  candidate at all, right?

17  A    Well, you can imagine a scenario in which that might be

18  the case.  They probably did have a preferred voter given the

19  fact that again 84 percent of the district's white.

11:31:27 20  Q    Is that the only basis that you have for saying that they

21  probably did have a candidate of choice?

22  A    Well, again, I can't state that definitively because I

23  didn't run an analysis to find that out.

24  Q    Okay.  Since -- you would agree that there are far more

11:31:52 25  than 3,700 black voters in Shelby County, right?

```
 1  A    I would assume so, but, again, this is a district in
 2  Shelby County, so it's only part of Shelby County.
 3  Q    Okay.  But you didn't do any analysis to determine whether
 4  there was racially-polarized voting, right?
 5  A    Correct.
 6  Q    Okay.  Are you suggesting we draw conclusions about the
 7  general electorate in Alabama based on this one election?
 8  A    Well, it is just one election, so we would have to base
 9  any kind of conclusion with a note of caution.  I guess what I
10  am stating here based on this example and, again, it's one
11  example, I will grant -- but this example in my academic work
12  is that it appears that black conservatives -- again, there
13  we're talking about white Republicans essentially -- seem to be
14  more than willing to vote for minority Republican candidates.
15  This is an example of it happening in Alabama.
16  Q    Okay.  So you say this is an example of that, but you
17  haven't provided any other examples in Alabama, right?
18  A    This is the only example I have, yes.
19  Q    Okay.  And I will represent to you that only 3,700 people
20  voted in that election.  So that would be a pretty tiny portion
21  of Alabama's population, correct?
22  A    Yes, that's correct.
23  Q    Okay.  In your first report, you also cite an article that
24  you have already discussed a bit, and I just have a few
25  questions about it.
```

11:32:11 (line 5)
11:32:27 (line 10)
11:32:48 (line 15)
11:33:20 (line 20)
11:33:42 (line 25)

           1          It's called True Colors, White Conservative Support For

           2    Minority Republican Candidates.  Do you recall that article?

           3    A    Yes.  Yes.

           4    Q    Okay.  Is it right that when you refer to minority

11:34:00   5    candidates in that article, you're lumping all different

           6    minority groups together, right?

           7    A    Well, that's fair.  Again, I mean, we know the race or

           8    ethnicity of these candidates that we're studying.  But the

           9    group we're studying are just minority candidates as a group.

11:34:19  10    Q    Okay.  And I think -- is it right that you analyzed 11

          11    elections in that article?

          12    A    Without looking, that sounds about right.

          13    Q    Okay.  I think you said that none of those elections were

          14    in Alabama, right?

11:34:34  15    A    There were no examples -- I mean, we used the entire set

          16    of elections that were available to us to study minority

          17    Republican candidates running for Governor or U.S. Senate.  So

          18    there wasn't an example to use from Alabama.  It just didn't

          19    exist.

11:34:51  20    Q    Okay.  So you didn't analyze any elections from Alabama?

          21    A    That's correct.  There weren't any to analyze.

          22    Q    Got it.  And of the 11 -- of the 11 elections you did look

          23    at, does it sound right to you there were four that involved a

          24    black candidate?

11:35:14  25    A    That sounds correct.

```
 1   Q    Okay.  And is it also correct that none of those black
 2   candidates actually won their general elections?
 3   A    I would have to look.  I would have to go back and look.
 4        I guess that would mean that perhaps Senator Tim Scott
 5   from South Carolina had not had an election at that point when
 6   we wrote this article, otherwise, he certainly would have been
 7   in the data set and would have been an example of the winning
 8   minority Republican candidate.
 9        So if it was before Senator Scott, then it may be the case
10   that none of the minority candidates who are black won in this
11   particular study.
12        Again, we weren't looking at winning or losing.  We were
13   looking at levels of support from white conservatives, so...
14   Q    Okay.  Since the article didn't examine any elections in
15   Alabama, is it fair to say that it doesn't provide any direct
16   evidence related to voting behavior in Alabama?
17   A    Well, I guess that's fair at a certain point.  Again, this
18   is -- was a nationwide study used elections that were available
19   to us from a variety of states for different offices.  It
20   doesn't necessarily mean that the pattern we uncovered in the
21   article wouldn't occur in Alabama, though.
22   Q    Okay.  But you haven't offered any evidence that that
23   pattern exists in Alabama, right?
24   A    Well, I think it does, as an expert sitting here today,
25   having conducted research on this topic.
```

Timestamps (left margin):
11:35:39 (line 5)
11:36:00 (line 10)
11:36:29 (line 15)
11:36:50 (line 20)
11:37:08 (line 25)

1    Q    Okay.  But --

2    A    I think it's pretty safe to say that white conservatives,

3    almost all of whom are Republicans today, would support a

4    minority Republican candidate even in Alabama.  I mean, that's

11:37:25 5    my opinion on the matter, having conducted research in this

6    area.

7    Q    Okay.  But you don't offer any actual evidence of that to

8    support that opinion, correct?

9    A    Well, the evidence I have is from this nationwide study we

11:37:41 10    did.  There wasn't a --

11              JUDGE MARCUS:  Let's stop for a second, Dr. Hood.

12    Ms. Madduri, just to allow the witness to finish his answer

13    before you put the next question.  You may complete your

14    answer.

11:37:58 15              THE WITNESS:  Thank you, Your Honor.

16         Again, there wasn't a case to study in Alabama in the

17    social sciences.  I'm not trying to be flippant, but we're not

18    laboratory sciences.  We have to study what's out there that's

19    occurred.  And they're just had not been a case at that point

11:38:17 20    when we wrote this article of a minority Republican candidate

21    running for U.S. Senate or Governor in Alabama.  So, no, that's

22    not part of the study.  I agree.

23         It doesn't mean that that pattern wouldn't be uncovered in

24    Alabama if we did -- if we were able to study it directly.

11:38:34 25    BY MS. MADDURI:

```
 1   Q    Okay.  But you haven't studied that, correct?
 2   A    Correct.
 3   Q    Dr. Hood, is it fair to say that you have studied partisan
 4   change in the South since the enactment of the Voting Rights
 5   Act?
 6   A    Yes.
 7   Q    Okay.  Is one of your publications on that topic called
 8   The Rational Southerner?
 9   A    Yes.
10   Q    And in your work, including in that publication, you
11   specifically discuss the partisan realignments that happened in
12   the South among black and white voters after the Voting Rights
13   Act passed; is that right?
14        MR. SMITH:  Your Honor, I would object.  This is
15   beyond the scope of what Dr. Hood has expressed an opinion on
16   and beyond the scope of his report.
17        JUDGE MARCUS:  We will see where she is going with
18   this.  You may proceed.  But let's get right to the point if we
19   could, Ms. Madduri.
20        THE WITNESS:  So the answer to that --
21        JUDGE MARCUS:  No, no, no.  I'm sorry.  What was the
22   question, Ms. Madduri?  I want to make sure we have it.
23        MS. MADDURI:  Sure.  The question was:  That in
24   Dr. Hood's work, he has specifically discussed the partisan
25   realignments that happened in the South among black and white
```

1  voters after the passage of the Voting Rights Act.

2        JUDGE MARCUS:  You may answer.

3        THE WITNESS:  Yes, that's correct.

4  BY MS. MADDURI:

11:40:26 5  Q    Okay.  And is it also correct based on your research that

6  once African-Americans were re-enfranchised after the Voting

7  Rights Act, they fairly quickly realigned to the Democratic

8  Party in the South?

9  A    Yes, that's fair.

11:40:41 10  Q    Okay.  And prior to partisan realignment, white

11  southerners had overwhelmingly preferred the Democratic Party,

12  correct?

13  A    In the South, yes.

14  Q    Okay.  And after the VRA passed, white southerners

11:40:54 15  realigned to affiliate with the Republican Party, correct?

16  A    Conservatives and moderates, yes.  I mean, if you are a

17  white progressive, you didn't realign is what I am saying.

18  Q    Okay.  But your research shows that generally white

19  southerners overall reaffiliated with the Republican Party

11:41:16 20  after the VRA was enacted, right?

21  A    Correct.  Because, you know, there are more white

22  conservatives than moderates and progressive, so, yes.

23  Q    And you would agree that that realignment is primarily a

24  function of racial and political dynamics, right?

11:41:34 25  A    Well, that's pretty broad racial and political.

1    Certainly, yes.  I mean, that -- yeah.

2    Q    Specifically, your research has found that the

3    increasingly liberal orientation of the National Democratic

4    Party on the issue of Civil Rights impacted white southerners,

11:42:01 5    correct?

6    A    Correct.

7    Q    Okay.  And you would -- your research I think shows that

8    the VRA was a milestone in the development of the Republican

9    Party in the South, right?

11:42:09 10    A    Yes.

11    Q    Okay.  And at the same time, there was also a transition

12    at the national level where the Democratic Party became more

13    liberal on the issue of Civil Rights for African-Americans, and

14    the Republican Party became more conservative on that same

11:42:27 15    issue, correct?

16    A    Yes.  There was an switch in issue positions at the

17    national level.

18    Q    Okay.  And the Republican Party was increasingly viewed as

19    the party of racial conservatism, right?

11:42:40 20    A    Yes, that's fair.

21    Q    Okay.  And black mobilization in the Democratic Party led

22    directly to the transition of whites to the Republican Party,

23    right?

24    A    Yes.  That's one of the major arguments of the book, yes.

11:42:54 25    Q    Okay.  So you would agree, then, that race is one of the

1  factors that impacts which political party Alabama voters

2  support, correct?

3  A    Well -- okay.  So it would be a little more specific.  Or

4  can you be more specific with that question?

11:43:13  5  Q    Yeah.  I can -- let me ask again.  So would you agree that

6  race is one of the factors that impacts which political party

7  voters in Alabama support?

8  A    Well, yes.  Now, differentiating between race and racism,

9  I mean, in the South today included in Alabama, a majority of

11:43:38 10  whites support the Republican Party.  More than a majority of

11  African-Americans support the Democratic Party.

12       So the -- very much so there are racial coalitions that

13  underlie the party structure at the state level in the South.

14  Q    Would you agree, then, that race is one of -- not just

11:44:14 15  speaking about the race of the people who support the party,

16  but the fact that race is an issue is one of the things that is

17  involved in voters selecting which political party they

18  affiliate with?

19  A    It can be, yes.  I mean, that's part of it.  There is, you

11:44:34 20  know, a multitude of things that may go into someone's calculus

21  for which party to join.

22       Position on racial issues, like affirmative action, for

23  instance, might be one of those.

24  Q    Okay.  And would you say that the position of the parties

11:44:53 25  on race-related issues is contributed to that divide that you

1  described?

2  A    Well, the parties sort of set the tone at the national

3  level with this switch in issue positions in about 1964.  And

4  so they -- the party elite sent out the signal which, in turn,

11:45:16  5  caused an exodus.  I mean, before the Voting Rights Act, you

6  really just had the Democratic Party in the South.  You had

7  factions within the Democratic Party.  Again, especially in

8  certain states, most African-Americans may have been

9  disenfranchised.  So you are really talking about a white

11:45:38  10  Democratic party.  When they switched issue positions in the

11  '64 Civil Rights Act, and the '65 Voting Rights Act were

12  passed, it did begin a slow exodus of white conservatives and

13  later white moderates to the Republican Party.  Fairly quickly,

14  though, in the mid 1960s, African-Americans who were

11:45:59  15  re-enfranchised moved very quickly to the Democratic Party.

16         So, you know, if you are a white conservative in order to

17  accomplish political goals in a party that's pretty quickly

18  becoming crowded out with issue -- or opinions that don't

19  necessarily mesh with yours, you're going to move to another

11:46:22  20  vehicle for that, and that's what happened with black

21  conservatives.

22  Q    Okay.  And I think you mentioned that the national party

23  switched issue positions.  You mean on issues related to race,

24  correct?

11:46:44  25  A    On Civil Rights, yes.  Yeah.  That's what I am talking

```
 1  about.
 2  Q    Okay.  Your analysis in this case has not looked at the
 3  impact that race-related issues -- how race-related issues
 4  contribute to the partisan divide between whites and blacks
 5  candidates, right?
 6  A    I didn't analyze that for this case, no.
 7  Q    And I'm sorry.  I think I said candidates, but I meant
 8  voters.  I can restate the question if you don't understand
 9  what I am asking?
10  A    Well, I didn't do that analysis period in this case.  I
11  mean, that's fair.
12  Q    Okay.  And your analysis doesn't in any way suggest that
13  race-related issues don't have an impact on the division
14  between voters, correct?
15  A    They may have an impact.  I am not saying that they're
16  not.
17  Q    And would you agree that a complete understanding of
18  southern party politics requires an appreciation of the role
19  that race has played and continues to play in that region?
20  A    That sounds like what I said yesterday and the first day
21  of class, so, yes.  It's not the only thing, but certainly you
22  have to understand race to understand southern politics.
23  Q    Okay.  I think I am just about done here, Dr. Hood.  I
24  want to ask you about one thing that you testified about during
25  your discussion with Ms. Gbe.
```

```
        1      You discussed the concept of the core preservation and the
        2   fact that some states at times list that as a criteria for
        3   redistricting.  Do you recall that?
        4   A    Yes.
11:48:43 5  Q    Is it your recollection that Alabama did not include core
        6   preservation in its redistricting guidelines in 2010?
        7   A    I just honestly don't remember the answer to that.  Not
        8   sure.
        9   Q    Okay.  I can pull the exhibit to refresh your
11:49:08 10 recollection.
       11   A    Okay.  Please do.
       12   Q    Okay.  That would be Plaintiffs' Exhibit 87, pages 917 and
       13   918.
       14      I can represent to you that this is a transcript of your
11:49:51 15 testimony in the Chestnut case in 2019.
       16   A    Okay.
       17   Q    Okay.  And we can zoom in a little bit on -- first on page
       18   917 at line 13, around line 13 to the bottom.  Okay, again,
       19   here I will represent to you that you were discussing the 2010
11:50:22 20 guidelines in this section of your testimony.
       21      And the last line there says, But nothing in that section
       22   mentions core preservation; is that correct?
       23   A    Well, okay.  So.
       24   Q    We are going to get it arranged for you to be able to see.
11:50:45 25 A    Okay.  All right.
```

```
 1   Q    If you can just hang on one second.  There you are being
 2   asked about the guidelines, and it says at the bottom at line
 3   25 on page 917, But nothing in that section mentions core
 4   preservation; is that correct?  And you say, I don't see it.
 5   A    That's correct.
 6   Q    Okay.  Does this -- go ahead?
 7   A    Up above, so I just want to point out up above we're
 8   talking about avoiding incumbent contests.  I mean, core -- you
 9   know, I don't disagree that apparently the document didn't use
10   the word core preservation.  But if you're worried about
11   incumbent contests in retaining incumbents, by virtue of that
12   fact, you're thinking about core preservation at least.  You
13   have to be.  If you draw someone out of their district or you
14   draw a district where someone has got 10 percent of the -- of
15   the constituents they had in the previous election cycle, you
16   know, so it has almost no core preservation, you are
17   endangering that incumbent.
18        So I'm just pointing that out.
19        Apparently, I don't disagree.  It didn't use the word core
20   preservation, but if it's talking about incumbency, it's still
21   a factor to think about.
22   Q    Okay.  So you agree that the 2010 guidelines did not list
23   core preservation as a guideline, right?
24   A    Not according to what I said here, no.  I mean, yes, I
25   agree with you.
```

11:51:16  (line 5)
11:51:35  (line 10)
11:52:00  (line 15)
11:52:17  (line 20)
11:52:35  (line 25)

1  Q    Okay.  So then core preservation as a guideline was only

2  added in 2021; is that right?

3  A    Well, if it wasn't there in 2011 or 2010, then, yes.

4  Q    Okay.

11:53:11  5         MS. MADDURI:  I don't have any further questions for

6  Dr. Hood.

7             JUDGE MARCUS:  Okay.

8             MS. MADDURI:  Thank you for your time.

9             THE WITNESS:  Thank you.

11:53:16 10         JUDGE MARCUS:  All right, Ms. Madduri.  We will turn

11  to counsel for Singleton, Mr. Quillen.

12             MR. QUILLEN:  Thank you, Your Honor.

13                          CROSS-EXAMINATION

14  BY MR. QUILLEN:

11:53:25 15  Q    Good afternoon, Dr. Hood.

16  A    Good afternoon.

17  Q    My name is Henry Quillen, and I represent the Singleton

18  plaintiffs in this case.

19         I'd like to begin by talking about your functionality

11:53:38 20  analysis.  You used the 2018 gubernatorial election and the

21  2020 presidential election as the basis of that analysis,

22  correct?

23  A    Correct.

24  Q    And for both of those elections, your analysis showed that

11:53:54 25  black voters overwhelmingly voted for the Democratic candidate,

```
 1  correct?
 2  A     Correct.
 3  Q     And for both of those elections, you built a model to
 4  estimate the results if those elections had been contested in
 5  three different hypothetical congressional districts, right?
 6  A     Correct.
 7  Q     One of those districts was District 7 in the plan that was
 8  enacted by the state of Alabama in 2021, right?
 9  A     Correct.
10  Q     And the other two districts were Districts 6 and 7 in the
11  whole county plan proffered by the Singleton plaintiffs,
12  correct?
13  A     Correct.
14  Q     You didn't present this analysis to the Alabama
15  Legislature before it enacted the 2021 plan, did you?
16  A     No.  It was -- I didn't have it done, no.
17  Q     Okay.  For the 2018 gubernatorial election, your analysis
18  estimated that the Democratic candidate would have received
19  more votes than the Republican candidate in Districts 6 and 7
20  in the Singleton whole county plan.  And if you would like me
21  to put that up on the screen for you, I can.
22  A     I have got it in front of me.  That's correct.  That's
23  correct.
24  Q     And the same is true for the 2020 presidential election,
25  correct?
```

11:54:09  (line 5)
11:54:21  (line 10)
11:54:36  (line 15)
11:55:00  (line 20)
11:55:15  (line 25)

```
 1   A    Yes, I believe so.  It was -- 49 to 49 in District 7.  I
 2   mean, it's very true.  It's 49.13 Democratic in Singleton
 3   District 7 and 48.92 percent Republican in that district.
 4        So I mean, mathematically, yes, that's correct.  It's
 5   almost a virtual tie, though.
 6   Q    But the Democrat had the plurality, correct?
 7   A    That's true.
 8   Q    And in the presidential election in Alabama, plurality is
 9   good enough to win, correct?
10   A    I think that's good enough to win in any state that I am
11   aware of, yes.
12   Q    There's no such thing as a presidential runoff general
13   election?
14   A    No.  Or Georgia would have tried it, so...  We have a
15   runoff for everything else, so...
16   Q    When you're trying to estimate the results of an election,
17   would you agree it's important to use the most accurate data
18   available to you?
19   A    Yes.
20   Q    The ecological inference has an inherent margin of error,
21   too, correct?
22   A    Yes.  I mean, all statistical models do.
23   Q    And the differential privacy rules of the Census Bureau
24   create potential errors, as well, in your ecological inference
25   analysis, correct?
```

A     Well, potentially, yes.  They're unknown, though.  We
can't control for those.  We don't know what the answer to that
is.

Q     Okay.  The Singleton whole county plan that you evaluated
doesn't split any counties across congressional districts,
correct?

A     That's correct.

Q     And for gubernatorial and presidential elections, the
Alabama Secretary of State reports election results at the
county level, correct?

A     Correct.

Q     And those figures were available to you when you were
doing your analysis, correct?

A     Certainly.

Q     You have the ability to calculate what the actual election
results would have been in District 6 and 7 of the Singleton
whole county plan in the 2010 gubernatorial election and the
2020 presidential election, correct?

A     Based on the county numbers, yes.

Q     But you didn't include those calculations in your report?

A     Well, no, that's not how I ran my functional analysis, so
I didn't.

Q     Did you look at the actual results in those counties to
compare them to the results of your model?

A     No.

1   Q      Did you review the report of the Singleton plaintiffs'

2   expert Dr. Natalie Davis?

3   A      I think I looked at it.

4   Q      Okay.

11:58:28   5            MR. QUILLEN:  Ms. York, could you pull up Exhibit S-2,

6   which is -- this is the report of Dr. Natalie Davis that's been

7   admitted into evidence?

8   BY MR. QUILLEN:

9   Q      You had an opportunity to respond to this report, correct?

11:58:51  10   A      I'm assuming so, yes.

11   Q      But you didn't respond to this report?

12   A      Correct.

13   Q      Can we go to page 24 of this pdf, please?  There we go.

14        Dr. Hood, in this part of Dr. Davis's report, she

11:59:20  15   calculates the actual election results in the counties that

16   encompass District 6 and District 7 in the Singleton whole

17   county plan for 12 elections dating back to 2012.

18        Do you recall seeing this when you reviewed her report?

19   A      I don't recall this, but go ahead.

11:59:45  20   Q      Do you have any reason to believe that she didn't add up

21   these numbers correctly?

22   A      Not sitting here, no.

23   Q      And would you agree that this sort of analysis is not

24   complicated?  If you had to do the same analysis, you would

11:59:57  25   just add up the county level results and divide by the totals?

```
 1  A     Yes.
 2  Q     So in this part of her work -- I will ask you to assume
 3  for purposes of my next few questions that she didn't make any
 4  mathematical errors here.
 5      Do you see how that she lists the counties that are in
 6  District 6, and then she lists the counties that are in
 7  District 7.
 8            MR. QUILLEN:  And, Ms. York, could you scroll down a
 9  little bit so we can see, yeah, the totals for both?
10            THE WITNESS:  Okay.
11  BY MR. QUILLEN:
12  Q     Yeah.  If we could skip ahead a couple of pages now to the
13  results for the 2018 gubernatorial election.  There we are.
14  That's -- these are the county level results on the right side
15  where you see 2018 Maddox-D, Ivey-R.  These are the results for
16  the 2018 gubernatorial election.  Do you see that?
17  A     Yes.
18  Q     In District 6, the Democratic candidate received
19  59 percent of the vote.  Do you see that?
20  A     Okay.
21  Q     And in District 7, the Democratic candidate received
22  56 percent of the vote.  Do you see that?
23  A     Okay.  Yes.  Yes.
24  Q     Can we switch back to Exhibit D-5 of your report at page
25  13?  And scrolling down a little bit, we see that for District
```

Timestamps:
12:00:17 (line 5)
12:00:33 (line 10)
12:00:57 (line 15)
12:01:22 (line 20)
12:01:51 (line 25)

1   7, actually could you go to the next page, it's page 13 of the

2   report pdf.

3        So for that race, your numbers were close.  You

4   underestimated by a little bit the actual result in District 6,

12:02:38 5   which it was actually 59, and you estimated 58.28, and you

6   slightly underestimated the result in District 7.  It was 56,

7   and you estimated 55.48; is that correct?

8   A    From -- I have been trying to follow.  I think so, yes.

9   Q    Okay.  Bear with me because I'd like to do the same thing

12:03:06 10  for the presidential election.  Maybe before we leave this --

11   can we just take note of what you said -- you estimated the

12   vote shares were in the presidential election in District 6 and

13   7.

14        So you said that in District 6, it was 52.03 percent; and

12:03:29 15  in District 7, it was 49.13 percent, correct?

16   A    Yes.

17   Q    Okay.  Can we go back to Dr. Davis's report now on -- I

18   think it's page 28 of the pdf?

19        Yes.  So here is the presidential election.  The bottom

12:04:06 20  percentage in the top group of numbers is 56 percent.  Now, I

21   will -- I do need to tell you, Dr. Davis did not take into

22   account third-party candidates, which you did.  But your

23   analysis found that third-party candidates received somewhere

24   between 1 and 2 percent of the vote, correct?

12:04:31 25  A    Correct.

1  Q    Okay.  So Dr. Davis found that the Democratic candidate in

2  the 2020 presidential election actually got 56 percent of the

3  vote in Congressional District 6, which is about 4 points

4  higher than you estimate, correct?

12:04:50  5  A    Correct.

6  Q    And scrolling down a little bit to the District 7 numbers,

7  Dr. Davis found that the Democratic candidate actually received

8  54 percent of the two-party vote compared to 49 percent in your

9  estimate, correct?

12:05:09  10  A    Correct.

11  Q    So for each of the four results you got -- two elections

12  in two districts -- you underestimated the actual Democratic

13  vote share, sometimes by a little, sometimes by, you know, at

14  least two or three points, correct?

12:05:28  15  A    Well, again, as we just talked about, for one thing, she's

16  not controlling for third-party candidates.

17      You know, my model starts out by disaggregating and then

18  reaggregating things.  So, you know, it's not exactly the same

19  method as what we're seeing here.

12:05:47  20      I mean, I can agree that in these counties in that

21  election this was the vote percentage.  My model, the

22  functional analysis takes into account how this district's

23  going to look moving out into the future, you know.  I have got

24  the current VAP numbers, for instance, I'm using as a spring

12:06:08  25  board for what the election might look like in the future.

1    Q    The current VAP numbers that you're using came from 2020

2    census, correct?

3    A    Correct.

4    Q    And we're looking at the 2020 presidential election,

12:06:21 5    correct?

6    A    That's one of the ones we're looking at, yes.

7    Q    Were there significant changes in demographics in either

8    of those districts between 2018 and 2020?

9    A    I don't know the answer to that.

12:06:33 10    Q    Do you have any reason to believe there were?

11    A    There were probably some changes.  I don't know if they're

12    significant or not.

13    Q    Okay.  Which would be a more accurate measure of the

14    results of the 2020 presidential election in District 6 and 7

12:06:54 15    of the Singleton whole county plan; your model or the results

16    that were certified by the Governor, Attorney General, and

17    Secretary of State of Alabama?

18    A    Well, I mean, the results are the results.  Right?  I have

19    modeled the results as a part of the *Gingles* test.  I mean, I

12:07:15 20    had to do that.  I can't just start out with the results and

21    say here they are.

22         I'm not disputing these are the vote totals.

23    Q    So based on your analysis and the actual election results,

24    would it be fair to say that in District 6 and 7 of the

12:07:38 25    Singleton whole county plan, black voters have an effective

```
 1  opportunity to elect the candidate of their choice?
 2  A    What do you mean by -- define effective.
 3  Q    Do they have a substantial opportunity to elect a black
 4  candidate?
 5  A    That is an opportunity.  Again, unsure, according to my
 6  numbers, District 7, especially in the Singleton plan would
 7  perform or not as a minority opportunity to elect district, for
 8  instance.
 9  Q    Right.  But you been looking at the -- looking at using
10  census numbers from the same year the 2020 presidential
11  election was contested, your model underestimated the
12  Democratic share by 5 percentage points?
13  A    Well, again, it's not apples to apples, to be fair.  We
14  would have to have the third-party votes in there.
15  Q    Right.  So well let's look at that.
16  A    And we know that -- something we haven't discussed that no
17  one can control for in Alabama is the fact that the absentee
18  by-mail votes cannot be put back into the proper precinct.
19  Q    So that would have been an additional source of error for
20  your analysis?
21  A    I don't know that it's a source of error.  It's just that
22  that's one of the reasons my numbers might slightly differ from
23  the vote totals, which we have at the county level, but we
24  don't have it that the precinct level, and that's where my
25  analysis took place.
```

```
 1   Q    Is a precinct-level analysis necessary when a district

 2   only includes whole counties?

 3   A    A precinct-level analysis is certainly necessary when one

 4   is trying to estimate how various racial or ethnic groups are

 5   voting for candidates, yes.

 6   Q    Yeah.  But that wasn't my question.

 7   A    Well, that's part of my analysis.

 8   Q    If we are trying to estimate what the results of the 2020

 9   election would have been, we don't need to know how the

10   absentee ballots were associated with particular precincts, do

11   we, because we already have the Secretary of State's certified

12   election results --

13        JUDGE MARCUS:  Yeah.  Please, if we would just allow

14   the question to be complete before we get the answer and allow

15   the answer to be complete before we go with the next question.

16        With that, you may proceed, Mr. Quillen.

17   BY MR. QUILLEN:

18   Q    If we're trying to estimate how the 2020 presidential

19   election would have come out in Alabama in these districts,

20   which are whole counties, we don't need to associate absentee

21   ballots with particular precincts because the results are

22   reported at the county level, correct?

23   A    Correct.  But you're not estimating anything.  You're just

24   taking the vote totals and adding them up.

25   Q    Right.  And in that way, it's more accurate than what you
```

12:09:33  (line 5)
12:09:48  (line 10)
12:10:10  (line 15)
12:10:26  (line 20)
12:10:41  (line 25)

1  did?

