FILED
2022 Jan-27  PM 06:20
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| **BOBBY SINGLETON**, *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 2:21-cv-1291-AMM** |
| | ) | |
| **JOHN H. MERRILL,** *in his* | ) | **THREE-JUDGE COURT** |
| *official capacity as Alabama* | ) | |
| *Secretary of State*, *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

|  |  |  |
|---|---|---|
| **EVAN MILLIGAN**, *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 2:21-cv-1530-AMM** |
| | ) | |
| **JOHN H. MERRILL,** *in his* | ) | **THREE-JUDGE COURT** |
| *official capacity as Secretary of* | ) | |
| *State of Alabama*, *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

Before MARCUS, Circuit Judge, MANASCO and MOORER, District Judges.

BY THE COURT:

## ORDER DENYING DEFENDANTS' EMERGENCY MOTION FOR STAY PENDING APPEAL

This case is before the court on an Emergency Motion For Stay Pending

Appeal filed by Alabama Secretary of State John H. Merrill, Alabama Senator Jim McClendon, and Alabama Representative Chris Pringle ("Defendants"), and responses filed by the *Milligan* plaintiffs and plaintiffs in the related cases. *Milligan* Doc. 110; *Milligan* Doc. 116; *Singleton* Doc. 90; *Caster* Doc. 107.[1] For the reasons explained below, we **DENY** Defendants' motion.

First things first. As we see it, this case is not, as Defendants say, "the rare Section 2 case in which Plaintiffs have admitted that they cannot possibly draw a map with an additional majority-minority district unless traditional redistricting principles are subordinated to race." Doc. 110 at 6.[2] Plaintiffs made no such concession because they did not subordinate traditional redistricting principles to

---

[1] This case is one of three cases currently pending in the Northern District of Alabama that challenge Alabama's congressional electoral map ("the Plan"). The other two cases are *Singleton v. Merrill*, Case No. 2:21-cv-1291-AMM (which challenges the Plan on constitutional grounds only), and *Caster v. Merrill*, Case No. 2:21-cv-1536-AMM (which challenges the Plan on statutory grounds only). *Singleton* and *Milligan* were consolidated for the limited purpose of expedited preliminary injunction proceedings and heard by this three-judge court. The motion for preliminary injunctive relief in *Caster* (which is pending before Judge Manasco sitting alone) was heard during the consolidated preliminary injunction hearing in *Singleton* and *Milligan*. All parties agreed during the preliminary injunction proceedings that any evidence admitted in one case could be used in any of the three cases unless counsel raised a specific objection. *See Singleton* Doc. 72-1; *Caster* Doc. 74; Tr. Dec. 20, 2021 Hrg. at 14–17; Tr. 29. (Unless otherwise specified, transcript citations are to the transcript of the seven-day preliminary injunction hearing, which is available at *Milligan* Doc. 105.) Accordingly, we considered evidence adduced in all three cases.

[2] Page number pincites are to the CM/ECF page number that appears in the top right-hand corner of each page, if such a page number is available.

race. *See infra* Part I. And this is a straightforward Section Two case, not a legal unicorn: the preliminary injunction rests on the court's exhaustive application of settled law to **two** extensive evidentiary records, *see Milligan* Doc. 107 at 52–214. Under controlling precedent, and based on this evidential foundation, the plaintiffs have likely established a violation of Section Two of the Voting Rights Act.

The preliminary injunction rests on an extremely robust body of evidence. We had the benefit of a seven-day preliminary injunction hearing that covered *Singleton*, *Milligan*, and *Caster* and included live testimony from seventeen witnesses (eleven experts and six other fact witnesses); more than 400 pages of prehearing briefing and 600 pages of post-hearing briefing; reports and rebuttal reports from every expert witness; more than 350 hearing exhibits; joint stipulations of fact that span seventy-five pages; and able argument by the forty-three lawyers who have appeared in the litigation. The transcript of the hearing spans nearly 2,000 pages.

Accordingly, the preliminary injunction rests on systematically detailed findings of fact (including our assessments of the credibility of all the expert witnesses) and carefully considered conclusions of law. *See Milligan* Doc. 107 at 139–225. After we conducted the fact-intensive analysis that Supreme Court and Eleventh Circuit precedents instruct us to conduct, we did not and do not regard the question of whether the *Milligan* plaintiffs are substantially likely to succeed on the merits of their Section Two claims as a close one. *See id.* at 195–96.

We consider four factors in our measure of Defendants' application for a stay pending appeal: (1) whether Defendants "ha[ve] made a strong showing that [they are] likely to succeed on the merits; (2) whether [Defendants] will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 425–26 (2009) (internal quotation marks omitted).

"A stay is an intrusion into the ordinary processes of administration and judicial review, and accordingly is not a matter of right, even if irreparable injury might otherwise result to the appellant." *Id.* at 427 (internal quotation marks and citations omitted). Defendants bear the burden of establishing that "circumstances justify an exercise of [the court's] discretion." *Id.* at 433–34.

Defendants make four arguments in support of their request for a stay, and we consider each in turn. To determine whether Defendants "ha[ve] made a strong showing that [they are] likely to succeed on the merits" of their arguments on appeal, *Id.* at 426, because our findings of fact in these fact-intensive cases will be subject to review only for clear error, *Cooper v. Harris*, 137 S. Ct. 1455, 1465 (2017), we assess for each argument whether our view of the evidence on that argument is "plausible in light of the entire record," *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2349 (2021). Ultimately, we conclude that Defendants' stay motion — which is effectively an unsupported motion for reconsideration — does not satisfy

their heavy burden.

## I.   Defendants have not made a strong showing that they are likely to prevail on their assertion that Plaintiffs cannot satisfy *Gingles* I.

