FILED
2022 Feb-07  PM 06:09
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT

# A

KAVANAUGH, J., concurring

# SUPREME COURT OF THE UNITED STATES

————————

Nos. 21A375 (21–1086) and 21A376 (21–1087)

————————

## JOHN H. MERRILL, ALABAMA SECRETARY OF STATE, ET AL.

21A375 (21–1086)          *v.*

### EVAN MILLIGAN, ET AL.

## JOHN H. MERRILL, ALABAMA SECRETARY OF STATE, ET AL.

21A376 (21–1087)          *v.*

### MARCUS CASTER, ET AL.

ON APPLICATIONS FOR STAYS OR INJUNCTIVE RELIEF

[February 7, 2022]

The application for a stay or injunctive relief presented to JUSTICE THOMAS and by him referred to the Court in No. 21A375 is treated as a jurisdictional statement, and probable jurisdiction is noted. The application for a stay or injunctive relief presented to JUSTICE THOMAS and by him referred to the Court in No. 21A376 is treated as a petition for a writ of certiorari before judgment. Respondents in No. 21A376 do not oppose treating the application as a petition for a writ of certiorari before judgment and do not oppose granting the petition (although they do oppose granting a stay). With that fact taken into account, the petition is granted. The district court's January 24, 2022 preliminary injunctions in No. 2:21–cv–1530 and No. 2:21–cv–1536 are stayed pending further order of the Court.

JUSTICE KAVANAUGH, with whom JUSTICE ALITO joins, concurring in grant of applications for stays.

I concur in the Court's stay of the District Court's injunction. I write separately to explain my vote, and to briefly

respond to the principal dissent. *Post,* p. ___ (opinion of
KAGAN, J.).

To begin with, the principal dissent is wrong to claim that
the Court's stay order makes any new law regarding the
Voting Rights Act. The stay order does not make or signal
any change to voting rights law. The stay order is not a
ruling on the merits, but instead simply stays the District
Court's injunction *pending a ruling on the merits.* The stay
order follows this Court's election-law precedents, which es-
tablish (i) that federal district courts ordinarily should not
enjoin state election laws in the period close to an election,
and (ii) that federal appellate courts should stay injunctions
when, as here, lower federal courts contravene that princi-
ple. See, *e.g., Purcell* v. *Gonzalez*, 549 U. S. 1 (2006) (*per
curiam*).

The principal dissent's catchy but worn-out rhetoric
about the "shadow docket" is similarly off target. The stay
will allow this Court to decide the merits in an orderly fash-
ion—after full briefing, oral argument, and our usual exten-
sive internal deliberations—and ensure that we do *not* have
to decide the merits on the emergency docket. To reiterate:
The Court's stay order is not a decision on the merits.

As background: This stay application arises from a dis-
pute over Alabama's congressional election districts. The
State recently adopted a districting plan that, according to
the State, employs the same basic districting framework
that the State has maintained for several decades. But two
weeks ago, a three-judge District Court concluded that Al-
abama's congressional districting plan likely violates fed-
eral voting rights law. The District Court ordered that Al-
abama's congressional districts be completely redrawn
within a few short weeks. The District Court declined to
stay the injunction for the 2022 elections even though the
primary elections begin (via absentee voting) just seven
weeks from now, on March 30.

The State has appealed, contending that the District

KAVANAUGH, J., concurring

Court was wrong on the merits. And given that the primary elections begin next month, the State has also sought an emergency stay of the District Court's injunction with respect to the 2022 elections.

With respect to the request for a stay of the District Court's injunction for the 2022 elections, the State argues that the District Court's injunction is a prescription for chaos for candidates, campaign organizations, independent groups, political parties, and voters, among others. The State says that those individuals and entities now do not know who will be running against whom in the primaries next month. Filing deadlines need to be met, but candidates cannot be sure what district they need to file for. Indeed, at this point, some potential candidates do not even know which district they live in. Nor do incumbents know if they now might be running against other incumbents in the upcoming primaries.

On top of that, state and local election officials need substantial time to plan for elections. Running elections statewide is extraordinarily complicated and difficult. Those elections require enormous advance preparations by state and local officials, and pose significant logistical challenges. The District Court's order would require heroic efforts by those state and local authorities in the next few weeks—and even heroic efforts likely would not be enough to avoid chaos and confusion.

