FILED

2022 Feb-16  AM 08:42
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 1

**No. __-___**

═══════════════════════════════════════════════

In the Supreme Court of the United States

────────────────────────────────────────────

JOHN H. MERRILL,
IN HIS OFFICIAL CAPACITY AS THE ALABAMA SECRETARY OF STATE, et al.
*Applicants*,

v.

EVAN MILLIGAN, et al.
*Respondents*.

────────────────────────────────────────────

**EMERGENCY APPLICATION FOR ADMINISTRATIVE STAY
AND STAY OR INJUNCTIVE RELIEF PENDING APPEAL
TO THE SUPREME COURT OF THE UNITED STATES**

────────────────────────────────────────────

Dorman Walker
BALCH & BINGHAM LLP
105 Tallapoosa Street, Ste. 200
P.O. Box 78 (36101)
Montgomery, AL 36104
(334) 269-3138
DWalker@Balch.com

Jeffrey M. Harris
Taylor A.R. Meehan
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
Jeff@ConsovoyMcCarthy.com

Steve Marshall
  *Attorney General*

Edmund G. LaCour Jr.
  *Counsel of Record*
A. Barrett Bowdre
Thomas A. Wilson
James W. Davis
Misty S. Fairbanks Messick
Brenton M. Smith
A. Reid Harris
Benjamin M. Seiss
OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, AL 36130-0152
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov

*Counsel for Applicants*

### PARTIES TO THE PROCEEDING AND RELATED PROCEEDINGS

Applicants are John H. Merrill, in his official capacity as Alabama Secretary of State, State Senator Jim McClendon, and State Representative Chris Pringle. Applicants were the defendants before the three-judge district court of the U.S. District Court for the Northern District of Alabama.

Respondents are Evan Milligan, Shalela Dowdy, Letetia Jackson, Khadidah Stone, Greater Birmingham Ministries, and the Alabama State Conference of the NAACP. Respondents were plaintiffs before the three-judge district court. Adia Winfrey was also a plaintiff before the three-judge court, but she voluntarily dismissed her case.

The proceedings below were:

1. *Evan Milligan, et al. v. John Merrill, et al.*, No. 2:21-cv-1530 (N.D. Ala.) – preliminary injunction entered January 24, 2022; stay denied January 27, 2022.

Related cases include:

1. *Marcus Caster, et al. v. John Merrill, et al.*, No. 2:21-cv-1536 (N.D. Ala.) – preliminary injunction entered January 24, 2022; stay denied January 27, 2022.

2. *Bobby Singleton, et al. v. John Merrill, et al.*, No. 2:21-cv-1291 (N.D. Ala.) – preliminary injunction requested as to Equal Protection Clause claim, which the district court declined to decide after granting the *Milligan* and *Caster* motions for preliminary injunction on January 24, 2022; preliminary injunction entered January 24, 2022; stay denied January 27, 2022.

## RULE 29.6 STATEMENT

Pursuant to Supreme Court Rule 29.6, Applicants each represent that they do not have any parent entities and do not issue stock.

Respectfully submitted,

Edmund G. LaCour Jr.
 *Counsel of Record*
OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov

*Counsel for Applicant John H. Merrill*

Dated: January 28, 2022

# TABLE OF CONTENTS

PARTIES TO THE PROCEEDING AND RELATED PROCEEDINGS......................i

RULE 29.6 STATEMENT .........................................................................ii

TABLE OF CONTENTS ........................................................... iii

TABLE OF AUTHORITIES .........................................................iv

OPINIONS BELOW ..................................................................4

JURISDICTION.........................................................................4

BACKGROUND AND PROCEDURAL HISTORY.......................................5

    A.  Alabama's 2021 Congressional Map..........................................5

    B.  Plaintiffs' Lawsuits ......................................................8

    C.  The District Court Enjoins Alabama's Congressional Districts.................. 10

    D.  The State's Appeal ................................................... 15

ARGUMENT ........................................................................ 15

    I.    This Court Is Likely To Note Probable Jurisdiction And Reverse The
        Three-Judge Court......................................................... 17

      A.  The court below badly misinterpreted *Gingles*'s first precondition
          beyond constitutional limits. .................................................. 18

      B.    The injunction also cannot be reconciled with the statutory text. ....... 28

      C.  Constitutional avoidance compels a stay pending appeal...................... 29

    II.    Irreparable Harm Will Result Absent This Court's Intervention. ........... 36

    III.  The Balance Of Harms And Public Interest Warrant A Stay. .................. 38

CONCLUSION........................................................................ 40

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Perez,*
  138 S. Ct. 2305 (2018) ........................................................................... 3, 4, 15, 25, 38

*Abrams v. Johnson,*
  521 U.S. 74 (1997) ...................................................................................... 33

*Barr v. Lee,*
  140 S. Ct. 2590 (2020) .................................................................................. 25

*Bartlett v. Strickland,*
  556 U.S. 1 (2009) ................................................................................... passim

*Benisek v. Lamone,*
  138 S. Ct. 1942 (2018) .................................................................................. 39

*Bethune-Hill v. Va. State Bd. of Elections,*
  137 S.Ct. 788 (2017) .................................................................................... 25

*Brnovich v. Democratic Nat'l Comm.,*
  141 S. Ct. 2321 (2021) ........................................................................ 27, 29, 35

*Bush v. Vera,*
  517 U.S. 952 (1996) ..................................................................................... 21

*Caster v. Merrill,*
  No. 2:21-cv-1536 .................................................................................... passim

*Cooper v. Harris,*
  137 S. Ct. 1455 (2017) ............................................................................. passim

*Davis v. Chiles,*
  139 F.3d 1414 (11th Cir. 1998) ....................................................................... 26

*Favors v. Cuomo,*
  881 F. Supp. 2d 356 (E.D.N.Y. 2012) ................................................................. 38

*Georgia v. Ashcroft,*
  539 U.S. 461 (2003) ............................................................................. 18

*Gill v. Whitford,*
  137 S. Ct. 2289 (2017) ........................................................................ 15

*Gonzalez v. City of Aurora,*
  535 F.3d 594 (7th Cir. 2008) ...................................................... 19, 22, 27

*Graves v. City of Montgomery,*
  807 F. Supp. 2d 1096 (M.D. Ala. 2011) ................................................ 37

*Growe v. Emison,*
  507 U.S. 25 (1993) ................................................................................. 4

*Holder v. Hall,*
  512 U.S. 874 (1994) .................................................... 18, 24, 287, 31

*Hollingsworth v. Perry,*
  558 U.S. 183 (2010) ............................................................................ 16

*Hunt v. Cromartie,*
  526 U.S. 541 (1999) .............................................................................. 2

*Husted v. Ohio State Conference of NAACP,*
  573 U.S. 988 (2014) ............................................................................ 39

*Johnson v. DeGrandy,*
  512 U.S. 997 (1994) ...................................................................... 22, 29

*Karcher v. Daggett,*
  455 U.S. 1303 (1982) .......................................................................... 16

*League of United Latin Amer. Citizens v. Perry ("LULAC"),*
  548 U.S. 399 (2006) .................................................................... passim

*Mac Govern v. Connolly,*
  637 F. Supp. 111 (D. Mass. 1986) ....................................................... 15

*McCulloch v. Maryland,*
    4 Wheat. 316 (1819) ................................................................................. 35

*Miller v. Johnson,*
    512 U.S. 1283 (1994) .................................................... 16, 21, 22, 30, 33

*Milligan v. Merrill,*
    No. 2:21-cv-1530 (N.D. Ala.)................................................................ passim

*Perry v. Perez,*
    565 U.S. 388 (2012) ............................................................................. passim

*Rostker v. Goldberg,*
    448 U.S. 1306 (1980) ................................................................................. 16

*Rucho v. Common Cause,*
    139 S. Ct. 2484 (2019) ......................................................................... 27, 36

*Shaw v. Hunt ("Shaw II"),*
    517 U.S. 899 (1996) ................................................... 22, 23, 30, 32, 34

*Shaw v. Reno ("Shaw I"),*
    509 U.S. 630 (1993) ............................................................................. passim

*Singleton v. Merrill,*
    No. 2:21-cv-1291 (N.D. Ala.)................................................................ passim

*Thompson v. DeWine,*
    959 F.3d 804 (6th Cir. 2020) ................................................................... 39

*Thornburg v. Gingles,*
    478 U.S. 30 (1986) ............................................................................... passim

*U.S. Alkali Export Ass'n v. United States,*
    325 U.S. 196 (1945) ................................................................................. 16

*United States v. Georgia,*
    546 U.S. 151 (2006) ................................................................................. 35

*Wesch v. Hunt,*
    785 F. Supp. 1491 (S.D. Ala. 1992) ...................................................... 6, 32

*Whitcomb v. Chavis,*
    396 U.S. 1055 (1970) ............................................................................... 16

*Winter v. NRDC,*
    555 U.S. 7 (2008) .................................................................................... 15

