FILED

2023 Jul-27  PM 03:16
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **BOBBY SINGLETON et al.,** <br><br> **Plaintiffs,** <br><br> v. <br><br> **WES ALLEN, in his official capacity as Alabama Secretary of State, et al.,** <br><br> **Defendants.** | **Case No.: 2:21-cv-01291-AMM** <br><br> **Three-Judge Court** |
| **EVAN MILLIGAN, et al.,** <br><br> **Plaintiffs,** <br><br> v. <br><br> **WES ALLEN, in his official capacity as Alabama Secretary of State, et al.,** <br><br> **Defendants.** | **No. 2:21-cv-01530-AMM** <br><br> **Three-Judge Court** |

### *SINGLETON* PLAINTIFFS' OBJECTION TO
### THE STATE'S REMEDIAL PLAN,
### MOTION FOR A PRELIMINARY INJUNCTION, AND
### MEMORANDUM OF LAW IN SUPPORT THEREOF

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................. ii

INTRODUCTION ................................................................................1

BACKGROUND ..................................................................................4

ARGUMENT .......................................................................................9

    I.    Plaintiffs Are Entitled to a Preliminary Injunction
        Barring Secretary Allen from Conducting Elections
        Under an Unconstitutional Plan ............................................9

        A.    A Racial Gerrymander Exists Where Race Predominates
                in the Design of a District .......................................10

        B.    Race Predominated in the Creation of District 7, Resulting
                in a Racial Gerrymander ..........................................11

        C.    The 2023 Plan Carried Forward and Made No Attempt
                to Remedy the Racial Gerrymander............................12

        D.    The Racially Gerrymandered District 7 Is Not Narrowly
                Tailored to Further a Compelling State Interest .......................13

    II.    The Plaintiffs' Plans Are a Constitutional and Sensible Remedy for
        the Racial Gerrymander .....................................................18

CONCLUSION ...................................................................................23

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Perez*,
　　138 S. Ct. 2305 (2018)................................................................2, 18

*Beer v. United States*,
　　425 U.S. 130 (1976)........................................................................7

*Bethune-Hill v. Va. State Bd. of Elections*,
　　580 U.S. 178 (2017)......................................................................11

*Bush v. Vera*,
　　517 U.S. 952 (1996)........................................................................3

*Cooper v. Harris*,
　　581 U.S. 285 (2017)............................................................. *passim*

*Covington v. North Carolina*,
　　283 F. Supp. 3d 410 (M.D.N.C. 2018),
　　*aff'd in relevant part and reversed in part on other grounds*,
　　138 S. Ct. 2548 (2018)........................................................... 21, 22

*Davis v. Chiles*,
　　139 F.3d 1414 (11th Cir. 1998) ...................................................11

*Easley v. Cromartie*,
　　532 U.S. 234 (2001).......................................................................22

*Energy Four, Inc. v. Dornier Med. Sys., Inc.*,
　　765 F. Supp. 724 (N.D. Ga. 1991)..................................................9

*Figures v. Hunt*,
　　507 U.S. 901 (1993)......................................................................5, 6

*Jeffers v. Clinton*,
　　756 F. Supp. 1195 (E.D. Ark. 1990) ...........................................23

*Ketchum v. Byrne*,
　　740 F.2d 1398 (7th Cir. 1984) .....................................................23

*Miller v. Johnson*,
    515 U.S. 900 (1995)...................................................................................1, 10

*North Carolina v. Covington*,
    138 S.Ct. 2548 (2018)............................................................. 2, 17, 22

*Osmose, Inc. v. Viance, LLC*,
    612 F.3d 1298 (11th Cir. 2010) ....................................................................9

*Personhuballah v. Alcorn*,
    155 F. Supp. 3d 552 (E.D. Va. 2016) ........................................................21

*Shaw v. Reno*,
    509 U.S. 630 (1993)..................................................................................6, 21

*Shelby County v. Holder*,
    570 U.S. 529 (2013).......................................................................................7

*United States v. Georgia*,
    892 F. Supp. 2d 1367 (N.D. Ga. 2012)........................................................9

*Vera v. Richards*,
    861 F. Supp. 1304 (S.D. Tex. 1994),
    *aff'd sub nom. Bush v. Vera*, 517 U.S. 952 (1996).....................................22

*Wesberry v. Sanders*,
    376 U.S. 1 (1964).........................................................................................4

*Wesch v. Hunt*,
    785 F. Supp. 1491 (S.D. Ala. 1992) (three-judge court),
    *aff'd sub nom. Camp v. Wesch*, 504 U.S. 902 (1992) .......................... *passim*

