FILED
2023 Aug-07  PM 03:25
U.S. DISTRICT COURT
N.D. OF ALABAMA



# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

**BOBBY SINGLETON et al.,**

      **Plaintiffs,**

v.

**WES ALLEN, in his official capacity as Alabama Secretary of State, et al.,**

      **Defendants.**

**Case No.: 2:21-cv-01291-AMM**

**Three-Judge Court**

## PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF THEIR OBJECTION TO THE STATE'S REMEDIAL PLAN AND MOTION FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. ii

INTRODUCTION ............................................................................ 1

ARGUMENT .................................................................................. 4

    I.    Undisputed Facts Establish That the Enacted Plan Is an
    Unconstitutional Racial Gerrymander .................................................. 4

        A.    The Defendants Admit That Race Predominated in the Creation
        of District 7 in 1992, and They Do Not Dispute That
        Subsequent Changes Were Inconsequential ............................... 5

        B.    A "Least Change" Plan Based on a Racial Gerrymander Is a
        Racial Gerrymander .................................................................. 7

            1.    The Plaintiffs Are Likely to Meet Their Burden of Proof
            That Race Predominated in the Creation of District 7 in
            the 2023 Plan ................................................................ 7

            2.    Reenacting a Gerrymander Does Not Eliminate the
            Gerrymander ................................................................. 9

        C.    The Defendants Mischaracterize the *Singleton* Plaintiffs'
        Arguments ................................................................................ 13

    II.    The Singleton Plan Is a Sensible and Constitutional Remedy for the
    Legislature's Unlawful Plan ............................................................. 16

CONCLUSION ............................................................................... 17

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Perez*,
138 S. Ct. 2305 (2018)...........................................................................13, 14

*Allen v. Milligan*,
143 S. Ct. 1487 (2023)...................................................................................12

*Bartlett v. Strickland*,
556 U.S. 1 (2009)...........................................................................................2

*Bush v. Vera*,
517 U.S. 952 (1996).....................................................................................8, 9

*Cooper v. Harris*,
581 U.S. 285 (2017)............................................................................. *passim*

*Covington v. North Carolina*,
283 F. Supp. 3d 410 (M.D.N.C. 2018),
*aff'd in relevant part and reversed in part on other grounds*,
138 S. Ct. 2548 (2018)....................................................................................11

*GRACE, Inc. v. City of Miami*,
No. 1:22-CV-24066-KMM, 2023 WL 4942064
(S.D. Fla. Aug. 3, 2023) .................................................................................11

*Jacksonville Branch of NAACP v. City of Jacksonville*,
No. 3:22-CV-493-MMH-LLL, 2022 WL 17751416
(M.D. Fla. Dec. 19, 2022)................................................................................11

*Knight v. Alabama*,
787 F. Supp. 1030 (N.D. Ala. 1991),
*aff'd in part, vacated in part, and rev'd in part*,
14 F.3d 1534 (11th Cir. 1994) .........................................................................1

*Lynch by Lynch v. Alabama*,
2011 WL 13186739, (N.D. Ala. Nov. 7, 2011),
*aff'd in part, vacated in part, and remanded sub nom.*
*I.L. v. Alabama*, 739 F.3d 1273 (11th Cir. 2014) ............................................1

*Miller v. Johnson*,
    515 U.S. 900 (1995)..........................................................................................8

*North Carolina v. Covington*,
    138 S. Ct. 2548 (2018)..................................................................... *passim*

*Personhuballah v. Alcorn*,
    155 F. Supp. 3d 552 (E.D. Va. 2016) ..........................................................12

*Shaw v. Reno*,
    509 U.S. 630, 649 (1993) .................................................................. *passim*

*Singleton v. Merrill*,
    582 F.Supp.3d 924 (ND Ala. 2022) ...........................................................12

## INTRODUCTION

The Defendants are between a rock and a hard place. On one hand, they must defend the Legislature's 2023 Plan as an adequate remedy for the likely violation of Section 2 of the Voting Rights Act. On the other, they must refute the *Singleton* Plaintiffs' allegation that the 2023 Plan is an unconstitutional racial gerrymander.

