FILED
2023 Aug-08  PM 04:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

7/30/2019                 Chestnut, et al., v. John H. Merrill                 Josiah Bonner

Page 1

IN THE UNITED STATES DISTRICT COURT FOR

THE NORTHERN DISTRICT OF ALABAMA

SOUTHERN DIVISION


LAKEISHA CHESTNUT, et al.,

          Plaintiffs,


          vs.                    CASE NO. 2:18-cv-907-KOB


JOHN H. MERRILL, in his official capacity as

Alabama Secretary of State,

          Defendant.

     *     *     *     *     *     *     *     *


     The videotaped deposition of JOSIAH

BONNER was taken before Bethany Whaley,

Certified Court Reporter, ACCR 661, as

Commissioner, on Tuesday, July 30, 2019,

commencing at approximately 9:00 a.m., at the

Office of Attorney General, 501 Washington

Avenue, Montgomery, Alabama, pursuant to the

stipulations set forth herein.


DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646



| | |
|---|---|
| 1 | APPEARANCES |
| 2 | |
| 3 | Representing the Plaintiff: |
| 4 | Ms. Lalitha Madduri |
| 5 | Perkins Coie |
| 6 | 700 13th Street, NW |
| 7 | Suite 600 |
| 8 | Washington, DC 20005-3960 |
| 9 | 202.654.6203 |
| 10 | Lmadduri@perkinscoie.com |
| 11 | |
| 12 | Representing the Defendant: |
| 13 | Mr. James W. Davis |
| 14 | Ms. Laura E. Howell |
| 15 | Office of the Attorney General |
| 16 | 501 Washington Avenue |
| 17 | Montgomery, Alabama 36130-0152 |
| 18 | 334.353.1018 |
| 19 | jimdavis@ago.state.al.us |
| 20 | |
| 21 | |
| 22 | |

Page 2

| 1 | INDEX |
|---|---|
| 2 | WITNESS                              PAGE |
| 3 | JOSIAH BONNER |
| 4 | EXAMINATION BY MS. MADDURI          7 |
| 5 | |
| 6 | |
| 7 | INDEX OF EXHIBITS |
| 8 | Bonner Exhibit 1 - Map of Congressional    31 |
| 9 | District Plan |
| 10 | Bonner Exhibit 2 - Map of Congressional    53 |
| 11 | Districts from 1950 |
| 12 | Bonner Exhibit 3 - 2011 State Board of     58 |
| 13 | Education Map |
| 14 | Bonner Exhibit 4 - Revised Plan 1          62 |
| 15 | Bonner Exhibit 5 - Revised Plan 2          62 |
| 16 | Bonner Exhibit 6 - Revised Plan 3          63 |
| 17 | Bonner Exhibit 7 - Illustrative Plan 4     63 |
| 18 | Bonner Exhibit 8 - Hypothetical 2020 Plan  82 |
| 19 | Map |
| 20 | Bonner Exhibit 9 - News article            120 |
| 21 | |
| 22 | |

Page 4

| | |
|---|---|
| 1 | APPEARANCES |
| 2 | (Continued) |
| 3 | |
| 4 | Representing the Defendant: |
| 5 | Mr. Dorman Walker |
| 6 | Balch & Bingham |
| 7 | 105 Tallapoosa Street |
| 8 | Suite 200 |
| 9 | Montgomery, Alabama 36104 |
| 10 | 334.2693138 |
| 11 | dwalker@balch.com |
| 12 | |
| 13 | |
| 14 | Also Present: |
| 15 | Erika McKay, Governor's office |
| 16 | Bryan Taylor, Governor's office |
| 17 | Skip Warren, videographer |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |

Page 3

| | |
|---|---|
| 1 | *  *  *  *  *  *  *  * |
| 2 | STIPULATIONS |
| 3 | It is hereby stipulated and agreed by |
| | and between counsel representing the parties |
| 4 | that the videotaped deposition of JOSIAH |
| | BONNER is taken pursuant to the Rules of Civil |
| 5 | Procedure, and that said deposition may be |
| | taken before Bethany Whaley, Certified Court |
| 6 | Reporter, as Commissioner, without the |
| | formality of a commission; that objections to |
| 7 | questions, other than objections as to the |
| | form of the questions, need not be made at |
| 8 | this time, but may be reserved for a ruling at |
| | such time as the deposition may be offered |
| 9 | into evidence, or used for any other purpose |
| | by either party hereto, provided by the |
| 10 | Statute. |
| 11 | It is further stipulated and agreed |
| | by and between counsel representing the |
| 12 | parties in this case, that the filing of the |
| 13 | |
| 14 | deposition of JOSIAH BONNER is hereby waived, |
| | and that said deposition may be introduced at |
| 15 | the trial of this case or used in any other |
| | manner by either party hereto provided for by |
| 16 | the Statute, regardless of the waiving of the |
| 17 | filing of same. |
| 18 | It is further stipulated and |
| 19 | agreed by and between counsel and the witness |
| 20 | that the reading and signing of the deposition |
| 21 | by the witness is waived. |
| 22 | *  *  *  *  *  *  *  * |

Page 5

Pages 2 to 5

7/30/2019                    Chestnut, et al., v. John H. Merrill                    Josiah Bonner

| | |
|---|---|
| 1     THE VIDEOGRAPHER:  The marks the | 1   A.   My name is Josiah Robins Bonner, |
| 2  beginning of MPEG one, volume one in the | 2  Jr. |
| 3  videotape deposition of Josiah Bonner.  We are | 3   Q.   And what is your address? |
| 4  on the record.  Today is Tuesday, July 30th, | 4   A.   1163 Wellesley, W-E-L-L-E-S-L-E-Y, |
| 5  2019, and the time is 9:01 a.m. | 5  Green, Tuscaloosa, Alabama 35406, but I am in |
| 6     My name is Skip Warren.  I'm the | 6  the process of moving.  And so my new address |
| 7  videographer.  The court reporter is Bethany | 7  is 7216 Sibley, S-I-B-L-E-Y, Montrose, |
| 8  Whaley.  We're at the offices of the Alabama | 8  Alabama, M-O-N-T-R-O-S-E, 36559.  And that |
| 9  Attorney General in Montgomery, Alabama.  The | 9  will be effective September 1st. |
| 10  matter is Chestnut, et al. versus Merrill, | 10   Q.   And have you ever been deposed |
| 11  et al. The Civil Action Number is | 11  before, sir? |
| 12  218-CV-907-KOB. | 12   A.   I was asked that question, and I |
| 13     Would counsel and all present | 13  was not able to give a definitive answer.  So |
| 14  please introduce themselves after which the | 14  I don't believe I have, but I have |
| 15  court reporter will swear in the witness? | 15  participated in depositions when I was in |
| 16     MS. MADDURI:  Lalitha Madduri for | 16  Congress. |
| 17  the plaintiffs. | 17   Q.   In what capacity did you |
| 18     MR. DAVIS:  Jim Davis for | 18  participate? |
| 19  Secretary of State John Merrill. | 19   A.   I was chairman and then ranking |
| 20     MS. HOWELL:  Laura Howell for | 20  member of the House Ethics Committee.  So we |
| 21  Secretary of State Merrill. | 21  deposed witnesses when we were doing |
| 22     MR. WALKER:  Dorman Walker for | 22  investigations.  I have been called as a |
| Page 6 | Page 8 |

| | |
|---|---|
| 1  Secretary of State John Merrill. | 1  witness -- or I was told I would be called as |
| 2     MS. MCKAY:  Erica McKay, | 2  a witness in civil disputes, child custody |
| 3  Governor's Legal Office. | 3  cases and all, but I never actually testified. |
| 4     MR. TAYLOR:  Bryan Taylor -- Bryan | 4   Q.   Okay.  So you've never testified |
| 5  with a Y -- Governor's Legal Office. | 5  in a court of law or any other -- |
| 6     JOSIAH BONNER, | 6   A.   Not that I'm aware of. |
| 7  being first duly sworn, was examined and | 7   Q.   So I'll just go over a couple |
| 8  testified as follows: | 8  ground rules then. |
| 9   | 9   A.   Okay. |
| 10  EXAMINATION BY MS. MADDURI: | 10   Q.   So we're going to try to make a |
| 11   Q.   Good morning -- | 11  clear record, and for the sake of the court |
| 12   A.   Good morning. | 12  reporter, I'll ask you questions, and I just |
| 13   Q.   -- Mr. Bonner.  Thank you for | 13  ask that you wait until I'm finished asking |
| 14  being here. | 14  the question before you respond, and I will |
| 15   A.   Thank you. | 15  similarly try not to speak over you to make |
| 16   Q.   Like I said, I think we'll wrap up | 16  her job a little bit easier. |
| 17  in about ten minutes, but we do appreciate | 17     And it's also important just to |
| 18  your time and taking the morning out for us, | 18  give audible answers, either yes or no, as |
| 19  so thank you. | 19  opposed to shaking your head or nodding your |
| 20   A.   It's my pleasure.  Absolutely. | 20  head or saying uh-huh or um-hmm just because |
| 21   Q.   Can you please state your full | 21  it's hard to understand what that means when |
| 22  name for the record? | 22  it's on paper.  Does that all make sense? |
| Page 7 | Page 9 |

7/30/2019                 Chestnut, et al., v. John H. Merrill              Josiah Bonner

| | |
|---|---|
| 1  A.  Yes, ma'am. | 1  the phone call or exactly who called me. |
| 2  Q.  And if you don't understand a | 2  I believe it was the -- the chief |
| 3  question that I ask, please just let me know, | 3  counsel, Mr. Taylor, who called just to make |
| 4  and I'll try to clarify. | 4  me aware of this, but I wouldn't want to swear |
| 5  A.  Okay. | 5  under oath about that because it could have |
| 6  Q.  If you don't tell me that you | 6  been someone else.  But it was someone in |
| 7  don't understand -- | 7  that -- in that legal office. |
| 8  A.  (Witness nods head.) | 8  Q.  Okay.  And what did they tell you |
| 9  Q.  -- I'll assume that you have | 9  about the case? |
| 10  understood.  Does that make sense? | 10  MR. DAVIS:  I would object to that |
| 11  A.  It makes sense. | 11  on grounds of privilege.  Mr. Taylor and the |
| 12  Q.  Okay.  And if you need a break at | 12  Attorney General's office represent |
| 13  any time, just please let me know. | 13  Mr. Bonner.  So don't go into details about |
| 14  A.  (Witness nods head.)  Okay. | 14  what the legal office has told you about the |
| 15  Q.  I just only ask that if there's a | 15  case. |
| 16  question pending we just finish that question | 16  Q.  (By Ms. Madduri)  What is your |
| 17  before we take the break. | 17  general understanding of the case? |
| 18  A.  That sounds fair. | 18  A.  Well, my general understanding is, |
| 19  Q.  Okay.  Is there any reason today | 19  is that there was a challenge to the current |
| 20  that you can't give your full and honest | 20  district lines and that the judge determined |
| 21  testimony? | 21  that there was not enough time to order -- to |
| 22  A.  No, ma'am. | 22  rule on that and to order new district lines |
|  Page 10 |  Page 12 |

| | |
|---|---|
| 1  Q.  Any medication or anything like | 1  and that that matter would be set aside. |
| 2  that? | 2  And that -- the remaining question |
| 3  A.  No, ma'am. | 3  was whether or not the plaintiffs' contention |
| 4  Q.  Okay.  Great.  So how did -- how | 4  that there be two minority districts would be |
| 5  did you learn about this case? | 5  heard at a later time. |
| 6  A.  I was told, I believe, by a member | 6  Q.  And I'm not asking you for any |
| 7  of our legal staff that there was a case and | 7  privileged information here, but who else have |
| 8  that the Secretary of State's office and the | 8  you spoken with about the case other than the |
| 9  Attorney General's office and the plaintiffs | 9  lawyers that -- |
| 10  may all have some interest in talking with me | 10  A.  No one else. |
| 11  given that I had worked on Capitol Hill for | 11  Q.  Were you provided with any |
| 12  18 years and then served in Congress for six | 12  documents or records regarding the case? |
| 13  terms. | 13  A.  I -- I was -- I met with one of |
| 14  Q.  Okay.  And do you remember when | 14  the attorneys in the Governor's office who |
| 15  you learned about the case? | 15  advised that I did not need to read any |
| 16  A.  It would have been within the last | 16  documents or ask for any documents to prepare |
| 17  six months.  ==I've been with Governor Ivey for== | 17  for this.  And therefore, I did not ask for |
| 18  ==seven and a half months.  I've been her Chief== | 18  any documents, and I did not read any |
| 19  ==of Staff since January 15th,== and so it was | 19  documents. |
| 20  after I moved into the Chief of Staff's | 20  Q.  How did you prepare for today's |
| 21  office, but I don't keep a daily calendar -- I | 21  deposition, if you did? |
| 22  keep a daily calendar, but I -- I don't recall | 22  A.  I got up, put on a nice suit, and |
|  Page 11 |  Page 13 |

**Page 14**

1  I -- I really came prepared to discuss my
2  experiences of having worked on Capitol Hill
3  in the federal delegation, Alabama
4  Congressional Delegation for about 28 years.
5      Q.   Understood.  So we can dig into
6  that.  So you were the congressional
7  representative for Alabama's 1st district --
8      A.   Yes, ma'am.
9      Q.   -- starting in 2003; is that
10  right?
11     A.   Yes, ma'am.
12     Q.   Okay.  Until 2013?
13     A.   Yes, ma'am.
14     Q.   Can you just describe for me your
15  district generally?
16     A.   It is a -- it's a very special
17  part of Alabama.  If you -- every member of
18  congress would think their district is the
19  most special, but ours is unique in the sense
20  that it's the only coastal district.  So we
21  have mountains in north Alabama, and in south
22  Alabama, we have beautiful Gulf Coast beaches.

**Page 15**

1      So Mobile and Baldwin Counties are
2  the two largest counties in the district.
3  They anchor, and they have for the last 40 to
4  50 years, the contiguous counties surrounding
5  it.  There's a lot of continuity in that
6  district in terms of its economy, in terms of
7  its history, and in terms of its -- its DNA.
8  A lot of it revolves around the water, around
9  the river system.
10     And when I was elected in 2002, I
11  became the fifth member of Congress to
12  represent that district since -- in -- in
13  90 years.  So there's not been a lot of
14  turnover.  I worked for my immediate
15  predecessor.  I was his press secretary and
16  then later his Chief of Staff.
17     And I actually interned for his
18  predecessor when I was in college.  So it's my
19  home, and as a result, I know that area of the
20  state fairly well.
21     Q.   Which part of the district did you
22  grow up in?

**Page 16**

1      A.   Well, at the time I grew up in
2  Camden, which is no longer in the district.
3  It's in Congresswoman Sewell's district, in
4  the 7th district.  But the -- the districts in
5  Alabama have changed over the last 40 to
6  50 years based on the population changes.
7      The Black Belt of Alabama, which
8  is predominantly the 7th congressional
9  district, has lost population, and therefore
10  they've had to go into Jefferson County which
11  is the most populated county in the state and
12  some even into Montgomery County as well just
13  to find enough people.
14     The county I grew up in had
15  probably 14,000 people in it when I was a
16  child, and it probably has 14,000 people in it
17  today if you're lucky.  But I grew up in the
18  northern part of the district.  But then in
19  1984, I moved to help my predecessor Sonny
20  Callahan get elected to Congress.  I was his
21  campaign press secretary, and then after he
22  was successful with his election, he asked me

**Page 17**

1  to go to Washington with him.
2      Q.   Can you describe -- you talked a
3  little bit about geography, a little bit about
4  other aspects of the district.  Can you talk a
5  little bit about the demographics of your
6  district when you represented it?
7      A.   So Mobile is the largest city in
8  the district, and it's the port of Alabama.
9  So we have one of the largest intrastate water
10  systems in the nation.  The Mobile Delta is
11  the second largest body of -- of water of its
12  kind in the nation.  Second only to the
13  Florida Everglades.
14     So the district's livelihood feeds
15  off of the bay and of the delta and of the
16  river system.  As a port city, we have a lot
17  of cargo that comes in and out of Mobile every
18  day.  And a lot of that cargo that goes out
19  come from the surrounding areas.
20     It comes from the timber-producing
21  companies in Clarke County and in Monroe
22  County and in Escambia County.  It comes from

**Pages 14 to 17**

7/30/2019                    Chestnut, et al., v. John H. Merrill                    Josiah Bonner

1  the poultry-producing counties.  I mean, it's
2  a state port.  It's, I think, the 13th largest
3  in the nation.
4          But in some areas like in -- in
5  timber, we're the largest.  In coal, we've
6  been number one or two in the nation.  So the
7  district's compactness has been largely
8  because the legislature and the federal
9  courts, when the legislature couldn't agree on
10 a legislative plan, recognized that there was
11 a community of interest in the 1st
12 congressional district that was unique.
13         And that community of interest, it
14 involves banking, it involves education, it
15 involves health care.  If you're in
16 Monroeville, Alabama and you're -- you've been
17 diagnosed with an illness that needs a
18 specialty hospital, you go to Mobile.
19         If you are in -- working along
20 highway -- U.S. Highway 43, which runs from
21 Mobile all the way up to Thomasville, working
22 at one of the chemical companies that have

                                        Page 18

1  in Mobile and Baldwin Counties.  It's just --
2  it's one of the oldest parts of the country
3  quite frankly.  And -- and that area's
4  political geography matches well with its
5  economic and social geography as well.
6      Q.   I think you talked a little bit
7  about the economic part of that.  Can you talk
8  a little bit about the political part that you
9  just mentioned, the political --
10     A.   Well, as I say, Congressman Frank
11 Boykin was -- John McDuffie was elected in the
12 19 teens.  He became a federal judge when he
13 left Congress.  Frank Boykin was in for
14 28 years.  He was the last Democrat member
15 elected.  Jack Edwards was elected in 1964,
16 served for 20 years.  Sonny Callahan was
17 elected in 1984, served for 18 years.
18         And then when I was elected in
19 2002, I served -- I did not complete my term,
20 but I was elected to my sixth term and later
21 resigned.  But the -- the district has, since
22 1964, elected Republican members of Congress,

                                        Page 20

1  located there or a steel mill that's located
2  there, it's very likely that you live
3  somewhere in Mobile or Baldwin Counties
4  because Washington County is not a very
5  populated county.  They couldn't supply all
6  the workers for those industrial needs.
7          So the -- the district truly is a
8  cohesive area that has been that way since
9  the -- the early 1960s in the -- in the --
10 when we had eight members of Congress, Mobile
11 and Baldwin Counties were separated.  But
12 after that time, the -- the leadership of
13 Alabama legislature and the Courts recognize
14 that it was impossible to separate Mobile and
15 Baldwin Counties because they were connected
16 by the bay and they truly -- they have
17 something in common that very few other parts
18 of the state have.
19         This year is Alabama's 200th year
20 as a state, but Mobile was founded in 1702.
21 Alabama was -- became a state in 1819.  So
22 even the oak trees talk a different language

                                        Page 19

1  but we have had a diverse political history
2  throughout the district as well.  For
3  instance, Mobile elected an African-American
4  mayor, Sam Jones, when it was still a majority
5  white city.
6          Unlike other cities in Alabama and
7  in the deep south, Mobile avoided some of the
8  racial -- racially charged issues that
9  Birmingham, Selma, and Montgomery had.  We had
10 a mayor, long before I lived there, that
11 worked hard to make sure that Mobile avoided
12 that.
13         And Mobile being a port city has
14 so much more international influence than,
15 quite frankly, some of the other cities as
16 well.  Plus, we're a much older city than
17 Birmingham, for instance.
18     Q.   Okay.  So you mentioned sort of
19 the unique economic features and political
20 features.  And I think you also said social
21 features.  Can you talk a little bit about
22 those?

