FILED

2023 Aug-21  PM 04:44
U.S. DISTRICT COURT
N.D. OF ALABAMA



# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **BOBBY SINGLETON,** *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | **No.: 2:21-cv-01291-AMM** |
| | ) | |
| **WES ALLEN,** *et al.* | ) | **Three-Judge Court** |
| | ) | |
| **Defendants.** | ) | |
| | ) | |
| **EVAN MILLIGAN,** *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | **No.: 2:21-cv-01530-AMM** |
| | ) | |
| **WES ALLEN,** *et al.* | ) | **Three-Judge Court** |
| | ) | |
| **Defendants.** | ) | |
| | ) | |
| **MARCUS CASTER,** *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | **No.: 2:21-cv-01536-AMM** |
| | ) | |
| **WES ALLEN,** *et al.* | ) | **Three-Judge Court** |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## *SINGLETON* PLAINTIFFS' PROPOSED
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................iv

PROPOSED FINDINGS OF FACT ..............................................................1

I.    The Plaintiffs .............................................................................1

II.    Historical Background...............................................................2

    A.    History of Districting in Alabama ...............................2

    B.    The 1992 Plan ..............................................................5

    C.    The 2001 and 2011 Plans............................................6

    D.    The 2021 Plan ..............................................................8

III.    This Court's Order Regarding the 2021 Plan.........................13

IV.    Adoption of the 2023 Plan and Rejection of Alternatives .................14

    A.    The 2023 Plan ............................................................14

    B.    The Singleton Plan and Jefferson County's Electoral
History.......................................................................15

    C.    Preserving the Jefferson County and Black Belt
Communities of Interest............................................21

    D.    Residences of Alabama's Representatives ................25

V.    Equitable Considerations in Adopting a New Plan..............26

PROPOSED CONCLUSIONS OF LAW ....................................................27

I.    Jurisdiction and Standing .......................................................27

II.    Analysis of a Claim of Racial Gerrymandering.....................27

III.    The 2023 Plan is an Unconstitutional Racial Gerrymander...............32

    A.    Race Undisputedly Predominated in the Creation of the
1992 Plan...................................................................32

B.     Because Race Predominated in the Creation of District 7, It Is a Racial Gerrymander ........................................................33

C.     The 2001, 2011, and 2021 Plans Were Racial Gerrymanders Because They Undisputedly Carried Forward the Race-Driving Lines of the 1992 Plan .....................................................34

D.     In Jefferson County, the 2023 Plan Is Materially the Same as the 2021 Plan .........................................................................35

E.     Demographic Evidence Shows That the 2023 Plan Continues to Sort Jefferson County's Residents by Race ........36

F.     The Legislature's Rejection of Race-Neutral Plans Is Further Circumstantial Evidence That It Intended to Enact Lines That Separate Voters by Race .........................................37

G.     The Defendants' Reliance on Core Preservation and Incumbency Protection Makes the Intent of the 1992 Plan Relevant Evidence of the Intent of the 2023 Plan ...................41

H.     Direct Evidence Shows That the 2021 Plan, on Which the 2023 Plan Was Based, Was Designed to Maintain an Indefensible Racial Quota .........................................................46

I.     No Court Has Ever Ratified the 1992 Plan or Its Successors ................................................................................47

J.     Racial Gerrymanders Do Not Become Constitutional Merely Through the Passage of Time .......................................51

K.     The Unconstitutionality of District 7 Arises Not from "Taint" or "Original Sin," but from the District's Shape and Demographics .................................................................52

IV.    Even if the Court Finds the Defendants Liable for Violating the Voting Rights Act, It Should Also Decide the *Singleton* Constitutional Claim ...........................................................................54

V.     The Remaining Preliminary Injunction Requirements – Irreparable Injury, Balance of Harms, and Public Policy – Are Met Here ...............................................................................................58

PROPOSED ORDER..................................................................................................59

# TABLE OF AUTHORITIES

**Cases**

*Ala. State Fed'n of Labor v. McAdory*,
　　325 U.S. 450 (1945)...................................................................................56

*Allen v. Milligan*,
　　143 S. Ct. 1487 (2023)................................................................. 44, 47, 55

*Am. Legion v. Am. Humanist Ass'n*,
　　139 S. Ct. 2067 (2019)..............................................................................51

*Bush v. Vera*,
　　517 U.S. 952 (1996)..................................................................................29

*Collegiate Licensing Co. v. Am. Cas. Co. of Reading, Pa.*,
　　713 F.3d 71 (11th Cir. 2013) .....................................................................14

*Cooper v. Harris*,
　　137 U.S. 285 (2017)............................................................................ *passim*

*Covington v. North Carolina*,
　　283 F. Supp. 3d 410 (M.D.N.C. 2018),
　　*aff'd in relevant part and reversed in part on other grounds*,
　　138 S. Ct. 2548 (2018)............................................................ 31, 42, 43, 44

*Davis v. Chiles*,
　　139 F.3d 1414 (11th Cir. 1998) .................................................................28

*Easley v. Cromartie*,
　　532 U.S. 234 (2001)............................................................................ 44, 54

*Figures v. Hunt*,
　　1992 WL 12012173 (June 5, 1992)............................................................48

*Figures v. Hunt*,
　　507 U.S. 901 (1993)..................................................................................32

*GRACE, Inc. v. City of Miami*,
　　2023 WL 3594310 (S.D. Fla. May 23, 2023)..............................................52

*GRACE, Inc. v. City of Miami*,
    No. 1:22-CV-24066-KMM, 2023 WL 5286232 (11th Cir. Aug. 4, 2023) ...52

*GRACE, Inc. v. City of Miami*,
    No. 1:22-CV-24066-KMM, 2023 WL 4853635
    (S.D. Fla. July 30, 2023)....................................................................................43

*GRACE, Inc. v. City of Miami*,
    No. 1:22-CV-24066-KMM, 2023 WL 4942064
    (S.D. Fla. Aug. 3, 2023) ...................................................................................43

*Harris v. McCrory*,
    159 F. Supp. 3d 600 (M.D.N.C. 2016) ..........................................................30

*Hays v. Louisiana*,
    839 F. Supp. 1188, 1191 (W.D. La. 1993) ............................................ 48, 49

*Jacksonville Branch of NAACP v. City of Jacksonville*,
    No. 3:22-CV-493-MMH-LLL,
    2022 WL 16754389 (11th Cir. Nov. 7, 2022) ...............................................43

*Jacksonville Branch of NAACP v. City of Jacksonville*, 635 F. Supp. 3d 1229
    (M.D. Fla. 2002) ...................................................................... 43, 47, 52, 53

*Jacksonville Branch of NAACP v. City of Jacksonville*,
    No. 3:22-CV-493-MMH-LLL,
    2022 WL 17751416 (M.D. Fla. Dec. 19, 2022) ............................................43

*Jennings v. Rodriguez*,
    138 S. Ct. 830 (2018)......................................................................................56

*Miller v. Johnson*,
    515 U.S. 900 (1995)........................................................................ 28, 29, 51

*Moore v. Moore*,
    229 F. Supp. 435 (S.D. Ala. 1964) ..............................................................3, 4

*Moore v. Moore*,
    246 F. Supp. 578 (S.D. Ala. 1965) .................................................................4

*North Carolina v. Covington*,
    138 S. Ct. 2548 (2018).................................................................... 28, 29, 42

*Page v. Va. State Bd. of Elections*,
   2015 WL 3604029 (E.D. Va. June 5, 2015)....................................................30

*Shaw v. Reno*,
   509 U.S. 630 (1993)..................................................... 33, 48, 49, 51

*Shelby County v. Holder*,
   570 U.S. 529 (2013)...................................................................50

*Singleton v. Merrill*,
   582 F.Supp.3d 924 (ND Ala. 2022) ............................................45

*United States v. Hays*,
   515 U.S. 737 (1995)...................................................................27

*Vera v. Richards*,
   861 F. Supp. 1304 (S.D. Tex. 1994),
   *aff'd sub nom. Bush v. Vera*, 517 U.S. 952 (1996)................................. 44, 47

*Wesch v. Hunt*,
   785 F. Supp. 1491 (S.D. Ala. 1992) (three-judge court),
   *aff'd sub nom. Camp v. Wesch*, 504 U.S. 902 (1992) ........................... *passim*

*Wisc. Legislature v. Wisc. Elections Comm'n*,
   142 S. Ct. 1245 (2022)...............................................................33

## Constitutional Provisions

U.S. Const. art. I, § 2................................................................26

## Statutes

28 U.S.C. § 1331.......................................................................27

28 U.S.C. § 1343(a)(3)................................................................27

28 U.S.C. § 1343(a)(4)................................................................27

28 U.S.C. § 1357.......................................................................27

28 U.S.C. § 2284.......................................................................27

42 U.S.C. § 1983.......................................................................27

42 U.S.C. § 1988 ................................................................................................27

Ala. Act. No. 2023-563 § 1(4)(g) .......................................................................40

The *Singleton* Plaintiffs propose the following findings of fact and conclusions of law.

## PROPOSED FINDINGS OF FACT

### I.    The Plaintiffs

1.    Plaintiffs Rodger Smitherman and Eddie Billingsley are Black registered voters who reside in Jefferson County and within the boundaries of Congressional District 7 in the 2021 Plan.

- Ex. 21 (Smitherman Voter Registration Information from Secretary of State).[1]

- Ex. 21A (Billingsley Voter Registration Information from Secretary of State).[2]

2.    Plaintiff Leonette W. Slay is a White registered voter who resides in Jefferson County and within the boundaries of Congressional District 6 in the 2021 Plan.

- Ex. 20 (Slay Voter Registration Information from Secretary of State).

3.    Plaintiff Bobby Singleton is a Black registered voter who resides in Hale County and within the boundaries of Congressional District 7 in the 2021 Plan.

---

[1] Exhibits identified only by a number are the exhibits on the Plaintiffs' Third Amended Exhibit List, ECF No. 181. Exhibits whose number is prefaced by the letters S, M, or D, are exhibits submitted at the January 2022 hearing by the *Singleton* Plaintiffs, *Milligan* Plaintiffs, or Defendants, respectively.

[2] This exhibit is attached to the *Singleton* Plaintiffs' Unopposed Motion to Supplement the Record, ECF No. 186.

- Ex. 19 (Singleton Voter Registration Information from Secretary of State).

4.    Plaintiffs Darryl Andrews and Andrew Walker are Black registered voters who reside in Montgomery County and within the boundaries of Congressional District 2 in the 2021 Plan.

- Ex. 18 (Andrews Voter Registration Information from Secretary of State).

- Ex. 22 (Walker Voter Registration Information from Secretary of State).

## II.    Historical Background

### A.    History of Districting in Alabama

5.    From 1822 until 1965, Alabama used Congressional districts with whole counties.

- Ex. 34 (Defendants' Responses and Objections to *Singleton* Plaintiffs' First Requests for Admissions) ¶ 1.

6.    From 1917 until 1965, Alabama's largest county, Jefferson County, constituted a single Congressional seat. In the 1960 census, Black residents comprised 34.6% of the population of Jefferson County.

- Ex. S22 (Congressional Maps).

