FILED

2023 Aug-21  PM 04:59
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| BOBBY SINGLETON, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No.: |
| v. | ) | 2:21-cv-1291-AMM |
| | ) | |
| WES ALLEN, *in his* | ) | THREE-JUDGE COURT |
| *official capacity as Alabama* | ) | |
| *Secretary of State, et al.* | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' JOINT PROPOSED
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Pursuant to this Court's Orders, Secretary of State Allen, Senator Livingston, and Representative Pringle respectfully submit their proposed findings of fact and conclusions of law.

## FINDINGS OF FACT

### A.  Parties

1.  Plaintiffs are Senator Bobby Singleton, Senator Rodger Smitherman, Eddie Billingsley, Leonette W. Slay, Darryl Andrews and Andrew Walker.

2.  Defendant Wes Allen is the Alabama Secretary of State and the chief elections official in the State of Alabama. Secretary Allen is sued in his official capacity.

1

3.      Senator Steve Livingston and Representative Chris Pringle are the Senate and House Chairs, respectively, of the Alabama Permanent Legislative Committee on Reapportionment ("the Committee"). Ala. Code § 29-2-51. They are defendants in their official capacities as Chairs of the Committee.

4.      The Committee is tasked with making a "continuous study of the reapportionment problems in Alabama seeking solutions thereto" and reporting its investigations, findings, and recommendations to the Legislature as necessary for the "preparation and formulation" of redistricting plans for the Senate, House, State Board of Education, and congressional districts in the State of Alabama. Ala. Code §§ 29-2-51, 29-2-52.

5.      Plaintiff Bobby Singleton is an Alabama State Senator, and he testified at both preliminary injunction hearings. *Singleton* Doc. 86 at 35-76; *Singleton* Doc. 185 at 32-58.

B.  **Continuity in Alabama's Congressional Maps**

6.      Following the 1970 census, Alabama dropped from eight seats in Congress to seven.[1] *Singleton* Doc. 57-7.

7.      The congressional districts Alabama has since used have generally maintained certain cores, even as population has shifted over the decades.

---

[1] Throughout this document, the term "Congress" and variations of it to refer to the U.S. House of Representatives. U.S. Senators are elected statewide and are not the focus of this litigation.

C. **The 1992 Map**

8.     Alabama's first majority-black congressional district, District 7, was imposed by court order in 1992. *See Wesch v. Hunt*, 785 F. Supp. 1491 (S.D. Ala. 1992) (three-judge court), *aff'd sub nom. Camp v. Wesch*, 504 U.S. 902 (1992), *Figures v. Hunt*, 507 U.S. 901 (1993).

9.     In 1990, the Alabama Legislature created the Permanent Legislative Committee on Reapportionment to lead redistricting efforts in the 1992 cycle. *Milligan* Doc. 82-22 at 2.

10.     The Committee held public meetings and reviewed numerous proposed congressional redistricting plans in September and October 1991, expecting the Alabama Governor to call a special session for redistricting that fall. *Id.* at 3-4. He did not do so. *Id.* at 4.

11.     Instead, on September 23, 1991, a plaintiff filed suit against the Governor and other State officials, alleging that holding the 1992 elections with the then-existing congressional plan would violate the United States Constitution. *See Wesch v. Hunt*, 785 F. Supp. 1491 (S.D. Ala. 1992). Intervenors joined the case "on their own behalf and on behalf of all African-American citizens of the State of Alabama," raising a Section 2 claim. *Id.* at 1493.

12.     The Committee continued its work developing a congressional plan for the 1992 election. *See Milligan* Doc. 82-22 at 4. "Virtually all" congressional plans

submitted to the Committee contained one "solid" majority-black district. *Id.* The Committee considered creating a plan with "two predominantly black districts," *id.* at 9, but no tenable two-majority-black-district plan was submitted to the Committee or introduced in the Legislature, *Milligan* Doc. 82-23 at 5.

13.     In the *Wesch* litigation, the intervenors submitted a plan that created two districts "with an African-American population of 59.33% and 61.98% respectively," but intervenors informed the court that they doubted African-Americans would have an "opportunity to elect candidates of their choice in these districts." *Wesch*, 785 F. Supp. at 1496.

14.     Alabama's most prominent black political leaders vocally opposed a congressional map with two majority-black districts. *See Milligan* Doc. 82-22 at 9.

15.     Four of Alabama's most prominent black political leaders testified before the Committee: Joe Reed, Chair of the Alabama Democratic Conference ("ADC")[2]; Jerome Gray, the ADC's Field Director; Albert Turner Sr., a "west Alabama political veteran" affiliated with the Alabama New South Coalition; and Lillian Jackson, President of the Alabama NAACP. *Id.*

---

[2] The ADC refers to itself as "the Black Caucus of the Alabama Democratic Party." Alabama Democratic Conference, Homepage, www.theadc.org (last visited August 17, 2023).

16.    Mr. Gray stated he had "serious reservations regarding whether blacks can get elected in either one of the districts" in a plan with two majority-black districts. *Milligan* Doc. 82-23 at 2.

17.    Mr. Turner Sr. was less circumspect: "I have no intention at all of trying to support a [map with] two black congressional seats in Alabama. I think it's ludicrous, to be honest with you. I don't see no possibility of having two seats that black folks can win in Alabama." *Id.* at 3.

18.    And Ms. Jackson made clear that the Alabama NAACP—a Plaintiff in this litigation—would not support a map with two majority-black districts, stating that such a plan would "lessen our chances of getting a minority or a black elected to [C]ongress. It would weaken our ability to raise funds or the candidate's ability because the resources would be greatly split." *Id.* at 4.

19.    On February 27, 1992, the Alabama Legislature passed a plan containing one majority-black district. *Milligan* Doc. 82-22 at 5. After the Legislature overrode a gubernatorial veto on March 5, *id.*, the State submitted the plan to the Department of Justice for preclearance on March 10, 1992, *id.* at 1.

20.    Meanwhile, a two-day trial occurred before a three-judge court. *Wesch v. Hunt*, 785 F. Supp. at 1492.

21.    On January 3, during the trial, the parties stipulated that "the African American population in the State of Alabama is sufficiently compact and contiguous

to comprise a single member significant majority (65% or more) African American Congressional district" and that such a district "should be created." *Milligan* Doc. 86-18.

22.     On March 9, the court declared unconstitutional the State's then-existing map (enacted in the 1980s) because of the State's failure to timely redraw its congressional map. 785 F. Supp. at 1500-01.

