FILED
2023 Sep-05  AM 08:19
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **BOBBY SINGLETON,** *et al.,* | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 2:21-cv-1291-AMM** |
| | ) | |
| **WES ALLEN,** *in his official capacity as Alabama Secretary of State*, *et al.,* | ) ) ) | **THREE-JUDGE COURT** |
| | ) | |
| **Defendants.** | ) | |

---

| | | |
|---|---|---|
| **EVAN MILLIGAN,** *et al.,* | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 2:21-cv-1530-AMM** |
| | ) | |
| **WES ALLEN,** *in his official capacity as Alabama Secretary of State*, *et al.,* | ) ) ) | **THREE-JUDGE COURT** |
| | ) | |
| **Defendants.** | ) | |

Before MARCUS, Circuit Judge, MANASCO and MOORER, District Judges.

PER CURIAM:

## <u>INJUNCTION, OPINION, AND ORDER</u>

These congressional redistricting cases have returned to this Court after the Supreme Court of the United States affirmed in all respects a preliminary injunction this Court entered on January 24, 2022. *See Allen v. Milligan*, 143 S. Ct. 1487, 1498, 1502 (2023).

These cases allege that Alabama's congressional electoral map is racially gerrymandered in violation of the United States Constitution and/or dilutes the votes of Black Alabamians in violation of Section Two of the Voting Rights Act of 1965, 52 U.S.C. § 10301 ("Section Two"). *See Singleton v. Allen*, No. 2:21-cv-1291-AMM (asserting only constitutional challenges); *Milligan v. Allen*, No. 2:21-cv-1530-AMM (asserting both constitutional and statutory challenges); *Caster v. Allen*, No. 2:21-cv-1536-AMM (asserting only statutory challenges).

*Milligan* is now before this three-judge Court, and *Caster* is before Judge Manasco alone, for remedial proceedings.[1] The map this Court enjoined ("the 2021 Plan") included one majority-Black district: District 7. District 7 became a majority-Black district in 1992 when a federal court drew it that way in a ruling that was summarily affirmed by the Supreme Court. *Wesch v. Hunt*, 785 F. Supp. 1491, 1497–1500 (S.D. Ala. 1992) (three-judge court), *aff'd sub nom. Camp v. Wesch*, 504 U.S. 902 (1992), *and aff'd sub nom. Figures v. Hunt*, 507 U.S. 901 (1993).

After an extensive seven-day hearing, this Court concluded that the 2021 Plan likely violated Section Two and thus enjoined the State from using that plan in the 2022 election. *See Milligan* Doc. 107; *Allen*, 143 S. Ct. at 1502.[2]

---

[1] *Singleton* remains before this three-judge Court but is not a part of the Section Two remedial proceedings. *See infra* at Part I.C.5.

[2] When we cite an order or other filing that appears in more than one of these cases, for the reader's ease we cite only the document filed in the *Milligan* case.

Based on controlling precedent, we held that "the appropriate remedy is a congressional redistricting plan that includes either an additional majority-Black congressional district, or an additional district in which Black voters otherwise have an opportunity to elect a representative of their choice." *Milligan* Doc. 107 at 5.[3] We observed that "[a]s the Legislature consider[ed remedial] plans, it should be mindful of the practical reality, based on the ample evidence of intensely racially polarized voting adduced during the preliminary injunction proceedings, that any remedial plan will need to include two districts in which Black voters either comprise a voting-age majority or something quite close to it." *Id.* at 6.

Because federal law dictates that the Alabama Legislature should have the first opportunity to draw a remedial plan, we gave the Legislature that opportunity. *See id*. The Secretary of State and legislative defendants ("the Legislators" and collectively, "the State") appealed. *Allen*, 143 S. Ct. at 1502.

On June 8, 2023, the Supreme Court affirmed the preliminary injunction. *See id*. The Supreme Court "s[aw] no reason to disturb th[is] Court's careful factual findings, which are subject to clear error review and have gone unchallenged by Alabama in any event." *Id.* at 1506. Likewise, the Supreme Court concluded there was no "basis to upset th[is] Court's legal conclusions" because we "faithfully

---

[3] Page number pincites in this order are to the CM/ECF page number that appears in the top right-hand corner of each page, if such a page number is available.

applied [Supreme Court] precedents and correctly determined that, under existing law, [the 2021 Plan] violated" Section Two. *Id.*

The State then requested that this Court allow the Legislature approximately five weeks — until July 21, 2023 — to enact a new plan. *Milligan* Doc. 166. All parties understood the urgency of remedial proceedings: the State previously advised this Court that because of pressing state-law deadlines, Secretary Allen needs a final congressional districting map by "early October" for the 2024 election. *Milligan* Doc. 147 at 3.[4] In the light of that urgency, and to balance the deference given to the Legislature to reapportion the state with the limitations set by *Purcell v. Gonzalez*, 549 U.S. 1, 4–8 (2006), we delayed remedial proceedings to accommodate the Legislature's efforts, entered a scheduling order, and alerted the parties that any remedial hearing would commence on the date they proposed: August 14, 2023. *Milligan* Doc. 168.

On July 21, 2023, the Legislature enacted and Governor Ivey signed into law a new congressional map ("the 2023 Plan"). Just like the 2021 Plan enjoined by this Court, the 2023 Plan includes only one majority-Black district: District 7. *Milligan* Doc. 186-1 at 2.

All Plaintiffs timely objected to the 2023 Plan and requested another

---

[4] In a later filing, the State advised the Court that Secretary Allen needs a final map by October 1, 2023. *Milligan* Doc. 162 at 7.

injunction. *See Singleton* Doc. 147; *Milligan* Doc. 200; *Caster* Doc. 179. The *Milligan* and *Caster* Plaintiffs argue that the 2023 Plan did not cure the unlawful vote dilution we found because it did not create a second district in which Black voters have an opportunity to elect a candidate of their choice (an "opportunity district"). *Milligan* Doc. 200 at 16–23; *Caster* Doc. 179 at 8–11. Separately, the *Milligan* and *Singleton* Plaintiffs argue that the 2023 Plan runs afoul of the U.S. Constitution. The *Milligan* Plaintiffs contend that the State intentionally discriminated against Black Alabamians in drawing the 2023 Plan, in violation of the Equal Protection Clause of the Fourteenth Amendment. *Milligan* Doc. 200 at 23–26. And the *Singleton* Plaintiffs argue that the 2023 Plan is an impermissible racial gerrymander — indeed, just the latest in a string of racially gerrymandered plans the State has enacted, dating back to 1992. *Singleton* Doc. 147 at 13–27.

The record before us thus includes not only the evidentiary materials submitted during the preliminary injunction proceedings, but also expert reports, deposition transcripts, and other evidence submitted during this remedial phase. *See Singleton* Docs. 147, 162, 165; *Milligan* Docs. 200, 220, 225; *Caster* Docs. 179, 191, 195; Aug. 14 Tr. 92–93; Aug. 15 Tr. 24–25. We also have the benefit of the parties' briefs, a hearing, three *amicus* briefs, and a statement of interest filed by the Attorney General of the United States. *Milligan* Docs. 199, 234, 236, 260.

The State concedes that the 2023 Plan does not include an additional

opportunity district. Indeed, the State has explained that its position is that notwithstanding our order and the Supreme Court's affirmance, the Legislature was not required to include an additional opportunity district in the 2023 Plan. Aug. 14 Tr. 159–64.

That concession controls this case. Because the 2023 Plan does not include an additional opportunity district, we conclude that the 2023 Plan does not remedy the likely Section Two violation that we found and the Supreme Court affirmed. We also conclude that under the controlling Supreme Court test, the *Milligan* Plaintiffs are substantially likely to establish that the 2023 Plan violates Section Two. As we explain below, our conclusions rest on facts the State does not dispute.

Because the record establishes the other requirements for relief — that the Plaintiffs will suffer irreparable injury if an injunction does not issue, the threatened injury to the Plaintiffs outweighs the damage an injunction may cause the State, and an injunction is not adverse to the public interest — under Federal Rule of Civil Procedure 65(d) we **PRELIMINARILY ENJOIN** Secretary Allen from conducting any elections with the 2023 Plan.

Under the Voting Rights Act, the statutory framework, and binding precedent, the appropriate remedy is, as we already said, a congressional districting plan that includes either an additional majority-Black district, or an additional district in which Black voters otherwise have an opportunity to elect a representative of their

choice. *See, e.g.*, *Bartlett v. Strickland*, 556 U.S. 1, 24 (2009) (plurality opinion); *Cooper v. Harris*, 581 U.S. 285, 306, (2017). We discern no basis in federal law to accept a map the State admits falls short of this required remedy.

"Redistricting is primarily the duty and responsibility of the State," *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018) (internal quotation marks omitted), but this Court "ha[s] its own duty to cure" districts drawn in violation of federal law, *North Carolina v. Covington*, 138 S. Ct. 2548, 2553 (2018). We are three years into a ten-year redistricting cycle, and the Legislature has had ample opportunity to draw a lawful map.

Based on the evidence before us, including testimony from the Legislators, we have no reason to believe that allowing the Legislature still another opportunity to draw yet another map will yield a map that includes an additional opportunity district. Moreover, counsel for the State has informed the Court that, even if the Court were to grant the Legislature yet another opportunity to draw a map, it would be practically impossible for the Legislature to reconvene and do so in advance of the 2024 election cycle. Accordingly, the Special Master and cartographer are **DIRECTED** to commence work forthwith on a remedial map. Instructions shall follow by separate order.

Because we grant relief on statutory grounds, and "[a] fundamental and longstanding principle of judicial restraint requires that [we] avoid reaching

constitutional questions in advance of the necessity of deciding them," *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988); *see also League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 442 (2006) ("*LULAC*"); *Thornburg v. Gingles*, 478 U.S. 30, 38 (1986), we again **RESERVE RULING** on the constitutional issues raised by the *Singleton* and the *Milligan* Plaintiffs, including the *Singleton* Plaintiffs' motion for a preliminary injunction.

***

We have reached these conclusions only after conducting an exhaustive analysis of an extensive record under well-developed legal standards, as Supreme Court precedent instructs. We do not take lightly federal intrusion into a process ordinarily reserved for the State Legislature. But we have now said twice that this Voting Rights Act case is not close. And we are deeply troubled that the State enacted a map that the State readily admits does not provide the remedy we said federal law requires.

We are disturbed by the evidence that the State delayed remedial proceedings but ultimately did not even nurture the ambition to provide the required remedy. And we are struck by the extraordinary circumstance we face. We are not aware of any other case in which a state legislature — faced with a federal court order declaring that its electoral plan unlawfully dilutes minority votes and requiring a plan that provides an additional opportunity district — responded with a plan that the state

concedes does not provide that district. The law requires the creation of an additional district that affords Black Alabamians, like everyone else, a fair and reasonable opportunity to elect candidates of their choice. The 2023 Plan plainly fails to do so.

# TABLE OF CONTENTS

I.     BACKGROUND ..................................................................13

   A.   Procedural Posture ....................................................13

      1.   Liability Proceedings ..........................................13

      2.   Remedial Proceedings .........................................18

   B.   Factual and Legal Background ...................................26

      1.   Constitutional and Statutory Provisions for Race In Redistricting ......26

      2.   Congressional Redistricting in Alabama ............................31

      3.   These Lawsuits ..................................................32

         a.   *Milligan*.................................................33

         b.   *Caster*..................................................37

         c.   The State ..............................................41

           i. The State's Arguments in *Milligan* ...................42

          ii. The State's Arguments in *Caster* ...................45

      4.   Our Findings and Conclusions on Liability ..............46

      5.   Supreme Court Affirmance ...................................53

         a.   Controlling Precedent ................................53

         b.   Part III-B-1 of the Chief Justice's Opinion ...........61

         c.   Justice Kavanaugh's Concurrence....................61

   C.   Remedial Proceedings...............................................64

      1.   The *Milligan* Plaintiffs' Objections.......................64

      2.   The *Caster* Plaintiffs' Objections........................68

      3.   The State's Defense of the 2023 Plan.....................70

      4.   The Plaintiffs' Replies.........................................77

         a.   The *Milligan* Plaintiffs............................77

         b.   The *Caster* Plaintiffs.............................80

      5.   The Parties' Motions for Clarification ...................82

      6.   The Plaintiffs' Motion *in Limine* .......................86

   D.   Stipulated Facts.......................................................88

   E.   The Remedial Hearing .............................................96

     1.      The Deposition Testimony ....................................................96

     2.      Arguments and Concessions.............................................102

  F.   The Preliminary Injunction Hearing ...................................111

II.    STANDARD OF REVIEW ...................................................111

  A.   Preliminary Injunctive Relief...............................................112

  B.   The Limited Scope of the Parties' Disagreement ....................112

  C.   The Remedial Standard We Apply ........................................113

  D.   In the Alternative ...............................................................130

III.   APPLICABLE LAW ..........................................................130

IV.   FINDINGS OF FACT AND CONCLUSIONS OF LAW ...........................134

  A.   The 2023 Plan Does Not Completely Remedy the Likely Section Two Violation We Found and the Supreme Court Affirmed....................................134

  B.   Alternatively: Even If the Plaintiffs Must Re-Establish Every Element of *Gingles* Anew, They Have Carried that Burden and Established that the 2023 Plan Likely Violates Section Two. ....................................................139

     1.      *Gingles* I - Numerosity ........................................139

     2.      *Gingles* I - Compactness.....................................140

        a.   Credibility Determinations .................................140

        b.   The "Meet or Beat" Requirement.......................147

        c.   Geographic Compactness Scores .....................150

        d.   Reasonable Compactness and Traditional Redistricting Principles...152

          i. Communities of Interest .....................................156

          ii. County Splits .................................................173

     3.      *Gingles* II & III – Racially Polarized Voting .....................178

     4.      The Senate Factors...........................................178

        a.   Senate Factor 8 ...............................................179

        b.   Senate Factor 9 ...............................................184

  C.   We Reject the State's Remaining Argument that Including an Additional Opportunity District in a Remedial Plan To Satisfy Section Two Is Unconstitutional Affirmative Action in Redistricting. ...........................185

  D.   The Record Establishes the Elements of Preliminary Injunctive Relief ...188

V.    REMEDY.................................................................191

VI.  CONSTITUTIONAL OBJECTIONS TO THE 2023 PLAN ........................194

VII. EVIDENTIARY RULINGS .........................................................................195

2023 Plan - Legislative Findings.............................................................Appendix A

2021 Reapportionment Committee Redistricting Guidelines .................Appendix B

# I.      BACKGROUND

## A.      Procedural Posture

### 1.      Liability Proceedings

On September 27, 2021, after the results of the 2020 census were released, the *Singleton* Plaintiffs filed a complaint against John Merrill, the former Secretary of State of Alabama.[5] *Singleton* Doc. 1. The *Singleton* Plaintiffs asserted that holding the 2022 election under Alabama's old congressional map ("the 2011 Plan") would violate the Equal Protection Clause of the Fourteenth Amendment because the districts were malapportioned and racially gerrymandered. *Id*. The Chief Judge of the Eleventh Circuit convened a three-judge court to adjudicate *Singleton*. *Singleton* Doc. 13.

On November 3, 2021, the Legislature passed the 2021 Plan. The next day, Governor Ivey signed the 2021 Plan into law, and the *Singleton* Plaintiffs amended their complaint to stake their claims on the 2021 Plan, asserting a racial gerrymandering claim under the Equal Protection Clause of the Fourteenth Amendment and an intentional discrimination claim under the Fourteenth and Fifteenth Amendments. *Singleton* Doc. 15 at 38–48. "The *Singleton* plaintiffs are registered voters in Alabama's Second, Sixth, and Seventh Congressional Districts

---

[5] On January 16, 2023, Wes Allen became the Secretary of State of Alabama. Pursuant to Federal Rule of Civil Procedure 25(d), Secretary Allen was substituted for former Secretary Merrill as a defendant in these cases. *Milligan* Doc. 161.

under the [2021] Plan; the lead plaintiff, Bobby Singleton, is a Black Senator in the Legislature." *Singleton* Doc. 88 at 10.

On the same day the *Singleton* Plaintiffs filed their amended complaint, the *Caster* Plaintiffs filed a lawsuit against Secretary Merrill. *Caster* Doc. 3. *Caster* is pending before Judge Manasco sitting alone. The *Caster* Plaintiffs challenged the 2021 Plan only under Section Two and asserted a single claim of vote dilution. *Id.* at 29–31. "The *Caster* plaintiffs are citizens of Alabama's First, Second, and Seventh Congressional Districts under the [2021] Plan." *Caster* Doc. 101 at 20.

On November 16, 2021, the *Milligan* Plaintiffs filed suit against Secretary Merrill and the Legislators, who serve as co-chairs of the Legislature's Committee on Reapportionment ("the Committee").[6] *Milligan* Doc. 1. The *Milligan* Plaintiffs asserted a vote dilution claim under Section Two, a racial gerrymandering claim under the Fourteenth Amendment, and an intentional discrimination claim under the Fourteenth Amendment. *Id.* at 48–52. "The *Milligan* plaintiffs are Black registered voters in Alabama's First, Second, and Seventh Congressional Districts and two organizational plaintiffs — Greater Birmingham Ministries and the Alabama State Conference of the National Association for the Advancement of Colored People,

---

[6] Former Senator Jim McClendon then served as co-chair of the Committee. Senator Steve Livingston has since become co-chair of the Committee. *See Milligan* Doc. 173. Pursuant to Federal Rule of Civil Procedure 25(d), Senator Livingston was substituted as a defendant in these cases. *Milligan* Doc. 269.

Inc. ('NAACP') — with members who are registered voters in those Congressional districts and the Third Congressional District." *Milligan* Doc. 107 at 12–13. The Chief Judge of the Eleventh Circuit convened a three-judge court to hear *Milligan* that includes the same three judges who comprise the *Singleton* Court. *Milligan* Doc. 23.

The Legislators intervened as defendants in *Singleton* and *Caster*. *See Singleton* Doc. 32; *Caster* Doc. 69.

Each set of Plaintiffs requested that this Court enjoin Alabama from using the 2021 Plan for the 2022 election. *Singleton* Doc. 15 at 47; *Milligan* Doc. 1 at 52; *Caster* Doc. 3 at 30–31; *see also Singleton* Doc. 57; *Milligan* Doc. 69; *Caster* Doc. 56. The *Singleton* Court consolidated *Singleton* and *Milligan* "for the limited purposes" of preliminary injunction proceedings; set a hearing for January 4, 2022; and set prehearing deadlines. *Milligan* Doc. 40. The *Caster* Court then set a preliminary injunction hearing for January 4, 2022 and set the same prehearing deadlines that were set in *Singleton* and *Milligan*. *Caster* Doc. 40. All parties agreed to a consolidated preliminary injunction proceeding which permitted consideration of evidence in a combined fashion.

A preliminary injunction hearing commenced on January 4 and concluded on January 12, 2022. *Allen*, 143 S. Ct. at 1502. During the hearing, this Court "received live testimony from 17 witnesses, reviewed more than 1000 pages of briefing and

upwards of 350 exhibits, and considered arguments from the 43 different lawyers who had appeared in the litigation." *Id.*

We evaluated the *Milligan* and *Caster* Plaintiffs' statutory claims using the three-part test developed by the Supreme Court in *Gingles*, 478 U.S. 30. And we preliminarily enjoined Alabama from using the 2021 Plan. *Milligan* Doc. 107. We held that under controlling precedent, "the appropriate remedy is a congressional redistricting plan that includes either an additional majority-Black congressional district, or an additional district in which Black voters otherwise have an opportunity to elect a representative of their choice." *Id.* at 5. Because we issued an injunction on statutory grounds, we declined to decide the constitutional claims of the *Singleton* and *Milligan* Plaintiffs. *Id.* at 214–17.

Because "redistricting and reapportioning legislative bodies is a legislative task which the federal courts should make every effort not to pre-empt," we gave the Legislature the first opportunity to draw a new map. *Wise v. Lipscomb*, 437 U.S. 535, 539 (1978) (White, J.); *Milligan* Doc. 107 at 6. The State appealed, and the Supreme Court stayed the injunction. *Allen*, 143 S. Ct. at 1502; *Merrill v. Milligan*, 142 S. Ct. 879 (2022).

On February 8, 2022, the *Singleton* Plaintiffs moved this Court for an expedited ruling on their constitutional claims. *Singleton* Doc. 104. All other parties opposed that motion, *see Singleton* Doc. 109; *Milligan* Doc. 135; *Caster* Doc. 127,

and we denied it on the ground that we should not decide any constitutional claims prematurely, *Singleton* Doc. 114.

On April 14, 2022, we held a status conference. *See Milligan* Doc. 143. Mindful that under Alabama law, the last date candidates may qualify with major political parties to participate in the 2024 primary election is November 10, 2023, *see* Ala. Code § 17-13-5(a), we directed the State to identify the latest date by which the Secretary of State must have a final congressional districting map to hold the 2024 election, *Milligan* Doc. 145. The State advised us that the Secretary needs the map "by early October." *Milligan* Doc. 147 at 3.

On November 21, 2022, this Court ordered the parties to meet and confer and file a joint report of their positions on discovery, scheduling, and next steps. *Milligan* Doc. 153. The parties timely filed a joint report and proposed a scheduling order, which we entered. *Milligan* Docs. 156, 157.

On February 8, 2023, we held another status conference. *See Milligan* Doc. 153. We again directed the State to identify the latest date by which the Secretary required a map to hold the 2024 election. *Milligan* Doc. 161. The State responded that a new plan would need to be approved by October 1, 2023, to provide time for the Secretary to reassign voters, print and distribute ballots, and otherwise conduct the election. *Milligan* Doc. 162 at 7.

On June 8, 2023, the Supreme Court affirmed the preliminary injunction in all

respects. *See generally Allen*, 143 S. Ct. 1487. The Supreme Court then vacated its stay. *Allen v. Milligan*, 143 S. Ct. 2607 (2023).

### 2.    Remedial Proceedings

After the Supreme Court's ruling, this Court immediately set a status conference. *Milligan* Doc. 165. Before the conference, the State advised us that "the . . . Legislature intend[ed] to enact a new congressional redistricting plan that will repeal and replace the 2021 Plan" and requested that we delay remedial proceedings until July 21, 2023. *Milligan* Doc. 166 at 2.

During the conference, the parties indicated substantial agreement on the appropriate next steps. *Milligan* Doc. 168 at 4. We delayed remedial proceedings until July 21, 2023 to accommodate the Legislature's efforts; entered a briefing schedule for any objections if the Legislature enacted a new map; and alerted the parties that if a remedial hearing became necessary, it would commence on the date they suggested: August 14, 2023. *Id*. at 4–7.

On June 27, 2023, Governor Ivey issued a proclamation that a special session of the Legislature would convene to consider the congressional districting map. *Milligan* Doc. 173-1. That same day, the Committee met, elected its co-chairs, and held its first public hearing to receive comments on potential plans. *Milligan* Doc. 173 ¶ 2.

On July 13, 2023, the Committee met and re-adopted its previous redistricting

guidelines ("the guidelines"). *Milligan* Doc. 180 ¶ 1; *Milligan* Doc. 107 app. A; *Milligan* Doc. 88-23. That day, the Committee held a second public hearing to receive comments on proposed remedial plans. *Milligan* Doc. 180 ¶ 1.

The special session of the Legislature commenced on July 17, 2023. *See Milligan* Doc. 173-1. On July 20, 2023, the Alabama House of Representatives passed a congressional districting plan titled the "Community of Interest Plan." *Milligan* Doc. 251 ¶¶ 16, 22. That same day, the Alabama Senate passed a different plan, titled the "Opportunity Plan." *Id.* ¶¶ 19, 22. The next day, a six-person bicameral Conference Committee passed the 2023 Plan, which was a modified version of the Opportunity Plan. *Id.* ¶ 23. Later that day, the Legislature enacted the 2023 Plan. *Milligan* Doc. 186.

Although neither the 2021 Plan, nor the Community of Interest Plan, nor the Opportunity Plan was accompanied by any legislative findings, when the Legislature enacted the 2023 Plan, it was accompanied by eight pages of legislative findings. We append the legislative findings to this order as Appendix A.

Governor Ivey signed the 2023 Plan into law the same day. *Milligan* Doc. 251 ¶ 26; Ala. Code § 17-14-70. It appears below. The 2023 Plan keeps Mobile and Baldwin counties together in District 1 and combines much of the Black Belt in Districts 2 and 7.[7]

---

[7] The parties previously stipulated that the Black Belt "is named for the region's



fertile black soil. The region has a substantial Black population because of the many enslaved people brought there to work in the antebellum period. All the counties in the Black Belt are majority- or near majority-BVAP," where "BVAP" means Black share of the voting-age population. *Milligan* Doc. 53 ¶ 60. They further stipulated that the Black Belt includes eighteen "core counties" (Barbour, Bullock, Butler, Choctaw, Crenshaw, Dallas, Greene, Hale, Lowndes, Macon, Marengo, Montgomery, Perry, Pickens, Pike, Russell, Sumter, and Wilcox), and that five other counties (Clarke, Conecuh, Escambia, Monroe, and Washington) are "sometimes included." *Id.* ¶ 61.

*Milligan* Doc. 186-1 at 1.

The 2023 Plan, like the 2021 Plan enjoined by this Court, has only one majority-Black district. *Compare Milligan* Doc. 186-1 at 2, *with Milligan* Doc. 107 at 2–3. In the 2023 Plan, the Black share of the voting-age population ("BVAP") in District 7 is 50.65% (it was 55.3% in the 2021 Plan). *Compare Milligan* Doc. 186-1 at 2, *with Milligan* Doc. 53 ¶ 57. The district with the next largest BVAP is District 2. *Milligan* Doc. 251 ¶ 3. In District 2, Black Alabamians account for 39.93% of the voting age population (it was 30.6% in the 2021 Plan). *Compare Milligan* Doc. 186-1 at 2, *with Milligan* Doc. 53 ¶ 128.

On July 26, 2023, the parties jointly proposed a scheduling order for remedial proceedings. *Milligan* Doc. 193. We adopted it. *Milligan* Doc. 194.

On July 27, 2023, the *Singleton* Plaintiffs objected to the 2023 Plan. *Singleton* Doc. 147. The *Singleton* Plaintiffs assert that the 2023 Plan violates the Fourteenth Amendment because the districts are racially gerrymandered. *Id.* at 16–22. The *Singleton* Plaintiffs request that the Court enjoin Secretary Allen from using the 2023 Plan and order a remedy, such as their own plan, which plan they say is race-neutral, honors traditional districting principles, and gives Black voters an opportunity to elect candidates of their choice in two districts. *Id.* at 27–28.

Also on July 27, 2023, the United States filed a Statement of Interest "to assist th[is] Court in evaluating whether the 2023 Plan fully cures the likely Section 2

violation in the 2021 Plan." *Milligan* Doc. 199 at 20. "The United States expresses no view on any factual disputes," "nor on any legal questions other than those related to applying Section 2 to the proposed remedy in this case." *Id.* at 5. The United States asserts that if this Court "conclude[s] that the 2023 Plan fails to completely remedy the likely Section 2 violation in the 2021 Plan, it must assume the responsibility of devising and implementing a legally acceptable plan." *Id.* at 19.

The *Milligan* and *Caster* Plaintiffs also timely objected to the 2023 Plan. *Milligan* Doc. 200; *Caster* Doc. 179. The *Milligan* Plaintiffs assert that the 2023 Plan offers no greater opportunity for Black Alabamians to elect a candidate of their choice than the 2021 Plan offered. *Milligan* Doc. 200 at 16–23. The *Milligan* Plaintiffs further say that the events giving rise to the 2023 Plan raise constitutional concerns because evidence suggests that the 2023 Plan was drawn to discriminate against Black Alabamians. *Id.* at 23–26. The *Milligan* Plaintiffs also ask us to enjoin Secretary Allen from conducting the 2024 election based on the 2023 Plan and order the Court-appointed Special Master to devise a new plan. *Id.* at 26.

The *Caster* Plaintiffs likewise assert that the 2023 Plan does not remedy the Section Two violation because it fails to create an additional district in which Black voters have an opportunity to elect a candidate of their choice. *Caster* Doc. 179 at 7–11. The *Caster* Plaintiffs also request that the Court enjoin the 2023 Plan and proceed to a court-driven remedial process to ensure relief for the 2024 election. *Id.*

at 3, 11.

The Court held a status conference on July 31, 2023. *See Milligan* Doc. 194 at 3. Before that conference, the parties indicated substantial disagreement about the nature of remedial proceedings. *See Milligan* Docs. 188, 195, 196, 201. During the conference, the Court and the parties discussed (1) a motion filed by the *Milligan* and *Caster* Plaintiffs to clarify the role of the *Singleton* Plaintiffs, *Milligan* Doc. 188; *see also Milligan* Docs. 195, 196, 201; (2) the *Singleton* Plaintiffs' motion for a preliminary injunction, *Singleton* Doc. 147; and (3) next steps.

After that conference, the Court clarified that remedial proceedings would be limited to whether the 2023 Plan complies with the order of this Court, affirmed by the Supreme Court, and Section Two. *Milligan* Doc. 203 at 4. The Court further clarified that because the scope of the remedial hearing would be limited, the constitutional claims of the *Singleton* Plaintiffs would not be at issue. *Id.* at 5. The Court then set a remedial hearing in *Milligan* and *Caster* for August 14, 2023, *id.* at 3, and a preliminary injunction hearing in *Singleton* to commence immediately after the remedial hearing, *id.* at 6.

On August 3, 2023, the State moved for clarification of the scope of remedial proceedings. *Milligan* Doc. 205. All Plaintiffs responded. *Milligan* Doc. 210; *Caster* Doc. 190; *Singleton* Doc. 160. Also on August 3, 2023, Congresswoman Terri Sewell (who represents District 7) and members of the Congressional Black Caucus

of the United States Congress sought leave to file an *amici curiae* brief in support of the Plaintiffs, which we granted, *Milligan* Docs. 208, 232, 236. Congresswoman Sewell and members of the Congressional Black Caucus assert that the 2023 Plan is an insufficient remedy for the likely Section Two violation found by this Court. *Milligan* Doc. 236 at 5. They too assert that this Court "should enjoin [the 2023 Plan] and direct the Special Master to redraw a map that complies with the Voting Rights Act." *Id.* at 10.

On August 4, 2023, the State responded to the Plaintiffs' objections to the 2023 Plan. *See Milligan* Doc. 220. The State defends the 2023 Plan as prioritizing "to the fullest extent possible" three communities of interest: the Black Belt, the Gulf Coast, and the Wiregrass.[8] *Id.* at 9. The State further asserts that the 2023 Plan fairly applies traditional districting "principles of compactness, county lines, and communities of interest," and because the *Caster* and *Milligan* Plaintiffs' "alternative plans would violate the traditional redistricting principles given effect in the 2023 Plan, [their] § 2 claims fail." *Id.* at 9–10.

On August 6, 2023, we again clarified the scope of the remedial proceedings

---

[8] We already have described the Black Belt. *See supra* at n.7. When the State refers to the "Gulf Coast," it refers to Mobile and Baldwin counties. *See Milligan* Doc. 220-11 at 5. When the State refers to the "Wiregrass," it refers to an area in the southeast part of the state that includes Barbour, Coffee, Covington, Crenshaw, Dale, Geneva, Henry, Houston, and Pike counties. *See id.* at 8.

in *Milligan* and *Caster*. *Milligan* Doc. 222. We explained that the purpose of those remedial proceedings would be to determine whether the 2023 Plan remedies the likely Section Two violation found by this Court and affirmed by the Supreme Court. *Id*. at 8–9. We reiterated that the remedial proceedings would not relitigate the findings made in connection with the previous liability determination. *Id*. at 11.

On August 7, 2023, all Plaintiffs replied in support of their objections to the 2023 Plan. *See Milligan* Doc. 225; *Caster* Doc. 195. The replies share a common premise: that any alleged reliance by the Legislature on traditional districting principles does not absolve the Legislature of its obligation to cure the Section Two violation found by this Court and affirmed by the Supreme Court. *See Milligan* Doc. 225 at 12; *Caster* Doc. 195 at 7–8.

On August 9, 2023, the National Republican Redistricting Trust ("the Trust") moved for leave to file an *amicus curiae* brief in support of the 2023 Plan, which the Court granted. *See Milligan* Docs. 230, 232, 234. The Trust asserts that the "2023 Plan adheres to traditional districting principles better than any of the Plaintiffs' plans, maintaining communities of interest that the 2021 Plan did not." *Milligan* Doc. 234 at 7. The Trust urges this Court to reject the Plaintiffs' remedial plans. *Id*. at 25.

Later that day, the *Milligan* and *Caster* Plaintiffs moved *in limine* to exclude testimony from certain experts and "any and all evidence, references to evidence,

testimony, or argument relating to the 2023 Plan's maintenance of communities of interest." *Milligan* Doc. 233 at 1. The State responded. *Milligan* Doc. 245.

On August 11, 2023, certain state and local elected officials in Alabama moved for leave to file an *amici curiae* brief in support of the Plaintiffs, which the Court granted. *See Milligan* Docs. 255, 258, 260. The elected officials join in full the *Milligan* Plaintiffs' objections and assert that this Court should enjoin Secretary Allen from using the 2023 Plan on the same grounds that we enjoined the 2021 Plan. *Milligan* Doc. 260 at 5, 14–15.

We held a remedial hearing in *Milligan* and *Caster* on August 14, 2023. *See Milligan* Doc. 203. Based on the agreement of all parties, the Court considered all evidence admitted in either *Milligan* or *Caster*, including evidence admitted during the preliminary injunction hearing, in both cases unless counsel raised a specific objection. *Id.* at 4; *Caster* Doc. 182; Aug. 14 Tr. 61. After the hearing, we directed the parties to submit proposed findings of fact and conclusions of law on August 19, 2023, and they did so. *See Milligan* Docs. 267, 268; *Caster* Docs. 220, 221.

## B.    Factual and Legal Background

### 1.    Constitutional and Statutory Provisions for Race In Redistricting

Article I, § 2, of the United States Constitution requires that Members of the House of Representatives "be apportioned among the several States . . . according to their respective Numbers" and "chosen every second Year by the People of the

several States." U.S. CONST. art. I, § 2. Each state's population is counted every ten years in a national census, and state legislatures rely on census data to apportion each state's congressional seats into districts.

Redistricting must comply with federal law. *Bartlett*, 556 U.S. at 7 (plurality opinion); *Reynolds v. Sims,* 377 U.S. 533, 554–60 (1964). At present, these cases concern a federal statutory requirement — Section Two, which provides:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).

> (b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

52 U.S.C. § 10301.

A state violates Section Two "if its districting plan provides 'less opportunity' for racial minorities [than for other members of the electorate] 'to elect representatives of their choice.'" *Abbott*, 138 S. Ct. at 2315 (internal quotation marks

omitted) (quoting *LULAC*, 548 U.S. at 425).

"The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Gingles*, 478 U.S. at 47. "Such a risk is greatest where minority and majority voters consistently prefer different candidates and where minority voters are submerged in a majority voting population that regularly defeats their choices." *Allen*, 143 S. Ct. at 1503 (internal quotation marks omitted) (alterations accepted).

"[A] plaintiff may allege a § 2 violation in a single-member district if the manipulation of districting lines fragments [or cracks] politically cohesive minority voters among several districts or packs them into one district or a small number of districts, and thereby dilutes the voting strength of members of the minority population." *Shaw v. Hunt*, 517 U.S. 899, 914 (1996) ("*Shaw II*").

"For the past forty years," federal courts "have evaluated claims brought under § 2 using the three-part framework developed in [*Gingles*]." *Allen*, 143 S. Ct. at 1502–03. To prove a Section Two violation under *Gingles*, "plaintiffs must satisfy three preconditions." *Id.* at 1503 (internal quotation marks omitted). "First, the minority group must be sufficiently large and [geographically] compact to constitute a majority in a reasonably configured district." *Id.* (internal quotation marks

omitted). "A district will be reasonably configured . . . if it comports with traditional districting criteria, such as being contiguous and reasonably compact." *Id.* "Second, the minority group must be able to show that it is politically cohesive." *Id.* (internal quotation marks omitted). "And third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it . . . to defeat the minority's preferred candidate." *Id.* (internal quotation marks omitted).

