FILED

2023 Sep-11  PM 12:50
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **BOBBY SINGLETON**, *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 2:21-cv-1291-AMM** |
| | ) | |
| **WES ALLEN**, *in his official* | ) | **THREE-JUDGE COURT** |
| *capacity as Alabama Secretary of* | ) | |
| *State*, *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

| | | |
|---|---|---|
| **EVAN MILLIGAN**, *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 2:21-cv-1530-AMM** |
| | ) | |
| **WES ALLEN**, *in his official* | ) | **THREE-JUDGE COURT** |
| *capacity as Alabama Secretary of* | ) | |
| *State*, *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

Before MARCUS, Circuit Judge, MANASCO and MOORER, District Judges.

PER CURIAM:

## ORDER DENYING SECRETARY ALLEN'S EMERGENCY MOTION FOR STAY PENDING APPEAL

These congressional redistricting cases are before this Court on a stay motion

filed by Alabama Secretary of State Wes Allen ("the Secretary"). *Milligan* Doc. 276.

## I.  PROCEDURAL POSTURE

These cases returned to this Court on June 8, 2023, after the Supreme Court affirmed a preliminary injunction we entered on January 24, 2022, that enjoined the Secretary from using Alabama's congressional districting plan ("the 2021 Plan"). *See Allen v. Milligan*, 143 S. Ct. 1487, 1498, 1502 (2023).

We immediately set a status conference. *Milligan* Doc. 165. Before the conference, the Secretary and the two legislative defendants (the co-chairs of the Alabama Legislature's Committee on Reapportionment, or "the Legislators") advised us that "the . . . Legislature intend[ed] to enact a new congressional redistricting plan that will repeal and replace the 2021 Plan" and requested that we delay remedial proceedings until July 21, 2023. *Milligan* Doc. 166 at 2. We delayed those proceedings until July 21, 2023, to accommodate the Legislature's efforts; entered a briefing schedule for any objections if the Legislature enacted a new map; and alerted the parties that if a remedial hearing became necessary, it would commence on the date they suggested: August 14, 2023. *Milligan* Doc. 168 at 4–6.

A special session of the Legislature commenced on July 17, 2023. *See Milligan* Doc. 173-1. On July 20, 2023, the Alabama House of Representatives passed a congressional districting plan titled the "Community of Interest Plan." *Milligan* Doc. 251 ¶¶ 16, 22. That same day, the Alabama Senate passed a different plan, titled the "Opportunity Plan." *Id.* ¶¶ 19, 22. The next day, a six-person

bicameral Conference Committee passed the 2023 Plan, which was a modified version of the Opportunity Plan. *Id.* ¶ 23. Later that day, the Legislature enacted the 2023 Plan and Governor Ivey signed it into law. *Milligan* Doc. 186; *Milligan* Doc. 251 ¶ 26; Ala. Code § 17-14-70. The 2023 Plan, like the 2021 Plan enjoined by this Court, has only one district that is majority-Black or Black-opportunity. *Compare Milligan* Doc. 186-1 at 2, *with Milligan* Doc. 107 at 2–3.

On July 26, 2023, the parties jointly proposed a scheduling order for remedial proceedings. *Milligan* Doc. 193. We adopted it. *Milligan* Doc. 194. Each set of Plaintiffs timely objected to the 2023 Plan. *Singleton* Doc. 147; *Milligan* Doc. 200; *Caster* Doc. 179. We held another conference on July 31, 2023 and set a remedial hearing in *Milligan* and *Caster* for August 14, 2023. *See Milligan* Doc. 194 at 3.

Before the remedial hearing, the parties filed motions, briefs, expert materials, depositions, other evidence, and fact stipulations. *See Milligan* Doc. 272 at 64–102. We held the remedial hearing on August 14 and received most exhibits into evidence. *See id.* at 195–97 (evidentiary rulings).

Based on the substantial record before us, on September 5, 2023, we enjoined the 2023 Plan on the ground that it failed to remedy the vote dilution we found (and the Supreme Court affirmed) in the 2021 Plan, and in the alternative on the ground that even if we were to conduct our analysis under *Thornburg v. Gingles*, 478 U.S. 30 (1986), from the ground up, the 2023 Plan still likely violates Section Two

because it dilutes the votes of Black Alabamians. *Milligan* Doc. 272. By separate order, we instructed the Special Master, cartographer, and Special Master's counsel we previously appointed to commence work on a remedial map. *Milligan* Doc. 273. We set a deadline of September 25, 2023, for a Report and Recommendation from the Special Master and his team to recommend three remedial maps. *See id.* at 7.

