FILED

2024 Jan-31  PM 02:05
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## NOTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |
|---|---|
| **BOBBY SINGLETON, RODGER SMITHERMAN, EDDIE BILLINGSLEY, LEONETTE W. SLAY, DARRYL ANDREWS, and ANDREW WALKER,** | |
| **Plaintiffs,** | |
| **v.** | |
| **WES ALLEN, in his official capacity as Alabama Secretary of State,** | **Case No. 2:21-cv-01291-AMM** |
| **Defendant,** | **Three-Judge Court** |
| **and** | |
| **SENATOR STEVE LIVINGSTON in his official capacity as Senate Chairman of the Permanent Legislative Committee on Reapportionment of the State of Alabama, and REPRESENTATIVE CHRIS PRINGLE, in his official capacity as House Chairman of the Permanent Legislative Committee on Reapportionment of the State of Alabama,** | |
| **Intervenor Defendants.** | |

## SECOND AMENDED COMPLAINT

Plaintiffs, pursuant to Fed. R. Civ. P. 15(a)(2), hereby amend their complaint against Defendant a second time as follows. All Defendants have provided written consent to the filing of this amended complaint.

1

1.     This Court has held that the State of Alabama's 2023 enacted Congressional redistricting plan likely violates Section 2 of the Voting Rights Act and has preliminarily enjoined its enforcement. Based on evidence already in the record, Plaintiffs agree that the 2023 plan violates Section 2 and contend that a final judgment should be entered to that effect.

2.     As an independent ground for enjoining enforcement of the 2023 enacted plan, Plaintiffs allege that it intentionally perpetuates the unconstitutional racial gerrymandering of Jefferson County (that originates in the 1992 consent judgment in *Wesch v. Hunt*) and thus violates the Equal Protection Clause.

3.     Plaintiffs allege as an additional independent ground for enjoining enforcement of the 2023 enacted plan, that, in violation of the Fourteenth and Fifteenth Amendments, the Legislature rejected a plan proposed by Plaintiffs that more closely complies with the redistricting principles set out in Act 2023-563 because the Plaintiffs' plan contained two effective crossover districts that encourage biracial political alliances in Jefferson County and ensures equal opportunity for Black voters in the Black Belt.

4.     Defendants contend that the Voting Rights Act does not require Alabama to provide two districts in which Black voters have an equal opportunity to elect candidates of their choice. But, as this Second Amended Complaint alleges, regardless of whether Defendants ultimately are able to defeat Plaintiffs' Voting

Rights Act claim, two congressional opportunity districts are required by the Constitution of the United States.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4), and 1357, and 52 U.S.C. §§ 10302 and 10310, to enforce the rights of plaintiffs alleged herein secured by Section 2 of the Voting Rights Act, 52 U.S.C.A. § 10301, and by Article I, § 2, and the Fourteenth and Fifteenth Amendments of the Constitution of the United States, and by 42 U.S.C. §§ 1983 and 1988.

6.      This Court has jurisdiction to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

7.      Venue is proper in this District under 28 U.S.C. § 1391(b).

8.      A three-judge District Court has been appointed (Doc. 13) pursuant to 28 U.S.C. § 2284(a), which states "a district court of three judges shall be convened when otherwise required by Act of Congress, or when an action is filed challenging the constitutionality of the apportionment of congressional districts . . . ."

## PARTIES

9.      Plaintiffs Rodger Smitherman and Eddie Billingsley are Black registered voters who reside in Jefferson County and within the boundaries of Congressional District 7 in both the 2021 and 2023 enacted plans.  Plaintiffs Smitherman and Billingsley allege that the 2021 plan split Jefferson, Tuscaloosa,

and Montgomery Counties in a manner that made District 7 racially gerrymandered to separate Black voters from White voters, and that the 2023 plan perpetuates that racial gerrymander by splitting Jefferson County along racial lines. Plaintiffs Smitherman and Billingsley also allege that the Legislature's refusal to enact plans they introduced which keep Jefferson County whole was intended to classify them by race, to undermine their efforts to develop effective multiracial electoral coalitions, and to dilute Black voting strength.

10.     Plaintiff Leonette W. Slay is a White registered voter who resides in Jefferson County and within the boundaries of Congressional District 6 in both the 2021 and 2023 enacted plans. Plaintiff Slay alleges that the 2023 plan splits Jefferson County in a manner that perpetuates previous racial gerrymanders of District 6 by separating Black voters from White voters and that prevents them from forming effective biracial and multiracial electoral coalitions.

11.     Plaintiff Bobby Singleton is a Black registered voter who resides in Hale County and within the boundaries of Congressional District 7 in both the 2021 and 2023 enacted plans. Plaintiff Singleton alleges that the 2023 plan splits Jefferson County in a manner that perpetuates previous racial gerrymanders of District 7 by dividing Jefferson County along racial lines and by separating western Black Belt counties from eastern Black Belt counties. Plaintiff Singleton also alleges that the Legislature's refusal to enact a plan he introduced which keeps Jefferson County

4

whole and includes the maximum possible number of Black Belt counties in a single district was intended to classify him by race, to undermine his efforts to develop effective biracial and multiracial electoral coalitions, and to dilute Black voting strength.

12.    Plaintiffs Darryl Andrews and Andrew Walker are Black registered voters who reside in Montgomery County and within the boundaries of Congressional District 2 in both the 2021 and 2023 enacted plans.    Plaintiffs Andrews and Walker allege that District 2 in the 2023 plan is racially gerrymandered to separate counties in the eastern Black Belt from counties in the western Black Belt and to connect the eastern Black Belt counties with Wiregrass counties so as to dilute their voting strength.    Plaintiffs Andrews and Walker also allege that the Legislature's refusal to enact the plan Plaintiff Singleton introduced, which keeps Jefferson County whole and includes the maximum possible number of Black Belt counties in a single district, was intended to classify them by race, to undermine their efforts to develop effective biracial and multiracial electoral coalitions, and to dilute Black voting strength.

