FILED

2024 Jul-11  AM 09:36
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **BOBBY SINGLETON**, *et al.*, <br> **Plaintiffs,** <br><br> **v.** <br><br> **WES ALLEN, in his official capacity as Alabama Secretary of State,** *et al.*, <br> **Defendants.** | **Case No. 2:21-cv-01291-AMM** <br><br> **THREE-JUDGE COURT** |
| **EVAN MILLIGAN**, *et al.*, <br> **Plaintiffs,** <br><br> **v.** <br><br> **WES ALLEN, in his official capacity as Alabama Secretary of State,** *et al.*, <br> **Defendants.** | **Case No. 2:21-cv-01530-AMM** <br><br> **THREE-JUDGE COURT** |

## <u>ORDER</u>

These congressional redistricting cases are before the Court on motions to dismiss filed by Secretary of State Wes Allen ("the Secretary") and Representative Chris Pringle and Senator Steve Livingston ("the Legislators") in their official capacity as Chairmen of the Alabama Legislature's Permanent Legislative Committee on Reapportionment. Doc. 233, *Singleton v. Allen*, 2:21-cv-1291-AMM (three-judge court); Doc. 331, *Milligan v. Allen*, 2:21-cv-1530-AMM (three-judge

court); Doc. 273, *Caster v. Allen*, 2:21-cv-1536-AMM. The motions are fully briefed. *Singleton* Doc. 236; *Milligan* Doc. 337; *Caster* Doc. 277 (oppositions); *Singleton* Doc. 239; *Milligan* Doc. 342; *Caster* Doc. 282 (replies). The United States filed a Statement of Interest. *Singleton* Doc. 238; *Milligan* Doc. 341; *Caster* Doc. 281. For the reasons explained below, the motions to dismiss in *Singleton* and *Milligan* are **DENIED**.[1]

## Table of Contents

I.   **BACKGROUND** ...................................................................................................**3**

  A.  Procedural History .......................................................................................3

  B.  Operative Complaints ..................................................................................6

II.  **STANDARD OF REVIEW** ...........................................................................**7**

III. **ANALYSIS** ......................................................................................................**8**

  A.  Constitutional Claims (*Singleton* and *Milligan*) .........................................8

    1. Racial Gerrymandering (*Singleton*) ........................................................9

    2. Intentional Racial Discrimination and Racial Classification (*Singleton*) ....17

    3. Intentional Racial Discrimination (*Milligan*) ...........................................20

  B.  Section Two Claims (*Singleton*, *Milligan,* and *Caster*) ...............................24

    1. Private Right of Action...........................................................................24

      a.   Text of Section Two.........................................................................25

      b.   Section Two Precedents ....................................................................41

    2. Factual Allegations – *Singleton*................................................................53

    3. Factual Allegations – *Milligan* ................................................................57

IV. **CONCLUSION**............................................................................................**60**

---

[1] Although Judge Manasco rules separately on the motion to dismiss *Caster*, which is pending before her sitting alone, we discuss in this Order the legal arguments that overlap either or both of these cases and *Caster*.

# I.     BACKGROUND

## A.     Procedural History

These cases began when three sets of plaintiffs alleged that Alabama's 2021 congressional redistricting plan ("the 2021 Plan") was racially gerrymandered in violation of the United States Constitution and/or diluted the votes of Black Alabamians in violation of Section Two of the Voting Rights Act of 1965 ("VRA"), 52 U.S.C. § 10301 ("Section Two"). *See Singleton* Doc. 1 (asserting only constitutional challenges); *Milligan* Doc. 1 (asserting both constitutional and statutory challenges); *Caster* Doc. 3 (asserting only statutory challenges).

After a seven-day hearing in January 2022, the Court concluded that the 2021 Plan likely violated Section Two and preliminarily enjoined the State from using that plan. *Milligan* Doc. 107; *Singleton* Doc. 88; *Caster* Doc. 101.[2] We held that "the appropriate remedy is a congressional redistricting plan that includes either an additional majority-Black congressional district, or an additional district in which Black voters otherwise have an opportunity to elect a representative of their choice."

---

[2] In light of the decision to issue a preliminary injunction on statutory grounds, the Court declined to decide the constitutional claims asserted in *Singleton* and *Milligan* based upon the longstanding canon of constitutional avoidance. Therefore, the *Singleton* claims did not receive a ruling.

*Id.* at 5.[3] The Court ruled "that any remedial plan will need to include two districts in which Black voters either comprise a voting-age majority or something quite close to it." *Id.* at 6. The Secretary and the Legislators appealed. *Milligan* Doc. 108; *Caster* Doc. 102.[4]

On June 8, 2023, the Supreme Court affirmed the preliminary injunction in all respects. *Allen v. Milligan*, 599 U.S. 1, 42 (2023). *Milligan* then returned to this three-judge Court, and *Caster* returned to Judge Manasco sitting alone. The Secretary and the Legislators "requested that we allow the Legislature approximately five weeks—until July 21, 2023—to enact a new plan," *Milligan* Doc. 311 at 4 (citing *Milligan* Doc. 166), and we did, *Milligan* Doc. 168. On July 21, 2023, the Legislature enacted and Governor Ivey signed into law a new congressional map ("the 2023 Plan"). *Milligan* Doc. 311 at 4–5. "Just like the 2021 Plan, the 2023 Plan include[d] only one majority-Black district: District 7." *Id.* at 5.

All three sets of Plaintiffs requested another preliminary injunction. *Id.* The Court conducted one hearing on the *Milligan* and *Caster* Plaintiffs' Section Two objections to the 2023 Plan, and another hearing on the *Singleton* Plaintiffs'

---

[3] Pincites are to the CM/ECF page number in the top right-hand corner of the page, if such a number is available.

[4] Though the *Caster* case was appealed initially to the Eleventh Circuit Court of Appeals, the Supreme Court granted the unopposed petition for certiorari and consolidated the appeal with the *Milligan* appeal.

constitutional claims. *Id.* The State conceded that the 2023 Plan did not include an additional opportunity district. *See id.* at 6.

On September 5, 2023, the Court issued another preliminary injunction, concluding that the 2023 Plan—just like the 2021 Plan—likely violated Section Two, enjoining the Secretary of State from using that plan, and reserved ruling on the constitutional claims. *Singleton* Doc. 191; *Milligan* Doc. 272; *Caster* Doc. 223. The Secretary moved the Supreme Court for a stay, which was denied. *Allen v. Milligan*, Emergency Application for Stay, No. 23A231 (Sept. 11, 2023); *Allen v. Milligan*, Order Denying Stay, No. 23A231 (Sept. 26, 2023).

When the Court issued the second preliminary injunction, we instructed the Special Master, cartographer, and Special Master's counsel we had previously appointed (the "Special Master Team") to commence work on a remedial map. *Milligan* Doc. 272 at 7. The Special Master solicited proposals and comments from the parties and the public and recommended three remedial plans to us. *See In re Redistricting 2023*, No. 2:23-mc-01181-AMM. The Court then received objections and held a public hearing on October 3, 2023.

The Court concluded that the Special Master's "Remedial Plan 3" "satisfie[d] all constitutional and statutory requirements while hewing as closely as reasonably possible to the Alabama Legislature's 2023 Plan," *Milligan* Doc. 311 at 7–8, and we ordered the Secretary to administer Alabama's upcoming 2024 congressional

elections using that plan, *id.* at 7.

In January 2024, Plaintiffs amended their respective complaints. *Singleton* Doc. 229; *Milligan* Doc. 329; *Caster* Doc. 271. Defendants filed separate motions to dismiss each of the three complaints. *Singleton* Doc. 233; *Milligan* Doc. 331; *Caster* Doc. 273.

### B. Operative Complaints

The *Singleton* Plaintiffs now assert three claims against the Secretary and the Legislators. *Singleton* Doc. 229 ¶¶ 67–83. First, the *Singleton* Plaintiffs assert that the 2023 Plan "is racially gerrymandered[] in violation of the Equal Protection Clause of the Fourteenth Amendment and Article I, § 2 of the Constitution of the United States." *Id.* ¶ 67. Second, these Plaintiffs claim that the drafters of the 2023 Plan violated the Fourteenth and Fifteenth Amendments by intentionally discriminating against Black Alabamians "by minimizing or diluting their voting strength" and "by intentionally drawing Congressional District lines in order to destroy otherwise effective crossover Districts." *Id.* ¶¶ 75, 78. Third, these Plaintiffs say that the 2023 Plan "violates Section 2 of the Voting Rights Act." *Id.* ¶ 80.

The *Milligan* Plaintiffs, meanwhile, assert two claims against the Secretary and the Legislators. *Milligan* Doc. 329 ¶¶ 190–205. First, the *Milligan* Plaintiffs allege that the 2023 Plan "improperly dilut[es] Black voter strength in violation of Section 2." *Id.* ¶ 195. Second, the *Milligan* Plaintiffs assert that "[t]he State enacted

[the 2023 Plan] with the intent to dilute the vote of Black Alabamians in violation of the Fourteenth Amendment . . . and Section 2." *Id.* at 73 (emphasis omitted).

The *Caster* Plaintiffs assert only one claim against the Secretary and the Legislators: a violation of Section Two. *Caster* Doc. 271 ¶¶ 123–29.

The United States filed a Statement of Interest in all three cases to address the availability of a private right of action to enforce Section Two of the VRA. *Singleton* Doc. 238; *Milligan* Doc. 341; *Caster* Doc. 281. The United States contends that "[t]he text of the Voting Rights Act, reinforced by Supreme Court precedent, establishes a private right of action to enforce Section 2." *Id.* at 11 (emphasis omitted). Alternatively, the United States argues that private litigants may enforce Section Two through 42 U.S.C. § 1983. *Id.* at 15.

## II.    STANDARD OF REVIEW

A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint need not make "detailed factual allegations"; its purpose is only to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). To survive a motion to dismiss under Rule 12(b)(6), "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.*

7

(internal citation omitted). To test the complaint, a court must discard any "conclusory allegations," take the facts alleged as true, *McCullough v. Finley*, 907 F.3d 1324, 1333 (11th Cir. 2018), and "draw all reasonable inferences in the plaintiff's favor," *Randall v. Scott*, 610 F.3d 701, 705 (11th Cir. 2010). These facts and inferences must amount to a "plausible" claim for relief, a standard that "requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

## III.     ANALYSIS

### A.     Constitutional Claims (*Singleton* and *Milligan*)

Defendants move to dismiss the constitutional claims in the *Singleton* and *Milligan* operative complaints. *See Singleton* Doc. 233, *Milligan* Doc. 331.

