FILED
2025 Jan-29 PM 06:58
U.S. DISTRICT COURT
N.D. OF ALABAMA

Page 1

```
1        IN THE UNITED STATES DISTRICT COURT

2      FOR THE NORTHERN DISTRICT OF ALABAMA

3              SOUTHERN DIVISION

4

5   CIVIL ACTION NO.:  2:21-cv-1291-AMM

6

7   BOBBY SINGLETON, et al.,

8           Plaintiffs,

9   v.

10  WES ALLEN, in his official capacity as

11  Alabama Secretary of State, et al.,

12          Defendants.

13  -------------------------------------------

14  CIVIL ACTION NO.:  2:21-cv-01530-AMM

15

16  EVAN MILLIGAN, et al.,

17          Plaintiffs,

18  v.

19  WES ALLEN, in his official capacity as

20  Alabama Secretary of State, et al.,

21          Defendants.

22  -------------------------------------------

23
```

Veritext Legal Solutions

877-373-3660

Singleton v. Allen
2:21-CV-01291-AMM-
Date 2/10/2025
Plaintiff Exhibit Label No. 35

1                    (continued)

2

3    CIVIL ACTION NO.:  2:21-cv-01536-AMM

4

5    MARCUS CASTER, et al.,

6            Plaintiffs,

7    v.

8    WES ALLEN, in his official capacity as

9    Alabama Secretary of State, et al.,

10            Defendants.

11

12

13            DEPOSITION TESTIMONY OF:

14            R. VOLNEY RISER II, Ph.D.

15                 August 15, 2024

16

17

18

19

20

21

22

23

Page 3

S T I P U L A T I O N S

1

2            IT IS STIPULATED AND AGREED

3    by and between the parties through their

4    respective counsel that the deposition of

5    R. VOLNEY RISER II, Ph.D. may be taken

6    before Lane C. Butler, a Court Reporter

7    and Notary Public for the State at Large,

8    at the law offices of Whatley Kallas,

9    2001 Park Place North, Suite 1000,

10   Birmingham, Alabama, on the 15th day of

11   August, 2024, commencing at approximately

12   10:00 a.m.

13           IT IS FURTHER STIPULATED

14   AND AGREED that the signature to and the

15   reading of the deposition by the witness

16   is waived, the deposition to have the

17   same force and effect as if full

18   compliance had been had with all laws and

19   rules of Court relating to the taking of

20   the depositions.

21           IT IS FURTHER STIPULATED

22   AND AGREED that it shall not be necessary

23   for any objections to be made by counsel

Page 4

1    to any questions except as to form or

2    leading questions and that counsel for

3    the parties may make objections and

4    assign grounds at the time of trial or at

5    the time said deposition is offered in

6    evidence, or prior thereto.

7            In accordance with the Federal

8    Rules of Civil Procedure, I, Lane C.

9    Butler, am hereby delivering to Dylan

10   Mauldin, Esq., the original transcript of

11   the oral testimony taken the 15th day of

12   August, 2024.

13           Please be advised that this is

14   the same and not retained by the Court

15   Reporter, nor filed with the Court.

16

17

18

19

20

21

22

23

```
 1                 A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFFS:

 4

 5    James U. Blacksher, Esq.

 6    ATTORNEY AT LAW

 7    825 Linwood Road

 8    Birmingham, Alabama  35222

 9    jublacksher@gmail.com

10

11

12    FOR THE PLAINTIFFS:

13

14    Abha Khanna, Esq. (via Zoom)

15    ELIAS LAW GROUP

16    1700 Seventh Avenue

17    Suite 2100

18    Seattle, Washington  98101

19    akhana@eliaslawgroup.com

20

21

22

23
```

Page 6

1      A P P E A R A N C E S  (continued)

2

3    FOR THE DEFENDANTS:

4

5    Dylan Mauldin, Esq.

6    Charles McKay, Esq.

7    501 Washington Avenue

8    Montgomery, Alabama   36104

9    dylan.mauldin@alabamaag.gov

10   charles.mckay@alabamaag.gov

11

12

13   FOR THE DEFENDANTS:

14

15   Riley Kate Lancaster, Esq.

16   Michael Taunton, Esq.

17   BALCH & BINGHAM

18   1901 Sixth Avenue North, Suite 1500

19   Birmingham, Alabama   35203

20   rlancaster@balch.com

21   mtaunton@balch.com

22

23

1            I N D E X

2

3    EXAMINATION BY:                    PAGE NO.

4    Mr. Mauldin                          10

5

6

7

8

9            E X H I B I T S

10

11    FOR THE DEFENDANTS:

12    Exhibit 1   Curriculum Vitae        14

13    Exhibit 2   Expert Report           14

14

15

16

17

18

19

20

21

22

23

1          I, Lane C. Butler, a Court

2    Reporter and Notary Public, State of

3    Alabama at Large, acting as Notary,

4    certify that on this date, pursuant to

5    the Federal Rules of Civil Procedure and

6    the foregoing stipulation of counsel,

7    there came before me at the law offices

8    of Whatley Kallas, 2001 Park Place North,

9    Suite 1000, Birmingham, Alabama,

10   commencing at approximately 10:00 a.m.,

11   on the 15th day of August, 2024, R.

12   VOLNEY RISER II, Ph.D., witness in the

13   above cause, for oral examination,

14   whereupon the following proceedings were

15   had:

16

17

18        ROBERT VOLNEY RISER II, Ph.D.,

19         having first been duly sworn,

20     was examined and testified as follows:

21

22        THE COURT REPORTER:  Thank you.

23           Attorneys, usual stipulations?

Page 9

1          MR. MAULDIN:  Yeah.

2          MR. BLACKSHER:  Yes.

3          Do you want to read and sign

4     your deposition or just waive it?

5          THE WITNESS:  I don't know if

6     I've ever been asked before.

7          MR. BLACKSHER:  Well, what it is

8     is you get to read it and make sure that

9     the court reporter accurately recorded

10    what you said, but you can't change what

11    you said.  So it's really just --

12         THE WITNESS:  Oh, no.  I'll try

13    to edit it, so.

14         MR. BLACKSHER:  Yeah.

15         THE WITNESS:  Yeah.

16         MR. BLACKSHER:  You don't want

17    to do that.

18         THE WITNESS:  It's too great a

19    temptation.

20         MR. BLACKSHER:  We'll waive the

21    read and sign, then.

22         THE WITNESS:  I'll trust you.

23

1   EXAMINATION BY MR. MAULDIN:

2       Q.    All right.  Good morning, Dr.

3   Riser.  My name is Dylan Mauldin with the

4   Alabama Attorney General's Office.  I

5   represent the secretary of state.

6           So you've been deposed before;

7   right?

8       A.    Uh-huh.

9       Q.    I'll go over some brief ground

10  rules for the deposition.  So this

11  deposition is an opportunity for us to

12  understand your testimony in this matter.

13  I'll be asking you questions, and you

14  will answer under oath.  Do you

15  understand that?

16      A.    Yes.

17      Q.    And so in this conversation,

18  there's --

19      A.    Yes.

20      Q.    -- there's different rules.  And

21  we have a court reporter here who'll be

22  recording your answers, so it's important

23  that you give audible answers instead of,

Page 11

1    you know, nodding or --

2       A.    Or a thumbs up.  Yeah.  Okay.

3       Q.    Do you understand that?

4       A.    Yes.

5       Q.    Similarly, it's important that

6    you answer each question, or if you do

7    not understand the question, please let

8    me know and I'll try to ask it again so

9    we stay on the same page.  Will you do

10   that?

11      A.    Yes.

12            MR. BLACKSHER:  You have to

13   speak up.  Because of where the mic is,

14   you're going to have to speak a little

15   louder.  Not into the mic but --

16            THE WITNESS:  Yes.

17            MR. BLACKSHER:  -- just speak up

18   a little louder.

19            THE WITNESS:  Yes.

20      Q.    So sometimes a witness will give

21   an answer and then later in the

22   deposition realize they forgot something

23   or misspoke.  If you need to add or

1    correct at any point in the deposition,

2    please let me or your counsel know.  Will

3    you do that?

4        A.   Yes.

5        Q.   Your counsel may object from

6    time to time.  Often an objection is to

7    the form of the question.  And when that

8    happens, your counsel is just making a

9    record, but you're still required to

10    answer the question.  If your counsel has

11    some other objection and thinks you

12    should not answer, he'll make that clear.

13    But if the objection is just to the form

14    of the question, you still answer.  Do

15    you understand?

16        A.   Yes.

17        Q.   We'll occasionally take breaks,

18    but if you need a break, let me know.

19    But if there's a question pending, I'll

20    need you to answer the question before we

21    take a break.

22            Is there any reason that you

23    cannot provide complete and truthful

1    testimony here today?

2        A.    There is not.

3        Q.    Do you have any questions before

4    we begin?

5        A.    No.  I think we're good.

6        Q.    All right.  Please state your

7    full name.

8        A.    Full name is Robert Volney Riser

9    II.

10       Q.    And where do you live?

11       A.    Livingston, Alabama.

12       Q.    What's your address?

13       A.    106 Pickens Street.

14       Q.    And how long have you lived

15   there?

16       A.    I think 15 years.

17       Q.    And where were you before?

18       A.    Tuscaloosa.

19       Q.    All right.  And I'll go ahead

20   and mark --

21       A.    Actually, let me -- I can't do

22   math.  Let me try to think.  I have been

23   in Livingston for 19 years, yeah.  So

1    yeah, 19.

2        Q.    Okay.  And do you have a copy of

3    your CV with you today?

4        A.    No, not with me.

5        Q.    Okay.  And what about your

6    report?

7        A.    I don't have my report either.

8        Q.    Okay.

9              THE WITNESS:  Do you have mine?

10       Q.    I have copies.

11       A.    Okay.  All right.

12       Q.    Then I'm going to go ahead and

13   mark your CV as Exhibit 1.  That's what

14   I'm showing you now.

15   (Exhibit 1 was marked for identification

16   and is attached.)

17       A.    Okay.

18       Q.    And your report as Exhibit 2,

19   what I'm showing you now.

20   (Exhibit 2 was marked for identification

21   and is attached.)

22             All right.  So, where did you

23   receive your undergraduate education?

Page 15

1    A.    Florida State.

2    Q.    And you received two bachelor

3  degrees?

4    A.    I did.

5    Q.    From there?

6         MR. BLACKSHER:  Could you speak

7  up just a little bit, Rob?  I'm having

8  trouble hearing.  It's aging, so.

9         THE WITNESS:  Oh, okay.

10    A.    Yes, I have two bachelor's

11  degrees from Florida State.

12    Q.    And when did you receive the

13  first one?

14    A.    1995.

15    Q.    And what was your major?

16    A.    Humanities.

17    Q.    And what about the second one?

18    A.    The second one is 1998.

19    Q.    And what was your major then?

20    A.    History.

21    Q.    History.  And then you received

22  a master's from the University of

23  Alabama?

1      A.    Correct.

2      Q.    And what was your concentration?

3      A.    There isn't really a

4   concentration at the master's level.    I

5   wrote a thesis in Southern history.

6      Q.    And what was that thesis about?

7      A.    The 1901 Constitutional

8   Convention.

9      Q.    And you also wrote your

10   dissertation on that convention; correct?

11   For your Ph.D.

12      A.    Yeah.    The Ph.D. dissertation

13   expanded and built upon it.

14    (Discussion held off the record.)

15      Q.    (By Mr. Mauldin) Okay.    And what

16   year did you receive your Ph.D.?

17      A.    2005.

18      Q.    And where did you receive it

19   from?

20      A.    The University of Alabama.

21      Q.    So on your master's thesis about

22   the 1901 Constitutional Convention, what

23   about the convention did you write about?

1      A.   So -- my word, it's been a

2   minute since I've looked at that thing.

3   So it -- I'm trying to think what its

4   title was.  The title was Between Scylla

5   and Charybdis, and I forget the subtitle.

6   But what it was about was the

7   constitutional convention delegates'

8   constitutional debates, by which I mean

9   in the context of the U.S. Constitution,

10  the potential constitutionality or

11  unconstitutionality of what they were

12  attempting to do.

13     Q.   So is, it correct to say your

14  master's thesis was about whether the

15  1901 Constitution was unconstitutional

16  under the federal constitution?

17     A.   It was about the delegates'

18  debates, arguing amongst themselves

19  really over would they get away with what

20  they were doing.

21     Q.   Okay.

22     A.   Really.

23     Q.   And was that the same topic as

1    your thesis?

2        A.    So the -- pardon me.  Do you

3    mean my dissertation?

4        Q.    Oh, sorry.  Yes, your

5    dissertation.

6        A.    Well, sometimes people call them

7    Ph.D. --

8        Q.    Yeah.

9        A.    -- thesis, so I had to kind of

10   check.  So the dissertation, it -- you

11   know, it essentially kept what I had

12   started as a master's student, just

13   expanded it in terms of depth and breadth

14   of the general analysis of the original

15   question.  But the dissertation expanded

16   into the early voting rights challenges

17   to the 1901 Constitution.  And so the

18   full title of that dissertation, it ended

19   up being the convention and then and also

20   the anti- -- as I call them, the

21   anti-disfranchisement cases.

22       Q.    All right.  And what is your

23   current occupation?

1    A.    I'm a professor of history.

2    Q.    And where at?

3    A.    The University of West Alabama.

4    Q.    How long have you taught there?

5    A.    I'm beginning my 20th year

6    tomorrow.

7    Q.    And where were you -- were you

8    teaching before that?

9    A.    When I was hired as UWA, I was a

10   law student at Alabama.  I was in my

11   first year.  So I left law school to take

12   the teaching job at UWA.

13   Q.    All right.  And do you teach at

14   any other schools?

15   A.    No, I do not.

16   Q.    All right.  And in your -- in

17   Exhibit 2, in your report, on page 1, you

18   say that you teach a course on -- you

19   teach or have taught courses in U.S.

20   constitutional history.

21   A.    I have.

22   Q.    And what does that class cover?

23   A.    It depends.  It can depend.

1    There -- it could be, in some cases, I've

2    taught just sort of a general survey of

3    U.S. constitutional history which divides

4    at Reconstruction, so part 1, part 2.

5    I've taught -- on occasion over the past

6    20 years, I've taught, say, directed

7    readings courses with particular

8    students.  I think I've had one or two

9    undergraduate seminars maybe dealing with

10   constitutional history topics.

11       Q.   So, how often do you teach the

12   class on constitutional history?

13       A.   At the undergraduate level,

14   maybe once every three years.

15       Q.   What about at any other level?

16       A.   At the postgraduate level and

17   for our MAT and MED programs, I offer

18   directed readings courses, both

19   antebellum and postbellum, annually.

20       Q.   And earlier, you talked about

21   how the class was divided into two parts.

22   So, is it two courses?

23       A.   Yeah.  Ours divide -- well, part

1  1 divides -- it ends at 1868.  Part 2

2  picks up at 1868.

3      Q.    And where does part 2 end?

4      A.    It can theoretically end -- it

5  could theoretically come up to the

6  present.  I'm trying to think if I have

7  ever had any readings assigned.  I

8  generally stop the readings around 1965.

9      Q.    And you're not sure if you've

10  ever continued into the present with that

11  course?

12     A.    I don't know that I've ever

13  assigned something on a more present

14  topic, not -- not as like a stand-alone

15  -- a stand-alone topic kind of thing.

16     Q.    Okay.  And you also list -- you

17  teach or have taught courses in

18  African-American history?

19     A.    Yes.

20     Q.    What does that course cover?

21     A.    Most often on campus -- and it's

22  been -- it's been a while since I taught

23  the regular sort of surveys of

1    African-American history.  Most recently,

2    I offered a little reading seminar for my

3    undergraduate majors on Alabama

4    African-American history.

5         Q.    And what time periods did that

6    cover?

7         A.    For that course, we studied the

8    period -- we studied from Reconstruction

9    up through the mid-20th Century.

10        Q.    And you also teach a -- teach or

11   have taught a course in the Gilded Age

12   and the Progressive Era?

13        A.    Correct.

14        Q.    Tell me a little bit about that

15   course.

16        A.    Well, Gilded Age and Progressive

17   Era, I mean the name comes from the

18   standard periodizations of U.S. history.

19   Gilded Age and Progressive Era spans

20   quite a period because the Gilded Age

21   picks up -- it overlaps with the end of

22   Reconstruction, and it would carry

23   forward -- for the Progressive Era

1  portion, that would carry forward through

2  the First World War.

3      Q.    So this -- generally, what time

4  period does this course cover?

5      A.    Gilded Age and Progressive Era

6  course?

7      Q.    Well, I mean, the -- can you

8  give me the dates, the start and end

9  date?

10      A.    I generally would start it circa

11  1877 and end it with the First World War,

12  so 1919.

13      Q.    And you teach a course in the

14  Jazz Age and Great Depression.  Can you

15  tell me a little bit about that, please.

16      A.    I have offered that.  So that

17  course picks up where the Gilded Age and

18  Progressive Era course leaves off.  And

19  for that course, we study the 1920s and

20  1930s.

21      Q.    Okay.  And it doesn't go beyond

22  the 1930s?

23      A.    It does not on my campus, no.

1    Q.    Okay.  And you also teach or

2  have taught a course on the history of

3  the American South.  What do you teach in

4  that course?

5    A.    It has been a very long time

6  since I offered --

7    Q.    Okay.

8    A.    -- coursework on the Southern

9  history.  Other colleagues of mine teach

10  those courses now.

11    Q.    Okay.

12    A.    That's my area of research, but

13  it's not an area where I teach very

14  often, not directly.

15    Q.    Okay.  How long do you think

16  it's been since you've taught that

17  course?

18    A.    At least a decade.

19    Q.    Okay.  And if you look at

20  Exhibit 1, your CV, on page 5, you list

21  courses regularly taught.

22    A.    Uh-huh.

23    Q.    And so that's U.S. History I,

1    U.S. History II, Historical

2    Methodologies, Senior Seminar, Civil War

3    Era, the Novel As History.

4        A.    Uh-huh.

5        Q.    So the courses you list on page

6    1 of your report are not courses you

7    regularly teach?

8        A.    Let me make sure.  I'm trying to

9    read what I've listed here.  I would say

10   that neither is an exclusive list.

11       Q.    Okay.

12       A.    I don't know how old this --

13   this doesn't look like a very old CV.  I

14   can't -- I could not begin to tell you

15   when I last updated that section, so.

16       Q.    Well, could you take a look at

17   your CV and take some time to tell me if

18   this is an up-to-date CV.

19       A.    It won't be badly out of date,

20   I'm sure, just from the formatting.  I

21   could not give you an exact date.  I

22   would just say it's -- it's not a very

23   old one.

1     Q.    Okay.  And you said that neither

2   of these lists of courses is an

3   exhaustive list?

4     A.    No.

5     Q.    What other courses have you

6   taught recently that are not in either of

7   these two documents?

8     A.    Pacific History does not appear

9   on either of these documents.

10    Q.    And what is that course?

11    A.    It's a survey of the history of

12  Oceania.  Well, it would be the -- the

13  non-American Pacific, Pacific -- not

14  really the Pacific rim as a -- we're

15  talking about Oceania, the islands of

16  Oceania.

17        I'm running a list in my head.

18  What have I taught this past year, mainly

19  for graduate reading level.  You know, I

20  can pull out of our records system if you

21  would like, and I can provide it to you

22  directly or through Blacksher.  I can

23  give you a roster of -- if you need to

1   see it, I can give you an exact census of

2   courses I have offered.

3       Q.   We can see about that.

4       A.   Yeah.

5       Q.   So --

6       A.   It's easy to get.  If you decide

7   you want it, it's easy for me to get it.

8       Q.   On the first page of your CV,

9   you list teaching research and advising

10  interests.  And one of those is voting

11  rights and elections.

12      A.   Correct.

13      Q.   Is that a course you teach or an

14  interest?

15      A.   No.  It's just a research area.

16  It comes from having done, well, 25 years

17  of research on the disfranchising era.

18      Q.   On page 2 of your report, you

19  said, "The unifying theme of my

20  scholarship is the development and

21  practical operation of political and

22  constitutional systems in the Jim

23  Crow-era South."

1        When you're talking about the

2   Jim Crow-era South here, what time period

3   are you referencing?

4       A.   The period where I -- where I

5   work most actively would be roughly the

6   1880s through the first decade of the

7   20th Century.

8       Q.   Do you have scholarship outside

9   of that area?

10      A.   The only time I have ever

11  published outside of the early 20th

12  Century is in a pair of articles that

13  appear in the Alabama Law Review, and

14  they were treating the tenure as a --

15  tenureship as chief justice of -- is it

16  okay if I look at the CV?

17      Q.   Oh, yes.  Yes.  Go ahead.

18      A.   I want to make sure I'm giving

19  you the right --

20      Q.   Yes.  Feel free to reference

21  either of those.

22      A.   It's -- yeah.  It was working on

23  Chief Justice Torbert.

1    Q.    In what time period would that

2    have been?

3    A.    He was chief justice in the

4    1970s.

5    Q.    Okay.  You mentioned the

6    disenfranchisement era.  What time period

7    is that?

8    A.    That -- that's what I focus on

9    most in my research, so that's roughly --

10   you know, we refer to a period as the

11   disfranchisement era, and we would

12   consider it roughly spanning the late

13   1880s through the 19-teens.  We can parse

14   that out into two sub-periods, the first

15   period where the Southern states dabbled

16   in suffrage restriction; whereas in the

17   second period, they expanded that and

18   went straight into disfranchisement,

19   which would be to limit or strip

20   citizenship rights as a basis of the

21   state constitutions.

22   Q.    And what year would that second

23   time period, the disenfranchisement

1   period, begin?

2       A.    That begins in the summer of

3   1890 in Mississippi.

4       Q.    All right.  So you said at the

5   beginning of the deposition you have been

6   deposed before.

7       A.    I have.

8       Q.    How many times?

9       A.    One.

10      Q.    And what case was that?

11      A.    It was in the Thompson case.

12      Q.    And have you testified in court

13  before?

14      A.    Never.

15      Q.    And have you provided expert

16  services in litigation before?

17      A.    Yes.

18      Q.    Aside from the Thompson case,

19  are there any others?

20      A.    Yes.  In the -- it'll be -- I

21  think it'll be cited in here.  It's

22  McLemore v. Hosemann.  It's a case out of

23  -- and I want to remember which district

1    in Mississippi -- the Southern District

2    of Mississippi.

3        Q.    And did you provide an expert

4    report in that case?

5        A.    I can't remember whether it was

6    -- I think they titled it a declaration.

7        Q.    And did you have an expert

8    report or a declaration in the Thompson

9    case?

10       A.    I did.

11       Q.    So also on page 2 of your

12   report, you say that you are frequently

13   called upon as an expert reviewer.    What

14   do you mean by that?

15       A.    So in historic -- in academic

16   publishing, the gold standard would be

17   double-blind peer review, or just

18   peer-reviewed publishing.    And so -- so

19   if it's a journal editor and they've

20   received a manuscript -- this would be a

21   historical journal -- they might send it

22   to me or some other number of reviewers.

23   The way it works there, it's double

1    blind, so I don't know who the author of

2    the article is and the author of the

3    article is never told who I am.

4         Book publishers will approach me

5    as well.  That's usually single blind.