2  A    It's more accurate from the standpoint of these were these

3  vote totals in these counties.  It's not necessarily more

4  accurate given all that I was trying to accomplish with my

12:10:57 5  analysis.

6  Q    What is the purpose of trying to build the results from

7  the 2020 presidential election from a precinct-level

8  demographic analysis if you already have the actual results?

9  A    Again, part of what I'm doing relates to prong 2 of the

12:11:20 10  *Gingles* analysis.

11  Q    Okay.  Does -- if what -- if what you -- if you come up

12  with a result that suggests that a Democrat would lose in a

13  district, but the actual results show that the Democrat would

14  have won, which one should you rely on to know whether or not

12:11:44 15  black -- the preferred candidate of black voters would have an

16  opportunity to win?

17  A    Well, for one, I think my model is pretty well thought

18  out, in terms of partitioning votes by race using real turnout

19  and registration data, looking at the demographics of the

12:12:05 20  district as it's going to exist in the future, and putting all

21  those things together to come up with a vote estimate.

22  Q    Which part of this projects demographic results into the

23  future?

24  A    Well, I have the VAP numbers for the new district.

12:12:25 25  Q    Right.  But that -- right.  But as we discussed, those

1  were based on the 2020 census, and one of your elections was

2  the 2020 election.  Does -- you are not projecting past the

3  year 2020, are you?

4  A    Well, even you are making a projection here with these

12:12:40  5  numbers.  These are 2020 presidential election numbers.

6  They're not numbers that we -- that someone's running for

7  Congress in this district, so...

8  Q    The --

9  A    It's not congruent in that regard.

12:12:56  10  Q    Did you run any analysis of races involving people running

11  for Congress in this district?

12  A    No, I did not.

13  Q    Okay.

14  A    I relied on state level elections where I could resort to

12:13:11  15  precincts in this district I needed to, so...

16  Q    If -- if you took your results based on 2020 census data,

17  and it had one -- you know, and it had one vote share for

18  Democrat, and the actual results had different vote share for

19  the Democrat, which of those would be more reliable?

12:13:37  20  A    Well, I mean, again, if you just want to calculate the

21  actual vote share, and you can do that using counties, then,

22  fine.  But, again, I'm doing much more than that for my

23  analysis.

24  Q    Do you -- based on your analysis and the actual results,

12:14:00  25  you wouldn't say that -- that -- that black voters have no

1  opportunity to elect a candidate of their choice, correct?

2  A    I wouldn't say no.  That's correct.

3  Q    Uh-huh.  Okay.  And if I told you that Dr. Davis actually

4  ran her analysis for 12 races, and the Democrat got more votes

12:14:25 5  than Republican in each one, would that surprise you?

6  A    Not necessarily.

7  Q    Okay.

8  A    I mean, this isn't an analysis, though.  These are just

9  numbers that are aggregated together.

12:14:46 10         MR. QUILLEN:  Ms. York, you can take this down now.

11         And, actually, can you please put up Dr. Hood's report,

12  page 15 of the pdf, page 14 of the report?

13         JUDGE MARCUS:  We are talking about the first report

14  now, right?

12:15:06 15         MR. QUILLEN:  Yes.  First report.  Exhibit D-5.  I'm

16  sorry.

17  BY MR. QUILLEN:

18  Q    Okay.  Here you are discussing primary elections.

19  Actually, yeah, if you could scroll down just a little bit.

12:15:29 20  Thank you.

21         In this bottom paragraph here, you wrote, If there is an

22  insufficient number of black voters to constitute a majority in

23  a Democratic primary, the black community may be unable to

24  elect their candidate of choice.

12:15:43 25         Do you see that?

```
 1   A    Yes.

 2   Q    Did you analyze whether black voters would constitute a

 3   majority of the voters in the Democratic primary in Districts 6

 4   and 7 of the Singleton whole county plan?

12:15:55  5   A    No.

 6   Q    Do you have any opinion about whether they would

 7   constitute a majority in those districts?

 8   A    No.  I don't.  Because I didn't look at that.

 9   Q    You don't have any reason to believe that they would not

12:16:09 10   constitute a majority in those districts?

11   A    I don't have a reason to say anything one way or the other

12   just sitting here right today.

13   Q    In your model, though, you did -- you did look at general

14   election votes broken down by party and race, correct?

12:16:27 15   A    Yes.

16   Q    If we could go to page 8 of your report, please.  Page 9

17   of the pdf.

18        This is -- this is the -- your model of the 2020

19   presidential election in District 6 in the Singleton whole

12:16:52 20   county plan.

21        Is that left column the breakdown of the Democratic votes

22   by race?

23   A    Yes.

24   Q    So it appears that black -- black Democratic voters

12:17:11 25   outnumbered white Democratic voters by more than three to one;
```

```
 1   is that right?

 2   A    In this calculations, yes.

 3   Q    Okay.  If we go to the next page --

 4   A    Those aren't necessarily --

 5            JUDGE MARCUS:  I'm sorry.  Let him finish his answer

 6   please, Mr. Quillen.

 7            THE WITNESS:  Those -- I'm just saying those aren't

 8   necessarily primary voters, though.

 9   BY MR. QUILLEN:

10   Q    Understood.

11   A    Okay.

12   Q    And if we could go to the next page where it has the

13   similar result for the 2018 gubernatorial election in District

14   6.  Here towards the bottom of the screen, the black Democratic

15   voters outnumbered the white Democratic numbers by more than

16   two to one, correct?

17   A    Yes, that's correct.

18   Q    Okay.  And if we go to the next page, which is the results

19   that you got for the 2020 presidential election in District 7.

20            I think -- let's see.  Oh, I'm sorry.  One more page.

21            Here, the black Democratic voters outnumbered the white

22   Democratic voters by more than eight to one, correct?

23   A    Yes.

24   Q    Okay.  And last one is on the next page, which is the 2018

25   gubernatorial election in District 7.  The black Democratic
```

```
 1  voters outnumbered the white Democratic voters by more than
 2  four to one?
 3  A    Yes.
 4  Q    You don't have any evidence, do you, that black turnout in
 5  primary elections is so low compared to general elections that
 6  black voters would be a minority in a Democratic primary in
 7  these districts, despite being the vast majority of the
 8  Democratic voters in the general election, do you?
 9  A    No, I don't have access to those data.  As I stated
10  earlier in my testimony, I asked for the voter registration and
11  history databases for some primary elections, and I was unable
12  to obtain them.
13  Q    Just as a matter of mathematics, if black Democratic
14  voters outnumber white Democratic voters by eight to one in a
15  general election, then for them to be the minority in the
16  primary election, their turnout would have to fall by
17  seven-eighths while white turnout remained at 100, correct?
18  A    Yeah, in that hypothetical, yes.
19  Q    Is that something that you have seen in your political
20  research --
21  A    I'm not saying that's the case.
22  Q    Okay.  All right.  If you will just give me one minute.
23            MR. QUILLEN:  Okay.  I have no further questions.
24            JUDGE MARCUS:  Thank you.  Mr. Smith, where are we in
25  terms of redirect?  We will be able to give our reporter a
```

Timestamps in left margin:
- 12:19:01 (line 5)
- 12:19:19 (line 10)
- 12:19:40 (line 15)
- 12:19:59 (line 20)
- 12:20:26 (line 25)

```
 1  break, but if you will be short, you may proceed.
 2          MR. SMITH:  Your Honor, I think it will be maybe
 3  five minutes.
 4          JUDGE MARCUS:  Fire away.
 5                  REDIRECT EXAMINATION
 6  BY MR. SMITH:
 7  Q    Dr. Hood, do you recall questions from plaintiffs' counsel
 8  about courts crediting your testimony?
 9  A    Yes.
10  Q    And, Dr. Hood, approximately how many cases have you
11  served as an expert witness in?
12  A    I'm not really sure.  I've testified -- testified in court
13  more than 25 times.
14  Q    And have a number of those courts credited your testimony?
15  A    Yes.
16  Q    And does that include the Northern District of Alabama in
17  the Chestnut case?
18  A    Yes.
19  Q    And, Dr. Hood, did Mr. Bryan assist you with processing
20  any data in this case?
21  A    Yes.  He did some geocoding.
22  Q    But is any opinion in your report that references that
23  data, in fact, your own opinion?
24  A    Yeah.  That's what I was saying earlier.  We did not
25  discuss the merits of my analysis or anything like that.  It
```

Timestamps: 12:20:36 (line 5), 12:20:48 (line 10), 12:21:08 (line 15), 12:21:24 (line 20), 12:21:40 (line 25)

```
 1  was literally discussion of some data that I needed him to run,
 2  that I used in my analysis.
 3  Q    And, Dr. Hood, do you recall being asked about the passage
 4  of the VRA in partisan realignment?
 5  A    Yes.
 6  Q    Dr. Hood, even if the passage of the VRA influenced some
 7  partisan realignment in the 1960s, does that tell us why anyone
 8  is voting for a Republican candidate today?
 9  A    Not necessarily.  I mean, you know, there are many --
10  again, there are many different issues that may make someone
11  identify as a Republican or a Democrat today.
12       So I would say it's part of the calculus, but not all of
13  the calculus, I guess is a fair way to put it.
14  Q    And, Dr. Hood, looking to page 15 of your report, where
15  you discuss the election of Representative Paschal, what was
16  the race of the Democratic candidate in the general election?
17  A    From my memory, I think they were white.
18  Q    And can you tell us what the vote shares in that general
19  election were between the Democratic and Republican candidates?
20  A    Well, yes.  So I will just read the sentence.
21       Paschal faced a white Democrat Sheridan Black in the
22  special general election held on July 13th, 2021.  In this
23  contest, Paschal won with 74.7 percent of the vote to
24  25.1 percent of the vote for black.
25  Q    And, Dr. Hood, would you say that's a safe margin that he
```

12:21:59  (line 5)
12:22:19  (line 10)
12:22:42  (line 15)
12:23:08  (line 20)
12:23:32  (line 25)

```
 1  won by?
 2  A    I think most legislative incumbents would think that's a
 3  safe margin, yes.
 4  Q    Dr. Hood, in performing your functionality analysis or any
 5  other -- would -- let me reframe that.  Withdrawn.
 6       Dr. Hood, when considering elections in this case on which
 7  you based your opinions, how did you go about picking the
 8  elections that you picked?
 9  A    Well, I picked recent elections that were conducted
10  statewide that were contested, as well.  Again, if you have a
11  statewide election, you can reconfigure it in any district you
12  want to, including districts that may or may not be in
13  existence.
14       So, again, the top of the ticket, most recent, statewide
15  elections in the past two election cycles, Governor and
16  President, if there was time, there could have been more done,
17  certainly.  Other elections could have been analyzed.  But I
18  viewed these as pretty probative in terms of trying to get a
19  fix or an idea of how these districts would perform out in the
20  future.
21  Q    And, Dr. Hood, given more time, would you review more
22  elections?
23  A    Certainly, I could have run more elections with more time,
24  yes.
25       MR. SMITH:  Your Honor, may have just a moment?
```

12:23:48  (line 5)
12:24:04  (line 10)
12:24:22  (line 15)
12:24:43  (line 20)
12:24:57  (line 25)

```
              1              JUDGE MARCUS:  You sure can.

              2    BY MR. SMITH:

              3    Q    Dr. Hood, one or two more questions.  Do you recall being

              4    asked about whether the core preservation factor was in the

12:26:08      5    redistricting guidelines before 2020, or 2021?

              6    A    Yes.

              7    Q    And have you reviewed the reapportionment redistricting

              8    guidelines from 2000 to know whether they were included in

              9    those guidelines?

12:26:24     10    A    I can't remember having ever looked at that document.

             11    Q    Okay.

             12              MR. SMITH:  Your Honor, nothing further from us.

             13              JUDGE MARCUS:  All right.  Any questions, Judge

             14    Manasco or Judge Moorer?

12:26:37     15              JUDGE MANASCO:  None from me.

             16              JUDGE MOORER:  None from me.

             17              JUDGE MARCUS:  All right.  Anything further for this

             18    witness?

             19         All right.  Seeing none, we thank you, Dr. Hood, and you

12:26:49     20    are excused.

             21              THE WITNESS:  Thank you, Your Honor.

             22              JUDGE MARCUS:  I take it we're going to go back to the

             23    plaintiffs' case when we come back after lunch.

             24         We talked about your expert from Caster would be the next

12:27:07     25    witness?
```

```
 1              MS. MADDURI:  That's right, Your Honor.

 2              JUDGE MARCUS:  That would be Dr. King.

 3              MS. MADDURI:  Correct.

 4              JUDGE MARCUS:  Do you have any other witnesses that

12:27:17 5   you are planning to call?

 6              MS. MADDURI:  We have one other witness who is a

 7   plaintiff in the case, Mr. Caster.

 8              JUDGE MARCUS:  All right.  And does that complete the

 9   presentation by all of the plaintiffs?  There would be nothing

12:27:31 10  further from Milligan or Singleton, I take it?

11              MR. BLACKSHER:  Nothing further --

12              JUDGE MARCUS:  Thank you.  Same thing for Milligan,

13   counsel?

14              MS. GBE:  Yes, nothing further from Milligan.

12:27:44 15             JUDGE MARCUS:  All right.  So then we will turn to

16   Mr. Davis to the rest of your case.

17          Who do you have lined up, just trying to get of sense of

18   whether we will get it in today or we'll go into tomorrow?

19              MR. DAVIS:  We intend to call Bradley Byrne, former

12:28:04 20  Congressman Bradley Byrne, Your Honor, again assuming his

21   schedule permits.  We will have to see when we get there.

22              JUDGE MARCUS:  Gotcha.  That would be the only one?

23              MR. DAVIS:  Correct.

24              JUDGE MARCUS:  Just so you're clear, originally, you

12:28:16 25  indicated that you might be calling the map drawer, the
```

1  cartographer Hinaman.  He has been fully deposed.  I take it

2  you are not planning to call him.

3        MR. DAVIS:  We do not plan to call him, Your Honor.

4  His deposition is in the record.

12:28:30  5        JUDGE MARCUS:  Yes.  Yes, it is.

6     All right.  With that, it's 12:28 your time.  We will

7  proceed, then, at 1:30 Central Standard Time, 2:30 Eastern

8  Standard Time with the Caster -- the rest of the Caster case.

9     Thank you all.  We will see you in about an hour.

12:28:52  10        (Recess.)

11        JUDGE MARCUS:  I take it the parties are ready to

12  proceed?  Caster I take is next?

13        MR. OSHER:  That's right, Your Honor.

14        JUDGE MARCUS:  All right.  Mr. Osher, you will be

13:29:47  15  calling Bridgett King, correct?

16        MR. OSHER:  Yes, that's right.

17        JUDGE MARCUS:  All right.  Thank you much.

18     Ms. King, if you will raise your right hand.

19                     BRIDGETT KING,

13:29:56  20  having been first duly sworn, was examined and testified as

21  follows:

22        JUDGE MARCUS:  Thank you very much.  If you will state

23  your name for the record, please.

24        THE WITNESS:  Sure.  Bridgett King.

13:30:14  25        JUDGE MARCUS:  Thank you, Ms. King, and you may

```
 1   proceed with your examination.
 2           MR. OSHER:  Thank you, Your Honor.
 3                        DIRECT EXAMINATION
 4   BY MR. OSHER:
 5   Q    Good afternoon, Dr. King.
 6   A    Good afternoon.
 7   Q    Thanks for being with us today.  Can you hear me okay?
 8   A    Yeah.  Can y'all hear me?
 9   Q    I think that works.
10           MR. OSHER:  Your Honor, does that work?
11           JUDGE MARCUS:  Yes.  We hear you fine.
12   BY MR. OSHER:
13   Q    All right.  Dr. King, you have been retained as an expert
14   for the by the Caster plaintiffs; isn't that right?
15   A    That's correct.
16   Q    Okay.  I would like to refer your attention to what's been
17   admitted as Plaintiffs' Exhibit 80, which I believe you have in
18   front of you, which is currently shown on the screen.  Is this
19   the initial report that you submitted for the plaintiffs in
20   this case?
21   A    Yes.
22   Q    Thank you.  And looking at the page after page 56 of that
23   initial report, is that a copy of your current resume?
24   A    Yes.
25   Q    We can go ahead and take that down.  Thank you.
```

1    Let's start with your background, Dr. King.  Can you
2    please give us a brief overview of your educational history?
3    A    Sure.  I have a bachelor's degree in psychology from
4    Hampton University, which I earned in 2003.  A master's degree
13:31:33 5    in justice studies, which I earned from Kent State University
6    in 2006, and a Ph.D. in political science also from Kent State
7    University, which I earned in 2012.
8    Q    Can you tell us about your dissertation at Kent State?
9    A    Sure.  So my dissertation was in analysis that looked at
13:31:54 10    the way state policies impact the voter turnout of
11    African-Americans from 2008 to -- great -- 2008 to -- 2006 to
12    2012.  I haven't looked at it in a while.
13    Q    Fair enough.  What sort of policies did you look at?
14    A    Sure.  My dissertation considers things like election day
13:32:19 15    registration, the severity or strictness of enforcing a voter
16    ID law requirements, variations in felony disenfranchisement
17    statutes that exist in the states, things like the number of
18    days prior to an election that one must register, days for
19    early voting, thing like that.
13:32:36 20    Q    Great.  And just to be clear, that focused on the impact
21    of voters who are black; isn't that right?
22    A    Yes, specifically focused on voter turnout among black
23    Americans, yes.
24    Q    So after you received your dissertation at Kent State,
13:32:53 25    what did you do after that?

```
 1  A     After completing my dissertation, I spent a year at the
 2  Brennan Center for Justice at NYU as a voting rights
 3  researcher.
 4  Q     What sort of work did you do at the Brennan Center?
13:33:05 5  A     So at the Brennan Center, we worked on a variety of
 6  projects that directly related to different issues surrounding
 7  the 2012 election.  So we did a collaborative multi-state
 8  survey with common cause.  I also did some work that looked at
 9  the allocation of resources and how that is connected to
13:33:26 10  demographics in different precincts and polling locations in
11  Florida.  Broadly, though, I along with the other voting rights
12  researchers were there to just support through social science
13  research any of the projects they might have been working on.
14  Q     Great.  And I'm showing this as much a reminder for me as
13:33:45 15  is for you, but if we can try to talk slowly so the court
16  reporter can take it all down, we would appreciate it.
17  A     I will slow down.
18  Q     So after your year at the Brennan Center, where did you go
19  after that?
13:33:57 20  A     I was a visiting instructor at Valdosta State University
21  in Georgia.
22  Q     What did you teach there?
23  A     While at Valdosta, I taught sort of a general American
24  government course.  I also taught public opinion.  And I taught
13:34:12 25  research methods, which I also taught while I was in grad
```

1 school.

2 Q    Gotcha.  And then after Valdosta State, where did you go

3 after that?

4 A    After Valdosta, I accepted my job at Auburn University

13:34:25 5 where I currently work.

6 Q    How long have you been at Auburn now?

7 A    I have been at Auburn since the 2014-2015 academic year.

8 Q    Great.  And what's your current position at Auburn?

9 A    I am an associate professor with tenure in the department

13:34:39 10 of political science and also the director of the master public

11 administration program.

12 Q    What classes have you taught and teach -- currently teach

13 at Auburn?

14 A    So at the undergraduate level, American government.  I

13:34:56 15 also have taught a class called state and local government that

16 has been revised and now wholly focuses on states.  I taught

17 classes in political participation, the legislative process,

18 which primarily focuses on Congress, but also state

19 legislatures.  I've done independent studies that focus on

13:35:15 20 felony disenfranchisement and election administration.  I think

21 that's it.

22     At the graduate level, I have taught a comparative state

23 politics class.  I also have -- currently teach our seminar in

24 public administration and public service.  I have taught our

13:35:37 25 diversity and public life course.  I taught a policy analysis

```
 1  course.  I also teach some classes that involve both grad
 2  students and undergraduate students around special topics
 3  issues.  So, for example, this past spring, I taught a class
 4  called the politics of pandemics with one of my colleagues.  We
 5  looked at government response, both domestically and
 6  internationally.  And I taught a class also last spring about
 7  black identity and institutions historically in the United
 8  States.
 9  Q    So turning now to your scholarships.  Have you published
10  literature on the subject of voting?
11  A    Yes.
12  Q    And can you tell us a little bit about that?
13  A    So an example of my scholarship on voting specifically
14  related to political participation, and I have published an
15  article that focuses on the effects of felony
16  disenfranchisement.  So the rate of felony disenfranchisement
17  in the states and how that impacts the voter turnout of
18  African-Americans.  I also do some work that looks more
19  directly at how or how -- what citizens experience when they go
20  to cast a ballot, how these interactions affect their
21  confidence in the electoral process.  So disposition of their
22  ballot, ballots in their community, ballots across the country.
23       I also have looked at how certain variations and access to
24  voting and registration information online and the state of
25  Alabama.  So those are primarily journal articles.
```

| | |
|---|---|
| 1 | But I have also coedited several books.  And so one that I |
| 2 | edited by myself focuses -- how do I say this -- it's kind of a |
| 3 | history of voting more broadly.  So starting with early America |
| 4 | and then ending in 2016, where I wrote essays over -- I think |
| 13:37:44  5 | it was eight time periods that sort of focus on what was |
| 6 | happening in terms of the evolution of voting rights in the |
| 7 | United States, and then those essays are supplemented with some |
| 8 | copies of the original documents that I discuss this these |
| 9 | essays for reference. |
| 13:38:00 10 | With some of my colleagues at Auburn, I also have worked |
| 11 | on -- edited books that specifically focus on election |
| 12 | administration, what it looks like now, and what it will look |
| 13 | like in the future.  That includes working with academics |
| 14 | outside of Auburn University and also election administration |
| 13:38:17 15 | practitioners from across the United States. |
| 16 | And then lastly, I coedited a book that is about the |
| 17 | causes and consequences of the decision to participate or not |
| 18 | participate in the context of the United States. |
| 19 | Q    And you touched on this before, but that does that |
| 13:38:37 20 | scholarship often discuss the influence of race on voting |
| 21 | behavior? |
| 22 | A    Yes. |
| 23 | Q    And has your scholarships specifically touched on the |
| 24 | history of voting in Alabama? |
| 13:38:49 25 | A    Both directly and indirectly.  So I would say through a |

1  lot -- so when talking about sort of current realities, history
2  is deeply embedded in that.  And so specifically when talking
3  about the evolution of voting rights, obviously, there are some
4  discussion of Alabama.

13:39:06  5      I would also say in that text that I mentioned earlier,
6  the edited text that goes from early America to 2016, I would
7  argue there's a considerable discussion specifically about the
8  state of Alabama along with the Deep South more general.
9  Q    And in the process of performing that research, have you
13:39:25 10  become familiar with Alabama's history of voting and
11  discrimination in voting?
12  A    Yeah.  I would say along with the process of performing
13  that research and living here and teaching students who are a
14  lot from Alabama, they ask questions, and I like to be in a
13:39:47 15  position to answer them.
16  Q    All right.
17          MR. OSHER:  Your Honor, at this point, I tender
18  Dr. King as an expert in the fields of political science,
19  research methodology, history of voting, and elections in the
13:39:58 20  United States and Alabama, voting behavior, and the matters
21  discussed in her reports.
22          JUDGE MARCUS:  Is there any challenge to Dr. King's
23  expertise from the state?
24          MR. BOWDRE:  No, Your Honor.
13:40:15 25          JUDGE MARCUS:  All right.  Seeing no challenge, we

1 will qualify Dr. King as an expert in each of the fields,

2 Mr. Osher, that you have identified, and you may proceed with

3 her as qualified.

4          MR. OSHER:  Thank you, Your Honor.

13:40:30 5 BY MR. OSHER:

6 Q    Dr. King, we looked at your initial report in this case.

7 Let's now turn to your rebuttal report, which has been admitted

8 as Plaintiffs' Exhibit 81.  And that is, in fact, your rebuttal

9 report that you submitted in this case?

13:40:50 10 A    Yes.

11 Q    Now, as to both of -- both of the reports that we

12 discussed, have you changed your opinions or conclusions in any

13 way since you signed them?

14 A    No.

13:40:58 15 Q    Okay.  Can you please briefly describe the materials you

16 reviewed in creating your expert reports?

17 A    Sure.  So I reviewed academic journal articles, also law

18 articles, and relevant texts, some data from state websites,

19 state organizations, and other relevant non-state entities,

13:41:26 20 non-profit organizations, for example, that would have relevant

21 data.  I looked at some news articles, some exit polls surveys,

22 I think that's about it.

23 Q    Do you use these sources that you have identified

24 routinely in your scholarship?

13:41:47 25 A    Yes.

1508

```
 1  Q    And is it usual for political scientists generally to use
 2  these sources in their scholarship?
 3  A    I would say yes.
 4  Q    Okay.  Could you please explain what the attorneys for the
 5  Caster plaintiffs asked you analyze for purposes of creating
 6  your initial report?
 7  A    Yes.  So I was asked to write a report that was responsive
 8  to several of the Senate Factors.
 9  Q    And can you tell us what your understanding is regarding
10  what the Senate Factors are and where they come?
11  A    Sure.  So the role of the Senate Factors is to provide a
12  more holistic sort of overview of circumstances and/or
13  conditions in the state that might be discriminatory when
14  trying to make a decision about discrimination related to
15  political participation, or equal access to participation I
16  should say.
17  Q    And it's not your understanding that this is going to show
18  intentional discrimination with respect to the policy being
19  challenged in this case, right?
20  A    That's my understanding.
21  Q    Is it common for political scientists to become familiar
22  with relevant people authority, such as cases, statutes, and
23  legislative history when they are engaging in scholarship like
24  this?
25  A    I would say yes.
```

Timestamps: 13:41:59 (line 5), 13:42:15 (line 10), 13:42:39 (line 15), 13:42:52 (line 20), 13:43:07 (line 25)

```
 1  Q     And do you often incorporate those sort of legal sources
 2  into your work?
 3  A     Yes.  And so as an example, I have an article that looks
 4  at the role that race plays when voters go to cast a ballot in
13:43:25  5  a foreign location.  So looking at same race interactions in
 6  polling locations, and that article, for example, references
 7  the Graddick case, so I would say, yes, it's fairly reasonable.
 8  Q     And the Graddick case you are referencing there, that is a
 9  federal court decision in Alabama regarding the people who work
13:43:42 10  at the polls?
11  A     Yes.
12  Q     All right.  Dr. King, did you have an opportunity to
13  observe Dr. Bagley's testimony presented by the Milligan
14  plaintiffs?
13:43:52 15  A     I did.
16  Q     And is it your understanding that Dr. Bagley also analyzed
17  the Senate Factors just as you did?
18  A     It is.
19  Q     Okay.  Do you generally -- did you generally agree with
13:44:02 20  the substance of his testimony?
21  A     Generally, yes.
22  Q     And in your independent analyses of each of the Senate
23  Factors, did you ultimately reach the same conclusions that he
24  did?
13:44:14 25  A     Yes.
```

1  Q   So rather than cover the same topics that Dr. Bagley

2  discussed in his testimony, I would like to focus on the areas

3  where your reports do not overlap.