Defendants' primary argument in support of a stay is that the plaintiffs cannot satisfy the first *Gingles* requirement — that as a group, Black voters in Alabama are "sufficiently large and geographically compact to constitute a [voting-age] majority" in an additional reasonably configured congressional district. *Cooper*, 137 S. Ct. at 1470 (internal quotation marks omitted). As we laid out in the preliminary injunction, our conclusion that the plaintiffs satisfied *Gingles* I proceeded in four steps: (1) a fact-finding about numerosity (*i.e.*, that Black voters as a group are sufficiently large to constitute a majority in a second majority-Black congressional district), *see Milligan* Doc. 107 at 146–47; (2) our findings crediting the testimony of the plaintiffs' *Gingles* I experts, Dr. Duchin and Mr. Cooper, *see Milligan* Doc. 107 at 148–56; (3) a fact-finding about geographical compactness (*i.e.*, that when we reviewed the statistical scores of geographic compactness — both by considering the expert testimony and by comparing the statistical compactness scores for the plaintiffs' illustrative remedial plans[3] and the majority-minority districts in those

---

[3] When we refer to the plaintiffs' illustrative remedial plans or districts, we are referring to the eleven different illustrative remedial plans submitted by the plaintiffs, each of which includes two majority-Black districts. We described these plans in the preliminary injunction as the "Cooper plans" (the seven illustrative plans prepared by Mr. Bill Cooper, the *Caster* plaintiffs' *Gingles* I expert) and the "Duchin

plans to the statistical compactness scores for the Plan and the challenged districts in the Plan — we found the plaintiffs' illustrative remedial plans strongly suggest that Black voters in Alabama are sufficiently compact to comprise an additional reasonably configured majority-Black district), *see id.* at 157–62; and (4) a fact-finding about reasonable compactness that considers more than mere geography (*i.e.*, that the majority-minority districts in the plaintiffs' illustrative remedial plans reflect the reasonable compactness of the Black population in Alabama when we make appropriate visual assessments and consider traditional redistricting principles), *see id.* at 162–174.

The final step, our fact-finding about reasonable compactness, proceeded in three component steps: (a) our visual assessment of the geographic dispersion of Black population in Alabama (which led us to find that we could see why the plaintiffs' experts expected to be able easily to draw a second reasonably configured majority-Black congressional district), *see id.* at 160–61; (b) our visual assessment of the majority-Black districts in the plaintiffs' illustrative remedial plans (which led us to find that those districts are not bizarrely shaped and do not include tentacles, appendages, or other such obvious irregularities), *see id.* at 162; and (c) our consideration of all of the traditional redistricting principles (which led us to find

---

plans" (the four illustrative plans prepared by Dr. Moon Duchin, the *Milligan* plaintiffs' *Gingles* I expert).

that the plaintiffs' remedial plans balance population across districts, include only contiguous districts, respect existing political subdivisions, respect important communities of interest, and protect incumbents as much as possible), *see id.* at 162– 74.

Defendants' stay motion does not contest the first six steps of our analysis. They argue only that the plaintiffs cannot establish *Gingles* I because of the "objective fact" that they cannot draw two majority-Black congressional districts "without subordinating traditional districting principles to race." *Milligan* Doc. 110 at 7 (emphasis omitted); *see also id.* at 8–14 (accusing plaintiffs of "sacrific[ing]" and "abandoning all" traditional redistricting principles). Further, Defendants say – four separate times, each without citation – that the plaintiffs "concede" or "admit[]" that they cannot draw a second majority-Black district without abandoning all traditional redistricting principles to considerations of race. *See id.* at 3, 4, 6. Ultimately, Defendants say, plaintiffs allowed race to pervade and predominate in their plans, and our ruling not only "concludes that such predominance is permissible," but also "will require race to be used at all times, in all places, and for all districts," and even "permits race to predominate in redistricting at all times, in all places, and in all districts." *Milligan* Doc. 110 at 3, 4, 11. We remain unpersuaded.

We first consider Defendants' claim that the plaintiffs have conceded this

point; we next consider Defendants' charge that the plaintiffs sacrificed traditional redistricting principles; and we finally consider whether the preliminary injunction allows race to predominate over traditional redistricting principles.

### A. Plaintiffs did not make the concession that Defendants say they did.

*First*, the plaintiffs did not make the concession that Defendants say they did. Defendants offer no citation for their claim because there was no concession. We have carefully reviewed every motion, every brief, and every expert report; and we carefully heard and then reviewed again every witness's testimony and every lawyer's argument; and that concession simply did not happen. Indeed, the plaintiffs' experts explained at length how and to what extent they considered each traditional redistricting principle. *See infra* at Parts I.B & I.C.1; *see Milligan* Doc. 107 at 53–64, 85–92, 148–52, 157–74.

### B. Plaintiffs did not sacrifice traditional redistricting principles, and Defendants offer no reason why any of our fact-findings on this are clear error.

*Second*, we reject Defendants' argument that plaintiffs cannot draw two majority-Black congressional districts without sacrificing traditional redistricting principles. In the preliminary injunction, we considered in turn each traditional districting principle (as expressed in the Alabama Legislature's redistricting guidelines, *Milligan* Doc. 88-23), and we made detailed findings of fact, based on all the evidence, about whether and to what extent the plaintiffs' experts considered

each one. *See Milligan* Doc. 107 at 162–74. In their stay motion, Defendants never mention any of these findings, let alone make a strong showing that on appeal, they will likely prevail on their argument that our view of the evidence was implausible. *See Milligan* Doc. 110 at 3–16. In the absence of even a passing mention of a reason why our findings were clear error, we will not issue a stay.