For those and other reasons, the State says that any judicial order requiring the State to redraw its congressional district lines should not apply to the imminent 2022 elections that begin next month.

Under our precedents, a party asking this Court for a stay of a lower court's judgment pending appeal or certiorari ordinarily must show (i) a reasonable probability that this Court would eventually grant review and a fair prospect that the Court would reverse, and (ii) that the applicant

would likely suffer irreparable harm absent the stay. *Hollingsworth* v. *Perry*, 558 U. S. 183, 190 (2010) (*per curiam*). In deciding whether to grant a stay pending appeal or certiorari, the Court also considers the equities (including the likely harm to both parties) and the public interest. *Ibid.*

As the Court has often indicated, however, that traditional test for a stay does not apply (at least not in the same way) in election cases when a lower court has issued an injunction of a state's election law in the period close to an election. See *Purcell*, 549 U. S. 1. This Court has repeatedly stated that federal courts ordinarily should not enjoin a state's election laws in the period close to an election, and this Court in turn has often stayed lower federal court injunctions that contravened that principle. See *ibid.*; see also *Merrill* v. *People First of Ala.*, 592 U. S. ___ (2020); *Andino* v. *Middleton*, 592 U. S. ___ (2020); *Merrill* v. *People First of Ala.*, 591 U. S. ___ (2020); *Clarno* v. *People Not Politicians*, 591 U. S. ___ (2020); *Little* v. *Reclaim Idaho*, 591 U. S. ___ (2020); *Republican National Committee* v. *Democratic National Committee*, 589 U. S. ___ (2020) (*per curiam*); *Democratic National Committee* v. *Wisconsin State Legislature*, 592 U. S. ___ (2020) (declining to vacate stay).

That principle—known as the *Purcell* principle—reflects a bedrock tenet of election law: When an election is close at hand, the rules of the road must be clear and settled. Late judicial tinkering with election laws can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters, among others. It is one thing for a State on its own to toy with its election laws close to a State's elections. But it is quite another thing for a federal court to swoop in and re-do a State's election laws in the period close to an election.[1]

──────────

[1] How close to an election is too close may depend in part on the nature of the election law at issue, and how easily the State could make the change without undue collateral effects. Changes that require complex or disruptive implementation must be ordered earlier than changes that

KAVANAUGH, J., concurring

Some of this Court's opinions, including *Purcell* itself, could be read to imply that the principle is absolute and that a district court may *never* enjoin a State's election laws in the period close to an election. As I see it, however, the *Purcell* principle is probably best understood as a sensible refinement of ordinary stay principles for the election context—a principle that is not absolute but instead simply heightens the showing necessary for a plaintiff to overcome the State's extraordinarily strong interest in avoiding late, judicially imposed changes to its election laws and procedures. Although the Court has not yet had occasion to fully spell out all of its contours, I would think that the *Purcell* principle thus might be overcome even with respect to an injunction issued close to an election if a plaintiff establishes at least the following: (i) the underlying merits are entirely clearcut in favor of the plaintiff; (ii) the plaintiff would suffer irreparable harm absent the injunction; (iii) the plaintiff has not unduly delayed bringing the complaint to court; and (iv) the changes in question are at least feasible before the election without significant cost, confusion, or hardship. Cf. *Lucas* v. *Townsend*, 486 U. S. 1301 (1988) (Kennedy, J., in chambers); *McCarthy* v. *Briscoe*, 429 U. S. 1317 (1976) (Powell, J., in chambers).

Here, however, even such a relaxed version of the *Purcell* principle would not permit the District Court's late-breaking injunction. That is because the plaintiffs could not satisfy at least two of those four prerequisites—namely, that the merits be clearcut in favor of the plaintiff, and that the changes be feasible without significant cost, confusion, or hardship.

As to the merits, the underlying question here is whether a second majority-minority congressional district (out of seven total districts in Alabama) is required by the Voting Rights Act and not prohibited by the Equal Protection

_____

are easy to implement.

Clause.  But the Court's case law in this area is notoriously unclear and confusing.  As THE CHIEF JUSTICE rightly notes, there is "considerable disagreement and uncertainty regarding the nature and contours of a vote dilution claim." *Post,* at 2 (dissenting opinion).  Indeed, an *amicus* brief filed by 14 States says (with some justification) that this Court and the lower federal courts "have been less than clear" about the rules that govern majority-minority districts, and bluntly adds that "States need clarity."  Brief for State of Louisiana et al. as *Amici Curiae* 3, 25.