*Wise v. Lipscomb,*
    437 U.S. 535 (1978) .............................................................................. 2, 37

## Statutes

28 U.S.C. §1651 ......................................................................................... 4, 5

28 U.S.C. §1651(a), ...................................................................................... 16

28 U.S.C. §1253 .................................................................................. 4, 15, 16

28 U.S.C. §2284 ............................................................................................ 4, 8

52 U.S.C. §10301 ................................................................................... passim

52 U.S.C. §10301(a) .................................................................................... 18

52 U.S.C. §10301(b) ............................................................................. passim

52 U.S.C. §20302(a)(8) ................................................................................ 37

Ala. Code §17-6-22 ...................................................................................... 39

Ala. Code §17-9-3(a) .................................................................................... 39

## Constitutional Provisions

U.S. Const. amend. XV, §§1-2 .................................................................... 35

**Other Authorities**

Duchin & Spencer, *Models, Race, and the Law*,
130 Yale L. J. Forum 744 (2021).................................................................. 10

To the Honorable Clarence Thomas, Associate Justice of the Supreme Court of the United States and Circuit Justice for the Eleventh Circuit:

After receiving the 2020 Census data, the State of Alabama enacted a new congressional district plan. Guided by race-neutral redistricting principles, the State's congressional plan mirrors district lines of past plans, making slight adjustments to accommodate population changes. App.219-21. Days ago, a three-judge district court enjoined Alabama from using the new congressional plan in forthcoming elections. App.5. Why? Because Alabama didn't "prioritize[] race" over traditional race-neutral redistricting principles. App.204. According to the three-judge court, Alabama should have first sorted its voters on the basis of race, starting with a "non-negotiable" racial target of adding another majority-black district. App.205.

The three-judge court has barred Alabama from using its lawfully enacted congressional redistricting plan on the theory that Alabama violated Section 2 of the Voting Rights Act. 52 U.S.C. §10301. The State's plan contains one majority-black district, as it has for decades; the court below concluded that the VRA requires two. The preliminary injunction of a State's electoral districts at this eleventh hour is by itself extraordinary. But all the more extraordinary is the legal error that pervades the injunction here. The court-ordered redraw marks a radical change from decades of Alabama's congressional plans. It will result in a map that can be drawn *only* by placing race first above race-neutral districting criteria, sorting and splitting voters across the State on the basis of race alone.

Well-established in the court below, no race-neutral map drawer would draw that map. In a sample of more than two million race-neutral maps generated *by*

1

*Plaintiffs' own experts*, not even one contained two majority-black districts. There is no better evidence that the first precondition for a vote dilution claim has not been met here. *See Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986). A second majority-black district that can be drawn only by initially subverting race-neutral redistricting criteria to a "non-negotiable" racial target is not a "reasonably configured" district. *Cooper v. Harris*, 137 S. Ct. 1455, 1470 (2017). Accordingly, no invocation of the VRA can justify, much less require, the race-based redraw of Alabama's race-neutral map.

The injunction leaves the State with no choice at all. The State can replace its lawfully enacted congressional district plan with a racial gerrymander and suffer the consequences of follow-on litigation. *See Wise v. Lipscomb*, 437 U.S. 535, 540 (1978) (op. of White, J.) (noting a "new legislative plan," in response to redistricting litigation would "be the governing law," thereby mooting a suit, "unless it, too, is challenged and found to violate the Constitution"); *see, e.g.*, *Hunt v. Cromartie*, 526 U.S. 541, 544-45 (1999). Or the State can cede its redistricting power to the district court, which will hire a third party to redraw districts that segregate Alabamians in Mobile and elsewhere by race. App.213. Either way, without a stay, the State's forthcoming congressional elections will be run on district lines that never could have been drawn by the Legislature but for sorting Alabamians on the basis of race alone. The United States Constitution cannot tolerate such a perversion of the VRA.

The court's order is contrary to the promise of the Equal Protection Clause. The injunction is premised on the noxious idea that redistricting begins and ends with racial considerations. The race-based sorting of a State's voters that the

injunction will require "reinforces the perception that members of the same racial group—regardless of their age, education, economic status, or the community in which they live—think alike, share the same political interests, and will prefer the same candidates at the polls." *Shaw v. Reno* ("*Shaw I*"), 509 U.S. 630, 647 (1993). And it sends an "equally pernicious" message to elected representatives in those districts: "their primary obligation is to represent only the members of that [racial] group, rather than their constituency as a whole." *Id.* at 648. If this is what the VRA requires of single-member districts, then the VRA is unconstitutional as applied here.

An immediate stay pending appeal is warranted. Alabama respectfully requests an administrative stay while the Court considers its stay application, a ruling on its application for a stay pending appeal as soon as practicable, as well as expedited consideration of its ultimate appeal. *See, e.g.*, *Abbott v. Perez*, 138 S. Ct. 2305, 2319, 2322 (2018); *Perry v. Perez*, 565 U.S. 388, 392 (2012).[1] The State's pre-election deadlines are here, absentee voting for the congressional primaries is set to begin in little more than two months, with in-person primaries to follow on May 24, and any eleventh-hour change to a State's existing districts would require reassignment of hundreds of thousands of voters to new districts. But this particular eleventh-hour change is constitutionally intolerable: beyond the massive disruption in Alabama's forthcoming elections, Alabamians will suffer the constitutional harm of being

---

[1] To further expedite the proceedings, after granting a stay or an injunction, the Court should convert this application into a jurisdictional statement, note probable jurisdiction, and vacate the district court's injunction. *See, e.g.*, *Abbott*, 138 S. Ct. 2305; *Perry*, 565 U.S. 1090.

assigned to racially segregated districts, irreconcilable with the Fourteenth Amendment, the Fifteenth Amendment, and the VRA as initially conceived.

## OPINIONS BELOW

Applicants seek a stay or injunction pending appeal of the three-judge district court's preliminary injunction, entered on January 24, 2022. The district court's opinion and order are reproduced at App.1-225. The three-judge court's denial of a stay pending appeal is reproduced at App.234-67.

## JURISDICTION

This Court has jurisdiction over this application for a stay pending appeal under 28 U.S.C. §1253 and §1651. This Court has exclusive jurisdiction to hear the State's appeal of the three-judge court's preliminary injunction of Alabama's congressional districts. 28 U.S.C. §1253 (Court has jurisdiction over injunctions issued as part of "civil action, suit or proceeding required by any Act of Congress to be heard and determined by a district court of three judges"); *see Abbott*, 138 S. Ct. at 2319-21; *see, e.g.*, *Perry*, 565 U.S. 388 ; *Growe v. Emison*, 507 U.S. 25 (1993).[2] The preliminary injunction is the product of Plaintiffs' constitutional and VRA challenges to Alabama's congressional districts. A three-judge court was empaneled to hear that challenge, 28 U.S.C. §2284, and has now barred Alabama from using its congressional districts in forthcoming elections. App.5. The injunction is indisputably issued as part of Plaintiffs' "civil action" requiring "a district court of three judges." 28 U.S.C. §1253.

---

[2] Three-judge courts in redistricting cases often adjudicate both constitutional claims and VRA claims, and have jurisdiction to decide all such claims in the challenge to the congressional or legislative districts. *See, e.g.*, *League of United Latin Amer. Citizens v. Perry* ("*LULAC*"), 548 U.S. 399 (2006).

And a stay of that preliminary injunction would be in aid of this Court's jurisdiction over the State's direct appeal. *See, e.g.*, *Perry*, 565 U.S. at 392; *see also* 28 U.S.C. §1651.

## BACKGROUND AND PROCEDURAL HISTORY

### A. Alabama's 2021 Congressional Map

For nearly 50 years, Alabama's congressional districts have remained remarkably similar. Following the 1970 census, Alabama dropped from eight congressional districts to seven. Ever since, District 1 has included the Gulf Coast counties; District 2, the Wiregrass and all or parts of Montgomery; District 3, the eastern-central parts of the State; District 4, the rural northwestern counties and the Sand Mountain area; District 5, the northernmost Tennessee Valley area; District 6, much of Jefferson County; and District 7, the western Black Belt[3] counties and parts of Tuscaloosa or Jefferson Counties. *Singleton v. Merrill*, No. 2:21-cv-1291, ECF57-7 at 37-43.

---

[3] "Black Belt" refers to a geographic region spanning across central Alabama that "is named for the region's fertile black soil." App.36. While there are different definitions, the parties to this case stipulated that the Black Belt includes eighteen "core" counties. App.37.

5

As part of redistricting litigation in the 1990s, a three-judge court ordered a congressional plan containing a majority-black District 7. *See Wesch v. Hunt*, 785 F. Supp. 1491 (S.D. Ala. 1992). In selecting between plans submitted to it, the court picked what became the 1992 plan in part because it "maintain[ed] the cores of existing Districts 1 and 2," and thus "better preserv[ed] the communities of interests in those two districts." *Id.* at 1495-97. An illustration of the 1992 Map is reproduced here. *See id.* at 1582; *Singleton v. Merrill*, No. 2:21-cv-1291, ECF57-7 at 40.