*Wisc. Legislature v. Wisc. Elections Comm'n*,
    142 S. Ct. 1245 (2022)..............................................................................2, 14

## INTRODUCTION

In the face of rulings by this Court and the United States Supreme Court that Alabama's congressional districts likely violate the Voting Rights Act, and two opportunity districts must be created, the State has chosen defiance over compliance. As the *Milligan* and *Caster* Plaintiffs will explain, the Legislature's second supposed opportunity district would guarantee the defeat of Black voters' preferred candidates in all but the most exceptional circumstances. That, however, is not the only unlawful aspect of the State's new plan. Like the last four plans before it, the new plan separates White and Black voters in Jefferson County for no compelling reason. Thus, the new plan is a racial gerrymander that violates the Fourteenth Amendment. Because the new plan violates the Constitution, it must be enjoined and replaced with a map drawn under the Court's supervision.

The 2023 plan carries forward a long tradition of racial gerrymandering in Alabama's congressional maps. Secretary of State John Merrill has conceded in prior litigation that Alabama's 1992 Congressional districting plan was a racial gerrymander. All Defendants in this case have likewise stipulated that the predominant purpose of the 1992 plan was to draw a majority-Black district, which is the definition of a racial gerrymander. *Miller v. Johnson*, 515 U.S. 900, 916 (1995). Secretary Merrill has also conceded that the 2001 and 2011 plans were drawn the way they were because of race. Randolph Hinaman, who drew the 1992, 2011,

and 2021 plans and consulted with the Legislature's Republicans on the 2001 plan, has testified that the 2011 plan can be traced back to the 1992 plan, that he used the 2011 plan as the starting point for the 2021 plan, and that he made no attempt to correct for the race-based line-drawing that characterized the 2011 plan and its predecessors. The Secretary's own expert agrees that the approach to drawing the 2021 plan was to effect the "least change" from the 2011 plan. ECF No. 54-1 at 22. The 2023 plan also changes little about the race-based split of Jefferson County. In short, the 2011 plan indisputably was a racial gerrymander, and no effort was made to remedy that gerrymander in the 2021 plan or the 2023 plan.

Recent decisions of the Supreme Court, including *Cooper v. Harris*, 581 U.S. 285 (2017), *North Carolina v. Covington*, 138 S. Ct. 2548 (2018), *Abbott v. Perez*, 138 S. Ct. 2305 (2018), and *Wisconsin Legislature v. Wisc. Elections Commission*, 142 S. Ct. 1245 (2022), hold that compliance with Section 2 of the Voting Rights Act cannot justify the creation of a racially gerrymandered, majority-Black Congressional district when there was no reason to believe that such a district was necessary to give Black voters the opportunity to elect the candidate of their choice. In the July 2023 special session, the Legislature failed to provide any analysis that would have indicated that a race-driven split of Jefferson County was necessary, rushing their plan into law just hours after it was introduced for the first time. Therefore, the racial gerrymander in the 2023 plan is unconstitutional.

2

Gerrymandering is subject to strict scrutiny even when a Legislature is attempting to remedy a violation of the Voting Rights Act.  Rejecting an argument that a remedial plan should not be subject to strict scrutiny because it is benignly motivated, the Supreme Court held that "we subject racial classifications to strict scrutiny precisely because that scrutiny is necessary to determine whether they are benign." *Bush v. Vera*, 517 U.S. 952, 984 (1996).

The Legislature did not have to adopt an unconstitutional plan. Plaintiffs Rodger Smitherman and Bobby Singleton submitted to the Legislature two plans that eliminate the racial gerrymander and honor Alabama's traditional districting principle that Congressional districts should respect county boundaries where possible. They abide by the principle of "one person, one vote" as established by the Supreme Court, and they respect the traditional redistricting principle of keeping counties whole to the extent possible. While these plans were drawn without gerrymandering, they nevertheless comply with Section 2 of the Voting Rights Act by providing two effective opportunity districts. The Legislature rejected these plans in favor of the unlawful racially gerrymandered plan it adopted. Because the Legislature had no reason to believe that a plan that separates voters by race was necessary to remedy its prior violation of the Voting Rights Act, the 2023 plan must be enjoined. And the Court can avoid further constitutional issues by creating a new plan that includes two opportunity districts without racial gerrymandering.