The strategy they adopt for the VRA remedy is to try reformulating the *Gingles* I standard on the basis of communities of interest in a way they hope will appeal to a majority of the Supreme Court. But this strategy runs afoul of the *Shaw* Equal Protection jurisprudence by retaining the split of Jefferson County along racial lines that was originally created to produce a supermajority-Black district. No matter how District 2 performs, the 2023 Plan cannot be an adequate remedy for the VRA violation if District 7 is an unconstitutional racial gerrymander.

Jefferson County and the Black Belt are the two most important communities of interest in Alabama history. For a century after Reconstruction, the Big Mules in industrial Jefferson County and the Bourbon White landowners in the Black Belt ruled the Alabama Legislature with an iron hand.[1] And for nearly two years the *Singleton* Plaintiffs have been demonstrating how keeping both those communities

---

[1] *See Lynch by Lynch v. Alabama*, 2011 WL 13186739, at *30 *et seq.*, *43 *et seq.* (N.D. Ala. Nov. 7, 2011), *aff'd in part, vacated in part, and remanded sub nom. I.L. v. Alabama*, 739 F.3d 1273 (11th Cir. 2014); *Knight v. Alabama*, 787 F. Supp. 1030, 1090 (N.D. Ala. 1991), *aff'd in part, vacated in part, and rev'd in part*, 14 F.3d 1534 (11th Cir. 1994) (explaining the history of the Big Mule–Bourbon Alliance in detail); *see also* Ala. Act 2023-563 at 1 ("[Traditional redistricting] principles are the product of history, tradition, bipartisan consensus, and legal precedent.").

of interest whole yields two effective crossover districts that comply with the VRA. In fact, the plan Senator Singleton proposed at the 2023 special session outperforms the Legislature's 2023 Plan in keeping together Mobile and Baldwin Counties, the Wiregrass, and the Black Belt.

So why wouldn't the Legislature adopt the 2023 Singleton Plan or one of the other versions of it? The two performing crossover districts would remedy the Section 2 VRA violation. "States can—and in proper cases should—defend against alleged § 2 violations by pointing to crossover voting patterns and to effective crossover districts. Those can be evidence, for example, of diminished bloc voting under the third *Gingles* factor or of equal political opportunity under the § 2 totality-of-the-circumstances analysis. And if there were a showing that a State intentionally drew district lines in order to destroy otherwise effective crossover districts, that would raise serious questions under both the Fourteenth and Fifteenth Amendments." *Bartlett v. Strickland*, 556 U.S. 1, 24 (2009).  Senators Singleton and Smitherman were told by the Legislature's leadership that national Republicans did not want to create a second opportunity district that might elect a Democrat. But using race as a proxy for partisan advantage violates the Equal Protection Clause.

The Defendants realize that their VRA defense of the 2023 Plan, which correctly points out that a remedial plan must comply with the Constitution as well as the VRA, undermines their ability to defend the *Singleton* Plaintiffs' contention

that the 2023 Plan unconstitutionally gerrymanders Jefferson County. So they attempt to rewrite the *Shaw* jurisprudence by arguing Plaintiffs must prove that the Legislature had a racially discriminatory motive, not just a motive to separate residents of Jefferson County by race. This is a blatant misreading of the case law, and this Court lacks the power to overrule those binding precedents. If this Court were to adopt the 2023 Singleton Plan as its remedial plan, it would avoid the most serious constitutional challenges the Defendants might level at the VRA.

The *Singleton* Plaintiffs wish to make their position clear. They agree that the VRA and the Constitution require drawing majority-Black or race-based crossover districts when no race-neutral plan can provide Black citizens an equal opportunity to elect candidates of their choice. But in the case of Alabama's congressional districts, plans that respect all the important communities of interest can produce two opportunity districts without resorting to splitting counties along racial lines. The *Singleton* Plaintiffs understand that many Alabamians, including the *Caster* and *Milligan* Plaintiffs, would prefer majority-Black congressional districts, but the Supreme Court does not permit race-based districting when Black voters have the opportunity to elect candidates of their choice in districts drawn without racial gerrymandering.