                                        Page 21

                                              Pages 18 to 21

7/30/2019          Chestnut, et al., v. John H. Merrill          Josiah Bonner

1      A.   We're not bragging, but we're the
2   mother of Mardi Gras.  So most Americans think
3   of Mardi Gras, they think of New Orleans, but
4   they would be mistaken because it started in
5   Mobile.  And it is spread throughout our area
6   of the state, Fairhope, Gulf Shores, Orange
7   Beach, Dauphin Island.
8          It -- it is a part of the
9   religious life of the district because it's
10  actually connected to the Catholic church, but
11  it's also something that -- other cities today
12  might start a Mardi Gras society, but none
13  have some as old as 150, 160 years of age.  So
14  it -- it is something that people in south
15  Alabama take part in throughout our district.
16          It's not uncommon during the
17  season for there to be 150 to 350,000 people
18  that have come in from all the surrounding
19  towns.  And some rent motel rooms and some
20  bring their RVs, but it's a family
21  celebration.
22      Q.   Is that in Mobile?

Page 22

1      A.   It is.
2      Q.   It is?
3      A.   That's where it originated, but
4   it's also in Fairhope, and it's in all of the
5   other veteran communities as well.  But it's
6   also -- I would -- I would expand the social
7   beyond just a celebration.  Mardi Gras, too,
8   connects heavily to Mother Nature.  We have
9   sailing.  We have fishing on the rivers, in
10  the gulf, in the bay.
11          Hunting is a popular sport.  It's
12  a very social sport.  It's a big -- big
13  economic driver too.  And so -- so, you know,
14  many instances you choose to live close to
15  where you work or close to where the schools
16  are that you want your children to go to, but
17  a lot of people choose to live in south
18  Alabama because of the plethora of
19  opportunities they've got to socialize, to
20  enjoy nature, and to enjoy getting out of the
21  woods and getting in the water.  And -- and
22  it's -- it's a common thread that connects a

Page 23

1   lot of people in that part of the state
2   together.
3      Q.   So I think we're getting there
4   already, but I think you're describing some
5   communities of interest that exist in your
6   district.  Can you just in your own words tell
7   me what a community of interest means?
8      A.   Well, I think a community of
9   interest is an area that complements each
10  other, that -- that supports each other, that
11  connects to each other, and it does it in
12  business and commerce.  It does this in
13  education.  It does it in law.
14          I mean, the attorneys in the small
15  towns around Mobile practice law at the
16  federal courthouse in -- in Mobile.  They
17  wouldn't go to the Middle District or to the
18  Northern District, with rare exception.
19          And then certainly that community
20  of interest has a political overtone as well.
21  When you are fortunate to be elected to
22  represent your district in Congress, you then

Page 24

1   quickly realize that you have an obligation to
2   serve the people in that district.
3          And so compactness, ease of
4   travel, going from one end of the district to
5   the other, either north, south, east, or west
6   is important, how you locate your district
7   offices.
8          Every congressional office has a
9   budget that's roughly the same amount.  There
10  is a slight adjustment for a major
11  metropolitan area like New York City or Los
12  Angeles or Dallas.  But you have basically a
13  million dollars -- it may be a little bit more
14  than that now -- to pay your staff, to rent
15  your office, to provide services to your
16  constituents.
17          And so that -- that community of
18  interest and that compactness is helpful to
19  you to be a better representative, to make
20  sure that you can do town hall meetings, that
21  you can go to your constituents and that they
22  don't have the burden of coming to Washington

Page 25

Pages 22 to 25

7/30/2019                    Chestnut, et al., v. John H. Merrill                    Josiah Bonner

**Page 26**

1  to see you.
2       Q.   I think very helpfully Alabama's
3  legislature has created a -- a definition sort
4  of for communities of interest, and I think
5  we've talked -- you know, it's pretty broad.
6  And I can -- I can read it to you.
7       It's from the legislature's
8  Reapportionment Committee Guidelines for
9  Congressional, Legislative, and Board of
10 Education Redistricting.
11      So it says that a community of
12 interest is defined as an area with recognized
13 similarities of interest including, but not
14 limited to, racial, ethnic, geographic,
15 governmental, regional, social, cultural,
16 partisan, or historic interest; county,
17 municipal, or voting precinct boundaries; and
18 commonality of communication.
19      So I think you've touched on a lot
20 of these already.
21      A.   (Witness nods head.)
22      Q.   A couple that I don't know if

**Page 28**

1  25 different countries that live in that part
2  of south Mobile County.  A smaller population,
3  but nonetheless a diverse population, lives in
4  the fishing village of Bon Secour, which is
5  over in Baldwin County, near Gulf Shores and
6  Orange Beach.
7       So, for instance, when we've had a
8  hurricane or when we had the oil spill --
9  hurricane that was most devastating to our are
10 was Hurricane Ivan in 2004.  Hurricane Katrina
11 hit in 2005.  It was equally -- it was worse
12 for the Gulf Coast, but Hurricane Ivan was
13 really more damaging to south Alabama than
14 Hurricane Katrina.
15      Or when we had the oil spill in
16 2010 off the coast of Louisiana, my office,
17 our staff, we worked to make sure that the
18 entire community of interest got the messages
19 of evacuation, of safety, of shelter, of -- of
20 help from FEMA, of -- of -- of help from the
21 organization that was set up by the Obama
22 administration help after the oil spill that

**Page 27**

1  we've talked about are the racial and ethnic
2  ones.
3       A.   (Witness nods head.)
4       Q.   Can you talk a little bit about
5  communities of interest from that aspect in
6  your district?
7       A.   Well, the first history has a very
8  diverse ethnic population.  Bayou La Batre is
9  a small costal community down in the southern
10 the part of Mobile County.  It's the seafood
11 capital of Alabama.
12      If you enjoy eating shrimp or crab
13 meat or oysters or fish in Washington, DC, at
14 some of the finest restaurants, it's very
15 likely that the product came through Bayou La
16 Batre.  It's a -- it's a shipbuilding
17 community.  And it is also where one of our
18 famous native sons, Forrest Gump, called home.
19 He is fictional.
20      But we have people from Cambodia,
21 from Vietnam, from Thailand, from Taiwan, from
22 China, from Mexico, probably 17, maybe 20 or

**Page 29**

1  Mr. Feinberg oversaw.
2       So you do that by going -- by
3  having translators.  You do that by -- by
4  actually doing flyers and mailings in
5  different languages.  You do it by working
6  with the Red Cross and other groups that
7  actually specialize -- especially a lot of
8  faith-based groups that specialize in
9  contacting those different communities.
10      So it would be one of the most, if
11 not the most, diverse congressional districts
12 in the state.  We have a large
13 African-American population that is spread
14 throughout the district, but there is a city
15 in the district, Prichard, Alabama, that
16 has -- it's one of the -- it would be one of
17 the ten largest cities in the state probably.
18      And it's today a majority
19 African-American population, but it wasn't
20 that long ago when it was majority Caucasian
21 population.  They elected their first
22 African-American mayor when it was majority

Pages 26 to 29

1    white town. And then after that, they elected
2    a white lady mayor when it was a majority
3    African-American town.
4            So there's been -- as I said
5    earlier, unlike some cities in the state and
6    throughout the nation, we have had a more
7    harmonious relationship with the different
8    racial backgrounds and ethnic backgrounds than
9    a lot of other parts of the country.
10   Q.    So you mentioned Prichard as a
11   place that's majority African-American. Are
12   there other places in the district where
13   African-Americans are more concentrated?
14   A.    There -- there are parts of Mobile
15   that are. Africatown, the plateau community,
16   is part in Mobile and part in Prichard.
17   Trinity Gardens -- there are sections of
18   town -- of the city of Mobile that are.
19   But I'm -- I -- I don't know the
20   numbers, but you could look at Bay Minette
21   which is the county seat of Baldwin County.
22   You can look at Chatom which is the county

Page 30

1    seat of Washington County. You could look at
2    Monroeville which is the county seat of Monroe
3    County. And you would see a -- a -- a healthy
4    balance in terms of the racial makeup. I just
5    can't tell you what those are.
6    Q.    And I'm not -- I'm not trying to
7    ask you for facts or figures, so thank you.
8    That's helpful.
9            One -- I think it would be helpful
10   if I gave you a map to look at instead of --
11   so I can -- this is the current Congressional
12   District Plan which we can mark as Exhibit 1.
13           (Bonner Exhibit 1 was
14            marked for identification.)
15           MR. DAVIS: Here, hand this down
16   to Bryan, and I will share -- I'll look on
17   with Jo. Just make sure you can see it.
18   A.    I've seen this before.
19   Q.    (By Ms. Madduri) Yes. I'm sure
20   you're familiar with this. I wanted to ask
21   you in Clarke County, what is that area that
22   is encompassed in congressional district 1

Page 31

1    that splits Clarke County?
2    A.    Clarke County, this area is
3    predominantly the area that leads into
4    Jackson, Alabama. So Clarke County has three
5    large cities. The county seat is Grove Hill.
6    And then the northernmost city is Thomasville,
7    and then Jackson is the southernmost city.
8            And so I will tell you that when
9    the decision was made in the redrawing prior
10   to this current map to split Clarke County,
11   there were a lot of local people, local
12   leaders, the editor of the newspaper, the --
13   some of the mayors, some of the other
14   prominent citizens in the community, both
15   African-American and white who were not
16   excited about having the split county.
17           But when -- when the legislature
18   made the decision and before that in the
19   previous redistricting effort to split Clarke
20   County, the members of the congressional
21   delegation made a commitment to the people of
22   Clarke County that rather than being concerned

Page 32

1    about having their county split, they would
2    find it beneficial. And we worked our hearts
3    out to make that happen.
4            So when I was elected in 2002,
5    Congressman Artur Davis was elected the same
6    year from the 7th congressional district, and
7    Artur and I agreed to do joint town hall
8    meetings. When Congressman Davis left
9    Congress and Congresswoman Terri Sewell came
10   in, she and I agreed to do joint town hall
11   meetings.
12           The ironic and, quite frankly, sad
13   thing was that we asked C-SPAN. We asked the
14   national media if they would like to see a
15   black Democrat from Birmingham and a white
16   Republican from Mobile do a joint town hall
17   meeting, and because it wasn't crossfire, it
18   wasn't controversial, and we weren't putting
19   boxing gloves on and -- and fighting each
20   other politically, it didn't make a lot of
21   news. But we did that every year.
22           And we did it. It's now

Page 33

**Page 34**

1  continued. Congressman Byrne, I believe,
2  continues to have these meetings with
3  Congresswoman Sewell. And so the concerns
4  that the people in Clarke County had was that
5  they felt, if I can speak for them, what they
6  told me was they felt -- they were concerned
7  that if they had a split county that they
8  would not be served by either member of
9  Congress.
10         And in fact, you'd probably add up
11  that we spent as much time in Clarke County as
12  we did in any of the other counties, but that
13  area goes north of Jackson, but it does not
14  go -- as I recall, it doesn't go all the way
15  into Grove Hill, and it certainly doesn't go
16  to Thomasville. And yet when someone from
17  Thomasville would call our office needing
18  help, or when someone from Jackson would call
19  Congresswoman Sewell's office needing help,
20  help was there.
21       Q.   And just so I'm clear, when --
22  when was -- you mentioned it happened in a

**Page 35**

1  previous redistricting cycle. When did
2  this --
3       A.   So the --
4       Q.   -- change happen to add Clarke
5  County or this part of Clarke County into --
6       A.   So when -- when Congressman
7  Callahan was elected in 1984, Wilcox County
8  was in there, my home, and all of Clarke
9  County. So the district actually, instead of
10  having six counties, had seven counties.
11         But because of the adjustments in
12  population, the -- Wilcox County left in the
13  1990 redrawing and Clarke County became split
14  as I recall in the 2000 and then again in
15  2010. And so it was split in 2000. It was
16  split further in 2010.
17       Q.   And what was -- what was your
18  involvement, if any, in that --
19       A.   Well, I was a member --
20       Q.   -- in those decisions?
21       A.   -- of Congressman Callahan's
22  staff, and so therefore, all of the members of

**Page 36**

1  Congress sent their Chiefs of Staff or a
2  designee to come down to work with the
3  legislature to -- to -- obviously the
4  legislature made the decision on drawing for
5  the federal races, for the state races, for
6  the state school board.
7         So our role was to come down to
8  answer questions, to work with them to help
9  understand communities of interest,
10  compactness of district, and offer whatever
11  help we could to help them do their
12  constitutionally mandated job of redrawing the
13  districts every ten years.
14       Q.   Were you ever involved in actually
15  drawing the map?
16       A.   I -- I saw others who knew how to
17  work the computer, but I never actually did
18  that, no, ma'am.
19       Q.   And what did you think about -- I
20  guess, first, what did you think about the
21  removal of Wilcox County from --
22       A.   Well, it was personally

**Page 37**

1  disappointing because it was my home county,
2  but it was not a surprise. The population --
3  there was a desire at that time made to create
4  a minority district.
5         And at that time, they needed a
6  certain percentage of minority vote in that
7  district to give the best chance of creating
8  that district. So there's a higher percentage
9  of African-Americans in Wilcox County even
10  though it's a small county, 14, 15,000 people.
11         And so the legislature at that
12  time made that decision, and so that's why
13  there's -- they call it the finger. But
14  that's why there's a finger that goes up into
15  Jefferson County that's going after the
16  largest population of primarily
17  African-American voters that can also connect
18  into the other Black Belt counties to create
19  that minority district.
20       Q.   In your view, did Wilcox County
21  share all of those same sorts of communities
22  of interest that you described with the rest

1  of what was formerly congressional district 1,
2  I think, in 1990, it sounds like?
3          A.   Actually, it probably was the
4  outlier.  Camden is 30 miles from Selma.  And
5  so if you are a child growing up in Wilcox
6  County and you need to go to the doctor or you
7  need to go to the grocery store or you needed
8  to go get a new pair of -- new set of tires,
9  you would go to Selma more than you would go
10 to Mobile.
11          So Wilcox County politically was
12 not as connected other than the fact it had
13 been in the district, and Congressman Edwards
14 served that district and Congressman Callahan
15 served that district including Wilcox County.
16          But I never had the privilege of
17 representing my home county, but my home also
18 shifted to Mobile when I moved there in 1984.
19 I was just -- I was actually born in Selma
20 because we didn't have a hospital in Camden.
21 And I didn't like it, so I moved away about
22 three days later to Camden.