- U.S. Department of Commerce, *Negro Population, By County: 1960*

*and         1950*,         Table         2,         available         at

https://www2.census.gov/library/publications/decennial/1960/pc-s1-

supplementary-reports/pc-s1-52.pdf.[3]

7.      In 1961, the Alabama Legislature passed a bill that divided Jefferson

County among four Congressional Districts.

- Ex. 34 (Defendants' Responses and Objections to *Singleton* Plaintiffs'

  First Requests for Admissions) ¶ 2.

Governor John Patterson vetoed this bill.

- Ex. 34 (Defendants' Responses and Objections to *Singleton* Plaintiffs'

  First Requests for Admissions) ¶ 3.

8.      In March 1964, a three-judge panel held that Alabama's nine-district

scheme for primary elections violated Article I, § 2 of the U.S. Constitution and the

Equal Protection Clause in the Fourteenth Amendment.

- *Moore v. Moore*, 229 F. Supp. 435 (S.D. Ala. 1964) (three-judge court).

9.      The Moore court gave the Legislature two years to enact a

constitutional redistricting plan.

- Ex. 34 (Defendants' Responses and Objections to *Singleton* Plaintiffs'

  First Requests for Admissions) ¶ 6.

---

[3] The Court may take judicial notice of census data. *See United States v. Phillips*, 287 F.3d 1053, 1055 n.1 (11th Cir. 2002).

- *Moore v. Moore*, 229 F. Supp. 435 (S.D. Ala. 1964) (three-judge court).

10.     In August 1964, the Legislature considered a plan that kept all Alabama counties whole, including Jefferson County, even though at 634,864 in the 1960 census, the county's population exceeded the ideal population of the eight Congressional districts at that time, which was 408,342.5.

- Ex. 34 (Defendants' Responses and Objections to *Singleton* Plaintiffs' First Requests for Admissions) ¶ 7.

11.     In the 1965 regular session, the Legislature enacted a plan that split Jefferson County among three Congressional Districts.

- Ex. 34 (Defendants' Responses and Objections to *Singleton* Plaintiffs' First Requests for Admissions) ¶ 9.

12.     The *Moore* court declared the plan constitutionally valid, even though it had a maximum population deviation of 13.3%. The Court found it "obvious that [Jefferson County] must be divided between at least two Congressional Districts."

- Ex. 34 (Defendants' Responses and Objections to *Singleton* Plaintiffs' First Requests for Admissions) ¶ 10.

- *Moore v. Moore*, 246 F. Supp. 578, 580–81 (S.D. Ala. 1965) (three-judge court).

13.     Jefferson County was the only county split in the 1965 plan and in the post-1970 census plan.

- Ex. 34 (Defendants' Responses and Objections to *Singleton* Plaintiffs' First Requests for Admissions) ¶ 11.

14.     The post-1970 census plan split Jefferson County among three Districts. The maximum deviation under this plan was 0.8%.

- Ex. 34 (Defendants' Responses and Objections to *Singleton* Plaintiffs' First Requests for Admissions) ¶ 12.

15.     Only Jefferson County and St. Clair County were split in the post-1980 census plan. The ideal size of a district was 556,270, smaller than Jefferson County's population, which was 671,371 in the 1980 census. The maximum deviation among the seven districts was 2.59%.

- Ex. 34 (Defendants' Responses and Objections to *Singleton* Plaintiffs' First Requests for Admissions) ¶ 13.

**B.     The 1992 Plan**

16.     In 1992, seven counties were split for the predominant purpose of drawing one majority-black District.

- *Wesch v. Hunt*, 785 F. Supp. 1491 (S.D. Ala. 1992) (three-judge court), *aff'd sub nom. Camp v. Wesch*, 504 U.S. 902 (1992), *Figures v. Hunt*, 507 U.S. 901 (1993).

- Ex. S40 (Secretary Merrill's *Chestnut* Pre-trial Brief) at 11 ("District 7 [in the 1992 Plan] appears to be racially gerrymandered, with a finger

sticking up from the black belt for the sole purpose of grabbing the black population of Jefferson County.").

17.   Before 1992, the Alabama Legislature had never published any redistricting principles that included a specific maximum population deviation for Congressional districts.

- Ex. 34 (Defendants' Responses and Objections to *Singleton* Plaintiffs' First Requests for Admissions) ¶ 15.

### C.   The 2001 and 2011 Plans

18.   In the 2000 census, Jefferson County's population rose to 662,285, which was still larger than the size of an ideal Congressional district (635,299). The post-2000 census plan split Jefferson County and seven other counties, maintaining zero population deviation.

- Ex. 34 (Defendants' Responses and Objections to *Singleton* Plaintiffs' First Requests for Admissions) ¶ 16.

19.   In the 2010 census, Jefferson County's population, 658,158, fell below the ideal size of Congressional districts (682,819), making splitting Jefferson County no longer mathematically necessary.

- Ex. 34 (Defendants' Responses and Objections to *Singleton* Plaintiffs' First Requests for Admissions) ¶ 17.

20.   In 2011, the Legislature passed a plan that continued to split Jefferson

County. The 2011 plan had zero population deviation.

- Ex. 34 (Defendants' Responses and Objections to *Singleton* Plaintiffs' First Requests for Admissions) ¶ 18.

21.   Both the 2001 and 2011 maps maintained the cores of districts, changing them only to equalize population. The 2011 map largely built off the 2001 map, which itself built off the 1992 map.

- ECF No. 67 (Defendant's Response in Opposition to Plaintiffs' Motions for Preliminary Injunction) at 12 ("Both the 2001 and 2011 maps maintained the cores of districts, changing them only to equalize population. The 2011 map largely built off the 2001 map, which itself built off the 1992 map.").

22.   A goal in drafting the 2011 map was to make sure that District 7 remained a majority-Black district, and the map's drafter, Randolph Hinaman, achieved that goal through race-conscious line-drawing.

- Ex. M11 (Hinaman Tr.) at 43:4–11 ("Q. … Was it a goal in drafting the 2011 congressional map to make sure that District 7 remained a majority black district? A. Yeah. Obviously, Congresswoman Sewell was one of my – one of my clients for that map. And she wanted to maintain her majority black district, yes.").

- *Id.* at 45:20–46:5 ("A. … But preserving Congresswoman Sewell's

majority black district was a priority for the delegation. Q. And that was the priority for you, as well? A. Yes.").

- *Id.* at 44:13–15 ("Q. Were you successful in making sure that District 7 remained a majority black district? A. We were.").

- *Id.* at 44:16–23 ("Q. How did you make sure of that? A. … But by what we added county and precinct-wise to make sure it did not dramatically alter the makeup of the district.").

- *Id.* at 44:24–45:12 ("Q. Explain that to me a little bit further. So what changes were you making in 2011? A. … And so then the discussion with Congresswoman Sewell would be, you know, where – what areas would we add to your district to get your district to ideal population. And, obviously, in looking at those areas, we, you know, wanted to make sure that we preserved the majority black district.").

### D.   The 2021 Plan

23.   In May 2021, the Legislature's Reapportionment Committee adopted a set of "Redistricting Guidelines." The very first guideline is that districts must comply with the United States Constitution. For Congressional districts, "minimal population deviation" and compliance with Section 2 of the Voting Rights Act were considered mandatory. Other guidelines were to be observed "to the extent that they do not violate or subordinate the foregoing policies prescribed by the Constitution

and laws of the United States and of the State of Alabama." These included avoiding contests between incumbents, respecting communities of interest,[4] minimizing the number of counties in each district, and preserving the cores of existing districts. Thus, if there is a conflict between the Equal Protection Clause of the United States Constitution and other goals such as protecting incumbents and preserving the cores of districts, the Equal Protection violation must be remedied at the expense of those goals.

- Ex. M28 (2021 Redistricting Guidelines) at 1–3.

24.   Mr. Hinaman, who had drafted the 2011 plan, was retained to draw the 2021 plan. He was retained not by the State of Alabama, but by a private organization called Citizens for Fair Representation or Alabamians for Fair Representation (Mr. Hinaman could not recall the exact name).

- Ex. M11 (Hinaman Tr.) at 52:25–53:6.

25.   Mr. Hinaman "'used [the] 2011 congressional map'—or, 'the cores of the existing districts'—as his 'starting point in drafting the 2021 congressional map.'"

- ECF No. 67 (Defendant's Response in Opposition to Plaintiffs'

---

[4] "A community of interest is defined as an area with recognized similarities of interests, including but not limited to ethnic, racial, economic, tribal, social, geographic, or historical identities. The term communities of interest may, in certain circumstances, include political subdivisions such as **counties**, voting precincts, municipalities, tribal lands and reservations, or school districts." (emphasis added). Ex. M28 (2021 Redistricting Guidelines) at 2–3.

Motions for Preliminary Injunction) at 14 (quoting Hinaman deposition testimony).

26.     Mr. Hinaman did not attempt to remedy the racial gerrymander of District 7. He did blunt the "finger" that extends into Jefferson County and add new precincts in Homewood and southwestern Jefferson County, but he testified that he did so in the interest of making the district more compact.

- Ex. M11 (Hinaman Tr.) at 132:2–19.

27.     Compared to the 2011 plan, the 2021 map represents a "least change approach." About 90% of the total population and 90% of the Black population of the 2011 version of District 7 remained there in 2021.

- ECF No. 67 (Defendant's Response in Opposition to Plaintiffs' Motions for Preliminary Injunction) at 63 (the 2011 and 2021 plans show "extraordinary similarity," and the "Legislature and map-drawer [were] interested in effecting the least changes possible").

- Ex. D1 (Bryan *Singleton* Report) at 22.

- Hearing Tr. (Volume IV) (Bryan) at 779:18–22 ("And what I see in this plan is that it largely represents what I would call a least-changes plan. There are no wholesale significant changes in the geography except what appears to be necessary in order to achieve one person one vote balance population requirements.").

28.     After drafting his map, Mr. Hinaman reviewed the racial makeup of its districts. He assumed that if District 7 had a Black Voting Age Population of less than 50%, he and the Reapportionment Committee's counsel would have looked for a basis to add Black people to the district.

- Ex. M11 (Hinaman Tr.) at 195:9–196:5.

29.     Representative Sewell told Mr. Hinaman that she would prefer to have a majority-Black district. After drawing his map, Mr. Hinaman reported to Representative Sewell that District 7 had a Black Voting Age Population of 54.22%.

- Ex. M11 (Hinaman Tr.) at 118:4–119:22.

30.     District 7 in HB1, which was enacted as Act 2021-555, (the "2021 plan") retains all or part of the same fourteen counties contained in District 7 in the 2011 plan, including the majority-Black rural counties, Sumter, Greene, Hale, Perry, Marengo, Dallas, Wilcox, and Lowndes.

- Ex. 34 (Defendants' Responses and Objections to *Singleton* Plaintiffs' First Requests for Admissions) ¶ 19.

31.     Before enacting the 2021 Plan, the Legislature performed no meaningful inquiry into whether the Voting Rights Act required the creation of a majority-Black district.

- Ex. M11 (Hinaman Tr.) at 167:23–168:1 ("Q. Are you aware of any racial polarization analysis that was done on any of the districts on the

2021 congressional map? A. I'm not.").

- Hearing Tr. (Volume VI) (Hood) at 1478:14–16 ("Q. You didn't present this analysis to the Alabama Legislature before it enacted the 2021 plan, did you? A. No. It was – I didn't have it done, no."