23.     The court denied the State's motion to adopt the legislative plan and ordered the State to adopt a court-ordered plan that ensured District 7 would have at least a 65% black majority, while "maintaining the cores of existing Districts 1 and 2," and thus "better preserv[ing] the communities of interests in those two districts" than the only other plan submitted to the court that achieved population equality among the districts. *Wesch*, 785 F. Supp. 1495-97. As a result, if the Department of Justice precleared the State's plan by March 27, it would take effect; otherwise, 1992 elections would occur using the court's plan. *Id.* at 1501.

24.     On March 27, the Department of Justice denied preclearance. It emphasized "at the outset the extreme time constraints imposed by the order of the Court." *Milligan* Doc. 82-18 at 1. "For that reason, our review to date necessarily has been limited, and similarly, the short time available has limited the state's ability to meet its burden under Section 5." *Id.*

25.     At this time during the 1990s, the Department of Justice was enforcing a "max-black" policy that the Supreme Court later held to be a misapplication of the Voting Rights Act. *Milligan* Doc. 53 at 9; *see also Miller v. Johnson*, 515 U.S. 900, 924-25 (1995).

26.     Accordingly, the State's plan never took effect.

27.     The State sought to stay the three-judge court's order on March 24, 1992, but the Supreme Court denied the application, *Camp v. Wesch*, 503 U.S. 954 (1992), and summarily affirmed the three-judge court, *Camp v. Wesch*, 504 U.S. 902 (1992).

28.     An illustration of the 1992 Map is repro-
duced here. *See also Singleton* Doc. 15 at 26; *Wesch*, 785 F. Supp. at 1582.



D.     **The 2002 and 2011 Maps**

29.     Both the 2002 and 2011 maps maintained the cores of preexisting districts, changing them only to equalize population. *See Milligan* Doc. 86-18 at 8, 11.

30.     In response to 2000 Census data, Alabama adopted new lines for its Congressional Districts in 2002 in Ala. Act No. 2002-57.

31.     Ala. Act No. 2002-57 was sponsored by Sen. Hank Sanders, a black Democrat. PI Tr. 63:6-64:1 (*Singleton* Doc. 86); 1217:17-24 (*Singleton* Doc. 86-4).

32.     Plaintiff Bobby Singleton—a State Senator—testified that Sen. Sanders was not known for sponsoring legislation intended to harm African-American voters. PI Tr. 64:2-4 (*Singleton* Doc. 86). Sen. Singleton further testified that, although he viewed the 2002 Map as a gerrymander, he thought that Sen. Sanders "did what they thought was safe, to make sure that we at least had a voice, … whether it was gerrymandering or not." *Id.* at 62:21-63:2, 64:5-13.

33.     Ala. Act No. 2002-57 was signed into law by Governor Don Siegelman, a Democrat.

34.     Following the 2010 Census, Randy Hinaman was hired by the Congressional delegation to draw a congressional districting map to be submitted to the Alabama Legislature. *Milligan* Doc. 86-19 at 11.

35.     That effort "essentially … was updating the 2001 map based on demographic changes that happened over the last ten years and" working with the Congressional delegation. *Milligan* Doc. 86-19 at 11. Most officeholders "would not go into a redistricting process looking for wholesale change." *Id. See also id.* at 13 ("[T]he people who were paying me to draw these maps preferred the districts similar to how they were."); *id.* at 14 ("[T]hey preferred to have their districts as close to what they had under that map going forward.").

8

36.     Hinaman used the 2002 Congressional map as a starting point for the 2011 Congressional map. *Milligan* Doc. 86-19 at 11.

37.     Hinaman did not seek to achieve any racial target when he drew District 7 of the 2011 congressional map. *Milligan* Doc. 86-19 at 12.

38.     The 2011 Congressional map was used for the 2012, 2014, 2016, 2018, and 2020 Congressional elections.

39.     Both the 2002 and 2011 maps received preclearance from the Department of Justice. Neither was ever deemed unlawful. They are reproduced below. *See also Singleton* Doc. 15 at 9, 28.




E.    **The 2021 Map**

40.    On May 5, 2021, at its first public meeting of the redistricting cycle, the Committee enacted guidelines for the 2021 redistricting plan. *See Milligan* Doc. 83-32.

41.    The guidelines were approved by a bipartisan vote of the Committee, with Plaintiff Senator Bobby Singleton voting for the guidelines. *Singleton* Doc. 68-8 at 2. Among other criteria, the guidelines expressed a policy of preserving the cores of districts.

42.    The Census Bureau provided initial redistricting data to Alabama on August 12, 2021. *See Singleton* Doc. 171-4 at 10.

43.    Sen. McClendon and Rep. Pringle provided the Legislature's map-drawer, Randy Hinaman, with the Guidelines. *See Milligan* Doc. 89-2 at 28. The Committee directed Hinaman "to follow the guidelines and to draw [the assigned] plans race neutral, without looking at race until after he had developed a plan." *Id.* (107:12-15).

44.    Hinaman used the 2011 congressional map as the starting point for the 2021 congressional map.  *Milligan* Doc. 86-19 at 57.

45.    Throughout this drafting, Hinaman again talked individually "with all of the members of congress … or their chief of staff" to discuss the 2020 Census data and potential map adjustments, though "Representative Palmer decided not to

take [Hinaman's] final [telephone] call." *Milligan* Doc. 86-19 at 22. During these conversations, they talked about changes that needed to be made based on population shifts and Hinaman would "share [his] screen to be able to show [the member of Congress] what the map look[ed] like." *Id.* The conversations were about "[t]heir specific districts and an adjacent district if there was some change there." *Id.*

46.     Hinaman did not "officially attend" the public hearings, but sometimes heard parts of them. *Milligan* Doc. 86-19 at 23-24. Then-Chair Jim McClendon, Chair Pringle, or counsel Walker would sometimes inform Hinaman of significant comments, like the desire for Montgomery to not be split among three Districts. *Milligan* Doc. 86-19 at 23-24. Hinaman also understood that "the Shoals area wanted to be kept as intact as possible," and people in Madison and Morgan counties considered themselves a community of interest, and "[p]eople in Baldwin and Mobile wanted to be kept together." *Id.*

47.     Chair McClendon offered unrebutted testimony that he did not instruct Hinaman to include a majority-black district, and that he did not "decide ahead of time that Alabama's plan must include a majority-black district." *Milligan* Doc. 89-3 at 29.