"Finally, a plaintiff who demonstrates the three preconditions must also show, under the totality of circumstances, that the political process is not equally open to minority voters." *Id.* (internal quotation marks omitted). "Courts use factors drawn from a report of the Senate Judiciary Committee accompanying the 1982 amendments to the [Voting Rights Act] (the Senate [F]actors) to make the totality-of-the-circumstances determination." *Georgia State Conf. of NAACP v. Fayette County Bd. of Comm'rs*, 775 F.3d 1336, 1342 (11th Cir. 2015); *accord Johnson v. De Grandy*, 512 U.S. 997, 1010 n.9 (1994); *infra* at Part IV.B.4.

The Senate Factors include:

(1) the history of voting-related discrimination in the State or political subdivision; (2) the extent to which voting in the elections of the State or political subdivision is racially polarized; (3) the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting; (4) the exclusion of members of the minority group from candidate slating processes; (5) the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health,

> which hinder their ability to participate effectively in the political process; (6) the use of overt or subtle racial appeals in political campaigns; and (7) the extent to which members of the minority group have been elected to public office in the jurisdiction.

*De Grandy*, 512 U.S. at 1010 n.9 (quoting *Gingles*, 478 U.S. at 44–45) (numerals added). Further, the Senate Factors include (8) "evidence demonstrating that elected officials are unresponsive to the particularized needs of the members of the minority group and (9) that the policy underlying the State's or the political subdivision's use of the contested practice or structure is tenuous may have probative value." *Id.* (quoting *Gingles*, 478 U.S. at 45) (numeral added).

The Senate Factors are not exhaustive. "Another relevant consideration is whether the number of districts in which the minority group forms an effective majority is roughly proportional to its share of the population in the relevant area." *LULAC*, 548 U.S. at 426; *accord De Grandy*, 512 U.S. at 1000. When a plaintiff alleges vote dilution "based on a statewide plan," the proportionality analysis ordinarily is statewide. *LULAC*, 548 U.S. at 437–38. Although proportionality may be a "relevant consideration" under the controlling Supreme Court test, it cannot be dispositive. Section Two does not "establish[] a right to have members of a protected class elected in numbers equal to their proportion in the population," 52 U.S.C. § 10301, and the Supreme Court has described at length the legislative history of that proportionality disclaimer. *See Allen*, 143 S. Ct. at 1500–01.

Because "the Equal Protection Clause restricts consideration of race and the

[Voting Rights Act] demands consideration of race, a legislature attempting to produce a lawful districting plan is vulnerable to competing hazards of liability." *Abbott*, 138 S. Ct. at 2315 (internal quotation marks omitted). "In an effort to harmonize these conflicting demands, [the Supreme Court has] assumed that compliance with the [Voting Rights Act] may justify the consideration of race in a way that would not otherwise be allowed." *Id.*; *accord Cooper*, 581 U.S. at 292.

### 2.    Congressional Redistricting in Alabama

Since 1973, Alabama has been apportioned seven seats in the United States House of Representatives. *Milligan* Doc. 53 ¶ 28. In all House elections held after the 1970 census and the 1980 census, Alabama elected all-white delegations. *Id.* ¶ 44. After the 1990 census, the Legislature failed to enact a congressional redistricting plan. *See Wesch*, 785 F. Supp. at 1494–95. Litigation ensued, and a federal court ultimately ordered elections held according to a plan that created one majority-Black district (District 7). *Wesch v. Folsom*, 6 F.3d 1465, 1467–68 (11th Cir. 1993); *Wesch*, 785 F. Supp. at 1498, 1581 app. A. In the 1992 election held using the court-ordered map, District 7 elected Alabama's first Black Congressman in over 90 years. *Milligan* Doc. 53 ¶ 44. District 7 remains majority-Black and in every election since 1992 has elected a Black Democrat. *Id.* ¶¶ 44, 47, 49, 58. After 2020 census data was released, Mr. Randy Hinaman prepared the 2021 Plan:



*Milligan* Doc. 70-2 at 40; *Milligan* Doc. 88-19.

### 3.   These Lawsuits

Three groups of plaintiffs sued to stop the State from conducting the 2022 elections with the 2021 Plan. *Allen*, 143 S. Ct. at 1502. As relevant here, we discuss the Section Two cases:

Page **32** of **198**

### a. *Milligan*

The *Milligan* Plaintiffs alleged that Section Two now requires two majority-Black or Black-opportunity congressional districts in Alabama.[9] The *Milligan* Plaintiffs asserted that the 2021 Plan reflected the Legislature's "desire to use . . . race to maintain power by packing one-third of Black Alabamians into [District 7] and cracking the remaining Black community." *Milligan* Doc. 1 ¶ 4.

To satisfy the first *Gingles* requirement, that Black voters as a group are "sufficiently large and geographically compact to constitute a majority in some reasonably configured legislative district." *Cooper*, 581 U.S. at 301 (internal quotation marks omitted). The *Milligan* Plaintiffs relied on the testimony of expert witness Dr. Moon Duchin. We found Dr. Duchin highly credible. *Milligan* Doc. 107 at 148–50.

Dr. Duchin opined in her report that because 27.16% of Alabama residents identified as Black on the 2020 Decennial Census, Black Alabamians are sufficiently numerous to constitute a majority in more than one congressional district. *Milligan* Doc. 68-5 at 5. Dr. Duchin testified that the 2021 Plan "pack[ed] Black population

---

[9] When we use the phrase "opportunity district" or "Black-opportunity," we mean a district in which a "meaningful number" of non-Black voters often "join[] a politically cohesive black community to elect" the Black-preferred candidate. *Cooper*, 581 U.S. at 303. We distinguish an opportunity district from a majority-Black district, in which Black people comprise "50 percent or more of the voting population and . . . constitute a compact voting majority" in the district. *Bartlett*, 556 U.S. at 19 (plurality opinion). For additional discussion, see *infra* at Part III.

into District 7 at an elevated level of over 55% BVAP, then crack[ed] Black population in Mobile, Montgomery, and the rural Black Belt across Districts 1, 2, and 3, so that none of them has more than about 30% BVAP." *Id.* at 6 fig.1; Tr. 564.[10]

As for compactness, Dr. Duchin included in her report a map that reflects the geographic dispersion of Black residents across Alabama. *Milligan* Doc. 68-5 at 12 fig.3. She opined that it is possible to draw two contiguous and reasonably compact majority-Black congressional districts; and she offered four illustrative plans ("the Duchin plans"). *Id.* at 7 fig.2. Dr. Duchin offered extensive analysis in her report and testimony during the preliminary injunction hearing about how her plans satisfied the one-person-one-vote rule, included contiguous districts, respected existing political subdivisions, and attempted to minimize county splits. *Id.* at 8; Tr. 586–90, 599, 626; *Milligan* Doc. 92-1.

Dr. Duchin also offered exhaustive analysis and testimony about the compactness of the districts in her plans. She described how she computed compactness scores using three metrics that are commonly cited in professional redistricting analyses: the Polsby-Popper score, the Reock score, and the cut-edges

---

[10] When we cite to the transcript from the 2022 preliminary injunction hearing, pincites are to the numbered pages of the transcript, not the CM/ECF pagination. *See Milligan* Doc. 105.

score. *Milligan* Doc. 68-5 at 9; Tr. 590–94.[11] Dr. Duchin provided average compactness scores for each of her plans on each of these metrics, *Milligan* Doc. 68-5 at 9, and testified, among other things, that all four of her plans were "superior to" and "significantly more compact than" the 2021 Plan using an average Polsby-Popper metric, *id.*; Tr. 593.

Dr. Duchin also testified that her plans respected the Black Belt as a community of interest as defined in the Legislature's 2021 redistricting guidelines. *See Milligan* Doc. 68-5 at 13; *Milligan* Doc. 88-23 at 2–3. Dr. Duchin observed that in the 2021 Plan, eight of the eighteen core Black Belt counties are "partially or fully excluded from majority-Black districts," while "[e]ach of the 18 Black Belt counties is contained in majority-Black districts in at least some" of her alternative plans. *Milligan* Doc. 68-5 at 13; *see also* Tr. 666–68. Ultimately, Dr. Duchin opined that the districts in her plans were "reasonably" compact. Tr. 594.

To satisfy the second and third *Gingles* requirements, that Black voters are "politically cohesive," and that each challenged district's white majority votes "sufficiently as a bloc to usually defeat [Black voters'] preferred candidate," *Cooper*, 581 U.S. at 302 (internal quotation marks omitted), the *Milligan* Plaintiffs relied on a racial polarization analysis conducted by expert witness Dr. Baodong Liu. We

---

[11] For an explanation of these metrics, *see Milligan* Doc. 107 at 61–62 n.9.

found Dr. Liu credible. *See Milligan* Doc. 107 at 174–175.

The *Milligan* Plaintiffs asked Dr. Liu to opine (1) whether racially polarized voting occurs in Alabama, and (2) whether such voting has resulted in the defeat of Black-preferred candidates in Alabama congressional elections. *Milligan* Doc. 68-1 at 1. Dr. Liu studied thirteen elections and opined that he observed racially polarized voting in all of them, which resulted in the defeat of Black-preferred candidates in all of them except those in District 7. *Milligan* Doc. 68-1 at 9, 11, 18. At the preliminary injunction hearing, Dr. Liu emphasized the clarity and starkness of the pattern of racially polarized voting that he observed. *See* Tr. 1271–76. He testified that racially polarized voting in Alabama is "very clear." Tr. 1293.

The *Milligan* Plaintiffs next argued that the Senate Factors "confirm[ed]" the Section Two violation. *Milligan* Doc. 69 at 16. The *Milligan* Plaintiffs emphasized Senate Factors 2 and 7 — racially polarized voting and a lack of Black electoral success — because in *Gingles* the Supreme Court flagged them as the "most important" factors, and because the parties' stipulations of fact established that they were not in dispute. *See id.* (citing *Milligan* Doc. 53 ¶¶ 44, 121, 167–69). The *Milligan* Plaintiffs asserted that Factors 1, 3, and 5 also are present because "Alabama has an undisputed and ongoing history of discrimination against Black people in voting, education, employment, health, and other areas." *Id.* at 17–18. The *Milligan* Plaintiffs relied on numerous fact stipulations, which we laid out at length

in the preliminary injunction. *See Milligan* Doc. 107 at 73–78 (quoting *Milligan*
Doc. 53 ¶¶ 130–54, 157–65).

In addition to the stipulated facts, the *Milligan* Plaintiffs relied on the expert
testimony of Dr. Joseph Bagley, whom we found credible. *See Milligan* Doc. 69 at
17–18; *Milligan* Doc. 107 at 185–187. Dr. Bagley opined about Senate Factors 1, 5,
6, 7, and 8, and he considered Factor 3 in connection with his discussion of Factor
1. *Milligan* Doc. 68-2 at 3–31. He opined that those Factors are present in Alabama
and together mean that the 2021 Plan would "result in impairment of black voters'
ability to participate fully and equitably in the political process of electing candidates
of their choice." Tr. 1177.

For all these reasons, the *Milligan* Plaintiffs asserted that they were likely to
prevail on their claim of vote dilution under the totality of circumstances.

### b. *Caster*

The *Caster* Plaintiffs likewise alleged that the 2021 Plan violated Section Two
because it "strategically cracks and packs Alabama's Black communities." *Caster*
Doc. 3 ¶ 1. The *Caster* Plaintiffs also requested a remedy that includes two majority-
Black or Black-opportunity districts. *Id.* at 31; *Caster* Doc. 97 ¶¶ 494–505.

To satisfy the first *Gingles* requirement, the *Caster* Plaintiffs relied on the
expert testimony of Mr. Bill Cooper. *Caster* Docs. 48, 56, 65. We found Mr. Cooper
highly credible. *See Milligan* Doc. 107 at 150–52. Mr. Cooper first opined that Black

Alabamians are sufficiently numerous to constitute a majority in more than one congressional district; Mr. Cooper explained that according to 2020 census data, Alabama's Black population increased by 83,618 residents, which constitutes a 6.53% increase in Alabama's Black population since 2010, which is 34% of the state's entire population increase since then. *Caster* Doc. 48 at 6–7. Mr. Cooper explained that there was a loss of 33,051 white persons during this time frame, a 1.03% decrease. *Id.* at 6 fig.1.

Mr. Cooper also opined that it is possible to draw two contiguous and reasonably compact majority-Black congressional districts; and he offered seven illustrative plans ("the Cooper plans"). *Caster* Doc. 48 at 20–36; *Caster* Doc. 65 at 2–6. Mr. Cooper testified that when he began his work, he expected to be able to draw illustrative plans with two reasonably compact majority-Black congressional districts because, at the same time the Legislature enacted the 2021 Plan, the Legislature also enacted a redistricting plan for the State Board of Education, which plan included two majority-Black districts. *Caster* Doc. 48 at 15–20; Tr. 433–37. Mr. Cooper testified that the Board of Education plan has included two Black-opportunity districts since 1996, and that continuously for those twenty-five years, more than half of Black voters in Alabama have lived in one of those two districts. *Caster* Doc. 48 at 16; Tr. 435. Mr. Cooper explained that the Board of Education plan splits Mobile County into two districts (with one district connecting Mobile

County to Montgomery County, and another connecting Mobile County to Baldwin County). Tr. 435–36; *Caster* Doc. 48 at 17 fig.8.

Like Dr. Duchin, Mr. Cooper offered extensive analysis and testimony about how his plans satisfied the one-person-one-vote rule, included contiguous districts, respected existing political subdivisions, and attempted to minimize county splits. Tr. 441–44, 446–47; *Caster* Doc. 48 at 22; *Caster* Doc. 65 at 5–6.

Also like Dr. Duchin, Mr. Cooper offered exhaustive analysis and testimony about the compactness of the districts in his plans. Mr. Cooper testified that he considered geographic compactness by "eyeballing" as he drew his plans, obtaining readouts of the Reock and Polsby-Popper compactness scores from the software program he was using as he drew, and trying to "make sure that [his] score was sort of in the ballpark of" the score for the 2021 Plan, which he used as a "possible yardstick." Tr. 444–46. He testified that all his plans either were at least as compact as the 2021 Plan, or they scored "slightly lower" than the 2021 Plan; he opined that all of his plans are "certainly within the normal range if you look at districts around the country." Tr. 446, 458; *accord Caster* Doc. 48 at 35–37.

Mr. Cooper further testified that he considered communities of interest in two ways: first, he considered "political subdivisions like counties and towns and cities," and second, he has "some knowledge of historical boundaries" and the Black Belt, so he considered the Black Belt. Tr. 447.

To satisfy the second and third *Gingles* requirements, that Black voters are "politically cohesive," and that each challenged district's white majority votes "sufficiently as a bloc to usually defeat [Black voters'] preferred candidate." *Cooper*, 581 U.S. at 302 (internal quotation marks omitted), the *Caster* Plaintiffs relied on a racial polarization analysis conducted by Dr. Maxwell Palmer, whom we found credible. *See Milligan* Doc. 107 at 174–176.

Dr. Palmer analyzed the extent to which voting is racially polarized in Congressional Districts 1, 2, 3, 6, and 7 because he was told that the proposed Black-opportunity districts would include voters from those districts. *Caster* Doc. 49 ¶ 9; Tr. 704. He examined how voters in those districts voted in the 2012, 2014, 2016, 2018, and 2020 general elections, as well as the 2017 special election for the United States Senate, and statewide elections for President, the United States Senate, Governor, Lieutenant Governor, Secretary of State, Attorney General, and several other offices. *Caster* Doc. 49 ¶¶ 6–7, 10; *see also* Tr. 707–13 (explaining how he used precinct-level data and analyzed the results on a district-by-district basis).

Dr. Palmer opined that "Black voters are extremely cohesive," *Caster* Doc. 49 ¶ 16, "[w]hite voters are highly cohesive," *id.* ¶ 17, and "[i]n every election, Black voters have a clear candidate of choice, and [w]hite voters are strongly opposed to this candidate," *id.* ¶ 18. He concluded that "[o]n average, Black voters supported their candidates of choice with 92.3% of the vote[,]" and "[o]n average, [w]hite

voters supported Black-preferred candidates with 15.4% of the vote, and in no election did this estimate exceed 26%." *Id.* ¶¶ 16–17. In his testimony, he characterized this evidence of racially polarized voting as "very strong." Tr. 701.

The *Caster* Plaintiffs then analyzed the Senate Factors, and they relied on judicial authorities, stipulated facts, and the testimony of Dr. Bridgett King, whom we found credible, *Milligan* Doc. 107 at 185–87. *Caster* Doc. 56 at 19–38. Dr. King opined that racially polarized voting in Alabama is "severe and ongoing," and "significantly and adversely impact[s] the ability of Black Alabamians to participate equally in the state's political process." *Caster* Doc. 50 at 4.

For all these reasons, the *Caster* Plaintiffs asserted that they were likely to prevail on their claim of vote dilution under the totality of circumstances.

### c.  The State

The State, in turn argued that the Committee properly started with the prior map and adjusted boundaries only as necessary to comply with the one-person, one-vote rule and serve traditional districting criteria. *See Milligan* Doc. 78 at 16. The State asserted that "nothing" in the Voting Rights Act "requires Alabama to draw two majority-black districts with slim black majorities as opposed to one majority-black district with a slightly larger majority." *Id.* at 17. We first discuss the State's position in *Milligan* during the preliminary injunction proceedings, and we then discuss the State's position in *Caster.*

### i.  The State's Arguments in *Milligan*

The State argued in *Milligan* that "[n]othing in Section 2 supports Plaintiffs' extraordinary request that this Court impose districts with Plaintiffs' surgically targeted racial compositions while jettisoning numerous traditional districting criteria." *Id.* at 18. The State relied on the expert testimony of Mr. Thomas M. Bryan. After an exhaustive credibility determination, we assigned "very little weight" to Mr. Bryan's testimony and found it "unreliable." *Milligan* Doc. 107 at 152–156; *see also infra* at Part IV.B.2.a.

The State argued that the Duchin plans did not respect the communities of interest in Alabama's Gulf Coast and the Wiregrass region. *Milligan* Doc. 78 at 82–84. The State objected to the Duchin plans on the ground that they "break up the Gulf Coast and scramble it with the Wiregrass," "separate Mobile and Baldwin Counties for the first time in half a century," and "split Mobile County for the first time in the State's history." *Id.* at 85. The State asserted that the Duchin plans did not respect the Black Belt because they split it between two districts. *Id.* at 85–86 n.15.

Mr. Bryan opined about compactness. He first opined that in each Duchin plan "compactness [wa]s sacrificed." *Milligan* Doc. 74-1 at 3. He later acknowledged and opined, however, that "Dr. Duchin's plans perform generally better *on average* than the [2021 Plan], although some districts are significantly less compact than

Alabama's." *Id.* at 19 (emphasis in original). And Mr. Bryan testified that he has "no opinion on what is reasonable and what is not reasonable" compactness. Tr. 979.

As for communities of interest, Mr. Bryan opined that Mobile and Baldwin counties are "inseparable." Tr. 1006. And he testified that the Black Belt is a community of interest and ultimately conceded that the Duchin plans had fewer splits than the 2021 Plan in the Black Belt. Tr. 1063–65.

Mr. Bryan explained his overall opinion that Dr. Duchin was able to "achieve a black majority population in two districts" only by "sacrific[ing]" traditional districting criteria. Tr. 874. He explained further his concern about "cracking and packing of incumbents." Tr. 874.

The State also offered testimony about the Gulf Coast community of interest from former Congressman Bradley Byrne, who testified that he did not want Mobile County to be split because he worried it would "lose[] its influence" politically. Tr. 1744.

The State briefly asserted that the *Milligan* Plaintiffs could not establish *Gingles* II and III because their racial polarization analysis was selective. *See Milligan* Doc. 78 at 97. But at the preliminary injunction hearing, the State offered the testimony of Dr. M.V. Hood, whom we found credible, *see Milligan* Doc. 107 at 176–77, and Dr. Hood testified that he and Dr. Liu "both found evidence of" racially polarized voting in Alabama. Tr. 1421.

The State then asserted that the "balance" of the Senate Factors favors the State because things in Alabama have "changed dramatically." *Milligan* Doc. 78 at 101–02 (internal quotation marks omitted) (quoting *Shelby County v. Holder*, 570 U.S. 529, 547 (2013)). As for Factor 1, the State acknowledged Alabama's "sordid history" and assert that it "should never be forgotten," but said that Alabama has "[o]vercome [i]ts [h]istory." *Id.* at 102. As for Factor 5, the State disputed that Black Alabamians still "bear the effects of discrimination," and that those effects "hinder their ability to participate effectively in the political process." *Id.* at 112 (internal quotation marks omitted) (quoting *Gingles*, 478 U.S. at 37). As for Factor 6, the State argued that historical evidence of racial appeals in campaigns is not probative of current conditions. *Id.* at 113–14. As for Factor 7, the State argued that minorities "have achieved a great deal of electoral success in Alabama's districted races for State offices." *Id.* at 116. As for Factor 8, the State vehemently disputed that elected officials in Alabama are not responsive to the needs of the Black community. *Id.* at 117–19. And as for Factor 9, the State urged that a procedure is tenuous only if it "markedly departs from past practices" and argued that the 2021 Plan was not tenuous because it did not meaningfully depart from the 2011 Plan. *Id.* at 119–20 (quoting S. Rep. 97-417 at 29 n.117).

The State did not offer any expert testimony about the Senate Factors.

### ii.  The State's Arguments in *Caster*

The State took much the same position in *Caster* that it took in *Milligan*, and Mr. Bryan attacked the Cooper plans for many of the same reasons he attacked the Duchin plans. We recite only a few relevant points.

First, with respect to *Gingles* I. On cross examination, Mr. Bryan conceded that he did not evaluate and had no opinion about whether the Cooper plans respected contiguity, or "the extent to which Mr. Cooper's plan[s] split political subdivisions." Tr. 931–32. When Mr. Bryan testified about compactness, he explained that he relied on compactness scores alone and did not "analyze any of the specific contours of the districts." Tr. 971.

After Mr. Bryan offered that testimony, the *Caster* Plaintiffs recalled his earlier testimony about how the Cooper plans "draw lines that appear to [him] to be based on race" and asked him where he offered any analysis "of the way in which specific districts in Mr. Cooper's illustrative plans are configured outside of their objective compactness scores." Tr. 972–73. Mr. Bryan testified that it "appears [he] may not have written text about that." Tr. 973.

When Mr. Bryan was asked about his opinions about communities of interest, he acknowledged that he did not analyze the Cooper plans based on communities of interest. Tr. 979–80.

As for *Gingles* II and III, Dr. Hood testified at the hearing that he had not

identified any errors in Dr. Palmer's work that would affect his analyses or conclusions. *See Caster* Doc. 66-2 at 2–34; Tr. 1407–11, 1449–50, 1456, 1459–61. Dr. Hood also testified that he did not dispute Dr. Palmer's conclusions that (1) "black voters in the areas he examined vote for the same candidates cohesively," (2) "black Alabamians and white Alabamians in the areas he examined consistently preferred different candidates," and (3) "the candidates preferred by white voters in the areas that he looked at regularly defeat the candidates preferred by black voters." Tr. 1445. Dr. Hood testified that he and Dr. Palmer both found a "substantive pattern" of racially polarized voting. Tr. 1448.

### 4.     Our Findings and Conclusions on Liability

"After reviewing th[e] extensive record," we "concluded in a 227-page opinion that the question whether [the 2021 Plan] likely violated § 2 was not a close one." *Allen*, 143 S. Ct. at 1502 (internal quotation marks omitted); *accord Milligan* Doc. 107 at 195; *Caster* Doc. 101 at 204. "It did." *Allen*, 143 S. Ct. at 1502; *accord Milligan* Doc. 107 at 195; *Caster* Doc. 101 at 204.

The parties developed such an extensive record and offered such fulsome legal arguments that it took us nearly ninety pages to describe their evidence and arguments. *See Milligan* Doc. 107 at 52–139. Our findings of fact and conclusions of law consumed eighty more pages. *See id.* at 139–210. They were exhaustive, and we do not repeat them here in full. We highlight those findings and conclusions that

are particularly relevant to our remedial task.

In our *Gingles* I analysis, we first found that the Plaintiffs "established that Black voters as a group are sufficiently large . . . to constitute a majority in a second majority-minority legislative district." *Id.* at 146 (internal quotation marks omitted). We then found that the Plaintiffs established that Black voters as a group are sufficiently geographically compact to constitute a majority in a second reasonably configured district. *Id.* at 147–74.

We began our compactness analysis with credibility determinations about the parties' expert witnesses. We found the testimony of Dr. Duchin and Mr. Cooper "highly credible," *id.* at 148–51, and we "assign[ed] very little weight to Mr. Bryan's testimony," *id.* at 152–56. We did not take lightly the decision not to credit Mr. Bryan. We based that decision on two evaluations — one that examined his credibility relative to that of Dr. Duchin and Mr. Cooper, and one that was not relative. *See id.* We expressed concern about instances in which Mr. Bryan "offered an opinion without a sufficient basis (or in some instances any basis)," enumerated seven examples, reviewed other "internal inconsistencies and vacillations," and described a demeanor that "reflected a lack of concern for whether [his] opinion was well-founded." *Id.* at 153–56.

We then reviewed "compactness scores" to assess whether the majority-Black congressional districts in the Duchin plans and the Cooper plans were "reasonably"

compact. *Id.* at 157–59. We determined that regardless of whether we relied strictly on the opinions of Dr. Duchin and Mr. Cooper about the reasonableness of the scores, or compared the scores for the illustrative plans to the scores for the 2021 Plan, the result was the same: the Plaintiffs' plans established that Black voters in Alabama could comprise a second reasonably configured majority-Black congressional district. *Id.* at 159.

Next, we considered the "eyeball" test for compactness. *See id.* at 159–62. Based on information in Dr. Duchin's report that the State did not dispute, we found that "there are areas of the state where much of Alabama's Black population is concentrated, and that many of these areas are in close proximity to each other." *Id.* at 161. We then found that the majority-Black districts in the Duchin plans and the Cooper plans appeared reasonably compact because we did not see "tentacles, appendages, bizarre shapes, or any other obvious irregularities that would make it difficult to find that any District 2 could be considered reasonably compact." *Id.* at 162.

Next, we discussed whether the Duchin plans and the Cooper plans "reflect reasonable compactness when our inquiry takes into account, as it must, traditional districting principles such as maintaining communities of interest and traditional boundaries." *Id.* (internal quotation marks omitted); *accord id.* at 162–74. We found that the Duchin plans and the Cooper plans respected existing political subdivisions

"at least as well as the [2021] Plan," and in some instances better than the 2021 Plan. *See id.* at 163–64.

We then turned to communities of interest. Before making findings, we reiterated the rule "that a Section Two district that is **reasonably** compact and regular, taking into account traditional districting principles, need not also defeat a rival compact district in a beauty contest." *Id.* at 165 (emphasis in original) (internal quotation marks omitted) (alterations accepted) (quoting *Bush v. Vera*, 517 U.S. 952, 977 (1996) (plurality opinion)). We were "careful to avoid the beauty contest that a great deal of testimony and argument seemed designed to try to win." *Id.*

We found that the Black Belt is an important community of interest, and that it was split among four congressional districts in the 2021 Plan: "Districts 1, 2, and 3, where the *Milligan* plaintiffs assert that their votes are diluted, and District 7, which the *Milligan* plaintiffs assert is packed." *Id.* at 167. In the Duchin plans and the Cooper plans, the "overwhelming majority of the Black Belt" was in "just two districts." *Id.* at 168. We noted that Mr. Bryan conceded that the Duchin plans and Cooper plans performed better than the 2021 Plan for the Black Belt. *Id.*

We then found that "[t]ogether with our finding that the Duchin plans and the Cooper plans respect existing political subdivisions, our finding that [they] respect the Black Belt supports a conclusion that [they] establish reasonable compactness." *Id.* at 169.

Although "we need not consider how . . . Districts 2 and 7 might perform in a beauty contest against other plans that also respect communities of interest," we nevertheless discussed the State's argument that the Duchin plans and Cooper plans ignored the Gulf Coast community of interest. *Id.* at 169–71. We found the "record about the Gulf Coast community of interest . . . less compelling," and that the State "overstate[d] the point." *Id.* at 169–70. Only two witnesses testified about the Gulf Coast. We discounted Mr. Bryan, and we found that the other witness did not support the State's "overdrawn argument that there can be no legitimate reason to split Mobile and Baldwin Counties consistent with traditional redistricting criteria." *Id.* at 170. We noted that the Legislature split Mobile and Baldwin Counties in its districting plan for the State Board of Education. *Id.* at 171.

We found that the State "d[id] not give either the *Milligan* Plaintiffs or the *Caster* Plaintiffs enough credit for the attention Dr. Duchin and Mr. Cooper paid to traditional redistricting criteria." *Id.* at 173. We found that their illustrative plans satisfied the reasonable compactness requirement for *Gingles* I.

Our findings about *Gingles* II and III were comparatively brief because the underlying facts were not in dispute. *See id.* at 174–78. We credited the testimony of Doctors Liu (the *Milligan* Plaintiffs' expert), Palmer (the *Caster* Plaintiffs' expert), and Hood (the State's expert). *See id.* All three experts found evidence of racially polarized voting in Alabama. Based on their testimony, we found that Black

voters in Alabama "are politically cohesive," that the challenged districts' "white majority votes sufficiently as a bloc to usually defeat Black voters' preferred candidate," *id.* at 174 (internal quotation marks omitted) (alterations accepted), and that "voting in Alabama, and in the districts at issue in this litigation, is racially polarized" for purposes of *Gingles* II and III, *id.* at 177–78.

We then discussed the Senate Factors. We found that Senate Factors 2 (racially polarized voting) and 7 (the extent to which Black Alabamians have been elected to public office) "weigh[] heavily in favor of" the Plaintiffs. *Id.* at 178–81. We found that Factors 1, 3, and 5 (all of which relate to Alabama's history of official discrimination against Black Alabamians) "weigh against" the State. *Id.* at 182–88. And we found that Factor 6 (racial appeals in political campaigns) "weighs in favor of" the Plaintiffs but "to a lesser degree" than Senate Factors 2, 7, 1, 3, and 5. *Id.* at 188–92. We made no findings about Factors 8 and 9, *id.* at 192–93, and we found that no Factor weighed in favor of the State. *Id.* at 195.

Finally, we discussed proportionality. We explained our understanding that under the Voting Rights Act and binding Supreme Court precedent, it is relevant, but not dispositive. *Id.* at 193. We rejected the State's argument that the Plaintiffs' arguments were "naked attempts to extract from Section 2 a non-existent right to proportional . . . racial representation in Congress." *Id.* at 195 (internal quotation marks omitted). And we stated that we did not resolve the motion for preliminary

injunctive relief "solely (or even in the main) by conducting a proportionality analysis" because, consistent with precedent, we conducted a thorough *Gingles* analysis and considered proportionality only as "part and parcel of the totality of the circumstances." *Id.*

Ultimately, we explained five reasons why we did not regard the liability question as "a close one":

> (1) We have considered a record that is extensive by any measure, and particularly extensive for a preliminary injunction proceeding, and the *Milligan* plaintiffs have adduced substantial evidence in support of their claim. (2) There is no serious dispute that the plaintiffs have established numerosity for purposes of *Gingles* I, nor that they have established sharply racially polarized voting for purposes of *Gingles* II and III, leaving only conclusions about reasonable compactness and the totality of the circumstances dependent upon our findings. (3) In our analysis of compactness, we have credited the *Milligan* plaintiffs' principal expert witness, Dr. Duchin, after a careful review of her reports and observation of her live testimony (which included the first cross-examination of her that occurred in this case). (4) Separately, we have discounted the testimony of Defendants' principal expert witness, Mr. Bryan, after a careful review of his reports and observation of his live testimony (which included the first cross-examination of him that occurred in this case). (5) If the *Milligan* record were insufficient on any issue (and it is not), the *Caster* record, which is equally fulsome, would fill in the gaps: the *Caster* record (which by the parties' agreement also is admitted in *Milligan*)*,* compels the same conclusion that we have reached in *Milligan*, both to this three-judge court and to Judge Manasco sitting alone.

*Id.* at 195–96. "Put differently," we said, "because of the posture of these consolidated cases, the record before us has not only once, but twice, established that the [2021] Plan substantially likely violates Section Two." *Id.* at 196.

### 5.  Supreme Court Affirmance

The Supreme Court affirmed the preliminary injunction in a 5-4 decision. We discuss that decision in three parts. We first discuss the part of the opinion that is binding precedent because it was joined by a majority of the Justices ("the Opinion of the Supreme Court"); we then discuss the portion of the Chief Justice's opinion that is the opinion of four Justices; we then discuss Justice Kavanaugh's concurrence.

### a.  Controlling Precedent

The Supreme Court began by directly stating the ruling:

> In January 2022, a three-judge District Court sitting in Alabama preliminarily enjoined the State from using the districting plan it had recently adopted for the 2022 congressional elections, finding that the plan likely violated Section 2 of the Voting Rights Act. This Court stayed the District Court's order pending further review. After conducting that review, we now affirm.

*Allen*, 143 S. Ct. at 1498 (internal citations omitted). Next, the Supreme Court recited relevant portions of the history of the Voting Rights Act, redistricting in Alabama, and these cases. *Id.* at 1498–1502. The Supreme Court then reiterated its ruling: "The District Court found that plaintiffs demonstrated a reasonable likelihood of success on their claim that [the 2021 Plan] violates § 2. We affirm that determination." *Id.* at 1502.

Next, the Supreme Court restated the controlling legal standards, as set forth in *Gingles* and applied by federal courts "[f]or the past forty years." *Id.* at 1502–04.

The majority opinion then again restated the ruling: "[a]s noted, the District Court concluded that plaintiffs' § 2 claim was likely to succeed under *Gingles*. Based on our review of the record, we agree." *Id.* at 1504 (internal citations omitted).

The Supreme Court then reviewed our analysis of each *Gingles* requirement. *Id.* at 1504–06. The Supreme Court agreed with our analysis as to each requirement. It did not hold, suggest, or even hint that any aspect of our *Gingles* analysis was erroneous. *See id.*

"With respect to the first *Gingles* precondition," the Supreme Court held that we "correctly found that black voters could constitute a majority in a second district that was reasonably configured." *Id.* at 1504 (internal quotation marks omitted). The Supreme Court ruled that "[t]he plaintiffs adduced eleven illustrative maps—that is, example districting maps that Alabama could enact—each of which contained two majority-black districts that comported with traditional districting criteria." *Id.*

The Supreme Court then considered the Duchin plans. It observed that we "explained that the maps submitted by [Dr. Duchin] performed generally better on average than did [the 2021 Plan]." *Id.* (internal quotation marks omitted) (alterations accepted). Likewise, the Supreme Court considered the Cooper plans. The Supreme Court observed that Mr. Cooper "produced districts roughly as compact as the existing plan." *Id.* And that "none of plaintiffs' maps contained any tentacles, appendages, bizarre shapes, or any other obvious irregularities that would make it

difficult to find them sufficiently compact." *Id.* (internal quotation marks omitted).

Next, the Supreme Court held that the "Plaintiffs' maps also satisfied other traditional districting criteria. They contained equal populations, were contiguous, and respected existing political subdivisions . . . . Indeed, some of plaintiffs' proposed maps split the same number of county lines as (or even *fewer* county lines than) the State's map." *Id.* (emphasis in original). Accordingly, the Supreme Court "agree[d] with" us that "plaintiffs' illustrative maps strongly suggested that Black voters in Alabama could constitute a majority in a second, reasonably configured, district." *Id.* (internal quotation marks omitted) (alterations accepted).

Next, the Supreme Court turned to the State's argument "that plaintiffs' maps were not reasonably configured because they failed to keep together a traditional community of interest within Alabama." *Id.* The Supreme Court recited the State's definition of "community of interest," as well as its argument that "the Gulf Coast region . . . is such a community of interest, and that plaintiffs' maps erred by separating it into two different districts." *Id.*

The Supreme Court "d[id] not find the State's argument persuasive." *Id.* at 1505. The Supreme Court reasoned that "[o]nly two witnesses testified that the Gulf Coast was a community of interest," that "testimony provided by one of those witnesses was partial, selectively informed, and poorly supported," and that "[t]he other witness, meanwhile, justified keeping the Gulf Coast together simply to

preserve political advantage." *Id.* (internal quotation marks omitted) (alterations accepted). The Supreme Court concluded that we "understandably found this testimony insufficient to sustain Alabama's overdrawn argument that there can be no legitimate reason to split the Gulf Coast region." *Id.* (internal quotation marks omitted).