Later in the day on September 5, 2023, the Secretary — but not the Legislators — appealed our ruling and filed this "emergency" stay motion. *Milligan* Doc. 274; *Milligan* Doc. 275; *Milligan* Doc. 276.

In the motion, the Secretary advised us that regardless of whether we had yet ruled, he would seek a stay in the Supreme Court on September 7, 2023. *Milligan* Doc 276 at 1. We directed the Plaintiffs to respond not later than 10:00 am CDT on September 8, 2023, and they did. *Milligan* Docs. 285, 287; *Caster* Doc. 235. Later on September 8, 2023, the Secretary filed a reply. *Milligan* Doc. 288.

## II.   STANDARD OF REVIEW

"A stay is an intrusion into the ordinary processes of administration and judicial review, and accordingly is not a matter of right, even if irreparable injury might otherwise result to the appellant." *Nken v. Holder*, 556 U.S. 418, 427 (2009) (internal quotation marks and citations omitted). The Secretary bears the burden of establishing that "circumstances justify an exercise of th[e court's] discretion." *Id.* at 433–34. A stay pending appeal is "extraordinary relief" and it requires the moving

4

party to satisfy a "heavy burden." *Winston–Salem/Forsyth Cnty. Bd. of Educ. v. Scott*, 404 U.S. 1221, 1231 (1971) (Burger, C.J., in chambers).

Under controlling precedent, we consider four factors to determine whether we should exercise our discretion to stay these cases pending the Secretary's appeal: (1) whether the Secretary "has made a strong showing that he is likely to succeed on the merits; (2) whether the [Secretary] will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken*, 556 U.S. at 425–26 (citation omitted).

## III.      ANALYSIS

We have said before that "this is a straightforward Section Two case, not a legal unicorn." *Milligan* Doc. 120 at 3. This case remains straightforward. We are aware, however, of no other case — and the Secretary does not direct us to one — in which a state legislature, faced with a federal court order declaring that its electoral plan unlawfully dilutes minority votes and requiring a plan that provides an additional opportunity district, responded with a plan that the state concedes does not provide that district. Likewise, it is exceptionally unusual for a litigant who has presented his arguments to the Supreme Court once already — and lost — to assert that he is now "overwhelmingly likely" to prevail on those same arguments in that Court in this case. Like our first injunction, our second injunction rests on an

exhaustive application of settled law to a robust evidentiary record that includes extensive fact stipulations.

As an initial matter, there is no emergency. When these cases returned to us from the Supreme Court, we immediately set a status conference. At the Secretary's request, we then delayed remedial proceedings for approximately five weeks to accommodate the Legislature's efforts to enact a remedial map. And we entered the scheduling order that the parties, including the Secretary, jointly proposed. After the remedial hearing, we conducted not only the remedial analysis requested by the Plaintiffs, but also the full *Gingles* analysis requested by the Secretary. We ruled expeditiously, weeks in advance of the early October deadline that the Secretary twice told us he needed to make. We have eleven illustrative maps in hand already, and the Special Master and his team are hard at work to recommend a lawful map for us to order the Secretary to use on the timetable that he set. In our view, these proceedings are running on precisely the schedule agreed upon by all parties.

In any event, we find that every factor we must consider strongly counsels against entering a stay pending appeal. We discuss each factor in turn.

## A.   The Secretary failed to show a strong likelihood that he will prevail on the merits of his appeal.

We find that the Secretary failed to show a strong likelihood that he will succeed on the merits of his appeal. The Secretary has not even attempted to make the strong showing that the law requires. The Secretary's assertion that he is

"overwhelmingly" likely to prevail on appeal is as bare as it is bold: it comprises only three sentences crafted at the highest level of abstraction with virtually no citations. *See Milligan* Doc. 276 at 4. The Secretary simply says that his arguments were set forth in his earlier brief. *Id*. But that brief came before we entered our injunction on September 5, so it does not engage, let alone rebut, any of our findings of fact or conclusions of law. Quite simply, the brief does not help us understand why the Secretary believes he will prevail on a clear-error review of our findings.