13.    Defendant Wes Allen is sued in his official capacity as the Alabama Secretary of State.    "The Secretary of State is the chief elections official in the state and shall provide uniform guidance for election activities."    Ala. Code § 17-1-3.    As Secretary of State, Defendant Allen certifies, to the judge of probate of each county,

the names of candidates for members of Congress to be placed on the ballot in the primary election, Ala. Code § 17-13-5(b), and in the general election, Ala. Code § 17-9-3(b), and, following the general election, he issues certificates of election to the persons elected to Congress, Ala. Code § 17-12-21.

14.     Defendant Intervenors Senator Steve Livingston and Representative Chris Pringle are co-chairs of the Permanent Legislative Committee on Reapportionment. They are sued in their official capacities. The Alabama Legislature created the Reapportionment Committee to "prepare for and develop a reapportionment plan for the State of Alabama." Ala. Code §§ 29-2-50 to 52. But the Reapportionment Committee did not "develop" either the 2021 or 2023 congressional plans; it merely accepted the plan developed by the members of Alabama's congressional delegation in 2021, and it merely accepted the plan developed by the Alabama Solicitor General in 2023.

## ALLEGATIONS OF FACT

15.     In this Court, the State conceded that the congressional redistricting plan enacted in 2011 (see Figure 1), was racially gerrymandered.[1]  The Legislature's

---

[1] "As the Court pointed out at a pretrial conference, District 7 appears to be racially gerrymandered, with a finger sticking up from the black belt for the sole purpose of grabbing the black population of Jefferson County. Defendant does not believe that the law would permit Alabama to draw that district today if the finger into Jefferson County was for the predominate purpose of drawing African American voters into the district." *Chestnut v. Merrill*, No. 2:18-CV-00907-KOB (N.D. Ala. Oct. 28, 2019), Doc. 101 (Defendant Merrill's pretrial brief) at 11.

duty, with the 2020 census data, was to remedy the racial gerrymander in Alabama's

Congressional redistricting plan. *Abrams v. Johnson*, 521 U.S. 74, 85-86 (1997).

## FIGURE 1



16.    To remedy a racial gerrymander, the Legislature must not allow traditional redistricting principles to be subordinated to racial considerations, unless they are necessary to satisfy a narrowly tailored, compelling state interest.  *E.g.*, *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 272 (2015); *Abrams v. Johnson*, 521 U.S. at 81, 85-86.

17.    Throughout the state's history, the most important traditional districting principle for drawing Alabama's Congressional districts has been preserving whole counties.

18.    For a century and a half, Alabama drew its congressional districts with whole counties.[2]  That ended when Alabama lost a seat in the U.S. House after the 1960 census, going from nine to eight representatives.  In 1961, the Alabama Legislature, led by representatives of the Black Belt, passed what was called the "Jefferson Chop-Up" bill, which divided Jefferson County among four Congressional Districts.  But Governor John Patterson vetoed the Chop-Up, saying it would "divest the citizens of that county of direct representation in Congress, is ... unthinkable, unwise, above all wrong, and therefore unconstitutional."[3]  The regular legislative session adjourned without breaking the filibuster mounted by Jefferson

---

[2] Singleton, Doc. 57-7. Many of the maps are included in the allegations below.

[3] ANNE PERMALOFF AND CARL GRAFTON, POLITICAL POWER IN ALABAMA 134-35 (1995).

County senators that prevented overriding the veto.  Governor Patterson then called a special session and got the Legislature to pass a compromise "9-8" plan, pursuant to which Democratic primary elections were held in all nine old districts, following which the general election for eight seats was conducted in the state at large.  The result was that eight Democratic incumbent Congressmen were elected, with the incumbent finishing ninth (Frank Boykin) losing his seat.[4]

19.     In February 1964, the U.S. Supreme Court ruled that Congressional districts must be equal in population.  *Wesberry v. Sanders*, 376 U.S. 1 (1964).  In March 1964, a three-judge panel held that the nine-district scheme for primary elections violated Article I, § 2 of the U.S. Constitution and the Equal Protection Clause in the Fourteenth Amendment.  *Moore v. Moore*, 229 F. Supp. 435 (S.D. Ala. 1964) (three-judge court).  But the federal court allowed the imminent 1964 elections to go forward under the 9-8 plan, giving the Legislature two years to enact a constitutional plan.  However, Governor George Wallace feared the at-large scheme would elect more Republicans.  In August 1964, he called the Legislature into special session to draw an eight-district plan.[5]  The plan that emerged kept all Alabama counties whole, including Jefferson County, even though at 634,864 in the 1960 census, the county's population greatly exceeded the ideal population of the eight

---

[4] See *id.* at 124-35 (1995). The text of the "9-8 Plan" is found in Ala. Code (Recompiled), tit. 17, §§426(1)-426(5) (1973 pocket part).

[5] *The Montgomery Advertiser*, August 2, 1964, p. 1.

Congressional districts at that time, which was 409,250.  See Figure 2.



20.    Attorney General Richmond Flowers warned that such a large population deviation would not survive federal court scrutiny.[6]  In the 1965 regular session, the Legislature enacted a plan that split Jefferson County among three Congressional Districts.  Governor George Wallace signed the bill, blaming the federal court.[7]  See Figure 3.  Jefferson County representatives asked the federal court to block this new "Chop-Up," but the court declared the plan constitutionally valid, even though it had a maximum population deviation of 13.3%.  *Moore v. Moore*, 246 F. Supp. 578 (S.D. Ala. 1965) (three judge court).  The Court found it "obvious that [Jefferson County] must be divided between at least two Congressional Districts," and "while had this Court found it necessary to declare the 1965 Redistricting Act . . . unconstitutional and devise its own redistricting plan, it possibly would not have found it necessary to divide the political unit of Jefferson County into three congressional Districts, these are not the Constitutional standards controlling the action of this Court."  246 F. Supp. at 580-82.

---

[6] *Alabama Journal*, November 23, 1964, p. 13.
[7] *Alabama Journal*, August 27, 1965, p. 13.

## FIGURE 3



ALABAMA'S
CONGRESSIONAL DISTRICTS

21.    Jefferson County was the only county split in the 1965 plan and in the post 1970 census plan.  The post 1970 census plan split Jefferson County between three Districts.  See Figure 4.  Only Jefferson County and St. Clair County were split in the post 1980 census plan.  See Figure 5.