After the motions to dismiss were fully briefed, the Supreme Court decided *Alexander v. South Carolina State Conference of the NAACP*, 144 S. Ct. 1221 (2024), which concerned claims of racial gerrymandering and intentional vote dilution. *Id.* at 1240, 1251–52. Defendants filed a notice of supplemental authority in both *Singleton* and *Milligan. See Singleton* Doc. 243, *Milligan* Doc. 358. Although the *Singleton* Plaintiffs addressed the potential significance of *Alexander* to their case, *Singleton* Doc. 244 at 1, the *Milligan* Plaintiffs moved us to strike that notice as irrelevant and a "thinly veiled attempt to file a sur-reply," *Milligan* Doc. 360 at 1. In particular, they argue that *Alexander*'s presumption that the legislature

acted in good faith applies only to racial-gerrymandering claims, not to vote-dilution claims. *Milligan* Doc. 360 at 2–4.

The presumption of the legislature's good faith, detailed at length in *Alexander*, applies in all districting cases in which a plaintiff alleges discriminatory intent, including both racial gerrymandering and vote dilution cases. *See Alexander*, 144 S. Ct. at 1235–36; *see also Abbott v. Perez*, 585 U.S. 579, 603, 607 (2018) ("[I]n assessing the sufficiency of a challenge to a districting plan, . . . the 'good faith of [the] state legislature must be presumed.'" (quoting *Miller v. Johnson*, 515 U.S. 900, 915 (1995))). The motion to strike is **DENIED**—we see no reason to ignore controlling Supreme Court precedent, and we do not regard Defendants' notice as a sur-reply.

We discuss each claim in turn.

### 1.    Racial Gerrymandering (*Singleton*)

The *Singleton* Plaintiffs allege that the 2023 Plan (particularly District 7) is a racial gerrymander in violation of the Equal Protection Clause of the Fourteenth Amendment and Article I, Section 2 of the Constitution. *Singleton* Doc. 229 ¶ 67. Specifically, they hinge their racial gerrymandering claim on the contours of District 7, which was created in 1992 and which, they claim, retains and "perpetuate[s]" the 1992 gerrymander. *See id.* ¶ 68.

Defendants move to dismiss the claim on the ground that "Plaintiffs'

allegations of past discrimination do not show intentional discrimination today."
*Singleton* Doc. 233 at 16 (emphasis and capitalization omitted). They argue that to
accept the *Singleton* Plaintiffs' "theory of the case . . . requires ignoring the
presumption of good faith due to legislative bodies." *Id.* at 15. According to
Defendants, the *Singleton* Plaintiffs' approach is "fundamentally flawed" because
"past discrimination cannot, in the manner of original sin, condemn governmental
action that is not itself unlawful." *Id.* at 15, 17 (quoting *Perez*, 585 U.S. at 603, 607).

Next, Defendants argue that "the Complaint contains no allegations plausibly
showing that a racial gerrymander originate[d] in the 1992 consent judgment in
*Wesch v. Hunt* or was intentionally maintained on the basis of race following the
2000, 2010, and 2020 censuses." *Id.* at 17 (internal quotation marks omitted).
Defendants contend that the *Singleton* Plaintiffs cannot "declare as a settled fact that
the 1992 Plan was a racial gerrymander and then . . . posit as a matter of law that the
2023 Legislature had an affirmative duty to fix it." *Id.* at 18.

Finally, Defendants argue that the *Singleton* "Plaintiffs have still not
sufficiently alleged the 2023 Legislature acted with a discriminatory purpose." *Id.*
Defendants say that "the most [the *Singleton*] Plaintiffs have alleged is that the
Legislature chose to enact District 7 while 'aware' of the district's 'racial
demographics,'" and "[t]hat's not enough." *Id.* (citing *Miller*, 515 U.S. at 916).

Defendants also move to dismiss the *Singleton* Plaintiffs' claim on the ground

10

that the *Singleton* "Plaintiffs' allegations provide obvious alternative explanations for the Legislature's actions." *Singleton* Doc. 233 at 19 (emphasis and capitalization omitted). According to Defendants, the *Singleton* Plaintiffs concede that their plan is less compact than the 2023 Plan, *id.* at 20, "that the 2023 Plan preserves the core of District 7 from preceding plans," *id.*, and that the 2023 Plan aimed to protect incumbents, *id.* at 21. Defendants further argue that the *Singleton* Plaintiffs' proposed plan "would have created two reliably Democratic congressional districts instead of one, an outcome their Republican colleagues across the aisle understandably would disfavor for partisan reasons." *Id.* Defendants say that these reasons explain why the *Singleton* Plaintiffs cannot show "that race predominated over traditional factors when enacting the 2023 Plan," *id.* at 22, especially given the good-faith presumption to which the Legislature is entitled, *id.* at 20.

The *Singleton* Plaintiffs respond that "the Alabama Legislature reenacted a racial gerrymander without justification." *Singleton* Doc. 236 at 11 (emphasis and capitalization omitted). According to the *Singleton* Plaintiffs, their gerrymandering claim "requires proof that the plan classifies voters by race, not that it discriminates against them." *Id.* And the *Singleton* Plaintiffs claim that "[i]t is the carrying forward of race-driven lines, not the carrying forward of any taint or ill intent, that makes District 7 a racial gerrymander." *Id.* (quoting *Singleton* Doc. 189 at 53).

The *Singleton* Plaintiffs point out that "Defendants do not contend that the

2023 split of Jefferson County differs in any material way from the race-based 1992 split, which the Secretary's predecessor admitted was a racial gerrymander." *Id.* at 12. The *Singleton* Plaintiffs say that "[u]nder the correct standard, this alone is sufficient for the Singleton Plaintiffs' gerrymandering claim to survive a motion to dismiss, because the Complaint alleges that Black and White Jefferson County voters remained separated by race in the 2023 plan." *Id.*

Defendants reply that the *Singleton* Plaintiffs rely solely on the "shape and demographics" of District 7, which is "not enough" "to state a racial gerrymandering claim." *Singleton* Doc. 239 at 3 (emphasis and capitalization omitted). Additionally, Defendants argue that the "Plaintiffs cannot cut corners by pointing to the 1992 Plan[,]" *id.* at 9 (emphasis and capitalization omitted), and that "[w]hatever a federal court did in 1992 says nothing about what the 2023 Legislature intended when it enacted the 2023 Plan[,]" *id.* at 11.

The Supreme Court has established "a two-step analysis" for the examination of racial gerrymandering claims under the Equal Protection Clause of the Fourteenth Amendment. *Cooper v. Harris*, 581 U.S. 285, 291 (2017). "First, the plaintiff must prove that 'race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district.'" *Id.* (quoting *Miller*, 515 U.S. at 916). The plaintiff must establish "that the legislature 'subordinated' other factors—compactness, respect for political subdivisions,

partisan advantage, what have you—to 'racial considerations.'" *Id.* (quoting *Miller*, 515 U.S. at 916). A plaintiff will prevail if he can prove "that a legislature elevated race to the predominant criterion," even if it did so "in order to advance other goals, including political ones." *Id.* at 291 n.1.

A plaintiff may satisfy the first step of the analysis "through 'direct evidence' of legislative intent, 'circumstantial evidence of a district's shape and demographics,' or a mix of both." *Id.* at 291 (quoting *Miller*, 515 U.S. at 916). As the Supreme Court explained in *Alexander*, "[d]irect evidence often comes in the form of a relevant state actor's express acknowledgment that race played a role in the drawing of district lines[,]" or it "can also be smoked out over the course of litigation." 144 S. Ct. at 1234. "Proving racial predominance with circumstantial evidence alone is much more difficult[,]" and is "especially difficult when the State raises a partisan-gerrymandering defense." *Id.* at 1234–35.

To prevail against that defense, a plaintiff must "disentangle race from politics" by proving "that the former drove a district's lines." *Cooper*, 581 U.S. at 308. "That means, among other things, ruling out the competing explanation that political considerations dominated the legislature's redistricting efforts." *Alexander*, 144 S. Ct. at 1235. Plaintiffs ordinarily tackle this burden by producing "an alternative map showing that a rational legislature sincerely driven by its professed partisan goals would have drawn a different map with greater racial balance." *Id.*

13

"Without an alternative map, it is difficult for plaintiffs to defeat [the Supreme Court's] starting presumption that the legislature acted in good faith. This presumption of legislative good faith directs district courts to draw the inference that cuts in the legislature's favor when confronted with evidence that could plausibly support multiple conclusions." *Id.* at 1235–36.

At the second step of the analysis, if the court finds that "racial considerations predominated over others, the design of the district must withstand strict scrutiny." *Cooper*, 581 U.S. at 292. The burden at the second step "shifts to the State to prove that its race-based sorting of voters serves a 'compelling interest' and is 'narrowly tailored' to that end." *Id.* (quoting *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 193 (2017)). "[O]ne compelling interest is complying with operative provisions of the Voting Rights Act . . . ." *Id.* "This standard is extraordinarily onerous because the Fourteenth Amendment was designed to eradicate race-based state action." *Alexander*, 144 S. Ct. at 1236.

If we treat the factual allegations in the *Singleton* Plaintiffs' operative complaint as true—as we must when reviewing a motion to dismiss for failure to state a claim—the *Singleton* Plaintiffs assert a plausible gerrymandering claim under the Equal Protection Clause. The *Singleton* Plaintiffs allege that the 1992 map that resulted from the *Wesch* consent judgment was a racial gerrymander because it split seven counties expressly "for the purpose of drawing one majority-Black district,"

and Alabama simply "continued the 1992 racial gerrymander in the Congressional redistricting plans enacted after the 2000 and 2010 censuses." *See Singleton* Doc. 229 ¶¶ 22, 27. According to the *Singleton* Plaintiffs, the State conceded in 2019 that the 1992 map was a racial gerrymander. *Id.* ¶¶ 15 & n.1, 26. And the *Singleton* Plaintiffs assert that, as their proposed plan demonstrates, it is now "practicable to end the 1992 racial gerrymander and draw a seven-district Congressional plan without splitting a single county and with only slight population deviations." *Id.* ¶ 39.