6    But in that case, it's the -- it's a

7    press.  I think all of mine have been

8    either university presses or trade

9    operations associated with university

10   presses.  But they will send me book

11   manuscripts for outside -- for outside

12   expert opinions.

13       Q.   And the materials you're

14   reviewing, are those mostly covering, you

15   know, events from the 1880s to the early

16   1910s?

17       A.   It's most common that I'm sent

18   material, yes, from the late 19th and

19   early 20th Centuries.

20       Q.   And is there ever material

21   outside of that time range?

22       A.   There has been.  It's pretty

23   rare that somebody will approach me with

1    something out of my time range, but it

2    has happened.

3        Q.    So, is it fair to say that your

4    expertise is in, you know, the time

5    period between 18 -- late 19th Century,

6    early 20th Century?

7        A.    Yes.

8        Q.    Do you have an expertise outside

9    of that time period?

10        A.    I do not.  I really don't do

11    research and publication outside of that

12    time period.  And thus -- because it's

13    not a time period where I spend a lot of

14    time in the archives and, in relative

15    terms, even in the secondary literature,

16    and as such, I would not hold myself out

17    as an expert for anything outside of the

18    late 19th and early 20th Centuries.

19        Q.    So, what did you do to prepare

20    for this deposition?

21        A.    Specifically for today's

22    meeting?

23        Q.    Yes, yes.

1      A.    I spoke with Mr. Blacksher, and

2    we discussed my report.  And in the --

3          MR. BLACKSHER:  And don't answer

4    with the details of what our discussions

5    were.  That's attorney-client, or

6    attorney work product privilege.

7      Q.    Yes.  So, did you review any

8    documents?

9      A.    My own report.

10     Q.    And did you speak to anyone

11   other than your counsel?

12     A.    No.

13     Q.    And so you've authored a report

14   for this case; correct?

15     A.    Correct.

16     Q.    And how many hours do you

17   estimate you spent preparing this report?

18     A.    So in terms of direct work on

19   this particular report of the drafting

20   and preparation of the document you have

21   in front of you, I double-checked

22   yesterday, and I billed 32 hours.  The

23   truth is I've been working on this stuff

1    for 25 years, so, you know, thus, it --

2    well, 25 years.

3        Q.    And what methodology did you use

4    to reach the opinions in this report?

5        A.    Well, I'm a qualitative

6    historian, so I work in -- which means

7    I'm working with -- first of all, when it

8    comes to primary source material, I can

9    only work with what exists.  So if

10   something was burned, destroyed, lost,

11   hidden a hundred years ago, I can't know

12   about it.  So I deal with what I can find

13   through manuscript sources.  Manuscript

14   sources here can -- because I'm dealing

15   with a matter of public policy, it can

16   involve anything from, say, published

17   decisions of the Alabama Supreme Court,

18   hypothetically speaking, of federal

19   courts.  It could -- you know, I could

20   track -- I could track things backwards.

21   Sort of the -- really the gold standard

22   would be personal correspondence and

23   diaries and materials like that.  So

1  there's that material.  And then there's

2  also the secondary literature and so

3  where you're examining what other

4  historians have found, what other

5  historians have concluded.

6       At the end of the day, these

7  things all come down to matters of

8  educated conjecture.  You -- you know,

9  you're going to have a multitude of

10 voices.  You're going to have a multitude

11 of sources.  And your job as a historian

12 is to attempt to make sense of it all,

13 not simply to document and accumulate

14 facts, because that would just make me an

15 antiquarian.  The purpose of the

16 historian is to explain why this thing

17 happened and how.  And so we do that, I

18 do that the best as -- the best as I can.

19 And you have to strive for objectivity in

20 everything that you do.  You have to let

21 the materials and the research direct

22 where you go.

23     Q.   And do you intend to testify

Page 37

1    about opinions beyond the opinions in

2    your report?

3        A.    Can you clarify?

4        Q.    Yes.  So -- sure.  At trial, do

5    you intend to provide opinions that are

6    not contained in this report?

7        A.    I would not think I would be

8    asked to testify upon anything beyond the

9    time period involved in the report and in

10   terms of what I hold myself out to be an

11   expert in.

12       Q.    And you said that was, roughly

13   speaking, late 19th Century, early 20th

14   Century?

15       A.    Correct.

16       Q.    And is everything in your

17   report -- does it take place within that

18   time period?

19       A.    I don't think anything in my

20   report takes place -- is it okay if I

21   look?

22       Q.    Yes, yes.  Feel free.

23       A.    Where did I end?

Page 38

1   Q.   Take your time.

2   A.   I can't remember.  Where do I

3   end?  I think I end with the fight

4   between -- yes.  I end with the fight

5   between the Lily Whites and the

6   Black-and-Tans within the Southern

7   Republican Party in the early 20th

8   century, so.

9   Q.   So around what year do the

10  events to, you know, frustrate like an

11  interracial political coalition, what

12  year do those begin in your report?

13  A.   From my report -- my report

14  begins in Reconstruction.  I think the

15  earliest -- I think I address Frederick

16  Bromberg's legislative service, I want to

17  say beginning -- I want to say he's

18  elected in 1868 off the top of my head.

19  Q.   Feel free to look at your

20  report.

21  A.   So it would begin -- it would

22  begin effectively with emancipation.

23  Efforts to -- and I'm speaking efforts to

1    frustrate interracial political

2    coalitions would begin immediately with

3    emancipation.

4        Q.    So on page 3 of your report,

5    paragraph 7, the second sentence, you

6    talk about from emancipation forward,

7    there was the struggle about political

8    participation.  You said earlier that

9    your report is concerned with late 19th

10   Century, early 20th Century.  So when you

11   say emancipation forward, are you talking

12   about the rest of that time period?

13       A.    Yeah.  For the duration of --

14   for the duration of the period covered in

15   my report.

16       Q.    Similarly, in your conclusion on

17   page 21, paragraph 37, you say from

18   emancipation onward.

19       A.    Yeah.

20       Q.    The same meaning there?

21       A.    Uh-huh.

22       Q.    Okay.

23       A.    Yes.

Page 40

1    Q.    Thank you.

2    A.    By the end of today, I will

3    remember to say "yes" for the court

4    reporter in the first instance, so.

5    Q.    So page 3, paragraph 6, you say,

6    "Theft, fraud, steal, destroy" are terms

7    "casually cast about in debates about

8    disfranchisement."  What do you mean by

9    that sentence?

10    A.    In that opening -- this would

11    have been paragraph 6 where I'm -- the

12    opening summary.  Is that right?

13    Q.    Yes.

14    A.    Yeah.  On page 3.  So what I'm

15    talking about there is the language of

16    political debate and political discourse,

17    you know, what is -- what -- what words

18    are partisans choosing to use to describe

19    either themselves or their opponents.

20    And you'll find, if you read manuscript

21    sources, if you look in newspaper

22    accounts, really editorial accounts from

23    newspapers, in partisan debates of those

Page 41

1    who are seeking to restrict, curb, deny,

2    you know, otherwise impede

3    African-Americans' political voice, you

4    will find that they commonly will -- they

5    will talk about, you know -- so if it's

6    the opponents of African-American voting,

7    they're going to talk of qualifications

8    and intelligence.  If you're talking

9    about, say, African-American voters or

10   politicians and their allies, they are

11   going to complain that their opponents

12   are -- it's always they're trying to

13   defraud them of their vote, they're

14   trying to steal their vote, they're

15   trying to destroy their vote.  So -- and

16   these terms are cast about to the point

17   in late 19th Southern history that it

18   becomes -- well, as I use the term here,

19   tropes, right.  So yeah.

20       Q.   Do you list any examples in this

21   report of anyone using those tropes?

22       A.   I think the only two people that

23   I quote at any length in this report are

1   Frederick Bromberg and Sydney Bowie.  We

2   can look to -- we can -- I could flip

3   through and find where I've quoted

4   Bromberg or Bowie directly, but I don't

5   -- I don't know what language they either

6   did or did not use.

7       Q.   Well, what I was referencing was

8   the theft, fraud, steal, destroy

9   language.  Are there any examples of that

10  in your report?

11      A.   I'm not recalling necessarily

12  off the top of my head, no.

13      Q.   Speaking of Frederick Bromberg,

14  so you use him as -- you say his

15  political career is kind of an example of

16  just the way the debates around, you

17  know, Black voting took place in late

18  19th Century, early 20th Century;

19  correct?

20      A.   I use Bromberg as an example of

21  sort of the shifting contours within

22  Southern Republican political discourse

23  with respect to African-Americans.

1     Q.    Why did you pick him?

2     A.    I picked Bromberg rather -- I

3  picked a single character because when it

4  comes to the institutional histories of

5  the two -- of the two main political

6  parties -- not the only political parties

7  but the two main political parties -- the

8  Republican Party and the Democratic

9  Party, then through the 19th Century,

10  they are very large, broad-based

11  coalitions covering, you know, the vast

12  geography.  And within that you have so

13  many competing philosophies and factions

14  that you can easily lose the forest for

15  the trees.  So in this case, I had a

16  really strong example of a Southern

17  Republican who had a very long life and

18  career, and so by following the --

19  following -- you know, using him sort of

20  as a guide to pull through -- through

21  that period, at least within Southern

22  Republican circles.

23     Q.    And so, why was he

1    representative of the larger shifts

2    within the party?

3        A.    Bromberg represents a bit of a

4    curiosity, first of all, because he lived

5    so very long, so the fact that he's going

6    to have lived for such a long time.

7    Bromberg also becomes an interesting

8    example because of his experience as a

9    young man during the Civil War era.  He's

10   a native Alabamian, but he spends the war

11   in Cambridge.  He's a lab assistant to

12   Charles Eliot.  And, you know, like 50

13   years later, Charles Eliot is the

14   legendary president of Harvard

15   University.  So Bromberg is important

16   because Bromberg saw everything and he

17   knew everyone.  Bromberg also is

18   significant because in the early 20th

19   Century, it becomes sort of a pet hobby

20   of his to try to correct the new

21   histories of Reconstruction that are

22   being ginned up, not only by Southern

23   scholars, but primarily for the benefit

1    of Southern scholars, partisans, the

2    various histories of Reconstruction we

3    would refer to as the Dunning School.

4    And so Bromberg, by the end of his life,

5    that's his project.  When he's not

6    practicing law, he's trying to correct

7    these various lies of Reconstruction.

8            The irony about Bromberg -- and

9    irony is what historians love -- is

10   Bromberg was a lifelong opponent of

11   African-American political participation.

12   The problem with Southern history, late

13   19th Southern history, is it is cast as a

14   clear, stark dichotomy, White Democrats,

15   Black Republicans.  But that never was

16   entirely true.  And the Republican Party

17   itself is a vast, great experiment in

18   interracial political cooperation.  But

19   because it is so vast, it means that

20   they're not all going to agree on any one

21   given thing.  And so Bromberg is a very

22   -- he's a very early, he's a very

23   prominent opponent of African-American

1    political participation, which was

2    typical of the faction of Republicans

3    that he represented, at least as a young

4    man.

5        Q.    So I believe you mentioned the

6    Dunning School --

7        A.    Uh-huh.

8        Q.    -- at some point.  Could you

9    elaborate on what that is?

10       A.    So the Dunning School takes its

11   name from William Archibald Dunning.

12   Dunning -- I'm forgetting off the top of

13   my head where Dunning is from.  Dunning

14   is not a Southerner.  Dunning is a

15   professor at Columbia University, and he

16   began -- in the 1880s, he begins -- he

17   begins -- when I say "publishing," I'm

18   going to use that broadly to refer to

19   books, articles, essays, lectures --

20   publishing on the history of Civil War

21   and Reconstruction.  And it's not simply

22   that -- excuse me.  It's not simply that

23   what Dunning is arguing in his work takes

1    a very pro-Southern, anti-abolitionist

2    tack.  That is the tack he takes.  What's

3    arguably most important about Dunning is

4    the constellation of young scholars that

5    he attracts to his seminar table.  Again,

6    not all are from the South.  The most

7    famous ones are young men and some women

8    from Southern states who then, in the

9    1890s and 19-teens, really well up until

10   the 1920s and '30s, they are continuing

11   to publish histories of Civil War and

12   Reconstruction.  And specifically, it's

13   always Civil War and Reconstruction.  And

14   they all follow sort of a basic

15   framework, which is abolition was bad,

16   the war was the tragic result of

17   abolitionists meddling, that

18   Reconstruction is a carnival of theft,

19   fraud, and abuse, that African-Americans

20   dominated the political scene in the

21   South.  They argue that this was bad.

22   They champion the rise of what they call

23   the New South.  These histories are

1    written in service, literal service of

2    the disfranchisement movement across the

3    south.

4         So when the Dunning School was

5    publishing histories of Reconstruction,

6    to use my own phrase, those are not so

7    much histories of Reconstruction as they

8    are histories for disfranchisement.  So

9    in order to justify politically, legally,

10   socially the disfranchisement of

11   African-Americans, they are publishing --

12   they are publishing scholarship that is

13   designed to poison the water, so to

14   speak.

15       Q.   So, would you say the -- kind of

16   a theme of your report is, you know,

17   pushing back on that narrative that it --

18   it kind of succeeded in a way, at least

19   insofar as it suggested that, you know,

20   Black voters had some success in, you

21   know, the late 19th -- late 19th century,

22   early 20th century?

23       A.   How do you mean "success"?

1    Q.   Well, they were able to

2    participate in the political process and

3    had some control in the Southern states.

4    A.   Until -- you would see

5    widespread African-American political

6    participation in every Southern state up

7    until the eve of that particular state

8    adopting -- whether the state adopted a

9    full-on constitution such as Alabama did

10   in 1901 or Virginia in 1902.   In other

11   cases, you have where states concluded

12   disfranchisement by amendment, and the

13   most famous, or infamous of those is

14   North Carolina.   Up until that point, you

15   still had -- I wouldn't necessarily use

16   the term "significant," but you had --

17   you had obvious identifiable

18   African-American political participation

19   in the South up until the disfranchising

20   constitutions were put into effect.

21   Q.   And so in Alabama, that was true

22   of until the 1901 Constitution?

23   A.   You would have seen significant

1    African-American voting in elections,

2    yes.

3        Q.    And I believe you also state in

4    your report that a lot of

5    African-Americans' votes were, you know,

6    stolen essentially.   Could you elaborate

7    on that?

8        A.    How did the theft occur?

9        Q.    Yes.

10       A.    Well, in some ways, it can be --

11   well, we -- their ballots can be stolen.

12   Their ballots can be cheated.   You could

13   have a situation -- say, if you were in

14   a -- and this isn't just true of Alabama.

15   If you were in an area of a Southern

16   state that had a very large

17   African-American population, say -- so

18   we're talking the river counties in

19   Mississippi, we're talking about the

20   Black Belt of Alabama, we're talking

21   about eastern North Carolina.   All right?

22   So areas where you still have

23   significant, if not major- -- majority or

1   plurality African-American populations --

2   you will -- you would often see in those

3   precincts, say, elections officials,

4   election registrars, probably more often

5   just through simple misadministration of

6   the count or of who maintained the

7   polling place, you could see them

8   routinely miscount stuff, miscount

9   ballots if they needed to.  And by

10  "needed to," I mean, if they think they

11  need to pad the total.  You would see

12  violence or the threat of violence.  That

13  would occur in areas of Southern states

14  where you have legitimate political

15  context between White factions.  So you

16  would see -- say in Reconstruction,

17  you're going to see a fight between local

18  Democratic groups and local Republicans

19  are going to be fighting over the count.

20  You would see -- later in the South when

21  the Populist Movement breaks out, you're

22  going to see -- in some states, you're

23  going to see a three-way fight.

1  Typically, Populists and Republicans

2  would cooperate through alliances.  And

3  in those cases, in areas where the

4  contest is very close, very fractious,

5  you're going to find -- you're going to

6  find the theft and fraud that I alluded

7  to there will venture into violence or

8  the threat of violence.

9      Q.   And was the theft and fraud, was

10  that limited to votes of

11  African-Americans or was it any voter?

12      A.   The very best single example I

13  can give of how that would work in

14  Alabama would be the Sayre bill.

15      Q.   And what year would that have

16  been?

17      A.   That's -- it's adopted -- I want

18  to say it was adopted in the 1892

19  legislature.

20      Q.   Okay.

21      A.   So we're talking about the first

22  -- or maybe 18- -- 1892 may have been the

23  first time it was enacted.  So the Sayre

1    bill let the governor hand-pick a,

2    essentially a helper who would be

3    installed inside the precinct, and the

4    helper's job was to help the voters with

5    their ballots.  And I don't know if

6    Alabama had yet adopted an Australian

7    ballot at that point.

8        Q.    What word was that?

9        A.    An Australian ballot.

10       Q.    What's that?

11       A.    So an Australian ballot -- so

12   there are secret ballots, and then there

13   are Australian ballots.  And the

14   difference between a secret ballot and an

15   Australian ballot is an Australian ballot

16   -- and it was first used in the British

17   colony of Australia.  It's a preprinted

18   ballot produced by the state.  I mean

19   state in the small "s" sense here.

20           And so this helper could, if he

21   so chose, help a particular voter, an

22   illiterate voter, for example, a blind

23   voter, a physically infirm voter, right,

1    you know, mark their ballot.  And so that

2    becomes a really easy way for the

3    governor -- in our -- in Alabama's case,

4    it's Governor Thomas Jones -- to appoint

5    a helper -- in his case, it's always

6    going to be a small "c" conservative

7    Democratic partisan -- who would, say, be

8    inside the polling place to, quote,

9    unquote, help see that the ballots are

10   marked correctly.

11           The practical effect of that is

12   to help see that ballots are not marked

13   for Populist and Republican candidates.

14   So if you come to the polling place

15   intending to vote for Populists and

16   Republicans, if you come to the polling

17   place and you intend to, you know, vote

18   while being Black, right, you could

19   reasonably expect that that helper is

20   going to manipulate your ballot in some

21   way.

22       Q.   Okay.

23       A.   So that is one example of how

1    the theft and fraud would work.

2        Q.    So you used the term "small 'c'

3    conservative."  I believe on page 11 of

4    your report, you talk about Alabama's

5    conservative White majority.  When you

6    use the term "conservative," what do you

7    mean?

8        A.    Resistance to change and

9    progress.  Attempting to cling to some

10   vision of the past.

11       Q.    And what would that have been in

12   this time period?

13       A.    Well, in context of the late

14   19th Century, they're clinging to the

15   image of the world before the Civil War

16   where all the men were White and all the

17   voters were Democratic, or in that

18   case -- or a Whig.  You would have had

19   Whigs in the antebellum period as well.

20   They're harking back to -- they're

21   harking back to a world where the men

22   that they would consider to be the best

23   men held sway and did not have to, you

1    know, brook disagreement from any other

2    political faction.

3            In the context of here

4    (indicating), I think we're speaking of

5    the Bourbon era.  What they're worried

6    about -- I see the footnote.  Yeah,

7    Bourbon era.  What the conservatives are

8    worried about is they're worried about

9    various breakaway White factions.

10   Q.    So, is it fair to say, in this

11   time period when you use "conservative,"

12   you're referencing, you know, White

13   supremacists essentially?

14   A.    I'm going to say the White

15   majority.  And the reason that I push

16   back on the use of the term "White

17   supremacists" there is -- it's not that

18   it's untrue.  It's that that's a more --

19   it's not quite anachronistic, but that's

20   not necessarily what you would have

21   always heard.  You would have seen the

22   phrase used in this time period, "White

23   supremacy," but more often than not,

1    you'll just see, say, White political

2    leaders, generally older ones, are going

3    to -- they're generally just going to

4    call themselves conservatives,

5    conservative Democrats.

6        Q.   So just to kind of ask in a

7    different way, when you use

8    "conservative," are you referring to a

9    set of views that extend beyond race?

10       A.   Well, I mean, sure.  Bourbon

11   Democrats, it's a -- you know, it's a

12   whole package of ideas.

13       Q.   What other ideas would it

14   include?

15       A.   Again, you know, this is going

16   to change.  Shifting faction, currency

17   questions come up a lot.  And it's --

18   when I say it comes up a lot, I mean,

19   literally, they will name their factions

20   over questions of the currency.  For

21   example, Greenbackers, they want to print

22   paper money.  Gold Democrats want to keep

23   the United States on the gold standard.

1    Silver Democrats want -- you know, want

2    to have themselves on the bimetallic

3    standard.  So you could have -- although

4    a Silver Democrat certainly would not be

5    a conservative.  So you will find, you

6    know, different White factions of --

7    within the political system organizing

8    around one political question or one

9    political, economic, commercial question.

10   It can change over time.

11        Q.   So, what did you think -- you

12   know, late 1890s, Alabama's White

13   majority, what were they trying to

14   conserve?

15        A.   Well, primarily, they're trying

16   to shut down the threat of the Populist

17   Movement, which really we know by the end

18   of the 19th Century -- I mean, the

19   Populist Party itself had been more or

20   less subsumed into the Democratic Party,

21   so it's not really the question

22   necessarily of Democratic control, but as

23   long as -- what they're really concerned

1    about is making sure that those White

2    factions remain under control.  And in

3    this case, by the late 1890s, we're

4    talking about the residual effects of the

5    Populist revolt.

6        Q.    And so, what was the Populist

7    revolt?

8        A.    So it surrounds the rise, the

9    rise and climax of various farm-based

10   organizations.  From the beginning of the

11   1880s, you would have had things like the

12   Patrons of the Grange.  "Grange" is a

13   term that comes from Scotland.  You would

14   have had farmers alliances.  You would

15   eventually see the birth of something

16   called the People's Party.  They never

17   called themselves Populists.  Their

18   opponents called them Populists.  They

19   would have called themselves -- well,

20   they would have called themselves the

21   People or Populites.

22           The reason that they achieved

23   strength is because when White voters

1   split, it means that different white

2   factions can appeal to African-American

3   voters and potentially gain power through

4   interracial political coalitions such as

5   -- so in the case of the late 19th

6   Century -- in late 19th Century Alabama,

7   conservative White Democrats are trying

8   to make sure that sort of

9   Populist-oriented Democrats do not make

10  league with African-American voters and

11  win a majority in the statewide

12  elections.  There are also concerns that

13  Republicans will formally enter into

14  alliances with Populists, and those will

15  be explicitly interracial political

16  alliances.  And so in order to maintain

17  their hold on power, by the end of the

18  19th Century, conservative Alabama

19  Democrats, they resolved that the answer

20  is going to be to strip African-Americans

21  of the vote, because once you have

22  stripped them of the vote, you simply

23  would not potentially have enough

Page 61

1    breakaway Whites to turn elections one

2    way or the other.

3        Q.   So, were the interracial

4    alliances successful at any point in

5    Alabama in this time period?  Did they

6    result in, you know, winning an election?

7        A.   I don't want to be cute here.

8    What do you mean by success?

9        Q.   Well, just win an election.  So

10   like, you know, did the Republican Party,

11   you know, win elections because of

12   interracial --

13       A.   You still have Republican

14   congressmen in Alabama as late as 1900.