4       So we're going to go ahead and start with Senate Factor 2.

13:44:28  5       So if I can direct your attention to the discussion of

6  Senate Factor 2 in your initial report, which starts on page

7  23.

8            MR. OSHER:  And, Jeff, you can go ahead and take it

9  down.  And I will let you know if we want to pull anything up

13:44:50 10  specifically.  Thank you.

11  BY MR. OSHER:

12  Q   So starting with paragraph 65, am I correct that you were

13  not asked to measure the extent to which black and white voters

14  in Alabama vote in a polarized manner?

13:45:04 15  A   That is correct.

16  Q   Okay.  And in looking at paragraph 65, you write, quote,

17  below, however, I discuss how racial attitudes and racialized

18  politics drive the historical and ongoing polarization among

19  black and white Alabamians.  Did I read that right?

13:45:19 20  A   Yes, that is correct.

21  Q   So what is your opinion as to whether racial attitudes and

22  racialized politics play a role in the polarization among black

23  and white voters in Alabama?

24  A   They do play a role.

13:45:36 25  Q   So based on your work studying voting in Alabama as well

1   as your election administration work in the state, is there a

2   general trend as to whether black and white voters support

3   different political parties today?

4   A    Yes.  Black voters overwhelmingly identify with the

13:45:54 5   Democratic Party and white voters the Republican Party.

6   Q    And I will direct your attention to paragraph 66 through

7   paragraph 75.

8        To what extent is this partisan alignment that you have

9   just identified between black and white voters the result of

13:46:17 10   positions that those parties have taken on issues specifically

11   relating to race?

12   A    Can you repeat that question?

13   Q    Sure.  You stated that it is your understanding that in

14   Alabama, blacks -- black voters overwhelmingly support the

13:46:33 15   Democratic Party and white voters support the Republican Party?

16   A    Uh-huh.

17   Q    Starting at page or paragraph 68 in your report, you begin

18   to outline the history of how that has come to be.  Can you

19   just give us a general overview of what that history is?

13:46:49 20   A    Sure.

21        So if we look to Reconstruction, specifically, and the

22   following Emancipation Proclamation more broadly, what

23   historically you see is African-American s aligning themselves

24   with Republican Party, which we might refer to as the party of

13:47:10 25   Lincoln.

           1          What you do, though, see, is specifically surrounding or
           2    -- the New Deal as one sort of focusing event, you begin to see
           3    a realignment, particularly through the New Deal, black
           4    Americans had access to public spaces that they hadn't had
13:47:30   5    access to before.  And they also had opportunities to
           6    participate in ways that didn't necessarily exist.  And so even
           7    though the New Deal wasn't explicitly about providing redress
           8    for some of these racial inequities, it did create
           9    opportunities for black Americans to participate in ways that
13:47:52  10    they hadn't participated before.
          11          And so basically then you begin to see black Americans
          12    aligning themselves with the Democratic Party.  And so we begin
          13    to talk about sort of this realignment that occurs over time.
          14          If you jump ahead a little bit, which you then see is sort
13:48:14  15    of the next focusing event as we might call it in political
          16    science or series of focusing events.  So the signing of the
          17    Civil Rights Act in 1964, and the Voting Rights Act in 1965,
          18    that also act as a catalyst towards pushing black Americans
          19    increasingly towards identifying as Democrats and with the
13:48:37  20    Democratic Party.
          21          And that also occurs because the Democratic Party
          22    specifically -- particularly northern Democrats, but the
          23    Democratic Party begins to take positions that are advantageous
          24    and create a more special justice and access in Civil Rights --
13:48:58  25    progressive Civil Rights positions that would improve the

1  living conditions of African-Americans in the United States.

2      At the same time, as those positions are coalescing and

3  forming within the Democratic Party, you see some white voters,

4  particularly those who are white voters in the South who also

13:49:21 5  were affiliated with the Democratic Party beginning to slowly

6  shift their party identification towards the Republican Party

7  as those issues around race sort of coalesce in the ways we

8  understand them today.

9  Q    And at the end there, you described white voters starting

13:49:42 10  to move to the Republican Party.  Can you tell us -- and I am

11  looking specifically at paragraph 72 and 73.  Can you tell us

12  about the -- I'm sorry -- paragraph 73 actions by the

13  Republican Party that were to hasten that realignment among

14  white voters to the Republican Party?

13:50:03 15  A    Sure.  So one of the things that the Republican Party did

16  as a way to attract sort of these potentially new supporters,

17  was to engage what I think and what I called reactionary

18  politics, reactionary racial politics where you -- so let me

19  back up a little bit.

13:50:26 20      So you can kind of think about it as constant battles over

21  sort of who has the right to access power in public spaces.

22  And so what you tended to see is as in this case as

23  African-Americans being more access to public places and spaces

24  in political power, which they had formerly been denied, you

13:50:48 25  see the Republican Party actively working to, I guess create

```
 1    road blocks to limit the capacity of these newly enfranchised

 2    -- not newly enfranchised, but these individuals to continually

 3    and increasingly have access to power.

 4    Q    And when you're referring to these individuals, you are
```
13:51:10 5    referring to black Americans?
```
 6    A    Sorry.  Yes.  Black Americans.  Apologies.

 7    Q    No problem.

 8         Okay.  And let's actually flip to paragraph 130, which is

 9    on page 46 of your initial report.  And there you identify
```
13:51:32 10   something called the Southern Strategy.  Can you tell us what
```
11    that was?

12    A    Yeah.  So the Southern Strategy you could basically

13    articulate it that it was a posture that used racialized

14    messaging to communicate an openness or welcomeness for these
```
13:51:53 15   disaffected voters who formerly identified with the Democratic
```
16    Party, or were decreasingly, I should say identifying with the

17    Democratic Party in the South.

18    Q    And, again, just to be clear, there you are referring to

19    white voters in the Democratic Party?
```
13:52:09 20   A    Yes, I was talking about -- sorry.
```
21    Q    That's okay.  Who alienated by the Democratic Party's

22    embrace of Civil Rights litigation?

23    A    Yes.  That is the population of individuals I am

24    referencing in that statement.
```
13:52:24 25   Q    And in paragraph 130, you note, quote, that the strategy

1    -- I'm sorry -- the strategy, quote, dictated a posture of the

2    denying neglect towards the aspirations of black Americans, end

3    quote.  Can you explain what you mean by that?

4    A    Yeah.  So one way to think about benign neglect is sort of

13:52:46 5    a position of indifference, where one acknowledges that there

6    are differences in the way people experience government or the

7    power that they have or their ability to participate

8    politically or access, you know, government in public spaces.

9    And basically, not actively working towards doing anything to

13:53:06 10    facilitate or present yourself as being affiliated with efforts

11    that might provide those individuals with a greater ability or

12    enhanced ability to access and realize that right.

13    Q    So sort of an intentional neglect, if that makes sense?

14    A    You could put it that way, yes.

13:53:26 15    Q    But this strategy was a clear direct appeal towards white

16    voters who had been alienated by the Democratic Party based on

17    its stance on racial issues?

18    A    That is correct.

19    Q    Okay.  In paragraph 133, you identified a concept that you

13:53:43 20    called the Long Southern Strategy.  Can you tell us what that

21    is?

22    A    Sure.  So the Long Southern Strategy is very much a

23    rebranding of the original southern strategy that we just

24    talked about previously.  But the Long Southern Strategy takes

13:54:01 25    into consideration the ways in which or how words have to be

```
 1  modified or presented in a different way, perhaps a way that is
 2  more subtle because some of the language that was used
 3  historically would not be accepted today.
 4  Q    And the Long Southern Strategy is something that political
 5  scientists today largely affiliate with the Republican Party;
 6  is that right?
 7  A    That is correct.
 8  Q    Okay.  This coded and subtle language that you referred
 9  to, do political scientists sometimes all this language dog
10  whistles?
11  A    Yes.
12  Q    Can you sort of explain what that term means?
13  A    Sure.  So if you think about a dog whistle in the formal
14  sense that you use for an actual dog, it is a whistle that
15  emits a high pitch sound that only a dog can hear.  If we think
16  about dog whistles in the political context, they are words
17  that are communicated, which for people who are not necessarily
18  meant to hear them or embrace them, they might just sound like
19  a phrase.  But for other individuals, they communicate
20  something more specific.
21  Q    Can you give us some examples of dog whistles as they
22  would be recognized by political scientists?
23  A    Sure.  I would probably say one of the oldest examples of
24  a dog whistle is the term welfare queens, which I imagine a lot
25  of people are familiar with.
```

```
 1          Some more contemporary dog whistles might be the use of
 2     law and order, inner city, those are the only two I can think
 3     of right now.
 4     Q    Would tough on crime be considered a dog whistle by
 5     political scientists?
 6     A    Possibly, yes.
 7     Q    What about references to people changing the country?
 8     A    Possibly, yes.
 9     Q    What about references to returning our country to the way
10     it was in the past?
11     A    Possibly, yes.
12     Q    And references to us versus them?
13     A    Yes.
14     Q    In paragraphs 134 through 140 of your report, you refer to
15     a series of statements by candidates and officeholders that you
16     refer to as racial appeals.  Do the statements that you
17     identify there fit within the strategy that we have been
18     discussing?
19     A    Yes.
20     Q    Do you happen to know specifically in Alabama when the
21     realignment that we have been discussing fully solidified?
22     A    2010.
23     Q    I'm sorry.  Was that 2010?
24     A    I'm sorry.  2010.
25     Q    Gotcha.  What was notable about that election?
```

         1   A    The -- there were considerable gains in the Republican
         2   Party in the state Legislature.
         3   Q    And in terms of timing, you know, what happened in the
         4   2008 election that would have been relevant to that -- the
13:57:25 5   completion of that realignment?
         6   A    Oh, Barack Obama was elected President.
         7   Q    And 2010 was the first --
         8   A    It was the first -- yes.  The 2010 election was the first
         9   election, midterm election after he was elected.
13:57:45 10  Q    So I want to take a step back.
        11        Just to be clear, your opinion is not asserting that this
        12   evidence suggests that anyone who affiliates with the
        13   Republican Party is motivated by racial bias.  That's not your
        14   testimony, right?
13:58:01 15  A    Absolutely not.
        16   Q    You are not asserting -- I'm sorry.  But instead, that
        17   race plays a material role in partisan politics today?
        18   A    Yes.
        19   Q    And that is the case in Alabama?
13:58:14 20  A    Yes.
        21   Q    I am now going to ask you to turn to your rebuttal report.
        22   And I will direct your attention to paragraph 23, and that
        23   starts on page 7 of your rebuttal report.  I am actually going
        24   to have you go to page 8 which lists a series of survey
13:58:40 25  results.  Can you tell us what those results indicate?

```
 1  A    Sure.  The survey results you just had me turn to indicate
 2  that on issues related to race, there are vast differences
 3  between the opinions of individuals who are Democrats and
 4  Democrat leaders and Republican and Republican leaders.
```
13:59:02  5  Q    Uh-huh.  And so these survey results indicate a wide gap
```
 6  in views on issues relating to race between the two major
 7  parties?
 8  A    Yes.
 9  Q    And the surveys that you identify here, are these national
```
13:59:19 10  surveys?
```
11  A    Yes.
12  Q    Okay.  Is there any reason why you didn't provide Alabama
13  specific survey results?
14  A    The only reason is I didn't have access to any, and when
```
13:59:32 15  doing my research, I couldn't find any.  Otherwise, I would
```
16  have used them.
17  Q    Gotcha.  From a political science perspective, do national
18  politics today drive partisan affiliation at the state level?
19  A    Yeah.  I mean, partisan leads at the national level often
```
13:59:48 20  regularly -- I would just say consistently signal to
```
21  individuals where the party stands on a variety of different
22  issues, or where a party, I should say, stands on a variety of
23  issues.
24  Q    Gotcha.  Okay.
```
14:00:03 25       MR. OSHER:  Jeff, I am going to ask you to pull up

1    Caster Plaintiffs' Exhibit 90, and specifically, go to

2    transcript pages 1 -- page 105.

3    BY MR. OSHER:

4    Q    And looking at lines 10 through 23, Dr. King, this is a

14:00:24 5    transcript of the deposition of Senator Jim McClendon, who was

6    a co-chair of the Alabama Permanent Legislative Committee --

7    Legislative Redistricting Committee.  I apologize if I got that

8    wrong.

9         Do you see the text there?

14:00:39 10   A    I do.

11   Q    All right.  I am going to go ahead and just read this into

12   the record.

13        Question:  Based on your 19 years serving in the

14   Legislature, in your view, do the views of the members of the

14:00:49 15   Democratic Party in Alabama generally differ from the members

16   of the Republican Party in Alabama when it comes to the issue

17   of removing Confederate monuments from public spaces?

18        Answer:  You know, I think if you make that broad and say

19   generally, I think I can agree with that statement.  There are

14:01:05 20   definitely exceptions.  But I think with the general in there,

21   I can say I generally agree with your statement.

22        Question:  So the answer to my question was yes?

23        Answer:  Yes.

24        MR. OSHER:  Jeff, if we can now go to page 109,

14:01:19 25   specifically lines 6 through 17.

```
 1  BY MR. OSHER:
 2  Q     And to save time here, I am going to represent to you,
 3  Dr. King, that in this portion of the deposition, Senator
 4  McClendon agrees that there are differing views generally among
```
14:01:40 `5  Democrats and Republicans in Alabama when it comes to criminal`
```
 6  justice reform.  Do you see that there?
 7  A     I do.
 8  Q     And then let's go to transcript page 110.
 9        Looking at lines 14 through 20.  And here again, I will
```
14:02:02 `10  represent to you that Senator McClendon agreed that there were`
```
11  general differences between Democrats and Republicans on the
12  issue of whether there is a significant amount of
13  discrimination against black residents of Alabama.  Do you see
14  that?
```
14:02:14 `15  A     Yes.`
```
16  Q     Okay.  Caster Plaintiffs' Exhibit 89 is a transcript of
17  the deposition of Representative Chris Pringle, who also was
18  the other co-chair of that committee.  And I will represent to
19  you -- actually I am sorry.  Let's go to page 124 of that
```
14:02:33 `20  deposition.`
```
21        And I will read the question.  And just to clarify, you
22  are saying that there's a difference between the general views
23  of the Democratic Party -- members of the Democratic Party and
24  members of the Republican Party when it comes to criminal
```
14:02:56 `25  justice reform.`

1        Answer:  There could be, yes.

2        Did you see that there?

3    A    Yes.

4    Q    Okay.  And then let's go to page -- the same page starting

14:03:05 5    at line 20 through the end of the page to line 2 of the next

6    page.  And I will represent to you that -- that Representative

7    Pringle also agreed that there were general differences between

8    Democrats and Republicans in Alabama on the issue of whether

9    there is a significant amount of discrimination against black

14:03:33 10    individuals of the state.  Do you see that there?

11    A    Yes.

12    Q    The conversations that I have just shown to you are

13    specific to Alabama.  Are those consistent with what the survey

14    results that you have in your report here, are they consistent

14:03:55 15    with those results?

16    A    Yes.  I would say they align with the national survey

17    results that are reported in my reports.

18    Q    Okay.  Thanks.  So from the perspective of a political

19    scientist, does the fact that black and white voters prefer

14:04:14 20    different parties exclude the possibility that those voters are

21    motivated by considerations relating to race?  I think you

22    might have cut out.  Can you say your answer again?

23    A    Oh.  Sorry.  I said no.

24    Q    And in light of the discussion above, is it your opinion

14:04:31 25    that racial attitudes and racialized politics do, in fact,

```
 1    influence the division and partisan affiliation among black and
 2    white voters in Alabama?
 3    A    Yes.
 4    Q    Okay.  Let's stay with your rebuttal report here.  And I'd
 5    like to take a step back starting at page 17 -- I'm sorry --
 6    paragraph 17, page 5.
 7         And I am looking at the section Roman Numeral II(a)
 8    support for black candidates among white Republican voters.  Do
 9    you see that?
10    A    I do.
11    Q    Okay.  Can you tell us generally what the plaintiffs'
12    attorneys asked you to do in this section of your rebuttal
13    report?
14    A    Yes.
15         So Dr. Hood made an assertion in his report that ideology
16    trumps race in the case of white Republicans and their support
17    of GOP minority candidates, specifically citing an article he
18    published with Mr. McKee.
19    Q    And in paragraphs 18 and 19, you provide a response to
20    that assertion.  Can you tell us what that response is?
21    A    Yes.  So two things:  First, the report -- not the report
22    -- sorry.  The paper does not explicitly focus on elections in
23    Alabama.  And furthermore, the report in its assessment of
24    white Republican willingness to vote for non-white or minority
25    GOP candidates uses a measure that clusters individuals from
```

14:04:47 (line 5)
14:05:06 (line 10)
14:05:16 (line 15)
14:05:41 (line 20)
14:06:07 (line 25)

```
         1  three different racial groups into one category of -- I think
         2  it's non-minority -- of minority.  Excuse me.  And so it
         3  doesn't explicitly evaluate the willingness of white
         4  Republicans to vote for a black Republican, nor -- so -- nor
14:06:29 5  does it articulate any conditions under which such a vote might
         6  occur.
         7  Q    And so in your view, does Dr. Hood's article tell us
         8  anything about whether racial considerations or racialized
         9  politics influence voting behavior among white Republicans?
14:06:4610  A    In Alabama, no.
        11  Q    Or generally?
        12  A    Can you ask me that again?
        13  Q    Sure.  That's fine.  We will go on.
        14       So starting at paragraph 20, if a white voter votes for a
14:07:0815  black candidate, does that exclude the possibility that that
        16  voter is motivated by biased racial attitudes?
        17  A    No.  So -- so the thing we have to consider, and, you
        18  know, it's very clearly articulated by scholars Jefferson and
        19  Tessler (phonetic) is that a white conservative voter or white
14:07:3320  Republican voter voting for a black or non-minority candidate
        21  in itself does not necessarily mean that that individual is not
        22  making or does not harbor or is not motivated any racial
        23  considerations.
        24       So one of the things that they point to is that it's not
14:07:5425  necessarily a blackness into itself that is the issue.  But it
```

1  is a specific manifestation or type of blackness that

2  individuals are not willing to support.

3       And so that would be someone who is black and actively

4  advocates for policies that would improve the lives of other

14:08:22 5  African-Americans.  It would be a candidate who -- who -- it

6  would be a candidate who won't engage in policies that will

7  append or work to change sort of the racial hierarchy that has

8  been supported historically by the parties since realignment.

9       So it's not a black candidate, per se, but a specific

14:08:50 10  manifestation of blackness that a candidate might present.

11       Also included in their analysis is an example where they

12  look at white voters for their support for Ben Carson or Jeb

13  Bush and the level of -- I think it's racial resentment -- or

14  belief that -- excuse me -- the belief that black voters have

14:09:17 15  too much influence or U.S. politics.  And what they actually

16  found is there is a relationship between people who are high on

17  that scale and their likelihood of voting for Carson.  And so

18  what that basically means is individuals who had higher support

19  for the assertion that black Americans have too much influence

14:09:38 20  on U.S. politics were actually more likely to vote for Ben

21  Carson, who himself is a black man.

22  Q    And that was also the case for those who harbored the

23  overtly prejudiced view that most African-Americans are more

24  violent than most whites?

14:09:54 25  A    According to the research, yes.

Q    Now, this specific example that you are providing, this
was not Alabama specific.  This was --

A    No.  Right.  This is the -- this data come from the
American National Election Study, which is a national study.
It is not specifically about Alabama.

Q    Gotcha.

     All right.  Let's turn to Section 2-B of your rebuttal
report which starts on page 9.  Can you explain to us what --
what the Caster plaintiffs' attorneys asked you do here?

A    Sure.  Also in Dr. Hood's report following the discussion
of his article with Dr. McKee, there was a -- I don't want to
call it a note, but there was some information that referred to
the election of Kenneth Paschal, whose last name I may not be
saying correctly, communicating or suggesting it was evidence
of the willingness of white Republicans to vote for a black
candidate or black Republican.

Q    Gotcha.  I'm sorry to -- stop right there.

          MR. OSHER:  Frankie or whoever has control, it looks
like someone has accidentally turned on their video.  Could I
have -- is it possible for someone to just forcibly mute that?

     Thank you.

BY MR. OSHER:

Q    Okay.  So your -- so you were looking at Dr. Hood's
identification of Mr. Paschal's victory in 2021, and the
suggestion that that tells us something about white voters'

```
 1  willingness to support black candidates, right?
 2  A    Yes.
 3  Q    Okay.  I am going to have you go --
 4        MR. OSHER:  And, Jeff, if you can pull this up, this
14:11:46 5  is the last page of your rebuttal report, which is Plaintiffs'
 6  Exhibit 81.
 7  BY MR. OSHER:
 8  Q    And the last sentence before the three numeral signs
 9  starting with using this example.  Can you read that last
14:12:07 10  sentence for us?
11  A    Yes.  Using this example to extrapolate any conclusion
12  about white voting behavior in Alabama would be scientifically
13  unsound.
14  Q    So from a political science methodology perspective, if
14:12:21 15  you were analyzing voting patterns at the congressional
16  district or state level in Alabama, would you rely on this
17  single election to reach any conclusion?
18  A    No.
19  Q    Can you tell us why that is?
14:12:34 20  A    Sure.  I mean, I think the scholarship that I just
21  mentioned by Drs. Jefferson and Tessler points to the need to
22  -- if you want to understand sort of what considerations go
23  into -- in this case, the willingness of white conservatives or
24  white Republicans to vote for a black Republican, you need to
14:12:59 25  understand who those voters are so their racial demographics
```

1  and also what sort of ideas they harbor or have about

2  African-Americans.

3       Further, it's one election.  And so that's -- it's one

4  election.  It is a small election.  And so while it -- and

14:13:22  5  because of that, it isn't really necessarily generalizable to

6  what white Republicans across the state might actually do.  And

7  so that is in part why I went about putting together this

8  table.  Because one thing I was interested in better

9  understanding, in terms of sort of a broader landscape of what

14:13:45 10  white Republicans support for black Republican candidates look

11  like was to consider other elections beyond that specific

12  election that we just had.

13  Q    And just -- I'm sorry.  Are you referring to the table on

14  pages 10 and 11 of your rebuttal report?

14:14:03 15  A    Sorry.  Yes.  The tables on pages 10 and 11.

16  Q    I'm sorry.  Go ahead.  I didn't mean to interrupt.

17  A    And so through a review, I would say, of more elections

18  beyond that specific one, and looking at successes of black

19  Republican candidates for a wide variety of races, when they

14:14:24 20  were running in primary elections where there were challengers,

21  my argument would actually be that in the case of the specific

22  election, so the Paschal election, his victory is more an

23  exception than the rule in terms of sort of what we see when we

24  take a more longitudinal sort of over time review of how

14:14:48 25  successful black Republican candidates have been in the state

1   of Alabama.

2   Q     Dr. King, I have a few more questions about your rebuttal

3   report.

4         Let's go to the beginning of the report starting at

14:15:02  5   paragraph 3.  And here you are responding to an assertion by

6   Mr. Bryan.  Can you tell us what that assertion is?

7   A     Sure.  He asserts that using black alone or single-race

8   black has been the most defensible position from a political

9   science perspective.

14:15:25 10   Q     Okay.  And what is your response to that assertion?

11   A     That's it's incorrect.

12   Q     Can you tell us -- what is your view about whether

13   single-race black or any-part black is the superior definition

14   from a political science perspective?

14:15:44 15   A     So -- so I think if you're going to make decisions about

16   people's identity, so in this case, who is black versus who

17   isn't black, I think you need to sort of embed that decision in

18   how we historically have identified black people in the United

19   States, and to this point, how that history has fundamentally

14:16:14 20   been embraced.  So if we think about early definitions of

21   people being black, we know that in the South and in Alabama,

22   individuals were considered black if they had any traceable

23   African or black American ancestry.  And so that definition --

24   so we can think of that as what we might refer to as the

14:16:38 25   one-drop rule.

1       And the one-drop rule has roots in racism where the idea

2  asserted was that to be white you could only be -- you had to

3  be basically pure white blood.  It's also true that

4  historically that one-drop rule was specifically attached to

14:17:07  5  individuals who had racial identities that were both black and

6  white, not necessarily black Hispanic Latino, black and Asian,

7  et cetera.  And if we think about this in the context of when,

8  you know, the black Americans in the United States who have

9  ancestral ties to enslaved populations, obviously, there is

14:17:31 10  some value in counting people who have a drop of black blood as

11  black, because obviously, during slavery that would mean you

12  had more bodies I guess I should say to be engaged in forced

13  labor.

14       Moving forward, though, even if we think about after the

14:17:53 15  end of slavery, the 13th, 14th, and 15th Amendments, and moving

16  into the Voting Rights Act and the Civil Rights Act, that

17  delineation of who was black so still focusing on if you are

18  part black, you are black, also helped to continue the racial

19  hierarchy that had dominated the South for centuries.

14:18:15 20       And so moving forward, again, we have now entered a space

21  where instead of the state assigning an identity to an

22  individual where individuals are effectively able to make a

23  conscious choice to identify with that specific heritage and

24  legacy, if they are of mixed race in heritage, and so, you

14:18:42 25  know, similar to how the state -- not necessarily the state of

1    Alabama, but the state in terms of government assigned

2    identities to individuals for a specific purpose, to strip for

3    lack of a better word, someone of that identity that they have

4    clearly and effectively asserted and chosen to identify with,

14:19:08  5    is in many ways a new manifestation of the same thing.

6         So I mean, if someone says they are black, whether it's

7    black in part, or all black for lack of a, you know, a better

8    term, I mean they are black because they have asserted their

9    blackness.

14:19:27 10    Q    And just to be clear, it's not your position that we

11    should continue the one-drop rule to maintain white supremacy,

12    right?

13    A    No, that is not my position that we should rely on the

14    one-drop rule to continue white supremacy.  My position is that

14:19:47 15    if people who have options -- technically, everyone has an

16    option.  But if people have options in choosing which parts or

17    parts of their multi-racial and multi-faceted identity in race

18    to assert, we should respect that assertion and their decision

19    to identify themselves that way.

14:20:11 20    Q    So given this history and the impact the one-drop rule has

21    had on racial self-identification, do you see the any-part

22    black or single-race black definition as superior in the

23    context of political science?