Nevertheless, out of an abundance of caution, we carefully revisited each finding of fact with fresh eyes to determine whether we could discern any basis to depart from our original analysis. We see none.

Undisputed evidence establishes that the plaintiffs' illustrative remedial plans equalize population across districts and include only contiguous districts. *See Milligan* Doc. 107 at 162–63. Substantial evidence establishes that the plaintiffs' illustrative remedial plans respect existing political subdivisions, including counties, cities, towns, and precincts, at least as well as the Plan does. *Id.* at 163–64. Substantial evidence, which Defendants do not mention in their stay motion, also establishes that the plaintiffs' illustrative remedial plans respect communities of interest. *Id.* at 164–71. Finally, one of the plaintiffs' illustrative remedial plans pairs no incumbents. *Id.* at 171. Although the plaintiffs' illustrative remedial plans do not retain the cores of existing districts as well as the Plan does, we found that this is not a fatal flaw under the Alabama Legislature's redistricting guidelines, and in any event that some disruption to the cores of existing districts is to be expected when

an additional majority-minority district must be drawn to comply with the Voting Rights Act. *Id.* at 172.

Ultimately, we adhere to our original finding that Defendants "do not give either the *Milligan* plaintiffs or the *Caster* plaintiffs enough credit for the attention [their experts] paid to traditional redistricting criteria. Defendants set a high bar for themselves when they asserted that the plaintiffs' remedial plans are not reasonably compact because [the plans] 'completely ignore,' 'subjugat[e],' 'jettison[],' *Milligan* Doc. 78 at 18, and 'sacrifice[]' traditional districting criteria, Tr. 874, and they did not meet it." *Milligan* Doc. 107 at 173.

Further, we adhere to our original finding that "[t]he evidence clearly establishes that [the plaintiffs' experts] carefully studied the [Alabama] Legislature's redistricting guidelines, considered many traditional redistricting principles, made careful decisions about how to prioritize particular principles when circumstances forced tradeoffs, and illustrated what different remedial plans might look like if the principles were prioritized in a different order." *Id.*

Accordingly, we adhere to our original finding that the plaintiffs' illustrative remedial plans "have nearly zero population deviation, include only contiguous districts, include districts that are at least as geographically compact as those in the Plan, respect traditional boundaries and subdivisions at least as much as the Plan, protect important communities of interest, protect incumbents where possible, and

provide a number of majority-Black districts that is roughly proportional to the Black percentage of the population." *Id.* Therefore, again we "find that the remedial plans developed by those experts satisfy the reasonable compactness requirement of *Gingles* I," *id.* at 173–74, and that the *Milligan* plaintiffs have established that Black voters as a group are sufficiently geographically compact to constitute a majority in a second congressional district, *id.* at 147.

### C. Race did not predominate in the plaintiffs' illustrative remedial plans, and Defendants offer no reason why any of our fact-findings on this score are clear error.

*Third,* we reject Defendants' arguments that race predominated in the plaintiffs' preparation of their illustrative remedial districts, that we "conclude[d] that such predominance is permissible under the Voting Rights Act," and that the preliminary injunction "will require race to be used at all times, in all places, and for all districts," and even "permits race to predominate in redistricting at all times, in all places, and in all districts." *Milligan* Doc. 110 at 3, 4, 11.

### 1. The plaintiffs' experts' map-making algorithms and computer-simulated plans do not suggest, let alone prove, that race predominated in their preparation of illustrative remedial districts.

We first consider Defendants' argument that computer-simulated plans generated according to a few selective redistricting criteria prove that race predominated in the plaintiffs' experts' preparation of the illustrative remedial plans. *Milligan* Doc. 110 at 3–4. Defendants base this argument on what they describe as a

"stunning concession" by Dr. Duchin that when she did not include race as a consideration in her map-making algorithm and used it to generate two million maps, no map came back with two majority-Black districts. *Id.* Defendants draw the inference from this "concession" that "only if Alabama had permitted race to predominate . . . could Alabama have drawn two majority-[B]lack districts." *Id.*

But Defendants' inference is a bridge too far: although the simulation results suggest that some awareness of race likely is required to draw two majority-Black districts, they do not establish that race must predominate to achieve that result. And the plaintiffs' illustrative remedial plans disprove the necessity of racial predominance: as we explained in the preliminary injunction, all eleven illustrative plans include two majority-Black districts without having allowed race to predominate. *See Milligan* Doc. 107 at 204-05. And in any event, as we explain below, *see infra* Parts I.C.3 & III, the law does not demand zero race consciousness from a Section Two plaintiff. Accordingly, Dr. Duchin's testimony on this issue is unremarkable, not "stunning." *Milligan* Doc. 110 at 3.

## 2. The testimony of the plaintiffs' experts, which we found was highly credible, supports our finding that race did not predominate in their preparation of illustrative remedial districts.

We next consider Defendants' argument that, separate and apart from the computer simulations, race predominated in the plaintiffs' experts' preparation of their illustrative remedial districts. In the preliminary injunction, we described in

detail the experts' testimony on this issue, which we found highly credible. *See Milligan* Doc. 107 at 58–59, 87–88, 149, 151. More particularly, Dr. Duchin testified that she relied heavily on the Alabama Legislature's redistricting guidelines, and she took the creation of two majority-Black districts, which as a *Gingles* I expert she was asked to try to draw, as a "nonnegotiable principle" sought in her illustrative plan, along with equal population among districts. Tr. 622, 647, 657–60, 690. Dr. Duchin labeled this principle "minority opportunity to elect," based on the provision in the Legislature's redistricting guidelines that "Districts shall be drawn in compliance with the Voting Rights Act of 1965, as amended. A redistricting plan shall have neither the purpose nor the effect of diluting minority voting strength, and shall comply with Section 2 of the Voting Rights Act and the Constitution." Tr. 574, 682-83; *see also Milligan* Doc. 88-23. She further testified that "after" population balance and minority opportunity to elect, she "took contiguity and compactness to be highest ranked following the Alabama guidelines" based on the way that those principles are expressed in those guidelines. Tr. 577, 622.