At this preliminary juncture, the underlying merits appear to be close and, at a minimum, not clearcut in favor of the plaintiffs.[2]  And in any event, the plaintiffs have not established that the changes are feasible without significant cost, confusion, or hardship.  Therefore, the plaintiffs cannot overcome even a more relaxed version of the *Purcell* principle.

In short, the *Purcell* principle requires that we stay the District Court's injunction with respect to the 2022 elections.  The Court has recognized that "practical considerations sometimes require courts to allow elections to proceed despite pending legal challenges."  *Riley* v. *Kennedy*, 553 U. S. 406, 426 (2008).  So it is here.  If the District Court's judgment is eventually affirmed after appellate review, the injunction can take effect for congressional elections that occur after 2022.[3]

The principal dissent disagrees and emphasizes the thor-

_____

[2] Even under the ordinary stay standard outside the election context, the State has at least a fair prospect of success on appeal—as do the plaintiffs, for that matter.

[3] Correcting an erroneous lower court injunction of a state election law does not itself constitute a *Purcell* problem.  Otherwise, appellate courts could never correct a late-breaking lower court injunction of a state election law.  That would be absurd and is not the law.  See, *e.g., Andino* v. *Middleton*, 592 U. S. ___ (2020); *Republican National Committee* v. *Democratic National Committee*, 589 U. S. ___ (2020) (*per curiam*).

KAVANAUGH, J., concurring

oughness of the District Court's opinion.  But if careful District Court consideration sufficed for an appellate court to deny a stay, then appellate courts could usually end the stay inquiry right there.  That is not how stay analysis works.  Contrary to the dissent's implication, the fact that the District Court here issued a lengthy opinion after considering a substantial record is the starting point, not the ending point, for our analysis of whether to grant a stay.

To sum up: In light of this Court's many precedents applying the *Purcell* principle and staying lower court injunctions of state election laws in the period close to an election, I concur in the Court's order granting a stay of the District Court's injunction here.  Contrary to the dissent's mistaken rhetoric, I take no position at this time on the ultimate merits of the parties' underlying legal dispute.  And I need not do so until the Court receives full briefing, holds oral argument, and engages in our usual extensive internal deliberations.  The words used by the Court in *Purcell* apply equally to this case: "We underscore that we express no opinion here on the correct disposition, after full briefing and argument, of the appeals from the District Court's . . . order or on the ultimate resolution of these cases."  549 U. S., at 5.  "Given the imminence of the election and the inadequate time to resolve the factual disputes, our action today shall of necessity allow the election to proceed without an injunction."  *Id.*, at 5–6.

Cite as: 595 U. S. ____ (2022)          1

ROBERTS, C. J., dissenting

# SUPREME COURT OF THE UNITED STATES

———————

Nos. 21A375 (21–1086) and 21A376 (21–1087)

———————

### JOHN H. MERRILL, ALABAMA SECRETARY OF STATE, ET AL.

21A375 (21–1086)          *v.*

### EVAN MILLIGAN, ET AL.

### JOHN H. MERRILL, ALABAMA SECRETARY OF STATE, ET AL.

21A376 (21–1087)          *v.*

### MARCUS CASTER, ET AL.

ON APPLICATIONS FOR STAYS OR INJUNCTIVE RELIEF

[February 7, 2022]

CHIEF JUSTICE ROBERTS, dissenting from grant of applications for stays.

I respectfully dissent from the stays granted in these cases because, in my view, the District Court properly applied existing law in an extensive opinion with no apparent errors for our correction. The governing standard for vote dilution claims under section 2 of the Voting Rights Act is set forth in *Thornburg* v. *Gingles*, 478 U. S. 30 (1986), which requires "the minority group . . . to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district." *Id.,* at 50. The District Court reviewed the submissions of the plaintiffs' experts and explained at length the factbound bases for its conclusion that the plaintiffs had made that showing. See *post*, at 3–4 (KAGAN, J., dissenting).