After the 2000 and 2010 redistricting cycles, congressional districts remained largely the same. Neither the 2001 nor 2011 Maps were ever declared unlawful by a court and both were precleared by the Department of Justice. They are reproduced here. *See Singleton v. Merrill*, No. 2:21-cv-1291, ECF 15 at 9, 28.



Following the 2020 census, Alabama retained its seven congressional districts. Because Alabama's population shifted and grew, the Legislature had to reapportion Alabama's existing congressional map. *See Caster v. Merrill*, No. 2:21-cv-1536, ECF 75 at 6, Fig. 1. District 7 in particular fell far below the ideal population, requiring the addition of more than 50,000 people. *Id.*, ECF 76-2 at 12-13 (population figures). As the Legislature added or subtracted people to and from districts to equalize their populations, it eliminated county splits in Cherokee, Clarke, and Montgomery Counties and made District 7 more compact. The Legislature did all this without considering race. *See* App.32; *see also Milligan v. Merrill*, No. 2:21-cv-1530, ECF 76-2 at 52 (comparing 2011 and 2021 Plans) & ECF 89-2 at 28; *Caster v. Merrill*, No. 2:21-cv-1536,



ECF80-19 at 25-26. The resulting map is reproduced above. *See* App.33.

In short, the 2021 Legislature followed "common practice" by "start[ing] with the plan used in the prior map and … chang[ing] the boundaries of the prior districts only as needed to comply with the one-person, one-vote mandate and to achieve other desired ends." *Cooper*, 137 S. Ct. at 1492 (Alito, J., concurring in part). Doing so "honor[ed] settled expectations and, [because] the prior plan survived legal challenge, minimize[d] the risk that the new plan w[ould] be overturned." *Id.*

**B. Plaintiffs' Lawsuits**

Three groups of Plaintiffs filed three lawsuits challenging Alabama's 2021 congressional redistricting plan. Each sought a preliminary injunction barring Alabama from using its enacted congressional districts in the forthcoming elections. The *Singleton* suit raised Equal Protection Clause claims. *Singleton v. Merrill*, No. 2:21-cv-1291 (N.D. Ala.), ECF 15. The *Milligan* suit—the subject of this stay motion and direct appeal—raised Equal Protection and VRA claims. *Milligan v. Merrill*, No. 2:21-cv-1530 (N.D. Ala.), ECF 1. The *Caster* suit raised only a VRA claim. *Caster v. Milligan*, No. 2:21-cv-1536 (N.D. Ala.), ECF 101. A three-judge court was convened for the *Singleton* and *Milligan* suits. *See* 28 U.S.C. §2284(a). The *Caster* suit remained pending before a single judge (who is a member of the three-judge court), but was combined with the other two cases for purposes of the preliminary injunction briefing, evidence, hearing, and resulting injunction. App.15-16.[4]

With respect to the VRA claims, the *Milligan* and *Caster* Plaintiffs presented materially the same theory—that Section 2 required Alabama's congressional districts to go from one majority-black district (existing District 7) to two (existing

---

[4] The State is simultaneously seeking a stay pending appeal in *Caster*. This case and *Caster* involve the same facts, the same legal claims, and the same congressional redistricting plan. The same three judges presided over the 7-day hearing and considered evidence from all Plaintiffs for any of the three cases. App.15-16. The one judge assigned to *Caster* then issued the same preliminary injunction order and opinion that was issued in *Milligan*.

The State has moved for a stay pending appeal in the Eleventh Circuit in *Caster*. No. 22-10272. But given that this case and the *Caster* litigation are inextricably intertwined, involving the same congressional map and the same VRA theory, the State intends to file in this Court an application for a stay pending appeal and petition for certiorari before judgment in *Caster* so that the matters can be decided together.

District 7 and a completely redrawn District 2). Plaintiffs proposed various demonstration plans, but each added the second majority-black district in the same way: stretching both Districts 1 and 2 across the width of the State, segregating white Alabamians in District 1 and black Alabamians in District 2. Where historically those of all races in the Mobile area were grouped together in a single district, unified by the unique industry and culture of Alabama's third-largest city, Mobile's black residents would instead be joined with black Alabamians in locations more than 250 miles away. *See* App.60, 164 (describing the "split" in "Mobile County in every illustrative plan"). The resulting black voting-age population of the Plaintiffs' proposed redrawn District 2 would barely exceed 50%. *See* App.85-86; *Milligan v. Merrill*, No. 2:21-cv-1530, ECF 88-3 at 10; *Caster v. Merrill*, No. 2:21-cv-1536, ECF 75 at 23-34, ECF 75-5 at 161.

Throughout the proceedings below, one undisputed fact stood out. Millions of illustrative maps generated by Plaintiffs' own experts—using algorithms programmed *not* to consider race—*never* resulted in a plan with two majority-black districts. One expert generated 10,000 maps without any consideration of race; not a single map included two majority-black districts.[5] *See* App.215-16; App.279-80 (Tr. 268:23-269:6); *Milligan v. Merrill*, No. 2:21-cv-1530, ECF 88-1 at 10 (Imai expert

---

[5] The expert confirmed that his algorithm did not account for the Legislature's policy of retaining the cores of existing districts. App.277 (Tr.230:3-14). Meaning, even if a map drawer were to draw Alabama's congressional districts on a blank slate, without considering race *or* Alabama's existing district lines, the map drawer would not draw two majority-black districts given Alabama's demography.

report).[6] Another Plaintiffs' expert testified that she created two million congressional plans for Alabama, also with a computer algorithm programmed not to "tak[e] race into account in any way."[7] What did she find? Not one of the millions of maps in her race-neutral algorithm contained two majority-black districts. App.346 (Tr. 682:11-12) (finding "some [maps] with one majority-black district, but never found a second … majority-black district in 2 million attempts").

Knowing they could not draw a second majority-black district using race-neutral traditional districting principles, Plaintiffs' experts "prioritized" race first in the creation of their demonstration plans, such that other redistricting criteria had to "yield." App.205. The *Milligan* Plaintiffs' expert, for example, programmed "two majority-black districts" and "population balance" as her "nonnegotiable principles" in her creation of demonstration plans; only "after that" did she follow things like "contiguity" and "compactness." App.312 (Tr. 577:16-20). That is, in every plan she proposed, she necessarily had to first subordinate race-neutral districting principles to the "nonnegotiable principle[]" of hitting her racial targets of two majority-black districts. App.214.

## C. The District Court Enjoins Alabama's Congressional Districts.

Days ago, the district court granted a preliminary injunction that bars Alabama from conducting any congressional elections using the 2021 Plan. App.5. The

---

[6] "Tr." refers to the hearing transcript. Full transcripts are available in *Milligan v. Merrill*, No. 2:21-cv-1530, ECF 105. Cited excerpts are included in the appendix.

[7] App.346 (Tr. 682); *see also* Duchin & Spencer, *Models, Race, and the Law*, 130 Yale L. J. Forum 744 (2021).

Court also delayed Alabama's candidate qualification deadline by two weeks (moving it to February 11, 2022), and ordered Secretary of State Merrill to advise the political parties about the delayed deadline. App.5-6. Finally, the Court granted the Legislature fourteen days to enact a remedial plan containing two majority-black districts "or something quite close to it"; failing that, the court would enlist a third party to draw such a remedial plan at Defendants' expense. App.6, 213-14, 416-45.

The Court held that Plaintiffs sufficiently demonstrated that two majority-black districts could be drawn, albeit by "prioritiz[ing] race," and so they must be drawn. App.205 (describing Plaintiffs' "compliance" with two-majority-black district "criterion" first, followed by traditional criteria after). The court reasoned it was sufficient that the two majority-black districts proposed by Plaintiffs were "reasonably compact," based on "the testimony of eminently qualified experts in redistricting, and the relative compactness of the districts in the remedial plans compared to that of the districts in the [State's existing] Plan." App.157. The analysis included "'eyeballing'" the Plaintiffs' proposed plans. App.160. The court acknowledged that 400,000 black individuals reside in Alabama's largest cities (Birmingham, Huntsville, Montgomery, and Mobile), and that the remaining 300,000 black individuals were spread across the State's Black Belt—covering 18 counties and stretching across the entire state. App.161 But rather than map the number of individuals living in these locations, the court relied on a "visual assessment" of the proportion of black voters in each of these locations, created by one of Plaintiffs' experts:



Figure 3: Black voting-age population share is shown by shading at the precinct level. The major cities have visible concentrations of Black population, and the Black Belt rural counties are clearly visible running East-West across the state.