# BACKGROUND

Alabama's Congressional districts did not divide counties from 1822 (when districts were first drawn) until 1965, when the Alabama Legislature split Jefferson County to comply with the Supreme Court's ruling that Congressional districts must not have wide disparities in population. Stipulated Facts (ECF No. 47) ¶¶ 4, 9, 10 (citing *Wesberry v. Sanders*, 376 U.S. 1 (1964)).[1] In 1965, splitting Jefferson County was unavoidable because its population exceeded the ideal population of a Congressional district by a significant margin. *Id.* ¶¶ 7, 10. In the 1965 plan and the plan following the 1970 census, Jefferson County was the only county in Alabama whose boundaries were split among multiple districts. *Id.* ¶ 11. In the plan following the 1980 census, only Jefferson and St. Clair Counties were split. *Id.* ¶ 13.

In 1992 a court-ordered plan, designed specifically to allocate voters by race, split several counties in District 7. Following the 1990 census, certain Black citizens of Alabama filed suit against State officials, alleging that the existing Congressional districts violated Section 2 of the Voting Rights Act by denying them "meaningful access to the voting process that would allow them to elect candidates of their choice." *Wesch v. Hunt*, 785 F. Supp. 1491, 1493 (S.D. Ala. 1992) (three-judge court), *aff'd sub nom. Camp v. Wesch*, 504 U.S. 902 (1992), *Figures v. Hunt*, 507

---

[1] The parties stipulated to certain facts for purposes of preliminary injunction proceedings. ECF No. 47 at 1; ECF No. 70 at 1.

U.S. 901 (1993). The 1990 census data allegedly showed that "the African–American population in Alabama is sufficiently compact and contiguous to permit the creation of a congressional district in which 65% or more of the residents are African–Americans." *Id.* The parties to the suit "agree[d] that such a district should be created." *Id.* at 1493–94. The Alabama Legislature failed to enact a new districting plan in time for preclearance by the Department of Justice before the 1992 election, requiring the court to order a plan itself. *Id.* at 1494–95. The court accepted the stipulation of all parties that the Voting Rights Act justified the creation of that one majority-black Congressional district, without making a judicial finding that the agreed upon plan actually was justified by Section 2 of the Voting Rights Act. *Id.* at 1499. Ultimately, the court adopted a plan that concentrated Black citizens in District 7, where they constituted 67.53% of the population. *Id.* at 1581. To do so, the plan split Jefferson, Tuscaloosa, Montgomery, Clarke, and Pickens Counties, placing a relatively large share of Black citizens in District 7 and a relatively small share in other districts. *Id.* at 1582.[2] Among the ways this split is manifested on the map are a "finger" reaching into Jefferson County to encompass the Black population of Birmingham while mostly avoiding the relatively White northern and southern

---

[2] The population of Jefferson County in District 7 was 75% Black, compared to 35% in the county overall. Disparities also existed for Tuscaloosa County (40% v. 26%), Montgomery County (80% v. 42%), Clarke County (56% v. 43%), and Pickens County (75% v. 42%). *Wesch*, 785 F. Supp. at 1505–07, 1558, 1569, 1575, 1577, 1581.

suburbs, and a line through the City of Tuscaloosa that places the relatively Black southern portion in District 7 and largely excludes the relatively White northern portion. *See id.* The court's overriding concern was explicitly racial; it honored the parties' stipulation that District 7 be at least 65% Black, and its opinion included 79 pages of tables that described the population of each district by race and no other attribute. *Id.* at 1498–99, 1503–81.

In 2019, Secretary Merrill conceded that the 1992 court-approved plan would violate the prohibition of racial gerrymandering first announced by the Supreme Court a year after *Wesch* was decided. *See Shaw v. Reno*, 509 U.S. 630 (1993). In his pretrial brief in *Chestnut v. Merrill*, he stated,

> District 7 appears to be racially gerrymandered, with a finger sticking up from the black belt for the sole purpose of grabbing the black population of Jefferson County. Defendant does not believe that the law would permit Alabama to draw that district today if the finger into Jefferson County was for the predomina[nt] purpose of drawing African American voters into the district. Alabama did so in the early 1990s as part of a consent decree ….

*Chestnut v. Merrill*, No. 2:18-CV-00907-KOB (N.D. Ala. Oct. 28, 2019), ECF No. 101 at 11 ("*Chestnut* Br."). Here, in *Singleton*, Secretary Merrill and the other Defendants have stipulated that the 1992 plan split Jefferson, Tuscaloosa, and other counties "for the predominant purpose of drawing one majority-black District." ECF No. 47 at ¶ 14. Secretary Merrill also admitted in *Chestnut* that the State carried forward the racial gerrymander in the plans that followed the 2000 and 2010

censuses: "once the district existed, Alabama had to continue to draw the district in order to comply with Section 5's anti-retrogression requirement." *Id.* at 11–12; *see also* Am. Compl. (ECF No. 15) at 9, 28 (maps of the 2002 and 2011 plans). Here, Secretary Merrill was referring to Section 5 of the Voting Rights Act, whose purpose "has always been to insure that no voting-procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Beer v. United States*, 425 U.S. 130, 141 (1976).