Because of this basic rule, neither the Legislature's 2023 Plan, nor the *Caster* and *Milligan* Plan, both of which separate voters by race despite the availability of

effective crossover districts, can satisfy strict scrutiny. At the very least, this Court must make clear that the Special Master may adopt districts that segregate voters by race only if he first determines that it is impossible to create two opportunity districts in a race-neutral manner.

As the *Singleton* Plaintiffs will show, creating such districts is not only possible, but also desirable as a matter of policy. Keeping Jefferson County whole promotes multiracial politics in the one Alabama county that has demonstrated its success. Splitting Jefferson County along racial lines would impede its progress toward minimizing racially polarized voting and deny its multiracial constituency a powerful voice in Congress. Keeping all but two of the Black Belt counties in one district provides their disproportionately impoverished citizens the best chance to obtain federal assistance in their struggle to overcome centuries of oppression. The same can be said about the asserted Mobile/Baldwin and Wiregrass communities of interest. And the 2023 Singleton Plan preserves Districts 1, 4, and 5 exactly as they were drawn in the 2021 plan, observing the Supreme Court's instructions to avoid changes that are unnecessary to rectify an unconstitutional racial gerrymander.

## ARGUMENT

### I.    Undisputed Facts Establish That the Enacted Plan Is an Unconstitutional Racial Gerrymander.

In a case involving racial gerrymandering, a plaintiff can meet its burden of proof by showing that the shape and demographics of a district alone indicate that

race was the predominant factor in the district's creation. In 1992, a racially gerrymandered District 7 was created for the predominant purpose of concentrating Black voters into a single congressional district. This is undisputed. Since then, the Alabama Legislature has reenacted essentially the same district after every census; the Defendants do not claim that the shape or demographics of District 7 in 2021 differ from the 1992 version in any material way. Because the new District 7 is essentially the same as a district that was admittedly racially gerrymandered, it is racially gerrymandered as well.

A racial gerrymander is unconstitutional unless the defendant can prove that it was narrowly tailored to address a compelling interest. Here, the Defendants cite policy preferences, such as maintaining the cores of existing districts and avoiding races between incumbents, but they do not claim these would constitute a compelling interest that would justify District 7 as it was enacted in 2023.

### A. The Defendants Admit That Race Predominated in the Creation of District 7 in 1992, and They Do Not Dispute That Subsequent Changes Were Inconsequential.

As the *Singleton* Plaintiffs have described, and as the Defendants have not disputed, the 1992 version of District 7 reached into Birmingham, southern Tuscaloosa County, and western Montgomery County to draw Black residents into the district, while leaving the relatively White population of Jefferson, Tuscaloosa, and Montgomery Counties in other districts. ECF No. 57 at 5. Secretary Merrill has

asserted in this Court that the 1992 version of District 7 "appears to be racially gerrymandered, with a finger sticking up from the black belt for the sole purpose of grabbing the black population of Jefferson County." *Chestnut v. Merrill*, No. 2:18-CV-00907-KOB (N.D. Ala. Oct. 28, 2019), ECF No. 101 at 11 ("*Chestnut* Br."). During the 2022 proceedings in this case, the Defendants stipulated that Jefferson County was split "for the predominant purpose of drawing one majority-Black district." ECF No. 47 at 3 ¶ 14. Drawing district lines with race as the predominant factor is the definition of a racial gerrymander. *Cooper v. Harris*, 581 U.S. 285 (2017).