Page 38

1          Q.   And then Clarke County, are there
2  any communities of interest that you think are
3  split up by this, the way that this is
4  divided?
5          A.   No.  If you're in Thomasville,
6  which is the northernmost city in -- in that
7  county, you're still going to gravitate toward
8  Mobile.  There's a major four-lane highway
9  that runs north and south.
10          You can look at the football
11 schedule this time of year, and you'll see
12 Thomasville plays Jackson, Grove Hill, and
13 Monroeville, Chatom, played Butler in Choctaw
14 County.  There's no political overtones to
15 developing a football schedule, but the
16 communities are connected even though
17 Thomasville is technically in the 7th
18 district -- politically in the 7th
19 congressional district.
20          Nobody who lives in that county --
21 few people who live in that county would be
22 able to tell you whether they live in the

Page 39

1  6th -- in the 7th district or the 1st district
2  because they have been well served by
3  Congresswoman Sewell and Congressman Byrne and
4  before him, me.
5          Q.   Generally when redistricting, do
6  you believe that it's preferable to keep
7  counties whole?
8          A.   It was the legislature's goal to
9  keep them whole.  That's what they told us.
10 At the time, Gerald Dial in the last
11 redistricting was, I believe, the head of the
12 Senate Reapportionment Committee, and Jim
13 McClendon was, I believe, head of the House
14 Reapportionment Committee.
15          And I think their -- they would
16 have preferred to have keep counties whole,
17 but they also were trying to get to zero
18 deviation.  They were trying to get to a -- a
19 map this the Justice Department would approve,
20 meeting all the other goals and objectives
21 that they had.
22          So I have a good friend who was

Page 40

1  the publisher of the local paper in -- in
2  Jackson -- actually was the publisher of the
3  local paper in Grove Hill which is the county
4  seat in Clarke County, but going back to
5  the -- to the map that was drawn that first
6  separated Clarke County -- Jim Cox is the
7  publisher's name.
8          He now owns the papers in Jackson
9  as well as in Thomasville, but I remember
10 specifically him telling me that he couldn't
11 see how it could be beneficial to having a
12 split county.  And years later he told me when
13 I assured him that we would make certain that
14 Clarke County was not underserved or ignored
15 in any way, he said, I should have trusted
16 you.  Y'all have done everything you promised
17 and then some.
18          So -- but yes, I think most people
19 would prefer to have their counties kept
20 whole, but it's easier said than done.  But
21 even so, if you look at this map, there really
22 are not that many split counties in Alabama

Page 41

Pages 38 to 41

7/30/2019                    Chestnut, et al., v. John H. Merrill                    Josiah Bonner

**Page 42**

1    compared to a lot of districts around the
2    country.
3          Q.    Do you -- what do you think about
4    the splitting of Montgomery County the way
5    it's split?
6          A.    Well, it -- it was split that way
7    to achieve the population goals, but I will
8    also tell you that being the capital city,
9    there are -- there were other members of
10   delegation that wanted to be -- wanted a part
11   of Montgomery County.
12          They wanted the -- some of it is
13   service oriented, and quite frankly, some of
14   it is -- is politically valuable to -- you
15   know, it's very expensive to run for office.
16   And so when you have a large city, the capital
17   city gives you an added reason to come here
18   not only to serve your district but also when
19   it's time to run for reelection to -- to meet
20   your political friends as well.
21          Q.    And what about for the
22   constituents in Montgomery County, do you

**Page 43**

1    think there are any issues with them being
2    split up this way?
3          A.    No, ma'am.  I don't personally
4    have any reason to believe there are any
5    issues.  Montgomery is also -- and I'm not an
6    expert on the 2nd district, but Montgomery's
7    economy has also been more closely tied to the
8    Wiregrass economy.
9          The Wiregrass of Alabama is a
10   geographic region like the Black Belt is.
11   It's made up of -- in Houston, Dale, Henry,
12   Coffee, Geneva, Barbour, Pike.  So if you were
13   to ask people in Dothan, in Houston County, if
14   they needed to go to -- go to a bigger city to
15   go shopping, to go to the hospital, to go to
16   do business, they would choose Montgomery over
17   Mobile in a heartbeat.
18          Q.    What are some -- you mentioned
19   economic interests in the Wiregrass region in
20   CD 2, what are some of those interests that
21   exist there?
22          A.    Well, one that easily comes to

**Page 44**

1    mind is -- is agriculture.  Alabama is a big
2    agriculture state.  For years it was our
3    leading industry statewide, but for many, many
4    years, for decades, the federal government had
5    a federal peanut program that the counties in
6    the 2nd district actively participated in
7    along with neighboring counties in Georgia and
8    in Florida.
9          And until they changed that
10   program, people in the 3rd district, people in
11   the 7th district, people in the 1st district
12   didn't grow peanuts.  It was -- it was based
13   on soil.  It was also based on the
14   historical -- if you were in that program, you
15   didn't want to get out of it because there
16   were years -- if there had been a surplus the
17   previous year, they would actually pay you to
18   not grow peanuts.  So it was a -- it was a
19   very lucrative program for those who were in
20   it.
21          But -- but there are other more
22   obvious differences as well.  We have Fort

**Page 45**

1    Rucker, and we have Maxwell and Gunter Air
2    Force Base.  So you've got Army Aviation down
3    in the Wiregrass, down in Enterprise area.
4    You've got the F-35s coming to Montgomery.
5    You've got Air University training all the
6    air -- the Air Force officers that will go on
7    to lead the Air Force in Montgomery.
8          We had an Air Force base in
9    Mobile.  It closed in the 1960s.  We build
10   ships for the Navy, so we have a much
11   different -- we're all pro military in the
12   state.  But you can be pro military, but you
13   can also see a -- a -- a stark difference in
14   terms of where you're going to put your
15   efforts.
16          Like in Huntsville with the
17   administration calling for the creation of
18   Space Force, that's something of real interest
19   to the folks in Madison County and Marshall
20   County.  Doesn't really have a lot of interest
21   to us on the coast unless we're going to ship
22   those rockets up the river system, and we may.

Pages 42 to 45

**Page 46**

1  But -- but our focus, if you were
2  in Congress from the 2nd congressional
3  district, you would want to be on the Armed
4  Services Committee. You'd have a vested
5  interest in protecting the federal
6  government's installations at Fort Rucker and
7  at Dannelly and at Maxwell Gunter.
8  And -- and that's borne out by
9  evidence that Congressman Dickinson who was in
10  office for 20-plus years, maybe 28 -- 24 was
11  on Armed Services. Congressman Everett was on
12  Armed Services. Congressman Bright was Armed
13  Services, and congressman -- Congresswoman
14  Roby was on it until she got on the
15  Appropriations Committee that was created when
16  the congressman from the 1st district
17  resigned. That would be me, but her goal was
18  to get on defense appropriations and she did.
19  Likewise, if you're from the 1st
20  district, you know, I -- I didn't have near as
21  much interest in helicopters as I did ships.
22  When I was in Congress, we got the contract

**Page 47**

1  for Austal which is an Australian shipyard to
2  build a new generation of warship for the
3  Navy, the littoral combat ship.
4  We got the contract for them to
5  build -- it was a 2-plus billion dollar
6  contract. And today 4,500 people work in that
7  shipyard. So that's -- that's an important
8  part of our economy, but it's also something
9  that you can't build ships in Dothan or
10  Montgomery. You've got to be in a deep water
11  port.
12  Q. Is there a -- an Airbus plant in
13  Mobile now?
14  A. There is. So we grew -- DNA has
15  long been in -- aerospace has long been in
16  Alabama's DNA. The Wright brothers actually
17  opened an aviation training center in
18  Montgomery in 1910, I believe. But we started
19  recruiting Airbus in my early years in
20  Congress, and then we landed them in 2012.
21  They made the decision to come.
22  They broke ground. They had the grand opening

**Page 48**

1  a year later, and today, they are building the
2  A-320 which is the most popular single-aisle
3  plane in the world with 9,000 planes on back
4  order.
5  And they have just started work on
6  an A-220 smaller jet that's based on a
7  Canadian jet, Bombardier, and so in less than
8  a decade, they will -- Mobile will become the
9  fourth largest city for commercial air --
10  aircraft manufacturing in the world, which is
11  pretty good.
12  Q. That's very impressive.
13  MR. DAVIS: Lali, would this be a
14  good time for --
15  MS. MADDURI: Sure.
16  MR. DAVIS: -- a break?
17  MS. MADDURI: Yeah.
18  THE VIDEOGRAPHER: This ends MPEG
19  one in the continued deposition of Josiah
20  Bonner. We are off the record at 9:52.
21  (A recess was taken.)
22  THE VIDEOGRAPHER: This begins

**Page 49**

1  MPEG two in the continued deposition of Josiah
2  Bonner. We're on the record at 10:02.
3  Q. (By Ms. Madduri) Mr. Bonner, can
4  you tell me -- you were mentioning there's
5  some particular agricultural interest in CD 2.
6  Is there any agricultural in CD 1?
7  A. There is. It's -- it's a
8  different type of agriculture. We -- a lot of
9  timber and soybeans, cotton, and other row
10  crops like that.
11  Q. And where in the district are
12  those located?
13  A. Washington, Clarke, Monroe,
14  Escambia, Baldwin. Although Baldwin is one of
15  the fastest growing counties, and so a lot of
16  their farmland is being squeezed for
17  development.
18  Q. Understood. And I think you were
19  talking about this a little bit before, but
20  can you tell me a bit about the split of
21  Jefferson County in the current plan?
22  A. Well, Jefferson County is the

7/30/2019                Chestnut, et al., v. John H. Merrill                Josiah Bonner

1  largest county in the state.  And as such,
2  the -- when you've got counties that are
3  losing population like Wilcox and Choctaw and
4  Lowndes, and you've got counties that are
5  growing in population like Jefferson and
6  Madison and Morgan, when the legislature --
7  not during this last redistricting but in the
8  previous ones, Congressman Claude Harris
9  represented the 7th congressional district.
10          And when he did not seek
11  reelection, Congressman Earl Hilliard who was
12  the state legislator at the time, state
13  senator, ran and was elected to that seat as
14  the first African-American to serve in the
15  delegation since reconstruction or for a long,
16  long time.
17          And then Congressman Hilliard was
18  defeated by Congressman Davis, and then
19  Congressman Davis chose to run for governor
20  and Congresswoman Sewell ran.  So I believe
21  that's my history, but the area in Jefferson
22  County was drawn as we understood it to create

Page 50

1  the best opportunity for an African-American
2  to be elected to Congress with -- I believe it
3  was a 65 percent was the number that they
4  used, but that's a few years ago.
5      Q.    And do you think -- do you think
6  it's harmful at all for Jefferson County to be
7  split this way?
8      A.    I would have no reason to believe
9  it is harmful to Jefferson County.
10      Q.    And my understanding is that
11  basically the city of Birmingham is captured
12  in congressional district 7; is that right?
13      A.    Yes, ma'am.
14      Q.    Okay.  And then it's mostly
15  suburbs or non city areas of Jefferson County
16  that are in congressional district 6; is that
17  right?
18      A.    That would be correct.  Jefferson
19  County is also one county away from being the
20  geographic center of Alabama.  Montevallo is
21  actually the geographic center.  It's in
22  Shelby County.

Page 51

1          And so Jefferson County being the
2  largest county, their -- their radius of
3  service and connectivity to Tuscaloosa, to
4  Walker County, to Blount County, to the other
5  counties that are contiguous.  A lot of people
6  go to Birmingham to shop, for medical reasons,
7  for banking reasons, and for other reasons,
8  but I -- I don't know that you would -- I
9  don't know that it would be easy to identify
10  when you were in the 7th congressional
11  district or the 6th congressional district
12  unless you were thinking with a political
13  mind.
14      Q.    That makes sense, but generally
15  there's no -- you don't think -- you're not
16  aware of any issues that arise by pulling the
17  city of Birmingham out of Jefferson County
18  this way?
19      A.    I am not.
20      Q.    You touched on this before, but
21  I'm just going to show you a map of 1950 --
22      A.    Okay.

Page 52

1      Q.    -- of the way the districts are
2  drawn.  This we can mark as Exhibit 2.  It's
3  the congressional districts as of 1950.
4          (Bonner Exhibit 2 was
5          marked for identification.)
6      Q.    (By Ms. Madduri)  So I realize
7  it's a little hard to see, but I think you
8  mentioned before that back then Mobile --
9  Mobile and Baldwin County were separate.
10      A.    Uh-huh.
11      Q.    Can you talk a little bit more
12  about -- I believe you said that you thought
13  it was best when they put those back together.
14  Can you talk a little bit about what issues
15  you think exist by having them separate like
16  this?
17      A.    Well, in -- in this map, you would
18  have to go back to a time when the Baldwin
19  County economy was primarily agriculture.
20  Today it is a much more diverse economy driven
21  largely by tourism.
22          And so Gulf Shores -- Orange Beach

Page 53

Pages 50 to 53

1  didn't even exist as a community.  Gulf Shores
2  was a small summertime vacation community,
3  mostly for locals to go about three months out
4  of the year.  It's now -- Gulf Shores, Orange
5  Beach, and Fort Morgan, which is
6  unincorporated in Baldwin County, it's a
7  year-round economy.  People come from the
8  north during the winter to escape cold
9  weather.
10          And so in the 1950s compared to
11  today, the economies of Mobile and Baldwin
12  County have grown closer and more alike in
13  shipbuilding, in seafood production, in
14  tourism.  And there's a strong connectivity
15  between those two counties today that are
16  unique to Alabama.  They are no two counties
17  like Mobile and Baldwin Counties because of
18  their geographic location.
19      Q.    And then also at this time Mobile
20  County was combined with some of the Black
21  Belt counties to the north --
22      A.    Uh-huh.

Page 54

1      Q.    -- of it?
2          Do you think that configuration
3  makes sense, or are there problems that you
4  see with that sort of thing?
5      A.    Well, it -- it -- it is still
6  connected in the current map to the Black Belt
7  counties.  It's just because of population
8  shifts.
9          As we've discussed previously,
10  you -- you lose population in one county.  You
11  gain in another faster growing county, and
12  those adjustments have been made.  But you'll
13  see, this would have been Wilcox County, which
14  as I mentioned, was in the district when I
15  first went to work with Congressman Callahan.
16  All of Clarke County, Washington County, and
17  Monroe County.
18          So it is hard to see, but it looks
19  like Choctaw County and Marengo were the two
20  counties in the 1950s, but they were taken out
21  in the 1960s remap as I recall.
22      Q.    In terms of communities of

Page 55

1  interest, do you think Mobile County shares
2  communities of interest with, I think, you
3  mentioned Choctaw and Marengo?
4      A.    To a much less degree than they do
5  with the counties that they currently -- I
6  mean, the alignment that we're looking at in
7  today's map for all practical purposes has
8  been in place for the last 30 to 40 years.
9          And -- and the economies of that
10  area have grown more aligned during that
11  period of time.  The continuity and the
12  communities of interest have grown more
13  aligned during that time.
14      Q.    What are some of the -- I guess
15  the lack of continuity between Mobile and
16  Choctaw and Marengo in your view?
17      A.    Well, Choctaw and Marengo would
18  probably go to Meridian, Mississippi to go
19  shopping, to go to the hospital, to go buy an
20  automobile.  They are currently in the 7th
21  congressional district.  Congresswoman Sewell
22  has field offices.

Page 56

1          You know, one of the challenges of
2  serving a district is you got to make sure
3  you've got staff that can get out and serve
4  those districts.  She does a great job.  She's
5  from Selma originally.  Her mother was on the
6  city council there.  And so she has a very
7  active constituent services program in these
8  rural areas.
9          They would go to Selma.  They
10  would certainly go -- Marengo County would go
11  to Selma to go shopping or for the hospital.
12  I saw Meridian, but they would have a closer
13  proximity to go to Selma and a more -- a
14  higher likelihood than they probably would to
15  come to Mobile.
16      Q.    And then also at this time,
17  Baldwin County, Escambia County, and Covington
18  County are in the same district.  Do you --
19  and I realize Baldwin and Escambia are
20  currently still in the same district.  So I
21  guess the question is:  Do you feel that
22  Covington County has --

Page 57

Pages 54 to 57

**Page 58**

1　　　　A.　Cov --
2　　　　Q.　-- communities of interest in
3　common with Escambia and Baldwin and this sort
4　of grouping?
5　　　　A.　Covington has a -- a strong
6　identity with Geneva County and Coffee County
7　in the Wiregrass. And that's not only where
8　it is in the political map, but it's also
9　where it is in the economic map as well. It's
10　hard to get from Andalusia to Mobile. There's
11　no four-lane highway.
12　　　　Q.　Yeah, they are not too close
13　together. I'm going to hand you the State
14　Board of Education District's Map from 2011,
15　and we can mark that as Exhibit 3.
16　　　　　　(Bonner Exhibit 3 was
17　　　　　　marked for identification.)
18　　　　Q.　(By Ms. Madduri) Are you familiar
19　with this map?
20　　　　A.　I'm -- I'm -- I'm looking at it
21　really for the first time in a long time.
22　I've --

**Page 59**

1　　　　Q.　Yeah.
2　　　　A.　I've never really studied the
3　State Board of Education maps that closely.
4　　　　Q.　Have you ever been involved in any
5　way in either giving input or --
6　　　　A.　No, ma'am.
7　　　　Q.　-- consulted in drawing these
8　maps?
9　　　　A.　No, ma'am.
10　　　　Q.　Okay. Were you familiar with them
11　at all when you were in Congress?
12　　　　A.　I -- I was familiar that the
13　legislature was redrawing the -- I mean, there
14　are eight districts as opposed to seven. They
15　have a totally different responsibility. They
16　are not federal representatives or state
17　representatives.
18　　　　　　So I would say that I -- I had
19　little to no interest in where the State Board
20　of Education maps were in this redraw or in
21　any previous redraw.
22　　　　Q.　I think you would have been Chief

**Page 60**

1　of Staff for Congressman Callahan probably
2　when these were drawn; is that right? It was
3　probably drawn -- let's say it was drawn 2011.
4　　　　A.　No. I was a member of Congress in
5　2011.
6　　　　Q.　Oh, sorry.
7　　　　A.　In --
8　　　　Q.　Yeah. Of course.
9　　　　A.　-- 2001, I was Chief of Staff, but
10　Congressman Callahan would not have sent me to
11　Montgomery to focus on the State Board of
12　Education.
13　　　　Q.　Okay. Looking at just where we
14　have District 1 on this map, do you have any
15　issues with the way this is configured?
16　　　　A.　I don't have an opinion --
17　　　　Q.　No opinion.
18　　　　A.　-- about it.
19　　　　Q.　Understood.
20　　　　　　No opinion on any -- any of this
21　configuration at all?
22　　　　A.　No.