32.     Before the 2021 Plan was enacted, the Chairs of the Reapportionment Committee, Senator Jim McClendon and Representative Chris Pringle received "talking points" from Mr. Hinaman and Reapportionment Committee counsel Dorman Walker stating that the Voting Rights Act required a majority-minority district, without providing any analysis explaining why that would be the case. The talking points advised voting against a plan supported by the League of Women Voters (which kept counties whole) because it violated Section 2 of the Voting Rights Act by not including a majority-minority district.[5] In other words, the chairs of the relevant committee were given guidance that established a specific racial threshold for a congressional district of more than 50% Black Voting Age Population.

- Ex. M29 (Talking Points) at 4.

- Ex. M12 (Pringle Tr.) at 135:15–137:6.

- Ex. M13 (McClendon Tr.) at 19:13–20:9.

33.     Both Representative Pringle and Senator McClendon testified that they

---

[5] As described below, this guidance was legally erroneous.

used these talking points in debate on redistricting.

- Ex. M12 (Pringle Tr.) at 115:21–118:12 ("I was using my talking points" in debate on the House floor regarding whether racial polarization analysis was required for districts with Black Voting Age Population above 51%.)

- Ex. M13 (McClendon Tr.) at 19:6–8 (referring to the talking points as "the bullet points we used on the floor, in my case on the floor of the senate").

34. Senator McClendon testified that he would not vote for the Whole County Plan because it did not have a majority-minority district.

- Ex. M13 (McClendon Tr.) at 96:12–97:11.

The 2021 Plan made no major changes to the 2011 Plan.

- *Allen v. Milligan*, Brief for Appellants at 74 (describing the 2021 Plan as a "least-changes congressional map").

- *Id.* at 53 ("The enacted districts reflect past districts. There was no major change to the existing lines.") (citations omitted).

- *Allen v. Milligan*, Oral Argument Tr. at 4 (LaCour) ("The state largely retained its existing districts and made changes needed to equalize population.").

### III.   This Court's Order Regarding the 2021 Plan

35.   In granting an injunction to the statutory claims of the *Milligan* and *Caster* Plaintiffs, this Court expressly declined to consider the Equal Protection claim of the *Singleton* Plaintiffs. *Singleton*, 582 F. Supp. 3d at 1034–35.[6]

### IV.   Adoption of the 2023 Plan and Rejection of Alternatives

### E.   The 2023 Plan

36.   The plan enacted by the Legislature in July 2023 (the "2023 Plan") was created without substantial involvement from the Legislative Committee on Reapportionment.

- 8/15/23 Tr. at 33–35.

37.   As in the plans before it, District 7 in the 2023 Plan extends an appendage up from the western Black Belt to encompass part of Jefferson County.

---

[6] In their Proposed Findings of Fact and Conclusions of Law, the *Milligan and Caster* Plaintiffs mistakenly refer to this opinion as "*Milligan v. Merrill*." And their proposed order provides that only they will submit proposed plans and supporting arguments to the special master, despite this Court's order stating that if "the Court determines that the 2023 Plan does not remedy the likely Section Two violation the Court previously identified, then the *Singleton* Plaintiffs will be afforded the opportunity to submit remedial maps for the special master to consider and to otherwise participate in proceedings before the special master to the same degree as the *Milligan* and *Caster* Plaintiffs." ECF No. 154 at 5. The *Singleton* case is the lead case in these proceedings, and it is the reason this three-judge district court was convened. *See Collegiate Licensing Co. v. Am. Cas. Co. of Reading, Pa.*, 713 F.3d 71, 78 (11th Cir. 2013) (the first-filed rule "provides that when parties have instituted competing or parallel litigation in separate courts, the court initially seized of the controversy should hear the case," and "[w]here two actions involving overlapping issues and parties are pending in two federal courts, there is a strong presumption across the federal circuits that favors the forum of the first-filed suit under the first-filed rule"). The *Singleton* Plaintiffs and their constitutional claims cannot so summarily and completely be written out of this litigation.

- Ex. 5 (2023 Plan Maps and Demographics).

38.     Although the 2023 Plan splits the population of Jefferson County roughly in half between District 6 and District 7, 71% of the Black population of Jefferson County is assigned to District 7. The portion of District 7 in Jefferson County in the 2023 Plan is about 57% Black. The portion of District 6 in Jefferson County is about 27% Black.

- Ex. 36 (Defendants' Responses and Objections to *Singleton* Plaintiffs' Third Requests for Admissions) ¶¶ 96–97.

39.     The 2023 Plan separates the eighteen core Black Belt counties in half, with nine in District 7 and nine in District 2.

- Ex. 5 (2023 Plan Maps and Demographics).

- *Singleton v. Merrill*, 582 F. Supp. 3d 924, 953 (N.D. Ala. 2022) ("[The *Milligan* parties] further stipulated that the Black Belt includes eighteen 'core counties' (Barbour, Bullock, Butler, Choctaw, Crenshaw, Dallas, Greene, Hale, Lowndes, Macon, Marengo, Montgomery, Perry, Pickens, Pike, Russell, Sumter, and Wilcox), and that an additional five counties (Clarke, Conecuh, Escambia, Monroe, and Washington) are 'sometimes included within the definition of the Black Belt.'").

   **F.     The Singleton Plan and Jefferson County's Electoral History**

40.     At the July 2023 session of the Legislature, Senator Bobby Singleton

introduced a redistricting plan that keeps Jefferson County whole, places sixteen of the eighteen core Black Belt counties in one district, and does not use race to make the county splits that are required to equalize population (the "Singleton Plan"). The Campaign Legal Center, a nonpartisan, nonprofit group that advocates for every eligible voter to meaningfully participate in the democratic process, drafted this plan and submitted it to the Supreme Court in an *amicus* brief in *Allen v. Milligan* and *Allen v. Caster*.

- 8/15/23 Tr. at 36.

- Ex. 6 (Singleton Plan Maps and Demographics).

- *Allen v. Milligan* and *Allen v. Caster*, Nos. 21-1086, 21-1087 (U.S.), Brief of *Amicus Curiae* Campaign Legal Center in Support of Appellees and Respondents (July 18, 2022), at 21–26.

41.     When he introduced his plan, Senator Singleton submitted information showing that the preferred candidates of Black voters have usually received more votes than their opponents in two districts in his plan. No legislator questioned the accuracy of Senator Singleton's information.

- Ex. 16 (Summary of Prior Election Results Submitted by Senators Singleton and Smitherman at the Special Session).

- 8/15/23 Tr. at 36–39.

42.     In statewide elections since 2012, the Democratic candidate received

more votes than their opponent in 22 of the 28 statewide races contested by a Democrat and a Republican in the Singleton Plan's Jefferson County district, and in 28 of 28 races in the Black Belt district.

- Ex. 36 (Defendants' Responses and Objections to *Singleton* Plaintiffs' Third Requests for Admissions) ¶ 102.

43.    The official results for Jefferson County elections attached to Plaintiff Leonette Slay's deposition show that over the past fourteen years, Democratic candidates won by substantial margins, and most countywide offices were not even contested by Republican candidates.

- Ex. 35 (Slay Tr.), ECF No. 171-5, at 16–20, 27–43, 51–66.

44.    Even in 2022, when turnout was only 41%, the lowest in 36 years, most Democratic candidates for statewide offices carried Jefferson County by 9,000 to 10,000 votes. The exception was the Democratic candidate for Governor, Yolanda Flowers, who beat Governor Ivey by only 3,592 votes. The Democratic candidates were unopposed in 18 county elections. In the sole contested countywide office, the Democratic candidate for Sheriff won by 8,396 votes.

- Ex. 35 (Slay Tr.), ECF No. 171-5, at 16–19, 44.

45.    Voter turnout in 2020 was 64.84%, and Joe Biden beat Donald Trump by 42,845 votes, while Doug Jones beat Tommy Tuberville by 56,330 votes, and the Democratic candidate beat the incumbent President of the Public Service

Commission by 42,863 votes. Seven county offices were won by unopposed Democrats, and Democrats carried five contested county races by substantial margins.

- Ex. 35 (Slay Tr.), ECF No. 171-5, at 27–28.

46.     Turnout in 2018 was 54.67%, and Democratic candidates won all seven contested statewide races in Jefferson County by margins ranging from 46,442 to 32,619 votes. In the last elections ever to be contested by Democrats for seats on the Alabama Supreme Court, the Democratic candidates carried Jefferson County by margins of 61,408 and 34,039 votes. Fifteen county offices were won by unopposed Democratic candidates, and Democrats won all seven contested county offices by substantial margins.

- Ex. 35 (Slay Tr.), ECF No. 171-5, at 30–33.

47.     In the 2017 special election for U.S. Senate, Democrat Doug Jones beat Republican Roy Moore by 83,409 votes.

- Ex. 35 (Slay Tr.), ECF No. 171-5, at 35.

48.     In the only two statewide races contested by Democrats in 2016, Hillary Clinton beat Donald Trump by 22,105 votes, and a relatively unknown Democratic candidate beat incumbent U.S. Senator Richard Shelby by 12,438 votes. Seventeen judicial and other county offices were contested, and Democratic candidates won all of them. Six judicial seats were won by unopposed Democrats.

- Ex. 35 (Slay Tr.), ECF No. 171-5, at 36–37.

49.     2014 was another low turnout year, with only 40.71% of registered voters voting in Jefferson County. The Democratic candidates for Lieutenant Governor and Attorney General outpolled the Republican candidates by narrow margins. The Democratic candidate for Governor lost to the Republican candidate by 282 votes, the Democratic candidate for Secretary of State lost by 2,817 votes, and the Democratic candidate for Commissioner of Agriculture lost by 3,406 votes. These were the last times a Republican candidate has defeated a Democratic candidate in Jefferson County for a statewide office. In countywide races, Republican candidates won Circuit Court Judge place 3 and Sheriff, the latter by a margin of 20,323 votes. These were the last times a Republican candidate has won a countywide race in Jefferson County. Democratic candidates won the other seven contested county elections.

- Ex. 35 (Slay Tr.), ECF No. 171-5, at 40–43.

50.     No contested Republican candidate for statewide or countywide office beat a Democratic opponent in Jefferson County in 2012. President Obama received 18,193 more votes in Jefferson County than did Senator Romney. Democrats Bob Vance and Lucy Baxley handily outvoted their Republican opponents for Chief Justice and PSC President. The Democratic candidate prevailed over the Republican candidate in sixteen contested county offices, and six Democrats and one Republican

were unopposed.

- Ex. 35 (Slay Tr.), ECF No. 171-5, at 51–54.

51.   In statewide races in 2010, the Democratic candidate prevailed in Jefferson County in nine, and the Republican candidate won in five.  In elections for county offices, four Democrats won contested races, and Republicans won six, while thirteen Democratic candidates were unopposed.

- Ex. 35 (Slay Tr.), ECF No. 171-5, at 55–60.

52.   In 2008, Democratic candidates carried Jefferson County in six statewide elections, including for President, in which Barack Obama beat John McCain by 16,200 votes.  Democrats won all ten contested or unopposed elections for county offices.