48.     Chair Pringle offered unrebutted testimony that he did not instruct Hinaman to create a majority-black district or to assign "particular demographics"

to any district, that he is unaware of anyone who would have provided such instructions, and that he did not "decide in advance that there had to be a majority-black district." *Milligan* Doc. 89-2 at 36.

49.   Hinaman followed the redistricting guidelines as he drafted a map for the Legislature. *Milligan* Doc. 86-19 at 35.

50.   "Preserving cores of existing districts was a guideline for the 2021 map." *Milligan* Doc. 86-19 at 11.

51.   Hinaman "used [the] 2011 congressional map"—or, "the cores of the existing districts"—as his "starting point in drafting the 2021 congressional map." *Milligan* Doc. 86-19 at 24-25.

52.   Because 2020 Census data showed District 7 was significantly under-populated, Hinaman altered its footprint to increase that district's population. *Milligan* Doc. 86-19 at 25.

53.   While adding population to District 7, Hinaman "didn't look at race at all." *Milligan* Doc. 86-19 at 25-26.

54.   Upon completing his final draft, and just one "week before the special session" scheduled for the Legislature to vote on the Congressional map, Hinaman for the first time examined the racial composition of the map in order to "comply with the Voting Rights Act." *Milligan* Doc. 86-19 at 26.

55.     Prior to evaluating the map for possible VRA issues, the only data Hina-man analyzed was "total pop[ulation] and geography," *Milligan* Doc. 86-19 at 26; thus, the only factors he considered when making any alteration to the 2011 map were race-neutral, *id*.; *see also id*. at 37-38 ("I made sure that when I added—I used traditional redistricting principles of total pop and geography considerations to add and subtract to these districts, and that that was not based on race.").

56.     "[O]nce we turned race on, nobody asked [Hinaman] to make any changes to District 7 or any other district." *Milligan* Doc. 86-19 at 45.

57.     Hinaman worked to make District 7 more compact by widening "it as it goes into Jefferson County and eliminate some of the longer, further-away [pre-cincts] at the northern part of the county[,]" all while "picking up whole precincts" and trying not to split any. *Milligan* Doc. 86-19 at 34. There are two precinct splits, one to pick up the incumbent's residence and the other to reach ideal population. *Id.* at 34-35. He also made District 7 more compact. *Id.* at 45. Hinaman eliminated District 7's finger-like protrusion into Jefferson County. *Id.*

58.     Rep. Sewell "felt strongly about picking up facilities and universities" and the military. *Milligan* Doc. 86-19 at 27, 30.

59.     Hinaman had split Alabama State University (in Montgomery) into two different districts, and Rep. Sewell "wanted it all in her district," "[s]o [Hinaman] put it back together." *Milligan* Doc. 86-19 at 27, 30.

60.     Rep. Sewell wanted all of the University of Alabama (in Tuscaloosa) in her District. *Milligan* Doc. 86-19 at 30.

61.     Rep. Sewell wanted Maxwell Air Force base (in Montgomery) in her District. *Milligan* Doc. 86-19 at 30.

62.     Hinaman testified that for Jefferson County, some Homewood precincts were in District 6 and some were in District 7 in the 2011 Congressional Map. Rep. Sewell "thought that maybe it might make sense for all of them to be in one district. She would be happy if they were [put] in hers, which [Hinaman] did." *Milligan* Doc. 86-19 at 30.

63.     The Congressional delegation were asked for their home addresses early in the process in order to ensure each Representative was drawn into his or her District.  Rep. Sewell provided both the address where she resides and a second address in Dallas County where she grew up, as she wanted both in her District. *Milligan* Doc. 86-19 at 30, 58.  Rep. Sewell lives about a mile from Rep. Palmer, with the former in Jefferson County and the latter living in Shelby County. *Id.* at 58.

64.     After the final draft was complete, Hinaman's VRA check with the mapmaking software revealed that District 7 contained approximately 55% black[3] voting-age population ("BVAP").

---

[3] This definition accounts for anyone who identified as "black" on the census, either alone or in addition to another racial identification.

65.     In the 2011 plan, by comparison, District 7 was approximately 60.5% BVAP. *See Milligan* Doc. 53 at 11.

66.     Sen. McClendon testified that the BVAP statistic was not generated until after the districts were drawn. *Milligan* Doc. 89-3 at 23.

67.     Moreover, Sen. McClendon testified that the Legislature did not seek to effect any BVAP threshold. *Milligan* Doc. 89-3 at 23.

68.     Both houses of the Legislature and their respective committees had the opportunity to consider the map and propose alternatives. *See, e.g.*, PI Tr. 71:18-72:11 (*Singleton* Doc. 86) (Sen. Singleton agreeing that "any member of the Legislature … could have drawn and introduced their own plan," and that he "could have presented another plan to the reapportionment committee").

69.     Governor Ivey called a special legislative session on redistricting to begin on October 28, 2021. *Milligan* Doc. 53 at 19.

70.     The Committee released the draft congressional map and draft maps for the State House, Senate, and Board of Education to the public and held a public meeting on October 26, 2021. *Milligan* Doc. 53 at 19-20.

71.     All four maps passed out of the Committee along partisan lines. *Milligan* Doc. 53 at 21.

72.   The full House considered the congressional plan on November 1, 2021. *Milligan* Doc. 53 at 22. It considered various substitute plans from both Republicans and Democrats, none of which was adopted. *Id.* at 22.

73.   The House passed the plan by a vote of 65 to 38. *Milligan* Doc. 53 at 22.

74.   The full Senate considered the congressional map on November 3, 2021. *Milligan* Doc. 53 at 22. Like the House, the Senate rejected several alternative plans. *Id.*

75.   The Senate passed the plan by a vote of 22-7 along partisan lines. *Milligan* Doc. 53 at 22.

**F.  Litigation**

76.   The *Singleton* Plaintiffs, the *Milligan* Plaintiffs, *Milligan v. Allen*, Case No. 2:21-cv-1530-AMM (N.D. Ala.) (three-judge court), and the *Caster* Plaintiffs, *Caster v. Allen*, Case No. 2:21-cv-1536-AMM (N.D. Ala.), all challenged the 2021 Plan.

77.   The *Singleton* Plaintiffs challenged the 2021 Plan as a violation of the Equal Protection Clause. *Singleton* Doc. 15.

78.   The *Milligan* Plaintiffs challenged the 2021 Plan as a violation of Section 2 of the Voting Rights Act and the Equal Protection Clause. *Milligan* Doc. 1.