Next, the Supreme Court considered an alternative basis for its agreement with our *Gingles* I analysis: that "[e]ven if the Gulf Coast did constitute a community of interest . . . [we] found that plaintiffs' maps would still be reasonably configured because they joined together a different community of interest called the Black Belt." *Id.* The Supreme Court then described the reasons why the Black Belt is a community of interest — its "high proportion of black voters, who share a rural geography, concentrated poverty, unequal access to government services, . . . lack of adequate healthcare, and a lineal connection to the many enslaved people brought there to work in the antebellum period." *Id.* (internal quotation marks omitted).

The Supreme Court agreed with us again, ruling that we "concluded— correctly, under [Supreme Court] precedent—that [we] did not have to conduct a beauty contest between plaintiffs' maps and the State's. There would be a split community of interest in both." *Id.* (internal quotation marks omitted) (alterations accepted) (quoting *Vera*, 517 U.S. at 977 (plurality opinion)).

The Supreme Court then rejected the State's argument that the 2021 Plan

satisfied Section Two because it performed better than Plaintiffs' illustrative plans on a core retention metric — "a term that refers to the proportion of districts that remain when a State transitions from one districting plan to another." *Id.* The Supreme Court rejected that metric on the ground that the Supreme Court "has never held that a State's adherence to a previously used districting plan can defeat a § 2 claim" because "[i]f that were the rule, a State could immunize from challenge a new racially discriminatory redistricting plan simply by claiming that it resembled an old racially discriminatory plan." *Id.* "That is not the law," the Supreme Court made clear: Section Two "does not permit a State to provide some voters less opportunity . . . to participate in the political process just because the State has done it before." *Id.* (internal quotation marks omitted).

The Supreme Court next discussed the second and third *Gingles* requirements. The Supreme Court accepted our determination that "there was no serious dispute that Black voters are politically cohesive, nor that the challenged districts' white majority votes sufficiently as a bloc to usually defeat Black voters' preferred candidate." *Id.* (internal quotation marks omitted). The Supreme Court recited the relevant racial polarization statistics and noted that the State's expert "conceded that the candidates preferred by white voters in the areas that he looked at regularly defeat the candidates preferred by Black voters." *Id.* (internal quotation marks omitted).

In the last step of its review of our analysis, the Supreme Court concluded that

the Plaintiffs "had carried their burden at the totality of circumstances stage." *Id.* at 1505–06. The Supreme Court upheld our findings that "elections in Alabama were racially polarized; that Black Alabamians enjoy virtually zero success in statewide elections; that political campaigns in Alabama had been characterized by overt or subtle racial appeals; and that Alabama's extensive history of repugnant racial and voting-related discrimination is undeniable and well documented." *Id.* at 1506 (internal quotation marks omitted).

The Supreme Court concluded its review of our analysis by again stating its ruling: "We see no reason to disturb the District Court's careful factual findings, which are subject to clear error review and have gone unchallenged by Alabama in any event. Nor is there a basis to upset the District Court's legal conclusions. The Court faithfully applied our precedents and correctly determined that, under existing law, [the 2021 Plan] violated § 2." *Id.* (internal quotation marks and citation omitted).

We have carefully reviewed the Opinion of the Supreme Court and discern no basis to conclude that any aspect of our Section Two analysis was erroneous.

Next, the Supreme Court turned to arguments by the State urging the Supreme Court to "remake [its] § 2 jurisprudence anew," which the Supreme Court described as "[t]he heart of these cases." *Id.* The Supreme Court explained that the "centerpiece of the State's effort is what it calls the 'race-neutral benchmark.'" *Id.* The Supreme

Court then described the benchmark, found the argument "compelling neither in theory nor in practice," and discussed problems with the argument. *Id.* at 1507–10.

Of special importance to these remedial proceedings, the Supreme Court rejected the State's assertion that "existing § 2 jurisprudence inevitably demands racial proportionality in districting, contrary to" Section Two. *Id.* at 1508. "[P]roperly applied," the Supreme Court explained, "the *Gingles* framework itself imposes meaningful constraints on proportionality, as [Supreme Court] decisions have frequently demonstrated." *Id.* The Supreme Court then discussed three cases to illustrate how *Gingles* constrains rather than requires proportionality: *Shaw v. Reno*, 509 U.S. 630, 633–34 (1993); *Miller* v. *Johnson*, 515 U.S. 900, 906, 910–11 (1995); and *Vera*, 517 U.S. at 957 (plurality opinion). *Allen*, 143 S. Ct. at 1508–09.

"Forcing proportional representation is unlawful," the Supreme Court reiterated, and Section Two "never requires adoption of districts that violate traditional redistricting principles." *Id.* at 1509–10 (internal quotation marks omitted) (alterations accepted). Rather, its "exacting requirements . . . limit judicial intervention to those instances of intensive racial politics where the excessive role of race in the electoral process . . . denies minority voters equal opportunity to participate." *Id.* at 1510 (internal quotation marks omitted) (alterations accepted).

In Part III-B-1 of the opinion, the Supreme Court then discussed "how the race-neutral benchmark would operate in practice." *Id.* Justice Kavanaugh did not

join Part III-B-1. *See id.* at 1497. Part III-B-1 is the only part of the Chief Justice's opinion that Justice Kavanaugh did not join. *See id.* We discuss it separately in the next segment of our analysis. *See infra* at Part I.B.5.b.

Finally, the Supreme Court rejected the State's arguments that the Supreme Court "should outright stop applying § 2 in cases like these" because it does not apply to single-member redistricting and is unconstitutional as we applied it. *Allen*, 143 S. Ct. at 1514. The Supreme Court observed that it has "applied § 2 to States' districting maps in an unbroken line of decisions stretching four decades" and has "unanimously held that § 2 and *Gingles* certainly . . . apply to claims challenging single-member districts.'" *Id.* at 1515 (internal quotation marks omitted) (alterations accepted) (quoting *Growe v. Emison*, 507 U.S. 25, 40 (1993)). The Supreme Court reasoned that adopting the State's approach would require it to abandon this precedent. The Supreme Court explained its refusal to do so: "Congress is undoubtedly aware of our construing § 2 to apply to districting challenges. It can change that if it likes. But until and unless it does, statutory *stare decisis* counsels our staying the course." *Id.*

The Supreme Court then rejected as foreclosed by longstanding precedent the State's argument that Section Two is unconstitutional as we applied it. *Id.* at 1516–17. The Court affirmed our judgments in *Caster* and *Milligan*. *Id.* at 1517.

### b.  Part III-B-1 of the Chief Justice's Opinion

In Part III-B-1, the Chief Justice, in an opinion joined by three other Justices, explained why the State's race-neutral benchmark approach would "fare[] poorly" in practice.[12] *Id.* at 1510 (Roberts, C.J.). The four justices explained that Alabama's benchmark would "change existing law" by "prohibiting the illustrative maps that plaintiffs submit to satisfy the first *Gingles* precondition from being based on race." *Id.* (internal quotation marks omitted). The four justices then explained why they saw "no reason to impose such a new rule." *Id.* The four justices acknowledged that the "line between racial predominance and racial consciousness can be difficult to discern," and explained their view that "it was not breached here." *Id.* at 1510–11.

We have considered Part III-B-1 carefully, and we do not discern anything about it that undermines our conclusion that the 2023 Plan does not remedy the Section Two violation that we found and the Supreme Court affirmed.

### c.  Justice Kavanaugh's Concurrence

Justice Kavanaugh "agree[d] with the [Supreme] Court that Alabama's redistricting plan violates § 2 of the Voting Rights Act." *Allen*, 143 S. Ct. at 1517

---

[12] We distinguish Part III-B-1, the opinion of four justices, from a "plurality opinion." "A plurality opinion is one that doesn't garner enough appellate judges' votes to constitute a majority, but has received the greatest number of votes of any of the opinions filed, among those opinions supporting the mandate." Bryan A. Garner, et al, The Law of Judicial Precedent 195 (2016) (internal quotation marks and footnote omitted) (alterations accepted). All the other parts of the Chief Justice's opinion garnered five votes.

(Kavanaugh, J., concurring). He "wr[o]te separately to emphasize four points." *Id.*
(Kavanaugh, J., concurring). *First,* Justice Kavanaugh emphasized that "the upshot
of Alabama's argument is that the Court should overrule *Gingles,*" "[b]ut the *stare
decisis* standard for this Court to overrule a statutory precedent, as distinct from a
constitutional precedent, is comparatively strict." *Id.* (Kavanaugh, J., concurring).
Justice Kavanaugh observed that "[i]n the past 37 years . . . Congress and the
President have not disturbed *Gingles,* even as they have made other changes to the
Voting Rights Act." *Id.* (Kavanaugh, J., concurring).

"*Second,*" Justice Kavanaugh emphasized, "Alabama contends that *Gingles*
inevitably requires a proportional number of majority-minority districts, which in
turn contravenes the proportionality disclaimer" in Section Two, but "Alabama's
premise is wrong." *Id.* at 1517–18 (Kavanaugh, J., concurring). "*Gingles* does not
mandate a proportional number of majority-minority districts." *Id.* at 1518
(Kavanaugh, J., concurring). Rather, "*Gingles* requires the creation of a majority-
minority district only when, among other things, (i) a State's redistricting map cracks
or packs a large and 'geographically compact' minority population and (ii) a
plaintiff's proposed alternative map and proposed majority-minority district are
'reasonably configured'—namely, by respecting compactness principles and other
traditional districting criteria such as county, city, and town lines." *Id.* (Kavanaugh,
J., concurring).

Justice Kavanaugh explained further that if "*Gingles* demanded a proportional number of majority-minority districts, States would be forced to group together geographically dispersed minority voters into unusually shaped districts, without concern for traditional districting criteria such as county, city, and town lines," but "*Gingles* and [the Supreme] Court's later decisions have flatly rejected that approach." *Id.* (Kavanaugh, J., concurring).

"*Third*," Justice Kavanaugh explained, "Alabama argues that courts should rely on race-blind computer simulations of redistricting maps to assess whether a State's plan abridges the right to vote on account of race," but as the Supreme Court "has long recognized—and as all Members of [the Supreme] Court . . . agree[d in *Allen*]—the text of § 2 establishes an effects test, not an intent test." *Id.* (Kavanaugh, J., concurring).

"*Fourth*," Justice Kavanaugh emphasized, "Alabama asserts that § 2, as construed by *Gingles* to require race-based redistricting in certain circumstances, exceeds Congress's remedial or preventive authority," but "the constitutional argument presented by Alabama is not persuasive in light of the Court's precedents." *Id.* at 1519 (Kavanaugh, J., concurring).

Justice Kavanaugh reiterated that he "vote[d] to affirm" and "concur[red] in all but Part III–B–1 of the Court's opinion." *Id.* (Kavanaugh, J., concurring).

\*\*\*

The State argues that Part III-B-1 tells us that only a plurality of Justices "concluded that at least some of the plans drawn by Bill Cooper did not breach the line between racial consciousness and racial predominance." *Milligan* Doc. 267 ¶ 39 (internal quotation marks omitted) (alterations accepted). The State overreads Part III-B-1 as leaving open for relitigation the question whether the Plaintiffs submitted at least one illustrative remedial plan in which race did not play an improper role.

The affirmance tells us that a majority of the Supreme Court concluded that the Plaintiffs satisfied their burden under *Gingles* I. This necessarily reflects a conclusion that the Plaintiffs submitted at least one illustrative map in which race did not play an improper role. Justice Kavanaugh's concurrence is to the same effect — Justice Kavanaugh did not suggest, let alone say, that he "vote[d] to affirm" despite finding that the Plaintiffs submitted no illustrative map that properly considered race. What Part III-B-1 tells us — and no more — is that only four Justices agreed with every statement in that Part.

### C.   Remedial Proceedings

We first discuss the Plaintiffs' objections to the 2023 Plan and the State's defense. We then discuss the parties' stipulations of fact and the remedial hearing.

### 1.   The *Milligan* Plaintiffs' Objections

The *Milligan* Plaintiffs object to the 2023 Plan on the ground that it "ignores this Court's preliminary injunction order and instead perpetuates the Voting Rights

Act violation that was the very reason that the Legislature redrew the map." *Milligan*

Doc. 200 at 6. The *Milligan* Plaintiffs assert that the 2023 Plan does not remedy the

Section Two violation we found because it does not include an additional

opportunity district. *Id.* They argue that District 2 is not an opportunity district

because the performance analyses prepared by Dr. Liu and the State indicate that

"Black-preferred candidates in the new CD2 will continue to lose 100% of biracial

elections . . . by 10%-points on average." *Id.* at 6–7 (citing *Milligan* Doc. 200-2 at 4

tbl.2).

   The *Milligan* Plaintiffs make three arguments to support their objection. *First*,

the *Milligan* Plaintiffs argue that the 2023 Plan fails to remedy the Section Two

violation we found because the 2023 Plan itself violates Section Two and dilutes

Black votes. *Id.* at 16–19. The *Milligan* Plaintiffs contend that the 2023 Plan "fails

th[e] § 2 remedial analysis for the same reasons its 2021 Plan did," because it

"permit[s] the white majority voting as a bloc in the new CD2 to easily and

consistently defeat Black-preferred candidates." *Id.* at 17.

   The *Milligan* Plaintiffs first rely on the State's evidence to make their point.

The Alabama Performance Analysis "found that *not once* in seven elections from

2018 to 2020 would Black voters' candidates overcome white bloc voting to win in

CD2." *Id.* at 18. And Dr. Liu's[13] analysis of 11 biracial elections in District 2

---

[13] The *Milligan* Plaintiffs relied on testimony from Dr. Liu during the preliminary

between 2014 and 2022 "shows zero Black electoral successes, with an average margin of defeat of over 10 percentage points," *id.*, because "voting is highly racially polarized," *Milligan* Doc. 200-2 at 1. Thus, the *Milligan* Plaintiffs say, "the new CD2 offers no more opportunity than did the old CD2." *Milligan* Doc. 200 at 19.

*Second*, the *Milligan* Plaintiffs argue that the legislative findings that accompany the 2023 Plan perpetuate the Section Two violation and contradict conclusions that we and the Supreme Court drew based on the evidence. *See id.* at 20–23. The *Milligan* Plaintiffs offer evidence to rebut the State's suggestion that there can be no legitimate reason to split Mobile and Baldwin counties: (1) a declaration by Alabama Representative Sam Jones, the first Black Mayor of Mobile, who "explains the many economic, cultural, religious, and social ties between much of Mobile and the Black Belt, in contrast to Baldwin County, which shares 'little of these cultural or community ties' with Mobile," *id.* at 22 (quoting *Milligan* Doc. 200-9 ¶ 15); and (2) an expert report prepared by Dr. Bagley,[14] who contrasts the "'intimate historical and socioeconomic ties' that the 'City of Mobile and the northern portion of Mobile County, including Prichard, have . . . with the Black Belt,'" with the "'ahistorical' effort to treat the Wiregrass or 'Mobile and Baldwin

---

injunction proceedings, and we found him credible. *Milligan* Doc. 107 at 174–75.

[14] The *Milligan* Plaintiffs relied on expert testimony from Dr. Bagley about the Senate Factors during the preliminary injunction proceedings, and we found him credible. *See Milligan* Doc. 107 at 78–81 and 185–87.

Counties as an inviolable'" community of interest, *id.* (quoting *Milligan* Doc. 200-15 at 1).

Further, the *Milligan* Plaintiffs urge that under binding precedent, we cannot defer to a redistricting policy of a state if it perpetuates vote dilution. *See id.* at 20 (citing *Allen*, 143 S. Ct. at 1505, and *LULAC*, 548 U.S. at 440–41).

The *Milligan* Plaintiffs assail the legislative findings on the grounds that they "contradict the Committee's own recently readopted guidelines, were never the subject of debate or public scrutiny, ignored input from Black Alabamians and legislators, and simply parroted attorney arguments already rejected by this Court and the Supreme Court." *Id.* at 20. The *Milligan* Plaintiffs observe that although the legislative findings prioritize as "non-negotiable" rules that there cannot be "more than six splits of county lines" and that the Black Belt, Gulf Coast, and Wiregrass be kept together "to the fullest extent possible," the guidelines prioritize compliance with Section Two over those rules. *Id.* at 20–21 (citing *Milligan* Doc. 200-4, Section 1, Findings 3(d), 3(e), 3(g)(4)(d), and *Milligan* Doc. 107 at 31) (internal quotation marks omitted). The *Milligan* Plaintiffs also observe that the guidelines did not set an "arbitrary ceiling" on the number of county splits and that the legislative findings "redefine[] 'community of interest.'" *Id.* at 21.

The *Milligan* Plaintiffs argue that the State ignores the Supreme Court's finding that the Duchin and Cooper plans "comported with traditional districting

criteria" even though they split Mobile and Baldwin counties. *Id.* at 21 (internal quotation marks omitted). And the *Milligan* Plaintiffs argue that in any event, the 2023 Plan does not satisfy the legislative finding that the specified communities must be kept together "to the fullest extent possible" because only the Gulf Coast is kept together, while the Black Belt remains split in a way that dilutes Black votes in District 2. *Id.* at 22 (internal quotation marks omitted).

*Third,* the *Milligan* Plaintiffs argue that the 2023 Plan raises constitutional concerns because it "may be" the product of intentional discrimination. *Id.* at 23–26. The *Milligan* Plaintiffs rest this argument on the "deliberate failure to remedy the identified [Section Two] violations"; white legislators' efforts to "cut out Black members on the Reapportionment Committee" from meaningful deliberation on the Committee's maps; public statements by legislators about their efforts to draw the 2023 Plan to maintain the Republican majority in the United States House of Representatives and convince one Supreme Court Justice to "see something different"; and the established availability of "less discriminatory alternative maps." *Id.* at 24–25 (internal quotation marks omitted).

The *Milligan* Plaintiffs ask that the Court enjoin Secretary Allen from using the 2023 Plan and direct the Special Master to draw a remedial map. *Id.* at 26.

### 2.   The *Caster* Plaintiffs' Objections

The *Caster* Plaintiffs assert that "Alabama is in open defiance of the federal

courts." *Caster* Doc. 179 at 2. They argue that the 2023 Plan "does not even come close to giving Black voters an additional opportunity to elect a candidate of their choice" because, like the 2021 Plan, it contains just one majority-Black district and "fails to provide an opportunity for Black voters to elect their preferred candidates in a second congressional district." *Id.* at 2, 8–9.

The *Caster* Plaintiffs rely on a performance analysis Dr. Palmer[15] prepared to examine District 2 in the 2023 Plan. *See id.* at 9–10; *Caster* Doc. 179-2. Dr. Palmer analyzed 17 statewide elections between 2016 and 2022 to evaluate the performance of Black-preferred candidates in District 2; he found "strong evidence of racially polarized voting" and concluded that Black-preferred candidates would have been defeated in 16 out of 17 races (approximately 94% of the time) in the new District 2. *Caster* Doc. 179-2 at 3, 6.

The *Caster* Plaintiffs urge us to ignore as irrelevant the discussion in the legislative findings about communities of interest. They contend that we and the Supreme Court already have found the State's arguments about communities of interest "'insufficient to sustain' Alabama's failure to provide an additional minority opportunity district." *Caster* Doc. 179 at 10 (quoting *Allen*, 143 S. Ct. at 1504–05).

If we consider the legislative findings, the *Caster* Plaintiffs identify a

---

[15] The *Caster* Plaintiffs relied on testimony from Dr. Palmer during the preliminary injunction proceedings, and we found him credible. *See Milligan* Doc. 174–76.

"glaringly absent" omission: "*any* discussion of the extent to which [the 2023 Plan] provides Black voters an opportunity to elect in a second congressional district." *Id.* at 11 (emphasis in original). According to the *Caster* Plaintiffs, the failure of the Legislature to explain how the 2023 Plan "*actually complies* with" Section Two is telling. *Id.* (emphasis in original)*.*

The *Caster* Plaintiffs, like the *Milligan* Plaintiffs, ask us to enjoin Secretary Allen from using the 2023 Plan and "proceed to a judicial remedial process to ensure . . . relief in time for the 2024 election." *Id*.

### 3.    The State's Defense of the 2023 Plan

At its core, the State's position is that even though the 2023 Plan does not contain an additional opportunity district, the Plaintiffs' objections fail under *Allen* because the 2023 Plan "cures the purported discrimination identified by Plaintiffs" by "prioritiz[ing] the Black Belt to the fullest extent possible . . . while still managing to preserve long-recognized communities of interest in the Gulf and Wiregrass." *Milligan* Doc. 220 at 9. The State contends that the "2023 Plan improves on the 2021 Plan and all of Plaintiffs' alternative plans by unifying the Black Belt while also respecting the Gulf and Wiregrass communities of interest." *Id.* at 27.

According to the State, "Plaintiffs cannot produce an alternative map with a second majority-Black district without splitting at least two of those communities of interest," so their Section Two challenge fails. *Id.* at 9. The State leans heavily on

the statement in *Allen* that Section Two "never require[s] adoption of districts that violate traditional redistricting principles." 143 S. Ct. at 1510 (internal quotation marks omitted).

The State argues that it is not in "defiance" of a court order because "[t]here are many ways for a State to satisfy § 2's demand of 'equally open' districts." *Milligan* Doc. 220 at 9. The State contends that the Plaintiffs "now argue that § 2 requires this Court to adopt a plan that divides communities of interest in the Gulf and Wiregrass to advance racial quotas in districting, but *Allen* forecloses that position." *Id.* at 10.

The State makes four arguments in defense of the 2023 Plan. *First*, the State argues that the 2023 Plan remedies the Section Two violation we found because the 2023 Plan complies with Section Two. *Id.* at 29. The State begins with the premise that it "completely remedies a Section 2 violation . . . by enacting *any* new redistricting legislation that complies with Section 2." *Id.* (emphasis in original). The State then reasons that the Plaintiffs must prove that the 2023 Plan is not "equally open." *Id.* at 31 (internal quotation marks omitted). The State argues that our "assessment," *id.* at 32, that "any remedial plan will need to include two districts in which Black voters either comprise a voting-age majority or something quite close to it," *Milligan* Doc. 107 at 6, was "'based on the [2021] Legislature's redistricting guidelines'" and "'choices that the [2021] Plan made,' all of which came *before*" the

2023 Plan, *Milligan* Doc. 220 at 32 (emphasis in original) (quoting *Milligan* Doc. 7 at 149, 151).

The States cites *Dillard v. Crenshaw County*, 831 F.2d 246, 250 (11th Cir. 1987), to say that we cannot focus exclusively on evidence about the 2021 Plan to evaluate whether the 2023 Plan is a sufficient remedy. *Milligan* Doc. 220 at 34–35 ("The evidence showing a violation in an *existing* election scheme may not be completely coextensive with a *proposed* alternative." (emphasis in original)).

The State contends that the 2023 Plan remedied the discriminatory effects of the 2021 Plan by applying traditional redistricting principles "as fairly" to majority-Black communities in the Black Belt and Montgomery "as to the Gulf and the Wiregrass." *Id.* at 33. The State claims that the 2023 Plan is "entitled to the presumption of legality" and "the presumption of good faith," and is governing law unless it is found to violate federal law. *Id.* at 36–37.

*Second*, the State asserts that the 2023 Plan complies with Section Two, and Plaintiffs cannot produce a reasonably configured alternative map. *See id.* at 37–60. The State urges that neither we nor the Supreme Court "ever said that § 2 requires the State to subordinate 'nonracial communities of interest' in the Gulf and Wiregrass to Plaintiffs' racial goals." *Id.* at 38. The State contends that the Plaintiffs cannot satisfy *Gingles* I because they did not offer a plan that "meet[s] or beat[s]" the 2023 Plan "on the traditional principles of compactness, maintaining

communities of interest, and maintaining political subdivisions that are adhered to in the State's plan." *Id.* at 38–39 (internal quotation marks omitted). "The focus now is on the 2023 Plan," the State says, and the Plaintiffs cannot lawfully surpass it. *Id.* at 40–41.

As for communities of interest, the State asserts that the 2023 Plan "resolves the concerns about communities of interest that Plaintiffs said was 'the heart' of their challenge to the 2021 Plan." *Id.* at 41. The State says that the Supreme Court's ruling that it was "not persuaded that the Gulf was a community of interest" would "surprise Alabamians and has been answered by the legislative record for the 2023 Plan." *Id.* at 41–42. The State claims that its argument on this issue is beyond dispute because the 2023 Plan "answers Plaintiffs' call to unify the Black Belt into two districts, without sacrificing indisputable communities of interest in the Gulf and Wiregrass regions." *Id.* at 42. The State contends that "[t]here can be no dispute that the 2023 Plan's stated goal of keeping the Gulf Coast together and the Wiregrass region together is a legitimate one, and § 2 does not (and cannot) require the State to disregard that legitimate race-neutral purpose in redistricting." *Id.* at 43. And the State contends, quoting the principal dissent in *Allen*, that the Gulf Coast is "indisputably a community of interest." *Id.* at 44 (internal quotation marks omitted) (alterations accepted).

The State offers two bodies of evidence to support its assertions about

communities of interest: (1) the legislative findings that accompanied the 2023 Plan, and (2) evidence about the Gulf Coast and the Wiregrass that the Legislature considered in 2023. *Id.* at 44–50. Based on this evidence, the State concludes that this is "no longer a case in which there would be a split community of interest in both the State's plan and Plaintiffs' alternatives," and "Plaintiffs will not be able to show that there is a plan on par with the 2023 Plan that also creates an additional reasonably configured majority-Black district." *Id.* at 51 (internal quotation marks omitted) (alterations accepted).

As for compactness and county splits, the State asserts that "each of Plaintiffs' alternative maps fails to match the 2023 Plan on compactness, county splits, or both." *Id.* at 56. The State argues that "a Plaintiff cannot advocate for a less compact plan for exclusively racial reasons." *Id.* at 57. The State urges us to disregard our previous finding that the Plaintiffs adduced maps that respected the guidelines because "evidence about the 2021 Plan based on its 2021 principles does not shine light on whether the 2023 Plan has discriminatory effects." *Id.*

The State relies on the expert report of Mr. Sean Trende, who "assessed the 2023 Plan and each of Plaintiffs' alternative plans based on the three compactness measures Dr. Duchin used in her earlier report." *Id.* Mr. Trende concluded that "the 2023 Plan measures as more compact" on all three scores "than Duchin Plans A, C, and D" and all the Cooper plans. *Id.*; *see also Milligan* Doc. 220-12 at 6–11. Mr.

Trende concedes that on two of the measures (Polsby-Popper and Cut Edges), the Duchin Plan B ties or beats the 2023 Plan, and on one of the measures (Cut Edges), a map that the *Milligan* and *Caster* Plaintiffs submitted to the Committee during the 2023 legislative process ("the VRA Plan")[16] ties the 2023 Plan. *See Milligan* Doc. 220 at 57. The State argues that Duchin Plan B and the VRA Plan "still fail under *Allen* because they have more county splits" (seven) than the 2023 Plan has (six). *Id.* at 58.

The State claims that if "Plaintiffs' underperforming plans could be used to replace a 2023 Plan that more fully and fairly applies legitimate principles across the State, the result will be . . . affirmative action in redistricting," which would be unconstitutional. *Id.* at 59–60.

*Third*, the State urges us to reject the Plaintiffs' understanding of an opportunity district on constitutional avoidance grounds. *See id.* at 60–68. The State begins with the undisputed premise that under Section Two, a remedial district need not be majority-Black. *Id.* at 60. The State then argues that nothing in *Allen* could "justify . . . replacing the 2023 Plan with Plaintiffs' preferred alternatives that elevate

---

[16] The *Milligan* and *Caster* Plaintiffs do not offer the VRA Plan in this litigation as a remedial map for purposes of satisfying *Gingles* I or for any other purpose. *See* Aug. 14 Tr. 123. It is in the record only because they proposed it to the Committee and the State's expert witness, Mr. Bryan, prepared a report that includes statements about it. *See Milligan* Doc. 220-10 at 53, *discussed infra* at Part IV.B.2.a.

the Black Belt's demographics over its historical boundaries." *Id.* at 61. The State

then argues that "*all* race-based government action must satisfy strict scrutiny," that

"[f]orcing proportional representation is not a compelling governmental interest,"

and that "sacrificing neutral [redistricting] principles to race is unlawful." *Id.* at 63

(emphasis in original) (internal quotation marks omitted).

The State argues that Plaintiffs' interpretation of Section Two contravenes

"two equal protection principles: the principle that race can never be used as a

negative or operate as a stereotype and the principle that race-based action can't

extend indefinitely into the future." *Id.* at 64–67. The State says that the Plaintiffs'

position "depends on stereotypes about how minority citizens vote as groups . . . and

not on identified instances of past discrimination." *Id.* at 68.

In their *fourth* argument, the State contends that we should reject the *Milligan*

Plaintiffs' intentional discrimination argument as cursory and because there is an

"obvious alternative explanation for the 2023 Plan: respect for communities of

interest." *Id.* at 68–71 (internal quotation marks omitted). And the State says the

*Milligan* Plaintiffs "rely on the complaints of Democrats in the Legislature." *Id.* at

70.

The State submitted with its brief numerous exhibits, including the 2023 Plan,

transcripts of the Committee's public hearings, a supplemental report prepared by

Mr. Bryan, Mr. Trende's report, and materials from the legislative process about two

of the three communities of interest they urge us to consider: the Gulf Coast and the Wiregrass. *See Milligan* Docs. 220-1–220-19.

The State cites Mr. Bryan's 2023 report four times, and three of those are in reference to the VRA Plan. *See Milligan* Doc. 220 at 21 (in the "Background" section of the brief, to describe how the VRA Plan treats Houston County); *id.* (also in the "Background" section of the brief, to say that in the VRA Plan, the BVAP for District 2 is 50%, and the BVAP for District 7 is 54%); *id.* at 58 (in the constitutional avoidance argument, to assert that the VRA Plan splits counties "along racial lines, in service of hitting a racial target"). The fourth citation was as evidence that District 2 in the 2023 Plan has a BVAP of 39.93%, which is a stipulated fact. *See id.* at 28; *Milligan* Doc. 251 ¶ 4.

Nowhere does the State argue (or even suggest) that District 2 in the 2023 Plan is (or could be) an opportunity district.

### 4. The Plaintiffs' Replies

#### a. The *Milligan* Plaintiffs

The *Milligan* Plaintiffs reply that it is "undisputed and dispositive" that the 2023 Plan "offers no new opportunity district." *Milligan* Doc. 225 at 2. The *Milligan* Plaintiffs accuse the State of ignoring the finding by us and the Supreme Court that they already have satisfied *Gingles* I, and of "try[ing] to justify the 2023 Plan through newly contrived [legislative] 'findings' that perpetuate the [Section Two] violation

and contradict their own guidelines." *Id.*

The *Milligan* Plaintiffs assert that the State "cannot . . . cite a single case in which a court has ruled that a remedial plan that fails to meaningfully increase the effective opportunity of minority voters to elect their preferred representatives is a valid [Section Two] remedy." *Id.* at 2–3.

The *Milligan* Plaintiffs distinguish their claim of vote dilution, for which they say the remedy is an additional opportunity district, from a racial gerrymandering claim, for which the remedy is "merely to undo a specific, identified racial split regardless of electoral outcomes." *Id.* at 4. The *Milligan* Plaintiffs say that the State's arguments about unifying the Black Belt fail to appreciate this distinction. *Id.*

The *Milligan* Plaintiffs resist the State's reliance on *Dillard* to reset the *Gingles* analysis. *Id.* at 5. They say the State misreads *Dillard*, which involved a complete reconfiguration of the electoral mechanism from an at-large system to a single-member system with an at-large chair. *See id.* (citing *Dillard*, 831 F.2d at 250). In that context, the *Milligan* Plaintiffs say, it "makes sense" for a court to "compare the differences between the new and old" maps with the understanding that "evidence showing a violation in an existing [at-large] election scheme may not be completely coextensive with a proposed alternative election system." *Id.* at 6 (internal quotation marks omitted). According to the *Milligan* Plaintiffs, that understanding does not foreclose, in a vote dilution case without an entirely new

electoral mechanism, focusing the question on "whether the new map continues to dilute Black votes as the old map did or whether the new map creates an 'opportunity in the real sense of that term.'" *Id.* (quoting *LULAC*, 548 U.S. at 429).

The *Milligan* Plaintiffs urge that if we reset the *Gingles* analysis, we will necessarily allow "infinite bites at the apple[:] Alabama would be permitted to simply designate new 'significant' communities of interest and anoint them *post hoc*, point to them as evidence of newfound compliance, and relitigate the merits again and again—all while refusing to remedy persistent vote dilution." *Id.*

The *Milligan* Plaintiffs argue that the State's defense of the 2023 Plan invites the very beauty contest that we must avoid, and that federal law does not require a Section Two plaintiff to "meet or beat each and every one of [a State's] selected and curated districting principles" on remedy. *Id.* at 8. If that were the rule, the *Milligan* Plaintiffs say they would be required to "play a continuous game of whack-a-mole that would delay or prevent meaningful relief." *Id.*

The *Milligan* Plaintiffs point out that the guidelines the Legislature used in 2023 were the exact same guidelines the Legislature used in 2021. *Id.* at 9. And the *Milligan* Plaintiffs say that if we pay as much attention to the legislative findings that accompanied the 2023 Plan as the State urges us to, we will run afoul of the rule that legislative intent is not relevant in a Section Two analysis. *Id.*

Finally, the *Milligan* Plaintiffs say that the State badly misreads *Allen* as

"authoriz[ing] states to reverse engineer redistricting factors that entrench vote dilution." *Id.* at 11. The *Milligan* Plaintiffs argue that *Allen* "specifically *rejected* this theory when it held that a state may not deploy purportedly neutral redistricting criteria to provide some voters less opportunity . . . to participate in the political process." *Id.* (emphasis in original) (internal quotation marks omitted).

### b.  The *Caster* Plaintiffs

The *Caster* Plaintiffs reply that "Alabama is fighting a battle it has already lost[]" and that "[s]o committed is the State to maintaining a racially dilutive map that it turns a deaf ear to the express rulings of this Court and the Supreme Court." *Caster* Doc. 195 at 2. The *Caster* Plaintiffs urge us "not [to] countenance Alabama's repeated contravention" of our instructions. *Id.*

The *Caster* Plaintiffs make three arguments on reply. *First*, they argue that Section Two liability can be remedied "only by a plan that cures the established vote dilution." *Id.* at 3. They urge that the liability and remedy inquiries are inextricably intertwined, such that whether a map "is a Section 2 *remedy* is . . . a measure of whether it addresses the State's Section 2 *liability*." *Id.* (emphasis in original).

The *Caster* Plaintiffs attack the State's attempt to "completely reset[] the State's liability such that Plaintiffs must run the *Gingles* gauntlet anew" as unprecedented. *Id.* at 4. The *Caster* Plaintiffs assert that *Covington*, 138 S. Ct. at 2553, forecloses the State's position, and they make the same argument about

*Dillard* that the *Milligan* Plaintiffs make. *See Caster* Doc. 195 at 4–6.

The *Caster* Plaintiffs criticize the State's argument about legislative deference to the 2023 Plan as overdrawn, arguing that "deference does not mean that the Court abdicates its responsibility to determine whether the remedial plan in fact remedies the violation." *Id.* at 8.

The *Caster* Plaintiffs expressly disclaim a beauty contest: "Plaintiffs do not ask the Court to reject the 2023 Plan in favor of a plan it finds preferable. They ask the Court to strike down the 2023 Plan because they have provided unrefuted evidence that it fails to provide the appropriate remedy this Court found was necessary to cure the Section 2 violation." *Id.* at 9 (internal quotation marks omitted).

*Second*, the *Caster* Plaintiffs assert that the State misreads the Supreme Court's affirmance of the preliminary injunction. *Id.* at 10–12. The *Caster* Plaintiffs argue that *Allen* did not require a "'meet or beat' standard for illustrative maps" and did not adopt a standard that "would allow the remedial process to continue ad infinitum—so long as one party could produce a new map that improved compactness scores or county splits." *Id.* at 10–11.