In one of the three sentences, the Secretary asserted that he "has fundamental disagreements with" our conclusions, but he did not identify any fact or rule of law that he says we misapprehended, misapplied, or otherwise misjudged. *Id*. We consumed more than 200 pages trying to consider every argument the Secretary made about the 2023 Plan, and the Secretary has not pointed us to a single specific error or omission. If it were enough for a stay applicant merely to assert a "fundamental disagreement" with an injunction, stay motions would be routinely (perhaps invariably) granted. That is not the rule. The Secretary's assertions are too general, too conclusory, and too bare to carry his heavy burden to establish a strong likelihood that he will prevail on appeal.

In any event, we find that the Secretary is likely to lose on appeal. The Secretary has lost three times already, and one of those losses occurred on appeal. *See Milligan* Docs. 107, 272; *Allen*, 143 S. Ct. at 1498, 1502. We have twice

enjoined a plan that includes only one majority-Black or Black-opportunity district on the ground that it likely dilutes the votes of Black Alabamians in violation of Section Two of the Voting Rights Act. Our second injunction, like the first, rests on undisputed facts, extensive evidence, and settled law. *See Milligan* Doc. 107 at 139–225; *Milligan* Doc. 272 at 134–96. Most notably, the Secretary stipulated to the critical facts about intensely racially polarized voting in Alabama. *See Milligan* Doc. 272 at 89–92; 178; Aug. 14 Tr. 64–65.

The legal basis for our analysis is not novel. We applied the same standard that federal courts have routinely applied for forty years, since Section Two was amended in 1982. *See generally Allen*, 143 S. Ct. at 1499–1501 (explaining Voting Rights Act jurisprudence, 1982 statutory amendments, and *Gingles*). As the Supreme Court explained in this case, "*Gingles* effectuates the delicate legislative bargain that § 2 embodies. And statutory *stare decisis* counsels strongly in favor of not 'undo[ing] . . . the compromise that was reached between the House and Senate when § 2 was amended in 1982.'" *Allen*, 143 S. Ct. at 1515 n.10 (quoting *Brnovich* v. *Democratic Nat'l Comm.*, 141 S.Ct. 2321, 2341 (2021)).

And the evidentiary basis for our analysis is not slender. The injunction the Secretary asks us to stay rests on not one, but **four** evidentiary records: the records developed in *Milligan* and *Caster* before our first injunction, and the records developed in both cases before our second injunction. We have reviewed thousands

of pages of briefing, hundreds of exhibits, numerous expert reports (including rebuttal and supplemental reports), and extensive fact stipulations, and we have the benefit of nine total days of hearings and able argument by dozens of lawyers.

After conducting the legal analysis that controlling precedent requires, we did not regard the dispositive question underlying either injunction as a close call. *See Milligan* Doc. 107 at 195–96; *Milligan* Doc. 272 at 8, 46, 52–53, 134–39.

Because of the exceptional public importance of the Plaintiffs' claim that the Alabama Legislature diluted the franchise for Black Alabamians, we have again carefully revisited each finding of fact and conclusion of law with fresh eyes. We see no basis to depart from our original analysis, nor to delay relief. We reconsider each of the Secretary's main arguments: (1) that the 2023 Plan remedied the likely Section Two violation we found in the 2021 Plan because it better respects certain traditional districting criteria — namely, compactness, communities of interest, and county splits, and (2) that the Plaintiffs have failed to establish that the 2023 Plan likely violates Section Two because race predominated in the drawing of their illustrative maps.

We again reject the Secretary's argument that the 2023 Plan remedied the vote dilution we found because it outperforms the 2021 Plan and the Plaintiffs' eleven illustrative maps with respect to compactness, communities of interest in the Black Belt, Gulf Coast, and Wiregrass, and county splits. This is for three separate and

independent reasons. *First,* as we explained in the injunction the Secretary asks us to stay, how the 2023 Plan performs on select traditional districting criteria was not relevant to the question we were required to answer in the remedial stage of this litigation: does the 2023 Plan "completely correct[]—rather than perpetuate[]—the defects that rendered the [2021 Plan] . . . unlawful." *Covington v. North Carolina*, 283 F. Supp. 3d 410, 431 (M.D.N.C.), *aff'd in relevant part*, *rev'd in part*, 138 S. Ct. 2548 (2018).  Because the original Section Two violation that we found was the dilution of Black votes, the question was whether the 2023 Plan cures that dilution by creating an additional district in which Black voters have a fair and reasonable opportunity to elect a candidate of their choice. *Milligan* Doc. 272 at 113–17.