FIGURE 5

ALABAMA
CONGRESSIONAL DISTRICTS
1980

22.    In 1992, seven counties were split for the purpose of drawing one majority-Black district in a federal court-ordered plan agreed to by the State defendants. *Wesch v. Hunt*, 785 F. Supp. 1491 (S.D. Ala. 1992) (three-judge court), *aff'd sub nom. Camp v. Wesch*, 504 U.S. 902 (1992), *Figures v. Hunt*, 507 U.S. 901 (1993).

23.    Until the 1992 consent decree, Alabama had no formal or informal maximum deviation limits on its Congressional redistricting plans.

24.    Zero population deviation in Alabama Congressional redistricting plans began in 1992, when the *Wesch* Court approved the plan. Because the 1992 plan was a federal court-ordered Congressional plan, the *Wesch* Court decided it should achieve "perfect equality." 785 F. Supp. at 1497-98 (citations omitted).[8] But had the Legislature acted in timely fashion, making it unnecessary for the District Court to order a plan, there would have been more leeway with population deviations, so long as the Legislature could "justify each variance no matter how small." 785 F. Supp. at 1498 n.5 (quoting *Karcher v. Daggett*, 462 U.S. 725, 730 (1983)).

25.    The zero-deviation court-ordered plan facilitated splitting county boundaries and census tracts to produce a racial gerrymander that was packed at 67.53% Black. The federal court in 1992 accepted the stipulation of all parties that

---

[8] But see *Abrams v. Johnson*, 521 U.S. at 99 (affirming a federal court-ordered Congressional plan for Georgia that had a maximum deviation of 0.35%).

the Voting Rights Act justified the creation of that one majority-Black Congressional District, without making a judicial finding that the agreed upon plan actually was justified by Section 2 of the Voting Rights Act.[9]  See Figure 6.

1582  785 FEDERAL SUPPLEMENT  FIGURE 6

APPENDIX B  TO FINAL JUDGMENT



---

[9] "This court will honor the stipulation, and accordingly, will not make an independent determination of whether § 2 of the Voting Rights Act requires the creation of a majority African–American congressional district in Alabama at this time."  *Wesch v. Hunt*, 785 F. Supp. at 1499.

26.    In 2019, the State conceded that the 1992 court-approved plan would violate the prohibition of racial gerrymandering first announced by the Supreme Court in *Shaw v. Reno*, 509 U.S. 630 (1993), a year after *Wesch* was decided.[10]

27.    Alabama continued the 1992 racial gerrymander in the Congressional redistricting plans enacted after the 2000 and 2010 censuses.  It told this Court it did so to comply with Section 5 of the Voting Rights Act.[11]  As a result, District 7 in the Act 2011-518 plan was still packed at 63.57% Black.

28.    In 2012, the U.S. Supreme Court reaffirmed that preserving county boundaries can justify minor population deviations among Districts.[12]  Today, Alabama's Congressional districts can be drawn without splitting any counties (because Jefferson County's population has fallen below the ideal population of a Congressional district), and the plans enacted by the Legislature in 2021 and 2023, which did not keep all counties whole, violated the Fourteenth Amendment's prohibition of racial gerrymandering by unjustifiably dividing Jefferson County along racial lines.

29.    The Congressional redistricting plan enacted as Act 2011-518 split

---

[10] See footnote 1 above.

[11] "[O]nce the [majority-black] district existed, Alabama had to continue to draw the district in order to comply with Section 5's anti-retrogression requirement." *Chestnut v. Merrill*, CA No. 2:18-CV-00907-KOB (N.D. Ala. Oct. 28, 2019) Doc. 101 (State Pre-Trial Brief) at 11-12.

[12] *Tennant v. Jefferson County Comm'n, West Virginia*, 567 U.S. 758 (2012).

seven counties: Clarke, Montgomery, Cherokee, Blount, Tuscaloosa, Jackson, and Jefferson.  Montgomery County was split among three Congressional Districts.  See Figure 1.

30.    The 1991 guidelines adopted by the Legislature's Reapportionment Committee, before the 1992 racial gerrymander was created, emphasized preserving county boundaries.  "Counties should be used as district building blocks where possible, and to the extent consistent with other aspects of these criteria."  785 F. Supp. at 1494 (quoting the guidelines).  "Preservation of political subdivisions promotes efficient representation, empowers a constituency's ability to organize productively, and serves as a deterrent to partisan gerrymandering." *Wesch v. Hunt*, 785 F. Supp. at 1498 (citations omitted).

31.    Since the 2011 Congressional plan was enacted, the Supreme Court has reaffirmed that the U.S. Constitution "does not require that congressional districts be drawn with precise mathematical equality," and that preserving county boundaries can "justify population differences between districts that could have been avoided by 'a good-faith effort to achieve absolute equality.'" *Tennant v. Jefferson County Comm'n, West Virginia*, 567 U.S. 758, 759 (2012) (quoting *Karcher v. Daggett*, 462 U.S. 725, 730 (1983)).  "[I]f a State wishes to maintain whole counties, it will inevitably have population variations between districts reflecting the fact that its districts are composed of unevenly populated counties." *Tennant*, 567 U.S. at

764.

32.    The *Tennant* Court approved a 0.79% maximum deviation for West Virginia's Congressional Districts, and it did not foreclose higher deviations for the sake of avoiding county splits.  To the contrary, the Supreme Court has repeatedly eschewed suggestions that it set a numerical limit for the "as nearly as practicable" deviation standard it first established in *Wesberry v. Sanders*, 376 U.S. 1, 7-8 (1964). "The whole thrust of the 'as nearly as practicable' approach is inconsistent with adoption of fixed numerical standards which excuse population variances without regard to the circumstances of each particular case."  *Karcher*, 462 U.S. at 731 (quoting *Kirkpatrick v. Preisler*, 394 U.S. 526, 530 (1969)).

33.    The 1964 plan maintained the tradition going back to Alabama's first Congressional plan in 1822 of splitting no counties at all.  Jefferson County constituted District 6 by itself, even though, as the court found in *Moore v. Moore*, *supra*, its population greatly exceeded the ideal District population.  See Figure 2. Alabama's 1965 Congressional plan split Jefferson County between three Districts, but no other county was split.  As noted above, the federal court found the plan in compliance with *Wesberry v. Sanders*, even though it had a maximum deviation of 13.3%.  See Figure 3.