According to the *Singleton* Plaintiffs, "the Legislature preserved the racial gerrymander of Congressional District 7" when it enacted the 2021 Plan, *id.* ¶ 46, and again when it enacted the 2023 Plan, *id.* ¶ 55. "District 7 contains about 54% of Jefferson County's population, but more than 71% of its Black population, resulting in a thirty-point gap between the proportion of the population that is Black inside and outside the district (57% inside, compared to 27% outside)." *Id.* The *Singleton* Plaintiffs specifically allege that "District 7 sharply separates majority-Black Birmingham from the relatively White 'Over the Mountain' suburbs like Mountain Brook and Vestavia Hills." *Id.* The *Singleton* Plaintiffs also specifically allege that the Legislature acted with discriminatory purpose when it enacted the 2023 Plan that "intentionally perpetuates the unconstitutional racial gerrymandering of Jefferson County." *Id.* ¶ 2.

15

In addition to these factual allegations (and all the reasonable inferences they support), this Court already has before it some evidence about the *Singleton* Plaintiffs' constitutional claims that was developed in connection with the preliminary injunctions we issued, which the Singleton Plaintiffs cited in their operative complaint. *See Singleton* Doc. 229 ¶¶ 1, 57, 77, 80. At the motion-to-dismiss stage, we consider only the complaint and reasonable inferences we can draw from it. *See Iqbal*, 556 U.S. at 678 ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." (quotation marks and citation omitted)); *Grossman v. Nationsbank, N.A.*, 225 F.3d 1228, 1231 (11th Cir. 2000) ("When considering a motion to dismiss, all facts set forth in the plaintiff's complaint are to be accepted as true and the court limits its consideration to the pleadings and exhibits attached thereto." (quotation marks and citation omitted)). Still, we are satisfied, based on the breadth of the pleadings and the requirement that we draw all reasonable inferences in the Plaintiffs' favor, that we cannot dismiss this claim at this early stage in the proceedings.

Although the legislature enjoys a good faith presumption that its map was driven by non-racial goals, the facts pleaded by the *Singleton* Plaintiffs asserting that racial concerns propelled the development of the Alabama map are enough at the motion-to-dismiss stage to overcome this good faith presumption. *See Alexander*,

144 S. Ct. at 1233. In *Alexander*, after all, the claims survived until the trial itself. *See id.* at 1237. The Defendants' motion to dismiss Count I of the *Singleton* Plaintiffs' complaint is therefore **DENIED**.

### 2. Intentional Racial Discrimination and Racial Classification (*Singleton*)

The second count of the *Singleton* Plaintiffs' operative complaint alleges that "the drafters of [the 2023 Plan] violated the Fourteenth and Fifteenth Amendments by intentionally drawing Congressional District lines in order to destroy otherwise effective crossover Districts." *Singleton* Doc. 229 ¶ 75.

Defendants move to dismiss the *Singleton* Plaintiffs' intentional racial discrimination and racial classification claim on the same grounds that it moved to dismiss their racial gerrymandering claim—addressing both claims under the single umbrella of "Plaintiffs' constitutional claims." *Singleton* Doc. 233 at 23; *see also id.* at 13 (addressing Plaintiffs' "claim[s] under the Equal Protection Clause" (emphasis and capitalization omitted)). As discussed above, they argue that the *Singleton* Plaintiffs have not stated a claim because past discrimination does not imply present discrimination and because there are obvious alternative explanations for the Legislature's actions. *See supra* at pp. 9–11.

The *Singleton* Plaintiffs respond that "the Legislature intentionally diluted Black votes by rejecting all plans that contained two performing crossover districts." *Singleton* Doc. 236 at 15 (emphasis and capitalization omitted). According to the

17

*Singleton* Plaintiffs, "the Legislature's rejection of crossover districts" must be viewed against the historical background of "Alabama's unbroken policy of suppressing efforts of Black voters to form electoral alliances with White voters and the use of political parties as the main instrument for maintaining White solidarity." *Id.* at 17.

Defendants reply that the *Singleton* Plaintiffs "fail[] to plausibly state a claim because the Legislature never 'destroyed otherwise effective crossover districts'; it merely adopted a plan other than the one Plaintiffs[] preferred." *Singleton* Doc. 239 at 12 (emphasis omitted) (quoting *Bartlett v. Strickland*, 556 U.S. 1, 24 (2009) (plurality opinion)).

"[A] plaintiff bringing a constitutional vote dilution challenge, whether under the Fourteenth or Fifteenth Amendment, [is] required to establish that the State or political subdivision acted with a discriminatory purpose." *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 481 (1997); *see also Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) ("Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."). "And if there were a showing that a State intentionally drew district lines in order to destroy otherwise effective crossover districts, that would raise serious questions under both the Fourteenth and Fifteenth Amendments." *Bartlett*, 556 U.S. at 24.

The *Singleton* Plaintiffs state a plausible intentional racial discrimination and

racial classification claim because they allege that the drafter of the 2023 Plan acted with discriminatory purpose "by intentionally drawing Congressional District lines in order to destroy otherwise effective crossover districts." *Singleton* Doc. 229 ¶ 75. The *Singleton* Plaintiffs allege that "[t]he drafter of [the 2023 Plan] did not include Jefferson County among the communities of interest the 2023 enacted plan is intended to protect." *Id.* ¶ 64. According to these Plaintiffs, the drafter excluded Jefferson County because it "is the one county in the state with a proven record of effective and persistent biracial politics." *Id.* The complaint claims that "[t]he drafter of the 2023 . . . plan knew that White voters in Jefferson County are more likely to share the equal rights and progressive political agenda of Black voters than do White voters in the Wiregrass." *Id.* ¶ 65. The *Singleton* Plaintiffs say that is why "[t]he 2023 plan . . . places Black voters in the eastern Black Belt in the same district with the Wiregrass counties, ensuring they would have no opportunity to elect a candidate of their choice." *Id.* And the *Singleton* Plaintiffs allege that "[b]y splitting Jefferson County and the Black Belt the 2023 . . . plan perpetuates Alabama's policy since Reconstruction of creating and maintaining election systems that are designed to encourage White electoral solidarity." *Id.* ¶ 66.

Here again, the evidentiary record may (or may not) ultimately support these allegations. But we are required at this early stage to accept the factual allegations as true and draw all the reasonable inferences they support, *see Randall*, 610 F.3d at

19

705, and they are sufficient to clear the low plausibility bar. The motion to dismiss Count II of the *Singleton* Plaintiffs' complaint is **DENIED**.

### 3. Intentional Racial Discrimination (*Milligan*)

Defendants also move to dismiss the *Milligan* Plaintiffs' intentional discrimination claim brought under the Fourteenth Amendment. *Milligan* Doc. 331 at 31. According to Defendants, the *Milligan* "Plaintiffs ignore, if not decry, the presumption of good faith due legislative bodies." *Id.* at 33. Defendants also contend that the *Milligan* "Plaintiffs' allegations of past discrimination do not show intentional discrimination today[,]" *id.* at 34 (emphasis and capitalization omitted), and that the *Milligan* "Plaintiffs have still not sufficiently alleged the 2023 Legislature intentionally discriminated against black voters," *id.* at 37. Defendants also say that the *Milligan* Plaintiffs fail to "allege an 'actual discriminatory effect.'" *Id.* at 44 (quoting *Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1321 (11th Cir. 2021)).

The *Milligan* Plaintiffs respond that their operative complaint "sufficiently alleges a claim of intentional discrimination based on vote dilution." *Milligan* Doc. 337 at 38 (emphasis and capitalization omitted). The *Milligan* Plaintiffs argue that "[a]t the pleading stage, [they] need only *plausibly allege* that race was a motivating factor in the 2023 Plan's enactment." *Id.* at 39. The *Milligan* Plaintiffs contend that they satisfy this burden by pleading facts regarding the "racial impact" and

"foreseeability of disparate impact" of the 2023 Plan, Alabama's long and sordid history of discrimination and "the Legislature's departure from its usual procedures" when enacting the 2023 Plan, "contemporaneous statements by legislators" regarding the 2023 Plan, and the "availability of less discriminatory alternatives" than the 2023 Plan. *Id.* at 40, 43, 45, 46 (emphasis and capitalization omitted).

Defendants reply that the *Milligan* "Plaintiffs attempt to lower the standard for establishing intentional vote dilution." *Milligan* Doc. 342 at 15. Defendants contend that "it cannot be that Alabama's history bans its legislature from ever enacting otherwise constitutional laws about voting." *Id.* at 17 (quoting *Greater Birmingham Ministries*, 992 F.3d at 1325). Defendants assert that the *Milligan* "Plaintiffs' allegations, if true, do not rule out 'more likely explanations[]'" for the Legislature's decision to enact the 2023 Plan. *Id.* (quoting *Iqbal*, 556 U.S. at 681).

"Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266. *Arlington Heights* lays out a list of factors the courts may consider in determining whether discriminatory purpose was a motivating factor in a Legislature's adoption of a statute, including: whether the legislation "bears more heavily on one race than another," "[t]he historical background of the decision," "[t]he specific sequence of events leading up to the challenged decision," and "[t]he legislative or administrative

21

history." *Id.* at 266–68.

The *Milligan* Plaintiffs allege discriminatory intent throughout their operative complaint. They claim that "[t]he 2023 Plan represents Alabama's latest discriminatory scheme, designed with the intent to crack Black voters into congressional districts in a manner that prevents the creation of two congressional districts in which Black voters have an equal opportunity to elect candidates of their choice." *Milligan* Doc. 329 ¶ 2. They further allege that the "stated goal" of the 2023 Plan was to "keep white voters in Baldwin and Mobile counties together 'to the fullest extent possible' based on their shared 'Spanish and French colonial heritage.'" *Id.* ¶ 6. They say that this was done intentionally to "protect the voting strength of the identified white European ethnic groups" and dilute Black votes: "[t]he Legislature intentionally placed Black voters from the Black Belt and the City of Mobile into majority-white congressional districts in small enough numbers that Black voters have no electoral influence." *Id.* ¶¶ 6–7. The *Milligan* Plaintiffs urge that the 2023 Plan "perpetuates . . . discriminatory effect[s] . . . [because] Black voters continue to lack any realistic opportunity to elect their candidate of choice and participate equally in the political process in a second congressional district." *Id.* ¶ 177.