15   You elect a congress- -- like a

16   Republican congressman from the

17   Birmingham area.  You will see

18   significant -- you'll see significant

19   votes cast for presidential -- Republican

20   presidential candidates in the election

21   returns.  You in -- so in 1890, at the

22   Democratic state convention, you have a

23   very contested convention.  It appears

1    the conservatives are going to lose

2    control.  And they are -- internally,

3    they almost lose control to a

4    Jeffersonian faction.  At the statewide

5    level, in 1892 and 1894, and definitely

6    in 1894, all evidence that we have

7    indicates that the Populists or the

8    Populist-oriented candidate for governor

9    of Alabama, Reuben Kolb, won, and he was

10    not inaugurated as governor because his

11    predecessor called out the National Guard

12    to keep him away from the capitol and his

13    supporters.  So you have a serious

14    political threat on their hands.  And he

15    could not have done that without the

16    support at the ballot box of

17    African-American voters.  It does not

18    mean that he himself was some sort of,

19    you know, equal voting rights advocate.

20    I would say he certainly was not.  But he

21    would have enjoyed, potentially -- when

22    they were counting those votes across the

23    state, he certainly enjoyed some number

Page 63

1    of votes cast by African-Americans.

2        Q.    Were there any other statewide

3    elections where the interracial coalition

4    got --

5        A.    No.  We never see it in Alabama.

6        Q.    Okay.

7        A.    They were -- the Bourbons were

8    really successful in stamping it out.

9        Q.    And when you say they were

10   "successful in stamping it out," are you

11   referencing the type of -- the fraud type

12   of maneuvers you referenced earlier?

13       A.    No.  Fraud is still -- fraud is

14   still -- fraud is still relatively

15   common.  It's something that -- by the

16   time of the 1901 convention, there's --

17   this rather odd phenomena has begun to

18   occur, and you'll have -- various

19   Democratic leaders will get up, and

20   essentially they will offer their

21   testimony and they'll confess to -- if

22   they're not confessing to their own

23   political sins, they'll confess to the

1    political sins that they know or have

2    heard of or that they would intimate that

3    they have firsthand knowledge of.  You

4    know, they're complaining that they're

5    teaching their boys that it's okay to

6    steal, that sort of thing.  And so they

7    are attempting to get that culture of

8    casual political fraud and political

9    theft -- they'll candidly admit to it --

10   as part of their program, as part of

11   their program to disfranchise

12   African-Americans.  There's a quip from a

13   now-dead historian named Sheldon Hackney

14   that what it amounts to is they're going

15   to close banks to stop bank robberies.

16        Q.   In page 10 of your report --

17             MR. BLACKSHER:  You want some

18   water?

19             THE WITNESS:  I could.

20        Q.   Do you want to take a quick

21   break?

22        A.   I don't think we need a break.

23   If he'll just bring me a glass of water.

1      (Discussion held off the record.)

2      Q.   (By Mr. Mauldin) So you say in

3  your report that Black voters had to

4  fight against White Democrats and hostile

5  Republicans well into the 20th Century.

6      A.   Uh-huh.

7      Q.   But your report, again, it ends

8  early 20th Century; correct?

9      A.   Yeah.

10     Q.   I'm sorry.  What was that?

11     A.   Yes.  I end mine --

12     Q.   Yeah.

13     A.   -- with the fight with the Lily

14  Whites and the Black-and-Tans.

15     Q.   And what year was that, roughly?

16     A.   I don't know if I could put an

17  exact year that it definitively end.  I

18  know that in the time period I'm dealing

19  with in my report, it sort of reaches a

20  climax with the administration of

21  Theodore Roosevelt, when President

22  Roosevelt came down on the side of the

23  Black-and-Tans and against the Lily

1   Whites.

2       Do I mention President

3   Roosevelt?

4       Q.    Page 20.

5       A.    Okay.  Yeah.   That's what I

6   thought.

7       Q.    So, what did President Roosevelt

8   do?  How did he respond to the

9   infighting?

10      A.    He fired the Lily White chairman

11  of the party.  His name was William

12  Vaughan.  And it's in footnote 38.

13  That's where I mention Vaughan --

14      Q.    Okay.

15      A.    -- is who he goes after.

16      Q.    You know, you say that

17  Republicans sought the African-American

18  vote, and the Democrats took it.  It's on

19  page 10 and 11, the last sentence.

20      A.    Oh.

21      Q.    It runs over.

22      And so not all Republicans were,

23  you know, resistant to --

1    A.    No.

2    Q.    -- Democrats joining them?

3    A.    Absolutely not.

4    Q.    Okay.  And you say that there

5    was a significant faction or a sizable

6    faction of Republicans who opposed the

7    interracial alliance?

8    A.    Uh-huh.

9    Q.    How large do you think that

10   faction was?  Was it less than the

11   majority?

12   A.    It's massive.  It's national in

13   scale.  You had -- here, I refer to

14   Bromberg, and I describe him as a liberal

15   Republican.  And that would be reflected

16   more in, say, the immediate aftermath of

17   the Civil War.  You know, the Republican

18   Party was not really -- was barely a

19   decade old.  No.  It was six years old

20   when Lincoln was elected.  And they go

21   immediately into wartime.  And during the

22   war, the Lincoln administration, you have

23   the primary fight is between -- well, you

1    have different factions within the

2    Republican Party, one which is committed

3    to an abolitionist program, making

4    abolition the centerpiece of how they

5    prosecuted the war, and then you would

6    have -- you had members of so many other

7    political factions and parties that had

8    been lumped into this Republican Party.

9    And so that's -- but that's the main

10   fight through the war is there's this

11   faction that are called radicals.  They

12   never called themselves radicals, but

13   they are called radicals by all of the

14   people they defeated.

15        And after the war, the party --

16   these factions sort of become a little

17   more well delineated, and you have again,

18   for example, you would have regular

19   Republicans and you would have liberal

20   Republicans.  And Bromberg would be one

21   of those.  Liberal Republicans, in term,

22   give rise to -- at the national level,

23   you have -- I mean, you have massive

Page 69

1    fights over decades between one group of

2    Republicans that called themselves

3    stalwarts and you have one group that

4    calls themselves half-breeds.  And that

5    fight, stalwart-half-breed fight, you

6    know, that continues on through the 19th

7    Century.  The half-breeds more or less

8    are the successors to the liberal

9    Republican Party, and they deeply resent

10   the stalwart Republicans' commitment.

11   It's not just their commitment to

12   African-American political and social

13   rights; it's that they make it a priority

14   of the party; whereas half-breeds want to

15   focus on commercial questions, you know,

16   the tariff, monetary disputes, that sort

17   of thing.  And so that faction, at the

18   national level, will continue.

19   Meanwhile, you know, in the Southern

20   states, at the state level, you have

21   fights between Lily Whites and

22   Black-and-Tans, for example.  So the

23   party is riven by these competing

Page 70

```
 1   factions, and African-American voters are
 2   literally caught in the middle of it.
 3           Because of how the Republican
 4   Party apportioned delegates to the
 5   national convention, Southern
 6   Republicans -- Southern Republicans pick
 7   the president, basically, so.
 8       Q.   So on in your report, you also
 9   say that Democrats tried to
10   disenfranchise Whites who displayed a
11   willingness to form the interracial
12   political coalitions.
13       A.   Uh-huh.
14       Q.   In your report, do you explain
15   how the Democrats tried to do that?
16       A.   How the -- the mechanics of it?
17       Q.   Yes.
18       A.   Well, the mechanics of it are --
19   you know, in terms of like the
20   instructions that are written on the
21   page, they can -- a voting registrar who
22   wishes to do can -- in Alabama, beginning
23   in 1902, they can effectively
```

1    disfranchise anybody they want to.  So

2    by -- literally, for -- they can declare

3    that you are not a person of good

4    character.  They can declare that you are

5    a person who lacks the ability to read

6    and write.  They can declare that you

7    lack proper understanding of the United

8    States Constitution.  They don't have to

9    do that in most cases because someone

10   who's illiterate is -- probably is going

11   to be afraid to come before the Board of

12   Registrars.  You also can rely upon

13   things like poll taxes.

14       Q.   So, how did Democrats go about

15   targeting the White voters who were

16   willing to form the interracial political

17   coalitions?

18       A.   The main way that you were going

19   to defuse the threat of an interracial

20   coalition -- and again, the threat of the

21   interracial coalition is not that you

22   have some interracial group operating on

23   the margins somewhere.  The threat is

1    that a disaffected -- a disaffected

2    minority of the White majority can

3    combine with the minority population.

4    And the way that you get -- the way that

5    you get rid of -- the way that they got

6    rid of the threat of a breakaway White

7    faction was by targeting African-American

8    voters.

9        Q.   But you do say on page 11 of

10   your report, the last sentence, that

11   Democrats were trying to disenfranchise

12   the Whites who were willing to form the

13   interracial coalitions; right?

14       A.   Oh, they intended to

15   disfranchise all of their opponents,

16   yeah.

17       Q.   So I guess my -- my question

18   was, how do they target those White

19   voters they wanted to disenfranchise?

20       A.   You would target them at the

21   point of registration.  And if you

22   couldn't get them at the point of

23   registration -- and what I mean by that

1    is when they would appear -- in the early

2    operation of the 1901 Constitution, the

3    registrars -- it wasn't a ministerial

4    office as it would have been for several

5    decade -- up until the -- it becomes sort

6    of a more active office again later on.

7    But under the 1901 Constitution, for the

8    in initial voter registration, the

9    registrars -- first of all, every man in

10   the state loses the right to vote.  So

11   once the constitution is ratified,

12   essentially all voter prior registrations

13   are null, so it all has to be redone in

14   the spring of 1902.  And so to get to do

15   it, to get yourself registered to vote,

16   you would have to show up in person

17   before your county's board of registrars.

18   Enormous time and concern and care goes

19   into the appointment of those registrars

20   because they were all-powerful.  They

21   could -- and there was essentially no way

22   to check anything that they did.  So the

23   governor and two other statewide

1    officials, they were put in charge of

2    selecting those county registrars.  And

3    so in all of the 66 counties -- and there

4    were only 66 counties then -- they

5    appointed three elections registrars.

6    And so you would appear before the

7    registrar.  And so if you go into the

8    registrars' office, if you show up -- and

9    that's one of the key phrases here -- you

10   potentially will be asked to testify out

11   loud in public whether or not you could

12   read and write.  Can you read and write?

13   Do you own X dollars of property?

14           There is a loophole that was in

15   the constitution, an infamous loophole.

16   In Alabama, it was called the Descendants

17   Clause.  And the loophole would get you

18   around the literacy test, could

19   theoretically get you around the literacy

20   test, and say things like the Character

21   Clause and the Understanding Clause and

22   the poll -- not the poll tax, but it

23   could get you around the, say, property

1    qualifications, that sort of thing.  But

2    to exercise it, you had to admit that you

3    were poor, that you were illiterate, and

4    so on.  So shame probably kept thousands

5    of men from -- they would have just --

6    they would have just been ashamed.

7         We know from the documentary

8    record -- I know -- that the registrars

9    are constantly in public begging White

10   men to show up to register to vote, and

11   they always will ensure no White man need

12   fear, no White man will be disfranchised,

13   no White man will be turned away.  We

14   know, though, that a lot of White men

15   just simply did not show up.  I forget a

16   percentage of how many White voters they

17   were able to strike from the rolls.  I

18   know they were able to strike 98 percent

19   of Black voters.  It's a far smaller

20   number of White voters.

21        Q.   But if you had to estimate, what

22   do you think it would be?

23        A.   Fifteen percent.

Page 76

1      Q.    Okay.

2      A.    It was very low.

3      Q.    So these -- the registrars, you

4   said that, you know, a registrar could

5   just, you know, determine that someone

6   had a poor moral character or --

7      A.    Yeah.

8      Q.    -- something similar to that.

9   Tell me a little bit about how they

10  exercised their authority, like -- and

11  how broad their authority was.

12     A.    You mean at the point of

13  registration?

14     Q.    Yes, yes.

15     A.    So they did not preserve --

16  beyond names on a roll, they don't

17  preserve records of their work, so there

18  isn't a manuscript record of all of the

19  rejected applications next to all of the

20  successful applications.  The only

21  specific rejected applications that we

22  can tell you about are the ones who

23  publicized the fact that they had been

1  disfranchised, and these were

2  typically -- typically, these were

3  African-Americans, and they were behind

4  those early voting rights cases that we

5  spoke of at the beginning.  That is --

6  that's what we would know about their

7  work.

8        We have -- I know there was at

9  least one of Alabama's registrars -- he

10  was a newspaper editor.  And as they went

11  along through their work, he would --

12  every week, you know, he would give quick

13  little updates.  What you'll find him --

14  Shropshire was his last name, I know.  He

15  was in Cherokee County.  And he, in his

16  newspaper, would give accounts.  It's

17  interesting that -- I told you before,

18  the registrars are always complaining

19  that too few White men are attempting to

20  register to vote, or in many counties

21  they're complaining of low participation

22  among White voters.  They'll complain

23  about low participation from White

1    voters, and they will specifically brag

2    of how few African-Americans they

3    registered, or they'll boast --

4    Shropshire will boast or some other

5    unnamed registrar will boast, "We have

6    registered none."  You know, that's

7    always their main boast.  So you don't --

8    I don't -- you don't find records of them

9    boasting about turning away White men.

10   You'll find records of them boasting

11   about turning away African-Americans.

12       Q.   So -- and you said the

13   registrars have -- you know, they were

14   basically all-powerful and their

15   authority was unchecked.

16       A.   For a brief period.

17       Q.   A brief period.  Okay.  So, were

18   they just kind of exercising arbitrary

19   authority to not register whoever they

20   didn't want to register?

21       A.   They were given the power to

22   judge an individual voter's fitness for

23   office.  There was --

1     Q.    Fitness for office?

2     A.    Fitness -- I'm sorry.

3     Fitness --

4     Q.    Yeah.  Okay.

5     A.    Fitness for -- sorry.  Fitness

6     for voting.

7     Q.    Okay.

8     A.    And that could -- they had the

9     -- they had the discretion, right, so the

10    state doesn't give them, "This is the

11    understanding test to give them."  They

12    had the discretion to draft a test to

13    determine whether or not someone

14    understood the duties of citizenship

15    under the United States Constitution.

16    They had the ability to make the

17    determination themselves whether someone

18    was a man known in his community of good

19    character.  They could demand a voter

20    come back -- a prospective voter come

21    back with character affidavits, for

22    example.

23              You could -- you could

1    theoretically appeal their decisions.

2    You would have to go through -- there was

3    this little -- there was this really,

4    really, really brief window you could

5    appeal their decisions in the state

6    circuit court.   Only one such appeal was

7    ever brought.

8        Q.    And I might have misunderstood

9    you, but I think you said that for a

10    brief period, the registrars were

11    unchecked.

12        A.    (Witness nods head.)

13        Q.    So, when did they quit being

14    unchecked?

15        A.    Immediately after.   So this was

16    only for the calendar year 1902.

17        Q.    Okay.

18        A.    Yeah.

19        Q.    And what happened in 1902 that

20    resolved that?

21        A.    The legislative -- the

22    legislature could adopt restrictions.

23    The main thing that -- the other main

1   thing about that initial voter

2   registration is that if you were

3   registered to vote in 1902, you were

4   presented with something called a

5   lifetime certificate.  And the state had

6   these printed.  They looked like giant

7   money.  They were a long, narrow thing,

8   and it would be this like -- I own a

9   couple now, and I think they say lifetime

10  certificate of voting.  And so you would

11  remain on the voting rolls for life

12  barring, you know, disqualification, you

13  know, on account of criminal conviction

14  or something later on.  You still had to

15  pay your poll taxes, and poll taxes are

16  going to knock out -- as the century --

17  as the 20th Century unfolds, we know --

18  in retrospect, we know the poll taxes

19  just laid waste to the Southern

20  electorate.  But after 1902, the

21  registrars lost most of the discretion

22  that they had been given under the 1901

23  Constitution, and their office becomes

1    more of a ministerial -- it becomes more

2    of a ministerial procedure than one of

3    where they get to exercise judgment.

4        Q.    And did you say the registrars,

5    you know, came into power really, or had

6    this arbitrary unchecked power in roughly

7    1901 because everyone had to re-register

8    to vote then, or was it earlier?

9        A.    They're appointed in late 1901,

10   early 1902.  Registration opens in March.

11   There were several prescribed

12   registration periods through the year

13   1902.

14       Q.    Okay.

15            MR. MAULDIN:  All right.  Do

16   y'all want to take about a five-minute

17   break?

18            THE WITNESS:  We can.

19                (Break taken.)

20       Q.    (By Mr. Mauldin) So in the

21   South, during the disenfranchisement era,

22   did Republicans seek, you know,

23   African-Americans' votes by promising to

1    actually count their votes and to listen

2    to them in the political process?

3        A.   Can you repeat that?

4        Q.   So during, you know, the

5    disenfranchisement era, you know, we

6    talked about how some Republicans were

7    seeking out the African-American vote.

8    Was, you know, part of their appeal, you

9    know, to stop, you know, the fraud,

10   essentially, you know, preventing them

11   from registering to vote or not counting

12   their votes?  Anything of that sort?

13       A.   You know, they didn't have --

14           MR. BLACKSHER:  I'm sorry.  Did

15   you say the disenfranchisement era?

16           MR. MAULDIN:  Yes.

17           MR. BLACKSHER:  Okay.

18       A.   Well, and so I -- as I have

19   framed it earlier, my work is, you know,

20   focused on the 1880s forward.

21       Q.   Yeah.  So like 1880 to roughly

22   1910, the same period as in your report.

23       A.   They don't have to.  And the

1    reason I say they don't have to is

2    because through the -- through the 1880s,

3    you have sort of a -- you have sort of a

4    settlement, we'll just say, within the

5    state of Alabama in the political system.

6    Everything just sort of -- in terms of

7    whether African-Americans will vote or

8    not, you have -- everything just sort of

9    settles into a -- for about a decade or

10   so into a static sense.  And so you would

11   have still had -- you would have had --

12   you'd have widespread participation of

13   African-Americans in the political

14   process, primarily in Republican Party

15   activity.  You would have had the -- the

16   top offices, such as it were, would have

17   been -- within the party would have been

18   occupied by White members of the party,

19   but you had -- at least at the level of,

20   say, populating their conventions with

21   delegates, it would be an integrated

22   affair.

23           The reason I said they didn't

1   have to fight is because you aren't

2   seeing through -- after the immediate

3   Reconstruction period, you don't see --

4   through the 1880s, you just don't see --

5   you just don't -- the elections are not

6   that closely contested at the state

7   level.  And so as long as -- as long as

8   the Democrats win and know that they're

9   going to win, they're not really going to

10   care that you have this minority faction

11   that contains, you know, any degree of

12   interracial cooperation.  When I say they

13   don't care, it's not that they're going

14   to approve of it; it's that they're not

15   going to feel the need to go out of their

16   way to destroy it.

17       Q.   In this same time period, did

18   Alabama Democrats try to appeal to White

19   voters by promising that they would not

20   let African-Americans vote?

21       A.   In the 1890s, yes.  Once Whites

22   began to divide on political questions.

23       Q.   So, does your report offer an

1    opinion on anything after the Lily White

2    dispute?

3        A.    No.

4        Q.    So it doesn't offer any opinion

5    on the maps at issue in this case?

6        A.    No.  No.

7        Q.    And it doesn't offer any opinion

8    on current voting patterns?

9        A.    I do not venture that, no.

10        Q.    And your opinion also doesn't --

11    your report also doesn't offer any

12    opinions on, you know, whether Alabama is

13    currently attempting to impede

14    interracial coalitions?

15        A.    No.  I've not spoken to any

16    present-day condition.

17        Q.    And so that includes your report

18    does not opine on the legislature's

19    intent in drawing any of the maps?

20        A.    No.  No.

21            MR. MAULDIN:  All right.  Well,

22    that's all I have.  I'm not sure if Ms.

23    Lancaster has anything else.

Page 87

1          THE COURT REPORTER:  Attorneys

2    on Zoom, does anyone have any questions?

3          MS. LANCASTER:  No questions for

4    me.

5

6               END OF DEPOSITION

7               (11:25 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

Page 88

```
 1              C E R T I F I C A T E

 2    STATE OF ALABAMA      )

 3    COUNTY OF JEFFERSON )

 4           I hereby certify that the above

 5    and foregoing proceeding was taken down

 6    by me by stenographic means, and that the

 7    content herein was produced in transcript

 8    form by computer aid under my

 9    supervision, and that the foregoing

10    represents, to the best of my ability, a

11    true and correct transcript of the

12    proceedings occurring on said date at

13    said time.

14           I further certify that I am

15    neither of counsel nor of kin to the

16    parties to the action; nor am I in

17    anywise interested in the result of said

18    case.

19           [Signature]

20           LANE C. BUTLER, RPR, CRR, CCR

21           CCR# 418 -- Expires 9/30/24

22           Commissioner, State of Alabama

23           My Commission Expires:  2/11/25
```

| & | | | |
|---|---|---|---|

**&**

**&** 6:17

**0**

**01530** 1:14
**01536** 2:3

**1**

**1** 7:12 14:13,15
  19:17 20:4 21:1
  24:20 25:6
**10** 7:4 64:16
  66:19
**1000** 3:9 8:9
**106** 13:13
**10:00** 3:12 8:10
**11** 55:3 66:19
  72:9
**11:25** 87:7
**1291** 1:5
**14** 7:12,13
**15** 2:15 13:16
**1500** 6:18
**15th** 3:10 4:11
  8:11
**1700** 5:16
**18** 33:5 52:22
**18362** 88:19
**1868** 21:1,2
  38:18
**1877** 23:11
**1880** 83:21
**1880s** 28:6
  29:13 32:15
  46:16 59:11
  83:20 84:2 85:4

**1890** 30:3 61:21
**1890s** 47:9
  58:12 59:3
  85:21
**1892** 52:18,22
  62:5
**1894** 62:5,6
**19** 13:23 14:1
  29:13 47:9
**1900** 61:14
**1901** 6:18 16:7
  16:22 17:15
  18:17 49:10,22
  63:16 73:2,7
  81:22 82:7,9
**1902** 49:10
  70:23 73:14
  80:16,19 81:3
  81:20 82:10,13
**1910** 83:22
**1910s** 32:16
**1919** 23:12
**1920s** 23:19
  47:10
**1930s** 23:20,22
**1965** 21:8
**1970s** 29:4
**1995** 15:14
**1998** 15:18
**19th** 32:18 33:5
  33:18 37:13
  39:9 41:17
  42:18 43:9
  45:13 48:21,21
  55:14 58:18

  60:5,6,18 69:6

**2**

**2** 7:13 14:18,20
  19:17 20:4 21:1
  21:3 27:18
  31:11
**2/11/25** 88:23
**20** 20:6 66:4
**2001** 3:9 8:8
**2005** 16:17
**2024** 2:15 3:11
  4:12 8:11
**20th** 19:5 22:9
  28:7,11 32:19
  33:6,18 37:13
  38:7 39:10
  42:18 44:18
  48:22 65:5,8
  81:17
**21** 39:17
**2100** 5:17
**25** 27:16 35:1,2
**2:21** 1:5,14 2:3

**3**

**3** 39:4 40:5,14
**30s** 47:10
**32** 34:22
**35203** 6:19
**35222** 5:8
**36104** 6:8
**37** 39:17
**38** 66:12

**4**

**418** 88:21

**5**

**5** 24:20
**50** 44:12
**501** 6:7

**6**

**6** 40:5,11
**66** 74:3,4

**7**

**7** 39:5

**8**

**825** 5:7

**9**

**9/30/24** 88:21
**98** 75:18
**98101** 5:18

**a**

**a.m.** 3:12 8:10
  87:7
**abha** 5:14
**ability** 71:5
  79:16 88:10
**able** 49:1 75:17
  75:18
**abolition** 47:15
  68:4
**abolitionist** 47:1
  68:3
**abolitionists**
  47:17