24    A    I mean, the any-part black is the more accurate definition

14:20:32 25    of blackness.

```
 1   Q    Okay.  Just a few more questions, Dr. King.
 2        I wanted to touch very briefly on Senate Factor 5, which
 3   inquires about socioeconomic disparities resulting from
 4   discrimination and their impact on access to political process.
 5        You said that you observed Dr. Bagley's testimony?
 6   A    I did.
 7   Q    And do you recall during his cross-examination questions
 8   about the fact that black residents of other states might also
 9   suffer from socioeconomic disparities that similarly exist in
10   Alabama?
11   A    Vaguely.
12   Q    Does the fact that such disparities might exist outside of
13   Alabama, such as in states in the North or the Midwest, does
14   the fact that those disparities exist change your opinion as to
15   the effect of those disparities in Alabama and their roots in
16   the history of discrimination here?
17   A    No.  I mean, every state has its own unique historical
18   cultural and political orientation or, you know, origins or
19   foundations.  So the fact that discrimination or
20   disenfranchisement looks different in another place does not
21   mean or negate the disenfranchisement or discrimination that
22   exists in Alabama.
23        I mean, if you, for example, consider like the great
24   migration which went from about 1910 to 1970, you have black
25   people migrating from the Deep South, including, which would
```

```
 1    include Alabama to places in the West Coast, the Midwest, and
 2    the Northeast, and if we look at sort of what their reaction
 3    was there, you know, major cities, you know, wouldn't allow
 4    black Americans in the North, right?  So I am not talking
 5    about -- but major cities wouldn't allow black Americans access
 6    to public housing.
 7         Places in the Midwest, the East Coast and the West also,
 8    you know, adopted things like restrictive covenants, and even
 9    though there might not have been explicit laws about
10    segregation, one thing that we can see even now is that cities
11    continue to be segregated even though the country is
12    increasingly becoming, you know, more racially and ethnically
13    diverse.
14         So their histories are different, but similar to how we
15    can trace state reaction to the black Americans in the South or
16    in Alabama getting citizenship rights and voting rights, you
17    can also see similar manifestations of those reactions as the
18    black population increased in northern cities.
19         I mean -- well, personal example, but I will spare y'all.
20         MR. OSHER:  Thank you, Dr. King.  I don't have any
21    other questions for you.
22         JUDGE MARCUS:  Thank you.  Cross-examination,
23    Mr. Bowdre.
24         MR. BOWDRE:  Thank you, Your Honor.
25                        CROSS-EXAMINATION
```

1534

BY MR. BOWDRE:

Q    Dr. King, my name is Barrett Bowdre, and I am an attorney
who represents Secretary of State John Merrill in this action.

     Can you hear me okay?

14:23:57 A    Yeah, I can hear you.

Q    Great.  You're testifying today as a political scientist;
is that correct?

A    I am a political scientist, yes.

Q    You are not a historian?

14:24:07 A    I am not a historian, no.

Q    And have you published any articles looking at political
behavior in Alabama?

A    Alabama specifically, no.

Q    Yes.  Okay.

14:24:18     I know that you didn't really discuss the Senate -- all
the Senate Factors in your direct, but you did discuss at least
most of them in your -- in your expert reports.  I do want to
ask a few questions about the first Senate Factor and the
history of racial discrimination in Alabama.

14:24:37     Would you agree that race relations have improved since
1965?

A    Absolutely.

Q    And in Alabama, it's been over 50 years since the state
has had an all-white primary; isn't that right?

14:24:54 A    Yes.

1    Q    And I'm not asking --

2    A    No, I was trying to do math in my head, but, yes.

3    Q    And the same would be true for poll taxes and literacy

4    tests and employment or property requirements for voting?

14:25:07  5    A    That is correct.

6    Q    Okay.  Is there any evidence that you know of to suggest

7    that a legislator was influenced by that history in Alabama

8    when he or she voted on their -- on the redistricting plan at

9    issue in this case?

14:25:25  10    A    Not to my knowledge, no.

11    Q    Okay.  I want to come back to felon voting laws, which you

12    discuss at length in your report.

13         But in the first part of your report, you say -- and this

14    is in paragraph 23.  I don't know -- do you have your report in

14:25:53  15    front of you?

16    A    I do.

17    Q    Okay.  So I am looking at paragraph 23.  And you discuss

18    Section 182 of the Constitution of Alabama, which as you note,

19    disqualified voters if they committed certain crimes.  And the

14:26:08  20    original -- Section 182 as you note, included all felonies,

21    plus crimes of moral turpitude, plus a number of listed crimes

22    such as vagrancy, which were racially tinged; is that correct?

23    A    That is correct.

24    Q    Okay.  And you would agree that that is not the current

14:26:26  25    law in Alabama?

```
 1  A    Oh, yes, I would agree, that is correct.
 2  Q    You also mentioned the races origins of secret ballots in
 3  paragraph 25 of your report.  Alabama still has a secret ballot
 4  law, right?
 5  A    Yeah.  Effectively the ballots we use today, yes.
 6  Q    Yeah.  And would you agree that the state's decision not
 7  to do away with the secret ballot and revert back to voice
 8  voting is not indicative of racial discrimination today, even
 9  though it was in the past?
10  A    Can you repeat that?
11  Q    Yeah.  Sorry.  Would you agree that Alabama's decision not
12  to do away with the secret ballot and revert to voice voting,
13  which was in place before Alabama instituted the secret ballot,
14  would you agree that that decision is not indicative of racial
15  discrimination today, even though the secret ballot's origin
16  was racist?
17  A    So just so I understand because that was long.
18  Q    Yes, ma'am.
19  A    Are you asking me if the state's continued use of the
20  secret ballot is not indicative of supporting what I note in
21  your report even though it had racist origins?
22  Q    Yes.
23  A    Yes.
24  Q    Sorry for that question.
25  A    It's fine.
```

Timestamps in left margin:
14:26:41 (line 5)
14:26:56 (line 10)
14:27:19 (line 15)
14:27:32 (line 20)
14:27:47 (line 25)

1    Q    Okay.  You note in your report that between -- and now I

2    am looking at paragraph 16 -- you note that between 1965 and

3    2013, at least 100 voting changes proposed by Alabama state,

4    county, or city officials were either blocked or altered under

14:28:12  5  the Voting Rights Act?

6    A    Can you tell me what paragraph that is again?  Is it page

7    16 or paragraph 16?

8    Q    You -- yeah.  You're correct.  Sorry.

9    A    It's okay.

14:28:28 10  Q    I'm sorry.  It's page 16, paragraph 44.  I'm sorry about

11   that.

12   A    No worries.  Okay.  Can you repeat the question again?

13   Q    Yeah.  So you say in your report that between 1965 and

14   2013, Alabama had 100 voting changes that were either blocked

14:28:49 15  or altered under the VRA; is that right?

16   A    That is the quote, yes.

17   Q    Okay.  Isn't it true that the last statewide objection

18   that was either lodged or sustained by the Department of

19   Justice occurred nearly 30 years ago in 1994?

14:29:04 20  A    I mean, the reference I used would say otherwise, but I

21   don't --

22   Q    Okay.  I will share my screen with you real quick if

23   that's okay with you?

24   A    That's fine.

14:29:31 25  Q    Well, I am going to try to share my screen with you.

```
 1  Okay.  Can you see this?  It says Department of Justice
 2  determination letters?
 3  A    Yes.
 4  Q    Okay.  And I am going to scroll down until the very last
 5  page.  And my question was between -- the last statewide
 6  objection was -- that occurred in 1994.  And so here the last
 7  statewide objection -- go to 2008, and then we see 1994.  And
 8  so my question is:  Do you see any statewide objections between
 9  1994 and 2008?
10  A    Right.  I was initially confused about your question
11  because my citation talks about state, city, or county.  So,
12  no, I do not see any statewide objections post that date.
13  Q    Okay.  Thank you.
14  A    Uh-huh.
15  Q    Okay.  Looking at paragraph 45 and 46, you discuss *Shelby*
16  *County vs. Holder*, and you say that one of the first changes
17  that Alabama made to its voting laws in the wake of *Shelby*
18  *County vs. Holder* was to institute one of the most rigorous
19  voter identification requirements in the nation.
20      So my first question about this is:  By including the
21  voter ID law in your discussion in, Modern Discrimination By
22  the State, do you think the law has the effect of reducing
23  voter -- black voter turnout or registration?
24  A    So I didn't do any analysis about the impacts of the
25  state's voter ID law on black voter registration and turnout.
```

14:30:12 (line 5)
14:30:36 (line 10)
14:30:47 (line 15)
14:31:13 (line 20)
14:31:35 (line 25)

```
 1  Q     So on what basis do you deem it discriminatory or part of

 2  the modern discrimination by Alabama?

 3  A     Sure.  There -- as you will note, there was a report cited

 4  by the U.S. Commission on Civil Rights, and so my inclusion of

 5  it in that section is based on the information that I reviewed

 6  in preparing this section.

 7  Q     Okay.  Well, let me ask you about that.

 8  A     Okay.

 9  Q     Did you look at any other resources when -- besides the

10  Alabama Advisory Committee when you were talking about the

11  voter ID law in Alabama?

12  A     That's what I cited, so I am going to assume no.

13  Q     Okay.  So -- are you aware that the Eleventh Circuit -- or

14  are you aware that this issue has been litigated both in the

15  Federal District Court and in the Eleventh Circuit?

16  A     I do know there was a -- there were courses -- not

17  courses, cases, excuse me, challenging Alabama's voter ID laws.

18  I could not cite their names verbatim to you, but I know that,

19  yes.

20  Q     Okay.  Do you know the results of those cases?

21  A     I mean, I live in Alabama, and I vote in Alabama.  And we

22  still have a voter ID law.  And so to a certain extent,

23  obviously, the voter ID law persisted.  But I also know there

24  are multiple forms of ID that people in Alabama can use to

25  vote, and I do not know if those multiple forms were part of
```

Timestamps in left margin: 14:31:59 (line 5), 14:32:18 (line 10), 14:32:39 (line 15), 14:32:56 (line 20), 14:33:13 (line 25)

```
 1    the original state proposed law, or if they are the result of
 2    some of that litigation.
 3    Q    Okay.
 4    A    That is what I know.
 5    Q    Well, let me ask you a few questions.  I am going to pull
 6    up the Eleventh Circuit decision in it, and I want to get your
 7    take very quickly.
 8    A    Keep in mind, I am not a lawyer.
 9    Q    Yeah.  I understand that.  I'm just trying to understand
10    your view as a political scientist and what resources you
11    looked at.
12         So, okay.  Do you see this Greater Birmingham Ministries
13    vs. Secretary of State?  And this is the Westlaw report at 992
14    F.3d 1299, which was released by the Eleventh Circuit in 2021?
15    A    Yes.
16    Q    Okay.  I want to read a couple of the findings by the
17    Eleventh Circuit.  And the first one is here on page 1325 of
18    the reported decision.  Quote, the fact remains that plaintiffs
19    cannot point to evidence -- not a single comment made by any
20    sitting Alabama legislator in reference to HB-19 to support
21    their argument that the voter ID law was intended to
22    discriminate against black and Latino voters, end quote.
23         Did I read that correctly?
24    A    Do you have a question?
25    Q    Yes.  Excuse me.  Did I read that correctly?
```

Timestamps in left margin: 14:33:23 (line 5), 14:33:39 (line 10), 14:34:07 (line 15), 14:34:40 (line 20), 14:34:55 (line 25)

1541

```
         1   A     Yes.

         2   Q     Okay.  And then I want to go down to page 1329.  And the

         3   Court says there that, It is undisputed that approximately

         4   99 percent of white voters and 98 percent of black voters

14:35:18 5   possess a photo ID.

         6         Did I read that right?

         7   A     Yes.

         8   Q     And then one more court quotation.

         9         And then this is at page 1310 of the reported decision.

14:35:41 10  In sum, a voter who lacks an appropriate form of ID may acquire

        11   the documents needed to obtain a voter ID for no fee.

        12         Did I read that right?

        13   A     Yes.

        14   Q     Okay.  So my question is:  You did not cite to the

14:36:05 15  Eleventh Circuit's decision, and you also did not cite to the

        16   District Court's decision, which had a lot of factual findings.

        17   And I was wondering why you did not do that.

        18   A     I do note that I did not do that, but I also believe that

        19   I noted in my report that the voter ID law was implemented.  So

14:36:26 20  even though -- I mean, I didn't make note of that, it's clearly

        21   communicated that the law was into effect.  So I'm not entirely

        22   sure what it is explicitly about either of those things that

        23   you think I should have -- or am I making sense?

        24   Q     Okay.  So sure.  Let's clear up that timeline, then.

14:36:49 25  A     Okay.
```

```
 1   Q    So in paragraph 46, you say that one of the first changes
 2   that Alabama did in response to Shelby County was to enact the
 3   voter ID law, and that --
 4   A    Or to implement.
 5   Q    Implement.  And then it went into effect in 2014; is that
 6   correct?
 7   A    Uh-huh.  Uh-huh.
 8   Q    And then this Eleventh Circuit decision that we just
 9   reviewed was from 2021, right?  I can pull that back up.
10   A    Wait.  You said that decision was from 2021?
11   Q    Yeah.  Because the -- the law was enacted, and then it was
12   challenged, and then it went to court, and then the Eleventh
13   Circuit upheld it, right?
14   A    In 2021?
15   Q    In 2021.
16   A    Okay.
17   Q    Okay.  And so you mentioned that instead of relying on
18   that case or looking at the evidence that was presented in that
19   case, you instead relied on the Alabama Advisory Committee's
20   report; is that correct?
21   A    In the assertion of the voter ID law being one of the most
22   rigorous in the nation, yes.
23   Q    Right.  Are you aware if the committee reviewed the
24   evidence in the voter ID litigation?
25   A    I am not aware.
```

```
 1  Q    Am I correct that the only discussion of the -- of the
 2  court case was in one of the statements of dissent and was not
 3  even mentioned by the committee itself; is that correct?
 4  A    I mean, I haven't read it, so I don't know.
14:38:34  5  Q    You did not read the committee report that you --
 6  A    Oh.  No.  I have thought you were saying it was in --
 7  sorry.  I misunderstood the question.  Sorry.
 8  Q    Okay.  I will rephrase.  I'm sorry.
 9  A    No.  You're fine.
14:38:44 10  Q    Am I correct, or do you know if the committee report
11  itself lists or discusses in any way either the district
12  court's or the Eleventh Circuit's decision in the voter ID
13  case?
14  A    I cannot remember sitting here off the top of my head what
14:39:01 15  is explicitly mentioned on all the pages of the report.
16  Q    Okay.  Are you aware how the advisory committee that you
17  cited to obtained its information, how it went about gathering
18  information for the report?
19  A    I know for some sections of the report they actually
14:39:19 20  called and contacted offices.  I mean, there were -- there was
21  a wide variety of activity based on what I remember from what I
22  read.  So I mean, if you could ask me like a more specific
23  question, maybe, I could answer.  I'm not really --
24  Q    Am I correct that one of the major ways that the committee
14:39:40 25  went about gathering evidence was to hear panelists that were
```

1  invited from advocacy organizations, including the ACLU,

2  Greater Birmingham Ministries, the Southern Poverty Law Center,

3  NAACP Legal Defense Fund, Equal Justice Initiative, Alabama

4  NAACP, and the Ordinary People Society?

14:40:00  5  A    I don't have the report in front of me.  But if that's

6  what's listed as the people that had meetings with, I also know

7  they had hearings with John Merrill, Secretary of State, so I

8  will trust that that is part of the report, because, again, I

9  don't have it in front of me.

14:40:16  10  Q    Okay.  I can pull it up real quick.

11  A    Okay.

12  Q    And I am referencing -- this is Defense Exhibit 88, and

13  it's 88-A because it was broken up into pieces.  And this is

14  the report to the Alabama Advisory Committee -- excuse me --

14:40:45  15  the report by the Alabama Advisory Committee to the United

16  States Commission on Civil Rights.

17        Is this the report you reviewed, Dr. King?

18  A    Yes.

19  Q    Okay.  I am going to skip down to page 60.  And this is a

14:41:02  20  news release on one of the -- I think the main public forum,

21  the main meeting that the committee held.  Do you see this?

22  A    Yes.

23  Q    And then we see that John Merrill testified?

24  A    Uh-huh.

14:41:15  25  Q    As you just mentioned.

```
 1  A     Uh-huh.

 2  Q     Then we have Congresswoman Sewell.  And then we have

 3  Representative from the ALCU, Greater Birmingham Ministries,

 4  Southern Poverty Law Center, NAACP Legal Defense Fund, Equal

 5  Justice Initiative, Alabama NAACP, and the Ordinary People

 6  Society.  Do you see that?

 7  A     Yes.

 8  Q     Okay.  Thank you.

 9        You mention in your report that Alabama closed some of the

10  DMV locations?

11  A     Uh-huh.

12  Q     This is paragraph 48?

13  A     Uh-huh.

14  Q     Am I correct that the closure of the DMV locations would

15  not affect a voter's ability to obtain a free voter ID from a

16  county registrar?

17  A     That is correct.  But I'm also not sure if the registrars

18  were issuing IDs at the time the DMVs closed.  Were they?

19  Q     I think the answer is yes, but I --

20  A     Okay.

21  Q     I won't go into that.

22        But it would also not affect the voter's ability to

23  request a visit from the Secretary of State's mobile unit,

24  would it?

25  A     No, it would not impede their ability to request a visit
```

Timestamps in left margin:
14:41:33 (line 5)
14:41:55 (line 10)
14:42:06 (line 15)
14:42:26 (line 20)
14:42:37 (line 25)

          1   from the mobile unit, no.

          2   Q    Are you aware that the Secretary of State does, in fact,

          3   have a mobile voter ID unit that will go to an individual

          4   voter's house?

14:42:50  5   A    I am very much aware of the mobile voter unit, yes.

          6   Q    The mobile voter unit will provide a free photo ID to that

          7   person?

          8   A    I am very much aware that the state offers free IDs at

          9   multiple points, yes.

14:43:04 10   Q    Okay.  You note in your report that Jenny Carroll, who is

         11   the chair of the advisory committee that you relied on said she

         12   tried to determine the hours of operation for the DMV in

         13   Bullock and Wilcox counties.  Did you yourself perform any

         14   research on this question?

14:43:26 15   A    Did I myself call the DMVs?

         16   Q    Yes.

         17   A    No.

         18   Q    All right.  Per your discussion in paragraph 53 of the

         19   report on polling closing -- excuse me -- I will start over.

14:43:46 20       In your discussion in paragraph 53 about polling location

         21   closures, did you do any investigation to determine why an

         22   individual polling location was closed or where those resources

         23   were reallocated if that location was closed?

         24   A    No.  I did not contact any of the counties that closed

14:44:11 25   their polling locations, nor did I ask about the reallocation

```
 1  of resources.
 2  Q    Okay.  Thank you.
 3  A    Uh-huh.
 4  Q    All right.  So moving on to Senate Factor 2, and I think
 5  this picks up on page 23 of your report.  Do you purport to be
 6  an expert on the voting behavior of Alabamians?
 7  A    Not specifically.
 8  Q    Okay.  Have you conducted or reviewed any surveys on why
 9  Alabamians vote the way they do?
10  A    Have I conducted or reviewed?
11  Q    Any surveys about why Alabamians vote the way they do?
12  A    Do you mean in terms of the considerations people make in
13  making their vote decisions, or is that what you mean?
14  Q    Sure.
15  A    I mean, so I, you know have -- I will say no.
16  Q    Okay.  Would you agree that voting tends to be racially
17  polarized in any state with black voters in which there are --
18  excuse me -- would you agree that voting tends to be racially
19  polarized in any state with black voters where a majority of
20  white voters tend to vote Republican?
21  A    I mean, honestly, without actually looking at some actual
22  data, I don't think I feel comfortable answering that question.
23  Q    Okay.  So you discussed some of this on your direct.  And
24  with the party realignment?
25  A    Uh-huh.
```

14:44:24  (line 5)
14:44:45  (line 10)
14:45:03  (line 15)
14:45:36  (line 20)
14:45:56  (line 25)

1  Q    Which is also paragraph 66 through 75 of your report, did

2  you look at Alabama's history in particular in discussing

3  political party realignment?

4  A    You mean did I look at the racial distribution of voters

14:46:13 5  in Alabama and their party affiliations?  No.

6  Q    I guess I am asking more about the history.  So you

7  discuss national trends and the National Republican Party and

8  you discuss some about the South in general.

9  A    Uh-huh.

14:46:28 10  Q    And my question is:  Did you examine any resources about

11  Alabama's history in particular?

12  A    No.  Only the extent to which it is the focus in some of

13  the books on southern politics.  For example, there is one of

14  the resources that I used has states that explicitly, you know,

14:46:46 15  dedicated to -- has a chapter, excuse me, explicitly dedicated

16  to each state.  And so there was information about Alabama in

17  there.  But I mean I didn't read a series of texts explicitly

18  about party realignment in Alabama.  If I had come across one,

19  I would have.

14:47:05 20  Q    Okay.  Well, this might be close.  Are you familiar with

21  the recent decision from the Middle District of Alabama called

22  *Alabama State Conference of NAACP vs. Alabama*?

23  A    That's a 2017?

24  Q    Is it a 2020 decision regarding a Section 2 challenge to

14:47:29 25  Alabama's at-large judicial elections?

```
 1  A     I would say familiar is a fair term, yes.
 2  Q     I am going to pull that up.
 3  A     Okay.
 4  Q     And get your opinion a little bit on the history of
 5  Alabama.
 6        Okay.  Do you see this on my shared screen?
 7  A     Yes.
 8  Q     And this is Alabama State Conference of NAACP vs. The
 9  State of Alabama, and the cite is 2020 WL 583803?
10  A     Yes.
11  Q     You did not discuss or cite to this opinion in your
12  report, did you?
13  A     I do not believe so, no.
14  Q     Okay.  This is looking at page 5 of the Westlaw cite?
15  A     Can you make that a little bigger?
16  Q     Yes.  I'm sorry.
17  A     Thank you.
18  Q     Okay.  Can you see that?
19  A     Yes.
20  Q     All right.  So this -- well, I will just read this first
21  paragraph, and I will ask you a couple of questions as we go
22  on.
23        So as part of the opinion, the Court says, quote,
24  African-Americans in Alabama prefer the Democratic Party by
25  overwhelming margins -- in excess of 90 percent in some recent
```

1  case.

2       I am going to skip down.

3       So Alabama voting is racially polarized, that is, there is

4  significant correlation between race and voting behavior in

14:49:19 5  Alabama.  The question of this case is why.  Is it on account

6  of race, as condemned by Section 2 of the VRA, or on account of

7  some other cause or causes such as partisan politics?

8       Did I read that right?

9  A    Yes.  The jump through me off a bit, but yes.

14:49:37 10  Q    In this next paragraph, do you see where the Court talks

11  about some of the national trends that you discuss with regard

12  to the passage of the VRA in 1965, Senator Goldwater voting

13  against that?  Do you see that?

14  A    In the highlighted section?

14:49:54 15  Q    Yes, ma'am.

16  A    Yes.

17  Q    Okay.  And then in this next paragraph, do you see where

18  the Court says, The second partisan shift took its sweet time

19  and is much more complicated.  Do you see that?

14:50:08 20  A    Yes.

21  Q    And in that section, the Court is discussing Alabama's

22  shift in particular, and you can see this as the Court talks

23  about the shift of the Legislature that George Wallace won the

24  Democratic election in, what, 1982 as a Democrat with over 90

14:50:37 25  percent of --

```
 1   A     I think you mean '62.

 2   Q     Well -- I'm sorry.  Let me skip down a little bit.

 3         We see here in 1972, Wallace survived the assanation

 4   attempt.  Skipping down a little bit.  The Court goes on to

 5   talk about Alabama's unique political history.  I guess that's

 6   the point.  I don't want to waste your time going through every

 7   single paragraph.

 8         But given this background, would you agree with that first

 9   sentence that we read, that the partisan shift in Alabama is

10   much more complicated and took, quote, its sweet time in a way

11   that the national shift did not?

12   A     I think that's fair, given that we talked about in my

13   direct the legislative shift didn't occur until 2010.  I think

14   that's fair.

15   Q     Okay.  You did not discuss this unique Alabama history in

16   your report, did you?

17   A     Not in the extensive detail that you just presented to me,

18   no.

19   Q     Why not?

20   A     I can't say it was an intentional omission on my part.  I

21   mean, a lot of where I started with my research was with

22   scholarship that I was familiar with, you know, through my

23   instruction, and then added on to that as I, you know,

24   uncovered more evidence.  So it wasn't intentional.

25   Q     Okay.
```

14:50:57 (line 5)
14:51:13 (line 10)
14:51:31 (line 15)
14:51:47 (line 20)
14:52:17 (line 25)

1    A    Whatever.

2    Q    Moving on a bit.  And you discussed this on your direct.

3    You discussed that black voters -- you discussed that black

4    voters tend to support black candidates regardless of ideology

14:52:36    5    or partisan affiliation; is that right?

6    A    Can you tell me where that is in your report?

7              MR. OSHER:  Objection, Your Honor.  That

8    mischaracterizes Dr. King's testimony.

9    BY MR. BOWDRE:

14:52:45   10    Q    Let me pull up the --

11              JUDGE MARCUS:  Why don't you just rephrase your

12    question or cite to the record.

13              MR. BOWDRE:  Yes, Your Honor.

14    BY MR. BOWDRE:

14:53:01   15    Q    Let me ask you about paragraph 76.  And here you say,

16    First, the literature suggests that both black and white voters

17    prefer to vote for candidates of their own race when the

18    contest includes a black and white candidate.  And second,

19    there is no clear relationship between the ideology of black

14:53:21   20    voters and their candidate preferences.  For example, while

21    90 percent of black voters supported Barack Obama in 2008, only

22    47 percent of blacks identify as liberal, but 45 percent

23    identify as conservative.

24    A    Uh-huh.

14:53:36   25    Q    Did I read that correctly?

```
 1   A    Yes, you did.
 2   Q    Okay.  So I guess I'm curious that if party affiliation
 3   does not matter as much as the color of the candidate, do you
 4   know if in 2016 blacks across the country in open primaries
 5   voted in high numbers for Ben Carson since there was no major
 6   black candidate in the Democratic Primary?
 7           MR. OSHER:  Objection, Your Honor.  That again
 8   mischaracterizes Dr. King's testimony.
 9           JUDGE MARCUS:  Do you understand the question,
10   Dr. King?
11           THE WITNESS:  Honestly, no.
12           JUDGE MARCUS:  Would you rephrase it, please?
13           MR. BOWDRE:  Yes, Your Honor.
14   BY MR. BOWDRE:
15   Q    So I am trying to understand the relationship that you
16   note between race and partisan affiliation.  And that race
17   according to this paragraph is a stronger indicator than
18   partisan affiliation.  Is that a fair characterization of that
19   paragraph?
20   A    I don't think I would say stronger.  I mean, but I think
21   what it actually says is black and white voters prefer.  That
22   doesn't necessarily mean that preference is stronger than other
23   preferences, just that it exists.
24   Q    Okay.  So thinking in the 2016 primaries, my question is?
25   A    Okay.
```

Timestamps: 14:53:58 (line 5), 14:54:11 (line 10), 14:54:18 (line 15), 14:54:34 (line 20), 14:54:59 (line 25)

```
 1  Q     And taking into account my question is about these
 2  preferences?
 3  A     Okay.
 4  Q     Do you know if to express that preference that black
 5  voters may have had for a black candidate?
 6  A     Uh-huh.
 7  Q     Do you know if black voters in open primaries voted in
 8  high numbers in support of Ben Carson, a black Republican,
 9  because there was no major black candidate in the Democratic
10  primary?
11  A     So in states where voters had options to vote across all
12  the primary candidates, am I aware of scholarship that suggests
13  that black voters in those states chose to vote for Ben Carson?
14  Q     Yes.
15  A     I am not aware.
16  Q     Okay.  So in your rebuttal report, you discuss this on
17  your direct, as well, you note that in that 2016 Republican
18  primary, whites harboring racially prejudiced views supported
19  Ben Carson at higher rates than they supported Jeb Bush; is
20  that correct?
21  A     That's correct.  Yes.
22  Q     In that case, the racially prejudiced voters were not
23  supporting the candidate of their own race, correct?
24  A     So that's a mischaracterization of the research.  What it
25  says is voters with higher -- what did it say -- voters who
```

1    have higher overly prejudiced views or voters who believe that

2    blacks have too much influence in U.S. politics are more likely

3    to vote for Carson.  That doesn't mean that there were not

4    voters who had those similar views that did not vote -- sorry.