Dr. Duchin repeatedly testified that she focused on race **only** to the extent that was necessary to be sure that she maintained two districts with a Black voting-age population ("BVAP") of greater than 50% to satisfy *Gingles* I. She "describe[d] the priority order this way: When you have to split a [voting tabulation district] looking to balance population, as I just said, by far, the first thing that I look at is the total

population of the [census] blocks. After that, the next consideration I had was compactness, trying to make kind of less eccentric and more regular boundaries between districts. I -- over the course of the many draft maps made, I did sometimes look at race of those blocks, but really, only to make sure that I was creating two districts over 50 percent. Beyond ensuring crossing that 50 percent line, there was no further consideration of race in choosing blocks within the split [voting tabulation districts]." Tr. 572–73.

Relatedly, Dr. Duchin emphasized that "[w]e've seen from the state that it's possible to have a substantially higher BVAP in a district, and I can tell you that it's possible, while having two districts to still have a substantially higher BVAP in a district." Tr. 578. She further testified that when she prepared her illustrative plans, there were times when she made decisions "that had the effect of reducing the Black Voting Age Population in one of the minority-majority [B]lack districts in order to satisfy other redistricting principles." Tr. 578. She gave as an example that she "took . . . county integrity to take precedence over the level of BVAP once that level was past 50 percent." Tr. 578.

Mr. Cooper's testimony about his consideration of race was materially similar and crystal clear on this point. *See* Tr. 437–41. He explained:

> Q.    So what specific traditional districting principles did you consider in drawing the illustrative plans in this case?

A.     Well, I took all of them into consideration. I examined the document produced back in May by the Alabama Legislature outlining the guidelines for redistricting. But a lot of that just incorporates the general concept of traditional redistricting principles. So I didn't prioritize any of them. I tried to balance them.

…

Q.     So was any one factor of the ones we just mentioned predominant, the predominant factor when you were preparing your illustrative plans in this case?

A.     Not really. I feel like I gave them equal weighting. It would be possible to prioritize others and come up with different configurations, but perhaps at the expense of one of the key redistricting principles. So you could draw very compact districts, but they might split numerous counties because they're perfect squares. Or you draw a district that is -- two districts that are maybe 60 percent [B]lack, but they wouldn't be contiguous. That, you know, so you have to balance it.

Q.     And did race predominate in your development of any of the illustrative plans?

A.     No. It was a consideration. This is a Section 2 lawsuit, after all. But it did not predominate or dominate.

Tr. 439–41.

Mr. Cooper testified that it was "necessary" for him to consider race to opine whether "the [B]lack population is sufficiently large and geographically compact to allow for the creation of an additional majority-[B]lack district," and that "[o]ne of the traditional redistricting principles is to be aware" that "you are not diluting minority voting strengths when you are developing a voting plan and the underlying districts." Tr. 437; *accord* Tr. 478–49 (cross examination).

Mr. Cooper further testified that if he had wanted to assign race a greater role, he could have:

> You know, my plans were intended to balance those [redistricting principles]. If I had just wanted to go in there willy-nilly and create two majority-[B]lack districts without paying attention to county lines, without paying attention to precinct lines, without paying attention to municipal lines, I could have drawn a fairly compact looking district that would have been higher in Black VAP for both District 7[] and District 2. I'm balancing things, and I'm not trying to take things to extreme, so I can't give you a really good -- I can't give you a really good example of what extreme I might have been able to hit. But these plans in no way maximize Black Voting [A]ge Population in District 2 and 7.

Tr. 503.

In the preliminary injunction, we found that the plaintiffs' experts testimony supported a finding that they did not allow race to predominate in their preparation of illustrative remedial plans. *See Milligan* Doc. 107 at 149, 151. Both Dr. Duchin and Mr. Cooper consistently and repeatedly refuted the claim that when they prepared their illustrative plans, they prioritized race above everything else. They explained that they used race only as necessary to answer the essential question asked of them as *Gingles* I experts: Is it possible to draw two reasonably compact majority-Black congressional districts? Put differently, they testified that they used race only for the purpose of determining and to the extent necessary to determine whether it was possible for the *Milligan* plaintiffs and the *Caster* plaintiffs to state a Section Two claim. As soon as they determined the answer to that question, they

assigned greater weight to other traditional redistricting criteria. Indeed, they testified about how the maps might have looked if they had prioritized race above everything else.

Dr. Duchin's testimony that she considered two majority-Black districts as "non-negotiable" does not change this analysis. All that means is that Dr. Duchin did not allow a minimum level of compliance with that criterion (*i.e.*, the level required to evaluate the question asked of her as a *Gingles* I expert) to yield to other considerations. Having determined that she could satisfy the numerosity requirement of *Gingles* I, she set about to address the critical corollary questions: whether the districts also could be drawn in a reasonably compact way and whether those districts also would respect the additional traditional redistricting principles of contiguity, existing political boundaries and subdivisions, important communities of interest, and so on. Defendants' stay motion offers no reason why any of these findings of fact is clear error, and we see none. Accordingly, it is not a basis for a stay.

### 3.  Under controlling precedent, the limited extent to which the plaintiffs' *Gingles* I experts considered race is not improper.