But while the District Court cannot be faulted for its application of *Gingles*, it is fair to say that *Gingles* and its

2                    MERRILL *v.* MILLIGAN

Roberts, C. J., dissenting

progeny have engendered considerable disagreement and
uncertainty regarding the nature and contours of a vote di-
lution claim. See *Gingles*, 478 U. S., at 97 (O'Connor, J.,
concurring in judgment) (characterizing the Court's ap-
proach at the outset as "inconsistent with . . . §2's dis-
claimer of a right to proportional representation"); *Johnson*
v. *De Grandy*, 512 U. S. 997, 1028 (1994) (Kennedy, J., con-
curring in part and concurring in judgment) (warning that
"placing undue emphasis upon proportionality risks defeat-
ing the goals underlying the Voting Rights Act"); *Gonzalez*
v. *Aurora*, 535 F. 3d 594, 597 (CA7 2008) (Easterbrook, J.)
(referring to section 2's "famously elliptical" language). See
also J. Chen & N. Stephanopoulos, The Race-Blind Future
of Voting Rights, 130 Yale L. J. 862, 871 (2021) (describing
section 2 vote dilution doctrine as "an area of law notorious
for its many unsolved puzzles"); C. Elmendorf, Making
Sense of Section 2: Of Biased Votes, Unconstitutional Elec-
tions, and Common Law Statutes, 160 U. Pa. L. Rev. 377,
389 (2012) (noting the lack of any "authoritative resolution
of the basic questions one would need to answer to make
sense of the results test").

  In order to resolve the wide range of uncertainties arising
under *Gingles*, I would note probable jurisdiction in *Milli-
gan* and grant certiorari before judgment in *Caster*, setting
the cases for argument next Term.  But I would not grant a
stay.  As noted, the analysis below seems correct as *Gingles*
is presently applied, and in my view the District Court's
analysis should therefore control the upcoming election.
The practical effect of this approach would be that the 2022
election would take place in accord with the judgment of the
District Court, but subsequent elections would be governed
by this Court's decision on review.

Cite as:  595 U. S. ____ (2022)          1

KAGAN, J., dissenting

# SUPREME COURT OF THE UNITED STATES

————————

Nos. 21A375 (21–1086) and 21A376 (21–1087)

————————

## JOHN H. MERRILL, ALABAMA SECRETARY OF STATE, ET AL.
21A375 (21–1086)          *v.*
EVAN MILLIGAN, ET AL.


## JOHN H. MERRILL, ALABAMA SECRETARY OF STATE, ET AL.
21A376 (21–1087)          *v.*
MARCUS CASTER, ET AL.

ON APPLICATIONS FOR STAYS OR INJUNCTIVE RELIEF

[February 7, 2022]

JUSTICE KAGAN, with whom JUSTICE BREYER and JUSTICE SOTOMAYOR join, dissenting from grant of applications for stays.

After considering a massive factual record, developed over seven days of testimony, and reviewing more than 1,000 pages of briefing, a three-judge District Court held that Alabama's redistricting plan violated Section 2 of the Voting Rights Act (VRA). The District Court (including two judges from the State) found that the plan unlawfully diluted the votes of the State's Black population, and ordered the State to devise a new plan for the 2022 elections. Alabama now seeks a stay of that ruling. Usually, when a litigant applies to this Court for a stay, it argues that the lower court erred under current law. But Alabama's application cannot be understood in that way. Accepting Alabama's contentions would rewrite decades of this Court's precedent about Section 2 of the VRA. For that reason, this Court goes

2                MERRILL *v.* MILLIGAN

Kagan, J., dissenting

badly wrong in granting a stay. There may—or may not—
be a basis for revising our VRA precedent in light of the
modern districting technology that Alabama's application
highlights. But such a change can properly happen only
after full briefing and argument—not based on the scanty
review this Court gives matters on its shadow docket. The
District Court here did everything right under the law ex-
isting today. Staying its decision forces Black Alabamians
to suffer what under that law is clear vote dilution. With
respect, I again dissent from a ruling that "undermines Sec-
tion 2 and the right it provides." *Brnovich* v. *Democratic
National Committee*, 594 U. S. ___, ___ (2021) (Kagan, J.,
dissenting) (slip op., at 2).[1]

──────────

[1] Because Justice Kavanaugh claims that the Court's stay has nothing
to do with the merits of Alabama's application and that the Court may
therefore appropriately use its emergency docket to grant the State re-
lief, see *ante,* at 2 (concurring opinion), I note a few uncontroversial prin-
ciples about stays pending appeal.