App.160-61. But mapping the *proportion* of black voters instead of the actual *number* of black voters creates the illusion that the black population across the Black Belt numerically exceeds the black population in Alabama's cities. In fact, the actual number of voters in the geographically smaller shaded regions of Huntsville, Birmingham, Montgomery, and Mobile well exceed the actual number of voters dispersed across the Black Belt. App.161. And it is that *number* of voters that is relevant, not necessarily the proportion, because an equally apportioned *number* of voters must be placed into each district. By mistakenly focusing on the proportion of black voting-age population rather than the actual number of black individuals, the court concluded that "[j]ust by looking at the population map, we can see why [Plaintiffs' experts] expected that they could easily draw two reasonably configured majority-Black districts." App.161.

The court went on to conclude that *Gingles*'s second and third preconditions were met, as well as the totality of the circumstances. App.174-96; *see Cooper*, 137 S. Ct. at 1470 (requiring "politically cohesive" minority group and a "white majority [that] must vote sufficiently as a bloc to usually defeat the minority's preferred candidate"). With respect to proportionality, the court acknowledged that the VRA disclaims that the number of majority-black districts must match the proportion of black voters. See 52 U.S.C. § 10301(b). But the court nevertheless concluded that the share of majority-black districts (14% of the congressional delegation, compared to Alabama's 27% of black voters) "weighs decidedly in favor of the plaintiffs." App.195.

The court rejected the State's arguments that the Plaintiffs' (and now the court's) conception of the VRA would raise serious constitutional questions because it prioritized race to dramatically overhaul the State's longstanding district geography on account of race. The court described Plaintiffs' experts as "prioritiz[ing] race only for the purpose of determining and to the extent necessary to determine whether it was possible … to state a Section Two claim. As soon as they determined the answer to that question"—meaning, after they hit a "'non-negotiable'" racial target of drawing two black-majority districts—"they assigned greater weight to other traditional redistricting criteria." App.205. The court forgave Plaintiffs' experts for making race a "'non-negotiable'" redistricting constraint because they did not try to "maximize" the number of majority-black districts or the BVAP of any one district. *Id*. They just had other race-neutral considerations "yield" "as necessary" to hit their race-based target of two majority-black districts. App.204-05.

13

Finally, the court declined to rule on the *Singleton* and *Milligan* Plaintiffs' Equal Protection Clause claims. App.214-17. Invoking the canon of constitutional avoidance, the court stated that "in light of our decision to issue a preliminary injunction on statutory grounds, and because Alabama's upcoming congressional elections will not occur on the basis of the map that is allegedly unconstitutional, we decline to decide the constitutional claims asserted by the Singleton and Milligan plaintiffs at this time." App.216.

Yesterday, the district court denied the State's motion for a stay of the preliminary injunction pending appeal. App.234-67. The court repeated that Plaintiffs' experts considered race just enough (but not too much), and that race-neutral redistricting criteria will have "to yield" to race sometimes (but not always). App.250, 252. With respect to *Gingles* I, the court emphasized various "fact-finding[s]" regarding "numerosity," "geographical compactness," "reasonable compactness that considers more than mere geography," and credibility. App.238-40. But not once did the court address the question of law that looms large in these redistricting cases: whether a plaintiff necessarily fails *Gingles* I when a majority-minority district would have never been drawn but for prioritizing race. Instead, the court quibbled with whether Plaintiffs agreed that two majority-black districts could not be neutrally drawn in Alabama. App.240-41. That was strange, given that the genesis of this undisputed fact was Plaintiffs' own evidence and testimony. In Plaintiffs' own words, based on more than two million race-neutral maps created by Plaintiffs' own experts, "it is hard to draw two majority-black districts by accident" in Alabama. App.349 (Tr. 685:23-25); *see also*

14

App.346 (Tr. 682:11-12) (Plaintiffs' expert "found some [maps] with one majority-black district, but *never* found a second … majority-black district *in 2 million attempts*" (emphasis added)). And the court earlier agreed that other redistricting criteria must "yield" to race to draw to black-majority districts. App.205. In short, the court's refusal to stay its injunction repeats the same errors that led to the preliminary injunction in the first place.

### D. The State's Appeal

The State immediately filed notices of appeal. The State now submits this application for a stay pending appeal, which this Court could also construe as a jurisdictional statement, note probable jurisdiction, and expedite the appeal. 28 U.S.C. §1253; *see Perry*, 565 U.S. 1090. In *Caster*, the State moved for a stay pending appeal from the Eleventh Circuit, and the Eleventh Circuit is holding the motion in abeyance pending this Court's resolution of the stay application in *Milligan*. *See* Order, No. 22-10272 (11th Cir. Jan. 28, 2022).

## ARGUMENT

The three-judge court's preliminary injunction is an "extraordinary remedy." *Winter v. NRDC*, 555 U.S. 7, 24 (2008); *see Mac Govern v. Connolly*, 637 F. Supp. 111, 116 (D. Mass. 1986) ("When the massive disruption to the political process of the [State] is weighed against the harm to plaintiffs of suffering through one more election based on an allegedly invalid districting scheme, equity requires that [this Court] deny relief."). As one of Plaintiff's counsel put it in the court below, the three-judge court's injunction and forthcoming overhaul of Alabama's congressional districts will

15

be "the benchmark for redrawing congressional districts probably for several more decades." App.404 (Tr. 1903:5-12).

In such circumstances, a stay pending appeal is warranted. *See, e.g.*, *Abbott*, 138 S. Ct. at 2319; *Gill v. Whitford*, 137 S. Ct. 2289 (2017); *Perry*, 565 U.S. 1090; *Miller v. Johnson*, 512 U.S. 1283 (1994); *Karcher v. Daggett*, 455 U.S. 1303 (1982) (Brennan, J., in chambers); *Whitcomb v. Chavis*, 396 U.S. 1055 (1970). A stay is appropriate when there is (1) "a 'reasonable probability' that four Justices will consider the issue sufficiently meritorious to grant certiorari or to note probable jurisdiction;" (2) "a fair prospect that a majority of the Court will conclude that the decision below was erroneous;" and (3) "a demonstration that irreparable harm is likely to result from the denial of a stay." *Rostker v. Goldberg*, 448 U.S. 1306, 1308 (1980) (Brennan, J., in chambers); *see Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010) (per curiam).

This Court may also grant injunctive or mandamus relief as necessary to preserve its appellate jurisdiction under the All Writs Act. 28 U.S.C. §1651(a); *see, e.g.*, *U.S. Alkali Export Ass'n v. United States*, 325 U.S. 196, 201-02 (1945). Because this case falls within the Court's mandatory appellate jurisdiction, 28 U.S.C. §1253, injunctive or mandamus relief pending appeal would be "in aid of [this Court's] jurisdiction," and "cannot be obtained in any other form or from any other court." Sup. Ct. R. 20.1.

This case features the exceptional circumstances making an immediate stay appropriate. Absent an order from this Court stopping the district court from imposing a racial gerrymander on Alabama for the forthcoming elections, the State and its

16

millions of citizens will suffer irreparable injury and the Court will effectively lose its appellate jurisdiction. If this Court does not intervene, districts will be redrawn, splitting and segregating Alabamians, for the upcoming primaries. Once the machinery of those elections begins and the first absentee ballots are cast in March, with hundreds of thousands of voters having been sorted into new race-based districts, the harm is done and cannot be unwound.

I.   **This Court Is Likely To Note Probable Jurisdiction And Reverse The Three-Judge Court.**

There is a more than reasonable probability that this Court will note probable jurisdiction and reverse the three-judge court given the serious constitutional concerns raised by its order. The court's interpretation of the VRA cannot possibly be constitutional, as the court ordered the Legislature to draw race-based districts that never could have been drawn without "prioritiz[ing] race." App.204.[8] The court's misconception of the *Gingles* preconditions and what suffices for the "totality of circumstances," 52 U.S.C. §10301(b), is contrary to this Court's precedent. More

_____

[8] At least four separate times, the court's opinion states that Plaintiffs' experts prioritized race in some way: "She was candid that she *prioritized* race only to the extent necessary to answer the essential question asked of her as a *Gingles* I expert … and clearly explained, with concrete examples, that she did not *prioritize* it to any greater extent." App.149 (emphasis added). "He was candid that he *prioritized* race only to the extent necessary to answer the essential question asked of him as a *Gingles* I expert … and clearly explained that he did not *prioritize* it to any greater extent." App.151 (emphasis added). "They explained that they *prioritized* race only as necessary to answer the essential question asked of them as a *Gingles* I experts." App.204 (emphasis added). And most damning: Plaintiffs' experts testified "that they *prioritized* race only for the purpose of determining and to the extent necessary to determine whether it was possible … to state a Section Two claim. As soon as they determined the answer to that question"—by prioritizing race—only then did they "assign[] greater weight to other traditional redistricting criteria." App.204-05 (emphasis added).

fundamentally, constitutional avoidance commands that the district court's further distortion of Section 2's "effects test" be reversed, lest the VRA be unconstitutional as applied to single-member districts.