Randolph Hinaman, who drew the 1992 plan adopted in *Wesch*, consulted with the Legislature's Republicans on the 2001 plan, and drew the 2011 and 2021 plans, recently confirmed what Secretary Merrill admitted: that the 2001, 2011, and 2021 plans perpetuated the basic features of the 1992 plan. Mr. Hinaman's testimony is unsurprising, given the near-total resemblance of the 1992 and 2011 plans. With just one exception, District 7 in both plans contains the same whole counties and the same split counties, reaching into Jefferson, Tuscaloosa, and Montgomery Counties to draw Black voters into the district.

The preclearance requirement ended in 2013, *Shelby County v. Holder*, 570 U.S. 529 (2013), but Alabama's 2021 plan drew District 7 strikingly similarly to its prior racially gerrymandered versions. District 7 "retains all or part of the same fourteen counties contained in District 7 in the 2011 plan, including the majority-

Black rural counties, Sumter, Greene, Hale, Perry, Marengo, Dallas, Wilcox, and Lowndes." ECF No. 47 ¶ 19. It still reached into Jefferson County to encompass the Black population of Birmingham while mostly avoiding the relatively White northern and southern suburbs. Am. Compl. (ECF No. 15) at 36 (2021 map). And it still drew a line through the City of Tuscaloosa that places the relatively Black southern portion in District 7 and largely excludes the relatively White northern portion. *Id.* These continuing features of the district were undisputedly created in 1992 as part of a redistricting plan driven by race.

The 2023 plan largely preserves the race-based split of Jefferson County, as shown below.



District 7 contains about 54% of Jefferson County's population, but more than 71% of its Black population, resulting in a thirty-point gap between the proportion of the population that is Black inside and outside the district (57% inside, compared to 27% outside). This is no accident: District 7 sharply separates Birmingham from the relatively White "Over the Mountain" suburbs like Mountain Brook and Vestavia. Therefore, District 7 remains a racial gerrymander.

## ARGUMENT

I.   **Plaintiffs Are Entitled to a Preliminary Injunction Barring Secretary Allen from Conducting Elections Under an Unconstitutional Plan.**

To prevail on a motion for a preliminary injunction, Plaintiffs must show: (1) a substantial likelihood that they will succeed on the merits; (2) that the preliminary injunction is necessary to prevent irreparable injury; (3) that the threatened injury absent an injunction outweighs the injury any injunction may impose on Defendant; and (4) that the injunction would not be adverse to the public interest. *See Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1307 (11th Cir. 2010). The decision to grant preliminary injunctive relief is within the broad discretion of the district court. *See United States v. Georgia*, 892 F. Supp. 2d 1367, 1372 (N.D. Ga. 2012) (granting motion for preliminary injunction).

When this Court granted a preliminary injunction prohibiting the Secretary from conducting future congressional elections under the 2021 plan, it explained

why the second, third, and fourth requirements were met. ECF No. 88 at 197–204. Because the Court's reasoning applies to the *Singleton* Plaintiffs' gerrymandering claim, this brief will focus on the first requirement: likelihood of success on the merits.

### A.   A Racial Gerrymander Exists Where Race Predominates in the Design of a District.

A claim of racial gerrymandering requires "a two-step analysis." *Cooper v. Harris*, 581 U.S. at 291. "First, the plaintiff must prove that 'race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district.'" *Id.* (quoting *Miller v. Johnson*, 515 U.S. 900, 916 (1995)). "Second, if racial considerations predominated over others, the design of the district must withstand strict scrutiny. The burden thus shifts to the State to prove that its race-based sorting of voters serves a 'compelling interest' and is 'narrowly tailored' to that end." *Id.* at 1464 (citations omitted). Here, the new District 7 doubles down on racial divisions in previous districts that were undisputedly drawn with race as the predominant factor. No compelling interest requires this; a racial gerrymander of District 7 is unnecessary to comply with the Voting Rights Act. Therefore, the 2023 plan violates the Constitution.