The Defendants have also conceded that the shape of District 7 in Jefferson County has remained substantially similar since 1992, including in the 2023 Plan. One of their own briefs asserts, "Both the 2001 and 2011 maps maintained the cores of districts, changing them only to equalize population. The 2011 map largely built off the 2001 map, which itself built off the 1992 map." ECF No. 67 at 12. Their own expert has described the 2021 Plan as a "least change approach." ECF No. 54-1 at 22, and they told the Supreme Court that "Alabama's 2021 congressional map is a continuation of past redistricting plans." *Allen v. Milligan*, Nos. 21-1086, 21-1087, Brief for Appellants at 54. In their most recent brief, they assert that the 2023 Plan "largely maintains existing districts." ECF No. 162 at 14. And while they point out changes to Districts 1, 2, and 7 in the 2023 Plan, they do not claim that any of these

changes affected Jefferson County, where a "finger" still reaches up from the Black Belt to encompass a disproportionately Black population.

> **B.  A "Least Change" Plan Based on a Racial Gerrymander Is a Racial Gerrymander.**

The Defendants argue that the 2023 plan cannot be a racial gerrymander because (according to them) the Legislature relied on traditional districting principles like preserving the cores of districts and protecting incumbents, without considering race. Starting with a prior map and making adjustments based on population changes, they claim, is unobjectionable because it is a common practice. But the idea that a racial gerrymander ceases to be a racial gerrymander when it is reenacted squarely contradicts both *Cooper v. Harris*, 581 U.S. 285 (2017), and *North Carolina v. Covington*, 138 S. Ct. 2548 (2018). It misconceives both the proof required to state a claim of racial gerrymandering, and the nature of the claim itself.

> **1.  The Plaintiffs Are Likely to Meet Their Burden of Proof That Race Predominated in the Creation of District 7 in the 2023 Plan.**

The Defendants maintain that a claim of racial gerrymandering turns only on a legislature's intent. ECF No. 162 at 5. Not once, however, do they cite the Supreme Court's definitive guidance on how intent is proven in cases of racial gerrymandering. There, "the plaintiff may make the required showing through 'direct evidence' of legislative intent, 'circumstantial evidence of a district's shape and demographics,' or a mix of both." *Cooper v. Harris*, 581 U.S. at 291. Therefore,

the shape and demographics of a district alone can prove that the legislature intended to make race the predominant factor in allocating voters to districts.

In some cases, it may be difficult to determine legislative intent from the shape and demographics of a district. Here, the task is easy because the Defendants do not dispute that the shape of District 7 is driven by race. Race admittedly predominated in the district's creation in 1992, and its shape has not meaningfully changed since. If any district can justify a finding of intent through circumstantial evidence of its shape and demographics, it is one undisputedly similar to a prior iteration that Secretary Merrill stated in court was "a racial gerrymander." *Chestnut* Br. at 11.[2]

By focusing on what they claim are race-neutral principles motivating the 2023 Plan, the Defendants misunderstand the nature of the harm caused by racial gerrymandering in the *Shaw* jurisprudence; it is not a traditional discrimination claim. *Miller v. Johnson*, 515 U.S. 900, 911 (1995) ("*Shaw* recognized a claim analytically distinct from a vote dilution claim.") (cleaned up). The harm caused by racial gerrymandering in the *Shaw* context is not the kind of practical disadvantage suffered by identifiable class of voters due to vote denial or dilution; rather, it is what the Court has labeled an "expressive harm." *Bush v. Vera*, 517 U.S. 952, 984 (1996) (opinion of O'Connor, J.). By reinforcing the perception that elected officials should

---

[2] While the 1992 plan was a court-ordered plan, that does not change the fact that it was gerrymandered by race. The Legislature was well aware that race drove the shape of District 7 when it reenacted similar plans in 2001, 2011, 2021, and 2023. See Part I.B.2 below.

represent primarily the members of one racial group, this expressive harm "would

seem to play no favorites, but to fall on every citizen and every representative alike."

*Id.* at 1053–54 (Souter, J., dissenting). So long as it continues to separate voters on

the basis of race, the racial gerrymander does not diminish its expressive harm over

time as might happen in the case of past discriminatory intent.