**Page 61**

1　　　　Q.　Okay.
2　　　　A.　Because a State Board of Education
3　member has a different responsibility. A
4　member of Congress is not only representing
5　their constituents with votes that they cast,
6　but also with services that they provide.
7　　　　　　So when someone who lives in
8　Washington County has a problem with Social
9　Security or with the Veteran's Administration
10　or they're in the military and they're trying
11　to get a different assignment, they're not
12　going to contact their state school board
13　member. They're going to contact their U.S.
14　Congressman.
15　　　　　　And so I've never really studied
16　maps for state legislators or school board
17　members or anyone else because my focus has
18　always been on how to put the best team
19　together to serve the people of the 1st
20　congressional district.
21　　　　　　I had over 450 town hall meetings
22　during my ten and a half years. I don't

Pages 58 to 61

**Page 62**

1  recall there ever being a state school board
2  member having a town hall meeting. I'm not
3  saying they don't or they didn't. But -- but
4  you serve -- if -- if you're a -- you just
5  have a different way of serving people when
6  you have a different job.
7      Q.   Yeah. That makes sense. Let's
8  move on.
9          I'm going to show you the -- I
10  want to get your thoughts on the maps that
11  plaintiffs are proposing in this case.
12      A.   Okay.
13      Q.   So I'm going to give you four
14  maps, and we'll just mark them all at the same
15  time for ease. So this is -- it will be
16  Exhibit 4.
17          (Bonner Exhibit 4 was
18          marked for identification.)
19      Q.   (By Ms. Madduri) Exhibit 4 is
20  called -- you'll see it's called Revised
21  Plan 1.
22          (Bonner Exhibit 5 was

**Page 63**

1          marked for identification.)
2      Q.   (By Ms. Madduri) Then we have
3  what will be Exhibit 5, which is called
4  Revised Plan 2.
5          (Bonner Exhibit 6 was
6          marked for identification.)
7      Q.   (By Ms. Madduri) And then
8  Exhibit 6 will be Revised Plan 3.
9          (Bonner Exhibit 7 was
10          marked for identification.)
11      Q.   (By Ms. Madduri) The last one is
12  called Illustrative Plan 4, and that will be
13  Exhibit 7.
14          Have you seen any of these plans
15  before?
16      A.   I don't know that I've ever seen
17  these plans, but I've seen different maps
18  during the previous redistricting efforts that
19  were equally as ugly.
20      Q.   Okay. So then I assume you
21  haven't had any conversations about these
22  or --

**Page 64**

1      A.   No. This is the first time I'm
2  seeing these.
3      Q.   And please take as much time as
4  you need because I realize there's a lot of
5  maps, and you haven't seen them before. But I
6  just generally want to get your thoughts on if
7  you see issues or if you have criticisms of
8  these maps.
9          I'm sure as you'll see, District 1
10  is different than it is in the current plan.
11      A.   Well, they all have a unique
12  characteristic, and that is that they would
13  destroy the opportunity for the
14  representatives from the 1st district and the
15  2nd district to serve their constituents in a
16  way that they have been served previously.
17          It would -- I mentioned that
18  it's -- there's no easy way to get from
19  Andalusia in Covington County to Mobile.
20          If you are the representative in
21  the 1st district in any of these maps and you
22  live in Mobile and you need to go to Houston

**Page 65**

1  County in Dothan, you're going to spend more
2  time in Florida than you will in Alabama.
3          Or if you're the representative
4  from -- and you live in Dothan but you've got
5  a meeting in Mobile, you're going to spend
6  more time in Florida than you will in Alabama.
7          If you live in the 2nd district
8  and you have been elected out of Mobile as
9  your base and you're trying to go to a town
10  hall meeting in Macon County or Bullock
11  County, you're going to spend half a day
12  getting there.
13          There -- there is no real
14  community of interest in these maps. And as
15  someone who's had the privilege of serving in
16  Congress and -- and doing his best to
17  represent all of the people in his district,
18  this would be a difficult challenge to
19  represent because there's so very little in
20  common with the proposals either of District 1
21  or District 2.
22      Q.   Can you talk a little bit more

1  about what you think is not in common and we
2  can -- we can take each in turn.  So how about
3  starting with congressional district 2 in
4  these proposed maps, which is -- which are
5  roughly similar.
6        You don't need to necessarily
7  understand exactly what is different between
8  each one, but of course if you have specific
9  concerns on any of them, please do let me
10  know.  But we can just start by talking about
11  congressional district 2 the way it's
12  proposed.
13        What are the -- what are the lack
14  of commonalities of interest in your view?
15     A.    Well, the -- the Washington and
16  Clarke and Monroe County in Exhibit 4 and
17  Exhibit 6 and Exhibit 7 have nothing in common
18  with Macon and Bullock Counties except that
19  they are counties in the state of Alabama.
20        They don't share any history.
21  They don't share any geographical alignment.
22  They don't share any social or political

1  alignment.  If -- if you -- you could name a
2  town that the congressman or congresswoman was
3  from, and it doesn't really matter where on
4  these maps you're looking at, it's going to be
5  difficult to serve them based on my experience
6  of service.
7     Q.    In what ways would it be difficult
8  to serve --
9     A.    Being accessible, of being aware
10  of -- of -- of the -- you know, there --
11  there's a value in -- in understanding an
12  area's historical relationship with each
13  other.  And so you'd have to learn a whole new
14  set of political leaders, mayors, county
15  commissioners, probate judges.
16        You have to learn a whole new set
17  of issues.  The challenges that someone in
18  Macon and Bullock County -- I -- I don't even
19  know what their economy is derived from quite
20  frankly.  Anymore than someone from Macon or
21  Bullock County would know what the economy of
22  Clarke or Washington or Monroe County was.

1  You might as well just go into Mississippi or
2  Georgia, if the law allowed you to but it
3  doesn't, to pick up constituents.
4        But it -- it is -- it's -- this
5  would be foreign, I believe, to any of the
6  people who have been elected to office, and
7  quite frankly, I think it would be foreign to
8  any of the people who run for office over the
9  last 30 years to try to serve -- try to be
10  elected to much less serve districts that are
11  configured like this.
12     Q.    I think you mentioned economics,
13  specifically the economy --
14     A.    Uh-huh.
15     Q.    -- being different or just
16  unknown.  Are there any other considerations
17  that you think would be difficult here?
18     A.    Well, so Houston County, Henry
19  County, Dale County, Geneva County, when the
20  people of those communities want to go to the
21  beach, they go to Florida.  They go to Destin.
22  They go to Navarre.  They go to Panama City.

1  They don't go to Gulf Shores or Orange Beach.
2        When they want to export products,
3  the -- the river system doesn't provide access
4  from the Wiregrass over to here (indicating).
5  You can come by rail, or you can come by
6  interstate in Florida, but there is -- so
7  there's just no continuity of our -- of our --
8  the things we've talked about previously, our
9  social life, our business life, our education
10  life.  For all practical purposes, this is in
11  a different part of the world.
12     Q.    You mentioned -- just right now
13  you mention educational life.
14     A.    Uh-huh.
15     Q.    In 2011 when that Board of
16  Education map was created, Alabama decided --
17  the Alabama legislature decided to put part of
18  Mobile County into sort of a similar --
19  similar configuration to this actually.
20        Do you see any issues with them
21  having done that?
22     A.    Again, State Board of Education

**Page 70**

```
 1   and the United States Congress to me are night
 2   and day.  And since that time, I believe I'm
 3   correct, they also changed the Board of
 4   Education to where now there's a separate
 5   board for two-year colleges as opposed to K
 6   through 12.  I don't know what that map looks
 7   like.
 8            And those are not elected
 9   positions.  They are appointed positions
10   confirmed by the state legislature.  But
11   students in Houston, Dale, Henry, Geneva,
12   Coffee Counties are more than likely to go to
13   Troy University in Pike County or to Wallace
14   Community College in Dothan than they are to
15   Spring Hill College, University of South
16   Alabama, or University of Mobile or Bishop
17   State or Coastal Alabama, which are the two
18   two-year systems here.
19            And so conversely, I'm talking
20   about two-year and four-year schools, you look
21   at the student bodies of the University of
22   South Alabama, you're going to see a much
```

**Page 71**

```
 1   larger concentration of students who are from
 2   what is in Exhibit 1, the traditional 1st
 3   congressional district.
 4       Q.   I think we've kind of talked about
 5   both districts, but let's just focus on the
 6   proposed congressional district 1.  Can you
 7   talk a little bit about what communities of
 8   interest you think are broken up here?
 9            Yeah.  We can start with that.
10   What communities of interest are broken up by
11   having District 1 configured this way?
12       A.   Economic and business, cultural.
13   I -- I mentioned earlier that if you were in
14   Congress from the current 2nd district
15   (indicating), you would probably want to be on
16   the Armed Services Committee supporting the
17   U.S. Army post Fort Rucker or the Air Force
18   bases at Maxwell Gunter.
19            If you are under the current maps
20   that you're proposing, it -- I'm not aware of
21   anyone who's ever been on Navy Seapower
22   Committee and Army and Air Force.  I mean, I'm
```

**Page 72**

```
 1   not saying it's not ever happened in the
 2   history of the Congress, but it's -- it's hard
 3   to be -- it's hard to serve that many
 4   different constituencies that would be
 5   important to your -- to your district, to the
 6   constituents that live there.
 7       Q.   Which -- which congressional
 8   committees were you on when you served?
 9       A.   Appropriations.
10       Q.   Any other?
11       A.   And ethics.
12       Q.   And ethics.  Any other?
13       A.   My early committees, I was on
14   agriculture and science and budget.  But those
15   were just to get me to appropriations.  The
16   1st congressional district has long had a seat
17   on appropriations, and that was a goal of mine
18   early on.
19       Q.   I think you've started to talk
20   about this, but can you help me understand if
21   you were representing the congressional
22   district 1 the way it's drawn in the -- in the
```

**Page 73**

```
 1   proposed maps, in your opinion, are there
 2   issues where there would have been conflicts
 3   of interests between the communities you
 4   were -- you would be representing?
 5       A.   I -- I think the conflict would be
 6   you would be serving multiple masters, not
 7   really two masters.  But you would be -- the
 8   economy in Mobile and Baldwin Counties is
 9   totally a different focus than the economy of
10   the Wiregrass area.
11            So in addition to the challenge of
12   getting from point A to point B, there would
13   be an additional expense.  I mean, I -- when I
14   was working with Congressman Callahan, we had
15   one district office.  I expanded it to two.
16            You would have to have at least
17   three.  Your budget's not going to up in a
18   rural area just because you have three
19   offices.  So you're going to have to have
20   fewer staff or more offices, but it's -- you
21   can't have both.
22            Just the -- the -- the challenge
```

7/30/2019                 Chestnut, et al., v. John H. Merrill                 Josiah Bonner

---

1    of getting into -- I mean, if -- if you have a
2    town hall meeting in Houston County, you --
3    your best bet may be to fly to Panama City,
4    Florida to drive up.  They do have an airport
5    in Dothan, but it has very limited air
6    service.
7          And there -- so you would only --
8    you'd have an airport in Mobile, and then
9    you'd have to get in the car and drive four
10   and a half to five hours to get to Dothan.
11         Q.    Other than economic interests, are
12   there any other issues where you see conflicts
13   of interest arising between the communities
14   that are in the proposed congressional
15   district 1?
16         A.    I think it would be fair to say
17   that there is -- there's just so little in
18   common between being in Tillman's Corner in
19   Mobile County and going up to Luverne in
20   Crenshaw County.
21         The -- the only way you would do
22   that today would be if you had a relative who

Page 74

---

1    programs that were unique to this area that
2    were also unique to Georgia and Florida.
3          But no one else in delegation even
4    knew what -- what those programs were because
5    they were so unique to that area.  And -- and
6    likewise, when you represent Mobile and
7    Baldwin Counties and you've got the
8    shipbuilding industry and the aerospace
9    industry, chemical industry and the steel
10   industry, you become -- you become affiliated
11   with the steel caucus, you become affiliated
12   with the shipbuilding caucus.
13         I mean, that becomes a part of
14   your network when you get to Washington to try
15   to better serve your constituents and the
16   companies and the individuals that work there.
17   So it really is a very strong economic
18   overture there.
19         Q.    Is that peanut program still in
20   effect?
21         A.    It -- it -- it is, but it changed
22   during a rewrite of the ag bill probably

Page 76

---

1    lived up there and you were going to a family
2    reunion.  I mean, there's -- there's no social
3    interaction.  There's no athletic interaction
4    to speak of.  There's -- so I -- I don't see
5    this being a map that if I were interested in
6    running for office, I would consider running
7    in because I -- not because I don't think I
8    could win it, but because I don't know why
9    anybody would want to serve in a district that
10   is this different from the -- the maps that
11   have historically served these two districts
12   and served them well.
13         Q.    Can you think of any issues that
14   exist where if you were representing this
15   district, where you would vote differently as
16   opposed to if you were representing the
17   district as it currently is?
18         A.    Well, I -- I mentioned the peanut
19   program.  I mean, when you were the
20   representative of the 2nd congressional
21   district, you became the -- you became the
22   expert, subject matter expert of agricultural

Page 75

---

1    12 years ago or so.  It was when I was in
2    Congress.
3          One of the things that I worked on
4    and it continues -- that Congressman Byrne
5    continues to work on is deepening of the port
6    of Mobile.  And so your focus is on working
7    with the Army Corps of Engineers, not Army
8    helicopters.  I mean, you -- you -- you have a
9    vested interest in supporting the -- the
10   programs that support the economy of that area
11   of the state that you live in.  Just like
12   Congressman Brooks is focused on supporting
13   Redstone Arsenal up in Madison County.
14         And Congresswoman Sewell and
15   Congresswoman Roby have worked to support
16   Maxwell and Congressman Rogers Maxwell and
17   Gunter in Montgomery.
18         Q.    And did you say it's the --
19   there's an interest in the Army Corps of
20   Engineers in and around Mobile?
21         A.    The Army Corps of Engineers
22   headquarters from -- all the way from

Page 77

Pages 74 to 77

Brownsville, Texas to Miami, Florida is
located in Mobile. So it's a large
headquarters for the entire Gulf of Mexico.
And it comes in handy when you're dealing with
a hurricane or an oil spill or trying to
dredge the water system to get the port to be
a -- a top ten port.
    Q.   And do you have any thoughts or
comments about the splitting of Mobile County?
In all -- in all four of the maps, that county
is split.
    A.   I -- I -- my thought would be that
it's -- Mobile County is different than Clarke
County. Mobile is one of the largest counties
in the state. It is the economic hub for this
area of the state.
        Remove the political maps, it's
the economic hub, and as such, splitting it
just for the political purposes of what I
assume would be the plaintiffs' motives, I
don't think is going to serve Mobile well or
the 1st congressional district well. But

Page 78

that's my personal opinion.
    Q.   And in -- in what ways do you
think it wouldn't serve the city of Mobile or
the county of Mobile?
    A.   Because of the things we've talked
about, the community of interest, the
continuity, the historical connections between
Mobile. And, you know, it -- it's like a -- a
spoken hub. I mean, this is the hub of
economic life in this whole region of the
state.
        And it is directly tied to
Washington County and to Clarke County and
Monroe County and Escambia County. It -- and
it does not have that connection or tie,
historic or otherwise, to the counties in
central Alabama or the counties in the
Wiregrass.
    Q.   If you were representing the new
proposed congressional district 1, do you
imagine that you would hold those same types
of joint town halls that you were doing for

Page 79

Clarke County?
    A.   Well -- well, I think if you're
going to be successful, you're going to --
you're going to make every effort to serve
your district obviously. But it would just be
a much harder thing to do. If you're in
Washington 40 to 45 weeks out of the year and
you come home for a recess week or a recess
month like August, it is much more challenging
when you're -- I mean, we were able to get
sometimes five town hall meetings a day
scheduled.
        It would be hard to do with --
with any of the four maps that you've got in
front of me. It's not just town halls. It's
also other ways. I mean, I had a field rep
who went on a monthly basis throughout the
district, every month went to all of the
counties in my district. Sometimes several
times.
        So you're either going to -- as I
say, you're going to increase your staff.

Page 80

You're going to increase your number of
offices, but you can't do both because your
budget doesn't increase.
    Q.   Do you think it would be
beneficial potentially to a district like
District 7 right now, which is very large in
the current map, in the 2011 plan, but would
be significantly reduced in size in some of
the proposed maps, for some of these same
reasons that you're talking about? For
example, the geography, the distance, the
number of offices you have to have?
    A.   Because of the way Congresswoman
Sewell serves her district and Congressman
Davis served his district, I believe that
they -- the people who live in those counties
have been very pleased with the service that
they've gotten. And they've done a -- a -- a
good job because those have been
historically -- the -- the adjustments have
been made based on population and getting to
zero deviation from this map to the one that

Page 81

7/30/2019          Chestnut, et al., v. John H. Merrill          Josiah Bonner

1  was ten years earlier.  And the one that was
2  ten years earlier.
3          You showed a map in the 1950s.
4  But if you look really in the 1970s, 1980s,
5  1990s, 2000s, 2010s, those maps that were
6  approved and that were also approved by the
7  Justice Department are very similar in terms
8  of the area of service.
9      Q.   I'm going to give you one more
10  map.  The last one, I promise.  And this will
11  be, I think, Exhibit 8.  I apologize if it's
12  smaller.
13          (Bonner Exhibit 8 was
14          marked for identification.)
15      Q.   (By Ms. Madduri)  And I can just
16  tell you this is a plan that our expert drew
17  because there's some speculation that in the
18  next redistricting cycle, Alabama may lose one
19  of its seats and go down to six congressional
20  districts instead of the current seven.
21          So I just want to get your general
22  thoughts on the same thing.  Same issues we've

Page 82

1  then that changes the scenario totally for
2  everybody, but -- but that will be because we
3  didn't do our job to make sure that every
4  person counts in our census.  And we're going
5  to do everything we can to -- to do that.
6      Q.   Okay.  Understood.  So no -- no
7  thoughts or comments on this map?
8      A.   No.
9      Q.   Okay.  That's fine.
10      A.   No, ma'am.
11      Q.   If you are called as a witness in
12  this case, what -- what do you expect to
13  testify about?
14      A.   Well, I would expect that if I
15  were called, it would be to give my experience
16  as someone who worked in the federal
17  delegation for about 28 years.
18      Q.   Are there any specific issues that
19  you believe you would testify about?
20      A.   No, ma'am.  I -- I could testify
21  on what it was like being a congressman and
22  working as a member of a congressional staff.

Page 84

1  been discussing, whether there are communities
2  of interest that are at issue here.  Just your
3  general views on this plan.
4      A.   Well, unfortunately, I -- I don't
5  really have an opinion about this because I'm
6  working for the Governor of Alabama, and our
7  goal is to keep all seven districts.  So we're
8  going to work to get as robust a census as
9  possible.  So we haven't even begun looking at
10  hypotheticals of six districts.  Our goal is
11  to keep seven or maybe get eight.
12      Q.   Understood.  If this situation
13  does arise, just looking at this map, are
14  there any specific issues that you see that
15  you find concerning?
16      A.   Well, I -- I -- I would say and I
17  think anyone who has ever served in office or
18  who ever aspires to serve in office that there
19  is a value to -- as compact a district that
20  has as much community of interest and
21  continuity of interest as possible.
22          And if we lose a seat, then --

Page 83

1  I'm comfortable with that.
2      Q.   Understood.  Did you
3  participate -- we -- we talked about this a
4  little bit, but I want to just get more
5  information.
6          Did you participate in any
7  capacity in Alabama's redistricting plan
8  following the 2010 census so to create that
9  2011 plan?
10      A.   I participated in the sense that
11  all of the members of Congress from Alabama,
12  Democrat and Republican, agreed to work with
13  the legislature as had been done in previous
14  redistricting efforts.  And we agreed to work
15  to support keeping the districts as close to
16  what they had been historically.
17          And we all did that knowing that
18  we would have to ultimately get a slightly
19  different district than what might be ideal
20  for us but because it was for the benefit of
21  the state as a whole and for our respective
22  seven congressional districts.