- Ex. 35 (Slay Tr.), ECF No. 171-5, at 61–66.

53.   The following table summarizes the official results of elections of statewide and countywide offices in Jefferson County from 2008 to 2022. This summary includes the Jefferson County Circuit and District Court Judges, District Attorney, Circuit Clerk, Treasurer, Tax Assessor, Tax Collector, and Judge of Probate offices, in which one is elected from the Birmingham Division and another from the Bessemer Division.

| Page nos. in Doc. 171-5 | Number of wins by Democratic candidates | Number of losses by Democratic candidates |
|---|---|---|
| 16-19: 2022 returns | 25 | 0 |
| 27-29: 2020 returns | 15 | 0 |
| 30-34: 2018 returns | 33 | 0 |
| 35: 2017 returns | 1 | 0 |
| 36-39: 2016 returns | 25 | 0 |
| 40-43: 2014 returns | 10 | 5 |
| 51-54: 2012 returns | 25 | 0 |
| 55-60: 2010 returns | 26 | 11 |
| 61-66: 2008 returns | 16 | 1 |

## G. Preserving the Jefferson County and Black Belt Communities of Interest

54.    Jefferson County and the Black Belt are the two most important communities of interest in Alabama history. For a century after Reconstruction, the Big Mules in industrial Jefferson County and the Bourbon White landowners in the Black Belt ruled the Alabama Legislature with an iron hand.

- *Lynch by Lynch v. Alabama,* 2011 WL 13186739, at *30 *et seq., *43 et seq.* (N.D. Ala. Nov. 7, 2011), *aff'd in part, vacated in part, and*

*remanded sub nom. I.L. v. Alabama,* 739 F.3d 1273 (11th Cir. 2014).

- *Knight v. Alabama,* 787 F. Supp. 1030, 1090 (N.D. Ala. 1991), *aff'd in part, vacated in part, and rev'd in part,* 14 F.3d 1534 (11th Cir. 1994) (explaining the history of the Big Mule–Bourbon Alliance in detail)

- Ala. Act 2023-563 at 1 ("[Traditional redistricting] principles are the product of history, tradition, bipartisan consensus, and legal precedent.").

55.    The Black Belt, named for the color of its soil, is well recognized as a community of interest.

- *Milligan v. Merrill*, ECF No. 53 (Joint Stipulated Facts for Preliminary Injunction Proceedings) ¶¶ 60–61 (explaining the origin of the term "Black Belt" and listing the counties of the Black Belt).

- Hearing Tr. (Volume VII) (Byrne) at 1705:1–5 ("Q. And the Black Belt is generally an area whose counties are generally majority black, right? A. It's actually called the Black Belt because of the soil. The soil is dark and rich there, so it's not called the Black Belt [because] of race or ethnicity.").

- Hearing Tr. (Volume VII) (LaCour) at 1875:7–1876:7 ("I would not dispute" that the Black Belt is a community of interest.).

56.    It is difficult for a member of Congress to provide effective

representation simultaneously to Birmingham and the Black Belt.

- 8/15/23 Tr. at 41–42.

57. On many issues, Birmingham and the Black Belt have differing interests, and getting help from Congress can be a zero-sum game.

- 8/15/23 Tr. at 41–42.

58. The 2023 Plan's split of the Black Belt impairs the Black Belt's ability to receive effective representation in Congress.

- 8/15/23 Tr. at 42–43.

59. Counties are integral to the civic life of Alabama. Elections are administered at the county level, and the Secretary of State reports results at the county level as well. Alabamians elect county sheriffs, county commissioners, county judges, county tax collectors, county tax assessors, and county boards of education. Political parties organize at the county level. Counties cluster individuals around a sense of community, and ordinary citizens identify themselves by the county in which they reside.

- Ex. S3 (Davis Rebuttal Report) at 1–2.

- Hearing Tr. (Volume I) (Davis) at 79:21–81:16.

60. Reuniting Jefferson County in particular is important because it gives Black Jefferson County voters, who are currently packed into the Seventh District, greater control over issues affecting Jefferson County. "It brings the folks who live

in Jefferson County together for political and for cultural purposes."

- Hearing Tr. (Volume I) (Davis) at 88:6–13.

61.     Plaintiff Leonette Slay grew up in Mississippi, graduated from Millsaps College, earned a Masters degree in Public Affairs, and served for thirty years in the U.S. Army: fourteen on active duty, and the rest in the Reserves. She retired in 2006 as a Colonel. Ms. Slay has been involved in Alabama politics as an officer of the League of Women Voters of Alabama since 1990, and in Jefferson County politics in particular since 1994.[7]

- Ex. 35 (Slay Tr.) at 10–13, 16–18.

62.     Gerrymandered districts provide such a strong assurance of success to some candidates that they do not respond to candidate questionnaires from the League of Women Voters.

- Ex. 35 (Slay Tr.) at 18–22.

63.     Racial gerrymandering in Jefferson County depresses voter turnout because voters know their candidate cannot win.

- Ex. 35 (Slay Tr.) at 22–23.

64.     Many Black and White voters in Jefferson County share interests including Medicaid expansion, reducing grocery taxes, obtaining a viable public transit system, revision of criminal justice laws, federal investment in infrastructure,

---

[7] Ms. Slay is not representing the League of Women Voters in this case.

and opposition to Sen. Tuberville blocking military appointments.

- Ex. 35 (Slay Tr.) at 24–25.

65. The Defendants' expert Thomas Bryan testified that keeping counties whole limits the opportunity to perform racial gerrymandering.

- Hearing Tr. (Volume IV) (Bryan) at 1095:7–1096:1.

66. In Alabama elections, the candidate of choice for Black voters in a general election is the Democrat. Experts in this case estimated the share of Black voters who vote for the Democratic candidate at approximately 92% (Bryan), 93%– 96% (Liu), and 97%–99% (Hood).

- Hearing Tr. (Volume IV) (Bryan) at 1079:19–25.
- Ex. M4 (Liu Report) at 9.
- Ex. D5 (Hood Report) at 4–11.

67. The Defendants' expert Thomas Bryan agreed that any district including all of Jefferson County would be a "Democratic performing district."

- Hearing Tr. (Volume IV) (Bryan) at 1085:13–20.

### H. Residences of Alabama's Representatives

68. Representative Gary Palmer, who represents District 6, lives in northern Shelby County, which would remain in District 6 in the Singleton Plan.

- Ex. 6 (Singleton Plan Maps and Demographics).

69. Representative Terri Sewell represents District 7. She resides in

Jefferson County, but when asked for her address during the development of the 2021 Plan, she gave two, including one in Dallas County. Dallas County is in District 7 in the Singleton Plan.

- Ex. M11 (Hinaman Tr.) at 117:13–22.

- Ex. 6 (Singleton Plan Maps and Demographics).

70.    A candidate for the U.S. House of Representatives must be an inhabitant of the state in which they are running on Election Day, but the candidate need not live in his or her district.

- U.S. Const. art. I, § 2.

71.    Under the Singleton Plan, Representatives Sewell and Palmer would not be paired against each other if Representative Sewell were to remain in District 7, where her Dallas County address is.

- Ex. 6 (Singleton Plan Maps and Demographics).

**V.    Equitable Considerations in Adopting a New Plan**

72.    Secretary Allen considers it likely that a new plan by around October 1, 2023, would provide enough time to reassign voters, print and distribute ballots, and otherwise conduct the forthcoming 2024 primary elections based on the new map. October 1, 2023 is 41 days from today.

- ECF No. 129 at 7.

## PROPOSED CONCLUSIONS OF LAW

### I.    Jurisdiction and Standing

73.    This three-judge District Court has jurisdiction to decide this challenge to the constitutionality of Congressional districts under 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4), 1357, and 2284, and 42 U.S.C. §§ 1983 and 1988.

74.    The *Singleton* Plaintiffs have standing to bring their claim for racial gerrymandering. A plaintiff has standing to challenge a legislature's action if he or she lives in a racially gerrymandered district or has been subjected to a racial classification. *United States v. Hays*, 515 U.S. 737, 744–45 (1995). Under the 2021 Plan, Plaintiff Slay resided in District 6, Plaintiffs Billingsley, Singleton and Smitherman resided in District 7, and Plaintiffs Andrews and Walker resided in District 2. In the 2023 Plan, Plaintiffs Andrews and Walker reside in District 2, while all other Plaintiffs reside in District 7. Three of the Plaintiffs—Senator Rodger Smitherman, Leonette Slay, and Eddie Billingsley—reside in Jefferson County, all of them in District 7.

### II.    Analysis of a Claim of Racial Gerrymandering

75.    A claim of racial gerrymandering requires "a two-step analysis." *Cooper v. Harris*, 581 U.S. 285, 291 (2017). "First, the plaintiff must prove that 'race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district.'" *Id.* (quoting

*Miller v. Johnson*, 515 U.S. 900, 916 (1995)). "Second, if racial considerations predominated over others, the design of the district must withstand strict scrutiny. The burden thus shifts to the State to prove that its race-based sorting of voters serves a 'compelling interest' and is 'narrowly tailored' to that end." *Id.* at 1464 (citations omitted).

76.    To prove that race was the predominant factor in a redistricting decision, the plaintiff may rely on "'direct evidence' of legislative intent, 'circumstantial evidence of a district's shape and demographics,' or a mix of both." *Cooper*, 581 U.S. at 291 (citation omitted); *see Davis v. Chiles*, 139 F.3d 1414, 1424 (11th Cir. 1998) ("A court may base such a finding either on circumstantial evidence regarding a district's shape and demographics or on direct evidence of a district-drawer's purpose."). Here, there is direct evidence that the 1992 Plan was designed to separate voters in Jefferson County by race and that the 2023 Plan perpetuates that racial design. And the shape and demographics of the Jefferson County "finger" are circumstantial evidence that confirms the direct evidence of a racial gerrymander.

77.    A legislature's use of race-blind criteria for redistricting does not preclude a finding that race predominated in the creation of a district. In *North Carolina v. Covington*, it was undisputed that the legislature "instructed its map drawers not to look at race when crafting a remedial map." 138 S. Ct. 2548, 2553

28

(2018). Nevertheless, the plaintiffs were entitled to relief because of "sufficient circumstantial evidence that race was the predominant factor governing the shape of those four districts." *Id.*

78.    It is important to distinguish intent to separate voters by race from intent to discriminate against some voters by diluting their voting strength. In a racial gerrymandering case, a plaintiff need not establish racially discriminatory intent on the part of the legislature. Gerrymandering is not a traditional discrimination claim, like vote dilution. *Miller v. Johnson*, 515 U.S. 900, 911 (1995) ("*Shaw* recognized a claim analytically distinct from a vote dilution claim.") (cleaned up). Rather, plaintiffs alleging an unconstitutional racial gerrymander must prove "that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Id.* at 916. The harm caused by racial gerrymandering is what the Supreme Court has labeled an "expressive harm." *Bush v. Vera*, 517 U.S. 952, 984 (1996). Therefore, discriminatory intent, or lack thereof, is irrelevant if a legislature enacts a plan that separates voters based on their race. *North Carolina v. Covington*, 138 S. Ct. at 2552–53 ("[I]t is the segregation of the plaintiffs—not the legislature's line-drawing as such—that gives rise to their claims. … [The Plaintiffs] argued in the District Court that some of the new districts were mere continuations of the old, gerrymandered districts. Because the plaintiffs asserted that they remained segregated on the basis of race, their claims

remained the subject of a live dispute ….”); *Harris v. McCrory*, 159 F. Supp. 3d 600, 604 (M.D.N.C. 2016) (“[T]he Court notes that it makes no finding as to whether individual legislators acted in good faith in the redistricting process, as no such finding is required.”), *aff'd sub nom. Cooper v. Harris*, 581 U.S. 285 (2017); *Page v. Va. State Bd. of Elections*, 2015 WL 3604029, at *8 (E.D. Va. June 5, 2015) (“Nevertheless, the good faith of the legislature does not excuse or cure the constitutional violation of separating voters according to race.”) (internal quotation marks omitted). Even if the Legislature’s good faith were relevant here, it would be hard to impute good faith to the Legislature in light of the revelation that Alabama’s Solicitor General participated in drawing the 2023 Plan and drafted its findings of fact, which were not shared with legislators until the last minute.