79.    The *Caster* Plaintiffs challenged the 2021 Plan as a violation of Section 2 of the Voting Rights Act. *Caster* Doc. 3.

80.    This Court granted the *Milligan* and *Caster* Plaintiffs a preliminary injunction on § 2 grounds. *Singleton* Doc. 88; *Milligan* Doc. 107; *Caster* Doc. 101. *Singleton v. Merrill*, 582 F. Supp. 3d 924, 936 (N.D. Ala. 2022) (three-judge court) (per curiam) ("[W]e **PRELIMINARILY ENJOIN** Secretary Merrill from conducting any congressional elections according to the Plan."); *Caster v. Merrill*, No. 2:21-cv-1536-AMM, 2022 WL 264819, *2 (N.D. Ala. Jan. 24, 2022) (same).

81.    This Court "reserve[d] ruling" on the *Singleton* Plaintiffs' Equal Protection claims. *Singleton*, 582 F. Supp. 3d at 937.

82.    The Supreme Court affirmed the Court's finding of a likely § 2 violation in the 2021 Plan.  *Allen v. Milligan*, 143 S. Ct. 1487 (2023).

**G. The 2023 Map**

83.    On June 15, 2023, one week after the Supreme Court's decision, Defendants informed the Court of their understanding "that the Alabama Legislature intend[ed] to enact a new congressional redistricting plan that w[ould] repeal and replace the 2021 Plan, which would obviate the need for a trial" on the legality of the 2021 Plan. *Singleton* Doc. 133 at 2. Defendants explained their understanding of the effect of repealing and replacing the 2021 Plan. If the Legislature succeeded:

> Then, as this Court previously recognized, "'[t]he new legislative plan, if forthcoming, will … be the governing law unless it, too, is challenged

and found to violate' federal law." *Milligan* Doc. 107 at 210-11 (quoting *Wise v. Lipscomb,* 437 U.S. 535, 540 (1978) (opinion of White, J.)).

*Singleton* Doc. 133 at 3.

84.     On June 27, 2023, the Governor called a special session of the Legislature to enact new congressional redistricting legislation. *See Milligan* Doc. 173-1.

85.     On July 17, 2023, the Legislature began a Special Session. *See Milligan* Doc. 173-1.

86.     On July 21, 2023, the Legislature passed, and the Governor signed into law, new redistricting legislation with Act No. 2023-563. *See Milligan* Doc. 220-11. The 2023 Act repeals the 2021 Plan and replaces it with the 2023 Plan.

87.     The 2023 Plan departs from the State's past district lines—a direct response to the *Allen* decision's statement "that a State's adherence to a previously used districting plan can[not] defeat a § 2 claim." *Allen*, 143 S. Ct. at 1505.

88.     The 2023 Plan prioritizes keeping the Black Belt together to the fullest extent possible while still complying with the constitutionally compelled requirement of population equality.

89.     The 2023 Plan also preserves long-recognized communities of interest in the Gulf and Wiregrass.

90.     The Act states [t]he Legislature's intent in adopting the congressional plan … to comply with federal law, including the U.S. Constitution and the Voting Rights Act of 1965, as amended." *Id*. § 17-14-70.1(2).

18

91.     The Act's legislative findings discuss the traditional principles given effect in the 2023 Plan including "minimal population deviation," contiguity, districts "composed of reasonably compact geography," minimizing splits of county lines, maintaining communities of interest, and avoiding pairing of incumbents. *Id.* § 17-14-70.1(3).

92.     The 2023 Plan places the Black Belt into two districts, a change from the 2021 Plan, which followed earlier redistricting plans in placing the 18 Black Belt counties into three or more districts.

93.     The Black Belt counties could not be placed into just one district without violating either principles of contiguity or minimal population deviation because the part of the State south of the Black Belt has too much population for a single congressional district and too little population for two congressional districts.

94.     The 2023 Plan flows from these traditional principles of compactness, county lines, and communities of interest.



*See Milligan* Doc. 200-1.

95.   In the 2023 Plan, core retention takes a back seat to the goal of curing

the division of the Black Belt identified by the § 2 Plaintiffs.

96.   Not a single Black Belt county is split between districts.

97.     Montgomery County is kept whole along with other eastern Black Belt counties in District 2. Several of these counties kept together in District 2 are also part of the Wiregrass region and are combined with other Wiregrass counties to form District 2, consistent with the Act's requirement that the Wiregrass region be kept together. *Id*. § 17-14-70.1(4)(d).

98.     The western Black Belt counties make up nearly all of District 7. District 7 also includes all but one of the five additional counties that are sometimes included in the Black Belt (Washington, Clarke, Monroe, Conecuh, and Escambia).

99.     Only Escambia is placed in District 1 to meet equal population and contiguity requirements.

100.    The changes between the 2021 and 2023 Plans significantly affected every district on the map and are shown below with the 2023 lines superimposed on the 2021 Plan:

**2021 Congressional Plan**

101.   The 2023 Plan respects county lines by splitting them only six times, the minimum number necessary to reach equal population among the districts.

102.   Compactness likewise took priority over core retention in the 2023 Plan. The 2023 Plan is overall more compact than the 2021 Plan.

103.   The 2023 Plan's commitment to simultaneously keeping the Black Belt, Gulf, and Wiregrass communities of interest together to the fullest extent possible resulted not only in increased compactness but also changes in the demographics of Districts 2 and 7 from the 2021 Plan.

104.   District 7 had a Black Voting Age Population of 55.26% in the 2021 Plan. District 7 now has a BVAP of 50.65%. The change is the result of the 2023 Plan's unifying of Montgomery County in District 2.

105.   District 2 had a BVAP of 30.12% in the 2021 Plan. District 2 now has a BVAP of 39.93%, an increase of nearly 33%. *Milligan* Doc. 220-10 at 11, 15.

106.   Alabama's incumbent Members of Congress are: Jerry Carl (District 1); Barry Moore (District 2); Mike Rogers (District 3); Robert Aderholt (District 4); Dale Strong (District 5); Gary Palmer (District 6); and Terri Sewell (District 7).

### H. The *Singleton* Plaintiffs' Equal Protection Claims

107.   The *Singleton* Plaintiffs filed suit challenging the 2011 Plan (as loaded with 2020 Census data) before the 2021 Plan's enactment, alleging that the 2011 Plan created a racially gerrymandered congressional map. *See Singleton* Doc. 1 at 1.

108.   Following passage of the 2021 Plan, the *Singleton* Plaintiffs filed an amended complaint alleging that the 2021 Plan violated the Equal Protection Clause for the same reasons. *See Singleton* Doc. 15 at 2.