The *Caster* Plaintiffs reply to the State's argument about affirmative action in redistricting by directing us to the statement in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 143 S. Ct. 2141, 2162 (2023), that "remediating specific, identified instances of past discrimination that violated the

Constitution or a statute" is a "compelling interest[] that permit[s] resort to race-based government action"; and the holding in *Allen*, 143 S. Ct. at 1516–17, that for the last forty years, "[the Supreme] Court and the lower federal courts have repeatedly applied" Section Two "and, under certain circumstances, have authorized race-based redistricting as a remedy" for discriminatory redistricting maps. *Caster* Doc. 195 at 12.

*Third*, the *Caster* Plaintiffs argue that the State concedes that the 2023 Plan does not provide Black voters an additional opportunity district. *Caster* Doc. 195 at 13–14. The *Caster* Plaintiffs urge us that this fact is dispositive. *See id.*

Ultimately, the *Caster* Plaintiffs contend that "[i]f there were any doubt that Section 2 remains essential to the protection of voting rights in America, Alabama's brazen refusal to provide an equal opportunity for Black voters in opposition to multiple federal court opinions—six decades after the passage of the Voting Rights Act—silences it, resoundingly." *Id.* at 15.

### 5.    The Parties' Motions for Clarification

While the parties were preparing their briefs, the *Milligan* and *Caster* Plaintiffs, as well as the State, each filed motions for clarification regarding the upcoming hearing. *See Milligan* Docs. 188, 205. The *Milligan* and *Caster* Plaintiffs sought to clarify the role of the *Singleton* Plaintiffs, *Milligan* Doc. 188 at 2, while the State asked for a ruling on whether the Court would "foreclose consideration" of

evidence it intended to offer in support of their *Gingles* I argument, *Milligan* Doc. 205 at 4–5. The State advised us that it would offer evidence "on whether race would now predominate in Plaintiffs' alternative approaches, as illuminated by new arguments in Plaintiffs' objections and their plan presented to the 2023 Reapportionment Committee." *Id.* at 5. And the State alerted us that it would not offer any evidence "challenging the demographic or election numbers in the performance reports" offered by the Plaintiffs (*i.e.*, the Palmer and Liu Reports). *Id.* at 6 (internal quotation marks omitted).

In response, the *Milligan* Plaintiffs asserted that "the sole objective of this remedial hearing is answering whether Alabama's new map remedies the likely [Section Two] violation." *Milligan* Doc. 210 at 1. "As such," the *Milligan* Plaintiffs continued, the State is "bar[red] . . . from relitigating factual and legal issues that this Court and the Supreme Court resolved at the preliminary injunction liability stage— including whether Mobile-Baldwin is an inviolable community of interest that may never be split, whether the legislature's prioritizing particular communities of interest immunizes the 2021 Plan from Section 2 liability, and whether Plaintiffs' illustrative maps are reasonably configured." *Id.* at 2. The *Milligan* Plaintiffs asserted that "the undisputed evidence proves that [the 2023 Plan] does not satisfy the preliminary injunction." *Id.* at 2–3.

The *Caster* Plaintiffs responded similarly. The *Caster* Plaintiffs argued that

"the question of Alabama's liability is not an open one for purposes of these preliminary injunction proceedings," because "[t]hat is precisely what the Supreme Court decided when it affirmed this Court's preliminary injunction just a few months ago." *Caster* Doc. 190 at 2 & Part I. "Rather," the *Caster* Plaintiffs argued, "the question before the Court is whether the 2023 Plan actually remedies the State's likely violation." *Id.* at 2, 7–8. The *Caster* Plaintiffs asserted that to answer that question, we needed only to determine "whether the 2023 Plan remedies the vote dilution identified during the liability phase by providing Black Alabamians with an additional opportunity district." *Id.* at 8. Likewise, the *Caster* Plaintiffs asserted that we should exclude as irrelevant the State's evidence that the 2023 Plan respects communities of interest. *Id.* at 12–13. The *Caster* Plaintiffs argued that on remedy, Section Two is not "a counting exercise of how many communities of interest can be kept whole." *Id.* at 12. They urged that the Gulf Coast evidence was merely an attempt to relitigate our findings about that community, which should occur only during a trial on the merits, not during the remedial phase of preliminary injunction proceedings. *Id.* at 13–14.

We issued orders clarifying that the scope of the remedial hearing would be limited to "the essential question whether the 2023 Plan complies with the order of this Court, affirmed by the Supreme Court, and with Section Two." *Milligan* Doc. 203 at 4; *see also Milligan* Doc. 222 at 9. We cited the rules that "any proposal to

remedy a Section Two violation must itself conform with Section Two," and that "[t]o find a violation of Section 2, there must be evidence that the remedial plan denies equal access to the political process." *Milligan* Doc. 222 at 10 (alterations accepted) (quoting *Dillard*, 831 F.2d at 249–50).

Accordingly, we ruled that "[a]lthough the parties may rely on evidence adduced in the original preliminary injunction proceedings conducted in January 2022 to establish their assertions that the 2023 Plan is or is not a sufficient remedy for the Section Two violation found by this Court and affirmed by the Supreme Court, th[e] remedial hearing w[ould] not relitigate the issue of that likely Section Two violation." *Milligan* Doc. 203 at 4. We reasoned that this limitation "follow[ed] applicable binding Supreme Court precedent and [wa]s consistent with the nature of remedial proceedings in other redistricting cases." *Id.* (citing *Covington*, 138 S. Ct. at 2348; and *Jacksonville Branch of the NAACP v. City of Jacksonville*, No. 3:22-cv-493-MMM-LLL, 2022 WL 17751416, 2022 U.S. Dist. LEXIS 227920 (M.D. Fla. Dec. 19, 2022)). We specifically noted that "[i]f the Defendants seek to answer the Plaintiffs' objections that the 2023 Plan does not fully remediate the likely Section Two violation by offering evidence about 'communities of interest,' 'compactness,' and 'county splits,' they may do so." *Milligan* Doc. 222 at 10. But we reserved ruling on the admissibility of any particular exhibits that the parties intended to offer at the hearing. *Id.* at 10–11.

We explained that "it would be unprecedented for this Court to relitigate the likely Section Two violation during these remedial proceedings," and that we "w[ould] not do so" because "[w]e are not at square one in these cases." *Milligan* Doc. 203 at 4. We observed that "this manner of proceeding [wa]s consistent with the [State's] request that the Court conduct remedial proceedings at this time and delay any final trial on the merits . . . until after the 2024 election." *Id.* at 5. And we explained why we would not require Plaintiffs to amend or supplement complaints, as the State suggested. *See id.* at 6–7.

### 6.    The Plaintiffs' Motion *in Limine*

The *Milligan* and *Caster* Plaintiffs also jointly filed a motion *in limine* in advance of the remedial hearing to exclude "the expert testimony of Mr. Thomas Bryan and Mr. Sean Trende, as well as any and all evidence, references to evidence, testimony, or argument relating to the 2023 Plan's maintenance of communities of interest." *Milligan* Doc. 233 at 1. The Plaintiffs asserted that because of the limited scope of the hearing, this evidence was irrelevant and immaterial. *See id.* at 3–12.

As for Mr. Trende, the Plaintiffs asserted that his "analysis—which compares Plaintiffs' illustrative plans, a plan Plaintiffs proposed to the Legislature, and the State's 2021 and 2023 Plans under compactness metrics, county splits, and the degree to which they split three identified communities of interest—sheds no light on whether the 2023 Plan remedies this Court's finding of vote dilution." *Id.* at 4

(internal quotation marks omitted). And the Plaintiffs asserted that "Mr. Bryan's analysis of a smaller subset of the same plans concerning the number of county splits and . . . the size and type of population that were impacted by them to offer opinions about whether there is evidence that race predominated in the design of the plans, similarly tilts at windmills." *Id.* (internal quotation marks omitted).

The Plaintiffs further asserted that those experts' "statistics regarding the 2023 Plan" are irrelevant in light of the State's "conce[ssion] that the Black-preferred candidates would have lost" in District 2 in "every single election studied by their own expert." *Id*. They urged us that "[t]he topics on which Mr. Trende and Mr. Bryan seek to testify have already been decided by this Court and affirmed by the Supreme Court." *Id*.

Similarly, the Plaintiffs asserted that the State's evidence about communities of interest is irrelevant. *Id.* at 7–12. The Plaintiffs argued that this evidence does not tend to make any fact of consequence more or less probable because it does not tell us anything about whether the State remedied the vote dilution we found. Put differently, the Plaintiffs say this evidence tells us nothing about whether the 2023 Plan includes an additional opportunity district. *Id*. And because the State concedes that District 2 is not an opportunity district, the Plaintiffs assert the evidence about communities of interest is not relevant at all. *Id.* at 11–12.

Separately, the Plaintiffs attacked the reliability of Mr. Bryan's testimony. *Id.*

at 5–7.

In response to the motion, the State argued that its evidence is relevant to the question whether the 2023 Plan violates Section Two. *Milligan* Doc. 245 at 2–7. More particularly, the State argued that the evidence is relevant to the question whether the Plaintiffs can establish that the 2023 Plan violates Section Two "under the same *Gingles* standard applied at the merits stage." *Id.* at 5 (internal quotation marks omitted). The State reasoned that "[n]o findings have been made (nor could have been made) regarding the 2023 Plan's compliance with § 2." *Id.* at 6. The State defended the reliability of Mr. Bryan's analysis. *Id.* at 7–9.

### D. Stipulated Facts

After they filed their briefs, the parties stipulated to the following facts for the remedial hearing. *See Milligan* Doc. 251; *Caster* Doc. 213. We recite their stipulations verbatim.

### I. Demographics of 2023 Plan

1. The 2023 Plan contains one district that exceeds 50% Black Voting Age Population ("BVAP").

2. According to 2020 Census data, CD 7 in the 2023 Plan has a BVAP of 50.65% Any-Part Black.

3. Under the 2023 Plan, the district with the next-highest BVAP is CD 2.

4. According to 2020 Census data, CD 2 in the 2023 Plan has a BVAP of 39.93% Any-Part Black.

## Population Summary

Thursday, July 20, 2023       7:14 PM

| District | Population | Deviation | % Devn. | [% White] | [% Black] | [% AP_Wht] | [% AP_Blk] | [% 18+_Blk] | [% 18+_AP_Blk] |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 717,754 | 0 | 0.00% | 65.36% | 25.07% | 70.31% | 26.46% | 23.8% | 24.63% |
| 2 | 717,755 | 1 | 0.00% | 50.86% | 39.93% | 54.97% | 41.63% | 38.83% | 39.93% |
| 3 | 717,754 | 0 | 0.00% | 70.79% | 20.39% | 75.16% | 21.76% | 19.93% | 20.7% |
| 4 | 717,754 | 0 | 0.00% | 81.53% | 6.93% | 86.55% | 7.9% | 6.74% | 7.22% |
| 5 | 717,754 | 0 | 0.00% | 69.02% | 17.59% | 75.72% | 19.29% | 17.33% | 18.33% |
| 6 | 717,754 | 0 | 0.00% | 70.23% | 19.36% | 75.03% | 20.51% | 18.58% | 19.26% |
| 7 | 717,754 | 0 | 0.00% | 40.89% | 51.32% | 44.15% | 52.59% | 49.68% | 50.65% |

## II.      General Election Voting Patterns in the 2023 Plan

5. Under the 2023 Plan, Black Alabamians in CD 2 and CD 7 have consistently preferred Democratic candidates in the general election contests Plaintiffs' experts analyzed for the 2016, 2018, 2020, and 2022 general elections, as well as the 2017 special election for U.S. Senate. In those same elections, white Alabamians in CD 2 and CD 7 consistently preferred Republican candidates over (Black-preferred) Democratic candidates. In CD 2, white-preferred candidates (who are Republicans) almost always defeated Black-preferred candidates (who are Democrats). In CD 2, white candidates (who were Republicans) always defeated Black candidates (who were Democrats).

## III. Performance of CD 2 in the 2023 Plan

6. The *Caster* Plaintiffs' expert Dr. Maxwell Palmer analyzed the 2023 Plan using 17 contested statewide elections between 2016 and 2022. That analysis showed:

a. Under the 2023 Plan, the average two-party vote-share for Black-preferred candidates in CD 2 is 44.5%.

b. Under the 2023 Plan, the Black-preferred candidate in CD 2 would have been elected in 1 out of the 17 contests analyzed.

Table 4: Vote Share of Black-Preferred Candidates — SB 5 Plan

|      |                          | CD 2   | CD 7   |
|------|--------------------------|--------|--------|
| 2022 | U.S. Senator*            | 38.6%  |        |
|      | Governor*                | 37.5%  |        |
|      | Attorney General*        | 39.1%  |        |
|      | Sec. of State*           | 39.2%  |        |
|      | Supreme Ct., Place 5*    | 39.7%  |        |
| 2020 | U.S. President           | 45.4%  | 61.4%  |
|      | U.S. Senator             | 47.7%  | 63.2%  |
| 2018 | Governor                 | 45.1%  | 63.7%  |
|      | Lt. Governor*            | 45.7%  | 62.7%  |
|      | Attorney General         | 48.3%  | 64.5%  |
|      | Sec. of State            | 45.8%  | 62.6%  |
|      | State Auditor*           | 46.6%  | 62.9%  |
|      | Supreme Ct., Chief       | 48.1%  | 65.5%  |
|      | Supreme Ct., Place 4     | 46.1%  | 63.2%  |
| 2017 | U.S. Senator             | 55.8%  | 72.0%  |
| 2016 | U.S. President           | 44.2%  | 60.3%  |
|      | U.S. Senator             | 43.9%  | 59.1%  |

* Indicates that the Black candidate of choice was Black.

7. The *Milligan* Plaintiffs' expert Dr. Baodong Liu completed a performance analysis of the 2023 Plan using 11 statewide biracial elections between 2014 and 2022. That analysis showed:

> a. Under the 2023 Plan, the average two-party vote-share for Black-preferred candidates in CD 2 is 42.2%.

> b. Under the 2023 Plan, the Black-preferred candidate in CD 2 would have been elected in 0 out of the 11 contests analyzed.

**Table 1: RPV in the 11 Biracial Elections based on the Livingston Plan, CD2**

| Election | Black Pref-Cand | White Pref-Cand | % vote cast for BPC in Livingston Plan | Black Support for Black Cand (95% CI) | White Support for Black Cand (95% CI) | BPC Won in Livingston Plan? | RPV? |
|---|---|---|---|---|---|---|---|
| 2022 Governor | Yolanda Flowers | Kay Ivey | 37.8% | 94.0% (90-96) | 4.9% (4-6) | No | Yes |
| 2022 US Senate | Will Boyd | Katie Britt | 38.8% | 93.5% (89-96) | 6.0% (4-9) | No | Yes |
| 2022 Attorney General | Wendell Major | Steve Marshall | 39.3% | 94.3% (91-97) | 6.3% (5-8) | No | Yes |
| 2022 Secretary of State | Pamela Laffitte | Wes Allen | 39.4% | 94.2% (90-97) | 6.0% (4-9) | No | Yes |
| 2022 Supreme Court, Place 5 | Anita Kelly | Bradley Byrne | 39.9% | 94.2% (91-97) | 6.6% (5-10) | No | Yes |
| 2018 Lt Governor | Will Boyd | Will Ainsworth | 46.0% | 93.6% (91-96) | 6.3% (5-10) | No | Yes |
| 2018 State Auditor | Miranda Joseph | Jim Zigler | 46.9% | 94.2% (90-97) | 8.2 (6-13) | No | Yes |
| 2018 Public Service Commission, Place 1 | Cara McClure | Jeremy Oden | 46.9% | 95.7% (93-97) | 6.5% (5-10) | No | Yes |
| 2014 Secretary of State | Lula Albert-Kaigler | John Merrill | 43.6% | 91.5% (88-94) | 6.2% (5-8) | No | Yes |
| 2014 Lt Governor | James Fields | Kay Ivey | 43.4% | 91.3% (88-93) | 6.3% (4-9) | No | Yes |
| 2014 State Auditor | Miranda Joseph | Jim Zigler | 41.7% | 88.0% (81-91) | 9.1% (6-14) | No | Yes |

8. Dr. Liu also analyzed the 2020 presidential election between Biden-Harris and Trump-Pence. His analysis of both the 2020 presidential election and the 11 biracial elections between 2014 and 2022 showed:

a. Under the 2023 Plan, the average two-party vote-share for Black-preferred candidates in CD 2 is 42.3%.

b. Under the 2023 Plan, the Black-preferred candidate in CD 2 would have been elected in 0 out of the 12 contests analyzed.

9. The Alabama Legislature analyzed the 2023 Plan in seven election contests: 2018 Attorney General, 2018 Governor, 2018 Lieutenant Governor, 2018 Auditor, 2018 Secretary of State, 2020 Presidential, and 2020 Senate. That analysis showed:

a. Under the 2023 Plan, the average two-party vote-share for Black-preferred candidates in CD 2 is 46.6%.

b. Under the 2023 Plan, the Black-preferred candidate in CD 2 would have been elected in 0 out of the 7 contests analyzed.

| Democrat CD | 2018 AG | 2018 GOV | 2018 LTGOV | 2018 AUD | 2018 SOS | 2020 PRES | 2020 SEN | Average |
|---|---|---|---|---|---|---|---|---|
| 1 | 39.2% | 38.5% | 36.7% | 37.6% | 36.9% | 34.8% | 38.2% | 37.4% |
| 2 | 48.5% | 45.3% | 46.0% | 46.8% | 46.0% | 45.6% | 48.0% | 46.6% |
| 3 | 33.3% | 32.6% | 31.2% | 31.8% | 31.5% | 29.3% | 31.9% | 31.6% |
| 4 | 24.8% | 24.8% | 21.7% | 22.6% | 21.7% | 18.6% | 21.9% | 22.3% |
| 5 | 39.2% | 38.6% | 36.8% | 38.0% | 37.4% | 36.2% | 39.5% | 37.9% |
| 6 | 35.6% | 36.2% | 32.8% | 33.7% | 33.2% | 33.4% | 35.9% | 34.4% |
| 7 | 64.7% | 64.0% | 62.9% | 63.2% | 62.9% | 61.6% | 63.4% | 63.2% |

| Republican CD | 2018 AG | 2018 GOV | 2018 LTGOV | 2018 AUD | 2018 SOS | 2020 PRES | 2020 SEN | Average |
|---|---|---|---|---|---|---|---|---|
| 1 | 60.8% | 61.5% | 63.3% | 62.4% | 63.1% | 65.2% | 61.8% | 62.6% |
| 2 | 51.5% | 54.7% | 54.0% | 53.2% | 54.0% | 54.4% | 52.0% | 53.4% |
| 3 | 66.7% | 67.4% | 68.8% | 68.2% | 68.5% | 70.7% | 68.1% | 68.4% |
| 4 | 75.2% | 75.2% | 78.3% | 77.4% | 78.3% | 81.4% | 78.1% | 77.7% |
| 5 | 60.8% | 61.4% | 63.2% | 62.0% | 62.6% | 63.8% | 60.5% | 62.1% |
| 6 | 64.4% | 63.8% | 67.2% | 66.3% | 66.8% | 66.6% | 64.1% | 65.6% |
| 7 | 35.3% | 36.0% | 37.1% | 36.8% | 37.1% | 38.4% | 36.6% | 36.8% |

## IV.   The 2023 Special Session

10. On June 27, 2023, Governor Kay Ivey called a special legislative session to begin on July 17, 2023 at 2:00 p.m. Her proclamation limited the Legislature to addressing: "***Redistricting***: The Legislature may consider legislation

Page **92** of **198**

pertaining to the reapportionment of the State, based on the 2020 federal census, into districts for electing members of the United States House of Representatives."

11. For the special session, Representative Chris Pringle and Senator Steve Livingston were the Co-Chairs of the Permanent Legislative Committee on Reapportionment ("the Committee"). The Committee had 22 members, including 7 Black legislators, who are all Democrats, and 15 white legislators, who are all Republicans.

12. Before the Special Session, the Committee held pre-session hearings on June 27 and July 13 to receive input from the public on redistricting plans.

13. At the Committee public hearing on July 13, Representative Pringle moved to re-adopt the 2021 Legislative Redistricting Guidelines ("Guidelines").

14. The Committee voted to re-adopt the 2021 Guidelines.

15. The only plans proposed or available for public comment during the two pre-session hearings were the "VRA Plaintiffs' Remedial Plan" from the *Milligan* and *Caster* Plaintiffs and the plans put forward by Senator Singleton and, Senator Hatcher.

16. On July 17, the first day of the Special Session, Representative Pringle introduced a plan he designated as the "Community of Interest" ("COI") plan.

17. The COI plan had a BVAP of 42.45% in Congressional District 2 ("CD2"), and Representative Pringle said it maintained the core of existing congressional districts.

18. The COI plan passed out of the Committee on July 17 along party and racial lines, with all Democratic and all Black members voting against it. Under the COI plan, the Committee's performance analysis showed that Black-preferred candidates would have won two of the four analyzed-statewide races from 2020 and 2022.

COMMMUNITY OF INTEREST PLAN

| Year | Race | CD2 | | CD7 | |
|------|------|--------|--------|--------|--------|
| | | % Dem. | % Rep. | % Dem. | % Rep. |
| 2020 | Pres. | 47.53 | 51.56 | 61.94 | 37.28 |
| 2020 | U.S. Senate | 50.23 | 49.77 | 64.19 | 35.81 |
| 2018 | Gov. | 47.77 | 52.23 | 63.89 | 36.11 |
| 2018 | A.G. | 50.97 | 49.03 | 64.34 | 35.66 |

19. The "Opportunity Plan" (or "Livingston 1") was also introduced on July 17. Senator Livingston was the sponsor of the Opportunity Plan.

20. The Opportunity Plan had a BVAP of 38.31% in CD2.

21. Neither the COI Plan nor Opportunity Plan were presented at the public hearings on June 27 or July 13.

22. On July 20, the House passed the Representative Pringle sponsored COI Plan, and the Senate passed the Opportunity Plan. The votes were along party lines with all Democratic house members voting against the COI plan. The house vote was also almost entirely along racial lines, with all Black house members, except one, voting against the COI plan. All Democratic and all Black senators voted against the Opportunity Plan.

23. Afterwards, on Friday, July 21, a six-person bicameral Conference Committee passed Senate Bill 5 ("SB5"), which [is] a modified-version of the Livingston plan ("Livingston 3" plan or the "2023 Plan").

24. The 2023 Plan was approved along party and racial lines, with the two Democratic and Black Conference Committee members (Representative England and Representative Smitherman) voting against it, out of six total members including Representative Pringle and Senator Livingston.

25. Representative England, one of the two Democratic and Black legislators on the Conference Committee, stated that the

2023 Plan was noncompliant with the Court's preliminary-injunction order and that the Court would reject it.

26. On July 21, SB5 was passed by both houses of the legislature and signed by Governor Ivey.

27. In the 2023 Plan enacted in SB5, the Black voting-age population ("BVAP") is 39.9%.

28. The map contains one district, District 7, in which the BVAP exceeds 50%.

29. SB5 passed along party lines and almost entirely along racial lines. Out of all Black legislators, one Republican Black House member voted for SB5, and the remaining Black House members voted against.

30. SB5 includes findings regarding the 2023 Plan. The findings purport to identify three specific communities of interest (the Black Belt, the Wiregrass, and the Gulf Coast).

## V. Communities of Interest

31. The Black Belt is a community of interest.

32. The Black Belt includes the 18 core counties of Barbour, Bullock, Butler, Choctaw, Crenshaw, Dallas, Greene, Hale, Lowndes, Macon, Marengo, Montgomery, Perry, Pickens, Pike, Russell, Sumter, and Wilcox. In addition, Clarke, Conecuh, Escambia, Monroe, and Washington counties are sometimes but not always included within the definition of the Black Belt.

33. The 2023 Plan divides the 18 core Black Belt counties into two congressional districts (CD-2 and CD-7) and does not split any Black Belt counties.

34. The 2023 Plan keeps Montgomery County whole in District 2.

35. The 2023 Plan places Baldwin and Mobile Counties together in one congressional district.

36. Baldwin and Mobile Counties have been together in one congressional district since redistricting in 1972.

37. Alabama splits Mobile and Baldwin Counties in its current State Board of Education districts, as well as those in the 2011 redistricting cycle.

## E.      The Remedial Hearing

Before the remedial hearing, the *Milligan* and *Caster* parties agreed to present their evidence on paper, rather than calling witnesses to testify live. *See, e.g.*, *Milligan* Doc. 233 at 1; Aug. 14 Tr. 92. Accordingly, no witnesses testified live at the hearing on August 14. Three events at the hearing further developed the record before us: (1) the attorneys made arguments and answered our questions; (2) we received exhibits into evidence and reserved ruling on some objections (see *infra* at Part VII), and (3) the parties presented for the first time certain deposition transcripts that were filed the night before the hearing, *see Milligan* Doc. 261.[17] We first discuss the deposition transcripts, and we then discuss the attorney arguments.

### 1.      The Deposition Testimony

The *Milligan* Plaintiffs filed transcripts reflecting deposition testimony of seven witnesses: (1) Randy Hinaman, the State's longstanding cartographer, *Milligan* Doc. 261-1; (2) Brad Kimbro, a past Chairman of the Dothan Area

---

[17] The depositions were taken after the briefing on the Plaintiffs' objections to the 2023 Plan was complete. *See Milligan* Doc. 261. The State did not raise a timeliness objection, and we discern no timeliness problem.

Chamber of Commerce, *Milligan* Doc. 261-2, who also prepared a declaration the State submitted, *Milligan* Doc. 220-18; (3) Lee Lawson, current President & CEO of the Baldwin County Economic Development Alliance, *Milligan* Doc. 261-3, who also prepared a declaration, *Milligan* Doc. 220-13; (4) Senator Livingston, *Milligan* Doc. 261-4; (5) Representative Pringle, *Milligan* Doc. 261-5; (6) Mike Schmitz, a former mayor of Dothan, *Milligan* Doc. 261-6, who also prepared a declaration, *Milligan* Doc. 220-17; and (7) Jeff Williams, a banker in Dothan, *Milligan* Doc. 261-7, who also prepared a declaration, *Milligan* Doc. 227-1.

During the remedial hearing, the *Milligan* Plaintiffs played video clips from the depositions of Mr. Hinaman, Senator Livingston, and Representative Pringle. (The Court later reviewed all seven depositions in their entirety.)

Mr. Hinaman testified that his understanding of the preliminary injunction was that the Legislature "needed to draw two districts that would give African Americans an opportunity to elect a candidate of their choice." *Milligan* Doc. 261-1 at 20, 22.[18] Mr. Hinaman testified that he drew the Community of Interest Plan that the Alabama House of Representatives passed. *Id.* at 23. He testified that of the maps that were sponsored by a member of either the Alabama House or the Alabama Senate, the Community of Interest Plan is the only one he drew. *Id.* at 24.

---

[18] When we cite a deposition transcript, pincites are to the numbered pages of the transcript, not the CM/ECF pagination.

Mr. Hinaman testified that he did not know who drew the Opportunity Plan, which the Alabama Senate passed. *Id.* at 31–32. He testified that he "believe[d] it was given to Donna Loftin, who is . . . supervisor of the reapportionment office, on a thumb drive." *Id.* at 32. Mr. Hinaman testified that he had no understanding of how the Opportunity Plan was drawn or why he did not draw it. *Id.* 32–34.

Mr. Hinaman testified that he had "numerous discussions with members of congress" and their staff during the special session. *Id.* at 45. Mr. Hinaman testified about the performance analyses he considered and that he was "more interested in performance than the raw BVAP number" because "not all 42 or 43 or 41 or 39 percent districts perform the same." *Id.* at 65–66.

When Mr. Hinaman was asked about the legislative findings, he testified that he had not seen them before his deposition, that no one told him about them, and that he was not instructed about them as he was preparing maps. *Id.* at 94.

Senator Livingston testified that he was "familiar" that the preliminary injunction ruled that a remedial map should include "two districts in which Black voters either comprise a voting-age majority or something quite close to it," but that his deposition was the first time he had read that part of the injunction. *Milligan* Doc. 261-4 at 51–52. Senator Livingston testified that he was "personally not paying attention to race" as maps were drawn or shown to him. *Id.* at 56.

When Senator Livingston was asked why he changed his focus from the

Community of Interest Plan to other plans, he said it was because "[t]he Committee moved, and [he] was going to be left behind." *Id.* at 66. He testified that the Committee members "had received some additional information they thought they should go in the direction of compactness, communities of interest, and making sure that . . . congressmen or women are not paired against each other," but he did not know the source of that information. *Id.* at 67–68.

Senator Livingston testified that a political consultant drew the Opportunity Plan, and Senator Roberts delivered it to the reapportionment office. *Id.* at 70. Senator Livingston testified that he did not have "any belief one way or another about where [the Opportunity Plan] would provide a fair opportunity to black voters to elect a preferred candidate in the second district." *Id.* at 71. Senator Livingston testified that Black-preferred candidates "have an opportunity to win" in District 2 even if they actually won zero elections. *Id.* at 96–97.

When Senator Livingston was asked who prepared the legislative findings, he identified the Alabama Solicitor General and testified that he did not "have any understanding of why those findings were included in the bill." *Id.* at 101–02.

Representative Pringle testified that he was familiar with the guidance from the Court about the required remedy for the Section Two violation. *Milligan* Doc. 261-5 at 17–18. Representative Pringle testified that he understood "opportunity to elect" to mean "a district which they have the ability to elect or defeat somebody of

their choosing," although he "ha[d] no magic number on that." *Id.* at 19–20. Representative Pringle twice testified that his "overriding principle" is "what the United States Supreme Court told us to do." *Id.* at 22– 23.

Representative Pringle testified that during the special session, he spoke with the Speaker of the United States House of Representatives, Mr. Kevin McCarthy. *Id.* He testified that Speaker McCarthy "was not asking us to do anything other than just keep in mind that he has a very tight majority." *Id.* at 22. Representative Pringle testified that like Mr. Hinaman, he had conversations with members of Alabama's congressional delegation and their staff. *Id.* at 23–24.

Representative Pringle testified that the only map drawer that he retained in connection with the special session was Mr. Hinaman. *Id.* at 25. Representative Pringle also testified that the Alabama Solicitor General "worked as a map drawer at some point in time." *Id.* at 26–28. Like Senator Livingston, Representative Pringle testified that the Opportunity Plan was drawn by a political consultant and brought to the Committee by Senator Roberts. *Id.* at 72.

Unlike Senator Livingston, Representative Pringle testified that he did not know who drafted the legislative findings. *Id.* at 90. He testified that he did not know they would be in the bill; the Committee did not solicit anyone to draft them; he did not know why they were included; he had never seen a redistricting bill contain such findings; and he had not analyzed them. *Id.* at 91–94.

Representative Pringle testified repeatedly that he thought that his plan (the Community of Interest Plan) was a better plan because it complied with court orders, but that he could not get it passed in the Senate. *See, e.g.*, *id.* at 99–102.

In heated testimony, Representative Pringle recounted that when he learned his plan would not pass the Senate, he told Senator Livingston that the plan that passed could not have a House bill number or Representative Pringle's name on it. *Id.* at 101–02. When asked why he did not want his name on the plan that passed, Representative Pringle answered that his plan "was a better plan" "[i]n terms of its compliance with the Voting Rights Act." *Id.* at 102.

Representative Pringle was asked about a newspaper article that he read that reported one of his colleagues' public comments about the 2023 Plan. *See id.* at 109–10. Neither he nor his counsel objected to the question, nor to him being shown the article that he testified he had seen before. *Id.* The article reported that the Alabama Speaker of the House had commented: "If you think about where we were, the Supreme Court ruling was five to four. So there's just one judge that needed to see something different. And I think the movement that we have and what we've come to compromise on today gives us a good shot . . . ." *Id.* at 109.

When Representative Pringle was asked whether he "agree[d] that the legislature is attempting to get a justice to see something differently," he answered that he was not, that he was "trying to comply with what the Supreme Court ruled,"

but that he did not "want to speak on behalf of 140 members of the legislature." *Id.* at 109–10. Representative Pringle also testified that his colleague had never expressed that sentiment to him privately. *Id.* at 110.

### 2.    Arguments and Concessions

During the opening statements at the remedial hearing, the *Milligan* Plaintiffs emphasized that there is "only one" question now before us: whether the 2023 Plan "remed[ies] the prior vote dilution, and does it provide black voters with an additional opportunity to elect the candidates of their choice." Aug. 14 Tr. 10. Nevertheless, the *Milligan* Plaintiffs walked us through their *Gingles* analysis, in case we perform one. *See* Aug. 14 Tr. 10–23. The *Milligan* Plaintiffs asserted that we previously found and the Supreme Court affirmed that they satisfied *Gingles* I. Aug. 14 Tr. 10–11. The *Milligan* Plaintiffs said that we can rely on that finding even though the Legislature enacted the 2023 Plan because *Gingles* I does not "look at the compactness of plaintiffs' map," but "looks at the compactness of the minority community," which we found and the Supreme Court affirmed. Aug. 14 Tr. 10–11. And the *Milligan* Plaintiffs assert that it is undisputed that they satisfy *Gingles* II and III because "there is serious racially polarized voting" in Alabama. Aug. 14 Tr. 11.

The *Milligan* Plaintiffs further urged that the key elements of the performance analysis are undisputed: "there is no dispute that the 2023 plan does not lead to the election of a . . . second African-American candidate of choice," Aug. 14 Tr. 11, and

that the 2023 Plan, "like the old plan, also results in vote dilution" because "black candidates would lose every election" in District 2, Aug. 14 Tr. 12.

The *Milligan* Plaintiffs accused the State of "rehash[ing] the arguments that both this Court and the Supreme Court have already rejected," mainly that "there could be no legitimate reason to split Mobile and Baldwin counties," "the Court should compare its allegedly neutral treatment of various communities in the 2023 plan to the treatment of the same alleged communities in" the illustrative plans, and "the use of race in devising a remedy is improper." Aug. 14 Tr. 12–13.

The *Milligan* Plaintiffs said that if we reexamine any aspect of our *Gingles* analysis, we should come out differently than we did previously on Senate Factor 9 (which asks whether the State's justification for its redistricting plan is tenuous). Aug. 14 Tr. 14–22. We made no finding about Factor 9 when we issued the preliminary injunction, but the *Milligan* Plaintiffs said that the depositions of Mr. Hinaman, Senator Livingston, and Representative Pringle support a finding now. *See* Aug. 14 Tr. 14–22.

During their opening statement, the *Caster* Plaintiffs argued that the State was in "defiance of the Court's clear instructions," because "[t]here is no dispute that the 2023 Plan . . . once again limits the state's black citizens to a single opportunity district." Aug. 14 Tr. 27–28. Based on stipulated facts alone, the *Caster* Plaintiffs urged this Court to enjoin the 2023 Plan because it "perpetuat[es] the same Section

2 violation as the map struck down by this Court last year." Aug. 14 Tr. 28.

The *Caster* Plaintiffs argued that we should understand the State's argument that we are back at square one in these cases as part and parcel of their continued defiance of federal court orders. Aug. 14 Tr. 29. The *Caster* Plaintiffs further argued that we should reject the State's argument that the 2023 Plan remedies the "cracking" of the Black Belt because the 2023 Plan merely "reshuffled Black Belt counties to give the illusion of a remedy." Aug. 14 Tr. 29–30. The *Caster* Plaintiffs reasoned that "Alabama gets no brownie points for uniting black voters and the Black Belt community of interest in a district in which they have no electoral power and in a map that continues to dilute the black vote." Aug. 14 Tr. 30. Finally, the *Caster* Plaintiffs urged us to ignore all the new evidence about communities of interest, because "Section 2 is not a claim for better respect for communities of interest. It is a claim regarding minority vote dilution." Aug. 14 Tr. 30.

In the State's opening statement, it asserted that if the Plaintiffs cannot establish that the 2023 Plan violates federal law, then the 2023 Plan is "governing law." Aug. 14 Tr. 33. The State assailed the Plaintiffs' suggestion that the question is limited to the issue of whether the 2023 Plan includes an additional opportunity district as a "tool for demanding proportionality," which is unlawful. Aug. 14 Tr. 36.