The Secretary conceded the answer: the 2023 Plan does not include an additional opportunity district. *See Milligan* Doc. 251 ¶¶ 5–9; Aug. 14 Tr. 163–64. The stipulated evidence fully supports his concession. District 2 has the second-highest Black voting-age population in the 2023 Plan. Based on (1) the undisputed expert opinions offered by the *Milligan* and *Caster* Plaintiffs, and (2) the Legislature's own performance analysis, the parties stipulated that in District 2 in the 2023 Plan, white-preferred candidates have "almost always defeated Black-preferred candidates." *Milligan* Doc. 251 ¶ 5; *see also Milligan* Docs. 200-2, 200-3; *Caster* Doc. 179-2. In the face of intense racial polarization, the 2023 Plan provides no greater opportunity for Black Alabamians to elect a candidate of their choice than

10

the 2021 Plan provided. Nothing about the Secretary's evidence on traditional districting criteria changes this fatal flaw in the 2023 Plan.

*Second*, as we explained when we enjoined the 2023 Plan, even assuming that the Secretary's evidence about traditional districting criteria were relevant to the question before us — *i.e.*, that we were required at the remedial stage to relitigate *Gingles* I from the ground up to determine whether the Plaintiffs have established that it is possible based on the size and shape of the Black population in Alabama to create a reasonably configured second majority-Black district — the Plaintiffs are not required to produce a plan that "meets or beats" the 2023 Plan on any particular traditional districting criteria to satisfy *Gingles* I.

As we explained and the Supreme Court affirmed, we do "not have to conduct a beauty contest between plaintiffs' maps and the State's." *Allen*, 143 S. Ct. at 1505 (internal quotation marks omitted) (alterations accepted); *see also Bush v. Vera*, 517 U.S. 952, 977 (1996) (plurality opinion) ("A § 2 district that is reasonably compact and regular, taking into account traditional districting principles such as maintaining communities of interest and traditional boundaries" is not required "to defeat rival compact districts designed by [the State] in endless 'beauty contests.'"). The Secretary cannot avoid Section Two liability merely by devising a plan that excels at the traditional criteria the Legislature deems most pertinent.

Put differently, the State cannot avoid the mandate of Section Two by

improving its map on metrics other than compliance with Section Two. Otherwise, it could forever escape correcting a Section Two violation by making each remedial map slightly more compact, or slightly better for some communities of interest, than the predecessor map.

Indeed, in the injunction the Secretary asks us to stay, we explained at length why we rejected as irreconcilable with the text of Section Two his position that communities of interest can operate as a trump card to override the requirement to comply with Section Two. *Milligan* Doc. 272 at 169–73. Section Two directs our attention to the "totality of circumstances," and it does not mention, let alone elevate or emphasize, communities of interest as a particular circumstance. *See* 52 U.S.C. § 10301(b). Consistent with this direction, nothing in our ruling or the Supreme Court's affirmance suggests that a remedial plan would cure racially discriminatory vote dilution if only the evidence were better on the Gulf Coast and the Black Belt were not split quite so much.

Under controlling precedent, the Plaintiffs' burden under *Gingles* I is to establish that the Black population in Alabama is "sufficiently large and geographically compact to constitute a majority in some reasonably configured legislative district." *Cooper v. Harris*, 581 U.S. 285, 301 (2017) (internal quotation marks omitted). We have twice found and the Supreme Court has once affirmed that it is. The Secretary has offered no evidence that either the size or the geographic

12

concentration of the Black population in Alabama has meaningfully changed — or changed at all — between when we made our finding in 2021 and now.

*Third*, as we explained in our preliminary injunction, even if we were to apply the Secretary's "meet or beat" requirement and conduct a beauty contest, at least some of the Plaintiffs' illustrative maps perform as well as the 2023 Plan on the traditional districting criteria the Secretary prefers. As for communities of interest — which are at the heart of the State's assertion that the 2023 Plan moved the needle on *Gingles* I — we explained that although the evidence about the Gulf Coast is more substantial now than it was before, it is still considerably weaker than the record on the Black Belt, which rests on extensive stipulated facts and includes extensive expert testimony, and which spanned a substantial range of demographic, cultural, historical, and political issues. *See Milligan* Doc. 272 at 156–61. We found that the new evidence about the Gulf Coast does not establish that the Gulf Coast is the community of interest of primary importance, nor that the Gulf Coast is more important than the Black Belt, nor that there can be no legitimate reason to separate Mobile and Baldwin Counties. We pointed out in both of our preliminary injunction orders that the Legislature has repeatedly split Mobile and Baldwin Counties in creating maps for the State Board of Education districts in Alabama, and the Legislature did so at the same time it drew the 2021 Plan. *Milligan* Doc. 272 at 38, 50, 96, 164; *Milligan* Doc. 107 at 171 (citing *Caster* Doc. 48 ¶¶ 32–41).