34.    Alabama lost a Congressional seat after the 1970 census, but the seven-District plan enacted in January 1972 also split only Jefferson County.  Jefferson

County precincts 1, 2, and 4 were placed in District 7, while precinct 12 was placed in District 4.   District 6 was contained entirely within Jefferson County.   The maximum deviation was 0.8%.  See Figure 4.

35.    The Congressional redistricting plan enacted in August 1981 split Jefferson County and St. Clair County each between two Districts.   No other counties were split.   The ideal size of a District was 556,270, still smaller than Jefferson County's population, which was 671,371 in the 1980 census.   The maximum deviation among the seven Districts was 2.59%. See Figure 5.

36.    By the 1990 census Jefferson County's population had declined to 652,109, but it was still larger than the ideal size of seven Districts, which was 577,227. *Wesch*, 785 F. Supp. at 1493.  As noted, to produce the racial gerrymander with a maximum deviation of plus or minus one person, the 1992 plan split seven counties.  See Figure 7.



Figure 7

37.     The 2001 plan maintained the racial gerrymander with zero population deviation.  In the 2000 census, Jefferson County's population rose to 662,285, which was still larger than the size of an ideal Congressional District (635,299).  In addition to Jefferson County, Morgan, St. Clair, Pickens, Coosa, Tuscaloosa, Montgomery, and Clarke Counties were split.  See Figure 8.



# 2002 Alabama US Congressional Districts
## Figure 8



38.    In the 2010 census, Jefferson County's population (658,158) fell below the ideal size of Congressional districts (682,819), making splitting an Alabama county no longer mathematically necessary.  Nevertheless, in 2011, the Legislature continued to split Jefferson County to retain the 1992 racial gerrymander with zero population deviation.  See Figure 1.

39.    With 2020 census data, it is practicable to end the 1992 racial gerrymander and draw a seven-district Congressional plan without splitting a single county and with only slight population deviations.

40.    The Plaintiffs' initially proposed Whole County Plan uses the official 2020 census data released on August 12, 2021.  With a maximum deviation of only 2.47%, it contains a Black Belt District 7 that is only 0.11% above ideal population and has 49.9% Black registered voters, and a Jefferson-Bibb-Perry-Hale District 6 that is only 0.36% above ideal population and has 42.3% Black registered voters.  Black voters have an opportunity to elect the candidate of their choice in both districts.  Joe Biden received 54.40% of the 2020 vote in the proposed District 7 counties and 56.02% in the proposed District 6 counties.  Sen. Doug Jones did even better, at 56.32% and 58.00%.  See Figure 9.  The 2020 election returns were not a one-off fluke; they are the most recent manifestation of dependable biracial coalition voting in the proposed Districts 6 and 7.  Federal and State statewide elections going back to 2012 show Black voters' choices, including Barack Obama, would have been

elected in these two crossover Districts.

41.    Below are the statistics for the Plaintiffs' Whole County Plan, and the map is in Figure 9.

Whole County US Congress Plan Deviations

| District | Population | Deviation | %Deviation | 18+ Pop | %18+ Wht | %18+ Blk | %18+ Hisp. | %WH RV | %BL RV | %Hisp RV | %Biden | %Trump |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 720903 | 3149 | 0.44% | 559860 | 67.90% | 23.71% | 3.25% | 71.91% | 24.62% | 0.98% | 34.69% | 65.31% |
| 2 | 709514 | -8240 | -1.15% | 553805 | 66.01% | 25.38% | 3.96% | 70.05% | 26.15% | 1.26% | 33.12% | 66.88% |
| 3 | 715486 | -2268 | -0.32% | 556784 | 75.21% | 16.64% | 4.13% | 79.99% | 16.84% | 1.11% | 27.29% | 72.71% |
| 4 | 712333 | -5421 | -0.76% | 550055 | 84.22% | 5.70% | 6.15% | 90.92% | 5.90% | 1.73% | 16.05% | 83.95% |
| 5 | 727206 | 9452 | 1.32% | 569546 | 72.27% | 17.14% | 4.96% | 77.32% | 17.65% | 1.72% | 36.77% | 63.23% |
| 6 | 720310 | 2556 | 0.36% | 562843 | 51.37% | 40.55% | 4.13% | 54.17% | 42.30% | 0.95% | 56.02% | 43.98% |
| 7 | 718527 | 773 | 0.11% | 564273 | 47.24% | 45.82% | 3.26% | 47.52% | 49.91% | 0.58% | 54.40% | 45.60% |

| | Population | Deviation | %Deviation | 18+ Pop | %18+ Wht | %18+ Blk | %18+ Hisp. | %WH RV | %BL RV | %Hisp RV | %Biden | %Trump |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Totals | 5024279 | | | 3917166 | 66.25% | 25.06% | 4.26% | 70.29% | 26.16% | 1.19% | 37.09% | 62.91% |



Whole County Plan    Figure 9

| District | Pop 2020 | % DEV | % WH 18 + | % BL 18 + | % LT 18 + | % WH RV | % BL RV | % LT RV | % Biden | % Trump |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 720903 | 0.44% | 67.90% | 23.71% | 3.25% | 71.91% | 24.82% | 0.98% | 34.69% | 65.31% |
| 2 | 709514 | -1.16% | 66.01% | 25.38% | 3.96% | 70.05% | 26.15% | 1.26% | 33.12% | 66.88% |
| 3 | 715486 | -0.32% | 75.21% | 16.64% | 4.13% | 79.95% | 16.84% | 1.11% | 27.29% | 72.71% |
| 4 | 712333 | -0.79% | 84.22% | 5.70% | 6.15% | 90.92% | 5.90% | 1.73% | 16.05% | 83.95% |
| 5 | 727206 | 1.30% | 72.27% | 17.14% | 4.98% | 77.32% | 17.85% | 1.72% | 36.77% | 63.23% |
| 6 | 728310 | 0.36% | 51.27% | 40.55% | 4.13% | 54.17% | 42.20% | 0.95% | 56.02% | 43.98% |
| 7 | 718527 | 0.11% | 47.24% | 45.82% | 3.26% | 47.52% | 49.91% | 0.58% | 54.40% | 45.60% |
| Totals | 5024279 | | 66.25% | 25.06% | 4.26% | 70.29% | 26.16% | 1.19% | 37.09% | 62.91% |