The *Milligan* Plaintiffs also allege that the historical background is relevant: "[f]rom the 1870s until the 1990 census, Alabama lacked a congressional district

that allowed Black Alabamians any ability to elect their candidates of choice until litigation." *Id.* ¶ 178. In addition, the *Milligan* Plaintiffs assert that the 2021 Plan "disregarded public input which supported the creation of a second Black opportunity district," *id.* ¶ 182, and the 2023 Plan was adopted "largely along racial lines over the vehement objections of Black legislators in both houses," *id.* ¶ 184. The *Milligan* Plaintiffs further allege that the Legislature enacted the 2023 Plan "despite multiple court orders directing the state to respond to the needs of its Black citizens by enacting a congressional districting plan that creates two majority-Black districts or something quite close to it, further evidencing the Legislature's intent to severely limit the political influence of Black Alabamians." *Id.* ¶ 185.

As in *Singleton*, in addition to the *Milligan* Plaintiffs' factual allegations (and all the reasonable inferences they support, taken in the light most favorable to the Plaintiffs), the Court already has before it some evidence that was developed in connection with the preliminary injunctions we issued and specifically incorporated by reference in the *Milligan* Plaintiffs' operative complaint. *See Milligan* Doc. 329 ¶ 99. The *Milligan* Plaintiffs have also developed additional evidence since the preliminary injunctions, and these more recent evidentiary materials are also part of the record. *See Milligan* Doc. 364 (evidentiary submission filed in connection with motion to quash). As we have already observed, however, we may consider only the pleadings and the reasonable inferences we can draw from them at this early stage,

on a motion to dismiss for failure to state a claim. Even still, the Plaintiffs have pleaded sufficient allegations to survive a motion to dismiss.

Because the *Milligan* Plaintiffs plausibly allege a claim of intentional racial discrimination, the Defendants' motion to dismiss that claim is **DENIED**.

## B.   Section Two Claims (*Singleton*, *Milligan*, and *Caster*)

Defendants also move to dismiss the Section Two claims in *Singleton* and *Milligan. Singleton* Doc. 233 at 23; *Milligan* Doc. 331 at 16. We first discuss Defendants' argument that Section Two contains no private right action, and we then discuss Defendants' argument that the operative complaints fail to allege sufficient facts to state a claim.

### 1.  Private Right of Action

Defendants contend that Section Two of the Voting Rights Act is not enforceable by private plaintiffs. *See Singleton* Doc. 233 at 23–24; *Milligan* Doc. 331 at 16–23; *Caster* Doc. 273 at 16–35. We have rejected this argument once before. *See Singleton v. Merrill*, 582 F. Supp. 3d 924, 1031 (N.D. Ala. 2022). We do so again today.

"Since the passage of the Voting Rights Act, federal courts across the country, including both the Supreme Court and the Eleventh Circuit, have considered numerous Section Two cases brought by private plaintiffs." *Id.* (collecting cases). Defendants identify only one case in which a circuit court has held that Section Two

did not create a private right of action. *See Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*, 86 F.4th 1204, 1206–07 (8th Cir. 2023), *aff'g* 586 F. Supp. 3d 893 (E.D. Ark. 2022), *reh'g en banc denied*, 91 F.4th 967 (8th Cir. 2024). But that decision is not binding on this Court, nor does its analysis compel us to dismiss these Section Two claims. And as we explain below, neither does it persuade us. We have carefully examined the issue anew, and we see no reason why Defendants' current motion should meet a different fate than their earlier motion. We begin, as we must, with the text of Section Two; we then examine applicable precedent.

### a. Text of Section Two

Section Two of the Voting Rights Act provides:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).

(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

52 U.S.C. § 10301.

Federal law supplies two potential vehicles for private plaintiffs to sue under Section Two: either by way of a private right of action contained in Section Two itself, or pursuant to 42 U.S.C. § 1983 ("Section 1983"). Section Two contains no express private right of action, so the dispositive question is whether one is implied. To establish an implied private right of action, plaintiffs must show that Section Two confers both a private right and a private remedy. *Sandoval*, 532 U.S. at 286 (citations omitted). If there is a private right, then private plaintiffs can presumptively sue under Section 1983, unless defendants show that Congress shut the door to a Section 1983 suit. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 & n.4 (2002). Then–Chief Justice Rehnquist, writing for the majority in *Gonzaga*, reasoned this way:

> Plaintiffs suing under § 1983 do not have the burden of showing an intent to create a private remedy because § 1983 generally supplies a remedy for the vindication of rights secured by federal statutes. Once a plaintiff demonstrates that a statute confers an individual right, the right is presumptively enforceable by § 1983.

*Id.* at 284 (internal citation omitted). And then, the State must "demonstrate that Congress shut the door to private enforcement." *Id.* at 284 n.4.

Defendants concede that Section Two created "new remedies," but they contend those remedies were only public, not private. *See Milligan* Doc. 331 at 17; *Caster* Doc. 273 at 17. Defendants do not give any reasons why they believe Section

Two did not create a private remedy separate and apart from the reasons why they assert Section Two did not create a private right. *See Milligan* Doc. 331 at Part I.A; *Caster* Doc. 273 at Parts I, II. All three sets of Plaintiffs have availed themselves of Section 1983, *Singleton* Doc. 229 ¶ 5; *Milligan* Doc. 329 ¶ 11; *Caster* Doc. 271 ¶ 129, and Defendants do not assert that Congress has shut the door to a remedy under Section 1983. *See Singleton* Docs. 233, 239; *Milligan* Docs. 331, 342; *Caster* Docs. 273, 282. Accordingly, the essential question before us is whether Section Two creates a private right. If we conclude that it does, there is no basis to dismiss any of these lawsuits.

Although the task of determining whether Section Two contains a private right is ours, the creation of that right (if it exists) is an exclusively legislative authority. "Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress. The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Sandoval*, 532 U.S. at 286 (citations omitted). Accordingly, we examine at the threshold "whether Congress intended to create a federal right." *Gonzaga*, 536 U.S. at 283 (emphasis omitted).

A statute confers a private right "where the provision in question is phrased in terms of the persons benefitted and contains rights-creating, individual-centric language with an unmistakable focus on the benefited class." *Health & Hosp. Corp.*

27

*of Marion Cnty. v. Talevski*, 599 U.S. 166, 183 (2023) (internal quotation marks omitted) (quoting *Gonzaga*, 536 U.S. at 284, 287). A statute does not confer a private right when it contains no rights-creating language or focuses on persons or entities other than the benefited class. *See, e.g.*, *Sandoval*, 532 U.S. at 288–89.

The most recent binding Supreme Court precedent about rights-creating language is *Health & Hospital Corporation of Marion County*, 599 U.S. 166 (2023), a case concerning two statutory provisions about the rights of nursing home residents. *Id.* at 171. We apply here the same methodology the Supreme Court used to decide that case, which can be summarized in this way:

- First, the Court began its analysis by observing that the statutory provisions at issue "reside in" a statutory section that "expressly concerns '[r]equirements relating to residents' rights.'" *Id.* at 184 (emphasis omitted) (quoting 42 U.S.C. § 1396r(c)). In assigning weight to this observation, the Supreme Court relied on (1) the rule that "statutory provisions 'must be read in their context,'" and (2) the recognition in *Gonzaga* that "[t]his framing is indicative of an individual 'rights-creating' focus." *Id.* (first quoting *West Virginia v. EPA*, 597 U.S. 697, 721 (2022); then quoting *Gonzaga*, 536 U.S. at 284).

- Next, the Court reviewed each statutory provision at issue and found that each one (1) discussed a specific right held by residents, with (2) a repeated focus on residents. *See id.* at 184–85.

- Then, the Court observed that the statutory provisions also discussed nursing homes, but found that this discussion did not undermine the focus of the provisions on residents' rights. The Court reasoned that "it would be strange to hold that a statutory provision fails to secure rights simply because it considers, alongside the rights bearers, the actors that might threaten those

28

rights." *Id.* at 185.

- Finally, the Court distinguished the statutory provisions from the provisions in *Gonzaga*, which "lacked 'rights-creating language,' primarily directed the Federal Government's distribution of public funds, and had an aggregate, not individual, focus." *Id.* at 185–86 (quoting *Gonzaga*, 536 U.S. at 290).

Like the provisions at issue in *Health & Hospital Corporation of Marion County*, Section Two resides in a statutory section that expressly concerns rights—in this case, voting rights for members of a class protected from discrimination based on race or color. The title of Section Two is "[d]enial or abridgement of right to vote on account of race or color through voting qualifications or prerequisites; establishment of violation." 52 U.S.C. § 10301. Following the Supreme Court's lead, we take this context and framing as "indicative of an individual 'rights-creating' focus." *Health & Hosp. Corp. of Marion Cnty.*, 599 U.S. at 184 (quoting *Gonzaga*, 536 U.S. at 284).

Further, subsection (a) of Section Two expressly discusses "the right of any citizen of the United States to vote," and it expressly prohibits voting practices that abridge voting rights based on race, color, or language-minority status. 52 U.S.C. § 10301(a) (incorporating by reference 52 U.S.C. § 10303(f)(2)). And subsection (b) expressly discusses the voting rights of persons who are "members of a class of citizens protected by subsection (a)." *Id.* § 10301(b). In the next sentence, subsection (b) refers twice to "members of a protected class." *Id.* Together, these subsections

protect citizens in the enumerated class from voting practices with discriminatory results, not just voting practices based on discriminatory intent (which the Fifteenth Amendment forbids based on race or color). *See Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 482 (1997); U.S. CONST. amend. XV. Because Section Two is comprised only of a title and three sentences of text, the upshot of the foregoing analysis is that every sentence of Section Two either refers to rights of the benefited class, contains rights-creating language that creates new rights for that specific class, or expressly focuses on the benefited class.

This precise and repetitive focus on the benefitted class distinguishes Section Two from the statutes at issue in *Sandoval* and *Gonzaga*, which the Supreme Court concluded did not confer implied private rights of action. In *Sandoval*, the statute at issue—Section 602 of Title VI of the Civil Rights Act, 42 U.S.C. § 2000d-1—did not even mention the benefited class: it said merely that "[e]ach Federal department and agency . . . is authorized and directed to effectuate the provisions of [Section 601]." 532 U.S. at 288–89 (quoting 42 U.S.C. § 2000d-1). Thus, the Court found that "the focus of § 602 is twice removed from the individuals who will ultimately benefit from Title VI's protection" because it "focuses neither on the individuals protected nor even on the funding recipients being regulated, but on the agencies that will do the regulating." *Id.* at 289.