**above** 8:13 88:4
**absolutely** 67:3
**abuse** 47:19
**academic** 31:15
**accordance** 4:7
**account** 81:13
**accounts** 40:22
  40:22 77:16
**accumulate**
  36:13
**accurately** 9:9
**achieved** 59:22
**acting** 8:3
**action** 1:5,14
  2:3 88:16
**active** 73:6
**actively** 28:5
**activity** 84:15
**actually** 13:21
  83:1
**add** 11:23
**address** 13:12
  38:15
**administration**
  65:20 67:22
**admit** 64:9 75:2
**adopt** 80:22
**adopted** 49:8
  52:17,18 53:6
**adopting** 49:8
**advised** 4:13
**advising** 27:9
**advocate** 62:19
**affair** 84:22

**affidavits** 79:21
**afraid** 71:11
**african** 21:18
  22:1,4 41:3,6,9
  42:23 45:11,23
  47:19 48:11
  49:5,18 50:1,5
  50:17 51:1
  52:11 60:2,10
  60:20 62:17
  63:1 64:12
  66:17 69:12
  70:1 72:7 77:3
  78:2,11 82:23
  83:7 84:7,13
  85:20
**aftermath** 67:16
**age** 22:11,16,19
  22:20 23:5,14
  23:17
**aging** 15:8
**ago** 35:11
**agree** 45:20
**agreed** 3:2,14
  3:22
**ahead** 13:19
  14:12 28:17
**aid** 88:8
**akhana** 5:19
**al** 1:7,11,16,20
  2:5,9
**alabama** 1:2,11
  1:20 2:9 3:10
  5:8 6:8,19 8:3,9
  10:4 13:11

  15:23 16:20
  19:3,10 22:3
  28:13 35:17
  49:9,21 50:14
  50:20 52:14
  53:6 60:6,18
  61:5,14 62:9
  63:5 70:22
  74:16 84:5
  85:18 86:12
  88:2,22
**alabama's** 54:3
  55:4 58:12 77:9
**alabamaag.gov**
  6:9,10
**alabamian**
  44:10
**allen** 1:10,19
  2:8
**alliance** 67:7
**alliances** 52:2
  59:14 60:14,16
  61:4
**allies** 41:10
**alluded** 52:6
**amendment**
  49:12
**american** 21:18
  22:1,4 24:3
  26:13 41:6,9
  45:11,23 49:5
  49:18 50:1,17
  51:1 60:2,10
  62:17 66:17
  69:12 70:1 72:7

  83:7
**americans** 41:3
  42:23 47:19
  48:11 50:5
  52:11 60:20
  63:1 64:12 77:3
  78:2,11 82:23
  84:7,13 85:20
**amm** 1:5,14 2:3
**amounts** 64:14
**anachronistic**
  56:19
**analysis** 18:14
**annually** 20:19
**answer** 10:14
  11:6,21 12:10
  12:12,14,20
  34:3 60:19
**answers** 10:22
  10:23
**antebellum**
  20:19 55:19
**anti** 18:20,21
  47:1
**antiquarian**
  36:15
**anybody** 71:1
**anywise** 88:17
**appeal** 60:2
  80:1,5,6 83:8
  85:18
**appear** 26:8
  28:13 73:1 74:6
**appears** 61:23

| | | | |
|---|---|---|---|
| **applications** 76:19,20,21 | **asking** 10:13 | **back** 48:17 55:20,21 56:16 79:20,21 | **begun** 63:17 |
| **appoint** 54:4 | **assign** 4:4 | **backwards** 35:20 | **believe** 46:5 50:3 55:3 |
| **appointed** 74:5 82:9 | **assigned** 21:7 21:13 | | **belt** 50:20 |
| **appointment** 73:19 | **assistant** 44:11 | **bad** 47:15,21 | **benefit** 44:23 |
| **apportioned** 70:4 | **associated** 32:9 | **badly** 25:19 | **best** 36:18,18 52:12 55:22 88:10 |
| **approach** 32:4 32:23 | **attached** 14:16 14:21 | **balch** 6:17 | |
| **approve** 85:14 | **attempt** 36:12 | **balch.com** 6:20 6:21 | **beyond** 23:21 37:1,8 57:9 76:16 |
| **approximately** 3:11 8:10 | **attempting** 17:12 55:9 64:7 77:19 86:13 | **ballot** 53:7,9,11 53:14,15,15,18 54:1,20 62:16 | **bill** 52:14 53:1 |
| **arbitrary** 78:18 82:6 | **attorney** 5:6 10:4 34:5,6 | **ballots** 50:11,12 51:9 53:5,12,13 54:9,12 | **billed** 34:22 |
| **archibald** 46:11 | **attorneys** 8:23 87:1 | | **bimetallic** 58:2 |
| **archives** 33:14 | **attracts** 47:5 | **bank** 64:15 | **bingham** 6:17 |
| **area** 24:12,13 27:15 28:9 50:15 61:17 | **audible** 10:23 | **banks** 64:15 | **birmingham** 3:10 5:8 6:19 8:9 61:17 |
| **areas** 50:22 51:13 52:3 | **august** 2:15 3:11 4:12 8:11 | **barely** 67:18 | **birth** 59:15 |
| **arguably** 47:3 | **australia** 53:17 | **barring** 81:12 | **bit** 15:7 22:14 23:15 44:3 76:9 |
| **argue** 47:21 | **australian** 53:6 53:9,11,13,15 53:15 | **based** 43:10 59:9 | **black** 38:6 42:17 45:15 48:20 50:20 54:18 65:3,14 65:23 69:22 75:19 |
| **arguing** 17:18 46:23 | **author** 32:1,2 | **basic** 47:14 | |
| **article** 32:2,3 | **authored** 34:13 | **basically** 70:7 78:14 | |
| **articles** 28:12 46:19 | **authority** 76:10 76:11 78:15,19 | **basis** 29:20 | **blacksher** 5:5 9:2,7,14,16,20 11:12,17 15:6 26:22 34:1,3 64:17 83:14,17 |
| **ashamed** 75:6 | **avenue** 5:16 6:7 6:18 | **began** 46:16 85:22 | |
| **aside** 30:18 | | **begging** 75:9 | |
| **asked** 9:6 37:8 74:10 | **b** | **beginning** 19:5 30:5 38:17 59:10 70:22 77:5 | **blind** 31:17 32:1 32:5 53:22 |
| | **b** 7:9 | | |
| | **bachelor** 15:2 | | |
| | **bachelor's** 15:10 | **begins** 30:2 38:14 46:16,17 | |

[board - chief]    Page 92

**board** 71:11
73:17
**boast** 78:3,4,5,7
**boasting** 78:9
78:10
**bobby** 1:7
**book** 32:4,10
**books** 46:19
**bourbon** 56:5,7
57:10
**bourbons** 63:7
**bowie** 42:1,4
**box** 62:16
**boys** 64:5
**brag** 78:1
**breadth** 18:13
**break** 12:18,21
64:21,22 82:17
82:19
**breakaway** 56:9
61:1 72:6
**breaks** 12:17
51:21
**breed** 69:5
**breeds** 69:4,7,14
**brief** 10:9 78:16
78:17 80:4,10
**bring** 64:23
**british** 53:16
**broad** 43:10
76:11
**broadly** 46:18
**bromberg** 42:1
42:4,13,20 43:2
44:3,7,15,16,17

45:4,8,10,21
67:14 68:20
**bromberg's**
38:16
**brook** 56:1
**brought** 80:7
**built** 16:13
**burned** 35:10
**butler** 3:6 4:9
8:1 88:20

**c**

**c** 3:6 4:8 5:1 6:1
8:1 54:6 55:2
88:1,1,20
**calendar** 80:16
**call** 18:6,20
47:22 57:4
**called** 31:13
59:16,17,18,19
59:20 62:11
68:11,12,13
69:2 74:16 81:4
**calls** 69:4
**cambridge**
44:11
**campus** 21:21
23:23
**candidate** 62:8
**candidates**
54:13 61:20
**candidly** 64:9
**capacity** 1:10,19
2:8
**capitol** 62:12

**care** 73:18
85:10,13
**career** 42:15
43:18
**carnival** 47:18
**carolina** 49:14
50:21
**carry** 22:22
23:1
**case** 30:10,11,18
30:22 31:4,9
32:6 34:14
43:15 54:3,5
55:18 59:3 60:5
86:5 88:18
**cases** 18:21 20:1
49:11 52:3 71:9
77:4
**cast** 40:7 41:16
45:13 61:19
63:1
**caster** 2:5
**casual** 64:8
**casually** 40:7
**caught** 70:2
**cause** 8:13
**ccr** 88:20,21
**census** 27:1
**centerpiece** 68:4
**centuries** 32:19
33:18
**century** 22:9
28:7,12 33:5,6
37:13,14 38:8
39:10,10 42:18

42:18 43:9
44:19 48:21,22
55:14 58:18
60:6,6,18 65:5,8
69:7 81:16,17
**certainly** 58:4
62:20,23
**certificate** 81:5
81:10
**certify** 8:4 88:4
88:14
**chairman** 66:10
**challenges**
18:16
**champion** 47:22
**change** 9:10
55:8 57:16
58:10
**character** 43:3
71:4 74:20 76:6
79:19,21
**charge** 74:1
**charles** 6:6
44:12,13
**charles.mckay**
6:10
**charybdis** 17:5
**cheated** 50:12
**check** 18:10
73:22
**checked** 34:21
**cherokee** 77:15
**chief** 28:15,23
29:3

choosing  40:18
chose  53:21
circa  23:10
circles  43:22
circuit  80:6
cited  30:21
citizenship
  29:20 79:14
civil  1:5,14 2:3
  4:8 8:5 25:2
  44:9 46:20
  47:11,13 55:15
  67:17
clarify  37:3
class  19:22
  20:12,21
clause  74:17,21
  74:21
clear  12:12
  45:14
client  34:5
climax  59:9
  65:20
cling  55:9
clinging  55:14
close  52:4 64:15
closely  85:6
coalition  38:11
  63:3 71:20,21
coalitions  39:2
  43:11 60:4
  70:12 71:17
  72:13 86:14
colleagues  24:9

colony  53:17
columbia  46:15
combine  72:3
come  21:5 36:7
  54:14,16 57:17
  71:11 79:20,20
comes  22:17
  27:16 35:8 43:4
  57:18 59:13
commencing
  3:11 8:10
commercial
  58:9 69:15
commission
  88:23
commissioner
  88:22
commitment
  69:10,11
committed  68:2
common  32:17
  63:15
commonly  41:4
community
  79:18
competing
  43:13 69:23
complain  41:11
  77:22
complaining
  64:4 77:18,21
complete  12:23
compliance  3:18
computer  88:8

concentration
  16:2,4
concern  73:18
concerned  39:9
  58:23
concerns  60:12
concluded  36:5
  49:11
conclusion
  39:16
condition  86:16
confess  63:21,23
confessing
  63:22
congress  61:15
congressman
  61:16
congressmen
  61:14
conjecture  36:8
conservative
  54:6 55:3,5,6
  56:11 57:5,8
  58:5 60:7,18
conservatives
  56:7 57:4 62:1
conserve  58:14
consider  29:12
  55:22
constantly  75:9
constellation
  47:4
constitution
  17:9,15,16
  18:17 49:9,22

71:8 73:2,7,11
  74:15 79:15
  81:23
constitutional
  16:7,22 17:7,8
  19:20 20:3,10
  20:12 27:22
constitutionali...
  17:10
constitutions
  29:21 49:20
contained  37:6
contains  85:11
content  88:7
contest  52:4
contested  61:23
  85:6
context  17:9
  51:15 55:13
  56:3
continue  69:18
continued  2:1
  6:1 21:10
continues  69:6
continuing
  47:10
contours  42:21
control  49:3
  58:22 59:2 62:2
  62:3
convention  16:8
  16:10,22,23
  17:7 18:19
  61:22,23 63:16
  70:5

[conventions - deposed]                                                    Page 94

conventions
  84:20
conversation
  10:17
conviction
  81:13
cooperate  52:2
cooperation
  45:18 85:12
copies  14:10
copy  14:2
correct  12:1
  16:1,10 17:13
  22:13 27:12
  34:14,15 37:15
  42:19 44:20
  45:6 65:8 88:11
correctly  54:10
correspondence
  35:22
counsel  3:4,23
  4:2 8:6 12:2,5,8
  12:10 34:11
  88:15
count  51:6,19
  83:1
counties  50:18
  74:3,4 77:20
counting  62:22
  83:11
county  74:2
  77:15 88:3
county's  73:17
couple  81:9

course  19:18
  21:11,20 22:7
  22:11,15 23:4,6
  23:13,17,18,19
  24:2,4,17 26:10
  27:13
courses  19:19
  20:7,18,22
  21:17 24:10,21
  25:5,6 26:2,5
  27:2
coursework
  24:8
court  1:1 3:6,19
  4:14,15 8:1,22
  9:9 10:21 30:12
  35:17 40:3 80:6
  87:1
courts  35:19
cover  19:22
  21:20 22:6 23:4
covered  39:14
covering  32:14
  43:11
criminal  81:13
crow  27:23 28:2
crr  88:20
culture  64:7
curb  41:1
curiosity  44:4
currency  57:16
  57:20
current  18:23
  86:8

currently  86:13
curriculum  7:12
cute  61:7
cv  1:5,14 2:3
  14:3,13 24:20
  25:13,17,18
  27:8 28:16

**d**

d  7:1
dabbled  29:15
date  8:4 23:9
  25:18,19,21
  88:12
dates  23:8
day  3:10 4:11
  8:11 36:6 86:16
dead  64:13
deal  35:12
dealing  20:9
  35:14 65:18
debate  40:16
debates  17:8,18
  40:7,23 42:16
decade  24:18
  28:6 67:19 73:5
  84:9
decades  69:1
decide  27:6
decisions  35:17
  80:1,5
declaration
  31:6,8
declare  71:2,4,6
deeply  69:9

defeated  68:14
defendants  1:12
  1:21 2:10 6:3,13
  7:11
definitely  62:5
definitively
  65:17
defraud  41:13
defuse  71:19
degree  85:11
degrees  15:3,11
delegates  17:7
  17:17 70:4
  84:21
delineated
  68:17
delivering  4:9
demand  79:19
democrat  58:4
democratic  43:8
  51:18 54:7
  55:17 58:20,22
  61:22 63:19
democrats
  45:14 57:5,11
  57:22 58:1 60:7
  60:9,19 65:4
  66:18 67:2 70:9
  70:15 71:14
  72:11 85:8,18
deny  41:1
depend  19:23
depends  19:23
deposed  10:6
  30:6

[deposition - effect]                                                Page 95

deposition 2:13
3:4,15,16 4:5
9:4 10:10,11
11:22 12:1 30:5
33:20 87:6
depositions 3:20
depression
23:14
depth 18:13
descendants
74:16
describe 40:18
67:14
designed 48:13
destroy 40:6
41:15 42:8
85:16
destroyed 35:10
details 34:4
determination
79:17
determine 76:5
79:13
development
27:20
diaries 35:23
dichotomy
45:14
difference 53:14
different 10:20
57:7 58:6 60:1
68:1
direct 34:18
36:21

directed 20:6,18
directly 24:14
26:22 42:4
disaffected 72:1
72:1
disagreement
56:1
discourse 40:16
42:22
discretion 79:9
79:12 81:21
discussed 34:2
discussion
16:14 65:1
discussions 34:4
disenfranchise
70:10 72:11,19
disenfranchis...
29:6,23 82:21
83:5,15
disfranchise
64:11 71:1
72:15
disfranchised
75:12 77:1
disfranchisem...
18:21 29:11,18
40:8 48:2,8,10
49:12
disfranchising
27:17 49:19
displayed 70:10
dispute 86:2
disputes 69:16

disqualification
81:12
dissertation
16:10,12 18:3,5
18:10,15,18
district 1:1,2
30:23 31:1
divide 20:23
85:22
divided 20:21
divides 20:3
21:1
division 1:3
document 34:20
36:13
documentary
75:7
documents 26:7
26:9 34:8
doing 17:20
dollars 74:13
dominated
47:20
double 31:17,23
34:21
dr 10:2
draft 79:12
drafting 34:19
drawing 86:19
duly 8:19
dunning 45:3
46:6,10,11,12
46:13,13,14,23
47:3 48:4

duration 39:13
39:14
duties 79:14
dylan 4:9 6:5
10:3
dylan.mauldin
6:9

e

e 5:1,1 6:1,1 7:1
7:9 88:1,1
earlier 20:20
39:8 63:12 82:8
83:19
earliest 38:15
early 18:16
28:11 32:15,19
33:6,18 37:13
38:7 39:10
42:18 44:18
45:22 48:22
65:8 73:1 77:4
82:10
easily 43:14
eastern 50:21
easy 27:6,7 54:2
economic 58:9
edit 9:13
editor 31:19
77:10
editorial 40:22
educated 36:8
education 14:23
effect 3:17
49:20 54:11

**effectively** 38:22
70:23
**effects** 59:4
**efforts** 38:23,23
**either** 14:7 26:6
26:9 28:21 32:8
40:19 42:5
**elaborate** 46:9
50:6
**elect** 61:15
**elected** 38:18
67:20
**election** 51:4
61:6,9,20
**elections** 27:11
50:1 51:3 60:12
61:1,11 63:3
74:5 85:5
**electorate** 81:20
**elias** 5:15
**eliaslawgroup...**
5:19
**eliot** 44:12,13
**emancipation**
38:22 39:3,6,11
39:18
**enacted** 52:23
**ended** 18:18
**ends** 21:1 65:7
**enjoyed** 62:21
62:23
**enormous** 73:18
**ensure** 75:11
**enter** 60:13

**entirely** 45:16
**equal** 62:19
**era** 22:12,17,19
22:23 23:5,18
25:3 27:17,23
28:2 29:6,11
44:9 56:5,7
82:21 83:5,15
**esq** 4:10 5:5,14
6:5,6,15,16
**essays** 46:19
**essentially**
18:11 50:6 53:2
56:13 63:20
73:12,21 83:10
**estimate** 34:17
75:21
**et** 1:7,11,16,20
2:5,9
**evan** 1:16
**eve** 49:7
**events** 32:15
38:10
**eventually**
59:15
**evidence** 4:6
62:6
**exact** 25:21 27:1
65:17
**examination** 7:3
8:13 10:1
**examined** 8:20
**examining** 36:3
**example** 42:15
42:20 43:16

44:8 52:12
53:22 54:23
57:21 68:18
69:22 79:22
**examples** 41:20
42:9
**except** 4:1
**exclusive** 25:10
**excuse** 46:22
**exercise** 75:2
82:3
**exercised** 76:10
**exercising** 78:18
**exhaustive** 26:3
**exhibit** 7:12,13
14:13,15,18,20
19:17 24:20
**exists** 35:9
**expanded** 16:13
18:13,15 29:17
**expect** 54:19
**experience** 44:8
**experiment**
45:17
**expert** 7:13
30:15 31:3,7,13
32:12 33:17
37:11
**expertise** 33:4,8
**expires** 88:21,23
**explain** 36:16
70:14
**explicitly** 60:15
**extend** 57:9

### f

**f** 88:1
**fact** 44:5 76:23
**faction** 46:2
56:2 57:16 62:4
67:5,6,10 68:11
69:17 72:7
85:10
**factions** 43:13
51:15 56:9
57:19 58:6 59:2
60:2 68:1,7,16
70:1
**facts** 36:14
**fair** 33:3 56:10
**famous** 47:7
49:13
**far** 75:19
**farm** 59:9
**farmers** 59:14
**fear** 75:12
**federal** 4:7 8:5
17:16 35:18
**feel** 28:20 37:22
38:19 85:15
**fifteen** 75:23
**fight** 38:3,4
51:17,23 65:4
65:13 67:23
68:10 69:5,5
85:1
**fighting** 51:19
**fights** 69:1,21
**filed** 4:15

**find**  35:12 40:20
  41:4 42:3 52:5,6
  58:5 77:13 78:8
  78:10
**fired**  66:10
**first**  8:19 15:13
  19:11 23:2,11
  27:8 28:6 29:14
  35:7 40:4 44:4
  52:21,23 53:16
  73:9
**firsthand**  64:3
**fitness**  78:22
  79:1,2,3,5,5
**five**  82:16
**flip**  42:2
**florida**  15:1,11
**focus**  29:8 69:15
**focused**  83:20
**follow**  47:14
**following**  8:14
  43:18,19
**follows**  8:20
**footnote**  56:6
  66:12
**force**  3:17
**foregoing**  8:6
  88:5,9
**forest**  43:14
**forget**  17:5
  75:15
**forgetting**  46:12
**forgot**  11:22
**form**  4:1 12:7
  12:13 70:11

**71**:16 72:12
  88:8
**formally**  60:13
**formatting**
  25:20
**forward**  22:23
  23:1 39:6,11
  83:20
**found**  36:4
**fractious**  52:4
**framed**  83:19
**framework**
  47:15
**fraud**  40:6 42:8
  47:19 52:6,9
  55:1 63:11,13
  63:13,14 64:8
  83:9
**frederick**  38:15
  42:1,13
**free**  28:20 37:22
  38:19
**frequently**
  31:12
**front**  34:21
**frustrate**  38:10
  39:1
**full**  3:17 13:7,8
  18:18 49:9
**further**  3:13,21
  88:14

**g**

**gain**  60:3
**general**  18:14
  20:2

**general's**  10:4
**generally**  21:8
  23:3,10 57:2,3
**geography**
  43:12
**giant**  81:6
**gilded**  22:11,16
  22:19,20 23:5
  23:17
**ginned**  44:22
**give**  10:23 11:20
  23:8 25:21
  26:23 27:1
  52:13 68:22
  77:12,16 79:10
  79:11
**given**  45:21
  78:21 81:22
**giving**  28:18
**glass**  64:23
**gmail.com**  5:9
**go**  10:9 13:19
  14:12 23:21
  28:17 36:22
  67:20 71:14
  74:7 80:2 85:15
**goes**  66:15
  73:18
**going**  11:14
  14:12 36:9,10
  41:7,11 44:5
  45:20 46:18
  51:17,19,22,23
  52:5,5 54:6,20
  56:14 57:2,3,15

**60**:20 62:1
  64:14 71:10,18
  81:16 85:9,9,13
  85:15
**gold**  31:16
  35:21 57:22,23
**good**  10:2 13:5
  71:3 79:18
**governor**  53:1
  54:3,4 62:8,10
  73:23
**graduate**  26:19
**grange**  59:12,12
**great**  9:18 23:14
  45:17
**greenbackers**
  57:21
**ground**  10:9
**grounds**  4:4
**group**  5:15 69:1
  69:3 71:22
**groups**  51:18
**guard**  62:11
**guess**  72:17
**guide**  43:20