14:56:47 5    Now I have confused myself.

6         That does not mean that there were not voters who also

7    harbored similar views who voted for Jeb Bush.

8    Q    Okay.  But a higher number of voters who harbored racially

9    prejudiced views voted for a candidate not of their own race;

14:57:09 10   is that correct?

11   A    So, again, this isn't about the number of people who

12   voted.  It was about the relationship between those views and

13   who they voted for.

14        I didn't assert anything about the number of people.  The

14:57:18 15   correlation is between the people's views and who they voted

16   for.  There is no math in here that talks about the number of

17   people who voted for either.  They were -- if that makes sense.

18   Q    Okay.  I think I will move on.

19   A    Okay.

14:57:31 20   Q    Thank you.

21   A    Sorry.  I feel like I'm not being helpful.

22   Q    You also note -- this is in paragraph 20.  The mere fact

23   that white Republicans support a minority candidate tells us

24   quite little about whether any of those voters are motivated by

14:57:57 25   racial considerations.  What does this mean?

1  A    So I think the -- so what it effectively means is that

2  someone -- so in this case, a white Republican, could vote for

3  a black Republican, and in that decision still add racial

4  calculations to that vote choice.  Does that make sense?

14:58:19 5      And so that's why the paragraph follows with the

6  discussion of Ben Carson as an example.

7  Q    Okay.  And I want to get to that.  But one more question

8  here.  Why are the subjective motivations of the voter

9  important if they are still voting for a black candidate?

14:58:40 10 A    Well, because so this -- I also think is worth noting that

11 this information is included in response to one of the

12 assertions made by Dr. Hood.  And so he is articulating that,

13 yes, white Republicans will support minority -- sorry -- GOP

14 candidates.  And so while this might happen, if you want to

14:59:08 15 understand if it's ideology or some other consideration that

16 is, you know, which is -- oh, what is the word I'm trying to

17 say -- not driving -- but contributing to that decision, right,

18 so if you are going to argue that it's just -- if you want to

19 say it's just party and there are no racial considerations and

14:59:32 20 you're going to communicate -- that's basically what he is

21 saying, right?  So they're all Republicans.  There are people

22 who are non white.  And they voted for them, anyway.  So,

23 clearly, race was not a consideration.

24      The point I was trying to make in the following paragraphs

14:59:47 25 is that you can be conservative, or in this case Republican,

```
  1   and you can support a minority candidate.  And you can do that
  2   while also having -- harboring what we might consider racially
  3   conservative views, so while making racial considerations.
  4   Q    Okay.
15:00:09  5   A    Does that make sense?  So I'm saying that decision is not
  6   absolved of race, even though you are voting for someone who is
  7   a minority.
  8   Q    All right.  Thank you.
  9   A    I'm sorry.
15:00:23 10   Q    For this conclusion, you rely on the article in 538; is
 11   that right, the Jefferson and Tessler article?
 12   A    It's a Vox article, but yeah.  I feel like it's on Vox.
 13   Q    I'm sorry.  Is it not footnote 16 on page 6?
 14   A    It is footnote 16, yes.
15:00:49 15   Q    That is a non peer-reviewed article?
 16   A    That is correct.  But I mean I feel like I would be remiss
 17   if I don't say that part of the way that political scientists
 18   actively try to contribute to discourse around issues is
 19   publishing things that are not peer-reviewed, but are relevant
15:01:08 20   and timely.  And so often times, that work will eventually
 21   appear, you know, in a peer-reviewed article or publication,
 22   but the academic publishing cycle did can take anywhere from
 23   18 months to two years, so we will be on to the next thing by
 24   then.  So, I mean, yes, it is not a peer-reviewed article, but
15:01:29 25   I think it's still valuable.  I mean, they provide links to all
```

```
 1  the data that they use.  You can go retrieve the analysis
 2  yourself.  So it is not unusual for political scientists to
 3  present research prior to peer review and for other political
 4  scientists to cite it.
```
15:01:49 5  Q    Okay.  Thank you.
```
 6  A    Uh-huh.
 7  Q    You -- so this is part of the article that you quote on
 8  paragraph 20.  You say that white voters who harbor racial
 9  prejudice will support a black candidate who successfully
```
15:02:04 10  demonstrates he or she is, quote, not in the business of
```
11  carrying water for their own racial group, end quote.
12       So my question here is, since the 538 article that you
13  quote from used Ben Carson as an example of a black candidate
14  that racially prejudiced white voters would support, is it fair
```
15:02:25 15  to say that the article implies that Ben Carson is, quote, not
```
16  in the business of carrying water for his own racial group?
17  A    So are you asking me if Ben Carson is the type of
18  candidate that they are describing, or that I quoted from their
19  description in the previous paragraph?
```
15:02:46 20  Q    Yes.
```
21  A    Yeah.  I mean, I would imagine -- I think if you look at
22  the things Ben Carson has stated when he was running, that
23  would be fair.
24  Q    Sorry.  I did not understand.  Could you repeat that?  I
```
15:03:02 25  just didn't understand?

```
 1  A    I was agreeing with you, yes.
 2  Q    Okay.  Would you say the same thing about Representative
 3  Paschal here in Alabama?
 4  A    I honestly haven't heard him speak, and I can't attest to
 5  where he stands on issues related to African-Americans.
 6  Q    Would you say this about any black Republican candidate
 7  that white voters vote for?
 8  A    No.
 9  Q    So what makes a candidate someone who, quote, does not --
10  is not in the business of carrying water for his own racial
11  group?
12  A    I mean, I think you would have to look at the statements
13  that are made by said candidate while they're on the campaign
14  trail when addressing issues related to race in the United
15  States.
16  Q    Do you have examples of those statements that Ben Carson
17  made?
18  A    I mean, it would just honestly at this point be based on
19  my own personal impression of him when he was running for
20  office.  I don't have his statements memorized, no.
21  Q    Okay.  So I am going to try and understand these two
22  theories together because they seem to me to have a little bit
23  of conflict.  And I just want you to help me get through that.
24       So under the first theory that you discuss in your initial
25  report, in which white voters tend to vote for the white
```

15:03:19 (line 5)
15:03:37 (line 10)
15:03:50 (line 15)
15:04:14 (line 20)
15:04:41 (line 25)

1   candidate, so if a white voter supports a white Republican,

2   that is, on the whole, indicative of race, because white voters

3   support white candidates.  Is that fair?

4   A    I think what my initial report actually says is that black

15:05:04  5   -- both black and white voters prefer to vote for candidates

6   who share their racial identity, and that exists outside of

7   party.

8   Q    Okay.  And then so acknowledging that and then trying to

9   combine that with the second theory that if a white voter

15:05:21 10   supports a black Republican, it is at least possible that that

11   is also a vote count on -- on either account of race or at

12   least indicative of racial prejudice, does this mean that a

13   white Republican would have to vote for a Democratic candidate

14   for that vote not to be cast on account of race?

15:05:42 15   A    I'm not entirely sure I actually understand what you're

16   asking me.

17   Q    I will rephrase it.

18   A    Okay.

19   Q    So I can make this clear.

15:05:53 20   A    Okay.

21   Q    If all you know about a voter is that he is white and

22   supports Republican candidates, can you tell whether that voter

23   is motivated by racial bias?

24   A    No.  You would only be able to tell in light of there

15:06:10 25   being options for a non-white candidate.  And you would also

| | |
|---|---|
| 1 | have to understand where that individual voter stands on issues |
| 2 | regarding race or perceptions of non-white people. |
| 3 | Q    Okay.  Do you have any evidence that any Republican voters |
| 4 | in Alabama are voting Republican in 2022 because of racial |
| 15:06:32  5 | bias? |
| 6 | A    I mean, we haven't had any elections, and, no. |
| 7 | Q    What about in the last election? |
| 8 | A    No.  I haven't done research on the racial attitudes of |
| 9 | Alabama voters to be in a position to make an assertion about |
| 15:06:50 10 | the extent to which racial considerations contribute to their |
| 11 | choices. |
| 12 | Q    Okay.  If a voter is pro life, supports strong protection |
| 13 | of Second Amendment rights, and favors smaller government, |
| 14 | which party might seem more attractive to that voter? |
| 15:07:08 15 | A    Can you repeat that one more time? |
| 16 | Q    If a voter is pro life, supports strong protection of |
| 17 | Second Amendment rights, and favors smaller government, which |
| 18 | party might seem more attractive to that voter? |
| 19 | A    I mean, I guess generically the Republican Party. |
| 15:07:24 20 | Q    Okay.  If that voter in fact -- |
| 21 | A    Go ahead. |
| 22 | Q    Okay.  If that voter, in fact, voted Republican, would you |
| 23 | say that is because of racial bias? |
| 24 | A    I mean, I don't think you could make that assertion |
| 15:07:45 25 | without, again, like I stated knowing who the candidates were |

```
 1  in a specific race and/or understanding where the individual
 2  voter stood on some of those issues we have already discussed.
 3  So, no, I wouldn't broadly say if someone is -- to your point,
 4  supports those issues and votes for a Republican that that is
 5  the conclusion one could draw.
 6  Q    Okay.
 7       JUDGE MARCUS:  Mr. Bowdre, let me just ask you a
 8  question.  We are looking for an appropriate point to take a
 9  break.  I don't want to interrupt you in the middle of a
10  thread.
11       You tell me what would be a good breaking point.
12       MR. BOWDRE:  May I ask maybe four more questions and
13  then take a break?
14       JUDGE MARCUS:  Sure.  Absolutely.
15       MR. BOWDRE:  Thank you, Your Honor.
16  BY MR. BOWDRE:
17  Q    In your rebuttal report, Dr. King, one of the reasons you
18  give for rejecting the study Dr. Hood relies on to show that
19  ideology trumps race for white Republicans is that the report
20  did not consider any elections conducted in the state of
21  Alabama.
22       And this is in paragraph 18, and obviously, you discussed
23  it in your direct.
24       I just want to be clear.  You did not conduct any surveys
25  of voter motivation in Alabama, did you?
```

15:08:10  (line 5)
15:08:22  (line 10)
15:08:34  (line 15)
15:08:54  (line 20)
15:09:08  (line 25)

```
 1   A     No.  But I also want to clarify that my assertion that

 2   Dr. Hood's report is inappropriate is about his assertion that

 3   we can learn about Alabama through, you know, an article that

 4   doesn't actually directly address Alabama.

 5   Q     Okay.  And the 538 article that you relied on --

 6   A     Uh-huh.

 7   Q     -- also did not directly address Alabama, correct?

 8   A     That is correct.

 9   Q     And you did not talk to any voters in Alabama about why

10   they vote the way they do?

11   A     No, I did not interview any voters, no.

12         MR. BOWDRE:  Your Honor, at this time, I think a break

13   would be appropriate.

14         JUDGE MARCUS:  All right.  We will take a 15-minute

15   break at this point and then come back and pick up the thread.

16   Thank you all.

17         (Recess.)

18         JUDGE MARCUS:  Are the parties ready to proceed?  I

19   think I am muted.  Can you hear me okay?

20     All right.  And, Mr. Osher, you are ready to proceed?

21         MR. OSHER:  I am, Your Honor.

22         JUDGE MARCUS:  All right.  Mr. Bowdre, you may proceed

23   with your examination of Dr. King.

24         MR. BOWDRE:  Thank you, Your Honor.

25   BY MR. BOWDRE:
```

15:09:30 (line 5)
15:09:48 (line 10)
15:10:03 (line 15)
15:26:45 (line 20)
15:26:59 (line 25)

1564

```
 1   Q    Dr. King, I have a few more questions about racial
 2   polarization in Alabama.
 3        And we discussed earlier the Alabama NAACP case, which was
 4   about judicial elections in Alabama.  Do you recall that case?
 5   A    Is that the one you just showed me a little while ago?
 6   Q    Yes.
 7   A    Yes.
 8   Q    And is it fair to say that you did not examine the
 9   evidence that was presented in that case?
10   A    I did not, no.
11   Q    Okay.  Am I correct that the Court specifically rejected
12   the plaintiffs' theory in that case that white voters'
13   preference for the Republican party in Alabama was on account
14   of race?
15            MR. OSHER:  Objection, Your Honor.  Dr. King has said
16   she has not reviewed the case.
17            JUDGE MARCUS:  Can you answer the question, Dr. King?
18            THE WITNESS:  I mean, I could read it if -- I mean, if
19   you pull it up.
20            JUDGE MARCUS:  I think --
21            THE WITNESS:  No, no.  I do not know.
22            JUDGE MARCUS:  All right.  Thank you.
23   BY MR. BOWDRE:
24   Q    I will share my screen with you, Dr. King.
25        Okay.  You see the same opinion that we looked at earlier?
```

15:27:19 (line 5)
15:27:30 (line 10)
15:27:49 (line 15)
15:28:03 (line 20)
15:28:14 (line 25)

1  A      Yes.

2  Q      Okay.  And this is, for the record, *Alabama State*

3  *Conference of NAACP vs. State of Alabama*.

4         And I am going to skip to Westlaw cite 48.

15:28:38  5  A      Can you zoom in again?

6  Q      Yes.

7  A      Thank you.

8  Q      I am going to read the highlighted part.

9         Dr. McKee, who is the plaintiffs' expert in that case,

15:28:53 10  Dr. McKee's conclusion that race best explains the present

11  results in Alabama judicial elections has at least two flaws.

12  First, his explanation for voter behavior unpersuasively writes

13  off ideology as a cause of partisan sorting.  And, second,

14  Dr. McKee did not consider facts specific to Alabama judicial

15:29:12 15  elections that speak to the results of those elections.  He did

16  not include any state judicial races in his empirical analysis.

17         And then I am going to skip to -- well, first, did I read

18  that correctly?

19  A      Yes.

15:29:30 20  Q      Okay.  Okay.  And then skipping to Westlaw cite 42, the

21  Court states that there is evidence that black Democrats get

22  more votes in statewide appellate judicial races than white

23  Democrats.  Under a multi-variate regression model in which the

24  two independent variables are the percentage of registered

15:29:57 25  voters who are African-American and whether the losing

1    candidate was African-American, black Democratic candidates

2    performed an average of 1.4 percentage points better than white

3    Democratic candidates in general elections.

4        And skipping down a paragraph, the Court says, from these

15:30:15 5    results, it reasonably can be inferred that white Democratic

6    voters give equal or greater support to black Democratic

7    candidates as they do to white Democratic candidates.

8        And then the final line I will read appears that --

9    Westlaw cite 43, The white Democratic primary voters appear to

15:30:36 10   give equal support to black Democratic candidates suggests that

11   black candidates are not penalized in appellate judicial

12   elections by their race alone.

13       Did I read that correctly?

14   A    Yeah.  I mean yes.

15:30:49 15   Q    And then the Court concludes the notion that

16   African-American candidates lose solely because of their skin

17   color is not supported by the evidence.  There is a strong case

18   that party not race is driving election results in Alabama

19   appellate judicial races.  Did I read that right?

15:31:05 20   A    Yes.

21   Q    And you did not discuss this in your report, correct?

22   A    Did not, no.

23   Q    Okay.  I have a couple of questions about your rebuttal

24   reports regarding any-part black versus single-part black or

15:31:23 25   single-race black responses.  And you recall your testimony on

```
 1   direct about this?
 2   A    Yes.
 3   Q    I want to make sure I'm getting the definitions right.  Is
 4   it your understanding any-part black is -- can be someone who
 5   checks more than one racial category versus a single-race black
 6   is someone who just chooses black as the racial category; is
 7   that correct?
 8   A    Generically, yes.
 9   Q    And you contend that any-part black is a proper method of
10   measurement?
11   A    Yes.
12   Q    Do you have any evidence to suggest that any-part black
13   voters vote the same as single black race voters?
14   A    No.  And I would suggest that based on why I included that
15   discussion in my rebuttal report and being responsive to the
16   notion that -- what is it, single-part black is the best
17   position defensible from a political science perspective, there
18   would also be no reason for me to engage in that analysis.
19   Q    Sorry.  Why is that?
20   A    So I -- so my discussion of single-part black -- not
21   single part.  Sorry.  Black alone and black in combination was
22   in direct response to the notion that that's the defensible
23   position from my discipline.
24   Q    Okay.  So you don't know if single-race blacks or any-part
25   blacks vote the same?
```

```
 1   A    No, I did not conduct that analysis.  I do not know.
 2   Q    Okay.  Do you agree that someone -- if we're -- excuse me.
 3   If we're measuring any-part black, you agree that someone can
 4   identify as Hispanic and black?
 5   A    Yes.
 6   Q    Do you know if Hispanic and black voters either
 7   single-race black or the aggregate of all any-part black vote
 8   similarly?
 9   A    Can you say that one more time?
10   Q    Yep.  Do you know if Hispanic and black voters and in the
11   second category of black voters, I am including both or either
12   single-race black or the aggregate of any-part black -- do you
13   know if those two categories would vote similarly?
14   A    So people who are black Hispanic and people who are -- who
15   only check black and people who check black and something else?
16   Q    Yes.
17   A    Is that what you are asking me?
18   Q    Yes.
19   A    Just to clarify.  I do not know.
20   Q    Okay.
21   A    I -- well, go ahead.
22   Q    In your report, you rely on political polling from news
23   organizations such as CNN and ABC, correct?
24   A    Yes.
25   Q    Okay.  Are you aware that according to a recent poll
```

Timestamps: 15:33:14 (line 5), 15:33:28 (line 10), 15:33:51 (line 15), 15:34:00 (line 20), 15:34:17 (line 25)

```
 1  conducted for the Wall Street Journal that Hispanics are evenly
 2  split in their support between Republican and Democratic
 3  parties?
 4  A     No, I did not know that.  But I mean, I think if we look
 5  at the history of black identity, we're talking about black and
 6  white combinations, not black and other.
 7  Q     Okay.  But you would agree that the any-part black would
 8  include someone who identifies as both black and Hispanic,
 9  right?
10  A     I mean, yes, I would, but I just wanted to, you know, for
11  the purpose of what I was speaking to specifically, I just
12  wanted to be clear.
13  Q     Okay.  I want to pull out Defendants' Exhibit 152.  Where
14  I do not believe is in evidence.  I think it was one of the
15  exhibits that was objected to by the Milligan plaintiffs.  I
16  will share my screen.
17        Do you see this, Dr. King?
18  A     I do.
19  Q     And this is the Wall Street Journal article entitled,
20  Hispanic Voters Now Evenly Split Between Parties?
21  A     Yes.
22  Q     And I am going to scroll down -- do you see these tables?
23  A     Yes.
24  Q     And the first table is -- the tables both are portrait of
25  the Hispanic voters, and then the first table is which
```

```
 1  candidate would you support for Congress?
 2  A     Uh-huh.
 3  Q     And we see that Hispanics are evenly split at 37 percent
 4  between a Democratic and a Republican candidate; is that
 5  correct?
 6  A     Yes, that's what I --
 7            MR. ROSS:  Your Honor, the Milligan plaintiffs
 8  continue to object to the inclusion of this evidence.  It's
 9  hearsay that no expert has testified about, and it doesn't even
10  breakdown by black people who are also Latino.  So there's no
11  basis for any of this testimony or for him to introduce it.  We
12  continue to object to it.
13            JUDGE MARCUS:  Again, at this point, he hasn't offered
14  it.  He simply has marked it for identification to
15  cross-examine.  When and if he argues it, we'll be happy to
16  take up that objection.  You may ask your question.
17            MR. BOWDRE:  Thank you, Your Honor.
18  BY MR. BOWDRE:
19  Q     The next table -- if the 2024 election for President were
20  held today, for whom would you vote, the table shows that
21  44 percent of Hispanics would vote for Biden versus 43 percent
22  for Trump.  Do you see that?
23  A     I do.
24  Q     Okay.  You say that this polling indicates to you that
25  there may be a difference in how Hispanics, which would include
```

Timestamps in left margin: 15:35:59 (line 5), 15:36:11 (line 10), 15:36:27 (line 15), 15:36:46 (line 20), 15:37:01 (line 25)

```
 1   black Hispanics may vote as compared to single-race blacks or
 2   the aggregate of all any-part blacks?
 3            MR. OSHER:  Objection, Your Honor.
 4            JUDGE MARCUS:  Sustained as to form.  The objection is
15:37:19 5   sustained, Mr. Bowdre.
 6            MR. BOWDRE:  Okay.  Sorry.  Why is that?
 7            JUDGE MARCUS:  It was the form of the question.
 8            MR. BOWDRE:  Okay.  Thank you, Your Honor.
 9   BY MR. BOWDRE:
15:37:34 10  Q    Dr. King, in your opinion as a political scientist, would
11   this polling be relevant to you in determining whether
12   Hispanics and black voters might vote differently?
13            MR. OSHER:  Objection, Your Honor.  This goes beyond
14   the scope --
15:37:49 15           JUDGE MARCUS:  I will take the answer to that
16   question.  Do you understand it, Dr. King?
17            THE WITNESS:  Can you repeat it?
18            JUDGE MARCUS:  Sure.
19            THE WITNESS:  Thank you.
15:37:56 20  BY MR. BOWDRE:
21   Q    Dr. King, in your opinion as a political scientist, would
22   this polling be relevant to you in determining whether
23   Hispanics and black voters might vote differently or the same?
24   A    So by relevant, do you mean, would I use it?  Can you sort
15:38:21 25  of clarify what you mean by using relevant?
```

```
 1   Q    Within the context of single-race blacks or any-part
 2   blacks, would this polling be relevant to you in determining
 3   that there might be a difference in how black Hispanics, for
 4   instance, might voting as compared to other blacks?
```
15:38:39
```
 5   A    I mean, possibly, but I'd say it's hard to tell for a
 6   variety -- so first of all, there's a variety of reasons with
 7   that categorization Hispanic, but that's a subside
 8   conversation.
 9        I mean, possibly.  I mean, that's the best answer I can
```
15:39:10
```
10   give you right now.
11   Q    Okay.
12        MR. BOWDRE:  Your Honor, at this time, I will move to
13   admit Defendants' Exhibit 152.
14        JUDGE MARCUS:  Your objection, Mr. Ross?  Mr. Ross,
```
15:39:28
```
15   did you want to comment about it?
16        MR. ROSS:  Yes, Your Honor.  Sorry.  I was just
17   getting logged back in.
18        We continue to object.  We don't think that it's relevant.
19   As I said, it doesn't even break out by their -- as this Court
```
15:39:42
```
20   knows, there are black people who are also Latino.  There are
21   white people who are Latino.  This information is in the
22   aggregate.  It's national.  There's been no expert testimony as
23   to it at all.  It's entirely hearsay.
24        JUDGE MARCUS:  Anything further, Mr. Osher, on that?
```
15:39:58
```
25        MR. OSHER:  From just that -- to clarify, defendants
```

have not laid the proper foundation for how this was generated

and what methodology was used.

JUDGE MARCUS:  Okay.  Anything further, Mr. Bowdre, on

that?

15:40:14  MR. BOWDRE:  Yes, Your Honor.  I would say that

Dr. King did testify that she relies on polling.  Specifically,

she said ABC and CNN polling, and this is a similar polling.

So it is the kind of evidence that political scientists like

Dr. King routinely rely on, and she cites similar evidence in

15:40:33  her report.

Obviously, it's up to Court as to what weight to give the

evidence, but I do think it is relevant, at least a little bit

in the discussion of single-race votes or single-race black

votes versus any-part black votes, which would include

15:40:53  Hispanics, which at least this polling does indicate might vote

differently than the majority of blacks, who are much more

closely aligned to the Democratic Party according to Dr. King.

JUDGE MARCUS:  The objection is sustained, counsel.

It is one thing to cross-examine her with it and quite another

15:41:13  to offer it without any foundation.  She hasn't seen it.  She

can't tell us anything about it.  Whether the polling

methodology was sound or not, who did it, and how it bears on

the issues here all remain open.  The foundation has not been

laid.  The objection is sustained.

15:41:40  BY MR. BOWDRE:

1574

1  Q     Dr. King, I will move on to Senate Factor 5, to that

2  portion of your report.

3        So a few questions about your conclusions regarding racial

4  education disparities.  And you say in your report that Alabama

15:41:59 5  ranks 39th among the 50 states when it comes to per pupil

6  spending on K-12 education.

7  A     Can you tell me what paragraph that is?

8  Q     I'm sorry.  This is paragraph 92.

9  A     Oh, sorry.  So what you're asking me is why I include the

15:42:26 10  information that Alabama ranks 39th of 50?

11  Q     Correct.  Why is that comparison relevant to your

12  determination or your analysis?

13  A     Oh.  So this section was focused explicitly on education

14  and potential disparities that exist.  And I think my general

15:42:57 15  sense is that I included it to position the state in total

16  relative to the United States.  Also PARCA exists in the state

17  of Alabama, and so it seemed relevant to include information

18  about the state -- the organization that is in the state.

19  Obviously, I can't go back in time and, you know, think

15:43:17 20  directly about what I was thinking, but that seems reasonable.

21  Q     Okay.  So would you agree that -- I think you said

22  situated in Alabama within the context of the United States

23  that that is -- or can be a helpful portion of your analysis in

24  determining the present effects of discrimination in Alabama?

15:43:35 25  A     I think that's reasonable.

```
 1  Q     Okay.  So you note that there is a disparity in per pupil
 2  funding.
 3  A     Uh-huh.
 4  Q     And my understanding is that Alabama by federal law
 5  releases reports of per pupil funding by individual school.
 6  Have you looked at those reports?
 7  A     I believe I got this information from the Alabama
 8  Department of Education.  So unless that information is housed
 9  on that website, probably not.
10  Q     Okay.  So did the information that you reviewed look --
11  did it provide the amount of funding per school in Alabama?
12  A     Per school or per school district?
13  Q     Both.
14  A     I think I was just looking at districts.
15  Q     Okay.
16  A     I believe -- or systems as I think they are actually
17  called.
18  Q     Okay.  Have you been following the reporting that AL.com
19  has been doing over the last couple of years on school funding
20  in Alabama?
21  A     Not closely, no.
22  Q     But you generally rely on AL.com and find it to be a
23  reputable news source?
24  A     Yes.
25  Q     So as part of its reporting, AL.com took all the
```

```
 1   information that the state issued on -- which comes in a --
 2   like a 500-page pdf broken down by school, and then AL.com put
 3   it into a searchable database so that people can, you know,
 4   search through and manipulate the numbers.  Have you looked at
 5   that database?
 6   A   I know there's a tool on the PARCA website that allows you
 7   to do something similar, but I don't know if that's the same
 8   tool.
 9   Q   Okay.
10   A   So possibly -- so I haven't gone to AL.com to explicitly
11   look at that tool if that's not the same tool as the other one
12   that I am aware of.
13   Q   Okay.  So you pick out Mountain Brook -- in paragraph 92,
14   you pick out Mountain Brook as the one of the example schools
15   and note that it spends $12,000 per student per the system; is
16   that correct?
17   A   According to the Alabama Department of Education, that's
18   what they reported, so I reported that.
19   Q   Okay.  I want to pull out the AL.com article and ask you a
20   few questions about that.
21   A   Okay.
22   Q   Okay.  Do you see this, the article entitled, Here's How
23   Much Each Alabama School Spent on Students?
24   A   Again, can you make it a little bigger?
25   Q   All right.
```

1   A      Thank you.

2   Q      Skip down to page --

3              JUDGE MARCUS:  Let me stop you for a moment.  Can you

4   just tell me what exhibit this, Mr. Bowdre?