We next turn to Defendants' argument that the plaintiffs' experts considered race in a role and to a degree that is either not required by the Voting Rights Act, or if it is, is unconstitutional. As we explained in the preliminary injunction, the problem with this strikes us as obvious: a rule that rejects as unconstitutionally race-focused a remedial plan for attempting to satisfy the *Gingles* I numerosity

requirement would preclude any plaintiff from ever stating a Section Two claim. *See Davis*, 139 F.3d at 1424–25 ("To penalize Davis, as the district court has done, for attempting to make the very showing that *Gingles* [and other precedents] demand would be to make it impossible, as a matter of law, for any plaintiff to bring a successful Section Two action."); *see also Clark v. Calhoun Cnty.*, 88 F.3d 1393, 1406–07 (5th Cir. 1996) ("[T]he first *Gingles* factor is an inquiry into causation that necessarily classifies voters by their race.").

Indeed, a rule that strikes down a remedial plan (as Defendants would) the moment the plan's preparer purposefully draws two districts with a BVAP that exceeds 50% would render superfluous all *Gingles* analysis past numerosity. More pointedly, if satisfying numerosity is an immediate constitutional dead end, there would be no need to consider compactness, racially polarized voting, or the totality of the circumstances. If Section Two is to have any meaning, it cannot require a showing that is necessarily unconstitutional. Defendants have identified no precedent that ever has taken such a step, and we will not be the first.

Further, as we explained in the preliminary injunction, even if we were to subject the plaintiffs' illustrative remedial plans to strict scrutiny, we would need to determine whether they are narrowly tailored to protect a compelling state interest. *See, e.g.*, *Alabama Legislative Black Caucus v. Alabama*, 231 F. Supp. 3d 1026, 1061–64 (M.D. Ala. 2017). In this context, narrow tailoring does not "require an

exact connection between the means and ends of redistricting" but rather just "good reasons to draft a district in which race predominated over traditional districting criteria." *Id.* at 1064 (internal quotation marks omitted) (emphasis omitted). Supreme Court precedent has assumed that compliance with the Voting Rights Act is just such a good reason; more particularly, the Court has "assumed that compliance with the [Voting Rights Act] may justify the consideration of race in a way that would not otherwise be allowed." *Abbott v. Perez*, 138 S. Ct. 2305, 2315 (2018); *accord Cooper*, 137 S. Ct. at 1464.

Under these precedents, when we consider the "laser precision" BVAPs that Defendants deride, *see Milligan* Doc. 102 ¶ 475, our decision to credit the testimony of the plaintiffs' experts about when and how and how much they considered race, and our finding that their illustrative remedial plans fully respect traditional redistricting principles, we do not see "a level of racial manipulation that exceeds what § 2 could justify," *Bush v. Vera*, 517 U.S. 952, 980–81 (1996).

Defendants' stay motion does not change our view. Defendants acknowledge, as they must, that Section Two "permits race-conscious districting only in a limited context. Specifically, Section 2 does permit limited racial preference among maps that honor a State's traditional districting principles." *Milligan* Doc. 110 at 7 (internal quotation marks and emphasis omitted). But, Defendants say, Section Two does not permit a plaintiff to consider race as a non-negotiable preference and then

"choose a plan from the suite of race-based maps subordinating traditional redistricting principles." *Id.* at 8. According to Defendants, this approach would allow a plaintiff to "work backwards," and assume the truth of the Section Two violation that they are trying to prove. *Id.* at 13.

This argument misstates both the law and the facts. As we already have explained, it misstates the facts because the plaintiffs did not "subordinate" or ignore traditional redistricting principles. *See supra* at Part I.B. And it misstates the law because a Section Two plaintiff either must place race in precisely the role that Defendants assail, or fail at the starting gate. The first *Gingles* precondition requires a Section Two plaintiff to establish as an element of the claim that the minority population is sufficiently numerous and geographically compact to draw an additional, reasonably configured majority-minority district. *Cooper*, 137 S. Ct. at 1470; *Milligan* Doc. 107 at 47. A Section Two plaintiff cannot state a claim simply by meeting the numerosity requirement. Any district that meets the numerosity requirement also must be reasonably compact; it must be contiguous; it must respect political boundaries and subdivisions; it must consider and respect often-competing communities of interest; and it must respect other traditional redistricting principles. These demands go far beyond consideration of race, and they require far more than a bare, preliminary showing of numerosity. None of this amounts to permission for a plaintiff simply to "choose from among a suite of race-based maps." *Milligan* Doc.

110 at 8. Nor does it reflect a requirement that a Section Two plaintiff set about drawing illustrative remedial plans using only race-neutral districting principles and hope to happen upon a plan that includes an additional majority-minority district.

> **4. There is no basis, factual or legal, for Defendants' assertion that the preliminary injunction will require race to be used and allow it to predominate in redistricting "at all times, in all places, and in all districts."**

Because the record forecloses a finding that race predominated in the plaintiffs' preparation of their illustrative remedial plans, and because we find that under controlling precedent, the limited extent to which those plans considered race in order to establish numerosity was proper, there is no basis for Defendants' claim that the preliminary injunction will require race to be used "at all times, in all places, and for all districts," and "permits race to predominate in redistricting at all times, in all places, and in all districts." *Milligan* Doc. 110 at 3, 4, 11. The preliminary injunction follows from and is consistent with clear instructions from controlling precedent about how and to what extent race may be considered in the preparation of illustrative remedial plans to state a Section Two claim. Defendants' assertion that this straightforward Section Two case requires all redistricting everywhere to be forever race-based is unsupported. *See also infra* Part III.