A stay pending appeal is an "extraordinary" remedy. *Williams* v.
*Zbaraz*, 442 U. S. 1309, 1311 (1979) (Stevens, J., in chambers); see also
*Ruckelshaus* v. *Monsanto Co.*, 463 U. S. 1315, 1316 (1983) (Blackmun, J.,
in chambers). The applicant (here, the State) bears the "especially
heavy" burden of proving that such relief is warranted. *Packwood* v. *Sen-
ate Select Committee on Ethics*, 510 U. S. 1319, 1320 (1994) (Rehnquist,
C. J., in chambers). Our stay standard asks (1) whether the applicant is
likely to succeed on the merits, and (2) whether the likelihood of irrepa-
rable harm to the applicant, the balance of equities, and the public inter-
est weigh in favor of granting a stay. See *Nken* v. *Holder*, 556 U. S. 418,
426 (2009). The inquiry thus has both a merits component and an equi-
table component.

That is true in election cases generally. As Justice Kavanaugh notes,
there is an exception: The Court has sometimes given less attention to
the merits in cases involving eleventh-hour election changes. See *Purcell*
v. *Gonzalez*, 549 U. S. 1, 4–5 (2006) (*per curiam*). But for the reasons
given in Part III, that exception does not apply here, given that the Dis-
trict Court ruled months before anyone in the State will cast a vote. See
*infra,* at 10–12.

And so we return to the ordinary standard for a stay pending appeal.
Because our discretionary power over election appeals is limited, I agree
that the Court will need to hear Alabama's appeal on our ordinary

## I

Following the 2020 census, the plaintiffs here challenged Alabama's newly enacted redistricting plan under Section 2. Alabama's population is 27% Black, but under the plan, Black voters have the power to elect their preferred candidate in only one of the State's seven congressional districts. That alone does not demonstrate vote dilution. What raises the prospect of a Section 2 claim is that Alabama's Black population is heavily "concentrated" in the urban population centers and an area of the State known as the Black Belt, "named for the region's fertile black soil," where many enslaved people were taken during the antebellum period. App. to Application in No. 21A375, pp. 36–37, 160–161 (App.). Because "Black voters in Alabama are relatively geographically compact," the plaintiffs argued that the State could have drawn a second congressional district, meeting traditional districting criteria, in which Black Alabamians would constitute a majority. *Id.*, at 161. But the State had instead "pack[ed]" much of the Black population into a single district, and "crack[ed]" the remainder over three others. *Id.*, at 36–41. That action, the plaintiffs contended, diluted their voting power.

The Court's longstanding precedent imposes strict requirements for proving a vote-dilution claim. To start, plaintiffs must satisfy three conditions, often referred to as the *Gingles* conditions. Those conditions are: (1) that the "minority group is sufficiently large and geographically compact to constitute a majority" in a district, (2) that the minority group "is politically cohesive," and (3) that the "white majority votes sufficiently as a bloc to enable it . . .

—————

docket. The question this stay application presents is what to do in the interim. Should we freeze the District Court's decision and thereby enable Alabama to proceed with the violation of voting rights found by that court? Or should we leave the District Court's decision in place, thus allowing a remedy to the adjudicated violation of rights to go into effect? For the reasons that follow, the latter course is the only appropriate one.

usually to defeat the minority's preferred candidate." *Growe* v. *Emison*, 507 U. S. 25, 40 (1993) (quoting *Thornburg* v. *Gingles*, 478 U. S. 30, 50–51 (1986); alterations omitted). If plaintiffs satisfy those conditions, they must then show that a Section 2 "violation has occurred based on the totality of the circumstances." *Bartlett* v. *Strickland*, 556 U. S. 1, 12 (2009) (plurality opinion). Those circumstances include the history of race-based discrimination in the State (especially as to voting rights), the extent to which voting is racially polarized, and the extent to which minority candidates have struggled to get elected to public office. See *Gingles*, 478 U. S., at 36–37, 44–45.