### A.  The court below badly misinterpreted *Gingles*'s first precondition beyond constitutional limits.

Section 2 of the VRA states that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State … in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color …." 52 U.S.C. §10301(a). To prove a violation, one must show that "political processes leading to nomination or election in the State or political subdivision are not equally open to participation," meaning individuals "have less opportunity" than others "to participate in the political process and to elect representatives of their choice." *Id*. §10301(b). "The purpose of the Voting Rights Act is to prevent discrimination in the exercise of the electoral franchise and to foster our transformation to a society that is no longer fixated on race." *Georgia v. Ashcroft*, 539 U.S. 461, 490 (2003).

This Court has since applied the VRA to the drawing of single-member districts. *See Cooper*, 137 S. Ct. at 1464 (noting that the "Court has long assumed that one compelling interest" to excuse race-based districting "is complying with operative provisions of the Voting Rights Act"); *see also Holder v. Hall*, 512 U.S. 874, 893 (1994) (Thomas, J., concurring in judgment) ("[W]e have converted the Act into a device for regulating, rationing, and apportioning political power among racial and ethnic groups."). To establish a Section 2 violation in such circumstances, three

preconditions must be met: (1) "a 'minority group' must be 'sufficiently large and geographically compact to constitute a majority' in some reasonably configured legislative district," (2) "the minority group must be 'politically cohesive,'" and (3) "a district's white majority must 'vote[] sufficiently as a bloc' to usually 'defeat the minority's preferred candidate.'" *Cooper*, 137 S. Ct. at 1470 (quoting *Gingles*, 478 U.S. at 50-51). This dispute largely centers on the first of these preconditions.

1. The district court's injunction is premised on a fundamental legal error about how a Section 2 plaintiff can establish that "a 'minority group' is 'sufficiently large and geographically compact to constitute a majority' in some reasonably configured legislative district." *Id*. The three-judge court believed that Plaintiffs satisfied *Gingles* I even in the face of Plaintiffs' own evidence showing that an Alabama map drawer would not draw two majority-minority districts using only race-neutral criteria. *Supra*, pp. 9-10, 14-15.[9] The map drawer would have to "prioritize[]" race and draw race-based districts "on purpose." App.205; App.349 (Tr. 685:24-25). There is no better indication that Plaintiffs' Section 2 claim fails at the first step as a matter of law. *See Cooper*, 137 S. Ct. at 1470 (requiring the possibility of "reasonably configured" majority-minority districts); *see, e.g.*, *Gonzalez v. City of Aurora*, 535 F.3d 594, 598 (7th Cir. 2008) (Easterbrook, C.J.) ("So what benchmarks [for Section 2 dilution]

---

[9] *See, e.g.*, App.279 (Tr. 268:23-269:6) ("noting that "[n]one" of the "30,000 simulated plans included two" majority-black districts "because [he] didn't tell the algorithm to create a second"); App.349 (Tr. 685:23-25) (Plaintiffs' expert's testimony that "it is hard to draw two majority-black districts by accident" in Alabama); App.346 (Tr. 682:11-12) (discussing Plaintiffs' expert's two million computer-generated race-neutral maps, where she "*never* found a second … majority-black district in 2 million attempts" (emphasis added)).

are possible? One would be the outcome of a race-neutral process in which all districts are compact."). A minority population is definitionally not sufficiently numerous and compact for purposes of *Gingles*'s first precondition if a race-neutral map drawer, considering only race-neutral traditional redistricting criteria, would never draw two majority-minority districts.

Worse still, the court below believed that the VRA not only allowed but *required* this prioritization of race. App.204-05 (discussing how experts "prioritized race only for the purpose of determining and to the extent necessary to determine whether it was possible … to state a Section 2 claim"); *see also* App.254 (rejecting argument that Section 2 plaintiff must use "only race-neutral districting principles" to meet *Gingles* I). The court reasoned that because *Gingles*'s first precondition requires Plaintiffs to propose plans with districts exceeding 50 percent BVAP, a Section 2 plaintiff must necessarily prioritize race first and consider other race-neutral factors second. App.204-05 (describing Plaintiffs' experts' testimony "that they *prioritized* race only for the purpose of determining and to the extent necessary to determine whether it was possible … to state a Section Two claim" and "as soon as they determined the answer to that question"—by prioritizing race—"they assigned greater weight to other traditional redistricting criteria").[10] By the district court's lights,

---

[10] The district court's 50-percent rationale is also oversimplified. In *Bartlett v. Strickland*, 556 U.S. 1 (2009), the plurality opinion held that race-based redistricting could *not* be justified under the VRA if a legislature's aim was only to draw "crossover" districts, where the minority population did not exceed a majority, versus a majority-minority district. *Id.* at 13-15. By implication, one cannot state a claim for vote dilution under the VRA if voters would not otherwise make up 50% or more of the black voting-age population in a "reasonably configured" district. *Id.* at 18; *Cooper*, 137 S.

Section 2 plaintiffs must therefore *assume* they are entitled to the relief they seek and then reverse engineer that remedial district, no matter how racially segregated. That reasoning is exactly backwards. It would render *Gingles* first precondition no precondition at all.

This Court's precedents—and the Constitution—make clear that a Section 2 plaintiff alleging vote dilution must *first* prioritize traditional redistricting criteria. Only then may the plaintiff assess whether the employment of traditional redistricting criteria has resulted in "reasonably configured" majority-minority districts that the State failed to create. *See Cooper*, 137 S. Ct. at 1470; *see, e.g.*, *LULAC v. Perry*, 548 U.S. at 399, 433-34 (2006) (discussing use of traditional redistricting criteria in satisfying *Gingles* I, lest courts "fail[] to account for the differences between people of the same race"); *Abrams v. Johnson*, 521 U.S. 74, 91-92 (1997); *Miller*, 515 U.S. at 919 (warning that traditional principles cannot be "subordinated to racial objectives"); *Bush v. Vera*, 517 U.S. 952, 977 (1996) (plurality op.) (Section 2 inquiry should account for "traditional districting principles such as maintaining communities of interest and traditional boundaries").

Injecting race as one of those traditional redistricting principles at step one is circular and senseless. It assumes from the start what Plaintiffs are ultimately trying to prove. A plaintiff cannot "prioritize[] race" at step one, and then, work backwards,

---

Ct. at 1470. But this Court has never suggested that one can "prioritize[]" race in drawing a proposed district to hit that 50% target. App.204. That would not only be circular; it would be inconsistent with the constitutional restraints on legislatures nationwide. As the Court explained in *Cooper*, it is unconstitutional for a legislature to set that same race-based target. 137 S.Ct. at 1469.

draw illustrative districts with that "non-negotiable" constraint (by "eyeballing" no less). App.160, 205. That approach unavoidably prioritizes race-based considerations above race-neutral redistricting criteria, thereby raising serious constitutional questions. *Miller*, 515 U.S. at 916; *Shaw v. Hunt*, 517 U.S. 899, 907 (1996) ("*Shaw II*") (racial gerrymander where "[r]ace was the criterion that … could not be compromised").[11]

The decision below fundamentally errs in this regard. The court accepted Plaintiffs' invitation to *start* the *Gingles* analysis by "prioritiz[ing]" race. App.204-05. That is, the court started the *Gingles* analysis by presuming the answer to the ultimate question. The court doubled down when it denied the State's stay motion, specifically rejecting that a plaintiff must "set about drawing illustrative remedial plans using only race-neutral districting principles and hope to happen upon a plan that includes an additional majority-minority district." App.254; *but see Gonzalez*, 535 F.3d at 600 (Easterbrook, C.J.) (asking whether Latino population was "concentrated in a way that *neutrally drawn* compact districts would produce three" VRA districts (emphasis added)).

---

[11] The court's error is little different than claims that majority-minority districts must be maximized in a redistricting plan, claims that this Court rejected in *Johnson v. DeGrandy*, 512 U.S. 997, 1016 (1994), and *Miller*, 515 U.S. at 923. In both cases, this Court rejected the notion that a VRA violation can be proved by the failure to maximize districts. *Id.* So too here—starting from the premise that two districts must be drawn, prioritizing that two-district racial target above race-neutral criteria raises the same constitutional problems. It transforms the VRA from a statute meant to stamp out race discrimination to a statute that requires it.