To satisfy the "race as predominant factor" requirement, the plaintiff "must prove that the legislature subordinated traditional race-neutral districting principles … to racial considerations." *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178,

10

187 (2017). In doing so, the plaintiff may rely on "'direct evidence' of legislative intent, 'circumstantial evidence of a district's shape and demographics,' or a mix of both." *Cooper*, 137 S. Ct. at 1464 (citation omitted); *see Davis v. Chiles*, 139 F.3d 1414, 1424 (11th Cir. 1998) ("A court may base such a finding either on circumstantial evidence regarding a district's shape and demographics or on direct evidence of a district-drawer's purpose."). Redistricting maps that violate traditional redistricting principles, for example, may constitute evidence of an unconstitutional racial gerrymander. *See Bethune-Hill*, 137 S. Ct. at 799 ("In general, legislatures that engage in impermissible race-based redistricting will find it necessary to depart from traditional principles in order to do so.").

### B. Race Predominated in the Creation of District 7, Resulting in a Racial Gerrymander.

The Defendants have stipulated that race was the predominant factor when the district court adopted District 7 in 1992. ECF No. 47 ¶ 14. As described above, the court in *Wesch* accepted the parties' stipulation that the district's population should be at least 65% Black, and it chose a plan that split an unprecedented number of counties in order to include their relatively Black areas while excluding relatively White ones. Although the court reviewed other aspects of the plans it considered, such as "the desirability of preserving compactness, cores of all districts, communities of interest, and political subdivisions," *Wesch*, 785 F. Supp. at 1499,

these were secondary to the overriding objective that the district be at least 65% Black.

Secretary Merrill has admitted that race also drove Alabama's redistricting plans after the 2000 and 2010 censuses as well. These plans, which left District 7 largely intact, were drawn allegedly to avoid retrogression—in other words, to keep the Black population high enough to avoid running afoul of the preclearance requirement of Section 5 of the Voting Rights Act. *See supra* pp. 6–7. Thus, both the 2001 and 2011 plans were racial gerrymanders as well.

### C.  The 2023 Plan Carried Forward and Made No Attempt to Remedy the Racial Gerrymander.

The 2023 plan retains the defining feature of the gerrymander that has existed since 1992: an extension of District 7 into Jefferson County to surround a disproportionately Black population. *See supra* pp. 4–9. This is the feature former Secretary Merrill conceded was a racial gerrymander. While the shape of the finger has changed over time to accommodate population growth, it has never stopped being a tool that separates voters by race to increase the Black population of District 7. At no point during the special session did the sponsors of the 2023 plan even attempt to justify their race-based district on grounds that would satisfy strict scrutiny.

### D.   The Racially Gerrymandered District 7 Is Not Narrowly Tailored to Further a Compelling State Interest.

As Secretary Merrill conceded, whether or not compliance with the Voting Rights Act may have justified packing Black voters into District 7 in 1992, it cannot justify further perpetuating racial divisions in Jefferson County.[3]

Here, the Legislature, which was ostensibly drawing new districts to comply with the Voting Rights Act, simply ignored the Supreme Court's decision in *Cooper v. Harris*, which held that a Congressional redistricting plan does not violate the Voting Rights Act just because it does not have a District with a BVAP majority. North Carolina contended that to avoid a Voting Rights Act violation it had to add Black voters to districts that were 48% and 43% BVAP until they exceeded 50%. The Supreme Court rejected this argument and held that the 50% BVAP Districts were unconstitutional racial gerrymanders, because there was enough white crossover voting in the 48% and 43% BVAP Districts to provide black voters an equal opportunity to elect the candidates of their choice. 137 S. Ct. at 1465–66.

Before adopting any plan that separates voters by race, it was incumbent on the Legislature to determine whether there was "a strong basis in evidence to conclude that § 2 demands ... race-based steps, [and] must carefully evaluate whether

---

[3] In fact, it was Secretary Merrill's position—with which Plaintiffs do not agree—that compliance with the Voting Rights Act can *never* be a compelling state interest that justifies a racial gerrymander. *Chestnut* Br. at 8 ("The Fourteenth Amendment trumps a statute, and it is not okay to violate a voter's Constitutional rights through racial sorting even if Congress purports to require it.").

a plaintiff could establish the *Gingles* preconditions ... in a new district created without those measures." *Wisc. Legislature v. Wisc. Elections Comm'n*, 142 S. Ct. 1245, 1250 (2022). Without such a basis in evidence, a remedial plan designed to reach a certain BVAP—even if the purpose was to comply with the Voting Rights Act—is a "textbook example of race-based districting" that cannot satisfy strict scrutiny. *Cooper v. Harris*, 581 U.S. at 301 (internal quotation marks omitted).