### 2.    Reenacting a Gerrymander Does Not Eliminate the Gerrymander.

While the Defendants urge the Court to focus exclusively on the intent of the

2023 Legislature, the Supreme Court has held that a racial gerrymandering claim

does not disappear when a new legislature reenacts old lines. After finding two North

Carolina State House districts to be unconstitutional racial gerrymanders, a district

court ordered the Legislature to draw new maps. When the Legislature did so, the

defendants asserted that the new maps mooted the plaintiffs' claims. The Supreme

Court stated,

> The defendants misunderstand the nature of the plaintiffs' claims. …
> [I]t is the segregation of the plaintiffs—not the legislature's line-
> drawing as such—that gives rise to their claims. … [T]hey argued in
> the District Court that some of the new districts were mere
> continuations of the old, gerrymandered districts. Because the plaintiffs
> asserted that they remained segregated on the basis of race, their claims
> remained the subject of a live dispute, and the District Court properly
> retained jurisdiction.

*North Carolina v. Covington*, 138 S. Ct. at 2552–53. Even if the 2023 Alabama

Legislature had the noblest of intentions when it reenacted the 2021 racial

gerrymander (which itself traces back to the 1992 racial gerrymander), that is of cold comfort to the voters who "remained segregated on the basis of race." *Id.*

Even if the Legislature did not consider race when reviewing the proposed 2023 Plan, that would not launder the driving purpose of the shape of District 7: to concentrate Black voters into a single district. In *North Carolina v. Covington*, it was undisputed that the legislature "instructed its map drawers not to look at race when crafting a remedial map." 138 S. Ct. at 2553. Nevertheless, the plaintiffs were entitled to relief because of "sufficient circumstantial evidence that race was the predominant factor governing the shape of those four districts." *Id.* Here, the circumstantial evidence that race predominated in the shape of District 7 is undisputed. Therefore, it would be immaterial if the 2023 Legislature did not consider race when perpetuating the racially gerrymandered District 7.

The Defendants rely exclusively on what they claim are race-neutral principles underlying the readoption of the Jefferson County gerrymander: preserving the cores of districts and avoiding the pairing of incumbents. In many cases, these principles are indeed race-neutral and unobjectionable. But when the starting point is a racially gerrymandered map, particularly a map that has been admitted to be a gerrymander, the presumption flips: preserving district cores and protecting incumbents is evidence that the line-drawers intended to separate voters by race. *Jacksonville Branch of NAACP v. City of Jacksonville*, No. 3:22-CV-493-

MMH-LLL, 2022 WL 17751416, at *13 (M.D. Fla. Dec. 19, 2022) (evidence that previous district lines were based on race "was significant because, in the 2021–2022 redistricting cycle, the City Council decided to maintain the lines from 2011 as much as possible in the interest of preserving district cores and protecting incumbents"); *Jacksonville*, 2022 WL 16754389, at *3 (11th Cir. Nov. 7, 2022) (an intent "to maintain the race-based lines created in the previous redistricting cycle" is "not a legitimate objective"); *GRACE, Inc. v. City of Miami*, No. 1:22-CV-24066-KMM, 2023 WL 4942064, at *4 (S.D. Fla. Aug. 3, 2023) ("The Court's analysis of core retention was therefore appropriately limited to an evaluation of whether the Remedial Plan perpetuated the harms of racial gerrymandering, which the Court found it did."); *GRACE*, 2023 WL 4853635, at *2–3 (S.D. Fla. July 30, 2023) (finding of racial gerrymandering was buttressed where the city's "intent was, as expressed, to preserve previously-drawn race-based lines of the Commission Districts in the 2022 redistricting process.'") (citation omitted); *Covington v. North Carolina*, 283 F. Supp. 3d 410, 431 (M.D.N.C. 2018) ("[E]fforts to protect incumbents by seeking to preserve the 'cores' of unconstitutional districts … have the potential to embed, rather than remedy, the effects of an unconstitutional racial gerrymander …."), *aff'd in relevant part and reversed in part on other grounds*, 138 S. Ct. 2548 (2018); *Covington*, 138 S. Ct. at 2551 (enjoining districts that "retain[ed] the core shape" of previously racially gerrymandered districts, because the redrawn