Page 85

Pages 82 to 85

7/30/2019          Chestnut, et al., v. John H. Merrill          Josiah Bonner

1     Q.   And to -- to the best of your
2  recollection, who or what types of people did
3  you have conversations with or communications
4  with about creating that sort of plan?
5     A.   Congresswoman Sewell, Congressman
6  Bachus, Congressman Brooks, Congressman
7  Rogers, Congresswoman Roby.
8     Q.   It sounds like the Alabama
9  delegation.  You don't have to -- it's not a
10  memory test.
11     A.   It's not a real interest to our
12  senate colleagues because they didn't have to
13  run in distract maps.
14     Q.   Right.
15     A.   So, but the seven members of
16  Congress from Alabama worked closely together
17  and supported each other and -- and -- and --
18  and were willing to work with the legislature
19  in a bipartisan way to produce a map that we
20  believed would be constitutional, would meet
21  the criteria, that would pass muster by the
22  Department of Justice.  This map did.  And

Page 86

1  served in the legislature.
2     Q.   Do you remember any of the -- the
3  specific legislators that you met with or had
4  conversations with about this?
5     A.   (Witness nods head.)  Well, I got
6  to know the Reapportionment Committee very
7  well.  We had Senator Vivian Davis Figures
8  from Mobile.  We had Representative Jamie Ison
9  from Mobile.  We had -- Senator Gerald Dial
10  was the chairman in the Senate or the
11  co-chairman, Representative Jim McClendon
12  who's now in the Senate was the co-chairman in
13  the House.
14     We -- when -- when the map and
15  therefore the political lines that are going
16  to be determined by that are in the hand of
17  the legislature, you work with the leadership
18  of the legislature, the bipartisan way.  You
19  work with the -- you work with the committee,
20  and that -- that's primarily who we spent most
21  of our time with because they were the ones
22  who -- in whose responsibility this fell.

Page 88

1  we -- we worked and our staffs worked to
2  support that effort.
3     Q.   So outside of the Alabama
4  Congressional Delegation, outside of your
5  staff, were there other individuals or
6  entities that you worked with in the --
7     A.   We worked with the Reapportionment
8  Committee of the Alabama Senate and House.
9     Q.   Uh-huh.
10     A.   And we worked with -- I'm sure --
11  I -- I -- I -- I don't know who the other
12  members worked with, but we -- we worked as a
13  cohesive group starting with us.
14     We had meetings.  And we would
15  come to Montgomery, and we would have lunch
16  with members of the legislature, but we did
17  that not just every ten years.  We did that to
18  maintain relationships.
19     Some of them actually had served
20  in the legislature prior to being elected to
21  Congress, so they had pre-existing
22  relationships there.  I did not.  I had never

Page 87

1     Congresswoman Sewell also worked
2  with the Justice Department.  The Attorney
3  General married a young lady from Mobile, and
4  so she and Attorney General Holder were good
5  friends.  She and President Obama and
6  Mrs. Obama were in school together, law school
7  and undergraduate.  I think she and Mrs. Obama
8  were in the same social sorority.
9     So we all did what we could to
10  help get it through the legislative process
11  and then get it approved with the stamp of
12  approval from the Justice Department.
13     Q.   Are you aware of any efforts to
14  create a second majority-minority district
15  during that redistricting cycle?
16     A.   There have been conversations
17  about that during that cycle and also
18  previously as well.  There was a general
19  consensus that if you were going to maintain
20  the threshold of what some believe that you
21  needed to have to guarantee a minority
22  district, then you would lower it such to try

Page 89

Pages 86 to 89

**Page 90**

1  to create a second district that you may well
2  risk having a minority representative in
3  Congress.
4      I believe it was 65 percent. And
5  I think you were going to lower it to create
6  two, and it would be closer to 50 percent.
7      Q.  What about instead of an actual
8  majority-minority second district, what about
9  like an influence district just where, you
10  know, the population -- the African-American
11  population would be higher but maybe not
12  actually up to whatever threshold the
13  legislature considered necessary to be a
14  effective majority-minority district?
15     A.  I was aware of -- look, you have
16  35 state senators, and you have 105 state
17  house members. Many of whom their motivation
18  for drawing district lines are their own
19  political interests.
20     So you would be talking to
21  Representative A or Senator B, and you may
22  well be talking to someone who was trying to

**Page 91**

1  draw a district for their political
2  aspirations as well. So there were a lot of
3  different dynamics at play here.
4      But -- and I don't -- and I'm not
5  speaking for anyone else in the delegation,
6  but I don't believe that anyone in the
7  delegation believed that the creation of a
8  second minority district or a -- a significant
9  influence district was something that -- that
10  was given any real encouragement by any
11  members of our delegation, Democrat or
12  Republican.
13     Q.  When you say "the delegation," you
14  mean the -- the seven --
15     A.  Federal. Uh-huh.
16     Q.  -- congressman -- congressmen and
17  women?
18     Why -- why do you think that
19  wasn't --
20     A.  Well, you'd have to ask the other
21  six members who were in at the time, but I
22  think everyone believed that there were

**Page 92**

1  historic benefits to the service of the
2  constituents to keep the districts as they
3  have been for several decades.
4      Q.  Were you supportive of creating a
5  second majority-minority or a significant
6  influence district?
7      A.  I saw no value in it because I was
8  very confident that I was serving the people
9  of my district regardless of their racial
10  background, their socioeconomic background,
11  their political views, their -- or -- or other
12  issues that -- that were at play.
13     Q.  To the -- to the best of your
14  recollection, were there any plans that you
15  remember that did propose having a second
16  majority-minority or a significant influence
17  district?
18     A.  I -- I remember seeing -- and I
19  can't tell you whether it was the 2010 or the
20  2000 redistricting, but I remember seeing a
21  plan similar to this that would have gone
22  under Mobile Bay.

**Page 93**

1      There was actually a question
2  about whether that would make that contiguous
3  or not. We'd go all the way over to Dothan.
4  I saw one that even went all the way up to
5  Auburn in Lee County. And then the other part
6  of Mobile that would go all the way up to
7  Pickens and Tuscaloosa.
8      And having been a student at the
9  University of Alabama and having had children
10  who attended the University of Alabama --
11     Q.  Uh-huh.
12     A.  -- I knew how hard it was to get
13  to Tuscaloosa. There's no four-lane road
14  there anymore than there's a four-lane road
15  from Mobile to Dothan.
16     So I -- I heard that there were
17  legislators that were talking about that, but
18  I didn't spend a lot of time encouraging that,
19  and therefore, I didn't spend any time with
20  those legislators. But -- but keep in mind,
21  other legislators, other members of Congress
22  from the delegation were similarly looking

Pages 90 to 93

1  after what was the district that they knew
2  best, and the one that they had worked in and
3  had run in and been successful in.
4      Q.   Do you recall having any
5  conversations or discussions or other
6  communications about why you didn't
7  encourage -- I think you said encourage -- a
8  second majority-minority or a significant
9  influence district?
10     A.   I -- I had no reason to encourage
11 creating a second minority district that would
12 have, in my view, been detrimental to my
13 district and to the service that my staff and
14 I were rendering.
15          We had an outstanding reputation
16 for serving people without regard to their
17 political views, their -- I mean, we did not
18 have a litmus test.  If you called my office
19 and you needed help, you got help.
20          And the proof of that is, is that
21 I won -- I -- I won five of the six counties
22 in my first race, and I won all six counties

Page 94

1  in every subsequent race and with a couple
2  times running unopposed.  If I were not doing
3  a good job, I would have drawn an opponent.
4      Q.   Uh-huh.  Did you ever speak with
5  any constituents or anyone in your district
6  about the potential to have a second
7  majority-minority district or --
8      A.   No one ever contacted me that I
9  can recall saying that they felt that they
10 needed a second minority district to be better
11 represented.  I'm not saying that there were
12 not people who might have thought that.
13          But when I went to town hall
14 meetings in Prichard or in Trinity Gardens or
15 in other communities throughout the district,
16 I -- I can't recall -- and again, I said I had
17 450, so I'm not saying they were all
18 lovefests, but I can't recall anyone ever
19 coming and saying that they wished that they
20 were in a different district and had a
21 different congressman.
22     Q.   In your view, why -- why was a

Page 95

1  second majority-minority or influence district
2  not created in the last plan in 2011?
3      A.   Well, I can't really speak for the
4  mindset of 140 legislators.
5      Q.   Of course.  In -- in your -- in
6  your view.
7      A.   I -- I -- I really don't know that
8  I'm qualified to answer that.
9      Q.   That -- that's perfectly fine.
10          And can you -- can you recall any
11 communications that you had with anybody,
12 conversations or written or in some of the,
13 you know, your delegation meetings --
14     A.   Well --
15     Q.   -- any conversations about
16 creating that or why it shouldn't be created
17 or should be?
18     A.   I -- I really and truly can't
19 recall that the delegation -- when we met to
20 talk about the redistricting process, I really
21 can't recall that we spent a lot of time
22 talking about all the different scenarios that

Page 96

1  were out there.
2          Our goal was to work cohesively to
3  represent the state, to keep as much
4  disruption to a minimum as possible, and to
5  show, as we tried to show with our daily
6  service, that regardless of -- of which party
7  we represented, that we represent the same
8  state.  And that we work together for the good
9  of the people of Alabama.
10     Q.   So it sounds like you don't recall
11 any conversations then within the delegation
12 about the potential for creating a second
13 majority-minority or influence district?
14     A.   I -- I -- I can't say
15 categorically there were none -- there were
16 not any.  I don't recall any at this moment,
17 no.
18     Q.   What about conversations or
19 communications outside of the delegation?  Do
20 you recall any of those?
21     A.   No, because we didn't come to
22 Montgomery to work with the state legislature

Page 97

| | |
|---|---|
| 1  with the goal of looking at options and | 1  Bachus.  And it was adjusted to where it would |
| 2  creating a different map.  We all believed | 2  be Congressman Aderholt.  And -- but -- but |
| 3  that we were serving -- I said with confidence | 3  for the greater good of serving the state, |
| 4  that I felt like I was serving the people of | 4  there was -- it -- it -- it was not that big |
| 5  my district. | 5  of an adjustment to where it created any |
| 6       I -- I think that every member of | 6  tension within the delegation. |
| 7  the delegation would have said the same thing. | 7       Q.    So to the -- best of your |
| 8  Without being cocky, just with -- just | 8  recollection, were there any, I guess, |
| 9  confidence that we were doing the best we | 9  disagreements between what the legislature had |
| 10  could to represent the people of our | 10  proposed and what the Alabama delegation had |
| 11  districts. | 11  wanted? |
| 12       Q.    Understood. | 12       A.    Once the legislature made its map |
| 13       Did -- in terms of the delegation, | 13  final, we all got on board trying to support |
| 14  did you -- was it your position then that you | 14  getting it cleared by the Justice Department |
| 15  should keep the districts the way that they | 15  and put into place so that we could know what |
| 16  were, or did you have a plan that you | 16  districts we would be running in and begin |
| 17  proposed -- | 17  that process. |
| 18       A.    We -- | 18       Ten years earlier, it was a much |
| 19       Q.    -- a physical plan that you | 19  more challenging effort.  The governor |
| 20  proposed? | 20  actually called, I think, two or three special |
| 21       A.    We knew we would have to make | 21  sessions to deal with redistricting.  A |
| 22  adjustments based on population. | 22  federal court had gotten involved. |
| Page 98 | Page 100 |

| | |
|---|---|
| 1       Q.    Uh-huh. | 1       And I was working as a staffer at |
| 2       A.    And -- and we agreed that we would | 2  the time, but there was a concern that we may |
| 3  make adjustments based on that.  And quite | 3  not even have maps in place for the members to |
| 4  frankly, some members ended up getting -- in | 4  run in.  So contrast that experience with this |
| 5  the final plan, some members ended up getting | 5  where we were working with the legislature |
| 6  counties that they had not sought.  But that | 6  that was trying to keep the districts as close |
| 7  was what, in the wisdom of the legislature, | 7  as to what they had been historically in |
| 8  needed to be done to accomplish the goal of | 8  recent history, we -- we -- we chose not to |
| 9  the map. | 9  disagree over little things. |
| 10       Q.    So did the delegation present a | 10       Q.    Understood. |
| 11  map that they wanted, or was there a | 11       MS. MADDURI:  I think -- do you -- |
| 12  physical -- you know, like a proposed map from | 12  would you want to take a break?  We've been |
| 13  the delegation? | 13  going for a little while.  I have some -- I do |
| 14       A.    I -- I believe we had an agreed | 14  have some questions about the previous |
| 15  upon.  I can't tell you that we produced a map | 15  redistricting too. |
| 16  or that a map was submitted.  It could have | 16       MR. DAVIS:  Sure.  This is a fine |
| 17  been.  I really don't recall.  We -- we ended | 17  time. |
| 18  up agreeing that we would take what the | 18       MS. MADDURI:  This might be a good |
| 19  legislature did and not challenge that. | 19  time to -- |
| 20       But, for instance, the northern | 20       THE WITNESS:  Sure. |
| 21  part of Tuscaloosa County in the previous | 21       THE VIDEOGRAPHER:  This ends MPEG |
| 22  redistricting was represented by Congressman | 22  two in the continued deposition of Josiah |
| Page 99 | Page 101 |

Pages 98 to 101

| | |
|---|---|
| 1   Bonner. We are off the record at 11:08. | 1   advantage of being a member who came from the |
| 2       (A recess was taken.) | 2   legislature like Congressman Rogers did is, is |
| 3       THE VIDEOGRAPHER: This begins | 3   that you have those preexisting friendships. |
| 4   MPEG three in the continued deposition of | 4   You have those preexisting relationships. But |
| 5   Josiah Bonner. We are on the record at 11:22. | 5   -- but -- but we worked closely. |
| 6       Q.   (By Ms. Madduri) So before the | 6       Walter Braswell was Congressman |
| 7   break, I think we were going to start talking | 7   Harris' Chief of Staff. Tom Bevill was |
| 8   about the previous cycle of redistricting. | 8   represented by Don Smith. You have to |
| 9   What was your -- what was your role in that? | 9   understand a small delegation like ours has a |
| 10      A.   I was Chief of Staff for | 10  very special relationship. The chiefs of |
| 11  Congressman Callahan. And just as when I was | 11  staffs meet every month and have lunch as do |
| 12  in Congress and sent my staff down, I went | 12  the members. |
| 13  down on behalf of Congressman Callahan, and I | 13      I can tell you of very few |
| 14  was there with the other Chiefs of Staff from | 14  congressional delegations that meet monthly, |
| 15  the other members of Congress. | 15  Democrat and Republican, House and Senate, and |
| 16      And it was basically the same | 16  talk about what we can do to -- to serve |
| 17  thing, to work with the legislature to try to | 17  Alabama as well as the Alabama delegation |
| 18  get a plan that was as close to what we had | 18  does. And that has historically been the |
| 19  knowing that there would have to be some | 19  case, and it continues to be the case. And |
| 20  adjustments made for population shift. | 20  it's one of the hallmarks of what makes this |
| 21      Q.   Do you remember, just roughly, how | 21  delegation so effective. |
| 22  many times did you meet or have conversations | 22      You look at Alabama's nine person |
| Page 102 | Page 104 |

| | |
|---|---|
| 1   about this with the other Chiefs of Staff and | 1   delegation compared to Texas or California or |
| 2   the delegation? | 2   New York or Florida, and they can't sometimes |
| 3       A.   Frequently. And by that, I would | 3   agree on what the state colors are much less |
| 4   say that leading up to the redistricting year, | 4   on how they can work together for the good of |
| 5   you know, we would meet probably -- it's been | 5   the state. |
| 6   20 years. It's been longer than that, but | 6       Q.   So you all met maybe five to ten |
| 7   we -- we would've met between five and ten | 7   times, you said, prior to that redistricting. |
| 8   times. | 8   What about with the legislature or legislature |
| 9       Q.   And that's the delegation? | 9   representatives? |
| 10      A.   Uh-huh. Yes, ma'am. | 10      A.   We -- we -- we would come -- of |
| 11      Q.   Okay. And what about | 11  those -- and five or ten is certainly a guess, |
| 12  representatives of the legislature? | 12  but of the times that we met, most of those |
| 13      A.   So Congressman Callahan had served | 13  meetings were in Washington. And then once |
| 14  in the legislature, and Congressman Bevill was | 14  the legislature started coming into session |
| 15  the senior member of Congress at the time. | 15  and they started to focus on that, we worked |
| 16  No. That would have been in the '90. | 16  closely with the governor who is a Democrat. |
| 17      So in the 2000, Sonny may have | 17      We worked closely with the Speaker |
| 18  been the only -- and -- and Spencer Bachus, I | 18  of the House who was a Democrat. We worked |
| 19  think were the only two members that had | 19  closely with the Lieutenant Governor and the |
| 20  previously served in legislature. | 20  Senate and the House leadership. And back in |
| 21      So the advantage of working for a | 21  the 2000 census as opposed to the 2000 -- or |
| 22  member who's been in the legislature or the | 22  the redistricting as opposed to the 2010, it |
| Page 103 | Page 105 |

Pages 102 to 105

1 was a Democrat majority in the legislature.
2     Q.    Within the congressional
3 delegation, were there -- did you all have
4 sort of a unified view on what should be done
5 with the redistricting?  Were there any
6 conflicting views or disagreements within the
7 delegation?
8     A.    We were consistent as we were ten
9 years later.  We -- we tried to work
10 cohesively to help the legislature draw a map
11 that would not disrupt the service to the
12 state but would, in fact, allow its continuity
13 to continue.
14     Q.    And were there any conflicts or
15 disagreement between what the legislature
16 wanted to do with the map versus what the
17 congressional delegation wanted to do?
18     A.    I believe that it was about that
19 time that some in the legislature wanted to
20 create a minority-majority district, and that
21 was creating some tension within the Democrat
22 members of the delegation, but it was not