79.     At the August 15 hearing, the Solicitor General/map drawer/statute drafter told this Court that the “legitimate neutral reasons” for maintaining the split of Jefferson County were “[t]he preexisting cores of districts, not wanting to pair Terr[i] Sewell with another incumbent, as well as -- and we made the district more compact.” 8/15/23 Tr. at 80. But when race predominated in the creation of a district, a legislature may not constitutionally perpetuate that district by appealing to traditional redistricting principles like preserving the cores of districts or protecting incumbents. “[E]fforts to protect incumbents by seeking to preserve the ‘cores’ of unconstitutional districts … ha[s] the potential to embed, rather than remedy, the

effects of an unconstitutional racial gerrymander ….” *Covington v. North Carolina*, 283 F. Supp. 3d 410, 431 (M.D.N.C. 2018), *aff'd in relevant part and reversed in part on other grounds*, 138 S. Ct. 2548 (2018); *see also* cases cited *infra* at pp. 42–45.

80.    Alabama's own redistricting guidelines do not permit the Alabama Legislature to preserve the cores of districts or protect incumbents if doing so would violate the Equal Protection Clause of the United States Constitution. Ex. M28 (2021 Redistricting Guidelines) at 2–3 (Legislature should preserve cores of districts and protect incumbents "to the extent that [these objectives] do not violate or subordinate the foregoing policies prescribed by the Constitution and laws of the United States"). Therefore, if the Legislature begins with a plan that is an unconstitutional racial gerrymander, it cannot readopt that plan with insubstantial changes in order to protect incumbents or preserve the cores of the gerrymandered districts.

81.    A legislature is not entitled to assume that the Voting Rights Act requires the creation of a majority-minority district without a "meaningful legislative inquiry" into "whether a plaintiff could establish the *Gingles* preconditions—including effective white bloc-voting—in a new district created without those measures." *Cooper v. Harris*, 581 U.S. at 304. Here, the Legislature ignored the evidence presented to it by Senators Singleton and Smitherman, which demonstrated that because of substantial white support for candidates preferred by Black voters,

eliminating the split in Jefferson County would produce an effective crossover district.

### III.     The 2023 Plan is an Unconstitutional Racial Gerrymander.

#### A.     Race Undisputedly Predominated in the Creation of the 1992 Plan.

82.     Race was the predominant purpose for splitting counties to draw one majority-Black district in the plan adopted in *Wesch v. Hunt*, 785 F. Supp. 1491 (S.D. Ala. 1992) (three-judge court), *aff'd sub nom. Camp v. Wesch*, 504 U.S. 902 (1992), *Figures v. Hunt*, 507 U.S. 901 (1993). The *Wesch* court accepted, without analysis, the parties' stipulation that a district with a Black population of at least 65% should be created in order to ensure compliance with Section 2 of the Voting Rights Act. *Id.* at 1498–99. To attain such a high Black population, the *Wesch* court broke with a traditional principle by which Alabama had drawn its congressional maps for 170 years: keeping counties whole, except where necessary to equalize population. *See* Ex. S22 (compendium of Alabama's congressional plans from 1822 to 2021). Even when Jefferson County was divided because its population was too large for one district, the district lines had no apparent connection to race. *Id.* (1965, 1972, and 1980 plans). The *Wesch* court drew appendages that reached out from the western Black Belt to encircle predominantly black portions of Jefferson County and Montgomery Counties, especially the cities of Birmingham and Montgomery. *Id.* (1992 plan). For the first time since the incorporation of Birmingham in 1871, its

urban residents now shared a congressional district with rural counties such as Wilcox, Choctaw, and Lowndes. These three counties are part of the Black Belt. *Singleton*, 582 F. Supp. 3d at 924.

### B.  Because Race Predominated in the Creation of District 7, It Is a Racial Gerrymander.

83.     In 1993, a year after *Wesch*, the Supreme Court made clear that drawing lines for predominantly racial purposes constitutes a racial gerrymander. *Shaw v. Reno*, 509 U.S. 630, 649 (1993) (a reapportionment statute can be challenged under the Equal Protection Clause if it "rationally cannot be understood as anything other than an effort to separate voters into different districts on the basis of race"). The *Shaw* Court held, however, that a racial gerrymander may be constitutional if it "is narrowly tailored to further a compelling governmental interest." *Id.* at 658. Since *Shaw*, the Supreme Court has further clarified that drawing a district to achieve a particular racial percentage, as the *Wesch* court did, is a racial gerrymander. *Cooper v. Harris*, 581 U.S. at 305–06; *Wisc. Legislature v. Wisc. Elections Comm'n*, 142 S. Ct. 1245, 1250 (2022).

84.     Secretary Merrill, the original defendant in this case, has stated in prior litigation that "District 7 [in the 1992 Plan] appears to be racially gerrymandered, with a finger sticking up from the black belt for the **sole purpose** of grabbing the black population of Jefferson County." Ex. S40 (*Chestnut* Pre-trial Brief) at 11 (emphasis added). Secretary Merrill is correct. Other than to divide Jefferson County

33

residents by race, there is no reason for the finger to exist. Therefore, under well-settled precedent, it was a racial gerrymander.

> **C.    The 2001, 2011, and 2021 Plans Were Racial Gerrymanders Because They Undisputedly Carried Forward the Race-Driven Lines of the 1992 Plan.**

85.    According to the Defendants themselves, the Legislature made minimal changes to District 7 from 1992 to 2021. Earlier in this case, the Defendants stated, "Both the 2001 and 2011 maps maintained the cores of districts, changing them **only to equalize population**. The 2011 map largely built off the 2001 map, which itself built off the 1992 map." ECF No. 67 (Defendant's Response in Opposition to Plaintiffs' Motions for Preliminary Injunction) at 12 (emphasis added). Thus, the two plans that followed the 1992 Plan had no changes at all except those that brought them into compliance with the constitutional requirement of equal population. As a matter of law, such changes are irrelevant to whether race predominated in the creation of those districts: "[A]n equal population goal is not one factor among others to be weighed against the use of race to determine whether race 'predominates.'" *Alabama Legislative Black Caucus*, 575 U.S. at 272. Therefore, the Defendants have conceded that as of 2011, District 7 had not changed in any material way.

86.    At the Supreme Court, the Defendants made the same concession about the 2021 Plan. In that plan, they said, "The enacted districts reflect past districts. There was no major change to the existing lines." *Allen v. Milligan*, Brief for

Appellants at 53 (citations omitted). They described the 2021 Plan as a "least-changes congressional map," *id.* at 74, noting that "more than 90%" of District 7 remained the same from 2011 to 2021, *id.* at 22. At oral argument, Alabama's Solicitor General reiterated the similarity between the 2021 Plan and previous iterations: "The state largely retained its existing districts and made changes needed to equalize population." *Allen v. Milligan*, Oral Argument Tr. at 4. Therefore, the Defendants conceded once again that District 7 had not changed materially since 1992.

### D. In Jefferson County, the 2023 Plan Is Materially the Same as the 2021 Plan.

87.     When the Solicitor General drew the 2023 Plan for the Legislature, he made significant changes to the 2021 Plan. But the Defendants have offered no argument or evidence that any of these significant changes took place in Jefferson County.[8] Just as it did in 1992, 2001, 2011, and 2021, a finger reaches up from the western Black Belt to capture a majority-Black population in the Birmingham area. That finger is wider than it was in 1992, but looks are deceiving; the increase in width derives primarily from the addition of three geographically large but sparsely

---

[8] At the August 15 hearing, the Secretary's counsel asserted that the BVAP of District 7 has fallen from 65% to 50% since 1992, and Montgomery is no longer in District 7. But the Defendants have not introduced evidence of the role of Jefferson County in the changes to BVAP, and changes to Montgomery County are irrelevant to plaintiffs who live in Jefferson County.

populated precincts on the border between Jefferson and Walker counties.[9] The

Defendants have not explained why this change should be considered material; the

finger was also wider in 2021, but the Defendants have repeatedly argued that the

Legislature made no significant changes to District 7 from 1992 to 2021.

> **E.     Demographic Evidence Shows That the 2023 Plan Continues to Sort Jefferson County's Residents by Race.**

88.     The Plaintiffs' evidence is not limited to the lines of District 7, which

the Defendants themselves assert have not changed materially since 1992. The

Plaintiffs have also shown, using the same type of demographic evidence on which

the Supreme Court has relied, that the demographics of District 7 in Jefferson County

make sense only as a racial gerrymander. Seventy-one percent of Black residents of

Jefferson County live in District 7, meaning that a Black resident of Jefferson County

is about two and a half times as likely to live in District 7 than District 6. In *Cooper*

*v. Harris*, the Court stated, "Within the same counties, the portions that fall inside

District 1 have black populations two to three times larger than the portions placed

in neighboring districts," and that this fact was evidence of "stark racial borders."

581 U.S. at 300. The stark difference between District 6 and District 7 in Jefferson

---

[9] The Defendants waited until the hearing to assert for the first time that the width of the finger is relevant to this case. Had they put the Plaintiffs on notice of this argument by including it in their response to the Plaintiffs' objection, the Plaintiffs would have included in their evidentiary submission a map showing these three precincts and their populations. In any event, the Defendants have not offered any evidence that the increased width of the Jefferson County finger has remedied the 1992 gerrymander in any meaningful way.

County is not surprising, given the undisputed raced-based origin of the district lines.

89.   The Defendants themselves concede this point in their proposed findings of fact and conclusion of law in *Caster* and *Milligan*. In support of their argument that the "VRA Plaintiffs' Remedial Map" is an unconstitutional racial gerrymander because of the way it splits Mobile County, they assert that "while 49.6% of Mobile County's overall voting age population is drawn into District 2, 72% of the black voting age population of the county is added to the district," which shows "the proposal's particularly stark racial divide." *Milligan*, ECF No. 267 at 17. The same "stark racial divide" exists in Jefferson County in the 2023 Plan, which assigns 71% of Black residents to District 7.

### F.   The Legislature's Rejection of Race-Neutral Plans Is Further Circumstantial Evidence That It Intended to Enact Lines That Separate Voters by Race.

90.   A legislature's decision to adopt a plan that conflicts with traditional redistricting criteria can be "persuasive circumstantial evidence tending to show racial predomination." *Bethune–Hill v. Va. State Bd. Of Elections*, 580 U.S. 178, 190 (2017).