109.   The Singleton Plaintiffs' equal protection theory traces back to the 1992 Plan. In their view, that map was drawn to create a majority-black District 7, the 2002 and 2011 congressional plans "perpetuated the racially gerrymandered District 7," the 2021 Legislature "intentionally perpetuated the unconstitutional racial gerry-mandering," *Singleton* Doc. 1 at 1-2, as did the 2023 Legislature, *Singleton* Doc. 147 at 5.

110.   The *Singleton* Plaintiffs later filed objections to the 2023 Plan and moved for a preliminary injunction. *Singleton* Doc. 147.

111.   In Plaintiffs' view, the 2023 Legislature's decision not to affirmatively "remedy the racial gerrymander" is proof enough to show racially predominant intent. *Singleton* Doc. 147 at 16, 27. They also note that plans introduced by Senators Singleton and Smitherman—which did not maintain cores, did pair incumbents, and were less compact than the 2023 Plan—were not enacted by the Legislature. *Id.* at 17-22; *see also Singleton* Doc. 185 at 15 ("The only other interest that the state identified that are important here are core retention and incumbency protection. And I will be the first to admit that on those two measures, the Singleton plan does not perform as well as the enacted plan.").

112.   Senator Singleton testified at the subsequent preliminary injunction hearing held before this Court on August 15, 2023 that he agrees "that it matters *why* a Legislature goes into a county as to whether or not [that county split] is a racial gerrymander." *Singleton* Doc. 185 at 56:15-18.

## CONCLUSIONS OF LAW

### I.   Standard of Review

113.   "A preliminary injunction is an 'extraordinary remedy never awarded as of right.'" *Brown v. Sec'y, U.S. Dep't of Health & Human Servs.*, 4 F.4th 1220, 1224 (11th Cir. 2021) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008)). "Indeed, the grant of a preliminary injunction is 'the exception rather than the rule.'" *Id.* (quoting *United States v. Lambert*, 695 F.2d 536, 539 (11th Cir. 1983)). Thus, "[t]he preliminary injunction is an extraordinary and drastic remedy not to be granted until the movant clearly carries the burden of persuasion as to the four prerequisites. The burden of persuasion in all of the four requirements is at all times upon the plaintiff." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1286 (11th Cir. 1990) (quotations omitted).

114.   Those four prerequisites that a movant must show to obtain a preliminary injunction are: "(1) a substantial likelihood of success on the merits; (2) a likelihood of suffering irreparable harm without a preliminary injunction; (3) that

the threatened injury to the party outweighs any harm that might result to the defendants; and (4) that an injunction is not adverse to the public interest." *Brown*, 4 F.4th at 1224. Where a government entity is involved, "'its interest and harm merge with the public interest,' so [a court] may consider the third and fourth factors together." *Id.* (quoting *Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020)).

## II.   The *Singleton* Plaintiffs Have Not Shown That Their Fourteenth Amendment Claims Are Likely to Succeed on the Merits.

115.   Legislatures often use the preexisting map as the starting point in the redistricting process. As Justice Alito explained, "[w]hen a new census requires redistricting, it is a common practice to start with the plan used in the prior map and to change the boundaries of the prior districts only as needed to comply with the one-person, one-vote mandate and to achieve other desired ends." *Cooper*, 137 S. Ct. at 1492 (Alito, J., concurring in part). This common practice of "preserving the cores of prior districts" is a "legitimate objective[]" that can constitutionally be given effect in a plan. *Karcher v. Daggett*, 462 U.S. 725, 740 (1983).[4]

116.   Doing so "honors settled expectations and, if the prior plan survived legal challenge, minimizes the risk that the new plan will be overturned." *Cooper*,

---

[4] *See also* Nathaniel Persily, *In Defense of Foxes Guarding Henhouses: The Case for Judicial Acquiescence to Incumbent-Protecting Gerrymanders*, 116 Harv. L. Rev. 649, 671 (2002); *Vieth v. Jubelirer*, 541 U.S. 267, 357-358 (2004) (Breyer, J., dissenting) (collecting sources); *Stenger v. Kellett*, No. 4:11-cv-2230, 2012 WL 601017, at *3 (E.D. Mo. Feb. 23, 2012) ("A frequently used model in reapportioning districts is to begin with the current boundaries and change them as little as possible while making equal the population of the districts.").

137 S. Ct. at 1492 (Alito, J., concurring in part); *see also Milligan* Doc. 89-3 at 9 (Sen. McClendon testifying that, when he served as House Chair of the Reapportionment Committee in 2011, the starting point for that map was the then-existing lines); PI Tr. 778:9-19 (*Singleton* Doc. 86-2) (expert Mr. Thomas Bryan explaining that, "more often than not, the starting point for doing redistricting or political redistricting is to begin with the plan that's in place, again, trying to conform with the principle of continuity of representation"); *id.* at 479:11-16 (*Caster* Plaintiffs' expert Mr. Bill Cooper testifying that he "almost never" begins map-drawing "with a blank slate," and instead "would always see what the so-called benchmark plan, the previous plan[,] looked like").

117.   Alabama's Legislature followed this ordinary and constitutional practice when drawing the 2021 Map. Once the State learned it would be keeping all seven of its congressional seats, the Legislature's map-drawer "used the cores of the existing districts as a starting point," never considered race when making the necessary adjustments to rebalance the districts, and otherwise adhered to traditional redistricting criteria like compactness. *Milligan* Doc. 89-1 at 24-25, 25-26, 37-38.

118.   The result was a map that was more compact than its immediate predecessor, had fewer county splits, and (incidentally) lowered BVAP in District 7 from about 62% to about 55%. *See* PI Tr. 784:4-7 (*Singleton* Doc. 86-2).

119.   The Legislature then enacted Act 2021-555, which adopted the race-blind map without change.

120.   In the 2023 Plan, enacted in Act 2023-563, the Legislature gave less effect to preserving the cores of districts. The Black Belt community of interest was placed into as few districts as possible, as was Montgomery County, which led to substantial changes in Districts 1, 2, 3, and 7. Compactness was also given greater effect as Districts 4, 5, and 6 were altered to balance out population. At the same time, however, preexisting cores of districts were not completely disregarded, and incumbents were not drawn out of their districts or paired with each other.