The State asserted that the Plaintiffs must come forward with new *Gingles* I evidence because under *Allen*, it "simply cannot be the case" that the Duchin plans

and Cooper plans are "up to the task." Aug. 14 Tr. 36. The State's principal argument was that those plans were configured to compete with the 2021 Plan on traditional districting principles such as compactness and respect for communities of interest, and they cannot outdo the 2023 Plan on those metrics. Aug. 14 Tr. 36–39. According to the State, the 2023 Plan "answers the plaintiffs' challenge" with respect to the Black Belt because it "take[s] out . . . those purportedly discriminatory components of the 2021 plan." Aug. 14 Tr. 39–41. Because "[t]hat cracking is gone," the State said, "the 2023 plan does not produce discriminatory effects." Aug. 14 Tr. 41.

Much of the State's opening statement cautioned against an additional opportunity district on proportionality grounds and against "abandon[ing]" legitimate traditional districting principles. *See* Aug. 14 Tr. 39–47. According to the State, "now proportionality is all that you are hearing about." Aug. 14 Tr. 47–48.

After opening statements, we took up the Plaintiffs' motion *in limine*. The Plaintiffs emphasized that even if they are required to reprove compactness for *Gingles* I, they could rely on evidence from the preliminary injunction proceeding (and our findings) to do so, because all the law requires is a determination that the minority population is reasonably compact and that an additional opportunity district can be reasonably configured. The Plaintiffs emphasized that under this reasonableness standard, they need not outperform the 2023 Plan in a beauty contest by submitting yet another illustrative plan. Aug. 14 Tr. 50–51, 58–59. According to

the Plaintiffs, "nothing can change the fact that" Black voters in Alabama "as a community are reasonably compact, and you can draw a reasonably configured district around them." Aug. 14 Tr. 54. Indeed, the Plaintiffs say, "[t]he only thing that can substantially change" where Black voters are in Alabama for purposes of *Gingles* I "would be a new census." Aug. 14 Tr. 55.

The Plaintiffs suggested that the State confused the compactness standards for a Section Two case, which focus on the compactness of the minority population, with the compactness standards for a racial gerrymandering case, which focus on the compactness of the challenged district. Aug. 14 Tr. 55, 57.

The State based its response to the motion *in limine* on arguments about the appropriate exercise of judicial power. *See* Aug. 14 Tr. 63. On the State's reasoning, the Plaintiffs "have to relitigate and prove" the *Gingles* analysis because the Court cannot "just transcribe the findings from an old law onto a new law." Aug. 14 Tr. 61, 63. Significantly, the State conceded that the Plaintiffs have met their burden in these remedial proceedings on the second and third *Gingles* requirements and the Senate Factors. Aug. 14 Tr. 64–65. So, according to the State, the only question the Court need answer is whether the Plaintiffs are required to reprove *Gingles* I. *See* Aug. 14 Tr. 64–66. The State said they must, because "it is [the State's] reading of *Allen* that reasonably configured is not determined based on whatever a hired expert map drawer comes in and says, like, this is reasonable enough. It has to be tethered

. . . to objective factors to a standard or rule that a Legislature can look at ex ante . . . ." Aug. 14 Tr. 67.

The State answered several questions about whether the Plaintiffs now must offer a new illustrative map that outperforms the 2023 Plan with respect to compactness and communities of interest. In one such exchange, we asked whether the State was "essentially arguing [that] whatever the state does, we can just say they shot a bullet, and we have now drawn a bull's eye where that bullet hit, and so it's good?" Aug. 14 Tr. 72. We followed up: "It's just some veneer to justify whatever the state wanted to do that was short of the [Voting Rights Act?]" Aug. 14 Tr. 72. The State responded that precedent "makes clear that the state does have a legitimate interest in promoting these three principles of compactness, counties, and communities of interest." Aug. 14 Tr. 72.

Again, we asked the State whether the Duchin plans and Cooper plans were subject to attack now even though we found (and the Supreme Court affirmed) that the additional opportunity districts they illustrated were reasonably configured. Aug. 14 Tr. 67. The State answered that because the comparator is now the 2023 Plan, the Duchin plans and Cooper plans could be attacked once again, this time for failing to outperform the 2023 Plan even though we found they outperformed the 2021 Plan. Aug. 14 Tr. 67–70.

We further asked the State whether "our statement that the appropriate remedy

for the . . . likely violation that we found would be an additional opportunity district ha[s] any relevance to what we're doing now?" Aug. 14 Tr. 75. "I don't think so," the State said. Aug. 14 Tr. 75. We pressed the point: "it is the state's position that the Legislature could . . . enact a new map that was consistent with those findings and conclusions [by this Court and the Supreme Court] without adding a second opportunity district?" Aug. 14 Tr. 75. "Yes," the State replied. Aug. 14 Tr. 75.

Moreover, the *Caster* Plaintiffs argued (in connection with the State's isolation of the dispute to *Gingles* I) that under applicable law, the *Gingles* I inquiry already has occurred. According to the *Caster* Plaintiffs, "[n]either the size of the black population nor its location throughout the state is a moving target[]" between 2021 and 2023. Aug. 14 Tr. 88. Likewise, they say, "[n]othing about the 2023 map, nothing about the evidence that the defendants can now present . . . can go back in time" to undermine maps drawn "two years ago." Aug. 14 Tr. 88. They add that "[n]othing about the tradition of Alabama's redistricting criteria has changed[]" since 2021, and that "[i]f anything, it is Alabama that has broken with its own tradition . . . in creating these brand new findings out of nowhere, unbeknownst to the actual committee chairs who were in charge of the process." Aug. 14 Tr. 89.

We carried the motion *in limine* with the case and received exhibits into evidence (we rule on remaining objections *infra* at Part VII).

We then asked for the State's position if we were to order (again) that an

additional opportunity district is required, and the State replied that such an order would be unlawful under *Allen* because it would require the State to adopt a map that violates traditional principles. Aug. 14 Tr. 157. When asked "at what point the federal court . . . ha[s] the ability to comment on whether the appropriate remedy includes an additional opportunity district" — "[o]n liability," "[o]n remedy," "[b]oth," "or [n]ever" — the State said there is not "any prohibition on the Court commenting on what it thinks an appropriate remedy would be." Aug. 14 Tr. 157–58.

The State then answered questions regarding its argument about traditional districting principles and the 2023 Plan. The Court asked the State whether it "acknowledge[d] any point during the ten-year [census] cycle where the [Legislature's] ability to redefine the principles cuts off and the Court's ability to order an additional opportunity district attaches." Aug. 14 Tr. 159. The State responded that that "sounds a lot like a preclearance regime." Aug. 14 Tr. 159.

Ultimately, the State offered a practical limitation on the Legislature's ability to redefine traditional districting principles: if the Court rules that "there is a problem with this map," then the State's "time has run out," and "we will have a court drawn map for the 2024 election barring appellate review." Aug. 14 Tr. 159–60.

We continued to try to understand how, in the State's view, a court making a liability finding has any remedial authority. We asked: "[W]hen we made the

liability finding, is it the state's position that at that time this Court had no authority to comment on what the appropriate remedy would be because at that time the Legislature was free to redefine traditional districting principles?" Aug. 14 Tr. 160. "Of course, the Court could comment on it[,]" the State responded. Aug. 14 Tr. 160.

Next, we queried the State whether Representative Pringle's testimony about the legislative findings should affect the weight we assign the findings. Aug. 14 Tr. 161–62. The State said no, because Representative Pringle is only one legislator out of 140, there is a presumption of regularity that attaches to the 2023 Plan, and the findings simply describe what we could see for ourselves by looking at the map. Aug. 14 Tr. 162. The State admonished us that "it's somewhat troubling for a federal court to say that they know Alabama's communities of interest better than Alabama's representatives know them." Aug. 14 Tr. 163.

Ultimately, we asked the State whether it "deliberately chose to disregard [the Court's] instructions to draw two majority-black districts or one where minority candidates could be chosen." Aug. 14 Tr. 163. The State reiterated that District 2 is "as close as you are going to get to a second majority-black district without violating *Allen*" and the Constitution. Aug. 14 Tr. 164. Finally, we pressed the question this way: "Can you draw a map that maintains three communities of interest, splits six or fewer counties, but that most likely if not almost certainly fails to create an opportunity district and still comply with Section 2?" Aug. 14 Tr. 164. "Yes.

Absolutely," the State said. Aug. 14 Tr. 164*; see also* Aug. 14 Tr. 76.

### F.     The Preliminary Injunction Hearing

The next day, the Court heard argument on the *Singleton* Plaintiffs' motion for a preliminary injunction. The *Singleton* Plaintiffs walked the Court through the claim that the 2023 Plan "preserves" and "carries forward" a racial gerrymander that has persisted in Alabama's congressional districting plan since 1992, when the State enacted a plan guaranteeing Black voters a majority in District 7 pursuant to a stipulated injunction entered to resolve claims that Alabama had violated Section Two of the Voting Rights Act, *see Wesch*, 785 F. Supp. At 1493, *aff'd sub nom. Camp*, 504 U.S. 902, *and aff'd sub nom. Figures*, 507 U.S. 901. August 15 Tr. 8, 10–15. The State disputed that race predominated in the drawing of the 2023 Plan, but made clear that, if the Court disagreed, the State did not contest the *Singleton* Plaintiffs' argument that the 2023 Plan could not satisfy strict scrutiny. Aug. 15 Tr. 82. The Court received some exhibits into evidence and reserved ruling on some objections. Aug. 15 Tr. 25–31, 59–60. We heard live testimony from one of the Plaintiffs, Senator Singleton; the State had the opportunity to cross-examine him. Aug. 15 Tr. 32–58. And we took closing arguments. Aug. 15 Tr. 61–85.

## II.     STANDARD OF REVIEW

As the foregoing discussion previewed, the parties dispute the standard of review that applies to the Plaintiffs' objections. We first discuss the standard that

applies to requests for preliminary injunctive relief. We then discuss the parties'
disagreement over the standard that applies in remedial proceedings, the proper
standard we must apply, and the alternative.

## A.    Preliminary Injunctive Relief

"[A] preliminary injunction is an extraordinary remedy never awarded as of
right." *Benisek v. Lamone*, 138 S. Ct. 1942, 1943 (2018) (internal quotation marks
omitted). "A party seeking a preliminary injunction must establish that (1) it has a
substantial likelihood of success on the merits; (2) irreparable injury will be suffered
unless the injunction issues; (3) the threatened injury to the movant outweighs
whatever damage the proposed injunction may cause the opposing party; and (4) if
issued, the injunction would not be adverse to the public interest." *Vital Pharms.,
Inc. v. Alfieri*, 23 F.4th 1282, 1290–91 (11th Cir. 2022) (internal quotation marks
and citation omitted).

## B.    The Limited Scope of the Parties' Disagreement

The Plaintiffs' position is that the liability phase of this litigation has
concluded, and we are now in the remedial phase. On the Plaintiffs' logic, the
enactment of the 2023 Plan does not require us to revisit any aspect of our liability
findings underlying the preliminary injunction. The question now, they say, is only
whether the 2023 Plan provides Black voters an additional opportunity district.

The State's position is that the enactment of the 2023 Plan reset this litigation

to square one, and the Plaintiffs must prove a new Section Two violation. "Only if the Legislature failed to enact a new plan," the State says, "would we move to a purely remedial process, rather than a preliminary injunction hearing related to a new law." *Milligan* Doc. 205 at 3; *Milligan* Doc. 172 at 45–46. On the State's logic, the Plaintiffs must reprove their entitlement to injunctive relief under *Gingles*, and some (but not all) of the evidence developed during the preliminary injunction proceedings may be relevant for this purpose.

As a practical matter, the parties' dispute is limited in scope: it concerns whether the Plaintiffs must submit additional illustrative maps to establish the compactness part of *Gingles* I, and the related question whether any such maps must "meet or beat" the 2023 Plan on traditional districting principles. This limitation necessarily follows from the fact that the State concedes for purposes of these proceedings that the Plaintiffs have established the numerosity component of *Gingles* I, all of *Gingles* II and III, and the Senate Factors. Aug. 14 Tr. 64–65.

The parties agree that in any event, the Plaintiffs carry the burden of proof and persuasion. *Milligan* Doc. 203 at 4.

## C.    The Remedial Standard We Apply

When, as here, a district court finds itself in a remedial posture, tasked with designing and implementing equitable relief, "the scope of a district court's equitable powers . . . is broad, for breadth and flexibility are inherent in equitable remedies."

*Brown v. Plata*, 563 U.S. 493, 538 (2011) (internal quotation marks omitted). But this power is not unlimited. The Supreme Court has long instructed that the "essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case." *Swann v. Charlotte-Mecklenburg Bd. Of Ed.*, 402 U.S. 1, 15 (1971) (quoting *Hecht Co. v. Bowles*, 321 U.S. 321, 329–30 (1944)). The court "must tailor the scope of injunctive relief to fit the nature and extent of the . . . violation established." *Haitian Refugee Ctr. V. Smith*, 676 F.2d 1023, 1041 (5th Cir. 1982). In other words, the nature and scope of the review at the remedial phase is bound up with the nature of the violation the district court sets out to remedy. *See id.*; *Wright v. Sumter Cnty. Bd. Of Elections & Registration*, 979 F.3d 1282, 1302–03 (11th Cir. 2020) ("[A] district court's remedial proceedings bear directly on and are inextricably bound up in its liability findings.").

The Voting Rights Act context is no exception. Following a finding of liability under Section Two, the "[r]emedial posture impacts the nature of [a court's] review." *Covington v. North Carolina*, 283 F. Supp. 3d 410, 431 (M.D.N.C.), *aff'd in relevant part*, *rev'd in part*, 138 S. Ct. 2548 (2018). "In the remedial posture, courts must ensure that a proposed[19] remedial districting plan completely corrects—rather than

---

[19] We understand that the 2023 Plan is enacted, not merely proposed. *Covington* used "proposed" to describe a remedial plan that had been passed by both houses of the North Carolina General Assembly after the previous maps were ruled

perpetuates—the defects that rendered the original districts unconstitutional or unlawful." *Id.* Accordingly, the "issue before this Court is whether" the 2023 Plan, "in combination with the racial facts and history" of Alabama, completely corrects, or "fails to correct the original violation" of Section Two. *Dillard*, 831 F.2d at 248 (Johnson, J.).

When, as here, a jurisdiction enacts a remedial plan after a liability finding, "it [i]s correct for the court to ask whether the replacement system . . . would remedy the violation." *Harper v. City of Chicago Heights*, 223 F.3d 593, 599 (7th Cir. 2000) (citing *Harvell v. Blytheville Sch. Dist. # 5*, 71 F.3d 1382, 1386 (8th Cir. 1995)). In a Section Two case such as this, that challenges the State's drawing of single-member district lines in congressional reapportionment, the injury that gives rise to the violation is vote dilution — "that members of a protected class 'have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.'" *Shaw II*, 517 U.S. at 914. At the remedy phase, the district court therefore properly asks whether the remedial plan "completely remedies the prior dilution of minority voting strength and fully provides equal opportunity for minority citizens to participate and to elect candidates of their choice." *United States v. Dall. Cnty. Comm'n*, 850 F.2d 1433, 1438 (11th

---

unconstitutional. *See* 283 F. Supp. 3d at 413–14, 419; *see also infra* at 121–23.

Cir. 1988).

Evidence drawn from the liability phase and the Court's prior findings "form[]
the 'backdrop' for the Court's determination of whether the Remedial Plan 'so far
as possible eliminate[d] the discriminatory effects'" of the original plan. *Cf.*
*Jacksonville Branch of NAACP*, 2022 WL 17751416, at *13, 2022 U.S. Dist. LEXIS
227920, at *33 (rejecting city's invitation to conduct analysis of its remedial plan
"on a clean slate" because "the remedial posture impacts the nature of the review"
(internal quotation marks omitted) (alterations accepted) (quoting *Covington*, 283 F.
Supp. 3d at 431)). "[T]here [i]s no need for the court to view [the remedial plan] as
if it had emerged from thin air." *Harper*, 223 F.3d at 599; *accord Jenkins v. Red
Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1115–16 (3d Cir. 1993)).

That said, a federal court cannot accept an unlawful map on the ground that it
corrects a Section Two violation in an earlier plan. "[A]ny proposal to remedy a
Section 2 violation must itself conform with Section 2." *Dillard*, 831 F.2d at 249.
So if the 2023 Plan corrects the original violation of Section Two we found, but
violates Section Two in a new way or otherwise is unlawful, we may not accept it.

Accordingly, we limit our analysis in the first instance to the question whether
the 2023 Plan corrects the likely Section Two violation that we found and the
Supreme Court affirmed: the dilution of Black votes in Alabama congressional
districts. Because we find that the 2023 Plan perpetuates rather than corrects that

violation, *see infra* at Part IV.A, we enjoin it on that ground. If we had found that the 2023 Plan corrected that violation, we then would have considered any claims the Plaintiffs raised that the 2023 Plan violates federal law anew.

For seven separate and independent reasons, we reject the assertion that the Plaintiffs must reprove Section Two liability under *Gingles*.

*First*, the State has identified no controlling precedent, and we have found none, that instructs us to proceed in that manner. We said in one of our clarification orders that it would be unprecedented for us to relitigate the Section Two violation during remedial proceedings, *see Milligan* Doc. 203 at 4, and the State has not since identified any precedent that provides otherwise.

*Second*, the main precedent the State cites, *Dillard*, aligns with our approach. *See* 831 F.2d at 247–48. In *Dillard*, Calhoun County stipulated that its at-large system of electing commissioners diluted Black votes in violation of Section Two. *Id.* The County prepared a remedial plan that altered the electoral mechanism to elect commissioners using single-member districts and retained the position of an at-large chair. *Id.* at 248. The plaintiffs objected on the ground that the remedial plan did not correct the Section Two violation. *Id.* The district court agreed that under the totality of the circumstances, the use of at-large elections for the chairperson would dilute Black voting strength. *Id.* at 249.

The Eleventh Circuit reversed on the ground that the district court failed to

conduct a fact-specific inquiry into the proposed remedy. *Id.* at 249–50. The appeals court ruled that when the district court simply "transferred the historical record" from the liability phase of proceedings to the remedial phase, it "incompletely assessed the differences between the new and old proposals." *Id.* at 250. The appeals court observed that in the light of the new structure of the commission, the nature of the chairperson's duties and responsibilities, powers, and authority would necessarily differ from those of the commissioners in the old, unlawful system. *See id.* at 250–52. Accordingly, the appeals court held that the district court could not simply rely on the old evidence to establish a continuing violation. *Id.* at 250.

The State overreads *Dillard*. The reason that new factual findings were necessary in *Dillard* was because, as the Eleventh Circuit observed, "procedures that are discriminatory in the context of one election scheme are not necessarily discriminatory under another scheme." *Id.* at 250. If the new system diluted votes, the method by which that could or would occur might be different, so the court needed to assess it. *See id.* at 250–52. Those concerns are not salient here: there is no difference in electoral mechanism. In 2023, the State just placed district lines in different locations than it did in 2021.

Accordingly, we do not read *Dillard* to support the *Gingles* reset that the State requests. When the entire electoral mechanism changes, it makes little sense not to examine the new system. But this reality does not establish an inviolable requirement

that every court faced with a remedial task in a redistricting case must begin its review of a remedial map with a blank slate.

Even if we are wrong that this case is unlike *Dillard*, what the State urges us to do is not what the Eleventh Circuit said or did in *Dillard*. After the appeals court held that the "transcription [of old evidence] does not end the evaluation," it said that it "must evaluate the new system in part measured by the historical record, in part measured by difference from the old system, and in part measured by prediction," and it faulted the district court for "incompletely assess[ing] the differences between the new and old proposals." *Id.* at 249–50.

We discern no dispute among the parties that a proper performance analysis of the 2023 Plan evaluates it "in part measured by the historical record, in part measured by difference from the old system, and in part measured by prediction." *Id.* at 250; *see Milligan* Doc. 251 at 2–6. Indeed, every performance analysis that we have — the State's, the *Milligan* Plaintiffs', and the *Caster* Plaintiffs' — does just that. *Milligan* Doc. 251 at 2–6. This understanding of a performance analysis is consistent with the analytical approach that the United States urges us to take in its Statement of Interest. *Milligan* Doc. 199 at 9–15.

Accordingly, we understand *Dillard* as guiding us to determine whether District 2 in the 2023 Plan performs as an additional opportunity district, not as directing us to reset the *Gingles* liability determination to ground zero.

*Third*, *Covington*, cited by both the State and the Plaintiffs, aligns with our approach. In *Covington*, the North Carolina General Assembly redrew its state legislative electoral maps after a three-judge court enjoined the previous maps as unconstitutional in a ruling that the Supreme Court summarily affirmed. 283 F. Supp. 3d at 413–14, 419. The plaintiffs objected to the remedial map, and the legislative defendants raised jurisdictional objections, including that "the enactment of the [remedial p]lans rendered th[e] action moot." *Id.* at 419, 423–24.

The district court rejected the mootness challenge on the ground that after finding a map unlawful, a district court "has a duty to ensure that any remedy so far as possible eliminate[s] the discriminatory effects of the past as well as bar[s] like discrimination in the future." *Id.* at 424 (internal quotation marks omitted) (quoting *Louisiana v. United States*, 380 U.S. 145, 154 (1965)). The district court cited circuit precedent for the proposition that "federal courts *must* review a state's proposed remedial districting plan to ensure it completely remedies the identified constitutional violation and is not otherwise legally unacceptable." *Id.* (emphasis in original) (collecting cases, including Section Two cases).

Further, the district court emphasized that its injunction was the only reason the General Assembly redrew the districts that it did. *Id.* at 425. (In *Covington*, the State itself was a party to the case.) The court reasoned that "[i]t is axiomatic that this Court has the inherent authority to enforce its own orders," so the case could not

be moot. *Id.* (also describing the court's "strong interest in ensuring that the legislature complied with, but did not exceed, the authority conferred by" the injunction). The Supreme Court affirmed this ruling by the district court. *Covington*, 138 S. Ct. at 2553 (concluding that the plaintiffs' claims "did not become moot simply because the General Assembly drew new district lines around them").

We do not decide the constitutional issues before us and the State has not formally raised a mootness challenge, but those distinctions do not make *Covington* irrelevant.[20] Both parties have cited it, *see Caster* Docs. 191, 195; *Milligan* Docs. 220, 225, and we understand it to mean that on remedy, we must (1) ensure that any remedial plan corrects the violation that we found, and (2) reject any proposed remedy that is otherwise unlawful. We do not discern anything in *Covington* to

---

[20] Notwithstanding that the issue was never formally presented to us by motion, federal courts have an "independent obligation to ensure that jurisdiction exists before federal judicial power is exercised over the merits" of a case, *see Morrison v. Allstate Indem. Co.*, 228 F.3d 1255, 1275 (11th Cir. 2000), so we have carefully considered the mootness issue. It is clear to us that under *Covington* this case is not moot. Just as the district court in *Covington* (1) "ha[d] a duty to ensure that any remedy so far as possible eliminate[s] the discriminatory effects of the past as well as bar[s] like discrimination in the future," and (2) "ha[d] the inherent authority to enforce its own orders," 283 F. Supp. 3d at 424–25, so too do we (1) have a duty to ensure that the State's proposed remedy completely cures the Section Two violation we have already found, and (2) have the inherent authority to enforce our preliminary injunction order. Moreover, we are acutely aware of the fact that Black Alabamians will be forced, if we do not address the matter, to continue to vote under a map that we have found likely violates Section Two.  That constitutes a live and ongoing injury.

suggest that if we do those two things, we fall short of our remedial task.

None of the other cases the State has cited compel a different conclusion. For instance, in *McGhee v. Granville County*, the County responded to a Section Two liability determination by drawing a remedial plan that switched the underlying electoral mechanism from an at-large method to single-member districts in which Black voters would have an increased opportunity to elect candidates of their choice. 860 F.2d 110, 113 (4th Cir. 1988). The district court rejected the remedial plan as failing to completely remedy the violation, but the Fourth Circuit reversed, holding that the district court was bound to accept this remedial plan because once "a vote dilution violation is established, the appropriate remedy is to restructure the districting system to eradicate, to the maximum extent possible *by that means*, the dilution proximately caused by that system." *Id.* at 118 (emphasis in original). The district court was not free to try to eradicate the dilution by altering other "electoral laws, practices, and structures" not actually challenged by the claim; instead, the district court had to evaluate the extent to which the remedial plan eradicated the dilution in the light of the electoral mechanism utilized by the State. *Id.* (internal quotation marks omitted).

The Fourth Circuit in *McGhee* did not hold that *Gingles* I compels a district court to accept a remedial map that provides *less* than a genuine opportunity for minority voters to elect a candidate of their choice. *See id.* To the contrary, the court

emphasized that the "appropriate remedy" for a vote dilution claim is to "restructure the districting system to eradicate . . . the dilution proximately caused by that system" "to the maximum extent possible," within the bounds of "the size, compactness, and cohesion elements of the dilution concept." *Id.*

*Fourth,* consistent with the foregoing discussion and our understanding of our task, district courts regularly isolate the initial remedial determination to the question whether a replacement map corrects a violation found in an earlier map. *See, e.g.*, *United States v. Osceola County*, 474 F. Supp. 2d 1254, 1256 (M.D. Fla. 2006); *GRACE, Inc. v. City of Miami*, --- F. Supp. 3d ---, No. 1:22-CV-24066, 2023 WL 4853635, at *7, 2023 U.S. Dist. LEXIS 134162, at *19–20 (S.D. Fla. July 30, 2023).

One three-judge court — in a ruling affirmed by the Supreme Court — has gone so far as to describe its task as "determining the meaning of the Voting Rights Act at the remedial stage of a case in which defendants are proven violators of the law." *Jeffers v. Clinton*, 756 F. Supp. 1195, 1199 (E.D. Ark. 1990), *aff'd*, 498 U.S. 1019 (1991). We do not go that far: no part of our ruling rests on assigning lawbreaker status to the State. *Id.* We are ever mindful that we "must be sensitive to the complex interplay of forces that enter a legislature's redistricting calculus," and we generally presume the good faith of the Legislature. *Abbott*, 138 S. Ct. at 2324 (internal quotation marks omitted). And the Supreme Court has specifically held that the "allocation of the burden of proof [to the plaintiffs] and the presumption of

legislative good faith are not changed by a finding of past discrimination." *Id.* This is because "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *Id.* (internal quotation marks omitted) (quoting *City of Mobile v. Bolden*, 446 U.S. 55, 75 (1980) (plurality opinion)).

As we explain below, *see infra* at Part IV, we have afforded the 2023 Plan the deference to which it is entitled, we have applied the presumption of good faith, and we have measured it against the evidentiary record by performing the legal analysis that we understand binding precedent to require. Put simply, the 2023 Plan has received a fair shot. (Indeed, we have substantially relaxed the Federal Rules of Evidence to allow the State to submit, and we have admitted, virtually all of the materials that it believes support its defense of the 2023 Plan. *Infra* at Part VII; Aug. 14 Tr. 91–142.)

*Fifth,* resetting the *Gingles* analysis to ground zero following the enactment of the 2023 Plan is inconsistent with our understanding of this Court's judicial power. At the remedial hearing, we queried the State about the relevance for these remedial proceedings of our statement in the preliminary injunction that the appropriate remedy was an additional opportunity district. *See supra* at Part I.E.2. According to the State, the statement has no legal force, Aug. 14 Tr. 74 — there is not any "prohibition on the Court commenting on what it thinks an appropriate

remedy would be," Aug. 14 Tr. 158, but such comments are limited to the context of the 2021 Plan, meaningless when the Legislature undertakes to enact a remedial map, and irrelevant when a court assesses that map. The State did not use the word "advisory," but in substance its argument was that the "comment" had no force or field of application and was merely our (erroneous) advice to the Legislature.

The State's view cannot be squared with this Court's judicial power in at least two ways. As an initial matter, it artificially divorces remedial proceedings in equity from liability proceedings in equity. As we already observed, federal courts must tailor injunctions to the specific violation that the injunction is meant to remedy; the idea is that the equitable powers of a federal court are among its broadest and must be exercised with great restraint, care, and particularity. *See, e.g.*, *Haitian Refugee Ctr.,* 676 F.2d at 1041 ("Although a federal court has broad equitable powers to remedy constitutional violations, it must tailor the scope of injunctive relief to fit the nature and extent of the constitutional violation established.").

In this way, a liability determination shapes the evaluation of potential remedies, and the determination of an appropriate remedy necessarily is informed by the nature of the conduct enjoined. *Id.*; *see also Covington*, 581 U.S. at 488 (citing *NAACP v. Hampton Cnty. Election Comm'n*, 470 U.S. 166, 183 n.36 (1985)). Again, redistricting cases are no exception. *See, e.g.*, *Dillard*, 831 F.2d at 248. We cannot reconcile these basic principles with the State's suggestion that after an exhaustive

liability determination, we cannot make a relevant or meaningful statement about the proper remedy.

Separately, the State's view is inconsistent with the Article III judicial power because it allows the State to constrain (indeed, to manipulate) the Court's authority to grant equitable relief. The State agrees that if the Legislature had passed no map, it would have fallen to us to draw a map. But the State argues that because the Legislature enacted a map, we have no authority to enjoin it on the ground that it does not provide what we said is the legally required remedy. Rather, the State says, we must perform a new liability analysis from ground zero. The State acknowledges that if we find liability, Alabama's 2024 congressional elections will occur according to a court-ordered map, but that's only because time will have run out for the Legislature to enact another remedial map before that election. Aug. 14 Tr. 159–60.

Put differently, the State's view is that so long as the Legislature enacts a remedial map, we have no authority to craft a remedy without first repeating the entire liability analysis. But at the end of each liability determination, the argument goes, we have no authority to order a remedy if the Legislature plans and has time to enact a new map. In essence, the State creates an endless paradox that only it can break, thereby depriving Plaintiffs of the ability to effectively challenge and the courts of the ability to remedy. It cannot be that the equitable authority of a federal district court to order full relief for violations of federal law is always entirely at the

mercy of a State electoral and legislative calendar.

*Sixth*, we discern no limiting principle to the State's argument that we should reset the liability analysis to ground zero, and this causes us grave concern that accepting the argument would frustrate the purpose of Section Two. As the Plaintiffs have rightly pointed out and we have described, the State's view of remedial proceedings puts redistricting litigation in an infinity loop restricted only by the State's electoral calendar and terminated only by a new census. *See Milligan* Doc. 210 at 6. These are practical limitations, not principled ones. The State has not identified, and we cannot identify, any limiting principle to a rule whereby redistricting litigation is reset to ground zero every time a legislature enacts a remedial plan following a liability determination. This is a significant reason not to accept such a rule; it would make it exceedingly difficult, if not impossible, for a district court ever to effectuate relief under Section Two.

It is as though we are three years into a ten-year baseball series. We've played the first game. The Plaintiffs won game one. The State had the opportunity to challenge some of the calls that the umpires made, and the replay officials affirmed those calls. Now, instead of playing game two, the State says that it has changed some circumstances that were important in game one, so we need to replay game one. If we agree, we will only ever play game one; we will play it over and over again, until the ten years end, with the State changing the circumstances every time

to try to win a replay. We will never proceed to game two unless, after one of the replays, there is simply no time for the State to change the circumstances. Nothing about this litigation is a game, but to us the analogy otherwise illustrates how poorly the State's position fits with any reasonable effort to timely and finally dispose of redistricting litigation.

*Seventh*, the State's argument that we must reset the *Gingles* analysis to ground zero ignores the simple truth that the 2023 Plan exists only because this Court held — and the Supreme Court affirmed — that the 2021 Plan likely violated Section Two. If the State originally had enacted the 2023 Plan instead of the 2021 Plan, we would have analyzed the Plaintiffs' attacks on the 2023 Plan under *Gingles*. But that's not what happened, so we won't proceed as though it did.

Further, we reject the State's argument that by limiting our initial remedial determination to the question of whether the 2023 Plan provides an additional opportunity district, we violate the proportionality disclaimer in Section Two. The State argues that we have staked the fate of the 2023 Plan on whether it provides proportional representation, which is unlawful. *See Milligan* Doc. 220 at 60–68.

The State is swinging at a straw man: the Plaintiffs' analysis did not and does not rest on proportionality grounds, and neither does ours. As an initial matter, we did not enjoin the 2021 Plan on the ground that it failed to provide proportional representation. We performed a thorough *Gingles* analysis and expressly

acknowledged a limited, non-dispositive role for evidence and arguments about proportionality. *See Milligan* Doc. 107 at 193–95. The Supreme Court affirmed our analysis, which we presume it would not have done were the analysis infected with a proportionality error. *See Allen*, 143 S. Ct. at 1502. Our remedial analysis cannot go back in time and taint our earlier ruling.

Likewise, the Plaintiffs do not urge us to enjoin the 2023 Plan on the ground that it fails to provide proportional representation. They urge us to enjoin it on the ground that it fails to provide the required remedy because District 2 is not an opportunity district. *See Milligan* Doc. 200 at 6–7; *Caster* Doc. 179 at 2–3. Federal law does not equate the provision of an additional opportunity district as a remedy for vote dilution with an entitlement to proportional representation; decades of jurisprudence so ensures. *Allen*, 143 S. Ct. at 1508–10. Any suggestion that the Plaintiffs urge us to reject the 2023 Plan because it fails to provide proportional representation blinks reality.

And as we explain below, we do not enjoin the 2023 Plan on the ground that it fails to provide proportional representation. We enjoin it on two separate, independent, and alternative grounds, neither of which raises a proportionality problem. *See infra* at Parts IV.A & IV.B.

For all these reasons, it is not a proportionality fault that we limit our initial determination to whether the 2023 Plan provides the remedy the law requires.

### D.    In the Alternative

Out of an abundance of caution, we have carefully considered the possibility that the foregoing analysis on the standard of review is wrong. We have concluded that even if it is, after a fresh and new *Gingles* analysis the 2023 Plan still meets the same fate. As we explain in Part IV.B below, even if we reexamine *Gingles* I, II, and III, and all the Senate Factors, relying only on (1) relevant evidence from the preliminary injunction proceedings, (2) relevant and admissible evidence from the remedial proceedings, and (3) stipulations and concessions, we reach the same conclusion with respect to the 2023 Plan that we reached for the 2021 Plan: it likely violates Section Two by diluting Black votes.

## III.    APPLICABLE LAW

"This Court cannot authorize an element of an election proposal that will not with certitude *completely* remedy the Section 2 violation." *Dillard*, 831 F.2d at 252 (emphasis in original); *accord, e.g.*, *Covington*, 283 F. Supp. 3d at 431. The requirement of a complete remedy means that we cannot accept a remedial plan that (1) perpetuates the vote dilution we found, *see, e.g.*, *Covington*, 283 F. Supp. 3d at 431; or (2) only partially remedies it, *see, e.g.*, *White v. Alabama*, 74 F.3d 1058, 1069–70 (11th Cir. 1996).

The law does not require that a remedial district guarantee Black voters' electoral success. "The circumstance that a group does not win elections does not

resolve the issue of vote dilution." *LULAC*, 548 U.S. at 428. Rather, the law requires that a remedial district guarantee Black voters an equal opportunity to achieve electoral success. "[T]he ultimate right of § 2 is equality of opportunity, not a guarantee of electoral success for minority-preferred candidates of whatever race." *De Grandy*, 512 U.S. at 1014 n.11.

Thus, as we said in the preliminary injunction, controlling precedent makes clear that the appropriate remedy for the vote dilution we found is an additional district in which Black voters either comprise a voting-age majority or otherwise have an opportunity to elect a representative of their choice. And as the Supreme Court explained in *Abbott*, this requirement is not new: "In a series of cases tracing back to [*Gingles*], [the Supreme Court has] interpreted [the Section Two] standard to mean that, under certain circumstance, States **must draw** 'opportunity' districts in which minority groups form 'effective majorit[ies].'" 138 S. Ct. at 2315 (emphasis added) (quoting *LULAC,* 548 U.S. at 426).