13

Put simply, we found that the new evidence about the Gulf Coast does not establish that separating the Gulf Coast to avoid diluting Black votes in the Black Belt violates, sacrifices, or otherwise transgresses traditional districting principles. *Milligan* Doc. 272 at 156–167. At most, the Secretary's new evidence on the Gulf Coast may show that the Black Belt and the Gulf Coast are geographically overlapping communities of interest that are not airtight and tend to pull in different directions. At best then, the Secretary has established that there are two relevant communities of interest and the Plaintiffs' illustrative maps and the 2023 Plan each preserve a different community, suggesting a wash on this metric: "[t]here would be a split community of interest in both." *Allen*, 143 S. Ct. at 1505. Thus, positing that there are two communities of interest does not undermine our determination that the Plaintiffs' eleven illustrative maps are reasonably configured and altogether consonant with traditional districting criteria.

Further, we found that the Secretary's limited evidence offered about the community of interest in the Wiregrass does not move the needle. *Milligan* Doc. 272 at 167–68. The basis for a community of interest in the Wiregrass is rural geography, a university (Troy), and a military installation (Fort Novosel). These few commonalities do not remotely approach the hundreds of years of shared and very similar demographic, cultural, historical, and political experiences of Alabamians living in the Black Belt. And they are considerably weaker than the common coastal

influence and historical traditions for Alabamians living in the Gulf Coast. Moreover, there is substantial overlap between the Black Belt and the Wiregrass. Three of the nine Wiregrass Counties (Barbour, Crenshaw, and Pike) are also in the Black Belt. Accordingly, any districting plan must make tradeoffs with these communities to meet equal population and contiguity requirements.

As for county splits, we found that the Secretary failed to establish that the 2023 Plan respects county lines better than all the Plaintiffs' illustrative plans. *Id.* at 173–77. Based on the report of the Defendants' own expert, six of the illustrative maps split the same number of counties as the 2023 Plan and satisfy the six-split ceiling the Legislature imposed: Cooper Plans 1, 3, 4, 5, and 7, and Duchin Plan D. *Id.* at 173–75. One of these plans, Cooper 7, performs better than the 2023 Plan by splitting only five counties.

And we found that the Secretary had also failed to establish that the 2023 Plan performed better with regard to geographic compactness. As an initial matter, we noted that the Secretary had not introduced any evidence undermining Dr. Duchin and Mr. Cooper's testimony that the compactness scores of the districts in their illustrative plans are reasonable. *Id.* at 150. Because that testimony was not relative — it opined about the Duchin plans and Cooper plans standing alone, not compared to any other plan — we noted that the enactment of a new plan did not affect it. *Id.* Nor did Mr. Trende's opinion, which, like Mr. Thomas Bryan's opinion before,

"offer[ed] no opinion on what is reasonable or what is not reasonable in terms of compactness." *Id.* at 151. Further, when we examined the relative compactness of the districts in the Duchin plans and the Cooper plans compared to that of the districts in the 2023 Plan, the result remained the same. *Id.* Mr. Trende acknowledged that Duchin Plan B outperformed the 2023 Plan on key compactness metrics, including average Polsby-Popper and cut edges, and did not opine that any of the Duchin plans or Cooper plans that received lower statistical scores received scores that were unreasonably lower or unreasonable. *Id.* at 151–52.

For all these reasons, we again found that the Plaintiffs had established that an additional Black-opportunity district can be reasonably configured without violating traditional districting principles relating to communities of interest, county splits, and compactness. Our finding does not run afoul of the Supreme Court's caution that Section Two never requires the adoption of districts that violate traditional districting principles; it simply finds that the Plaintiffs' plans do not violate traditional districting principles.

We next turn to the Secretary's argument that race predominated in the drawing of the Plaintiffs' eleven illustrative maps. We and the Supreme Court already concluded that it did not. *See Milligan* Doc. 272 at 144–46. Our earlier preliminary injunction would not have been affirmed if there were an open question whether race played an improper role in the preparation of all of the Plaintiffs'

16

illustrative plans. The State already has presented this argument to the Supreme Court and lost.