42.    The key to any whole-county Congressional redistricting plan is Jefferson County.  The only other possible whole-county options that keep Jefferson County whole are to join Jefferson County either with Blount County or with Walker County.  In both options, even though in the district including Jefferson County the Black registered voter percentage would drop to about 38.9%, it would still be an opportunity district, in which Black voters could elect a candidate of their choice. However, at 4.67% and 5.49%, the overall maximum deviations would be twice as high as the Jefferson-Bibb-Perry-Hale District 6.  The only other counties contiguous to Jefferson – Tuscaloosa, St. Clair, and Shelby – are too populous to be joined in a whole-county Congressional District with Jefferson.

43.    Maximum population deviation in the range yielded by Plaintiffs' Whole County plan satisfies the constitutional standard for Congressional districts established by *Wesberry v. Sanders*, as most recently refined in *Tennant v. Jefferson County Comm'n, Karcher v. Daggett* and *Abrams v. Johnson*.  It can be justified as a remedy for the racial gerrymander preserved in the 2011, 2021, and 2023 plans and by Alabama's traditional policy of preserving whole counties.

44.    In the first half of September 2021, the Legislature's Reapportionment Committee held over two dozen hearings across Alabama. At the first of those hearings, and at several hearings thereafter, the League of Women Voters of Alabama presented the Whole County Plan as an example of one that responds to

the many speakers' pleas to keep their counties whole and that remedies the current racial gerrymander.  Plaintiffs do not know of any other Congressional redistricting plan that was presented to or considered by the Reapportionment Committee during these hearings.

45.    In a special session of the Legislature that began October 28, 2021, Plaintiffs' Whole County Congressional plan was introduced as SB10, sponsored by Senators Singleton, Smitherman, Beasley, Figures, and Sanders-Fortier. Modifications of the SB10 plan were offered as substitutes, because some legislators thought its 2.47% maximum deviation was too high.  One substitute made minor splits of three counties to achieve a 0.69% maximum deviation, which is lower than the deviation approved in *Tennant v. Jefferson County*.  The other substitute made minor splits in six counties to achieve a 0% maximum deviation.  These substitute plans, which moved fewer than 10,000 voters out of the counties split to lower the deviation, demonstrated that the enacted 2021 plan, which removed hundreds of thousands from Jefferson, Tuscaloosa, and Montgomery Counties, could not be explained by pursuit of a zero-deviation policy.

46.    Instead of adopting Plaintiffs' Whole County Plan, the Legislature preserved the racial gerrymander of Congressional District 7, which necessarily maintained the racial gerrymanders in Districts 2 and 6.  Ala. Act No. 2021-555. The Act 2021-555 plan was drafted by incumbent members of Alabama's

Congressional delegation to maintain their current districts with only those changes necessary to equalize populations.  Below are the statistics, and the map is shown in Figure 10.



User:
Plan Name: **Draft Congress Plan**
Plan Type:

## Population Summary

Sunday, October 24, 2021                                                                                          6:25 PM

| District | Population | Deviation | % Devn. | [18+_Pop] | [% 18+_Pop] | [18+_Wht] | [% 18+_Wht] | [18+_Blk] | [% 18+_Blk] |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 717,754 | 0 | 0.00% | 557,535 | 77.68% | 371,902 | 66.7% | 138,128 | 24.77% |
| 2 | 717,755 | 1 | 0.00% | 557,677 | 77.7% | 350,279 | 62.81% | 162,714 | 29.18% |
| 3 | 717,754 | 0 | 0.00% | 564,281 | 78.62% | 386,048 | 68.41% | 136,382 | 24.17% |
| 4 | 717,754 | 0 | 0.00% | 556,133 | 77.48% | 463,433 | 83.33% | 39,834 | 7.16% |
| 5 | 717,754 | 0 | 0.00% | 561,187 | 78.19% | 403,155 | 71.84% | 95,757 | 17.06% |
| 6 | 717,754 | 0 | 0.00% | 552,286 | 76.95% | 397,498 | 71.97% | 100,878 | 18.27% |
| 7 | 717,754 | 0 | 0.00% | 568,067 | 79.15% | 222,731 | 39.21% | 308,030 | 54.22% |

Total Population:                     5,024,279
Ideal District Population:            717,754

**Summary Statistics:**

| | |
|---|---|
| Population Range: | 717,754 to 717,755 |
| Ratio Range: | 0.00 |
| Absolute Range: | 0 to 1 |
| Absolute Overall Range: | 1 |
| Relative Range: | 0.00% to 0.00% |
| Relative Overall Range: | 0.00% |
| Absolute Mean Deviation: | 0.14 |
| Relative Mean Deviation: | 0.00% |
| Standard Deviation: | 0.35 |

Maptitude                                                                                      Page 1 of 1



**Committee Draft Congressional Plan**

Legislative Committee on Reapportionment

47.    District 7 in the Act 2021-555 plan retained all or part of the same fourteen counties contained in District 7 in the 2011 plan, including the majority-Black rural counties, Sumter, Greene, Hale, Perry, Marengo, Dallas, Wilcox, and Lowndes.  But 232,758 or 75.6% of the 308,030 Black voting-age population in District 7 came from expanded parts of the same three urban counties that were split in the 2011 plan, Jefferson, Tuscaloosa, and Montgomery.

48.    Of the 294,027 people in the part of Jefferson County drawn into District 7 of the 2021 plan, 61.6% were Black.  Of the 380,694 people in the rest of Jefferson County, all of which were assigned to District 6, only 25.5% were Black.

49.    Of the 184,266 people in the part of Tuscaloosa County placed in District 7, 34.2% were Black.  Only 8.1% of the 42,767 people in the rest of Tuscaloosa County were Black, and they were placed in District 4.