Likewise, *Gonzaga* considered provisions of the Family Educational Rights

30

and Privacy Act of 1974, 20 U.S.C. § 1232g ("FERPA"). *Gonzaga*, 536 U.S. at 278. One such provision stated that: "No funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of permitting the release of education records . . . of students without the written consent of their parents . . . ," *id.* at 279 (quoting 20 U.S.C. § 1232g(b)(1)), while another "direct[ed] the Secretary of Education to enforce this and other of the Act's spending conditions," *id.* (citing 20 U.S.C. § 1232g(f)). The Court found that the focus of these provisions was also "two steps removed from the interests of" the benefited class because they "speak only to" the regulating agency. *Id.* at 287. The Court concluded that the provisions at issue did not imply a private right because they "contain no rights-creating language, they have an aggregate, not individual, focus, and they serve primarily to direct the [regulating agency's] distribution of public funds to educational institutions." *Id.* at 290.

Unlike the statutes in *Sandoval* and *Gonzaga*, the language of Section Two "focuses . . . on the individuals protected." *Sandoval*, 532 U.S. at 289. It explicitly protects "the right of any citizen of the United States to vote" without being discriminated against, and then refers repeatedly to "members of a protected class," or some variation of that phrase. *See* 52 U.S.C. § 10301. It "serve[s] primarily" to protect citizens' rights and to prevent states from interfering with those rights. *See Gonzaga*, 536 U.S. at 290. If all of this is not rights-creating language with an

31

"unmistakable focus on the benefited class," *Cannon v. Univ. of Chi.*, 441 U.S. 677, 691 (1979), it is difficult to imagine what is.

Indeed, Section Fourteen of the Voting Rights Act reinforces the idea that Congress contemplated suits by private parties when it enacted Section Two. Section 14(e) provides: "In any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee, reasonable expert fees, and other reasonable litigation expenses as part of the costs." 52 U.S.C. § 10310(e). "[A]ny action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment" means *all* such actions or proceedings, because where Congress uses the word "any" and "'did not add any language limiting the breadth of that word,' . . . 'any' means all." *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1186 (11th Cir. 1997) (quoting *United States v. Gonzales*, 520 U.S. 1, 5 (1997)); *see also Deroy v. Carnival Corp.*, 963 F.3d 1302, 1316 (11th Cir. 2020) (recognizing that, in a statute, "'any' means 'every' or 'all'" (citing *United States v. Castro*, 837 F.2d 441, 445 (11th Cir. 1988))). And Section Two is unambiguously an action or proceeding to "enforce the voting guarantees of the . . . fifteenth amendment." 52 U.S.C. § 10310(e); *see Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 656 (2021). Section Fourteen therefore anticipates that private litigants will sue to "enforce the guarantees of the . . . fifteenth amendment" alongside the

32

United States. 52 U.S.C. § 10310(e).

The Eighth Circuit says, however, that the term "prevailing party" here refers only to defendants. *Ark. State Conf.*, 86 F.4th at 1213 n.4. As we see it, that offers too strained a reading of the statute. Congress specified that a "prevailing party, other than the United States" should receive attorneys' fees, not that a "defendant" should receive attorneys' fees—which would have been a much simpler and more direct way to prescribe that outcome, if that is what Congress had intended. In fact, the Supreme Court has construed identical language found in the attorney-fee provision of Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a-3(a) ("CRA"),[5] to refer to private plaintiffs. *See Newman v. Piggie Park Enters., Inc.*, 390 U.S. 400, 401 n.1, 402 (1968) (per curiam) (holding that the term "prevailing party, other than the United States" in Title II's attorney-fee provision refers to private plaintiffs); *see also id.* at 402 ("Congress . . . enacted the provision for counsel fees [in Title II of the CRA] . . . to encourage individuals injured by racial discrimination to seek judicial relief under Title II."). Moreover, Congress has specifically told us that it intended private parties to be able to recover attorneys' fees if they prevailed on

---

[5] The CRA's attorney fee provision reads as follows: "In any action commenced pursuant to this subchapter, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs, and the United States shall be liable for costs the same as a private person." 42 U.S.C. § 2000a-3(b).

Section Two claims: Congress explained that "[f]ee awards are a necessary means of enabling *private citizens* to vindicate these Federal rights." *See* S. REP. NO. 94-295, at 40 (1975) (emphasis added); *see also* H. REP. NO. 97-227, at 32 (1981) ("It is intended that citizens have a private cause of action to enforce their rights under Section 2. . . . If they prevail they are entitled to attorneys' fees under [Section 14(e)] and [42 U.S.C. §] 1988.").

"[T]he words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *West Virginia*, 597 U.S. at 721. Thus, the reference in Section Fourteen of the VRA to private plaintiffs suing to enforce their voting rights supports the determination that Section Two contains a private right of action. Viewing Section Two along with Section Fourteen reinforces Congress's intention to allow private parties to sue to enforce their right to vote free from discrimination. *See Morse v. Republican Party of Va.*, 517 U.S. 186, 234 (1996) (reasoning that the language referring to a "prevailing party, other than the United States" in Section Fourteen indicates "the existence of a private right of action under § 10").

As far as we can tell, no court has held under the first step of the analysis that Section Two does not create a private right. Rather, the one circuit court that has concluded that Section Two does not confer a private right of action, the Eighth Circuit, rested its decision on the second step of the analysis—a determination that

Section Two does not create a private remedy. *See Ark. State Conf. NAACP*, 86 F.4th at 1216. Notably, the Eighth Circuit did not address the question whether private plaintiffs may sue under Section 1983 to enforce Section Two because the plaintiffs had not raised the issue. *Id.* at 1218.

The Eighth Circuit viewed the question whether Section Two creates a private right as an open one because, in addition to the rights-creating language we have described, Section Two also contains language that refers to states, and the court was unsure "what to do when a statute focuses on both." *Id.* at 1209–10. But the Supreme Court has provided an unambiguous answer to that question that the Eighth Circuit did not consider.[6] In *Health & Hospital Corporation of Marion County*, the statutes at issue (like Section Two) referred to the rights of the benefitted class, but also directed requirements at "actors that might threaten those rights," and the Supreme Court still held that the statutes created private rights. 599 U.S. at 185. That a statutory provision discussing the rights of a benefitted class "also establish[es] who it is that must respect and honor these statutory rights," the Court explained, "is not a material diversion from the necessary focus on the [rights-holders]." *Id*. The Court

---

[6] The Supreme Court issued *Health & Hospital Corporation of Marion County* after the Eighth Circuit heard oral argument but before the Eighth Circuit issued its decision. *See Health and Hosp. Corp. of Marion Cnty.*, 599 U.S. at 166; *Ark. State Conf. NAACP*, 86 F.4th at 1204.

further reasoned that "[t]he Fourteenth Amendment hardly fails to secure § 1983-enforceable rights because it directs state actors not to deny equal protection." *Id.* at 185 n.12.

Based on case precedent and the text of Section Two, we see a clear answer to the question whether Section Two creates a private right: it does. Defendants nevertheless urge us to hold that Section Two does not confer a private right for four reasons. We discuss each in turn.

*First*, Defendants argue that for Section Two to create a private right of action, it must create a new right not found elsewhere in federal law. *See Singleton* Doc. 233 at 23–24; *Milligan* Doc. 331 at 17. Defendants claim that Section Two cannot do this because it was passed pursuant to Congress's power under Section Two of the Fifteenth Amendment, which gives Congress the power to enforce the rights guaranteed in the Fifteenth Amendment, but not the power to create new rights. *See* U.S. CONST. amend. XV; *Brnovich*, 594 U.S. at 656; *see Milligan* Doc. 331 at 17–18.[7]

Defendants are wrong that to create a private right of action, Section Two must create a new right not found elsewhere in federal law. That premise runs

---

[7] The Supreme Court already has rejected, in this very case, the argument that Section Two exceeds congressional authority under the Fifteenth Amendment. *See Milligan*, 599 U.S. at 41.

36

headlong into controlling precedent. For example, in *Morse v. Republican Party of Virginia*, 517 U.S. 186 (1996), the Court found an implied private right of action in Section Ten of the Voting Rights Act, which, on Defendants' logic, would also merely be protecting preexisting Fifteenth Amendment rights. *See id.* at 233 (holding that § 10 "established a right to vote without paying a fee"). And in *Allen v. State Board of Elections*, 393 U.S. 544 (1969), *abrogated by Ziglar v. Abbasi*, 582 U.S. 120, 132 (2017), the Supreme Court found an implied private right of action in Section Five of the Voting Rights Act. *See id.* at 557; *cf. Schwier v. Cox*, 340 F.3d 1284, 1297 (11th Cir. 2003) (finding an implied private right of action in the materiality provision of a similar statute passed under congressional Fifteenth Amendment enforcement power).

It is unsurprising, then, that Defendants have cited no precedent holding that Congress cannot imply a private right of action to enforce an existing federal right. They rely on language found in *Sandoval* (quoted later in *Gonzaga*) referring to "new rights," but that language did not hold (or even suggest, in the context of those cases), that the protected right must be completely novel and found nowhere else in federal law. In *Sandoval*, the Court used the term "new rights" to explain that rights-creating language in one section of a statute did not necessarily imply a private right of action to enforce another section of the same statute. *See* 532 U.S. at 289 (cleaving a difference between Sections 601 and 602 of Title VI of the Civil Rights Act of 1964).

*Sandoval* did not address the question whether Congress may grant a private right of action to enforce an existing federal right. Nor did *Gonzaga*, which merely quoted the sentence from *Sandoval* referring to "new rights" when explicating the general background principles for discovering congressional intent. *See Gonzaga*, 536 U.S. at 286–87. There was no discussion in *Gonzaga* of whether the rights referred to in the statute at issue were new or not. *See id.*

*Second,* Defendants argue that Section Two does not unambiguously confer individual rights because there is ambiguity about its focus, which Defendants say one court has held is "unclear" because it includes both the conduct prohibited and the party regulated. *Milligan* Doc. 331 at 20 (citing *Ark. State Conf. NAACP*, 86 F.4th at 1209–10). But like the Eighth Circuit, Defendants do not account for the instructions found in *Health & Hospital Corporation of Marion County*. *See* 599 U.S. at 185. As we have already explained, *see supra* at pp. 34–35, if the statutory text at issue in that case created private rights while also mentioning actors and conduct that could threaten those rights, then we can discern no principled basis to conclude that Section Two does not likewise create private rights.