**h**

**h**  7:9
**hackney**  64:13
**half**  69:4,5,7,14
**hand**  53:1
**hands**  62:14
**happened**  33:2
  36:17 80:19
**happens**  12:8

harking  55:20 55:21
harvard  44:14
he'll  12:12 64:23
head  26:17 38:18 42:12 46:13 80:12
heard  56:21 64:2
hearing  15:8
held  16:14 55:23 65:1
help  53:4,21 54:9,12
helper  53:2,20 54:5,19
helper's  53:4
hidden  35:11
hired  19:9
historian  35:6 36:11,16 64:13
historians  36:4 36:5 45:9
historic  31:15
historical  25:1 31:21
histories  43:4 44:21 45:2 47:11,23 48:5,7 48:8
history  15:20,21 16:5 19:1,20 20:3,10,12 21:18 22:1,4,18

24:2,9,23 25:1,3 26:8,11 41:17 45:12,13 46:20
hobby  44:19
hold  33:16 37:10 60:17
hosemann  30:22
hostile  65:4
hours  34:16,22
huh  10:8 24:22 25:4 39:21 46:7 65:6 67:8 70:13
humanities  15:16
hundred  35:11
hypothetically  35:18

**i**

ideas  57:12,13
identifiable  49:17
identification  14:15,20
ii  2:14 3:5 8:12 8:18 13:9 25:1
illiterate  53:22 71:10 75:3
image  55:15
immediate  67:16 85:2
immediately  39:2 67:21 80:15
impede  41:2 86:13

important  10:22 11:5 44:15 47:3
inaugurated  62:10
include  57:14
includes  86:17
indicates  62:7
indicating  56:4
individual  78:22
infamous  49:13 74:15
infighting  66:9
infirm  53:23
initial  73:8 81:1
inside  53:3 54:8
insofar  48:19
installed  53:3
instance  40:4
institutional  43:4
instructions  70:20
integrated  84:21
intelligence  41:8
intend  36:23 37:5 54:17
intended  72:14
intending  54:15
intent  86:19
interest  27:14
interested  88:17
interesting  44:7 77:17

interests  27:10
internally  62:2
interracial  38:11 39:1 45:18 60:4,15 61:3,12 63:3 67:7 70:11 71:16,19,21,22 72:13 85:12 86:14
intimate  64:2
involve  35:16
involved  37:9
irony  45:8,9
islands  26:15
issue  86:5
it'll  30:20,21

**j**

james  5:5
jazz  23:14
jefferson  88:3
jeffersonian  62:4
jim  27:22 28:2
job  19:12 36:11 53:4
joining  67:2
jones  54:4
journal  31:19 31:21
jublacksher  5:9
judge  78:22
judgment  82:3
justice  28:15,23 29:3

**justify** 48:9

**k**

**kallas** 3:8 8:8
**kate** 6:15
**keep** 57:22
  62:12
**kept** 18:11 75:4
**key** 74:9
**khanna** 5:14
**kin** 88:15
**kind** 18:9 21:15
  42:15 48:15,18
  57:6 78:18
**knew** 44:17
**knock** 81:16
**know** 9:5 11:1,8
  12:2,18 18:11
  21:12 25:12
  26:19 29:10
  32:1,15 33:4
  35:1,11,19 36:8
  38:10 40:17
  41:2,5 42:5,17
  43:11,19 44:12
  48:16,19,21
  50:5 53:5 54:1
  54:17 56:1,12
  57:11,15 58:1,6
  58:12,17 61:6
  61:10,11 62:19
  64:1,4 65:16,18
  66:16,23 67:17
  69:6,15,19
  70:19 75:7,8,14
  75:18 76:4,5

77:6,8,12,14
78:6,13 81:12
81:13,17,18
82:5,22 83:4,5,8
83:9,9,10,13,19
85:8,11 86:12
**knowledge** 64:3
**known** 79:18
**kolb** 62:9

**l**

**l** 3:1
**lab** 44:11
**lack** 71:7
**lacks** 71:5
**laid** 81:19
**lancaster** 6:15
  86:23 87:3
**lane** 3:6 4:8 8:1
  88:20
**language** 40:15
  42:5,9
**large** 3:7 8:3
  43:10 50:16
  67:9
**larger** 44:1
**late** 29:12 32:18
  33:5,18 37:13
  39:9 41:17
  42:17 45:12
  48:21,21 55:13
  58:12 59:3 60:5
  60:6 61:14 82:9
**law** 3:8 5:6,15
  8:7 19:10,11
  28:13 45:6

**laws** 3:18
**leaders** 57:2
  63:19
**leading** 4:2
**league** 60:10
**leaves** 23:18
**lectures** 46:19
**left** 19:11
**legally** 48:9
**legendary** 44:14
**legislative** 38:16
  80:21
**legislature**
  52:19 80:22
**legislature's**
  86:18
**legitimate** 51:14
**length** 41:23
**level** 16:4 20:13
  20:15,16 26:19
  62:5 68:22
  69:18,20 84:19
  85:7
**liberal** 67:14
  68:19,21 69:8
**lies** 45:7
**life** 43:17 45:4
  81:11
**lifelong** 45:10
**lifetime** 81:5,9
**lily** 38:5 65:13
  65:23 66:10
  69:21 86:1
**limit** 29:19

**limited** 52:10
**lincoln** 67:20,22
**linwood** 5:7
**list** 21:16 24:20
  25:5,10 26:3,17
  27:9 41:20
**listed** 25:9
**listen** 83:1
**lists** 26:2
**literacy** 74:18
  74:19
**literal** 48:1
**literally** 57:19
  70:2 71:2
**literature** 33:15
  36:2
**litigation** 30:16
**little** 11:14,18
  15:7 22:2,14
  23:15 68:16
  76:9 77:13 80:3
**live** 13:10
**lived** 13:14 44:4
  44:6
**livingston** 13:11
  13:23
**local** 51:17,18
**long** 13:14 19:4
  24:5,15 43:17
  44:5,6 58:23
  81:7 85:7,7
**look** 24:19
  25:13,16 28:16
  37:21 38:19
  40:21 42:2

[looked - movement]

**looked** 17:2
81:6
**loophole** 74:14
74:15,17
**lose** 43:14 62:1
62:3
**loses** 73:10
**lost** 35:10 81:21
**lot** 33:13 50:4
57:17,18 75:14
**loud** 74:11
**louder** 11:15,18
**love** 45:9
**low** 76:2 77:21
77:23
**lumped** 68:8

**m**

**made** 3:23
**main** 43:5,7
68:9 71:18 78:7
80:23,23
**maintain** 60:16
**maintained** 51:6
**major** 15:15,19
50:23
**majority** 50:23
55:5 56:15
58:13 60:11
67:11 72:2
**majors** 22:3
**make** 4:3 9:8
12:12 25:8
28:18 36:12,14
60:8,9 69:13
79:16

**making** 12:8
59:1 68:3
**man** 44:9 46:4
73:9 75:11,12
75:13 79:18
**maneuvers**
63:12
**manipulate**
54:20
**manuscript**
31:20 35:13,13
40:20 76:18
**manuscripts**
32:11
**maps** 86:5,19
**march** 82:10
**marcus** 2:5
**margins** 71:23
**mark** 13:20
14:13 54:1
**marked** 14:15
14:20 54:10,12
**massive** 67:12
68:23
**master's** 15:22
16:4,21 17:14
18:12
**mat** 20:17
**material** 32:18
32:20 35:8 36:1
**materials** 32:13
35:23 36:21
**math** 13:22
**matter** 10:12
35:15

**matters** 36:7
**mauldin** 4:10
6:5 7:4 9:1 10:1
10:3 16:15 65:2
82:15,20 83:16
86:21
**mckay** 6:6
**mclemore** 30:22
**mean** 17:8 18:3
22:17 23:7
31:14 40:8
48:23 51:10
53:18 55:7
57:10,18 58:18
61:8 62:18
68:23 72:23
76:12
**meaning** 39:20
**means** 35:6
45:19 60:1 88:6
**mechanics**
70:16,18
**med** 20:17
**meddling** 47:17
**meeting** 33:22
**members** 68:6
84:18
**men** 47:7 55:16
55:21,23 75:5
75:10,14 77:19
78:9
**mention** 66:2,13
**mentioned** 29:5
46:5

**methodologies**
25:2
**methodology**
35:3
**mic** 11:13,15
**michael** 6:16
**mid** 22:9
**middle** 70:2
**milligan** 1:16
**mine** 14:9 24:9
32:7 65:11
**ministerial** 73:3
82:1,2
**minority** 72:2,3
85:10
**minute** 17:2
82:16
**misadministra...**
51:5
**miscount** 51:8,8
**mississippi** 30:3
31:1,2 50:19
**misspoke** 11:23
**misunderstood**
80:8
**monetary** 69:16
**money** 57:22
81:7
**montgomery**
6:8
**moral** 76:6
**morning** 10:2
**movement** 48:2
51:21 58:17

**mtaunton** 6:21
**multitude** 36:9
36:10

**n**

**n** 3:1 5:1 6:1 7:1
**name** 10:3 13:7
13:8 22:17
46:11 57:19
66:11 77:14
**named** 64:13
**names** 76:16
**narrative** 48:17
**narrow** 81:7
**national** 62:11
67:12 68:22
69:18 70:5
**native** 44:10
**necessarily**
42:11 49:15
56:20 58:22
**necessary** 3:22
**need** 11:23
12:18,20 26:23
51:11 64:22
75:11 85:15
**needed** 51:9,10
**neither** 25:10
26:1 88:15
**never** 30:14
32:3 45:15
59:16 63:5
68:12
**new** 44:20 47:23
**newspaper**
40:21 77:10,16

**newspapers**
40:23
**nodding** 11:1
**nods** 80:12
**non** 26:13
**north** 3:9 6:18
8:8 49:14 50:21
**northern** 1:2
**notary** 3:7 8:2,3
**novel** 25:3
**null** 73:13
**number** 31:22
62:23 75:20

**o**

**o** 3:1
**oath** 10:14
**object** 12:5
**objection** 12:6
12:11,13
**objections** 3:23
4:3
**objectivity**
36:19
**obvious** 49:17
**occasion** 20:5
**occasionally**
12:17
**occupation**
18:23
**occupied** 84:18
**occur** 50:8
51:13 63:18
**occurring** 88:12
**oceania** 26:12
26:15,16

**odd** 63:17
**offer** 20:17
63:20 85:23
86:4,7,11
**offered** 4:5 22:2
23:16 24:6 27:2
**office** 10:4 73:4
73:6 74:8 78:23
79:1 81:23
**offices** 3:8 8:7
84:16
**official** 1:10,19
2:8
**officials** 51:3
74:1
**oh** 9:12 15:9
18:4 28:17
66:20 72:14
**okay** 11:2 14:2
14:5,8,11,17
15:9 16:15
17:21 21:16
23:21 24:1,7,11
24:15,19 25:11
26:1 28:16 29:5
37:20 39:22
52:20 54:22
63:6 64:5 66:5
66:14 67:4 76:1
78:17 79:4,7
80:17 82:14
83:17
**old** 25:12,13,23
67:19,19

**older** 57:2
**once** 20:14
60:21 73:11
85:21
**ones** 47:7 57:2
76:22
**onward** 39:18
**opening** 40:10
40:12
**opens** 82:10
**operating** 71:22
**operation** 27:21
73:2
**operations** 32:9
**opine** 86:18
**opinion** 86:1,4,7
86:10
**opinions** 32:12
35:4 37:1,1,5
86:12
**opponent** 45:10
45:23
**opponents**
40:19 41:6,11
59:18 72:15
**opportunity**
10:11
**opposed** 67:6
**oral** 4:11 8:13
**order** 48:9
60:16
**organizations**
59:10
**organizing** 58:7

oriented 60:9 62:8
original 4:10 18:14
outside 28:8,11 32:11,11,21 33:8,11,17
overlaps 22:21
own 34:9 48:6 63:22 74:13 81:8

**p**

p 3:1 5:1,1 6:1,1
pacific 26:8,13 26:13,14
package 57:12
pad 51:11
page 7:3 11:9 19:17 24:20 25:5 27:8,18 31:11 39:4,17 40:5,14 55:3 64:16 66:4,19 70:21 72:9
pair 28:12
paper 57:22
paragraph 39:5 39:17 40:5,11
pardon 18:2
park 3:9 8:8
parse 29:13
part 20:4,4,23 21:1,3 64:10,10 83:8

participate 49:2
participation 39:8 45:11 46:1 49:6,18 77:21 77:23 84:12
particular 20:7 34:19 49:7 53:21
parties 3:3 4:3 43:6,6,7 68:7 88:16
partisan 40:23 54:7
partisans 40:18 45:1
parts 20:21
party 38:7 43:8 43:9 44:2 45:16 58:19,20 59:16 61:10 66:11 67:18 68:2,8,15 69:9,14,23 70:4 84:14,17,18
past 20:5 26:18 55:10
patrons 59:12
patterns 86:8
pay 81:15
peer 31:17,18
pending 12:19
people 18:6 41:22 59:21 68:14
people's 59:16

percent 75:18 75:23
percentage 75:16
period 22:8,20 23:4 28:2,4 29:1 29:6,10,15,17 29:23 30:1 33:5 33:9,12,13 37:9 37:18 39:12,14 43:21 55:12,19 56:11,22 61:5 65:18 78:16,17 80:10 83:22 85:3,17
periodizations 22:18
periods 22:5 29:14 82:12
person 71:3,5 73:16
personal 35:22
pet 44:19
ph.d. 2:14 3:5 8:12,18 16:11 16:12,16 18:7
phenomena 63:17
philosophies 43:13
phrase 48:6 56:22
phrases 74:9
physically 53:23

pick 43:1 53:1 70:6
picked 43:2,3
pickens 13:13
picks 21:2 22:21 23:17
place 3:9 8:8 37:17,20 42:17 51:7 54:8,14,17
plaintiffs 1:8,17 2:6 5:3,12
please 4:13 11:7 12:2 13:6 23:15
plurality 51:1
point 12:1 41:16 46:8 49:14 53:7 61:4 72:21,22 76:12
poison 48:13
policy 35:15
political 27:21 38:11 39:1,7 40:16,16 41:3 42:15,22 43:5,6 43:7 45:11,18 46:1 47:20 49:2 49:5,18 51:14 56:2 57:1 58:7,8 58:9 60:4,15 62:14 63:23 64:1,8,8 68:7 69:12 70:12 71:16 83:2 84:5 84:13 85:22

politically 48:9
politicians 41:10
poll 71:13 74:22 74:22 81:15,15 81:18
polling 51:7 54:8,14,16
poor 75:3 76:6
populating 84:20
population 50:17 72:3
populations 51:1
populist 51:21 54:13 58:16,19 59:5,6 60:9 62:8
populists 52:1 54:15 59:17,18 60:14 62:7
populites 59:21
portion 23:1
postbellum 20:19
postgraduate 20:16
potential 17:10
potentially 60:3 60:23 62:21 74:10
power 60:3,17 78:21 82:5,6
powerful 73:20 78:14

practical 27:21 54:11
practicing 45:6
precinct 53:3
precincts 51:3
predecessor 62:11
preparation 34:20
prepare 33:19
preparing 34:17
preprinted 53:17
prescribed 82:11
present 21:6,10 21:13 86:16
presented 81:4
preserve 76:15 76:17
president 44:14 65:21 66:2,7 70:7
presidential 61:19,20
press 32:7
presses 32:8,10
pretty 32:22
preventing 83:10
primarily 44:23 58:15 84:14
primary 35:8 67:23

print 57:21
printed 81:6
prior 4:6 73:12
priority 69:13
privilege 34:6
pro 47:1
probably 51:4 71:10 75:4
problem 45:12
procedure 4:8 8:5 82:2
proceeding 88:5
proceedings 8:14 88:12
process 49:2 83:2 84:14
produced 53:18 88:7
product 34:6
professor 19:1 46:15
program 64:10 64:11 68:3
programs 20:17
progress 55:9
progressive 22:12,16,19,23 23:5,18
project 45:5
prominent 45:23
promising 82:23 85:19
proper 71:7

property 74:13 74:23
prosecuted 68:5
prospective 79:20
provide 12:23 26:21 31:3 37:5
provided 30:15
public 3:7 8:2 35:15 74:11 75:9
publication 33:11
publicized 76:23
publish 47:11
published 28:11 35:16
publishers 32:4
publishing 31:16,18 46:17 46:20 48:5,11 48:12
pull 26:20 43:20
purpose 36:15
pursuant 8:4
push 56:15
pushing 48:17
put 49:20 65:16 74:1

**q**

qualifications 41:7 75:1
qualitative 35:5

**question** 11:6,7
12:7,10,14,19
12:20 18:15
58:8,9,21 72:17
**questions** 4:1,2
10:13 13:3
57:17,20 69:15
85:22 87:2,3
**quick** 64:20
77:12
**quip** 64:12
**quit** 80:13
**quite** 22:20
56:19
**quote** 41:23
54:8
**quoted** 42:3

**r**

**r** 2:14 3:5 5:1
6:1 8:11 88:1
**race** 57:9
**radicals** 68:11
68:12,13
**range** 32:21
33:1
**rare** 32:23
**rather** 43:2
63:17
**ratified** 73:11
**reach** 35:4
**reaches** 65:19
**read** 9:3,8,21
25:9 40:20 71:5
74:12,12

**reading** 3:15
22:2 26:19
**readings** 20:7
20:18 21:7,8
**realize** 11:22
**really** 9:11 16:3
17:19,22 26:14
33:10 35:21
40:22 43:16
47:9 54:2 58:17
58:21,23 63:8
67:18 80:3,4,4
82:5 85:9
**reason** 12:22
56:15 59:22
84:1,23
**reasonably**
54:19
**recalling** 42:11
**receive** 14:23
15:12 16:16,18
**received** 15:2,21
31:20
**recently** 22:1
26:6
**reconstruction**
20:4 22:8,22
38:14 44:21
45:2,7 46:21
47:12,13,18
48:5,7 51:16
85:3
**record** 12:9
16:14 65:1 75:8
76:18

**recorded** 9:9
**recording** 10:22
**records** 26:20
76:17 78:8,10
**redone** 73:13
**refer** 29:10 45:3
46:18 67:13
**reference** 28:20
**referenced**
63:12
**referencing**
28:3 42:7 56:12
63:11
**referring** 57:8
**reflected** 67:15
**register** 75:10
77:20 78:19,20
82:7
**registered** 73:15
78:3,6 81:3
**registering**
83:11
**registrar** 70:21
74:7 76:4 78:5
**registrars** 51:4
71:12 73:3,9,17
73:19 74:2,5,8
75:8 76:3 77:9
77:18 78:13
80:10 81:21
82:4
**registration**
72:21,23 73:8
76:13 81:2
82:10,12

**registrations**
73:12
**regular** 21:23
68:18
**regularly** 24:21
25:7
**rejected** 76:19
76:21
**relating** 3:19
**relative** 33:14
**relatively** 63:14
**rely** 71:12
**remain** 59:2
81:11
**remember**
30:23 31:5 38:2
40:3
**repeat** 83:3
**report** 7:13 14:6
14:7,18 19:17
25:6 27:18 31:4
31:8,12 34:2,9
34:13,17,19
35:4 37:2,6,9,17
37:20 38:12,13
38:13,20 39:4,9
39:15 41:21,23
42:10 48:16
50:4 55:4 64:16
65:3,7,19 70:8
70:14 72:10
83:22 85:23
86:11,17
**reporter** 3:6
4:15 8:2,22 9:9

10:21 40:4 87:1
**represent** 10:5
**representative**
    44:1
**represented**
    46:3
**represents** 44:3
    88:10
**republican** 38:7
    42:22 43:8,17
    43:22 45:16
    54:13 61:10,13
    61:16,19 67:15
    67:17 68:2,8
    69:9 70:3 84:14
**republicans**
    45:15 46:2
    51:18 52:1
    54:16 60:13
    65:5 66:17,22
    67:6 68:19,20
    68:21 69:2,10
    70:6,6 82:22
    83:6
**required** 12:9
**research** 24:12
    27:9,15,17 29:9
    33:11 36:21
**resent** 69:9
**residual** 59:4
**resistance** 55:8
**resistant** 66:23
**resolved** 60:19
    80:20

**respect** 42:23
**respective** 3:4
**respond** 66:8
**rest** 39:12
**restrict** 41:1
**restriction**
    29:16
**restrictions**
    80:22
**result** 47:16
    61:6 88:17
**retained** 4:14
**retrospect** 81:18
**returns** 61:21
**reuben** 62:9
**review** 28:13
    31:17 34:7
**reviewed** 31:18
**reviewer** 31:13
**reviewers** 31:22
**reviewing** 32:14
**revolt** 59:5,7
**rid** 72:5,6
**right** 10:2,7
    13:6,19 14:11
    14:22 18:22
    19:13,16 28:19
    30:4 40:12
    41:19 50:21
    53:23 54:18
    72:13 73:10
    79:9 82:15
    86:21
**rights** 18:16
    27:11 29:20

62:19 69:13
    77:4
**riley** 6:15
**rim** 26:14
**rise** 47:22 59:8
    59:9 68:22
**riser** 2:14 3:5
    8:12,18 10:3
    13:8
**riven** 69:23
**river** 50:18
**rlancaster** 6:20
**road** 5:7
**rob** 15:7
**robberies** 64:15
**robert** 8:18 13:8
**roll** 76:16
**rolls** 75:17
    81:11
**roosevelt** 65:21
    65:22 66:3,7
**roster** 26:23
**roughly** 28:5
    29:9,12 37:12
    65:15 82:6
    83:21
**routinely** 51:8
**rpr** 88:20
**rules** 3:19 4:8
    8:5 10:10,20
**running** 26:17
**runs** 66:21

## s

**s** 3:1,1 5:1 6:1
    7:9 53:19
**saw** 44:16
**sayre** 52:14,23
**scale** 67:13
**scene** 47:20
**scholars** 44:23
    45:1 47:4
**scholarship**
    27:20 28:8
    48:12
**school** 19:11
    45:3 46:6,10
    48:4
**schools** 19:14
**scotland** 59:13
**scylla** 17:4
**seattle** 5:18
**second** 15:17,18
    29:17,22 39:5
**secondary**
    33:15 36:2
**secret** 53:12,14
**secretary** 1:11
    1:20 2:9 10:5
**section** 25:15
**see** 27:1,3 49:4
    51:2,7,11,16,17
    51:20,22,23
    54:9,12 56:6
    57:1 59:15
    61:17,18 63:5
    85:3,4