15:46:57  5              MR. BOWDRE:  I'm sorry, Your Honor.  This has not been

6   previously marked.  I think it would be Defense Exhibit 9 for

7   demonstratives.

8              JUDGE MARCUS:  Thank you.

9   BY MR. BOWDRE:

15:47:13 10   Q    So here at the top of page 3, the article note, The

11   average total spending at schools in Alabama not serving

12   specialized populations was 9,374, and that spending ranged

13   from a low of 4,593 per student at Eufaula's Moorer Middle

14   School to a high of $20,020 at Lee County's Loachapoka High

15:47:40 15   School.  And you live in Lee County, correct?

16   A      I do.

17   Q      Are you familiar with Loachapoka High School?

18   A      I know it's in Lee County.

19   Q      Okay.  Are you aware that the majority of students at

15:47:52 20   Loachapoka are black?

21   A      I was aware that Loachapoka is a predominantly black

22   community, so inferring, I would assume that the school would

23   be black.

24   Q      Okay.  I am going to go up to the conclusion of -- at

15:48:09 25   least of this reporter.  One surprising finding in the school

```
 1    level spending numbers was that spending is actually higher in
 2    schools with higher levels of poverty, generally speaking, even
 3    after federal dollars -- which are typically higher at schools
 4    with more students in poverty -- are removed.
```
15:48:26 5          Did I read that right?
```
 6    A    Yes.
 7    Q    Do you agree with that conclusion, or do you have any
 8    thoughts about that conclusion?
 9    A    I mean, we looked at school two data points.
```
15:48:48 10   Q    Well, I'm sorry.
```
11    A    I am not sure if --
12    Q    Okay.  I think -- let me scroll up.  I think it's clear
13    that --
14    A    Okay.
```
15:48:57 15   Q    They're not just talking about two --
```
16    A    No.  I meant in our conversation here.  Like I have only
17    seen two.
18    Q    Well, I guess -- I'm sorry.
19          I'm asking you presumably -- well, let me take a step
```
15:49:12 20   back.
```
21    A    Sure.
22    Q    Why did you include Mountain Brook as the one example in
23    your report?
24    A    I included Mountain Brook to show the range.  That's
```
15:49:26 25   really the only reason.  And I actually think this is directly

```
 1  from an Alabama Department of Education report.  Like so I
 2  wasn't sitting there looking at the entire list.  And then I
 3  was like, oh, let me pick Mountain Brook.  I don't think that's
 4  what actually happened here.
 5  Q    Okay.  What, if anything -- I guess I am a little still
 6  confused why you chose Mountain Brook as the example in your
 7  report if there are -- if looking at range, there would be
 8  other schools with higher per pupil spending.
 9  A    No.  So I think --
10          MR. OSHER:  Object, Your Honor.  Sorry.  Objection.
11  Asked and answered.
12          JUDGE MARCUS:  No.  We will take it one more time.
13  Overruled.
14          THE WITNESS:  So if I recall correctly, when I was
15  looking at the data from the Department of Education -- when I
16  was reading the reference from the Department of Education,
17  they listed Mountain Brook, and they listed Autauga.  And I
18  just included that in the report.
19  BY MR. BOWDRE:
20  Q    I see.
21  A    So it's probably -- should be an indirect quote with no
22  quotation marks, and I apologize for that.
23  Q    So are you making any larger points about the relationship
24  of school spending and outcomes in Alabama?
25  A    No.  No.  This -- this paragraph that we're talking about,
```

1   paragraph 92, is literally just about differences in spending

2   across the state.

3        I mean, I do note in the footnote that there are racial

4   differences between those two counties.  But with -- like I

15:51:18 5   just said with this, like you can't make assumptions off of

6   necessarily two data points.  It's descriptive.  It's not

7   correlational, and it's not causal.

8   Q    I see.  Okay.

9   A    I'm sorry.  Does that make sense?

15:51:31 10  Q    Yes, it does.  Thank you.

11  A    Oh, okay.

12  Q    All right.  Skipping ahead to economic disparities.

13       In discussing economic disparities, you note in your note

14  that the unemployment rate for black Alabamians was 4.6 percent

15:52:02 15  and for white Alabamians is 2.5 percent, correct?

16  A    Can you tell me what paragraph we're in?

17  Q    Yes.  I'm sorry.  Paragraph 103 on the first paragraph?

18  A    Okay.

19  Q    Do I have that right?

15:52:14 20  A    So as an example that -- is that what we're talk about?

21  The employment rate for black residents?  Is that what we're

22  talking about?  Can you read the quote again?  I guess that's

23  easier.  Sorry.

24  Q    Yes.  I'm sorry.  This is coming from paragraph 103, and

15:52:31 25  you state, In terms of employment, the unemployment rate for

African-American workers, 4.6 percent, is twice that of white

workers, 2.5 percent.

 Do you see that?

A Yes.  Sorry.  Yes.

15:52:47 Q Is it correct or do you know that the nationwide black

unemployment rate is 7.1 percent?

A I did not know that.

Q So per this citation you cite to -- I'm sorry.  Just give

me one second.

15:53:22 A You're fine.

Q Okay.  Yeah.  This is footnote 108.

A Okay.

Q Which is the Economic Policy Institute, State Unemployment

By Rate and Ethnicity?

15:53:49 A Uh-huh.

Q I am going to pull that up for you.  Defendants'

Exhibit 158, and I think it is also an objected to exhibit.

You see this?

A I do.

15:54:16 Q Is this the report you looked at?

A It was a website, so it looked a little different, but I

am going to assume yes.

Q Okay.  Would it help if I scrolled through it?  I did save

it as a pdf, so it might be a little bit different.

15:54:31 A I guess -- if it's not fine, I will let you know.

```
 1   Q    Okay.  So my main questions are on this first page.  And
 2   we see that the nationwide black unemployment rate is
 3   7.1 percent.  Is that what that says?
 4   A    Yes, it does.
 5   Q    And the DC -- just for comparison, the D.C. unemployment
 6   rate, the black unemployment rate is 11.7 percent; is that
 7   correct?
 8   A    That is correct.
 9   Q    Okay.  And that is compared to Alabama's 4.6 percent that
10   you mentioned in your report, right?
11   A    That is true.
12   Q    So previously, you gave us an example of putting Alabama's
13   number in context with the education spending?
14   A    Uh-huh.
15   Q    Why did you not do that when it came to unemployment?
16   A    Again, so like I said earlier, if the comparison was
17   present, I included it, but I didn't go through each point
18   looking for information to compare Alabama to other places.
19        So, for example, when I was doing my research on
20   education, one of the first places I went to was PARCA and the
21   Department of Education.  And so the comparison was present, so
22   I included it.
23        I will say, though, I mean, it's clear that Alabama's
24   black unemployment rate is lower than -- what is that, D.C.?
25   D.C. is also lower than nationwide black unemployment.  But
```

1 that also doesn't, like, eliminate the fact that there is a

2 disparity between black unemployment and white unemployment in

3 the state.

4 Q    But you also did not note the national comparison, like --

5 A    I -- sorry.  I didn't mean to cut you off.  I apologize.

6 Q    No.  Go ahead.

7 A    No.  I was going to say you are correct.  I did not note

8 that -- I did not include nationwide unemployment statistics in

9 the section.  You are correct.

10 Q    Thank you.

11 A    Uh-huh.

12         MR. BOWDRE:  Your Honor, I would move to admit Defense

13 158 since we have offered it before, and this is I think

14 different than the last offer in that this is -- Dr. King has

15 testified that this is the article that she relied on.  She

16 obviously found it relevant and reliable because she relied on

17 it, and it is relevant to this case because it shows

18 unemployment rates not just for Alabama, but for other

19 jurisdictions, as well.

20         JUDGE MARCUS:  Any objection?

21         MR. ROSS:  Your Honor, I believe it was the Milligan

22 plaintiffs that objected.  As you know, the Supreme Court has

23 said that this is an intensely local analysis, and so we object

24 to including any evidence about other states, because as

25 Dr. King testified, the relevant comparison is black Alabamians

15:56:26 (line 5)
15:56:45 (line 10)
15:57:07 (line 15)
15:57:24 (line 20)
15:57:39 (line 25)

1   to white Alabamians, not to black people in other states and

2   other cities.

3           JUDGE MARCUS:  So the objection is not one of

4   foundation, but of relevancy.

15:57:54 5           MR. ROSS:  Yes, Your Honor, relevance and hearsay,

6   since this is not a government document, so we don't know the

7   underlaying basis.

8           JUDGE MARCUS:  We will reserve on 158.

9           MR. ROSS:  Thank you.

15:58:08 10  BY MR. BOWDRE:

11  Q    Dr. King, moving on to paragraph 112 of your report, this

12  is about the section of your report entitled, Criminal Justice

13  and Felony Disenfranchisement?

14  A    Yes.

15:58:35 15  Q    So you know -- this is the first sentence of paragraph 113

16  in which you were talking about the incarceration rate in

17  Alabama and the effect that that has on felon voting in

18  Alabama.

19           And you say that these disparities make Alabama an outlier

15:58:59 20  among other states; is that correct?

21  A    Is that in paragraph 112?

22  Q    The beginning of paragraph 113.

23  A    Oh.  Sorry.  Yes.  Proceed.  That is what I wrote.  Yes.

24  Q    So, here again, why is it important or why do you note

15:59:23 25  that Alabama is an outlier as compared to other states?

1  A    Again, I can't say that I was actively trying to exclude

2  or include nationwide comparisons.  I mean, I can't really give

3  you an I did it because of X or Y.  I often, you know -- so I

4  will just say this:  As a, you know, as a social scientist,

16:00:00  5  when talking about and presenting statistics, sometimes you

6  present national points of comparison, and other times you

7  don't.  I can't -- I can't speak for -- me.  I will speak for

8  myself.  But I can't say I sit there and have an active sort of

9  dialogue or discussion about, you know, should I do it here or

16:00:23 10  shouldn't I do it there.  It's not that intentional.

11  Q    Okay.  But you would agree that at times it can be helpful

12  or relevant to have that context?

13  A    Oh, yeah.  I agree wholly, yes.

14  Q    So in the previous paragraph, which is paragraph 112?

16:00:42 15  A    Yes.

16  Q    You say that the incarceration rate in Alabama is 1,132

17  black residents imprisoned per 100,000 black residents in the

18  state, and 421 white residents imprisoned per 100,000 white

19  residents in the state.  Did I read that correctly?

16:01:02 20  A    That is correct, yes.

21  Q    Okay.  And for that, you rely on the sentencing project,

22  The Color of Justice; is that correct?

23  A    I do.

24  Q    In --

16:01:24 25  A    Yes.

```
 1   Q    I am going to pull that up and share that on my screen.
 2   A    Please do.
 3   Q    And this is -- I'm sorry.  Can you see that?
 4   A    Yes.
```
16:01:39
```
 5   Q    And this is Defense Exhibit 153, which I also think was
 6   objection by the Milligan.  But I assume like the other ones
 7   would be in evidence in the Caster case.
 8        Is this the report that you relied on, Dr. King?
 9   A    It is.
```
16:02:11
```
10   Q    I'm sorry.  I missed that.  Okay.  I am going to skip down
11   to page 21.  And this is -- the Table 7 is the black
12   differential high to low.  Do you see that?
13   A    I do.
14   Q    And then I have Alabama highlighted, and I see the numbers
```
16:02:39
```
15   that you pulled -- 421 and 1,132 for a disparity of 2.7; is
16   that right?
17   A    Can you zoom in?
18   Q    Yes.  I'm sorry.  Go ahead.  Can you see that?
19   A    I can.
```
16:02:57
```
20   Q    And those are the numbers that you pulled for your report?
21   A    Yes.  But I believe I pulled the Alabama numbers from the
22   text and not the table.
23   Q    Okay.  But the numbers are the same?
24   A    Yes, uh-huh.
```
16:03:09
```
25   Q    Okay.  And so scrolling out just a little bit.  Would you
```

```
 1  agree that this places Alabama as the 49th state right behind

 2  Hawaii, in terms of the black/white differential looking high

 3  to low?

 4  A    Can you scroll down?

 5       So, yes.

 6  Q    Okay.  But you did not include that context in your

 7  report, did you?

 8  A    I --

 9            MR. ROSS:  Your Honor, the Milligan plaintiffs.

10            JUDGE MARCUS:  One moment.  If you hear an objection,

11  Dr. King, just give me a chance to hear it and rule on it

12  before we rule on the objection, okay?

13            THE WITNESS:  Will do.

14            JUDGE MARCUS:  Thank you.

15       Mr. Ross?

16            MR. ROSS:  Your Honor, the Milligan plaintiffs also

17  objected to this report on the same basis relevance, hearsay,

18  and foundation.  We have the same issues as we have had with

19  the last several exhibits.

20            JUDGE MARCUS:  Let me ask this question just so I'm

21  clear.  Caster, have they offered this?

22            MR. OSHER:  No, Your Honor.

23            JUDGE MARCUS:  Was this among the materials you have

24  offered, Mr. Osher?

25            MR. OSHER:  No, Your Honor.
```

16:03:31 (line 5), 16:03:43 (line 10), 16:03:54 (line 15), 16:04:11 (line 20), 16:04:22 (line 25)

1        JUDGE MARCUS:  Are you objecting as well, or do you

2   have no position on this.

3        MR. OSHER:  In the joint pretrial report or prehearing

4   report, the Caster plaintiffs did not interpose an objection to

16:04:34 5   this exhibit.

6        JUDGE MARCUS:  All right.  Do you want to tell us

7   about relevance, Mr. Bowdre?

8        MR. BOWDRE:  Yes, Your Honor.

9        JUDGE MARCUS:  He said, one, it isn't relevant what

16:04:47 10   the nationwide figures are.  What's relevance is what the

11   Alabama figures are.  And, two, he says that it's hearsay.  It

12   doesn't come from some official government document or report

13   from the Justice Department of Bureau of Prisons or anything

14   like that, and therefore, he is objecting on the grounds of

16:05:10 15   hearsay.

16        MR. BOWDRE:  Yes, Your Honor.  I will address hearsay

17   first.

18      So Dr. King has testified as an expert she has relied on

19   this.  It is cited in her expert report on footnote 127.  And

16:05:32 20   at a preliminary injunction hearing, all the rules of hearsay I

21   don't think apply with full force, and the Court has discretion

22   to consider, you know, just for the speed of things and the

23   quick nature of things -- this is *Levi Strauss & Company vs.*

24   *Sunrise International Trading, Inc.,* 51 F.3d at 985, and --

16:05:58 25   just one sentence quote is:  At the preliminary injunction

stage, a district court may rely on affidavits and hearsay
materials, which would not be admissible evidence for a
permanent injunction if the evidence is appropriate given the
character and objectives of the injunctive proceeding.

And as for relevance, I think that Dr. King has testified
that it can be useful and relevant to situate Alabama's numbers
within the context of America and within the context of other
states.  Indeed she does so in the immediate next sentence in
her report in paragraph 113.

JUDGE MARCUS:  We will reserve on the admissibility so
I have a chance to counsel with my colleagues.  You may
proceed.  So we're clear, we have reserved on 153, as well as
on is 158.

Did you want to add something, Mr. Ross?  I didn't mean to
cut you off.

MR. ROSS:  Yes, Your Honor.  I am sorry.  I just want
to acknowledge that we also had a foundation objection, which I
believe is similar to our other objections.  I just wanted to
make sure I have it.

JUDGE MARCUS:  Yes, I understand.

MR. ROSS:  Thank you, Your Honor.

JUDGE MARCUS:  So everyone is clear, we have reserved
on 153 and 158.  These are not government reports purporting to
summarize statistics nationwide.  You may proceed with your
next question.

1        MR. BOWDRE:  Thank you, Your Honor.

2  BY MR. BOWDRE:

3  Q    I apologize if you have already answered this, but you did

4  not provide this context in your report; is that correct?

16:07:33 5  A    I did not state where Alabama falls relative to the other

6  49 states.  You are correct.  But I would again make the same

7  point I made earlier, that even though Alabama's black/white

8  differential is one of the lowest, it still exists within the

9  state.

16:07:57 10  Q    Okay.  Thank you.

11  A    Uh-huh.

12  Q    Okay.  In paragraph 120, you discuss the Census Bureau and

13  policies of counting inmates of where they are imprisoned.  And

14  my question is -- and you note that Alabama does the same

16:08:25 15  thing, right?

16  A    Uh-huh.

17  Q    And my question is:  I just want to be clear that this is

18  a Census Bureau policy of counting inmates at the prison and

19  not something that Alabama uniquely has done; is that correct?

16:08:37 20  A    Right.  When conducting the census and geographically

21  positioning people, the Census Bureau counts incarcerated

22  people where they are housed, correct.

23  Q    And other states, not all other states, but a lot of other

24  states do not reallocate where those people are counted for

16:09:00 25  terms of redistricting?

```
 1  A      There are some states that don't, and there are some
 2  states that do, yes.
 3  Q      In fact, only 13 states relocate their prison populations;
 4  isn't that right?
 5  A      I mean, I don't know the number off the top of my head,
 6  but if that's number you're presenting as fact, I will take
 7  your report.
 8  Q      Okay.  Let's talk about felon disenfranchisement for a
 9  moment.
10  A      Okay.
11  Q      Let me skip some of these questions.  So I am looking at
12  paragraph 115?
13         JUDGE MARCUS:  Again, just so that I am clear,
14  Mr. Bowdre, you're referring to Dr. King's first report,
15  paragraph -- the paragraph you're referencing?
16         MR. BOWDRE:  Yes, Your Honor.  Paragraph 115 of
17  Dr. King's initial report.
18  BY MR. BOWDRE:
19  Q      You discuss the Supreme Court's decision in *Hunter vs.*
20  *Underwood*?
21  A      Uh-huh.
22  Q      Did you read that case?
23  A      In its entirety, no.  And so I think something I should
24  say here is so as a political scientist relative to my work,
25  when I engage in court cases, particularly as part of my
```

16:09:08 (line 5)
16:09:24 (line 10)
16:09:48 (line 15)
16:10:06 (line 20)
16:10:15 (line 25)

 1  scholarship, it's fundamentally looking at what the decision

 2  was and sort of what the potential impact of that decision was.

 3       So I don't regularly in my, you know, academic work as

 4  faculty at Auburn University nor as sort of in my academic

16:10:40  5  presentation in response to the Senate Factors, did I -- I

 6  didn't change the way I approach research for this is what I

 7  guess I'm trying to say to you.

 8  Q    Okay.  Thank you.

 9       So my question stems from the sentence, Although Section

16:10:54 10  182 was struck down in *Hunter vs. Underwood*, Amendment 579 was

11  added to the Alabama Constitution in 1996?

12  A    Uh-huh.

13  Q    So my question is:  Didn't *Hunter vs. Underwood* only

14  strike down the felon disenfranchisement provision as it --

16:11:13 15  actually related only to misdemeanants not felons?

16            MR. BLACKSHER:  Your Honor, this is Jim Blacksher for

17  the Singleton plaintiffs.

18            JUDGE MARCUS:  Yes, sir.

19            MR. BLACKSHER:  I would remind, Your Honor, that that

16:11:28 20  very issue is pending before the Eleventh Circuit.  There was

21  oral argument in *Thompson vs. Merrill* on the felon

22  disenfranchisement case only about a month ago.  I am

23  co-counsel in the case.

24            JUDGE MARCUS:  Yes.  Mr. Bowdre, what is it you want

16:11:44 25  to ask her?  What the district court ruled?

```
 1              MR. BOWDRE:  No, Your Honor --
 2              JUDGE MARCUS:  Or the Eleventh Circuit?  I am not sure
 3   I have the import of the question.
 4              MR. BOWDRE:  I'm sorry.  I'm asking her about her
 5   assertion in paragraph 115 that the U.S. Supreme Court in
 6   Hunter vs. Underwood struck down Alabama's provision.  And my
 7   question --
 8   BY MR. BOWDRE:
 9   Q    And my question is:  Didn't the Court only strike down the
10   provision as it applied to misdemeanors?
11   A    I think this is just a poor wording on my part, in terms
12   of, you know -- yes, I probably should have been more specific
13   in the way I wrote that one sentence.
14   Q    Okay.  So as Mr. Blacksher pointed out, are you aware that
15   Alabama's felony disenfranchisement law has recently been
16   litigated in federal court?
17   A    The current law?
18   Q    Yes.
19   A    Well, I am now.
20   Q    You were not when you wrote your report?
21   A    Like did I know there were challenges against the Moral
22   Turpitude Act?  Is that what we're talking about?
23   Q    Yes.  The 2017 provision that you discuss in paragraph
24   116.
25   A    No.  Actually, I was not aware that it was currently being
```

1    litigated in court.

2    Q    Okay.  And so you were also not aware that the district

3    court the Middle District of Alabama upheld Alabama's law?

4    A    You mean the one in place now?

16:13:28  5    Q    Yes.

6    A    I mean, I know it's in place.

7    Q    Okay.  Let me go back --

8    A    I don't -- I don't understand what you are asking me.

9         MR. OSHER:  Your Honor, I am going to object to this

16:13:41 10   line of questioning.  Dr. King's not asserting that this law is

11   -- it is unlawful.  She's asserting that it has a

12   discriminatory effect, period.  She's not opining on the

13   legality of the provision.  And the questions about what a

14   court has done or has not done is not relevant to her opinions

16:14:02 15   in this case.

16        JUDGE MARCUS:  You may ask her whether she's familiar

17   with it or not.  To the extent the objection went to that

18   question, it is overruled.  And then let's see if we can move

19   this along, Mr. Bowdre.

16:14:14 20        MR. BOWDRE:  Yes, Your Honor.

21   BY MR. BOWDRE:

22   Q    Just to be clear, Dr. King, it's your testimony that you

23   were not familiar with the *Thompson vs. Merrill* decision or

24   that litigation when you wrote your report; is that correct?

16:14:26 25   A    Yes, that would be correct.

```
 1  Q    Okay.  In paragraph 117 of your report, you state that
 2  despite passage of the 2017 law clarifying which crimes are
 3  disenfranchising, there has been no effort on the part of the
 4  state to inform the thousands of Alabamians who prior to 2017
```
16:15:00 5  may have been told that they were ineligible due to their
```
 6  felony convictions, but for whom the Moral Turpitude Act
 7  clarified that they are indeed eligible to vote; is that
 8  correct?
 9  A    That is what I wrote, yes.
```
16:15:13 10 Q    And for that assertion, you relied on a student note in
```
11  the Harvard bar review; is that correct?
12  A    That and my -- I mean, I couldn't cite my own personal
13  knowledge.  I don't believe so.  I didn't.
14  Q    Okay.  What is your personal knowledge about that
```
16:15:31 15 assertion?
```
16  A    So as part of my work at Auburn University, one of my
17  colleagues has a grant with the secretary -- no -- not a grant
18  -- a contract -- with the Secretary of State's office to
19  provide training for the voter registrars across the state
```
16:15:49 20 relative to the work that they do.  And so part of that work
```
21  focuses on moral turpitude and efforts to notify people that
22  they are eligible.  Not -- so part of that work is about
23  explaining what the act is, what the -- we go through the
24  cases, we present, you know, different potential felonies
```
16:16:13 25 people could be convicted of.  And so I mean we have

```
        1  conversations about what they do or don't do as part of their
        2  jobs.
        3       And so.
        4  Q    So I just want to make sure I understood what you just
16:16:26 5  said.
        6  A    Sorry.
        7  Q    You were discussing a grant either with --
        8  A    It's a contract through the Secretary of State's office
        9  that one of my colleagues has, yes.
16:16:37 10 Q    Okay.  So the Secretary of State's office has contracted
       11  with your colleague?
       12  A    Uh-huh.
       13  Q    To explain?
       14  A    No.
16:16:43 15 Q    To voters what the moral turpitude law is?
       16  A    No.  She's contracted with the registrars to provide
       17  formal training over Alabama's voter registration rules.  And
       18  so part of that training involves discussions of the Moral
       19  Turpitude Act and how they as registrars are supposed to deal
16:17:02 20 with it when someone shows up and says they have a felony
       21  conviction.  So while we're there, oftentimes we regularly have
       22  conversations about sort of what it is or what they don't do as
       23  a part of their jobs, and notifying people is not a part of
       24  their jobs.  And they work for the state, so...
16:17:22 25 Q    I see.  Okay.
```

```
 1  A    I didn't want to -- I mean -- putting that -- sorry.
 2  Q    Have you been in contact with anyone at the Secretary of
 3  State's office or the Board of Pardon and Paroles about their
 4  efforts, if any, to reach voters?
16:17:41  5  A    No, I did not contact the Secretary of State's office or
 6  the Board of Pardons and Paroles.  I did not do that.  You are
 7  correct.
 8  Q    Okay.  And since you are not aware of the *Thompson*
 9  litigation, is it safe to say that you did not review any of
16:17:55 10  the evidentiary submissions in that case?
11  A    That would be safe to say, yes.
12  Q    Okay.  Did you check to see if there were any newspaper
13  articles or blog posts for social media posts about the 2017
14  law either from the Secretary of State's office or from anyone
16:18:14 15  else that might inform Alabama voters?
16  A    I know there is a press release on the Secretary of
17  State's website because I have seen it.  And I would imagine at
18  some point in time, I probably read an article on AL.com.
19  Q    Okay.  When you were you were at the Secretary of State's
16:18:35 20  website, did you see the infographic on that website listing
21  felonies that require restoration?
22  A    You mean the CERV?
23  Q    Yes.
24  A    I mean, I -- I'm sure I have seen it.  I can't say I was
16:18:49 25  actively looking for it, but I am sure I have seen it.
```

```
 1   Q    Okay.  I am going to pull up Defense Exhibit 156.

 2   A    I'm sorry.

 3   Q    Do you see that, Dr. King?

 4   A    I do.  And I do actually believe I have seen this before.

16:19:18  5   Q    Okay.  Did you see it on the Secretary of State's website,

 6   do you think?

 7   A    Probably.

 8   Q    Okay.  You just know that you have seen it before?

 9   A    I know I have seen it, yes.

16:19:32 10   Q    But you would not say that this is an effort to inform

11   people of the 2017 law?

12   A    No.  And I think -- no, I don't think -- I know when I

13   mentioned inform, I meant to actively contact people, not post

14   information on the Internet as you would for any state

16:19:53 15   statutory change.  I should have worded what I was implying

16   more specifically.

17   Q    I see.  So you mean --

18   A    Like direct.

19   Q    Okay.  I will move on.  Thank you.

16:20:11 20   A    Uh-huh.

21   Q    This is looking at paragraph 118 in the CERV process that

22   you just mentioned.  And you note that there have been 3,493

23   voting rights restorations from 2016 to 2020?

24   A    Uh-huh.

16:20:36 25   Q    That is through the CERV process.
```

```
 1        Did you also look to see how many pardons were granted by
 2   the Bureau of Pardons and Paroles during that same time period?
 3   A    I did not.
 4   Q    Would you agree that being pardoned would also restore an
 5   individual's right to vote?
 6   A    Yes.
 7   Q    Okay.  You did not discuss that in your report?
 8   A    No, I did not.  And, again, it wasn't some sort of
 9   intentional -- let me not include this data point.
10   Q    Continuing on Senate Factor 5, would you say that the
11   factors you have discussed have hindered the ability of black
12   Alabamians to register to vote?
13   A    Can you tell me what page Senate Factor 5 is on?  Would
14   you be able to tell me what page Senate Factor 5 starts on?
15   Q    Yes.  Senate Factor 5 in your report starts on page 30.
16   A    Let's see.  In Senate Factor 5, I discuss education,
17   economic disparities, criminal justice and felony
18   disenfranchisement and --
19        JUDGE MARCUS:  Dr. King, I have to ask you again
20   please just slow down so the reporter can take all of this
21   down.  Thanks very much.
22        THE WITNESS:  My apologies.  I'm sorry.
23        JUDGE MARCUS:  Just take your time.
24        THE WITNESS:  Okay.  So in Senate Factor 5, I discuss
25   education, economic disparities, criminal justice and felony
```

```
 1  disenfranchisement, and health care, I believe.  Health
 2  insurance and health outcomes.  Okay.
 3       So can you repeat your question?
 4  BY MR. BOWDRE:
 5  Q    Yes.
 6  A    Thank you.
 7  Q    Would you say that the factors that you have discussed
 8  with regard to Senate Factor 5 have hindered the ability of
 9  black Alabamians to register to vote?
10  A    So I would say in my report, I do not conduct any analysis
11  that directly connects these disparities to voter registration
12  or casting about among black Alabamians.  What I do is provide
13  them in the context of the broader social science or political
14  science literature that suggests these things do matter and can
15  impact political participation.
16  Q    Okay.  But you do not look directly at either voter
17  registration rates or voter participation turnout among black
18  Alabamians in recent elections; is that correct?
19  A    I did not conduct any voter registration or turnout
20  analysis, correct.
21  Q    And is that -- would you not consider that to be relevant
22  to your analysis?
23  A    I mean, I -- to a certain extent.  I mean, so my
24  understanding of the Senate Factors as I am as a political
25  science -- as a political scientist, am supposed to contribute
```

16:23:09  5
16:23:19 10
16:23:43 15
16:24:02 20
16:24:20 25

1   to is to discuss the extent to which -- I mean, I am reading it

2   now -- that the extent to which there is discrimination in

3   areas such as education, employment, and health, that could

4   hinder the ability of individuals to participate.  Is that

16:24:44   5   correct?  And I think that's correct, right?  So as a political

6   scientist who is not positioned to conduct my own research

7   relative to that answer, I did the best that I could with

8   respect to providing information about Alabama and its

9   disparities and connecting that to what we know in the

16:25:06   10   overarching literature relative to political science.