* * *

Defendants' stay motion makes attention-grabbing but unsupported claims about our *Gingles* I finding, many of which say something like: "Plaintiffs undertook

serious gerrymandering by subordinating traditional redistricting principles to their goal of maximizing [B]lack voting power," *Milligan* Doc. 110 at 14 (internal quotation marks omitted). We carefully revisited our *Gingles* I finding in search of any indication that our original view of the evidence was implausible, and we found none. Accordingly, we will not issue a stay on this basis.

## II. Defendants have not made a strong showing that they are likely to prevail on their assertion that an analysis of the totality of the circumstances forecloses relief under Section 2.

Defendants argue that because the "Legislature did not decline to pass congressional plans resembling Plaintiffs' illustrative maps 'on account of race or color,' but rather because of traditional districting principles and basic political geography and demographics," our conclusion that the Plan "results in a denial or abridgement of" Plaintiffs' rights "on account of race or color" is "erroneous." *Milligan* Doc. 110 at 17 (quoting the Voting Rights Act, 52 U.S.C. § 10301(a)). But this is a *non sequitur* — that the Legislature did not intend to violate the Voting Rights Act does not mean that the Plan does not violate the Voting Rights Act.

We neither considered nor made any findings about the intent of the Legislature because under controlling precedent, intent is not relevant to the question whether the Plan violates the Voting Rights Act. The Supreme Court has directed that a Section Two analysis must "assess the impact of the contested structure or practice on minority electoral opportunities on the basis of objective factors," and

that whether the legislature intended that impact is "the wrong question." *Thornburg v. Gingles*, 478 U.S. 30, 44 (1986) (internal quotation marks omitted). And the Eleventh Circuit has held that "proof that a contested electoral practice or mechanism was adopted or maintained with the intent to discriminate against minority voters, is not required under Section 2 of the Voting Rights Act." *City of Carrollton Branch of NAACP v. Stallings*, 829 F.2d 1547, 1553 (11th Cir. 1987).

Although Defendants assert broadly that the totality of the circumstances "prohibit relief under Section 2," *Milligan* Doc. 110 at 14, Defendants do not dispute (or even mention) any of our extensive findings of fact about the totality of the circumstances. *See Milligan* Doc. 107 at 178–95. Those findings span nearly twenty pages, considered substantial expert testimony and other evidence, and rely on numerous facts stipulated by the parties. *See id.* We found that Senate Factors 1, 2, 3, 5, 6, and 7, as well as a proportionality analysis, weigh in favor of a finding that the Plan violates Section Two. *See id.* Defendants' stay motion does not even say that (let alone make a "strong showing" that) even one (let alone all) of those findings rests on a view of the evidence that is implausible. *Nken*, 556 U.S. at 426. (And Defendants do not challenge at all our finding that the plaintiffs have satisfied the requirements of *Gingles* II and III concerning racially polarized voting.)

## III.   Defendants have not made a strong showing that they are likely to prevail on appeal on their argument that Section Two is unconstitutional.

Defendants argue that the preliminary injunction "misinterprets Section 2 as

a nearly all-purpose exemption to the Fourteenth Amendment's prohibition against race-based sorting" because it "permits plaintiffs to subordinate all aspects of redistricting to race." *Milligan* Doc. 110 at 18–19. But this (1) mischaracterizes the preliminary injunction, (2) again promotes the erroneous claim that the plaintiffs' illustrative remedial plans subordinate all other considerations to race, and (3) ignores decades of case law in which federal courts have found violations of Section Two without running afoul of the Equal Protection Clause.

*First*, the preliminary injunction is highly context-specific. It spends more than eighty pages describing each part of each party's argument and combing the record for relevant evidence. It then spends more than seventy pages systematically describing each step of our analysis in a fact-intensive inquiry that includes many separate steps, with fact findings and credibility determinations each step of the way. It does not comment on, let alone purport to decide, how Section Two might apply to any other set of facts.

This is entirely consistent with the rule that "the section 2 inquiry 'is particularly dependent upon the facts of each case and requires an intensely local appraisal of the design and impact of the contested electoral mechanisms,'" *Solomon v. Liberty Cnty. Comm'rs*, 221 F.3d 1218, 1226 (11th Cir. 2000) (en banc) (quoting *Gingles*, 478 U.S. at 79). Indeed, this rule is the reason why the fact-findings underlying the preliminary injunction are reviewable only for clear error: "the

application of the clearly-erroneous standard to ultimate findings of vote dilution preserves the benefit of the trial court's particular familiarity with the indigenous political reality without endangering the rule of law." *Gingles*, 478 U.S. at 79.

*Second*, the preliminary injunction does not permit the *Milligan* plaintiffs or the *Caster* plaintiffs to "subordinate all aspects of redistricting to race." *Milligan* Doc. 110 at 19. As we already have explained, *see supra* at Part I, that is not what those plaintiffs did, nor is it what we allowed. Indeed, as the *Caster* plaintiffs correctly point out, "[n]o one in this case, including the [c]ourt, has suggested that Section 2 requires subordination of traditional redistricting principles." *Caster* Doc. 107 at 10.

We concluded that the *Milligan* plaintiffs established a substantial likelihood that they will prevail on the merits of their argument that Black voters in Alabama are sufficiently numerous and geographically compact to constitute a voting-age majority in a second reasonably configured majority-Black district only after we carefully considered each and all of the arguments before us about traditional redistricting criteria and the Alabama Legislature's redistricting guidelines. *See Milligan* Doc. 107 at 162–74. Had we found that the plaintiffs' illustrative second majority-Black district was not contiguous or reasonably compact, or paid insufficient attention to preserving existing political boundaries, for example, we necessarily would not have reached the same conclusion.