Under our precedent, plaintiffs have long satisfied the first *Gingles* condition—the only condition at issue in Alabama's stay application—by showing that another "reasonably compact" majority-minority district can be drawn, consistent with "traditional districting principles." See, *e.g.*, *League of United Latin American Citizens* v. *Perry*, 548 U. S. 399, 430, 433 (2006) (*LULAC*). Those principles include—in addition to compactness—contiguity, respect for existing political subdivisions, and the desire to keep together existing communities of interest.[2] See *id.,* at 433; *Alabama Legislative Black Caucus* v. *Alabama*, 575 U. S. 254, 272 (2015). To make the requisite showing, plaintiffs typically submit one or more illustrative, alternative maps complying with traditional districting criteria while also adding a majority-minority district.

The plaintiffs here did just that. In a seven-day preliminary injunction hearing with live testimony from 17 witnesses, they built an extensive factual record, including substantial evidence going to the ease of creating a second majority-Black district. Based on that record, the District

_____

[2] Alabama's redistricting guidelines define a "community of interest" as "an area with recognized similarities of interests, including but not limited to ethnic, racial, economic, tribal, social, geographic, or historical identities." App. 46.

Court found that the plaintiffs' 11 illustrative plans (each with a second majority-Black district) complied with traditional districting criteria as well as or better than Alabama's enacted plan.  As the court explained, the plaintiffs' proposed plans "have nearly zero population deviation, include only contiguous districts, include districts that are at least as geographically compact as those in [Alabama's] Plan, respect traditional boundaries and subdivisions at least as much as [Alabama's] Plan, protect important communities of interest, [and] protect incumbents where possible."  App. 173.  Alabama's efforts to rebut the plaintiffs' showing hinged on an expert to whom the District Court gave "very little weight."  *Id.*, at 152.  The court explained that his testimony was riddled with "internal inconsistencies and vacillations," and that he often "offered an opinion without a sufficient basis (or in some instances any basis)."  *Id.*, at 153, 155–156.  And even that expert had to concede that, as to compactness, the plaintiffs' plans "perform generally better on average" than the enacted state plan.  *Id.*, at 158.  Faced with that mountain of evidence, the District Court found the first *Gingles* condition met.  Indeed, the court noted that just eyeballing the map of Alabama's Black population (as printed below) shows how "eas[y]" it is— given the shape of the Black Belt and the nearby locations of Birmingham and Mobile—to "draw two reasonably configured majority-Black districts."  App. 160–161.



Figure 1.  Black Voting-Age Population Share

The District Court also found that the plaintiffs made the required showings on the other *Gingles* conditions and the totality of the circumstances.  The court stated that "there is no serious dispute that Black voters [in Alabama] are 'politically cohesive,' nor that the challenged districts' white majority votes 'sufficiently as a bloc to usually defeat [Black voters'] preferred candidate[s].'"  App. 174 (quoting *Cooper* v. *Harris*, 581 U. S. ___, ___ (2017) (slip op., at 13)) (second alteration in original).  Too, the court found that the vast majority of factors considered in the totality-of-circumstances inquiry favored the plaintiffs, including the "extent to which voting . . . is racially polarized" (very), the "extent to which members of the minority group have been elected to public office" (rarely), and the history of voting-rights discrimination in the State (significant).  App. 178–193.  The court noted that recent political campaigns in Alabama had included "obvious and overt appeals to race."  *Id.*, at 190.  (To take just two, Congressman Mo Brooks "repeatedly claimed that Democrats [were] waging a 'war on whites,'" and Roy Moore asserted that the Civil Rights Amendments to the Constitution "'completely tried to wreck the form of government that our forefathers intended.'"  *Id.*, at 189–190.)  After all this, the court considered whether, under Alabama's plan, "the number of districts in which the minority group forms an effective majority is roughly proportional to its share of the population."  *LULAC*, 548 U. S., at 426.  The court found it was not, noting that Black Alabamians are 27% of the population but have meaningful influence over just 14% of congressional seats.  App. 194.  Or put another way, "less than one-third of Alabama's Black population resides in a majority-Black district, while 92% of Alabama's non-Hispanic white population resides in a majority-white district."  *Id.*, at 194–195.

In light of that "extremely robust body of evidence," the District Court held that the record "compels" the conclusion

that Alabama's redistricting plan "substantially likely violates Section Two." *Id.*, at 196, 236. Indeed, the District Court did "not regard the question" whether the plaintiffs were "substantially likely to prevail on the merits of their Section Two claim as a close one." *Id.*, at 195.