That error would be bad in any case. But it is especially serious here where the prioritization of race at the start made all the difference. No race-neutral map drawing would result in two black-majority districts. In Plaintiffs' expert's own words, "it is hard to draw two majority-black districts by accident" in Alabama. App.349 (Tr. 685:23-25). For this reason, Plaintiffs had to start by making two black-majority districts "non-negotiable," no matter what race-neutral criteria had to "yield" to draw them. App.205. Everything else was secondary. *See* App.204-05; App.57 (programming "two majority-black districts" as "nonnegotiable," and only "after that" following principles like "contiguity" and "compactness").[12] Simply put, Plaintiffs *first* prioritized a racial target (drawing two majority-minority districts) and then backfilled their case with various arguments about how those illustrative plans were sufficiently consistent with race-neutral traditional redistricting criteria, even though such plans would not have resulted but for the prioritization of race first and other criteria second. Plaintiffs' reverse order of operations rendered their maps

---

[12] Specifically, the court endorsed the *Milligan* Plaintiffs' expert's approach that "took the creation of two majority-Black districts, which she was asked to try to draw, as a 'non-negotiable principle' sought in her illustrative plan, along with equal population among districts." App.57. Plaintiffs' expert euphemistically labeled that nonnegotiable, race-based target the "minority opportunity to elect" criterion. *Id.* Other evidence shows how race abounded in Plaintiffs' creation of two majority-black districts. None of the more than two million race-neutral maps contained two majority-black districts. App.300 (Tr. 565:11-14); App.346 (Tr. 682:3-14; 682:12-14); *see also* App.327 (Tr. 647:12-20) ("no question" that "one reason that there are nine splits in counties in this plan as opposed to six splits in counties is … because of the weight [she] gave to the criteria of ensuring two majority-black congressional districts"); App.334 (Tr. 664:17-24) (subordinating geographic compactness to racial preferences by placing "the Black Belt counties in majority-black districts" despite necessarily rendering lower geographic-compactness scores); App.320 (Tr. 600:10-16); App.341 (Tr. 671:22-672:14).

unconstitutional, as "[r]ace was the criterion that … could not be compromised." *Shaw II*, 517 U.S. at 907.

The three-judge court's view of the VRA makes VRA compliance irreconcilable with the U.S. Constitution. A map that starts with a "non-negotiable" racial target of two majority-black districts and that can be drawn only when race is "prioritized," App.151, goes far beyond Section 2's mandate of an "equally open" political process, 52 U.S.C. §10301(b). Just as "[n]othing in §2 grants special protection to a minority group's right to form political coalitions," *Bartlett*, 556 U.S. at 15, nothing in Section 2 grants Plaintiffs a right to a predetermined number of majority-minority districts that can exist only when race subordinates "traditional districting principles," *LULAC*, 548 U.S. at 433; *see also Holder*, 512 U.S. at 907 (Thomas, J., concurring) ("few devices could be better designed to exacerbate racial tensions than the consciously segregated districting system currently being constructed in the name of the Voting Rights Act").

2. The district court wrongly believed that *Gingles* I always requires a map drawer to subvert, to some extent, traditional redistricting criteria to race. According to the court, "a remedial plan" would be rendered "unconstitutional … for attempting to satisfy *Gingles* I" if the State is correct. App.205. That is not so. Under the correct approach, there should be no "remedial plan" *at all* unless the *Gingles* preconditions are all met. Plaintiffs and the district court bypassed all of this by assuming the ultimate conclusion that Alabama needed to draw two majority-black districts.

The flaw in this approach is the fact that no map drawer could produce such maps without subordinating traditional districting principles to race. *Supra*, pp. 9-10, 14-15. It cannot be done unless race is "prioritized" and other race-neutral redistricting principles "yield" to that race-based target. App.205. There is no better indication that *Gingles* I is not met. The district court never reconciled that stunning fact with *Gingles*'s first precondition. The court instead deferred to Plaintiffs' "eminently qualified" experts' conclusion that the districts were good enough. App.157. But no court can defer to an expert, however "eminently qualified" in some regard, when it comes to the legal requirements (and limitations) of the legal standards of Section 2. *See Abbott*, 138 S. Ct. at 2326; *Barr v. Lee*, 140 S. Ct. 2590, 2591 (2020) (vacating preliminary injunction after finding plaintiffs failed to establish they were likely to succeed on the merits). Especially so here, where that expert's "understanding" was that "race consciousness is expressly permitted," App.349 (Tr. 685:19-20), and that she didn't even "know of a way to talk about the traditional [districting] principles that is truly race blind," App.346 (Tr. 682:20-22). In her words: "[T]hat it is hard to draw two majority-black districts by accident *shows the importance of doing so on purpose*." App.349 (Tr. 685:23-25) (emphasis added).

To be clear, the flaw in this approach is not Plaintiffs' subjective intent to present maps with two districts that exceed 50% BVAP, as they must to state a claim. The flaw is the objective fact that no map drawer could hit that racial target of two majority-black districts without prioritizing race first and other race-neutral criteria second. Put differently, the problem is not that Plaintiffs were "attempting to satisfy

*Gingles* I," App.204; the problem is that their attempt failed because no map drawer could have produced maps in a race-neutral way. *Bethune-Hill v. Va. State Bd. of Elections*, 137 S.Ct. 788, 799 (2017). If Plaintiffs could show that some subset of millions of race-neutral maps would produce two majority-black districts, this might be a different case. But the problem for Plaintiffs—and what necessarily ends this case— is that it is impossible in Alabama to draw any map with two majority-minority districts "consistent with traditional, race-neutral principles." *Id.*; *see also, e.g.*, *Davis v. Chiles*, 139 F.3d 1414, 1425 (11th Cir. 1998). As the three-judge court said, Plaintiffs had to "prioritize[]" race, and have race-neutral criteria "yield" to that race-conscious one. App.205.[13]

The court's error is best encapsulated by its statement that Plaintiffs' experts "prioritized race only to the extent necessary." App.149, 151. That makes no sense. The court's formulation presumes the answer to the question at the heart of *Gingles*'s first precondition. If it were permissible to "prioritize[]" race to meet *Gingles* I (it is not), then *Gingles* I is a meaningless test that can always be satisfied and will always make race the overriding criterion in drawing district lines. It is hardly surprising, especially with modern redistricting technology, that one can "prioritize[]" race and redraw a district where the black voting-age population just exceeds 50%. App.204. Instead, the relevant question for *Gingles* I—the question the three-judge court never

---

[13] For one example, the *Milligan* expert conceded that she looked at race when splitting voting districts (or "VTDs"), "but really, only to make sure that I was creating two districts over 50 percent." App.308 (Tr. 573:3-5). This is like an archer saying she did not consider the bullseye except to ensure she was aiming at it.

asked but that Plaintiffs' experts have already answered—is what results when one does not prioritize race as a "non-negotiable" constraint. *Id.*

The three-judge court's rule is also unadministrable, for all the same reasons this Court decided the plaintiffs' twist on the VRA was unadministrable in *Bartlett*. If Section 2 requires legislatures to "prioritize[] race" over traditional race-neutral districting principles somewhat (for *Gingles* I) but not too much (for the Constitution), then there can be no "sound judicial and legislative administration" of the statute. *Bartlett*, 556 U.S. at 17. Every redistricting cycle, legislatures will be forced to ask whether they have allowed their traditional race-neutral principles "to yield" enough—but not too much—to racial considerations. App.205; *see also, e.g.*, App.245 (explaining away two million race-neutral simulations as showing "that *some aware-ness* of race likely is required to draw two majority-Black districts" but not so much that "race must predominate") (emphasis added). This "test" would practically guar-antee redistricting litigation every cycle in numerous jurisdictions, "transfer[ring] much of the authority to regulate [districting] from the States to the federal courts." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2341 (2021).

"A requirement to draw election districts" based on answers to questions like how much race is too much— "ought not to be inferred from the text or purpose of § 2." *Bartlett*, 556 U.S. at 17. For if federal courts are not equipped to answer the question, "At what point does permissible partisanship become unconstitutional?" *Rucho v. Common Cause*, 139 S. Ct. 2484, 2501 (2019), neither are they equipped to determine "How much race is too much?" when it comes to prioritizing race over

traditional race-neutral principles. The only "workable standard[]" for "sound judicial and legislative administration," *Bartlett*, 556 U.S. at 17, is one in which Section 2's compactness inquiry focuses on possible "outcome[s] of a *race-neutral* process in which all districts are compact," *Gonzalez*, 535 F.3d at 598 (emphasis added).

Finally, it makes no sense that the court sanctioned Plaintiffs' use of race because it wasn't as bad as it could have been. According to the court, Plaintiffs' map drawers could have subordinated those traditional principles to race even more, but they didn't. *See, e.g.*, App.58-59 (noting that Plaintiffs' expert "took … county integrity to take precedence over the level of BVAP *once that level was past 50 percent*") (emphasis added); App.88 (noting that Plaintiffs' expert "testified that if he had wanted to assign race a greater role, he could have"). If that were acceptable, then the maps drawn in *Cooper*—ultimately declared unconstitutional by this Court—should have been acceptable too. North Carolina subordinated traditional districting principles to race only "sometimes," when it interfered with "'the more important thing' … to create a majority-minority district." 137 S. Ct. at 1469. Sound familiar? It was unconstitutional in *Cooper*, and it was unconstitutional here. A federal court cannot order an overhaul of Alabama's congressional map based on the same fundamental error.