Plaintiffs Bobby Singleton and Rodger Smitherman, both of whom are Alabama State Senators, introduced plans at the special session that would have created two opportunity districts without any race-based line-drawing, that respected the longstanding districting principle of keeping counties whole to the extent possible, and that largely preserved the Black Belt community of interest in a single district. The Alabama Legislature rejected both plans.

### SINGLETON PLAN



### SMITHERMAN PLAN



The Singleton and Smitherman plans show that the Legislature had no reason to believe that gerrymandering District 7 was necessary to create two opportunity districts, and therefore that the racial gerrymander in District 7 cannot withstand strict scrutiny. Both plans contain a district largely composed of Jefferson County, and another district largely composed of Black Belt counties. None of these districts have a Black Voting Age Population of 50% or more. Yet in these districts, the preferred candidates of Black voters for statewide and federal offices generally would have received more votes than their opponents in previous elections, as the following tables show.

**Singleton Plan**

| Year | Did the preferred candidates of Black voters receive the most votes? | |
|------|----------------------------------|----------------------|
| | **Jefferson County District** | **Black Belt District** |
| 2012 | Yes | Yes |
| 2014 | Mostly No[4] | Yes |
| 2016 | Yes | Yes |
| 2017 | Yes | Yes |
| 2018 | Yes | Yes |
| 2020 | Yes | Yes |
| 2022 | Mostly Yes[5] | Yes |

---

[4] The Democratic candidate for Attorney General received more than 50% of the two-party vote. The Democratic candidates for Governor, Lieutenant Governor, Secretary of State, Auditor, and Commissioner of Agriculture and Industries received less than 50%.

[5] The Democratic candidates for Attorney General, Secretary of State, and Associate Justice received more than 50% of the two-party vote. The Democratic candidate for Governor received less than 50%.

**Smitherman Plan**

| Year | Did the preferred candidates of Black voters receive the most votes? | |
| :---: | :---: | :---: |
| | **Jefferson County District** | **Black Belt District** |
| 2012 | Yes | Yes |
| 2014 | Mostly Yes[6] | Yes |
| 2016 | Yes | Yes |
| 2017 | Yes | Yes |
| 2018 | Yes | Yes |
| 2020 | Yes | Yes |
| 2022 | Yes | No |

All in all, in the Singleton Plan, the preferred candidates of Black voters received more votes in 22 of the past 28 races in the Jefferson County district (79%), and in all 28 races in the Black Belt district. In the Smitherman Plan, the preferred candidates of Black voters received more votes in 26 of the past 28 races in the Jefferson County district (93%), and in 23 of the past 28 races in the Black Belt district (82%).

Because crossover voting has allowed the preferred candidates of Black voters to succeed the vast majority of the time, it cannot be said that "a district's white majority … [votes] sufficiently as a bloc to usually defeat the minority's preferred candidate." *Cooper v. Harris*, 581 U.S. at 302 (internal quotation marks omitted); *accord North Carolina v. Covington*, 138 S. Ct. 2548, 2550 (2018) ("A group of plaintiff voters, appellees here, alleged that the General Assembly racially

---

[6] The Democratic candidates for Governor, Lieutenant Governor, Attorney General, and Auditor received more than 50% of the two-party vote. The Democratic candidates for Secretary of State and Commissioner of Agriculture and Industries received less than 50%.

gerrymandered their districts when—in an ostensible effort to comply with the requirements of the Voting Rights Act of 1965—it drew 28 State Senate and State House of Representatives districts comprising **majorities** of black voters. The District Court granted judgment to the plaintiffs, and we summarily affirmed that judgment.") (emphasis added) (citation omitted).

In *Abbott v. Perez*, the Supreme Court cited *Cooper v. Harris* when it held that Texas had not shown good reasons to draw a racially gerrymandered District without showing that doing so was necessary to create an opportunity for minority voters to elect their preferred candidates: "North Carolina argued that its race-based decisions were necessary to comply with § 2, but the State could point to 'no meaningful legislative inquiry' into 'whether a new, enlarged' district, 'created without a focus on race, ... could lead to § 2 liability.'" 138 S. Ct. 2305, 2334–35 (quoting *Cooper v. Harris*, 581 U.S. at 304). During the Alabama special session, the proponents of the 2023 plan were given data showing that the Singleton and Smitherman plans included two opportunity districts without focusing on race, and they never claimed that it was necessary to focus on race to avoid Section 2 liability.