districts continued to bear the hallmarks of racial predominance); *Personhuballah v. Alcorn*, 155 F. Supp. 3d 552, 561 n.8 (E.D. Va. 2016) ("In any event, maintaining district cores is the type of political consideration that must give way to the need to remedy a *Shaw* violation."); *see Allen v. Milligan*, 143 S. Ct. 1487, 1505 (2023) (majority opinion) ("But this Court has never held that a State's adherence to a previously used districting plan can defeat a § 2 claim. If that were the rule, a State could immunize from challenge a new racially discriminatory redistricting plan simply by claiming that it resembled an old racially discriminatory plan."); *id.* at 1531 (Thomas, J., dissenting) ("Absent core retention, there is no apparent race-neutral reason to insist that District 7 remain a majority-black district uniting Birmingham's majority-black neighborhoods with majority-black rural areas in the Black Belt."); *id.* at 1528 n.10 (Thomas, J., dissenting) ("The District Court disregarded the 'finger' because it has been present in every districting plan since 1992, including the State's latest enacted plan. *Singleton v. Merrill*, 582 F.Supp.3d 924, 1011 (ND Ala. 2022) (per curiam). But that reasoning would allow plaintiffs to bootstrap one racial gerrymander as a reason for permitting a second.").

Because the shape of District 7 in Jefferson County in the 2023 Plan is undisputedly similar to the one used to create a Black majority, the Defendants' statements that they preserved cores of existing districts and protected incumbents

are essentially admissions that the *Singleton* Plaintiffs are likely to prevail on their claim that race predominated in the creation of that district.

### C.   The Defendants Mischaracterize the *Singleton* Plaintiffs' Arguments.

Because preserving the cores of gerrymandered districts is plainly evidence that race predominated in the creation of those districts, and because the Defendants have not attempted to controvert that evidence or introduce any of their own, the conclusion is inevitable: the split of Jefferson County in the 2023 Plan is a racial gerrymander. And because the Defendants have not asserted that the gerrymander satisfies strict scrutiny, it is unconstitutional. Unable to escape this basic logic, the Defendants attack arguments the *Singleton* Plaintiffs did not make.

First, the Defendants accuse the *Singleton* Plaintiffs of claiming that the 2023 Plan is unlawful because it does not contain "districts with Plaintiffs' preferred racial compositions." ECF No. 162 at 11. The *Singleton* Plaintiffs have offered alternative plans with different racial compositions than the 2023 Plan, but never argued that 2023 Plan is unlawful because it does not match these compositions. The *Singleton* Plaintiffs' argument is that the 2023 Plan separates voters on the basis of race, and that no compelling interest justifies this racial gerrymander.

Second, the Defendants claim that the *Singleton* Plaintiffs "imput[e] the alleged purpose of past redistricting plans to the 2023 Plan," ECF No. 162 at 10, noting that under *Abbott v. Perez*, a previous legislature's discrimination "cannot, in

13

the manner of original sin, condemn governmental action that is not itself unlawful." 138 S. Ct. at 2305, 2324 (2018). The *Singleton* Plaintiffs' gerrymandering claim, however, relies not on some free-floating "taint" from a previous legislature that could invalidate otherwise lawful districts, but on the shape and demographics of District 7, which undisputedly show that the 2023 Plan separates voters by race. As described above, the *Singleton* Plaintiffs' *Shaw* claim is distinct from a claim of discriminatory vote dilution, *Abbott v. Perez*, 138 S. Ct. at 2314, and the Legislature's good faith or lack thereof is irrelevant. In fact, the portion of *Abbott v. Perez* that more closely corresponds to the *Singleton* Plaintiffs' claims is Part IV.B, which affirmed a finding of racial gerrymandering on the merits. 138 S. Ct. at 2334–35. There, it was undisputed that a district's lines were drawn the way they were because of race, and the Court rejected the Legislature's evidence that race-based line drawing was necessary to satisfy Section 2 of the Voting Rights Act. *Id.* Here, the Alabama Legislature carried forward, with insubstantial changes, district lines undisputedly drawn for predominantly racial purposes. It is the carrying forward of race-driven lines, not the carrying forward of any taint or ill intent, that makes District 7 a racial gerrymander.