Page 106

1 something that we felt -- that Congressman
2 Callahan felt that he needed to get involved
3 in because he was going to work with the
4 delegation regardless.
5     Q.    And was that the creation -- what
6 ultimately was the creation of congressional
7 district 7?
8     A.    Yes, ma'am.
9     Q.    Okay.  Did you or you on behalf of
10 congressional -- Congressman Callahan have any
11 views about whether that district should or
12 shouldn't be created?
13     A.    Not that I recall.
14     Q.    Do you remember any conversations
15 about --
16     A.    (Witness shakes head.)
17     Q.    -- the creation of that --
18     A.    No, ma'am, I really don't.
19     Q.    Do you recall if you were
20 supportive of creating that district?
21     A.    Well, my role was really to focus
22 on the 1st congressional district, and it

Page 107

1 didn't really have as much of an impact
2 because this is where you get parochial.
3     You -- you focus on your district,
4 and then it's like putting a puzzle together.
5 You see how your district's going to fit with
6 this district and that district.  So our focus
7 was on trying to preserve the integrity of the
8 1st congressional district, which is what we
9 did.
10     Q.    Were any changes made to the 1st
11 congressional district in order to create that
12 majority-minority district?
13     A.    Well, in the 1990 census, we lost
14 Wilcox County, and then in the 2000 census, we
15 lost a part of Clarke County.
16     Q.    Was that something that you -- I
17 guess, first with Wilcox County, the loss of
18 Wilcox County, was that something that you
19 opposed or supported or how -- how was that?
20     A.    Well, I was a relatively young
21 staffer, and so I didn't really have a -- a
22 vote, if you will.  They needed to make the

Page 108

1 adjustments.  As I recall, the -- the map that
2 was drawn that resulted in the loss from
3 Wilcox County I think was actually drawn by a
4 three-judge panel, I believe.
5     So we -- we were not -- my ties to
6 Wilcox County were personal.  They were not
7 the congressman's ties.  He was from Mobile,
8 and he wanted to make certain that the
9 district remained as intact from Mobile and
10 Baldwin Counties as possible, and therefore
11 that was my objective too.
12     Q.    Do you recall any conversations or
13 communications about the drawing of the map by
14 that three-judge panel in relation to the 1990
15 redistricting?
16     A.    I remember that the legislature
17 was not able to draw a map, and we needed a
18 map.  And it went to a three-judge panel, and
19 the map they produced was one that the members
20 of Congress all -- I mean, if a three-judge
21 panel makes the decision, it -- it's hard to
22 go back in and ask them if they'll make some

Page 109

Pages 106 to 109

1  changes to it to make you a little bit
2  happier. So we -- we took it, and we were --
3  we did the best we could to serve it.
4      Q.    But do you remember having any
5  conversations or communications about just the
6  views on what they had done?
7      A.    So now we're going back to --
8      Q.    We're going back to 1990.
9      A.    -- '90. I -- I don't recall any
10 conversations.
11     Q.    And when that map was redrawn,
12 the -- the majority-minority district was not
13 created, correct?
14     A.    I -- I believe that's correct.
15 I'd have to look at the map to see, but I
16 believe that that's correct.
17     Q.    Okay. I think you mentioned that
18 the redistricting process in relation to the
19 2000 census was contentious. Can you talk a
20 little bit about what you mean -- meant by
21 that?
22     A.    Well, Congressman Harris believed

1  that he served the people of the 7th district
2  well. And he -- I think most of the members
3  of -- of the delegation believed that he did
4  and most of the people in his district did
5  because he was re-elected several times.
6          But when the decision was made to
7  create the district, President Clinton was in
8  office, and I guess to soften the blow, if you
9  will, Congressman Harris was made U.S.
10 Attorney.
11         So he was no longer going to be
12 afforded the opportunity to be -- I mean, I'm
13 not saying he couldn't have gotten elected.
14 He was very popular. But the district was
15 created to create a majority-minority
16 district.
17         And I don't -- I don't know that
18 many people could have gotten elected in that
19 district other than a minority member who was
20 Congressman Earl Hilliard -- then State
21 Senator Earl Hilliard.
22         I mean, he had a primary, but the

1  primary for all practical purposes served as
2  tantamount to the general election because if
3  you got the Democrat nomination, as was true
4  in Alabama for many years, you basically had
5  been elected. The general election was just a
6  formality.
7      Q.    So I think I might have asked you
8  this, but I'm misremembering, so I want to
9  make sure I understood what you said.
10         Do you -- were you supportive of
11 creating that majority-minority district?
12     A.    As a young Hill staffer, no one
13 really asked me whether I supported it or not.
14 The -- the members of the delegation, though,
15 agreed to work with -- through the differences
16 of opinion.
17         Congressman Harris is deceased.
18 He died of cancer, so he would not be here to
19 speak for himself. And I'm certainly not
20 qualified to speak for him, but my
21 recollection -- his Chief of Staff and I were
22 good friends. It was Walter Braswell. He has

1  passed away as well. So there's no one who
2  can dispute what I'm about to say.
3          But I think that they personally
4  believed -- they were Democrats, conservative
5  Democrats, but they served that district with
6  integrity and with professionalism and to the
7  best of their ability. And I think in their
8  view, they -- they believed they could have
9  continued to serve the district.
10         But the political decision of
11 creating the majority-minority district was
12 made, and the reality was that that district
13 was not drawn with the intent to keep a white
14 Democrat in that seat. That's not unusual
15 with other districts around the country where
16 those decisions are made by their legislators
17 as well.
18     Q.    Right. So when you say the
19 decision was made, you're referring to the
20 Alabama legislature's decision?
21     A.    (Witness nods head.)
22     Q.    And --

1    A.    Yes, ma'am.
2    Q.    Oh, thank you.
3          And I -- I realize -- I realize
4    that -- I believe you were Chief of Staff at
5    that point, correct?
6    A.    In 1990, I was, yes.
7    Q.    Right.  Okay.  Or sorry -- in
8    2000.
9    A.    2000.
10   Q.    In the -- in the -- in the cycle
11   where the majority-minority was -- district
12   was created which is in 2000, correct?
13   A.    Well, I was Chief of Staff in 1990
14   and Chief of Staff in 2000.  If you've got the
15   maps, we can look at and I can show you.
16   Q.    I actually don't think I have that
17   map, but I just want to clarify.
18   A.    I -- I was Chief of Staff in 1990,
19   and I was Chief of Staff in 2000.
20   Q.    Correct.  And I might be
21   misunderstanding, but I thought the -- I
22   thought you said that the majority-minority

Page 114

1    district, CD 7, was created in the 2000 --
2    following the 2000 census?
3    A.    No.  It would have been created in
4    1990 --
5    Q.    Okay.
6    A.    -- following that because
7    President Clinton was in office during the
8    time that Congressman Harris became U.S.
9    Attorney.  And he was in office -- he was
10   elected in the '92 election and served until
11   2000.
12         So it would have been in the 1990
13   census that resulted in the redraw of the maps
14   that created the minority -- majority-minority
15   district.
16   Q.    Understood.  Understood.
17   A.    I was a young Chief of Staff.  12.
18   Q.    Understood.
19         And just to make sure I have this
20   straight, so then was that the cycle where you
21   said there were five to ten meetings of the
22   Alabama Congressional Delegation and

Page 115

1    subsequent meetings with the legislature?
2    A.    Yes.  And when I answered the
3    question about five to ten meetings, I could
4    not swear under oath that there were five or
5    ten.
6    Q.    Absolutely.
7    A.    All I know is, is that we
8    worked -- as I said, we -- we had monthly
9    meetings as the Chiefs of Staff.  The
10   delegation had monthly meetings.  And so I
11   don't know how many meetings we had, but how
12   ever many meetings we had that were focused on
13   redistricting, the goal was to try to work
14   together for the good of the state.
15   Q.    Understood.
16         To the best of your recollection,
17   was there any -- anyone that you were aware of
18   related to the Alabama Congressional
19   Delegation that was opposed to creating that
20   majority-minority district?
21   A.    I don't believe there was anyone
22   who was opposed to that I can recall.

Page 116

1    Congressman Harris didn't see the need for it.
2    But -- but that was -- but that was his view,
3    and it was not shared by the people who made
4    that decision.
5    Q.    Did you have any concerns with the
6    creation of that district --
7    A.    I --
8    Q.    -- the majority-minority district?
9    A.    I -- I really did not have any
10   concerns because my focus was on the 1st
11   congressional district.
12   Q.    Do you recall if Representative
13   Callahan had any --
14   A.    No.
15   Q.    -- concerns with creating that
16   district?
17   A.    None that I can recall.
18   Q.    Do you recall any communications
19   with anyone that you had where they were
20   concerned or opposed to creating that
21   majority-minority district?
22   A.    I -- I really don't remember that

Page 117

Pages 114 to 117

1 it was a -- a -- an issue for the delegation
2 other than Congressman Harris. And I don't
3 recall that it was even that controversial in
4 the legislature. But again, that's been
5 37 years ago, 39 years ago. It's been a few
6 years.
7  Q. Understood.
8   And just so I'm clear though.
9 There was a -- some kind of litigation that
10 followed that map being created with the
11 three-judge panel that you mentioned?
12  A. In the 1990?
13  Q. Right. So I believe that map was
14 adopted in around 1992 because --
15  A. I --
16  Q. -- Clinton was in office?
17  A. That -- that would sound about
18 right.
19  Q. Okay. So was there litigation
20 that you're aware of relating to that map
21 after that, so sometime in the early or
22 mid-1990s?

Page 118

1  A. I really don't recall whether
2 there was litigation. As a result of the map,
3 I remember that the legislature failed to do
4 its job, and the federal courts made the
5 decision to draw the map.
6  Q. When you say failed to do their
7 job, what do you mean?
8  A. The legislature in Alabama, as I
9 think in most states, is charged the
10 responsibility of redrawing every ten years
11 based on a new census.
12  And as I recall, the legislature
13 was unable to agree on a plan, and if they
14 couldn't do it, the federal courts made the
15 decision that they could. Someone had to.
16  Q. Okay. So the legislature was
17 unable to create a map at all?
18  A. That -- that's my recollection.
19  Q. Okay. Do you recall what were the
20 main --
21  A. I don't.
22  Q. -- disagreements or what issues

Page 119

1 led to that?
2  A. I'm sorry. I don't.
3  Q. No, that's fine. What is the --
4 the Alabama Fair Reapportionment Fund?
5  A. Can you tell me a little bit more
6 about it?
7  Q. Well, I actually don't know that
8 much about it.
9  A. Okay.
10  Q. So I was hoping that you would
11 tell me about it.
12  MR. DAVIS: Did you say Alabama
13 Fair Reapportionment Fund?
14  MS. MADDURI: Correct.
15  A. I'm -- I'm sorry. I -- I don't
16 recognize that name.
17  Q. (By Ms. Madduri) Let me see. I
18 do have an article that mentions it, so I can
19 give you that in case it helps trigger.
20  MS. MADDURI: We can mark it. I
21 think we'll be at Exhibit 9.
22  (Bonner Exhibit 9 was

Page 120

1  marked for identification.)
2  MR. WALKER: Are we going to mark
3 this?
4  MS. MADDURI: Yes. It's going to
5 be Exhibit 9.
6  Q. (By Ms. Madduri) And feel free to
7 review the article. I believe you're quoted
8 on the first page of that document.
9  A. I am. I have not seen this in a
10 long time so...
11  Q. And I know it's been a long time,
12 so I apologize for asking you to think back so
13 far.
14  A. Okay. So this fund, based on this
15 newspaper article, and now jogging my memory,
16 was established by the seven members of the
17 congressional delegation. And it appears that
18 all seven of them supported it.
19  I cannot answer whether all seven
20 of them financially contributed to it, but it
21 addresses something we talked about earlier.
22 So this was dealing with the 2001

Page 121

Pages 118 to 121

redistricting effort, but ten years earlier
when the federal courts drew this, the -- each
congressional office has what is called a
members representational account, an MRA.
        That's the money -- it's like your
budget -- that you have to hire your staff, to
set up a district office, to pay for telephone
services, newspaper subscription services, and
things like that. The law is clear that you
cannot use your congressional budget for
reapportionment purposes.
        So as is noted in this article,
which has been entered as an exhibit, this
article states -- and I would have no reason
to dispute is -- that Congressman Callahan
actually had to spend $250,000 from his
campaign fund ten years earlier to -- in
federal court in legal fees to support getting
a plan, a map, a redistricting plan that would
in fact allow him to continue to work, run in
a district that is close to what it looks like
today.

                                        Page 122

        So the members, proactively trying
to avoid a repeat of what happened ten years
ago, agreed to support a plan that we went to
the legislature and encouraged them to
consider. And it was a plan that called for
keeping the districts as opposed to the plan
that at that time Dr. Joe Reed, who is
chairman of the Alabama Democratic Conference,
was pushing, which was to create a second
minority district.
        But in this article, it says, it
quotes Congressman Hilliard who was the first
African-American member of the delegation
since reconstruction to say that -- Hilliard
says he knows of no plans to try to create the
second majority black district because the
changes that would require like -- because the
changes that would require likely wouldn't be
approved by the courts.
        So you have to keep in mind it was
a different Justice Department. It was a
different time, and at that time, while it

                                        Page 123

appears Dr. Reed wanted two minority
districts, Congressman Hilliard as the
Democrat -- he was not the only Democrat -- he
was not the only Democrat in delegation, but
he was the only minority Democrat in the
delegation -- was not supportive of that
effort to create two minority districts
because he didn't think the courts would
actually support that.
        That's what I -- that's my
interpretation of this. And I'm sorry that
when you asked about the account, it -- it was
not a name I was familiar with. But I do
recall it now.
    Q.    Okay. So you mentioned, as this
article says, that Representative Callahan had
to spend $250,000 from his campaign fund ten
years ago to challenge Reed's plan?
    A.    Right.
    Q.    Okay. So in Reed's plan that this
is referring to, it's your understanding that
that had two majority-minority districts?

                                        Page 124

    A.    I didn't really recall that he was
pushing that in 1990, but I don't dispute if
that's the case. We would certainly be able
to -- to factually determine that. I do
recall that there has been discussion for some
time about creating two minority -- two
majority-minority districts, but the challenge
was always going to be whether it would
actually pass muster with the Civil Rights
Division and the Department of Justice.
    Q.    Do you recall what Representative
Callahan was unsupportive of in Reed's plan?
    A.    Well, it would have created --
it -- it would have divided Mobile and Baldwin
Counties, and it would have destroyed the 1st
congressional district as it had existed and
as he served.
        I don't recall the specifics from
that. I would have to go back, but the court
records would show the different maps that
were introduced at that time as evidence.
    Q.    Do you recall this letter that

                                        Page 125

                        Pages 122 to 125

7/30/2019           Chestnut, et al., v. John H. Merrill           Josiah Bonner

1   this article was referencing which was
2   signed -- the article says was signed by
3   Representative Callahan?
4        A.   I -- I recall it now.
5        Q.   Well, no.  That's fine.  I mean,
6   it was a long time ago.  I'm --
7        A.   I don't recall the verbiage of the
8   letter.  I don't recall the ask, but I'm sure
9   it was raising money.  I mean, it says it was
10  a fund raising fund to try to raise money in a
11  legal way to try to get the legislature to
12  deal with the redistricting effort that the
13  legislature ten years earlier had failed to be
14  able to do.
15       Q.   So in connection with the 2000
16  census in that redistricting, is it correct
17  that Congressman Callahan did not support a
18  second majority-minority district being drawn
19  at that time?
20       A.   I -- I would respectfully dispute
21  that description.  I don't recall Congressman
22  Callahan ever sharing with me his opinion

Page 126

1   about the pros or cons of creating a second
2   majority-minority district.
3             His focus was self-serving.  It
4   was to keep the congressional district that he
5   had.  And quite frankly, so was the view of
6   the other six members of Congress.  If you've
7   got something that works, why would you lead
8   the effort to change it?
9        Q.   Do you recall who was involved
10  with managing that fund, the Alabama Fair
11  Reapportionment Fund?
12       A.   Well, this article says -- and so
13  therefore I will have to take it on face
14  value; I guess this is before fake news was
15  created -- that it was -- that the money was
16  raised and the address was the Alabama
17  Republican Party.
18            But keep in mind, we did not have
19  the ability to use congressional money for
20  this.  We had already -- ten years earlier,
21  we -- the Callahan campaign had spent
22  $250,000, which was a lot more money then.

Page 127

1   It's a lot of money today.
2             But today, that would -- back
3   then, that was a significant amount of money
4   that was used from the campaign, which was a
5   legal use of the money, but I think
6   Congressman Callahan was not alone in
7   believing that -- other members of Congress
8   were spending money as well in that court
9   defending their districts.
10            So he believed it was better to
11  raise the money through this account than to
12  have to take money out of your campaign
13  account.
14       Q.   Have you ever been involved in
15  raising money for that fund to the best of
16  your recollection?
17       A.   As a congressional staffer, I
18  would have been restricted in raising money
19  for any type of political activity.  Each
20  House member has the opportunity to name one
21  staff member as their political liaison, if
22  you will, who can be a spokesman or who can

Page 128

1   coordinate with the campaign activities.
2             I had that role when I was his
3   Chief of Staff.  So I had that in 1990 and I
4   had it in 2000.  I did not have it when he was
5   first elected in 1984.
6        Q.   So in that role or otherwise, had
7   you ever been involved in fundraising for that
8   fund?
9        A.   Not that I recall.
10       Q.   Do you recall who the primary
11  sources of funding for that -- for the fund
12  were?
13       A.   Probably the same companies and
14  individuals.  I don't know whether they could
15  take company -- the corporate money or not.
16  I -- so I shouldn't say companies.  But we --
17  look, in Alabama and probably in most states,
18  it's the same people that get asked to write
19  the campaign contributions to both parties, to
20  both candidates.
21            So my guess is, is that if you
22  look at an FEC report today and you look at

Page 129

Pages 126 to 129

one in -- in 2000 when this fund was created,
you would see the same type of groups and
entities and people who were involved in the
political process.

It may be a different person, but
it would be who -- the person who was in
charge of -- the president of the Farmers
Federation, the president of the power
company, or the president of the -- this group
or that group, the business community.

They all have been -- they've --
they've grown exponentially over the years,
but they are the ones who traditionally
support both Democrats and Republicans.