91.   While this Court's preliminary injunction order did not by its terms obligate the Legislature to adopt the Singleton Plan, or any specific plan, it is telling that the Legislature rejected the Singleton Plan, which outperformed the 2023 Plan on the Legislature's own redistricting principles. Those principles include the

following:

- Congressional districts shall have minimal population deviation.

- Plans must comply with the one person, one vote principle of the Equal Protection Clause of the 14th Amendment of the United States Constitution.

- Plans must comply with the Voting Rights Act.

- Districts must respect communities of interest, which may include counties and municipalities.

- Districts must be contiguous and reasonably compact.

- The Legislature shall try to preserve the cores of existing districts.

- Contests between incumbents will be avoided when possible.

Except for preserving cores of districts, which is discussed below, the Singleton Plan generally performs as well as or better than the 2023 Plan, without including any race-based lines. The enactment of the 2023 Plan instead of the Singleton Plan buttresses the conclusion that the Legislature, by rubber-stamping the Solicitor General's plan, intended to enact race-based lines in Jefferson County.

92.   *Minimal population deviation/"One Person, One Vote"*: Like the enacted 2023 plan, each district in the Singleton plan has the same population, plus or minus one person.

93.   *Voting Rights Act*: The Defendants have conceded that the 2023 Plan

fails to give Black voters the opportunity to elect candidates of their choice in two districts. In the Singleton Plan, such candidates received more votes than their opponents in two districts the vast majority of the time.

94.     *Respecting communities of interest, including counties and municipalities*: From 1822 to 1965, Alabama's Congressional districts always followed county lines. And from 1965 to the beginning of the racial gerrymandering era in 1992, only two counties were ever split, and even then by necessity because Jefferson County's population was larger than that of an ideal district. For the first time in decades, it is possible to return to the traditional principle of creating districts without splitting county boundaries, which the Singleton plan does (except for minor, race-neutral splits to equalize population). Jefferson County is one of the most important communities of interest in Alabama, yet the 2023 Plan splits hundreds of thousands of residents of Jefferson County from each other, creating a divide between majority-Black and majority-White portions of Birmingham and its suburbs.

95.     The Singleton plan also respects the integrity of the Black Belt community of interest. It includes 16 of the 18 "core" Black Belt counties in a single district, which would give the Black Belt a dedicated advocate in Congress.[10]

---

[10] The Defendants stipulated in *Milligan* that "[t]he Black Belt includes the core counties of Barbour, Bullock, Butler, Choctaw, Crenshaw, Dallas, Greene, Hale, Lowndes, Macon, Marengo, Montgomery, Perry, Pickens, Pike, Russell, Sumter, and Wilcox." No. 21-cv-1530-AMM, ECF

8/15/23 Tr. at 40–42. The 2023 Plan splits the Black Belt down the middle. The western half of the Black Belt must compete with Birmingham for its Representative's attention and efforts. *Id.* at 42–43. And the eastern half is not only combined with the Wiregrass, but also will virtually never elect the candidate of choice for Black voters, who make up more than half of the residents of this portion of the Black Belt.

96.     The Plaintiffs have not taken a position on whether Mobile and Baldwin Counties or the Wiregrass are important communities of interest. But even if they are, the Singleton Plan performs better here as well. Both plans include Mobile and Baldwin Counties in one district, but unlike the 2023 Plan, the Singleton Plan keeps District 1 exactly as the Legislature drew it in 2021. With respect to the Wiregrass, the Defendants' counsel said something at the August 15 hearing that is both misleading and troubling: that the Singleton Plan cuts off two Wiregrass counties from the rest of the region. 8/15/23 Tr. at 22. The statement is misleading because these counties—Crenshaw and Pike—are also included in the 2023 Plan's

---

No. 53 ¶ 61. The Singleton Plan leaves Barbour and Russell Counties out of its Black Belt district only because it is mathematically impossible to include them. If all eighteen Black Belt counties are in the same district, they cut off the southernmost counties of the state, creating a region that cannot be divided into districts of equal population with the districts in the rest of the state. Moreover, the 2023 Plan lists Barbour County as a Wiregrass County, and the Singleton Plan includes Barbour County in its Wiregrass District. Ala. Act. No. 2023-563 § 1(4)(g). Russell County has perhaps the least in common with the Black Belt than any "core" Black Belt county; the majority of its population lives in Phenix City, which unofficially observes Eastern Time because of its close ties with the adjacent city of Columbus, Georgia.

description of the Black Belt, and they are included in the Black Belt district in the Singleton Plan. It is the 2023 Plan, not the Singleton Plan, that largely cuts off a Wiregrass County—Covington—from its communities of interest. And the statement is troubling because it implies that the Legislature believed that keeping Crenshaw and Pike, two small, majority-White counties, in the majority-White Wiregrass District, was more important than giving the Black Belt, a majority-Black region of eighteen counties, an effective voice in Congress.

97.    *Contiguity and compactness*: The Singleton plan is contiguous and only marginally less compact than the 2023 enacted plan (and is about as compact as the 2021 enacted plan). Therefore, the Singleton Plan serves the goal of compactness about as well as the other plans, without racial gerrymandering.

98.    *Protecting Incumbents*: Although protecting incumbents is not a legitimate redistricting principle when the existing districts are racially gerrymandered, the Singleton Plan would not necessarily pit incumbents against each other, as Representative Sewell could continue to represent District 7 from her address in Dallas County.

###    G.    The Defendants' Reliance on Core Preservation and Incumbency Protection Makes the Intent of the 1992 Plan Relevant Evidence of the Intent of the 2023 Plan.

99.    The only ground on which the Defendants have justified keeping Jefferson County's race-based district lines is a focus on preserving the cores of

districts and protecting incumbents. These considerations, however, cannot change

a gerrymandered district into one that is not gerrymandered:

> The defendants misunderstand the nature of the plaintiffs' claims. …
> [I]t is the segregation of the plaintiffs—not the legislature's line-
> drawing as such—that gives rise to their claims. … [T]hey argued in
> the District Court that some of the new districts were mere
> continuations of the old, gerrymandered districts. Because the plaintiffs
> asserted that they remained segregated on the basis of race, their claims
> remained the subject of a live dispute, and the District Court properly
> retained jurisdiction.

*North Carolina v. Covington*, 138 S. Ct. at 2552–53. This is true even if, as in

*Covington*, there is no dispute that the current legislature allegedly did not take race

into account when it maintained gerrymandered district lines. *Id.* at 2553.[11]

100.   Moreover, when the starting point for redistricting is a racially

gerrymandered map, particularly a map that has been admitted to be a gerrymander,

preserving district cores and protecting incumbents is evidence that the line-drawers

intended to separate voters by race. *Jacksonville Branch of NAACP v. City of*

*Jacksonville*, No. 3:22-CV-493-MMH-LLL, 2022 WL 17751416, at *13 (M.D. Fla.

---

[11] The Defendants have attempted to distinguish *Covington* on the grounds that the district court had already held that the district lines, as originally drawn, were racially gerrymandered. That is a distinction without a difference, as the Defendants here have admitted that Jefferson County's district lines, as originally drawn, were also racially gerrymandered. Additionally, this case is also in a remedial posture like *Covington*. It does not matter that this Court found liability only on the Voting Rights Act claim because it may consider all challenges to a remedial plan. *Covington v. North Carolina*, 283 F. Supp. 3d 410, 425 (M.D.N.C. 2018) (rejecting the defendants' argument that "this Court may consider only those challenges to a remedial districting plan that rely on the same legal theory as the original violation."), *aff'd in part and rev'd in part*, 138 S. Ct. 2548 (2018).

Dec. 19, 2022) (evidence that previous district lines were based on race "was significant because, in the 2021–2022 redistricting cycle, the City Council decided to maintain the lines from 2011 as much as possible in the interest of preserving district cores and protecting incumbents"); *Jacksonville*, 635 F. Supp. 3d 1229, 1286 (M.D. Fla. 2002) ("Moreover, as other courts have recognized, by invoking core retention and incumbency protection as the predominant motive behind the shape of the Challenged Districts, the City makes the historical foundation for these districts particularly relevant."); *Jacksonville*, 2022 WL 16754389, at *3 (11th Cir. Nov. 7, 2022) (an intent "to maintain the race-based lines created in the previous redistricting cycle" is "not a legitimate objective"); *GRACE, Inc. v. City of Miami*, No. 1:22-CV-24066-KMM, 2023 WL 4942064, at *4 (S.D. Fla. Aug. 3, 2023) ("The Court's analysis of core retention was therefore appropriately limited to an evaluation of whether the Remedial Plan perpetuated the harms of racial gerrymandering, which the Court found it did."); *GRACE*, 2023 WL 4853635, at *2–3 (S.D. Fla. July 30, 2023) (finding of racial gerrymandering was buttressed where the city's "intent was, as expressed, to preserve previously-drawn race-based lines of the Commission Districts in the 2022 redistricting process.'") (citation omitted); *Covington v. North Carolina*, 283 F. Supp. 3d 410, 431 (M.D.N.C. 2018) ("[E]fforts to protect incumbents by seeking to preserve the 'cores' of unconstitutional districts … have the potential to embed, rather than remedy, the effects of an unconstitutional racial

gerrymander ….”), *aff'd in relevant part and reversed in part on other grounds*, 138 S. Ct. 2548 (2018); *Covington*, 138 S. Ct. at 2551 (enjoining districts that "retain[ed] the core shape" of previously racially gerrymandered districts, because the redrawn districts continued to bear the hallmarks of racial predominance); *Personhuballah v. Alcorn*, 155 F. Supp. 3d 552, 561 n.8 (E.D. Va. 2016) ("In any event, maintaining district cores is the type of political consideration that must give way to the need to remedy a *Shaw* violation."); *Easley v. Cromartie*, 532 U.S. 234, 262 n.3 (2001) (Thomas, J., dissenting) (stating on behalf of four Justices that "the goal of protecting incumbents is legitimate, even where … individuals are incumbents by virtue of their election in an unconstitutional racially gerrymandered district ... is a questionable proposition," but noting that the question was not presented to the Supreme Court or district court and, therefore, that the Court had not addressed it); *Vera v. Richards*, 861 F. Supp. 1304, 1336 (S.D. Tex. 1994), *aff'd sub nom. Bush v. Vera*, 517 U.S. 952 (1996) ("Incumbent protection is a valid state interest only to the extent that it is not a pretext for unconstitutional racial gerrymandering."); *see Allen v. Milligan*, 143 S. Ct. 1487, 1505 (2023) (majority opinion) ("But this Court has never held that a State's adherence to a previously used districting plan can defeat a § 2 claim. If that were the rule, a State could immunize from challenge a new racially discriminatory redistricting plan simply by claiming that it resembled an old racially discriminatory plan."); *id.* at 1531 (Thomas, J., dissenting) ("Absent core retention,

there is no apparent race-neutral reason to insist that District 7 remain a majority-black district uniting Birmingham's majority-black neighborhoods with majority-black rural areas in the Black Belt."); *id.* at 1528 n.10 (Thomas, J., dissenting) ("The District Court disregarded the 'finger' because it has been present in every districting plan since 1992, including the State's latest enacted plan. *Singleton v. Merrill*, 582 F.Supp.3d 924, 1011 (ND Ala. 2022) (per curiam). But that reasoning would allow plaintiffs to bootstrap one racial gerrymander as a reason for permitting a second.").