121.   In the resulting plan, District 7 no longer stretches into Montgomery County, and while Jefferson County remains divided between Districts 6 and 7, the "finger" that once characterized District 7's shape in Jefferson County no longer exists. This reprioritization of traditional redistricting principles resulted in a BVAP (50.6%) in District 7 that is lower than in previous maps, and a plan that is overall more compact than the 2021 Plan.

122.   Plaintiffs argue that Defendants conceded that District 7 is a racial gerrymander, but they did no such thing. In a brief in another case, the former Secretary of State said, in reference to District 7, "Defendant does not believe that the law would permit Alabama to draw that district today if the finger into Jefferson County was for the predomina[nt] purpose of drawing African American voters into

the district." *Singleton* Doc. 147 at 10. That statement is unremarkable and means only this: Even if Section 5 required race-conscious districting to achieve preclearance, in a post-Section 5 world, States cannot rely on Section 5 to justify drawing in a race-predominate manner. That statement does not foreclose adopting a plan in which part of Jefferson County is in District 7 for *race-neutral* reasons, whether they be to preserve the core of districts, to accommodate the preferences of a Congresswoman who had expressed a desire to represent both Jefferson and Dallas Counties, or to avoid incumbent conflicts, among others.

123.   "Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).

124.   And for racial gerrymandering claims, "the burden of proof on the plaintiffs … is a demanding one." *Easley v. Cromartie*, 532 U.S. 234, 241 (2001). "Race must not simply have been *a* motivation for the drawing of a majority-minority district, but the *predominant* factor motivating the legislature's districting decision." *Id* at 241 (citation and internal quotation marks omitted).

125.   Courts assessing a racial gerrymandering claim "must be sensitive to the complex interplay of forces that enter a legislature's redistricting calculus. Redistricting legislatures will, for example, almost always be aware of racial

demographics; but it does not follow that race predominates in the redistricting process." *Miller*, 515 U.S. at 915-16.

126.  Because of (1) the "evidentiary difficulty" of distinguishing "between being aware of racial considerations and being motivated by them," (2) "the sensitive nature of redistricting," and (3) "the presumption of good faith that must be accorded legislative enactments," courts must "exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race." *Id.* at 916.

127.  As explained in greater detail below, Plaintiffs cannot shoulder their heavy evidentiary burden of proving racial predominance, particularly in light of the "obvious alternative explanation" for Act 2023-564—that it retains cores of districts and longstanding communities of interest and protects incumbents. *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009).

128.  The *Singleton* Plaintiffs look back more than three decades to the congressional map imposed by the 1992 *Wesch* decision. *See* 785 F. Supp. 1491. But no one alleges that the *Wesch* court violated the Equal Protection Clause or argues that the 1992 Map was unlawful when drawn (nor would such an argument make much sense, considering that the plan was approved by three federal judges and affirmed by the Supreme Court).

129.   Nor is there support for the notion that any alleged racial purpose in the 1992 Map is imputed to each Legislature that subsequently enacted a congressional map resembling its predecessor.

130.   The *Singleton* Plaintiffs relied heavily on a stipulation earlier in these proceedings that the "In 1992, seven counties were split for the predominant purpose of drawing one majority-black District. *Wesch v. Hunt,* 785 F. Supp. 1491 (S.D. Ala. 1992) (three-judge court), *aff'd sub nom. Camp v. Wesch*, 504 U.S. 902 (1992), *Figures v. Hunt*, 507 U.S. 901 (1993)[,]" *Singleton* Doc. 57 at 3. But the stipulation was made only for the 2021/2022 preliminary injunction proceedings. *Singleton* Doc. 57 at 1. Since then, the *Singleton* Plaintiffs propounded Requests for Admission on the same topics in the stipulations, and the Defendants did *not* admit race predominated. *Singleton* Doc. 167-2 at 2 ("Admitted that seven counties were split in the 1992 Congressional plan adopted by a three-judge court. Otherwise denied."). At the August 15 hearing, counsel for Secretary Allen was clear that we agree that the evidence from the first preliminary injunction proceedings was admissible for these preliminary injunction proceedings, except for the earlier stipulations. *Singleton* Doc. 185 at 24-25.

131.   Regardless of the purpose behind the 1992 Map, whether measured based on the initial drafter, the parties to the *Wesch* litigation, or the federal court that ordered implementation of the map, "[p]ast discrimination cannot, in the manner

of original sin, condemn governmental action that is not itself unlawful. The ultimate question remains whether a discriminatory intent has been proved in a given case." *Abbott*, 138 S. Ct. at 2324-25 (cleaned up). Thus, "there can be no doubt about what matters: It is the intent of the 20[23] Legislature." *Abbott*, 138 S. Ct. at 2324.

132.   Any consideration of race in past redistricting cycles—which itself would have been done in the light of the the VRA—cannot support a springing Equal Protection claim with respect to the *present* redistricting cycle.

## A.   Plaintiffs Have Not Shown That Racial Considerations Predominated Over Traditional Redistricting Criteria in the 2023 Plan.

133.   Plaintiffs have not shown that "the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district," *Cooper*, 137 S. Ct. at 1463, and their Fourteenth Amendment claims therefore are unlikely to succeed.

134.   Comparing the 2023 Plan against its predecessors strongly suggests that the Legislature's predominant purposes were legitimate, normal, and, perhaps most relevant here, race-neutral. The Black Belt community of interest is given priority over retaining the cores of the 2021 districts, leading to substantial changes to each district in the map. Those changes generally make the 2023 Plan more compact than the 2021 Plan. But cores of preexisting districts are still preserved to some extent, and pairing of incumbents is avoided.

135.   The Singleton Plaintiffs don't dispute that these goals are advanced in the 2023 Plan. And that is enough to end their case.

136.   Preserving existing districts is a valid, race-neutral justification for the latest changes to the congressional map. *See, e.g.*, *Abrams v. Johnson*, 521 U.S. 74, 99-100 (1997) (affirming State interest in "maintaining core districts").

137.   Moreover, "the Constitution does not place an *affirmative* obligation upon the legislature to avoid creating districts that turn out to be heavily, even majority, minority. It simply imposes an obligation not to create such districts for predominantly racial, as opposed to political or traditional, districting motivations." *Easley*, 532 U.S. at 249.

138.   Thus, the Legislature was not required to disregard traditional redistricting criteria simply because District 7's core contained more black voters than Plaintiffs deem optimal. Rather, it is precisely when a "legislature 'subordinate[s]' other factors—compactness, respect for political subdivisions, partisan advantage, what have you—to 'racial considerations,'" *Cooper*, 137 S. Ct. at 1464, that a gerrymandering claim arises.