Our ruling was consistent with others in which district courts required additional opportunity districts to remedy a vote-dilution violation of Section Two. *See, e.g.*, *Perez v. Texas*, No. 11-CA-360-OLG-JES-XR, 2012 WL 13124275, at *5, 2012 U.S. Dist. LEXIS 190609 (W.D. Tex. Mar. 19, 2012) (on remand from the Supreme Court, ordering the "creation of a new Latino district" to satisfy Section Two); *League of United Latin Am. Citizens v. Perry*, 457 F. Supp. 2d 716, 719 (E.D.

Tex. 2006) (ordering, on remand from the Supreme Court, a remedial plan that restored an effective opportunity district); *accord, e.g.*, *Baldus v. Members of Wis. Gov't Accountability Bd.*, 862 F. Supp. 2d 860, 863 (E.D. Wis. 2012) (rejecting a state's remedial plan and adopting a Section Two plaintiff's remedial proposal that increased a remedial district's minority population to ensure an "effective majority-minority" district).

We have reviewed the relevant jurisprudence for guidance about how to determine whether the 2023 Plan includes an additional opportunity district. The State appears to have charted new waters: we found no other Section Two case in which a State conceded on remedy that a plan enacted after a liability finding did not include the additional opportunity district that the court said was required.

In any event, we discern from the case law two rules that guide our determination whether the 2023 Plan in fact includes an additional opportunity district. *First*, we need a performance analysis (sometimes called a functional analysis) to tell us whether a purportedly remedial district completely remedies the vote dilution found in the prior plan. A performance analysis predicts how a district will function based on statistical information about, among other things, demographics of the voting-age population in the district, patterns of racially polarized voting and bloc voting, and the interaction of those factors. *See generally Milligan* Doc. 199.

Appellate courts commonly rely on performance analyses to review district court decisions about remedial plans. *See, e.g.*, *LULAC*, 548 U.S. at 427 (reviewing a district court's evaluation of a proposed remedial district on the basis of a performance analysis that included evidence of the minority share of the population, racially polarized voting in past elections, and projected election results in the new district); *Dall. Cnty. Comm'n*, 850 F.2d at 1440 (rejecting a remedial plan because a performance analysis demonstrated that racially polarized voting would prevent the election of Black-preferred candidates in the proposed remedial district).

District courts also commonly rely on performance analyses to evaluate remedial plans in the first instance. *See, e.g.*, *Osceola County*, 474 F. Supp. 2d at 1256 (rejecting a remedial proposal that, "given the high degree of historically polarized voting," failed to remedy the VRA violation); *League of United Latin Am. Citizens*, 457 F. Supp. 2d at 721 (ordering remedial plan with three new "effective Latino opportunity districts" and basing determination that districts would "perform" on population demographics and statewide election data).

*Second,* the Supreme Court has not dictated a baseline level at which a district must perform to be considered an "opportunity" district. Nor has other precedent set algorithmic criteria for us to use to determine whether an alleged opportunity district will perform. But precedent does clearly tell us what criteria establish that a putative opportunity district will not perform. When a performance analysis shows that a

cohesive majority will "often, if not always, prevent" minority voters from electing the candidate of their choice in the purportedly remedial district, there is a "denial of opportunity in the real sense of that term." *LULAC*, 548 U.S. at 427, 429. And when voting is racially polarized to such a "high degree" that electoral success in the alleged opportunity district is "completely out of the reach" of a minority community, the district is not an opportunity district. *Osceola County*, 474 F. Supp. 2d at 1256.

## IV.   FINDINGS OF FACT AND CONCLUSIONS OF LAW

Our findings and conclusions proceed in two parts. We first consider whether, under the precedent we just described, the 2023 Plan completely remedies the likely Section Two violation that we found and the Supreme Court affirmed. We then consider whether, starting from square one, the Plaintiffs have established that the 2023 Plan likely violates Section Two.

### A.   The 2023 Plan Does Not Completely Remedy the Likely Section Two Violation We Found and the Supreme Court Affirmed.

The record establishes quite clearly that the 2023 Plan does not completely remedy the likely Section Two violation that we found and the Supreme Court affirmed. The 2021 Plan included one majority-Black congressional district, District 7. This Court concluded that the Plaintiffs were substantially likely to establish that the 2021 Plan violated Section Two by diluting Black votes. *See Milligan* Doc. 107. We determined that under binding precedent, the necessary remedy was either an

additional majority-Black district or an additional Black-opportunity district. *Id.* at 5–6. We observed that as a "practical reality," because voting in Alabama is intensely racially polarized, any such district would need to include a Black "voting-age majority or something quite close to it." *Id.* at 6.

We explicitly explained that the need for two opportunity districts hinged on the evidence of racially polarized voting in Alabama — which the State concedes at this stage — and that our *Gingles* I analysis served only to determine whether it was reasonably practicable, based on the size and geography of the minority population, to create a reasonably configured map with two majority-minority districts.

The Supreme Court affirmed that order in all respects; it neither "disturb[ed]" our fact findings nor "upset" our legal conclusions. *Allen*, 143 S. Ct. at 1502, 1506. The Supreme Court did not issue any instructions for us to follow when the cases returned to our Court or warn us that we misstated the appropriate remedy. We discern nothing in the majority opinion to hold (or even to suggest) that we misunderstood what Section Two requires. We have carefully reviewed the portion of the Chief Justice's opinion that received only four votes, as well as Justice Kavanaugh's concurrence, and we discern nothing in either of those writings that adjusts our understanding of what Section Two requires in these cases. We do not understand either of those writings as undermining any aspect of the Supreme Court's affirmance; if they did, the Court would not have affirmed the injunction.

We simply see no indication in *Allen* that we misapplied Section Two.

Because there is no dispute that the 2023 Plan does not have two majority-Black districts, *Milligan* Doc. 251 ¶ 1, the dispositive question is whether the 2023 Plan contains an additional Black-opportunity district. We find that it does not, for two separate and independent reasons.

*First*, we find that the 2023 Plan does not include an additional opportunity district because the State itself concedes that the 2023 Plan does not include an additional opportunity district. *See id.* ¶¶ 5–9; Aug. 14 Tr. 163–64. Indeed, the State's position is that the Legislature was not required to include an additional opportunity district in the 2023 Plan. Aug. 14 Tr. 157–61, 163–64.

*Second*, we find that the 2023 Plan does not include an additional opportunity district because stipulated evidence establishes that fact. District 2 has the second-highest Black voting-age population after District 7, and District 2 is the district the Plaintiffs challenge. *See Milligan* Doc. 200 at 6–7; *Milligan* Doc. 251 ¶ 3. District 2 (with a Black voting-age population of 39.93%) is, according to the State, "as close as you are going to get" to a second majority-Black district. Aug. 14 Tr. 164.

Based on (1) expert opinions offered by the *Milligan* and *Caster* Plaintiffs and (2) the Legislature's own performance analysis, the parties stipulated that in District 2 in the 2023 Plan, white-preferred candidates have "almost always defeated Black-preferred candidates." *Milligan* Doc. 251 ¶ 5; *see also Milligan* Docs. 200-2, 200-3;

*Caster* Doc. 179-2.

Standing alone, this stipulation supports a finding that the new District 2 is not an opportunity district. Because voting is so intensely racially polarized in District 2, a Black-voting age population of 39.93% is insufficient to give Black voters a fair and reasonable opportunity to elect a representative of their choice: it will either never happen, or it will happen so very rarely that it cannot fairly be described as realistic, let alone reasonable.

The evidence fully supports the parties' stipulation. The *Milligan* Plaintiffs' expert, Dr. Liu, examined the effectiveness of Districts 2 and 7 of the 2023 Plan in eleven biracial elections between 2014 and 2022. *Milligan* Doc. 200-2 at 1. Dr. Liu opined that in District 2, "[a]ll Black-preferred-candidates . . . in the 11 biracial elections were defeated." *Id.* at 2. Dr. Liu further opined that the District 2 races were not close: the average two-party vote share for the Black preferred candidates in District 2 was approximately 42%. *Id.* at 3; *Milligan* Doc. 251 ¶ 7. Accordingly, Dr. Liu concluded that "voting is highly racially polarized in [Districts 2] and [7] in the [2023] Plan," and the new District 2 "produces the same results for Black Preferred Candidates" that the 2021 Plan produced. *Milligan* Doc. 200-2 at 1.

The *Caster* Plaintiffs' expert, Dr. Palmer, reached the same conclusion using a different analysis. Dr. Palmer analyzed the 2023 Plan using seventeen contested statewide elections between 2016 and 2022. *Milligan* Doc. 251 ¶ 6; *Caster* Doc. 179-

2. Dr. Palmer opined that "Black voters have a clear candidate of choice in each contest, and White voters are strongly opposed to this candidate." *Caster* Doc. 179-2 ¶¶ 8, 11–12. Dr. Palmer further opined that "Black-preferred candidates are almost never able to win elections in" District 2 because "[t]he Black-preferred candidate was defeated in 16 of the 17 elections [he] analyzed." *Id.* ¶¶ 8, 11–12, 18, 20; *accord Milligan* Doc. 251 ¶ 6. Dr. Palmer observed that Black preferred candidates regularly lost by a substantial margin: the two-party vote share for the Black preferred candidates in District 2 was 44.5%. *Caster* Doc. 179-2 ¶ 18; *see also Milligan* Doc. 213 ¶ 6. Accordingly, Dr. Palmer opined that the new District 2 does not allow Black voters to elect a candidate of their choice. *Caster* Doc. 179-2 ¶ 20.

We credited both Dr. Liu and Dr. Palmer in the preliminary injunction proceedings, *see Milligan* Doc. 107 at 174–76, and we credit them now for the same reasons we credited them then. Both experts used the same methodology to develop their opinions for these remedial proceedings that they used to develop their opinions on liability. *See Milligan* Doc. 200-2 at 2; *Caster* Doc. 179-2 ¶ 9 & n.1. And the State has not suggested that we should discredit either expert, or that we should discount their opinions for any reason.

Indeed, the Legislature's analysis of the 2023 Plan materially matches Dr. Liu's and Dr. Palmer's. The Legislature analyzed the 2023 Plan in seven election contests. *Milligan* Doc. 251 ¶ 9. The Legislature's analysis found that "[u]nder the

2023 Plan, the Black-preferred candidate in [District] 2 would have been elected in 0 out of the 7 contests analyzed." *Id*. And it showed that the losses were by a substantial margin: "Under the 2023 Plan," the Legislature's analysis found, "the average two-party vote-share for Black preferred candidates in [District] 2 is 46.6%." *Id*.

All the performance analyses support the same conclusion: the 2023 Plan provides no greater opportunity for Black Alabamians to elect a candidate of their choice than the 2021 Plan provided. District 2 is the closest the 2023 Plan comes to a second Black-opportunity district, and District 2 is not a Black-opportunity district. Accordingly, the 2023 Plan perpetuates, rather than completely remedies, the likely Section Two violation found by this Court.

**B.    Alternatively: Even If the Plaintiffs Must Re-Establish Every Element of *Gingles* Anew, They Have Carried that Burden and Established that the 2023 Plan Likely Violates Section Two.**

Even if we reset the *Gingles* analysis to ground zero, the result is the same because the Plaintiffs have established that the 2023 Plan likely violates Section Two. We discuss each step of the *Gingles* analysis in turn.

### 1.    *Gingles* I - Numerosity

The numerosity part of *Gingles* I considers whether Black voters as a group are "sufficiently large . . . to constitute a majority" in a second majority-Black congressional district in Alabama. *Cooper*, 581 U.S. at 301 (internal quotation marks

omitted). This issue was undisputed during the preliminary injunction proceedings, *Milligan* Doc. 107 at 146, and the State offers no evidence to challenge our previous finding. Accordingly, we again find that Black voters, as a group, are "sufficiently large . . . to constitute a majority" in a second majority-Black congressional district in Alabama. *Cooper*, 581 U.S. at 301 (internal quotation marks omitted).

## 2.  *Gingles* I - Compactness

We next consider whether the *Milligan* and *Caster* Plaintiffs have established that Black voters as a group are sufficiently geographically compact to constitute a majority in a second reasonably configured congressional district. We proceed in three steps: *first*, we explain our credibility determinations about the parties' expert witnesses; *second*, we explain why the State's premise that reasonable compactness necessarily requires the Plaintiffs' proposed plans to "meet or beat" the 2023 Plan on all available compactness metrics is wrong; and *third*, we consider the parties' arguments about geographic compactness on the State's own terms.

### a.  Credibility Determinations

In the preliminary injunction, we found Dr. Duchin and Mr. Cooper "highly credible." *Milligan* Doc. 107 at 148–52. The State has not adduced any evidence or made any argument during remedial proceedings to disturb those findings. We also found credible Dr. Bagley, who earlier testified about the Senate Factors and now opines about communities of interest. *Id.* at 185–87. Likewise, the State has not

adduced any evidence or made any argument during remedial proceedings to disturb our original credibility determination about Dr. Bagley. Accordingly, we find credible each of Plaintiffs' *Gingles* I experts.

Although we "assign[ed] very little weight to Mr. Bryan's testimony" in the preliminary injunction and explained at great length why we found it unreliable, *id.* at 152–56, the State again relies on Mr. Bryan as an expert on "race predominance," this time through an unsworn report where he "assessed how county 'splits differ by demographic characteristics when it comes to the division of counties' in Plaintiffs' alternative[]'" plans. *See Milligan* Doc. 267 ¶ 156 (quoting *Milligan* Doc. 220-10 at 22). When we read the State's defense of the 2023 Plan, it is as though our credibility determination never occurred: the State repeatedly cites Mr. Bryan's opinions but makes no effort to rehabilitate his credibility. *See generally Milligan* Doc. 220.

Likewise, when we read Mr. Bryan's 2023 report, it is as though our credibility determination never occurred. Mr. Bryan makes no attempt to rehabilitate his own credibility or engage any of the many reasons we assigned little weight to his testimony and found it unreliable. *See generally Milligan* Doc. 220-10. Mr. Bryan even cites this case as one of two cases in which he has testified, without mentioning that we did not credit his testimony. *See id.* at 4. The district court in the other case found "his methodology to be poorly supported" and that his "conclusions carried little, if any, probative value on the question of racial predominance."

*Robinson v. Ardoin*, 605 F. Supp. 3d 759, 824 (M.D. La. 2022).

When we read the State's response to the Plaintiffs' motion to exclude Mr. Bryan's 2023 report as unreliable, it is again as though our credibility determination never occurred. The State does not acknowledge it or suggest that any of the problems we identified have been remedied (or at least not repeated). *See generally Milligan* Doc. 245.

Against this backdrop, it is especially remarkable that (1) the State did not call Mr. Bryan to testify live at the remedial hearing, and (2) Mr. Bryan's report is not sworn. *See Milligan* Doc. 220-10. "[C]ross-examination is the greatest legal engine ever invented for the discovery of truth." *Kentucky v. Stincer*, 482 U.S. 730, 736 (1987) (internal quotation marks omitted) (quoting 5 J. Wigmore, Evidence § 1367 at 29 (3d ed. 1940)). Cross-examination strikes us as especially important because this Court already has found this expert witness' testimony incredible and unreliable. It strikes us as even more valuable when, as here, a witness has not reduced his opinions to sworn testimony.

Standing alone, these circumstances preclude us from assigning any weight to Mr. Bryan's 2023 opinion. But these circumstances don't stand alone: even if we were to evaluate Mr. Bryan's 2023 opinion without reference to our earlier credibility determination, we would not admit it or assign any weight to it.

As the Supreme Court made clear in *Daubert v. Merrell Down*

*Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), Federal Rule of Evidence 702 requires this Court to "perform the critical 'gatekeeping' function concerning the admissibility" of expert evidence. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (*en banc*) (quoting *Daubert*, 509 U.S. at 589 n.7). That gatekeeping function involves a "rigorous three-part inquiry" into whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Id.* (quoting *City of Tuscaloosa v. Harcos Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)). "The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion." *Id.*

The State has not met its burden on at least two of these three requirements. *First*, as explained above, this Court ruled that Mr. Bryan was not a credible witness in January 2021. *Milligan* Doc. 107 at 152. *Second*, Mr. Bryan's report is not reliable. For that, the Court "assess[es] 'whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue.'" *Frazier*, 387 F.3d at 1261–62 (quoting *Daubert*, 509 U.S. at 592–93). There are two parts to the methodology question: relevance and reliability. *See Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1310–12 (11th Cir. 1999). Under the relevance part, "the

court must ensure that the proposed expert testimony is relevant to the task at hand, . . . i.e., that it logically advances a material aspect of the proposing party's case." *Id.* at 1312 (internal quotation marks omitted). "[T]he evidence must have a valid scientific connection to the disputed facts in the case." *Id.*

Under the reliability part, courts consider "four noninclusive factors," namely "(1) whether the theory or technique can be tested; (2) whether it has been subjected to peer review; (3) whether the technique has a high known or potential rate of error; and (4) whether the theory has attained general acceptance within the scientific community." *Id.* The "primary focus" should "be solely on principles and methodology, not on the conclusions that they generate," so "the proponent of the testimony does not have the burden of proving that it is scientifically correct, but that by a preponderance of the evidence, it is reliable." *Id.* (internal quotation marks omitted). As explained below, Mr. Bryan's report is neither relevant nor reliable.

Mr. Bryan's 2023 opinion is that "race predominated in the drawing of both the [Districts 2] and [7] in the [VRA Plan] and the Cooper Plans." *Milligan* Doc. 220-10 ¶ 7. That opinion rests on what Mr. Bryan calls a "[g]eographic [s]plits [a]nalysis of [c]ounties." *Id.* at 22. *First*, as to reliability, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the

opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

The Plaintiffs attack Mr. Bryan's 2023 opinion as *ipse dixit*, and we agree. Mr. Bryan's report does not explain how his opinion about race predominance is connected to the geographic splits methodology that he used, or even why an evaluation of race predominance ordinarily might be based on geographic splits analysis. *See Milligan* Doc. 220-10 at 22–26. Mr. Bryan simply presents the results of his geographic splits analysis and then states in one sentence a cursory conclusion about race predominance. *Id.* The State's response does nothing to solve this problem. *See Milligan* Doc. 245 at 7–10.

*Second*, as to helpfulness, the Plaintiffs have not offered the VRA Plan as an illustrative plan for *Gingles* I, so we have no need for Mr. Bryan's opinion about that plan. The Plaintiffs did offer the Cooper plans, but we also have no need for his opinion about those: we presume the preliminary injunction would not have been affirmed if there were an open question whether race played an improper role in the preparation of all of them, given that the State squarely presented this argument to the Supreme Court. And even if we were to accept Mr. Bryan's opinion about the Cooper plans (which we don't), the State stakes no part of its defense of the 2023 Plan on arguments about that opinion: the State cites Mr. Bryan's opinion only once in the argument section of its brief, and that is to make an argument about the VRA Plan. *Milligan* Doc. 220 at 58. Accordingly, nothing in Mr. Bryan's report is helpful

to this Court's decision whether the Plaintiffs have established that the 2023 Plan likely violates Section Two.

Because we again do not credit Mr. Bryan and we find his 2023 opinion unreliable and unhelpful, we **GRANT IN PART** the Plaintiffs' motion *in limine* and **EXCLUDE** his opinion from our analysis. *See* Fed. R. Evid. 702; *Daubert*, 509 U.S. at 589–92. For those same reasons, even if we were to receive Mr. Bryan's opinion into evidence, we would assign it no weight.

We turn next to Mr. Trende's opinion. *See Milligan* Doc. 220-12. The State relies on Mr. Trende to "assess[] the 2023 Plan and each of Plaintiffs' alternative plans based on the three compactness measures Dr. Duchin used in her earlier report." *Milligan* Doc. 220 at 57–58. Mr. Trende is a Senior Elections Analyst at Real Clear Politics, he is a doctoral candidate at Ohio State University, and he has a master's degree in applied statistics. *Milligan* Doc. 220-12 at 2–4.

The Plaintiffs do not contest Mr. Trende's qualifications to testify as an expert. And because he uses the same common statistical measures of compactness that Dr. Duchin used, the Plaintiffs do not contest the reliability of his methods. Accordingly, we admit Mr. Trende's report for the limited and alternative purpose of conducting a new *Gingles* analysis. We explain the weight we assign it in that analysis below.

### b.  The "Meet or Beat" Requirement

We now pause to correct a fundamental misunderstanding in the State's view of step one of the *Gingles* analysis. Our task is not, as the State repeatedly suggests, to compare the Plaintiffs' illustrative plans with the 2023 Plan to determine which plan would prevail in a "beauty contest." *Allen*, 143 S. Ct. at 1505 (internal quotation marks omitted) (alterations accepted). As the Supreme Court affirmed in this very case, "[t]he District Court . . . did not have to conduct a beauty contest between plaintiffs' maps and the State's." *Id.* (internal quotation marks omitted) (alterations accepted); *see also Vera*, 517 U.S. at 977 (plurality opinion) ("A § 2 district that is *reasonably* compact and regular, taking into account traditional districting principles such as maintaining communities of interest and traditional boundaries" is not required "to defeat rival compact districts designed by [the State] in endless 'beauty contests.'" (emphasis in original)).

Nevertheless, the State frames the "focus" of these proceedings as "whether Plaintiffs can produce an alternative map that equals the 2023 Plan on the traditional principles that *Allen* reaffirmed were the basis of the § 2 analysis." *Milligan* Doc. 220 at 33. But neither *Allen* nor any other case law stands for that proposition. Our preliminary injunction order — affirmed by the Supreme Court — explained that "[c]ritically, our task is not to decide whether the majority-Black districts in the Duchin plans and Cooper plans are 'better than' or 'preferable' to a majority-Black

district drawn a different way. Rather, the rule is that '[a] § 2 district that is **reasonably** compact and regular, taking into account traditional districting principles,' need not also 'defeat [a] rival compact district[]' in a 'beauty contest[].'" *Milligan* Doc. 107 at 165 (emphasis in original) (quoting *Vera*, 517 U.S. at 977–78 (plurality opinion)).

Instead of the "meet-or-beat" requirement the State propounds, the essential question under *Gingles* I is and has always been whether the minority group is "sufficiently large and geographically compact to constitute a majority in some reasonably configured legislative district." *Cooper*, 581 U.S. at 301 (internal quotation marks omitted). This standard does not require that an illustrative plan outperform the 2023 Plan by a prescribed distance on a prescribed number of prescribed metrics. An illustrative plan may be reasonably configured even if it does not outperform the 2023 Plan on every (or any particular) metric. The standard does not require the Plaintiffs to offer the *best* map; it requires them to offer a reasonable one. Indeed, requiring a plaintiff to meet or beat an enacted plan on every redistricting principle a State selects would allow the State to immunize from challenge a racially discriminatory redistricting plan simply by claiming that it best satisfied a particular principle the State defined as non-negotiable.

Accordingly, that the 2023 Plan preserves communities of interest differently from the Plaintiffs' illustrative maps, or splits counties differently from the

illustrative maps, does not automatically make the illustrative maps unreasonable. As Mr. Cooper testified, different maps will necessarily prioritize traditional districting criteria in different ways. This is why the maps offered by a Section Two plaintiff are only ever *illustrative*; states are free to prioritize the districting criteria as they wish when they enact a remedial map, so long as they satisfy Section Two. The State has essentially conceded that it failed to do so here, maintaining that it can skirt Section Two by excelling at whatever traditional districting criteria the Legislature deems most pertinent in a redistricting cycle.

The bottom line is that the Plaintiffs' illustrative maps can still be "reasonably configured" even if they do not outperform the 2023 Plan on every (or any particular) metric. The premise that forms the backbone of the State's defense of the 2023 Plan therefore fails.

More fundamentally, even if we were to find that the 2023 Plan respects communities of interest better or is more compact than the 2021 Plan — that the 2023 Plan "beats" the 2021 Plan — that would not cure the likely violation we found because the violation was not that the 2021 Plan did not respect communities of interest, or that it was not compact enough. We found that the 2021 Plan likely diluted Black votes. The State cannot avoid the mandate of Section Two by improving its map on metrics **other than compliance with Section Two**. Otherwise, it could forever escape remediating a Section Two violation by making each

remedial map slightly more compact, or slightly better for communities of interest, than the predecessor map. That is not the law: a Section Two remedy must be tailored to the specific finding of Section Two liability.

In any event, we do not find that the 2023 Plan respects communities of interest or county lines better than the Plaintiffs' illustrative maps. *See* infra at Part IV.B.2.d.

### c. Geographic Compactness Scores

We next turn, as we did in the preliminary injunction, to the question whether the compactness scores for the Duchin plans and the Cooper plans indicate that the majority-Black congressional districts in those plans are reasonably compact. In the preliminary injunction, we based our reasonableness finding about the scores on (1) the testimony of "eminently qualified experts in redistricting," and (2) "the relative compactness of the districts in the [illustrative] plans compared to that of the districts in the [2021] Plan." *See Milligan* Doc. 107 at 157.

The enactment of the 2023 Plan has not changed any aspect of Dr. Duchin and Mr. Cooper's testimony that the compactness scores of the districts in their plans are reasonable. *See id.* (citing such testimony at Tr. 446, 471, 492–493, 590, 594). Because that testimony was not relative — it opined about the Duchin plans and Cooper plans standing alone, not compared to any other plan — the enactment of a new plan did not affect it.

Neither does Dr. Trende's opinion affect the testimony of Dr. Duchin and Mr. Cooper about reasonableness. When we originally analyzed that testimony, we concluded that because Mr. Bryan "offered no opinion on what is reasonable and what is not reasonable in terms of compactness," "the corollary of our decision to credit Dr. Duchin and Mr. Cooper is a finding that the Black population in the majority-Black districts in the Duchin plans and the Cooper plans is reasonably compact." *Id.* at 157–58 (internal quotation marks omitted). Like Mr. Bryan then, Mr. Trende now offers no opinion on what is reasonable or what is not reasonable in terms of compactness. *See Milligan* Doc. 220-12 at 6–11 ("Analysis of Maps"). Accordingly, the State still has adduced no evidence to question, let alone disprove, the Plaintiffs' evidence that the Black population in the majority-Black districts in the illustrative plans is reasonably compact.

When we examine the relative compactness of the districts in the Duchin plans and the Cooper plans compared to that of the districts in the 2023 Plan, the result remains the same. Mr. Trende acknowledges that on an average Polsby-Popper metric, Duchin plan 2 is "marginally more compact" than the 2023 Plan, and that on a cut edges metric, Duchin plan 2 outperforms the 2023 Plan. *Id.* at 10. (Nevertheless, Mr. Trende opines that the 2023 Plan outperforms all illustrative plans when all three metrics are taken in account. *Id.*) And Mr. Trende does not opine that any of the Duchin plans or Cooper plans that received lower statistical scores

received unreasonably lower scores or unreasonable scores. *See id.*at 8–10.

"[A]s far as compactness scores go, all the indicators [again] point in the same direction. Regardless how we study this question, the answer is the same each time. We find that based on statistical scores of geographic compactness, each set of Section Two plaintiffs has submitted remedial plans that strongly suggest that Black voters in Alabama are sufficiently numerous and reasonably compact to comprise a second majority-Black congressional district." *Milligan* Doc. 107 at 159.

### d. Reasonable Compactness and Traditional Redistricting Principles

As we said in the preliminary injunction, "[c]ompactness is about more than geography." *Id.* If it is not possible to draw an additional opportunity district that is reasonably configured, Section Two does not require such a district. In the preliminary injunction, we began our analysis on this issue with two visual assessments: one of the Black population in Alabama, and one of the majority-Black districts in the Duchin and Cooper plans. *See id.* at 160–62.

Our first visual assessment led us to conclude that "[j]ust by looking at the population map [of the Black population in Alabama], we can see why Dr. Duchin and Mr. Cooper expected that they could easily draw two reasonably configured majority-Black districts." *Id.* at 161. The State suggests no reason why we should reconsider that finding now. And the enactment of the 2023 Plan does not change the map we visually assessed, or the conclusion that we drew from it.

Our second visual assessment led us to conclude that we "d[id] not see tentacles, appendages, bizarre shapes, or any other obvious irregularities [in the Duchin or Cooper plans] that would make it difficult to find that any District 2 could be considered reasonably compact." *Id.* at 162. The enactment of the 2023 Plan does not change the maps that we visually assessed, nor the conclusion that we drew from them.

In the preliminary injunction, "we next turn[ed] to the question whether the Duchin plans and the Cooper plans reflect reasonable compactness when our inquiry takes into account, as it must, 'traditional districting principles such as maintaining communities of interest and traditional boundaries.'" *Id.* (quoting *LULAC*, 548 U.S. at 433). We follow the same analytic path now.

This step of the analysis is at the heart of the State's assertion that the 2023 Plan moved the needle on *Gingles* I. The State argues that "the lesson from *Allen* is that Section 2 requires Alabama to avoid discriminatory effects in how it treats communities of interest, even if that means sacrificing core retention," and that neither we nor the Supreme Court have "ever said that [Section Two] requires the State to subordinate 'nonracial communities of interest' in the Gulf and Wiregrass to Plaintiffs' racial goals." *Milligan* Doc. 267 ¶¶ 215–16 (quoting *LULAC*, 548 U.S. at 433). The State contends that the Plaintiffs cannot "show that there is a reasonably configured alternative remedy that would also maintain communities of interest in

the Black Belt, Gulf, and Wiregrass, on par with the 2023 Plan." *Milligan* Doc. 220 at 37 (internal quotation marks omitted).

At its core, the State's position is that no Duchin plan or Cooper plan can "meet or beat" the 2023 Plan with respect to these three communities of interest and county splits. The State leans heavily on additional evidence about these communities of interest, the rule that Section Two "never require[s] adoption of districts that violate traditional redistricting principles," *Allen*, 143 S. Ct. at 1510 (internal quotation marks omitted), and the legislative findings that accompany the 2023 Plan.

The State contends that "this is no longer a case in which there would be a split community of interest" in both the Plaintiffs' plans and the enacted plan, because in the 2023 Plan, the "Black Belt, Gulf, and Wiregrass communities are maintained to the maximum extent possible." *Milligan* Doc. 220 at 51 (internal quotation marks omitted) (alterations accepted). The State asserts that the 2023 Plan "rectifies what Plaintiffs said was wrong with the 2021 Plan" because it "puts all 18 counties that make up the Black Belt entirely within Districts 2 and 7" and keeps Montgomery whole in District 2. *Id.* at 42–43.

For their part, the *Milligan* Plaintiffs say that the 2023 Plan changed nothing. They attack the legislative findings about traditional districting principles — more particularly, the legislative findings about communities of interest, county splits, and

protection of incumbents — as perpetuating the vote dilution we found because these findings were "tailored to disqualify" the Plaintiffs' illustrative plans. *Milligan* Doc. 200 at 20. The *Milligan* Plaintiffs accuse the State of "ignor[ing] that the Supreme Court recognized" that the Duchin plans and Cooper plans "comported with traditional districting criteria, even though they split Mobile and Baldwin counties"; they say that the record continues to support that conclusion; and they cite a declaration from the first Black Mayor of Mobile and a supplemental report prepared by Dr. Bagley. *Id.* at 21–22 (internal quotation marks omitted). The *Milligan* Plaintiffs assert that the 2023 Plan keeps together only the Gulf Coast while perpetuating vote dilution in the Black Belt and splitting the Wiregrass between Districts 1 and 2. *Id.* at 22–23.

Before we explain our findings and conclusions on these issues, we repeat the foundational observations that we made in the preliminary injunction: (1) these issues were "fervently disputed," (2) the State continues to insist that "there is no legitimate reason to separate Mobile County and Baldwin County," (3) our task is not to decide whether the majority-Black districts in the Duchin plans and Cooper plans are "better than" any other possible majority-Black district, and (4) "we are careful to avoid the beauty contest that a great deal of testimony and argument seemed designed to try to win." *Milligan* Doc. 107 at 164–65.

### i.  Communities of Interest

As we previously found and the Supreme Court affirmed, the Black Belt "stands out to us as quite clearly a community of interest of substantial significance," but the State "overstate[s] the point" about the Gulf Coast. *See Milligan* Doc. 107 at 165–71; *accord Allen*, 143 S. Ct. at 1505. The evidence about the Gulf Coast is now more substantial than it was before, but it is still considerably weaker than the record on the Black Belt, which rests on extensive stipulated facts and includes extensive expert testimony, and which spanned a range of demographic, cultural, historical, and political issues. *See Milligan* Doc. 107 at 165–67.

As the Supreme Court recognized, in the preliminary injunction we found that, "[n]amed for its fertile soil, the Black Belt contains a high proportion of black voters, who share a rural geography, concentrated poverty, unequal access to government services, . . . lack of adequate healthcare, and a lineal connection to the many enslaved people brought there to work in the antebellum period." *Allen*, 143 S. Ct. at 1505 (internal quotation marks omitted).

We now have the additional benefit of Dr. Bagley's testimony about the Black Belt, Gulf Coast, and Wiregrass. *See Milligan* Doc. 200-15. We credit his testimony and find his opinions helpful, particularly (1) his opinion further describing the shared experience of Black Alabamians in the Black Belt; and (2) his opinion that "treating Mobile and Baldwin Counties as an inviolable" community of interest is

"ahistorical" in light of the connections between Mobile and the Black Belt. *See id.* at 1.

Dr. Bagley's testimony further describes the shared experiences of Alabamians in the Black Belt, which are "not only related to the fertility of the soil and the current poverty" there, but "are also characterized by" many shared racial experiences, including "Indian Removal, chattel slavery, cotton production, Reconstruction and Redemption, sharecropping, convict leasing, white supremacy, lynching, disenfranchisement, the birth of Historically Black Colleges and Universities . . . , struggles for civil and voting rights, Black political and economic organization, backlash in the form of violence and economic reprisal, repressive forms of taxation, [and] white flight," to name a few. *Id.* at 2.

Dr. Bagley opines that "many of these characteristics" also apply to "metropolitan Mobile," which Dr. Bagley describes as "Black Mobile." *Id.* at 2–3. Dr. Bagley explains that the Port of Mobile (a cornerstone of the State's arguments about the Gulf Coast community of interest) "historically saw the importation and exportation of human chattel, up to the illegal importation of enslaved individuals by the crew of the Clotilda in 1860," as well as "the export of the cotton grown by the enslaved people in the Black Belt." *Id.* at 2. And Dr. Bagley explains that Black Alabamians living in modern Mobile share experiences of "concentrated poverty" and a "lack of access to healthcare" with Alabamians in the Black Belt, such that

Black Alabamians in Mobile have more in common with people in the Black Belt than they do with people in whiter Baldwin County. *Id.* at 3–4.

Further, Dr. Bagley opines that treating Mobile and Baldwin Counties as an inseparable community of interest is "ahistorical." *Id.* at 1, 4–7. His testimony is that the State overstates the evidence of "alleged connections" between Mobile and Baldwin Counties and fails to acknowledge the reality that "Black Mobile is geographically compact and impacted by poverty relative to Baldwin County, which is, by contrast, affluent and white." *Id.* at 4.

The State does little to diminish Dr. Bagley's testimony. *See Milligan* Doc. 220 at 44–49. *First,* the State disputes only a few of the many details he discusses, none of which undermines his substantive point. *See id. Second*, without engaging Dr. Bagley's testimony about the connections between the Black Belt and Mobile, or his testimony that treating the Gulf Coast as "inviolable" is "ahistorical," the State reiterates its previous argument that the Gulf Coast is "indisputably" a community of interest that Plaintiffs would split along racial lines. *Id.* at 39–40. *Third,* without engaging Dr. Bagley's point about the shared racial experiences of Alabamians living in the Black Belt (or the stipulated facts), the State asserts that the 2023 Plan successfully unites the Black Belt as a "nonracial community of interest." *Id.* at 38. And *fourth,* the State urges us to assign Dr. Bagley's opinion little weight because a "paid expert cannot supersede legislative findings, especially where, as here, the

expert's opinions are based on a selective retelling of facts." *Id.* at 48–49. We discuss each argument in turn.

*First,* the State's effort to refute specific details of Dr. Bagley's testimony about the Black Belt is unpersuasive. Dr. Bagley's report is well-supported and factually dense. *See Milligan* Doc. 200-15. Even if we accept *arguendo* the State's isolated factual attacks, *see Milligan* Doc. 220 at 44–49, neither the basis for nor the force of the report is materially diminished.