In these remedial proceedings, the only new support the Secretary offered for this argument is an unsworn expert report from Mr. Bryan. In our first preliminary injunction, we "assign[ed] very little weight to Mr. Bryan's testimony" and detailed at great length the reasons why we found it unreliable. *Milligan* Doc. 107 at 152–56. We found his written proffer unreliable in the remedial phase and we refused to admit it. *Milligan* Doc. 272 at 141–46. We explained, among other things, that Mr. Bryan does not connect his *ipse dixit* opinion about race predominance to the "geographic splits" methodology that he used, or even explain why an evaluation of race predominance should be based on "geographic splits analysis." *See Milligan* Doc. 220-10 at 22–26. Instead, Mr. Bryan simply presents the results of his geographic splits analysis and then states in one sentence a cursory conclusion about race predominance. *Id.* We also found his report unhelpful because it opines about a plan that the Plaintiffs suggested to the Legislature but have not offered in this litigation, and we have no need for that opinion. *Milligan* Doc. 272 at 145–46.

We also rejected the Secretary's new argument that the *Milligan* and *Caster* Plaintiffs' interpretation of Section Two would require affirmative action in redistricting. *Milligan* Doc. 272 at 185–88. As an initial matter, it is premature, speculative, and entirely unfounded for him to assail any plan we might order as a

17

remedy as "violat[ing] the 2023 Plan's traditional redistricting principles in favor of race" because we have not yet adopted a remedial plan. *Milligan* Doc. 220 at 59. The Special Master has only just begun his work, we directly instructed him that any proposed plan he submits must "[c]omply with the U.S. Constitution and the Voting Rights Act," and we will carefully review any plan he recommends to ensure that this requirement is met. *Milligan* Doc. 273 at 7.

Beyond that, we also rejected the faulty premise that by accepting the Plaintiffs' illustrative plans for *Gingles* purposes, we improperly held that the Plaintiffs are entitled to "proportional . . . racial representation in Congress." *Milligan* Doc. 107 at 195 (internal quotation marks omitted); *accord Milligan* Doc. 272 at 128–29; 186–87. This faulty premise is the reason why affirmative action cases, like the *Harvard* case the State relies on, 143 S. Ct. 2141, are fundamentally different from this case. Section Two expressly disclaims any "right to have members of a protected class elected in numbers equal to their proportion in the population." 52 U.S.C. § 10301(b). And "properly applied, the *Gingles* framework itself imposes meaningful constraints on proportionality, as [Supreme Court] decisions have frequently demonstrated." *Allen*, 143 S. Ct. at 1508; *see also id.* at 1518 (Kavanaugh, J., concurring).

Unlike the affirmative action programs the Supreme Court struck down in *Harvard*, 143 S. Ct. 2141, which were expressly aimed at achieving balanced racial

outcomes in the makeup of the university student bodies, the Voting Rights Act guarantees only "equality of opportunity, not a guarantee of electoral success for minority-preferred candidates of whatever race." *Johnson v. De Grandy*, 512 U.S. 997, 1014 n.11 (1994). The Voting Rights Act does not provide a leg up for Black voters — it merely prevents them from being kept down with regard to what is arguably the most "fundamental political right," in that it is "preservative of all rights" — the right to vote. *Democratic Exec. Comm. Of Fla. v. Lee*, 915 F.3d 1312, 1315 (11th Cir. 2019). For all these reasons, we again find that the Secretary is unlikely to prevail on his argument about race predominance.

**B.   The issuance of a stay will substantially injure the other parties in these proceedings — for the second time in this census cycle.**

We further find that the issuance of a stay would substantially injure the other parties in these proceedings. In the injunction the Secretary asks us to stay, we found that the Plaintiffs will suffer irreparable harm if they must vote in the 2024 election based on a likely unlawful redistricting plan. *Milligan* Doc. 272 at 188–90. In his stay motion, the Secretary does not mention, let alone rebut, this finding. The Secretary does not even acknowledge the injury Plaintiffs will suffer from a stay.

"Courts routinely deem restrictions on fundamental voting rights irreparable injury. And discriminatory voting procedures in particular are the kind of serious violation of the Constitution and the Voting Rights Act for which courts have granted immediate relief." *League of Women Voters of N.C. v. North Carolina*, 769

F.3d 224, 247 (4th Cir. 2014) (internal quotation marks omitted) (citing *Obama for Am. v. Husted*, 697 F.3d 423 (6th Cir. 2012); *Alt. Political Parties v. Hooks*, 121 F.3d 876 (3d Cir. 1997); and *Williams v. Salerno*, 792 F.2d 323 (2d Cir. 1986)) (quoting *United States v. City of Cambridge*, 799 F.2d 137, 140 (4th Cir. 1986)).