50.    79.6% of the 65,519 people in the part of Montgomery County placed in District 7 were Black, while 47.4% of the 166,435 people in the rest of Montgomery County were Black.

51.    Plaintiffs' Whole County Plan eliminated these racial gerrymanders and provided Black voters an effective opportunity to elect candidates of their choice in two Congressional districts.  By simply removing the county splits, the Whole County Plan preserved the cores of Districts 6 and 7 in the 2011 plan, creating one district dominated by populous Jefferson County joined with Bibb County and the

Black Belt counties of Hale and Perry, and a second district that includes all the other Black Belt counties except Barbour and Russell. There was no objective, non-racially discriminatory justification for preserving the racially gerrymandered District 7 first created in 1992.

52.     Following remand from the Supreme Court, *Allen v. Milligan*, 599 U.S. 1 (2023), the Reapportionment Committee held its first hearing to consider a remedial plan on June 27, 2023. At that hearing the Singleton Plaintiffs announced their preference for a variation of their Whole County Plan taken from an amicus brief filed in the Supreme Court by the Campaign Legal Center. The CLC Plan kept Jefferson County whole and, instead of joining it with Bibb, Hale, and Perry Counties, it added eight adjoining precincts in Shelby County to form District 6, and it included all the Black Belt counties in District 7 except for Barbour and Russell.

**FIGURE 11**





Election returns demonstrated that both District 6 and District 7 in the CLC Plan performed as effective opportunity districts, even though neither district contains a Black voting-age majority.

    53.   In the Special Session that began July 17, 2023, Senators Singleton and

Smitherman introduced both the CLC Plan, labeled the Singleton Plan, and the zero-deviation Whole County Plan, labeled the Smitherman Plan. They expressed preference for the Singleton Plan because it did not split Jefferson County, because it joined as many Black Belt counties in one district as is mathematically possible, and because it preserved Districts 1, 4, and 5 exactly as they were drawn in the 2021 enacted plan. The leadership of the Reapportionment Committee expressed an objection that neither plan contained a majority-BVAP district. Later, Representative Pringle and Senator Livingston joined the Defendant Secretary's objection that the Singleton and Smitherman plans "did not maintain cores, did pair incumbents, and were less compact than the 2023 Plan…." Doc. 190 at 24.

54.    None of the proposed remedial plans drawn by members of the Reapportionment Committee was enacted.  Instead, on the last day of the special session, a plan drawn at least in part by the Alabama Solicitor General was rushed through passage without any debate in either the Reapportionment Committee, the House, or the Senate. Act 2023-563.

55.    The 2023 plan largely preserves the race-based split of Jefferson County, as shown below.



District 7 contains about 54% of Jefferson County's population, but more than 71% of its Black population, resulting in a thirty-point gap between the proportion of the population that is Black inside and outside the district (57% inside, compared to 27% outside). This is no accident: District 7 sharply separates majority-Black

Birmingham from the relatively White "Over the Mountain" suburbs like Mountain Brook and Vestavia Hills. District 7 remains a racial gerrymander.

56.    On its face, Act 2023-563 says the 2023 plan gives effect to the "non-negotiable" principles of contiguity, compactness, splitting only six counties to achieve "minimal population deviation," keeping together communities of interest, and preventing any incumbent conflict. Of secondary importance are the principles of preserving the cores of existing districts, minimizing the number of counties in each district, and minimizing splits of neighborhoods and other political subdivisions.

57.    Conspicuously absent from the statutory language is the principle of creating two opportunity districts, which this Court's preliminary injunction required. And Defendants have conceded that the enacted 2023 Plan contains only one opportunity district. It is apparent that the drafter of Act 2023-563 intended to advance the argument that Section 2 of the Voting Rights Act cannot constitutionally require Alabama to draw two opportunity Congressional districts.

58.    The intent of the Legislature to deny Black voters an opportunity to form effective electoral alliances with White voters and to elect candidates of their choice in two Congressional districts is made evident by the Legislature's refusal to adopt the Singleton Plan, which much more closely complies with the Act 2023-563 redistricting principles than does the 2023 enacted plan.

59.     The Singleton plan is only marginally less compact than the 2023 enacted plan, and it splits the minimum six counties solely to achieve zero population deviation. Most importantly, the Singleton plan avoids any conflict with the Equal Protection Clause, because it splits no county along racial lines, while the 2023 enacted plan divides Black and White voters in Jefferson County, a racial gerrymander that unjustifiably maintains a majority-BVAP in District 7.

60.     The Singleton plan does a better job than does the 2023 enacted plan of keeping together the communities of interest defined by Act 2023-563. The Singleton Plan keeps sixteen of the Black Belt counties together in one district, which is the maximum possible number. One of the two counties not included in the Black Belt district, Barbour County, is also listed in Act 2023-563 as a Wiregrass County; the Singleton Plan puts it in the Wiregrass district. The other, Russell County, is associated more with Lee County and Columbus, Georgia, than it is with the rest of the Black Belt. The 2023 enacted plan splits the Black Belt down the middle, placing the western core Black Belt counties in District 7 and the eastern Black Belt counties in District 2.

61.     Act 2023-563 defines the Gulf Coast community of interest as composed of Mobile and Baldwin Counties.  The Singleton plan keeps Mobile and Baldwin together in District 1 exactly the way the Legislature drew it in the 2021 plan. The 2023 enacted plan keeps Mobile and Baldwin Counties together but

changes the District 1 boundaries that defined the Gulf Coast community of interest in the 2021 plan.

62.    Act 2023-563 defines the Wiregrass as Barbour, Coffee, Covington, Crenshaw, Dale, Geneva, Henry, Houston, and Pike Counties. The Singleton Plan keeps all of these counties together in a Wiregrass-focused district, except for Crenshaw and Pike Counties, which Act 2023-563 also places in the Black Belt community of interest, and the Singleton Plan places them in the Black Belt district.

63. In sum, the Singleton Plan keeps all residents of every county, except for Russell County, together with their Act 2023-563 communities of interest. The 2023 enacted plan excludes one county, Covington, from its Wiregrass community of interest.