*Third*, Defendants argue that the mere use of the term "rights" is not enough to create a private cause of action, citing *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1 (1981). *See Milligan* Doc. 342 at 10. But our analysis doesn't rest exclusively on the use of the word "rights." *See supra* at pp. 27–31. In any event,

*Pennhurst State* does not help Defendants. There, the Supreme Court declined to find an implied right in a statute that provided that mentally handicapped persons "have a right to appropriate treatment, services, and habilitation" in "the setting that is least restrictive of . . . personal liberty," *Pennhurst State*, 451 U.S. at 13 (quoting 42 U.S.C. § 6010). The Court held that the reference to "a right" was precatory because it was found only in a "bill of rights" provision of the statute, while the enabling provisions of the statute were funding-related, and the bill of rights provision lacked "any language suggesting that [it] is a 'condition' for the receipt of federal funding" under the statute. *Id.* To the contrary, the Court reasoned, the language and structure of the statute "demonstrate[d] that it is a mere federal-state funding statute." *Id.* at 18. *Pennhurst State* thus cautions that "[i]n expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *Id*.

We have not looked at the word "rights" in a vacuum; rather, we have considered the word within the statutory provision and the statute taken as a whole, in order to see whether the statutory provision is using "rights-creating language." *Sandoval*, 532 U.S. at 288 (quotation marks and citation omitted). And it is not merely the presence of the term "rights" in Section Two, but rather the entire provision's focus on the rights of "members of a protected class" and its place within the Voting Rights Act—a statute created, after all, for the sole purpose of enforcing

a citizen's right to vote free from discrimination. *See supra* at pp. 24–31 (discussing statutory text of Section Two); *supra* at pp. 32–35 (discussing Section Fourteen of the VRA); *infra* at pp. 42–49 (discussing applicable precedents).

*Fourth,* Defendants assert that the "federal review mechanism" in the Voting Rights Act indicates that Congress did not mean to imply a private right of action in Section Two. *Caster* Doc. 273 at 27. Defendants rely on *Gonzaga* to argue that "where a statute provides a federal review mechanism, the Supreme Court has been less willing to identify individually enforceable private rights." *Id.* (internal quotation marks omitted).

This argument fails at the gate because FERPA, the statute at issue in *Gonzaga,* is fundamentally unlike Section Two. In *Gonzaga,* the Supreme Court observed that its "conclusion that FERPA's nondisclosure provisions fail to confer enforceable rights [wa]s buttressed by the mechanism that Congress chose to provide for enforcing those provisions." 536 U.S. at 289. FERPA "expressly authorized the Secretary of Education to 'deal with violations' of the Act," and the Secretary did so by creating an office to field complaints from individuals and then initiate investigations, request a response from the institution subject to the complaint, find violations, and mandate steps to resolve them. *Id.* at 289–90 (emphasis omitted) (quoting 20 U.S.C. § 1232(g)(f)). But Congress chose no such extensive administrative procedures for Section Two, and they differ in kind from the Attorney

General's prosecutorial discretion to bring Section Two lawsuits in court. Allowing the Attorney General to elect to bring a lawsuit is not the kind of detailed alternative "federal review mechanism" Congress created to enforce FERPA, which the *Gonzaga* Court was discussing. *See id.* at 290.

Even if the Attorney General's power to sue were like the elaborate federal review mechanism described in *Gonzaga* (and it is not), *Gonzaga* clarifies that the likeness is not "an independent basis for precluding private enforcement." *Id.* at 290 n.8. This fits with other jurisprudence allowing both private and public lawsuits to enforce federal rights. *See, e.g.*, *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 255 (2009) (finding a private right of action in Title IX of the Civil Rights Act despite it having an "express enforcement mechanism" in the form of "an administrative procedure"). Put simply, the reality that the Attorney General may bring a lawsuit in federal court does not compel, or even suggest, the conclusion that Congress meant to imply no right of action for private individuals also to bring enforcement actions pursuant to Section Two of the VRA.

### b. Section Two Precedents

Standing alone, our conclusion that the text of Section Two implies a private right of action is a sufficient reason to deny Defendants' motions to dismiss. But there is more. Relevant precedent also supports our conclusion, including in particular two Supreme Court cases: *Morse* and *Milligan*. And principles of

41

congressional ratification and statutory *stare decisis* reinforce that result.

### i.    Relevant Precedent

As we previously explained, "[a] ruling that Section Two does not provide a private right of action would badly undermine the rationale offered by the Court in *Morse*." *Singleton*, 582 F. Supp. 3d at 1031. In *Morse*, the Supreme Court held that Section 10 of the Voting Rights Act contained a private right of action, reasoning that:

> Although § 2, like § 5, provides no right to sue on its face, "the existence of the private right of action under Section 2 . . . has been clearly intended by Congress since 1965." S. Rep. No. 97–417, at 30. We, in turn, have entertained cases brought by private litigants to enforce § 2. It would be anomalous, to say the least, to hold that both § 2 and § 5 are enforceable by private action but § 10 is not, when all lack the same express authorizing language.

517 U.S. at 232 (opinion of Stevens, J., with Ginsburg, J. joining) (some internal citations omitted); *see id.* at 240 (opinion of Breyer, J., with O'Connor, J. and Souter, J. joining) (agreeing that Section 10 confers a private right of action because Sections Two and Five do).

The Court's conclusion that Section 10 affords a private right of action turns in no small measure on its foundational observation that Section Two, like Section Five, is indeed enforceable by private right of action. *See id.* at 232. And the Court saw no reason for treating Section Ten any differently. *Id.* The very rationale for the Supreme Court's determination that Section Two affords a private right of action is

that Congress has "clearly intended" that since 1965. *Id.* (quoting S. REP. NO. 97–417, at 30); *see also Singleton*, 582 F. Supp. 3d at 1031 ("[T]he understanding [in *Morse*] that Section Two provides a private right of action was necessary to reach the judgment that Section Ten provides a private right of action.").[8]

"When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 67 (1996); *see also Dana's R.R. Supply v. Att'y Gen.*, 807 F.3d 1235, 1240 n.3 (11th Cir. 2015) (noting that a statement is dicta only if it "could have been deleted without seriously impairing the analytical foundations of the holding" (quoting *Denno v. Sch. Bd. of Volusia Cnty.*, 218 F.3d 1267, 1283 (11th Cir. 2000) (Forrester, J., concurring in part))); *United States v. Crawley*, 837 F.2d 291, 292 (7th Cir. 1988) (Posner, J.) (same). This holds true for any analysis that the court "explicat[es] and appl[ies]," even where the court "could have decided the case on other grounds." *United States v. Kaley*, 579 F.3d 1246, 1253 n.10 (11th Cir. 2009).

---

[8] In addition to observing that Sections Two and Five conferred private rights of action, the Court in *Morse* supported its conclusion that Section Ten confers a private right of action by reasoning that: the achievement of the VRA's goals would be severely hampered if only the Attorney General could sue to enforce Section Ten; the Attorney General had urged the Court to find a private right of action; and other sections of the VRA (specifically, Sections Three and Fourteen) contain language recognizing that private persons can sue to enforce their rights under the VRA. *See Morse*, 517 U.S. at 231–34.

However, even if we were to treat *Morse*'s statements as dicta, we are "obligated to respect [them]." *Henderson v. McMurray*, 987 F.3d 997, 1006 (11th Cir. 2021) (Pryor, C.J.). "[T]here is dicta and then there is dicta, and then there is Supreme Court dicta." *Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006). As far as we see it, at the very least, this is Supreme Court dicta with the support of five justices; and if it is a holding, plainly it would be controlling, despite the fractured votes. *See Marks v. United States*, 430 U.S. 188, 193 (1977). We will not upend it.

Defendants nevertheless urge us to ignore the language found in *Morse* on the ground that it is gravely wounded by *Sandoval. See Milligan* Doc. 331 at 22–23; *Caster* Doc. 273 at 34–35. The Supreme Court has spurned some private-right-of-action cases that were decided before *Sandoval*, describing them as part of an "*ancien regime*" in which "the Court assumed it to be a proper judicial function to provide such remedies as are necessary to make effective a statute's purpose." *Ziglar*, 582 U.S. at 131–32 (internal quotation marks and citation omitted). But *Morse* is not even mentioned in *Sandoval* and it is not part of the *ancien regime* that *Sandoval* criticized. As the Supreme Court explained in *Sandoval*, the headline case for abandoning the *ancien regime* was *Cort v. Ash*, 422 U.S. 66 (1975). *See Sandoval*, 532 U.S. at 287. *Morse* was decided twenty-one years after *Cort*. As an inferior federal court, we are required to "leav[e] to [the Supreme Court] the prerogative of overruling its own decisions." *Agostini v. Felton*, 521 U.S. 203, 237

44

(1997) (citation omitted); *see also United States v. Gibson*, 434 F.3d 1234, 1246 (11th Cir. 2006) ("It is not given to us to overrule the decisions of the Supreme Court.").

Furthermore, *Shelby County v. Holder*, 570 U.S. 529 (2013), also suggested, albeit in dicta, that Section Two implies a private right of action, and *Shelby County* postdates *Sandoval.* In *Shelby County*, the Supreme Court invalidated Section Five's preclearance regime as unconstitutional. *Id.* at 537–38. In describing the statutory scheme, the Court explained that "[b]oth the Federal Government and individuals have sued to enforce § 2, and injunctive relief is available in appropriate cases to block voting laws from going into effect." *Id.* at 537 (citations omitted). And in the final paragraph of the opinion, the Court ruled that its decision about Section Five "in no way affects the permanent, nationwide ban on racial discrimination in voting found in § 2." *Id.* at 557. Defendants' argument about *Sandoval* does not account for *Shelby County* either. *See Milligan* Doc. 331 at 22–23; *Caster* Doc. 273 at 34–35.

Other federal circuits apparently share our understanding of Supreme Court jurisprudence, including the Eleventh Circuit. *See Ala. State Conf. NAACP v. Alabama*, 949 F.3d 647, 649 (11th Cir. 2020), *vacated on other grounds sub nom. Alabama v. Ala. State Conf. NAACP*, 141 S. Ct. 2618 (2021); *see also Robinson v. Ardoin*, 86 F.4th 574, 587–88 (5th Cir. 2023) ("We conclude that . . . there is a right for these [private] Plaintiffs to bring these [Section Two] claims."); *Mixon v. Ohio*,

193 F.3d 389, 406 (6th Cir. 1999) ("An individual may bring a private cause of action under Section 2 of the Voting Rights Act.").[9]

In 2020, the Eleventh Circuit explained the history of private enforcement of Section Two this way:

> The Voting Rights Act (VRA) is widely considered to be among the most effective civil rights statutes ever passed by Congress. Its success is largely due to the work of private litigants. For more than fifty years, private parties have sued states and localities under the VRA to enforce the substantive guarantees of the Civil War Amendments. Today, private parties remain the primary enforcers of § 2 of the VRA.