[seeing - state]

seeing  85:2
seek  82:22
seeking  41:1
  83:7
seen  49:23
  56:21
selecting  74:2
seminar  22:2
  25:2 47:5
seminars  20:9
send  31:21
  32:10
senior  25:2
sense  36:12
  53:19 84:10
sent  32:17
sentence  39:5
  40:9 66:19
  72:10
serious  62:13
service  38:16
  48:1,1
services  30:16
set  57:9
settlement  84:4
settles  84:9
seventh  5:16
several  73:4
  82:11
shame  75:4
sheldon  64:13
shifting  42:21
  57:16
shifts  44:1

show  73:16 74:8
  75:10,15
showing  14:14
  14:19
shropshire
  77:14 78:4
shut  58:16
side  65:22
sign  9:3,21
signature  3:14
  88:19
significant
  44:18 49:16,23
  50:23 61:18,18
  67:5
silver  58:1,4
similar  76:8
similarly  11:5
  39:16
simple  51:5
simply  36:13
  46:21,22 60:22
  75:15
single  32:5 43:3
  52:12
singleton  1:7
sins  63:23 64:1
situation  50:13
six  67:19
sixth  6:18
sizable  67:5
small  53:19 54:6
  55:2
smaller  75:19

social  69:12
socially  48:10
somebody  32:23
sorry  18:4 65:10
  79:2,5 83:14
sort  20:2 21:23
  35:21 42:21
  43:19 44:19
  47:14 60:8
  62:18 64:6
  65:19 68:16
  69:16 73:5 75:1
  83:12 84:3,3,6,8
sought  66:17
source  35:8
sources  35:13
  35:14 36:11
  40:21
south  24:3
  27:23 28:2 47:6
  47:21,23 48:3
  49:19 51:20
  82:21
southern  1:3
  16:5 24:8 29:15
  31:1 38:6 41:17
  42:22 43:16,21
  44:22 45:1,12
  45:13 47:1,8
  49:3,6 50:15
  51:13 69:19
  70:5,6 81:19
southerner
  46:14

spanning  29:12
spans  22:19
speak  11:13,14
  11:17 15:6
  34:10 48:14
speaking  35:18
  37:13 38:23
  42:13 56:4
specific  76:21
specifically
  33:21 47:12
  78:1
spend  33:13
spends  44:10
spent  34:17
split  60:1
spoke  34:1 77:5
spoken  86:15
spring  73:14
stalwart  69:5,10
stalwarts  69:3
stamping  63:8
  63:10
stand  21:14,15
standard  22:18
  31:16 35:21
  57:23 58:3
stark  45:14
start  23:8,10
started  18:12
state  1:11,20 2:9
  3:7 8:2 10:5
  13:6 15:1,11
  29:21 49:6,7,8
  50:3,16 53:18

53:19 61:22
62:23 69:20
73:10 79:10
80:5 81:5 84:5
85:6 88:2,22
**states** 1:1 29:15
47:8 49:3,11
51:13,22 57:23
69:20 71:8
79:15
**statewide** 60:11
62:4 63:2 73:23
**static** 84:10
**stay** 11:9
**steal** 40:6 41:14
42:8 64:6
**stenographic**
88:6
**stipulated** 3:2
3:13,21
**stipulation** 8:6
**stipulations**
8:23
**stolen** 50:6,11
**stop** 21:8 64:15
83:9
**straight** 29:18
**street** 13:13
**strength** 59:23
**strike** 75:17,18
**strip** 29:19
60:20
**stripped** 60:22
**strive** 36:19

**strong** 43:16
**struggle** 39:7
**student** 18:12
19:10
**students** 20:8
**studied** 22:7,8
**study** 23:19
**stuff** 34:23 51:8
**sub** 29:14
**subsumed** 58:20
**subtitle** 17:5
**succeeded** 48:18
**success** 48:20,23
61:8
**successful** 61:4
63:8,10 76:20
**successors** 69:8
**suffrage** 29:16
**suggested** 48:19
**suite** 3:9 5:17
6:18 8:9
**summary** 40:12
**summer** 30:2
**supervision**
88:9
**support** 62:16
**supporters**
62:13
**supremacists**
56:13,17
**supremacy**
56:23
**supreme** 35:17
**sure** 9:8 21:9
25:8,20 28:18

37:4 57:10 59:1
60:8 86:22
**surrounds** 59:8
**survey** 20:2
26:11
**surveys** 21:23
**sway** 55:23
**sworn** 8:19
**sydney** 42:1
**system** 26:20
58:7 84:5
**systems** 27:22

**t**

**t** 3:1,1 7:9 88:1
88:1
**table** 47:5
**tack** 47:2,2
**take** 12:17,21
19:11 25:16,17
37:17 38:1
64:20 82:16
**taken** 3:5 4:11
82:19 88:5
**takes** 37:20
46:10,23 47:2
**talk** 39:6 41:5,7
55:4
**talked** 20:20
83:6
**talking** 26:15
28:1 39:11
40:15 41:8
50:18,19,20
52:21 59:4

**tans** 38:6 65:14
65:23 69:22
**target** 72:18,20
**targeting** 71:15
72:7
**tariff** 69:16
**taught** 19:4,19
20:2,5,6 21:17
21:22 22:11
24:2,16,21 26:6
26:18
**taunton** 6:16
**tax** 74:22
**taxes** 71:13
81:15,15,18
**teach** 19:13,18
19:19 20:11
21:17 22:10,10
23:13 24:1,3,9
24:13 25:7
27:13
**teaching** 19:8
19:12 27:9 64:5
**teens** 29:13 47:9
**tell** 22:14 23:15
25:14,17 76:9
76:22
**temptation** 9:19
**tenure** 28:14
**tenureship**
28:15
**term** 41:18
49:16 55:2,6
56:16 59:13
68:21

**terms** 18:13
33:15 34:18
37:10 40:6
41:16 70:19
84:6
**test** 74:18,20
79:11,12
**testified** 8:20
30:12
**testify** 36:23
37:8 74:10
**testimony** 2:13
4:11 10:12 13:1
63:21
**thank** 8:22 40:1
**theft** 40:6 42:8
47:18 50:8 52:6
52:9 55:1 64:9
**theme** 27:19
48:16
**theodore** 65:21
**theoretically**
21:4,5 74:19
80:1
**thereto** 4:6
**thesis** 16:5,6,21
17:14 18:1,9
**thing** 17:2 21:15
36:16 45:21
64:6 69:17 75:1
80:23 81:1,7
**things** 35:20
36:7 59:11
71:13 74:20

**think** 13:5,16,22
17:3 20:8 21:6
24:15 30:21
31:6 32:7 37:7
37:19 38:3,14
38:15 41:22
51:10 56:4
58:11 64:22
67:9 75:22 80:9
81:9
**thinks** 12:11
**thomas** 54:4
**thompson** 30:11
30:18 31:8
**thought** 66:6
**thousands** 75:4
**threat** 51:12
52:8 58:16
62:14 71:19,20
71:23 72:6
**three** 20:14
51:23 74:5
**thumbs** 11:2
**time** 4:4,5 12:6
12:6 22:5 23:3
24:5 25:17 28:2
28:10 29:1,6,23
32:21 33:1,4,9
33:12,13,14
37:9,18 38:1
39:12 44:6
52:23 55:12
56:11,22 58:10
61:5 63:16
65:18 73:18

85:17 88:13
**times** 30:8
**title** 17:4,4
18:18
**titled** 31:6
**today** 13:1 14:3
40:2
**today's** 33:21
**told** 32:3 77:17
**tomorrow** 19:6
**took** 42:17
66:18
**top** 38:18 42:12
46:12 84:16
**topic** 17:23
21:14,15
**topics** 20:10
**torbert** 28:23
**total** 51:11
**track** 35:20,20
**trade** 32:8
**tragic** 47:16
**transcript** 4:10
88:7,11
**treating** 28:14
**trees** 43:15
**trial** 4:4 37:4
**tried** 70:9,15
**tropes** 41:19,21
**trouble** 15:8
**true** 45:16 49:21
50:14 88:11
**trust** 9:22
**truth** 34:23

**truthful** 12:23
**try** 9:12 11:8
13:22 44:20
85:18
**trying** 17:3 21:6
25:8 41:12,14
41:15 45:6
58:13,15 60:7
72:11
**turn** 61:1
**turned** 75:13
**turning** 78:9,11
**tuscaloosa**
13:18
**two** 15:2,10
20:8,21,22 26:7
29:14 41:22
43:5,5,7 73:23
**type** 63:11,11
**typical** 46:2
**typically** 52:1
77:2,2

| u |
|---|

**u** 3:1 5:5
**u.s.** 17:9 19:19
20:3 22:18
24:23 25:1
**uh** 10:8 24:22
25:4 39:21 46:7
65:6 67:8 70:13
**unchecked**
78:15 80:11,14
82:6
**unconstitutional**
17:15

unconstitution... 17:11

under 10:14 17:16 59:2 73:7 79:15 81:22 88:8

undergraduate 14:23 20:9,13 22:3

understand 10:12,15 11:3,7 12:15

understanding 71:7 74:21 79:11

understood 79:14

unfolds 81:17

unifying 27:19

united 1:1 57:23 71:7 79:15

university 15:22 16:20 19:3 32:8 32:9 44:15 46:15

unnamed 78:5

unquote 54:9

untrue 56:18

updated 25:15

updates 77:13

use 35:3 40:18 41:18 42:6,14 42:20 46:18 48:6 49:15 55:6 56:11,16 57:7

used 53:16 55:2 56:22

using 41:21 43:19

usual 8:23

usually 32:5

uwa 19:9,12

**v**

v 1:9,18 2:7 30:22

various 45:2,7 56:9 59:9 63:18

vast 43:11 45:17 45:19

vaughan 66:12 66:13

venture 52:7 86:9

views 57:9

violence 51:12 51:12 52:7,8

virginia 49:10

vision 55:10

vitae 7:12

voice 41:3

voices 36:10

volney 2:14 3:5 8:12,18 13:8

vote 41:13,14,15 54:15,17 60:21 60:22 66:18 73:10,15 75:10 77:20 81:3 82:8 83:7,11 84:7 85:20

voter 52:11 53:21,22,23,23 73:8,12 79:19 79:20 81:1

voter's 78:22

voters 41:9 48:20 53:4 55:17 59:23 60:3,10 62:17 65:3 70:1 71:15 72:8,19 75:16 75:19,20 77:22 78:1 85:19

votes 50:5 52:10 61:19 62:22 63:1 82:23 83:1 83:12

voting 18:16 27:10 41:6 42:17 50:1 62:19 70:21 77:4 79:6 81:10 81:11 86:8

**w**

waive 9:4,20

waived 3:16

want 9:3,16 27:7 28:18 30:23 38:16,17 52:17 57:21,22 58:1,1 61:7 64:17,20 69:14 71:1 78:20 82:16

wanted 72:19

war 23:2,11 25:2 44:9,10 46:20 47:11,13 47:16 55:15 67:17,22 68:5 68:10,15

wartime 67:21

washington 5:18 6:7

waste 81:19

water 48:13 64:18,23

way 31:23 42:16 48:18 51:23 54:2,21 57:7 61:2 71:18 72:4 72:4,5 73:21 85:16

ways 50:10

week 77:12

went 29:18 77:10

wes 1:10,19 2:8

west 19:3

whatley 3:8 8:8

whig 55:18

whigs 55:19

white 45:14 51:15 55:5,16 56:9,12,14,16 56:22 57:1 58:6 58:12 59:1,23 60:1,7 65:4 66:10 71:15

72:2,6,18 75:9
75:11,12,13,14
75:16,20 77:19
77:22,23 78:9
84:18 85:18
86:1
**whites**  38:5 61:1
65:14 66:1
69:21 70:10
72:12 85:21
**widespread**
49:5 84:12
**william**  46:11
66:11
**willing**  71:16
72:12
**willingness**
70:11
**win**  60:11 61:9
61:11 85:8,9
**window**  80:4
**winning**  61:6
**wishes**  70:22
**witness**  3:15
8:12 9:5,12,15
9:18,22 11:16
11:19,20 14:9
15:9 64:19
80:12 82:18
**women**  47:7
**won**  62:9
**word**  17:1 53:8
**words**  40:17
**work**  28:5 34:6
34:18 35:6,9

46:23 52:13
55:1 76:17 77:7
77:11 83:19
**working**  28:22
34:23 35:7
**works**  31:23
**world**  23:2,11
55:15,21
**worried**  56:5,8
56:8
**write**  16:23 71:6
74:12,12
**written**  48:1
70:20
**wrote**  16:5,9

**x**

**x**  7:1,9 74:13

**y**

**y'all**  82:16
**yeah**  9:1,14,15
11:2 13:23 14:1
16:12 18:8
20:23 27:4
28:22 39:13,19
40:14 41:19
56:6 65:9,12
66:5 72:16 76:7
79:4 80:18
83:21
**year**  16:16 19:5
19:11 26:18
29:22 38:9,12
52:15 65:15,17
80:16 82:12

**years**  13:16,23
20:6,14 27:16
35:1,2,11 44:13
67:19
**yesterday**  34:22
**young**  44:9 46:3
47:4,7

**z**

**zoom**  5:14 87:2

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# R. VOLNEY RISER

Professor of History ▪ Department of History & Social Sciences
The University of West Alabama ▪ UWA Station 22
Livingston, Alabama 35470 ▪ rvolneyriser@gmail.com ▪ www.rvolneyriser.com

## TEACHING & PROFESSIONAL EXPERIENCE

**Professor of History,** August 2019-
The University of West Alabama

**Associate Professor of History,** 2014–2019
The University of West Alabama

**Assistant Professor of History,** 2007–2014
The University of West Alabama

**Lecturer in History,** 2005–2007
The University of West Alabama

**Editor,** 2012-2017
*The Alabama Review*

## TEACHING, RESEARCH, & ADVISING INTERESTS

U.S. Constitutional History
American Legal History
Voting Rights and Elections

American Political History
Gilded Age & Progressive Era
Southern History

## PUBLICATIONS

**Published Books**

*Defying Disfranchisement: Black Voting Rights Activism in the Jim Crow South, 1890–1908*
(Louisiana State University Press, May 2010; paperback edition, January 2013).

*A Goodly Heritage: Judges and Historically Significant Decisions of the United States Court for the Middle District of Alabama, 1804–1955* (Bounds Library Occasional Papers Series, no. 7, University of Alabama School of Law, May 2010).

**Books in Progress**

*Retribution in History: Politics, Anti-Democracy, and Jim Crow Constitutionalism, 1890-1915*

*The Litigious Mr. Washington: Booker T. Washington and the Courts.*



EXHIBIT
tabbies
1

**Published Peer-reviewed Articles**

(co-authored with Tony A. Freyer and Paul M. Pruitt, Jr.) "Clement Clay Torbert and Alabama Law Reform." *Alabama Law Review* 63, no. 4 (2012): 867–94.

"Disfranchisement, the U.S. Constitution, and the Courts: Alabama's 1901 Constitutional Convention Debates the Grandfather Clause." *American Journal of Legal History* 48, no. 3 (2006): 237–79.

"'The Milk in the Cocoanut': Booker T. Washington, Theodore Roosevelt, and the Fear of Conspiracy in Alabama's 1901 Constitutional Ratification Referendum." *Southern Historian* 26 (Spring 2005): 30–54.

"The Burdens of Being White: Empire and Disfranchisement." *Alabama Law Review* 53, no. 1 (Fall 2001): 243–72.

**Articles in Progress**

"Empire's Ladder: African American Emigration to Hawai'i, 1899-1901."

"Jim Crow's Unexpected Influence upon Hawaii: Southern Disfranchisement, Northern Imperialists, and the 1900 Hawaiian Organic Act."

"Ua Mau ke Ea o ka 'Āina i ka Pono: Hawai'i's 1900 Territorial Delegate Election and the Fight to Redeem the 1900 Organic Act."

# PRESENTATIONS

**Selected Academic Presentations**

"Jim Crow's Unexpected Influence upon Hawaii: Southern Disfranchisement, Northern Imperialists, and the 1900 Hawaiian Organic Act." Policy History Association Biennial Meeting, Nashville, June 1-3, 2016.

"The Genius of Wilford Smith." Association of the Study of African American Life and History Annual Meeting, Jacksonville, Florida, October 2–6, 2013 (delivered in absentia).

"Introducing Wilford H. Smith." American Historical Association Annual Meeting, New Orleans, January 3–6, 2013.

"The 'Fightin' Granddaddy' Clause: Voting, and Military Service as Proxies for Race in the Disfranchisement Era." American Historical Association, Boston, January 6–9, 2011.

"Whence Came *Williams*: Voting Rights Activism in 1890s Mississippi." Centennial Celebration of Civil Rights Conference, University of Southern Mississippi, Hattiesburg, October 21–23, 2010.

"The Lost Promise of Collaboration: Booker T. Washington, W. E. B. Du Bois, and the Implications of Their (Failed) Joint Fight Against Jim Crow." Southern Historical Association Annual Meeting, Louisville, November 5–8, 2009.

"How Long was the Long Civil Rights Movement?: The Example of African American Voting Rights Claims in the Disfranchisement Era." San Francisco State University Rights Conference, San Francisco State University, September 17–18, 2009.

"Who Was Henry Williams?: Disfranchisement, Black Protest, and the Case of *Williams v. Mississippi*." Race and Place in the American South Conference, The University of Alabama, Tuscaloosa, 2008.

"Black Voting Rights Activism in Disfranchisement Era Alabama." Southern Historical Association Annual Meeting, Birmingham, 2006.

"The Cases of Jackson Giles: Black Voting Rights Activism in the Progressive Era." Social Science History Association Annual Meeting, Minneapolis, November 2–5, 2006.

"The Anti-Disfranchisement Cases of 1890–1915." Association for the Study of African American Life and History Annual Meeting, Atlanta, September 27–30, 2006.

## AWARDS, FELLOWSHIPS & GRANTS

-2022 Global South Research Grant, New Orleans Center for the Gulf South, Tulane University
-2020 Joel Williamson Research Fund Summer Fellowship, Southern Historical Collection, University of North Carolina–Chapel Hill
-2019 Loraine McIlwain Bell Trustee Professor Award, University of West Alabama
- U.S.-Norway Fulbright Foundation, Fulbright Roving Scholars Program 2019-2020 (Alternate).
-National Science Foundation EPSCOR RII grant, "Bamboo: An Integrated Model Using Natural and Human Systems Sustainability for Adoption." Social Science Team Co-PI. (unfunded)
-University Research Grant, University of West Alabama, 2011–2012
-University Research Grant, University of West Alabama, 2007–2008
-University Research Grant, University of West Alabama, 2006–2007
-Phi Kappa Phi
-Phi Theta Kappa
-University of Alabama Outstanding Dissertation Award, 2005 (sole winner across all colleges and disciplines)
-University of Alabama, College of Arts and Sciences Outstanding Dissertation Award, 2005

-Charles G. Summersell "Best Article" Prize, 2005, *Southern Historian*
-Artemas Killian Callahan Sr. Scholarship, 2004–2005, University of Alabama School of Law
-Judge Henry H. Mize Scholarship, 2004–2005, University of Alabama School of Law
-History Department Dissertation Fellowship, Fall 2003, University of Alabama
-Graduate Council Dissertation Fellowship, 2002–2003, University of Alabama Graduate Council

# UNIVERSITY & DEPARTMENTAL SERVICE

-Chair, Department of History and Social Sciences, 2008–14
-Founding Director, *UWA in Ireland*, 2017–
-Adviser-at-Large and Academic Credentials Coordinator, UWA International Programs, 2014–
-Team Academic Adviser, Varsity Men's & Women's Soccer, 2013–
-Faculty Mentor, UWA Athletic Department, 2011–15.
-Tutwiler Scholars Committee, 2016–2019.
-University T&P Review Group, 2020-
-Faculty Senate Departmental Representative, 2020-
-Chair, McIlwain-Bell Trustee Professor Award Committee, 2020-21
-T&P College Review Group, College of Liberal Arts, 2008-14
-T&P College Review Group, College of Education, 2014-15
-T&P College Review Group, College of Natural Sciences and Mathematics, 2016–19
-Ed.D. in Rural Education, Advisory Group, 2017
-University Charter School, Curriculum Committee, 2017
-University Athletic Committee, 2010–
-University Honors Program Committee, 2008–11
-University Honors Council, 2011–15
-University Academic Council, 2008–14
-University Graduate Council, 2008–14
-University Council on Teacher Education, 2008–14
-Campus Parking and Transportation Committee, 2010–
-SACS Accreditation Team, Editorial Committee, 2011–12
-SACS Response Special Committee, 2014
-Search Committee, Assistant Director of International Programs, 2019
-Search Committee, Assistant Professor of Political Science, 2017-18
-Search Committee, Assistant Professor Psychology, 2014
-Search Committee, Director of Admissions, 2011
-Search Committee, Archival Records Management Coordinator, Center for the Study of the Black
-Search Committee, UWA Campus School Director, 2010
-Search Committee, Assistant Professor of Educational Research, 2009-10
-UWA Constitution Day Committee, 2005–14
-History Department Curriculum Review Committee, 2009–14
-Judge, Alabama History Day, 2019
-Judge, Behavioral Sciences Division, West Alabama Regional Science Fair, 2010–16
-Judge, Humanities Division, Alabama Junior Academy of Science, 2009

-College of Liberal Arts Representative, Academic Integrity Committee, 2008-14
-College of Liberal Arts Representative, Faculty Information Committee, 2008–13
-Co-chair, College of Liberal Arts Homecoming Planning Committee, 2008
-Search Committee Chair, Assistant Professor of U.S. History, 2008–2009
-Search Committee, Director of Educational Programming and Assistant Professor of Anthropology,
-Search Committee, Assistant Professor of Inorganic Chemistry, 2008
-Focus Group on Town-Gown Relations, 2008
-Search Committee, Director of the Center for the Study of the Black Belt
        and Assistant Professor of History, 2007–2008
-University Research Grants Committee, 2007–2008
-*Sucarnoochee Review* Authors' Reading, Reception Committee, 2006
-UWA Constitution Day Speaker, 2005

## COURSES REGULARLY TAUGHT

HY 211 – U.S. History I
HY 212 – U.S. History II
HY 300 – Historical Methodologies
HY 400 – Senior Seminar
HY 314/514 – Civil War Era
HY 498/598 – The Novel as History

## SERVICE TO THE PROFESSION

**Editorial**

Editor-in-Chief, *The Alabama Review*, 2012–17
Assistant Editor and Business Manager, *Southern Historian*, 2001–02

**Published Interviews**

"R. Volney Riser Discusses Disfranchisement and Anti-Democracy." *The Docket* 1, no. 4 (December 2018), available online: https://lawandhistoryreview.org/issue/december-2018/

**Public Commissions**

Fort Tombecbé Advisory Commission, 2008–14
State of Alabama WWI Advisory Commission, 2015–17

**Manuscript Referee**

*Agricultural History*
*American Political Science Review*

*Florida Historical Quarterly*
*Journal of the Abraham Lincoln Association*
*Journal of the Georgia Association of Historians*
*Journal of Southern History*
Louisiana State University Press
McGraw-Hill Higher Education
Oxford University Press
The University of Alabama Press
University Press of Florida
*Southern Historian*
*Southern Studies*

## Panel Chair/Commenter

Panel Chair and Commenter, "Government, Work, and Murder." University of Alabama Graduate Student Conference on Power and Struggle. Tuscaloosa, October 10, 2019.

Panel Chair, "Integration in the United States, Broadly Considered." University of Alabama "Where We Stand" Conference Commemorating the Fiftieth Anniversary of the "Stand in the Schoolhouse Door." Tuscaloosa, April 5, 2013.

Panel Chair and Commentator, "The Legacies of the World War I Era: Race, Reunification, and Women's Rights."  University of Alabama Graduate History Students Association Conference on Power and Struggle, Tuscaloosa, February 24–25, 2012.

Panel Chair, "The Science of Food: The Transformation of American Foodways Through Science and Technology, 1880–1920." Organization of American Historians, Houston, March 17–20, 2011.

Panel Chair and Commentator, "Segregated Rights."  San Francisco State University Rights Conference, San Francisco, September 17–18, 2009 (commentary offered in absentia due to illness).

Panel Chair, "Alabama's Path to Modernity: Reconsidering the New South Perspective on Global and Regional Industrial Expansion."  Alabama Association of Historians Annual Meeting, the University of West Alabama, Livingston, February 6–7, 2009.