11       But no, I did not conduct a separate analysis that looks

12   at the impact of each of these factors on individual voter

13   turnout.  No.  I did not do that.

14   Q    Okay.  Would you agree that in recent elections both that

16:25:30   15   black voter registration is on par with white voter

16   registration in Alabama generally speaking?

17   A    I haven't looked at the Alabama voter registration and

18   turnout statistics lately, so --

19   Q    Okay.  So you mentioned --

16:25:47   20   A    I can't --

21   Q    -- I am not trying to belabor this point.

22   A    No, you're fine.

23   Q    I want to make sure I understand.

24       In paragraph 34, for instance, and this is I think part of

16:26:01   25   the first Senate Factor your discussion.  You mentioned that

```
 1  only 23 percent of blacks are registered to vote.  And I guess
 2  my question is --
 3  A    Can you repeat that paragraph again, please?
 4  Q    Yeah.  I think it was paragraph 23.  I'm sorry.  It was
 5  paragraph 34 of your report.
 6  A    Okay.
 7  Q    And my question is:  When we're discussing whether any of
 8  these disparities that you discuss with regard to Senate Factor
 9  5?
10  A    Uh-huh.
11  Q    And whether those disparities would hinder political
12  participation by blacks in Alabama?
13  A    Uh-huh.
14  Q    I guess my question is:  Why did you not look at or
15  consider voter registration or voter turnout data?
16  A    So -- so first thing, the statistics you pointed to about
17  where I looked at voter -- registered voters is from 1965.  So
18  that is old.
19       And so can ask you me your question one more time?  Why
20  did I not look at voter registration and turnout relative to
21  the factors I discuss in response to Senate Factor 5?
22  Q    Yes.
23            MR. OSHER:  Objection, Your Honor.  Asked and
24  answered.  She has been asked this question.
25            JUDGE MARCUS:  Overruled.  You may answer.
```

16:26:20 (line 5)
16:26:36 (line 10)
16:26:47 (line 15)
16:27:10 (line 20)
16:27:26 (line 25)

```
 1              THE WITNESS:  Sure.  So, again, in response to Senate
 2    Factor 5, I provided evidence of disparities across a wide
 3    variety of public sector areas that through political science
 4    scholarship have been demonstrated to impact the ability of --
 5    one's ability to participate politically.  In order to conduct
 6    the type of analysis you just mentioned where I look at -- you
 7    know, I perform a -- you would have to perform a regression
 8    analysis that looks at these factors and then individual
 9    turnout to determine if there has been in effect, I off the top
10    of my head, cannot think of a data set that would allow me to
11    do that across all of those factors for individual voters in
12    Alabama.
13    BY MR. BOWDRE:
14    Q    Okay.  I think I only have one -- two more questions about
15    this.  But I want to make sure I understand it correctly.
16              So you just said that you look at the factors that have
17    been identified in the political science literature?
18    A    Uh-huh.
19    Q    That are related to negative voter participation?
20    A    Well -- well, no.
21              JUDGE MARCUS:  Let -- Ms. Dr. King, please, let him
22    finish the question.
23              THE WITNESS:  I apologize.
24              JUDGE MARCUS:  And then you can give the answer.
25              THE WITNESS:  I'm sorry.
```

1604

BY MR. BOWDRE:

Q    So my understanding of what you just said was that you look at the factors that have been identified in the political science literature as having some connection with negative voter participation.  And then you look at whether those factors exist in Alabama without making that further step of connecting, you know, those things with actual voter participation in Alabama.  Is that generally right?

A    Generally.

Q    Okay.  And so my -- would it affect your analysis, or would it give you pause as to your conclusions if white voters and black voters in Alabama participated in voting and in registration at the same rates?

A    No.

Q    Why not?

A    So can I use an example to sort of explain why not?

Q    Sure.

A    Okay.  So one of the examples that we -- so one of the factors that we know matters in political science relative to voter participation is education.  And so we know that as education increases, people are more likely to vote and/or cast a ballot.

     What we also know within that literature is that while there is an effect for both black and white voters, the magnitude of the effect is not the same.

1       So the effect is present, but the size of the effect is
2   present -- excuse me -- is not consistent across those groups.
3       So what the literature tells us about African-American
4   voter turnout, and to a certain extent registration, is that in
16:30:50 5   -- when looking at education as an example specifically, what
6   you actually do see is higher participation among
7   African-Americans than you would expect relative to those
8   disparities that I discussed in my report about education.  And
9   so how we as political scientists whose -- you know, studied
16:31:14 10   these things have, you know, sensed out or tried to understand
11  them is while there is an effect, for example, of education,
12  the magnitude is lesser for African-Americans because
13  African-Americans have, you know, other factors that supersede
14  or reduce what the expected effect of educational turnout might
16:31:39 15  be.
16      So we talk about things like group consciousness and
17  communal activities that mobilize black people to vote more
18  than you would expect them to given what we know about
19  education disparities in the United States.  So just because
16:31:57 20  voter registration is higher or voter turnout is higher for a
21  population that is negatively impacted by those disparities, I
22  mean, it doesn't mean that those disparities don't matter with
23  respect to African-Americans.  What the literature suggests is
24  because of those disparities, African-Americans have found ways
16:32:20 25  to navigate systems that make voter registration and turnout

```
 1    higher.  And so without those disparities, you probably would
 2    probably see registration and turnout higher than it is.  So
 3    that's why if they were at parity as you noted, I wouldn't
 4    necessarily change my opinion.
16:32:35  5    Q    Okay.  Thank you.  Senate Factor 6.  And this starts on
 6    page 45 of your report.
 7         And Senate Factor 6 concerns political campaigns that have
 8    been characterized by overt or subtle racial appeals; is that
 9    correct?
16:32:56 10    A    I am a few pages behind you.  Yes.  Go ahead.
11    Q    So in paragraph 135, you discuss some racist comments by a
12    former Alabama legislator that were recorded as part of a
13    federal investigation.  Would you agree that those comments
14    were not part of a political campaign?
16:33:36 15    A    Electoral campaign, I would agree.
16    Q    And --
17    A    Not part of the campaign to secure office, I would agree,
18    yes.
19    Q    Okay.  How did you go about determining which campaign ads
16:34:00 20    to review?
21    A    I will be perfectly honest with you.  It was a struggle to
22    find records of old campaign ads.  I honestly started -- there
23    are repositories of campaign ads that exist.  So I started
24    there.  And then honestly to find ads in Alabama that were
16:34:25 25    still present, I did a lot of googling.  I am going to be
```

1  perfectly honest with you.

2  Q    Okay.  Do you think your report provides a representative

3  sample of campaign ads in Alabama?

4  A    Representative of those I was able to find.

16:34:38 5  Q    In determining what weight or import -- let me rephrase

6  that.

7       In determining the import of a racial appeal in a

8  campaign, do you think it matters at all whether the candidate

9  won the election or not?

16:34:57 10  A    No.  Because I mean I think there are a wide variety of

11  things that will go into the calculus of, you know, how a

12  campaign shakes out.

13  Q    Okay.  So there would not be a difference between, you

14  know, someone like George Wallace running in the '60s on a --

16:35:19 15  on a platform of segregation and being rewarded for it by being

16  elected into office versus someone running a very similar

17  campaign in 2010 and not getting office; you would not

18  differentiate those?

19  A    I mean, the world is very different between now and when

16:35:36 20  it was in 1965.  And so I can imagine someone running a

21  campaign similar to George Wallace's and not winning because

22  people were overwhelmingly offended.

23  Q    All right.  I think we're in agreement on that.  Okay.  So

24  I will just continue.

16:35:58 25       On -- and I don't have too many questions on this.  The

```
     1  first campaign ad you discussed is Tim James's 2010 ad.  And
     2  Tim James lost that election, correct?
     3  A    Okay.
     4  Q    Is that correct?
16:36:14 5  A    What page are we on?  Yes, I do believe so.  I believe so.
     6  Q    Okay.  In paragraph 140, you mentioned two other ads, one
     7  by Jeff Sessions?
     8  A    Uh-huh.
     9  Q    And one by Arnold Looney?
16:36:28 10 A    Uh-huh.
     11 Q    So a couple of questions about those.  One, would you say
     12 that to the extent that these ads make a racial appeal, it is a
     13 racial appeal that is not along black/white lines?  And these
     14 are -- just to provide the context, these are in relation to
16:36:51 15 illegal immigration, correct?
     16 A    I mean, I would say that's accurate.
     17 Q    Okay.  And both of those candidates lost those elections,
     18 correct?
     19 A    Okay.  Correct.
16:37:11 20 Q    Okay.
     21 A    I would like to say, though, I mean --
     22      JUDGE MARCUS:  Is this in response to a question,
     23 Dr. King?
     24      THE WITNESS:  I'm sorry.  Go ahead.
16:37:28 25      JUDGE MARCUS:  We proceed by question and answer.  So
```

```
 1  if you don't understand the question, let us know, and we will
 2  have him rephrase it.  And then when you get a question, take
 3  all time you need to answer.
 4        Next question, Mr. Bowdre.
 5        MR. BOWDRE:  Thank you.
 6  BY MR. BOWDRE:
 7  Q    Moving on to Senate Factor 8, which begins on page 52 of
 8  your report.
 9        You list Medicaid as one example of the lack of
10  responsiveness by Alabama officials to the needs of black --
11  excuse me -- to the needs of black Alabamians.  Would you agree
12  that the Affordable Care Act which created the Medicaid
13  expansion option was passed largely along party lines?
14  A    I would agree with that, yes.
15  Q    Okay.  Would you also agree that some other Republican
16  states not in the South and without Alabama's history have
17  decided not to opt in to Medicaid expansion?
18  A    I mean, I don't have a list in front of me, but I am
19  assuming you have done the research.  So if you can assert that
20  that is in fact the case, then yes.
21  Q    Okay.  Do you think that there are reasons other than race
22  why a certain state might not wish to opt in to Medicaid
23  expansion?
24  A    Yes.  But I don't think those other reasons negates the
25  fact that choosing not to do so can also be like interpreted as
```

Timestamps in left margin:
16:37:41 (line 5)
16:37:55 (line 10)
16:38:14 (line 15)
16:38:38 (line 20)
16:38:55 (line 25)

```
 1  neglecting the needs of a specific population.
 2  Q    Okay.
 3           MR. BOWDRE:  Your Honor, may I have a moment?
 4           JUDGE MARCUS:  You may, indeed.
 5           MR. BOWDRE:  Your Honor, at this time, I don't have
 6  any further questions.  Thank you.
 7           JUDGE MARCUS:  Thank you.  Mr. Osher?
 8           MR. OSHER:  Thank you, Your Honor.
 9                    REDIRECT EXAMINATION
10  BY MR. OSHER:
11  Q    Dr. King, during cross-examination, do you recall being
12  asked about your response to Dr. Hood's statement about white
13  Republican support for minority candidates?
14  A    Yes.
15  Q    Okay.  And that was in your rebuttal report?
16  A    Yes.
17  Q    Okay.  I want to make sure that the competing opinions
18  here are accurately characterized.
19           So what is your understanding of the assertion that
20  Dr. Hood makes about what white Republican support for minority
21  candidates meets?
22  A    So Dr. Hood's assertion as presented in the article that
23  he wrote with Dr. McKee and in his initial report, his -- my
24  understanding of his assertion is that the evidence presented
25  in that article that black -- sorry -- that white Republicans
```

1 will vote for minority candidates is evidence that ideology is

2 more important than race in making candidate election

3 decisions.

4 Q    Okay.  And what is your response to that assertion?

16:41:07 5 A    That the evidence he presents to support that assertion is

6 insufficient as identified by that specific article.

7 Q    So it is your response that a white voter's support for a

8 minority candidate is not evidence that racial bias is not at

9 play in that voter's behavior; is that right?

16:41:35 10 A    That is correct.

11 Q    Okay.  And you are not asserting that a white voter's

12 support for a minority candidate means that that voter is

13 racially biased?

14 A    That is also correct.

16:41:51 15 Q    And you are not saying that ideology has no impact on

16 partisan preference in Alabama?

17 A    That is also correct.

18 Q    But, instead, that race also influences partisan

19 preference in Alabama?

16:42:05 20 A    That is correct.

21 Q    Okay.  You were asked about the Alabama State Conference

22 case regarding election of judges.

23        MR. OSHER:  And can you pull that case up for us,

24 Jeff?  And can we go to page 46 of the pdf?

16:42:17 25 BY MR. OSHER:

```
 1   Q     So I am looking at the second paragraph on this page that

 2   starts with, there was evidence that.  And, Dr. King, I believe

 3   you were shown this during cross-examination.  And if you could

 4   highlight the second to last sentence in that paragraph.  Okay.

16:42:52  5   So that says, But the notion that African-American candidates

 6   do solely because of their skin color is not supported by the

 7   evidence.  Do you see that?

 8   A     I do.

 9   Q     Are you offering an opinion that -- strike that.

16:43:08 10         You are not suggesting that black candidates in Alabama

11   lose because of their race, right?

12   A     That's correct.

13   Q     Instead, you are offering an opinion about the impact that

14   racial considerations have on partisan preference?

16:43:21 15   A     That is correct.

16   Q     And it is your opinion that support for minority

17   candidates tells us very little about whether racial

18   considerations are at play?

19   A     That is correct.

16:43:35 20   Q     You were asked about in the context of racial appeals the

21   McGregor case, the 2010 case regarding state legislators very

22   clearly saying racist things about black Alabamians.  Do you

23   recall being asked about that?

24   A     I do.

16:44:00 25   Q     And you said that wasn't in the context of a campaign for
```

```
 1  office.  Is that you said?
 2  A     Correct.
 3  Q     But that was in the context of an attempt to influence
 4  black turnout based on what was on the ballot or not on the
 5  ballot; isn't that right?
 6  A     That is correct.
 7  Q     Okay.
 8            MR. OSHER:  Your Honor, if I could just have a moment.
 9            JUDGE MARCUS:  Sure.
10            MR. OSHER:  That's all.  Thank you, Dr. King.
11            JUDGE MARCUS:  Thank you.  Any questions, Judge
12  Manasco or Judge Moorer for Dr. King?
13            JUDGE MANASCO:  None from me.
14            JUDGE MOORER:  No.  Thank you.
15            JUDGE MARCUS:  Thank you, Dr. King.  You are excused.
16            THE WITNESS:  Thank you.
17            JUDGE MARCUS:  Did we have -- we had another witness
18  for the Caster plaintiffs, did we not?
19            MR. OSHER:  We do.  We do, Your Honor.  Dr. Caster is
20  here to testify.
21            JUDGE MARCUS:  All right.  Do you want to take a short
22  break before we start, or do you want to go right into it?
23            MR. OSHER:  I -- a very short break.  That would.
24            JUDGE MARCUS:  All right.  We will take just
25  five minutes and then get started.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1      Quick question:  The extent of your examination of
2  Dr. Caster length-wise would be what?
3           MR. OSHER:  I would guess 30 minutes.
4           JUDGE MARCUS:  And, Mr. Davis, your cross for
16:45:32 5  Dr. Caster?
6           MR. DAVIS:  Actually, I had another question I will
7  pose in a moment, Your Honor.  Mr. Walker is actually crossing.
8  And if he's in the room downstairs, I will let him answer that.
9           JUDGE MARCUS:  Okay.  I -- are you going to
16:45:47 10  cross-examine him?
11           MR. DAVIS:  No, Judge.  Mr. Dorman Walker is going
12  to --
13           JUDGE MARCUS:  The sole examination of it.
14      All right.  Why don't we just in the meantime take --
16:45:59 15  there -- hi, Mr. Walker.  Quick question:  Rough sense of
16  timing on Caster cross-examination?
17           MR. WALKER:  15 minutes, Your Honor.
18           JUDGE MARCUS:  I am just trying to figure out whether
19  we will get it all in today or not.
16:46:13 20      I have 4:46 your time.  Why don't we take a ten-minute
21  break, and we will see where we go from there.  And then we
22  will get started in ten minutes with your next witness,
23  Mr. Osher.  Thank you.
24           (Recess.)
16:54:42 25           MR. DAVIS:  Judge Marcus, before testimony begins

1  again, I had a question for the Court if I may.

2           JUDGE MARCUS:  Of course.

3           MR. DAVIS:  Considering the lateness of the hour, I

4  wondered if the Court thought it was safe for me to let

16:54:55 5  Mr. Byrne know we will begin his testimony in the morning and

6  not this evening.

7           JUDGE MARCUS:  Indeed it is.  I think that's clear

8  because they have about a half hour, 45 minutes for this

9  witness, and we will not go beyond 6:00 o'clock Central

16:55:09 10  Standard Time at the latest today.  But if you can have your

11  witness lined up a little earlier, we would like to get started

12  at 8:30 Central Standard Time.  Is that a problem for anyone?

13           MR. DAVIS:  I do not think it will be a problem for

14  any of the counsel.  And I will confirm with Mr. Byrne.

16:55:28 15           JUDGE MARCUS:  All right.  We will start, then, Byrne

16  tomorrow morning at 8:30.  Is he the last of your witnesses, or

17  were you planning to call someone else?

18           MR. DAVIS:  No.  He will be the last of our witnesses,

19  Judge.

16:55:41 20           JUDGE MARCUS:  Okay.  Is there any additional evidence

21  that, Mr. Walker, you were going to be putting on besides what

22  we have already had presented?

23           MR. WALKER:  No, sir, Your Honor.  I will not.

24           JUDGE MARCUS:  Okay.  So you are not calling

16:55:57 25  Mr. Pringle or Mr. McClendon?

```
 1              MR. WALKER:  They will not be called, Your Honor.
 2              JUDGE MARCUS:  Okay.  The only final question I have,
 3    do you expect any rebuttal either from Caster, Singleton, or
 4    Milligan?
 5              MS. KHANNA:  Not from Caster, Your Honor.
 6              MR. ROSS:  Not at this time, Your Honor.
 7              JUDGE MARCUS:  All right.  And for Singleton?  Well,
 8    if there's anything -- I'm sorry, Mr. Blacksher, Mr. Whatley?
 9              MR. WHATLEY:  Not at this time, Your Honor.
10              JUDGE MARCUS:  I'm sorry?
11              MR. WHATLEY:  I said we don't expect any rebuttal at
12    this time, Your Honor.
13              JUDGE MARCUS:  Thanks very much.  Let's proceed, then,
14    with the next witness for the Caster plaintiffs.  Ms. Khanna,
15    you will be conducting that?
16              MS. KHANNA:  No.  It's actually going to be Mr. Osher.
17    But I wanted to flag for the Court maybe you can already see
18    Mr. Caster appears to be having some video troubles and trying
19    to publish it with him.  Maybe before Mr. Davis lets
20    representative Byrne go, we should see if we can resolve this.
21              JUDGE MARCUS:  Okay.  Mr. Davis?
22              MR. WALKER:  He has left the room, sir.  I think he is
23    moving -- there he is.
24              MR. DAVIS:  I am here listening, Judge.
25              JUDGE MARCUS:  You heard they were having some
```

1    mechanical problems getting Mr. Caster hooked up here.  So you

2    might want to keep Byrne on deck just in case we go with him

3    instead.

4              MR. DAVIS:  Very well.

16:57:31 5              JUDGE MARCUS:  Thanks.

6              MS. KHANNA:  Thank you, Your Honor.  I know Mr. Osher

7    is calling him right now to see if they can help troubleshoot.

8              JUDGE MARCUS:  Thank you.  While we are waiting,

9    Ms. Khanna, is that Mr. or Dr. Caster?

16:58:15 10              MS. KHANNA:  I think it's Dr. Caster.

11              JUDGE MARCUS:  Thank you.

12              MS. KHANNA:  Apologies, Your Honor.  Just give us one

13    more moment to see if we can resolve the problem.

14              JUDGE MARCUS:  Okay.

17:00:39 15              MS. KHANNA:  Looking bleak for this moment.  I think

16    maybe it's best rather than wasting the Court's time to jump to

17    Representative Byrne if he is available.  Thank you for your

18    flexibility.

19              JUDGE MARCUS:  All right.  Thank you.  Mr. Davis, does

17:00:52 20    that work for you?

21              MR. DAVIS:  It works for me fine.  It will be just a

22    moment, though.  Mr. Byrne was in another part of the building

23    and is headed back into his office.

24              JUDGE MARCUS:  Thank you.  Do you want us to take a

17:01:02 25    five-minute break to do that?

1    MR. DAVIS:  It will probably take him that long to get
2    back and log in, Judge.

3    JUDGE MARCUS:  Why don't we take a five-minute break,
4    and we will get started with Mr. Byrne.

17:01:12  5    (Recess.)

6    JUDGE MARCUS:  Mr. Walker, any problem if we go
7    forward with Mr. Caster -- Dr. Caster who we have here now?

8    MR. WALKER:  Your Honor, we would be happy to go
9    forward with Dr. Caster now and put Mr. Byrne off until
17:04:19 10   tomorrow.

11   JUDGE MARCUS:  Okay.  Would you be kind enough to tell
12   him that we will start with him at or about 8:30, depending on
13   whether we finish up with Dr. Caster tonight?  We just can't
14   give him any guarantee, but I expect we will get started at
17:04:34 15   8:30.

16   MR. WALKER:  Yes, sir.  I will make sure he knows.

17   MR. DAVIS:  Thank you very much.

18   JUDGE MARCUS:  Thank you very much.  Thank you,
19   Mr. Davis.

17:04:42 20                    MARCUS E. CASTER,
21   having been first duly sworn, was examined and testified as
22   follows:

23   JUDGE MARCUS:  Would you be kind enough to state your
24   name for the record, please.

17:04:54 25   THE WITNESS:  Marcus Ellis Caster.