And *third,* the preliminary injunction allows only as much consideration of race as controlling precedent and the Constitution allow. As we explained in the preliminary injunction, *see Milligan* Doc. 107 at 22–28, because "the Equal Protection Clause restricts consideration of race and the [Voting Rights Act] demands consideration of race, a legislature attempting to produce a lawful districting plan is vulnerable to competing hazards of liability." *Abbott*, 138 S. Ct. at 2315 (internal quotation marks omitted). "In an effort to harmonize these conflicting demands, [the Supreme Court has] assumed that compliance with the [Voting Rights Act] may justify the consideration of race in a way that would not otherwise be allowed." *Id.*; *accord Cooper*, 137 S. Ct. at 1464. More specifically, the Court has "assumed that complying with the [Voting Rights Act] is a compelling state interest, and that a State's consideration of race in making a districting decision is narrowly tailored and thus satisfies strict scrutiny if the State has good reasons for believing that its decision is necessary in order to comply with the [Voting Rights Act]." *Abbott*, 138 S. Ct. at 2315 (internal quotation marks and citations omitted).

Accordingly, the question for us in evaluating plaintiffs' illustrative remedy is not whether the remedial plan is entirely race-neutral, but whether it reflects "a level of racial manipulation that exceeds what § 2 could justify" to avoid diluting the voting strength of a minority population. *Vera*, 517 U.S. at 980–81. As we explained in the preliminary injunction, we do not find that the plaintiffs improperly considered

race; we find that the plaintiffs considered race only to the limited extent that such considerations are proper, ordinary, and required in light of the numerosity requirement for a Section Two claim. *See Milligan* Doc. 107 at 146–74, 204–06. We based that finding on testimony from the plaintiffs' experts as well as their expert reports. *See Milligan* Doc. 107 at 148–52 (explaining findings about Duchin and Cooper testimony). Defendants' stay motion offers no reason why our view of that evidence is wrong, let alone implausible in light of the entire evidentiary record.

## IV. Defendants have not made a strong showing that they are likely to prevail on appeal on their assertion that the equities weigh in favor of a stay.

Defendants make seven arguments about the balance of the equities in support of their request for a stay, all of which repeat arguments that we already have carefully considered and rejected. *See id.* at 131–36, 199–204. Nevertheless, we have carefully reconsidered each one. We again reject Defendants' arguments because they either ignore, are inconsistent with, or do not satisfy the controlling legal standard, or they are simply wrong on the facts.

*First*, Defendants urge that when "evaluating challenges to electoral processes 'just weeks before an election,' federal courts must 'weigh, in addition to the harms attendant upon issuance or nonissuance of an injunction, considerations specific to election cases and its own institutional procedures." *Milligan* Doc. 110 at 9 (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006)). We have carefully weighed the considerations *Purcell* describes, *see Milligan* Doc. 107 at 197–204, 210–14, but

only out of an abundance of caution — this case is not like *Purcell* because we are not "just weeks before an election." 549 U.S. at 4. In *Purcell*, the election occurred on November 7, 2006, and the application for relief pending appeal was filed one to two months beforehand. *See id.* at 3. As we explained in the Preliminary Injunction, the general election will occur in November 2022, approximately ten months from now; the primary election will occur on May 24, 2022, approximately four months from now; and even if we consider the March 30, 2022 date when absentee voting may begin, we are still more than two months out. *See Milligan* Doc. 107 at 3–4, 133, 200–01.

In the preliminary injunction, we explained multiple separate and independent reasons why, based on the evidentiary record before us, we are confident that there is sufficient time for the Legislature to draw a replacement map: the Legislature enacted the Plan in a matter of days last fall; the Legislature has been on notice since at least the time that this litigation was commenced months ago (and arguably earlier) that a new map might be necessary; the Legislature already has access to an experienced cartographer; the Legislature has not just one or two, but at least eleven illustrative remedial plans to consult, one of which pairs no incumbents; and one of the plaintiffs' expert witnesses demonstrated that he can draw a draft plan in part of an afternoon. *Id.* at 214. Defendants' stay motion identifies no infirmity in even one of those findings of fact, let alone all of them.

We also explained in the preliminary injunction that there is precedent for the timetable we allowed. *See id.* (citing *Larios v. Cox*, 300 F. Supp. 2d 1320, 1356–57 (N.D. Ga. 2004), *aff'd*, 542 U.S. 947 (2004), which allowed nineteen days for a legislature to enact a remedial plan). Defendants do not discuss this precedent, which was just one example. The *Caster* plaintiffs identify others, including *Harris v. McCrory*, 159 F. Supp. 3d 600, 627 (M.D.N.C. 2016) (allowing fourteen days). *See Caster* Doc. 107 at 15. Accordingly, we see no reason to stay our decision to impose a similar timetable.

*Second,* Defendants urge that we should withhold immediate relief because the preliminary injunction "could become the benchmark for redrawing congressional districts probably for several more decades." *Milligan* Doc. 110 at 3. But this argument ignores and is inconsistent with the standard that controls the question whether to withhold relief: necessity. *See, e.g.*, *Upham v. Seamon*, 456 U.S. 37, 44 (1982) ("[W]e have authorized District Courts to order or to permit elections to be held pursuant to apportionment plans that do not in all respects measure up to the legal requirements, even constitutional requirements. Necessity has been the motivating factor in these situations.") (citations omitted). Under *Upham* and the rule it confirms, because we have found that the *Milligan* plaintiffs are otherwise entitled to preliminary injunctive relief, we may withhold relief on the ground that the election is too soon only if the record establishes that we absolutely must.