## II

Alabama insists that the District Court's decision is wrong, even though the State does not contest any of the findings outlined above. Alabama does not argue, for example, that its enacted plan performs better than the plaintiffs' proposed plans when measured against traditional districting criteria like compactness. Rather, Alabama argues that the proposed plans do not satisfy the first *Gingles* condition because the plaintiffs' experts did not draw them with race wholly out of mind—"using only race-neutral criteria." Application in No. 21A375, p. 19 (Application). The State would essentially require the plaintiffs to demonstrate that modern map-drawing software, designed to give no attention at all to race, would produce maps with two majority-Black districts. See *id.*, at 25–26.

But in making that claim, the State seeks to graft onto the VRA a new requirement, lacking any foundation in our precedent. The first *Gingles* condition (recall only the initial step in a much larger analysis) asks a question specifically about race: Is a minority group "sufficiently large and geographically compact to constitute a majority" in an additional district, consistent with traditional districting criteria? *Growe*, 507 U. S., at 40; see *supra*, at 3. Consistent with the nature of that question, the plaintiffs here did what plaintiffs in a Section 2 case have always done: They hired experts and charged them with the task of drawing maps with another reasonably configured majority-Black district. That has been the very project of the first *Gingles* condition: If plaintiffs cannot produce such illustrative maps—showing that what they are asking for is possible—

their claim fails at an early stage of the litigation. See *Strickland*, 556 U. S., at 18–19. At no time has this Court held that plaintiffs must answer the race-infused question of the first *Gingles* condition without any awareness of race; indeed, until recently, that would have been well-nigh impossible. In Alabama's view, though, the advent of computerized districting should change the way the first *Gingles* condition operates. Plaintiffs can now use technology to generate millions of possible plans, without any attention to race. Alabama claims that some number of those plans (what number is unclear) must contain an additional majority-Black district for Section 2 plaintiffs to satisfy the first *Gingles* condition. See Reply to Application in No. 21A375, p. 1. But whatever the pros and cons of that method, this Court has never demanded its use; we have not so much as floated the idea, let alone considered how it would work. Alabama's stay request, then, is premised on an entirely new view of what the law requires.

To make matters worse, the record gives Alabama no basis for arguing that this case would come out differently under its race-blind computer-simulation approach. Alabama's brief centers on the supposedly show-stopper claim that one of the plaintiffs' experts had randomly generated a large number of Alabama plans, and produced not a one with two majority-Black districts. See *id.*, at 1, 21–24. But as an initial matter, Alabama never introduced that expert's study into the record, and the testimony about it takes up just four pages of a nearly 2,000-page hearing transcript. See App. 236, 346–349. In any event, the analysis was based on stale 2010 census data—not the relevant 2020 data, which showed a relative increase in Alabama's Black population. And it did not account for several of Alabama's traditional districting criteria, including keeping communities of interest (like the Black Belt) together. See *supra*, at 4, n. 2. When the plaintiffs' expert was asked at the hearing whether a race-blind computer program could

KAGAN, J., dissenting

produce maps with two majority-Black districts, she replied that it "certainly" could. App. 349. So Alabama's application for a stay rests on only this much: a single study not in the record that supposedly—but not actually—shows that the plaintiffs cannot comply with a requirement we have never adopted (and that stands in some tension with *Gingles*).

The question whether to accept Alabama's position demands serious and sustained consideration—the kind of consideration impossible to give "on a short fuse without benefit of full briefing and oral argument." *Does* v. *Mills*, 595 U. S. ___, ___ (2021) (slip op., at 1) (BARRETT, J., concurring in denial of application for injunctive relief). Alabama's challenge to the District Court's decision cannot succeed unless this Court adopts a novel legal rule. And more—a novel legal rule of potentially large consequence. See, *e.g.*, J. Chen & N. Stephanopoulos, The Race-Blind Future of Voting Rights, 130 Yale L. J. 862 (2021) (showing that one way of implementing Alabama's approach would yield, across the country, "substantially fewer districts where minority voters are able to elect their preferred candidates"). Substantial questions merit substantial thought. Here, the District Court carefully and correctly applied the now-existing law and concluded that Alabama has unlawfully diluted the voting power of Black Alabamians. See *ante,* at 1 (ROBERTS, C. J., dissenting) ("[T]he District Court properly applied existing law in an extensive opinion with no apparent errors for our correction"). This Court is wrong to stay that decision based on a hastily made and wholly unexplained prejudgment that it is ready to change the law.