## B.    The injunction also cannot be reconciled with the statutory text.

Even if the prioritization of race were permissible under this Court's *Gingles* framework (Constitution aside), the statutory text forecloses Plaintiffs' Section 2 claim in another way. The statute asks whether the political processes … in the State" are "*equally open* to participation by [black Alabamians] in that [they] have less

opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. §10301(b) (emphasis added). That text "commands" the "consideration of 'the totality of circumstances' that have a bearing on whether the State makes voting 'equally open' to all and gives everyone an equal 'opportunity' to vote." *Brnovich*, 141 S. Ct. at 2341; *accord Holder*, 512 U.S. at 901 (Thomas, J., concurring) (noting "[s]ome conceptions of representative government may primarily emphasize the formal value of the vote as a mechanism for participation in the electoral process, whether it results in control of a seat or not," such that "a vote duly cast and counted would be deemed just as 'effective' as any other").

Applied here, the court jumped straight to the amorphous, so-called Senate factors, failing to start with the text. App.178. As a result, the court failed to realize Plaintiffs' claims failed the statute's "equally open" requirement in a more basic way. If Plaintiffs cannot produce a map with two majority-minority districts without "prioritiz[ing] race," App.204, then it is impossible to say that the State has denied minority voters equal opportunity to participate in the political process.

## C. Constitutional avoidance compels a stay pending appeal.

The district court's interpretation of the VRA raises serious constitutional questions. If the district court is correct, then Section 2's "effects test," as prescribed by *Gingles* and progeny, cannot possibly be constitutional as applied to single-member districts. Likewise, if an "equally open" political process under the VRA requires racial preferences in drawing single-member districts, then the VRA cannot possibly be constitutional as applied to single-member districts. *See DeGrandy*, 512 U.S. at

1017 (stating "one is not entitled to suspect (much less infer) dilution from mere fail-ure to guarantee a political feast"). To the extent there is any doubt about whether Section 2 would permit Plaintiffs' race-prioritization here, the Court should "resolve that doubt by avoiding serious concerns under the Equal Protection Clause." *Bartlett*, 556 U.S. at 21.

1. Any "assignment of voters on the basis of race" is subject to constitutional law's "strictest scrutiny." *Miller*, 515 U.S. at 915. Redistricting is not an exception to that constitutional proscription. Section 2 permits race-conscious districting only in the limited context of choosing among maps that honor a State's "traditional district-ing principles." *LULAC*, 548 U.S. at 433. For example, it should be beyond dispute that the Legislature never could have constitutionally passed the maps that the dis-trict court has ordered here since those maps started from a racial target of two ma-jority-black districts—a target that made it "necessary" for Plaintiffs' map drawers to split areas as large as Mobile County and as small as voting districts in a way unex-plainable on grounds other than race. *See, e.g.*, *Shaw II*, 517 U.S. at 907 (racial ger-rymander where "[r]ace was the criterion that … could not be compromised"); *Miller*, 515 U.S. at 916 (racial gerrymander where map "subordinated traditional race-neu-tral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, to racial considerations").

Here, too, a court cannot order something that a legislature constitutionally could not do. Just as a legislature cannot make race a "'more important thing'" than

race-neutral considerations "to create a majority-minority district," *Cooper*, 137 S. Ct. at 1469, a court cannot order that race be "prioritized" before the *Gingles* preconditions have even been met, App.149, 151, 205. The VRA does not authorize race-based changes at all times, in all places, and in all districts. And the VRA certainly does not authorize race-based changes where, as here, such changes would never have resulted if only race-neutral criteria were considered. *See supra*, pp. 9-10, 14-15.

2. The district court's application of *Gingles* I and its totality-of-circumstances analysis takes Section 2 beyond its promise of "equal[] … opportunity." 52 U.S.C. §10301(b). It is yet another real-world example of the federal courts' transformation of the VRA, a statute "originally perceived as a remedial provision directed specifically at eradicating discriminatory practices that restricted blacks' ability to register and vote in the segregated South." *Holder*, 512 U.S. at 893 (Thomas, J., concurring). Now? The act has become "a grant of authority to the federal judiciary to develop theories on basic principles of representative government" and impose "destructive assumptions" on legislative redistricting in particular. *Id.* at 893-94.

Applying those destructive assumptions to single-member districts, the district court "ha[s] acted on the implicit assumption that members of racial and ethnic groups must all think alike on important matters of public policy"—wherever they live—"and must have their own 'minority preferred' representatives holding seats in elected bodies if they are to be considered represented at all." *Id.* at 903. The court's injunction, like others that have come before it, will "unnecessarily infuse race into virtually every redistricting, raising serious constitutional questions." *Bartlett*, 556

U.S. at 20. Plaintiffs programmed "two majority-black districts" as "nonnegotiable" and only "after that" considered traditional districting principles. App.57. Nevertheless, the court approved this decision to consider race-neutral criteria only "after the race-based decision [of reaching a targeted number of majority-minority districts] had been made," *Shaw II*, 517 U.S. at 907. If that is what the VRA requires, the VRA is unconstitutional.

The court's error is illustrated by the racial gerrymander that will necessarily follow. The only inference to be drawn from Plaintiffs' proposed districts—every one of which divides southern Alabama, beginning in Mobile County, by black and white— is that race predominates:[14]



_____

[14] The district court suggested that the Legislature could submit a remedial plan that keeps together Alabama's two Gulf Counties—Mobile and Baldwin. App.171. But prioritizing that non-racial principle would require an even more grotesque racial gerrymander elsewhere in the State. Thus, none of Plaintiffs' proposed plans tried to



*See Milligan v. Merrill*, No. 2:21-cv-1530, ECF 76-4 at 69, 71, 73, 75.[15]

Districts 1 and 2 in Plaintiffs' plans were "obviously drawn for the purpose of separating voters by race," *Shaw I*, 509 U.S. at 645, and subordinate the State's traditional communities of interest to Plaintiffs' own "predominant, overriding desire to create [two] majority-black districts," *Abrams*, 521 U.S. at 81 (internal quotation marks omitted); *see also Miller*, 515 U.S. at 917 ("Although by comparison with other districts the geometric shape of the [district at issue] may not seem bizarre on its face, when its shape is considered in conjunction with its racial and population

---

maintain communities of interest on the Gulf Coast. And so it is, with some irony, that thirty years after the three-judge court in *Wesch* rejected a plan that split Mobile in favor of one that "better preserve[d] the communities of interests in" "Districts 1 and 2," 785 F. Supp. at 1497, the court below has declined to "maintain[]" those "communities of interest," *LULAC*, 548 U.S. 433.

[15] The district court somehow did "not see" in these maps any "tentacles, appendages, bizarre shapes, or any other obvious irregularities that would make it difficult to find that any District 2 could be considered reasonably compact." App.162.

densities, the story of racial gerrymandering … becomes much clearer."); *see also* App.358 (Tr. 856:12-23) ("[Y]ou can see easily that [the District 2] line almost precisely exactly follows the contours of the very highest black population VTDs—can literally go from one to the next …. It is literally like the dividing line of black and much-less-black population."); App.359 (Tr. 857:9-14) ("Similarly, in District 7, you can see that it … very carefully captures large portions of black populations."). Indeed, the *Singleton* Plaintiffs' expert described one of Plaintiffs' illustrative plans as "an effort to pull and concentrate black voters in the Second [District] and then in the Seventh [District]." App.272 (Tr.112:6-7). "It's an outcome-based plan," she continued, "[t]here's no question." App.272 (Tr.112:8-9). Those "[r]acial classifications" that animate Plaintiffs' proposed remedies "are antithetical to the Fourteenth Amendment, whose central purpose was to eliminate racial discrimination emanating from official sources in the States." *Shaw II*, 517 U.S. at 907.

In short, a second majority-minority district would likely have to stretch roughly 250 miles from Mobile to the Georgia border. App.60; *Milligan v. Merrill*, No. 2:21-cv-1530, ECF 48 at 23, 25, 29; *cf. LULAC*, 548 U.S. at 432 (faulting plan for stringing together several "disparate communities of interest"). Such race-based redistricting "reinforces the perception that members of the same racial group—regardless of their age, education, economic status, or the community in which they live— think alike, share the same political interests, and will prefer the same candidates at the polls." *Shaw I*, 509 U.S. at 647. And it sends an "equally pernicious" message to elected representatives in those districts that "their primary obligation is to represent

only the members of that group, rather than their constituency as a whole." *Id.* at 648.

3. Congress derived its authority to enact Section 2 of the VRA pursuant to the Fifteenth Amendment, guaranteeing "[t]he right of citizens of the United States to vote shall not be denied or abridged by … any State on account of race, color, or previous condition of servitude." *Chisom*, 501 U.S. at 383; U.S. CONST. amend. XV, §§1-2. Congress may enforce the substantive provisions of the Fifteenth Amendment, as well as the Fourteenth Amendment, "by creating private remedies against the States for *actual violations* of those provisions." *United States v. Georgia*, 546 U.S. 151, 158 (2006) (emphasis added). But here, the district court's interpretation of the VRA goes well beyond remedying any "actual violations" of the Fourteenth or Fifteenth Amendments. The court effectively deprived Alabama of its ability to keep its race-neutral redistricting plan, directly contrary to this Court's most recent statement that "§2 does not deprive the States of their authority to establish non-discriminatory voting rules." *Brnovich*, 141 S. Ct. at 2343.