## II.  The Plaintiffs' Plans Are a Constitutional and Sensible Remedy for the Racial Gerrymander.

The *Singleton* Plaintiffs believe that the Singleton and Smitherman plans are excellent remedies for the Legislature's racial gerrymander. If they had to choose one, they would urge the Court to adopt the Singleton plan, which creates two real

opportunity districts and satisfies traditional districting principles as well as, or better than, the Legislature's plan. Those principles, adopted for the 2020 redistricting cycle and readopted for the 2023 special session, include the following:

- Congressional districts shall have minimal population deviation.

- Plans must comply with the one person, one vote principle of the Equal Protection Clause of the 14th Amendment of the United States Constitution.

- Plans must comply with the Voting Rights Act.

- Districts must respect communities of interest, which may include counties and municipalities.

- Districts must be contiguous and reasonably compact.

- The Legislature shall try to preserve the cores of existing districts.

- Contests between incumbents will be avoided when possible.

The Singleton plan adheres to these principles without racial gerrymandering.

*Minimal population deviation/"One Person, One Vote"*: Like the enacted 2023 plan, each district in the Singleton plan has the same population, plus or minus one person.

*Voting Rights Act*: As the *Milligan* and *Caster* Plaintiffs will show, the 2023 plan violates the Voting Rights Act because it does not even come close to giving Black voters the opportunity to elect candidates of their choice in two districts. In

the Singleton Plan, such candidates received more votes than their opponents in two districts the vast majority of the time.

*Respecting communities of interest, including counties and municipalities*: From 1822 to 1965, Alabama's Congressional districts always followed county lines. And from 1965 to the beginning of the racial gerrymandering era in 1992, only two counties were ever split, and even then by necessity because Jefferson County's population was larger than that of an ideal district. For the first time in decades, it is possible to return to the traditional principle of creating districts without splitting county boundaries, which the Singleton plan does (except for minor, race-neutral splits to equalize population). While the enacted 2023 plan splits fewer counties than its 2021 predecessor, it still unnecessarily splits Jefferson County, creating a divide between majority-Black and majority-White portions of Birmingham and its suburbs in Jefferson County.

The Singleton plan also respects the integrity of the Black Belt community of interest. It includes 16 of the 18 "core" Black Belt counties in a single district.[7] The enacted plan splits the Black Belt down the middle, with half of its core counties in

---

[7] The Defendants stipulated in *Milligan* that "[t]he Black Belt includes the core counties of Barbour, Bullock, Butler, Choctaw, Crenshaw, Dallas, Greene, Hale, Lowndes, Macon, Marengo, Montgomery, Perry, Pickens, Pike, Russell, Sumter, and Wilcox." No. 21-cv-1530-AMM, ECF No. 53 ¶ 61.

one district and half in another. Moreover, the Singleton plan preserves the Mobile/Baldwin and Wiregrass communities of interest.

*Contiguity and compactness*: The Singleton plan is contiguous and only marginally less compact than the 2023 enacted plan (and is about as compact as the 2021 enacted plan). Therefore, the Whole County Plan serves the goal of compactness about as well as the other plans, without racial gerrymandering.

*Preserving cores of districts*: The Legislature's redistricting principles state, "The Legislature shall try to preserve the cores of existing districts." This goal is sensible—unless those districts have been racially gerrymandered. In that case, "preserving the core of existing districts" is just a euphemism for retaining the racial gerrymander. "[E]fforts to protect incumbents by seeking to preserve the 'cores' of unconstitutional districts … ha[s] the potential to embed, rather than remedy, the effects of an unconstitutional racial gerrymander …." *Covington v. North Carolina*, 283 F. Supp. 3d 410, 431 (M.D.N.C. 2018), *aff'd in relevant part and reversed in part on other grounds*, 138 S. Ct. 2548 (2018); *see also Personhuballah v. Alcorn*, 155 F. Supp. 3d 552, 561 n. 8 (E.D. Va. 2016) ("In any event, maintaining district cores is the type of political consideration that must give way to the need to remedy a *Shaw* violation."). The Singleton plan may not preserve the cores of existing districts as well as the Legislature's enacted plan. But, as a remedy for the racially gerrymandered 2023 plan, that is a virtue, not a vice.

21

The Singleton plan also observes the Supreme Court's instruction that districts not affected by the racial gerrymander should not be altered in a remedial plan. *See North Carolina v. Covington*, 138 S. Ct. at 2554. Districts 1, 4, and 5 in the Singleton plan are identical to those districts in the 2021 enacted plan.