Third, the Defendants complain that the *Singleton* Plaintiffs' theory would mean that "any time the conditions justifying creation of a VRA district in the past dissipate, the State may find itself with a springing Fourteenth Amendment violation

based on the *original* creation of that district." ECF No. 162 at 14–15. A "springing"

violation would be one that results from an event beyond the Legislature's control,

which is not the *Singleton* Plaintiffs' theory. Instead, the *Singleton* Plaintiffs assert,

and can scarcely believe the Defendants would deny, that when a legislature draws

race-based lines, it must have "'good reasons' to think that it would transgress the

[Voting Rights] Act if it did not draw race-based district lines." *Cooper v. Harris*,

581 U.S. at 293. The Defendants seem to be complaining about the unfairness of

requiring the Alabama Legislature to be familiar with governing federal law before

it passes legislation that affects the voting rights of millions of people. But this is not

hard; Secretary Merrill acknowledged that the anti-retrogression requirement of

Section 5 of the Voting Right Act—the justification for extending a finger into

Jefferson County—no longer constrains the Legislature. *Chestnut* Br. at 11–12.

Nevertheless, in 2023 the Legislature gave Jefferson County the finger again.

> Fourth, the Defendants assert the following:

> Even if racial considerations predominated in 1992, and even if any of
> that intent could be imputed to the 2023 Map (despite binding Supreme
> Court and Eleventh Circuit precedents holding otherwise), Plaintiffs
> have not actually argued that the 1992 Map violated the Equal
> Protection Clause. And indeed, it would be a tough argument to make
> considering that the 1992 Map was imposed by a federal court.

ECF No. 162 at 13. This one is actually true, but it misses the point. The 1992 Plan

undisputedly separated voters for predominantly racial purposes, but it was not until

the next year that the Supreme Court held that drawing lines for predominantly racial

purposes constitutes a racial gerrymander. *Shaw v. Reno*, 509 U.S. 630, 649 (1993). In 2001 and 2011, the Legislature's race-based lines likely could have survived strict scrutiny because of the anti-retrogression requirement of Section 5. But under today's law, including *Cooper v. Harris*, a racial gerrymander that is not narrowly tailored to serve a compelling interest is unconstitutional, whether it would have been allowed in 1992 or not. The Defendants' position of "it used to be legal" is an all-purpose argument for ignoring changes in binding law. Edit a few words in the Defendants' brief and Alabama gets to keep its segregated schools:

> Even if racial considerations predominated in [the assignment of Black children to segregated schools prior to *Brown v. Board of Education*], and even if any of that intent could be imputed to the [continued segregation of schoolchildren], Plaintiffs have not actually argued that the [segregation of schoolchildren prior to *Brown v. Board of Education*] violated the Equal Protection Clause. And indeed, it would be a tough argument to make considering that [segregation] was [allowed] by a federal court [in *Plessy v. Ferguson*].

The law changes, and Alabama must change with it.

## II.   The Singleton Plan Is a Sensible and Constitutional Remedy for the Legislature's Unlawful Plan.

The Defendants have not disputed that the Singleton Plan meets or beats the 2023 Plan on every districting principle the Defendants invoke. Thus, the *Singleton* Plaintiffs will not belabor the issue here, but they must make clear that adopting the Singleton Plan would allow this Court to sidestep the potentially serious constitutional issues that would arise if it ordered a remedial plan that separates

16

voters by race.[3] *See Cooper v. Harris*, 581 U.S. at 293 (legislature must have "'good reasons' to think that it would transgress the [Voting Rights] Act if it did not draw race-based district lines").