Q.    And what was your understanding of
the purpose or the goal of that fund?

A.    To try to get the legislature to
approve a map that would avoid us going to
another lengthy and expensive federal court
proceeding and to try to keep the district
maps as closely aligned as they had been
during the previous decade for the upcoming

Page 130

decade.

Q.    And did you work with this same
fund when you became the congressman?

A.    I don't think we called it that.
I don't even know that we -- I don't know what
the name of that fund was, but we all chipped
in and raised -- we -- we all -- when I --
Congressman Bonner followed the leadership of
Congressman Callahan.

And when it was time for us to
work with the legislature in 2010, we all, all
seven members, Democrat and Republican,
donated money to try to help the legislature
draw a map that was as close to the one as the
one we had.  We did not to my -- I don't
recall whether we actually introduced a map,
but Congresswoman Sewell, Congressman Bachus,
Congressman Rogers, Congresswoman -- now I'm
talking about the 2010.

We -- we all agreed to try to work
together as we had previously for the last --
as long as I've been around.  The map you

Page 131

showed in 1950, I was born in 1959.  So that
predates my knowledge.

Q.    To the best of your recollection,
were funds -- was that fund ever used to --
whether it's lobby against or argue against --

A.    No.

Q.    -- the creation of a second
majority-minority district?

A.    That was never the goal.  The goal
was to keep the districts as close to what
they were.  And it really was not -- I mean,
look, we -- we had -- in the 2010
redistricting effort, we had the first
African-American president.

We had, I believe, the first
African-American Attorney General, and I had a
very good working relationship with General
Holder.  And to the extent any congressman has
a good working relationship with the White
House, I had a good working relationship with
White House.

On my last day in office, General

Page 132

Holder called to tell me what -- he was very
complimentary and said that it would -- he was
sad to see me leave, but he was wishing me
best wishes.

But it was his Justice Department
that stamped approved when this map came down.
And when we were working in the 2010
redistricting effort to get the map we
currently have as we had previously, we were
working in the same spirit that it existed for
the last 40 years.

And it -- it -- it's hard to
describe that in a transcript, but it was a
spirit of collegiality.  It was a spirit of
common service to the state.  It was a spirit
of -- of making sure that the 4.8 million
people that lived in our state, regardless of
the skin tone that they had or the accent that
they had or the conditions that they grew up
in, that -- that they were well served and
served well and with integrity.

Q.    Is it your general understanding

Page 133

7/30/2019            Chestnut, et al., v. John H. Merrill            Josiah Bonner

1  that to -- if a second majority-minority
2  district was to be created, that would
3  necessarily require changing sort of these
4  historical districts that you've been
5  describing all morning?
6      A.   Well, I've never seen a map that I
7  can recall that could create a second
8  majority-minority map that would not
9  substantially alter the integrity of the 1st
10 congressional district.  None of the maps that
11 you introduced as exhibits today do that.
12     And as I said, I remember seeing
13 maps that legislators were talking about in
14 previous efforts that would take part of
15 Mobile and run it up to -- there -- there is
16 no four-lane highway from Mobile to -- to
17 Sumter County or to Greene County or to
18 Pickens County.  You're going to be going on
19 two-lane farm-to-market roads in a lot of
20 that.
21     Or that would take it under the
22 bay.  And one of the maps in this 2000

Page 134

1  redistrict that Dr. Reed pushed actually
2  circled Congressman Callahan's home on Dog
3  River.  It circled it.  The house across the
4  street wasn't -- it was going to be in the
5  Mobile district.
6      Congressman Callahan's house was
7  drawn to Dog River underneath Mobile Bay all
8  the way over to Dothan, and I think it -- it
9  may not have gone to Auburn in Lee County.  It
10 went up to Russell County.
11     And so that offended the census
12 that -- you talk about gerrymandering.  That
13 was the ultimate where someone was going to
14 take him -- he would have not even been able
15 to drive out of his driveway, he would have
16 been in another congressional district.
17     So you can't expect that he was
18 excited about that.  But we have never
19 supported doing anything that would destroy
20 the integrity of -- of not only our district,
21 but really of the -- of the districts that
22 have well served this state.

Page 135

1      Q.   Do you think there are any people
2  in Alabama, your constituents, whether in the
3  overall state or in congressional district 1
4  who would have benefited from having a second
5  majority-minority district in Alabama?
6      A.   I -- I don't know how they could
7  have.  When I received the NAACP award as the
8  champion in 2009, they didn't put an asterisk
9  on it.  When I got the very first earmark,
10 back when we could do earmarks, was for
11 Pritchard, Alabama because the mayor and the
12 council had had such a long-running dispute
13 that they wouldn't even agree to pay the
14 firefighters.
15     And they didn't even have enough
16 money to put gas in the fire trucks.  And so I
17 got a grant -- a -- an earmark for Pritchard
18 to get an expanded water service so that the
19 fire hydrants could actually work, and we
20 could put money in the fire trucks so that if
21 someone's house caught on fire that it would
22 be put out.

Page 136

1      I didn't carry Prichard in the
2  ballot boxes.  I don't know that I ever
3  carried Prichard in the ballot boxes.  I got
4  more and more votes each time.  Prichard was a
5  majority-minority city, but I served the
6  people of Prichard with all my heart.
7      And that's why I can't imagine why
8  anybody would have ever wanted -- someone
9  might have wanted a Democrat because there
10 were Democrats that didn't vote for me.  But I
11 never gave anyone reason to believe that they
12 were not being well served because I was
13 Caucasian and they were not.
14     Q.   Were there any issues or needs
15 that you saw or were told about from your
16 African-American constituents that were
17 different than other white constituents in
18 your district?
19     A.   Well, sure.  The African-American
20 constituents asked for me to help them get
21 recognition for Africatown, which I did.  That
22 was probably not something that other -- I

Page 137

Pages 134 to 137

1   mean, that wasn't even something that
2   residents in any other counties were
3   interested in. Africatown was the site of the
4   last slave ship to actually land, the
5   Clotilda. They just recently found it.
6          But -- but -- but that's somewhat
7   of a -- I mean, I think you can go to any
8   demographic group. You can go to a -- a group
9   of soccer players and their focus is on soccer
10  fields. You can go to a group that focuses on
11  ballet or on some other activity, and they're
12  interested in that.
13         And so -- but -- but when the
14  African-American constituents that I worked
15  for and represented asked for my help, to the
16  best of my ability, we helped them.
17  Q.    Do you recall any examples of what
18  African-American constituents asked you for
19  that you were able to help them on aside from
20  the --
21  A.    No.
22  Q.    -- Africatown?

Page 138

1   A.    They needed help with the water
2   pressure and the firehoses in Prichard, and --
3   and we helped. There would have been times
4   where there -- there were applications for
5   public transportation grants. We -- we
6   provided those letters of support.
7          There are other examples of where
8   the particular neighborhood -- or a -- a good
9   friend of mine who I served with in the
10  leadership Mobile class was from the Trinity
11  Gardens area. Trinity Gardens is a majority
12  African-American section of Mobile.
13         She -- there had been some
14  shootings. Her son had been murdered, and she
15  asked if I would come have a town hall meeting
16  to meet with the young people to try to
17  encourage them to put the guns down and to
18  start loving and -- and -- and not hating.
19  And I went.
20         I went to 26 funerals of soldiers
21  that died in Afghanistan and Iraq. Probably
22  18 were African-American. I preached at one

Page 139

1   of the services. When I was standing in
2   Howard Johnson, Jr.'s bedroom with his three
3   sisters and his mother and father -- he was
4   the first soldier killed from Alabama -- I
5   wasn't standing in a black man's bedroom.
6          I was standing in an American
7   hero's bedroom. And when the father asked me
8   to preach -- he's a minister -- asked me to
9   moderate, to MC the funeral that was on
10  national TV, it was after I had said, Reverend
11  Johnson, whatever you need me to do, I will
12  do.
13         And until the day he died several
14  years later, we remained extremely close. And
15  I would be heartsick to think that anyone in
16  his family believed that I wasn't doing
17  everything in my power as a human being to
18  serve them well in their time of grief.
19  Q.    That's really sad, but it sounds
20  like you did a --
21  A.    Well, it's just -- it's just the
22  way we did things.

Page 140

1   Q.    Uh-huh.
2   A.    And we did it with the -- with the
3   25 other families as well. Thank goodness
4   they didn't all ask me to lead a funeral
5   service, but -- but, you know, when you're
6   standing there and you're looking at the
7   trophies and the blue ribbons -- I mean, he
8   was an all-star athlete, and he answered his
9   country's service. And he was killed in the
10  early days of the war in Iraq.
11         And my wife baked a pound cake,
12  and I went into to see the family whom I had
13  never met before. But that's the kind of
14  bonding experience that I tried to have with
15  all of my constituents.
16         Whether it was the bad times -- I
17  mean, same thing with the oil spill. We're
18  talking about minorities as though we're just
19  talking about African-Americans, but you go to
20  Bayou La Batre, the little fishing village,
21  and when the oil spill -- when the explosion
22  occurred at Deepwater Horizon, you have to

Page 141

Pages 138 to 141

1  understand that initially -- people forget --
2  initially, we were told that -- that there was
3  no leakage. And then they said, Well, there's
4  been a breach. There is some leakage.
5      We knew that the explosion
6  occurred. We knew people had been killed, but
7  then, once we started seeing that plume of oil
8  coming up, and it was such a helpless feeling.
9  And my staff and I went door-to-door to
10  businesses whose owners couldn't even speak
11  English to let them know that we were going to
12  stand by them in Mobile and Baldwin Counties.
13      I didn't go to Washington to work
14  to take some of those meetings. And when
15  you're hugging someone whose livelihood -- and
16  if you fish for a living, if you shrimp for a
17  living, and you can't get your boat out in the
18  water because it's filled with oil, you can
19  have -- don't have any money to buy bread and
20  milk for your kids.
21      And so we pressed the people at
22  BP, and we pressed the organization what was

Page 142

1  set up to provide help to those families as
2  hard as anyone could have pressed. And I did
3  that because that was my job.
4      Q.  I'm sure it meant a lot to your
5  constituents to see you come door-to-door.
6      A.  It meant a lot to me --
7      Q.  Yeah.
8      A.  -- to be able to help them.
9      Q.  Yeah. In terms of civil rights
10  issues, were there any specific issues that
11  came up a lot in your district or that you
12  thought -- you understood that your
13  African-American constituents cared
14  specifically about?
15      A.  Not off the top of my head. If
16  you can give me some examples, I can -- I'd be
17  happy to -- it's kind of like this article, it
18  may jog my memory. But Mobile, as I mentioned
19  earlier, had a very progressive Mayor Joe
20  Langan --
21      Q.  Uh-huh.
22      A.  -- who worked with the

Page 143

1  African-American community back in the '50s
2  and '60s during the Civil Rights Movement.
3      And Mobile was fortunate to avoid
4  not all, but most of the battle scars, if you
5  will, that some Alabama cities have. And --
6  and so we -- we did not have some of the
7  issues that other places had to deal with.
8      Q.  Uh-huh. What about things like,
9  for example, educational outcomes? There are
10  generally pretty large disparities between
11  educational outcomes for African-Americans and
12  white people in Alabama, within lots of
13  different parts of the country. Was that ever
14  an issue that came up for you?
15      A.  Not in a -- not in a negative way.
16  As I said when I went to Trinity Gardens
17  with -- with my friend after her son had been
18  murdered, I mean, I -- I visited -- my goal
19  was to visit every high school in my district.
20  I did not complete that goal, but I visited
21  most of them.
22      And I -- I -- I went to the

Page 144

1  schools that were majority-minority schools, I
2  went to the private schools. I went to the
3  Catholic schools. I went to the schools that
4  had a more even balance. I mean, I -- I went
5  wherever. I sponsored an art contest every
6  year for the kids of the 1st congressional
7  district.
8      I nominated probably 145, maybe
9  200 young men and women to go to the military
10  academies. We did not have a quota. We
11  nominated the best students that could be
12  competitive. We nominated a lot of students
13  from different racial and ethnic backgrounds.
14      And so I don't recall that it
15  was -- there was a real time during my
16  ten-and-a-half years where there was an issue
17  that -- that arose specifically with regard to
18  it being a Civil Rights issue.
19      For instance, Senator Figures and
20  I -- as she was on the redistricting committee
21  in the 2010 redistricting and maybe even on in
22  2000, I'm not sure when she -- I think she was

Page 145

| | |
|---|---|
| 1  in -- on the city council at that time. | 1  state under Governor James' administration but |
| 2      But anyway, you know, we used | 2  was never recognized by the Federal Bureau of |
| 3  to -- we -- we used to laugh at how -- we were | 3  Indian Affairs. |
| 4  ringing a bell for the Salvation Army one time | 4      Two counties over, the Poarch Band |
| 5  at Christmastime and got very competitive | 5  of Creek Indians got a state recognition, and |
| 6  that -- who got the most money in their | 6  they also got a federal recognition.  The |
| 7  kettle, but we used to laugh at how some -- | 7  Poarch Band of Creek Indians built a casino. |
| 8  how hard it was for some people to imagine | 8  They're -- by all accounts, are making a lot |
| 9  that a -- a black Democrat and a white | 9  of money. |
| 10 Republican could be such close friends. | 10     You've got four major Indian |
| 11     And she had a son that got in | 11 tribes in Alabama:  Creek, Choctaw, Cherokee, |
| 12 trouble and I did everything I could to help | 12 and Chickasaw.  And two within 60 miles of |
| 13 him, not because she was a state senator or | 13 each are as opposite as night is from day. |
| 14 because she was black or because she was a | 14     Both really good groups of people |
| 15 female, but it was the right thing to do. | 15 that work really hard, but one with that |
| 16     So I don't recall that there was | 16 federal recognition got a certain benefit that |
| 17 a -- a real time or issue where the -- the | 17 the others who sought that recognition, they |
| 18 people in my district, regardless of their | 18 never got.  I actually sponsored the |
| 19 political views or their racial makeup, would | 19 legislation for the MOWAS to get federal |
| 20 have -- would have had -- that I would have | 20 recognition, but I was not able to get it |
| 21 given them reason to believe that I was | 21 through the House and the Senate. |
| 22 insensitive to their views even when there | 22  Q.   Uh-huh. |
| Page 146 | Page 148 |

| | |
|---|---|
| 1  were times when we disagreed. | 1   A.   So I think that in this country |
| 2      And that was every time I went and | 2  and quite frankly in the world, you're going |
| 3  had dinner with my mother-in-law, I would have | 3  to always see examples of where some people |
| 4  disagreements, but -- but they were usually | 4  are -- have a -- have more advantage because |
| 5  friendly. | 5  of education or more advantage because of |
| 6   Q.   Yeah.  That's just part of the -- | 6  genetics.  You know, some people are just born |
| 7  that's just part of the job. | 7  healthier than other people. |
| 8   A.   Yeah. | 8      But -- but I really don't -- I |
| 9   Q.   It sounds like you really made it | 9  can't give you a specific example of where -- |
| 10 around your district -- | 10 I mean, look, I'm -- in my spare time, I'm |
| 11  A.   I did. | 11 head of the -- I'm -- I'm a volunteer chairman |
| 12  Q.   -- a lot. | 12 of the board for the Alabama School of Math |
| 13     Did you observe anything that, you | 13 and Science. |
| 14 know, you recall where there were more | 14     It's the only -- there's 17 STEM |
| 15 differences maybe socioeconomically -- just | 15 schools in the nation.  Alabama has one of |
| 16 socioeconomically between more minority | 16 them.  I don't know what the racial makeup is |
| 17 communities and more white communities? | 17 of our student body.  They take students from |
| 18  A.   Well, I observed that there were | 18 all 67 counties.  It's a free public |
| 19 differences between -- within the minority | 19 education.  But I would say probably 40 |
| 20 communities.  In Washington County, there's | 20 percent, maybe 45 percent are |
| 21 a -- a -- the -- the Mobile Washington Band of | 21 African-American. |
| 22 Choctaw Indians that was recognized by the | 22     And you're taking young people who |
| Page 147 | Page 149 |

1  are gifted in the math and science area that
2  might live in a rural area like Wilcox County
3  and it's giving them a chance to go to a world
4  class education -- get a great education and
5  go on and get a great scholarship to go off to
6  college. So I've -- I've always prided myself
7  in looking for opportunities to help all
8  people.
9      Q.    Uh-huh. Did -- do you believe
10  that African-Americans in your district
11  supported Obamacare or the Affordable Care
12  Act?
13     A.    I think that they probably did.
14     Q.    Did you support the Affordable
15  Care Act?
16     A.    I did not.
17     Q.    Do you think African-Americans in
18  your district supported the repeal of
19  Obamacare?
20     A.    It's a broad generalization but
21  probably not.
22     Q.    Did you support repealing?

Page 150

1      A.    I did.
2      Q.    Do you believe that
3  African-Americans in your district supported
4  the reauthorization of the Voting Rights
5  Act --
6      A.    I -- I did not --
7      Q.    -- from 2006?
8      A.    I did not hear from that many
9  African-Americans about that, but I took that
10  vote very seriously. In the -- in the 2000
11  presidential election, Bush v. Gore, we saw a
12  moment in time where the disputed ballots in
13  that presidential election were not in the
14  voting right states.
15         South Florida was not covered
16  under that. The disputed ballots in Ohio and
17  in Michigan and other states, and so I
18  consulted with Congressman Edwards who had
19  actually been in Congress when the first
20  Voting Rights Act passed and with subsequent
21  reauthorizations as well as Congressman
22  Callahan who had been in.