101.   The reason that the Defendants' own justifications for continuing to gerrymander District 7 work *against* them is not that the intent, or "taint," or "original sin" of a previous legislature is imputed to the current one.  These concerns are relevant only for a claim of intentional discrimination. For a claim based on racial gerrymandering, if a district is already racially gerrymandered, it is more likely that the current legislature intended to enact lines that separate voters by race if it kept the same district lines. After all, when the Alabama Legislature enacted the 2021 and 2023 Plans, Secretary Merrill had already told this Court that the 1992 Plan (which the Defendants have argued is substantially similar to the 2001 and 2011 plans) was a racial gerrymander, and that the end of retrogression gave the Legislature more freedom to draw new district lines. Ex. S40 (*Chestnut* Pre-trial Brief) at 11–12. Twice in a row, the Legislature nevertheless reenacted racially gerrymandered lines with insignificant changes.

**H.    Direct Evidence Shows That the 2021 Plan, on Which the 2023 Plan Was Based, Was Designed to Maintain an Indefensible Racial Quota.**

102.   Although the Plaintiffs rely on circumstantial evidence for their claim that the 2023 Plan is a racial gerrymander, it is not necessary to go back to 1992 to find direct evidence of an intent to separate voters by race; direct evidence shows that this was the Legislature's intent in 2021.

103.   When debating and enacting the 2021 Plan, the Legislature was under the mistaken impression that it was required to include a majority-Black district in order to comply with the Voting Rights Act, and thus it rejected any plans that did not have such a district. Findings of Fact ¶¶ 31–34. The Defendants' proposed findings of fact and conclusions of law in *Caster* and *Milligan* recognize that this was legal error. *Milligan*, ECF No. 267 at 86 ("A VRA-compliant plan does not require a magic number of majority-minority districts, nor does it require hitting a racial target of 50% BVAP in any one district."). Because the Legislature lacked any basis, much less a "strong basis in evidence," to believe that a majority-Black district was necessary, the 2021 Plan was plainly unconstitutional under *Cooper v. Harris*, 581 U.S. at 292–93, 306 ("North Carolina's belief that it was compelled to redraw District 1 (a successful crossover district) as a majority-minority district rested not

on a 'strong basis in evidence,' but instead on a pure error of law.").[12]

104.    One might think that the Legislature would have changed its attitude toward the Jefferson County split after the *Singleton* Plaintiffs pointed out this error of law in their prior briefing. One would be wrong. Even though the Jefferson County split had been the most egregious feature of the race-driven 2021 Plan, the 2023 Legislature decided to keep it. The proximity between the two plans is further circumstantial evidence that the 2023 Legislature intended to maintain race-based district lines in Jefferson County. *See Jacksonville*, 635 F. Supp. 3d at 1287 ("On the current record, the circumstantial evidence considered in combination with the historical evidence presents a virtually unrebutted case that the Challenged Districts exist as they do in the Enacted Plan as a result of racial gerrymandering.").

## I.    No Court Has Ever Ratified the 1992 Plan or Its Successors.

105.    No court has ever ratified the constitutionality of the 1992 Plan or its successors. Although the Supreme Court summarily affirmed two orders of the

---

[12] In 2023, the *Caster* and *Milligan* Plaintiffs submitted to the Legislature a proposed remedial plan, which they stated "is based on the Plaintiffs' illustrative plans," Ex. 11 at 2, all of which had the creation of two majority-Black districts as a non-negotiable criterion. Because the Singleton Plan has demonstrated that it is possible to create two opportunity districts without using race to draw district lines, the *Caster* and *Milligan* plan is also unconstitutional under *Cooper v. Harris*. The Supreme Court's holding that race did not predominate in the majority-Black illustrative plans, "created with an express target in mind," was limited to what Section 2 plaintiffs must do "to satisfy the first step of *Gingles*." *Allen*, 143 S. Ct. at 1512. This Court's preliminary injunction says if the State's plan is determined to violate Section 2, any remedial plan will be "subject to the rule that a district drawn in order to satisfy § 2 must not subordinate traditional districting principles to race substantially more than is reasonably necessary to avoid § 2 liability." *Singleton*, 582 F. Supp. 3d at 959 (citing *Vera*, 517 U.S. at 978–79) (cleaned up).

three-judge district court in *Wesch v. Hunt*, neither appeal turned on whether it is constitutional to separate voters by race when drawing Congressional districts. The first appeal, by Governor Hunt, complained that the district court had failed to adopt a plan passed by the Legislature that also used race as the predominant factor in creating a supermajority-Black district. Jurisdictional Statement, *Figures v. Hunt*, 1992 WL 12012173, at *2–3 & n.1 (June 5, 1992). The second appeal, by the plaintiffs, challenged the district court's decision not to modify its plan to comply with guidance from the Justice Department that a second majority-Black district must be created. *Id.* at *3–5. Each time the appellants were asking the Supreme Court to order the district court to engage in more race-based line drawing, and each time the Supreme Court refused.

106.    In fact, had *Wesch* been decided just one year later, it likely would have rejected what became the 1992 Plan as an unconstitutional racial gerrymander. In 1992, when *Wesch* created a new district designed to be at least 65% Black, the Louisiana State Legislature did the same: it created a new district that was 63% Black to increase Black representation in Congress. *Hays v. Louisiana*, 839 F. Supp. 1188, 1191, 1205 (W.D. La. 1993). The Louisiana plan was challenged in district court as a racial gerrymander. While the litigation was pending, the Supreme Court decided in *Shaw v. Reno* that segregation of voters by race is unconstitutional unless it satisfies strict scrutiny. Relying on *Shaw*, the district court held that "the Plan in

general and Louisiana's Congressional District 4 in particular are products of racial gerrymandering and are *not* narrowly tailored to further any compelling governmental interest," and it enjoined the use of the Louisiana plan. *Id.* at 1191. The facts on which the court relied, including the irregular shape of the new district and legislators' admissions that they intended to use race to create the district, are similar to the facts of *Wesch*, in which an irregular district was created, and all parties and the Court acknowledged that race was the reason. Therefore, the fact that *Wesch* was decided the way it was, before *Shaw v. Reno*, does not imply in any way that District 7 is constitutional.[13]

107.   The lack of constitutional challenges to the 1992, 2001, and 2011 Plans also does not imply that these plans are constitutional. *Shaw* held that a racial gerrymander may be constitutional if it "is narrowly tailored to further a compelling governmental interest," 509 U.S. at 658, and the Supreme Court has assumed ever since that complying with the Voting Rights Act is a compelling interest. *Cooper v. Harris*, 581 U.S. at 292. Therefore, if the 1992 Plan, the 2001 Plan, or the 2011 Plan had been challenged as an unconstitutional racial gerrymander, the defendants could have argued that racial gerrymandering was required to prevent vote dilution under Section 2, or retrogression under Section 5. Whether or not those defenses would

---

[13] The district court's opinion in *Hays* was later vacated when the Louisiana State Legislature passed another districting plan. 114 S. Ct. 2731 (1994).

have prevailed, they would have been colorable. Therefore, while these Plans were obvious racial gerrymanders, they were not obviously unconstitutional racial gerrymanders. Especially in light of the Justice Department's uncompromising stand on retrogression, it is unsurprising that they continued to be reenacted in essentially the same form every cycle, and that they were not challenged in court.

108. By the 2020 redistricting cycle, however, the only legitimate justification for Alabama's racial gerrymander had disappeared. In 2013, the Court held the coverage formula in Section 4 of the Voting Rights Act, which subjected Alabama to Section 5, unconstitutional. *Shelby County v. Holder*, 570 U.S. 529 (2013). As Secretary Merrill explained in 2019, "Today, with Section 5 effectively tabled, Alabama has more liberty to draw its districts differently." Ex. S40 (*Chestnut* Pre-trial Brief) at 12. And in 2017, the Court held that Section 2 cannot save a racial gerrymander unless the legislature has made a "meaningful legislative inquiry" and developed a "strong basis in evidence" that Section 2 requires the creation of a majority-minority district. *Cooper v. Harris*, 581 U.S. at 305–06. After these cases were decided, Defendant Merrill conceded that District 7 had been racially gerrymandered in 1992, and he stated that he "does not believe that the law would permit Alabama to draw that district today if the finger into Jefferson County was for the predominate [sic] purpose of drawing African American voters into the district." Ex. S40 (*Chestnut* Pre-trial Brief) at 11. The Defendants have disclaimed

any argument that the 2023 Plan can survive strict scrutiny, 8/15/23 Tr. at 82, so if the 2023 Plan is racially gerrymandered, it is necessarily unconstitutional.

>    **J.   Racial Gerrymanders Do Not Become Constitutional Merely Through the Passage of Time.**

109.   In their response to the Plaintiffs' objection, the Defendants posit that "[e]ven if the 'original purpose' motivating a law is problematic, 'the passage of time may obscure that sentiment.'" ECF No. 162 at 12 (quoting *Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067, 2083 (2019)). The Defendants rely only on cases involving the Establishment Clause and felon disenfranchisement, probably because this principle has never been applied in the context of racial gerrymandering. As explained above, a *Shaw* claim is unique: it requires a plaintiff to prove only that the Legislature intended to enact lines that separate voters by race. The "expressive harm" that voters suffer because of this separation does not disappear any more than the harm from riding segregated buses would disappear because it had persisted for decades. *Miller v. Johnson*, 515 U.S. 900, 911 (1995) ("Just as the State may not, absent extraordinary justification, segregate citizens on the basis of race in its public parks, buses, golf courses, beaches, and schools, so did we recognize in *Shaw* that it may not separate its citizens into different voting districts on the basis of race.") (citations omitted).

110.   Twice in the past year, district courts in the Eleventh Circuit have rejected arguments that gerrymandered district lines were too old to be

unconstitutional. In *GRACE, Inc. v. City of Miami*, Miami residents challenged a new districting plan for City Commission districts, whose "geographic shape and racial demographic make-up … have remained largely the same since single-member districts were instituted in the City in the late 1990s." 2023 WL 3594310, at *19 (S.D. Fla. May 23, 2023). The defendant argued that the plaintiffs were "25 years too late" in seeking a preliminary injunction, but the court disagreed because "the harms in this case arise from the new Enacted Plan and the result of the most recent redistricting." *Id.* at *15.[14] Similarly, another district court sided with challengers to Jacksonville's redistricting of City Council districts in 2021, even though those districts contained only minor changes to districts drawn in 2011. *Jacksonville Branch of NAACP v. Jacksonville*, 635 F. Supp. 3d 1229 (M.D. Fla. 2022).

### K. The Unconstitutionality of District 7 Arises Not from "Taint" or "Original Sin," but from the District's Shape and Demographics.