139.   The Singleton Plaintiffs rely heavily (at *Singleton* Doc. 147:17-18, 21-22) on *Cooper v. Harris* to support their argument that the Legislature was required to do more than employ these traditional redistricting criteria. But *Cooper* does not support their racial-gerrymandering claim.

140.    In *Cooper*, there was no serious question that race was the predominant factor in drawing District 1 because North Carolina sought to achieve an *express racial target* of 50% BVAP. *See Cooper*, 137 S. Ct at 1468. The key question in *Cooper* was whether that specific use of race could be justified by the VRA on the facts of the case, and the Supreme Court answered in the negative.

141.    This case is on a different footing. Unlike *Cooper*, the changes Alabama made to its district lines in 2023 were *not* predominantly based on race.

142.    Nevertheless, Plaintiffs seem to argue that, under *Cooper*, the State must engage in a districting process that would move people out of District 7 because of their race. No language in *Cooper* supports Plaintiffs' theory that the Fourteenth Amendment requires Alabama to redraw its congressional map to achieve the racial compositions Plaintiffs propose.

143.    In *Bartlett v. Strickland*, the Supreme Court clarified that States have no obligation to create crossover districts to "maximiz[e] minority voting strength." 556 U.S. 1, 23 (2009) (plurality op.) (citation omitted). And in *Cooper*, the Supreme Court found that a 50% "target" for BVAP could not withstand strict scrutiny.

144.    The Equal Protection Clause does not require States to consider race in redistricting to ensure that a minority population in a district stays below a certain ceiling.   Quite   the   contrary.   "[T]he   Constitution   does   not   place

an *affirmative* obligation upon the legislature to avoid creating districts that turn out to be heavily, even majority, minority." *Cromartie*, 532 U.S. at 249.

B.   **Plaintiffs Have Not Proved Racial Predominance in the 2023 Plan Based on the Consideration of Race in Previous Redistricting Cycles.**

145.   The *Singleton* Plaintiffs seek to impute to the current Legislature the alleged intent embodied in past redistricting cycles. For several interrelated reasons, these arguments are not likely to succeed on the merits.

146.   Plaintiffs cannot impute the alleged purpose of *past* redistricting plans to the 2023 Plan, for "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *Abbott*, 138 S. Ct. at 2324. Thus "[t]he 'ultimate question remains whether a discriminatory intent has been proved in a given case,'" meaning that "what matters" in this case is the intent of the Legislature that enacted the 2023 Plan. *Id.* at 2324-25

147.   Plaintiffs thus must show that the 2023 Legislature acted "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). That is especially so here, where courts "must be sensitive to the complex interplay of forces that enter a legislature's redistricting calculus." *Miller*, 515 U.S. at 915-16. "Redistricting legislatures will, for example, almost always be aware of racial

demographics; but it does not follow that race predominates in the redistricting process." *Id.* at 916.

148.   Thus, arguments that the 2023 Legislature made minimal changes do not move the ball. At most, Plaintiffs allege that Alabama somehow acted improperly by failing to affirmatively create districts with Plaintiffs' preferred racial compositions. *See Singleton* Doc. 147 at 18 (touting two plans with different racial demographics). But that theory runs headlong into *Feeney*. Even if the Legislature *could* have drawn a whole new map instead of retaining the core of District 7, Plaintiffs do not come close to surmounting the Legislature's presumption of good faith and showing that the Legislature retained district cores "because of" and not merely "in spite of" racial concerns. *Feeney*, 442 U.S. at 279).

149.   Even if the Legislature *could* have drawn a new map that completely ignored the core of District 7, Plaintiffs have failed to provide evidence showing that the Legislature's decision to retain part of the cores of districts was "because of" racial concerns and not merely "in spite of" them. *Feeney*, 442 U.S. at 279.

150.   Plaintiffs also assert that racial considerations predominated in the 2023 redistricting plan because the plan allegedly "[c]arried [f]orward" racial considerations that affected districting plans adopted decades earlier. *See Singleton* Doc. 147 at 12. As noted above, this is not how constitutional analysis of legislative

purpose works—particularly in the redistricting context. *Abbott*, 138 S. Ct. at 2324-25.

151.   Moreover, even if the "original purpose" motivating a law is problematic, "the passage of time may obscure that sentiment." *American Legion v. American Humanist Ass'n*, 139 S. Ct. 2067, 2083 (2019); *see also School Dist. of Abington Twp., Pa. v. Schempp*, 374 U.S. 203, 264 (1963) (Brennan, J., concurring) ("[The] government may originally have decreed a Sunday day of rest for the impermissible purpose of supporting religion but abandoned that purpose and retained the laws for the permissible purpose of furthering overwhelmingly secular ends"); *see also* PI Tr. 1536:6-26 (*Singleton* Doc. 86-5)  (Plaintiffs' expert Dr. King agreeing that Alabama's decision not to do away with the secret ballot and revert to voice voting—despite the secret ballot's purportedly racist origins—is not indicative of racial discrimination today).

152.   More fundamentally, actions by a 1992 federal court, 2002 Legislature, 2011 Legislature, or 2021 Legislature do not taint the actions of the 2023 Legislature. The Supreme Court's explicit admonition in *Abbott* reiterated what the Eleventh Circuit had already recognized: "it is not reasonable to assign any impermissible motives held by" one legislature to another. *Johnson v. Governor of State of Fla.*, 405 F.3d 1214, 1226 (11th Cir. 2005) (en banc). "The result would be to reverse the presumption that a State's laws are constitutional, and plunge federal

courts into far-reaching expeditions regarding the sins of the past in order to question the laws of today"—precisely what Plaintiffs demand of this Court. *Id*.

153.   Even if racial considerations predominated in 1992, and even if any of that intent could be imputed to the 2023 Map (despite binding Supreme Court and Eleventh Circuit precedents holding otherwise), Plaintiffs have not actually argued that the 1992 Map violated the Equal Protection Clause. And indeed, it would be a tough argument to make considering that the 1992 Map was imposed by a federal court. Plaintiffs do not allege that the parties or the *Wesch* court in 1992 lacked "good reasons" to believe that the VRA required that consideration of race. *Cooper*, 581 U.S. at 301.

154.   Nor have Plaintiffs shown that the 2002 or 2011 maps ran afoul of the Equal Protection Clause. During those redistricting cycles, Alabama was covered by Section 5 of the VRA, which blocked any changes to voting laws that would result in "retrogression." *See Beer v. United States*, 425 U.S. 130, 141 (1976) ("the purpose of §5 has always been to insure that no voting-procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise"). And both plans received preclearance under Section 5.