*Second,* the State continues to insist that the Gulf Coast is "indisputably" a community of interest that cannot be separated, especially "along racial lines," but the record does not bear this out, particularly in the light of the State's failure to acknowledge, let alone rebut, much of Dr. Bagley's testimony. The State says nothing about Dr. Bagley's testimony that treating Mobile and Baldwin Counties as inseparable is ahistorical because those Counties were in separate congressional districts for almost all the period between 1876 and the 1970s. *Milligan* Doc. 200-15 at 7. The State ignores his testimony that Black Alabamians living in poverty in Mobile don't have very much in common with white, affluent Alabamians living in Baldwin County. The State ignores his testimony that those Black Alabamians have more in common (both historically and to the present day) with Black Alabamians living in the Black Belt. Put simply, even if we accept all the new evidence about the Gulf Coast, it fails to establish that the Gulf Coast cannot be separated under any

circumstance, let alone to avoid or remedy vote dilution.

*Third,* Dr. Bagley's report further disproves what the parties' fact stipulations already had precluded: the State's assertion that the Black Belt is merely one of three "nonracial" communities of interest that the 2023 Plan keeps together as much as possible. *Milligan* Doc. 220 at 38. The Plaintiffs have supported their claims with arguments and evidence about the cracking of Black voting strength in the Black Belt. *See, e.g.*, *Milligan* Doc. 69 at 19, 29–30; *Caster* Doc. 56 at 7, 9–10. Extensive stipulations of fact and extensive expert testimony have described a wide range of demographic, cultural, historical, and political characteristics of the Black Belt, many of which relate to race. *See Milligan* Doc. 107 at 165–67.

On remedy, the Plaintiffs argue that the new District 2 perpetuates rather than remedies the dilution we found in the Black Belt. *Milligan* Doc. 200 at 19. And Dr. Bagley's testimony is that many of the shared experiences of Alabamians living in the Black Belt are steeped in race. *Milligan* Doc. 200-15 at 1–4. The State's failure to rebut Dr. Bagley's testimony undermines its insistence that the Black Belt is no longer at the heart of this case and is merely one of three nonracial communities of interest maintained in the 2023 Plan.

We already faulted the State once for pressing an overly simplistic view of the Black Belt. In the preliminary injunction, we relied on the substantial body of evidence about the Black Belt (much of it undisputed) to reject the State's assertion

that the Plaintiffs' "attempt to unite much of the Black Belt as a community of interest in a remedial District 2 is 'merely a blunt proxy for skin color.'" *Milligan* Doc. 107 at 168 (quoting *Milligan* Doc. 78 at 86). As we explained, "[t]he Black Belt is overwhelmingly Black, but it blinks reality to say that it is a 'blunt proxy' for race – on the record before us, the reasons why it is a community of interest have many, many more dimensions than skin color." *Id.* at 169. The State's assertion that the Black Belt is a "nonracial" community of interest now swings the pendulum to the opposite, equally inaccurate, end of the spectrum.

*Fourth*, the State argues that as between Dr. Bagley's testimony about communities of interest and the legislative findings about communities of interest, we are required by law to defer to the legislative findings. *Milligan* Doc. 220 at 48–49. But the State ignores the Plaintiffs' argument that no deference is owed to a legislature's redistricting policies that perpetuate rather than remedy vote dilution. *Compare Milligan* Doc. 200 at 20 (*Milligan* Plaintiffs' objection to deference, citing discussions of core retention in *Allen* and incumbency protection and partisan political goals in *LULAC*), *with Milligan* Doc. 220 (State's filing, making no response).

We regard it as beyond question that if we conclude that the 2023 Plan perpetuates vote dilution, we may not defer to the legislative findings in that Plan. Ordinarily, that rule would not matter for our present task: because the point of a

*Gingles* I analysis is to determine whether a challenged plan dilutes votes, we would not refuse deference to legislative findings for *Gingles* I purposes on the ground that the findings perpetuate vote dilution. It would be circular reasoning for us to assume the truth of our conclusion as a premise of our analysis.

This is not the ordinary case: we found that the Plaintiffs established that the 2021 Plan likely violated Section Two by diluting Black votes, and the State has conceded that District 2 in the 2023 Plan is not a Black-opportunity district. In this circumstance, we discern no basis in federal law for us to defer to the legislative findings.

The *Milligan* Plaintiffs impugn the findings on numerous other grounds — namely, that they were "after the fact 'findings' tailored to disqualify" the Plaintiffs' illustrative plans; "contradict" the guidelines; "were never the subject of debate or public scrutiny"; "ignored input from Black Alabamians and legislators"; and "simply parroted attorney arguments already rejected by this Court and the Supreme Court." *Milligan* Doc. 200 at 20. And the *Milligan* Plaintiffs urge us to reject the findings' attempt to "enshrine as 'non-negotiable' certain supposed 'traditional redistricting principles'" about communities of interest and county splits. *Id.* Ultimately, the *Milligan* Plaintiffs suggest that the legislative findings are not what they purport to be: the result of the deliberative legislative process. The testimony and evidence were that the findings were drafted by the Alabama Solicitor General,

were adopted without review or debate by the Legislature or even really knowing why they were placed there, and included only at counsel's instigation.

We have reviewed the legislative findings carefully and make three observations about them for present purposes. *First*, although the northern half of Alabama is home to numerous universities, a substantial military installation, various engines of economic growth, and two significant metropolitan areas (Huntsville and Birmingham), the legislative findings identify no communities of interest in that half of the state. *See* App. A. *Second*, the legislative findings, unlike the guidelines, give no indication that the Legislature considered whether the 2023 Plan dilutes minority voting strength. The guidelines set that as a priority consideration, but the legislative findings do not mention it and set other items as "non-negotiable" priorities (*i.e.*, keeping together communities of interest and not pairing incumbents).[21] The only reason why the 2023 Plan exists is because we enjoined the 2021 Plan on the ground that it likely diluted minority voting strength. And *third*, there is a substantial difference between the definition of "community of interest" in the legislative findings and that definition in the guidelines: the legislative findings stripped race out of the list of "similarities" that are included in

---

[21] To facilitate the reader's opportunity to make this comparison conveniently, we attach the guidelines to this order as Appendix B. *Compare* App. B at 1, *with* App. A at 2.

the guidelines definition. *Compare* App. A at 4, *with* App. B. In a case involving extensive expert testimony about a racial minority's shared experience of a long and sordid history of race discrimination, this deletion caught our eye. We further observe that the legislative findings explicitly invoke the "French and Spanish colonial heritage" of the Gulf Coast region while remaining silent on the heritage of the Black Belt. App. A at 6.

In any event, we do not decline to defer to the legislative findings on the grounds the *Milligan* Plaintiffs suggest. We decline to defer to them because the State (1) concedes that District 2 in the 2023 Plan is not an opportunity district, and (2) fails to respond to the Plaintiffs' (valid) point that we cannot readily defer to the legislative findings if we find that they perpetuate vote dilution.

Ultimately, we find that the new evidence about the Gulf Coast does not establish that the Gulf Coast is the community of interest of primary importance, nor that the Gulf Coast is more important than the Black Belt, nor that there can be no legitimate reason to separate Mobile and Baldwin Counties.

And we repeat our earlier finding that the Legislature has repeatedly split Mobile and Baldwin Counties in creating maps for the State Board of Education districts in Alabama, and the Legislature did so at the same time it drew the 2021 Plan. *Milligan* Doc. 107 at 171 (citing *Caster* Doc. 48 ¶¶ 32–41).

We further find that the new evidence about the Gulf Coast does not establish

that separating the Gulf Coast to avoid diluting Black votes in the Black Belt violates traditional districting principles. At most, while the State has developed evidence that better substantiates its argument that the Gulf Coast is or could be a community of interest, the State has not adduced evidence that the Gulf Coast is an inseparable one.

We specifically reject the State's argument that the 2023 Plan "rectifies what Plaintiffs said was wrong with the 2021 Plan" by "unifying the Black Belt while also respecting the Gulf and Wiregrass communities of interest." *Milligan* Doc. 220 at 27, 42; *accord* Aug. 14 Tr. 39 (arguing that the 2023 Plan "cures the cracking" of the Black Belt); July 31, 2023 Tr. 32 (arguing that "now there are three communities of interest that are at issue," the State "cracked none of them," and the Plaintiffs "cracked two of them"). On this reasoning, the State says that "there is no longer any need to split the Gulf" to respect the Black Belt, because the 2023 Plan keeps the Gulf Coast together and splits the Black Belt into only two districts. *Milligan* Doc. 267 at ¶ 225.

The problem with this argument is the faulty premise that splitting the Black Belt into only two districts remedies the cracking problem found in the 2021 Plan. "Cracking" does not mean "divided," and the finding of vote dilution in the 2021 Plan rested on a thorough analysis, not the bare fact that the 2021 Plan divided the Black Belt into three districts. *See, e.g.*, *Milligan* Doc. 107 at 55, 147–74. As the

Supreme Court has explained, "cracking" refers to "the dispersal of blacks into districts in which they constitute an ineffective minority of voters." *Bartlett*, 556 U.S. at 14 (plurality opinion) (quoting *Gingles*, 478 U.S. at 46 n.11).

The Plaintiffs have established — and the State concedes — that in the new District 2, Black voters remain an ineffective minority of voters. *Milligan* Doc. 251 ¶¶ 5–9. This evidence — and concession — undermines the State's assertion that the 2023 Plan remedies the cracking of Black voting strength in the Black Belt simply by splitting the Black Belt into fewer districts. In turn, it explains the reason why there remains a need to split the Gulf Coast: splitting the Black Belt as the 2023 Plan does dilutes Black voting strength, while splitting the Gulf Coast precipitates no such racially discriminatory harm.

The long and the short of it is that the new evidence the State has offered on the Gulf Coast at most may show that the Black Belt and the Gulf Coast are geographically overlapping communities of interest that tend to pull in different directions. These communities of interest are not airtight. At best, the Defendants have established that there are two relevant communities of interest and the Plaintiffs' illustrative maps and the 2023 Plan each preserve a different community, suggesting a wash when measured against this metric. In other words, "[t]here would be a split community of interest in both." *Allen*, 143 S. Ct. at 1505. Thus, positing that there are two communities of interest does not undermine in any way the

determination we already made that the eleven illustrative maps presented in the preliminary injunction are reasonably configured and are altogether consonant with traditional redistricting criteria.

In our view, the evidence about the community of interest in the Wiregrass is sparse in comparison to the extensive evidence about the Black Belt and the somewhat new evidence about the Gulf Coast. The basis for a community of interest in the Wiregrass — essentially in the southeastern corner of the State — is rural geography, a university (Troy), and a military installation (Fort Novosel). These few commonalities do not remotely approach the hundreds of years of shared and very similar demographic, cultural, historical, and political experiences of Alabamians living in the Black Belt. And they are considerably weaker than the common coastal influence and historical traditions for Alabamians living in the Gulf Coast. Not to mention that these commonalities could apply to other regions in Alabama that the State fails to mention as possible communities of interest.

Further, there is substantial overlap between the Black Belt and the Wiregrass. Three of the nine Wiregrass Counties (Barbour, Crenshaw, and Pike) are also in the Black Belt. Accordingly, any districting plan must make tradeoffs with these communities to meet equal population and contiguity requirements.

Finally, a careful review of the testimony about the Wiregrass reveals that the State makes the same error with its Wiregrass argument that we (and the Supreme

Court) previously identified in its Gulf Coast argument. To support its assertions about the community of interest in the Wiregrass, the State relies on three witnesses: a former Mayor of Dothan, a past Chairman of the Dothan Area Chamber of Commerce, and a commercial banker in Dothan. *See Milligan* Doc. 261-2 (Kimbro deposition); *Milligan* Doc. 220-18 (Kimbro declaration); *Milligan* Doc. 261-6 (Schmitz deposition); *Milligan* Doc. 220-17 (Schmitz declaration); *Milligan* Doc. 261-7 (Williams deposition); *Milligan* Doc. 227-1 (Williams declaration). Much of their testimony focuses on the loss of political influence and efficacy that may occur if the Wiregrass region is not mostly kept together in a single congressional district. *See Milligan* Docs. 220-17 ¶¶ 3–5, 7, 9 (Schmitz Declaration); 220-18 ¶¶ 5–9 (Kimbro Declaration); 224-1 ¶¶ 11–13 (Williams Declaration). But as we earlier found with respect to the Gulf Coast, testimony about keeping a community of interest together "simply to preserve political advantage" cannot support an argument that the community is inseparable. *See Allen*, 143 S. Ct. at 1505 (internal quotation marks omitted) (alterations accepted). Accordingly, we assign very little weight to the argument and evidence about a community of interest in the Wiregrass.

We do not reject only the State's **factual** argument — that the Plaintiffs' illustrative plans are not reasonably compact because they violate traditional redistricting principles related to communities of interest. More broadly, we also reject the State's legal argument that communities of interest somehow are a

dispositive factor in our analysis such that we must accept a remedial map that purports to respect communities of interest, but does not cure the vote dilution we found in the 2021 Plan.

Throughout remedial proceedings, the State has used arguments about communities of interest as the foundation of its defense of the 2023 Plan. The State starts with the premise that "[t]here are many ways for a plan to comply with" Section Two, *Milligan* Doc. 267 ¶ 179, *see also* Aug. 14 Tr. 46; cites the rule that Section Two "never require[s] adoption of districts that violate traditional redistricting principles," *Milligan* Doc. 220 at 8, 10, 14, 34, 39, 60 (internal quotation marks omitted); says that the Legislature knows Alabama's communities of interest better than federal courts, Aug. 14 Tr. 163; and extrapolates from these truths that any illustrative plan that splits an area the State defines as a community of interest does not satisfy *Gingles* because it "violates" communities of interest, *Milligan* Doc. 267 ¶¶ 158, 208; *see also Milligan* Doc. 220 at 40, 59. The State's position is that if it can prove that the 2023 Plan serves communities of interest better than the Plaintiffs' illustrative plans, the 2023 Plan survives a Section Two challenge on that ground regardless of whether it includes one or two Black-opportunity districts.

Indeed, on the State's reasoning, because the 2023 Plan better serves communities of interest than do the Plaintiffs' illustrative plans, an order requiring an additional Black-opportunity district to cure vote dilution is unlawful. Aug. 14

Tr. 157. The State maintains that this is true even if we find (as we do) that the 2023 Plan perpetuates rather than remedies the vote dilution that we and the Supreme Court found in the 2021 Plan. Aug. 14 Tr. 157–60. Put differently, the State asserts that communities of interest are the ultimate trump card: because the 2023 Plan best serves communities of interest in southern Alabama, we must not enjoin it even if we find that it perpetuates vote dilution. *See* Aug. 14 Tr. 157–60.

We cannot reconcile the State's position with any of the authorities that control our analysis. We cannot reconcile it with the text or purpose of Section Two, nor with the Supreme Court's ruling in this case, nor with other controlling Supreme Court precedents. We discuss each authority in turn.

*First*, we cannot reconcile the State's position that communities of interest work as a trump card with the text or purpose of Section Two. As the Supreme Court explained in this case, the Voting Rights Act "'create[d] stringent new remedies for voting discrimination,' attempting to forever 'banish the blight of racial discrimination in voting.'" *Allen*, 143 S. Ct. at 1499 (quoting *South Carolina v. Katzenbach*, 383 U.S. 301, 308 (1966)). To that end, for more than forty years, Section Two has expressly provided that a violation is established based on the "totality of circumstances." *Id.* at 1507 (internal quotation marks omitted) (quoting 52 U.S.C. § 10301(b)). Subsection (b) of Section Two of the Voting Rights Act provides, in pertinent part:

A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

52 U.S.C. § 10301(b).

Section Two does not mention, let alone elevate or emphasize, communities of interest as a particular circumstance. *See id.* If communities of interest really are (or even could be) **the** dispositive circumstance in a Section Two analysis (liability or remedy), the statute would not direct a reviewing court's attention to the totality of circumstances without saying a word about communities of interest.

*Second*, we cannot reconcile the State's position that communities of interest work as a trump card with the Supreme Court's ruling in this case. The Supreme Court "d[id] not find the State's argument persuasive" on communities of interest for two reasons: the evidence did not support the "overdrawn" assertion that "there can be no legitimate reason to split" the Gulf Coast, and even if the Gulf Coast is a community of interest, splitting it is not a fatal flaw in the Plaintiffs' illustrative plans because those plans better respect a different community of interest, the Black Belt. *See Allen*, 143 S. Ct. at 1505 (internal citations omitted). The Supreme Court then continued its analysis of the "totality of circumstances" and affirmed our preliminary injunction on the ground that the 2021 Plan likely violated Section Two. *Id.* at 1506.

Nothing in the Court's ruling says, let alone suggests, that a remedial plan would cure vote dilution if only the evidence were better on the Gulf Coast and the Black Belt were not split quite so much. The Supreme Court specifically ruled that we "did not have to conduct a beauty contest between plaintiffs' maps and the State's," and the Supreme Court emphasized the importance of considering the "totality" of circumstances. *Id.* at 1505–07 (internal quotation marks omitted) (alterations accepted). Indeed, the Supreme Court rejected the State's proposed "race-neutral benchmark" in part because that approach "suggest[ed] there is only one circumstance that matters," and "[t]hat single-minded view of § 2 cannot be squared with the [statute's] demand that courts employ a more refined approach." *Id.* at 1506–08 (internal quotation marks omitted) (alterations accepted).

*Third*, we cannot reconcile the State's position with other Supreme Court precedents. Our research has produced no Section Two precedent that rises and falls on how well a plan respects any particular community of interest.

Further, as Section Two precedents have tested the idea that one circumstance is particularly important in the *Gingles* analysis, the Supreme Court has time and again rejected the idea that any circumstance can be the circumstance that allows a plan to dilute votes. *See, e.g.*, *id.* at 1505 (rejecting argument that core retention metric is dispositive and reasoning that Section Two "does not permit a State to provide some voters less opportunity . . . to participate in the political process just

because the State has done it before" (internal quotation marks omitted)); *Wis. Legislature v. Wis. Elections Comm'n*, 142 S. Ct. 1245, 1250 (2022) (per curiam) (faulting district court for "focus[ing] exclusively on proportionality" instead of "totality of circumstances analysis"); *LULAC*, 548 U.S. at 440–41 (rejecting argument that incumbency protection can justify exclusion of voters from a district when exclusion has racially discriminatory effects). Indeed, we have been unable to locate any case where the Supreme Court has prioritized one traditional districting criterion above all others.

For each and all these reasons, we reject the State's argument that because the 2023 Plan best serves communities of interest in southern Alabama, we cannot enjoin it even if we find that it perpetuates racially discriminatory vote dilution.

### ii. County Splits

In the preliminary injunction, we found that the Plaintiffs' illustrative plans "reflect reasonable compactness" because they respected county lines. *See Milligan* Doc. 107 at 162–63. When it affirmed this finding, the Supreme Court observed that "some of plaintiffs' proposed maps split the same number of county lines as (or even *fewer* county lines than) the State's map." *Allen*, 143 S. Ct. at 1504 (emphasis in original).

By way of reference: the only applicable guideline when the 2021 Plan was passed was that "the Legislature shall try to minimize the number of counties in each

district"; the 2021 Plan split six counties; and no illustrative plan splits more than nine counties. *See Milligan* Doc. 107 at 32, 61, 88–89.

When the Legislature passed the 2023 Plan, it enacted a "finding" that "the congressional districting plan shall contain no more than six splits of county lines, which is the minimum necessary to achieve minimal population deviation among the districts. Two splits within one county is considered two splits of county lines." App. A at 3. Like the 2021 Plan, the 2023 Plan splits six counties.

The State now argues that because of the Legislature's finding, we must discard any illustrative map that contains more than six county splits. *Milligan* Doc. 220 at 58–59. Based on the report of the State's expert, Mr. Trende, this ceiling would disqualify five of the Plaintiffs' illustrative maps: Cooper Plans 2 and 6, which split seven counties; Duchin Plan B, which splits seven counties; and Duchin Plans A and C, which split nine counties. *See Caster* Doc. 48 at 22; *Milligan* Doc. 220 at 58; *Milligan* Doc. 220-12 at 12. Most notably, this ceiling would disqualify Duchin Plan B, which is the only illustrative plan that the State concedes ties or beats the 2023 Plan on statistical measures of compactness (Polsby-Popper and Cut Edges). *See Milligan* Doc. 220 at 57–58. So when looking at the county splits metric alone, even on the State's analysis, six of the Plaintiffs' illustrative maps satisfy the ceiling the Legislature imposed: Cooper Plans 1, 3, 4, 5, and 7, and Duchin Plan D. Mr. Trende's chart shows this clearly:

| Number of County Splits, by Map | |
| --- | --- |
| Map | County Splits |
| Illustrative 7 | 5 |
| Duchin 4 | 6 |
| Illustrative 1 | 6 |
| Illustrative 3 | 6 |
| Illustrative 4 | 6 |
| Illustrative 5 | 6 |
| 2021 Map | 6 |
| 2023 Map | 6 |
| Duchin 2 | 7 |
| Illustrative 2 | 7 |
| Illustrative 6 | 7 |
| Ps Remedial | 7 |
| Duchin 1 | 9 |
| Duchin 3 | 9 |

*Milligan* Doc. 220-12 at 12.

But the State would not have us look at the county splits metric alone. As we understand the State's argument about the legislative finding capping county splits at the stated minimum, the finding operates like the ace of spades: after ten of the eleven illustrative plans lose in a compactness beauty contest, the finding trumps the last illustrative plan left (Duchin Plan B). On the State's reasoning, the Plaintiffs have no plays left because the Legislature has decreed that the cap on county splits is "non-negotiable." App. A at 3.

But we already have refused to conduct the compactness beauty contest, so the legislative finding cannot work that way. If it guides our analysis, it must function differently. For all the same reasons we refused to conduct a compactness

beauty contest, this legislative finding cannot demand that we conduct a county-split beauty contest. *See supra* at Part IV.B.2.b.

Nevertheless, in an abundance of caution, we measure all the illustrative maps against the legislative finding. As explained above, if we limit our analysis to the illustrative plans that comply with the finding, we consider six plans: Duchin Plan D and Cooper Plans 1, 3, 4, 5, and 7. *See Milligan* Doc. 220-12 at 12.

We first discuss Cooper Plan 7, because it is the only illustrative plan that outperforms the 2023 Plan on county splits. (Duchin Plan D and Cooper Plans 1, 3, 4, and 5 tie the 2023 Plan. *See id.*) Even if we were to indulge the idea that the legislative finding capping county splits works as an ace, it could not trump Cooper Plan 7. The State attacks Cooper Plan 7 on the ground that it does not minimize population deviation. *Milligan* Doc. 220 at 58 n.13.

The State's argument about Cooper Plan 7 is an unwelcome surprise. We found in the preliminary injunction that all the illustrative maps "equalize population across districts." *Milligan* Doc. 107 at 162–63. We based that finding on the agreement of the parties and the evidence. *See id.* (citing *Milligan* Doc. 68-5 at 8, 13; *Caster* Doc. 48 at 21–34; *Caster* Doc. 65 at 2–6; Tr. 930). And the Supreme Court affirmed that finding. *Allen*, 143 S. Ct. at 1504 (finding that the Plaintiffs' maps "contained equal populations, were contiguous, and respected existing political subdivisions, such as counties, cities, and towns").

Page **176** of **198**

We returned to Cooper Plan 7 to confirm that it minimizes population deviation. *See Caster* Doc. 65 at 5 fig.2. The least populated congressional district in Cooper Plan 7 includes 717,752 people; the most populated congressional district in Cooper Plan 7 includes 717,755 people. *Id.* We summarily reject the State's cursory, unsupported suggestion in a footnote that a deviation of three humans (or 0.00000418%) precludes a finding that Cooper Plan 7 equalizes population across districts and disqualifies Cooper Plan 7 as a reasonably configured illustrative map under *Gingles* I.

Thus, even if we were to conduct the "meet or beat" beauty contest that the State asks us to, the undisputed evidence shows that the Plaintiffs have submitted at least one illustrative map that beats the 2023 Plan with respect to county splits. We also find that the Plaintiffs have submitted at least five illustrative maps (Duchin Plan D and Cooper Plans 1, 3, 4, and 5) that meet the 2023 Plan on this metric by splitting the same number of counties — six.

*** 

Accordingly, we again find that the Plaintiffs have established that an additional Black-opportunity district can be reasonably configured without violating traditional districting principles relating to communities of interest and county splits. This finding does not run afoul of the Supreme Court's caution that Section Two never requires the adoption of districts that violate traditional redistricting principles.

It simply rejects as unsupported the State's assertion that the Plaintiffs' illustrative plans violate traditional redistricting principles relating to communities of interest and county splits.

### 3.    *Gingles* II & III – Racially Polarized Voting

During the preliminary injunction proceedings, "there [wa]s no serious dispute that Black voters are politically cohesive nor that the challenged districts' white majority votes sufficiently as a bloc to usually defeat Black voters' preferred candidate." *Milligan* Doc. 107 at 174 (internal quotation marks omitted); *accord Allen*, 143 S. Ct. at 1505.

At the remedial hearing, the State stipulated that *Gingles* II and III are again satisfied. Aug. 14 Tr. 64–65 ("We will have no problem stipulating for these proceedings solely that they have met II and III.").

The evidence fully supports the State's stipulation: Dr. Liu opined "that voting is highly racially polarized in" District 2 and District 7 of the 2023 Plan "and that this racial polarization . . . produces the same results for Black Preferred Candidates in both [Districts 2] and [7] as the results in the 2021" Plan. *Milligan* Doc. 200-2 at 1. Dr. Palmer's opinion is materially identical. *Caster* Doc. 179-2 ¶¶ 11–14, 16–20.

### 4.    The Senate Factors

During the preliminary injunction proceedings, we found that Senate Factors 1, 2, 3, 5, 6, and 7 weighed in favor of the Plaintiffs. *Milligan* Doc. 107 at 178–92.

We adopt those findings here. We made no finding about Senate Factors 8 and 9. *Id.* at 192–93.

During the remedial hearing, the State conceded that it has put forth no new evidence about the Senate Factors and the Plaintiffs have "met their burden" on the Factors for purposes of remedial proceedings. Aug. 14 Tr. 65.

The *Milligan* and *Caster* Plaintiffs now urge us, if we reset the *Gingles* analysis, to consider evidence adduced since we issued the preliminary injunction that bears on Factors 8 and 9. Aug. 14 Tr. 147–48. The State concedes that the evidence relevant to an analysis of these Factors is "exceedingly broad." Aug. 15 Tr. 79. We consider each remaining Senate Factor in turn, and we limit our discussion to new evidence.

### a. Senate Factor 8

**Senate Factor 8: "[W]hether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group." *Gingles*, 478 U.S. at 37.**

Senate Factor 8 considers "the political responsiveness of" elected officials. *United States v. Marengo County Comm'n*, 731 F.2d 1546, 1573 (11th Cir. 1984) (emphasis omitted). The Plaintiffs' argument is that the political responsiveness of elected officials to this litigation — more particularly, to the Supreme Court's affirmance of the preliminary injunction — weighs in favor of the Plaintiffs. Based on our review of undisputed evidence, we cannot help but find that the circumstances

surrounding the enactment of the 2023 Plan reflect "a significant lack of responsiveness on the part of elected officials to the particularized needs" of Black voters in Alabama. *Gingles*, 478 U.S. at 37. Our finding rests on three undisputed facts.

*First*, the process by which the Legislature considered potential remedies for the vote dilution that Black Alabamians experienced precludes a finding of responsiveness. The 2023 Plan was neither proposed nor available for comment during the two public hearings held by the Committee. *Milligan* Doc. 251 ¶ 15. Likewise, neither of the plans that originally passed the Alabama House (Representative Pringle's plan, the Community of Interest Plan), and the Alabama Senate (Senator Livingston's plan), was proposed or available for comment during the Committee's public hearings. *See id.* ¶¶ 15–21.

The 2023 Plan was passed by the Conference Committee on the last day of the Special Session. *Id.* ¶ 23. Representative Pringle did not see the bill that became the 2023 Plan, including its legislative findings and the State's performance analysis showing that Black voters would consistently lose in the new District 2, until that morning. *See Milligan* Doc. 261-5 at 92, 97. He first saw those documents that morning, and the 2023 Plan was Alabama law by that evening. As Representative Pringle testified, "[i]t all happened so fast." *Id.* at 105.

The availability of the 2023 Plan is noteworthy not only because of its late

timing, but also because of its apparently mysterious provenance: its original source and cartographer were unknown to one of the Committee chairs, Senator Livingston, when he voted on it. *See Milligan* Doc. 238-2 at 3. To this day, the record before us does not make clear who prepared the 2023 Plan.

Representative Pringle testified about his frustration that his plan did not carry the day, and his reason is important: he thought his plan was the better plan for compliance with Section Two (based in part on a performance analysis that he considered), his plan was initially expected to pass both the House and the Senate, and he either did not understand or did not agree with the reason why support for it unraveled in the Senate the day it passed the House. *See Milligan* Doc. 261-5 at 22–23, 31–32, 41–42, 69–70, 75–76, 80–81, 98–102.

Representative Pringle testified that he was not a part of the discussions that led his Senate colleagues to reject his plan because those occurred behind closed doors. *Id.* at 28, 101. Although Representative Pringle ultimately voted for the 2023 Plan, he testified (testily) that he told Senator Livingston that he did not want his name or an Alabama House bill number on it. *Id.* at 101–02. When asked why the Alabama Senate insisted on leaving District 2 at a 39.93% Black voting-age population in the 2023 Plan, Representative Pringle directed the question to Senator Livingston or the Alabama Solicitor General. *Id.* When asked specifically about a media comment from Representative Ledbetter (the Speaker of the Alabama House)

that the 2023 Plan gives the State "a good shot" at getting "just one judge" on the Supreme Court "to see something different," Representative Pringle testified that he was not "attempting to get a justice to see something differently," but he did not "want to speak on behalf of 140" Legislators. *Id.* at 109–10.

For his part, Senator Livingston testified that his focus shifted from Representative Pringle's plan to a new plan after other senators "received some additional information" which caused them to "go in [a different] direction" focused on "compactness, communities of interest, and making sure that" incumbents are not paired. *Milligan* Doc. 261–4 at 67–68. According to Senator Livingston, this "information" was a "large hiccup" — it was the reason why "the committee moved" and "changed focus" away from Representative Pringle's plan. *Id.* at 65–68. But Senator Livingston testified that he did not know what this "information" was, where it had come from, or even who received it. *Id.* Senator Livingston recalled that he first learned of the "information" in a "committee conversation," but he did not recall who told him about it and had no "idea at all" of its source. *Id.* at 68.

*Second,* the unprecedented legislative findings that accompany the 2023 Plan preclude a finding of responsiveness. *See* App. A. This is for two reasons. As an initial matter, as we have already previewed, a careful side-by-side review of the legislative findings and the guidelines (which were the same in 2021 and 2023) reveal that the findings excluded the statement in the guidelines that "[a] redistricting

plan shall have neither the purpose nor the effect of diluting minority voting strength." *Compare* App. B at 1, *with* App. A. at 2. Although the findings eliminated the requirement of nondilution, they prioritized as "non-negotiable" the principles that the 2023 Plan would "keep together communities of interest" and "not pair incumbent[s]." App. A at 3. Under this circumstance, we cannot find that the legislative findings support an inference that when the Legislature passed the 2023 Plan, it was trying to respond to the need that we identified for Black Alabamians not to have their voting strength diluted.

Separately, the undisputed testimony of members of the Legislature counsels against an inference in favor of the State based on the findings. Representative Pringle and Senator Livingston both testified that the Alabama Solicitor General drafted the findings, and they did not know why the findings were included in the 2023 Plan. *Milligan* Doc. 261-4 at 102 (Senator Livingston); *Milligan* Doc. 261-5 at 91 (Representative Pringle); *Milligan* Doc. 238-2 at 6 (joint interrogatory responses). Representative Pringle testified that he had not seen another redistricting bill contain similar (or any) findings. *Milligan* Doc. 261-5 at 91. And of the three members of the Legislature who testified during remedial proceedings, none had a role in drafting the findings. *Milligan* Doc. 261-4 at 101–03 (Senator Livingston); *Milligan* Doc. 261-5 at 90–91 (Representative Pringle); Aug. 15 Tr. 58 (Senator Singleton). In the light of this testimony, which we reiterate is not disputed (or even questioned),

we cannot conclude that the findings weigh in favor of the 2023 Plan.

If we had any lingering doubt about whether the 2023 Plan reflects an attempt to respond to the needs of Black Alabamians that have been established in this litigation, that doubt was eliminated at the remedial hearing when the State explained that in its view, the Legislature could remedy the vote dilution we found without providing the remedy we said was required: an additional opportunity district. *See* Aug. 14 Tr. 163–64. For purposes of Factor 8, we are focused not on the tenuousness of the policy underlying that position, but on how clearly it illustrates the lack of political will to respond to the needs of Black voters in Alabama in the way that we ordered. We infer from the Legislature's decision not to create an additional opportunity district that the Legislature was unwilling to respond to the well-documented needs of Black Alabamians in that way.

Lest a straw man arise on appeal: we say clearly that in our analysis, we did not deprive the Legislature of the presumption of good faith. *See, e.g.*, *Abbott*, 138 S. Ct. at 2324. We simply find that on the undisputed evidence, Factor 8, like the other Factors, weighs in favor of the Plaintiffs.

### b.  Senate Factor 9

**Senate Factor 9: Whether the policy underlying the 2023 Plan "is tenuous." *Gingles*, 478 U.S. at 37.**

We again make no finding about Senate Factor 9.

**C.**     **We Reject the State's Remaining Argument that Including an Additional Opportunity District in a Remedial Plan To Satisfy Section Two Is Unconstitutional Affirmative Action in Redistricting.**

The State asserts that the Plaintiffs' illustrative plans "sacrifice communities of interest, compactness, and county splits to hit predetermined racial targets"; that if those "underperforming plans could be used to replace a 2023 Plan that more fully and fairly applies legitimate principles across the State, the result will be court-ordered enforcement of a map that violates the 2023 Plan's traditional redistricting principles in favor of race"; and that this would be "affirmative action in redistricting" that would be unconstitutional. *Milligan* Doc. 220 at 59–60; *see also id.* at 60–68.

As an initial matter, it is premature (and entirely unfounded) for the State to assail any plan we might order as a remedy as "violat[ing] the 2023 Plan's traditional redistricting principles in favor of race." *Milligan* Doc. 220 at 59. Moreover, we have rejected based on the evidence before us every premise of the State's argument: that the Plaintiffs' plans "sacrifice" traditional redistricting principles, that their illustrative plans are "underperforming," and that the 2023 Plan "more fully and fairly applies legitimate principles across the State." *See supra* Parts IV.A & IV.B. We also have rejected the faulty premise that by accepting the Plaintiffs' illustrative plans for *Gingles* purposes, we improperly held that the Plaintiffs are entitled to

"proportional . . . racial representation in Congress." *Milligan* Doc. 107 at 195 (internal quotation marks omitted).

This mistaken premise explains why affirmative action cases, like the principal case on which the State relies, *Harvard*, 143 S. Ct. 2141, are fundamentally unlike this case. In the *Harvard* case, the Supreme Court held that Harvard and the University of North Carolina's use of race in their admissions programs violated the Equal Protection Clause and Title VI of the Civil Rights Act of 1964. *Id.* at 2175. Based on the record before it, the Supreme Court found that the admissions programs were impermissibly aimed at achieving "proportional representation" of minority students among the overall student-body population, and that the universities had "promis[ed] to terminate their use of race only when some rough percentage of various racial groups is admitted." *Id.* at 2172. Based on these findings, the Court concluded that the admissions programs lacked any "logical end point" because they "'effectively assure that race will always be relevant and that the ultimate goal of eliminating' race as a criterion 'will never be achieved.'" *Id.* (quoting *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 495 (1989)).