"Voting is the beating heart of democracy." *Lee*, 915 F.3d at 1315. "And once the election occurs, there can be no do-over and no redress" for voters whose rights were violated. *League of Women Voters of N.C.*, 769 F.3d at 247.

The Plaintiffs already suffered irreparable injury once in this ten-year census cycle, when they voted under the unlawful 2021 Plan in 2022. The Secretary has made no argument that if the Plaintiffs were again required to cast votes in 2024 under an unlawful districting plan, that injury would not be irreparable. Accordingly, we find that the Plaintiffs will suffer irreparable harm absent injunctive relief.

Absent relief now, the Plaintiffs will suffer this irreparable injury until at least 2026, which is more than halfway through this census cycle. The Secretary offers no reason, let alone a compelling one, why Alabamians should have to wait that long to vote under a lawful congressional districting map. *See Milligan* Doc. 276. Having prevailed at every turn so far, the Plaintiffs are entitled to relief. Having lost at every turn so far, the Secretary cannot support a demand that Alabamians again cast their votes under an unlawful map while he tries for the fourth time to prevail.

C.      **The absence of a stay will not irreparably harm the Secretary.**

We also find that the absence of a stay will not harm, let alone irreparably

harm, the Secretary or the State of Alabama. The Secretary asserts that "[a]bsent a

stay, the State will be compelled to cede its sovereign redistricting power to the Court

so that Alabamians can be segregated into different districts based on race." *Id.* at 4.

Every piece of this argument is wrong: we have not compelled the State to "cede"

its authority; we have not ordered the State to "segregate" Alabamians; and we have

not "segregated" Alabamians. *See id.*

As the Supreme Court has long explained, the State's redistricting power is

subject to federal law. *Reynolds v. Sims*, 377 U.S. 533, 554–60 (1964). As the

Supreme Court explained in this case, a longstanding federal statute, the Voting

Rights Act, requires that the State not dilute the votes of Black Alabamians. *Allen*,

143 S. Ct. at 1502–03. And as we have explained, we have a "duty to cure" districts

drawn in violation of federal law through an "orderly process in advance of

elections," when the state legislature either won't or can't do so. *Milligan* Doc. 272

at 7 (quoting *Covington*, 138 S. Ct. at 2553).

Almost two years into this litigation, we are confident that neither our

injunctions nor the Supreme Court's affirmance amount to an undue intrusion on the

State's sovereignty. Nor do we suggest that federal judges know Alabama better than

Alabama's elected leaders. It is, however, the ordinary business of an independent

judiciary to carefully apply controlling precedents and duly follow the law as enacted by Congress to ensure that the Secretary administers congressional elections according to a districting plan that does not dilute the votes of Black Alabamians. We reject the Secretary's suggestion that compliance with federal law is an onerous burden that comes at too great a cost to the State.[1]

Moreover, we emphatically reject the Secretary's claim that our order requires the State to "segregate[ ] [Alabamians] into different districts based on race." *Milligan* Doc. 276 at 4. We have rejected that argument twice already, and the Supreme Court has rejected it as well. *Milligan* Doc. 107 at 204–06; *Milligan* Doc. 272 at 185–88; *Allen*, 143 S. Ct. at 1504–06. Federal law has long acknowledged that state legislatures can in theory face "competing hazards of liability" when balancing the requirements of the Voting Rights Act with the requirements of the

---

[1] The Secretary cites one case in his opening brief, *Abbott v. Perez*, to argue that the harm suffered by a state counsels in favor of a stay. *See* 138 S. Ct. 2305, 2324 (2018). But in that case, the Supreme Court held that Texas' inability to enforce its districting plan would irreparably harm the state **to the extent** the plan was not unlawful. *See id.* ("**Unless that statute is unconstitutional**, th[e district court's injunction] would seriously and irreparably harm the State, and only an interlocutory appeal can protect that State interest." (emphasis added)). The Secretary invokes *Karcher v. Daggett* in his reply brief, *see Milligan* Doc. 288 at 2, but that case similarly held only that the prospect of using a court-ordered map would likely cause the state irreparable harm after Justice Brennan found there was a fair prospect that the Court would conclude that the state's districting plan had not violated the one-person, one-vote rule. *See* 455 U.S. 1303, 1306 (1982) (Brennan, J., in chambers). Here, we have determined that the 2023 Plan likely violates Section Two. The Secretary does not cite a single case in which a court has held that the harm suffered by a state in having to use a court-ordered map counsels in favor of a stay notwithstanding the fact that the state's plan violates (or likely violates) the law.