64.    The drafter of Act 2023-563 did not include Jefferson County among the communities of interest the 2023 enacted plan is intended to protect. That is because Jefferson County, which along with the Black Belt has been one of the two most important communities of interest in Alabama history, is the one county in the state with a proven record of effective and persistent biracial politics.

65.    The drafter of the 2023 enacted plan knew that White voters in Jefferson County are more likely to share the equal rights and progressive political agenda of Black voters than do White voters in the Wiregrass. The 2023 plan thus places Black voters in the eastern Black Belt in the same district with the Wiregrass

counties, ensuring they would have no opportunity to elect a candidate of their choice.

66.     By splitting Jefferson County and the Black Belt the 2023 enacted plan perpetuates Alabama's policy since Reconstruction of creating and maintaining election systems that are designed to encourage White electoral solidarity and that deter Black and White voters, regardless of their differences, from finding common ground and forming effective coalitions. For example:

(a)     The Democratic Redeemers "drew the color line" in the 1874 election and 1875 Constitution and threatened Whites who supported the "Black Republicans."

(b)     In 1893, as a reaction to growing support for the Populist movement, the Legislature passed a complex election statute (the Sayre Law) which was designed to disfranchise both Blacks and illiterate, lower class Whites, those groups being perceived as likely supporters of the Populist platform.

(c)     The systematic disenfranchisement of Blacks, accomplished by the 1901 Alabama Constitution was a main plank in the platform of Southern Progressivism culminating in defeat of efforts in the 1890's to form political coalitions between Hill Country White Populists and Black voters.  Such a coalition threatened to undermine the color line of White supremacy that had

been drawn in 1874 with the ascendancy of the Democrats.

(d)    Even though the 1901 Constitution eliminated almost all Black voters, the all-White primary was enacted in 1903 further to ensure that all White voters would be unified in the general election.

(e)    Changes to election rules, like the 1915 Second Choice voting method, were repealed when White factions challenged the Democratic Party leadership by electing Bibb Graves and Hugo Black.

(f)    When the White Primary was declared unconstitutional in 1944, Alabama enacted the Boswell Amendment to prevent Black citizens from voting in the Democratic primary.

(g)    "White Supremacy" remained at the top of the Democratic logo that appeared on general election ballots until January 1965, with Governor Wallace protesting that its removal would drive White Voters into the Republican Party.

(h)    The Republican Party's "Southern Strategy" gradually persuaded more and more White Voters to leave the Democratic Party and its civil rights agenda, until in 2010 Republican leaders in the Legislature succeeded in gaining veto-proof majorities in the House and Senate by challenging all White Democrats elected from majority-White districts.

# COUNT I
## Racial Gerrymandering:
### Equal Protection Clause of the Fourteenth Amendment
### and Article I, § 2 of the U.S. Constitution

67.     Alabama's Congressional redistricting plan, enacted in 2023, Ala. Act No. 2023-563, is racially gerrymandered, in violation of the Equal Protection Clause of the Fourteenth Amendment and Article I, § 2 of the Constitution of the United States.

68.     District 7 has been designed to perpetuate the racial gerrymander first created in 1992, by preserving the core of District 7 in the 2011 plan, retaining zero population deviation, and expanding the racially divisive split in Jefferson County, while maintaining one majority-Black voting-age district in an alleged attempt to comply with Section 2 of the Voting Rights Act.

69.     The Supreme Court of the United States has held that claims of partisan gerrymandering are nonjusticiable in federal courts, even though "such gerrymandering is 'incompatible with democratic principles.'" *Rucho v. Common Cause*, 139 S. Ct. 2484, 2506 (2019) (quoting *Arizona State Legislature v. Arizona Independent Redistricting Comm'n*, 135 S. Ct. 2652, 2658 (2015)).  But the Court reaffirmed that federal courts may remedy two other forms of anti-democratic gerrymandering.  "In two areas—one-person, one-vote and racial gerrymandering— our cases have held that there is a role for the courts with respect to at least some issues that could arise from a State's drawing of congressional Districts."  *Rucho*,

41

139 S. Ct. at 2496 (citing *Wesberry v. Sanders*, 376 U.S. 1, (1964), and *Shaw v. Reno*, 509 U.S. 630 (1993) (*Shaw I*)).

70.     Racial gerrymandering is unconstitutional when traditional redistricting principles have been subordinated to racial considerations in ways that do not satisfy a narrowly tailored, compelling state interest.  *E.g.*, *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 272 (2015).  "If District lines were drawn for the purpose of separating racial groups, then they are subject to strict scrutiny because 'race-based decisionmaking is inherently suspect.'" *Rucho v. Common Cause*, 139 S. Ct. at 2502 (citing *Miller v. Johnson*, 515 U.S. 900, 915 (1995); *Bush v. Vera*, 517 U.S. 952, 959 (1996) (principal opinion)).

71.     As the State of Alabama has conceded, whether or not compliance with the Voting Rights Act may have justified packing Black voters in a single Congressional District in the 1992 consent decree, the Voting Rights Act cannot justify further perpetuating the packed majority-Black District 7 and the minimization of Black voters' influence in Districts 2 and 6.

72.     The Legislature simply continued to ignore the Supreme Court's decision in *Cooper v. Harris,* 581 U.S. 285 (2017), which held that a Congressional redistricting plan does not violate the Voting Rights Act just because it does not have a District with a Black voting-age population majority (50% plus 1 BVAP). North Carolina contended that to avoid a VRA violation it had to increase to over 50%

BVAP Districts that were 48% and 43 % BVAP. The Supreme Court rejected this argument and held that the 50% BVAP Districts were unconstitutional racial gerrymanders, because there was enough White crossover voting in the 48% and 43% BVAP Districts to provide Black voters an equal opportunity to elect the candidates of their choice. 581 U.S. at 294-95.

73.    The *Cooper v. Harris* Court reminded us that to establish a VRA violation all three preconditions in *Thornburg v. Gingles*, 478 U.S. 30 (1986), must be satisfied. First, a "minority group" must be "sufficiently large and geographically compact to constitute a majority" in some reasonably configured legislative District. *Id*. at 50. Second, the minority group must be "politically cohesive." *Id*. at 51. And third, a District's White majority must "vote [ ] sufficiently as a bloc" to usually "defeat the minority's preferred candidate." 581 U.S. at 301-02.