*Ala. State Conf. NAACP*, 949 F.3d at 649 (footnotes omitted). The Eleventh Circuit went on to observe that "[t]he Department of Justice has filed only 4 of the 61 enforcement actions under § 2 since 2013." *Id.* n.2.[10] And the Circuit held that "[t]he

_____

[9] Most recently, a three-judge district court in the Southern District of Mississippi has followed *Robinson* and relevant Supreme Court precedent in holding that Section Two confers a private cause of action. *See Miss. State Conf. NAACP v. State Bd. of Election Comm'rs.*, No. 3:22-cv-00734-DPJ-HSO-LHS (July 2, 2024) (per curiam).

[10] Indeed, the Department of Justice has observed that private plaintiffs have brought over 400 Section Two cases resulting in judicial decisions since 1982, while the Department of Justice itself has brought just 44 cases. *See* Brief of United States as Amicus Curiae at 1–2, *Turtle Mountain Band of Chippewa Indians v. Howe*, No. 23-3655, 2024 WL 1417744 (8th Cir. Mar. 25, 2024) (citing Ellen D. Katz et al., *To Participate and Elect: Section 2 of the Voting Rights Act 40*, Univ. Mich. L. Sch. Voting Rts. Initiative (2024), https://voting.law.umich.edu; Voting Section Litigation, U.S. Dep't of Just. (2024), https://perma.cc/V5XK-Z7L8).

It is also worth noting at this juncture that the Supreme Court has "attached significance to the fact that the Attorney General had urged [it] to find that private

VRA, as amended, clearly expresses an intent to allow private parties to sue the States. The language of § 2 and § 3, read together, imposes direct liability on States for discrimination in voting and explicitly provides remedies to private parties to address violations under the statute." *Id.* at 652. Although we are not bound by this Circuit precedent because it was vacated on mootness grounds, the analysis is persuasive.

We next turn to *Milligan*, the recent decision of the Supreme Court in this very case. Although *Milligan* did not resolve the specific question whether Section Two provides a private right of action, it is nevertheless instructive.

In *Milligan*, the Supreme Court began with the recognition that "[b]y 1981, . . . only sixteen years[] [after the VRA was passed in 1965], many considered the VRA 'the most successful civil rights statute in the history of the Nation.'" *Milligan*, 599 U.S. at 10 (quoting S. REP. NO. 97–417, at 111 (1982)). "The Act 'create[d]

---

litigants may enforce the [VRA]." *Morse*, 517 U.S. at 231–32 (citing *Allen*, 393 U.S. at 557 n.23). The Attorney General has urged this Court—and numerous others—to find that Section Two affords a private right of action. *See* Statement of Interest of the United States, *Singleton v. Allen*, No. 2:21-cv-01291 (N.D. Ala. March 14, 2024); *see also* Brief for the United States as Appellee, *Alpha Phi Alpha Fraternity, Inc. v. Sec'y, State of Ga.*, No. 23-13914 (11th Cir. April 8, 2024); Brief of the United States as Amicus Curiae, *Ark. State Conf. of NAACP v. Ark. Bd. of Apportionment*, No. 22-1395 (8th Cir. Apr. 22, 2022); Statement of Interest of the United States, *Chandler v. Allen*, No. 2:21-cv-1531 (N.D. Ala. Sept. 22, 2023); Statement of Interest of the United States, *Ga. State Conf. NAACP v. Raffensperger*, No. 1:21-cv-1259 (N.D. Ga. July 26, 2021).

stringent new remedies for voting discrimination,' attempting to forever 'banish the blight of racial discrimination in voting.'" *Id.* (quoting *South Carolina v. Katzenbach*, 383 U.S. 301, 308 (1966)). The Court described important amendments to Section Two enacted in 1982, and observed that since then, "[f]or the past forty years, [the Court has] evaluated claims brought under § 2 using the three-part framework developed in [its] decision in *Thornburg v. Gingles*, 478 U.S. 30 . . . (1986)." *Milligan*, 599 U.S. at 17. That jurisprudence includes legions of Section Two claims asserted by private plaintiffs and adjudicated by the Supreme Court: *Gingles*, 478 U.S. 30; *Voinovich v. Quilter*, 507 U.S. 146 (1993); *Growe v. Emison*, 507 U.S. 25 (1993); *Johnson v. De Grandy*, 512 U.S. 997 (1994); *Holder v. Hall*, 512 U.S. 874 (1994); *Bush v. Vera*, 517 U.S. 952 (1996); *Shaw v. Hunt*, 517 U.S. 89 (1996); *Abrams v. Johnson*, 521 U.S. 74 (1997); *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399 (2006); *Cooper*, 581 U.S. 285; *Perez*, 585 U.S. 579; *Brnovich*, 594 U.S. 647; *Wis. Legislature v. Wis. Elections Comm'n*, 595 U.S. 398 (2022); *Milligan*, 599 U.S. 1.

### ii.    Congressional Ratification

As the *Milligan* Court explained repeatedly in the context of other attacks on Section Two, this long history of private plaintiffs bringing Section Two challenges means that Congress is "undoubtedly aware of [the Court's] constru[ction of] § 2," and "Congress has never disturbed [the Court's] understanding of § 2 as *Gingles*

construed it." 599 U.S. at 19, 39. And Congress "can change that if it likes" *Id.* at 39.

It has long been the rule that "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239–40 (2009) (citation omitted). In none of its amendments to the Voting Rights Act has Congress ever questioned the then-unanimous view of the courts that Section Two was privately enforceable. *See generally* Pub. L. No. 91-285, 84 Stat. 314 (1970); Pub. L. No. 94-73, 89 Stat. 400 (1975); Pub. L. No. 97-205, 96 Stat. 131 (1982); Pub. L. No. 109-246, 120 Stat. 577 (2006). In its most recent amendment, in 2006, Congress expressly noted "the continued filing of section 2 cases that originated in covered jurisdictions" as "[e]vidence of continued discrimination" that supported the need to strengthen certain provisions of the Voting Rights Act. Pub. L. No. 109-246, 120 Stat. 577 (2006).

Indeed, the Senate Report to the 1982 amendment, which the Supreme Court has called the "authoritative source for legislative intent" behind Section Two, *Gingles*, 478 U.S. at 43 n.7, said that it "reiterates the existence of the private right of action under Section 2, as has been clearly intended by Congress since 1965," S. REP. NO. 97-417, at 30 (citing *Allen*, 393 U.S. 544). The House Report to the 1982 amendment echoes precisely the same congressional intent. *See* H. REP. NO. 97-227,

49

at 32 (1981) ("It is intended that citizens have a private cause of action to enforce their rights under Section 2."). And the Senate Report to the 1975 amendment explains that fee awards under Section Fourteen of the VRA "are a necessary means of enabling *private citizens* to vindicate these Federal rights." S. REP. NO. 94-295, at 40 (1975) (emphasis added). Congress has not only ratified the federal courts' longstanding interpretation that Section Two may be enforced by private plaintiffs through inaction by failing to change the law, but it has also explicitly stated that it agrees with this interpretation.

Defendants, nevertheless, urge us that because the Supreme Court has not definitively decided the issue, there is no interpretation for Congress to ratify. *See Milligan* Doc. 331 at 21, 23. This argument ignores the reality that (but for one very recent occasion), no federal court has ever closed its doors to a private plaintiff seeking to enforce Section Two on the ground that it implies no private right of action. The point is simple: if we have consistently misunderstood a congressional enactment in case after case, court after court, decade after decade, surely Congress would have told us so by now. Nearly forty years after *Gingles*—and nearly sixty years after the passage of the Voting Rights Act itself—it is appropriate to assign some degree of legal significance to this reality, even if only as a data point that confirms our reading of the text.

### iii.    Statutory *Stare Decisis*

In addition, statutory *stare decisis* principles counsel that we should stay the course in allowing private plaintiffs to sue under Section Two. "[S]*tare decisis* carries enhanced force when a decision . . . interprets a statute" because "unlike in a constitutional case, critics of our ruling can take their objections" to Congress, which "can correct any mistake it sees." *Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 456 (2015); *see also* BRYAN A. GARNER ET AL., THE LAW OF JUDICIAL PRECEDENT 333 (2016) ("Stare decisis applies with special force to questions of statutory construction. Although courts have power to overrule their decisions and change their interpretations, they do so only for the most compelling reasons—but almost never when the previous decision has been repeatedly followed, has long been acquiesced in, or has become a rule of property."). We are guided by decades of unbroken controlling precedent suggesting that Section Two implies a private right of action, and we see no congressional effort to course correct. Accordingly, we think "statutory *stare decisis* counsels our staying the course." *Milligan*, 599 U.S. at 39.

The Supreme Court has "identified several factors to consider in deciding whether to overrule a past decision, including . . . the workability of the rule it established . . . and reliance on the decision." *Knick v. Twp. of Scott*, 588 U.S. 180, 203 (2019) (internal quotation marks omitted) (quoting *Janus v. State, Cnty., & Mun.*

*Emps.*, 585 U.S. 878, 917 (2018)). Allowing private plaintiffs to bring Section Two claims has proven to be a workable rule—having gone unquestioned for decades in multiple Supreme Court decisions. In fact, the ability of private parties to bring Section Two claims has become "the sort of stable background rule that fosters meaningful reliance." *Loper Bright Ents. v. Raimondo*, 603 U.S. ___, ___ (2024), slip op. at 33 (internal quotation marks and citation omitted). There has been no "tinkering" with the ability of private parties to bring Section Two claims by the Supreme Court, lower courts (with one, lone exception), or Congress. *Id.* And because "Congress has spurned multiple opportunities to reverse" the Supreme Court's and lower courts' treatment of private-plaintiff Section Two actions, we think "a superspecial justification" would be necessary to reverse course, and we see none here. *Kimble*, U.S. at 456, 458.