## Selected Book Reviews

Steven P. Brown, *Alabama Justice: The Cases and Faces that Changed a Nation.* (*Alabama Review*, 75, no. 2 [April 2022]: 192-94.

Stephen Budiansky, *Oliver Wendell Holmes: A Life in War, Law, and Ideas.* (*Journal of Southern History*, 86, no. 3 [August 2020]: 732-33.

Edward O. Frantz, *The Door of Hope: Republican Presidents and the First Southern Strategy, 1877–1913.* (*Register of the Kentucky Historical Society* 113, no. 1 [Winter 2015]: 126-27).

Kermit L. Hall and Melvin I. Urofsky, *New York Times v. Sullivan: Civil Rights, Libel Law, and the Free Press.* (*Journal of Southern History* 79, no. 1 [February 2013]: 227).

Bernie D. Jones, *Fathers of Conscience: Mixed-Race Inheritance in the Antebellum South.* (*Journal of Mississippi History*, forthcoming).

James Savage, *Jim Garrison's Bourbon Street Brawl: The Making of a First Amendment Milestone.* (*Journal of Southern History* 78, no. 1 [February 2012]: 232–33).

Daniel R. Biddle and Murray Dubin, *Tasting Freedom: Octavius Catto and the Battle for Equality in Civil War America.* (*American Historical Review* 116, no. 3 [June 2011]: 805–06).

Susan Reverby, *Examining Tuskegee: The Infamous Syphillis Study and its Legacy.* (*Alabama Review* 64, no. 3 [July 2011]: 242–44).

Michael A. Ross, *Justice of Shattered Dreams: Samuel Freeman Miller and the Supreme Court During the Civil War Era.* (*Southern Historian* 25 [Spring 2004]: 109–10).

David W. Blight, *Race and Reunion: The Civil War in American Memory.* (*Southern Historian* 25 [Spring 2004]: 107–08).

Charles B. Dew, *Apostles of Disunion: Southern Secession Commissioners and the Causes of the Civil War.* (*Southern Historian* 24 [Spring 2003]: 65–66).

Michael Perman, *Struggle for Mastery: Disfranchisement in the South, 1888–1908.* (*Southern Historian* 23 [Spring 2002]: 127–29).

**Dictionary & Encyclopedia Entries**

"Disfranchisement," in *The World of Jim Crow America: A Daily Life Encyclopedia* (ABC-Clio, 2019)

"NAACP" and "*Powell v. Alabama*," in the *Encyclopedia of the Supreme Court of the United States* (Gale Group, 2008)

"Convict Leasing" in the *Encyclopedia of Anti–Slavery and Abolition* (Greenwood Press, 2007)

"Trilateral Commission" in *Conspiracy Theories in American History: An Encyclopedia* (ABC-Clio, 2004)

"Joseph Philo Bradley," "William Rufus Day," and "Sanford Ballard Dole" in the *Historical Dictionary of the Gilded Age* (M. E. Sharpe Publishers, 2003)

*"Saenz v. Roe," "U.S. v. Butler," "Missouri v. Holland," "Craig v. Boren,"* "Balanced Budget Amendment," "American Tobacco Case," "Granger Cases," *"Ex parte Garland,"* and *"Collector v. Day"* in the *Dictionary of American History* (Scribner's, 2002).

## CONSULTING

**Amici**

"Historians' Brief," *Allen v. Milligan*, 2023, No. 21–1086, United States Supreme Court

**Expert Witness Testimony/Litigation Support**

Expert witness in *McLemore v. Hoseman*, 2019-, No. 3:19-cv-00383, U.S. District Court for the Southern District of Mississippi.

Expert witness in *Thompson v. Merrill*, 2018-, No. 2:16-cv-00783, U.S. District Court for the Middle District of Alabama.

## OTHER PROFESSIONAL EXPERIENCE

**Academic Tutor and Student Athlete Personal Monitor,** 2003–2004
Athletic Department, The University of Alabama

**Benefits Specialist,** March 1997–August 1997
Florida Retirement System
Tallahassee, Florida

**Uniform Commercial Code Examiner,** May 1995–March 1997; August 1997–May 1998
Florida Department of State, Division of Corporations
Tallahassee, Florida

**Editor**, 1993–1995
Florida Division of Administrative Hearings
Tallahassee, Florida

## EDUCATION

**Doctor of Philosophy**, U.S. History, 2005
The University of Alabama, Tuscaloosa, Alabama
-University of Alabama Outstanding Dissertation Award, 2005
        (sole winner, across all colleges and disciplines)

9 | R. VOLNEY RISER

-College of Arts and Sciences Outstanding Dissertation Award, 2005
-Graduate Council Dissertation Fellowship, 2002-2003

**Master of Arts**, History, 2000
The University of Alabama, Tuscaloosa, Alabama

**Bachelor of Arts**, History, 1998, Cum Laude
The Florida State University, Tallahassee, Florida

**Bachelor of Arts**, Humanities, 1995
The Florida State University, Tallahassee, Florida

**Associate of Arts**, 1992
Tallahassee Community College, Tallahassee, Florida

## REFERENCES

**Kari Frederickson, Ph.D.**
Professor of History
The University of Alabama
kari@ua.edu
(205) 348-7100

**Ashley Dumas, Ph.D.**
Associate Professor
Department of History and Social Sciences
The University of West Alabama
adumas@uwa.edu
(205) 652-3830

**Mark D. Davis, Ph.D.**
Dean, College of Liberal Arts
Director, International Programs
The University of West Alabama
mdavis@uwa.edu
(205) 652-3570

**Mark D. Hersey, Ph.D.**
Associate Professor of History
Co-Editor, *Environmental History*
Mississippi State University
mhersey@history.msstate.edu
(662) 325-3604

**EXPERT REPORT OF R. VOLNEY RISER**

**CONTOURS OF INTERRACIAL POLITICAL COALITION-BUILDING
IN LATE-NINETEENTH CENTURY ALABAMA**

**May 17, 2024**

EXHIBIT

2

**INTRODUCTION AND QUALIFICATIONS**

**1.** My name is R. Volney Riser, and my residence is Livingston, Alabama. I appear in this matter in a private expert capacity, and plaintiffs' attorneys have retained me to research and describe historical efforts in Alabama to discourage or inhibit interracial political coalition building through the nineteenth and early twentieth centuries.

**2.** My methodological approach reflects standard professional norms for qualitative historical research. I derive my conclusions from close analysis and reading of manuscript sources buttressed by my authoritative background in the relevant secondary literature. I am compensated at the rate of $200 per hour. My fee is not contingent upon either my opinions or the outcome of this matter.

**3.** I am a historian of U.S. political and constitutional history, and I am a Professor of History at the University of West Alabama ("UWA"). I have taught at UWA since 2005. From 2012–2017, I was Editor-in-Chief of a historical journal, the *Alabama Review*, the official academic outlet of the Alabama Historical Association. I hold bachelor's degrees from Florida State University (1995 and 1998), and I hold an M.A. (2000) and a Ph.D. in American History (2005) from the University of Alabama. My formal historical training concentrated on U.S. Constitutional History and Southern History, and I completed both a master's thesis and doctoral dissertation that examined Alabama's 1901 Constitutional Convention. Regarding the latter, I was selected for the College of Arts & Sciences' "Outstanding Dissertation" award for 2005, and I was subsequently also announced as the university's "Outstanding Dissertation" award winner for that calendar year. At UWA, I teach or have taught courses in U.S. Constitutional History, African American History, the Gilded Age & Progressive Era, the Jazz Age and Great Depression, and the History of the American South.

1

**4.** I have published two books: *Defying Disfranchisement: Black Voting Rights Activism in the Jim Crow South, 1890–1908* (Louisiana State University Press, 2010; 2nd ed. 2013) and *A Goodly Heritage: Judges and Historically Significant Decisions of the U.S. District Court for the Middle District of Alabama* (Occasional Papers of the Bounds Law Library, University of Alabama School of Law, 2010). I have also published articles in the *Alabama Law Review*, the *American Journal of Legal History*, and *Southern Historian*.[1] I have additionally contributed numerous entries to reference volumes, including essays on disfranchisement and various landmark episodes in U.S. legal, constitutional, and political history.[2] The unifying theme of my scholarship is the development and practical operation of political and constitutional systems in the Jim Crow-era South. I am frequently called upon as an expert reviewer, chiefly for work treating southern states' legal and constitutional histories, and for work assessing broader national legal and constitutional developments as related to the American South.

**5.** I have provided expert witness services in two other cases within the past five years, *McLemore* v. *Hosemann*, 3:2019-CV-00383 (S. D. Miss, 2019) and *Thompson* v. *Merrill*, 2:16-cv-783-ECM-SMD (M. D. Ala., 2020). In 2022, I joined an amicus brief in *Milligan* v. *Allen*,

---

[1] R. Volney Riser, "Disfranchisement, the U.S. Constitution, and the Federal Courts: Alabama's 1901 Constitutional Convention Debates the Grandfather Clause," *American Journal of Legal History* 48, no. 3, 237–79 (Fall 2006) (evaluating the Alabama Constitution framers' concerns that their disfranchisement provisions might trigger judicial intervention or punitive congressional responses); Riser, "'The Milk in the Cocoanut': Booker T. Washington, Theodore Roosevelt, and the Fear of Conspiracy in Alabama's 1901 Constitutional Ratification Referendum," *Southern Historian* 26, 30–54 (Spring 2005) (discussing prominent conspiracy theories that helped drive ratification of Alabama's "disfranchising" constitution); Riser, "The Burdens of Being White: Empire and Disfranchisement," *Alabama Law Review* 53, no.1, 243–72 (Fall 2001) (addressing the concurrent public and policy-makers' debates over the relationship between disfranchisement and territorial expansion).

[2] Riser, "Disfranchisement," in *The World of Jim Crow America: A Daily Life Encyclopedia* (ABC–Clio, July 2019); Riser, "NAACP" and "*Powell v. Alabama*," in the *Encyclopedia of the Supreme Court of the United States* (Gale Group, 2008); Riser, "Convict Leasing" in the *Encyclopedia of Anti–Slavery and Abolition* (Greenwood Press, 2007); Riser, "Joseph Philo Bradley," "William Rufus Day," and "Sanford Ballard Dole" in the *Historical Dictionary of the Gilded Age* (M. E. Sharpe Publishers, 2003); Riser, "*Saenz v. Roe*," "*U.S. v. Butler*," "*Missouri v. Holland*," "*Craig v. Boren*," "Balanced Budget Amendment," "*American Tobacco Case*," "*Granger Cases*," "*Ex parte Garland*," and "*Collector v. Day*" in the *Dictionary of American History* (Scribner's, 2002).

599 U.S. ___ (2023). Though I am a scholar of constitutional and legal matters, I am not an attorney.

## SUMMARY

**6.** Various tropes occur within late-nineteenth century southern political culture, and some of the most durable are ones concerning various manipulations of African Americans' votes. Theft, fraud, steal, destroy—these terms are casually cast about in debates about disfranchisement, as are discussions about "qualification" and "intelligence." The root of all this, however, the impulse behind statutory suffrage restriction and later disfranchisement, was white men's voting behavior. Disfranchisement happened when and how it did because white men were leaving the Democratic fold. When white men broke away from the party, even in relatively small numbers, that effectively put African American voters back in play.

**7.** Examples are sadly rare where with respect to African American voting Alabama political leaders expanded their vocabulary beyond crude anecdotes about ballot box stuffing and alleged vote fraud schemes. From Emancipation forward, Whites struggled to either believe or accept that African Americans could make political decisions for themselves, denigrating them as a "bloc" to be manipulated rather than as a class of voters qualified to act in their own interest in partnerships or coalitions of their own design or choosing. White men were said to selflessly and bravely "stand together" to support the Democratic ticket out of patriotic devotion; Black men were described as thoughtless and venal, consumed by avarice and ignorance. As for white men who broke with the Democratic party, they were either scalawag Republicans or they were

3

alleged to have voted the Populist ticket because they were duped by charlatans.[3] Conservative Democratic leaders denounced those white dissidents who tolerated any degree of interracial cooperation as "race traitors." Interracial coalitions thus were discussed as fears or threats and never as mere political arrangements of mutual agreement entered into freely.

**8.** Democrats were not alone in their hostility toward African Americans. A significant faction within the Republican party was just as committed to limiting African Americans' political opportunities, both on the ballot and at the ballot box. This manifested first in the Liberal Republican movement of the early 1870s and then was reenergized at the turn of the century. The "Lily White" initiative of the early twentieth century sought to capitalize upon Democrats' successful disfranchisement campaign, and its leaders moved to purge African Americans from their ranks, presenting a new white man's party to Alabama voters.

### RECONSTRUCTION AS AN EXPERIMENT IN INTERRACIAL COALITION BUILDING

**9.** The first important political coalition in U.S. history was the antebellum abolition movement, and, after the Civil War and Emancipation, Congressional Reconstruction was the United States government's first attempt to support and encourage interracial democracy by official means. Alabama's experience in Reconstruction confirmed the broader regional pattern.[4] Emancipation

---

[3] "Scalawag" is a term peculiar to the Reconstruction era South, and it refers to southern-born whites who joined the Republican Party or otherwise cooperated with the occupation governments during Congressional Reconstruction. Scalawags are usually lumped together with "carpetbaggers," who were northerners (whether Black or White) who came to the South in search of state or federal office and who participated in or otherwise supported the Reconstruction governments. Though in the political context carpetbaggers are officeholders, the term applied to all northerners who moved South and participated in the Republican Party. These are not terms partisans would take for themselves—they were always epithets, in this case epithets applied by Democrats to their opponents.
[4] The two longstanding authoritative histories of the Reconstruction era are Eric Foner's *Reconstruction: America's Unfinished Revolution, 1863-1877* (Harper's, 1988) and W. E. B. DuBois's *Black Reconstruction in America, 1860-1880* (Harcourt, 1935).

of itself was not enough to bring African Americans into the political system. The Freedmen required protection and needed encouragement, and they found both in the Republican Party-affiliated Union Leagues.[5] With the implementation of Congressional Reconstruction, Freedmen's gains were sustained with federal civil and military authorities ensuring (or attempting to do so) their physical safety and the fair conduct of voter registration and elections.[6] White Democrats, meanwhile, initially boycotted state politics, participation in which required swearing loyalty oaths to the United States as well as accepting the fact that African American men now could register and vote. This boycott gave rise to two of the more durable lies told of Reconstruction, that white southerners had been "disfranchised," and that Reconstruction-era politics were forcefully dominated and controlled by Black voters and Black officeholders.

## REPUBLICAN HOSTILITY TOWARD AFRICAN AMERICANS

**10.** Republicans were often just as hostile as Democrats toward African American political participation. Republicans agreed with maintaining the Union, and beyond that, their attitudes sharply diverged. For present purposes, it is enough to understand they were divided on the question of whether Blacks should have a voice in the party and in affairs of state. That may at first glance seem surprising, which reflects southern Democrats' success in flattening Republicans' image into a two-dimensional caricature. It obscured any appreciation of internal

---

[5] The Union Leagues originated in border states and large cities during the Civil War as secret men's clubs of Union supporters who worked semi-covertly to combat Copperhead (pro-Southern) Democrats' activities. These were effectively Republican Party auxiliaries and after the War, northern interests sponsored their activities in the occupied South, encouraging and supporting the Freedmen's entry into the political process. Regarding both the Union League, see Michael W. Fitzgerald, *The Union League Movement in the Deep South: Politics and Agricultural Change During Reconstruction* (LSU Press, 1989).

[6] For up-to-date studies of Alabama more generally in the Reconstruction Era, see, e.g.: William Warren Rogers Jr., *Reconstruction Politics in a Deep South State: Alabama, 1865-1874* (Alabama, 2021); Michael W. Fitzgerald, *Reconstruction in Alabama: From Civil War to Redemption in the Cotton South* (LSU Press, 2017); Margaret Storey, *Loyalty and Loss: Alabama's Unionists in the Civil War and Reconstruction* (LSU Press, 2004).

Republican Party debates and internecine public squabbles about both (1) whether African Americans should be encouraged to participate fully in the political process and (2) the particular aims of Reconstruction, especially regarding the Grant Administration's aggressive pursuit of an Emancipationist vision for the postbellum U.S., one focused on racial justice and federal support for the same.[7]

**11.** The contours of Republicans' internal debates about the direction of Reconstruction are well-documented, and they are every bit as complex and tortured as was the broader national experience of the War and its aftermath. Even a trained specialist can get lost in its thicket of characters and conflicts. It is helpful, then, to follow particular biographical examples, in this case the prominent Mobile attorney, politician, and commentator Frederick G. Bromberg. Bromberg's career and recollections offer a useful window into the true state of Reconstruction era Alabama politics, and the arc of his political career bears out Alabama's development of (or failure to do so) a healthy, durable interracial democracy.[8]

**12.** Frederick Bromberg was by the early twentieth century recognized as a prominent Mobile attorney, and in his spare time published historical reminiscences in the *Papers of the Iberville Historical Society* and dabbled in editorial commentary for the *Mobile Unionist*, a progressive Republican newspaper. Bromberg was conspicuous, and for some suspicious, because of that latter distinction, but he was no mere curiousity. He was one of the last survivors of Alabama's

---

[7] See, e.g.: Loren Schweninger, Black Citizenship and the Republican Party in Reconstruction Alabama. *Alabama Review* 19, no. 2 (April 1976): 83-103; Schweninger, *James T. Rapier and Reconstruction* (Chicago, 1978); Richard Bailey, *Neither Carpetbaggers nor Scalawags: Black Officeholders During the Reconstruction of Alabama, 1867-1878* (NewSouth Books, 2010); Michael W. Fitzgerald, *Urban Emancipation: Popular Politics in Reconstruction Mobile, 1860-1890* (LSU Press, 2002); William Warren Rogers, Jr., *Reconstruction Politics in a Deep South State: Alabama, 1865-1974* (Alabama, 2021); Peter Kolchin, *First Freedom: The Responses of Alabama's Blacks to Emancipation and Reconstruction* (Praeger, 1972); Sarah Woolfolk Wiggins, *The Scalawag in Alabama Politics, 1865-1881* (Alabama, 1977).

[8] Margaret Davidson Sizemore published the only lengthy biography of Bromberg. See, "Frederick G. Bromberg of Mobile: An Illustrious Character, 1837-1928." *Alabama Review* 19, no 2 (April 1976): 104-112.

Reconstruction governments. Bromberg was a Harvard undergraduate when Alabama seceded, and he remained in Cambridge for the duration of the War working as Prof. Charles Eliot's laboratory assistant and as a mathematics instructor. He returned home after the war to begin a teaching career, and he immediately allied himself with the Republican party, thus becoming a scalawag. Bromberg held a number of municipal offices in the early years of Reconstruction before being elected to the state senate in 1868 and to the U.S. House of Representatives in 1872.[9]

**13.** Offended by the then-current "Lost Cause" myths of Reconstruction, Bromberg took it as his duty to try and correct Democratic lies, starting with the claim of carpetbag rule—"...a most gross error, which an honest inquiry would easily have demonstrated.."[10] Working through the details of his political career, Bromberg showed that at all levels and at all times, native white southerners held the upper hand. African Americans and mixed-race "creoles" participated in government, but, again, only as part of a broader, white-dominated coalition. In the legislature, he recollected that two of Mobile county's Representatives were of African American descent. In the thirty-two member Senate, he knew "one white Democrat...and one negro."[11] Among the other thirty members, only nine were carpetbaggers. The governor, Winston Smith, was an Alabamian, though the lieutenant governor was a carpetbagger. And, regarding the 100-member

---

[9] See, generally: Sizemore, "Frederick Bromberg of Mobile."

[10] Frederick Bromberg, "Reconstruction Period in Alabama, part I." *Papers of the Iberville Historical Society*, no. 3 (1911): 2. The work that immediately prompted Bromberg's essays was William Garrot Brown's *A History of Alabama, for Use in Schools* (University Publishing Company, 1900), and Brown reflected the developing historiographic trends that originated in the work and teaching of William Archibald Dunning, chiefly his *The Constitution of the United States in Civil War and Reconstruction: 1860-1867* (1897), *Essays on the Civil War and Reconstruction and Related Topics* (1897), and *Reconstruction: Political and Economic, 1865-1877* (1905). Dunning trained directly scores of historians attending Columbia University, and through his broader professional influence shaped an entire generation of American scholars and commentators. Among those was Walter Lynwood Fleming, whose *Civil War and Reconstruction in Alabama* (MacMillan, 1905) dominated scholarship on the state until the mid-twentieth century. For a broad overview of the entire Dunning School and its legacy see John David Smith and J. Vincent Lowery, eds., *The Dunning School: Historians, Race, and the Meaning of Reconstruction* (Kentucky, 2013).

[11] Bromberg, "Reconstruction, pt I," 4.

House, he was "certain the number of negroes did not exceed thirteen."[12] Bromberg felt unable to state exactly how many Representatives were carpetbaggers, but "I think...it is safe to say that all of the representatives who came from the counties which had a majority of white registered voters...sent natives, or old ante-bellum citizens."[13]

14. Bromberg was writing in 1910-1911, some forty years after the fact, by which time Democratic mythmaking had firmly cemented in the broader public's mind the notion of Black domination and heavy-handed carpetbag rule. Disputing that myth was Bromberg's purpose. What he devoted less attention to, or, rather, what your average conservative white Democrat would perhaps not apprehend, was a broader truth about Republican-ruled Alabama: white Democrats were not Black Alabamians only enemy, for even within Republican ranks, they were attacked and undermined not because of policy, but because of their color. Bromberg cared about correcting the record because he took offense at being classed himself as party to any Black domination or carpetbag rule. Carpetbaggers, Bromberg explained, were Northerners who followed or participated in the U.S. Army's occupation of the South "whose chief purpose was to secure the offices required to be filled under the reconstruction measures, and who generally allied themselves with the negroes, as an ignorant, pliable class of voter, in opposition to the better element of the Republican party."[14]

15. Republicans, nationally and at the state-level, split into "Regular" and "Liberal" factions, with the former championing interracial democracy and an Emancipationist vision of the Civil War and Reconstruction. Liberal Republicans, on the other hand, emerged as critics of the Grant Administration's many corruption scandals but also and more significantly as opponents of

---

[12] Bromberg, "Reconstruction, pt I," 5.
[13] Bromberg, "Reconstruction, pt I," 6.
[14] Bromberg, "Reconstruction, pt I," 1.

Grant's efforts at a wholesale reconstruction of southern society. They fiercely objected, for example, to the Ku Klux Klan Acts and Grant's enforcement of the same. Frederick Bromberg was a Liberal, and his 1872 election reflected that faction's national strategy of seeking alliances with Democrats. Indeed, the Republican Bromberg was elected as the Democratic Party nominee, running against the "Regular" Republican nominee, Jeremiah Haralson, a well-known African American political activist. Rejected in 1874 by both Democrats and Republicans, Bromberg sought reelection as a fringe party nominee, but this time Jeremiah Haralson handily won the seat. Thus Bromberg's electoral career came to an end, and he devoted himself professionally to the law.