```
 1              JUDGE MARCUS:  Thank you, sir, and you may proceed,
 2   Mr. Osher.
 3              MR. OSHER:  Thank you, Your Honor.
 4                         DIRECT EXAMINATION
 5   BY MR. OSHER:
 6   Q    Good afternoon/evening, Dr. Caster.
 7   A    Good afternoon.  Good evening to everyone.  Your Honors.
 8   Q    Thank you for being with us.
 9              MR. OSHER:  Your Honor, I apologize for the
10   technicalities difficulties.
11              JUDGE MARCUS:  That's quite all right.
12   BY MR. OSHER:
13   Q    Dr. Caster, are you a plaintiff in this lawsuit?
14   A    Yes.
15   Q    And where do you live?
16   A    I live in McIntosh, Alabama, which is in Washington
17   County.
18   Q    Great.  And do you have family in Alabama?
19   A    Yes.  I have a two brothers that live in Mobile County in
20   the city of Mobile.  My mother also stays in Mobile County and
21   Mount Vernon, Alabama, and me and if I family we reside in
22   McIntosh, which is in Washington County, Alabama.
23   Q    Can you tell us a bit about your childhood, where did you
24   grow up?
25   A    I grew up in Mount Vernon, which is a town north of
```

Mobile, north of Mobile County.  Very small, one red light and
a few stop signs, so it's very small, rural, but the
environment there was -- it was pretty nice and enjoined.  But
Mobile County has a vast outskirts of communities such as Mount
Vernon, Citronelle, those are on the further north end of
Highway 43.

Q    Okay.  And I think you said you went to Citronelle High
School?

A    Yes.  I went to Citronelle High School.

Q    What further education did you get after that?

A    After Citronelle, I received a basketball scholarship at
the University of Mobile where I received my bachelor's degree
in sports medicine, pre-physical therapy.  I received my
master's degree in business administration from University of
Phoenix, and I received my doctor's of business administration
from Walden University, and I am now currently at Arkansas
State University getting an education specialist degree in
education leadership.

Q    Thank you.  Dr. Caster, if you could go even slower, that
would be great.  The court reporter has to take down every word
that we say.  And it's not an easy task.

A    Sure.

Q    What do you currently do for a living?

A    Currently, I am a teacher educator in the Clarke County
school system.  I teach kids three through five, and also I am

1621

1  an adjunct business professor at Southern New Hampshire

2  University teaching students getting their master's degree in

3  business administration.

4  Q    And where else have you taught in Alabama?

17:07:49  5  A    I taught in Mobile -- I taught with the Mobile County

6  public schools systems when I first came out of college.  I was

7  assistant basketball coach at Spring Hill College.  I also

8  taught in Mobile at the drug education council where I was the

9  youth council coordinator for the city of Mobile and the county

17:08:07 10  of Mobile.

11  Q    Can you tell us just a little bit more about the drug

12  education council?

13  A    Yes.  At the drug education council, I was -- where I was

14  the youth council coordinator, my job was to serve as the

17:08:23 15  liaison between the county commissioners of Mobile, the city

16  council of Mobile, and the mayor of Mobile, and the youth of

17  the city and county of Mobile County.  So our job was to try to

18  identify problems that was going on in the city and county of

19  Mobile and present those problems to the mayor of Mobile, to

17:08:49 20  the county commissioners of Mobile, and to the city council

21  members of Mobile to try to strengthen the youth and -- and

22  bridge the gap between the youth and local and county, city

23  government.

24  Q    In your work with the drug education council, did you get

17:09:07 25  an opportunity to learn what the communities of interests of

1    the residents of Mobile are?

2    A    Yes, we did.  Having to go to Government Plaza every week

3    to attend the county commissioners' meeting and having to

4    attend the city council meetings, you get a brief understanding

17:09:30 5    of what the citizens of Mobile, citizens of Mobile, what were

6    the issues in their districts, and what they are wanting for

7    their district, and also when you attend -- when we attended

8    the county commissioners' meeting, we had an opportunity to

9    find out what was going on in the rural areas, such as

17:09:53 10   Citronelle, Prichard, Alabama, Mount Vernon, and other -- other

11   towns and cities that's on the outskirts of Mobile County.

12   Q    And did you get an opportunity to identify what the

13   particular needs of the black community are in those areas?

14   A    Yes.  I had an opportunity to listen to a lot of the

17:10:16 15   residents to come to the county, the county commissioners'

16   meeting.  They was -- most of their concerns were education,

17   jobs.  They was wanting to get more jobs.  They was also

18   wanting to -- protection for the youth, and high-paying jobs,

19   as well.  So there's a lot -- there's a variety of things that

17:10:42 20   was a concern for a lot of the citizens of the county of

21   Mobile.

22   Q    So we will talk about those issues in a bit.

23        I have a couple of other questions about your background.

24   Have you ever run for political office?

17:10:57 25   A    Yes, sir, I did.  I ran for Alabama House of

1   Representatives District 65 back in 2018.

2   Q    That's in Washington County?

3   A    It covers Washington County, Choctaw County, and a portion

4   of Clarke County.

17:11:13 5   Q    And when running that campaign, did you have a chance also

6   to learn the unique needs of the black community in your area?

7   A    Yes, I did.  And the needs -- and the needs for the black

8   community area was pretty much the same as the ones that was in

9   Mobile, Mobile County.  More jobs, more trades and training,

17:11:38 10   more resources, and just things dealing with trade and the

11   recreation facilities for the youth.

12   Q    Dr. Caster, how do you identify in terms of your race?

13   A    Black, African-American.

14   Q    Okay.  Are you registered to vote in Alabama?

17:11:57 15   A    Yes, I am.

16   Q    Do you vote regularly?

17   A    Yes, I do.  I vote in both primary, local, city, any type

18   of election that we have, I try to voice my opinion by casting

19   a vote.  Voting is very important to me, my family.  It's

17:12:14 20   something that we take very seriously and that I instill that

21   in my children.  And I also try to instill that into other

22   family members and friends, as well.

23   Q    Do you know which congressional district you live in?

24   A    Yes, Congressional District 1.

17:12:30 25   Q    Okay.  And who currently represents that district?

```
 1   A     Jerry Carl.
 2   Q     Do you know who represented that district prior to
 3   Mr. Carl?
 4   A     Priority to Mr. Carl, it was Bradley Byrne.
 5   Q     Did you vote for Jerry Carl in the last election?
 6   A     No, I did not.  I actually voted for James Averhart.
 7   Q     And James Averhart was a -- he's a black man?
 8   A     That's correct.
 9   Q     And Mr. Carl won that campaign, though, right?
10   A     Yes, he did.
11   Q     Did you vote for Bradley Byrne when he was running for
12   Congress?
13   A     No, I did not.
14   Q     Why didn't you support Mr. Byrne in his congressional
15   campaigns?
16   A     Well, just by the values and things that my community
17   need, I felt as though my community, people in Washington
18   County, people that are north of Mobile County, and some people
19   that are also in Mobile County, the things that we want for our
20   community I felt as though the other candidates that were --
21   James Averhart, Robert Kennedy, Jr., those individuals, I felt
22   like those were the ones that were better -- was better
23   representative of what the needs of my community was looking
24   for.  And I felt as though that the other Representative
25   Bradley Byrne and Representative Carl, they didn't represent
```

Timestamps: 17:12:43 (line 5), 17:13:00 (line 10), 17:13:15 (line 15), 17:13:33 (line 20), 17:13:58 (line 25)

1    the needs of my community.

2    Q    And, Dr. Caster, you made several references to my

3    community there.  Are you specifically referring to the black

4    community?

17:14:10  5    A    Yes, that's correct.

6    Q    Do you know whether the congressional elections in

7    District 1 have been competitive recently?

8    A    No, they have not.

9    Q    In light of that, do you feel like you have a voice in

17:14:27 10    congressional elections in Alabama?

11    A    No, I don't.  I -- we continue -- I continue to vote, but

12    I do not feel as though that my voice is being heard because

13    we're not getting someone that's representing the black

14    community.  I mean, so, no, I don't feel like my vote is being

17:14:47 15    heard -- is being heard at all.

16    Q    Dr. Caster, what result are you trying to achieve in this

17    lawsuit with respect to your congressional district?

18    A    A voice.  A voice.  I was -- I mean, my ancestors fought

19    for us to have a right and opportunity to vote.  And, you know,

17:15:09 20    and it's already difficult from -- it's difficult having to

21    talk to blacks and try to get them out to vote.  And but when

22    they feel like their vote is not counted, it distracts them and

23    discourages them from going back to the polls.  And I try to --

24    I try to be an activist in my community in a positive way.  And

17:15:33 25    then when I'm going out trying to talk to people about

1626

1 registering to vote and being prepared to vote, they kind of

2 feel as though it's falling on deaf ears because they don't

3 feel like their vote don't count when they have someone in

4 office that doesn't represent them at all.

17:15:52  5 Q     Now, you don't mean literally not counted, right?  They're

6 able to cast a vote --

7 A     Yeah.  They're able to cast a vote, but when I say don't

8 count, it's by getting someone in office that does not

9 represent them.

17:16:06 10 Q     And if you were to live in a -- if you were to succeed in

11 this lawsuit and the state was ordered to create a second

12 majority-black district, do you think it's likely that your

13 current representative would change as a result of that?

14 A     Could you repeat the question, please?

17:16:26 15 Q     Would you think the individual who represents your

16 district would change if you were moved into a second

17 majority-black congressional district?

18 A     I'm sorry.  I'm trying my best to hear you on this

19 computer.  I got my volume turned up, but I am still having

17:16:44 20 problems.

21 Q     No problem.  Thank you for letting me know.

22       So if you were to succeed in this lawsuit and the state

23 drew a second majority-black congressional district that you

24 lived in, do you think the person who currently represents your

17:16:57 25 district would change as a result of that?

1  A    Would they change?  Would the person that's currently the

2  representative would they change or the new person?

3  Q    Would you elect someone else besides Mr. Carl to represent

4  your congressional district?

17:17:14  5  A    Oh.  Yes.  I would -- I would elect someone else besides

6  Representative Carl to represent my district.

7  Q    And would that change in representation, would it benefit

8  or harm the black community in your area?

9  A    I think it would be more beneficial to the black community

17:17:33  10  to have someone in that will be able to listen to the citizens

11  in our community, that would visit the citizens in our

12  community, that would go to Washington to represent us and to

13  vote on bills that represent our community would be very

14  beneficial to the district, our district, and the citizens --

17:17:59  15  the black citizens in the community, as well.

16  Q    And so just to be clear, you talked about feeling like you

17  -- your vote doesn't count in congressional elections based on

18  where you live.  Do you think the black community in your area

19  has even an opportunity to elect their representative of choice

17:18:19  20  right now?

21  A    No.  No, we don't.

22  Q    Are you having issues hearing me right now?  I think --

23  A    I can hear you.  Yeah.  It just kind of -- I have to try

24  to lean in, but I can hear you.

17:18:36  25  Q    Okay.  My apologies if I'm cutting out.

1    All right.  Dr. Caster, you identified a few issues that

2  people -- that people in the black community have identified as

3  particular needs that they have in the area that you live in.

4    You talked about employment.  Can you tell us more about

17:18:56  5  what the specific employment-related needs of the black

6  community are in your area?

7  A    Well, in my area, we have -- we have three to four

8  multibillion dollar plants.  And in they generate billions of

9  dollars each year.  And these plants employ a lot of people in

17:19:20 10  our -- in the state.  Unfortunately, a lot of individuals that

11  stay in the community that are black does not work for the

12  plants themselves because they don't have the training -- they

13  don't have the trades in order to get inside of these plants.

14  But our white counterparts are able to get these positions, get

17:19:40 15  positions at these plants, and we are not able to get positions

16  at the plants.

17  Q    Is the result of that, that the black -- members of the

18  black community have to get lower paying and less flexible

19  jobs?

17:19:55 20  A    That's pretty much -- that's pretty much throughout our

21  community, yes.  They -- we work at low-wage organizations and

22  companies where others -- whites get paid more.  And it just --

23  it just the way it is -- that's just where we are right now.

24  Sad to say, but that's the truth.

17:20:19 25  Q    Do you think that the COVID-19 pandemic has made that

1  issue worse for the black community?

2  A    Definitely, yes.  COVID has impacted our community very

3  hard.  Deaths and sickness, yes.  It has definitely impacted

4  our community.

17:20:37 5  Q    And in terms of employment, as well?

6  A    Yes.

7  Q    Are you familiar with the American Rescue Plan or the 2021

8  COVID Relief Bill?

9  A    Yes, I'm familiar with it.

17:20:49 10  Q    Do you know whether that legislation provided assistance

11  to people who lost their job during the pandemic?

12  A    Yes, it did.

13  Q    And how did Representative Carl vote on that legislation?

14  A    Against it.

17:21:03 15  Q    Did you want him to support it?

16  A    Yes.

17  Q    Did you think that his vote against it served or disserved

18  the black community?

19  A    It was a disservice to the black community.

17:21:15 20  Q    What about transportation?  Is that a unique need of the

21  black community in your area?

22  A    Yes, it is.  Transportation is a -- we don't have public

23  transportation.  We don't have cabs.  We don't have Uber.  We

24  don't have Lyft, anything, to get our people -- even if they

17:21:40 25  didn't have a vehicle to get them to, you know, transportation

|  |  |
|---|---|
| | 1 | to a job even if they did have one.  So, yes, lack of |
| | 2 | transportation is really a problem. |
| | 3 | MR. OSHER:  Mr. Walker, I think your -- |
| | 4 | BY MR. OSHER: |
| 17:22:00 | 5 | Q    Are you familiar with the infrastructure bill that |
| | 6 | President Biden recently signed into law? |
| | 7 | A    Yes, I'm familiar with it. |
| | 8 | Q    Do you know whether that legislation had any provisions |
| | 9 | pertaining to expanding access to public transit? |
| 17:22:17 | 10 | A    Yes. |
| | 11 | Q    Would that be something that your community would benefit |
| | 12 | from? |
| | 13 | A    Yes.  Yes, definitely. |
| | 14 | Q    My apologies.  I didn't mean to talk over you. |
| 17:22:30 | 15 | Do you know how Representative Carl voted on the |
| | 16 | infrastructure bill? |
| | 17 | A    Against it. |
| | 18 | Q    Did you want him to support it? |
| | 19 | A    Yes. |
| 17:22:36 | 20 | Q    And did his vote serve or disserve the black community in |
| | 21 | your area? |
| | 22 | A    It was a disservice to the black community. |
| | 23 | Q    What about access to quality and affordable health care, |
| | 24 | is that an issue for the black community in particular in your |
| 17:22:57 | 25 | area? |

```
 1  A    Yes, it is.
 2  Q    Can you tell us a little bit more about that?
 3  A    Yes.  We -- our community is -- first of all is -- we need
 4  health care, more affordable health care.  And because our
17:23:15  5  communities is particularly in an area -- when I mentioned
 6  those four multibillion dollar plants, they -- they also emit
 7  pollution in the area, and a lot of individuals from our
 8  community get sick from it.  Most of -- in fact, just about
 9  everyone that I know stays around these plants, and they're
17:23:42 10  predominantly black that stays in these areas right around
11  these plants, and they get sick easy from cancer, easy from
12  lung disease and different ailments that they might have, and
13  we definitely need health care because, you know, they can't
14  afford to move out from these places.  So it is very important.
17:24:01 15  Q    Are you familiar with the Build Back Better Act?
16  A    Yes, I'm familiar with it.
17  Q    Do you know whether any provisions of that legislation are
18  aimed to reduce pollution in disadvantaged communities?
19  A    Yes.  Yes.  Parts of the bill was for pollution and things
17:24:25 20  like that.  But, you know, once again, the -- our
21  representative votes against all the bills that supposed to
22  serve our community.
23  Q    And so Jerry Carl voted against the Build Back Better Act?
24  A    Yes.
17:24:38 25  Q    And that legislation failed -- or currently is not
```

1632

```
 1  enacted, right?
 2  A    Correct.
 3  Q    Those provisions would have helped your community when it
 4  comes to the pollution that the factories in your area cause
17:25:00 5  for the black community?
 6  A    Yes, sir, that's correct.  We have our housing, child
 7  care, and everything.
 8  Q    Does the proximity of the factories to the black
 9  neighborhoods in your area affect the quality of drinking
17:25:18 10  water?
11  A    Yes.  Actually, yes.  There was -- mercury was found in
12  the water I think back in 2013.  And -- and back then, the
13  drinking water was almost compared to that of Michigan.  And a
14  lot of individuals from the community actually received some
17:25:39 15  type of pay behind it, but the water is still not up to par.
16  So right now, people in the community now, they just put a
17  filter on their water faucet and pray for the best.
18  Q    And you referenced Michigan.  You're referring to Flint,
19  Michigan?
17:26:02 20  A    That's correct.
21  Q    Do you know whether the Build Back Better Act has
22  provisions meant to improve the quality of drinking water in
23  disadvantaged communities?
24  A    Yes.
17:26:13 25  Q    And, again, Representative Carl voted against it?
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

```
 1  A     That's correct.
 2  Q     You spoke about your work in Mobile with specifically the
 3  younger individuals who live there.  Did you notice any issues
 4  related to criminal justice specifically in the city of Mobile?
```
17:26:38  5  A     Yes.  I mean, Mobile -- Mobile has been going through a
```
 6  lot when it comes to criminal justice right now.  A lot of -- a
 7  lot of blacks being incarcerated more so than the whites.
 8        And a lot of the bills in the -- the bills that was -- the
 9  first step bill, you know, was supposed to help with some of
```
17:27:13 10  these issues.  And, again, our representative just don't
```
11  support these bills that is supposed -- you know, that's to
12  help our community.
13  Q     And was that a reference to the First Step Act?
14  A     Yes.
```
17:27:27 15  Q     From a few years ago?
```
16  A     Yes.
17  Q     And am I understanding you that Representative Byrne voted
18  against that?
19  A     That's correct.
```
17:27:35 20  Q     One more, Dr. Caster.  Access to high speed Internet.  Is
```
21  that an issue for the black community in your area?
22  A     Yes.  That's why I -- yes.  Yeah.  I'm at work now, so
23  high speed Internet at my house is -- is almost like dial up.
24        So we definitely need access to high speed Internet, more
```
17:28:04 25  broadband connections, things of that nature to try to -- you

1634

1 know, the more you have that, the more people can seek jobs

2 online, things that you can just do a lot more by having high

3 speed Internet.  And like I said, we don't have -- we don't

4 have access to a lot of that being in the rural area that we're

17:28:22 5 located in.

6 Q    And with the COVID pandemic, did that lack of access to

7 Internet harm students when they had to stay home?

8 A    Yes.  Yes.  In -- in Mobile County, and Mobile County

9 actually had to -- they actually put the access on a bus and

17:28:48 10 had parents to if they wanted -- if they didn't have Internet

11 at home, they could pull up by the bus and get the Internet

12 access from the -- from there.

13       And in my area, which is the rural area of Washington

14 County, you know, Washington County and Mobile County, they

17:29:07 15 butt right up against one another, so in the rural Mobile

16 County, like I say the Internet access, we just don't have --

17 we just don't have the resources right now.

18 Q    And I just want to be clear here.

19       You're talking about the black community specifically,

17:29:23 20 blacks' access to high speed Internet?

21 A    Yes.

22 Q    Do you know whether the infrastructure bill we talked

23 about earlier has provisions that would increase access to high

24 speed Internet around the country?

17:29:41 25 A    About $65 billion.

```
 1  Q    And Representative Carl vote against the bill, did that
 2  serve or disserve the black community with respect to that
 3  issue?
 4  A    Disserve.
17:29:51  5  Q    And just to be clear, some of these bills passed, some did
 6  not?
 7  A    Right.
 8  Q    Representative Carl consistently voted against them,
 9  right?
17:29:59 10  A    That's correct.
11  Q    Do you mean to say that white residents of Alabama don't
12  have needs in the areas that we've been talking about?
13  A    No.  No.  Everyone.  Everyone have a needs, you know, it's
14  black, white, Hispanic, everyone have them.  But when I speak
17:30:17 15  to you, I'm talking about as far as our representative in our
16  congressional district and a disservice to blacks.
17  Q    And is it that the level of need among the black community
18  the just significantly higher than those in the white
19  community?
17:30:33 20  A    No.  No.  It's not that it's higher.  It's just the fact
21  that it's important and it matters.
22  Q    Okay.  And will the issues that we talked about earlier in
23  terms of employment, in terms of education, that desperately
24  impact black residents of your area, does that result in a
17:30:51 25  higher need in these areas for the black community?
```

```
 1  A    Yes.  It's definitely s higher need because we don't have.
 2  And so if you don't have them, have the resources, then you
 3  know, those who don't have, there's a higher need for -- to try
 4  to get them to catch up with everyone else.  And a lot of, you
 5  know, a lot of people in, you know, neighboring us, they have
 6  access to some of these things, and we just don't.
 7  Q    All right.  Dr. Caster, I just have a few more questions
 8  for you.  I want to talk about where you live and your
 9  understanding of Washington County and Mobile County.
10       Do you understand the Washington, Mobile, and Baldwin
11  counties are all currently in the same congressional district?
12  A    Yes.
13  Q    Based on your work in Washington and Mobile counties,
14  would you say that black residents of those areas have a lot in
15  common with those who live in Baldwin County?
16  A    From what I see, the people from my area, my community,
17  they frequently visit Mobile County for entertainment, the
18  Mardi Gras, things of that nature.  That's where we go for to
19  support Mobile, and in the same time, Mobile comes to our area
20  and support us, as well, so, yes.
21  Q    Would you say that black residents of your area in the
22  city of Mobile have more in common with the Black Belt region
23  and the counties in the Black Belt than they do with Baldwin
24  County?
25  A    Yes.
```

17:31:13 (line 5)
17:31:33 (line 10)
17:31:48 (line 15)
17:32:15 (line 20)
17:32:32 (line 25)

Q    In fact, you were very patient with us on Friday when we
thought that you were going to testify then.  When you didn't,
where did you go after that?

A    I was actually in the Black Belt.  My son had two
basketball games in the Black Belt last week in Marengo County
Tuesday, and then I think it was Friday we was in Camden in
Wilcox County.

Q    And so just to be clear.  So I'm sorry.

What's your view about whether the -- or the economies of
the city of Mobile and the economies of Baldwin County in your
view, are they similar, independent, how do they compare to one
another?

A    Well, when you look at the simple fact that Mobile County
-- they both on the Gulf Coast, okay, and a bridge separates
the two.  Baldwin County is more tourists.  And Mobile County
is through the ports and blue collar.  So, therefore, the
economies are totally different from one another.  If anything
is incumbent, it would be Mobile County and Washington County
where I stay, where you talk about blue collar workers when you
come to the factories and the plants and also the Black Belt.

Q    That was the case that people go from Mobile to Baldwin
County and from Baldwin County to Mobile, right, people --
people go between those counties all the time, right?

A    Yes.  Yes.

Q    But you're saying that the nature of the economies are

```
 1  different?
 2  A    Correct.
 3  Q    Do you think that black residents of Washington and Mobile
 4  County would be better served if they were a part of the
 5  congressional district that covered the Black Belt?
 6  A    Yes, I do.
 7  Q    And is that because the representative that would
 8  represent that district would better serve the interests of the
 9  black community?
10  A    That would be correct.
11            MR. OSHER:  Your Honor, just a moment?
12            JUDGE MARCUS:  Sure.
13            MR. OSHER:  Dr. Caster, that's all I have for you.
14  Thank you for your time.
15            JUDGE MARCUS:  Thank you.  Mr. Walker, you may
16  proceed.
17            MR. WALKER:  Thank you, Your Honor.  And I apologize
18  to Mr. Osher and the Court for interrupting his examination.
19                      CROSS-EXAMINATION
20  BY MR. WALKER:
21  Q    Dr. Caster, hello.  I am Dorman Walker.  I represent the
22  chairs of the reapportionment committee.
23  A    Nice to meet you.
24  Q    Nice to meet you, sir.  I will ask you a few questions.
25        You talked about a representative who would represent the
```

The timestamps in the left margin are:
17:34:34 (line 5), 17:34:45 (line 10), 17:35:22 (line 15), 17:35:26 (line 20), 17:35:41 (line 25).

```
 1  interests of the black community.  Could that person be black
 2  or white?
 3  A    Yes, it could be black or white.
 4  Q    And could it --
 5  A    Someone --
 6  Q    I'm sorry?
 7  A    I say, yes, it could be someone black or white, just
 8  someone that's looking out for, you know, that understand the
 9  needs of the black community and is willing to do something
10  about it.
11  Q    And could that person be Republican or Democrat?
12  A    It could.
13  Q    And --
14  A    We have a Republican, and that's not been working.
15  Q    Thank you, sir.  Would it be someone in that area who
16  understands the needs of -- you have talked about the needs of
17  primarily black people in Washington County, so would it be
18  that representative be somebody from that area who could
19  understand those best?
20  A    Yes, it could.
21  Q    Are you familiar with the -- with the alternative
22  districts that have been proposed in this case?  Have you seen
23  any alternative maps?
24  A    I saw some, but I am not totally familiar with them.  I
25  did see some alternative maps.
```

1  Q     Let me just show you something.

2        Can you see the map that I have put up?

3  A     Yes, sir, I can.

4  Q     Figure 10, Alabama U.S. House Illustrative Plan 1 from the

17:37:32  5  Cooper Report.  And you see that -- you see where Washington

6  County here is where I am moving the cursor?

7  A     Yes, I do.

8  Q     And you see that this proposed district, which is typical

9  of the districts proposed by Mr. Cooper or drawn by Mr. Cooper

17:37:50 10  stretches all the way over to the border of Georgia; is that

11  correct?

12  A     Yes, that's what -- according to this map, yes.

13  Q     How many times in the last several years have you visited

14  Russell or Barbour or Henry County?

17:38:06 15  A     Not -- I visited Russell County I think it was once.

16  Q     And when was that, sir?

17  A     That was a few years ago.

18  Q     Do you know anything about the demographics of those

19  counties?

17:38:28 20  A     No.

21  Q     Do you know anything about the industries of those

22  counties?

23  A     No, I do not.

24  Q     Do you know where those people go to get their health

17:38:43 25  care?

```
 1  A    No, I do not.

 2  Q    Do you feel like you are in a community of interest with

 3  those people?

 4        MR. OSHER:  Objection, Your Honor.  Dr. Caster is not

 5  a map drawer.  He is not a politician.  We need to lay some

 6  foundation of what community of interest means.

 7        JUDGE MARCUS:  Mr. Walker?

 8        MR. WALKER:  Your Honor, I've asked words -- it's a

 9  plain simple question.  Does he feel like he is in a community

10  of interest for the people who live over in those counties.  I

11  don't think it's a legal term.

12        JUDGE MARCUS:  You are asking it in the common usage

13  of the words; is that correct?

14        MR. WALKER:  I am asking it in the common usage of the

15  words, Your Honor.

16        JUDGE MARCUS:  The objection is overruled.  You may

17  answer the question, Dr. Caster.

18        THE WITNESS:  Can you repeat the question, please?

19  BY MR. WALKER:

20  Q    Yes, sir.  Do you believe that you are in a community of

21  interest with these people on the western -- on the eastern

22  border of Alabama in Russell County, Barbour County, and Henry

23  County, who you have testified basically that you don't know

24  anything about?

25  A    That's correct.  I'm not -- I don't have any -- I don't
```

```
 1  know anything about them, so I can't say that I am in the
 2  interest of -- that community interest with them or not, so I
 3  can't adequately answer that question.
 4  Q    Thank you.
 5             MR. WALKER:  Your Honor, can I have just a second?
 6             JUDGE MARCUS:  You sure can.
 7             MR. WALKER:  Your Honor, thank you, sir.  That's all
 8  we have.
 9             JUDGE MARCUS:  All right.  Any redirect, Mr. Osher?
10             MR. OSHER:  Just a moment, Your Honor, if you would
11  indulge me.
12             JUDGE MARCUS:  Sure.
13             MR. OSHER:  Nothing more.  Thank you, Dr. Caster.
14  Thank you for your patience, and I am glad we were able to get
15  you on tonight.
16             THE WITNESS:  No problem.
17             JUDGE MARCUS:  Thank you, Dr. Caster, and you are
18  excused.
19             THE WITNESS:  Thank you, Your Honor.
20             JUDGE MARCUS:  We will break for the day, folks, and
21  we will get started tomorrow morning at 8:30 Central Standard
22  Time rather than 9:00.
23        And I take it at that point, Mr. Davis, you will be ready
24  to proceed with your next witness.
25             MR. DAVIS:  We certainly expect to.  Mr. Byrne thinks
```

Timestamps:
17:40:01 (line 5)
17:40:19 (line 10)
17:40:41 (line 15)
17:40:46 (line 20)
17:41:05 (line 25)

1    he can move something around and be here by 8:30.  If he's not

2    here at 8:30, it won't be long.  And I do think there may be

3    some business to take up with the Court on exhibits at some

4    point.

17:41:20  5         JUDGE MARCUS:  I expect we will take them up before we

6    get to closing.

7         MR. DAVIS:  I believe we can make good use of the

8    court time even if Mr. Byrne is a few minutes late.

9         JUDGE MARCUS:  Okay.  Thank you all.  Anything further

17:41:32 10   from anyone?  If not, have a good evening, ladies and

11   gentlemen.  And we will see you back here 8:30 tomorrow morning

12   Central Standard Time, 9:30 Eastern Time.  Court is adjourned.

13         (Whereupon, the above proceedings were concluded at

14        5:41 p.m.)

15

16

17

18

19

20

21

22

23

24

25

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1                          CERTIFICATE

2

3

4        I certify that the foregoing is a correct

5   transcript from the record of proceedings in the

6   above-entitled matter.

7

8

9

10

11   _____        01-11-2022

12   Christina K. Decker, RMR, CRR                Date

13   Federal Official Court Reporter

14   ACCR#:   255

15

16

17

18

19

20

21

22

23

24

25