The record before us falls far short of showing necessity. When we issued the preliminary injunction, we considered the relevant evidence (an attestation from Alabama Director of Elections Clay Helms, *see Milligan* Doc. 79-7, as well as other evidence) and discussed it at length. *See Milligan* Doc. 107 at 131–36, 199–204. We have again considered that evidence, and we do not see it any differently now than we saw it then. When we issued the preliminary injunction, we also reasoned that withholding relief without a finding of necessity would effectively allow the Legislature's redistricting decisions to hover above the law for Alabama's 2022 congressional elections. *See id.* at 199–202. Defendants' stay motion offers no reason to allow that result.

*Third,* Defendants assert that if the Legislature is required to draw a new map "with the 2022 campaign cycle in full swing, chaos would ensue." *Milligan* Doc. 110 at 6. But a federal court's decision whether to allow an election to proceed under an unlawful electoral map does not rise and fall on the status of a campaign cycle. Defendants cite no legal authority for that proposition, and we are aware of none. In any event, Defendants have not established that administrative "chaos" is forthcoming (or even likely). When we issued the preliminary injunction, we found that Mr. Helms identified administrative challenges of complying with a preliminary injunction, but that he had not asserted that it could not be done. *See Milligan* Doc. 107 at 201–02. We also found that Mr. Helms's attestation was only part of the

record on this issue, and that other record evidence strongly suggests that the Legislature became well aware of the potential need for a map to include two majority-Black districts in plenty of time to facilitate compliance with an injunction requiring just such a map. *See id.* at 202–04. On further review, we do not see that Mr. Helm's attestation or any other evidence forecasts or promises chaos, or even comes close.

*Fourth,* Defendants argue that candidates already have spent "significant time and money" campaigning to potential voters, much of which will be "wasted if those voters are later moved to a different district." *Milligan* Doc. 110 at 23. But there is no legal basis for us to consider this argument unless and until the Supreme Court or Eleventh Circuit sets potential campaign waste as the bar for district courts to use when determining whether an election should proceed under a plainly unlawful districting plan.

*Fifth*, Defendants urge that potential congressional candidates will have "mere days to even consider whether to run in brand new districts." *Id.* at 20. But this is a circumstance well within the Legislature's control and discretion, not one that requires a stay: The Legislature may further extend the qualifying deadline under Alabama law to allow candidates more time to consider their options.

*Sixth*, Defendants argue that there is "precious little time" for the Legislature to draw a new map, and they cite an article and another district court case that suggest

that it could take as long as a month to draw a map. *Id.* at 21–22. But there is no evidence that in this case, which we already have distinguished from the one Defendants cite, *see Milligan* Doc. 107 at 132–34, 199–204, it will take the Legislature a month to draw a new map. The only record evidence indicates otherwise: the Legislature passed the existing map in a matter of days last fall. A special session of the Legislature called by the Governor commenced on October 28, 2021, the Legislature codified a new map on November 3, 2021, and the Governor signed it into law on November 4, 2021. *Id.* at 32–33. Indeed, the fourteen-day period we allowed is approximately double the amount of time it took the Legislature to enact the current congressional map. Accordingly, we cannot withhold relief on this basis.

*Seventh*, Defendants argue that the equities tilt in favor of a stay because the map simply carries forward districts that have been around for a long time. *Milligan* Doc. 110 at 25. But this is a red herring — Defendants cite no decision of any court anywhere that suggests that after a federal court has concluded that a plaintiff is substantially likely to prevail on a claim of vote dilution under the Voting Rights Act, the court should nevertheless withhold relief because the challenged map is aged. The argument also ignores the obvious reality that as maps age, demographic changes may eventually turn a lawful map into an unlawful map. The Black population in Alabama grew from 25.26% of the population in the 1990 census to

27.1% of the population in the 2020 census. At the same time, the white population dropped from 73.65% of the population in the 1990 census to 63.12% of the population in the 2020 census. *See Milligan* Doc. 107 at 85; *Wesch v. Hunt*, 785 F. Supp. 1491, 1503 app. B (S.D. Ala. 1992), *aff'd sub nom. Camp v. Wesch*, 504 U.S. 902 (1992), and *aff'd sub nom. Figures v. Hunt*, 507 U.S. 901 (1993).

Despite ample opportunity, Defendants still have not made the one showing that federal law requires before we may withhold relief: that even though we have concluded that plaintiffs (1) are substantially likely to prevail on their claim that the Plan violates the Voting Rights Act and (2) have satisfied the other requirements for a preliminary injunction, it is necessary for us to withhold immediate relief. Absent a preliminary injunction, the plaintiffs will suffer irreparable injury until 2024 — nearly halfway through this census cycle.

\*\*\*

We are aware that the preliminary injunction is consequential, and we have carefully considered each argument that Defendants have raised in favor of a stay. (Indeed, we have taken slightly longer than the ten hours Defendants asked us to take to allow responses to, carefully consider, and rule on this motion.) We discern no basis for a finding that this case is the extraordinary case in which we must allow an election to proceed under a map that we have determined — on the basis of a substantial evidentiary record — very likely violates the Voting Rights Act.

Defendants have identified no controlling precedent that requires us to (or even suggests that we should) upend our determination, based on the evidence before us, that a modest extension of the qualifying deadline is sufficient to allow time for Alabama's 2022 congressional election to proceed under a lawful map. Defendants cite no precedent in which the Supreme Court ever has upended a district court's determination that an election need not and should not go forward under an unlawful map. We do not break new ground.

Therefore, Defendants' emergency motion for a stay of the injunction pending the appeal is **DENIED**.

**DONE** and **ORDERED** this 27th day of January, 2022.

_____
**STANLEY MARCUS**
UNITED STATES CIRCUIT JUDGE

_____
**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE

_____
**TERRY F. MOORER**
UNITED STATES DISTRICT JUDGE