### III

As to the equities, Alabama does not—because it cannot—contend that redrawing its map in advance of this year's elections would be impossible. The State's legislature enacted its current plan in less than a week. See App.

202. And the legislature has all the tools necessary to draw another, including "access to an experienced cartographer" and "not just one or two, but at least eleven illustrative remedial plans" complying with the District Court's injunction. *Id.*, at 214. For that matter, nothing about the court's injunction could have come as a surprise. The State has been on notice "since at least 2018" that these or similar plaintiffs (after receiving new census data) "would likely assert a Section Two challenge to any 2021 congressional redistricting plan that did not include two majority-Black districts or districts in which Black voters otherwise have an opportunity to elect a representative of their choice." *Id.*, at 202. And indeed, the legislature in this current election cycle considered at least one alternative map containing two majority-Black districts. *Ibid.*; see Joint Stipulated Facts in No. 2:21–cv–1530 (ND Ala.), ECF Doc. 53, p. 22, ¶¶113–114. Simply put, Alabama has known for quite some time that the VRA may require it to draw a different map; it has all it needs to do so; and it has shown just how quickly it can act when it wants to.

And Alabama cannot here invoke the so-called *Purcell* principle, which disfavors changing election rules at the eleventh hour. See *Purcell* v. *Gonzalez*, 549 U. S. 1, 4–5 (2006) (*per curiam*). Alabama contends that the District Court's order comes too late because changing the map now may confuse voters who are moved to new precincts, and may hurt "non-major-party candidates" who "have to scramble to obtain" new signatures. Application 39. But the District Court was right to say that "this case is not like *Purcell* because we are not 'just weeks before an election.'" App. 261 (quoting *Purcell*, 549 U. S., at 4). The general election is around nine months away; the primary date is in late May, about four months from now. See App. 261. Even the first day of absentee primary voting (which Alabama has leeway to modify) is March 30, more than two months after

KAGAN, J., dissenting

the court issued its order.  See *ibid.*  This Court has previously denied stays of districting orders issued at similar times.  See, *e.g.*, *Harris* v. *McCrory*, 159 F. Supp. 3d 600 (MDNC) (enjoining a State from using its enacted map in February of an election year, despite mid-March primary), stay denied, 577 U. S. 1129 (2016); *Personhuballah* v. *Alcorn*, 155 F. Supp. 3d 552 (ED Va.) (imposing a new remedial map in January of an election year, despite mid-June primary), stay denied, 577 U. S. 1125 (2016).  I see no reason to do otherwise here.  The plaintiffs "commenced their lawsuits within hours or days of the enactment" of Alabama's plan in November 2021.  App. 203.  And the District Court immediately expedited its proceedings; indeed, consistent with everything else the court did right, it moved with astonishing speed.  The only delay (of a few weeks) came "at the request" of the State.  *Ibid.*  Alabama is not entitled to keep violating Black Alabamians' voting rights just because the court's order came down in the first month of an election year.

\*     \*     \*

Today's decision is one more in a disconcertingly long line of cases in which this Court uses its shadow docket to signal or make changes in the law, without anything approaching full briefing and argument.  Here, the District Court applied established legal principles to an extensive evidentiary record.  Its reasoning was careful—indeed, exhaustive—and justified in every respect.  To reverse that decision requires upsetting the way Section 2 plaintiffs have for decades—and in line with our caselaw—proved vote-dilution claims.  That is a serious matter, which cannot properly occur without thorough consideration.  Yet today the Court skips that step, staying the District Court's order based on the untested and unexplained view that the law needs to change.  That decision does a disservice to our own appellate processes, which serve both to constrain and to

12                      MERRILL *v.* MILLIGAN

KAGAN, J., dissenting

legitimate the Court's authority.  It does a disservice to the
District Court, which meticulously applied this Court's
longstanding voting-rights precedent.  And most of all, it
does a disservice to Black Alabamians who under that prec-
edent have had their electoral power diminished—in viola-
tion of a law this Court once knew to buttress all of Ameri-
can democracy.