Where the Alabama Legislature cannot draw two majority-black districts, given the State's demography, without "prioritiz[ing] race" as a "non-negotiable" redistricting constraint, it is unfathomable that the VRA could compel the State to depart from existing law and draw two majority-black districts anyway. Any such expansion of the VRA that endorses Plaintiffs' race-conscious meddling with the State's race-neutral plan ignores that any "exercise of [Congress's] Fifteenth Amendment authority even when otherwise proper still must 'consist with the letter and spirit of

the Constitution.'" *Id.* (quoting *McCulloch v. Maryland*, 4 Wheat. 316, 421 (1819)). Requiring States' redistricting processes to bear an "uncomfortable resemblance to political apartheid," *Shaw I*, 509 U.S. at 647, consists with neither.

*   *   *

In the dissenting opinion in *Rucho*, members of this Court lamented the possibility that "today's mapmakers can generate thousands of possibilities at the touch of a key—and then choose the one giving their party maximum advantage (usually while still meeting traditional districting requirements)." 139 S. Ct. at 2513 (Kagan, J., dissenting). What Plaintiffs have done here would make the dissenters' nefarious mapmaker blush. Plaintiffs generated *millions* of random race-neutral maps. *None* resulted in two majority-minority districts. There can be no question, then, that the maps Plaintiffs ultimately proffered are an extreme racial gerrymander solely designed to hit a predetermined racial target. *Cf. id.* at 2518 (deeming congressional map an extreme political gerrymander after an "expert produced 3,000 maps, adhering … to the districting criteria that the North Carolina redistricting committee had used, other than partisan advantage," and every "one of the 3,000 maps would have produced at least one more Democratic House Member than the State's actual map"). They are "an out-out-outlier" with the most severe constitutional consequence—ordering unprecedented changes to Alabama's existing districts on the basis of race alone. *Id.*

## II.    Irreparable Harm Will Result Absent This Court's Intervention.

Without a stay, the State will forever lose its ability to appeal the preliminary injunction before the forthcoming elections are conducted under a court-ordered

36

racially gerrymandered map that upends the legislatively enacted map. The injunction leaves Alabama with no real choice. The State can replace its congressional plan (by February 7) and suffer the consequences of follow-on litigation for the newly gerrymandered districts. *See Wise*, 437 U.S. at 540 (op. of White, J.); App.5. Or the State can cede its sovereign redistricting power to the district court, which will hire a third party to redraw districts (at the State's expense) that segregate Alabamians in Mobile and elsewhere by race. App.5, 213. Either way, without a stay and appellate review, the State's forthcoming elections are guaranteed to be run on district lines that never would or could have been drawn but for sorting Alabamians on the basis of race alone.

Adding to the harm, the court has required all of this mere days before the first in a series of forthcoming election deadlines. The candidate qualifying deadline was supposed to be today, but has been extended until February 11 by the court's order. App.6. Other pre-election deadlines are also looming. Any redrawing of district lines requires the State to update voter-registration records to reflect the redraw, well in advance of when absentee voting begins on March 30, 2022. Federal law, moreover, requires the State to provide ballots to certain voters no later than April 9, 2022. *Id.* at 4-5; 52 U.S.C. §20302(a)(8). Simply put, "the election machinery wheels [are] in full rotation," *Graves v. City of Montgomery*, 807 F. Supp. 2d 1096, 1112 (M.D. Ala. 2011), and the district court has ordered the State to scrap existing law and replace it with something unconstitutional.

Without this Court's intervention, Alabama's only choices are effectively no

choices at all: a state-drawn racially gerrymandered map or a court-drawn racially gerrymandered map. *See Lipscomb*, 437 U.S. at 540; *see, e.g.*, *Abbott*, 138 S. Ct. at 2317. Moreover, this overhaul of Alabama's congressional map at this late hour would require the last-minute reassignment of hundreds of thousands of voters to new districts and could force candidates and groups seeking ballot access to obtain thousands of new signatures. The State's "inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State." *Abbott*, 138 S. Ct. at 2324 n.17.

## III.   The Balance Of Harms And Public Interest Warrant A Stay.

A stay is also warranted because the district court's order at this late hour is inflicting grave harm on the public interest, which outweighs Plaintiffs' purported interest in voting in districts that "prioritize[] race." App.204. Enjoining the State from using its congressional districts throws the current election into chaos.

That disruption harms not only the State, it also harms voters and candidates across the State. As even the district court recognized, "there can be no doubt that there is a limited window" for redrawing the districts. App.214. Courts and experts alike have recognized that a court drawing a map "should have as its goal the imposition of a plan no later than one month before candidates may begin qualifying for the primary ballot,' which 'means that the court should begin drawing its plan about three months before the beginning of ballot qualification in order to build in time for possible hearings and adjustments to the plan.'" *Favors v. Cuomo*, 881 F. Supp. 2d 356, 364 (E.D.N.Y. 2012). After all, "[i]t is best for candidates and voters to know significantly in advance of the petition period who may run where." *Id.* at 371; *see also* App.393-94 (Tr. 1693:16-1694:70).

But here, the district court proposes beginning this complicated process just days before (and possibly even days after) ballot qualification has ended. Voters and candidates everywhere are bound to be confused. In particular, non-major-party candidates and political organizations seeking ballot access may have to scramble to obtain thousands of new signatures if they find that they have been obtaining signatures from the wrong district. Ala. Code §§17-6-22, 17-9-3(a).

That is why federal courts ordinarily don't change election rules at the eleventh hour. Such orders "can themselves result in voter confusion and consequent incentive to remain away from the polls." *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006). By ordering radically new districts days before the candidate qualifying deadline and less than two months before absentee voting is to begin, the district court's decision squarely implicates *Purcell. See, e.g.*, *Husted v. Ohio State Conference of NAACP*, 573 U.S. 988 (2014) (staying a lower-court order that changed election laws 61 days before election day); *Thompson v. DeWine*, 959 F.3d 804, 813 (6th Cir. 2020) (election day was "months away but important, interim deadlines … [we]re imminent").

By comparison, Plaintiffs assert irreparable harm from having to vote under a plan that did not sufficiently "prioritize[] race" over non-racial districting principles. App.204. This factor does not weigh heavily in their favor, particularly where Alabama's districts have retained the same geography for decades, and the *Milligan* Plaintiffs presumably could have lodged nearly identical arguments against Alabama's 2011 Map. But they didn't. *See Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) (collecting cases for proposition that "a party requesting a preliminary

injunction must generally show reasonable diligence"). And in all events, it is impossible to make out a case for irreparable harm when that irreparable harm can be solved only by harming hundreds of thousands of others with a racial gerrymander as a "remedy."

Finally, the court's stay of "the January 28, 2022 qualification deadline for 14 days, through February 11, 2022," App.6, does little to help. Even if the Legislature or court could settle on a new map in the next week, congressional candidates would have only about a week to assess any new map (which could also be subject to challenge as a racial gerrymander) and decide whether to enter a congressional race in which absentee voting will begin the following month. App.133. Most fundamentally, there are hundreds of thousands of Alabamians who are not a party to this litigation but who nevertheless will be thrown into new districts based on their race. The public interest undoubtedly weighs in favor of a stay.

## CONCLUSION

For the foregoing reasons, Applicants respectfully ask the Court to enter an administrative stay and then a stay or an injunction pending appeal. The Court should also construe this stay application as a jurisdictional statement, note probable jurisdiction, and expedite the appeal.

40

Respectfully submitted,

| | |
|---|---|
| Dorman Walker | Steve Marshall |
| BALCH & BINGHAM LLP | *Attorney General* |
| 105 Tallapoosa Street, Ste. 200 | Edmund G. LaCour Jr. |
| P.O. Box 78 (36101) | *Solicitor General* |
| Montgomery, AL 36104 | *Counsel of Record* |
| (334) 269-3138 | A. Barrett Bowdre |
| DWalker@Balch.com | Thomas A. Wilson |
| | *Deputy Solicitors General* |
| *Counsel for Sen. McClendon* | James W. Davis |
| *and Rep. Pringle* | *Deputy Attorney General* |
| | Misty S. Fairbanks Messick |
| Jeffrey M. Harris | Brenton M. Smith |
| Taylor A.R. Meehan | A. Reid Harris |
| CONSOVOY MCCARTHY PLLC | Benjamin M. Seiss |
| 1600 Wilson Blvd., Ste. 700 | *Assistant Attorneys General* |
| Arlington, VA 22209 | OFFICE OF THE ATTORNEY GENERAL |
| (703) 243-9423 | STATE OF ALABAMA |
| Jeff@ConsovoyMcCarthy.com | 501 Washington Avenue |
| | P.O. Box 300152 |
| *Counsel for Secretary Merrill* | Montgomery, AL 36130-0152 |
| | (334) 242-7300 |
| | Edmund.LaCour@AlabamaAG.gov |
| | |
| | *Counsel for Secretary Merrill* |

JANUARY 28, 2022