*Avoiding contests between incumbents*: The Legislature's guidelines also call for avoiding contests between incumbents where possible. In racially gerrymandered plans, however, protecting incumbents at all costs works the same way as preserving the cores of districts: it perpetuates the gerrymander. Four Supreme Court Justices have stated that whether "the goal of protecting incumbents is legitimate, even where … individuals are incumbents by virtue of their election in an unconstitutional racially gerrymandered district ... is a questionable proposition." *Easley v. Cromartie*, 532 U.S. 234, 262 n.3 (2001) (Thomas, J., dissenting) (noting that question was not presented to the Supreme Court or district court and, therefore, that the Court had not addressed it). Lower courts have agreed. *Covington*, 283 F. Supp. 3d at 431 ("[E]fforts to protect incumbents by seeking to preserve the 'cores' of unconstitutional districts … ha[s] the potential to embed, rather than remedy, the effects of an unconstitutional racial gerrymander …."); *Vera v. Richards*, 861 F. Supp. 1304, 1336 (S.D. Tex. 1994), *aff'd sub nom. Bush v. Vera*, 517 U.S. 952 (1996) ("Incumbent protection is a valid state interest only to the extent that it is not a pretext for unconstitutional racial gerrymandering."); *Ketchum v. Byrne*, 740 F.2d

1398, 1408 (7th Cir. 1984) ("Since it is frequently impossible to preserve white incumbencies amid a high black-percentage population without gerrymandering to limit black representation, it seems to follow that many devices employed to preserve incumbencies are necessarily racially discriminatory."); *see Jeffers v. Clinton*, 756 F. Supp. 1195, 1200 (E.D. Ark. 1990) ("The desire to protect incumbents, either from running against each other or from a difficult race against a black challenger, cannot prevail if the result is to perpetuate violations of the equal-opportunity principle contained in the Voting Rights Act."). The *Singleton* Plaintiffs would have liked to protect all incumbents, but it is essentially impossible to simultaneously 1) remedy the racial gerrymander, 2) protect incumbents, and 3) preserve the general shape of the Congressional districts outside the gerrymandered area.

In short, on all the redistricting criteria laid out by the Legislature, the Plaintiffs' plans are superior or comparable to the enacted 2021 plan, except when necessary to remedy the racial gerrymander. And the Plaintiffs' plans have the added benefit of not being unlawful.

## CONCLUSION

Alabama's District 7 perpetuates an admitted racial gerrymander, without serving any compelling interest. Therefore, it cannot and should not be the basis for the 2024 election. The Court should enjoin the 2023 plan and order a remedy, such

as the Singleton plan, that is race-neutral, honors traditional districting principles, and gives Black voters an opportunity to elect the candidates of their choice in two districts.

Dated: July 27, 2023                     Respectfully submitted,

*/s/ James Uriah Blacksher*
James Uriah Blacksher
825 Linwood Road
Birmingham, AL 35222
Tel: (205) 612-3752
Fax: (866) 845-4395
Email: jublacksher@gmail.com

Joe R. Whatley, Jr.
WHATLEY KALLAS, LLP
2001 Park Place North
1000 Park Place Tower
Birmingham, AL 35203
Tel: (205) 488-1200
Fax: (800) 922-4851
Email: jwhatley@whatleykallas.com

*/s/ Henry C. Quillen*
Henry C. Quillen
(admitted *pro hac vice*)
WHATLEY KALLAS, LLP
159 Middle Street, Suite 2C
Portsmouth, NH  03801
Tel: (603) 294-1591
Fax: (800) 922-4851
Email: hquillen@whatleykallas.com

Myron Cordell Penn
PENN & SEABORN, LLC
1971 Berry Chase Place
Montgomery, AL 36117
Tel: (334) 219-9771

Email: myronpenn28@hotmail.com

Diandra "Fu" Debrosse Zimmermann
Eli Hare
DICELLO LEVITT GUTZLER
420 20th Street North, Suite 2525
Birmingham, AL 35203
Tel.: (205) 855.5700
Email: fu@dicellolevitt.com
          ehare@dicellolevitt.com

U.W. Clemon
U.W. Clemon, LLC
Renasant Bank Building
2001 Park Place North, Tenth Floor
Birmingham, AL 35203
Tel.: (205) 506-4524
Fax: (205) 538-5500
Email: uwclemon1@gmail.com

Edward Still
2501 Cobblestone Way
Birmingham, AL  35226
Tel: (205) 335-9652
Fax: (205) 320-2882
Email: edwardstill@gmail.com

*Counsel for Singleton Plaintiffs*