## CONCLUSION

The Defendants' flawed justification for gerrymandering Jefferson County is simple: although Jefferson County's district lines were originally created with the predominant purpose of separating Black and White voters, the Legislature may reenact those lines with insubstantial changes in perpetuity. In other words, "I say … segregation now … segregation tomorrow … segregation forever." George Wallace, First Inaugural Address at 2 (Jan. 14, 1963), https://digital.archives. alabama.gov/digital/collection/voices/id/2952. The Defendants are wrong. The 2023 Plan should be enjoined and replaced with a plan, such as the Singleton Plan, that provides two opportunity districts without dividing Alabamians along racial lines.

---

[3] This Court held that the *Milligan* and *Caster* Plaintiffs' illustrative plans, which had non-negotiable racial targets, were constitutional because they "prioritized race only for the purpose of determining and to the extent necessary to determine whether it was possible for the *Milligan* plaintiffs and the *Caster* plaintiffs to state a Section Two claim." ECF. No. 88 at 204–05. Once liability is established and a plan is offered as a remedy, however, any racial targets must be narrowly tailored to ensure compliance with the Voting Rights Act, as the Supreme Court held in *North Carolina v. Covington*, *Cooper v. Harris*, *Abbott v. Perez*, and *Wisconsin Legislature v. Wisconsin Elections Commission*, 142 S. Ct. 1245 (2022). This Court recognized the distinction between maps that establish liability under Section Two and maps that remedy a violation of Section Two: "Further, if we determine that the Plan violates Section Two, that would not be a determination that the *Milligan* plaintiffs are entitled to a map of their choice, or to one of the remedial maps submitted to establish the first *Gingles* requirement: those maps are illustrative maps submitted for the purposes of establishing liability under Section Two." ECF No. 88 at 51.

Dated: August 7, 2023                    Respectfully submitted,

                                         */s/ U.W. Clemon*
                                         U.W. Clemon
                                         U.W. Clemon, LLC
                                         Renasant Bank Building
                                         2001 Park Place North, Tenth Floor
                                         Birmingham, AL 35203
                                         Tel.: (205) 506-4524
                                         Fax: (205) 538-5500
                                         Email: uwclemon1@gmail.com

                                         Henry C. Quillen
                                         (admitted *pro hac vice*)
                                         WHATLEY KALLAS, LLP
                                         159 Middle Street, Suite 2C
                                         Portsmouth, NH  03801
                                         Tel: (603) 294-1591
                                         Fax: (800) 922-4851
                                         Email: hquillen@whatleykallas.com

                                         Joe R. Whatley, Jr.
                                         W. Tucker Brown
                                         WHATLEY KALLAS, LLP
                                         2001 Park Place North
                                         1000 Park Place Tower
                                         Birmingham, AL 35203
                                         Tel: (205) 488-1200
                                         Fax: (800) 922-4851
                                         Email: jwhatley@whatleykallas.com
                                            tbrown@whatleykallas.com

                                         James Uriah Blacksher
                                         825 Linwood Road
                                         Birmingham, AL 35222
                                         Tel: (205) 612-3752
                                         Fax: (866) 845-4395
                                         Email: jublacksher@gmail.com

                                         Myron Cordell Penn

PENN & SEABORN, LLC
1971 Berry Chase Place
Montgomery, AL 36117
Tel: (334) 219-9771
Email: myronpenn28@hotmail.com

Diandra "Fu" Debrosse Zimmermann
Eli Hare
DICELLO LEVITT GUTZLER
420 20th Street North, Suite 2525
Birmingham, AL 35203
Tel.: (205) 855.5700
Email: fu@dicellolevitt.com
        ehare@dicellolevitt.com

Edward Still
2501 Cobblestone Way
Birmingham, AL  35226
Tel: (205) 335-9652
Fax: (205) 320-2882
Email: edwardstill@gmail.com

***Counsel for Singleton Plaintiffs***