Page 151

1      And it was not an easy vote for me
2  to cast. There were only about 35 or 36 who
3  voted against it. So I knew that I wasn't
4  voting to get something passed, but I believed
5  with all of my heart that we had seen with the
6  presidential election of 2000 and with other
7  examples as well -- that if -- it -- and it
8  worked and we needed it in the '60s for sure.
9  But -- but why didn't we apply it to the whole
10  country?
11         That was my logic behind that, but
12  I really did not have that much mail or phone
13  calls from -- I'm not saying I didn't have
14  any, but it was not a -- it was not a -- a
15  red-button issue that we heard a lot about.
16         The health care bill was. And I
17  will tell you why I voted against it. I can't
18  tell you why -- the entire Alabama delegation
19  voted against it, including Congressman Davis,
20  who was in office at the time.
21         But I kept a copy of that bill on
22  my desk. And people would come to see me, and

Page 152

1  they didn't want a picture with me. They
2  wanted a picture of that bill because it was
3  this tall (indicating). But I believed with
4  all of my heart that social security was
5  created with bipartisan support.
6         Medicare was created with
7  bipartisan support. Medicaid was created with
8  bipartisan support, and I did vote to expand
9  Medicaid to include prescription drugs -- I'm
10  sorry -- Medicare.
11         We're early in my time in Congress
12  which was not popular with some of my
13  Republican constituents, but I thought it was
14  the right thing to do. But for the life of
15  me, I actually -- at a Republican retreat
16  where the president came, begged the president
17  to not force -- he had the votes to do it, and
18  he did it. But I didn't believe that it was
19  right for the country on something that
20  touched everyone because health care's
21  universal.
22         I just didn't think it was right

Page 153

Pages 150 to 153

1  for us to have a partisan vote on something
2  that was bipartisan, as bipartisan as health
3  care. So I did vote against it. I think it
4  is safe to your premise that the majority of
5  the African-American constituents that
6  contacted me were supportive of it.
7      But some could argue that they
8  were supportive of it because the first
9  African-American president was proposing it.
10  President Clinton tried it with his wife
11  leading the effort, and Congress couldn't get
12  it passed.
13      And there are some who would say
14  today that people are opposed to it because it
15  was President Obama's bill. Just as there are
16  some people would believe today that if
17  President Trump had proposed it, there are
18  some who would support it even if it were the
19  same bill.
20      I just thought it was a bad piece
21  of legislation, that we needed to do
22  something, but I thought to do it on a

Page 154

1  back and she said, To my surprise, my family
2  understood why you did it.
3      That was personally rewarding to
4  me because my goal was never to be divisive in
5  that. I just felt that if we were going to do
6  it in 20 -- when was it? 2007?
7      Q.  2006.
8      A.  2006?
9      Q.  Yeah.
10      A.  -- then it should apply to
11  everyone.
12      Q.  Did you meet with or consult with
13  any African-American leaders --
14      A.  I did.
15      Q.  -- on this issue?
16      A.  I -- I talked with -- before big
17  boats, TARP, the voting rights extension, the
18  Affordable Care Act, there were -- I would
19  oftentimes seek advice even though, as a
20  congressman, you don't need to seek it because
21  you're going to get it anyway. But -- but I
22  oftentimes would seek the advice of -- of

Page 156

1  partisan vote would divide the country.
2      Q.  With regards to the Voting Rights
3  Act, did you hold any town halls --
4      A.  I did.
5      Q.  -- on that issue?
6      A.  Well, I didn't hold any town halls
7  on that issue. I --
8      Q.  Or did it came up at town halls?
9      A.  It came up at some. I defended my
10  vote. And even with people that disagreed
11  with me -- and there were some, but I think
12  they respected the fact that the -- the -- the
13  logic that I used. But yes, I mean, there
14  were people -- my executive assistant is --
15  was African-American.
16      Q.  Uh-huh.
17      A.  She was conservative. She was a
18  Republican. And she said, Jo, this is hard
19  for me to explain when I go home at
20  Thanksgiving.
21      And when I told her my reasoning,
22  she went home at Thanksgiving. And she came

Page 155

1  friends in a very unofficial way.
2      And yes, I -- I talked with a
3  number of my African-American friends about
4  it, about my logic behind it. One is a very
5  good friend of mine. He was a colonel in the
6  Air Force, and he said actually -- and he
7  lived in south Florida at the time. He said,
8  I think you make a pretty good point.
9      Q.  So would you be --
10      MR. DAVIS:  How -- how we doing?
11  Governor's going to need our Chief of Staff
12  back before too terribly long.
13      MS. MADDURI:  Understood. I don't
14  have too much more. Just a page.
15      Q.  (By Ms. Madduri) So would you be
16  supportive -- I'm -- I'm sure you know that
17  now the Supreme Court has overturned the part
18  of the Voting Rights Act that I believe were
19  discussed in Section 4 and Section 5, the
20  preclearance requirement, that only applied
21  to, you know, specific states as you
22  mentioned.

Page 157

Pages 154 to 157

1       Would you be supportive of
2  reinstating those sections if it applied to
3  all states, all jurisdictions equally?
4      A.   Well, I -- I don't have a vote
5  anymore.
6      Q.   Understood.  But your view on
7  that?
8      A.   But look, I -- my view -- I would
9  be consistent with my view.  I thought it
10 should apply to all states.
11     Q.   Do you think there's any kind of
12 partisanship divide between African-American
13 and white voters in your district or Alabama
14 as a whole?
15     A.   Define "partisanship divide."
16     Q.   Do you think one race, whether
17 white or black, votes more for Democrats or
18 Republicans?
19     A.   Sadly, I think that the evidence
20 would suggest that more African-Americans vote
21 Democrat than Republican, and that's
22 frustrating to Republicans like me who want to

Page 158

1  make -- in -- in the words of a former party
2  chairman, who want to build a big tent.
3      And we want to give people who
4  have the same values and the same goals and
5  the same aspirations a room in our party.
6      Q.   In your view, why -- why do you
7  think African-Americans tend to vote for
8  Democrats more?
9      A.   That's like asking me to read the
10 minds of the legislature.  I -- I don't know.
11 I was very proud of my many, many
12 African-American friends and supporters from
13 all walks of life.  And I was equally proud to
14 represent those that did not support me, but I
15 did everything I knew to do to serve all
16 people well and with integrity.
17     And I can't really look back on --
18 on that chapter and think well, if I had done
19 things differently, I might have gotten a few
20 more votes here or a few more votes there.
21     Q.   Just in -- and just in your
22 opinion, do you think -- what reasons do you

Page 159

1  think, if any, exist that African-Americans
2  don't tend to support Republicans?
3      A.   I -- I really don't have an
4  informed opinion about that.
5      MR. TAYLOR:  Make sure I
6  understand the extent of the question.  His
7  personal opinion about why African-Americans
8  support Republicans or Democrats?
9      MS. MADDURI:  Okay.
10     Q.   (By Ms. Madduri)  Do you think the
11 same is true on the other side?  Do you think
12 white voters tend to support Republicans more
13 often?
14     A.   Well -- well, are you talking
15 about Alabama or you --
16     Q.   Yeah --
17     A.   -- talking about nationally?
18     Q.   -- Alabama.  Alabama.  Your
19 district, your -- within your experience
20 personally.
21     A.   In -- in the last 35 years, but it
22 wasn't that long ago when Alabama was a

Page 160

1  one-party state.
2      Q.   Uh-huh.  Do you have --
3      A.   It was a Democrat state.
4      Q.   And you've -- you've been -- I
5  mean, you've watched that transformation, I'm
6  sure.  Do you have any views on why that
7  transformation happened?
8      A.   I -- I think many former Democrats
9  who became Republicans would tell you that the
10 party that they knew and grew up in changed
11 and no longer reflected their views and
12 values.
13     And, I mean, President Reagan
14 switched parties and --
15     Q.   Uh-huh.
16     A.   So there are a lot of examples of
17 people.  George Wallace, Jr --
18     Q.   Uh-huh.
19     A.   -- the son of former Democrat
20 Governor George Wallace, switched parties.
21     A lot of people switched parties,
22 but I think that the national party, as

Page 161

Pages 158 to 161

1   evidenced by what's going on today, that the
2   Democrats continue to move further and further
3   to the left. And I think that for a lot of
4   people who grew up in Alabama being a
5   Democrat, they just don't recognize that party
6   anymore.
7       Q.   Are there any specific issues that
8   jump out to you in terms of this leftward
9   movement --
10      A.   Well --
11      Q.   -- that you think they --
12      A.   I --
13      Q.   -- disagree with?
14      A.   I think everything from today's
15  run up to the presidential campaign is about,
16  you know, universal free health care. Well,
17  we passed the Affordable Care Act. It's not
18  free. And there's no way it will ever be
19  free. You got to pay for it if you're going
20  to have a quality health care service.
21          So I -- I just think that even my
22  Democrat friends in Alabama today, and I've

Page 162

1   got many of them, have a hard time defending
2   some of the socialistic policies and -- and
3   views of the -- of the national Democrat
4   party.
5       Q.   And I'm -- just to make sure
6   you're not too worried, I'm at pretty much the
7   end of everything. Just a couple more
8   questions for you.
9       A.   I feel like I've been a political
10  commentator.
11      Q.   Well, I mean, your perspective is
12  interesting.
13      A.   Sure.
14      Q.   You've been involved in space.
15      A.   Not complaining.
16      Q.   Yeah.
17      A.   Not complaining.
18      Q.   You can -- you can become a pundit
19  after this.
20          I'm curious if you think there are
21  any unique needs in the -- in the City of
22  Mobile as opposed to the rest of the

Page 163

1   congressional district.
2       A.   Well, clearly the -- the continued
3   development of the port of Alabama is unique
4   to Mobile. It is a port that serves the whole
5   state, but we are -- as I say, I think we're
6   the 13th largest port.
7           We're -- we're in a position with
8   what the state is doing with the new
9   infrastructure bill. We're in a position to
10  invest a sizable amount of resources to make
11  Mobile one of the top five port cities in the
12  nation. That's going to great a whole new
13  economy of jobs and opportunities.
14          You won't need a four-year degree
15  or even a two-year degree, but you'll be able
16  to make 85 or 90 or $100,000 a year, which is
17  more than double the average family of four
18  income. That's big time. That's a big-time
19  opportunity.
20          The continued growth of the
21  aerospace industry in Mobile with Airbus and
22  the continued growth of the shipbuilding

Page 164

1   industry, I mentioned the shipbuilder Austal,
2   they're the ones building the Navy ships. But
3   they are competing now with a -- for a
4   contract to get a frigate that would add
5   another 2500 people.
6           So you take 4500 people that work
7   there now and you add another 2500 people,
8   that's a game changer to your economy. So the
9   Mobile economy is also -- I mean, it -- it
10  takes a special skill set to be a pipe fitter
11  on a ship or to -- to be a welder on an
12  airplane. You don't want someone who's not
13  trained to do that.
14          So one of our challenges is to
15  continue to grow our economy, to continue to
16  grow our workforce so that young people who
17  are born in that wonderful town today have a
18  chance to get a good education, get a job, and
19  raise their family in a place that they love
20  and call home.
21      Q.   Uh-huh. Do most people that work
22  in Mobile, do they all live in that same

Page 165

Pages 162 to 165

1  space, or are they also coming from other
2  counties?
3       A.    They live in other counties, but a
4  large percentage of them live in the Mobile,
5  Baldwin County area. Goes back to that
6  continuity and community of -- of interest.
7       Q.    Do you see any benefits to
8  African-Americans in Mobile if they were
9  included in a district that also included
10  counties from the Black Belt area?
11      A.    They are.
12      Q.    I guess more counties from the
13  Black Belt area as opposed to where they are
14  now?
15      A.    Well, the -- the district that --
16  if -- if the legislature had the ability to
17  create a new district that would be ideal in
18  every setting, in my view, it would be as
19  close to what we've got now as we have,
20  because of the historical similarities,
21  because of the recent convergence.
22                 It's like we were talking about

Page 166

1  General.
2       Q.    I actually don't know exactly, so
3  I can't -- I can't comment on --
4       A.    I believe --
5       Q.    -- that one way or the other.
6       A.    I believe that's true.
7       Q.    Okay.
8       A.    And I do find it interesting
9  personally that his Justice Department
10  approved this map. And that it was good when
11  he was Attorney General, and that now there's
12  a desire to change it, I -- I don't understand
13  the logic behind that.
14      Q.    Okay.
15            MS. MADDURI:  Well, I think -- I
16  think that's all my questions.
17            THE WITNESS:  Okay.
18            MR. DAVIS:  Before we go off the
19  record, do we need to talk?  Let's step out in
20  the hall.
21            THE VIDEOGRAPHER:  We are off the
22  record at 12:44.

Page 168

1  earlier with Baldwin County, the Baldwin
2  County in 1950 and the Baldwin County of today
3  are two different places.
4                 I -- I can't personally see that
5  there's going to be any real benefit to
6  splitting Mobile up or to even splitting
7  Mobile and Baldwin Counties apart just for
8  the -- the political benefit of the
9  plaintiffs. I -- I think that you've got to
10  think about the 780,000 people who live there
11  and who currently are interconnected in so
12  many different ways as we've discussed.
13      Q.    What do you mean when you say "the
14  political benefits of the plaintiffs"?
15      A.    Well, the -- the plaintiffs are
16  the ones who are advocating for the second
17  district, I believe.
18      Q.    (Attorney nods head.)
19      A.    And I believe I'm right that one
20  of the -- correct me if I'm wrong, that one of
21  the people at the national level that is
22  advocating for this is the former Attorney

Page 167

1                 (A recess was taken.)
2            THE VIDEOGRAPHER:  We are on the
3  record at 12:46.
4            MR. DAVIS:  Defendant has no
5  questions. Thank you, Mr. Bonner.
6            MS. MADDURI:  Thank you, sir.
7            THE VIDEOGRAPHER:  This ends MPEG
8  three and concludes the deposition of Josiah
9  Bonner. We are off the record July 30th,
10  2019, and the time is 12:46 p.m.
11
12            (The deposition of JOSIAH BONNER
13            was concluded at 12:46 p.m.)
14
15
16
17
18
19
20
21
22

Page 169

Pages  166  to  169

```
 1      *  *  *  *  *  *  *  *  *  *  *
 2             REPORTER'S CERTIFICATE
 3      *  *  *  *  *  *  *  *  *  *  *
        STATE OF ALABAMA)
 4      COUNTY OF ST. CLAIR)
 5           I, Bethany Whaley, Certified Court
 6      Reporter and Notary Public in and for the
        State of Alabama at Large, do hereby certify
 7      that on July 30, 2019, I reported the
 8      aforementioned proceedings, and that the pages
 9      herein contain a true and accurate
10      transcription of the said proceedings.
11           I further certify that I am
12      neither of kin nor of counsel to the parties
13      to said cause, nor in any manner interested in
        the results thereof.
14
15
16           This the 12th day of August, 2019.
17           s/s Bethany Whaley
18           Bethany Whaley, ACCR 661
19           Certified Court Reporter and
20           Notary Public for the
21           State of Alabama
22           My commission expires 3/27/22.

                                      Page 170
```

```
 1      Josiah Bonner, c/o
        Office of the Attorney General
 2      501 Washington Avenue
        Montgomery, Alabama 36130-0152
 3
 4      Case: Lakeisha Chestnut, et al., v. John H. Merrill
 4      Date of deposition: July 30, 2019
 5      Deponent: Josiah Bonner
 6
 7      Please be advised that the transcript in the above
 8      referenced matter is now complete and ready for signature.
 9      The deponent may come to this office to sign the transcript,
10      a copy may be purchased for the witness to review and sign,
11      or the deponent and/or counsel may waive the option of
12      signing. Please advise us of the option selected.
13      Please forward the errata sheet and the original signed
14      signature page to counsel noticing the deposition, noting the
15      applicable time period allowed for such by the governing
16      Rules of Procedure. If you have any questions, please do
17      not hesitate to call our office at (202) 232-0646.
18
19
20      Sincerely,
        Digital Evidence Group
21      Copyright 2019 Digital Evidence Group
        Copying is forbidden, including electronically, absent
22      express written consent.

                                      Page 171
```

```
 1      Digital Evidence Group, L.L.C.
        1730 M Street, NW, Suite 812
 2      Washington, D.C. 20036
        (202) 232-0646
 3
 4      SIGNATURE PAGE
        Case: Lakeisha Chestnut, et al., v. John H. Merrill
 5      Witness Name: Josiah Bonner
        Deposition Date: July 30, 2019
 6
 7      I do hereby acknowledge that I have read
        and examined the foregoing pages
 8      of the transcript of my deposition and that:
 9
10      (Check appropriate box):
        ( ) The same is a true, correct and
11      complete transcription of the answers given by
        me to the questions therein recorded.
12      ( ) Except for the changes noted in the
        attached Errata Sheet, the same is a true,
13      correct and complete transcription of the
        answers given by me to the questions therein
14      recorded.
15
16
17      _____    _____
        DATE               WITNESS SIGNATURE
18
19
20
21
22      _____    _____
        DATE               NOTARY

                                      Page 172
```

```
 1      Digital Evidence Group, LLC
 2      1730 M Street, NW, Suite 812
 3      Washington, D.C. 20036
 4      (202)232-0646
 5
 6             ERRATA SHEET
 7
 8      Case: Lakeisha Chestnut, et al., v. John H. Merrill
 9      Witness Name: Josiah Bonner
10      Deposition Date: July 30, 2019
11      Page No.   Line No.    Change
12
13
14
15
16
17
18
19
20
21      _____    _____
22      Signature          Date

                                      Page 173
```

                                      Pages 170 to 173

Made In USA



Alabama -- U.S. House
Interstate
0    30    60    90
Miles
2011 Plan

Made In USA



ALABAMA'S
CONGRESSIONAL DISTRICTS



Chestnut Defense 1292



Made in USA

# 2011 State Board of Education Districts



BONNER
EXHIBIT 3
Josiah Bonner
7/30/2019

Reported by
Bethany Whaley, CCR



Made in USA



Alabama -- U.S. House
Interstate
0    30    60    90
Miles
Revised Plan 1



Made in USA



Alabama -- U.S. House

Revised Plan 2



Alabama -- U.S. House

0    30    60    90

Miles

Revised Plan 3

Made in USA



Alabama -- U.S. House

Illustrative Plan 4

Made In USA

## VI. Hypothetical 2020 Plan

### (a) Geographic Area

41.     The map in **Figure 2** (on the next page) depicts a 6-district hypothetical 2020 plan ("Hypothetical Plan"), with a realistic possibility that two of the six districts will be majority-Black CVAP by 2020.

**Figure 2**



Alabama U.S. House –Hypothetical 2020 6-District Plan

42.     The Hypothetical Plan is drawn using 2010 VTDs (and 2010 population), with a projected 2020 statewide population of 4.9 million (slightly

15



BONNER
EXHIBIT 8
Josiah Bonner
7/30/2019