111.   The Defendants have relied on *Abbott v. Perez*, 138 S. Ct. 2305, 2318 (2018), but that opinion helps show how the Defendants have mischaracterized the Plaintiffs' claims by accusing them of assigning one Legislature's motives to another. The portion of *Abbott* on which the Defendants have relied is inapposite to

---

[14] The district court enjoined the use of Miami's Commission districts, but the Eleventh Circuit stayed that order because it was issued too close to the next election. *GRACE, Inc. v. City of Miami*, 2023 WL 5286232 (11th Cir. Aug. 4, 2023).

the Plaintiffs' claims, legally and factually. In *Abbott*, the Court addressed a claim that some districts intentionally diluted the votes of Latinos (a claim of discrimination) and a separate claim that one district was racially gerrymandered. On the intentional discrimination claim, the district court had invalidated districts adopted by the Texas Legislature in 2013 based on plans developed by the court itself, solely because the Texas Legislature had not cured the "taint" of a previous legislature that had enacted different, intentionally discriminatory districts. 138 S. Ct. 2305, 2318 (2018).

112.   The portion of *Abbott v. Perez* that more closely corresponds to the *Singleton* Plaintiffs' claims is Part IV.B, which affirmed a finding of racial gerrymandering on the merits. 138 S. Ct. at 2334–35. There, it was undisputed that a district's lines were drawn the way they were because of race, and the Court rejected the Legislature's evidence that race-based line drawing was necessary to satisfy Section 2 of the Voting Rights Act. *Id.*

113.   Here, the Alabama Legislature carried forward, with minimal changes, district lines undisputedly drawn for predominantly racial purposes. It is the carrying forward of race-driven lines, not the carrying forward of any taint or ill intent, that makes District 7 a racial gerrymander. The shape and demographics of District 7 are sufficient to carry the *Singleton* Plaintiffs' evidentiary burden. Therefore, a finding of racial gerrymandering here is consistent with *Abbott v. Perez. See Jacksonville*,

635 F. Supp. 3d at 1288 ("To apply core preservation in the way the City asserts in this case would mean that once enacted, a legislature could perpetuate racially gerrymandered districts into the future merely by invoking a 'neutral' desire to maintain existing lines. This is not what *Abbott* holds.") (footnote omitted).

114.   The Supreme Court's statement in *Easley v. Cromartie* that "the Constitution does not place an affirmative obligation upon the legislature to avoid creating districts that turn out to be heavily, even majority, minority" also is inapposite to the Plaintiffs' claims. 532 U.S. 234 (2001). The Plaintiffs' claim is not that District 7 is unconstitutional because it is majority-Black, but because its lines separate voters by race in Jefferson County. Moreover, District 7 did not just "turn out" to be majority-minority; it was admittedly designed predominantly for that purpose in 1992, and the shape of the Jefferson County part of that still majority-Black district admittedly has been reenacted without substantial change.

### IV.   Even if the Court Finds the Defendants Liable for Violating the Voting Rights Act, It Should Also Decide the *Singleton* Constitutional Claim.

115.   When this Court found that the 2021 Plan violated the Voting Rights Act, it deferred ruling on the *Singleton* constitutional claim. *Singleton*, 582 F. Supp. 3d at 1034–35. It credited the Defendants' assertion that the VRA and Equal Protection issues are "intertwined," and this Court likely would receive guidance from the Supreme Court on how to reconcile them. ECF No. 114 at 8. Now, in this

remedy phase on remand, Defendants acknowledge that the 2023 Plan must satisfy both the statutory and constitutional standards governing redistricting: "*Allen,* in addressing whether the there was a VRA violation in the 2021 Plan, did not decide any Equal Protection Clause claims regarding the constitutionality of any proposed remedy that will now govern every voter in the State of Alabama. Any such remedy must be consistent with the Supreme Court's Equal Protection Clause cases …." *Milligan*, ECF No. 267 at 90. Arguably, this Court cannot avoid addressing the *Singleton* Plaintiffs' claim before conducting a race-based analysis under the Voting Rights Act. At the very least, prudence dictates ruling on the constitutionality of the 2023 Plan even if the Court finds liability under the Voting Rights Act, for three reasons:

116. *First*, the Defendants appear determined to challenge the constitutionality of the Voting Rights Act at the Supreme Court, as they did in their prior appeal. Although the Court disagreed, three dissenting Justices opined that the Voting Rights Act is unconstitutional for a reason the Defendants did not assert, and Justice Kavanaugh essentially invited the Defendants to raise this reason in a subsequent appeal. *Allen v. Milligan*, 143 S. Ct. 1487, 1543–44 (2023) (Thomas, J., dissenting); *id.* at 1519 (Kavanaugh, J., concurring) ("Justice THOMAS notes, however, that even if Congress in 1982 could constitutionally authorize race-based redistricting under § 2 for some period of time, the authority to conduct race-based

redistricting cannot extend indefinitely into the future. But Alabama did not raise that temporal argument in this Court, and I therefore would not consider it at this time.") (citation omitted). The Defendants' proposed findings of fact and conclusions of law in *Caster* and *Milligan* lay the groundwork to accept this invitation and possibly raise other constitutional challenges as well. *Milligan*, ECF No. 267 at 94–96. Thus, the next appeal in this case could raise serious questions about the constitutionality of the Voting Rights Act.

117.   While the canon of constitutional avoidance prioritizes decisions on statutory grounds over decisions on constitutional grounds, the potential for a challenge to the constitutionality of the Voting Rights Act itself raises an even more serious prudential concern. In this context, "the duty of the federal courts to avoid the unnecessary decision of constitutional questions," *Ala. State Fed'n of Labor v. McAdory*, 325 U.S. 450, 470 (1945), would be best fulfilled if this Court gives the Supreme Court an opportunity to avoid declaring the Voting Rights Act unconstitutional. *See Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018) ("When a serious doubt is raised about the constitutionality of an act of Congress, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.") (cleaned up).

118.   The *Singleton* plaintiffs' racial gerrymandering claim raises no significant constitutional issues, despite its basis in the Equal Protection Clause. That

is because the claim boils down to one simple factual question: did race predominate in the creation of the 2023 Plan? If it did, strict scrutiny applies. *Cooper v. Harris*, 581 U.S. at 291–92. While in some cases strict scrutiny involves difficult constitutional questions, no such questions arise here because the Defendants do not even attempt to satisfy strict scrutiny. Thus, if race predominated, the 2023 Plan is an unconstitutional racial gerrymander. The Court's decision would break no new ground, and it would fit neatly within an uncontroversial line of precedent.

119. *Second*, a decision on the constitutional claim will prevent the Defendants exploiting this Court's silence to misrepresent the issues at the Supreme Court again. In *Singleton*, it was contested whether the 2021 Plan was race-neutral, or if race predominated in its creation. By deferring a decision in *Singleton*, this Court did not resolve that dispute. But at the Supreme Court in *Caster* and *Milligan*, the Defendants acted as if it had been resolved in their favor, describing the 2021 Plan as race-neutral at least twenty-eight times, including on the first page of their stay application, merits brief, and reply brief, and at the beginning and end of their oral argument. *Allen v. Milligan*, No. 21-1086 (S. Ct.), Emergency Application for Administrative Stay et al. at 1, 2, 35; Reply in Support of Emergency Application for Administrative Stay et al. at 17 n.9, 21; Brief for Appellants at 1, 2, 31, 53, 54, 56, 57, 64, 70, 74, 77, 78; Reply Brief for Appellants at 1, 4, 6, 30, 122; Oral Argument Tr. at 4, 5, 62. Never did the Defendants acknowledge that this issue was

undecided or controversial. By deciding the *Singleton* constitutional claim, this Court can provide clarity to the Supreme Court and prevent the Defendants from eliding the threshold question whether District 7 in the 2023 Plan is an unconstitutional racial gerrymander.

120.   *Third*, the issues presented in *Singleton* overlap with issues that will arise in the special master proceedings, and therefore will need to be decided anyway. Those issues include the extent to which a mapdrawer can constitutionally retain district lines that were originally based on race, and what justifications are required when a mapdrawer uses race in creating a plan. Because the special master and cartographer will need clear instructions from this Court, these issues cannot be deferred until after the Supreme Court decides the next appeal; they must be decided soon. Therefore, the prudential concerns that typically motivate the canon of constitutional avoidance are substantially reversed here.

## V.   The Remaining Preliminary Injunction Requirements—Irreparable Injury, Balance of Harms, and Public Policy—Are Met Here.

121.   When it enjoined the 2021 Plan, this Court held that the *Caster* and *Milligan* Plaintiffs had met the remaining requirements for a preliminary injunction. *Singleton*, 582 F. Supp. 3d at 1026–29. Those requirements continue to be met here, and the Defendants have not argued otherwise. Therefore, if the *Singleton* Plaintiffs are likely to succeed on their merits of their claim, they are entitled to a preliminary

injunction.

## PROPOSED ORDER

1.      The 2023 Plan is racially gerrymandered and likely violates the Equal Protection Clause of the Fourteenth Amendment.

2.      The Secretary of State, his officers, agents, and those working in concert with them or at their direction are enjoined from conducting any future election using the 2023 Plan.

3.      The Court shortly will enter an order scheduling proceedings leading to adoption of a Congressional redistricting plan that complies with Section 2 of the Voting Rights Act and the Equal Protection Clause.  Pursuant to the Omnibus Order entered August 1, 2023, ECF No. 154, the plaintiffs in *Singleton*, *Milligan*, and *Caster* will be afforded the opportunity to submit remedial maps for the Special Master to consider and to otherwise participate to the same degree in proceedings before the Special Master.

Dated: August 21, 2023                    Respectfully submitted,

                                          */s/ Henry C. Quillen*
                                          Henry C. Quillen
                                          (admitted *pro hac vice*)
                                          WHATLEY KALLAS, LLP
                                          159 Middle Street, Suite 2C
                                          Portsmouth, NH  03801
                                          Tel: (603) 294-1591
                                          Fax: (800) 922-4851
                                          Email: hquillen@whatleykallas.com

Joe R. Whatley, Jr.
W. Tucker Brown
WHATLEY KALLAS, LLP
2001 Park Place North
1000 Park Place Tower
Birmingham, AL 35203
Tel: (205) 488-1200
Fax: (800) 922-4851
Email: jwhatley@whatleykallas.com
       tbrown@whatleykallas.com

*/s/ James Uriah Blacksher*
James Uriah Blacksher
825 Linwood Road
Birmingham, AL 35222
Tel: (205) 612-3752
Fax: (866) 845-4395
Email: jublacksher@gmail.com

Myron Cordell Penn
PENN & SEABORN, LLC
1971 Berry Chase Place
Montgomery, AL 36117
Tel: (334) 219-9771
Email: myronpenn28@hotmail.com

Diandra "Fu" Debrosse Zimmermann
Eli Hare
DICELLO LEVITT GUTZLER
420 20th Street North, Suite 2525
Birmingham, AL 35203
Tel.: (205) 855.5700
Email: fu@dicellolevitt.com
       ehare@dicellolevitt.com

U.W. Clemon
U.W. Clemon, LLC
Renasant Bank Building
2001 Park Place North, Tenth Floor
Birmingham, AL 35203

Tel.: (205) 506-4524
Fax: (205) 538-5500
Email: uwclemon1@gmail.com

Edward Still
2501 Cobblestone Way
Birmingham, AL  35226
Tel: (205) 335-9652
Fax: (205) 320-2882
Email: edwardstill@gmail.com

***Counsel for Singleton Plaintiffs***