155.   The *Singleton* Plaintiffs assert that "Secretary Merrill conceded that the 1992 court-approved plan would violate the prohibition of racial gerrymandering

….” *Singleton* Doc. 147 at 10. That is not accurate. All the Secretary "conceded" is that VRA Section 5's anti-retrogression requirement applied to those plans and limited the State's options with regard to District 7, and that post-Section 5, Alabama may not have been able to lawfully draw the same lines for the first time, *if* done for a predominately racial purpose. *See Chestnut v. Merrill*, No. 2:18-CV-00907-KOB (N.D. Ala. Oct. 28, 2019), ECF No. 101 at 11-12. That is not a concession that the Legislature adopted the 2002 or 2011 plans for a predominantly racial purpose.

156.   Plaintiffs have failed to impute any unconstitutional intent to the 2023 Map. The past maps were the product of a court order and the VRA's then-existing requirements, along with normal changes in population that occur over the course of a decade. No court invalidated those maps, and the 2002 and 2011 Maps both satisfied Section 5's then-extant preclearance requirements. Alabama's retention of the cores of its districts was a constitutionally legitimate policy choice, and Plaintiffs' attempt to upend those plans cannot overcome the presumption of the current Legislature's good faith. *See Abbott*, 138 S. Ct. at 2325.

157.   Plaintiffs cite a handful of cases to suggest that "when the starting point is a racially gerrymandered map, … preserving district cores and protecting incumbents is evidence that the line-drawers intended to separate voters by race." *Singleton* Doc. 165 at 14. But cases like *Covington v. North Carolina*, 283 F. Supp. 3d 410 (M.D.N.C. 2018), are inapposite because they both (1) involved a prior

finding of a racial gerrymander, and (2) included numerous other findings beyond the mere resemblance of a new plan to its predecessor. The challenged plan in *Covington*, for example, "divided the city of Greensboro along racial lines" in a way that was "inexplicabl[e]." *North Carolina v. Covington*, 138 S. Ct. 2548, 2551 (2018). Here, in contrast, there are numerous neutral explanations for the contours of the 2023 Plan's District 7.

158.   The recent decisions regarding the City of Jacksonville's city council likewise provide a helpful contrast with this case. The case did not turn on the fact that the city council maintained the cores or preexisting districts. Rather, it turned on "the historical evidence together with Plaintiffs' other direct and circumstantial evidence that makes a strong showing that the City Council in 2022 reenacted the 2011 lines not despite their racial components but specifically to maintain them." *Jacksonville Branch of NAACP v. City of Jacksonville*, 635 F. Supp. 3d 1229, 1288 (M.D. Fla. 2022). Plaintiffs produced "substantial evidence showing that from 2011 through the present the only 'core' to be protected for Districts 7, 8, 9, and 10 is its Black racial majority." *Id.* For example, a member of the council made clear that it was a "'fundamental principal'" for her that certain districts "maintain … the significant BVAP majorities contained in them." *Id.* at 1229. Such evidence is lacking in this case.

159.    Following the finding that the city's plan had unconstitutionally packed voters into the challenged districts, the City Council's decision to draw a new plan that "prioritized criteria … predestined to perpetuate, rather than correct, the preexisting racial gerrymandering in the City Council districts" helped establish that the replacement plan was also race-predominant. *Jacksonville Branch of NAACP v. City of Jacksonville*, No. 3:22-CV-493-MMH-LLL, 2022 WL 17751416, at *14 (M.D. Fla. Dec. 19, 2022). "[T]he fact that the Packed Districts retain[ed] high BVAP percentages [wa]s not, in and of itself, problematic." *Id.* The problem was that after a finding that the city had drawn racially predominant districts in violation of the Constitution, "the City all but guaranteed that the unconstitutional effects of the Enjoined Plan and its predecessors would be carried forward into the Remedial Plan." *Id.* at *17. In this case, however, there has been no finding that the 2023 Plan's predecessors were racial gerrymanders or showing by Plaintiffs that the criteria shaping the 2023 Plan were selected to lock in any purported racial gerrymander.

160.    The question is not whether Alabama, drawing on a blank slate, could have considered race in drawing District 7 in its current configuration. The question is instead whether, after 30 years of history with the current districts, Alabama may adopt a districting plan that largely maintains existing districts consistent with the State's policy of maximizing core retention, continuity of representation, and

keeping communities of interest in their existing districts. The answer is "Yes." *See Cromartie*, 532 U.S. at 249.

161.   To the extent Plaintiffs argue that the 2023 Map is unconstitutional because the Legislature declined to pass the Plaintiffs' preferred map, Plaintiffs' claim fails. There are ample race-neutral reasons why the Legislature may have rejected the Plaintiffs' plans, which pit incumbents against each other, dramatically upended the cores of districts, and were less compact that the 2023 Plan. The Legislature's rejection of those plans is not evidence that race predominated in the 2023 Plan, and certainly is not sufficient evidence to overcome the presumption of good faith.

## CONCLUSION

The motion for preliminary injunction is hereby denied.

Respectfully submitted,

Steve Marshall
  *Attorney General*

/s/ Edmund G. LaCour Jr.

Dorman Walker (ASB-9154-R81J)
BALCH & BINGHAM LLP
Post Office Box 78 (36101)
445 Dexter Avenue, Suite 800
Montgomery, AL 36104
Telephone: (334) 269-3138
Email: dwalker@balch.com

Edmund G. LaCour Jr. (ASB-9182-U81L)
  *Solicitor General*

James W. Davis (ASB-4063-I58J)
  *Deputy Attorney General*

Misty S. Fairbanks Messick (ASB-1813-T71F)
Brenton M. Smith (ASB-1656-X27Q)

| | |
|---|---|
| ***Counsel for Sen. Livingston and Rep. Pringle*** | Benjamin M. Seiss (ASB-2110-O00W) *Assistant Attorneys General* |

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov
Jim.Davis@AlabamaAG.gov
Ben.Seiss@AlabamaAG.gov
Brenton.Smith@AlabamaAG.gov

***Counsel for Secretary Allen***

## CERTIFICATE OF SERVICE

I certify that I electronically filed this document using the Court's CM/ECF system on August 21, 2023, which will serve all counsel of record.

/s/Edmund G. LaCour Jr.
Edmund G. LaCour
*Counsel for Secretary Allen*