In contrast, the Voting Rights Act and the *Gingles* analysis developed to guide application of the statute "do[] not mandate a proportional number of majority-minority districts." *Allen*, 143 S. Ct. at 1518 (Kavanaugh, J., concurring). Section Two expressly disclaims any "right to have members of a protected class elected in

numbers equal to their proportion in the population." 52 U.S.C. § 10301(b). And "properly applied, the *Gingles* framework itself imposes meaningful constraints on proportionality, as [Supreme Court] decisions have frequently demonstrated." *Id.* at 1508 (majority opinion). So unlike affirmative action in the admissions programs the Supreme Court analyzed in *Harvard*, which was expressly aimed at achieving balanced racial *outcomes* in the makeup of the universities' student bodies, the Voting Rights Act guarantees only "equality of opportunity, not a guarantee of electoral success for minority-preferred candidates of whatever race." *De Grandy*, 512 U.S. at 1014 n.11. The Voting Rights Act does not provide a leg up for Black voters — it merely prevents them from being kept down with regard to what is arguably the most "fundamental political right," in that it is "preservative of all rights" — the right to vote. *See Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1315 (11th Cir. 2019).

But a faulty premise and prematurity are not the only problems with the State's argument: it would fly in the face of forty years of Supreme Court precedent — including precedent *in this case* — for us to hold that it is unconstitutional to order a remedial districting plan to include an additional minority-opportunity district to satisfy Section Two. In the Supreme Court, the State argued that the Fifteenth Amendment "does not authorize race-based redistricting as a remedy for § 2 violations." *Allen*, 143 S. Ct. at 1516. The Supreme Court rejected this argument

in two sentences: "But for the last four decades, this Court and the lower federal courts have repeatedly applied the effects test of § 2 as interpreted in *Gingles* and, under certain circumstances, have authorized race-based redistricting as a remedy for state districting maps that violate § 2. In light of that precedent . . . we are not persuaded by Alabama's arguments that § 2 as interpreted in *Gingles* exceeds the remedial authority of Congress." *Id.* at 1516–17 (internal citations omitted).

### D.    The Record Establishes the Elements of Preliminary Injunctive Relief

We find that the Plaintiffs have established the elements of their request for preliminary injunctive relief. We discuss each element in turn.

For the reasons we have discussed, *see supra* Parts IV.A & IV.B, we find that the Plaintiffs are substantially likely to succeed on the merits of their claims that (1) the 2023 Plan does not completely remedy the likely Section Two violation that we found and the Supreme Court affirmed in the 2021 Plan; and (2) the 2023 Plan likely violates Section Two as well because it continues to dilute the votes of Black Alabamians.

We further find that the Plaintiffs will suffer irreparable harm if they must vote in the 2024 congressional elections based on a likely unlawful redistricting plan. "Courts routinely deem restrictions on fundamental voting rights irreparable injury. And discriminatory voting procedures in particular are the kind of serious violation of the Constitution and the Voting Rights Act for which courts have granted

immediate relief." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) (internal quotation marks omitted) (citing *Obama for Am. v. Husted,* 697 F.3d 423, 436 (6th Cir. 2012); *Alternative Political Parties v. Hooks,* 121 F.3d 876 (3d Cir. 1997); and *Williams v. Salerno,* 792 F.2d 323, 326 (2d Cir. 1986)) (quoting *United States v. City of Cambridge*, 799 F.2d 137, 140 (4th Cir. 1986).

"Voting is the beating heart of democracy," and a "fundamental political right, because it is preservative of all rights." *Democratic Exec. Comm. of Fla.*, 915 F.3d at 1315 (internal quotation marks omitted) (alterations accepted). And "once the election occurs, there can be no do-over and no redress" for voters whose rights were violated and votes were diluted. *League of Women Voters of N.C.*, 769 F.3d at 247.

The Plaintiffs already suffered this irreparable injury once in this census cycle, when they voted under the unlawful 2021 Plan. The State has made no argument that if the Plaintiffs were again required to cast votes under an unlawful districting plan, that injury would not be irreparable. Accordingly, we find that the Plaintiffs will suffer an irreparable harm absent injunctive relief.

We observe that absent relief now, the Plaintiffs will suffer this irreparable injury until 2026, which is more than halfway through this census cycle. Weighed against the harm that the State will suffer — having to conduct elections according to a court-ordered districting plan — the irreparable harm to the Plaintiffs' voting

rights unquestionably is greater.

We next find that a preliminary injunction is in the public interest. The State makes no argument that if we find that the 2023 Plan perpetuates the vote dilution we found, or that the 2023 Plan likely violates Section Two anew, we should decline to enjoin it. Nevertheless, we examine applicable precedent.

The principal Supreme Court precedent is older than the Voting Rights Act. In *Reynolds*, which involved a constitutional challenge to an apportionment plan, the Court explained "once a State's legislative apportionment scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan." 377 U.S. at 585. "However," the Court acknowledged, "under certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case, even though the existing apportionment scheme was found invalid." *Id.* The Court explained that "[i]n awarding or withholding immediate relief, a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles." *Id.*

More recently, the Supreme Court has held that district courts should apply a

necessity standard when deciding whether to award or withhold immediate relief. In *Upham v. Seamon*, the Court explained: "[W]e have authorized District Courts to order or to permit elections to be held pursuant to apportionment plans that do not in all respects measure up to the legal requirements, even constitutional requirements. Necessity has been the motivating factor in these situations." 456 U.S. 37, 44 (1982) (per curiam) (internal citations omitted).

We conclude that under these precedents, we should not withhold relief. Alabama's congressional elections are not close, let alone imminent. The general election is more than fourteen months away. The qualifying deadline to participate in the primary elections for the major political parties is more than two months away. Ala. Code § 17-13-5(a). And this Order issues well ahead of the "early October" deadline by which the Secretary has twice told us he needs a final congressional electoral map. *See* Milligan Doc. 147 at 3; *Milligan* Doc. 162 at 7.

## V.   REMEDY

Having found that the 2023 Plan perpetuates rather than corrects the Section Two violation we found, we look to Section Two and controlling precedent for instructions about how to proceed. In the Senate Report that accompanied the 1982 amendments to Section Two that added the proportionality disclaimer, the Senate Judiciary Committee explained that it did not "prescribe[e] in the statute mechanistic rules for formulating remedies in cases which necessarily depend upon widely varied

proof and local circumstances." S. Rep. No. 97-417 at 31, 97th Cong., 2d Sess. 26, *reprinted in* 1982 U.S. Code Cong. & Adm. News 177, 208.

Rather, that committee relied on "[t]he basic principle of equity that the remedy fashioned must be commensurate with the right that has been violated," and explained its expectation that courts would "exercise [our] traditional equitable powers to fashion . . . relief so that it completely remedies the prior dilution of minority voting strength and fully provides equal opportunity for minority citizens to participate and to elect candidates of their choice." *Id.*

That committee cited the seminal Supreme Court decision about racially discriminatory voting laws, *Louisiana*, 380 U.S. at 154. S. Rep. No. 97-417 at 31 n.121. In *Louisiana*, the Supreme Court explained that upon finding such discrimination, federal courts have "not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." 380 U.S. at 154.

The Supreme Court has since held that a district court does not abuse its discretion by ordering a Special Master to draw a remedial map to ensure that a plan can be implemented as part of an orderly process in advance of elections, where the State was given an opportunity to enact a compliant map but failed to do so. *See Covington*, 138 S. Ct. at 2553–54 (rejecting State's argument that district court needed to "giv[e] the General Assembly—which 'stood ready and willing to

promptly carry out its sovereign duty'—another chance at a remedial map," and affirming appointment of Special Master because the district court had "determined that 'providing the General Assembly with a second bite at the apple' risked 'further draw[ing] out these proceedings and potentially interfer[ing] with the 2018 election cycle'" (internal citations omitted)).

Because we enjoin the use of the 2023 Plan, a new congressional districting plan must be devised and implemented in advance of Alabama's upcoming congressional elections. The State has conceded that it would be practically impossible for the Legislature to reconvene in time to enact a new plan for use in the upcoming election. Aug. 14 Tr. 167. Accordingly, we find that there is no need to "provid[e] the [Legislature] with a second bite at the apple" or other good cause to further delay remedial proceedings. *See Covington*, 138 S. Ct. at 2554.

We will therefore undertake our "duty to cure" violative districts "through an orderly process in advance of elections" by directing the Special Master and his team to draw remedial maps. *Id.* (citing *Purcell*, 549 U.S. at 4–5). We have previously appointed Mr. Richard Allen as a Special Master and provided him a team, including a cartographer, David R. Ely, and Michael Scodro and his law firm, Mayer Brown LLP to prepare and recommend to the Court a remedial map or maps for the Court to order Secretary of State Allen to use in Alabama's upcoming congressional elections. *See Milligan* Docs. 102, 166, 183. The procedural history preceding these

appointments has already been catalogued at length in our prior orders. *See Milligan* Docs. 166, 183. Specific instructions for the Special Master and his team will follow by separate order.

## VI.   CONSTITUTIONAL OBJECTIONS TO THE 2023 PLAN

In the light of our decision to enjoin the use of the 2023 Plan on statutory grounds, and because Alabama's upcoming congressional elections will not occur on the basis of the map that is allegedly unconstitutional, we decline to decide any constitutional issues at this time. More particularly, we **RESERVE RULING** on (1) the constitutional objections to the 2023 Plan raised by the *Singleton* and the *Milligan* Plaintiffs, and (2) the motion of the *Singleton* Plaintiffs for preliminary injunctive relief on constitutional grounds, *Singleton* Doc. 147.

This restraint is consistent with our prior practice, *see Milligan* Doc. 107, and the longstanding canon of constitutional avoidance, *see Lyng*, 485 U.S. at 445 (collecting cases dating back to *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 341 (1936) (Brandeis, J., concurring)). Where, as here, a decision on the constitutional issue would not entitle a plaintiff "to relief beyond that to which they [are] entitled on their statutory claims," a "constitutional decision would [be] unnecessary and therefore inappropriate." *Id.* at 446. This principle has particular salience when a court considers (as we do here) a request for equitable relief, *see id.*, and is commonly applied by three-judge courts in redistricting cases, *see, e.g.*,

*LULAC*, 548 U.S. at 442; *Gingles*, 478 U.S. at 38.

## VII.  EVIDENTIARY RULINGS

During the remedial hearing, the Court accepted into evidence many exhibits. *See generally* Aug. 14 Tr. 91–142. Most were stipulated, although some were stipulated only for a limited purpose. *Id.* We have since excluded one exhibit: the State's Exhibit J, Mr. Bryan's 2023 Report. *See supra* at Part IV.B.2.a.

At the hearing we reserved ruling on the motion *in limine* and on some objections to certain of the State's exhibits. *See* Aug. 14 Tr. 91, 105–142. Most of the objections we reserved on were relevance objections raised in connection with the motion *in limine*. *See id.* at 108–30 (discussing such objections to State Exhibits C2, D, E, F2, G, H, I, L, M, N, O, P, Q, R, and S).

As we discussed in Parts II.B and II.C, we conclude that our remedial task is confined to a determination whether the 2023 Plan completely remedies the vote dilution we found in the 2021 Plan and is not otherwise unlawful, but we consider in the alternative whether under *Gingles* and the totality of the circumstances the Plaintiffs have established that the 2023 Plan likely violates Section Two. *See supra at* Parts II.B, II.C, IV.A & IV.B.

Accordingly, the motion *in limine* is **GRANTED IN PART AND DENIED IN PART**, and all of the Plaintiffs' relevance objections raised in connection with the motion *in limine* are **OVERRULED** to the extent that we consider the evidence

as appropriate in our alternative holding.

After considerable deliberation, we dispose of the remaining objections this way:

- Objections to State Exhibits A, B2, B3, C2, D, N, and P are **OVERRULED**. These exhibits are admitted to establish what was said at public hearings held by the Committee and what materials were considered by the Committee, but not for the truth of any matter asserted therein.

- Objections to State Exhibits E, F2, G, H, I, L, M, O, Q, R, and S are **OVERRULED**. These exhibits are admitted.

- Objections to the *Milligan* Plaintiffs' Exhibits M13, M32, M38, and M47 are **SUSTAINED**. These exhibits are excluded.

**DONE** and **ORDERED** this 5th day of September, 2023.

_____
**STANLEY MARCUS**
UNITED STATES CIRCUIT JUDGE

_____
**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE

_____
**TERRY F. MOORER**
UNITED STATES DISTRICT JUDGE

# APPENDIX A

SB5 **ENROLLED**



FILED
2023 Sep-28 PM 10:59
U.S. DISTRICT COURT
N.D. OF ALABAMA

1    XBT977-3

**ACT #2023 - 563**

2    By Senator Livingston

3    RFD: Conference Committee on SB5

4    First Read: 17-Jul-23

5    2023 Second Special Session



**SB5 Enrolled**



1  Enrolled, An Act,

2                                                                                    ,

3

4         To amend Section 17-14-70, Code of Alabama 1975, to

5    provide for the reapportionment and redistricting of the

6    state's United States Congressional districts for the purpose

7    of electing members at the General Election in 2024 and

8    thereafter, until the release of the next federal census; and

9    to add Section 17-40-70.1 to the Code of Alabama 1975, to

10   provide legislative findings.

11   BE IT ENACTED BY THE LEGISLATURE OF ALABAMA:

12        Section 1. Section 17-14-70.1 is added to the Code of

13   Alabama 1975, to read as follows.

14   §17-14-70.1

15        The Legislature finds and declares the following:

16             (1) The Legislature adheres to traditional

17   redistricting principles when adopting congressional

18   districts. Such principles are the product of history,

19   tradition, bipartisan consensus, and legal precedent. The

20   Supreme Court of the United States recently clarified that

21   Section 2 of the Voting Rights Act "never requires adoption of

22   districts that violate traditional redistricting principles."

23             (2) The Legislature's intent in adopting the

24   congressional plan in this act described in Section 17-14-70.1

25   is to comply with federal law, including the U.S. Constitution

26   and the Voting Rights Act of 1965, as amended.

27             (3) The Legislature's intent is also to promote the

28   following traditional redistricting principles, which are



**SB5 Enrolled**



29   given effect in the plan created by this act:

30   a. Districts shall be based on total population as
31   reported by the federal decennial census and shall have
32   minimal population deviation.

33   b. Districts shall be composed of contiguous geography,
34   meaning that every part of every district is contiguous with
35   every other part of the same district.

36   c. Districts shall be composed of reasonably compact
37   geography.

38   d. The congressional districting plan shall contain no
39   more than six splits of county lines, which is the minimum
40   number necessary to achieve minimal population deviation among
41   the districts. Two splits within one county is considered two
42   splits of county lines.

43   e. The congressional districting plan shall keep
44   together communities of interest, as further provided for in
45   subdivision (4).

46   f. The congressional districting plan shall not pair
47   incumbent members of Congress within the same district.

48   g. The principles described in this subdivision are
49   non-negotiable for the Legislature. To the extent the
50   following principles can be given effect consistent with the
51   principles above, the congressional districting plan shall
52   also do all of the following:

53   1. Preserve the cores of existing districts.

54   2. Minimize the number of counties in each district.

55   3. Minimize splits of neighborhoods and other political
56   subdivisions in addition to minimizing the splits of counties



57    and communities of interest.

58          (4)a. A community of interest is a defined area of the
59    state that may be characterized by, among other commonalities,
60    shared economic interests, geographic features, transportation
61    infrastructure, broadcast and print media, educational
62    institutions, and historical or cultural factors.

63          b. The discernment, weighing, and balancing of the
64    varied factors that contribute to communities of interest is
65    an intensely political process best carried out by elected
66    representatives of the people.

67          c. If it is necessary to divide a community of interest
68    between congressional districts to promote other traditional
69    districting principles like compactness, contiguity, or equal
70    population, division into two districts is preferable to
71    division into three or more districts. Because each community
72    of interest is different, the division of one community among
73    multiple districts may be more or less significant to the
74    community than the division of another community.

75          d. The Legislature declares that at least the three
76    following regions are communities of interest that shall be
77    kept together to the fullest extent possible in this
78    congressional redistricting plan: the Black Belt, the Gulf
79    Coast, and the Wiregrass.

80          e.1. Alabama's Black Belt region is a community of
81    interest composed of the following 18 core counties: Barbour,
82    Bullock, Butler, Choctaw, Crenshaw, Dallas, Greene, Hale,
83    Lowndes, Macon, Marengo, Montgomery, Perry, Pickens, Pike,
84    Russell, Sumter, and Wilcox. Moreover, the following five



85    counties are sometimes considered part of the Black Belt:
86    Clarke, Conecuh, Escambia, Monroe, and Washington.

87         2. The Black Belt is characterized by its rural
88    geography, fertile soil, and relative poverty, which have
89    shaped its unique history and culture.

90         3. The Black Belt region spans the width of Alabama
91    from the Mississippi boarder to the Georgia border.

92         4. Because the Black Belt counties cannot be combined
93    within one district without causing other districts to violate
94    the principle of equal population among districts, the 18 core
95    Black Belt counties shall be placed into two reasonably
96    compact districts, the fewest number of districts in which
97    this community of interest can be placed. Moreover, of the
98    five other counties sometimes considered part of the Black
99    Belt, four of those counties are included within the two Black
100   Belt districts — Districts 2 and 7.

101        f.1. Alabama's Gulf Coast region is a community of
102   interest composed of Mobile and Baldwin Counties.

103        2. Owing to Mobile Bay and the Gulf of Mexico
104   coastline, these counties also comprise a well-known and
105   well-defined community with a long history and unique
106   interests. Over the past half-century, Baldwin and Mobile
107   Counties have grown even more alike as the tourism industry
108   has grown and the development of highways and bay-crossing
109   bridges have made it easier to commute between the two
110   counties.

111        3. The Gulf Coast community has a shared interest in
112   tourism, which is a multi-billion-dollar industry and a



## SB5 Enrolled



113    significant and unique economic driver for the region.

114          4. Unlike other regions in the state, the Gulf Coast
115    community is home to major fishing, port, and ship-building
116    industries. Mobile has a Navy shipyard and the only deep-water
117    port in the state. The port is essential for the international
118    export of goods produced in Alabama.

119          5. The Port of Mobile is the economic hub for the Gulf
120    counties. Its maintenance and further development are critical
121    for the Gulf counties in particular but also for many other
122    parts of the state. The Port of Mobile handles over 55 million
123    tons of international and domestic cargo for exporters and
124    importers, delivering eighty-five billion dollars
125    ($85,000,000,000) in economic value to the state each year.
126    Activity at the port's public and private terminals directly
127    and indirectly generates nearly 313,000 jobs each year.

128          6. Among the over 21,000 direct jobs generated by the
129    Port of Mobile, about 42% of the direct jobholders reside in
130    the City of Mobile, another 39% reside in Mobile County but
131    outside of the City of Mobile, and another 13% reside in
132    Baldwin County.

133          7. The University of South Alabama serves the Gulf
134    Coast community of interest both through its flagship campus
135    in Mobile and its campus in Baldwin County.

136          8. Federal appropriations have been critical to
137    ensuring the port's continued growth and maintenance. In 2020,
138    the Army Corps of Engineers allocated over two hundred
139    seventy-four million dollars ($274,000,000) for the Port of
140    Mobile to allow the dredging and expansion of the port.



## SB5 Enrolled

141   Federal appropriations have also been critical for expanding
142   bridge projects to further benefit the shared interests of the
143   region.

144         9. The Gulf Coast community has a distinct culture
145   stemming from its French and Spanish colonial heritage. That
146   heritage is reflected in the celebration of shared social
147   occasions, such as Mardi Gras, which began in Mobile. This
148   shared culture is reflected in Section 1-3-8(c), Code of
149   Alabama 1975, which provides that "Mardi Gras shall be deemed
150   a holiday in Mobile and Baldwin Counties and all state offices
151   shall be closed in those counties on Mardi Gras." Mardi Gras
152   is observed as a state holiday only in Mobile and Baldwin
153   Counties.

154         10. Mobile and Baldwin Counties also work together as
155   part of the South Alabama Regional Planning Commission, a
156   regional planning commission recognized by the state for more
157   than 50 years. The local governments of Mobile, Baldwin, and
158   Escambia Counties, as well as 29 municipalities within those
159   counties, work together through the commission with the
160   Congressional Representative from District 1 to carry out
161   comprehensive economic development planning for the region in
162   conjunction with the U.S. Economic Development Administration.
163   Under Section 11-85-51(b), factors the Governor considers when
164   creating such a regional planning commission include
165   "community of interest and homogeneity; geographic features
166   and natural boundaries; patterns of communication and
167   transportation; patterns of urban development; total
168   population and population density; [and] similarity of social



169    and economic problems."

170          g.1. Alabama's Wiregrass region is a community of
171    interest composed of the following nine counties: Barbour,
172    Coffee, Covington, Crenshaw, Dale, Geneva, Henry, Houston, and
173    Pike.

174          2. The Wiregrass region is characterized by rural
175    geography, agriculture, and a major military base. The
176    Wiregrass region is home to Troy University's flagship campus
177    in Troy and its campus in Dothan.

178          3. All of the Wiregrass counties are included in
179    District 2, with the exception of Covington County, which is
180    placed in District 1 so that the maximum number of Black Belt
181    counties can be included within just two districts.

182          Section 2. Section 17-14-70, Code of Alabama 1975, is
183    amended to read as follows:

184          "§17-14-70

185          (a) The State of Alabama is divided into seven
186    congressional districts as provided in subsection (b).

187          (b) The numbers and boundaries of the districts are
188    designated and established by the map prepared by the
189    Permanent Legislative Committee on Reapportionment and
190    identified and labeled as Pringle Congressional Plan 1
191    Livingston Congressional Plan 3-2023, including the
192.   corresponding boundary description provided by the census
193    tracts, blocks, and counties, and are incorporated by
194    reference as part of this section.

195          (c) The Legislature shall post for viewing on its
196    public website the map referenced in subsection (b), including



197    the corresponding boundary description provided by the census
198    tracts, blocks, and counties, and any alternative map,
199    including the corresponding boundary description provided by
200    the census tracts, blocks, and counties, introduced by any
201    member of the Legislature during the legislative session in
202    which this section is added or amended.

203            (d) Upon enactment of ~~Act 2021-555, adding~~the act
204    amending this section and adopting the map identified in
205    subsection (b), the Clerk of the House of Representatives or
206    the Secretary of the Senate, as appropriate, shall transmit
207    the map and the corresponding boundary description provided by
208    the census tracts, blocks, and counties identified in
209    subsection (b) for certification and posting on the public
210    website of the Secretary of State.

211            (e) The boundary descriptions provided by the certified
212    map referenced in subsection (b) shall prevail over the
213    boundary descriptions provided by the census tracts, blocks,
214    and counties generated for the map."

215            Section 3. The provisions of this act are severable. If
216    any part of this act is declared invalid or unconstitutional,
217    that declaration shall not affect the part which remains.

218            Section 4. This act shall be effective for the election
219    of members of the state's U.S. Congressional districts at the
220    General Election of 2024 and thereafter, until the state's
221    U.S. Congressional districts are reapportioned and
222    redistricted after the 2030 decennial census.

223            Section 5. This act shall become effective immediately
224    upon its passage and approval by the Governor, or upon its



**SB5 Enrolled**

225    otherwise becoming law.

**SB5 Enrolled**



226
227
228
229     President and Presiding Officer of the Senate
230
231
232
233
234     Speaker of the House of Representatives
235
236
237     SB5
238     Senate 19-Jul-23
239     I hereby certify that the within Act originated in and passed
240     the Senate, as amended.
241
242     Senate 21-Jul-23
243     I hereby certify that the within Act originated in and passed
244     the Senate, as amended by Conference Committee Report.
245
246                             Patrick Harris,
247                             Secretary.
248
249     _____
250
251
252     House of Representatives
253     Amended and passed: 21-Jul-23
254
255     House of Representatives
256     Passed 21-Jul-23, as amended by Conference Committee Report.
257
258     _____
259
260
261     By: Senator Livingston


APPROVED July 21, 2023

TIME 5:28 PM

_____
GOVERNOR

Page 10

Alabama Secretary Of State
Act Num....: 2023-563
Bill Num...: S-5
Recv'd 07/21/23    05:41pmSLF

**HOUSE ACTION**

DATE: 7-19 20 23

RD 1 RFD 56

**REPORT OF STANDING COMMITTEE**

This bill having been referred by the House to its standing committee on State Government and was acted upon by such committee in session, and returned therefrom to the House with the recommendation that it be

Passed w/amend(s) ___ w/sub ✓

This 20 day of July 2023.

_(signature)_, Chairperson

DATE: 7.20 202___

RF W 506 RD 2 CA

DATE: ___ 20

RE-REFERRED ☐   RE-COMMITTED ☐

Committee ___

I hereby certify that the Resolution as required in Section C of Act No. 81-889 was adopted and is attached to the Bill,

SB ___

YEAS ___   NAYS ___

JOHN TREADWELL, Clerk

FURTHER HOUSE ACTION (OVER)

---

**SENATE ACTION**

I hereby certify that the Resolution as required in Section C of Act No. 81-889 was adopted and is attached to the Bill,

SB ___

yeas ___   nays ___   abstain ___

PATRICK HARRIS, Secretary

I hereby certify that the notice & proof is attached to the Bill, SB ___ as required in the General Acts of Alabama, 1975 Act No. 919.

PATRICK HARRIS, Secretary

**CONFERENCE COMMITTEE**

Senate Conferees ___

SOR ___

_(handwritten)_

PONSORS

19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35

# APPENDIX B

FILED
2021 Dec-27  PM 01:06
U.S. DISTRICT COURT
N.D. OF ALABAMA

1    **REAPPORTIONMENT COMMITTEE REDISTRICTING GUIDELINES**

2                            May 5, 2021

3    **I. POPULATION**

4    The total Alabama state population, and the population of defined subunits
5    thereof, as reported by the 2020 Census, shall be the permissible data base used
6    for the development, evaluation, and analysis of proposed redistricting plans. It is
7    the intention of this provision to exclude from use any census data, for the purpose
8    of determining compliance with the one person, one vote requirement, other than
9    that provided by the United States Census Bureau.

10   **II. CRITERIA FOR REDISTRICTING**

11   a.    Districts shall comply with the United States Constitution, including the
12   requirement that they equalize total population.

13   b.     Congressional districts shall have minimal population deviation.

14   c.    Legislative and state board of education districts shall be drawn to achieve
15   substantial equality of population among the districts and shall not exceed an
16   overall population deviation range of ±5%.

17   d.    A redistricting plan considered by the Reapportionment Committee shall
18   comply with the one person, one vote principle of the Equal Protection Clause of
19   the 14th Amendment of the United States Constitution.

20   e.    The Reapportionment Committee shall not approve a redistricting plan that
21   does not comply with these population requirements.

22   f.    Districts shall be drawn in compliance with the Voting Rights Act of 1965, as
23   amended. A redistricting plan shall have neither the purpose nor the effect of
24   diluting minority voting strength, and shall comply with Section 2 of the Voting
25   Rights Act and the United States Constitution.

26   g.    No district will be drawn in a manner that subordinates race-neutral
27   districting criteria to considerations of race, color, or membership in a language-
28   minority group, except that race, color, or membership in a language-minority
29   group may predominate over race-neutral districting criteria to comply with
30   Section 2 of the Voting Rights Act, provided there is a strong basis in evidence in
31   support of such a race-based choice. A strong basis in evidence exists when there
32   is good reason to believe that race must be used in order to satisfy the Voting Rights
33   Act.

10213405.2

RC 044593

h.     Districts will be composed of contiguous and reasonably compact geography.

i.     The following requirements of the Alabama Constitution shall be complied with:

(i)     Sovereignty resides in the people of Alabama, and all districts should be drawn to reflect the democratic will of all the people concerning how their governments should be restructured.

(ii)     Districts shall be drawn on the basis of total population, except that voting age population may be considered, as necessary to comply with Section 2 of the Voting Rights Act or other federal or state law.

(iii)     The number of Alabama Senate districts is set by statute at 35 and, under the Alabama Constitution, may not exceed 35.

(iv)     The number of Alabama Senate districts shall be not less than one-fourth or more than one-third of the number of House districts.

(v)     The number of Alabama House districts is set by statute at 105 and, under the Alabama Constitution, may not exceed 106.

(vi)     The number of Alabama House districts shall not be less than 67.

(vii)     All districts will be single-member districts.

(viii)     Every part of every district shall be contiguous with every other part of the district.

j.     The following redistricting policies are embedded in the political values, traditions, customs, and usages of the State of Alabama and shall be observed to the extent that they do not violate or subordinate the foregoing policies prescribed by the Constitution and laws of the United States and of the State of Alabama:

(i)     Contests between incumbents will be avoided whenever possible.

(ii)     Contiguity by water is allowed, but point-to-point contiguity and long-lasso contiguity is not.

(iii)     Districts shall respect communities of interest, neighborhoods, and political subdivisions to the extent practicable and in compliance with paragraphs a through i. A community of interest is defined as an area with recognized similarities of interests, including but not limited to ethnic, racial, economic, tribal, social, geographic, or historical identities. The term communities of interest may, in certain circumstances, include political subdivisions such as counties, voting

2

RC 044594

1   precincts, municipalities, tribal lands and reservations, or school districts. The
2   discernment, weighing, and balancing of the varied factors that contribute to
3   communities of interest is an intensely political process best carried out by elected
4   representatives of the people.

5   (iv)   The Legislature shall try to minimize the number of counties in each district.

6   (v)   The Legislature shall try to preserve the cores of existing districts.

7    (vi)   In establishing legislative districts, the Reapportionment Committee shall
8   give due consideration to all the criteria herein. However, priority is to be given to
9   the compelling State interests requiring equality of population among districts and
10   compliance with the Voting Rights Act of 1965, as amended, should the
11   requirements of those criteria conflict with any other criteria.

12    g.   The criteria identified in paragraphs j(i)-(vi) are not listed in order of
13   precedence, and in each instance where they conflict, the Legislature shall at its
14   discretion determine which takes priority.

15   **III. PLANS PRODUCED BY LEGISLATORS**

16   1.   The confidentiality of any Legislator developing plans or portions thereof
17   will be respected. The Reapportionment Office staff will not release any
18   information on any Legislator's work without written permission of the Legislator
19   developing the plan, subject to paragraph two below.

20   2.   A proposed redistricting plan will become public information upon its
21   introduction as a bill in the legislative process, or upon presentation for
22   consideration by the Reapportionment Committee.

23   3.   Access to the Legislative Reapportionment Office Computer System, census
24   population data, and redistricting work maps will be available to all members of
25   the Legislature upon request. Reapportionment Office staff will provide technical
26   assistance to all Legislators who wish to develop proposals.

27   4.   In accordance with Rule 23 of the Joint Rules of the Alabama Legislature
28   "[a]ll amendments or revisions to redistricting plans, following introduction as a
29   bill, shall be drafted by the Reapportionment Office." Amendments or revisions
30   must be part of a whole plan. Partial plans are not allowed.

31   5.   In accordance with Rule 24 of the Joint Rules of the Alabama Legislature,
32   "[d]rafts of all redistricting plans which are for introduction at any session of the
33   Legislature, and which are not prepared by the Reapportionment Office, shall be
34   presented to the Reapportionment Office for review of proper form and for entry
35   into the Legislative Data System at least ten (10) days prior to introduction."

10213405.2

RC 044595

**IV.   REAPPORTIONMENT COMMITTEE MEETINGS AND PUBLIC HEARINGS**

1.     All meetings of the Reapportionment Committee and its sub-committees will be open to the public and all plans presented at committee meetings will be made available to the public.

2.     Minutes of all Reapportionment Committee meetings shall be taken and maintained as part of the public record. Copies of all minutes shall be made available to the public.

3.     Transcripts of any public hearings shall be made and maintained as part of the public record, and shall be available to the public.

4.     All interested persons are encouraged to appear before the Reapportionment Committee and to give their comments and input regarding legislative redistricting. Reasonable opportunity will be given to such persons, consistent with the criteria herein established, to present plans or amendments redistricting plans to the Reapportionment Committee, if desired, unless such plans or amendments fail to meet the minimal criteria herein established.

5.     Notice of all Reapportionment Committee meetings will be posted on monitors throughout the Alabama State House, the Reapportionment Committee's website, and on the Secretary of State's website. Individual notice of Reapportionment Committee meetings will be sent by email to any citizen or organization who requests individual notice and provides the necessary information to the Reapportionment Committee staff. Persons or organizations who want to receive this information should contact the Reapportionment Office.

**V. PUBLIC ACCESS**

1.     The Reapportionment Committee seeks active and informed public participation in all activities of the Committee and the widest range of public information and citizen input into its deliberations. Public access to the Reapportionment Office computer system is available every Friday from 8:30 a.m. to 4:30 p.m. Please contact the Reapportionment Office to schedule an appointment.

2.     A redistricting plan may be presented to the Reapportionment Committee by any individual citizen or organization by written presentation at a public meeting or by submission in writing to the Committee. All plans submitted to the Reapportionment Committee will be made part of the public record and made available in the same manner as other public records of the Committee.

4

10213405.2

RC 044596

3.      Any proposed redistricting plan drafted into legislation must be offered by a member of the Legislature for introduction into the legislative process.

4.      A redistricting plan developed outside the Legislature or a redistricting plan developed without Reapportionment Office assistance which is to be presented for consideration by the Reapportionment Committee must:

a.      Be clearly depicted on maps which follow 2020 Census geographic boundaries;

b.      Be accompanied by a statistical sheet listing total population for each district and listing the census geography making up each proposed district;

c.      Stand as a complete statewide plan for redistricting.

d.      Comply with the guidelines adopted by the Reapportionment Committee.

5.      Electronic Submissions

a.      Electronic submissions of redistricting plans will be accepted by the Reapportionment Committee.

b.      Plans submitted electronically must also be accompanied by the paper materials referenced in this section.

c.      See the Appendix for the technical documentation for the electronic submission of redistricting plans.

6.      Census Data and Redistricting Materials

a.      Census population data and census maps will be made available through the Reapportionment Office at a cost determined by the Permanent Legislative Committee on Reapportionment.

b.      Summary population data at the precinct level and a statewide work maps will be made available to the public through the Reapportionment Office at a cost determined by the Permanent Legislative Committee on Reapportionment.

c.      All such fees shall be deposited in the state treasury to the credit of the general fund and shall be used to cover the expenses of the Legislature.

## Appendix.

## ELECTRONIC SUBMISSION OF REDISTRICTING PLANS

## REAPPORTIONMENT COMMITTEE - STATE OF ALABAMA

10213405.2

RC 044597

1

The Legislative Reapportionment Computer System supports the electronic submission of redistricting plans. The electronic submission of these plans must be via email or a flash drive. The software used by the Reapportionment Office is Maptitude.

The electronic file should be in DOJ format (Block, district # or district #, Block). This should be a two column, comma delimited file containing the FIPS code for each block, and the district number. Maptitude has an automated plan import that creates a new plan from the block/district assignment list.

Web services that can be accessed directly with a URL and ArcView Shapefiles can be viewed as overlays. A new plan would have to be built using this overlay as a guide to assign units into a blank Maptitude plan. In order to analyze the plans with our attribute data, edit, and report on, a new plan will have to be built in Maptitude.

In order for plans to be analyzed with our attribute data, to be able to edit, report on, and produce maps in the most efficient, accurate and time saving procedure, electronic submissions are REQUIRED to be in DOJ format.

Example: (DOJ FORMAT BLOCK, DISTRICT #)

SSCCCTTTTTTBBBBDDDD

SS              is the 2 digit state FIPS code

CCC            is the 3 digit county FIPS code

TTTTTT         is the 6 digit census tract code

BBBB           is the 4 digit census block code

DDDD                is the district number, right adjusted

**Contact Information:**

Legislative Reapportionment Office

Room 317, State House

11 South Union Street

Montgomery, Alabama 36130

(334) 261-0706

6

10213405.2

RC 044598

1  For questions relating to reapportionment and redistricting, please contact:

2  Donna Overton Loftin, Supervisor

3  Legislative Reapportionment Office

4  donna.overton@alsenate.gov

5  Please Note: The above e-mail address is to be used only for the purposes of
6  obtaining information regarding redistricting. Political messages, including those
7  relative to specific legislation or other political matters, cannot be answered or
8  disseminated via this email to members of the Legislature. Members of the
9  Permanent Legislative Committee on Reapportionment may be contacted through
10 information contained on their Member pages of the Official Website of the
11 Alabama Legislature, legislature.state.al.us/aliswww/default.aspx.

10213405.2

RC 044599