Constitution, *Abbott*, 138 S. Ct. at 2315 (quoting *Bush,* 517 U.S. at 977 (plurality opinion)), but we and the Supreme Court have explained at great length why those concerns are not borne out on this record in this case, *see Allen*, 143 S. Ct. at 1517.

The Voting Rights Act is a well-established antidiscrimination law. Nothing about our injunction applying it countenances, let alone demands, segregation, racial gerrymandering, or anything else improper.  As we have found and the Supreme Court has affirmed, there are at least eleven maps illustrating how the required remedy lawfully can be provided. The Special Master is hard at work to recommend three lawful remedial maps to us. And we have not yet ordered the Secretary to use any specific map, so any suggestion that we are "segregat[ing]" voters based on race is unfounded and premature.

We observe that the Legislators have not appealed our injunction nor asked us for a stay. This detail is not material to our separate and independent rejection of the Secretary's arguments about Alabama's sovereignty, but we cannot help but notice that the Legislators apparently do not share the Secretary's concern about this "emergency." As a practical matter, the Legislators' silence undermines the Secretary's position. It is the Legislature's task to draw districts; the Secretary simply administers elections. As the Legislators explained when they moved to intervene as Defendants in *Singleton* and *Caster*, the Secretary does not represent their interest because "[h]e has no authority to conduct redistricting, and

23

consequently has no experience in redistricting. His relevant duties are to administer elections." *Singleton* Doc. 25 at 5; *Caster* Doc. 60 at 5. According to the Legislators, "[t]he Legislature, via its Reapportionment Committee, not the Secretary of State, is the real party in interest in this case." *Id.* We do not stake our decision to deny a stay on this observation — we simply explain why we do not assume that the Legislators have any emergent concern that this Court has improperly invaded their domain.

On reply, the Secretary argues that absent a stay, "the State will be precluded from enforcing a statute enacted by representatives of its people," and the "importance of the statutory and constitutional arguments presented by the State" supports a stay. *Milligan* Doc. 288 at 2. These reasons are meritless. We understand that the 2023 Plan is a statute. We concluded that it does not remedy the vote dilution we found and, in any event, likely violates Section Two. Under those circumstances, the Plan's status as a statute is not a reason to stay our injunction. Likewise, we understand the importance of the statutory and constitutional issues in this case. We and the Supreme Court rejected the State's arguments on those issues. Under that circumstance, the importance of the issues is no reason to stay our order.

## D.    A stay is not in Alabama's public interest.

Finally, we find that the public interest weighs decisively against a stay. We observe that the words "public interest" do not appear in the Secretary's stay motion, other than in his recitation of the applicable legal standard. *Milligan* Doc. 276 at 3.

24

The Secretary asserts that when the "government is the party opposing the . . . injunction, its interest and harm merge with the public interest." *Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020) (citing *Nken*, 556 U.S. at 435). We find that a stay would greatly disserve the public interest. Alabama's interest is in the conduct of lawful congressional elections. We have enjoined the use of the 2023 Plan on the same grounds we enjoined the use of the 2021 Plan, and our first injunction was affirmed in all respects. *See Allen*, 143 S. Ct. at 1487, 1498, 1502. The Plaintiffs — like all Alabamians — already have endured one congressional election in this census cycle that the Secretary administered under an unlawful map. We see no reason to allow that to happen again.

* * *

We repeat that we are deeply troubled that the State enacted a map that the Secretary readily admits does not provide the remedy we said federal law requires. And we are disturbed by the evidence that the State delayed remedial proceedings but did not even nurture the ambition to provide that required remedy. Under these circumstances, we cannot understand why it would be a reasonable exercise of our discretion to order a stay pending the Secretary's second appeal. The law requires the creation of an additional district that affords Black Alabamians, like everyone else, a fair and reasonable opportunity to elect candidates of their choice. Without further delay.

25

**DONE** and **ORDERED** this 11th day of September, 2023.

_____
**STANLEY MARCUS**
UNITED STATES CIRCUIT JUDGE

_____
**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE

_____
**TERRY F. MOORER**
UNITED STATES DISTRICT JUDGE