74.    Districts 6 and 7 in the Singleton and Smitherman plans have more than enough White crossover voting to prevent meeting the third *Gingles* precondition. Black voters' choice of candidates in Districts 6 and 7 have prevailed by substantial margins over the past decade.

## COUNT II
### Intentional Racial Discrimination and Racial Classification:
### Equal Protection Clause of the Fourteenth Amendment and
### the Fifteenth Amendment of the U.S. Constitution

75.    The drafters of Act No. 2023-563 violated the Fourteenth and Fifteenth Amendments by intentionally drawing Congressional District lines in order to

destroy otherwise effective crossover Districts. *Bartlett v. Strickland*, 556 U.S. 1, 24 (2009).

76.     The Legislature's own guidelines, the districting principles set out in Act No. 2023-563, and Alabama's traditional districting principle of drawing Congressional districts with whole counties were violated when, instead of adopting either the Singleton plan or the Smitherman plan, the Legislature perpetuated the racially gerrymandered majority-Black District 7.

77.     The Singleton and Smitherman plans were rejected because, as required by Section 2 of the Voting Rights Act and this Court's Preliminary Injunction, they would have provided two districts in which Black voters would have an equal opportunity to elect candidates of their choice.

78.     Thus Act No. 2023-563 and the 2023 enacted plan are intended to discriminate against Black Alabamians by minimizing or diluting their voting strength, in violation of the Fourteenth and Fifteenth Amendments.

79.     Act No. 2023-563 and the 2023 enacted plan also violate the Equal Protection Clause by refusing to adopt the effective crossover districts contained in the Singleton and Smitherman plans. By rejecting available plans that met the non-racial districting principles contained in the statute better than the enacted plan does, the Legislature intended unconstitutionally to classify Jefferson County's citizens by race by deterring the alliance of Black and White voters in Jefferson County.

## COUNT III
## Violation of Section 2 of the Voting Rights Act

80.     Alabama's Congressional redistricting plan, enacted in 2023, Ala. Act No. 2023-563, violates Section 2 of the Voting Rights Act, 52 U.S.C. § 10301. The Supreme Court and this Court have held that two reasonably configured majority-BVAP congressional districts can be drawn in Alabama and that the other conditions required to establish a Section 2 violation, as prescribed by *Thornburg v. Gingles*, 478 U.S. 30 (1986), are satisfied.

81.     Any remedy for the judicially found violation of Section 2 of the Voting Rights Act must contain two districts which comply with the Voting Rights Act and the Constitution by providing Black voters an equal opportunity to elect candidates of their choice.

82.     Act No. 2023-563 violates the Constitution and Section 2 of the Voting Rights Act by requiring that no incumbents be placed in the same district, which practically prohibits the creation of two opportunity districts.

83.     The 2023 enacted plan violates the Constitution and Section 2 of the Voting Rights Act by creating only one opportunity district, and that one opportunity district is unconstitutionally racially gerrymandered.

WHEREFORE, Plaintiffs pray:

That this three-judge Court will expedite a trial on the merits and render a decision in time for constitutional, non-discriminatory Congressional Districts to be

put in place before the candidate qualification deadlines for the 2026 primary and general elections.

That the Court require Defendant to respond promptly to the claims set out herein, authorize limited required discovery to commence immediately, schedule a trial on the merits, and provide relief as follows:

A.    Enter a declaratory judgment that Alabama's Congressional redistricting plan, enacted in 2023, Act No. 2023-563, is racially gerrymandered, in violation of Article I, § 2, and the Equal Protection Clause of the Fourteenth Amendment of the Constitution of the United States, is intentionally racially discriminatory in violation of the Fourteenth and Fifteenth Amendments, violates the Equal Protection Clause by purposefully deterring alliances of Black and White voters, and violates Section 2 of the Voting Rights Act.

B.    Issue a permanent injunction prohibiting implementation of Act No. 2023-563 in future elections for members of Congress.

C.    Because the Legislature has refused to remedy the constitutional Voting Rights Act violations in the 2021 Congressional redistricting plan, require implementation of a Court-ordered redistricting plan that complies with the Constitution and laws of the United States.

E.    Award plaintiffs their reasonable attorneys' fees and expenses.

F.    Grant such other and further relief as the Court may deem just and

equitable.

Respectfully submitted this 31st day of January, 2024.

*/s/ James Uriah Blacksher*
James Uriah Blacksher
825 Linwood Road
Birmingham, AL 35222
Tel: (205) 612-3752
Fax: (866) 845-4395
Email: jublacksher@gmail.com

Joe R. Whatley, Jr.
WHATLEY KALLAS, LLP
2001 Park Place North
1000 Park Place Tower
Birmingham, AL 35203
Tel: (205) 488-1200
Fax: (800) 922-4851
Email: jwhatley@whatleykallas.com

*/s/ Henry C. Quillen*
Henry C. Quillen
(admitted *pro hac vice*)
WHATLEY KALLAS, LLP
159 Middle Street, Suite 2C
Portsmouth, NH  03801
Tel: (603) 294-1591
Fax: (800) 922-4851
Email: hquillen@whatleykallas.com

Myron Cordell Penn
PENN & SEABORN, LLC
1971 Berry Chase Place
Montgomery, AL 36117
Tel: (334) 219-9771
Email: myronpenn28@hotmail.com

Diandra "Fu" Debrosse Zimmermann
Eli Hare

DICELLO LEVITT LLP
505 20th Street North, Suite 1500
Birmingham, AL 35203
Tel.: (205) 855.5700
Email: fu@dicellolevitt.com
        ehare@dicellolevitt.com

U.W. Clemon
U.W. Clemon, LLC
Renasant Bank Building
2001 Park Place North, Tenth Floor
Birmingham, AL 35203
Tel.: (205) 506-4524
Fax: (205) 538-5500
Email: uwclemon1@gmail.com

Edward Still
2501 Cobblestone Way
Birmingham, AL 35226
Tel: (205) 335-9652
Fax: (205) 320-2882
Email: edwardstill@gmail.com

*Counsel for Plaintiffs*