Defendants distinguish statutory *stare decisis* arguments on the same ground they attack any suggestion of congressional ratification: they assert that because the Supreme Court has not definitively decided the issue, the doctrine does not apply. *See Milligan* Doc. 331 at 23. We see the point and have taken care to rest our ruling on the statutory text. But we reject the argument that we must otherwise close our eyes to Congressional intent. The federal courts (including the Supreme Court) have consistently and uniformly allowed private plaintiffs to enforce a high-profile congressional enactment for nearly sixty years, and we see no indication in any

congressional record that Congress believes all of that (or any of it) was mistaken.

***

In our view, the text of Section Two compels the conclusion that private plaintiffs may enforce it, either through an implied private right of action, Section 1983, or both. And other doctrines confirm our understanding of the text. It is difficult in the extreme for us to believe that for nearly sixty years, federal courts have consistently misunderstood one of the most important sections of one of the most important civil rights statutes in American history, and that Congress has steadfastly refused to correct our apparent error. The Defendants' motions to dismiss the Section Two claims in *Singleton* and *Milligan* on the basis that Section Two lacks a private right of action are **DENIED**.

### 2.    Factual Allegations – *Singleton*

The Defendants also move to dismiss the *Singleton* Plaintiffs' Section Two claim on the ground that it "is supported by zero factual allegations." *Singleton* Doc. 233 at 23. According to the Defendants, the *Singleton* Plaintiffs "make no attempt to allege that black Alabamians 'have less opportunity to participate in the political process.'" *Id.* at 24 (quoting *Chisom v. Roemer*, 501 U.S. 380, 397 (1991)). The Defendants further argue that the *Singleton* Plaintiffs fail to establish "the existence of a permissible remedy," which is "part of their 'prima facie case in section 2 vote

dilution cases.'" *Id.* at 25 (quoting *Nipper v. Smith*, 39 F.3d 1494, 1524, 1530 (11th Cir. 1994)).

The *Singleton* Plaintiffs respond that we already have held that the 2023 Plan likely violates Section Two, and our prior orders "were incorporated by reference into" the operative complaint. *Singleton* Doc. 236 at 21. And the *Singleton* Plaintiffs argue "that this Court has already held that Black Alabamians have less opportunity to participate in the political process, in both the 2021 and 2023 plans." *Id.* at 23. The *Singleton* Plaintiffs further contend that they have "identified multiple permissible remedies, including the Whole County Plan and variations of it." *Id.* at 24.

The Defendants reply that the incorporation by reference doctrine "has no place here." *Singleton* Doc. 239 at 17. The Defendants contend that although "the Federal Rules permit incorporation by reference to pleadings and exhibits in the same case[,] . . . a party may not incorporate by reference evidence from an earlier action . . . or allegations in another party's complaint." *Id.* at 18 (emphasis and citations omitted).

"To succeed in proving a § 2 violation under *Gingles*, plaintiffs must satisfy three 'preconditions.'" *Milligan*, 599 U.S. at 18 (quoting *Gingles*, 478 U.S. at 50). "First, the 'minority group must be sufficiently large and [geographically] compact to constitute a majority in a reasonably configured district.'" *Id.* (quoting *Wis.*

*Legislature*, 595 U.S. at 402). "Second, the minority group must be able to show that it is politically cohesive." *Id.* (quoting *Gingles*, 478 U.S. at 51). "And third, 'the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it . . . to defeat the minority's preferred candidate.'" *Id.* (quoting *Gingles*, 478 U.S. at 51). Plaintiffs who satisfy the three *Gingles* preconditions "must also show, under the 'totality of circumstances,' that the political process is not 'equally open' to minority voters." *Id.* (quoting *Gingles*, 478 U.S. at 45–46).

"Courts use factors drawn from a report of the Senate Judiciary Committee accompanying the [Voting Rights Act] to make the totality-of-the-circumstances determination." *Ga. State Conf. NAACP v. Fayette Cnty. Bd. of Comm'rs.*, 775 F.3d 1336, 1342 (11th Cir. 2015); *accord De Grandy*, 512 U.S. at 1010 n.9 (quoting *Gingles*, 478 U.S. at 44–45). Indeed, as we have described in our first Order granting a preliminary injunction, we look to the Senate Judiciary Committee Factors, which include:

> the history of voting-related discrimination in the State or political subdivision; the extent to which voting in the elections of the State or political subdivision is racially polarized; the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting; the exclusion of members of the minority group from candidate slating processes; the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political

process; the use of overt or subtle racial appeals in political campaigns; and the extent to which members of the minority group have been elected to public office in the jurisdiction.

*Singleton*, 582 F. Supp. 3d at 958 (quoting *De Grandy*, 512 U.S. at 1010 n.9); *accord Gingles*, 478 U.S. at 44–45. However, as we noted in our first preliminary injunction Order, "[t]he Senate Factors are not exhaustive." *Singleton*, 582 F. Supp. 3d at 958.

The *Singleton* Plaintiffs assert a plausible Section Two claim. As the *Singleton* Plaintiffs allege in their operative complaint, we have held as part of a preliminary injunction that the "conditions required to establish a Section 2 violation . . . are satisfied." *Singleton* Doc. 229 ¶ 80. The *Singleton* Plaintiffs do not incorporate allegations from another party's complaint or from a prior action; they simply rely on our previous findings. In the light of the extensive briefing and hearings and exhaustive rulings we have made, there can be no serious argument that the Defendants are not on notice about the findings to which the *Singleton* Plaintiffs refer. And the *Singleton* Plaintiffs plausibly allege the existence of a remedy: a map "contain[ing] two districts which comply with the Voting Rights Act and the Constitution by providing Black voters an equal opportunity to elect candidates of their choice." *Id.* ¶ 81. That allegation is enough at this preliminary stage in the proceedings.

The Defendants' motion to dismiss the *Singleton* Plaintiffs' Section Two claim is **DENIED**.

56

### 3.      Factual Allegations – *Milligan*

The Defendants also move to dismiss the *Milligan* Plaintiffs' Section Two Claim on the basis that the *Milligan* "Plaintiffs fail to plead facts showing an unequal opportunity 'to participate in the political process.'" *Milligan* Doc. 331 at 23 (emphasis and capitalization omitted). According to the Defendants, a Section Two "plaintiff must show that members of the minority group are excluded 'from effective participation in political life.'" *Id.* at 26–27 (quoting *White v. Regester*, 412 U.S. 755, 769 (1973)). In other words, a plaintiff must show that he is "denied access to the political system." *Id.* at 27 (quoting *Whitcomb v. Chavis*, 403 U.S. 124, 155 (1971)). The Defendants say that the *Milligan* Plaintiffs' allegations "come nowhere close" to that standard. *Id.*

The *Milligan* Plaintiffs respond that "[t]he facts alleged in the complaint are ample to support the Section 2 claim under well-settled precedent and the correct pleading standard." *Milligan* Doc. 337 at 34. Moreover, like the *Singleton* Plaintiffs, the *Milligan* Plaintiffs incorporated by reference "this Court's prior findings," along with the testimony of their expert "and other experts on racially polarized voting across Alabama." *Milligan* Doc. 329 ¶ 99. The *Milligan* Plaintiffs also contend that they can "'show, under the "totality of circumstances," that the political process is not "equally open" to minority voters,' based on factors drawn from the Senate Judiciary Committee report accompanying the 1982 amendments to the VRA."

57

*Milligan* Doc. 337 at 34 (quoting *Milligan*, 599 U.S. at 18). The *Milligan* Plaintiffs argue that "[i]n *this case*, the Court reaffirmed that these factors provide a proper basis for a finding of unequal opportunity to participate under the totality of circumstances." *Id.*

The Defendants reply that the *Milligan* "Plaintiffs fail to state a claim under the text of Section 2." *Milligan* Doc. 342 at 12 (emphasis and capitalization omitted). According to the Defendants, because the *Milligan* Plaintiffs do not allege that they were "denied access to the political system," they fail to plead an essential element of a Section Two claim. *Id.* at 13, 15 (quoting *Whitcomb*, 403 U.S. at 155).

As we see it, the *Milligan* Plaintiffs assert a plausible claim for relief under Section Two. The *Milligan* Plaintiffs allege in their operative complaint that "the 2023 Plan continues to deny Black Alabamians an equal opportunity to participate in the political process by cracking the Black population's electoral strength across three congressional districts (in particular, CD1, CD2, and CD7)." *Milligan* Doc. 329 ¶ 5. The complaint continues: "Black voters in the Black Belt are cracked or fragmented among CD1, CD2, and CD7 in a manner that permits the white majority to vote as a bloc and routinely outvote them." *Id.* (footnote omitted). And the *Milligan* Plaintiffs allege that "[a]mong other factors, there is a long history and ongoing pattern of discrimination in voting, education, employment, health, and other areas in Alabama that affect Black voters' ability to participate equally in the

political process." *Id.* ¶ 194. The *Milligan* Plaintiffs allege that "Black candidates have never been elected in any majority-white congressional district, recent congressional and other political campaigns have been characterized by overt and subtle racial appeals, [and] the Legislature and white Congressmembers have been unresponsive to the particular concerns of Black voters." *Id.*

The *Milligan* Plaintiffs further allege that "the state's justifications for decades of cracking Black voters across districts are tenuous, as made particularly clear when the state in 2023 flouted two court orders and the Supreme Court to enact another congressional map with only a single majority-Black congressional district." *Id.* In particular, the *Milligan* Plaintiffs observe that "[t]he Legislature's own analysis of how the 2023 Plan would perform for Black-preferred candidates showed that Black candidates and the candidates preferred by Black voters lost in the new CD2 in all seven elections the Legislature's expert analyzed," which "represent[ed] no change in opportunity for Black voters from the 2021 Plan." *Id.* ¶¶ 4, 83. As they allege, the new CD2 had a BVAP "of just under 40%," *id.* ¶ 81, despite this Court's explicit instruction, affirmed by the Supreme Court, to create "two districts in which Black voters either comprise a voting-age majority or something quite close to it," *Singleton*, 582 F. Supp. 3d at 936.

Accordingly, the Defendants' motion to dismiss the *Milligan* Plaintiffs' Section Two claim is **DENIED**.

## IV.       CONCLUSION

The motions to dismiss in *Singleton* (Doc. 233) and *Milligan* (Doc. 331) are

**DENIED**. The motion to strike in *Milligan* (Doc. 360) is also **DENIED**.

**DONE** and **ORDERED** this 11th day of July, 2024.

**STANLEY MARCUS**
UNITED STATES CIRCUIT JUDGE

**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE

**TERRY F. MOORER**
UNITED STATES DISTRICT JUDGE