**16.** As a private citizen, as a civic leader and political commentator, and as a committed Republican, Bromberg also was a lifelong critic of African American political involvement and a champion of the disfranchisement movement. Bromberg's personal papers contain relatively few documents pertaining to his personal or political affairs, but what does survive is telling. Washington, D.C., attorney Luther Smith wrote in 1896 concerning a legal matter and added commentary on Bromberg's prior suggestion "that the colored electors ought to be taken off of the republican [sic] ticket and white men put in their stead."[15] Bromberg wanted Blacks out of the political arena. Writing in 1901 to Harvard President Charles Eliot, under whom Bromberg had worked as a research assistant, he noted with satisfaction that "with the removal of the negro out of politics in the south [sic], as a voting and office-holding factor, the prevailing threa[t] of social equality between whites and blacks will be removed."[16] And Bromberg was no mere spectator to the disfranchisement campaign in Alabama, recalling proudly in a 1925 *Alabama*

---

[15] Luther Smith to Frederick Bromberg, August 3, 1896. Frederick Bromberg Papers, Southern Historical Collection, UNC-Chapel Hill.
[16] Frederic Bromberg to Charles Eliot, December 27, 1901, Bromberg Papers.

*Law Journal* article that he had suggested to the President of Alabama's 1901 constitutional convention a prohibition on Black office-holding, and that he continued to press the suggestion to state officials well into the new century.[17]

**17.** Bromberg's recollections are the late-in-life reminiscences of a single retired politician, but his example bears out the well-documented if broadly underappreciated truth that even during Reconstruction, that one brief attempt at interracial democracy, white partisans sought to undermine, exclude, and isolate Black voters and prospective office-holders. Bromberg recognized that Blacks could have no influence or voice in elections absent interracial coalition building, and he resented that they had been able to do so. This only underscores the fact that for Blacks to hold any ground in the political arena required that they fight a two-front battle against white Democrats and hostile Republicans, one that carried on well into the twentieth century.

**REDEMPTION AND BOURBON CONTROL**

**18.** The Reconstruction Era never saw any effective threat to white control, but white men divided between the Republican and Democratic parties, and the former cemented their majorities with Black men's support and votes. Though Democrats gained significant electoral purchase through their condemnation of white Republicans who "demeaned" themselves by their association with African American voters, Democrats ultimately regained control of state politics through threats, intimidation and violence. While Republicans had *sought* African American

---

[17] Frederick Bromberg, "The Right to Vote—The Right to Hold Office." *Alabama Law Journal*, 1925, reprinted in "Frederick George Bromberg," in *History of Alabama and Her People*, vol. II (Chicago: American Historical Society, Inc., 1927). 682-84; 683.

votes, Democrats *took* them. Having thus "redeemed" the state, Democrats governed more or less unchallenged through the so-called Bourbon Era.[18]

**19.** Though Alabama's conservative white majority definitely (and, again, openly) manipulated, threatened, and cajoled African American voters, they did not through either registration or apportionment devote significant energies to addressing white division. This is not because Whites never divided politically, but because there was for decades no chance of any meaningful inter-racial cooperation, which would have been the only means to threaten Democratic control. Alabama Democrats thus saw no need to refresh their toolbox until the early 1890s, when various agrarian-based protest movements peeled away significant numbers of previously reliable Democratic votes. White men were leaving the conservative Democrat fold in significant enough numbers to give Black voters new relevance, and thus began a decade of furious efforts to first control and then disfranchise both Blacks *and* those Whites who displayed any willingness to form or participate in inter-racial political coalitions.

---

[18] "Bourbon" was an epithet applied by opponents and critics of the Democrats who "redeemed" their states from Republican rule. The term itself derived from critics of the French royal house, of whom it had been said that the Bourbons "learned nothing and forgot nothing." In the early- to mid-nineteenth century, "Bourbon" was an epithet any political faction might apply to their opponents, but by the 1880s, it settled upon the conservative Democratic redeemers. Democrats never would have called themselves "Bourbons." Instead, southern party regulars called their organization "the Democracy," and disaffected agrarians in different settings called themselves "Jeffersonians" or, once silver emerged as a political issue, "Silver Democrats." The father of Southern history, C. Vann Woodward, wished historians would abandon the term, but his proposal proved unpersuasive. (C. Vann Woodward, *Origins of the New South, 1877-1913* [LSU Press, 1951] 75 n. 1). William Allen Going's *Bourbon Democracy in Alabama, 1874-1890* (Alabama, 1951) remains the best standalone study of Alabama from Redemption through the Bourbon era. The best-known treatment of Redemption at present is Nicholas Lemann's *Redemption: The Last Battle of the Civil War* (Farrar, Straus and Giroux, 2006). Lemann's study focuses on Mississippi, but it is applicable to the whole of the Deep South. George Rable's *But There Was No Peace: The Role of Violence in the Politics of Reconstruction* (Georgia, 1984), Michael Perman's *The Road to Redemption: Southern Politics, 1869-1879* (North Carolina, 1984), and Dan Carter's *When the War Was Over: The Failure of Self-Reconstruction in the South, 1865-1867* (LSU Press, 1985) are useful as well.

## GROWING THREAT OF INTERRACIAL COOPERATION

**20.** There has for generations in academic circles been a battle of French phrases concerning whether disfranchisement amounted to a *fait accompli* or a Bourbon *coup d'etat*. With respect strictly to African American ballot access, the difference is effectively null. Their votes were routinely miscounted and manipulated in the two decades before disfranchisement; afterward, they had no votes that could be manipulated. Likewise, before disfranchisement came to Alabama, Bourbon Democrats ran the state, and Democrats ran it afterwards. So why do it all? The answer is white division, or, rather, to deny any other white-dominated faction the ability to either benefit from African American votes or to form any effective interracial electoral coalition.[19]

**21.** Disfranchisement came to Alabama following the tumultuous 1890s, when conservative, "Bourbon" Democrats and agrarians warred for control of the state's government. White men had since Emancipation overwhelmingly voted Democratic, but 1880s agrarian discontent and an early 1890s national economic depression attracted wage laborers and small farmers into a new "People's Party" (a.k.a. the Populist Party), portending doom for the state's conservative Democratic rulers. Eighteen-ninety was the year agrarianism blossomed fully across Alabama's political landscape, but agrarians were not conservatives' only worry that year. It was also the year of Blair's Education Bill and Lodge's Elections Bill, the latter of which proposed to

---

[19] For an overview of the disfranchisement movement, *see, e.g.*, R. Volney Riser, *Defying Disfranchisement: Black Voting Rights Activism in the Jim Crow South, 1890–1908* (Baton Rouge: Louisiana State University Press, 2010); Michael Perman, *Struggle for Mastery: Disfranchisement in the South, 1888–1908* (Chapel Hill: University of North Carolina Press, 2001); J. Morgan Kousser, *The Shaping of Southern Politics: Suffrage Restriction and the Establishment of the One-Party South, 1880–1910* (New Haven: Yale University Press, 1972); Sheldon Hackney, *Populism to Progressivism in Alabama* (Princeton: Princeton University Press, 1969); C. Vann Woodward, *Origins of the New South, 1877–1913* (Baton Rouge: Louisiana State University Press, 1951); V. O. Key, *Southern Politics in State and Nation* (New York: Vintage, 1949).

12

establish broad federal statutory authority over state elections, which would have guaranteed African Americans could act freely in the political arena.[20]

**22.** With the political and social order they had nurtured since Reconstruction seeming to crumble, besieged conservatives maintained their grip on government through brazen frauds. This was not new. Political hacks had bought, sold, stolen, and destroyed Black men's votes ever since Black men first had votes for them to buy, sell, steal, and destroy. From Redemption through the 1890s, Alabama's conservative Democrats used these practices to settle intra-party disputes. But in the 1890s, interracial coalitions of Populists and Republicans threatened to unseat Democrats.

**23.** Alabama's Democratic leaders recognized that their actions were their own greatest problem. Yet they stopped short of blaming themselves. Instead, the Democracy laid blame for the 1890's political turmoil at its *white* opponents' feet. Interracial political coalitions were illegitimate factions; Populists and white Republicans thus were social deviants. If not for Black voters, they reasoned, those factions could gain no purchase. The threat was not actually that Black men would vote and attain office, rather that with white men's votes divided, Black men's votes could be sought, won (or just taken) by rival white parties. The Democratic party had lost its monopoly over white voters, and uncertain of their ability to manipulate and control the count of Black ballots, they acted to eliminate any threat of interracial electoral cooperation.

---

[20] The authoritative treatment of this period in Alabama remains William Warren Rogers, Sr.'s *One-Gallused Rebellion: Agrarianism in Alabama, 1865-1896* (LSU, 1970).

## ALABAMA'S 1899 CONSTITUTIONAL CONVENTION
## AND THE 1900 DEMOCRATIC PARTY PRIMARY

**24.** Treatments of the disfranchisement movement in Alabama typically began with a discussion of the Sayre Bill and then continue on to the 1901 Constitutional Convention.[21] Relatively little attention, though, has been paid to the 1898 legislative session and its consideration of the 1898 constitutional convention enabling act, and what treatments do exist imbue that legislation with an air of inevitability. Securing its passage had not been easy or simple, and a significant campaign had been launched through the state press pushing for its adoption.[22]

**25.** Anniston attorney Sidney J. Bowie was a leader in the public campaign supporting the legislatiion, and would be elected to the U.S. House of Representatives in 1900. A circular authored by Bowie appeared around the state in February 1898. In an ocean of comment, Bowie's stood out for its precise dissection of the threat facing conservative Democrats and for its detailed accounting of how that attack might unfold. Conversations about disfranchisement tend to focus on what happened to Black voters in Black-majority counties, but White counties were Bowie's real concern. Using Talladega County as his example, "it is a matter of arithmetic merely to demonstrate that if the solid negro vote be added to 251 whites they can elect whomever they please, though the 251 whites be opposed by 2,945 of their own race, or more than thirteen to one."

**26.** For Bowie and his fellow Democrats, African American voters could only be presumed to act as an unthinking bloc, and, unless they agreed with the mass of White voters, an illegitimate one.

---

[21] The Sayre Bill is discussed in all histories of Alabama published in the last half-century or so, but the only standalone work on the subject is David Ashley Bagwell's article "The 'Magical Process': The Sayre Election Law of 1893." *Alabama Review* 25, no 2 (April 1972): 83-104.

[22] The most accessible and well-known published study on Alabama politics specifically in this period is Sheldon Hackney's *Populism to Progressivism in Alabama* (Princeton, 1969).

And, the potential for this African American "bloc" to win the day was an unparalleled danger. Bowie denounced men who emphasized voting frauds from the Black Belt counties and who denied their contra-Democratic stance was at odds with white supremacy. White dissent coupled with African American votes, i.e. interracial coalition-building, was intolerable. "We are opposed," he continued, "to the rule of a minority of white men...as odious to every principle of free government, and of the whole essence of democracy, which is not in the least mitigated by the fact that minority is supplemented by a sufficient number of blacks to turn the scales." White politicians' appeals for African American votes meant that "the negro...is the arbitrator and his vote changes the result... *Negro arbitration in principle is not distinguishable from Negro rule*..."(emphasis added). [23]

**27.** Bowie would not consider anything less than the wholesale disfranchisement of African Americans. Anything else was a waster of time and an effort to "keep obscure the purpose to cut this running sore from the body politic of the state for fear the time has not yet arrived for speaking plain words about unquestioned evils." Bowie cast his call as a cry for salvation: "Under existing conditions white division is fraught with great perils," and "where all things are subordinate to one party," by which he meant African American voters, "white men themselves are only half free." Bowie likened interracial coalitions and the influence Blacks derived from them to something demonic, insisting it must be exorcised to secure white men's futures: "*Relief from the incubus of negro suffrage is essential to the full freedom of the white man*" (emphasis added). [24]

---

[23] "Proposed Constitutional Convention," *Birmingham Age-Herald*, 20 February 1898, p 10. The *Age-Herald* did not attach Bowie's name to this in the February 20 edition, but it did so when it re-ran it the next day.
[24] Ibid.

**28.** The 1898 legislature approved the enabling legislation and Governor Joseph Forney Johnston signed the "Constitutional Convention Act" into law. However, the progressive wing of the Alabama Democratic party that Governor Johnston represented, and intended to court in his upcoming senatorial campaign, was less than enthusiastic about the convention. With the opposite "Bourbon" wing of the party looking to dominate that assembly, Governor Johnston feared the direction a Bourbon-led constitutional convention would take. Less than a year after he signed the convention bill, Johnston brought the legislature into a special session and asked them to repeal the enabling act.[25] The legislature gave the governor what he wanted. Johnston explained to Mobile's *Daily Register* that had he failed to intervene, Alabama's 1899 constitutional convention would have "been in the hands of the representatives of the corporations, the gold standard men, and the Palmer and Buckner bolters," by which he meant Bourbon Democrats committed equally to disfranchisement and the destruction of the Progressive and agrarian reform-minded movements whose support he hoped to enjoy in his 1900 campaign for the U.S. Senate.[26]

**29.** Joseph Johnston never opposed disfranchisement, and he was no champion of African American voting rights, but he understood just how unpopular the initiative was, and knew it would disproportionately affect renegade white voters who had broken with the party.[27] Race was the cornerstone issue in the 1900 Democratic senatorial preference primary.[28] Johnston and Morgan each advocated disfranchisement, but the Governor warned that the Bourbons intended to disfranchise lower and working-class whites along with Blacks. Morgan, for his part,

---

[25] Hackney, *Populism to Progressivism in Alabama*, 148-151; 163-167.
[26] *Mobile Daily Register*, 19 November 1899.
[27] Joseph F. Johnston, "Negro Suffrage in Alabama," *The Independent* 51 (8 June 1899): 1535-1537.
[28] Official party nominations came from local and state Democratic conventions, but there was an open primary where voters could express a preference.

16

subordinated every real issue to white supremacy. He and his supporters advocated wholesale

Black disfranchisement at every turn and alleged that Johnston opposed the same. Morgan's

campaign strategy had not been the least bit creative, but it was effective. Sydney Bowie rode

Morgan's coattails to a Democratic congressional nomination, and now, as the effective U.S.

Representative-elect, he wrote to salute Morgan, declaring that "political morality and decency

have been signally vindicated."[29]

## 1901: AFRICAN AMERICANS ARE DISFRANCHISED

**30.** The pro-disfranchisement legislature swept into office by the 1900 primary in short order

approved an enabling act, setting the stage for the 1901 constitutional convention. The story of

the 1901 convention is well-known at this point, and, dominated as it was by the Democratic

Party, there is little use here in recounting its internal deliberations. It is the subsequent

ratification referendum that matters for present purposes. Joseph Johnston, now the former

governor, led the Anti-Ratification campaign. In this, as was true when he successfully fought to

call off the 1899 constitutional convention, Johnston was driven primarily by his senatorial

ambitions, calculating that leading the Anti effort would (1) make sure his Populist-leaning

voting base would not lose their right to vote and (2) have no ill effect upon his political future.

Johnston and his allies operated separately from African American leaders, though Pro-

Constitution forces of course attempted to link Johnston with the cause of Black voters, and the

charge seemed to gain little ground. In the end, the 1901 Constitution was ratified only through

---

[29] Sydney Bowie to John Tyler Morgan, 17 April 1900, John Tyler Morgan Papers, Manuscript Division, Library of Congress (microfilm copy, Auburn University) reel 3; Andrew L. Williams to John Tyler Morgan, 1 May 1900, Morgan Papers, reel 4.

17

the curious "support" of the state's African American population, who provided the final 108,613 to 81,734 victory.[30]

**31.** In the immediate aftermath of ratification, rumors and whispers swirled that various combinations of Populists, Republicans, and otherwise disaffected Democrats would secret themselves onto county Boards of Registrars to sabotage the 1902 registration. The seriousness of those is hard to judge.[31] While all this unfolded, and while conservatives basked in victory, following the referendum the Anti-Ratificationists launched a push for control of the Alabama Democratic Party. This movement was the natural result, a *Washington Post* editorial observed, of an "intestinal quarrel" in Alabama, the manifestation of "the long-pending clash between the Bourbon and the progressive elements of the white population."[32] Bourbons had controlled the Democratic party (and the state) via the voting apparatuses of the Black majority counties. That is how through theft and intimidation they could "count in" Black votes as they saw fit. But, with upwards of ninety-eight percent of the state's Black men disfranchised, power shifted toward white population centers where a majority of voters had opposed ratification. From this shift was born the direct "White" primary movement in Alabama. After a failed 1902 attempt to regain the governorship, in 1906, with conservatives unable to "count in" Black votes against him, Joseph Johnston emerged as one of two victors (U.S. Representative John Hollis Bankhead Sr. was the other) in the Alabama Democratic Party's peculiar "Dead Shoe" U.S. senatorial primary of that same year.[33]

---

[30] Riser, *Defying Disfranchisement*, 134-37.
[31] See, e.g. regarding the implementation of the 1901 Constitution's suffrage provisions, Riser, *Defying Disfranchisement*, 138-53.
[32] *Washington Post*, 18 November 1901.
[33] Johnston claimed that incumbent governor William Dorsey Jelks had benefitted from misconduct in the 1902 Democratic primary, though this is debatable. The 1906 "Dead Shoe" primary was staged to designate "alternate" U.S. Senators in the event of the death or resignation of either of the elderly incumbents, John Tyler Morgan and Edmund Winston Pettus. The intention was to direct the legislature when it voted to appoint a new Senator (Congress submitted the Seventeenth Amendment to the U.S. Constitution to the states six years later). Seven

**THE LILY WHITES**

**32.** Even as Democrats maneuvered to inoculate themselves from the threat of interracial coalition-building, they maneuvered as well to exploit Republicans' own well-documented internal hostility toward African Americans, flirting and teasing them with the idea that in an all-white game, Republicans would attain a new measure of respectability among white voters generally. U.S. Representative John Hollis Bankhead Sr. told a *Washington Star* reporter in late May that "many men of wealth and social and business prominence" voted Democratic "under protest." Alabama's industrial leaders were among them and were Republicans at heart and "if conditions were such as to admit of it would vote with the Republican party. As long as the negro is in politics, however, they cannot do so. They have to ignore every other consideration in politics when confronted with the danger of negro domination."[34]

**33.** Bankhead's comment could be dismissed as a mere gambit if not for the fact that a sizeable faction of Alabama Republicans was as keen as Democrats to cast out Blacks from state politics, eager to reassure white voters there was nothing interracial about the GOP. Forty years earlier, these would have been Liberal Republicans such as Frederick Bromberg. Now, though, they were "Lily Whites," and as soon as Alabama ratified the 1901 constitution, they moved aggressively to seize control of the Republican party apparatus.

**34.** What happened inside Alabama's Republican Party reflected a broader regional trend. The new constitutions "which made it impossible for a negro to vote," Henry Litchfield West wrote

---

candidates entered the race, including John Barnett Knox, President of the 1901 Constitutional Convention, and former governor William C. Oates. U.S. Representative John Hollis Bankhead Sr. finished first and Johnston second. The legislature confirmed Bankhead's appointment in July 1907 following Morgan's death in June. Pettus died in July 1907, just days after Bankhead entered the Senate, and Johnston succeeded him in short order. See, e.g.: Grace Hooten Gates, "The Dead Shoe Primary." Huntsville Historical Review 2, no 1 (January 1972): 3-17 and Kari Frederickson, *Deep South Dynasty: The Bankheads of Alabama* (Alabama, 2021).
[34] "The Negro Question," *Washington (D.C.) Evening Star*, 2 May 1901, p 1.

19

in the October 1902 *Forum*, "have resulted in the creation of a White Republican party." The Democracy's dominance over southern politics would not soon abate, but "the seed of disintegration has been sown in the disfranchisement of the negro and the consequent possibility of a Republican party without a black attachment."[35] West's assertion is questionable. Simply eliminating Blacks from the party could not really help southern Republicans. First, disfranchisement did not (and nor was it ever likely to) weaken "the Democracy." Democratic party machines dictated the southern states' disfranchisement campaigns, and Democrats dominated every state afterward. Second, even if white Democrats *had* been tempted to switch their party affiliation, President Roosevelt, like President Grant before, was doing his best to preserve Blacks' standing within the Republican Party, and that was something that no self-respecting southern Democrat could or would abide.

**35.** Black Republicans and the interracial "Black-and-Tan" faction they belonged to did not take the Lily White movement lightly or passively.[36] They refused to go without a fight and announced a campaign against their G.O.P. assailants. "They will raise $10,000," the *Daily Ledger* reported, "to wage a war on the lily whites."[37] It helped that they had Booker T. Washington on their side, and Washington wasted no time in alerting the President as to what was afoot. But Roosevelt required no coaxing. He responded quickly and harshly to Alabama's Lily White movement and started to remove Republican appointees who had cast their lot with it.[38] Alabama's Lily Whites remained publicly defiant, convinced that purging Blacks was a necessary step towards building a "respectable" white man's Republican Party.

---

[35] Henry Litchfield West, "American Politics," *Forum* 34, no. 2 (October 1902): 173-176, 174-175.
[36] Southern Republicans were divided into Lily White and Black-and-Tan factions until the Lily Whites' final triumph in the 1960s, which coincided with a broader realignment of southern party politics in the 1960s and 1970s.
[37] *Birmingham Daily Ledger*, 19 September 1902.
[38] Louis R. Harlan, *Booker T. Washington: The Wizard of Tuskegee, 1901-1915* (Oxford, 1983) 7-10. This began in September 1902, when he fired Birmingham U.S. Attorney William Vaughan, a former state party chairman who had aided the Lily Whites. Roosevelt replaced Vaughan (who had obtained his position by the grace of Mark Hanna)

**36.** While Republicans argued through late 1902 and early 1903, concerns began to emerge that the debate was encouraging Blacks to feel that they mattered. Joseph Johnston, anticipating another future senatorial run, complained to an interviewer that Roosevelt's approach had caused "unrest . . . among the Negroes, who are being led to believe that they are a factor in the politics of the country and must insist upon their rights."[39]

## CONCLUSION

**37.** From Emancipation onward, the overwhelming majority of Alabama's white political class, irrespective of party affiliation, rejected the premise of interracial democracy and fought to obstruct and undermine any interracial political coalitions. From a remove of more than 150 years, this has in the popular mind flattened into a simple White/Black dichotomy, where Democrats are the former and Republicans are the latter. That, however, only proves how succesfully Democrats had twisted Alabama's political vocabulary, for it carefully elides away Alabama Republicans' own pronounced unease toward African American voters.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 16th day of May 2024, at Livingston, Alabama.

---

with a Democrat---Judge Thomas R. Roulhac. (*New York Times*, 8 October 1902, 20 October 1902, 25 October 1902, and 26 October 1902; *Birmingham Daily Ledger*, 12 September 1902) In November 1902, Roosevelt struck again, firing Lily White collaborationist Julian Bingham from the post of Collector of Internal Revenue for Alabama. Bingham was also succeeded by a Democrat---Tuskegee Postmaster Joseph Thompson, brother of Alabama U.S. Representative Charles Thompson, whose district included Booker T. Washington's Tuskegee Institute. (*Baltimore (Md.) Afro-American Ledger*, 15 November 1902; *New York Times*, 11 November 1902; *Washington Post*, 11 November 1902). Three more Alabama Lily White officeholders were "marked for decapitation by rumor," the *New York Times* reported. Birmingham Postmaster J. W. Hughes, Montgomery U.S. Attorney W. S. Reese, and Mobile U.S. Marshall Frank Simmons expected to be Roosevelt's next victims. (*New York Times*, 13 November 1902).

[39] *Chicago Broad Ax*, 11 July 1903.